UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 1:13-cr-00409 AWI |
| | ) | |
| Plaintiff, | ) | MOTION FOR RECONSIDERATION |
| | ) | |
| vs. | ) | |
| | ) | |
| ADAM ALAN HENRY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Fresno, California                Monday, July 7, 2014

REPORTER'S TRANSCRIPT OF PROCEEDINGS

REPORTED BY:
GAIL LACY THOMAS, RMR-CRR
Certified Court Reporter
CSR No. 3278

APPEARANCES OF COUNSEL:

For the Government:          **DAVID GAPPA**
                            Assistant U.S. Attorney
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721

For the Defendant:          **ANTHONY P. CAPOZZI**
                            Attorney at Law
                            1233 W. Shaw Ave
                            Suite 102
                            Fresno, California 93711

3

1    Monday, July 7, 2014                    Fresno, California

2                                           2:00 p.m.

3

4          THE CLERK:  Number 11 on the calendar, No. 13-409,

5    United States versus Adam Alan Henry, defendant's motion for

6    reconsideration of the magistrate detention order.

7          MR. CAPOZZI:  They're still bringing the defendant

8    out, Your Honor.

9          THE COURT:  Okay.

10         MR. CAPOZZI:  Your Honor, Tony Capozzi appearing with

11   Adam Henry who is present in court in custody.

12         MR. GAPPA:  Good afternoon, Your Honor.  David Gappa

13   for the United States.

14         THE COURT:  Okay, this is the date and time set for

15   defense motion to reconsider the magistrate judge's

16   determination as far as continuing detention.  And in this

17   case, I have received and reviewed the motion for

18   reconsideration with the new and different facts set forth.  I

19   also have received from Pretrial Services the bail review

20   memorandum, dated July 2nd.  Apparently that was presented to

21   Judge Oberto.

22         I've also received certain documents from the

23   Government marked Government's Exhibits 1 through 3.  And I

24   just note for the record, I believe that those are the same

25   documents that were presented to me when I did a bail review

4

1    hearing on Mr. Henry some time ago.

2         MR. CAPOZZI:  I think -- I'm sorry, I think that's

3    when you said to go back to the magistrate.

4         THE COURT:  Yes.  Okay.

5         MR. CAPOZZI:  I've just been handed these,

6    Your Honor.  I'm just looking at them briefly.  I think they

7    were pictures taken back in 2010.  And this had to do with

8    defendant's fiancee way back in 2010, these pictures.

9         But anyway, Your Honor, the pretrial, when the first

10   hearing came up, made a recommendation that he be released.

11   It went to a hearing.  I wasn't the attorney at the time.  It

12   went to the bail hearing, and Judge Austin decided that he

13   would be a danger to the community and held him detained.

14        We tried to set other hearings, but there was really

15   no change in circumstances other than the health condition.

16   Just recently, his employer, Louise and Gary Reed, have agreed

17   to put up the equity in their home.  They were his employers.

18   They firmly believe in the defendant, and I questioned them

19   repeatedly before coming into court as to whether or not they

20   thought he would be a danger to the community, and they're

21   adamant that he would not.

22        I have them here to testify if the Court would like

23   to ask them any questions.  His mother is here, who we're

24   asking that he be allowed to go live with her.  Now, he can

25   barely get around, barely walk.  I don't see how he can be a

1    threat to anyone in the community.

2         Not only that, he would not have a computer in his

3    mother's house.  His mother is an attorney.  She understands

4    how the courts work, and she would abide by any conditions

5    that are set out here.  And it's a rural area.  There is

6    little or no public transportation out there.  He does not

7    drive.  He can't drive now because of his condition.  I just

8    don't see him being out there with his mother, and if need be,

9    an ankle bracelet.

10        His employers, who are his aunt and uncle, are

11   willing to put up their house and knowing that this is like a

12   *Vaccaro* bond.  That if he commits any violations, if he runs,

13   and that's not even an issue.  If he did anything that would

14   make him a danger to the community, they would lose their

15   equity in their home.  They understand that, and they're

16   willing to put up their home and do that, and they're willing

17   here, sitting back in the courtroom nodding "yes" to testify

18   today.  And his mother is willing to take full responsibility

19   for him too.

20        Now, the Government has submitted some pictures that

21   have been given to the Court before.  These existed when the

22   defendant was living up in Turlock, I believe it was at the

23   time, and there was a camera inside the house.  And there's a

24   video that was shown, or pictures from the video that were

25   shown in the mother's bedroom with a juvenile.  The defendant

1    wasn't even there, was not even part of what was going on.  He

2    was working.  And what you're seeing here is not -- I don't

3    think it's something that would show that he's a danger to the

4    community under the conditions we're setting now.

