PHILLIP A. TALBERT
United States Attorney
DAVID L. GAPPA
ROSS PEARSON
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ADAM ALAN HENRY, <br><br> Defendants. | CASE NO. 1:13-CR-0409-AWI <br><br> UNITED STATES' TRIAL BRIEF <br><br> DATE: November 7, 2017 <br> TIME: 1:00 p.m. <br> COURT: Hon. Dale A. Drozd |

The United States of America, by and through its attorneys, Phillip A. Talbert, United States Attorney, and David L. Gappa and Ross Pearson, Assistant United States Attorneys, files this trial brief to aid the court in understanding this case and issues that might arise at trial.

## I.   INTRODUCTION AND CASE STATUS

### A.   Trial Status

Jury trial is scheduled to begin on Tuesday, November 7, 2017, at 1:00 p.m. before the Honorable Dale A. Drozd, United States District Judge. The government estimates that it can complete the presentation of its case within three court days. Counsel for Henry has estimated that it may take an additional one court day to present Henry's case. And assuming Henry presents a case, the government anticipates that it will present a rebuttal case, which would take approximately half a day. Keeping in mind that the Court will be closed on Friday, November 10, 2017, in observation of Veteran's Day, and given the Court's scheduling restraints, the government believes the jury should be able to commence

deliberations no later than Wednesday, November 15, 2017.

**B.  Charges**

On March 16, 2017, a grand jury charged Henry in a two-count superseding indictment with conspiracy to sexually exploit a child, in violation of 18 U.S.C. § 2251(a) and (c), and receipt and distribution of a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). (Doc. 110.)

**C.  Miscellaneous Matters**

1.  The government estimates its case-in-chief can be presented in approximately three full court days.  Defendant has estimated that the defense case may take less than one court day.

2.  Trial by jury has not been waived by the parties.

3.  In light of stipulations to which the parties have agreed, the government expects to call fewer than ten witnesses in support of its case-in-chief.  Testimony from more than half of these witnesses will be brief if they are called.

## II.  STATEMENT OF FACTS

In September 2013, Ceres Police Department Detective Britton Moore began investigating an internet protocol address suspected of downloading child pornography.  The IP address was registered to Lock-N-Stitch, a business located in Ceres, California.  On September 19, 2013, Detective Moore, along with assistance from other law enforcement officers, executed a search warrant at Lock-N-Stitch.  During the search, Detective Moore discovered that the computer located in the IT office had child pornography on it.

The employee in charge of IT, Adam Henry, was not present during the search of Lock-N-Stitch, so Detective Moore obtained a search warrant for Henry's residence the same day.  During the search of Henry's residence, Detective Moore seized multiple devices that contained child pornography.  Detective Moore and Ceres Police Department Detective Arthur Hively later forensically examined the devices, and they found not only child pornography but also videos of a fourteen- and fifteen-year-old victim changing clothes and using the bathroom.  These videos had been recorded in the Henry residence using hidden cameras.  Detectives Moore and Hively later identified the victim, who confirmed that she did not know she was being recorded.

A. **<u>Detective Moore discovers child pornography being downloaded at an IP address registered to Lock-N-Stitch.</u>**

On September 10, 2013, Detective Moore was using the Child Protection System, a law enforcement tool designed to identify downloads of child pornography, to identify local computers that were suspected of downloading child pornography. The Child Protection System showed that twenty-four files with hash values[1] and names associated with known child pornography were being downloaded at an IP address of 71.94.43.84. Detective Moore opened a law enforcement version of Shareaza, a peer-to-peer file sharing program, and accessed the videos being downloaded at the IP address of 71.94.43.84. Detective Moore viewed two of the videos and confirmed that they were, in fact, child pornography. Detective Moore was also able to determine that this IP address had been downloading files with hash values associated with known child pornography since June 5, 2013.

Detective Moore next identified the source of the IP address. Through an open-source search, Detective Moore determined that the IP address of 71.94.43.84 was registered to Charter Communications. Detective Moore sent a search warrant to Charter Communications for subscriber information for the IP address. On September 18, 2013, Charter responded that the account holder for IP address 71.94.43.84 was a business in Turlock, California, called Lock-N-Stitch.

