UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-CR-409-DAD |
| | ) | |
| vs. | ) | TESTIMONY OF ANTONIO RUEZGA |
| | ) | MOTION TO STRIKE |
| ADAM ALAN HENRY, | ) | MOTION FOR MISTRIAL |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Fresno, California                    Wednesday, November 15, 2017

                                      Thursday, November 16, 2017

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **DAVID L. GAPPA**
                          and **ROSS PEARSON**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721


For the Defendant:        Law Offices of Anthony P. Capozzi
                          BY: **ANTHONY P. CAPOZZI**
                          1233 West Shaw Avenue
                          Suite 102
                          Fresno, California 93711

3

1                                    **INDEX**

2    **GOVERNMENT'S WITNESSES**:

3     **ANTONIO RUEZGA**                                        4
       DIRECT EXAMINATION BY MR. GAPPA                          4
4      CROSS-EXAMINATION BY MR. CAPOZZI                         5
       **ANTONIO RUEZGA (NO JURY PRESENT)**                     19
5      FURTHER CROSS-EXAMINATION BY MR. CAPOZZI                 20
       REDIRECT EXAMINATION BY MR. GAPPA                        26
6      RECROSS-EXAMINATION BY MR. CAPOZZI                       26

7    **DEFENDANT'S WITNESSES**:

8     **ADAM ALAN HENRY (NO JURY PRESENT)**                     35
       DIRECT EXAMINATION BY MR. CAPOZZI                        35

9                                    * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    Wednesday, November 15, 2017                    Fresno, California

2    3:41 p.m.

3           THE COURT:  All right.  Mr. Gappa and Mr. Pearson,

4    does the United States have any rebuttal witnesses that it

5    wishes to call.

6           MR. GAPPA:  Yes, Your Honor.  We have Antonio Ruezga.

7           THE CLERK:  Please approach the stand.

8                          **ANTONIO RUEZGA**,

9    called as a rebuttal witness on behalf of the Government,

10   having been first duly sworn, testified as follows:

11          THE CLERK:  State your full name for the record and

12   spell it.

13          THE WITNESS:  My name is Antonio Ruezga.  Last name

14   is R-U-E-Z-G-A.

15          MR. GAPPA:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17   BY MR. GAPPA:

18   Q.  Sir, who do you work for?

19   A.  I currently work for Merced County Human Services Agency.

20   Q.  Who did you work for in November 2013?

21   A.  For CSA, which is Stanislaus County Child Protective

22   Services.

23   Q.  And were you, as part of your responsibilities in that

24   job, at a residence on Burman Drive in Turlock, California on

25   November 13th, 2013?

5

1  A.  Yes, sir.

2  Q.  Was a search warrant being served at the residence that

3  day?

4  A.  Yes, sir.

5  Q.  Were the adult occupants of the residence present that

6  day?

7  A.  Yes, sir.

8  Q.  Was Adam Henry present that day?

9  A.  Yes, sir.

10  Q.  Did you hear him make any statements?

11  A.  Yes, I did.

12  Q.  What did he say?

13  A.  He informed me that he wasn't sure of his charges.  And

14  stated that his wife was not part of the charges that were

15  brought about by the incident.

16        MR. GAPPA:  Your Honor, I don't have any other

17  questions.

18        THE COURT:  Any cross-examination?

19                    CROSS-EXAMINATION

20  BY MR. CAPOZZI:

21  Q.  Who were you employed by back then?

22  A.  Stanislaus County.

23  Q.  Stanislaus County what?

24  A.  Child Protective Services.

25  Q.  Was he advised of his rights one way or the other?

1   A.  I believe so, sir.

2   Q.  Were you?  Did you advise him of his Miranda rights?

3   A.  No.

4   Q.  Did someone else advise him while you were there?

5   A.  I don't recall, sir, but I --

6   Q.  Was he in custody at the time?

7   A.  Yes, sir.

8           MR. CAPOZZI:  Judge, I'd move to exclude those

9   statements.  And I don't want to ask for a mistrial at this

10  point.

11          THE COURT:  I'll rule outside the presence.  Any

12  other questions?

13  BY MR. CAPOZZI:

14  Q.  What else did he say?

15          THE COURT:  Well --

16  BY MR. CAPOZZI:

17  Q.  Did he make any other statements to you?

18  A.  We had some conversation, yes.  I don't recall everything

19  that he said, sir.

20  Q.  Wait.  I didn't hear what you said.

21  A.  We did have other conversation, sir.  I don't recall

22  everything that he told me.

23  Q.  Do you have a copy of the statement he made?

24  A.  Yes.

25  Q.  And what is -- in your statement?  You have it there with

1    you?

2    A.  Yes, I do.

3    Q.  Can I see that?

4    A.  Sure.

5         MR. CAPOZZI:  Can I approach, Judge?

6         THE COURT:  You may.

7    BY MR. CAPOZZI:

8    Q.  So while he was under arrest and handcuffed, Mr. Henry

9    reported to --

10        MR. GAPPA:  Your Honor, I would object.

11        THE COURT:  Sustained.  Don't read it.

12        MR. CAPOZZI:  All right.

13   Q.  Is it true that he -- was he trying to protect his wife?

14        MR. GAPPA:  Objection.  Calls for speculation.

15        THE COURT:  Sustained.

16   BY MR. CAPOZZI:

17   Q.  Did he say anything negative about his wife?

18   A.  Not to my knowledge.

19   Q.  He said she wasn't involved?

20   A.  Correct.

21   Q.  All right.  And that's on what day?

22   A.  November the 3rd -- 13th, 2013.

23   Q.  2013?

24   A.  Correct.

25   Q.  And he was under arrest when he made those statements to

8

1  you?

2  A.  I don't know, sir.  He did have handcuffs on.

3  Q.  Do you recall putting in your report, "while under arrest

4  and handcuffed," Mr. Henry reported to you?

5  A.  Yes, sir.

6  Q.  So you still don't know whether or not he was under

7  arrest?

8  A.  He could have been.  I don't know, sir.

9  Q.  Okay.  Did he also say that none of the children were

10 involved in or exposed to anything inappropriate?

11 A.  Yes, he did.

12 Q.  Okay.  And everything was concentrated to the bedroom,

13 where the children had no access?

14 A.  That was what he told me.

15 Q.  Right.  So what was he talking about?  Sex with his wife

16 in the bedroom?

17 A.  I don't know, sir.

18 Q.  Was he talking about child pornography?

19 A.  Maybe.  Yes, sir.

20 Q.  You think so?

21 A.  I think so.

22 Q.  Did you say -- did he say it was child pornography?

23        MR. GAPPA:  Objection, Your Honor, calls for

24 speculation.

25        THE COURT:  That question doesn't.

1   BY MR. CAPOZZI:

2   Q.  Did he say it was child pornography?

3   A.  He didn't say anything, sir.

4   Q.  Pardon me?

5   A.  He didn't say anything other than everything was

6   concentrated in the bedroom.

