UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-CR-409-DAD |
| | ) | |
| vs. | ) | GOVERNMENT CLOSING ARGUMENTS |
| | ) | |
| ADAM ALAN HENRY, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

Fresno, California                    Thursday, November 16, 2017

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          United States Attorney's Office
                            BY: **DAVID L. GAPPA**
                            and **ROSS PEARSON**
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721


For the Defendant:          Law Offices of Anthony P. Capozzi
                            BY: **ANTHONY P. CAPOZZI**
                            1233 West Shaw Avenue
                            Suite 102
                            Fresno, California 93711

3

1    Thursday, November 16, 2017                    Fresno, California

2    9:55 a.m.

3          THE COURT:  Let the record reflect that we are back

4    in the presence of the jury.  Good morning, ladies and

5    gentlemen.

6          THE JURY:  Good morning.

7          THE COURT:  And would the government like to give its

8    closing argument at this time?

9          MR. PEARSON:  Yes, Your Honor.

10         THE COURT:  You may proceed, Mr. Pearson.

11         MR. PEARSON:  Thank you.

12         Good morning.  This is the defendant's collection of

13   child pornography.  It dates from 2007 all the way to 2013.

14   And in the 2013 volume, on a password protected side, there

15   are pictures and there are videos of A.T.  Pictures and videos

16   that the defendant and his wife took from a hidden camera that

17   they set up together in the bathroom.  The defendant committed

18   these two crimes.  And that's why we're asking you to find him

19   guilty on both counts.

20         I'm going to walk through each crime and we're going

21   to talk about the elements.  And after I'm done here, the

22   judge is going to give you instructions on the elements of

23   each count.  What we have to prove beyond a reasonable doubt.

24         So receipt of child pornography has five elements.

25   I'm not going to read those all to you.  You can read them

4

1    later and you'll get instructions.  But we have stipulated to

2    three of those elements.  So we're really just talking about

3    two.  There is the defendant knowingly received a visual

4    depiction.  That the defendant knew that the visual depiction

5    was of a minor engaged in sexually explicit conduct.

6            In this case, there's a lot of child pornography.

7    And it spreads from 2007 to 2013.  You heard the testimony.

8    Exhibit 16, the defendant's old computer.  There's child

9    pornography on there from 2007, 2008, 2009, 2010.  It starts

10   three years before the defendant knew Angele, before Angele

11   moved to the United States.  There's the hard drive, the loose

12   hard drive that was found in the defendant's living room.  Has

13   pornography on it from 2010.  Child pornography.  And then, of

14   course, the two items that you heard a lot about, the

15   Lock-N-Stitch hard drive and the NAS in the defendant's home.

16           So let's talk about Lock-N-Stitch for a little bit.

17   The defendant was the IT manager there.  He was a good IT

18   manager.  You heard Gary Reed tell you he was sophisticated,

19   he knew networks, he knew computers, he knew how to set things

20   up.  You heard him explain in his own words.  This is a

21   sophisticated IT manager.

22           And the morning of the search on a computer that only

23   he had access, on a computer that was locked, that he had the

24   password to, there was child pornography moved into a folder

25   called "MOV."  The very morning of the search.

1      Now, his job was network security.  His job was to

2  make sure that no one was downloading pornography of any kind,

3  not just child pornography.  But for a number of months, may,

4  June, July, August, September, there was child pornography

5  being downloaded on that computer.  And then the morning of

6  the search, that child pornography, with the titles that you

7  can see here, was moved into a folder called MOV, move.  That

8  child pornography was headed to the NAS.  And you heard about

9  the NAS.  You heard that there was a password protected

10 portion and an unprotected side.

11     Yesterday the defendant was asked when you spoke with

12 Detective Hively, "Was there anything that you told him that

13 was not true?"  And he said, "No, not from what I remember."

14 So let's hear what he said about that password protected side

15 of the NAS.

16     (Playing video.)

17     MR. PEARSON:  She accesses the side without the

18 password.  He starts to say she has the password and then

19 corrects himself.  She's going to go through the open side and

20 categorize it.  He makes another statement to Detective Hively

21 that day about who has access to the password protected side.

22     (Playing video.)

23     MR. PEARSON:  Angele doesn't have access to the

24 password protected side.  That's what the defendant told

25 Detective Hively that day.  "She accesses the one without the

1    password." And he explains why, it's because he's worried that

2    she might stumble across something bad.  What should that tell

3    you?  That he knows that there's something bad on that side.

4    He knows that he's been downloading files and he's been

5    placing them on to that computer.

6           And that's true.  And we know it's true because he

7    can see the Aurrora file.  And you can see the files that he

8    created.  You see Aza and Aza 1 and Aza 2.  And there is a lot

9    of adult pornography in there.  There's also child pornography

10   in there.

11          And remember Detective Moore's testimony when we

12   started this trial.  It's that to get the child pornography

13   into that point you need to take a number of steps.  The

14   defendant would have to go on to Shareaza, have to enter the

15   search terms, have to click a file with a title to download

16   that file.  Once that file downloaded, he'd see the title and

17   he would move it to the NAS, to this password protected side,

18   the side that Angele didn't access.

