**ANTHONY P. CAPOZZI, CSBN: 068525**
**LAW OFFICES OF ANTHONY P. CAPOZZI**
1233 W. SHAW AVE., SUITE 102
FRESNO, CALIFORNIA 93711
PHONE: (559) 221-0200
FAX: (559) 221-7997
EMAIL: Anthony@capozzilawoffices.com
www.capozzilawoffices.com

ATTORNEY FOR Defendant,
ADAM ALAN HENRY

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

* * * * * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ADAM ALAN HENRY,<br><br>Defendant. | Case No.: 1:13-CR-00409 DAD-BAM<br><br>**MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29(c) AND IN THE ALTERNATIVE MOTION FOR NEW TRIAL PURSUANT TO RULE 33(a) OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**<br><br>**Date: March 5, 2018**<br>**Time: 10:00 a.m.**<br>**Court: 5** |

TO:   THE   ABOVE   ENTITLED   COURT   AND   TO   THE   UNITED   STATES ATTORNEY GENERAL FOR THE EASTERN DISTRICT OF CALFIORNIA:

Defendant, ADAM ALAN HENRY, hereby submits the following Motion for Judgment of Acquittal and, in the alternative, Motion for New Trial.

## MOTION FOR JUDGMENT OF ACQUITTAL

**I.      STANDARD OF REVIEW**

Evidence is sufficient to support a conviction if, reviewing the evidence in the light

most favorable to the government, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Lennick*, 18 F.3d 814, 818 (9th Cir.), cert. denied, 513 U.S. 856, 115 S.Ct. 162, 13 L.Ed.2d 100 (1994).

A trial court's denial of a motion for acquittal under Federal Rule of Criminal Procedure 29 is reviewed de novo. *United States v. Johnson*, 357 F.3d 980, 983 (9th Cir. 2003).

**A.    The Evidence Is Not Sufficient On Count 1 Of The Superseding Indictment To Amount To A Violation Of 18 U.S.C. §§ 2251(a) and (e) Conspiracy To Sexually Exploit A Minor.**

COUNT ONE: [18 U.S.C. §§ 2251(a) and (e)-Conspiracy to Sexually Exploit a Minor]

The Grand Jury charges: THAT

ADAM ALAN HENRY,

defendant herein, beginning on an unknown date no later than in approximately May 2012, and continuing through approximately September 19, 2013, in Stanislaus County, within the State and Eastern District of California, and elsewhere, knowingly conspired with others known and unknown to the grand jury to employ, use, persuade, induce, entice, or coerce **a minor to engage in any sexually explicit conduct** for the purpose of producing any visual depiction of such conduct knowing or having reason to know that the visual depiction would be produced or transmitted using materials that had been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, all in violation of Title 18, United States Code, Sections 2251(a) and (e). (emphasis added.)

**This count has a Mandatory Minimum of 15 years.**

The evidence on Count One consisted of a video taken by Angele Henry in her bedroom of A.T. and videos surreptitiously taken of A.T. in the Defendant's bathroom and screenshots taken from the bathroom videos.

Nothing in any of the videos or screenshots constitutes "**using a minor to engage in**

1    **any sexually explicit conduct.**" The camera set-up in the in the bathroom was elevated and

2    attached to a hanging plant above the shower/tub. It was not situated as to focus on the lower

3    extremities of the body.

4         18 U.S.C. § 2256 defines Sexual Exploitation and other Abuse of Children as follows:

5             For the purposes of this chapter [*18 USCS §§ 2251* et seq.], the
              term--
6             **(1)** "minor" means any person under the age of eighteen years;
7             **(2)** (A) Except as provided in subparagraph (B), "sexually
                  explicit conduct" means actual or simulated--
8                 **(i)** sexual intercourse, including genital-genital, oral-
                      genital, anal-genital, or oral-anal, whether between
9                     persons of the same or opposite sex;
10                **(ii)** bestiality;
                  **(iii)** masturbation;
11                **(iv)** sadistic or masochistic abuse; or
                  **(v)** lascivious exhibition of the genitals or pubic area of
12                    any person;
13            **(B)** For purposes of subsection 8(B) of this section, "sexually
                  explicit conduct" means--
14                **(i)** graphic sexual intercourse, including genital-genital,
                      oral-genital, anal-genital, or oral-anal, whether
15                    between persons of the same or opposite sex, or
                      lascivious simulated sexual intercourse where the
16                    genitals, breast, or pubic area of any person is
                      exhibited;
17                **(ii)** graphic or lascivious simulated;
18                        **(I)** bestiality;
                          **(II)** masturbation; or
19                        **(III)** sadistic or masochistic abuse; or
20                **(iii)** graphic or simulated lascivious exhibition of the
                      genitals or pubic area of any person;

21

22         In *United States v. Overton,* 573 F.3d 679, 686 (9th Cir. 2009) the court stated as

23    follows:

24            [T]he trier of fact will often look to six factors to determine
              whether a visual depiction of a minor constitutes a "lascivious
25            exhibition of the genitals or pubic area" in the particular case:

26                1) whether the focal point of the visual depiction is on the
                      child's genitalia or pubic area;
27                2) whether the setting of the visual depiction is sexually
28                    suggestive, i.e., in a place or pose generally associated

> with sexual activity;
> 3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
> 4) whether the child is fully or partially clothed, or nude;
> 5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;
> 6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

> *United States v. Dost,* 636 F. Supp. 828, 832 (S.D.Cal. 1986), aff'd sub nom. *United States v. Wiegand,* 812 F.2d 1239 (9th Cir. 1987).  The Dost factors, as they are commonly referred, are neither exclusive nor conclusive, but operate as merely "a starting point" for determining whether a particular image is "so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." *United States v. Hill,* 459 F.3d 966, 972 (9th Cir. 2006) (quoting *Wiegand,* 812 F.2d at 1244).

