UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-CR-409-DAD |
| | ) | |
| vs. | ) | TRIAL TESTIMONY |
| | ) | OF ADAM ALAN HENRY |
| ADAM ALAN HENRY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Fresno, California                Wednesday, November 15, 2017

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **DAVID L. GAPPA**
                          and **ROSS PEARSON**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721


For the Defendant:        Law Offices of Anthony P. Capozzi
                          BY: **ANTHONY P. CAPOZZI**
                          1233 West Shaw Avenue
                          Suite 102
                          Fresno, California 93711

3

1                                <u>INDEX</u>

2

   <u>DEFENDANT'S WITNESSES</u>:
3
    **ADAM ALAN HENRY**                                      4
4    DIRECT EXAMINATION BY MR. CAPOZZI                   4
     CROSS-EXAMINATION BY MR. GAPPA                     54
5    REDIRECT EXAMINATION BY MR. CAPOZZI                86
     RECROSS-EXAMINATION BY MR. GAPPA                   95
6    REDIRECT EXAMINATION BY MR. CAPOZZI                97
     RECROSS-EXAMINATION BY MR. GAPPA                   97
7                                * * * * *

8

9                               **EXHIBITS**

10   No Exhibits Marked for Identification or Received in Evidence

11                               * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Henry   D

4

1    Wednesday, November 15, 2017              Fresno, California

2    11:44 a.m.

3            THE COURT:  Mr. Capozzi, the next defense witness.

4    We are back in the presence of the jury.

5            MR. CAPOZZI:  Call Adam Henry, Your Honor.

6                         **ADAM ALAN HENRY**,

7    called as a witness on behalf of the Defendants, having been

8    first duly sworn, testified as follows:

9            THE CLERK:  Please have a seat.  State your full name

10   for the record and spell it.

11           THE WITNESS:  Adam Alan Henry.  A-D-A-M A-L-A-N

12   H-E-N-R-Y.

13                      DIRECT EXAMINATION

14   BY MR. CAPOZZI:

15   Q.  Okay.  I didn't hear a thing.  Can you spoke closer to

16   that.

17   A.  Adam Alan Henry.  Is that better?

18   Q.  Better.

19   A.  A-D-A-M A-L-A-N H-E-N-R-Y.

20   Q.  Adam, how old are you?

21   A.  39.

22   Q.  39?

23   A.  Yes, sir.

24   Q.  Where were you working when all of this incident occurred?

25   A.  Lock-N-Stitch in Turlock, California.

Henry D

1    Q.   And your position?

2    A.   The IT manager.

3    Q.   I'm sorry?

4    A.   The IT manager.

5    Q.   What was your job?  What did it include?

6    A.   Pretty much anything with a circuit in it.  I did

7    telephones.  I did some of the remote wireless for the

8    computer controlled machines in the background.  The computers

9    themselves.  Just kind of a basket of everything.

10   Q.   Okay.  I'm going to jump to something else right now

11   before we get into the work there.  Were you living with

12   another woman, someone named Rebecca Jackson, prior to being

13   married to Angele Henry?

14   A.   Different name, but yes.  Same woman.

15   Q.   Her name was different back when you were with her?

16   A.   Yes.

17   Q.   You were living together with her?

18   A.   Yes, sir.

19   Q.   You saw her testify yesterday:

20   A.   Yes, sir.

21   Q.   Did you set up a camera in the bathroom of the house the

22   two of you were living in?

23   A.   Yes, sir.

24   Q.   And how did that come about and why?

25   A.   We were each other's second significant relationship each

1   and we were kind of going through the whole, you know,

2   experimental stage.  Just try a little bit of everything, see

3   what -- finding out what types of things we liked, I guess.

4   And that was some of -- the camera was a part of that.

5   Q.   You did install a camera in that bathroom?

6   A.   Yes, sir.

7   Q.   Did she have knowledge of that?

8   A.   Yes, sir.

9   Q.   Did you talk to her first before you did that?

10  A.   In fact, actually in a couple of those that were shown,

11  she was watching it and telling me how to angle it.  Yes.

12  Q.   All right.  And again, why did you guys do that?

13  A.   Just playing around to be honest.

14  Q.   And was she ever videoed on that camera?

15  A.   Yes.

16  Q.   And at the time she was being videoed, did you tell her?

17  A.   She was part of turning it on, so I didn't have to -- I

18  didn't specifically say, "hey," because we were both standing

19  there turning it on.

20  Q.   Did you turn it on when she's in the shower without her

21  knowing it?

22  A.   No.

23  Q.   How long did you live together with her?

24  A.   Barring a few month gap at one point, basically five

25  years.

1    Q.   Five years.

2    A.   Yes, sir.

3    Q.   At some point did you meet Angele Henry, then Angele

4    Brennan?

5    A.   Angele Brennan, yes.

6    Q.   And how did you meet Angele?

7    A.   Rebecca was -- she tended to bring her work home.  So

8    she'd be working evenings and to pass the time sometimes I'd

9    play around on online video game.  And one of the people that

10   I ended up spending time with online just doing stuff

11   was -- turned out to be Angele.

12   Q.   Okay.  You're playing a game on a computer?

13   A.   Yes.  With people around the world.  And she just happened

14   to be one of them.

15   Q.   What game was this?

16   A.   It was called World of Warcraft.  It's an cartoony

17   like --

18   Q.   Try to speak into the --

19   A.   It's called World of Warcraft.  Cartoony type -- just a

20   time passer.

21   Q.   How do you play the game?  You assume a role and someone

22   else assumes another role?

23   A.   Yes.  The characters have names.

24   Q.   And how do you know it was Angele Henry -- or Brennan on

25   the other side?

1   A.   Through a long process.  Initially she was just the

2   character of whatever.  We ended up -- our characters worked

3   well together, so over time we started talking more in game

4   and then some of the activities in the game are better

5   facilitated by voice chats.  So we'd start doing that.  And

6   just over time started talking more, getting to know each

7   other.

8   Q.   Okay.  Did she assume any names in the games that you were

9   playing?

10  A.   Yes.  She had two main characters that she would switch

11  back and forth.

12  Q.   And what were the main characters?

13  A.   Her primary was named Sylvia, her secondary was named

14  Aurrora.

15  Q.   Aurrora.

16  A.   Yes, sir.

17  Q.   Did those names ultimately turn up on your computers?

18  A.   They were used when we set up the Netgear, yes, sir.

19  Q.   All right.  Why were those names used?

20  A.   It was actually her choice.  She chose the network name of

21  Pink Lagoon and then we just picked those names.  I believe,

22  if I remember correctly, the password share got named Aurrora

23  and then her individual folder that she kept all her personal

24  private videos in was named Sylvia.

25  Q.   Was that on the Aurrora side of the Netgear?

1  A.  Yes.

2  Q.  Did she have access to that?

3  A.  Yes, sir.

4  Q.  Did she have the password to that?

5  A.  Yes, sir.

6  Q.  Did you ever tell Detective Hively that she did not have

7  the password?

8  A.  No, sir.

9  Q.  Did you tell him she had the password?

10  A.  I believe my exact words were "she had the pass," at one

11  point.  "Pass" short for password.

12  Q.  So you met her on a computer.

13  A.  Yes, sir.

14  Q.  And did she give you her personal background, et cetera,

15  while you were playing this game?

16  A.  Again, not for a long time.  It's one of those things,

17  you're anonymous -- you don't know the other person on the

18  other side and you just kind of slowly start getting to know

19  somebody.  It's probably a slower process than in real life.

20  But eventually we got to know each other, trust each other

21  enough that we started sharing more and more information.

22  Q.  Did you tell her you were living with somebody else?

23  A.  Yes.  Actually, in -- for a long time, in order to avoid

24  unnecessary complications, I used to just say "yeah, I'm

25  married" just to not have to deal with drama.

1  Q.  Did she -- did you find out whether or not she was married

2  at the time?

3  A.  Eventually I learned that -- I can't remember the exact

4  timing, but she was either -- I believe she was in the middle

5  of going through a divorce right when we started getting to

6  that point of information sharing.

7  Q.  Okay.  And when did you start chatting with her on this

8  game?  What year?

9  A.  At what point did I first meet the character?  Or actually

10 start exchanging personal information?

11 Q.  Probably the personal information.

12 A.  That would have been towards the latter end of 2008, I

13 believe.

14 Q.  Okay.  And that's when she revealed who she was and you

15 revealed who you were?

16 A.  Names were not really exchanged.  By personal information,

17 it was more, "Hey, I happen to be living in this time zone,

18 this city," then it got to here's the general -- it was a very

19 slow leaking of information.

20 Q.  Where did you ultimately learn she was living?

21 A.  Toronto, Ontario, Canada.

22 Q.  Canada?

23 A.  Yes, sir.

24 Q.  And you told her where you were living?

25 A.  Yes.  Yes, sir.

1  Q.  Did she -- did you ever invite her to come out, to meet
2  her personally?
3  A.  Yes.  Eventually when the divorce was final, she was
4  looking to spread her wings, do a little bit of touristy
5  stuff.  I offered to show her around California, she came out.
6  Q.  When did she come out?
7  A.  The first time was about a year after that, latter end of
8  2009, I believe.
9  Q.  Some time in 2009?
10 A.  Yes, sir.
11 Q.  You said the latter end?
12 A.  I believe so.
13 Q.  Okay.  How long was she here the first time?
14 A.  The first time?  Not very long, maybe like a week.
15 Q.  Okay.  And then did you continue the communication with
16 her?
17 A.  Yes.  After we actually met each other face to face, it
18 kind of -- started talking more.  That was right about the
19 time Rebecca and I were starting to drift apart.  We
20 eventually were still living together, but we were roommates
21 basically.  Separate lives.  Separate rooms.  All that.  And
22 Angele ended up becoming my best friend.
23 Q.  Okay.  Did she come out again?
24 A.  Frequently, yes, sir.
25 Q.  Did she ever bring the children with her?

1    A.   Eventually, once we learned enough about each other that

2    she trusted me around her children, yes.

3    Q.   Okay.  Did she -- when she came out to stay with you, did

4    she stay with you when Rebecca was there?

5    A.   When I was still with Rebecca, living with Rebecca, no.

6    She would usually get a motel.  After we were roommates, she

7    would tend to stay, yes.

8    Q.   So at some point you and Rebecca moved on, separate

9    residences?

10   A.   Eventually, yes, sir.

11   Q.   After you did that, were you living in an apartment?

12   A.   Yes, sir.

13   Q.   Would Angele then come out and stay with you in the

14   apartment?

15   A.   She helped me move into the apartment.  Yes, sir.  And

16   then she would come out and stay.

17   Q.   Did you have a computer in the apartment?

18   A.   Just one at that point because there wasn't much room.

19   Q.   Was it any of the ones in this case that we have?

20   A.   I don't believe so.  I believe it's been reformatted,

21   retasked, yeah.

22   Q.   All right.  At some point did you then move from that

23   apartment to a place, a house?

24   A.   Yes, sir.

25   Q.   Where?

Henry   D

13

1    A.   That would be the Burman Drive address.

2    Q.   And that's where the search took place?

3    A.   Yes, sir.

4    Q.   And you moved there with Angele?

5    A.   Yes.

6    Q.   And were the kids with you guys then?

7    A.   Yes, sir.

8    Q.   Her two children?

9    A.   Yes.

10   Q.   When you're there at the house now, you had -- was there

11   more space?

12   A.   Quite a bit.  Quite a bit, yes, sir.

13   Q.   Okay.  Were you working at Lock-N-Stitch at the time you

14   first met Angele?

15   A.   Long before, yeah.  I was working there when I was living

16   in Fresno and commuting.

17   Q.   I forgot to ask you.  When did you start at Lock-N-Stitch?

18   A.   It was actually July of 2005.

19   Q.   Okay.  And you -- she started coming out in 2009?

20   A.   Yes, sir.

21   Q.   So you'd been there four years already?

22   A.   Yes, sir.

23   Q.   And you have -- how many computers did you have in your

24   apartment?

25   A.   Not much space, just one at that point.

1  Q.  When you went to the house, how many square feet in that
2  house?
3  A.  Oh, 2500 and change.
4  Q.  How much?
5  A.  2500 and change.
6  Q.  Okay.  And did you have more than one computer then?
7  A.  Not on day one.  But very shortly after, she got her own.
8  More started being added as parts became available.  Yes, sir.
9  Q.  In addition to your job at Lock-N-Stitch, did you help
10 other people repair their computers?
11 A.  Quite often.  Yes, sir.
12 Q.  Did people drop off their computers at your place?
13 A.  Yes, sir.
14 Q.  And did you ever get to work on all of them?
15 A.  Most of them, yes, sir.  Sometimes there would be just a
16 dead one and I'd try booting it up and determined that it was
17 just flat dead and I'd have to tell them and they'd just go
18 buy a new one and it would just stay there.
19 Q.  Did you keep them there at your house though?
20 A.  Any time I thought there was a part that I could salvage
21 and retask, I would generally, yes.
22 Q.  Keep it there.  Where did you put it?
23 A.  Big pile in the garage.
24 Q.  Okay.  There was an item 16 that was found in the garage.
25 A.  Yes, sir.