5            And in my motion, I attached a picture of the

6    defendant on August 2013.  You can see how big he was back

7    then.  He's lost almost 100 pounds in the jail.

8            He has a problem with his knee -- severe problem.

9    We've tried to get him medical care.  Some has been given.

10   Nowhere as near adequate.  We think if we can get him out, he

11   will -- going to have surgery, reconstructive surgery.  His

12   employer, aunt and uncle, have kept him on their medical

13   insurance all these months he's been in jail to be able to

14   provide him medical care.  We're asking that he be released to

15   his mother, ankle bracelet if need be.  I just don't see how

16   in the world he can be a threat to anyone.  If the Court has

17   any questions about that issue, I'll be glad to put his aunt

18   and uncle on the stand.  Thank you, Judge.

19           THE COURT:  On behalf of the Government.

20           MR. GAPPA:  Your Honor, briefly.  These are very much

21   the same arguments that were made first to Judge Austin, and

22   then he considered them and found that there was no

23   combination of conditions that could reasonably assure the

24   safety of the community and concluded that the defendant was a

25   danger.

1    He noted there is a presumption that the defendant is

2    both a danger and a flight risk.  And subsequently, when the

3    defendant believed that there were changed circumstances, it

4    came to this court, but then it went to Judge McAuliffe, and

5    Judge McAuliffe considered everything and concluded, as did

6    Judge Austin, that the defendant was a danger, and that there

7    were no conditions that could mitigate the risk of harm that

8    he presented to the community and continued his detention.

9    More recently, Judge Oberto looked at everything,

10   including what was argued here today, and concluded, as did

11   Judge Austin and Judge McAuliffe, that he is not just presumed

12   to be dangerous, but that based on the record, nothing had

13   changed to warrant revisiting that decision.

14   So the Government agrees that there is -- as Judge

15   Oberto found, no changed circumstance that would suggest that

16   the Court should fashion or attempt to fashion conditions,

17   because as the Pretrial Services report indicates, those items

18   that have been brought to this Court's attention, first on the

19   issue of the medical care, don't really go to his

20   dangerousness, and the fact that somebody is willing to post

21   equity in a property, again, doesn't mitigate the

22   dangerousness that he presents.

23   This case has some similarities to the Ninth Circuit

24   decision in *United States v. Hir*, which is H-I-R, which was

25   reported at 517 F.3d 1081.  And that was a Judge Reinhardt

8

1    decision, in which the Ninth Circuit panel upheld the

2    detention of a defendant.  And there, the Court noted that

3    there was simply no adequate means of effectively monitoring

4    that defendant.

5         I would suggest that that's the situation here.  This

6    Pretrial Services office no longer has GPS monitoring.  So to

7    the extent that the defendant says he's going to go to a

8    medical appointment or go to visit his attorney and leave this

9    remote area in Fresno County, there is absolutely no means by

10   which his movements can be tracked.  That doesn't even

11   consider that once out, he could do what others have done and

12   simply cut off the monitor.  That is something that has

13   happened.  And other defendants have fled, or attempted to

14   flee the jurisdiction of the Court before charges were filed,

15   while charges have been pending and while on supervision on

16   Pretrial Services.

17        So, for instance, I was just at a hearing that

18   started at approximately 1:45.  The defendant is Wilson.  He

19   is facing a charge for receipt and distribution of child

20   pornography.  After a search was done at his residence, he

21   fled to Mexico and was wanted there and was evading arrest and

22   returned to the United States, but ultimately law enforcement

23   was able to locate him in Mexico and return him to the United

24   States.

25        A different defendant, Vargas-Martinez, is the

1  subject of pending charges related to firearms and drugs, and

2  when the evidence was reviewed, it was determined that he had

3  child pornography on a computer that he had been using, and

4  when that was brought to his attention, and he was notified

5  that he was going to be facing a charge for receipt or

6  distribution of child pornography, he cut off his ankle

7  monitor.  That was on June 14th, 2014.  He's still at large.

8          There was a different defendant, which I believe was

9  sentenced by this court, but if not, it was Judge O'Neill.

10  But the defendant, Gary Collins, had been on pretrial release

11  with home detention and cut off that monitor on September 9th,

12  2013, and absconded.

13          A different defendant, who is pending sentencing in

14  this court has fled.  After a search warrant was done and

15  child pornography was found, he had indicated through his

16  mother that when they broke their lease for an apartment in

17  Bakersfield, that they were going to Mexico, and instead,

18  having broken the lease and her having resigned from her job

19  in Kern County fled to Florida.  And ultimately many months

20  later, law enforcement was able to track him down.