The next day, Detective Moore and other law enforcement officers executed a search warrant at Lock-N-Stitch.[2] According to sign-in sheets, more than twenty employees were present when Detective Moore searched the company, and there were approximately twenty computers on site. Detective Moore and other officers began examining each computer, looking for evidence of child pornography or the presence of peer-to-peer software.

Only one computer had peer-to-peer software on it: the computer in the IT room. This computer was turned on and the screen showed a user account of "Adam Henry" with a password protecting the computer. Gary Reed, the owner of Lock-N-Stitch, told Detective Moore that Adam Henry was the IT manager for the company, and that there were no other employees assigned to the IT department. Henry

---

[1] A hash value is a string of alphanumeric characters that represent a digital file. If any bit of data in the file is changed, the hash value of the file will change. Therefore, if two files have the same hash value they can be assumed to be the same file.

[2] Lock-N-Stitch is a Turlock-based company that specializes in repairing cracked and damaged cast iron and other metals.

1  was not at Lock-N-Stitch that day.

2  After an on-site preview showed that the computer had peer-to-peer software on it, Detective
3  Moore removed two hard drives from the computer tower and took them to Ceres PD for an initial
4  forensic analysis to determine if the hard drives had child pornography on them.

5  Detective Moore found child pornography on one of the hard drives. The hard drive contained
6  the peer-to-peer file sharing software Shareaza. When a user downloads a file from Shareaza, the files
7  are temporarily stored in an "incomplete" folder until the download is completed, at which time the file
8  is automatically moved to a folder of completed downloads. Even when the files have not finished
9  downloading, some files in the "incomplete" folder are still viewable.

10 The Lock-N-Stitch hard drive from the IT room did not have any downloads in the completed
11 folder, but the "incomplete" folder contained 727 partially-downloaded files. Of those files, 687 either
12 had a size of zero bytes, were "not viewable," or contained adult pornography. But forty of the files in
13 the "incomplete" folder contained child pornography that Detective Moore was able to view. There were
14 also six child pornography videos in the recycle bin of the Lock-N-Stitch IT hard drive.

15     **B.**     **Detective Moore discovers more child pornography on a password-protected side of a home network at Henry's residence, and Henry admits his wife does not access the**
16     **password-protected side of the network.**

17 After Detective Moore discovered child pornography on the IT computer's hard drive at Lock-N-
18 Stitch, he began to author a search warrant for Adam Henry's residence, 1131 Burman Drive in Ceres,
19 California. Meanwhile, Gary Reed called Henry and asked him to come to Lock-N-Stitch, a plan to get
20 him to leave his house. Henry left, got in his car, and drove away from his house, at which time officers
21 stopped and arrested him. Henry was transported to Lock-N-Stitch, and Detective Hively interviewed
22 him. Henry waived his Miranda rights and agreed to speak to Detective Hively.

23 During the interview, Henry told Detective Hively that it was "quite possible" that if Detective
24 Hively looked at Henry's hard drive he would find something that "shouldn't be there." Detective
25 Hively questioned Henry further, and eventually Henry admitted that he had found a few files of child
26 pornography but that he "consistently deleted them." On further questioning, though, Henry told
27 Detective Hively that it would "possible" that he would find child pornography at his residence and that
28 the child pornography would be "in a locked partition . . . a password protected partition" on his home

TYPE PLEADING NAME          4

1  server. Henry provided Detective Hively with the password, and said that his wife accesses the folder
2  without the password.
3  Later that day, a judge signed the warrant and Detective Moore and other law enforcement
4  officers searched Henry's residence. At Henry's residence, the officers found a number of computer
5  devices, including a Network Attached Storage device (referred to as a NAS), a computer tower in the
6  garage, and loose hard drives.
7  Henry, who police had initially transported to the residence for the search, identified the NAS
8  and told Detective Moore that there would be peer-to-peer files stored on the device. Henry also showed
9  Detective Moore a computer in the main living room and gave Detective Moore the password
10 "Stitch@11." Detective Moore opened the computer and attempted to access a file titled "Aurrora,"
11 which was password protected. Detective Moore entered the password "Stitch@11" and he was able to
12 access the file and see child pornography. Detective Moore seized the NAS, along with a number of
13 other devices, and took them to Ceres Police Department for forensic analysis.