7   Q.  Right.  To the bedroom.  And you don't know what he was

8   referring to; do you?

9   A.  No, sir.

10  Q.  In your statement, didn't you say "upon entry into the

11  home, Mr. Henry was arrested by FBI agents"?

12          MR. GAPPA:  Objection, Your Honor.  He's reading from

13  the report.

14          MR. CAPOZZI:  I'm asking if that's in the report.

15          THE COURT:  Sustained.

16  BY MR. CAPOZZI:

17  Q.  Is that in your report?

18          THE COURT:  Sustained.

19          MR. CAPOZZI:  Oh.  Okay.

20  Q.  Do you know whether or not he was arrested by the FBI

21  prior to your statement?

22  A.  No, sir.

23  Q.  You don't.  Can I show you your report?  Judge, can I --

24          THE COURT:  You may approach.

25          MR. CAPOZZI:  Yes.

1   Q.  What does that say right there?

2   A.  It does say that.

3   Q.  What does it say?

4   A.  It says that he was under arrest.

5   Q.  And present at the time this was going on was his wife,

6   Mrs. Henry; is that correct?

7   A.  I believe so, yes.

8   Q.  And his mother-in-law Diane Brennan?

9   A.  Correct.

10  Q.  And his children, Aidan -- I can never pronounce that.

11          THE DEFENDANT:  Siobhan.

12  BY MR. CAPOZZI:

13  Q.  Siobhan and Liam, three children?

14  A.  They were in the residence.

15  Q.  Okay.

16          MR. CAPOZZI:  No more questions.  Thank you, sir.

17          THE COURT:  Any redirect?

18          MR. GAPPA:  No, Your Honor.

19          THE COURT:  May this witness be excused?

20          MR. GAPPA:  Yes, Your Honor.

21          THE COURT:  Thank you, sir.  You're free to go.

22          Any other government rebuttal witnesses?

23          MR. GAPPA:  No, Your Honor.

24          THE COURT:  Does the government rest at this time?

25          MR. GAPPA:  Yes, Your Honor.

1       THE COURT:  Does the defense --

2       MR. CAPOZZI:  Judge, I'm going to recall the

3  defendant.  I'm sorry.

4       THE COURT:  All right.  Surrebuttal.

5       MR. CAPOZZI:  Yes.

6       THE COURT:  All right.  We'll take a five-minute

7  recess, ladies and gentlemen.  Please heed the previous

8  admonition.  I won't have you out of the courtroom long.

9    (The jury left the courtroom.)

10      THE COURT:  Let the record reflect we're outside the

11 presence of the jury.  The defense has moved to strike the

12 testimony of the rebuttal witness on the grounds that the

13 statement that was testified to was unlawfully obtained.  I

14 have no -- I don't have enough information.  And that witness

15 clearly didn't have enough information for me to even consider

16 that issue.  And if my memory serves me correctly, I could be

17 wrong, which search -- that testimony had to do with the

18 November 13th search, federal search, execution of the federal

19 search warrant?

20      MR. GAPPA:  Yes.

21      THE COURT:  Detective Hively's interview with the

22 defendant, which we know was Mirandized, was taken in

23 connection with the state search warrant, the earlier

24 September search warrant.  Correct?

25      MR. CAPOZZI:  Right.

1          MR. GAPPA:  Yes.

2          THE COURT:  So I don't have anything in front of me

3    about any statements taken on November 13th from which I could

4    determine one way or another whether that statement was

5    lawfully or unlawfully obtained.

6          MR. CAPOZZI:  Well, judge, you heard from the

7    defendant when he testified.  Because I stupidly asked.  "Did

8    you say anything to the FBI when they came in?"  And he goes,

9    "No, I exercised my right to an attorney."

10          THE COURT:  Now that you say that.  I do think he

11   worked that into one of his answers.  Said at some point

12   during that day he invoked his right to counsel.

13          Anyway, I mean, I know nothing about the context.

14   Was he in custody?  This gentleman testified he was in

15   handcuffs.  He characterized him as being under arrest.  But

16   he doesn't know what an arrest is one way or another.  He's

17   Child Protective Services.

18          So what's the government's position about this?

19   You're going to have to defend that statement?

20          MR. GAPPA:  Your Honor, we're not saying that he was

21   in custody.  But even assuming he were in custody, even

22   assuming he had been Mirandized, our view is that these are

23   spontaneous statements and that, further, the witness who just

24   testified is not law enforcement.  So they were certainly --

25          THE COURT:  Well, that's the question.  You got a

13

1    brief on whether Stanislaus County Child Protective Services

2    is law enforcement for purposes of statements?  I mean, under

3    some circumstances --

4            MR. CAPOZZI:  It is.

5            THE COURT:  Are they law enforcement officers under

6    California law?  Do they have the power to arrest?

7            MR. GAPPA:  He said no.

8            THE COURT:  Who said no?

9            MR. GAPPA:  The witness.

10           THE COURT:  He didn't testify to it.

11           MR. GAPPA:  Well, but for purposes of the Court's, I

12   think, determination.  We could bring him back if the Court

13   wanted more information directly from him.  But I --

14           THE COURT:  He's your witness.  The defense has moved

15   to strike his testimony.  What's the government's position?

16           MR. GAPPA:  Well --

17           THE COURT:  We would have thought you would have

18   thought about this before you put him up there.

19           MR. GAPPA:  But then it's the defendant's burden, I

20   think, to show -- regardless, he was not in custody to the

21   extent that he was arrested.  He -- there was no

22   interrogation, so these are spontaneous statements.  And these

23   were not elicited by a law enforcement officer.

24           THE COURT:  Well, that's what you're telling me.  But

25   Stanislaus County CP -- is that what you're banking on, as a

1    matter of law, Stanislaus County Child Protective Services

2    Officers are not law enforcement officers?  Is that -- you're

3    putting all your eggs in that basket?

4            MR. GAPPA:  That's what I've been told.  But I

5    believe, Your Honor, even in the context of Miranda

6    violations.  We're not saying that there were one, but just

7    for purposes of an alternative analysis, that even if there

8    are Miranda violations, that doesn't make statements that were

9    elicited by law enforcement in violation of Miranda rights

10   completely inadmissible for all purposes.

11           THE COURT:  Mr. Capozzi, looking back at the

12   testimony.  At least based upon that testimony, it does not

13   appear even if the defendant -- at least based upon that

14   testimony, if you don't have anything else, it does not

15   appear, based upon that officer's testimony, that Mr. Henry

16   was subject to an interrogation even if the CPS officer

17   qualified as law enforcement and even if Mr. Henry was in

18   custody at the time.

19           And the reason I say that is the question was:

20           "Did you hear him make any statements?

21           "Yes, I did.

22           "What did he say?

23           "Answer:  He informed me that he wasn't sure of

24           his -- that he wasn't sure of his charges and stated

25           that his wife was not part of the charges that were

1        brought about by the incident."