19          And so there's a lot of adult pornography and a lot

20   of child pornography.  But this isn't just a big dump of

21   everything he downloaded from the NAS because he sorted it.

22   We've been through this, but it's important.  "Sorted."

23   "Bad."  "No."  "Kid."  This folder should tell you a lot.

24   There is a folder on the password protected side of the NAS

25   called "kid" and it has child pornography in it.  That's not

1   an accident.  That's not mistaken downloads.

2           Now, you heard that -- you heard the defendant say

3   sometimes the names are wrong, sometimes they don't really

4   indicate what's in the video.  These names weren't wrong.  You

5   saw the names.  Lolita.  Preteen.  6 yo.  PTHC.  And even

6   worse.

7           These videos were clearly child pornography.  And

8   there were 27 of them in a folder made for child pornography.

9   That wasn't an accident because the defendant made the folder.

10  He sorted it.  This was his collection of child pornography.

11  It was made meticulously, it was made by an IT manager.  And

12  he did the same thing with the child pornography from 2007 and

13  2010.  If you look at the file paths, that child pornography

14  is sorted also.

15          So what about the search terms?  Who was sitting at

16  that computer?  Let's look again at what the defendant told

17  Detective Hively the day he was arrested.

18      (Playing video.)

19          MR. PEARSON:  You notice that?  He doesn't say,

20  "Angele was sitting at my computer typing in these search

21  terms."  He said, "I created a bunch of searches and just let

22  it run."  That was four years ago.  And what were the search

23  terms that he put in?  These right here.  All right?

24          And if you notice, this was a small detail, but he

25  also says he was trying to find things to spice up their

1    relationship.  He was looking for things Angele was into.

2    What was Angele into?  Costumes.  We have searches for

3    "costume porn."  And "costume."  She was into medieval things.

4    We have searches for "medieval" and "renaissance."  And in

5    between those searches, he searched for "PTHC," he searched

6    for "preteen" and he searched "underage."  And you saw some of

7    the titles that those searches would generate.  That's

8    knowingly downloading child pornography.

9         This isn't Angele sitting at the computer searching.

10   That's not what he told Detective Hively four years ago.  This

11   is the defendant searching for terms to spice up their life.

12   Searching for things that she's interested.  Searching for

13   child pornography.

14        Now, what about this password issue?  Who has this

15   password?  The defendant does.  He gave it to Detective

16   Hively.  He gave it to Detective Moore.  He's protective of

17   his passwords.  Gary Reed got up here and testified that no

18   one else at Lock-N-Stitch had the defendant's password, not

19   even the owner of Lock-N-Stitch had the password for his work

20   computer.

21        Defendant said he was very protective of his media,

22   that's why he needed to create the password protected side.

23   He said that he set up that password protected side so that he

24   could store items on there.  And remember Detective Moore

25   testified about how that side was set up.  There were two user

accounts on the NAS.  There was an account called "Adam."  The
Adam account had access to the entire NAS, it was an
administrator.  And then there was an account called "Angele."
The Angele account didn't have access to the full NAS.  It had
limited access.  It didn't have access to the Aurrora share
where the child pornography was found.

It doesn't make sense.  And that's why this was Adam
and not Angele who committed this offense.  Adam was the IT
person at Lock-N-Stitch.  Adam was the one who set up the
network.  Adam was the one who made the accounts to give the
Adam account full access, the Angele account partial access.
Adam was the one who typed in the search terms.  Adam was the
one who said he had access to the protected side.  Adam was
the one who said Angele didn't.  The defendant was the one who
downloaded this child pornography.  That's why he is guilty of
receipt of child pornography.

So what about the conspiracy?  The judge will
instruct you that a conspiracy has two elements.  The
defendant must agree with another person to commit sexual
exploitation of a minor.  And the defendant must become a
member of that conspiracy knowing of at least one of its
objects and intending to accomplish it.

So there's an agreement to commit a crime and there
must be a criminal purpose for that agreement.  And as I told
you in my opening statement, it takes two people to have a

1   conspiracy.  Here it was Adam and it was Angele.  We're not

2   trying to minimize what Angele did.  We're not hiding from it.

3   We're saying that she was an equal participant in this

4   conspiracy.

5          She was the one who was texting A.T.  She was the one

6   who was chatting with her.  She was the one who was trying to

7   make A.T. feel comfortable changing in the bathroom, changing

8   in the bedroom, showering.  It wouldn't have made sense for

9   Adam to do that.  He didn't have that personal relationship.

10   He had a different role and he still helped Angele set up the

11   camera, create these videos, create these screenshots.

12          Let's look at the scope of this agreement.  And

13   there's this significant date of January 2nd, 2013.  Where the

14   defendant says Angele was home alone with A.T.  And Angele was

15   the one who set up the camera in the bathroom there -- we're

16   not denying -- set up the camera in the bedroom there.  We're

17   not denying that.  But where did that video end up?  On the

18   password protected side of the NAS.  And screen captures from

19   that video on the password protected side of the NAS.