In *Overton,* the defendant took five (5) nude photographs of a minor and claimed that the photo **did not** depict "sexually explicit conduct" within the meaning of 18 U.S.C. § 2251. The district judge sitting without a jury reviewed the five (5) photos, all of which were nude photos of the minor, that the defendant shepherded the minor in taking the pictures throughout the house, the court concluded that three (3) portrayed "sexually explicit conduct" because they depicted the lascivious exhibition of the minor's genitals or pubic area.  The court supported its factual findings with detailed descriptions of each photograph with reference to the *Dost* factors as follows:

> Exhibit 6-2 depicts a lascivious exhibition of the genitals or pubic area of the victim. Although the child's genitals are not the focal point of the image and are partially covered, the child's genitals are visible. The child's breasts are also visible. The image is sexually suggestive because the child is sitting on a bed--a place generally associated with sexual activity. The image also suggests sexual coyness. The child is posed with her head down, hair hanging in her face, and her arms covering her breasts. The hair in the child's face and arms partially covering her breasts suggests sexual coyness or reluctance. The victim testified that Overton directed her regarding where to place her hands. Thus, the image's depiction of sexual coyness was intended and the image was likely designed to elicit a sexual response in the viewer.

Exhibit 6-4 depicts a lascivious exhibition of the genitals or pubic area of the victim. The child is standing by a fireplace nude. She is facing the camera with her breasts fully exposed. The child's hands are covering part of her genitals. The child's breasts and genitals are the focal point of the image. Although only the lower portion of the child's face is visible, her hair is covering her face, suggesting sexual coyness. The image is likely to arouse or satisfy the sexual cravings of a voyeur.

Exhibit 6-5 depicts a lascivious exhibition of the genitals or pubic area of the victim. The image is a close up, frontal view of the child's genitals and breasts, both of which are fully exposed. The

child's genitals are in the center of the picture and are thus the focal point of the image. The image is sexually suggestive because the child is sitting with her legs spread apart--a pose generally associated with sexual activity. In light of the prominence of the child's genitals and her pose, the image was very likely intended to elicit a sexual response in the viewer.

*Overton*, 573 F.3d 687

The minor testified that Overton "told me what to do", "he made me pose" and he would "tell me to move my hands in a certain way" so that "he could get a MI shot."

The court ultimately found that the homemade images of the minor were intended and designed to elicit a sexual response. *Id.* at 689.

It is important to note of the five (5) nude pictures in the *Overton* case, three (3) were found to portray "sexually explicit conduct."  In the present case, the minor was not shepherded by Mr. Henry to pose in any nude pictures.  Nor are any of the depictions of the minor portrayed as exhibited by the *Overton* Court displaying the genital or pubic area.

The Supreme Court has clearly established that not all images of nude children amount to child pornography because "nudity", without more, is protected expression. *New York v. Ferber,* 458 U.S. 747, 765 n. 18; 102 S. Ct. 3348; 73 L. Ed. 2d 1113 (1982); see also *Osborne v. Ohio,* 495 U.S. 103, 112; 110 S. Ct. 1691; 109 L. Ed. 2d 98 (1990).

In *United States v. Hill,* 322 F. Supp. 2d 1081 (2004 Cent. Dt. of Calif.), affirmed 459 F.3d 766 (2006), the court stated that not all pictures of children are child pornography: Only images containing "lascivious exhibition of the genitals or pubic area" qualify. Citing 18

1    U.S.C. § 2256(8)(B), 2256 (2)(B)(iii) and *Doe v. Chamberlin,* 299 F.3d 192, 196 (3rd Cir.

2    2002).

3        In *United States v. Steen,* 634 F.3d 822 (5th Cir. 2011) a case with the facts almost

4    identical to the present case, the court determined the defendant's conduct did not constitute a

5    violation of 18 U.S.C. § 2251(a) and that the case **SHOULD NOT** have gone to the jury.  The

6    facts are as follows:

7        While visiting a tanning salon, Steen would stand on a chair, looked over the wall into

8    the next tanning room, and video recorded the activity in the room adjacent to him. Steen

9    videotaped a minor for 15 seconds as she adjusted the machine settings and entered the tanning

10   bed. Most of the video displayed her back and hair, though her pubic region was visible on the

11   right edge of the frame for approximately 1.5 seconds before she closed the tanning bed. *Id.* at

12   822.

13       Steen was indicted for a violation of 18 U.S.C. § 2251(a). The court focused on the

14   definition of "sexually explicit conduct" i.e. as to whether the video depicted "lascivious

15   exhibition of the genitals or pubic area of any person."

16       The defense moved for an instructed verdict asserting that the evidence was insufficient

17   to move beyond a reasonable doubt that the conduct filmed was sexually explicit or lascivious.

18   The District Court denied the motion and the jury found the defendant guilty on the production

19   of child pornography. *Id.* at 825.

20       In assessing conduct under § 2251(a) the court asked:

21           1.    Did the production involve the use of a minor engaging in sexually

22       explicit conduct, and

23           2.    Was the visual depiction a depiction of such conduct?

24       The court stated "Steen clearly used [the minor] for the purpose of producing a nude

25   video, but the statute requires more – the film must depict sexually explicit conduct."  *Id.* at

26   826.

27       The court analyzed the *Dost* factors, (*United States v. Dost,* 636 F.Supp. 828 (S.D. Cal,

28   1986) aff'd 813 F.2d 1231 (9th Cir. 1987) (unpublished table decision).) and found the

evidence was insufficient to find a lascivious exhibition of the genitals finding that the focal

point of the visual depiction is not on the minor's genitals or pubic area. The pubic area was only visible for about 1.5 seconds. The film did not accent the pubic area – to the contrary, the brief seconds the pubic region is visible, it is on the far side of the image's frame. The court found the first *Dost* factor lacked factual support since it did not point to a finding of lasciviousness. *Steen* at 826.