1   Q.  Now, was that a computer that was in use when Angele came

2   out?

3   A.  When she first came out, yes.  It was actually my primary

4   in 2009.  Yes, sir.

5   Q.  2009.  Okay.  And did she use that item 16 at all?

6   A.  Yes.  In fact, actually in the summer of 2010, I had moved

7   on to another computer and set that one up for her.  She

8   became a sole user of it.

9   Q.  Was that being used -- do you know what Skype is?

10  A.  Yes, sir.

11  Q.  And that -- you tell us.

12  A.  It's a video chat that you can -- it's almost like the

13  iPhone app, the FaceTime, similar to that.

14  Q.  Did she use that, Skype --

15  A.  Yes.

16  Q.  -- aspect of that computer?

17  A.  Yes, sir.

18  Q.  To do what?

19  A.  Long distance rates were kind of expensive.  Often times

20  she would visit without the kids.  She would use that to keep

21  in contact daily, talking to them before bedtime.  Just

22  keeping in contact with them.

23  Q.  That's when they were back in Canada and she's here?

24  A.  Yes, sir.

25  Q.  Okay.  Now, did you guys have a common interest in terms

1  of adult pornography?

2  A.  Yes, sir.

3  Q.  Tell us about that.

4  A.  She liked watching it.  And so did -- and I -- wasn't

5  objectionable.  Yes, I liked it too.

6  Q.  You both enjoyed watching adult pornography?

7  A.  Yes.  Not -- together, yeah.

8  Q.  Yeah.  Did you ever download adult pornography?

9  A.  Yes.  Yes, sir.

10  Q.  And when did you start doing that?  Was it before her or

11  after her?

12  A.  Sorry.  Back in college, I'd had some friends, we'd all

13  swap around data.  We'd get stuff.  There was quite a bit of

14  that being exchanged.  We were all young guys.  And those all

15  kind of ended up in the junk pile.  And eventually she came

16  out, those got pulled out, put on the stuff.  And then later,

17  I ended up downloading more, yes, sir.

18  Q.  Okay.  So you were downloading adult pornography prior to

19  her coming out?

20  A.  I don't know.  I don't remember ever actually downloading

21  it.  I think it was more just swapped around on CDs and

22  various media.

23  Q.  Okay.  Are you familiar with the Shareaza program?

24  A.  Yes, sir.

25  Q.  What is -- it's a peer-to-peer program?

1   A.  Yes, sir.

2   Q.  Have you used that before?

3   A.  Yes, sir.

4   Q.  When did you start using Shareaza?

5   A.  The earliest date that I know for sure is based on some of

6   these evidence reports.  The oldest file was from December of

7   2005, I believe it was.

8   Q.  And why were you using it in December of 2005?

9   A.  I've used it for years for primarily music.  It did have a

10  few applications for work, but mostly just for music.

11  Q.  Did you use Shareaza for work at all?

12  A.  Yes, sir.

13  Q.  And from 2005?

14  A.  Yes, sir.

15  Q.  Okay.  For what purpose for work?

16  A.  As an example, there was one program that my employer

17  was -- liked to use, it was his preference.  And the company

18  ended up going bankrupt.  But they weren't bought out by

19  anybody.  So the program wasn't transferred to another

20  company.  So he'd asked me if I could find a copy of it for

21  him.  And I was able to find one on Shareaza.

22  Q.  Did you use the Shareaza program at work to download adult

23  pornography?

24  A.  Eventually, yes, sir.

25  Q.  When did you start doing that?

1  A.  After we got back from the honeymoon.  So it would have

2  been, approximately, I believe, the third week of May 2013.

3  Q.  The third week.

4  A.  Yes.

5  Q.  And you were downloading adult pornography?

6  A.  Yes, sir.

7  Q.  Okay.  How many videos of adult pornography do you think

8  you had?

9  A.  I never did an exact count, but between all the devices,

10  old, new, et cetera, probably in the realm of 10,000.

11  Q.  That many?

12  A.  Very -- like some of them would be tiny, some of them

13  would be large, but total quantity probably --

14  Q.  Did you ever get to view all of those?

15  A.  No.

16  Q.  Why would you have so many if you haven't even viewed

17  them?

18  A.  At first it was just because they were handed over and

19  they just kind of went into the pile.  I was at work all day.

20  Angele would watch a lot of them while she was home alone

21  without the kids.  Eventually she -- we were talking and she

22  said she had either gone through all or at least most of them

23  and was looking for fresh material.

24  Q.  So you would put search terms in for the adult pornography

25  at work?

1   A.   Yes.

2   Q.   You knew it was -- did you know it was against policy?

3   A.   Yes.

4   Q.   Why did you do that?

5   A.   Angele was -- we -- she had gotten pregnant in February, I

6   believe, of that year.  And --

7   Q.   2013?

8   A.   Yes, sir.  And she started having issues, complaining of

9   complications.  She was always wanting to engage in sex on a

10  daily basis.  But it started becoming problematic for her.

11  And she was -- the way she said it was she wanted something to

12  spice it up, to engage her more, something that she could take

13  her mind off, something new.  And that was my first time going

14  through a pregnancy with somebody and to me it was -- it

15  seemed like her version of pickles and ice cream, I guess.

16  Q.   Okay.  I'm going to show you what's marked as Government's

17  Exhibit 1.  There's 1.  Do you recall seeing this at all?

18  A.   Yes, sir.

19  Q.   And what is this?

20  A.   That was my computer at work.

21  Q.   At work.  And my finger is pointed to what?

22  A.   I believe that is 1A, sir.

23  Q.   And the one next to it?

24  A.   1B, sir.

25  Q.   On this 1A, is this the downloading material that you had

20

1   from Shareaza?

2   A.   Both of those had been used to download Shareaza in their

3   time.  When the police showed up, it was the one on the left

4   that was currently being used.

5   Q.   Okay.  And the one on the right, what was on that one?

6   A.   That also had Shareaza.  That was the hard drive in use

7   prior to the other one.  It was -- that one was in use from, I

8   believe it was January of 2011 to approximately the same time

9   in 2012.  And then 1A was in use from approximately January of

10  2012 up to the search warrant.

11  Q.   All right.  Did you dislodge the distribution -- I can

12  never think of the right terminology.  Dislodge -- prevent

13  anything coming in from being distributed?

14  A.   Yes, sir.

15  Q.   Did you do that on Exhibit -- on 1A?

16  A.   I habitually did it on all the copies of Shareaza that I

17  use.

18  Q.   Even on the 1B that had the music on it?

19  A.   Yes, sir.

20  Q.   Why did you do that?

21  A.   Years ago, when I first started using it, internet lines

22  were quite a bit slower and I found -- like I said earlier, I

23  did spend time playing online games and stuff.  And a lot of

24  time I would let Shareaza run in the background.  And when I

25  first started using it, I used the default settings across the

21

1  board.  And I found that it would take up so much of the

2  connection that anything else that I tried to do was

3  agonizingly slow.  So I just got in the habit of turning that

4  off.

5  Q.  Okay.  Did you have computers at home at this point in

6  time?  In September of 2013.

7  A.  Yes, sir.

8  Q.  All right.  Did you have one that you used most of the

9  time?

10  A.  Yes, sir.

11  Q.  I want to show you what's marked as 5. -- Government's

12  Exhibit 5.1.  Can you tell us what that is?

13  A.  That is my computer, my primary computer at home on the

14  desk in the living room.

15  Q.  And looking at 5.2.

16  A.  Same computer.

17  Q.  Same computer?

18  A.  Yes, sir.

19  Q.  And that was in the living room?

20  A.  Yes, sir.

21  Q.  Did you ever play child pornography on that computer?

22  A.  No, sir.

23  Q.  Did you ever download any child pornography --

24  A.  No, sir.

25  Q.  -- on that computer?

Henry D

22

1       Did you ever access that computer to your work

2  computer at work that was in Exhibit 1?

3  A.   No, sir.

4  Q.   Could you have done that?

5  A.   No, sir.  Not the way anything was configured.

6  Q.   Showing you Government's Exhibit 5.3.  What is that on the

7  table there?

8  A.   That was two computers.  She was actually in the middle of

9  transferring from one computer to another.

10  Q.   Who is "she"?

11  A.   Sorry.  Angele.  She did not have enough room in her

12  office for both computers under the desk.  So I -- she

13  temporarily set up a work station on the kitchen table just to

14  transfer data over.

15  Q.   Was she using the computers there at the table?

16  A.   Yes, sir.

17  Q.   Looking at Government's 5.5, what is that?

18  A.   That is the master bedroom looking into the master

19  bathroom.

20  Q.   And is there a computer in that picture at all?

21  A.   There is a monitor, keyboard, et cetera on the dresser fed

22  to a computer in the wall behind.

23  Q.   In the bathroom, is it?

24  A.   Yes, sir.

25  Q.   And showing you Exhibit 5.6, what is this?

1  A.  Side view of the same monitor and dresser.

2  Q.  Showing you Exhibit 5.7.  What are those?

3  A.  Number 8 is the computer that the lines go through the

4  wall into the monitor we just saw.  And 9 is the network

5  attached storage, the Netgear device.

6  Q.  This is in the bathroom?

7  A.  Yes, sir.

8  Q.  Any particular reason why it's in the bathroom?

9  A.  As I said, she and I would watch it and that computer,

10  having the monitor there was obviously, you know, personal

11  time, you don't want the kids -- it's --

12  Q.  Exhibit 5.8.  What is this one?

13  A.  That is a set of shelving units, areas in the master

14  bathroom -- bedroom, excuse me, looking into the master

15  bathroom.  At the time we were using it as a changing table

16  for the newborn.

17  Q.  Did you ever set up a camera in the bedroom to videotape

18  anybody?

19  A.  We had had -- my wife was very firmly bisexual and we had

20  had a few threesomes, some of those were recorded.

21  Q.  Specifically did you ever set up a camera to videotape

22  A.T. in the bedroom?

23  A.  No, sir.

24  Q.  Did you ever set up a camera to videotape A.T.?

25  A.  I set up the camera that was used to, but I never set it

1    up for that reason, no, sir.

2    Q.   All right.  Let me show you what's marked as Government's

3    Exhibit 5.9.  What is that?

4    A.   That is the bathroom at the front of the house, just

5    outside my wife's office.

6    Q.   All right.  And there is the planter there.

7    A.   Yes, sir.

8    Q.   And is that the planter that has the camera in it?

9    A.   I don't know if it did at this time.  Depending on which

10   warrant that was out of.  But that was the one that was used,

11   yes, sir.

12   Q.   This is a picture taken from the first warrant by the

13   state.

14   A.   Okay.  Then it's not in there, no, sir.

15   Q.   Okay.  It's not in there?

16   A.   No, sir.

17   Q.   When was it put in?

18   A.   Put in?  February of 2012.

19   Q.   And the purpose of putting it in?

20   A.   My wife was very firmly an exhibitionist and she used to

21   do public stuff in Toronto.  And when she came out here, I

22   told her "you cannot get away with that here."  And she had

23   otherwise -- there are quite a few videos in her folder.  She

24   would record herself in various activities alone and she

25   wanted to be able to continue doing that.

1    Q.  And view the videos?

2    A.  Yes, sir.

3    Q.  Were you intending on videotaping other people in the

4    bathroom?

5    A.  No, sir.

6    Q.  Show you a picture of the --

7              THE COURT:  Would this be a convenient time to break?

8              MR. CAPOZZI:  Oh, yes.  I'm sorry, judge.  We're

9    going to go a while.

10             THE COURT:  Ladies and gentlemen, please heed the

11   Court's previous admonition.  We'll reconvene at 1:30 this

12   afternoon.  1:30.

13       (The jury left the courtroom.)

14             THE COURT:  We're outside the presence of the jury.

15   Are there other defense witnesses after Mr. Henry?  One more.

16             MR. CAPOZZI:  Short character.

17             THE COURT:  Do you still think we're going to

18   conclude this afternoon?

19             MR. CAPOZZI:  I'll be done in an hour.

20             THE COURT:  Okay.  And then cross.  Perhaps it would

21   be best, then, if we -- whenever we end, if we end early,

22   would counsel then be available to talk briefly about jury

23   instructions?

24             MR. CAPOZZI:  Yes, I think we should.

25             THE COURT:  And we'll finalize that tonight.  Mr.

1    Gappa was nodding, I didn't wait for his answer.

2              MR. GAPPA:  Yes.  Yes.

3              THE COURT:  So whenever we finish today, we'll --

4              MR. CAPOZZI:  Good.

5              THE COURT:  -- talk about jury instructions.  We'll

6    get them finalized so that you have a packet if not late

7    tonight, then by the minute you report to the courtroom

8    tomorrow.

9              MR. CAPOZZI:  Okay.

10             MR. GAPPA:  And Your Honor, just as a protocol issue,

11   is it the Court's practice to do all or most of the

12   instructions after argument?