21          So those are just some relatively recent examples of

22  situations where defendants have either fled before or during

23  the pendency of criminal proceedings.  So it is in the

24  Government's view a very significant risk that he presents.

25          The defense has said that these images are old.

1    Well, the reason that the Government has some images that go

2    back as far as 2009 and 2010 is that when the issue was first

3    raised, the defense said that the defendant had absolutely

4    nothing to do with the creation of any material involving any

5    minors, or that this was all the defendant's wife who had done

6    this activity.  So the point of showing that this had been

7    going on for several years was to rebut the suggestion that

8    this was a new activity that he engaged in.  And, in fact,

9    this activity had predated his awareness of his wife and his

10   relationship with her, and it is significant.  In the

11   Government's view, that there are numerous recordings, both

12   still and video, and some of these clearly depict the

13   defendant having installed the cameras, positioning the

14   cameras, checking the quality of the images that were being

15   produced.  The defendant did that in concert with his wife

16   most recently, but had done this on his own previously.  And,

17   in fact, had recorded relatives in his home, unbeknownst to

18   them, and so has breached the trust of those relatives.

19           The employers are people that he worked for.  They're

20   related to him.  He breached their trust by using their work

21   equipment to obtain and then distribute child pornography, and

22   that's how it was that he was detected.

23           This is, I don't think, unreasonable speculation on

24   the Government's part.  However, the belief is that the

25   defendant was using the employer's computer, both because it

1  provided a faster connection, but also that it might obscure

2  his involvement with the offense given that he's not using

3  that as his residence where he'd be readily identified.  But

4  rather, if it were detected by law enforcement, would come

5  back to a business perhaps that would be less noticeable for

6  law enforcement.

7         So on the issue of the recency of his activity,

8  Exhibit 3, the Court might note has some images that were

9  taken, not just in 2010, but 2011, 2012, 2013, as recently as

10  August.  So just 30 days prior to the defendant being

11  apprehended.  It appears that some of these are images that

12  the defendant took with a camera phone and then was

13  transmitting to his wife and making comments about the people

14  that he had been capturing images of surreptitiously.

15         So this is demonstrating his interest in creating

16  images of people out in the community.  There is a presumption

17  that he's a danger.  The Government believes that these

18  exhibits demonstrate he's a danger.  Three magistrates have so

19  found.  We don't believe that there is anything that he can

20  put together in the way of a property bond that addresses and

21  weighs against all of the risks that he does present if he

22  were released.  So we would ask the Court not to attempt to

23  fashion any conditions.

24         THE COURT:  All right, anything further on behalf of

25  defense?

1        MR. CAPOZZI:  Yes, Judge, a lot.  This Exhibit 3 that

2   the Government has just talked about, there is no child

3   pornography on there whatsoever.  These are pictures, if I'm

4   not mistaken, taken at a shopping center and sent to his wife

5   regarding a joke they had between the two of them.

6        And, two, he supposedly accumulated child porn at the

7   business because it wouldn't lead to him, is what the

8   Government is saying.  The point is, he was the only computer

9   specialist at that job.  He was the one that took care of the

10  computers.  So for the Government to say that he did it to

11  avoid detection is an absurdity.

12       And for the Government to now be bringing up a flight

13  issue, which is not even a part of this case, no one has ever

14  determined him to be a flight risk.  He clearly is not a

15  flight risk.  He can barely walk.

16       As to whether he would be a danger by leaving to get

17  medical care, he can't drive.  His mother would take him.  We

18  would make that a provision, that any time he left the house,

19  he would be with his mother.  We would ensure that.

20       The fact that he has this medical problem, to me,

21  completely obviates any danger to the community, any flight

22  risk.  And, again, if need be, Your Honor, I can put out his

23  aunt and uncle and his mother to tell you what kind of person

24  he is, and that he would never be a flight risk, that he would

25  never do any harm to any children at all.

1           And I think conditions can be set to ensure, one,

2    that he appears.  I can assure you that he will appear.  And,

3    two, to avoid any danger to the community.

4           Thank you, Judge.

5           THE COURT:  Okay, all right.  All right, is the

6    matter submitted?

7           MR. CAPOZZI:  Yes.

8           THE COURT:  All right, in this case, let me, first of

9    all, say with respect to Mr. and Mrs. Reed, I don't need their

10   testimony.  I'm certainly satisfied with respect to their

11   sincerity and willingness to put up their equity in their

12   home.