14 **C.     Through forensic analysis, Detectives Moore and Hively discover a more than three hundred and eighty files of child pornography on four devices seized from Lock-N-Stitch and Henry's residence.**
15

16 Since the search, Detectives Moore and Hively have performed extensive forensic analysis on
17 the devices they seized. The reports provided in discovery and the government's expert notices more
18 fully detail the analysis Detectives Moore and Hively performed. In short, Detectives Moore and Hively
19 found child pornography on four devices: the Lock-N-Stitch Hard Drive, the NAS from Henry's
20 residence, a loose hard drive found in a drawer in Henry's living room, and a computer tower in Henry's
21 garage.
22 The hard drive from Lock-N-Stitch contained forty-six videos of child pornography, and it also
23 contained a list search terms from Shareaza, some of which were child pornography-related search
24 terms: "pthc," "r@ygold," "preteen," and "underage."
25 On the NAS, the detectives found more than two hundred files of child pornography. The NAS at
26 Henry's residence contained two primary files users could access (called "shares"). One share, titled
27 "Media," was not protected by any password. The other share, titled "Aurrora," was only accessible with
28 a password. The two shares contained a substantial amount of similarities, but one key difference: only

the password-protected "Aurrora" folder contained child pornography. Some of the child pornography was also sorted into subfolders entitled "Bad," "No," and "Kid."

The loose hard drive from the living room drawer contained seventy-nine files of child pornography. Like the child pornography on the NAS, some of the child pornography on the loose hard drive was also sorted into subfolders titled "Kid." Creation dates show that some of the files were downloaded as early as 2010.

Finally, the computer tower in Henry's garage contained sixty-one files of child pornography. Creation dates on these files show the child pornography was downloaded as early as November 2005.

### D. Detectives Moore and Hively identify an underage victim of hidden videos Adam and Angele Henry set up in the bathroom, and one video of the victim changing clothes in Henry's bedroom. The FBI searches the Henry residence and finds additional evidence of hidden recordings.

During the forensic examination of the NAS, Detectives Moore and Hively found what appeared to be homemade videos from a hidden camera at the Henry residence. The videos showed Adam and Angele setting up and testing a camera they hid in the bathroom to record houseguests, then recording the houseguests.

One victim of these hidden recordings was a girl who appeared to be a teenager. Detectives Moore and Hively found videos of her on the NAS—on both the "Media" and "Aurrora" shares— changing clothes in the bathroom. The same victim appeared in another video in which Angele Henry set up a hidden camera in the bedroom and recorded the victim while she tried on clothes. At one point during the recording, Angele Henry turned the victim towards the hidden camera and removed her top, briefly exposing the victim.

The videos of this victim were not only saved to the NAS, but there were also screenshots of the videos saved capturing the victim in various stages of undress. These videos and pictures were saved under a folder called "Not Ok," a subfolder called "Misc People" and another subfolder with the victim's name. From there, the videos were further subdivided and categorized—within the folder with the victim's name were two subfolders: "15" and "14." The victim was 14 and 15 when she was surreptitiously recorded.

Through further investigation, Detectives Moore and Hively were able to identify the victim, AT,

who confirmed that she did not know she was being recorded. Detectives Moore and Hively also found other hidden camera recordings of houseguests and Henry's ex-girlfriends.

After Detectives Moore and Hively found the hidden recordings and identified the victim, agents with the FBI obtained a second search warrant for the Henry residence to look for evidence of the hidden recordings. During the search, the FBI found a macramé plant with a hole cut in it. At the time of the search, the plant was in the garage, but it had been hanging in the bathroom, positioned to record guests and fitted with a hidden camera. In photos of the first search of the Henry residence, in fact, the macramé plant can be seen hanging in the bathroom. The FBI also found a number of recording devices, including security cameras, small cameras, and a Canon Vixio camcorder set up on the same shelf from which the victim, AT, was recorded.

### E. In text messages, Adam sends Angele pictures of girls at a baseball game.

In August 2012, within the timeframe of the alleged conspiracy, Adam Henry went to a Stockton Ports baseball game. During the game, he began sending text messages to Angele bragging about the "t&a" he saw at the game: young girls wearing "tank tops" and "daisy duk[e]s" and showing "tons of bare skin." Henry included pictures of numerous girls, at one point commenting that one of the girls had "nice legs," and at another point apologizing to Angele "for bragging." The age of these girls is unknown, but they appear to be teenagers, and they do not appear to know Henry took their pictures.