2            So it was not established.  And I don't think you

3    established, in your cross-examination of the witness -- I'm

4    taking another look right now.  You established that the

5    witness did not advise the defendant of his right to remain

6    silent.  He does not know whether anyone else did.

7            You elicited testimony that at least this witness

8    believed that the defendant was in custody at the time, though

9    he equivocated about whether he was under arrest.  He really

10   didn't know.

11           And then you asked him, "Did he make any other

12   statements to you?"  We had some conversations, yes.  I don't

13   recall everything that he said.  What -- we did have other

14   conversations, sir.  I don't recall everything he told me."

15   And then you reviewed statements that he made.

16           But no where did you establish during that

17   examination that Mr. Ruezga interrogated the defendant, nor

18   was it ever established that he asked him any questions at

19   all.  At most, there was -- the witness characterized it as we

20   had a conversation.  Otherwise he said he heard him make a

21   statement.  So I don't think it's been established that there

22   was an interrogation.

23           MR. CAPOZZI:  Then we should recall this witness.

24   Because he only had one page of his report.  I'd like to see

25   the other.  And we have the FBI report from Mr. Lucas, the FBI

1  agent says he entered the house, he advised Mr. Henry of his

2  rights and he invoked his rights to an attorney --

3          MR. GAPPA:  Your Honor --

4          MR. CAPOZZI:  -- on entry to the house.

5          MR. GAPPA:  Your Honor, it wouldn't change the

6  Court's analysis I don't think.  The record establishes that

7  it wasn't an interrogation.

8          THE COURT:  So far I haven't heard anything that

9  establishes that it --

10          MR. CAPOZZI:  Then I want to call him to establish

11  it.

12          THE COURT:  Well, get your witness.

13          MR. CAPOZZI:  Is he still here?

14          MR. GAPPA:  I don't know.

15          MR. CAPOZZI:  Well, I'll get him.  Evidently he went

16  down to victim services or somewhere.  I don't know.  He's a

17  government witness, I would ask the government to get him

18  back.  Is Hively running him down?

19          THE COURT:  Detective Hively is seated in the

20  audience, I don't think he's running anybody down.

21          MR. GAPPA:  Your Honor, our view is that that is not

22  a custodial interrogation.

23          THE COURT:  I'm going to allow it.  Look, you called

24  the witness.

25          MR. GAPPA:  Right.

1          THE COURT:  I'm going to let -- if we have to recess

2   for the evening and get him back here tomorrow morning and do

3   it outside the presence of the jury, I'm letting the defense

4   attempt to establish whether this was a non-Mirandized

5   interrogated statement after the defendant invoked his right

6   to remain silent.

7          MR. GAPPA:  So would that be done outside --

8          THE COURT:  That's what I just said.

9          MR. CAPOZZI:  Yes.

10         THE COURT:  But I'm going to let him do it.

11         MR. GAPPA:  Okay.

12         THE COURT:  So do you want me to recess for the

13   evening and do it tomorrow morning?  Or do you want to see if

14   we can get him back now?

15         MR. CAPOZZI:  Let's see if we can get him back.

16         MR. GAPPA:  Your Honor, I think what might make sense

17   is if I can reach him, tell him not to leave.  We can address

18   that issue tonight.  I just -- obviously I think the Court

19   would be concerned with what the jury is going to be doing.

20   So --

21         THE COURT:  I'm not concerned.  It's four o'clock.

22   We got a half hour.  Get him back here.

23         MR. GAPPA:  Okay.

24         MR. CAPOZZI:  And I would ask the government to

25   produce FBI Agent Lucas, who did the advisement of rights.

1          THE COURT:  Well, not -- I'm not going -- we're not

2    having a full blown suppression hearing, unless you establish

3    that there was an interrogation.  If there's no interrogation,

4    you're not entitled to suppression whether he invoked or not.

5          MR. CAPOZZI:  Okay.  Comes down to a definition of

6    interrogation?

7          THE COURT:  Well, at -- I mean, you got to

8    establish -- he's got to be in custody.  Mr. Pearson is here.

9    I know Mr. Gappa stepped out, so I'm not having --

10          MR. CAPOZZI:  Yeah.

11          THE COURT:  You got to have -- he's got to be in

12    custody.

13          MR. CAPOZZI:  Yes.

14          THE COURT:  He's got to -- it's got to be in response

15    to an interrogation.

16          MR. CAPOZZI:  Uh-huh.

17          THE COURT:  And if he wasn't advised or was advised

18    and invoked and was interrogated, then the government's got a

19    problem.  Which I would have thought they would have thought

20    through before we called the rebuttal witness.

21          Even if you establish that the -- he's in custody and

22    it was an interrogation, I've also got to determine that a CPS

23    officer is a law enforcement officer.  Because if it's a

24    non-law enforcement, then it can't be an interrogation.  So

25    you got quite a few hoops to jump through, I think.  But it's

1   not -- it's not frivolous to make sure that we understand the

2   circumstances.

3       (Off the record.)

4           THE COURT:  Is Mr. Ruezga returning?

5           MR. GAPPA:  Your Honor, I reached him on his cell

6   phone.  He said he would come back.  He's coming back.

7           THE COURT:  Mr. Ruezga, please re-take the witness

8   stand and remember, sir, you are still under oath.

9                       **ANTONIO RUEZGA**,

10  called as a rebuttal witness on behalf of the Government,

11  having been previously sworn, testified as follows:

12          THE WITNESS:  Yes, sir.

13          THE COURT:  We are outside the presence of the jury.

14  The defense has made a motion to strike this witness'

15  testimony on the grounds that it is the fruits of an

16  unconstitutional interrogation, non-Mirandized interrogation

17  of the defendant.  I have identified off the top of my head

18  what I think might be the issues in connection with that and

19  noted that, at least based upon what's on the record so far,

20  that I don't think the grounds for such a motion to strike

21  have been established.

22          Mr. Capozzi, you asked to be allowed to recall the

23  witness outside the presence of the jury so that you could

24  ferret out some more evidence upon which I could perhaps make

25  a more clearly informed determination.

1          Fair characterization, Mr. Gappa, Mr. Pearson?

2          MR. GAPPA:  Yes.

3          MR. PEARSON:  Yes, Your Honor.

4          MR. CAPOZZI:  Yes.

5          THE COURT:  I didn't ask you, Mr. Capozzi.

6          MR. CAPOZZI:  Oh, I'm sorry.

7          THE COURT:  All right.  You may proceed.

8          MR. CAPOZZI:  Okay.

9                    FURTHER CROSS-EXAMINATION

10   BY MR. CAPOZZI:

11   Q.  Mr. Ruezga, is it?

12   A.  Ruezga.

13   Q.  You work for Child Protective Services of -- is it

14   Stanislaus County?

15   A.  I was working --

16   Q.  Then.

17   A.  Then.  Correct.  Stanislaus County.

18   Q.  On November 13th, were you told to go to an emergency

19   response location at a family home by the Ceres Police

20   Department?

21   A.  Yes, sir.

22   Q.  And with you was Detective Art Hively.  Do you remember

23   Detective Hively?

24   A.  Yes, sir.

25   Q.  Detective Britton Moore.

1   A.   Correct.

2   Q.   An FBI Agent Mark Lucas.

3   A.   Yes, sir.

4   Q.   Okay.  And to conduct the child welfare investigation; is

5   that correct?