20          The agreement began well before this too.  It

21   actually starts back in February of 2012 when Adam and Angele

22   together set up the camera in the bathroom.  And you can see

23   the videos of them.  Adam gets in the bathroom.  Counts.

24   Tests the picture.  That same day, Angele gets in the

25   bathroom, adjusts the camera.

1        For an agreement, they need to have had a meeting of

2    the minds.  You don't need to see them shake hands, send a

3    text message to each other saying "Let's exploit A.T."  You

4    can infer it here.  Here you can infer it from them setting up

5    the camera and creating it to capture videos and images of

6    A.T.

7        The next point in this is April of 2012.  When the

8    defendant personally upgrades the camera in the bathroom.  You

9    can see the picture quality improving.  They're refining their

10   technique.  They're getting it better.

11       And then about a month later, A.T. uses the bathroom

12   and she changes clothes and they capture that and that video

13   ends up on the password protected side of the NAS.  But

14   there's a problem with it.  There's this curtain in the way.

15   You can see A.T. right here.  But you can't really see her

16   because there's a curtain blocking the view.

17       So what do Adam and Angele do?  They take the curtain

18   down.  And note the date on this.  June 12th, 2012.  You can

19   see them together removing this curtain.  And the defendant

20   told you yesterday it was cleaning day.  This curtain gets

21   dirty, they just had to take it down every once in a while and

22   clean it.

23       But the date is significant because that very same

24   day A.T. comes over and three times they catch her changing

25   clothes, changing clothes again and then using the bathroom.

1    That's why that date is so crucial.  Because two weeks before

2    they take a video and they can't see A.T.  And then two weeks

3    later, the very day that A.T. comes over, they happen to take

4    the curtain down to clean it.  That's not cleaning day.

5    That's not a coincidence.  That's them conspiring to get these

6    screenshots, get these videos of A.T.  This is them working

7    together for that specific purpose.

8           They did other problem solving in this case too.  A

9    few weeks later, A.T. uses the bathroom, but there's a bright

10   light.  You can't see the video of her.  So eventually, Adam

11   and Angele install a window shade.  And then the very next day

12   they test that window shade.  This is them working, refining

13   their technique.  They see a problem.  A light shining in the

14   bathroom that prevents them from seeing A.T.  So they work

15   together, put up a window shade to block that light.  And then

16   they test it.

17          And then April 8th, the day that -- the day after

18   they put up that shade, A.T. comes over again.  And they catch

19   her three times changing clothes.  And the third time she

20   showers.  And that video of her showering ends up on a

21   password protected side of the NAS.  It ends up in a folder

22   called [A.T.] beneath a folder labeled "exes" including the

23   defendant's ex-fiancee.  And underneath a bunch of folders

24   labeled "not okay."

25          And that video is the clearest video of A.T. naked.

1   And that screenshot ends up in that same folder.  And what

2   does the defendant do that day?  He rummages through the

3   underwear and holds them up to the camera.  That's him

4   participating.  That's him taking part in this conspiracy.

5   That's him agreeing to sexually exploit A.T.

6         And so it's not just this one date.  That date is

7   important.  But they had tried to capture videos of A.T.

8   before that.  And they continued to try to capture videos of

9   A.T. after that.  This is a conspiracy developing, them honing

10  their technique, them working together.  Even if you don't

11  hear them say "Let's exploit A.T.," you can see the agreement

12  forming.

13        And, in fact, the agreement was not just because

14  Angele was there.  Because you heard the defendant had

15  surreptitiously recorded people even before Angele showed up.

16  Four years before this conspiracy happened, the defendant had

17  a hidden camera in his bathroom, recorded three different

18  women.

19        The purpose of this conspiracy was to exploit A.T.

20  She was the object of their attention.  She was -- this wasn't

21  just Angele acting alone.  Angele joking and texting the

22  victim.  That was part of the conspiracy.  That was developing

23  her, grooming her to be comfortable.

24        And you can see that -- oops.  Sorry.  You can see

25  that in the text messages that they exchanged.  Angele saying

1    there was a 16 year old that fit that category they'd been

2    talking about.  The defendant going to a baseball game and

3    sending pictures about the T and A that he saw.  Those girls

4    that Detective Hively called "age difficult."

5          And you can especially see that in where these videos

6    and where these pictures ended up.  This isn't just voyeurism.

7    There was only a folder created for [A.T.].  From the guests

8    that the defendant recorded, only [A.T.] got her own folder.

9    Only [A.T.] got her own screen captures.  So it wasn't just a

10   running video trying to get anyone that came through.  This

11   was a conspiracy to get videos and pictures of A.T.

12   specifically and it worked.

13          That's why those pictures didn't just end up on

14   Angele's share of the NAS, just on the media side.  They ended

15   up on the Aurrora side because the defendant was

16   participating.  He agreed to commit this crime.  He agreed to

17   try to get pictures, screenshots of A.T. to try to exploit

18   her.  And we believe that they succeeded.  We think that those

19   screenshots, that those videos and pictures, that they amount

20   to sexual exploitation.  But even if they don't, it's the

21   agreement that's the crime.  It's them meeting together

22   thinking, "How can we record A.T.?  How can we create these

23   videos?  How can we get these pictures?"  And that's why the

24   defendant is guilty of conspiracy to sexually exploit A.T.