The second and third *Dost* factors consider whether the setting or pose of the depiction is sexually suggestive or unnatural. The court found the tanning salon was not a sexually suggestive setting, nor were the minor's movements unnatural for someone who is tanning. *Steen* at 827.

The fifth *Dost* factor, suggesting sexual coyness was irrelevant since the minor did not know she was being recorded. *Steen* at 827.

The fourth *Dost* factor is nudity, which the video satisfied, since the minor was fully nude for the tanning. *Steen* at 827.

The sixth *Dost* factor as to whether the visual depiction is intended or designed to elicit a sexual response in the viewer is the most difficult to apply.  However, even if Steen was stirred by his voyeuristic pursuits, there was insufficient evidence to conclude that the image of the minor's genitals was designed to elicit a sexual response or whether merely being a voyeur excited Steen.  The court stated that when a photographer selects and positions his subjects, it is a quite different matter from the peeking of a voyeur upon an unaware subject pursuing activities unrelated to sex. (Citing *Overton* in a footnote at 573 F.3d at 688-89, finding that the sixth factor is especially relevant when the producer of the image encouraged the minor and setting to fit his particular lust and contrasting the value of the factor when a defendant merely possessed illicit materials.) *Steen* at 828.

The *Steen* court ultimately held as follows:

> We have previously adopted the ordinary meaning of the phrase "lascivious exhibition," which we defined as "a depiction which displays or brings forth to view in order to attract notice to the genitals or pubic area of children, in order to excite lustfulness or sexual stimulation in the viewer." Here, the government's evidence cannot meet this standard.

1
2
> We must conclude that Steen's conduct did not constitute the crime with which he was charged, and the case should not have gone to the jury.

3

4  *Steen* at 828.

5        The same analysis should apply in this case with regard to the *Dost* factors.  The focal

6  point of the visual depiction of the minor is not on her genitalia, nor of the pubic area. The

7  pubic area was visible for approximately one to two seconds in the video of the minor in the

8  bathroom.

9        The second and third factors consider the setting or pose of the depiction as sexually

10  suggestive or unnatural. The minor's movements in the bathroom were not unnatural for

11  someone who is taking a shower. The actions of Mrs. Henry in the bedroom do not depict a

12  nude minor nor do they depict any nudity in a sexually suggestive manner.

13        The fourth *Dost* factor is that of nudity which the Supreme Court has held that "nudity,

14  without more is protected expression." (*New York v. Ferber*, 458 U.S. 747, 765 n. 18; 102 S.

15  Ct. 3348; 73 L. Ed. 2d 1113.)  Surreptitiously filming a nude person taking a shower on its own

16  does not meet the standard for producing child pornography.

17        The last *Dost* factor, whether the visual depiction is intended or designed to elicit a

18  sexual response in the viewer is without any evidence.  Most importantly, the screenshots of the

19  videos of the minor are not of any genitals or of the pubic area.

20        In the present case, no evidence was presented to establish that the visual depiction

21  were intended or designed to elicit a sexual response in the viewer.  Government exhibits 28.1

22  to 28.13, nor any of the videos of A.T. constitute **using a minor to engage in any sexually**

23  **explicit conduct.**

24        Reviewing the evidence in the light most favorable to the Government, a rational trier

25  of fact could not have found facts sufficient to constitute a violation of Title 18  U.S.C. §

26  2252(a) and (e).

27        Accordingly, Count One should be dismissed.

28  ///

## II.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE DEFENDANT A NEW TRIAL PURSUANT TO RULE 33 (a)

### A.    Standard of Review

In *United States v. Kellington*, 214 F.3d 1084, 1097 (9th Cir. 2000) the court stated:

> [a] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. *Alston, 874 F.2d at 1211* (citation omitted).  The Court is not obligated to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witness. *Id.* Given the procedural posture of this case, the scope of the district court's discretion bears elaboration:
>
> > If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.  *United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980).  Our role is limited to determining whether the district court "clearly and manifestly" abused its discretion.  Id.*  The decision "is within the sound discretion of the district court, and the appellant carries a significant burden to show" an abuse of discretion. *United States v. Steel, 759, F.2d 706, 713 (9th Cir. 1985)).*

The *Lincoln* court, *supra*, further stated that this

> Authority should be exercised sparingly and with caution; nevertheless, the trial court has wide discretion in deciding whether to grant a new trial in the interest of justice. Corresponding to the district court's broad discretion is the limited scope of our review: we will reverse the district court's ruling on the motion for new trial only if we find that ruling to be a clear and manifest abuse of discretion.  See *United States v. Bohn, 508 F.2d 1145, 1150 (8th Cir. 1975); United States v. Robinson, supra, 71 F. Supp. At 10-11*; 2 Wright, Federal Practice and Procedure: Criminal, § 553 at 486-87.

The Supreme Court in *Tibbs v. Florida*, 457 U.S. 31, 38; 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), in footnote 11 cited *United States v. Lincoln,* 630 F.2d 1313 (8th Cir. 1980) explaining the difference between evidentiary weight and evidence sufficiency. For example, the court declared:

> The court reviewing the sufficiency of the evidence, whether it be the trial or appellate court, must apply familiar principles. It is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn in its favor from the evidence. The verdict may be based on whole or in part on circumstantial evidence. The evidence need not exclude every reasonable hypothesis except that of guilt…. *Id.*, at 1316.
>
> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different…. The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury. *Id., at 1319.*

Defendant adopts and incorporates the arguments set out hereinabove regarding the sufficiency of the evidence in the motion for acquittal. The defense contends that the verdict is contrary to the weight of the evidence. The evidence presented by the Government preponderates heavily against the verdict and that a serious miscarriage of justice has occurred.