13             THE COURT:  I do all of the instructions after

14   argument.  But that's why I want to finalize the packet.  You

15   are free to use the packet of jury instructions during your

16   argument.

17             MR. GAPPA:  Thank you, Your Honor.

18             THE COURT:  All right.  See you at 1:30.

19        (Lunch Recess.)

20        (The jury entered the courtroom.)

21             THE COURT:  Let the record reflect we are back in the

22   presence of the jury.  Sorry for the delay, ladies and

23   gentlemen.  I had one additional matter I was taking care of

24   just before we brought you back in, ran a little over.

25             Mr. Capozzi, you may continue with your examination.

1              MR. CAPOZZI:  Thank you, judge.

2    Q.  I think I was showing you some pictures of the residence

3    on Burman Avenue.  And showing you Exhibit Number 5.10.  I

4    think I showed this to you, but I'm not sure.  Is this the

5    computer that you use at your house?

6    A.  Yes.

7    Q.  And this is the one that was sitting on the desk?

8    A.  Living room.

9    Q.  What is this that I'm looking at?  What is this?

10   A.  That's the computer tower.

11   Q.  Computer tower?

12   A.  Yes.

13   Q.  Okay.  And then this, in Exhibit 5.1, that's the monitor?

14   A.  Yes.

15   Q.  On your desk?

16   A.  And the tower is over to the right of it.

17   Q.  To the right?

18   A.  Yes.

19   Q.  Over here somewhere?

20   A.  Between the fish tank and the monitor.

21   Q.  Right in here somewhere?

22   A.  Yes.

23   Q.  Is it on the floor or up higher?

24   A.  No, it was right where you were pointing.

25   Q.  Then you had items stored in the garage.  Did you not?

1    A.  Yes, sir.

2    Q.  And on the day that the state came in and did a search

3    warrant, Exhibit 5.11.  Was that the condition of your garage?

4    A.  Yes.

5    Q.  Now, on your computer at work.  That Exhibit number -- I

6    think it was Number 1.  Did you put in the Shareaza program on

7    that computer?

8    A.  Yes, sir.

9    Q.  What date did you do that?

10   A.  I don't remember, but I would think it would be shortly

11   after the installation of the operating system and stuff.

12   Which I believe was on 1A we're talking about, or 1B?

13   Q.  I'm talking about Lock-N-Stitch where you did the Shareaza

14   to download the adult pornography.

15   A.  Oh, what date did I install Shareaza?

16   Q.  Yes.

17   A.  There's two hard drives, they both have Shareaza on it.

18   1B would probably have been installed around January of '11

19   and the other one around January of '12, on 1A.

20   Q.  When did you start downloading the adult pornography

21   on --

22   A.  I believe it was the --

23   Q.  -- work --

24   A.  -- second or third week of May of 2013.

25   Q.  Was that around May 23rd?

1  A.  Yeah, it would have been just before then, I believe.

2  Q.  And you were using Shareaza?

3  A.  Yes, sir.

4  Q.  Ever hear of LimeWire?

5  A.  Not until recently in regard to this case.

6  Q.  Have you ever used LimeWire?

7  A.  No.

8  Q.  Pardon me?

9  A.  No, sir.

10 Q.  And when you say you downloaded adult pornography starting

11 on May 23rd, tell us the process how that works.

12 A.  It's been pretty well described in here.  There's -- you

13 can either go by category or I would do like kind of generic

14 search terms related to some of the adult stuff that Angele

15 and I had seen on websites, commercial websites.  And look for

16 stuff with that.

17 Q.  So you put -- assume you put the word search terms in at

18 ten o'clock in the morning.  Do you sit there and wait until

19 noon to get everything that you put in?

20 A.  No.  When you first enter the search terms, it relatively

21 quickly comes back with a list of available files associated

22 with either that term or the tags or whatever.  And then you

23 can select files from that list and tell them to download and

24 then they can begin.

25 Q.  Okay.  Does it -- what period of time were you downloading

1    this adult pornography?

2    A.   As in what time did I start it going?  Or what time was it

3    running?

4    Q.   Started it on May 23rd, around there.

5    A.   Yeah, about a few days before.

6    Q.   How long did it run?

7    A.   Just in the background off and on until the police came.

8    Q.   Pardon me?

9    A.   In the background off and on until the police came, the

10   program was running.

11   Q.   The police came in September, 2013?

12   A.   Correct.  Some files will download quickly, other ones

13   will take a long time.  In fact, as was mentioned earlier,

14   even at the warrant, there was still like 700 plus files in

15   the process of being downloaded that had not finished even

16   months later.

17   Q.   So from May 23rd, 2013 until September, was it 19th, 2013,

18   when the raid happened, the search happened, downloads were

19   still occurring?

20   A.   Yes.  The downloads at the time of the search warrant were

21   still -- continuation of the searches that apparently happened

22   way back in May.

23   Q.   Okay.  And did you have an opportunity to review all of

24   those videos that came through during that period of time?

25   A.   No, sir.

1    Q.   What would you do?

2    A.   I would -- whenever there was something in the completed,

3    I'd move it over to a storage file.  And whenever there was a

4    few in the storage file, I would copy them using like a thumb

5    drive to the Netgear at the house.

6    Q.   What's a thumb drive?

7    A.   A little stick you can plug into a USB port that has

8    storage on it.  That's all it's for.

9    Q.   You plug it in the side of your computer at work?

10   A.   Yes.

11   Q.   And then you would download what's on the computer from

12   the Shareaza on to that thumb drive?

13   A.   Yes, sir.

14   Q.   Do you sit there and watch everything while it's

15   happening?

16   A.   No, sir.

17   Q.   It just happens without being on the monitor?

18   A.   You get like a little progress bar and it's done.

19   Q.   So you take it on the thumb drive.  What do you do with

20   that thumb drive?

21   A.   Then I would, when I went home for that day, either that

22   day or a few days later, whenever I got to it, I would do the

23   same thing in reverse and move them over to the Netgear.

24   Q.   Did you watch them when you do that?

25   A.   No, sir.

1    Q.  How many times did you do that, download it on a thumb

2    drive?

3    A.  I don't recall.  They -- they go slowly.  It wasn't very

4    many times over the months.

5    Q.  Okay.  And you saw the police reports in this case.

6    A.  Yes.

7    Q.  When did the child pornography start downloading, what

8    date?

9    A.  May 28th.

10   Q.  And it went through to what date?

11   A.  June 3rd.

12   Q.  2013?

13   A.  Yes, sir.

14   Q.  And there was no more search terms put in --

15   A.  No more search terms, no more new downloads.  All of it

16   was within that time frame.

17   Q.  Okay.  Let's look at Exhibit 5. -- well, let me see.  Here

18   it is.  Exhibit -- Government Exhibit 1A.4 is the exhibit

19   number.  Can you read it up there?

20   A.  Yes, sir.

21   Q.  Now, these are -- tell us what this is, if you can.

22   A.  That is a list of the search terms recovered from item 1A.

23   Q.  The search terms recovered from where?

24   A.  1A, my work computer.  It's a partial list.  There's

25   another 26, I believe.

1  Q.  Looking at page 2.  There's more.

2  A.  Yes.

3  Q.  Searches terms.

4  A.  Yes.

5  Q.  And page three.

6  A.  Yes, sir.

7  Q.  Okay.  Now, did you come to learn what Angele's interests

8  were?

9  A.  Yeah, she was pretty open about some things.

10 Q.  In terms of -- what about renaissance fairs, have you guys

11 gone to renaissance fairs?

12 A.  Yes.  We ended up going to one.  In fact, she like

13 homemade costumes for the whole family to wear.  And of course

14 hers included a corset.  And, yes.

15 Q.  And do you speak French?

16 A.  I picked up a couple of phrases, like "come here please" I

17 would hear her say to the kids.  But other than that, I surely

18 wouldn't be able to spell it.

19 Q.  Did she speak some French?

20 A.  Yes, sir.  A fair amount.

21 Q.  Did she write some French?

22 A.  I believe so.  I'm not sure I ever actually saw her

23 writing much, but I've seen her write a few odds and ends.

24 Q.  Do you speak French?

25 A.  No, sir.

1    Q.   Do you understand French?

2    A.   No, sir.

3    Q.   Okay.  On the top here, it says last written date is June

4    30th.  You see that?

5    A.   June 3rd.

6    Q.   June 3rd, 2013.  I'm sorry.  So does that mean the last

7    day that the search terms were put in?

8    A.   From my understanding, that was the last time that this

9    registry entry was updated, written to.  Which would mean the

10   last time a search term was entered, yes.

11   Q.   Did you put the search term "corset" in?

12   A.   No, sir.

13   Q.   By putting that term in -- well, if you did put it in,

14   what would you expect to get back?

15   A.   Probably stuff related to corsets.

16   Q.   You didn't put that term in?

17   A.   No, sir.

18   Q.   Going down the list.  "Adilia"?

19   A.   No, sir.

20   Q.   "Horse"?

21   A.   No, sir.

22   Q.   "Pony"?  "Dog"?

23   A.   No, sir.

24   Q.   Keep going down the list.  "Mommy me"?

25   A.   No, sir.

1  Q.  "Mom daughter"?

2  A.  No, sir.

3  Q.  "Skirt"?

4  A.  No, sir.

5  Q.  Did you have an interest in little girls with skirts?

6  A.  No, sir.

7  Q.  Did Angele ever mention that to you?

8  A.  I knew she liked women in skirts.  She would -- had some,

9  yes.

10 Q.  Indeed, in that videotape of [A.T.] in the bedroom, did

11 you see a little skirt that was displayed?

12 A.  Yes.  That was one of her favorites.

13 Q.  How about "r@ygold"?

14 A.  No.  I never even heard of that before this case.

15 Q.  "Costume porn"?

16 A.  No, sir.

17 Q.  And going to the next page is "costume porn" again.  Any

18 of these down the list to where my pen is, where it says

19 "bedroom dancing paroles did he chanson"?

20 A.  No, sir.

21 Q.  As far as you know, is that a French term?

22 A.  Looks like it to me, from what I've seen.

23 Q.  Did you put that in?

24 A.  No, sir.

25 Q.  Did you put "bedroom" in?

1    A.   No.

2    Q.   How about "friendly indians"?

3    A.   I believe so, yes.

4    Q.   What is "friendly indians"?

5    A.   It's actually -- if I remember correctly, it's the band

6    that does the theme song to one of the shows that we were

7    watching.  So we were looking for a clip of the theme song.

8    Q.   So the list below that, are those songs?

9    A.   Yes.

10   Q.   What about "libertines"?

11   A.   That is -- we got that -- or I got that from one of the

12   adult commercial websites that we would look at.

13   Q.   Going to the next page.  Did you put any of those?

14   A.   I believe I put all those in.  And they are all related to

15   like I said, the adult commercial websites.

16   Q.   Have you ever gotten child porn on any of those?

17   A.   As far as I know, no.  No.  Nothing in that time frame

18   came in.

19   Q.   In downloading adult porn, would you ever get child porn?

20   A.   Not that I have ever seen from that, no.

21   Q.   Did child porn ever come in that you didn't intend to get?

22   A.   As in "come in," you talking downloads?

23   Q.   Downloads, yeah.  Sorry.

24   A.   I've never seen any from downloads like that.  Like, when

25   we were -- like I said, back in college, when we would swap

Henry D.

1  stuff around, we'd end up -- there was a few things

2  that -- I've since learned a new definition of.  But at the

3  time I thought they were what I would have called questionable

4  under that, and they always got deleted.

5  Q.  Whenever you received something else that you thought was

6  child porn, what did you do?

7  A.  Instantly deleted it.  Purged it.

8  Q.  When you took that thumb drive home and put it on a device

9  back home, which device was that?

10  A.  That would be the Netgear.

11  Q.  I'm sorry?

12  A.  That would be the Netgear, sir.

13  Q.  Item number 9?

14  A.  Yes.

15  Q.  Did you put it on the media side, Aurrora side?

16  A.  No, I would specifically put it on the Aurrora.

17  Q.  Did you ever give the thumb drive to Angele to put on the

18  Netgear?

19  A.  I don't recall.  It's possible.

20  Q.  There's a password for the Aurrora side of the Netgear;

21  correct?

22  A.  Yes, sir.

23  Q.  You said that Angele had that password?

24  A.  Yes, sir.

25  Q.  Why are you so sure of that?

38

1    A.   Because it was originally set up for us and communal

2    access.   And that side -- the media folder -- the Netgear had

3    a couple of different functions.   One of them was overall

4    network storage.   But it could also stream media to another

5    device, like a DVD player on the network that's capable of

6    accepting media that way.   So -- but it -- the DVD player

7    couldn't access through a password.   There was no option to

8    type that in.

9            So the media player was a folder that originally

10   contained just sorted named movie files so that they could be

11   played on another screen in the house.   And the Aurrora folder

12   was all our vacation pictures, the unsorted stuff, everything

13   else basically.

14   Q.   Why is that on the password protected if it's family

15   stuff?

16   A.   Part of my job is the whole security thing.   And you hear

17   horror stories about somebody's home network getting hacked

18   and the next thing you know home movies are all over the

19   internet.