13          I did receive the memorandum from Pretrial Services.

14   There may be some issue with respect to the equity in the

15   home, but it obviously is somewhere at least between 90,000

16   and $120,000, which is not insignificant.  And apparently

17   Mr. Henry has been in their employ and is still under their

18   health insurance, and obviously for Mr. and Mrs Reed to be

19   willing to put up their home obviously means they have great

20   faith in two things:  One, of course, is his not being a

21   flight risk, putting their home in jeopardy, or the equity of

22   their home in jeopardy.  And the other is, of course, is the

23   dangerousness.  I don't question that.

24          I also don't really view this -- in terms of a flight

25   risk, I think those factors certainly if flight were an issue,

14

1    then I would think that those are certainly militating factors

2    as far as any concerns about a flight.  I recognize there is

3    some information regarding his wife's country of origin and

4    having visited that area, but, again, things like seizing

5    passports, et cetera, might be able to take care of that.

6              The bigger concern, obviously, is the danger.  And in

7    this case, obviously the -- what I'm looking at is the nature

8    of the offense.  For one, obviously, the seriousness, the fact

9    that they do involve offenses for which Congress has spoken

10   repeatedly and forcefully regarding the serious nature of

11   these types of offenses.  The appellate courts, including the

12   United States Supreme Court, has weighed in on this on a

13   number of occasions and making it very clear that the lower

14   courts -- just how seriously they are, that they are matters

15   for which there is clear danger.

16             And as counsel is probably aware, I've had a number

17   of different defendants in on these kinds of cases.  Some of

18   them are in wheelchairs.  It is not really a matter of

19   physically being able to assault someone physically or

20   anything like that.  It's just the nature of this kind of

21   offense.

22             When this case came before me initially, and I did

23   review the Government's opposition at that time, and I do

24   agree, and obviously this has been reviewed by Judge Austin,

25   Judge McAuliffe, and Judge Oberto.  I'm looking at this de

1   novo, but I certainly recognize independently the factors in

2   here, the nature of the offense, the -- it is categorized as a

3   crime of violence.  Minor victims are involved in this case.

4   Arguably, the weight of evidence is there.

5          What the photos do show, the evidence does show, is

6   a -- is a longer-standing interest -- sexual interest in

7   children.  His sophisticated technological abilities, and

8   really what I see, even though these aren't -- I wouldn't

9   necessarily consider them to be pornography in that sense, but

10  certainly the photos that were taken of family members,

11  et cetera, really cause a great deal of concern for this

12  court.  And I do find overall in terms of even considering

13  Mr. Henry's physical impairment, his mother's willingness to

14  not only take him into her home, but to transport him and to

15  be a third-party custodian, I still don't find that any of

16  those are sufficient to overcome the clear danger that's

17  presented by the nature of the offense, the serious nature of

18  the offense, the possible penalties, et cetera.

19          I do note on reconsideration, there were two things

20  that the Court had to address specifically.  One was the

21  willingness to place the equity, and I certainly indicated is

22  a factor in terms of mitigating and militating flight risk,

23  but does not address the issue of the dangerousness.

24          And then with respect to the physical issues, I did

25  review the e-mails sent by defendant's mother, and I certainly

1  do not doubt her sincerity.  But at least in terms of medical

2  care or treatment, what is obviously lacking is some kind of

3  medical documentation.

4          In the most reconsideration, the defense did indicate

5  it is difficult.  It's been apparently extremely difficult, if

6  not impossible, to get medical records, but I just don't have

7  anything other than obviously e-mails indicating condition.

8          MR. CAPOZZI:  Your Honor, if I may, I did submit

9  medical records to the U. S. Attorney's Office and to the

10  Pretrial office.  They have those.  We got them about a week

11  or so ago.  The problem is interpreting them.

12          THE COURT:  Well, yeah.  Okay, all right.

13          Okay, so at least at this point in time, I have

14  reconsidered, I have considered the overall scope.  I have

15  also considered the specific issues of the willingness to

16  place equity in a home and also the medical condition of

17  Mr. Henry, but I don't find that those overcome the issue

18  regarding dangerousness to the community.  So I am going to

19  deny the motion for reconsideration.

20          MR. CAPOZZI:  Thank you, Judge.

21          THE COURT:  Now, this is already set for the

22  magistrate judge in August?

23          MR. CAPOZZI:  Yes.

24          MR. GAPPA:  Thank you, Your Honor.

25          (Court was adjourned at 2:23 PM.)

17

         I, Gail Lacy Thomas, Certified Court Reporter,
certify that the foregoing transcript is true and correct.


Dated:  07/13/2016              /s/ Gail Lacy Thomas
                                GAIL LACY THOMAS, RMR-CRR