### III. APPLICABLE STATUTES AND ELEMENTS OF THE OFFENSE

#### A. Count One: Conspiracy to Sexually Exploit a Minor, 18 U.S.C. §§ 2251(a) and (e)

1. Essential Elements

Count One charges Henry with conspiring to sexually exploit a minor, in violation of 18 U.S.C. §§ 2251(a) and (e). Section 2251(a) provides:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been

> mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). Subsection (e) notes that anyone who conspires to violate this section shall be imprisoned not less than 15 years nor more than 30 years.

There are two elements to conspiracy to sexually exploit a minor: (1) the defendant must agree with one or more person to commit the crime of sexual exploitation of a minor; and (2) the defendant intended to commit the offense of sexual exploitation of a minor. See United States v. Grovo, 826 F.3d 1207, 1217 (9th Cir. 2016) (conspiracy to advertise child pornography, in violation of 18 U.S.C. § 2251(d)); United States v. Moe, 781 F.3d 1120, 1124 (9th Cir. 2015) (general elements of conspiracy). A defendant is guilty of the offense of sexual exploitation of a minor if, at the time the minor victim was under the age of eighteen years, the defendant or another person employed, used, persuaded, induced, enticed or coerced a victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, and the visual depiction was produced using materials that had been mailed, shipped, or transported across state lines or in foreign commerce. See 18 U.S.C. § 2251(a); Ninth Circuit Model Jury Instruction 8.181 (2010 Ed.).

For this count, the government's theory of the case is twofold. First, it is the government's position that Henry actually created a visual depiction of sexually explicit conduct when he set up hidden cameras in his residence, recorded AT, and took screenshots of the recordings.

Second, even if these photos do not amount to sexually explicit conduct, Henry is still guilty of conspiring to sexually exploit a minor because he and Angele entered into an agreement to create visual depictions of AT engaged in sexually explicit conduct. Even if Adam and Angele did not complete the act and create visual depictions of sexually explicit conduct, the agreement alone is sufficient to support a conviction for conspiracy to sexually exploit a minor. See United States v. Johnston, 789 F.3d 934, 940–41 (9th Cir. 2015).

In Johnston, for instance, federal agents found chat logs of Johnston asking a co-conspirator to take pictures of nude children for him. Id. at 937–38. The co-conspirator sent Johnston child pornography that had been made months earlier, and on appeal Johnston challenged the sufficiency of

the evidence, arguing that there was no conspiracy because the photos he received were produced months prior to the agreement. Appellant's Opening Brief at 20-22, United States v. Johnston, 789 F.3d 934 (9th Cir. 2015) (No. 13-10097). The Ninth Circuit rejected this argument and found there was sufficient evidence for a reasonable jury to conclude that Johnston conspired to produce child pornography based solely on the chat transcripts. Johnston, 789 F.3d at 940–41. Under Johnston, the government needs only prove that Henry agreed with a co-conspirator to sexually exploit a minor—not that he completed the task.

### 2. "Sexually Explicit Conduct"

The term "sexually explicit conduct" is defined in 18 U.S.C. § 2256(2) as actual or simulated:

> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
>
> (ii) bestiality;
>
> (iii) masturbation;
>
> (iv) sadistic or masochistic abuse; or
>
> (v) lascivious exhibition of the genitals or pubic area of any person.

18 U.S.C. § 2256(2).

In determining whether a depiction includes Lascivious Exhibition of the Genital or Pubic Area of Any Person, the trier of fact may consider any of the following factors:

(1) Whether the focal point of the depiction is the child's genital or pubic area;

(2) Whether the setting of the depiction is sexually suggestive, for instance, the setting is in a place or pose generally associated with sexual activity;

(3) Whether the child is depicted in an unnatural pose or in inappropriate attire, considering the age of the child;

(4) Whether the child is fully or partially clothed or is nude;

(5) Whether the depiction suggests sexual coyness or a willingness to engage in sexual activity;

(6) Whether the depiction is intended or designed to elicit a sexual response from the viewer.

United States v. Overton, 567 F.3d 1148, 1151 (9th Cir. 2009) (quoting United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986)).

Additionally, whether a depiction is lewd or lascivious should be viewed from the perspective of the photographer, not from the perspective of the minor being photographed.  An exhibition of the genitals or pubic area may encompass a visual depiction of a child's genital or pubic area even where those areas are covered by clothing.  United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986); United States v. Wiegand, 812 F.2d 1239, 1244 (9th Cir. 1987); United States v. Villard, 885 F.2d 117, 122 (3rd. Cir. 1989); United States v. Knox, 32 F.3d 733 (3rd Cir. 1994).