6   A.   They were conducting their investigation and I was

7   conducting the Child Protective Services investigation.

8   Q.   Right.  But you went in the house with them; didn't you?

9   A.   I was invited in, yes, sir.

10  Q.   Yeah.  Along with the law enforcement agents; is that

11  correct?

12  A.   We were there, correct.

13  Q.   All right.  Upon entry into the house, Mr. Henry was

14  arrested by the FBI agents; wasn't he?

15  A.   Yes, sir.

16  Q.   Okay.  The -- and there was an FBI arrest order for Mr.

17  Henry?

18  A.   There could have been.  I'm not sure, sir.

19  Q.   Can I show you the report?  Is that what you put in your

20  report?  Can I --

21  A.   Okay.

22        THE COURT:  You may approach.

23        THE WITNESS:  Okay.  Prior -- can I clarify

24  something?

25  BY MR. CAPOZZI:

1   Q.  Sure.

2   A.  Okay.  Part of this report was written by a court -- by a

3   court officer with Stanislaus County Child Protective

4   Services.  So some of it was written by me, some of it wasn't.

5   That part was not written by me, sir.

6   Q.  Okay.  Do you know if there was an arrest order for Mr.

7   Henry?

8   A.  I believe so.

9   Q.  Okay.  Did you see one?

10  A.  No, sir.

11  Q.  Thank you.  I think I asked you.  You said that he was

12  arrested when the FBI agents entered the house; right?

13  A.  I think they spoke to him first and then he was arrested.

14  Q.  Okay.  Fair.  And then did you state in this report,

15  "While he was under arrest and handcuffed, Mr. Henry reported

16  to "you --

17  A.  Correct.

18  Q.  -- "Ruezga, he was not sure what he was being arrested

19  for.  But that his wife had nothing to do with the charges."

20       Is that what he said?

21  A.  Correct.

22  Q.  Did you ask him a question?

23  A.  I did ask him a question.

24  Q.  Yeah.  Okay.

25       THE COURT:  What did you ask him, sir?

1          THE WITNESS:  I don't recall specifically what I

2    asked.  The reason I was there is to conduct a child welfare

3    investigation.  And my question was not entered into that

4    document.  So I don't recall the actual question, but the

5    question that I would have probably been asking Mr. Henry

6    would be were the children present?  Was there anybody else

7    involved with the child -- with whatever was going on?  And

8    then he -- and then that was his answer, what he gave me.

9          As towards the end of my statement there, he

10   continued saying that the children were not involved -- the

11   children were not privy to whatever was going on, that

12   everything was within the bedroom.

13         THE COURT:  So you knew that it was a child

14   pornography investigation?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  And you think that what you would have

17   asked him and what is referred to is "Was anyone else

18   involved?"

19         THE WITNESS:  Correct.

20         THE COURT:  And you would have done that because you

21   would want to know whether or not you could leave the children

22   in that location?

23         THE WITNESS:  Correct, sir.

24         THE COURT:  Okay.  And you think you asked that

25   question in this case?

1          THE WITNESS:  I believe so, sir.

2          THE COURT:  All right.

3    BY MR. CAPOZZI:

4    Q.  And he was taken down to the police department after that;

5    do you know?

6          MR. GAPPA:  Objection.  Relevance.

7          THE COURT:  Sustained.

8    BY MR. CAPOZZI:

9    Q.  Well, on that day you went to the police department.  Is

10   that correct?  After that.

11   A.  Yes, sir.

12   Q.  Along with him?

13   A.  No, sir.

14   Q.  With Mrs. Henry?

15   A.  I met -- Mrs. Henry voluntarily went to -- or she was

16   taken to the police department.  And I then met up with them.

17   Q.  Okay.  But you asked him the question when he was

18   handcuffed and under arrest; isn't that correct?

19   A.  I guess you could say that, yeah.

20   Q.  Yeah.  And with you, standing with you, was Detective

21   Moore, Detective Hively and FBI Agent Lucas?

22   A.  At that time, no, sir.  I was --

23   Q.  Where were they?

24   A.  They -- he was sitting down handcuffed and they were

25   questioning -- I believe at that time they were questioning

1   Mrs. Henry and I was allowed to speak to him by myself.

2   Q.  Okay.  While he was handcuffed and sitting down?

3   A.  While he was sitting down, correct.

4   Q.  And you asked him questions?

5   A.  Yes, I did.

6   Q.  Were you working in tandem with the law enforcement

7   agents?

8   A.  No, sir.

9   Q.  What --

10  A.  Yes and no, sir.  They do the law enforcement part and I

11  do the Child Protective Services part.

12  Q.  Do you consider yourself a law enforcement officer?

13  A.  No, sir.  I --

14  Q.  You can't make any arrest?

15  A.  I cannot make an arrest, correct.

16  Q.  Carry a gun?

17  A.  No, sir.

18  Q.  But you're there with the law enforcement people; is that

19  correct?

20  A.  I was part -- yes, I did go with them.

21  Q.  Did you go there at the beginning of the search when they

22  all came in, were you there with them?

23  A.  No, sir.

24          MR. GAPPA:  That's been asked and answered.

25          MR. CAPOZZI:  I don't remember that one.

1       THE COURT:  Hold on.  Sustained.  He's already

2  answered that he did go in with the law enforcement officers.

3       MR. CAPOZZI:  With them.  I have nothing more.

4       THE COURT:  Any further questions from the

5  government?

6       MR. GAPPA:  Just one, possibly two if I could, Your

7  Honor.

8                   REDIRECT EXAMINATION

9  BY MR. GAPPA:

10  Q.  Mr. Ruezga, if I understood, you were conducting your own

11  investigation?

12  A.  Correct.

13  Q.  And you were not asking questions on behalf of any law

14  enforcement people there?

15  A.  Correct.

16       MR. GAPPA:  Those are my only questions, Your Honor.

17                   RECROSS-EXAMINATION

18  BY MR. CAPOZZI:

19  Q.  Well, did you ask him about child pornography?

20  A.  I don't recall, sir.

21  Q.  You don't recall.  Then why were you there?

22  A.  I don't recall --

23       MR. GAPPA:  Asked and answered.

24       THE WITNESS:  If I --

25       THE COURT:  Overruled.

1      THE WITNESS:  I don't recall if I particularly asked

2 him that question.  But I -- I'm pretty sure I did.