25          Now, you're about to hear a different story here.

1    You're going to hear that this was all Angele.  That she was

2    the one sitting at the computer typing in the passwords and

3    she dumped her child pornography on to the computer that he'd

4    had for a few years before she showed up.  And that the fact

5    that he ended up on camera was just some combination of

6    accident or bad luck or something else.

7            But go back to the statement the defendant made to

8    Detective Hively four years ago.  Four years before he had

9    time to see the evidence, to think about the case.  He

10   told -- he never said this was Angele.  He didn't say Angele

11   was the one at my computer typing in the password.  He didn't

12   say that Angele was the one searching for child pornography.

13   He didn't say Angele had access to the Aurrora share.  He said

14   that she had access to the unprotected side.

15           So what do we know here?  What's undisputed?  There

16   is child pornography downloaded at Lock-N-Stitch.  It was

17   downloaded on a computer in the defendant's office.  A

18   computer that's locked by password.  That child pornography

19   ended up on the NAS in the defendant's house.  Ended up on a

20   side of the NAS that's locked by a password, a password that

21   the defendant gave to Detective Hively and Detective Moore.

22   And on that same password protected side, there were videos of

23   A.T. and screen grabs taken from a camera that the defendant

24   and his wife set up together.

25           That's why we're asking you to find the defendant

1    guilty on both counts.  Thank you.

2         THE COURT:  Ladies and gentlemen, we're going to take

3    a brief five-minute recess to allow the attorneys to get set

4    up for the next closing argument.  Please heed the Court's

5    previous admonition.  We'll be back in five minutes.

6       (Recess.)

7       (Defense closing argument was transcribed under separate

8        cover.)

9       (The following proceedings were held at 11:13 a.m.)

10        THE COURT:  Mr. Gappa, you may present the closing

11   argument.

12        MR. GAPPA:  Thank you, Your Honor.

13        So good morning, ladies and gentlemen.  This is the

14   government's last opportunity to tell you why you should find

15   the defendant guilty of Count One and Count Two.  Before I do

16   that and summarize some of the points that Mr. Pearson has

17   already communicated to you, I want to thank you on behalf of

18   both of us as well as Mr. Mancini, Detective Hively, the other

19   witnesses that the government presented.

20        When you came in here last week, you were told that

21   this case was projected to conclude at the end of this week

22   and that through the course of the evidence coming out, some

23   of it would be very disturbing material.  And indeed some of

24   that was.  We did our best to limit your exposure to that.

25   There were three clips that we edited and then further

1  restricted those to about ten seconds.  But there's also a lot

2  of disturbing content, just on those file titles alone.

3          So we want to thank you for your service.  You play a

4  very important part in this process.  And we're asking you to

5  find the defendant guilty of these two counts.  And I want to

6  let you know that Mr. Capozzi did a great job on his closing.

7  And the defendant is entitled to be well represented.  Mr.

8  Capozzi is the most experienced attorney here.  And he's done

9  his job.  But what is his job?  His job as a defense attorney

10 is to distract and to deflect and to give you alternate facts

11 or argue things that aren't necessarily what actually

12 happened.  And he started by bringing up something irrelevant

13 for this case.

14         This case is not about who should be or who was

15 sitting in that chair.  This case is about Adam Henry, the

16 defendant, and what he did and why he's guilty of these two

17 offenses.  It's about the crimes that he committed using these

18 pieces of evidence.  And we want you to think through his

19 inconsistent arguments, think about when he was interviewed on

20 September 19th, 2013, what had he done that morning?

21         We know there's testimony from witnesses, including

22 the defendant, that he went to work early that morning.  Where

23 did he go?  He went to Lock-N-Stitch.  What did he do?  He

24 logged on to his password protected computer and what did he

25 do?  There's evidence there that he saw the completed folder

1   for Shareaza that had been installed on that computer and used
2   on that computer to download child pornography, had been
3   downloading for months.

4        And even the defendant admits that he starts the
5   process for downloads, he lets it run and then he checks it.
6   And when it's completed, he moves things over.  And what had
7   he done on the morning of September 19th, 2013?  Just that.
8   He checked the incomplete folder.  He checked the complete
9   folder.  He saw two titles that he was interested in.  He put
10  them into a folder that he created called "Aza."  And look at
11  those two titles.  One of those is clearly indicative of child
12  pornography referenced a "12 yo" and the other title
13  references sexual activity and 13 people.

14       So there's no doubt that the defendant saw that
15  material on that day.  And that he moved those over to be
16  transported to his Netgear Ready NAS, Exhibit 9.  That's what
17  he did that morning.  Then he went home.  Little did he know
18  that law enforcement had been detecting his conduct for
19  months.  And you saw that network activity report.  Exhibit 5.
20  You only saw one page.  But remember, there is a lengthy
21  portion of that report that you didn't see.