In weighing and evaluating the evidence, the defense contends that the evidence presented by the Government on Count one **does not** establish a violation of 18 U.S.C. § 2251(a) and (e).  It is respectfully requested that the conviction on Count One be vacated.

**B.      The Defendant's Fifth And Sixth Amendment Rights Were Violated By The Testimony Of Jose Antonio Ruezga.**

In *Estelle v. Smith,* 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981) the court stated:

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[no] person…shall be compelled in any criminal case to be a witness against himself." The essence of this basic constitutional principle is "the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe v. Connecticut,* 367 U.S. 568, 581-582 (1961) (opinion announcing the judgment) (emphasis added). See also *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55 (1964); E. Griswold, The Fifth Amendment Today 7 (1955).

The Court has held that "the availability of the [*Fifth Amendment*] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault*, 387 U.S. 1, 49 (1967).

In *Estelle supra*, a judge informally ordered that the states attorney arrange a psychiatric examination of the defendant to determine competency to stand trial.  The defendant was interviewed at the jail and found the defendant competent to stand trial.

At the sentencing hearing, the state called the doctor to testify. Outside the presence of the jury it was elicited that the doctor did not obtain permission from the defendant's attorney to examine him, that he had discussed his conclusion and diagnosis with the state's attorney and that the state's attorney requested his testimony.  The doctor's testimony at sentencing was based upon his interview with the defendant.  The doctor was the only witness called by the state.   The doctor's role changed when he testified and became an agent of the State presenting unwarned statements made in a post-arrest custodial setting. (*Id.* at 460.)

The *Estelle* court saw no basis to distinguish between the guilt and penalty phases of a defendant's trial so far as the Fifth Amendment privileges is concerned. The court found that the defendant's Fifth Amendment privilege was directly involved because the State used as evidence against the defendant the substance of his disclosures during the pretrial psychiatric examination. (*Id.* at 464.)

What is important in the *Estelle* case and is particularly applicable to the Defendant, Adam Henry, is the following:

1          The fact that respondent's statements were uttered in the context

2   of a psychiatric examination does not automatically remove them

3   from the reach of the Fifth Amendment. See n. 6, *supra*. The state
    trial judge, *sua sponte*, ordered a psychiatric evaluation of

4   respondent for the limited, neutral purpose of determining his
    competency to stand trial, but the results of that inquiry were

5   used by the State for a much broader objective that was plainly
    adverse to respondent. Consequently, the interview with Dr.

6   Grigson cannot be characterized as a routine competency
    examination restricted to ensuring that respondent understood the

7   charges against him and was capable of assisting in his defense.
    Indeed, if the application of Dr. Grigson's findings had been

8   confined to serving that function, no Fifth Amendment issue
    would have arisen.

9

10   *Id.* at 465.

11       On November 13, 2013, FBI Special Agent Mark Lucas reported that the Defendant,

12   Adam Henry, was **arrested** at his home in Turlock, California, he was provided an FD-395

13   Advice of Rights form.  The Defendant signed the form and invoked his right to an attorney at

14   8:14 a.m. The report also indicated the Mr. Henry was handcuffed. (Exhibit A - Report of Mark

15   Lucas)

16       On November 13, 2013, Mr. Henry was represented by attorney Kirk McAllister in

17   People v. Adam Henry, case number 1463984, in the Superior Court of Stanislaus County.  The

18   complaint filed on September 27, 2013, charged Mr. Henry with violating Penal Code section

19   311.11(a), Possession of Information or Images Depicting Sexual Conduct of a Person Under

20   18 years of age. Mr. McAllister appeared with the Defendant at his arraignment on October 18,

21   2013.  (Exhibit B - Stanislaus County Superior Court Case Index)

22       In the 13 page report submitted under seal, the evidence is clear that a social worker

23   was contacted by MRP (Mandatory Reporting Parting) and requested CPS assistance as MRP

24   was serving a federal warrant to Adam Henry for child pornography.  It was anticipated that

25   Angele Henry would also be arrested. (Exhibit C – CPS Report (See page one of report))

26       On page six of the social worker's report, staff person Jose Antonio Ruezga on

27   November 13, 2013, at 6:30 a.m. responded to an AA [unknown shorthand] this SW [Social

28   Worker] met with CPD [Ceres Police Department] Detectives Art Hively and Britton Moore

1  and FBI agent Mark Lucas and his team for a briefing of the search warrant of Mr. Henry's

2  residence.  FBI agent Lucas reported that they were searching for various items in connection

3  with "receipt/distribution of child pornography and production of child pornography."

4      As the team entered the residence Defendant, Adam Henry, was secured and

5  handcuffed.  FBI agent Mark Lucas, in his report, stated that Mr. Henry was **arrested**.  The

6  social worker then went on to interview the Defendant and testified as a final rebuttal witness

7  for the Government that the Defendant stated that his wife had nothing to do with the charges.

8  As in *Estelle*, Mr. Ruezga became an agent of the State.

9      This testimony was allowed into evidence after Defendant's opening statement, cross-

10  examination with Government witnesses and after Defendant's testimony that it was his wife

11  who had committed these offenses and not him.  No cautionary instruction was requested nor

12  one given by the court. The defense moved for a mistrial which was denied and then moved to

13  strike the testimony which was also denied.

14      In *Estelle, supra*, the Defendant had already been indicted and an attorney appointed to

15  represent him.  Clearly, his attorney should have been contacted prior to submitting to a

16  psychiatric interview. *Id.* at 468.