20   Q.   There was some child pornography videos played in court.

21   Have you ever seen those child pornography videos before?

22   A.   I haven't seen them yet.   I wasn't going to watch.

23   Q.   You didn't look at them here?

24   A.   No.

25   Q.   Have you ever seen -- well, you don't know --

Case 1:13-cr-00409-ADA-BAM   Document 270   Filed 02/06/18   Page 39 of 98
Henry D.

39

1    A.  The descriptions of the ones that I read in the police

2    reports, no.

3    Q.  No.  There was some videos of you taking down a curtain in

4    the bathroom.  Do you remember why that occurred and how that

5    occurred?

6    A.  It actually happened -- occurred relatively recently.  It

7    was -- frequently it was a cloth curtain.  My wife -- like I

8    said, I was usually at work, she tended to be home all day.

9    And one of the things she did take care of was the laundry.

10   And every once in a while she'd say, "Hey, it's time to wash

11   that thing" and I'd, you know, take it down.

12   Q.  And that -- in that video, it seemed -- it's a cloth

13   curtain?

14   A.  Yes.

15   Q.  What were you doing with it?

16   A.  Taking it down to be washed.

17   Q.  Were you taking it down because you couldn't get a good

18   view of [A.T.]?

19   A.  No, sir.

20   Q.  Did you even know [A.T.] was being videotaped?

21   A.  No, sir.

22   Q.  When the curtain was taken down, did you see Angele take

23   the curtain?  Did you hand it over to her?  Do you remember

24   that?

25   A.  Yes.

1    Q.  What was she doing?

2    A.  She -- when we bought it, I think she got it at like

3    Kohl's or something.  But you buy the curtain in one fabric

4    section and then nearby you can like pick which hooks you want

5    to go in it.  And they have to be like pulled out.

6    Q.  So she was taking the hooks out?

7    A.  Yeah, they're metal hooks.

8    Q.  Can you tell whether or not she was putting them in a

9    drawer?

10   A.  It looked like she was putting them in the drawer by the

11   door.

12   Q.  What were you doing with that curtain then?  Was it

13   washed?

14   A.  I don't remember.  I handed it over to her on my way out

15   of the house.

16   Q.  Okay.  27.2.  We just have a still shot of a 27.2.  But

17   the curtain -- well, it's right here.  But it was taken down

18   that day?

19   A.  That's the one from that day, yes.

20   Q.  And then she put the hooks in a drawer there?

21   A.  Yes, sir.

22   Q.  Was that curtain ever put back up?

23   A.  Yes, sir.

24   Q.  Pardon me?

25   A.  Yes, sir.

1    Q.   Do you remember when?

2    A.   No.  Like I said, it went up and down fairly frequently.

3    We had two large dogs living in the house, trained dogs.  We

4    had two children.  Things got dirty on a relatively regular

5    basis.  So it would -- things were always getting washed and

6    that was one of them.

7    Q.   When the police came out and searched the first time,

8    they -- there was a plant in the -- above the shower; is that

9    correct?  With a camera?

10   A.   Well, it wasn't in there then.  But yes, the plant was

11   there.

12   Q.   Good point.  Thank you.  When the police came out the

13   first time, September 19th, 2013.  The plant was still there;

14   was it not?

15   A.   Yes.

16   Q.   Was the camera there?

17   A.   No, sir.

18   Q.   Did you know the police were coming on that first search?

19   A.   No, sir.

20   Q.   You were surprised?

21   A.   To say the least.

22   Q.   Why wasn't the camera there?  Did you take it down?

23   A.   Yes.  Quite a while before.

24   Q.   When did you take it down?

25   A.   May.  It would have been the first half of May.

1  Q.  Of 2013?

2  A.  Yes, sir.

3  Q.  But the plant was still in the bathroom?

4  A.  Yes.

5  Q.  Above the shower.  Was there any reason to leave the plant

6  still up there if the --

7  A.  Decoration.

8  Q.  Okay.

9  A.  Left it.

10  Q.  I want to find that picture, if I can.  Showing you

11  Exhibit 10.1.  Is that your house in Turlock?

12  A.  Yes, sir.

13  Q.  Now, I'm going to show you a picture.  It's Government

14  Exhibit 10.2.  10.2.  And I'll show you the Bates number on

15  this picture.  Do you see that?

16  A.  Yes, sir.

17  Q.  When was this picture taken by the government?

18  A.  I would presume that to be the second one, since it's

19  focusing on.

20  Q.  The second search warrant?

21  A.  Yes, sir.

22  Q.  And that was in November?

23  A.  Yes, sir.

24  Q.  Was there a camera in there?

25  A.  No, sir.

1    Q.   And where was this located?

2    A.   That's the front bathroom outside Angele's office.

3    Q.   So you hadn't taken that out of the bedroom?  Or bathroom?

4    A.   The plant?  No.

5    Q.   Let me show you a defense exhibit that I showed Detective

6    Hively.  It's Exhibit H.

7    A.   Yes.

8    Q.   It was described as that bathroom where the camera was; is

9    that correct?

10   A.   Yes, sir.

11   Q.   What do you see in that picture?

12   A.   At this point, I see the counter, the tub with the curtain

13   up.

14   Q.   What's right here?

15   A.   A mirror.

16   Q.   Pardon me?

17   A.   A mirror.

18   Q.   Mirror.  And what is this right here?

19   A.   That is a painting that -- I can't remember if Angele did

20   it herself or one of her class did it or something.  But it's

21   a painting.

22   Q.   And was this on -- across the way?

23   A.   Yes, sir.

24   Q.   And what is this right here?

25   A.   I'm sorry, that's off screen, I can't see.

1    Q.  Oh, right -- oh, sorry.  What is this right here?

2    A.  That is the planter hanging in the shower.

3    Q.  And was that the way that bathroom was when the police

4    came out on the second search?

5    A.  Yes, sir.

6    Q.  And the plant was still in the same place --

7    A.  Hadn't moved.

8    Q.  -- as it was on the first search?

9    A.  Yes, sir.

10   Q.  You didn't take it down and try to hide it from them?

11   A.  Didn't -- there wasn't a reason to.

12   Q.  And showing you Exhibit -- Defense Exhibit J.  Was this a

13   picture -- let me see, which way does it go?  This way.  A

14   picture of the plant?

15   A.  Yes, sir.

16   Q.  Next to that painting?

17   A.  Yes, sir.

18   Q.  In the bathroom?

19   A.  Yes, sir.

20   Q.  And this was on the second search?

21   A.  That's when they took it, yes, sir.

22   Q.  So the plant was in the bathroom and not in the garage?

23   A.  Correct.

24   Q.  And when you put that camera in the plant in the bathroom,

25   was that to videotape juveniles?

45

1  A.  No.

2  Q.  To -- A.T.?

3  A.  No.

4  Q.  Other adults?

5  A.  No.  Well, other than Angele, no.

6  Q.  Did you take any snapshots of any of those videos with

7  A.T. being naked?

8  A.  I didn't even know the videos were there, much less take

9  snapshots of them.

10  Q.  You didn't take any of those snapshots?

11  A.  No, sir.

12  Q.  Did you ever see those videos before you ever came to

13  court here?  Well, I showed you, did I not?

14  A.  Yes, sir.

15  Q.  Did you ever see videos of her naked, A.T.?

16  A.  Only --

17  Q.  Here?

18  A.  Yes.

19  Q.  Okay.  How about the video of her in your bedroom?

20  A.  Again, I never seen that before we were going through

21  evidence.

22  Q.  Did you even know that that was going to be done?

23  A.  No.  I was at work.

24  Q.  Had you communicated with Angele that day?

25  A.  Yes.

Henry D

46

1    Q.  What were you doing that -- that was taken in the
2    afternoon; was it not?
3    A.  From what I've seen of the discovery, the first segment,
4    where it shows her setting it up was at 1:30 in the afternoon.
5    Q.  Where were you at 1:30 in the afternoon?
6    A.  I was at work.
7    Q.  Had you talked to Angele earlier?
8    A.  Yes.
9    Q.  And what did you tell her you were going to be doing that
10   afternoon?
11   A.  Around a little before noon, right around noon, I told her
12   that I had a meeting at two o'clock.
13   Q.  That you had to attend?
14   A.  Yes.
15   Q.  Did you tell her how long it would go?
16   A.  No.  But she had the car.  So whenever I --
17   Q.  Okay.  So you weren't home when that video was taken?
18   A.  No, sir.
19   Q.  And not aware of A.T. being videotaped?
20   A.  No.  Not even a little.
21   Q.  Did you have any interest in seeing her in that videotape?
22   A.  No.
23   Q.  Were you trying to sexually exploit her?
24   A.  No.
25   Q.  Did you have an agreement with your wife to sexually

1    exploit A.T.?

2    A.   Not even a little.

3    Q.   Was there any interest in sexually exploiting her?

4    A.   No interest in minors at all.  No.  No, sir.

5    Q.   Your interest is in adults?

6    A.   Quite firmly, yes, sir.

7    Q.   You're at this baseball game in the summer of, what, '12?

8    A.   '12, yes, sir.

9    Q.   All right.  And you're conversing with your wife.  Are you

10   not?

11   A.   Quite a bit.

12   Q.   All right.  Was it solely about young kids at the baseball

13   game?

14   A.   No.

15   Q.   What did you guys talk about?

16   A.   Talking about the fact that we were in a slew of debt and

17   we need to get her paperwork done so she could get a job.

18   Trying to figure out how we were going to pay the property

19   taxes.

20   Q.   And those are texts going back and forth?

21   A.   Yes, sir.

22   Q.   You saw the texts that the government put in?

23   A.   Yes, sir.

24   Q.   Was there more texts than just what they put in?

25   A.   Quite a bit.

48

1    Q.   Quite a bit?

2    A.   Yes, sir.

3    Q.   Why were you sending those pictures back to her?

4    A.   Originally it started -- she's from Toronto.  And when she

5    first started coming out here, it came as kind of a culture

6    shock at how much less the native Californians tend to wear.

7    And it was a bit of adjustment both for her and what she was

8    expecting her kids to wear in public and all that.  So it was

9    kind of just --

10   Q.   Have you gone back to Toronto?

11   A.   Yes.

12   Q.   You have?  A big city?

13   A.   It felt very similar to San Francisco actually.

14   Q.   Unfamiliar to Turlock?  Different than Turlock?

15   A.   Quite a bit.  As much as -- yes, small town versus San

16   Francisco, yeah.

17   Q.   On item 16, that's the one that was in use from '05 to '08

18   or '9, or had --

19   A.   It was in use until 2010.

20   Q.   It was last used in 2010.

21   A.   Yes.  According to the documents I've seen, it was last

22   used August 20th.

23   Q.   August 20, 2013.

24   A.   2010.

25   Q.   2010.  I'm sorry.  You're right.  Was Angele using that

1   computer?

2   A.   Yes.

3   Q.   Had you used Shareaza on that computer?

4   A.   Yes.

5   Q.   Did you use Shareaza to download any porn on that?

6   A.   No, sir.

7   Q.   She used that one.  How -- is there any way that child

8   porn -- child porn was found on 16; is that right?

9   A.   That's my understanding, yes.

10  Q.   Did you put any on there?

11  A.   No, sir.

12  Q.   Is there a way that could get there and have the dates '05

13  or '06, '07, '08 on there?

14  A.   Yes.

15  Q.   How?

16  A.   There's actually several.  The first is -- the most

17  easiest is doing like either a cut and paste or like a --

18  Q.   Speak into the mike.  I can't hear you.

19  A.   There's actually quite a few different ways that can

20  happen.  The most common would probably be either a cut and

21  paste or a move.

22  Q.   Did you have any device at your house, or at work that

23  transposed or put anything on item 16 that was child porn?

24  A.   No, sir.

25  Q.   Nothing?  Do you know whether or not the police found

Henry - D

50

1  anything, any item that transferred child porn over to that

2  device?

3  A.   Looking through everything, there was no source for it.

4  Q.   Now, we put the Cellebrite records in evidence, your

5  telephone records.

6  A.   Yes.

7  Q.   August 23rd, 2013 at 3:05 in the afternoon.  Where were

8  you?

9  A.   I was at work.

10  Q.   All right.  On the Shareaza computer at

11  Lock-N-Stitch -- let me go back to one other point.  I want to

12  show you -- it's Defense Exhibit D.1.  Is this a picture of

13  your office back then?

14  A.   Yes, sir.

15  Q.   And would Angele come in and sit in your desk there?

16  A.   Yes.  Usually in the afternoon, I was quite often working

17  out in the rest of the plant.  I would come in and see her

18  there.  But I wouldn't have any idea of knowing how long she'd

19  been there.

20  Q.   Would your computer be running?

21  A.   Yes.

22  Q.   Would it usually run all day?

23  A.   All day and sometimes night, yeah.

24  Q.   Did you have to put a password in it every single time if

25  it's running?

1    A.   Depends if I locked it when I was heading out.

2    Q.   Do you normally lock it when you were working around the

3    business?

4    A.   I try to remember because it's good security policy, but

5    sometimes I forget.