        3.      Interstate Nexus

To prove the interstate nexus, the government plans to offer evidence that the images of the victim were recorded using a device that, based on the "country-of-origin label," was manufactured in Japan. Presenting evidence of an electronic device's "country-of-origin labels," which indicate that such device had been manufactured overseas, are sufficient evidence in the Ninth Circuit "to prove that the[y] moved in foreign commerce." United States v. Fox, 357 Fed. Appx. 64, 65 (9th Cir. 2009) (citing United States v. Patterson, 820 F.2d 1524, 1526 (9th Cir. 1987).  All of the images were also transported to a computer hard drive that was manufactured outside the state of California as well.

**B.** **Count Two: Receipt or Distribution of Material Depicting the Sexual Exploitation of Minors, 18 U.S.C. § 2252(a)(2)**

Count Two charges Henry with receipt and distribution of a visual depiction of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2). Pursuant to 18 U.S.C. § 2252(a)(2):

> Any person who ... knowingly receives, or distributes, any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if –
>
> (A)    the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>
> (B)    such visual depiction is of such conduct.

18 U.S.C. § 2252(a)(2).

In order to prove the crime of receipt and distribution of child pornography, the government must prove four elements beyond a reasonable doubt:

1. Defendant knowingly received or distributed one or more visual depictions of a minor;
2. The visual depiction involved one or more actual minors engaged in sexually explicit conduct;
3. Defendant was aware of the sexually explicit nature and character of the materials and that the visual depiction was of a minor engaged in sexually explicit conduct; and
4. The image had been:
   a) mailed, shipped or transported in interstate or foreign commerce, or
   b) produced using materials that themselves were so mailed, shipped or transported.

The second and fourth elements have been established by stipulation. The parties have stipulated that the visual depictions of two files found at Henry's residence involved one or more actual minors engaged in sexually explicit conduct. (Doc. 191.) And the parties have also stipulated that the files recovered from the Lock-N-Stitch computer in Henry's office were received from use of a peer-to-peer software program called Shareaza and an internet connection supplied by Charter Communications, which has servers located outside of the state of California.[3] (Id.)

## IV.    EVIDENTIARY ISSUES

### A.    Computer Files In General

The standard for authenticating computer records is the same for authenticating other records and does not vary simply because the record happens to be originally in electronic form. United States v. Vela, 673 F.2d 86, 90 (9th Cir. 1982). The witness who testifies to the authenticity of the computer record need not have special qualifications and need not have programmed the computer or even understand the technical operation of a computer. United States v. Salgado, 250 F.3d 438, 453 (6th Cir.

---

[3] The Ninth Circuit has found a "nexus to interstate commerce" where "activities ... have an economic or commercial character," such as possession of child pornography obtained through the internet. United States v. Adams, 343 F.3d 1024, 1028 (9th Cir. 2003). In Adams, the defendant admitted "that he viewed and possessed 'prohibited images' downloaded from the Internet," and was therefore convicted of possession of child pornography, in violation of Title 18, United States Code, Section 2252(a)(4)(B). Id. at 1027. In addition, the Ninth Circuit has found in dicta that the Internet and mail order catalogs provide an interstate market for new material for many pornographers. United States v. McCoy, 323 F.3d 1114, 1139-40 (9th Cir. 2003).

1  2001) ("it is not necessary that the computer programmer testify in order to authenticate the computer
2  generated records.")  Instead, the witness need only have first-hand knowledge of the facts to which they
3  testify, such as examining or seizing the computer from which the records were obtained.  United States
4  v. Whitaker, 127 F.3d 595, 601 (7th Cir. 1997).

5        The authenticity of the computer program itself is also generally not a bar to the admission of
6  evidence derived from the use of such a program.  Such a challenge is defeated by providing sufficient
7  facts to support a finding that the records are trustworthy and the opposing party is afforded the
8  opportunity to inquire into the accuracy of such records.  United States v. Briscoe, 896 F.2d 1476 1494-
9  95 (7th Cir. 1990).  Typically, the reliability of a computer program can be established by showing that
10 the users of the program actually do rely upon it on a regular basis.  Id., at 1494 (holding that
11 computerized records held by a telephone company were admissible).