3      MR. CAPOZZI:  Yeah.

4 Q.  You had reports of child pornography being on a computer?

5 A.  That was the understanding.

6 Q.  Right.  And that's why you were there.

7 A.  Correct.

8      MR. CAPOZZI:  Okay.  Thank you.

9      THE COURT:  As a result of -- first of all, tell me,

10 as best you can recall, what questions you asked of Mr. Henry?

11      THE WITNESS:  My question would have been if the

12 children were involved in any of the pornography.  If they had

13 any knowledge of it.  Or they were either viewing it or being

14 exposed to it.

15      THE COURT:  Okay.  And do you recall what answer you

16 got?

17      THE WITNESS:  The only answer that I can recall was

18 the statement that was given, that everything was kind of

19 concerning the bedroom, constrained in the bedroom and the

20 children had no access to it.

21      THE COURT:  Did you ask any other questions?

22      THE WITNESS:  Yes.  The other questions I probably

23 would have asked, the well being of the children as far as

24 medical information and so forth.

25      THE COURT:  Any other questions?

1          THE WITNESS:  Not that I can recall.

2          THE COURT:  Did you ask specifically whether anyone

3     else was involved with child pornography?

4          THE WITNESS:  No.  I don't recall.

5          THE COURT:  Are you saying that when you asked about

6     the child pornography in general, that Mr. Henry merely

7     offered in response, "The children aren't exposed to any of

8     this.  I'm not sure of the charges that are against me but

9     whatever they are, my wife wasn't involved in it"?

10         THE WITNESS:  As I recall, that was the conversation.

11         THE COURT:  How long do you think your entire

12    conversation with Mr. Henry took place on that day?

13         THE WITNESS:  Probably 15 minutes.

14         THE COURT:  15 minutes.  That's quite a while.

15    That's not very many questions.  What else did you talk about?

16         THE WITNESS:  Concerns about the house.  The well

17    being of the children within the household.

18         THE COURT:  As a result of your part of the

19    investigation, did the children remain in the home following

20    that search or were they taken?

21         THE WITNESS:  The children remained in the home with

22    the understanding that Mr. Henry was not going to be in the

23    home and neither was Mrs. Henry.

24         THE COURT:  So --

25         THE WITNESS:  They -- I'm sorry.

1          THE COURT:  You made a direction?

2          THE WITNESS:  We did what we call a safety plan.  We

3    wrote up a safety plan that the children would remain in the

4    house with grandma, under grandma's care.  And that mom was

5    not allowed to go back in the house and dad was not allowed to

6    go back into the house until we said it was deemed to be safe.

7          THE COURT:  Okay.  And did you report what you

8    learned from your 15-minute conversation with Mr. Henry that

9    day, did you report that to the FBI or Detective Hively or

10   Detective Moore?

11         THE WITNESS:  No, sir.  I conducted -- I did a -- I

12   made a report and I presented it to -- present it to the court

13   officer, who then proceeds with the case to the court.

14         THE COURT:  All right.  And it's your belief that, as

15   a Child Protective Services officer at that time, that you did

16   not act under California law as a peace officer or law

17   enforcement officer?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  No power to arrest?

20         THE WITNESS:  Correct.

21         THE COURT:  Not authorized to carry a firearm?

22         THE WITNESS:  Correct.

23         THE COURT:  Ever present cases for consideration by

24   the district attorney's office for possible prosecution?

25         THE WITNESS:  I have not.

1        THE COURT:  Did you view that as part of your duties?
2    Or is there a different division --
3        THE WITNESS:  There's a different division that would
4    handle that part of it.
5        THE COURT:  Did my questions cause any other
6    questions to be asked?
7    BY MR. CAPOZZI:
8    Q.  Mrs. Henry was arrested along with Mr. Henry that day;
9    wasn't she?
10   A.  I believe so.
11   Q.  Yes.  And then you, at that time, agreed to leave the
12   children with grandma?
13   A.  After having the party sign a safety plan that the
14   children were going to remain in grandma's care, correct.
15   Q.  Then did you go down to the police department afterwards?
16   A.  I believe so, yes.
17   Q.  Why?
18   A.  Because I --
19        MR. GAPPA:  Objection.  Relevance.
20        MR. CAPOZZI:  Oh, I think it's very relevant.
21        THE COURT:  Overruled.
22        THE WITNESS:  Because I didn't interview Mrs. Henry.
23   BY MR. CAPOZZI:
24   Q.  Okay.  Did you interview Mr. Henry more?
25   A.  I don't think so.  I don't think I did anymore

1   interviewing that day.

2   Q.  Is that because he invoked his right to an attorney?

3   A.  I don't know that he invoked his right to an attorney.

4          THE COURT:  Anything further?

5   BY MR. CAPOZZI:

6   Q.  In that report that you did -- or you didn't write the

7   report; is that right?

8   A.  I wrote -- I wrote the report.

9   Q.  Portion.

10  A.  Portions of that report, correct.

11  Q.  Was that report given to any law enforcement officials?

12  A.  Not to my knowledge.

13  Q.  You don't know one way or the other?

14  A.  I don't think it would be given to any law enforcement.

15  Q.  Okay.  Do you have that full report with you today?

16  A.  No, sir.

17  Q.  Just the two pages?

18  A.  I no longer work for the county.

19  Q.  Oh, that's right.

20  A.  So I'm not privy to that information anymore.

21         MR. CAPOZZI:  Okay.  I'm out of questions.

22         THE COURT:  All right.  Any further questions from

23  the government?

24         MR. GAPPA:  No, Your Honor.

25         THE COURT:  May this witness now be excused?  Because

1    I'm not bringing him back again.

2              MR. CAPOZZI:  Unless the Court has other questions.

3              THE COURT:  No.  I've asked all mine.  Can the

4    witness be excused?

5              MR. GAPPA:  Yes.  Please, Your Honor.

6              THE COURT:  Thank you, sir.  Sorry for the

7    inconvenience of bringing you back.

8              THE WITNESS:  That's okay.

9              MR. CAPOZZI:  We just need information how we can get

10   ahold of him later.

11             THE COURT:  Well, that's up to you.  You've got an

12   investigator.

13             MR. GAPPA:  Your Honor, the only other point on this

14   issue is there was reference to -- thank you, Mr. Ruezga.  The

15   only other point is there was reference to his two-page report

16   by the defense.  But we got these two pages, which came from

17   the defense.  So --

18             MR. CAPOZZI:  What's the relevance of that?

19             MR. GAPPA:  Well, that was all I wanted to say.

20             THE COURT:  All right.  That's fine.  Anything else

21   that the defense wants to add to their motion to strike the

22   testimony?

23             MR. CAPOZZI:  Judge, I think this was a complete

24   violation of his rights, due process rights.  To bring someone

25   like that in at the last moment for rebuttal to try to stick

1    the knife in at the end of a trial I think is just going too

2    far.  And the government has done that in this instance.  I

3    ask for a mistrial.