22       But just take a look at those titles.  And you see
23  those are all titles that, during the period of time the
24  Detective Moore was using his law enforcement version of
25  Shareaza, that those files were being detected shared from or

1   available from that Lock-N-Stitch hard drive.  And you look at

2   those titles and you decide.  Is that child pornography?  Is

3   somebody who has those titles and those files on that device

4   somebody who's interested in only adult pornography?  Or is

5   that somebody who's looking for the titles and the content

6   that's reflected in that exhibit?

7           So he knows what's been going on.  And that's why,

8   when he's brought in to Lock-N-Stitch and he's interviewed,

9   he's nervous.  But he's pretty smart.  We'll concede that.

10  And he's obviously got some college education, he's been

11  trained, he knows how to do networks.  And he's thinking.

12  Uh-ho.  The police are here.  I'm in trouble.  I've got to

13  come up with an explanation for what's been going on.

14          So what does he do?  He says different things.  He

15  says, "I was just looking for adult porn."  Detective Hively

16  asked him, "Well, how did you do that?"  And he says, "I

17  didn't know how to use Shareaza and I didn't know how to

18  search for adult porn on Shareaza.  So I would just put in

19  search terms, general terms like XXX porn."

20          Think about whether that's credible when you hear now

21  his testimony that as far back as when he was in college, he

22  had an interest in pornography.  And it was interesting that

23  he wouldn't concede that he was downloading pornography back

24  in college.  He did admit that he was exchanging it with other

25  people.  And asked how did you get the pornography?  Oh, I got

1   it from other people.  So for some reason he doesn't want to

2   concede that he's downloading adult pornography back in

3   college.  But he admits that he had that interest in that

4   pornography as far back as college.  And he's sharing it with

5   people.

6          And we would argue that his interest in pornography

7   progressed and it got worse.  And his interests evolved and

8   they devolved, because you heard Detective Hively talk about,

9   when asked how much was there on that set of computers?  And

10  there's no doubt there's a lot of adult pornography.  And it's

11  true.  And we're not saying that it's illegal.  Everybody has

12  their own opinion about whether that's appropriate.  And you

13  can make your own judgments.  That's not what we're focused

14  on.  We're focused on the illegal material.

15         And it's important to know -- and review the

16  testimony.  Detective Hively found Shareaza on Exhibit 16, the

17  computer that was first used.  That program had been installed

18  on this computer.  Take a look at this computer, ladies and

19  gentlemen.  This is an eight disk raid.  This is a defendant

20  production where he took all of those hard drives and he put

21  them together and he figured out a way to make that work.  And

22  then he installed Shareaza on it.

23         And what did he do with Shareaza?  He downloaded

24  child pornography.  And how do we know that?  Because we have

25  an exhibit that shows exactly what was on there.  It's 36.2.

1    And we know that there were about 61 child pornography files

2    that were on this computer.  And where were they found?  They

3    were found in folders.  One of them is "new folder."  And one

4    of them is "new folder/no."  Does that sound familiar?  We'll

5    get to the folder structure from item 9 and see how the

6    classification coincided with what he had been doing years

7    earlier on that device.

8            But he had installed Shareaza.  And used Shareaza to

9    download child pornography there.  So there were approximately

10   34 child pornography videos that were then transferred over to

11   the hard drive, which is in evidence as Exhibit 18.  And the

12   evidence from Detective Hively was there were 34 child

13   pornography videos added on September 8th, 2010.  And where

14   were they put here?  In something called "new folder/kid."

15           And then there were 25 child pornography videos added

16   on August 20th, 2010.  Where were those videos put?  "New

17   folder(2)new folder/no."  This was done in 2010.  This

18   computer was last accessed and shut down on August 25th, 2010.

19   That material was downloaded before Angele Henry was living in

20   that house.  This is a computer that the defendant used and

21   created.  And that's where a significant amount of child

22   pornography was found.

23           And one thing that hasn't been covered a lot, but I

24   just want to point out to you is if you look at the items in

25   evidence, you'll see things such as "Product of Thailand,"

1    some of the items were made in other locations.  For instance,

2    this hard drive, Exhibit 1A, which came from the Lock-N-Stitch

3    computer, was made in Thailand.  And the Canon Vixia

4    camcorder is made in Japan.

5            So if you look, almost every single item that was

6    used either to download the child pornography or to create the

7    images of A.T., those items are manufactured outside of the

8    State of California.  Which is important for jurisdictional

9    basis.  So I did want to point that out to you.

10           But go back to Adam Henry explaining to Detective

11   Hively what he had been doing with Shareaza.  What do you use

12   Shareaza for?  I believe that when people were asked at the

13   beginning, whose familiar with Shareaza?  No hands went up.

14   This is a program which is peer-to-peer file sharing.  Is that

15   what people would use to look for adult pornography?  Is that

16   what people use to look for music legally?  No.  If you want

17   music legally, what do you do?  You use iTunes, you go to

18   Amazon.  Whatever your favorite vendor is.  And you pay for or

19   get however you want streaming the music that way.  What did

20   Adam Henry do?  He used Shareaza and he got it in violation of

21   copyright laws.