17      In *Estelle, supra,* the defendant had been indicted and an attorney appointed to represent

18  him and he had a Sixth Amendment right to the assistance of counsel before submitting to the

19  psychiatric interview (citations omitted).  *Id.* at 468.

20      In the present case, Adam Henry had been charged with violating Penal Code section

21  311.11(a), Possession of Information or Images Depicting Sexual Conduct of a Person Under

22  18 years of age, on September 27, 2013, in Stanislaus County, retained an attorney and was

23  arraigned on October 18, 2013, in case number 1463984 in the Stanislaus County Superior

24  Court.  Indeed, on November 13, 2013, not only did the Defendant have any attorney, he

25  refused to waive any of his Miranda rights. (Exhibit A)

26      The *Estelle* court stated:

27          The Sixth Amendment, made applicable to the states through the
           Fourteenth Amendment, provides that "[in] all criminal

28          prosecutions, the accused shall enjoy the right . . .to have the

---

assistance of counsel for his defense." The "vital" need for a lawyer's advice and aid during the pretrial phase was recognized by the Court nearly 50 years ago in *Powell v. Alabama, 287 U.S. 45, 57, 71 (1932).* Since then, we have held that the right to counsel granted by the *Sixth Amendment* means that a person is entitled to the help of a lawyer "at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois, 406 U.S. 682, 688-689 (1972)* (plurality opinion); *Moore v. Illinois, 434 U.S. 220, 226-229 (1977).* And in *United States v. Wade, 388 U.S., at 226-227,* the Court explained:

> "It is central to [the *Sixth Amendment*] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." (Footnote omitted.)

See *United States v. Henry,* 447 U.S. 264 (1980); *Massiah v. United States,* 377 U.S. 201 (1964). See also *White v. Maryland,* 373 U.S. 59 (1963); *Hamilton v. Alabama,* 368 U.S. 52 (1961).

*Id*. at 469-470.

The *Estelle* court found that the defendant's Sixth Amendment right to counsel clearly had attached when the doctor examined the defendant at the jail which was a critical stage of the proceeding.  Defense counsel had not been notified in advance and as a result the defendant was denied the assistance of an attorney in making a decision whether to proceed with the examination. *Id.* at 470-471.

The court went on to say

> Because "[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege," the assertion of that right "often depends upon legal advice from someone who is trained and skilled in the subject matter." *Maness v. Meyers, 419 U.S. 449, 466 (1975).*

*Id.* at 471.

In *The People of the State of New York v. Greene,* 306 A.D.2d 639, 760 N.Y.S.2d 769, 2003 N.Y. Slip Op. 14932 (Exhibit D - Copy of Opinion) a case almost, if not identical to this

case, a Child Protective Services officer (CPS) and a State Police Investigator interviewed the victim of a sexual molestation incident as part of a Family Violence Response Team (FVRT). After the interview the defendant was arrested and retained an attorney.

At a later time, the CPS worker saw the defendant at the jail while he was incarcerated for the sex charges against the victim.   She asked to speak with him, identified herself, indicated that she knew he had an attorney, mentioned the attorney by name, and stated that the defendant did not have to talk to her. The defendant met with her and gave a statement.

The County Court admitted the defendant's statement made to the CPS worker on rebuttal and the defendant was convicted.

On appeal the *Greene* court stated that there was no question the defendant was represented by counsel and could not have waived that right without counsel being present. (*Id.* at 640)   However, the question became **whether the CPS caseworker can be deemed an agent of the police such that she should not have spoken with the defendant without counsel.** *IBID*.

The court went on to state:

> Relevant indicia of State involvement, which may transform private conduct into State action, include: a clear connection between the police and the private investigation; completion of the private act at the instigation of the police; close supervision of the private conduct by the police; and a private act undertaken on behalf of the police to further a police objective." (*People v. Ray*, 65 NY2d 282, 286 [1985] [citations omitted]).

> Here, the FVRT, a joint venture between the Division of Family Services and police agencies, collaborated on sexual abuse investigations. As a member of the FVRT, the CPS caseworker interviewed the victim with a State Police investigator. She regularly shared information gained through her interviews with the police and District Attorney's office, and intended to do so here. The police investigator characterized himself as being in charge of the FVRT and testified that if the CPS caseworker knows there is a criminal investigation, that caseworker will tell him or the correct authority the information obtained from a defendant. While social workers are generally not agents of the police (*see e.g. Matter of Luis M.,* 83 NY2d 226 [1994]; *People v Batista,* 277 AD2d 141 [2000], *lv denied* 96 NY2d 825 [2001]),

we are satisfied that, under the specific facts of this case, the CPS caseworker was an agent of the police. Because of the common purpose of the FVRT, the cooperative working arrangement through the structure of the FVRT and the understanding that incriminating statements obtained by the CPS caseworker would be communicated to the police agency, all of the indicia of an agency relationship are satisfied (*see People v Ray, supra* at 286).

A person's right to counsel cannot hinge on the government's characterization of its own investigation (*see People v West,* 81 NY2d 370, 380 [1993]). The regulatory mandate that a CPS caseworker conduct face-to-face interviews with subjects of child abuse reports (18 NYCRR 432.2 [b] [3] [ii] [a]) cannot overcome a subject's constitutional right if the CPS caseworker is an agent for the police at the time of the interview. That mandate can be complied with either by arranging an interview with the subject and counsel or merely completing the information gathering by the CPS caseworker without the ability to use the statement in any criminal proceeding (*see e.g. People v Townes,* 41 NY2d 97, 104-105 [1976]).

*Id.* at 641.

The court ultimately held that since the evidence was utilized by the prosecutor as rebuttal evidence, the evidence could only have been considered by the jury on the issue of credibility and the jury should have been so instructed.