6    Q.   Do you know whether or not Angele had the password to

7    that --

8    A.   Oh, she did.

9    Q.   She did?

10   A.   Yes.

11   Q.   How do you know?

12   A.   Because I gave it to her.  She'd come in and help me on

13   the weekends sometimes if I had to do like server software

14   upgrades on the weekend at work stations, where there was like

15   30 work stations.  It cut the work load in half if two of us

16   are doing it.

17   Q.   Show you what's marked as Government's Exhibit Number 2.

18   You see the IP address on this one?

19   A.   Yes, sir.

20   Q.   71.94.43.84.

21   A.   Yes, sir.

22   Q.   What address to what computer is that?

23   A.   That was the address on the wireless through the B network

24   that Shareaza would run on.

25   Q.   And that was on that computer in your office?

1    A.  Yes.

2    Q.  On your computer that you had at home, item 3, the one on

3    your desk, there was no child pornography on that; correct?

4    A.  No, sir.

5    Q.  On the -- on Exhibit 31 of the government, 31.1.  We were

6    shown -- is this your home computer?

7    A.  I believe so.

8    Q.  Now, there's that 72.18.240.20.  What address is that for?

9    A.  That was the web server of the -- at the Lock-N-Stitch.

10   Q.  Lock-N-Stitch.  That's not to the one that had Shareaza on

11   it; correct?

12   A.  No, in fact, they're completely different addresses.  It's

13   a dedicated IP address on a T-1 --  on a completely different

14   internet access line.

15   Q.  I'm showing you an exhibit -- oops.  Somewhere here.  Oh,

16   there it is.  31.2, government's.  And there are other numbers

17   there.  Are any of those to the Lock-N-Stitch computer that

18   you had Shareaza on?

19   A.  I think the second one from the bottom one is the same

20   one.  Because it would be the wireless router.

21   Q.  The wireless router is 71.94?

22   A.  I believe so, yes.

23   Q.  Well, this is the Lock-N-Stitch computer:  Correct.

24   A.  Correct.

25   Q.  Okay.  Was that connected to your home computer, item 3?

1   A.   No.

2   Q.   Not at all.  On the 19th, you were arrested in this case;

3   were you not?

4   A.   Yes, sir.

5   Q.   And you were called to go to work and arrested on the way?

6   A.   Yes, sir.

7   Q.   Did you agree to cooperate in this case?

8   A.   Yes.

9   Q.   Did you agree to cooperate at home?

10  A.   Yes.

11  Q.   Did you give -- did you answer any questions they gave

12  you?

13  A.   I answered every question they gave me.

14  Q.   Did you give them passwords they didn't have?

15  A.   Anything they asked for or needed, yes.

16  Q.   Did you talk to them about the plant in the bathroom?

17  A.   No, sir.

18  Q.   Did they ever ask you that?

19  A.   No, sir.

20  Q.   How about in the second search?

21  A.   They didn't ask me anything because after the first one, I

22  immediately asked for an attorney.

23  Q.   Okay.  But in the questions you were asked, you cooperated

24  with them?

25  A.   Yes.  I kept thinking it all had to be some mistake and if

Henry - X

54

 1    I cooperated, it would --

 2    Q.   Go away.

 3    A.   -- clear it up, yeah.

 4    Q.   Did you lie to them?

 5    A.   No, sir.

 6    Q.   Were you honest in your answers?

 7    A.   As -- from what I knew what was going on, I was trying to

 8    be as honest as I could of course.

 9              MR. CAPOZZI:   Thank you.  No more questions.

10              THE COURT:   Cross-examination.

11              MR. GAPPA:   Thank you, Your Honor.

12                        CROSS-EXAMINATION

13    BY MR. GAPPA:

14    Q.   So you heard Rebecca Jackson testify yesterday; correct?

15    A.   Yes, sir.

16    Q.   And you heard her testify that she never consented to

17    having you make a video recording of her in the shower;

18    correct?

19    A.   No, that's not what I heard.

20    Q.   And she testified you -- that she didn't know you had made

21    a video of her using the shower; correct?

22    A.   I believe she said something along the lines of she would

23    not -- she didn't know about a secreted camera, but she didn't

24    remember whether there was any other consensual recordings of

25    her in the shower.

1   Q.  So do you believe that Rebecca Jackson testified falsely?

2   A.  No.

3   Q.  You've had an interest in adult pornography from no later

4   than when you were in college; correct?

5   A.  Sorry.  Say that again?

6   Q.  You've had an interest in adult pornography, according to

7   your testimony, no later than when you were in college;

8   correct?

9   A.  I'm not sure I'd say "interest."  It was just one of the

10  things all the guys were doing and -- but yeah, that's when we

11  started accumulating, I guess.

12  Q.  Well, when you say "accumulating," what were you

13  accumulating?

14  A.  Most of it at that time, because we're talking like

15  mid '90s, was on like CDs, stuff like that.  I remember one CD

16  had like all the Playboy centerfolds like ever up to that

17  point.  It was just various odds and ends depending on who was

18  passing it around, where they'd gotten it from.

19  Q.  So that would be pornography; correct?

20  A.  Yes, sir.

21  Q.  And you were exchanging pornography with other people at

22  that time; correct?

23  A.  I didn't really go getting it much, so I tended to be

24  handed more stuff rather than being handing out.  But yeah.

25  Q.  You had an interest in the material?

56

1  A.  Yes.

2  Q.  And these were friends of yours?

3  A.  Co-workers, friends.  We were all techs.

4  Q.  So was this a formal setting, where --

5  A.  No.

6  Q.  -- you would -- or was this a one-on-one exchange with

7  people?

8  A.  It all depended.  If somebody had something -- and it

9  wasn't just pornography.  It was all kinds of stuff.  If

10  somebody got something they thought was interesting,

11  pornography, some new video game, just about anything, they'd

12  burn it off to a CD, two, three, four, and hand it out to

13  people.

14  Q.  But you exchanged pornography with some of your friends at

15  the time in college; correct?

16  A.  Yes.

17  Q.  And how did you get the pornography at that time?

18  A.  It was mostly on CDs.

19  Q.  But how did you obtain the pornography you gave to other

20  people?

21  A.  It was handed to me by other people.

22  Q.  So they would just give it to you, you didn't give it to

23  them?

24  A.  Anything I gave out, I had to get first.  So they would

25  hand me stuff.  If it was -- sometimes it would get passed on,

1    sometimes it would just end up in a junk -- in a pile.

2    Q.  And you did say it would end up in a junk pile, what did

3    you mean by that?

4    A.  Like in the garage, there was basically a large pile

5    of -- it was computer parts, CDs, just all kinds -- anything

6    related that wasn't actively being used just got tossed in a

7    pile.

8    Q.  You set up the network at Lock-N-Stitch; correct?

9    A.  Yes, sir.

10   Q.  What kind of training did you receive prior to becoming

11   the IT director at Lock-N-Stitch?

12   A.  Went to a few years of community college.  Ended up going

13   to work before finishing my degree.  I've taken several

14   seminars.  I've gotten Microsoft certifications.  I've spent

15   five years working for an ISP/tech repair company doing

16   everything from installing internet lines, wide area networks,

17   security, virus cleanups.  Anything and everything.  I've done

18   auditing work, tracking whose accessed files when and where.

19        Pretty much everything over the years except

20   programming.  And slowly over time I kind of refined my

21   preferences to I like working with networks, network security,

22   stuff like that.  And I ended up going to work for

23   Lock-N-Stitch.  And from there, I went to a few seminars

24   within that.  I kept abreast of TechNet through -- express

25   certifications, which is Microsoft's bulletin service of new

1    warnings, new stuff coming out, patches, et cetera.

2    Q.  So is it fair to say that you actually took classes and

3    you went to different training programs even before you

4    started at Lock-N-Stitch?

5    A.  Yes, sir.

6    Q.  And it sounds like you're pretty advanced in your ability

7    to work with networks.

8         MR. CAPOZZI:  Objection.  Vague and ambiguous.

9    "Pretty advanced."

10        THE COURT:  Overruled.  I'll let the witness answer,

11   if he can.

12        THE WITNESS:  I've mostly worked kind of solo, but at

13   the same time I have -- I've known enough to do what needed to

14   be done or I've known where to find out how to do it.

15   BY MR. GAPPA:

16   Q.  Well, this outside audit that was referred to earlier was

17   done for purposes in part to see how well the network had been

18   set up; correct?

19   A.  That was my understanding, yes.

20   Q.  And the end result was the assessment showed that it had

21   been set up well; correct?

22   A.  That was what I was told at the review that year, yes,

23   sir.

24   Q.  So when did you set up that network at Lock-N-Stitch?

25   A.  It was an ongoing process.  But I would have started it

1    when I started at Lock-N-Stitch, so roughly -- live 2005.

2    Q.   And when you were working there at times, there are up to

3    40 people working at Lock-N-Stitch; correct?

4    A.   I never stopped and counted, but something in that area.

5    Q.   How many computers were on the network?

6    A.   In the realm of 30 to 40.  I don't know an exact number,

7    I'm sorry.

8    Q.   How many servers were on the network?

9    A.   At what point in time?

10   Q.   Most recently when you worked there.

11   A.   Most recently, I believe we had three.

12   Q.   And that was 2013?

13   A.   Yes, sir.

14   Q.   And what were the three servers for?

15   A.   One was the web and email server.  The second one was a

16   data server, which contained all of the data for the company,

17   including the user drives that were described earlier, the

18   shared drives, all of that.  And the third one was dedicated

19   to running the company inventory control software.

20   Q.   And were those servers connected to each other?

21   A.   The data server and the program server were

22   interconnected, they ran parallel.  The web/email server was

23   not.  For security purposes, it was set kind of outside.

24   Q.   There's also a wireless network; correct?

25   A.   Yes, sir.

1    Q.   And you set that up?

2    A.   Yes, sir.

3    Q.   And that was so that when you were troubleshooting issues

4    on the network, you could jump between the wireless network

5    and then the Lock-N-Stitch network; correct?

6    A.   Not exactly.

7    Q.   Wasn't that what you told Detective Hively?

8    A.   No, sir.

9    Q.   How many routers were on the Lock-N-Stitch network?

10   A.   Routers?

11   Q.   Yes.

12   A.   How are you defining "router"?

13   Q.   Well, what is a router?

14   A.   Usually it refers to a piece of equipment that

15   transfer -- well, routes internet traffic or network traffic

16   from one place to another.  It's usually an intelligent device

17   as opposed to the dumb version, which would be just a hub.

18   Q.   And how many of those devices did you put on the

19   Lock-N-Stitch network?

20   A.   Hubs or routers?

21   Q.   Hubs first.

22   A.   Hubs?  Whenever I needed to turn one connection into

23   multiples.  So I don't know the count.  Quite a few.

24   Q.   How many of the other devices?

25   A.   Routers?  Not nearly as many.  Maybe two or three.

1   Q.   So you knew how to navigate through that network; correct?

2   A.   I believe so.

3   Q.   And you had configured the network; correct?

4   A.   Yes, sir.

5   Q.   And what's involved with configuring the network, what

6   does that mean?

7   A.   Depends on what stage and who does it.  There's everything

8   from the actual physical cabling to the virtual

9   infrastructure, telling what can talk to what.

10  Q.   So you had set all of that up; correct?

11  A.   Yes, sir.

12  Q.   So when you say that the web and email server was not

13  allowed to set up -- I'm sorry, to communicate with the data

14  server.  You had set it up that way and configured the network

15  that way?

16  A.   I segregated them for security purposes, yes, sir.

17  Q.   And you set up a firewall; correct?

18  A.   Yes, sir.

19  Q.   And how did you do that?

20  A.   Ordered the equipment, read the manuals, cross-referenced

21  with online stuff and programmed it.

22  Q.   You told Detective Hively that you had remote access to

23  Lock-N-Stitch from your home; correct?

24  A.   Yes, sir.

25  Q.   And you used remote access when you were at home at times

1    to connect to the Lock-N-Stitch network; correct?

2    A.   Specifically to one of the servers.

3    Q.   And so you did that on more than one occasion; correct?

4    A.   Quite a few of us did.

5    Q.   And some of it was because you would have a technical

6    issue.  If you were working at home, you could log in

7    remotely, access the network at Lock-N-Stitch, diagnose the

8    problem and hopefully solve it; correct?

9    A.   Not exactly.

10   Q.   But something close to that; correct?

11   A.   Close to that, yes.

12   Q.   So what would be the difference?  If you -- as the person

13   who configured that network, how did you do it?

14   A.   I wasn't diagnosing the network, I was usually -- it was

15   specific to something on the server.  Because one of the

16   servers had -- trying to -- well, the remote connection was

17   set up so that people outside who needed to be -- the owners

18   of the company, the CFO could get into documents that they

19   needed while outside the network.  But all those documents

20   were configured to be accessible via the server.  So there was

21   nothing on the work stations.  So I never used it to diagnose

22   the work stations, because the entire thing was designed to

23   not pass traffic past the servers themselves.  So anything

24   that I did was done within that box.