12       In the present case, Detectives Moore and Hively, who forensically analyzed the computer
13 devices and hard drives underlying the government's charges, will testify that computer programs (such
14 as EnCase and FTK Imager) were utilized to retrieve much of the information found on the seized
15 phones and computer devices.  Such programs are well known and are a generally accepted means of
16 conducting a forensic examination of a computer for the purpose of retrieving evidence.  Considering
17 the fact that defense experts commonly rely upon the same program, the government has neither
18 received nor anticipates receiving any objections to the use exhibits extracted with EnCase or FTK
19 Imager.  See, e.g., United States v. Giberson, 527 F.3d 882, 885-889 (9th Cir. 2008) (endorsing use of
20 similar program "iLook" as forensics tool in child pornography cases).

21       **B.     Video and Still Images**
22       The government intends to display parts of approximately six videos depicting child
23 pornography that Henry possessed, and approximately one dozen videos of the minor victim that Adam
24 and Angele conspired to create.

25       Given the very high burden of proof generally, and that the government will need to prove the
26 defendant acted intentionally and knowingly in committing the charged offenses, the government should
27 be given wide latitude in displaying each of these images in court.  Since the government's burden is
28 extremely high - as the defense will argue in its closing - the government should "not be restricted to a

modest quantum of evidence that will support the indictment." United States v. Gallo, 543 F.2d 361, 365 (D.C. Cir. 1976).

### C. Defendant's Statements

The government intends to introduce statements made by the defendant on September 19, 2013, about his conduct relating to the charged offenses. Under the Federal Rules of Evidence, a defendant's statement is admissible only if offered against him; the defendant conversely may not elicit his own prior statements. Fed. R. Evid.801(d)(2)(A); United States v. Fernandez, 839 F. 2d 639 (9th Cir. 1988). The government may also introduce statements of the defendant to third persons under Federal Rule of Evidence 801(d)(2).

#### 1. Admissions by Party-Opponent

A statement is not hearsay if "...(2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity .... " Federal Rule of Evidence 801(d)(2)(a). Admissions by a party are treated as non-hearsay under Rule 801(d)(2)(A) and are thus admissible for their truth. Bocchino & Sonenshein at 137.

#### 2. Statement That Party Adopts

A statement is not hearsay if "... The statement is offered against a party and is . . . (B) a statement of which the party has manifested an adoption or belief in its truth ...." Federal Rule of Evidence 801(d)(2)(B). A statement made by another person that is subsequently adopted by the party-opponent is regarded as an admission of the party-opponent and is therefore admissible for its truth under Rule 801(d)(2)(B). Bocchino & Sonenshein at 137. A statement may be adopted by the party-opponent either expressly or through silence. Id.; See, e.g., United States v. Schaff, 948 F.2d 501 (9th Cir. 1991) (defendant's silence during statement made in his presence by his sister regarding instructions he had given her was admissible); United States v. Villarreal, 764 F.2d 1048 (5th Cir. 1985) (defendant's failure to disagree could reasonably be taken as an admission).

#### 3. Statements Offered by the Defendant

If the government chooses not to introduce statements made by the defendant, the defendant may not introduce those statements as they would be hearsay (as they would not be offered by a party-opponent).

4. Observations of the Defendant's Demeanor During Questioning

The government does not believe that the defendant's physical demeanor when responding to questions should be an issue. But if it becomes necessary to elicit this testimony, even when a subject is questioned in a custodial setting a law enforcement officer can later testify about a defendant's physical response to being confronted with incriminating evidence. See United States v. Velarde-Gomez, 269 F.3d 1023, 1031 (9th Cir. 2001).

D. **Evidence Found During the Search of Defendant's Residence**

The government will offer items of evidence that were seized from defendant's residence. The prosecution need only prove a rational basis from which the trier of fact may conclude that the exhibits did, in fact, belong to the defendant. Fed. R. Evid. 401(a); United States v. Blackwell, 694 F.2d 1325, 1330 (D.C. Cir. 1982); United States v. Sutton, 426 F.2d 1202 (D.C. Cir. 1969).

E. **Demonstrative Exhibits/Summaries and Charts**

The government may introduce or use at trial summaries and charts. The government may also use some of its charts and summaries during the opening statement, the presentation of its case-in-chief and/or during closing argument. These charts and summaries will substantially assist the court in understanding the government's proof in this case.