4              THE COURT:  Anything else from the prosecution?

5              MR. GAPPA:  No, Your Honor.  We believe that it was

6    proper testimony.  There's no constitutional violation.  And I

7    think the Court asked the relevant questions.  The record

8    would support that finding.

9              MR. CAPOZZI:  If I can respond?

10             THE COURT:  You may.

11             MR. CAPOZZI:  15 minute conversation.  There's some

12   questions and answers going on.  He's there with Detective

13   Moore, Detective Hively and the FBI.  And in his report he

14   said there's an arrest warrant for him.  And he says he was

15   arrested in his report.  Clear violation.

16             THE COURT:  The motion to strike will be denied.  It

17   is unclear to me whether this qualified as an in-custody

18   interrogation.  The handcuffing alone, it's my recollection

19   from prior research, does not necessarily establish an arrest.

20   It may be or it may not be that Mr. Henry was in custody at

21   the time.

22             Two, I find that the -- as described by Mr. Ruezga,

23   the conversation that he had with Mr. Henry was not an

24   interrogation.

25             And finally, I conclude, at least based upon what I

have in front of me so far, that Mr. Ruezga was not a law enforcement officer, but was acting solely for purposes of child protective reasons.  According to his unchallenged testimony, he didn't share the answers received nor the report that he wrote with law enforcement, that his inquiry was simply for purposes of attempting to determine whether the children could safely remain in the home.  Which eventually they did, albeit with a grandmother's care and custody.

        For all of those reasons, the motion to strike is denied.  And on the same grounds, the motion for mistrial is denied.  That ruling is without prejudice if the defense can provide me with any legal authority that they believe supports either a motion to strike or a motion for mistrial before we reconvene or when we reconvene by tomorrow morning, I will certainly read it and consider it.

        As with many issues that come up in the middle of a trial, this one is requiring me to rule quickly and without much consultation -- but I've done -- of legal resources. I've done the best I can.  I know in my own mind how I framed the issue.  I think my questions to the witness were pointed at those areas.

        I think, based upon what I have in front of me, there's no basis to grant either motion so they're denied. But they are denied without prejudice.

        Now, in light of that ruling, do you wish to present

 1  a surrebuttal case?  You had indicated at one point that you

 2  wanted to recall your client.

 3         MR. CAPOZZI:  It would be for something outside the

 4  presence, Your Honor.

 5         THE COURT:  In support of your motion to strike?

 6         MR. CAPOZZI:  Yeah.

 7         THE COURT:  All right.

 8         MR. CAPOZZI:  I'd like to call him as a witness.  We

 9  can do it from here, if it's okay.

10         THE COURT:  Do you mind if he remains at counsel

11  table?

12         MR. GAPPA:  No, Your Honor.

13         THE COURT:  It would be quicker.

14                     **ADAM ALAN HENRY**,

15  called as a surrebuttal witness on behalf of the Defendant,

16  having been previously sworn, testified as follows:

17         THE COURT:  Mr. Henry, you're being recalled as a

18  witness outside the presence of the jury.  Please remember

19  that you are still under oath.  You may question the witness.

20         MR. CAPOZZI:  Thank you, judge.

21                     DIRECT EXAMINATION

22  BY MR. CAPOZZI:

23  Q.  Mr. Henry, do you remember the date, was it November 13th,

24  2013?

25  A.  I'm not sure I'll ever forget.  Yes.

1  Q.  And you're at home.  And did some law enforcement people

2  arrive at your house?

3  A.  Yes.  I was actually asleep.  And I heard the knocking at

4  the door.  And when I opened the door, there was a bunch of

5  men with guns.

6  Q.  Speak into the microphone.

7  A.  When I opened the door, there were a bunch of men with

8  guns pointing at me, yes.

9  Q.  At the time did you know Detective Hively?

10 A.  Yes, we talked when he interviewed me during the state

11 one.

12 Q.  Was he there?

13 A.  Yes.

14 Q.  Was Detective Moore there?

15 A.  Yes.

16 Q.  FBI Agent Lucas?

17 A.  Yes.

18 Q.  Child Protective Services Ruezga, I think it was?

19 A.  He followed in behind the guns, but yes.  He was there.

20 Q.  And the guns were drawn?

21 A.  Yes.  I opened it to pistols and shotgun, yes.

22 Q.  What happened when they entered?

23 A.  Pretty much the first thing they did was they -- one of

24 them handcuffed me.  The rest of them spread through the

25 house.  Gathered up all the children and my mother-in-law and

1    my wife.  And while they were gathering them, they sat down.

2    As soon as they made sure they had everybody, the FBI

3    agent --

4    Q.  Hold on.  Let me ask you a question.  You're handcuffed?

5    A.  Yes, sir.

6    Q.  Were you put in a chair?

7    A.  Yes.  I was sat down, yes.

8    Q.  Did anybody tell you you were under arrest?

9    A.  Yes.

10   Q.  Do you remember who?

11   A.  It was FBI Agent Mark Lucas.

12   Q.  Lucas.  Okay.  And he said "you're under arrest."  And

13   you're handcuffed?

14   A.  Yes.

15   Q.  Then what did he do next?

16   A.  He did the whole Miranda thing.  Asked me to sign it and

17   then I invoked my right to attorney.

18   Q.  You said you wanted a lawyer?

19   A.  Yes.

20   Q.  Where was Mr. Ruezga?

21   A.  He was standing around while they were securing the

22   residence.

23   Q.  Was he in the same room that you were with Mr. Lucas?

24   A.  Yes.  We were in the great room because I had just opened

25   the door and he didn't go through the residence until they

1    secured it.  So he was in that room.

2    Q.   Then did Mr. -- Detective Hively, Detective Moore or FBI

3    Agent Lucas ask you any more questions?

4    A.   As soon as I -- as soon as they secured the residence,

5    they asked -- and I did that.  And I -- and then they stopped

6    talking to me.

7    Q.   But they said you were under arrest?

8    A.   Yes.

9    Q.   And then did Ruezga come up to you and talk to you?

10   A.   Yes, sir.

11   Q.   What did he say to you?

12   A.   He asked me if -- about what was going on, what had found

13   find.  He didn't tell me any more than the agents did what was

14   going on.  I had no idea what charges were.  I just assumed it

15   was still related to the original stuff, just being upgraded

16   as I'd been told during my interview might happen to federal.

17   I had no idea about the recordings or anything at that point.

18   Q.   Did he mention something about child pornography?

19   A.   Yes.  He was asking about that, where it might have been

20   located, who might have had access to it.  If it was on a

21   computer that the kids might have seen something on.  Things

22   of that nature.

23   Q.   And your response was?

24   A.   My response was as far as I knew everything was on the

25   Netgear that the police had seized during the first one

1    because that's the only place that I copied files from the

2    work computer to.  And so it was all concentrated in the

3    bedroom.