22           Again, we're not concerned about that.  It may be

23   wrong.  But it's interesting that you use file sharing

24   software to do things illegal.  He said back in college they

25   would circulate adult pornography, things like Playboy

1    centerfolds, et cetera.  And he conceded that a simple Google

2    search could get you adult pornography.  And, in fact, I think

3    he admitted that he had at one point accessed websites.  So

4    you don't get child pornography doing Google searches.  You

5    don't go to websites and download child pornography.  You get

6    that from Shareaza.

7         So he knows that at this point in the interview, that

8    law enforcement knows somebody's been using Shareaza to

9    download child pornography.  So he starts thinking, "How do I

10   explain this?"  So he then says, "Well, I was looking for

11   porn.  XXX porn.  And if I ever saw anything that even was

12   questionable, any kind of child pornography, I'd immediately

13   delete it."  Which is inconsistent now with what he says four

14   years later of never having seen any child pornography.  And

15   then he would say further, I would put it in the recycle bin

16   and delete it.

17        Well, think about where I started this discussion

18   with you just now?  Go back to the morning of September 19th,

19   2013.  We know his statement to Detective Hively at that point

20   is not true because he had put things in the recycle bin as

21   well.  There were six child pornography videos that were in

22   that recycle bin.  And those six are the ones that had been

23   transferred over to the Netgear Ready NAS.  So there are

24   already inconsistencies in what he's telling Detective Hively.

25        So it seemed to be that at the time he's interviewed

1    with Detective Hively, he's just trying to make it look like

2    an accident.  That he's not really interested in getting child

3    pornography.  And that if he ever stumbled across it, he

4    immediately deletes it, has nothing to do with it.

5           Well, if you go through that interview, you listen,

6    and you watch it, you'll see at some point it seems like maybe

7    it's changed.  And he realizes this story that I'm telling is

8    probably not working out.

9           So then Detective Hively says, "All right.  If we go

10   to your home, are we going it find child pornography?"  And he

11   says, "It's possible."  And then Detective Hively says, "Well,

12   if it's possible, where would we find it?"  And Adam Henry

13   says exactly where they would find it.  He says, "You'd go to

14   my house, it's in the hallway closet in a cabinet.  It's in a

15   NAS, a network attached storage device on the secure partition

16   that's password protected."  Exactly where they went and

17   exactly what they found.

18          And how was it that that material was organized?  If

19   we go to the folder structure for Exhibit 9.  You recall there

20   was testimony about the password protected side and the

21   non-password protected side.  And what did Adam Henry tell

22   Detective Hively?  He would take things from work and put them

23   on to the password protected side.  And why did he do that?

24   Because he didn't want Angele or anybody to come across

25   anything that was bad or that would be objectionable.  And so

1   it's consistent in part with what he said because he said, "I

2   would go through it and then I would put things on the

3   unsecured side for her to look at.  And we would look at that

4   together."

5        So take a look at that folder structure.  It's very

6   important.  It shows that he is sorting.  And that child

7   pornography is under a subfolder of "sorted."  "Bad."  You see

8   reference to "animal."  And then you see the "new folder."

9   And then you see those two other folders, "kid" and "no."  And

10  that's where a very significant amount of child pornography

11  was located.

12       So there's overwhelming evidence that there is

13  material that meets all of the elements of a minor engaged in

14  sexually explicit conduct that had traveled through the

15  internet and that the defendant searched for it.  Now he says

16  today, four years later, that it was Angele who came in and

17  sat at his computer and put in those search terms.

18       Well, let's just think about that for a moment.  If

19  we go to those search terms.  Think about how implausible that

20  is.  First of all, go back to his statement to Detective

21  Hively on September 19th, 2013.  What did he say?  He said we

22  were having issues -- and I'm kind of summarizing.  But we

23  were looking to spice up our sex life.  And I thought I would

24  go find material that she was interested in because we would

25  look at this adult pornography together.  So he says, "I

1   searched for things that she was interested in.  And I found

2   some things that were clearly labeled as such."  And he

3   specifically said things such as costume, renaissance, people

4   in these old outfits.  So he's attributed himself to those

5   search terms.

6        He wants you to believe that the person who put in

7   those search terms for "costume," "renaissance," "dancing," et

8   cetera, he thinks that's Angele.  Well, he had said to

9   Detective Hively on September 19th that he did that, that he

10  put in search terms looking for material for her and he found

11  it.

12        So it's another thing of is it inconsistent?  He says

13  one thing.  When it doesn't work he thinks about it some more

14  and shifts his theory.  And think about it, the defense that

15  he's presenting, does this make sense?  Angele Henry

16  apparently at the time, when these search terms were entered,

17  was probably six months pregnant.  And then if you go into the

18  following months before the search, six, seven, eight, nine

19  months pregnant.  And she comes in using the only car to his

20  work place, goes to his password protected computer.

21        And remember, he is already on record as telling

22  Detective Hively that he didn't give her the password to the

23  Netgear Ready NAS at home.  And when Detective Hively says "I

24  need the password for the work computers," he says "I'm not

25  going to give it to you unless my boss tells me."  So

initially he's, I think, telling the truth that he's protective of his passwords.  But he's got a password protected computer.  You need to put in a user name and a password.