Further in *Greene* uncharged crimes were admitted but no cautionary instruction was given. This was found to be error as was the failure to give an instruction on the rebuttal evidence. The jury was to be cautioned that such evidence was only to be used in determining credibility.

In *Greene* the court held as follows:

In summation, therefore, we hold that the failure to give the jury limiting instructions with respect to defendant's prior bad acts denied defendant the right to a fair trial and warrants a reversal of the judgment as a matter of discretion in the interest of justice notwithstanding defense counsel's failure to preserve said issue by either requesting said instructions or objecting to the court's failure to so charge (*see* CPL 470.15 [3], [6]; *People v Fleegle,* 295 AD2d 760, 762-763 [2002]*, supra; People v Intelisano, supra* at 883, 884). Defendant's right to a fair trial was further compromised by defense counsel's failure to request a limiting instruction with respect to the testimony of the CPS caseworker

1        and failure to object to certain inappropriate comments by the
2        prosecutor in summation.

3  *Id.* at 643-644.

4      The same analysis should apply with Mr. Henry where the finding of guilt rest squarely

5  on the jury's assessment of the credibility of the Defendant, such an error cannot be harmless.

6  The introduction of CPS social worker Ruezga's testimony was highly prejudicial to the

7  Defendant and a violation of his Fifth and Sixth Amendment rights.

8

9      **C.**    **The Government's Failure To Produce Material Discovery Violated The**

10  **Defendant's Right To Due Process.**

11      During the trial the Government introduced exhibits 28.1 to 28.13.  The defense had not

12  been presented with exhibit 28.13 prior to the exchange of exhibits a few days before trial.

13  (Exhibit E - Trial Exhibits 28.1 to 28.13)

14      The defense contends that the Government was required to but failed to produce trial

15  exhibit 28.13 pursuant to *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215

16  (1963); *Giglio v. United States,* 405 U.S. 150, 154-155, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),

17  the Jenks Act (18 U.S.C. § 3500) and Federal Rules of Criminal Procedure 16.

18        The purpose of Jencks is to give "criminal defendants a fair
19        opportunity to impeach government witnesses." *United States v.*
          *Pisello,* 877 F.2d 762, 768 (9th Cir. 1989).

20        Discovery in federal criminal cases is generally governed by Fed.
21        R. Crim. P. 16.   Rule 16 is broader than *Brady,* "requiring
          disclosure of all documents 'material to preparing the defense.'"
22        *United States v. Muniz-Jaquez,* 718 F.3d 1180, 1183 (9th Cir.
23        2013) (quoting Fed. R. Crim. P. 16(a)(1)(E)(i).  Rule 16(a)(1)(E)
          provides for the production of discovery, upon a defendant's
24        request.

25  *United States v. Toilolo,* 2014 U.S. Dist.Lexis 34571.

26      If a court does find a *Brady, Giglio,* or *Jencks* violation, dismissal is within its power to

27  grant.

28  ///

> [First, a] district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." *United States v. Chapman,* 524 F.3d 1073, 1084 (9th Cir. 2008) (alterations in *Chapman*)

The discovery presented to the defense includes Government's trial exhibits 28.1 to 28.12. (Exhibit E)  Included in one police report written by Det. Hively, he stated that he located "a subfolder with two screenshots of A.T. that were taken from videos in which she was recorded in the Henry's bathroom while changing.  They had been labeled 'bath1.jpg' and 'bath2.jpg.'  There are an additional ten screenshots of A.T. taken from the video in which she was changing clothes in front of O/Henry, Angele." (Exhibit F)

The defense has contended that even with this alleged screenshot, Count One should fail due to a lack of the sufficiency of the evidence.  The defense further contends that without exhibit 28.13, neither the videos nor screenshots 28.1 to 28.12 are sufficient to establish a violation of 18 U.S.C. § 2251 (a) and (e).

The Government's failure to produce exhibit 28.13 violated the Defendant's right to due process.  It is respectfully requested that Count One be dismissed based upon the Government's failure to properly disclose exhibit 28.13.

### D.    Prosecutorial Comments About Defense Counsel In Final Argument Prejudiced The Defendant.

In its rebuttal argument to the jury the Government stated the following:

> So we want to thank you for your service. You play a very important part in this process. And we're asking you to find the defendant guilty of these two counts. And I want to let you know that Mr. Capozzi did a great job on his closing. And the defendant is entitled to be well represented. Mr. Capozzi is the most experienced attorney here. And he's done his job. But what is his job? His job as a defense attorney is to distract and to deflect and to give you alternate facts or argue things that aren't necessarily what actually happened. And he started by bringing

1    up something irrelevant for this case.

2    (RT 17:5-13)

3          The defense contends that this was an attack on defense counsel's credibility by

4    backhandedly praising defense counsel.  It is akin to vouching in addition to improper comment

5    about opposing counsel.

6          In *United States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir. 1993) the court stated:

> Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers. See, e.g., *Berger v. United States*, 295 U.S. 78, 88, 79 L.Ed. 1314, 55 S.Ct. 629 (1935).  While lawyers representing private parties may – indeed, must – do everything ethically permissible to advance their clients' interests, lawyers representing the government in criminal cases serve truth and justice first.  The prosecutor's job isn't just to win, but to win fairly, staying well within the rules. See *United States v. Hill*, 953 F.2d 452, 458 (9th Cir. 1991). (Citations omitted.)

In *Kojayan,* the prosecutor had misstated underlying facts in his rebuttal argument, that later were determined to be untrue, and referred to defense counsel's alleged improper conduct eight times.

         The court indicated that the prosecutor made unsupported factual claims from outside the record.  When a lawyer asserts that something not in the record is true, he is, in effect, testifying.  He is telling the jury, "Look, I know a lot more about this case than you, so believe me when I tell you X is a fact." This is definitely improper. (*Id.* at 1321.)