25   Q.   Okay.  You set up a network at your home on Burman Drive;

1    correct?

2    A.   Yes, sir.

3    Q.   Is that the first time you ever set up a home network?

4    A.   I'd done like quick cabling type networks, but nothing

5    like that before, no.

6    Q.   So you set up the network attached storage device that's

7    now Exhibit 9; correct?

8    A.   Yes, sir.

9    Q.   And you knew there was a password protected side; correct?

10   A.   Yes, sir.

11   Q.   And today you're claiming that Angele had access to that

12   password protected side?

13   A.   She did, yes, sir.

14   Q.   You told Detective Hively on September 19th, 2013 that she

15   had access to the unprotected side; correct?

16   A.   She had that access also, yes, sir.

17   Q.   And you said that the password protected side is

18   essentially a duplicate of the unprotected side, but that you

19   would put anything bad on the password protected side so no

20   one could see anything objectionable.  Is that what you told

21   Detective Hively?

22   A.   I think it was something like that.  There were pretty

23   much duplicates.  I would jump -- put that stuff on that side

24   first because, yes, until it was gone through -- yeah.

25   Q.   Well, you said --

1    A.   Pretty close.

2    Q.   -- you did that because you didn't want her to see

3    anything that she might find objectionable; correct?

4    A.   I don't recall saying her specifically.

5    Q.   And then you said that she had access to the non-password

6    protected side; correct?

7    A.   As well as the Aurrora, yes, sir.

8    Q.   And you said that you had this electronic folder from

9    years ago you'd gotten from a friend that had pornography on

10   it.  And that went on to the non-password protected side;

11   correct?

12   A.   I believe it was on both.  That was one of those things I

13   was talking about getting stuff from --

14   Q.   But you said it went to the non-password protected side;

15   correct?  That's what you told Detective Hively?

16   A.   I believe it ended up in both locations, yes.

17   Q.   So you told Detective Hively it went to the non-password

18   protected side and that Angele hadn't even gone through all

19   that pornography; correct?

20   A.   Sounds correct.

21   Q.   And then the reason that you told Detective Hively that

22   you started looking for pornography was that at some point you

23   would -- after she was delivering the baby -- sit down and

24   that would be a bonding experience to go through new material;

25   correct?

Henry - X

65

1  A.  When I first started, it was because we were looking for

2  the spice.  As I said, by the time the police were there, she

3  was eight months pregnant.  That was delayed, so it became

4  once she had it, we would go through it.  Yes, sir.

5  Q.  So is it your testimony that you were looking for material

6  that would spice up your sex life, even though you had a large

7  amount of material that she hadn't gone through on the

8  non-password protected side that she had access to?

9  A.  When I said "gone through," what I was referring to is not

10  necessarily just watched, but she was going to be going

11  through and -- as we've said, the titles don't necessarily

12  reflect the content.  A lot of those had names that had

13  nothing to do with the content.  So what she was doing, she

14  was going through, watching the video and then renaming the

15  file to actually reflect the content so that way she could put

16  them into folders by content type, figured out what she wanted

17  to watch, et cetera.  So I kept the other stuff separate until

18  she could do that.  Because if I just started dumping

19  unsorted, un-renamed stuff on to those, it would just block up

20  whatever she was doing.

21  Q.  So you used the word "sorted," you admit that you were

22  sorting through the material that you were putting on the

23  secured side; correct?

24  A.  No, sir.

25  Q.  Well, when you say that you didn't want to give her things

1   that hadn't been sorted, what did you mean?

2   A.  They were still in just the Aza and Aza 1 folder, I

3   mean --

4   Q.  And then you would sort it from there; correct?

5   A.  The idea was we would, yes.

6   Q.  But you did that; correct?

7   A.  I never sorted any of the stuff that came in through the

8   peer-to-peer.

9   Q.  Is there anything that you told Detective Hively on

10  September 19th, 2013 that was not true?

11  A.  As far as I know, no.  I was trying very hard to be

12  honest.  To be honest, I was in a bit of shock at the time.  I

13  was trying to be fully cooperative.

14  Q.  Was there anything that you told Detective Hively on

15  September 19th, 2013 that was not true?

16  A.  As far as I'm aware, no.

17  Q.  So everything that you told him that day was true?

18  A.  As far as --

19          MR. CAPOZZI:  Asked and answered.  As far as he is

20  aware.

21          THE COURT:  Overruled.

22  BY MR. GAPPA:

23  Q.  So you told Detective Hively on that day that you were

24  really good at noticing patterns on the firewall; correct?

25  A.  That was one of my jobs was trying to keep track of

1  traffic, yes.

2  Q.  So part of the Lock-N-Stitch policy was that no

3  pornography was to be downloaded on that network; correct?

4  A.  Correct.

5  Q.  You knew you could get into serious trouble if you were

6  caught downloading any type of pornography at Lock-N-Stitch;

7  correct?

8  A.  I knew I was at risk of being potentially fired.  It never

9  occurred to me that I would be here for adult pornography.

10  Q.  But isn't adult pornography readily available with any

11  internet browser?

12  A.  Usually stand alone pictures and stuff like that, but yes.

13  Q.  And you could do that search with a basic Google search;

14  correct?

15  A.  That was how we found some of the commercial terms that I

16  had used on the search terms, yes.

17  Q.  And you'd already had a large amount of pornography before

18  2013; correct?

19  A.  Yes.

20  Q.  In fact, you had a large amount of pornography even before

21  you first met Angele; correct?

22  A.  Yeah, it was -- like I said, the junk pile, but yeah, it

23  was there.

24  Q.  So you started to become more curious about all types of

25  pornography; correct?

1  A.  Not exactly.

2  Q.  So the still images weren't of great interest to you;

3  correct?

4  A.  They were not of great interest to her.  No.

5  Q.  They were not of great interest to you; were they?

6  A.  They didn't impact me one way or the other, the difference

7  between the two.

8  Q.  So you really enjoyed your job at Lock-N-Stitch; didn't

9  you?

10 A.  Yes.

11 Q.  But you were willing to risk it just for the opportunity

12 to download adult pornography?

13 A.  Oversimplification, I believe.  But essentially, yeah.

14 Q.  You were pretty nervous when you began your interview with

15 Detective Hively on September 19th, 2013; weren't you?

16 A.  I'd been pulled out of my house without any notification,

17 any -- yes, yes, I was.

18 Q.  And you were pretty nervous because you'd been downloading

19 child pornography at Lock-N-Stitch; correct?

20 A.  Not even a little.

21 Q.  And you had, in fact, moved a child pornography video from

22 the Shareaza completed folder to a folder that was on the

23 network attached storage device, Exhibit 9; correct?

24 A.  No.

25 Q.  There were only two files in that folder that you had

69

1   moved that morning on September 19th; correct?

2   A.   I don't remember.

3   Q.   Well, can we go to Exhibit 1A.6.  This is in evidence.

4        So those are two files that were completely

5   downloaded using Shareaza; correct?

6   A.   They appear to be.

7   Q.   And they were downloaded on Exhibit 1A at the

8   Lock-N-Stitch work place; correct?

9   A.   Looks like the case, yes, sir.

10  Q.   And the completion happened prior to September 19th, 2013;

11  correct?

12  A.   I don't see any way to tell that from here.

13  Q.   And the files were created on May 28th, 2013; correct?

14  A.   Yes, sir.

15  Q.   And they were last modified on September 19th, 2013 at

16  7:02 a.m.; correct?

17  A.   I don't see the a.m. or p.m. on here, but that looks like

18  the case, yes.

19  Q.   Do you see 07:02:02.

20  A.   Oh, military time, yes, sir.

21  Q.   So that was the morning of the search warrant; correct?

22  A.   Appears to be the case.

23  Q.   And you'd been at work that morning at Lock-N-Stitch;

24  correct?

25  A.   Yes, sir.

1    Q.  And then you went home?

2    A.  Yes, sir.

3    Q.  And then did you end up going back to work because there

4    was a search warrant being executed there; correct?

5    A.  I was taken back, yes, sir.

6    Q.  So these were two files you moved that morning at

7    Lock-N-Stitch and put into a folder called Aza; correct?

8    A.  If it was me, then yes.  If it wasn't me, then no.

9    Q.  And there were only two files in that particular folder;

10   correct?

11   A.  According to the screen, yes.

12   Q.  And one of those files has "Pthc candygirls Ira 12yo."

13   Correct?

14   A.  Yes, sir.

15   Q.  And that was a file you put into that folder in that

16   morning; correct?

17   A.  As I said, I don't know if I put it in that folder.

18   Q.  Well, who would have done it?

19   A.  Anybody with access to that computer.

20   Q.  Who was there that morning with you at seven in the

21   morning?

22   A.  A few people, including people who dropped me off.

23   Q.  Okay.  So -- and then are you saying Angele Henry did

24   this?

25   A.  No, I'm not.  I'm saying I don't know.  I don't remember

71

1    doing it myself, so I can't say yes or no.

2    Q.  The second title is "21 Guys Fuck 13 Young Fertile Girls

3    And Cum Inside Their Pussy."  That was a file you put into

4    that folder; isn't it?

5    A.  Again, I don't remember if it was me or not.

6    Q.  And you put it into that folder because you wanted it to

7    end up on Exhibit 9; isn't that true?

8    A.  That was how generally stuff got moved.

9    Q.  That's how all the child pornography on Exhibit 9 got

10   there; correct?  You downloaded it from Lock-N-Stitch and then

11   you transferred it to the NAS on the secured side.  Isn't that

12   true?

13   A.  From what the police report stated, yes, the child

14   pornography came in with the adult stuff and then was

15   transferred over to the Netgear, yes.

16          THE COURT:  Mr. Gappa, can I ask you one question?

17   What -- no, that screenshot that was just up.  What exhibit is

18   that?

19          MR. GAPPA:  1A.7.

20          THE COURT:  Yeah, I don't -- see, that's not what was

21   up.

22          MR. GAPPA:  It's a two-page document.  I think we

23   were looking at the second page.

24          THE COURT:  Mine's not.  Mine's a one-page.

25          MR. CAPOZZI:  Is it 1A.7?

72

1        THE COURT:  1A.7, and there's a second page to that?

2        MR. GAPPA:  Yes.

3        THE COURT:  Can we -- can I see the defense binder?

4   Can I see anybody's binder?  Is it in there?

5        MR. GAPPA:  Yeah.

6        THE COURT:  Okay.  Good.  Thanks.  Sorry to

7   interrupt.

8        MR. GAPPA:  I apologize if for some reason that

9   second page is missing.

10       THE COURT:  Yes.  You may proceed.  I apologize for

11  interrupting.  But it was important for me to make sure that I

12  knew what was being displayed.

13  BY MR. GAPPA:

14  Q.  So I was having you confirm that you put the files from

15  the Lock-N-Stitch drive on to Exhibit 9; correct?

16  A.  I put some files, I don't know if I put all of them.

17  Q.  And you created this folder structure; correct?

18  A.  No, sir.

19  Q.  So when you would put those in there, you would sort

20  through it, as you said, to Detective Hively because you

21  didn't want anything to go on to the non-password protected

22  side that would disturb Angele; correct?

23  A.  As I told him, I had not sorted anything downloaded

24  through the peer, but eventually that was the plan.

25  Q.  So you just kept downloading and moving things over,

73

1   downloading and moving things over and you never got around to

2   sorting it?

3   A.   He asked me that same question and I said yes.

4   Q.   And even though you -- before you did those first searches

5   in May of 2013, even though you still had a large quantity of

6   pornography on the unsecured side that hadn't been sorted?

7   A.   It had been viewed by her, but it had not been sorted.

8   And I was asked for fresh material, so I was trying to provide

9   it.   Yes.

10  Q.   Now, you told Detective Hively that if you ever saw a file

11  without a title, you would immediately delete it; correct?

12  A.   Correct.

13  Q.   How often did you download any files with Shareaza that

14  did not have a title?

15  A.   I'm not sure I ever come across that in Shareaza itself.

16  Q.   So why did you tell Detective Hively "if there was

17  anything without a title, I would immediately delete it"?

18  A.   Because over time, like I said before, I had received

19  files in the past and sometimes there would be a file without

20  a title and I learned early on that a lot of times that was

21  indicative of like a virus attachment or something like that,

22  that basically made the file dangerous to open.   So I would

23  delete it.

24  Q.   So how often did you get a file without a title using

25  Shareaza?

1   A.  I don't recall of an instance where that happened.

2   Q.  So then why did you tell Detective Hively that if -- when

3   that happened, that you would immediately delete the file?

4   A.  I was suddenly confronted, out of the blue, by saying,

5   hey, your computer is doing this.  I was trying to figure out

6   how that could have happened.  To do that, I was trying -- I

7   was trying to go back through the entire history of my

8   interactions with received files, download files, trying to

9   figure out some type of correlation, explanation for how that

10  could have happened.  And there was a bit of bleed over

11  because there was a few times I was talking about the old

12  files I got from a friend, there was no titles, some bleed

13  over back and forth as I was trying to figure out what the

14  heck could have happened.