It is well-established that a trial court, in its discretion, may allow the presentation of summary evidence to guide and assist a trier of fact in understanding and judging a factual controversy. See, Fed. R. Evid. 1006; United States v. Skalicky, 615 F.2d 1117, 1120-1121 (5th Cir. 1980); United States v. Cooper, 464 F.2d 648, 656 (10th Cir. 1972). A foundation for the admission of each chart and summary will be laid through the testimony of various witnesses, who will testify that the charts and summaries accurately reflect information contained in documents already in or to be admitted into evidence. See United States v. Lemire, 720 F.2d 1327, 1349 (D.C. Cir. 1983); United States v. Pollack, 417 F.2d 240, 241 (5th Cir. 1969).

Courts have repeatedly allowed the use of charts and summaries similar to the ones the government may intend to use in this case. United States v. Stephens, 779 F.2d 232 (5th Cir. 1985)(simple flow charts tracing the defendant's use of loan proceeds); United States v. Porter, 821 F.2d 968, 974-975 (4th Cir. 1987)(summary of telephone numbers); United States v. Orlowski, 808 F.2d

1283, 1289 (8th Cir. 1986)(charts tracing the disposition of the checks generating defendant's receipts and reflecting defendant's total unreported income).  Courts allow the charts when the evidence involves numerous exhibits which are difficult to examine in court without the charts or the charts are helpful to the jury.  United States v. Stephens, 779 F.2d at 239; United States v. Scales, 594 F.2d 558, 564 (6th Cir. 1979).

### F.    Stipulations

To date, the parties have filed one stipulation with the court.  On May 29, 2017, the parties stipulated that if called as a witness, Richland (Washington) County Sheriff's Detective Roy Shepherd would testify that he has reviewed a copy of some image files that were recovered from a computer seized at the defendant's residence at 1131 Burman Drive in Turlock, California. He can confirm that the images depict a female who, when the videos were recorded in the states of Washington and/or Oregon, was between the ages of 8 and 11." (Doc. 121.)

The parties also stipulated that if called as a witness, "Retired Stephens County (Georgia) Sheriff's Major Michael Crozier would testify that he has reviewed a copy of some image files that were recovered from a computer seized at the defendant's residence at 1131 Burman Drive in Turlock, California. He can confirm that the images depict a female who was between the ages of 4 and 5 when the videos were created. The images were created in and distributed outside the state of Georgia." (Doc. 121.)

Finally, the parties stipulated that the files recovered from the Lock-N-Stitch computer in Henry's office were received from use of a peer-to-peer software program called Shareaza and an internet connection supplied by Charter Communications, which has servers located outside of the state of California.

Counsel for the government may again contact defense counsel to see what can further be done to present the case as efficiently as possible.  The parties will advise the court of ultimate the scope of its stipulations before the trial begins.

### G.    Judicial Notice

Under the doctrine of judicial notice and Rule 201 of the Federal Rules of Evidence, if requested by a party, the court must take judicial notice of any undisputed facts which are either (1) generally

known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. The government may, for example, ask the court to take judicial notice of certain undisputed facts, such as Ceres, California, being within the Eastern District of California.

### H. Cross-Examination of Defendant's Character Witnesses

The government anticipates that Henry will call character witnesses. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony (only) as to reputation or by testimony in the form of an opinion.

On cross-examination of the defendant's character witness, the government may inquire into specific instances of the defendant's past conduct relevant to the character trait at issue. Fed. R. Evid. 405(a); Michelson v. United States, 335 U.S. 469, 479 (1948). However, the defendant may not ask about specific instances of such conduct on direct examination. Fed. R. Evid. 405(a).

### I. Use of Witness Summaries and PowerPoint Presentations

Because of the voluminous and highly technical nature of some of the computer evidence in this case, the government intends to rely on the testimony of Detective Art Hively to summarize and analyze the contents of the information retrieved from the defendant's computer, as well as defendant's and Angele's cell phones. One or more components of Detective Hively's forensic report may be offered as evidence in this regard, as well as a summary of text messages that Detective Hively created from text messages retrieved from Adam's and Angele's phones.