4    Q.  You made a statement about your wife?

5    A.  Yes.  At the time I had no idea about her involvement, so

6    I told the -- I didn't even know about the recordings or

7    anything.  So I just -- as far as I knew, she had no knowledge

8    or involvement at the time.  So it's --

9    Q.  Where was your wife when you were being questioned?

10   A.  She was in the next room in the kitchen being interviewed

11   by at least Detective Moore.

12   Q.  Do you know whether or not she was handcuffed?

13   A.  From the reports I read, she was not.

14   Q.  Did you believe you could have got up and left?

15   A.  No.

16   Q.  Were you told that you were being restrained and you

17   couldn't leave?

18   A.  Yes.  There was -- like I said, I was handcuffed, placed

19   in a chair, told not to move and there was an agent not quite

20   looming over me, but he was making sure I wasn't going

21   anywhere.

22   Q.  And when they came into the house, they had guns drawn?

23   A.  Yes.

24   Q.  And did they say you were under arrest?

25   A.  Yes.  It took them a couple of seconds after they came in,

1  looked around, but --

2       THE COURT:  Based upon the testimony I've heard so

3  far, unless it's challenged, I'm going to modify my ruling to

4  find that the defendant was in custody at the time of the

5  statement.

6       MR. CAPOZZI:  No further questions.

7       THE COURT:  Any cross-examination on these issues?

8       MR. GAPPA:  No, Your Honor.

9       THE COURT:  All right.  And you wish to --

10      MR. CAPOZZI:  I renew my motion.

11      THE COURT:  Okay.  The motion is still denied.  I

12  will modify the ruling in that I am now finding, based upon

13  what's in front of me now, without prejudice to something

14  different or more being presented by either side, that the

15  defendant was in custody at the time.

16      And I am basing my denial of the motion to strike and

17  the denial of the motion for mistrial on the grounds that the

18  Child Protective Services Officer was not a law enforcement

19  officer, was not acting in concert with law enforcement

20  officers in connection with his conversation and that his

21  conversation and inquiries posed to the defendant with respect

22  to child welfare did not constitute an interrogation.

23      But I am modifying the ruling and concluding that he

24  was, in fact -- I said before it wasn't clear to me.  I'm now

25  changing that, I'm ruling he was in custody at the time this

1  exchange took place.  I'm basing my ruling on the fact that

2  the CPS officer was not a law enforcement officer, was not

3  acting as a law enforcement officer and did not engage in an

4  interrogation of the defendant.  Otherwise same ruling.

5  Always without prejudice.  If anybody's got any authority,

6  they can certainly bring it to my attention and I'll

7  reconsider.

8            MR. GAPPA:  Thank you, Your Honor.

9            THE COURT:  Anything else on this issue?

10           MR. GAPPA:  No, Your Honor.

11           THE COURT:  Is the defense planning on calling any

12  surrebuttal?

13           MR. CAPOZZI:  No.

14           THE COURT:  Let's get that on the record.  I take

15  it -- well, once you -- prosecution has already rested --

16           MR. GAPPA:  Correct.

17           THE COURT:  -- following their rebuttal case.  After

18  you decline to put on any surrebuttal witnesses, you'll rest

19  your case.

20           MR. CAPOZZI:  Right.  And again renew the 29 motions.

21           THE COURT:  You're renewing your Rule 29 motions and

22  I'm denying them for the same reasons as I denied them when

23  they were initially made.  Just so the record is clear.  You

24  have renewed them.  And I am once again denying them.

25           All right?  Let's bring the jury back in so that we

1    can send them home.

2         (Proceedings adjourned at 4:38 p.m.)

3                              ***

1    Thursday, November 16, 2017                    Fresno, California

2    9:33 a.m.

3            THE COURT:  Let the record reflect that we are back

4    in session outside the presence of the jury.  We held an off

5    the record jury instruction conference last night.  And did

6    everybody get the finalized packet by email last night?

7            MR. CAPOZZI:  Yes, Your Honor.

8            MR. GAPPA:  Yes, Your Honor.

9            THE COURT:  And I indicated that I would allow you to

10   put any objections on the record this morning.  But before we

11   do so, the defense filed this morning a request for sealing

12   and two documents submitted requesting that they be sealed.

13           I quickly reviewed the documents that were submitted.

14   I've not yet signed the order authorizing them to be filed

15   under seal.  What does that filing relate to, Mr. Capozzi.

16           MR. CAPOZZI:  I did it under seal because it relates

17   to A.T. and the CPS investigation.  But if that's not a

18   concern to the Court, then you don't need to do it under seal.

19           THE COURT:  My quick review indicates that -- I

20   didn't see that these related to A.T.

21           MR. CAPOZZI:  Well, it relates to -- I'm sorry.  The

22   children, Mr. Henry's children.

23           THE COURT:  Right.  I mean, there's information -- I

24   mean, the names and other things in here that perhaps should

25   be redacted.  Normally I --

1          MR. CAPOZZI:  I'm okay with that.

2          THE COURT:  -- I would be saying, look, the

3   information set forth in these reports is not completely

4   subject to sealing, although the filing of a redacted version

5   certainly would be appropriate.  We're here in the middle of

6   trial.  We've got a jury waiting.  So I don't want to delay

7   things.  Does the government have any objection to these two

8   documents being filed under seal?

9          MR. GAPPA:  No, Your Honor.

10         THE COURT:  All right.  Well, in the -- for the sake

11  of expediency, I'll sign the order allowing them to be filed

12  under seal.  Mostly because I'm -- I just want the record to

13  be clear as to what was before the Court and submitted.

14         But what is the reason for submitting these

15  documents?

16         MR. CAPOZZI:  To bring further evidence out from what

17  happened yesterday.  There's a top report, but if you flip

18  over to the second report of the -- it goes to the November

19  13, 2013, it's page one of eight.  It's a delivered service

20  log from Mr. Ruezga.  It says Henry defense Bates number 6

21  down at the bottom, judge.

22         THE COURT:  All right.  I think I'm looking at the

23  document.

24         MR. CAPOZZI:  First paragraph.  November 13th at 6:30

25  a.m.  This -- Mr. Ruezga meets with the Ceres Police

1  Department Detective Art Hively, Britton Moore, FBI Mark Lucas

2  and his team for briefing of the search warrant.  It talks

3  about where the meeting took place.  They went over what they

4  were going to do.  He goes into the house.  I think it's

5  on -- if we flip over to page -- well, anyway, it's a meeting

6  prior to going in.

7          He's meeting with law enforcement.  Going in as part

8  of law enforcement.  The evidence was law enforcement was

9  there with their guns drawn when they go into the house.

10 Defendant's advised of his rights, says "I want an attorney."

11 Mr. Ruezga does his questioning and that comes into evidence.

12         Two fold.  One, it's a violation of the Miranda and

13 should not have come in.  And secondly, he's with Child

14 Protective Services.  And bringing in someone from Child

15 Protective Services during this trial here I think is unduly

16 prejudicial and not probative of anything in this case.  I

17 think it violated defense constitutional rights and I want to

18 renew my motion for a mistrial.