So Angele allegedly comes in six to nine months pregnant, puts in these search terms and -- by the way, nobody saw her typing.  Every witness the defense put in, nobody could say they saw her typing.  At best they could say she was in his chair in his office.  But assume that she's there.  You would have to believe that she was typing.  And that she got on to his password protected computer, opened up Shareaza, saw what the search box was, typed in these terms, saw the titles that were available for downloading, clicked on those.  Started the download process.  And then went about her business.  Because the defendant says it sometimes will run in the background for months.  And he said he had no idea any of that was happening.

This is a man who built the network at Lock-N-Stitch.  Who does network security.  Who set up the fireball.  Who knows everything about the way a router can direct things to a specific computer.  And he says he had no idea that was going on?  It's just not believable that she would do that in the first instance.  But once that process is started, that she would weeks, months later, go in, check the Shareaza folder for completed files and then move them over to a place where

1   they could either remotely transfer them as he did at times or

2   put them on a USB drive.  And then transfer them.

3        That's a lot of work.  And she's not the

4   sophisticated person who uses Shareaza, who is using the

5   network that is password protected at work.  So that's a lot

6   of work.  You would think if she were really interested in

7   doing that, she could sit at home while he's at work.  And if

8   you believe him and his presentation yesterday, she had access

9   to the secured side.  So she could just download at will any

10  kind of child pornography and just keep it.  He didn't know

11  about it, she could keep it hidden on the secured side of the

12  NAS.  That's what he wants you to believe.

13       So it's very inconsistent.  I mean, you've got to

14  decide what is your defense?  And it seemed like at the

15  beginning he's saying it was all an accident, it's a mistake,

16  I didn't intend to do it.  And then when he sees years later,

17  "Boy, they sure have a lot of evidence.  Maybe I better come

18  up with a better argument."  Now it's Angele.  But again,

19  we're not here to judge Angele.  She is part of the

20  conspiracy.  And I'll get to that in a few minutes.  But his

21  explanation is very inconsistent.  And so we know he's the one

22  who's responsible for downloading that child pornography.

23       I just want to take a moment to respond to the

24  arguments and the back and forth on the transfer of files from

25  Lock-N-Stitch to the Ready NAS.  Our evidence was, and

1  Detective Hively talked about how, if you look at Exhibit 33,

2  and you look at the file creation dates and the entry modified

3  dates.

4         The end result of that testimony, if you look at

5  those five files, our view is that those show that within

6  moments, within less than two minutes, they were on the

7  Exhibit 1A Lock-N-Stitch hard drive and then they were on the

8  Netgear Ready NAS.  And the only way that could have been

9  accomplished is if they were transferred remotely.  And the

10 defendant had said to Detective Hively he often worked

11 remotely from home.

12        And he says, well, that IP address doesn't go to that

13 computer, but it's also true that those are Lock-N-Stitch IP

14 addresses and all of the traffic goes through those IP

15 addresses to a router and the router directs it to a specific

16 computer.  So, again, that's another deflection and

17 distraction.

18        The point is it's certainly possible and Detective

19 Hively established that those files went from the

20 Lock-N-Stitch computer to the secured partition on the Netgear

21 Ready NAS.  But in addition, the defendant himself said I

22 would take things.  I would create folders called Aza, Aza 1,

23 Aza 2, and I would put those on a thumb drive and then I would

24 take them home and put them on the Netgear into the secured

25 partition.  So whether these particular files in Exhibit 33

1  went through remote transfer or whether they went through a

2  thumb drive transfer, the point is they went from 1A to

3  Exhibit 9.

4         So ladies and gentlemen, I think on the count for

5  receipt, in light of some of the parts that are already agreed

6  to, in light of the content that you've seen, in light of all

7  those titles, where they were found, the period of time under

8  which they were downloaded and the search terms that were

9  entered, the methodology, where they all ended up, the folder

10  structure on the locations where they were found, going as far

11  back as 2010 and the reference to "kid" and "no," that's all

12  Adam Henry's evidence.

13         Now, I'm going to segue over to the conspiracy count.

14  There's a connection there.  He says there's no evidence that

15  the defendant -- and then he said, in fact, there's no

16  evidence that Angele viewed any of the child pornography.

17  Well, when you see the sorting and the folder structure,

18  that's circumstantial evidence, which is every bit as valid

19  and as powerful as direct evidence.  So don't be misled by

20  that.  And it relates, again, to A.T.'s material.  There was

21  no intent on his part, he says.  He didn't even know that that

22  material was there.

23         But that's not credible, ladies and gentlemen,

24  because think about it.  We saw and Mr. Pearson showed you the

25  summary of the installation of the cameras, you see the

defendant on a ladder.  You see Angele Henry on a ladder.  You

see them making these adjustments.  They go in.  They test the

recordings.  And then over time, as needed, they make

adjustments.  And he walked you through when there's a shower

curtain obstructing the view of A.T. behind there using the

toilet, to take the shower curtain down and solve that

problem.  Then when there's that light and the glare, they put

a curtain over the window.  He says we just happened to be

cleaning that day.  What a coincidence that on that very day

when the shower curtain comes down, you've got them recording

multiple videos of A.T.