         The misstatements were in the Government's rebuttal argument with the court stating that "Evidence matters; closing argument matters; statements from the prosecutor matter a great deal." (Id. at 1323.)

         In *United States v. Frederick,* 78 F.3d 1370, 1378 (9th Cir. 1996) the prosecutor made three related impermissible attacks on the defense attorney during closing argument with the court stating:

> When prosecutorial conduct is called in question, the issue is whether, considered in the context of the entire trial, that conduct

appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." *United States v. Simtob,* 901 F.2d 799, 806 (9th Cir. 1990) (citing *United States v. Young,* 470 U.S. 1, 11, 84 L.Ed.2d 1, 105 S.Ct. 1038 (1985)).

The defense alleged that the following comments prejudiced the defense:

> Finally, [S.F.], on cross-examination, there is no doubt that it is a defense attorney's job to do his best to cross-examine thoroughly the witnesses presented by the Government for the benefit of his client. And you can have admiration for Mr. Jacobson [the defense attorney] because is a skilled practitioner of that art.

ER 157. This comment precipitated the following exchange:

> Mr. Jacobson: Excuse me, Your Honor, I object, comments about me are not appropriate.
>
> The Court: Sustained.
>
> Prosecutor: Sorry. I'm trying to compliment him that he did a very good job of confusing her on the stand.
>
> Mr. Jacobson: Excuse me, Your Honor, I object, comments about me are not appropriate.
>
> The Court: Proceed with your argument, that's enough.

Immediately following this admonition, and without any intervening comment or question, the prosecutor told the jury:

> It is also not his job to ask you to look at all of the evidence.  And he is asking you to look at little bits and pieces. The Government and the Judge will be asking you to consider all of the evidence in making your decision.

*Id.* at 1378-1379.

The Frederick court cited:

> The court relied on *Bruno v. Rushen,* 721 F.2d 1193 (9th Cir. 1983), cert. denied, 469 U.S. 920 (1984), we expressed our disapproval of prosecutors' attacks on defense attorneys. "Neither is it accurate to state that defense counsel, in general, act in underhanded and unethical ways, and absent specific evidence in the record, no particular defense counsel can be maligned." *Id.* at 1195.

The Frederick court found:

> The prosecutor's final argument about the defendant's lawyer, made immediately after the court had sustained two other objections on the ground that her comments were inappropriate, did however constitute a serious misstep. [6]   In her final comment the prosecutor implied that 1) the government and the court were allied, 2) they were allied against the defense, and 3) the government and the court wanted the jury to seek the truth by considering all the evidence, in contrast to the defense attorney, who was asking the jury not to see the truth.

In footnote six, the court stated:

> Because this statement was intended to bolster the credibility of the prosecutor and undercut that of the defendant, it might be considered akin to vouching in addition to constituting improper comment about opposing counsel. For the purposes of this opinion, the name we ascribe to the error is not important; what matters is our determination that it constituted a serious violation of the defendant's rights.

In the present case the Government stated that defense counsel had done his job to distract and deflect and to give alternate facts or to argue things that aren't necessarily what actually happened. What the Government is arguing is that Defendant's Counsel is lying. Those comments are highly prejudicial to the Defendant and violates his right to due process.


### E.       Cumulative Error

The Frederick's court stated that

> In some cases, although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. See *United States v. Green,* 648 F.2d 587 (9th Cir. 1981). *Id.* at 1381.

In the present case there are numerous further misstatements to the jury in final argument.

///

///

Government's closing argument, page 14, lines 5-12:

> And you can especially see that in where these videos and where these pictures ended up. This isn't just voyeurism. There was only a folder created for [A.T.]. From the guests that the defendant recorded, only [A.T.] got her own folder. Only [A.T.] got her own screen captures. So it wasn't just a running video trying to get anyone that came through. This was a conspiracy to get videos and pictures of A.T. specifically and it worked.

This argument is a complete fabrication in that there are at least four other recorded people that had folders marked with their names.

Government's closing argument, page 20, lines 6-14:

> And we would argue that his interest in pornography progressed and it got worse. And his interests evolved and they devolved, because you heard Detective Hively talk about, when asked how much was there on that set of computers? And there's no doubt there's a lot of adult pornography. And it's true. And we're not saying that it's illegal. Everybody has their own opinion about whether that's appropriate. And you can make your own judgments. That's not what we're focused on. We're focused on the illegal material.

Judge Ishii had disallowed any evidence of adult pornography since it had nothing to do with the possession of child pornography. The Government implied that even though adult pornography is legal, the jury as asked to make their own judgment as to whether it led to possession of child pornography or whether it was inappropriate.

This was irrelevant and highly prejudicial.

Government's closing argument, page 20, lines 15-25 and page 21, lines 1-14:

> And it's important to know -- and review the testimony. Detective Hively found Shareaza on Exhibit 16, the computer that was first used. That program had been installed on this computer. Take a look at this computer, ladies and gentlemen. This is an eight disk raid. This is a defendant production where he took all of those hard drives and he put them together and he figured out a way to make that work. And then he installed Shareaza on it.

> And what did he do with Shareaza? He downloaded child pornography. And how do we know that? Because we have an exhibit that shows exactly what was on there. It's 36.2.

1
2
3
4
5

And we know that there were about 61 child pornography files that were on this computer. And where were they found? They were found in folders. One of them is "new folder." And one of them is "new folder/no." Does that sound familiar? We'll get to the folder structure from item 9 and see how the classification coincided with what he had been doing years earlier on that device.