15  Q.  You knew that you had been downloading child pornography,

16  you knew the police were there, you knew you were caught, you

17  knew you were in trouble and you were trying to come up with a

18  story, isn't that true?

19          MR. CAPOZZI:  Objection.

20          THE WITNESS:  Not even a little bit.

21  BY MR. GAPPA:

22  Q.  So you knew there would be a problem because they would

23  find titles that indicated child pornography; correct?

24  A.  No, sir.

25  Q.  In fact, if we go back to the second page of the exhibit

1   we were looking at, there were only two files there; correct?

2   A.   The document you showed me, yes, sir.

3   Q.   And you're telling me that you didn't think that that

4   material might get you into trouble?

5   A.   I'm telling you I didn't know what the material was.

6   Q.   If we could go to Exhibit 33.  The testimony from

7   Detective Hively indicated that, in his opinion, this exhibit

8   which has five pages which relate to five different titles and

9   five videos indicates that each of those videos was on the

10  Lock-N-Stitch hard drive and then within minutes was on the

11  Netgear ReadyNAS Exhibit 9.  Did you hear that testimony?

12  A.   Yes, sir.

13  Q.   And there was also testimony about how that could have

14  happened.  And it was explained that that could be done

15  through remote access.  Correct?

16  A.   I heard that testimony.

17  Q.   And do you have a different explanation for how files got

18  from Exhibit 1A, the Lock-N-Stitch hard drive, within minutes

19  getting on to your Netgear ReadyNAS?

20  A.   Yes, there's easy explanations for that.

21  Q.   And what is the explanation, in your opinion?

22  A.   The file created date has been somewhat misrepresented to

23  this point.  It's not a reliable metric for auditing files

24  like this.  The problem with it is the file created date is

25  actually the first date the file is created.  Period.  On any

76

1   device.  It doesn't matter what it is.  So if you have -- do

2   you mind if I give an example?

3   Q.  Go ahead.

4   A.  Let's say you have a thumb drive with a file on it.  And

5   you plug it into a laptop.  You want this file on this laptop.

6   If you just do the left click drag and drop, the default that

7   everybody does, it's going to automatically create a copy.

8   The copy is a new file independent of the original in the

9   thumb drive, so it's going to have a new file created date.

10        Alternatively, you can do things like you can select

11  a move, you can do a cut and paste.  There's a few other

12  things I believe, like a WinZip archive extraction, a few

13  other things.  But if you do those and copy it, what it does

14  is it moves the original from the thumb drive to the laptop.

15  And it's not considered a new file.  It's considered the

16  original in a new place.  So it's not going to have a file

17  created date.  Doing that, you could carry a file around, if

18  you're moving it, through half a dozen devices across ten

19  years and it will still keep the original file created date.

20  Q.  And that's an interesting --

21  A.  It wouldn't change.

22  Q.  -- explanation and it may or may not true, but it doesn't

23  explain how the file creation date shows that within minutes

24  this file was on Exhibit 1A and then on Exhibit 9.

25  A.  Okay.  If you put a thumb drive into 1A and you copy the

1 file to it, that might take a little bit of time.  You take it

2 to the Netgear.  You move it on to the Netgear.  It's going to

3 retain the date from 1A.  A couple of minutes ago, according

4 to it.  Even if it was hours, days, weeks, months later, it

5 would still be within a couple of minutes.

6 Q.  And you said perhaps file creation dates are

7 overemphasized; correct?

8 A.  From my experience and training, that they are not

9 considered, in fact, actually -- usually when we're doing

10 auditing on servers, you're not supposed to allow -- to use

11 the internal dates.  They have highly expensive software you

12 buy that does nothing but keep track of it independently so

13 that it could be accurately tracked.

14 Q.  But you've been very concerned about the actual date that

15 relates to this set of file creation dates, May 28th, 2013;

16 correct?

17 A.  What do you mean "highly concerned"?

18 Q.  Well, you presented evidence of what was going on in your

19 office and who was there and who might have been using the

20 computer.

21 A.  Well, that seems to be the -- when this was happening.  So

22 yes, that was the focus of what I was paying attention to.

23 Q.  So you told Detective Hively you really didn't know how to

24 look for adult pornography when you were first using Shareaza;

25 correct?

1    A.   I said I -- yeah, I mostly used like commercial websites.

2    I was using peer to peer at that point, yes.

3    Q.   And when did you first use Shareaza to look for adult

4    pornography?

5    A.   I believe it was, like I said earlier, about the second to

6    third week, somewhere in there, of May.

7    Q.   Of what year?

8    A.   2013.

9    Q.   And so you had used Shareaza previously though; correct?

10   A.   Yes.

11   Q.   When was the first time you used Shareaza?

12   A.   I don't remember exactly.  The oldest copy that I've seen

13   in the police reports, I believe, was dated December of 2005.

14   Q.   And how many times did you download and install Shareaza

15   on any computer that you had access to?

16   A.   Quite a few.

17   Q.   How many times approximately?

18   A.   Probably most of the computers that I had, maybe half a

19   dozen to ten.

20   Q.   And why were you putting Shareaza on all of those

21   computers all those times?

22   A.   Because I used it for various things.

23   Q.   Like what?

24   A.   Sometimes for music, sometimes for work related stuff.

25   Various odd times.  Nothing major.  Just like a little thing

1    here and there.  It might go weeks or months or even years

2    without being used.  But then I might find -- need one thing,

3    go look for it and then not again.

4    Q.  You had this interest in pornography that went back many

5    years.  You had various versions of Shareaza.  You knew how to

6    search for music, but you didn't start using Shareaza to look

7    for pornography until 2013?

8    A.  As you pointed out, I had quite a bit.  It wasn't really a

9    need.

10   Q.  So then when you finally did decide you'd take a look at

11   Shareaza for purposes of looking for pornography, you said you

12   really didn't know what search terms to put in.

13   A.  As I said, I haven't used it for that.  I mean, with

14   music, it's kind -- and programs, if you're looking for that,

15   it's pretty cut and dried, you type in the program name, you

16   type in a song and you get what you're searching for.

17   Q.  And you would then put in search terms and you're saying

18   that you never looked at any of the material that was being

19   downloaded?

20   A.  No.  I was asked not to.

21   Q.  So you would put in the search term, see the potential

22   files related to the search term and then decide, looking at

23   the titles, which ones you were interested in; correct?

24   A.  Incorrect.  No.

25   Q.  And then you would complete the download process or at

1  least tell it to complete the download process; correct?

2  A.  That part, yes.

3  Q.  And speaking of those searches terms, if we could go to

4  Exhibit 1A.4.  You testified that these search terms were not

5  all put in to Shareaza by you; correct?

6  A.  Correct.

7  Q.  You only put in things that related to music?

8  A.  Incorrect.  No.

9  Q.  And so you didn't put in the term "PTHC"?

10  A.  No, sir.

11  Q.  Or "preteen"?

12  A.  No, sir.

13  Q.  "Underage"?

14  A.  No, sir.

15  Q.  "Animal"?

16  A.  No, sir.

17  Q.  And all of that type of material ended up on the secured

18  side of Exhibit 9; correct?

19  A.  So I've read, yes, sir.

20  Q.  Now, during the interview with Detective Hively at some

21  point he asked you for the password; correct?  For the

22  Lock-N-Stitch network or computers there.

23  A.  Yes.

24  Q.  And you were reluctant to give it to him?

25  A.  Yes.  Until I got confirmation.  It wasn't mine to give

1    out.

2    Q.   But you had come up with the password; correct?

3    A.   Correct.

4    Q.   And it wasn't until your employer told you to give it to

5    law enforcement that you gave it up?

6    A.   Of course.  It wasn't mine to give out.

7    Q.   And you're saying now that you gave the password to Angele

8    Henry and that she would come in on weekends and help you with

9    IT related projects?

10   A.   Yes.

11   Q.   What type of IT work did she do?

12   A.   Sometimes we'd get a new version of the software and

13   basically you have to go around to every single computer and

14   double click the process and just let it run.  And it was just

15   scut work mostly.  Just help make it go twice as fast.

16   Q.   If we could go to Exhibit 35.3.  If we go to the second

17   page.  These are communications between you and Angele;

18   correct?

19             MR. CAPOZZI:  What exhibit was this?  I'm sorry.

20             MR. GAPPA:  This is 35.3.

21             THE COURT:  At page 2?

22             MR. GAPPA:  Yes.

23             THE WITNESS:  They appear to be, yes, sir.

24   BY MR. GAPPA:

25   Q.   And this -- at the beginning, on that first entry, is from

1  Angele to you; correct?

2  A.  It looks that way, yes.

3  Q.  And then the second one is also from Angele to you;

4  correct?

5  A.  Yes, sir.

6  Q.  And the statement is, "I think she's 16, good Lord she

7  fits into that category we have been talking about."

8        You got that message; correct?  From Angele?

9  A.  It looks like my phone did.  I don't remember ever reading

10 it.  I certainly never responded to it.

11 Q.  So you hadn't been talking about any category of girls

12 with Angele?

13 A.  We had talked about categories of women.  Like I said, she

14 was bisexual.  We had talked about women.

15 Q.  So if we go to 35.2.  This also was a series of messages

16 between you and Angele.  These were taken in August of 2012

17 and sent in August of 2012; correct?

18 A.  It looks correct, yes, sir.

19 Q.  And you sent a message saying "Soooo much T and A";

20 correct?

21 A.  Yes, sir.

22 Q.  And that was on August 17th of 2012; correct?

23 A.  Either that or the 18th.  The documents we got from the

24 report say the 18th, but these say the 17th.  I'm not sure why

25 there's a discrepancy, but one or the other.

Henry   X

83

1    Q.   But then you were sending, in close proximity to that

2    message to Angele, photos to her; correct?

3    A.   Correct.

4    Q.   And we see these photos that you had taken in close

5    proximity to that message; correct?

6    A.   I haven't seen it on my screen.  Yes, sir.

7    Q.   And if we go to item 24.  Do those people appear to be

8    under the age of 18?

9    A.   You talking about the ones on the screen or in general?

10   Q.   On the screen.

11   A.   I don't know.

12   Q.   Well, what do they appear to be to you?

13   A.   I don't know.

14   Q.   What about on entry 26?

15   A.   I didn't ask them their age.  They were posing for a

16   picture.  I took it.  I didn't ask them their age, no.

17   Q.   And you'd been noticing them; correct?

18   A.   They'd kind of walked back and forth, yeah.

19   Q.   They kept walking back and forth, hanging around,

20   according to your message; correct?

21   A.   Yeah.

22   Q.   You took a picture of them?

23   A.   I asked them if I could and they said yes.

24   Q.   And you sent it to Angele?

25   A.   Correct.

1  Q.  If we go to Exhibit 35.5.  That's a message you received

2  from Angele; correct?

3  A.  Looks like it.

4  Q.  So is your testimony that the camera in Burman Drive was

5  installed for purposes of Angele's interest in being an

6  exhibitionist?

7  A.  That was my understanding when I agreed to put it up.

8  Q.  Understanding that you had?

9  A.  We had talked about it.  She asked me if I could put it up

10  for her for that purpose.  I said all right.  And then when we

11  started doing other plans for that room in the front area, I

12  took it out.

13  Q.  So did you make recordings of her being an exhibitionist?

14  A.  There's quite a few.

15  Q.  Did you put them in any particular folder?

16  A.  They are in her Sylvia folder, as I recall.

17  Q.  From that camera?

18  A.  I don't know if they're from that camera.  If she put them

19  in there.  I didn't mess with that stuff.  We had made the

20  exhibitionism videos of her and they ended up in there.  But

21  she -- whatever she recorded on this, I don't know what she

22  did with it.

23  Q.  And is there any particular reason that you chose the

24  guest bathroom as opposed to your bathroom?

25  A.  There were reasons and it was not the guest bathroom when

1    I agreed to do it.

2    Q.   There were two bathrooms in the residence; correct?

3    A.   There are actually three.

4    Q.   Okay.   If we could go to Exhibit 27.10.   That's in

5    evidence.   Can we play that?

6            (Playing video.)

7    BY MR. GAPPA:

8    Q.   What are you doing there?

9    A.   I was holding up a set of undergarments.

10   Q.   And that's --

11   A.   Two sets actually.

12   Q.   -- A.T.'s clothing there; correct?

13   A.   I did not know that.

14   Q.   She was there that day at your residence; correct?

15   A.   I did not know that either.

16   Q.   And you recorded her in that bathroom; correct?

17   A.   No.

18   Q.   And --

19           (Playing video.)

20   BY MR. GAPPA:

21   Q.   This is the same day that this video was recorded; isn't

22   it?

23   A.   I would have no way of knowing that.

24   Q.   And then after that video was recorded of her using the

25   shower, you created that screen capture; didn't you?

1    A.   No.

2              MR. GAPPA:  Those were my questions, Your Honor.

3              THE COURT:  Would you like a recess before redirect?

4              MR. CAPOZZI:  Good idea.  Thank you.

5              THE COURT:  Ladies and gentlemen, we'll take our

6    afternoon recess at this time.  We'll reconvene at 10 minutes

7    after three.  Please heed the Court's previous admonition.