Federal Rule of Evidence 1006 provides that "the contents of voluminous writings, recordings or photographs which cannot be conveniently examined in court may be presented in the form of a chart, summary or calculation." The Ninth Circuit has recognized that summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." United States v. Shirley, 884 F. 2d 1130, 1133 (9th Cir. 1989), quoting United States v. Lemire, 720 F. 2d 1327, 1348 (D.C. 1983); see also United States v. Meyers, 847 F. 2d 1408, 1412 (9th Cir. 1988) (approving the use of a summary witness where the sequence of events was confusing and the chart contributed to the clarity of presentation).

Although the underlying materials upon which the summary testimony is based must be "admissible," they need not be actually admitted into evidence. <u>United States v. Meyers</u>, 847 F. 2d at 1412. The foundation for admission of such a summary is simply that the records are voluminous and that in-court examination would be inconvenient. <u>United States v. Duncan</u>, 919 F. 2d 981, 988 (5th Cir. 1990).

### J. Chain of Custody

Evidence regarding the chain of custody concerning an item of seized evidence goes to the weight as opposed to the admissibility of the evidence. <u>United States v. Matta-Ballesteros</u>, 71 F.3d 754, 769 (9th Cir. 1995); <u>United States v. Robinson</u>, 967 F.2d 287, 292 (9th Cir. 1992). In fact, so long as the prosecution "introduce[s] sufficient proof so that a reasonable juror could find the [proffered evidence is] in substantially the same condition as when they were seized", the evidence is admissible so long as there is a "reasonable probability the [evidence has] not been changed in important respects." <u>Matta-Ballesteros</u>, 71 F.3d at 768 (citing to <u>United States v. Harrington</u>, 923 F.2d 1371, 1374 (9th Cir. 1991); See also Fed. R. Evid. 901(a).

Furthermore, "in the absence of any evidence of tampering, a presumption exists that public officers 'properly discharge[d] their official duties." <u>Harrington</u>, 923 F.2d at 1374 (citing to <u>United States v. Gallego</u>, 276 F.2d 914, 917 (9th Cir. 1960)). Conversely, "merely raising the possibility of tampering is not sufficient to render evidence inadmissible." <u>Harrington</u>, 923 F.2d at 1374 (citing to <u>United States v. Vansant</u>, 423 F.2d 620, 621 (9th Cir. 1970)).

### K. Reciprocal Discovery

To date, the government has provided more than one thousand pages of discovery to the defense and has turned over items as they have been unearthed or otherwise developed. The government will continue to do this. Since the inception of this prosecution, the government has made available for the defense review all of the items of evidence, whether intended to be used as trial exhibits or not, over which it has custody or control.

The government has requested and received limited reciprocal discovery. Should the defendant seek to introduce any evidence that should have been provided to the government as reciprocal

TYPE PLEADING NAME

17

discovery, the government previously has successfully moved to exclude it under Rule 16(d)(2) of the Federal Rules of Criminal Procedure.

### L.   Presentation of Witnesses

It is possible that the government may have to call certain witnesses out of order, or re-call witnesses to testify to various events to maintain a chronological presentation. The government will strive for an orderly presentation of the evidence to assist the court and the defendant in understanding the evidence being presented.

## V.   WITNESS EXCLUSION AND CASE AGENT DESIGNATION

The government moves pursuant to Rule 615 of the Federal Rules of Evidence that all witnesses be excluded from trial until their testimony has been completed, with the exception of the government's lead agent, Det. Art Hively of the Ceres Police Department, and any additional testifying expert witnesses. United States v. Little, 753 F.2d 1420, 1441 (9th Cir. 1985). These witnesses are excepted from any sequestration order as their knowledge qualifies them as essential to counsel in understanding and presenting the case properly. See, e.g., United States v. Seschillie, 310 F.3d 1208 (9th Cir. 2002); United States v. Connors, 894 F.2d 987 (8th Cir. 1990).

## VI.   CONCLUSION

The foregoing is a summary of points the government anticipates may arise at trial. Should any legal issues arise that have not been covered in this trial brief, the United States respectfully requests leave to submit such further memoranda as may be necessary.

Dated:  November 2, 2017                                    PHILLIP A. TALBERT
                                                                                  United States Attorney

                                                                     By:   /s/ ROSS PEARSON
                                                                             ROSS PEARSON
                                                                             DAVID L. GAPPA
                                                                             Assistant United States
                                                                             Attorneys