19         THE COURT:  Anything the government wishes to add?

20         MR. GAPPA:  Your Honor, we don't think this changes

21 the facts nor the Court's analysis.  One or both of these were

22 referenced when Mr. Ruezga was cross-examined.  And we don't

23 read anything in either of these documents that's inconsistent

24 with his description.  And we believe the Court's analysis was

25 correct.

1          And even assuming, as the Court found, that the

2    defendant was in custody, he was not subject to a custodial

3    interrogation by law enforcement.   That CPS worker is not law

4    enforcement.   He was simply there conducting an investigation

5    for his agency, not as a law enforcement officer.   As a child

6    protective service worker.   And those statements were not a

7    Miranda violation.

8          THE COURT:   Anything further, Mr. Capozzi?

9          MR. CAPOZZI:   No, judge.

10         THE COURT:   As I indicated yesterday in ruling on the

11   motion in the first instance, I believe that the evidence

12   before the Court, though perhaps not fully developed, is that

13   Mr. Henry was in custody.   There was a warrant for his arrest.

14   The FBI agent who participated in the November search executed

15   that warrant, handcuffed the defendant, provided him with

16   Miranda advisement.   He invoked his right to counsel.   And it

17   was thereafter that the CPS officer, who had accompanied law

18   enforcement to the location where the search was to be

19   executed, engaged him -- engaged the defendant in conversation

20   and did pose questions to the defendant.

21         The parties have not provided the Court with any

22   legal authority.   Mr. Capozzi now provides some further

23   evidence indicating that the CPS officer met with law

24   enforcement in a parking lot before accompanying them to the

25   residence where the search warrant was to be executed.   But

1   the fact that he was present during that briefing, I don't

2   think, indicates anything more about the extent to which he

3   was working in connection with law enforcement.

4          He testified yesterday that he did not share what he

5   learned during the interview -- or during the questioning of

6   the defendant with law enforcement officers who were present.

7   And that he also did not provide those law enforcement

8   officers with a copy of his report that reflected the

9   defendant's responses.  And that the officers were off

10  executing the search warrant when he engaged the defendant in

11  the conversation.

12         It seems to me that the CPS officer, who no longer

13  works for CPS and, from my observation, wasn't

14  particularly -- no longer works for CPS.  I think he said he

15  was in private industry now.  My perception was that he would

16  have preferred to be elsewhere rather than testifying here

17  yesterday.

18         But he indicated he's not a law enforcement officer.

19  He wasn't working in concert with the officers.  He didn't

20  share the information that he obtained with them and that his

21  conversation was focused on the welfare of the children and

22  what was going to happen with them as a result of the

23  execution of the search and the arrest.

24         For Miranda itself -- in Miranda itself, the Supreme

25  Court defined custodial interrogation as, quote, "questioning

1    initiated by law enforcement officers after a person has been

2    taken into custody or otherwise deprived of his freedom of

3    action in any significant way."

4         Here, the CPS officer was not a law enforcement

5    officer nor was the -- nor were the questions that he asked

6    motivated by a law enforcement purpose.  They were motivated

7    by a different purpose, the protection of the children who he

8    knew to be located within the home.

9         I found only one case.  Granted, I was working on

10   other cases after we ended trial.  Thought perhaps there would

11   be some authority provided.  I did what minimal research I was

12   able to do late last night.  Found only one case.  It appears

13   at 38 ALR 6th 97 published in 2008 originally.  The case

14   referred to is *People versus Greene*.  It's a New York State

15   case that appears at 189 Miscellaneous 2d 276, 730 NYS 2d 697,

16   County Court, 2001.  Where the Court held that a social case

17   worker conducting a face-to-face interview with a defendant

18   who was charged with numerous counts of rape, sexual abuse and

19   incest was not an agent of law enforcement and thus

20   inculpatory statements voluntarily made by the defendant to

21   the social worker were admissible in the defendant's

22   prosecution even though the defendant was represented by

23   counsel and was being held in a county jail interview room;

24   and even though the social worker interviewed the defendant

25   independent of law enforcement in response to a report of

1    sexual abuse made to Child Protective Services; and even

2    though the social workers were not required to give Miranda

3    warnings to interviewees.

4           So in that case, the inculpatory statements made by

5    the defendant to the social worker were found to be

6    admissible.  It's the closest I could find to anything

7    involved in this situation.

8           I will say, for what it's worth, I found the

9    testimony that was submitted in rebuttal to be, for the most

10   part, unnecessary, cumulative.  I thought that it was

11   cumulative to the extent that -- to the extent the prosecution

12   was rebutting the defendant's claim or suggestion that

13   his -- that Angele, his wife at the time, was responsible for

14   anything unlawful and that this was an attempt to rebut that

15   assertion or suggestion by the defense.

16          Detective Hively had already testified that, at least

17   at the time of the exercise of the September State Court

18   search warrant, that the defendant had made statements

19   exonerating his wife and indicating that she had no access to

20   the areas and the material in question.  So to bring in the

21   CPS officer in rebuttal to testify that he made similar

22   statements in November at the time of the federal search

23   warrant seemed to me to not add a lot to the mix.

24          And does raise this issue, which I think is

25   not -- not a frivolous one.  It's -- now, but we are where we

are.  I have to rule on it.  For the reasons I've stated on the record, I'm denying the motion for -- to strike the testimony.  I'm denying the motion for a mistrial.

With respect to the new aspect of the motion, which is that the mere fact that the officer, Mr. Ruezga, is a Child Protective Services Officer, that calling him and identifying him as Child Protective Services -- as a Child Protective Services Officer who is there for the welfare of the children, that that somehow is unduly prejudicial to the defense.  I deny the motion to strike to the extent that it's based upon that new argument.

The notion that -- there was no emphasis during his testimony regarding any danger or harm posed to the children. And I think one would assume, under these circumstances with children in the house, that Child Protective Services would at least, as a matter of course, be involved to check in to make sure that the children's well being -- that they were cared for in light of the fact that they're -- that the father of the house was being arrested.  And I believe the mother of the house had just been released on bond, if I recall, from charges in State court.

In any event, under these circumstances, I don't think it would be unusual at all to assume that Child Protective Services would at least check in to the situation. And, therefore, calling a Child Protective Services Officer as

1  a witness in rebuttal in and of itself I don't think

2  prejudices the defense in any way.  So that aspect of the

3  motion is denied as well.

4      (Further proceedings were held, not transcribed herein.)

5      (The proceedings were concluded at 9:50 a.m.)

6

7          I, KAREN HOOVEN, Official Reporter, do hereby certify

8  that the foregoing transcript as true and correct.

9

10  DATED:  30th of November, 2017     /s/  Karen Hooven____
                                       KAREN HOOVEN, RMR-CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25