          And he says he had nothing to do with that.  That he

had no interest in her.  You heard her come in and testify

that one time when she was typing at a keyboard, that he went

over and he rubbed her shoulders.  And that made her

uncomfortable.  You saw the text messages where he's at a

baseball game and he's taking pictures.  You look at those

pictures and you see do those appear to be girls, young girls?

Minors?  People under the age of 18?  And that he's commenting

and sending those to Angele.

          And then you think, separately from that on different

dates, there are messages where one of the images is of [A.T.]

and she's in a provocative outfit and there's a reference to

"I had to fit her into this."  And then there's one, too, that

you need to pay careful attention to.  And that's where Angele

1   says to Adam, "You've got to come next week.  One of those

2   assistant instructors or instructors gets me every time.

3   She's 16.  She fits into that category we've been talking

4   about."

5          And remember when the defendant was testifying

6   yesterday.  I think he slipped a little bit.  Because he said,

7   "Yeah, Angele and I were interested in having sex with another

8   woman."  And that was directly in the context of these

9   communications.  So he admits that he was interested in having

10  sex with other people with his wife, but he denies that it was

11  ever directed to a 16 year old.

12         At the same time he says "I never had any interest in

13  A.T."  But look at those screen captures.  He says, again,

14  there's no evidence that he ever viewed that material.  But

15  where do those screen captures end up?  They're on the secured

16  side.  And the fact that he was at work when the bedroom

17  videos was created doesn't mean that much because he clearly

18  knew that video was there because there are ten screen

19  captures that are made.

20         Can we go to those screen captures?  That's one of

21  them.  I think we can infer that somebody who's looking at a

22  video and creates a screen capture is really focused on what

23  they're interested in.  And what do you see there?  And there?

24  And then you saw efforts of Angele directly to reposition her.

25  And then she actually even at one point said, "What do you

1    think?  Should I go get a camera?  We'll take some pictures."

2    She said, "I left the room so you could have your privacy."

3    So very manipulative on Angele's part.

4            And on this count, what she does can be attributed to

5    the defendant because we're now in January of 2013.  So this

6    is well after the installation of the first cameras and the

7    first videos of this victim.

8            So then we have the screen captures from the bathroom

9    videos.  And he says, "I didn't know those were made.  I had

10   no interest in that."  Those are the screen captures from the

11   bathroom.  If we go through those.  And the last one, there

12   was even a question of, "Is that the victim?  Is that A.T.?"

13   And then we showed that was made from Exhibit 27.7, that video

14   that was created on April 8th, 2013.  And it takes a lot of

15   work to actually get a screen capture at a specific point.

16   And that's the one that he was most interested in.

17           So that, in our opinion, is material that meets the

18   definition of sexually explicit conduct.  It takes a little

19   bit of work to get the instructions.  You'll be given a lot of

20   definitions.  But I trust that you will be able to work

21   through that and you'll see is there any pubic hair showing in

22   this picture?  This doesn't show oral sex, this doesn't show

23   intercourse.  You don't have to have that.  You can have that,

24   that certainly qualifies.  But you don't need that.

25           Sexually explicit conduct includes lewd or lascivious

1   exhibition or display of the genital area.  You don't have to

2   have nudity.  Here we do.  And there are factors that you can

3   look at.  One of those is is it intended to elicit a sexual

4   response in the viewer?  You'll go through those factors.  And

5   our position is that the material satisfies that definition.

6   As Mr. Pearson said, again, keep focused on what the crime

7   that's being charged is and what he's guilty of.  It's

8   conspiracy.

9          And what is conspiracy?  You'll get this definition.

10  If we could switch to -- "A conspiracy is a kind of criminal

11  partnership, an agreement of two or more persons to commit one

12  or more crimes.  The crime of conspiracy is the agreement to

13  do something unlawful; it does not matter whether the crime

14  agreed upon was committed."

15         It says that it doesn't matter whether the crime that

16  they agreed to commit was committed.  Our position is they did

17  not only agree, but they actually committed the crime of

18  sexual exploitation of A.T.  So that's why we will ask you to

19  find the defendant guilty.

20         The defense also referenced the standard.  It's a

21  standard that we embrace and take very seriously.  Beyond a

22  reasonable doubt.  But you will also be instructed that it is

23  not required that the government prove guilt beyond all

24  possible doubt.  We submit to you that we have proven these

25  crimes beyond a reasonable doubt.  And for those reasons, we

1   ask that you find the defendant guilty on both counts.  Thank

2   you for your time and for your service.

3       (The proceedings were concluded at 11:44 a.m.)

4

5           I, KAREN HOOVEN, Official Reporter, do hereby certify

6   that the foregoing transcript as true and correct.

7

8   DATED:  8th of December, 2017      /s/  Karen Hooven____
                                       KAREN HOOVEN, RMR-CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25