6
7
8
9
10

But he had installed Shareaza. And used Shareaza to download child pornography there. So there were approximately 34 child pornography videos that were then transferred over to the hard drive, which is in evidence as Exhibit 18. And the evidence from Detective Hively was there were 34 child pornography videos added on September 8th, 2010. And where were they put here? In something called "new folder/kid."

11
12
13
14

This was not true.   Detective Hively testified at the grand jury that Item 16, the computer from in the garage used Limewire **not** Shareaza.   Detective Hively in one of his reports specifically indicated that Shareaza was **never** used to download child pornography on item 16.

15

Government's closing argument, page 21, lines 15-20:

16
17
18
19

And then there were 25 child pornography videos added on August 20th, 2010. Where were those videos put? "New folder (2) new folder/no." This was done in 2010. This computer was last accessed and shut down on August 25th, 2010. That material was downloaded before Angele Henry was living in that house.

20
21

The evidence was that Angele Henry was staying with Mr. Henry prior to August 25, 2010.

22

Government's closing argument, page 22, lines 5-9:

23
24
25
26

So if you look, almost every single item that was used either to download the child pornography or to create the images of A.T., those items are manufactured outside of the State of California. Which is important for jurisdictional basis. So I did want to point that out to you.

27

No evidence was ever produced as to which device recorded the videos in Count One.

28

///

1    Government's closing argument, page 22, lines 10-24:

2           But go back to Adam Henry explaining to Detective Hively what
            he had been doing with Shareaza. What do you use Shareaza for?
3           I believe that when people were asked at the beginning, whose
            familiar with Shareaza? No hands went up. This is a program
4           which is peer-to-peer file sharing. Is that what people would use
            to look for adult pornography? Is that what people use to look for
5           music legally? No. If you want music legally, what do you do?
            You use iTunes, you go to Amazon. Whatever your favorite
6           vendor is. And you pay for or get however you want streaming
            the music that way. What did Adam Henry do? He used Shareaza
7           and he got it in violation of copyright laws.
8

9           Again, we're not concerned about that. It may be wrong. But it's
            interesting that you use file sharing software to do things illegal.
10

11   The Government used an unproven, uncharged crime to prejudice the Defendant that

12   had nothing to do with child pornography.

13   Government's closing argument, page 23, lines 1-6:

14          And he conceded that a simple Google search could get you adult
            pornography. And, in fact, I think he admitted that he had at one
15          point accessed websites. So you don't get child pornography
            doing Google searches. You don't go to websites and download
16          child pornography. You get that from Shareaza.
17

18   This comment was misleading since the evidence was overwhelming that the Defendant

19   had used Shareaza for his work and that child pornography had not been downloaded until

20   Angele Henry entered the picture.

21   Government's closing argument, page 26, lines 21-25:

22          And remember, he is already on record as telling Detective
            Hively that he didn't give her the password to the Netgear Ready
23          NAS at home. And when Detective Hively says "I need the
            password for the work computers," he says "I'm not going to give
24          it to you unless my boss tells me."
25

26   The Defendant never told Detective Hively that Angele Henry did not have the

27   password to the Netgear.

28   ///

Government's closing argument, page 28, lines 13-22:

> So it's very inconsistent. I mean, you've got to decide what is your defense? And it seemed like at the beginning he's saying it was all an accident, it's a mistake, I didn't intend to do it. And then when he sees years later, "Boy, they sure have a lot of evidence. Maybe I better come up with a better argument." Now it's Angele. But again, we're not here to judge Angele. She is part of the conspiracy. And I'll get to that in a few minutes. But his explanation is very inconsistent. And so we know he's the one who's responsible for downloading that child pornography.

This argument is to remind the jurors of the Defendant's comment to Jose Antonio Ruezga taken after the Defendant had exerted his right to an attorney and to remain silent. This was highly prejudicial.

Government's closing argument, page 31, lines 12-16:

> And he says he had nothing to do with that. That he had no interest in her. You heard her come in and testify that one time when she was typing at a keyboard, that he went over and he rubbed her shoulders. And that made her uncomfortable.

A.T. did not testify that the Defendant made her uncomfortable – indeed Judge Ishii had excluded such testimony.

The defense submits that the cumulative effect of the numerous errors committed by the Government is sufficient to establish prejudice to the Defendant to warrant a reversal of the convictions herein. (*United States v. Frederick,* 78 F.3d 1370, 1380 (9th Cir. 1996) and *United States v. Green,* 648 F.2d 587 (9th Cir. 1981).

## CONCLUSION

The Defendant's Fifth and Sixth Amendment rights were violated by the testimony of Jose Antonio Ruezga to the Defendant's prejudice.

The evidence in Count One was not sufficient to sustain a conviction.

The Government's failure to produce material discovery violated the Defendant's right to due process.

Prosecutorial comments about defense counsel and misstatements by the prosecutor in

1    final argument severely prejudiced the Defendant.

2         It is respectfully requested that the court grant an acquittal pursuant to Rule 29(a) of the

3    Federal Rules of Criminal Procedure on Count One due to a lack of the sufficiency of the

4    evidence.

5         In the alternative on Count One – grant a mistrial for the violation of Defendant's Fifth

6    and Sixth Amendment rights.

7         In the alternative grant a new trial on Count One pursuant to Rule 33(a) of the Federal

8    Rules of Criminal Procedure.

9         On Count Two, grant a mistrial for the violation of Defendant's Fifth and Sixth

10   Amendment rights.

11        In the alternative on Count Two, grant a new trial pursuant to Rule 33(a) of the Federal

12   Rules of Criminal Procedure.

13                                        Respectfully submitted,

14   Dated:      January 8, 2018      By:   */s/Anthony P. Capozzi*
15                                          ANTHONY P. CAPOZZI
                                            Attorney for ADAM ALAN HENRY

16

17

18

19

20

21

22

23

24

25

26

27

28