8         (Recess.)

9              THE COURT:  Let the record reflect that we're back in

10   the presence of the jury.  Mr. Capozzi, you may conduct your

11   redirect.

12             MR. CAPOZZI:  Thank you, judge.

13                         REDIRECT EXAMINATION

14   BY MR. CAPOZZI:

15   Q.   Mr. Henry, you were asked by the U.S. Attorney whether or

16   not you were reluctant to give the password at Lock-N-Stitch

17   to Mr. Hively.

18   A.   Yes.

19   Q.   Did you say you were reluctant?

20   A.   No, sir.

21   Q.   Isn't it true you said, "Before I can give it to you, I

22   need to check with the owner"?

23   A.   What I told him was I needed to either see the search

24   warrant or have my boss tell me it was okay.  It was not mine

25   to give.

1   Q.  All right.  And didn't Mr. Hively then get up and call for

2   Mr. Reed and ask if he could have that password?

3   A.  Yes, sir.

4   Q.  And then you said okay, I'll give it to you?

5   A.  He told me to give it to him and I immediately recited it.

6   Q.  Okay.  You weren't trying to hide it, were you?

7   A.  Of course not.

8   Q.  Then 35 -- Government's Exhibit 35.3.  It's on page 2.

9   Government 35.3 this is.  Page 2.  "I think she's 16, good

10  Lord she fits into that category we have been talking about."

11  Is that from Angele to you?

12  A.  Yes, that's from her to me.

13  Q.  Did you respond to that?

14  A.  As you can see, no, I didn't.  I'm not even -- I don't

15  even remember seeing it.  That one is dated 6-3.  The next

16  text message in the line is a day later with no response.

17  Q.  You carry your cell phone with you?

18  A.  I have a tendency to set it down and walk away.

19  Q.  You forget it.

20  A.  I try to.

21  Q.  My wife always complains at me for not having it.

22  A.  Yeah.

23  Q.  When you get text messages, did you respond to them

24  immediately?

25  A.  Sometimes not.

1    Q.  Do you check your phone every ten minutes for a text
2    message?
3    A.  I deal with screens all day, I tend to avoid them if I
4    can.
5    Q.  All right.  So this "I think she's 16, good Lord she fits
6    into that category we have been talking about."  What were you
7    talking about?
8    A.  I don't even remember specifically.  I know we had -- she
9    was actively looking for women to involve, because like I
10   said, she was bisexual and we had discussed different types,
11   trying to find a common interest in women.  That's the only
12   thing that I could think of.
13   Q.  A common interest of women under 18?
14   A.  No.  No, no, no.  Women.  Women.
15   Q.  She's talking about 16.  "She fits into that category."
16   Do you know what she's referring to?
17   A.  No.  No, sir.
18   Q.  Did she have an interest in children?
19   A.  Not that I knew of before this, no.
20   Q.  All right.  Didn't she run a day care center up in
21   Toronto?
22   A.  Yes.
23   Q.  Didn't she run an Art in the Park for children in Turlock?
24   A.  Yes, sir.
25   Q.  And didn't [A.T.] attend that Art in the Park with her?

1   A.  Yes, sir.

2   Q.  On a number of occasions?

3   A.  Most occasions from what I understand.

4   Q.  Did you ever go to Art in the Park with the kids?

5   A.  Never.  I was at work.

6   Q.  All right.  Let's go to 35.5.  Were you emailed this

7   picture of [A.T.]?

8   A.  According to this I was texted it.

9   Q.  Or texted.  I'm sorry.  On 9-16-2012.

10  A.  Yes, sir.

11  Q.  All right.  What was happening that day?

12  A.  My understanding is Angele and [A.T.] were costume

13  shopping for Halloween.

14  Q.  September 16th?

15  A.  Yes, sir.

16  Q.  All right.  And was that an outfit that she had tried on,

17  as far as you know?

18  A.  As far as I know, yes, she tried on -- from looking

19  through the evidence after the fact, several.  And that was

20  apparently one of them.

21  Q.  Do you know whether or not [A.T.] was aware when that

22  picture was taken?

23  A.  I have no idea.

24  Q.  No idea.  Okay.

25          The U.S. Attorney asked you about the Sylvia folder

1    and why that was under password protected or whether you put

2    stuff on that one.  Was there a reason you would put

3    information on the Sylvia that was password protected?

4    A.   Yes.

5    Q.   And the reason was?

6    A.   As I mentioned before, you always hear nightmares about

7    people's home movies getting hacked and suddenly they're

8    plastered all over the internet.  And that was where she kept

9    her personal videos.

10   Q.   Did Angele put videos on the Aurrora side under Sylvia?

11   A.   They were all of her, yes, she put them there.

12   Q.   And were these pictures, videos of her naked?

13   A.   Every one of them, yeah.

14   Q.   Okay.  Is this the exhibition thing you were talking

15   about?

16   A.   Yes.  Yes.  There were videos, pictures, yes.

17   Q.   And those videos, she's masturbating?

18   A.   Yes.

19   Q.   And she takes videos of that?

20   A.   Yes.

21   Q.   And then does she look at those videos?

22   A.   Yes.  Most of them she'll put on one of her corsets,

23   masturbate.  And then later watch it and masturbate to herself

24   masturbating, yes.

25   Q.   On Exhibit 27.10, you're showing undergarments in the

1  video in the bathroom.

2  A.  Yes.

3  Q.  Explain that.

4  A.  She would often -- often, but here and there, as a

5  surprise or her idea of foreplay, however you'd call it.  I'd

6  come home and sometimes there would be a trail of clothing to

7  the bedroom where she would have a friend of hers.  Other

8  occasions, I'd be at home, she'd go out, supposedly grocery

9  shopping and come home with a friend.  That day, I'd come home

10  and I had to turn around and leave.  I was just picking

11  something up.  And she said, hey, I've got a friend or two in

12  the hot tub or whatever.  Before you leave, display that and

13  keep in mind for when you come back.  I -- apparently it was

14  A.T. and someone else, but I did not know that at the time.

15  It was not from her an abnormal request.

16  Q.  So when you say she had some people, you would come home

17  from work or from shopping or wherever and you would see

18  clothing, under garments?

19  A.  The equivalent of a whole trail of rose petals was her

20  idea was, yes.

21  Q.  And she's with somebody?

22  A.  Yes.

23  Q.  Were they men?

24  A.  No.  Never.

25  Q.  Other women?

A.  Yes, sir.  Invariably.

Q.  And on this day, you came home during the day?

A.  Yes.  If I recall correctly, cross-referencing with the text messages, there was -- something had broken and I needed some parts.  I couldn't find them locally and we couldn't afford to wait to get them shipped in.  The big pile of stuff I had, I had a spare so I came home just to grab it.

Q.  Okay.  And then she -- how did she tell you to show those up for the camera?

A.  I didn't --

MR. GAPPA:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained.

MR. CAPOZZI:  Withdraw.

Q.  How did you know what to do?

A.  Of course whenever I come in and out, whenever I move around, I try and be, you know, spouse, I'd check in.  Hey, this is what's happening.  So I told her, hey, I'm going to be swinging by to pick something up.  She had met me at the door and kind of laid it out.  Saying, hey, I'm planning a surprise.  Just titillation type thing.  "Keep this in mind for the rest of the day" or whatever.  And asked me to do that while she watched on the screen.  I remember I did it once.  And then I started to set it down and go to leave.  And she called me back and said, "No, no, I didn't see it clearly" or something.  "Do it again." And I did it just like real quick

1    and, "Hey, I got to go."

2    Q.   Where did you go?

3    A.   Back to work with the part to fix it.

4    Q.   Back at Lock-N-Stitch?

5    A.   Yes.

6    Q.   I'm going to show you what's marked as 31.2.  Government

7    Exhibit 31.2.  What -- can you interpret this for us?  What do

8    you see there?  What does that mean?

9    A.   Yes, sir.  The remote capability built into windows has

10   two components to it.  There's a client and there's a server.

11   Basically the thing that connects and the thing that gets

12   connected to.  This --

13   Q.   Say that again.

14   A.   You have a client half and a server half.  The client

15   connects to a server, the server receives connections from a

16   client.

17   Q.   Okay.

18   A.   So what this is it's saying that this has -- the server

19   client has been activated.  The client is built into --

20   Q.   Server client.  Is that right here?

21   A.   Yes, sir.  The client is built in to all versions of

22   windows.  It's one of the ways they get money.  They ship the

23   client out for free and then they charge for the server.  So

24   what happens is the first time you connect to a -- a terminal

25   server, it registers the IP address of the server in this

Henry - RD

94

1  list.

2  Q.  Is that this list that's right here?

3  A.  Yes, sir.

4  Q.  So what does that mean, that this client was making

5  contact with those addresses?

6  A.  Yes, sir.

7  Q.  All right.

8  A.  And that's reflective of what I had said earlier, we -- I

9  would connect in to the Lock-N-Stitch server.  So those are

10  the servers.

11  Q.  Which computer is this?

12  A.  This is my work computer.

13  Q.  Okay.  So it's -- is it configured to those addresses?

14  A.  All that means is at one point or another, this computer

15  connected to other computers at those addresses.

16  Q.  Well, does this mean that it's configured to receive?

17  A.  No.  In fact, actually this one you can tell was never

18  configured to receive.

19  Q.  How do you know that?

20  A.  The other half of terminal service is -- from terminal

21  server client is the terminal server service or host.  And

22  that's a completely separate piece of software.  When that

23  gets configured, it creates another entry like the one you

24  see, only instead of terminal server client, it would be

25  terminal server -- sorry, I don't remember the exact verbiage.

1    It was either server host, service or something like that.

2    But it is in alphabetic order replied after terminal server

3    client.  And as you can see here, the next entry is TPG, not

4    terminal server, service, client host or whatever.  So this

5    one has never been configured to receive a connection.

6    Q.  Okay.  Now, in plain English, what did you just say?

7    A.  Sorry.  This computer in its entire lifetime has never

8    received a terminal server client, otherwise you would see

9    another line.

10   Q.  And that means what?

11   A.  My work computer was never connected to from anywhere much

12   less my home computer.

13   Q.  It was not?

14   A.  It was not.  Never.

15            MR. CAPOZZI:  No more questions.  Thank you.

16            THE COURT:  Any recross?

17            MR. GAPPA:  Very briefly, Your Honor.

18                        RECROSS-EXAMINATION

19   BY MR. GAPPA:

20   Q.  The IP addresses on Exhibit 31.2 belong to Lock-N-Stitch;

21   correct?

22   A.  I'm not sure which --

23   Q.  If we could put up 31.2.  It's on the left side.  You see

24   the folder structure with reference to servers?

25   A.  Yes, sir.

1    Q.   And those IP addresses belong to Lock-N-Stitch?

2    A.   May I make a clarification?

3    Q.   Well, do those IP addresses belong to Lock-N-Stitch?

4    They're aligned to Lock-N-Stitch?

5    A.   Short answer is no.

6    Q.   They're assigned to Lock-N-Stitch.

7    A.   No.

8    Q.   Associated with Lock-N-Stitch?

9    A.   No.

10   Q.   And the -- well, what are they connected to then?

11   A.   The top three are intra net IP addresses, they can be

12   assigned or associated with any internal network.  They just

13   happen -- I used that as an internal scheme.  The last two are

14   IP addresses associated with two different internet lines run

15   into Lock-N-Stitch.

16   Q.   So when you would remote from your home computer, did you

17   use any of those IP addresses?

18   A.   Yes.

19   Q.   Yes?

20   A.   Yes.

21   Q.   Which ones?

22   A.   The very bottom one.  That's the only one.

23   Q.   Okay.

24        MR. GAPPA:  Those are my questions, Your Honor.

25        THE COURT:  Any re-redirect?

1          MR. CAPOZZI:  Just one quick question.

2                    REDIRECT EXAMINATION

3    BY MR. CAPOZZI:

4    Q.  The bottom one on that list?  Is it still up?

5    A.  Yes, sir.

6    Q.  Is that attached to the item 1A, the Shareaza computer at

7    work?

8    A.  No.  It's completely segregated.

9          MR. CAPOZZI:  Thank you.  No more questions.

10         THE COURT:  Any re-recross?

11         MR. GAPPA:

12                   RECROSS-EXAMINATION

13   BY MR. GAPPA:

14   Q.  It's completely segregated because you set the network up

15   that way?  You configured it?

16   A.  Correct.

17         MR. GAPPA:  That's all I have, Your Honor.

18         THE COURT:  Triple redirect.

19         MR. CAPOZZI:  That's it.

20         THE COURT:  All right.  Shall we take a brief recess?

21         MR. CAPOZZI:  Yes, please.

22      (The proceedings were concluded at 3:27 p.m.)

23

24

25

98

1          I, KAREN HOOVEN, Official Reporter, do hereby certify

2    that the foregoing transcript as true and correct.

3

4    DATED:  6th of February, 2018      /s/  Karen Hooven

5                                       KAREN HOOVEN, RMR-CRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25