McGREGOR W. SCOTT
United States Attorney
DAVID GAPPA
ROSS PEARSON
Assistant United States Attorneys
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 1:13-CR-00409 DAD |
|---|---|
| Plaintiff, | GOVERNMENT SENTENCING MEMORANDUM AND RESPONSE TO DEFENDANT'S SENTENCING ARGUMENTS |
| v. | |
| ADAM ALAN HENRY, | DATE: April 30, 2018 |
| Defendant. | TIME 1:30 p.m.<br>COURT: Hon. Dale A. Drozd |

**I.     INTRODUCTION**

A jury in Fresno returned two guilty verdicts against the defendant on November 17, 2017. Docket Item 238.  A grand jury had returned a superseding indictment against the defendant that charged him with one count of receipt or distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2), and one count of conspiracy to sexually exploit a minor in violation of 18 U.S.C. § 2251(a) and (e).  Docket Item 110.  The court has scheduled a sentencing hearing for April 30, 2018.

The United States Probation Office submitted a presentence investigation report (PSR), dated April 9, 2018, that outlines the defendant's offense conduct and calculates a range for sentencing under the U.S. Sentencing Commission's Sentencing Guidelines.  The report includes recommendations for a total term of imprisonment of 262 months and a 180-month term of supervised release.  The report recommends that no fine be imposed but that the defendant be ordered to pay mandatory $100 special

assessments with the issue of restitution being left open.

The government concurs with the sentencing calculations of the probation office, but objects to the absence of an appropriate two-level increase, under U.S.S.G. § 2G2.2(b)(3)(F).  When that adjustment is made, the sentencing range becomes 324-405 months imprisonment, and a sentence at the bottom of that range would be appropriate in light of sentencing considerations at 18 U.S.C. § 3553(a) and (b)(2).  Given the defendant's lengthy and demonstrated interest in child pornography and the seriousness of his offenses, a lifetime term of supervised release is also appropriate.  He also should be ordered to pay an appropriate amount of restitution to any victim who has properly documented a claim.

## II. THE DEFENDANT KNOWINGLY ENGAGED IN DISTRIBUTION OF CHILD PORNOGRAPHY, SO HIS OFFENSE LEVEL SHOULD INCORPORATE THIS CONDUCT.

The probation office has not included a two-level increase in offense level under U.S.S.G. § 2G2.2(b)(3)(F) even though the United States Court of Appeals for the Ninth Circuit has held that use of a file-sharing program to download child pornography justifies a two-level distribution enhancement under U.S.S.G. § 2G2.2(b)(3)(F).  *United States v. Vallejos,* 742 F.3d 902, 908 (9th Cir. 2014).  A jury in Fresno found Vallejos guilty of receipt of child pornography after the government proved that he had used a peer-to-peer file-sharing program to obtain child pornography.  The sentencing court imposed a two-level increase in offense level, because the defendant had installed and used the file-sharing program.  The Ninth Circuit in *Vallejos* rejected the defendant's sentencing argument that because "he had no intent to distribute" child pornography, the district court should have calculated his sentence using an offense level consistent with receipt, rather than one consistent with receipt plus an enhancement for distribution.  *Id*. at 906.  The Ninth Circuit stated that it was joining at least eight other circuits in holding that "the knowing use of a file-sharing program to download child pornography involves not merely the receipt of illicit material, but also the reciprocal distribution of it." The court added that "it matters not, for purposes of the enhancement, whether someone else actually downloads a file from the defendant's computer." *Id.* at 908.  Finally, in a footnote, the court observed that the

GOVERNMENT SENTENCING MEMORANDUM                 2

defendant had installed a file-sharing program, knew how to use the program, and did not present evidence that he had so little knowledge of how the program worked "as would unmistakably negate his presumed intent to distribute the child pornography files on his computer to all LimeWire users." *Id.* at 908 n.5.

Several circuits have held that merely placing child pornography in a shared folder on a file sharing network warrants application of a distribution enhancement. *See, e.g., United States v. McManus,* 734 F.3d 315, 319 (4th Cir.2013) ("[Section] 2G2.2(b)(3)(F) is a residual enhancement" that may be applied "when a defendant knowingly permits others to access and retrieve child pornography files in the defendant's possession, even if he does so passively."); *United States v. Reingold,* 731 F.3d 204, 229–30 (2d Cir. 2013) ("[K]nowingly placing child pornography files in a shared folder on a peer-to-peer file-sharing network constitutes distribution ... even if no one actually obtains an image from the folder" and "without regard to whether the defendant's primary purpose in placing child pornography files in a file-sharing program was to receive or to distribute child pornography."). Other circuits, in the sentencing context, have interpreted the statutory definition of "distribution" as, "when [a party] either transfers it to another person or makes it *accessible* to others through a file-sharing website or peer-to-peer network." *United States v. Grzybowicz,* 747 F.3d 1296, 1308 (11th Cir.2014) (emphasis added); *see also United States v. Collins,* 642 F.3d 654, 655–57 (8th Cir. 2011) (affirming a district court's determination of "distribution" to only require placing the images in a shared folder of a peer-to-peer network and knowledge of how that system works). This is consistent with the technology, where users control what is in their shared folders, and, once removed, those images are not accessible through the internet. *See Vadnais,* 667 F.3d at 1208–09.

Although the Sentencing Commission amended U.S.S.G. § 2G2.2(b)(3)(F), effective November 1, 2016, to clarify that the two-level distribution enhancement applies if "the defendant knowingly engaged in distribution," the government has met that burden in this case. The defendant falsely

GOVERNMENT SENTENCING MEMORANDUM        3

represented to the probation office that "the sharing or distribution characteristics on Shareaza had been disabled on all programs."  Docket Item 286-5 at 1, lines 25-26.  But Detective Hively prepared reports that confirm that this is not true.  The defendant had conceded at trial that many years before he installed a version of Shareza on his employer's computer he had installed an earlier version of Shareaza on a different computer.  Detective Hively found a version of Shareza on a computer (Exhibit 16) located in the defendant's garage that appeared to have been most recently used no later than in 2009.  It contained many child pornography files that had been downloaded with Shareaza prior to 2009.  Detective Hively observed that the file-sharing function of that version of Shareza had not been disabled.  Exhibit A at Bates 1380.  Nor had the file-sharing function been disabled on one of the two Shareaza programs that had been installed on the computer that the defendant used at Lock-n-Stitch.  Exhibit A at Bates 1379.  There is no known way to determine whether the sharing feature of the program had been enabled or disabled prior to the date on which the programs on the computers were examined.  Exhibit A at Bates 1378.   And the fact that the defendant knew how to take steps to try to disable the sharing feature of a file-sharing program underscores his relative sophistication with technology and confirms that he knew of the file-sharing properties of Shareaza.

     Detective Hively has confirmed that the defendant's use of the file-sharing program Shareaza led to the actual distribution of child pornography files even on the version of Shareaza on which the sharing feature had been disabled.  Detective Hively determined that the defendant had changed the default location into which files would be downloaded when using Shareaza on his work computer.  Attachment A at Bates 1372.  This again underscores the defendant's sophistication with technology and his awareness of the file-sharing features of Shareaza.  Detective Hively also researched whether the folder that the defendant had used as the location for downloads (c:/Shareaza) would be available to other network users for sharing.  A white paper from the National White Collar Crime Center revealed that all folders available for sharing appear at the beginning of file called Library1.dat.  When Detective

GOVERNMENT SENTENCING MEMORANDUM     4

Hively examined the Library1.dat file on the computer that was used to download child pornography at Lock-n-Stitch, he learned that any file that was in that folder was available for sharing on the network. And on the morning of the search warrant at Lock-n-Stitch the folder had contained at least one child pornography video before the defendant moved it to his home network.  Attachment A at Bates 1372-74. The defendant admitted that he used the same Shareaza program on the same computer to download files and transfer them to his home network.  There were dozens of child pornography files that would have been available for sharing from the defendant's computer on the wider, publicly accessible networks to which the Shareza program connected.

The Ninth Circuit noted in *Vallejos* that a defendant who installs a file-sharing program and knows how to use it has "the presumed intent to distribute the child pornography files on his computer to all . . . users" of the program or network.   The defendant was a sophisticated computer user who built and maintained computer networks.  He also knew how computers were built and how they operated. He also knew how file-sharing programs operated as corroborated by his claim that he took steps to disable the sharing features of Shareaza on his work computer.  But he took no steps to disable the sharing features of the Shareaza program that he had installed on the computer that was found to contain child pornography in his garage (which he earlier had used in his residence).  All of this supports the application of the two-level increase for distribution of child pornography through use of Shareaza.

**III.     RESPONSE TO THE DEFENDANT'S OBJECTIONS TO THE PSR**

The defendant has objected to the probation office's offense level calculation, because it does not include a reduction in his offense level for playing a minor role in the conspiracy to sexually exploit A.T.  It is clear that the defendant installed hidden cameras in a residence in Fresno and secretly recorded females using a bathroom even before he first interacted with Angele Henry.  Trial evidence also showed that the defendant and Angele installed the cameras used to record A.T. using a bathroom

GOVERNMENT SENTENCING MEMORANDUM     5

in the defendant's residence, and they made concerted efforts to improve image quality through actions such as adding or removing curtains. To the extent that he claims the cameras were only installed to further Angele's exhibitionist fantasies, one can only wonder why he chose to install the cameras in a bathroom that guests would use instead of the more private bathroom connected to his bedroom. And that he was not present when Angele secretly recorded A.T. in the defendant's bedroom is not surprising, given that the victim had rebuffed the defendant's physical touching of her. Indeed, even Angele Henry did not reveal that she was attempting to record images of the victim changing into or without clothing. Notably, the one video recording that Angele made by herself ended up on the password-protected side of the defendant's network attached storage (NAS) device on the home network he developed and maintained. The defendant told Detective Hively that he accessed and controlled the secured side while Angele accessed the unsecured side.

The court should not strike, but rather should consider, the reference in the PSR to the defendant's collection of numerous very lengthy child pornography videos. Detective Hively confirmed that the defendant possessed at least two child pornography videos that exceeded three hours in length (the longest referencing in the title "PTHC – Sweet Lil' 11 Webcam Collection" with the other referencing in its title "Russian Lolita 15Yo (Original Complete)" with several other videos exceeding one hour in length (including one that referenced "(Pthc Moscow 45 long version (01.48.08)") which was one hour forty-eight minutes and eight seconds in length. The court stated its strong preference that clips from any child pornography videos shown to the jury not exceed 30 seconds, presumably because replaying any length of the recorded sexual exploitation of any minor re-victimizes innocent people and traumatizes the sensibilities of anyone who does not have a sexual interest in children. The Sentencing Commission has noted that "if the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted," so the government urges the court to give considerable weight to the defendant's retention of a significant number of very lengthy videos that depicted horrible sexual

abuse being inflicted on very young children, including toddlers. *See* U.S.S.G. § 2G2.2 Application Note 6(B)(ii). It is significant that the lengthy videos were obtained on many different dates from no later than on February 2, 2007, until September 11, 2013, just before the defendant was first arrested. Attachment B at Bates 1381. Indeed, the court should consider that the earliest date on which the defendant appears to have acquired child pornography videos was November 4, 2005. Attachment B at Bates 678-79.

The defendant objects to the imposition of a two-level increase in offense level for obstruction of justice, under U.S. Sentencing Guidelines § 3C1.1, but because the defendant perjured himself at trial, the court should impose this enhancement. Every defendant has a right to a fair trial and to testify, but no defendant has a right to testify falsely. The defendant falsely testified that he was not responsible for knowingly searching for and receiving child pornography and that he did not participate in a conspiracy with Angele Henry to sexually exploit minor victim A.T. Following are just some representative examples of the defendant's material false testimony that support a two-level increase in offense level:

- The defendant testified that he never entered any search terms associated with child pornography (such as PTHC, preteen, R@ygold, or underage) that were retrieved from the registry of the computer at the defendant's office at Lock-n-Stitch. Transcript at 80. But the defendant's computer was password protected, and he admitted that he used the same computer and program to search for music. Angele was never shown or known to have any familiarity with that file-sharing program, and the jury obviously did not believe that he provided her his computer password and/or network access, that she traveled to his office and accessed his computer, and then typed in search terms that began a download process that lasted for months. This was even less believable in the context of the defendant's roles as the developer of and security officer for the network on which even legal adult pornography was prohibited. He asked the jury to believe that his pregnant wife both asked him to search for legal pornography during a time when she allegedly secretly logged onto his work computer and searched for illegal child pornography. And then, months later when downloads were completed, she returned to his password-protected computer and retrieved the downloaded files and transferred them to the defendant's residence and placed them onto a side of a network attached storage device that the defendant told Detective Hively was password protected and that she did not access. Logic and common sense support the jury's rejection of the defendant's false narrative.

- The defendant also testified falsely that he never got any child pornography when downloading adult pornography. Transcript at 36. But the defendant had told Detective Hively during an interview that if any child pornography files were downloaded, he would

GOVERNMENT SENTENCING MEMORANDUM        7

immediately delete them. The defendant knew that law enforcement had detected child pornography files entering the Lock-n-Stitch network, so that was what he thought (in 2013) was the best explanation for the presence of that material being downloaded. Of course, detectives later confirmed that he had entered specific search terms associated with child pornography (such as PTHC, preteen, R@ygold, and underage), and on the morning that law enforcement interviewed him and searched his work computer, he had only hours earlier transferred at least one child pornography file (PTHC candygirls Ira 12 yo) from a folder on his work computer to his home network. Transcript at 70-71.

- The defendant also testified falsely that he had no sexual interest in minors. Transcript at 65-66. But he took pictures of apparently minor females who were at a minor league baseball game in Stockton, California and made suggestive comments about them when transmitting them to Angele. He and Angele also discussed "the category we have been talking about" and a message from Angele about a 16 year-old girl referenced the defendant's earlier discussion. Child pornography was also recovered from hard drives associated with computers that were used before the defendant's relationship with Angele Brennan (later Henry) began. The defendant was also recorded by the video camera that he installed in his bathroom rummaging through A.T.'s clothing (including her bra and underwear) and holding items up to the camera piece by piece.

The defendant also testified falsely that he never intended to capture any images of A.T. using the shower and toilet in one of the bathrooms in his house. He claimed that the only reason that he helped Angele install a camera was so that she could act out her exhibitionist fantasies. Transcript at 23-25. But, as mentioned above, the defendant installed hidden cameras in a residence that he owned in Fresno to secretly record other females even before he first interacted with Angele Brennan (later Henry). And presumably the jury believed one of those women (Rebecca Jackson) rather than the defendant's testimony that she had asked him to record her using a shower.

The government's timeline showed the coincidence of the defendant and Angele either adding or removing curtains from a window or shower just before recordings of A.T. were made, and when placed in context, it was apparent to the jury that this was done to improve the quality of the recordings (rather than, as the defendant suggested, him helping to do the regular cleaning of the shower curtain). And the most explicit images of A.T. were still images that the defendant created from the secret video recordings produced in his bedroom and bathroom, all of which ended up on the password-protected side of the network attached storage device. The defendant told Detective Hively in 2013 that he placed

material on the password-protected side that might be objectionable and that he did not want Angele to see before he screened it. Notably, no child pornography or bestiality was located outside of this secured area, but both types of material were located not only there but also on hard drives associated with computers used prior to the defendant's relationship with Angele Brennan (later Henry)

### IV. CONGRESSIONAL CONCERN ABOUT CHILD PORNOGRAPHY OFFENDERS REMAINS STRONG AND MILITATES AGAINST LENIENCY FOR THE DEFENDANT.

The court knows that numerous statutory and Sentencing Guidelines amendments have strengthened the penalties for federal offenses related to the sexual exploitation of minors, and they support a sentence of imprisonment of 324 months followed by a lifetime term of supervised release. The defendant is in the general population of sexual offenders who have been deemed worthy of significant federal punishments. The continued focus on people who use the internet to sexually exploit children, such as the defendant, demonstrates that Congress has made this area a legislative priority, and it has attempted to ensure effective prosecution and punishment of offenders. Relatively recent legislative activity is consistent with a Congressional attempt to "restore the government's ability to prosecute child pornography offenses successfully," by "ensuring that the criminal prohibitions against child pornography remain enforceable and effective," *United States v. MacEwan*, 445 F.3d 249 n.12 (3rd Cir. 2006). This need is even more critical as technology and offenders become more sophisticated and the number of potential victims becomes larger while their age becomes lower.

Imposing a sentence within the relevant Guidelines ranges, while taking account of the defendant's personal history and characteristics, would be consistent with Congressional and judicial recognition of the harms inflicted upon victims of child pornography, including the victim whom the defendant surreptitiously recorded with video cameras from which he made the most explicit possible still images. By increasing the punishment based on the facts of an offender's particular conduct, courts

can tailor sentences for defendants based upon the nature and circumstances of the offenses they have committed. Despite the defendant's suggestion to the contrary, not all defendants involved with child pornography face the same specific offense characteristics. Some defendants have higher Guideline ranges while others have lower ranges, and some are only charged with and sentenced for possession of child pornography. Still others, like this defendant, are charged with more serious offenses such as sexual exploitation of a minor. But the Ninth Circuit has reiterated that the primary victims Congress sought to protect by enacting § 2252 (which relates to trafficking in and possession of child pornography rather than its production) were "the children involved in the production of pornography." *United States v. Blinkinsop*, 606 F.3d. 1110 (9th Cir. 2010), citing *United States v. Boos*, 127 F.3d 1207, 1211 (9th Cir. 1997). This is so, because images depicting minors engaged in sexually explicit conduct are "intrinsically related to the sexual abuse of children" "because this documentation is" "a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." *Boos*, at 1211.

      As the Ninth Circuit also acknowledged in *Blinkinsop*, the victims "involved in pictorial and cinematic pornography additionally endure ongoing harm because their images have been preserved in a permanent medium." *Blinkinsop*, at 1118. And criminalizing possession and receipt of child pornography gives an incentive to such individuals to destroy these materials to alleviate continuing harm to the children who have been and are being exploited. *Id.*; *see also Osborne v. Ohio*, 495 U.S. 103, 11 (1990). Here the defendant acquired child pornography as early as 2005 and rather than destroying it, as he suggested to Detective Hively, he copied it onto newer hard drives as he began using newer computers.

GOVERNMENT SENTENCING MEMORANDUM      10

## V. RELEVANT SENTENCING FACTORS SUPPORT THE SENTENCE RECOMMENDED BY THE GOVERNMENT

The considerations at 18 U.S.C. § 3553(a)(1) through (6) justify a sentence that includes a term of 324 months imprisonment followed by a lifetime term of supervised release.  Although the Sentencing Commission's Guidelines are now only advisory, Congress made clear in 18 U.S.C. § 3553 (b)(2) that departures from the Guidelines in child crimes and sexual offenses are strongly disfavored and should generally only be considered when there exists a mitigating circumstance of a kind or to a degree that has been affirmatively and specifically identified as a permissible ground of downward departure in the guidelines or policy statements.

The nature and circumstances of the offense and the history and characteristics of the defendant weigh in favor of the government's recommended sentence.  The defendant obtained approximately two hundred videos depicting child pornography, many of which were substantially longer than five minutes; indeed, more than six of the videos were in the range of one to more than three hours in length.  The Guidelines note that this factor alone can provide a basis for an upward departure, so at a minimum, this weighs heavily against a recommendation for a prison term below the Guidelines range.  The defendant progressed from using a peer-to-peer program on his home computer(s) to using the faster internet connection at the business where he established and maintained the network.  No doubt the defendant believed his activity was less likely to be detected on a larger business network (and that is also likely why he stated that he disabled sharing on the program on his work computer; he knew that law enforcement could detect internet protocol addresses sharing child pornography).   He had only relatively recently made the transition to using his employer's faster network, but his criminal activity there had been taking place for months when law enforcement unexpectedly showed up with a search warrant at Lock-n-Stitch.  Indeed, he had transferred child pornography from one network (at Lock-n-Stitch) to another (at his home) on the very day that he was confronted by the Ceres Police Department.

But that is only one aspect of the defendant's criminal misconduct.  He also progressed from secretly hiding cameras by himself at his residence in Fresno, used to record adult women, to conspiring to hide different cameras in a different bathroom with Angele Henry to create sexually explicit images of a minor female.  This escalation of seriousness in offense conduct supports the government's recommended sentence, a sentence that results, in part, from the Guidelines appropriately treating the defendant's crimes as distinct categories of conduct that do not group for purposes of sentencing.  This is especially appropriate when the court considers the text communications between the defendant and Angele Henry referencing "the category" of young females that they had been discussing.  The victim (A.T.) depicted in the recordings captured in the defendant's residence has stated that the defendant had "weirded" her out when she was in his presence, and in a pretrial interview, she revealed details about how the defendant had attempted to or actually had inappropriate physical contact with her.  Attachment C.  The defendant and Angele had access to this victim through a work relationship the defendant had with the victim's father, and through her employment as a babysitter for the defendant's own family.  He took advantage of those relationships and sexually exploited a victim who likely will forever be less likely to trust people and feel secure in anyone else's bedroom or bathroom.

Although the defendant has pointed to what he would like the court to consider a difficult childhood, it must be recognized that a Pretrial Services report contained conflicting information about the defendant's upbringing.  Even assuming the defendant did confront some issues as a child, this type of hardship is not unique as almost everyone can point to challenges of different sorts that must be overcome in the transition from childhood to adulthood.  Here, the defendant not only graduated from high school, he attended Fresno Community College for several years, and then began working for different companies constructing and maintaining computer networks.  No one has drawn a causal connection between anything allegedly in the defendant's upbringing and the poor choices he made as

an adult.  Nor would such a connection be supportable.   Nor do the Guidelines contemplate a departure or variance on this ground for the types of offenses for which the defendant was convicted.

Although the defendant has asked the court to factor into its sentencing decision the results of a polygraph examination and various doctor reports, these are of dubious value, especially since none of the authors have been subjected to cross-examination.  Notably the polygraph examiner asked whether the defendant had "ever intentionally and deliberately searched for child porn or images of minors on any electronic device."  This references a mental state higher than that necessary for conviction.  The defendant, through the examiner, also claims he did not "know child porn or sexual images of minors were on any . . . electronic devices prior to being contacted by law enforcement."  But to the extent he persists in these positions, he bolsters the appropriateness of finding no acceptance of responsibility as well as obstruction of justice.  The government also notes that the doctors who examined the defendant and whose reports have been offered interviewed the defendant, and prepared their reports, long before a jury found him guilty of the offenses for which he is being sentenced.  Some of the reports acknowledged that the opinions might be different if the defendant was actually responsible for downloading child pornography.  Judge Ishii gave thoughtful analysis in rejecting proposed trial testimony from the authors of the reports and noted that several passages actually potentially damaged the defendant's arguments.  It does not appear that the defendant has made any effort to update the reports since they were written years ago for a purpose other than sentencing.  Although a sentencing court has wide latitude in considering material, there is very little value in the proffered reports until and unless the authors are made available for cross-examination.

The defendant's criminal activity took place, in part, at his place of employment, so this arguably negates using his employment history as a mitigating factor.  Indeed, his technical sophistication and position of trust enabled him to access the Lock-n-Stitch network with no oversight by his employer, and he abused that trust by engaging in criminal activity.  If anything, his employment should be

considered an aggravating factor.  Many other defendants facing sentencing for the same crimes have no prior criminal history, so although the defendant remains in Criminal History Category I, he does have a prior felony conviction (related to theft from an employer, which also militates against using his employment history as a mitigating factor) that should not be considered a basis for leniency.

There are other aspects related to the history and characteristics of the defendant, as well as protection of the public, that should concern the court and which justify imposing the sentence recommended by the government.  There was undoubtedly a time, perhaps as he suggested when he was in college, when the defendant's interest in pornography was constrained to obtaining and viewing images of adults engaged in sexually explicit conduct.  That is not illegal conduct.  But eventually he began recording his own pornographic videos, and then he began to secretly record females using a bathroom in his house in Fresno.  Apparently the defendant's pornographic interests expanded to include images of bestiality and then images of children being sexually abused.  The defendant then progressed to creating his own sexually explicit material by hiding cameras in the residence he shared with Angele Henry.  As noted, the defendant was in public at a baseball game taking photos of what appear to be minor females.  Not only did he send the photos to Angele, shared text messages also suggested they shared a sexual interest in females that was not limited by their age.  The defendant was not an unwitting victim of Angele's conduct but rather an evolving predator with increasingly deviant interests.

A sentencing court must consider the need for the sentence imposed to reflect the seriousness of an offense, to promote respect for the law, to provide just punishment for an offense, to provide adequate deterrence to criminal conduct, and to provide the defendant with needed educational training, medical care, or other correctional treatment in the most effective manner.  And the court must choose a sentence that will "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(c).  The court should consider that the defendant not only consumed a significant quantity of child pornography for many years, he also acted upon his sexual interests in increasingly dangerous ways.  A

GOVERNMENT SENTENCING MEMORANDUM        14

lengthy term of imprisonment would protect the public, and enable him to receive needed mental health treatment and to address any other medical issues that he has confronted recently.

The court also should impose a lifetime term of supervised release. Congress, in the PROTECT Act, provided for a lifetime term of supervised release for the offenses for which the defendant will be sentenced. The concern was that sex offenders, such as the defendant, who have manifested a sexual interest in minors have restrictions placed on their access to minors, computers, the internet, etc. in order to minimize the risk that they will reoffend. The defendant has demonstrated his sexual interest in minors, particularly minor females, and in order to minimize the risks to society that he will reoffend, the government submits that he should be subject to a supervision for as long as he is out of custody.

The Ninth Circuit has upheld a lifetime term of supervised release for a defendant who was convicted for possession of child pornography. *United States v. Cope*, 506 F.3d 908 (9th Cir. 2007). The Ninth Circuit noted that other circuit courts of appeal have held that life terms of supervised release are reasonable for those convicted of possession of child pornography. *See Hayes*, 445 F.3d at 537 (2d Cir. 2006) ("The fact that Hayes already was a recidivist . . . weakens substantially his argument that" a lifetime term was unreasonable.); *United States v. Gonzalez*, 445 F.3d 815, 820 (5th Cir. 2006) (lifetime term for possession of child pornography was reasonable); *see also United States v. Moriarty*, 429 F.3d 1012, 1025 (11th Cir. 2005) (lifetime term did not violate Eighth Amendment). The defendant's crimes here are arguably more serious than possession of child pornography, so a longer period of supervision is warranted. The longer the term of supervision, the lower the risk of reoffending that the defendant will present to the public, since part of the supervision process will include registration as a sex offender, restrictions on access to minors, computers, and the internet.

GOVERNMENT SENTENCING MEMORANDUM      15

## VI. THE IMPACT OF THE DEFENDANT'S CRIMINAL ACTIVITY ON HIS VICTIMS HAS BEEN IMMENSE AND ALSO SUPPORTS THE SENTENCE RECOMMENDED BY THE GOVERNMENT AS WELL AS RESTITUTION.

When imposing its sentence, the court should consider the victim impact statements attached to the probation report as well as the video recorded impact statement from one of the victims. Several victims and several parents have eloquently stated the impact of knowing that people like the defendant derived sexual pleasure from seeing video images of the sexual abuse of minors. As one victim wrote:

> I was only seven when my predator began molesting me and photographing me. It went on for two years before they found him on the internet sending pictures of me to men. Then they found me after arresting him, but my life has never been the same. I have lived my life uncomfortable with men and boys around. I am always conscious of my clothing and making sure no one can see any parts of me. I worry about the pictures of me that are out there and I hate that others see them. I have feared over the years that someone would recognize me in public. I wish only that every single one can be found and destroyed some day. It is upsetting thinking about them and I want them to go to jail for doing it. . . . I went to therapy for a while but I stopped because I just wanted to forget it. With the pictures still out there I can't.

Victim Impact Statement, Docket Item 287 at 3.

Another victim has written about some of the impacts of "this horrific crime that continues to follow me." She wrote on March 31, 2017, that

> I have tried over the years to overcome my past and not let it determine my future, but perpetrators and stalkers still find a way to view this filth. As a child I had no control over these acts nor the videos that were produced. As I have aged, I'm appalled at the number of people who find this on the internet still.
>
> From the time that this came into the public eye, I have been unable to live in my Family home not only due to fact that these crimes were made in that home . . . but also to the fact that harassment by people who began to watch my house and post our comings and goings in chat rooms.
>
> I was unable to have social media like the normal kid(s), because these sick individuals would find me and send me very threatening messages against my welfare.
>
> Every time someone views this trash, they are once again making me re-live the most horiffic part of my childhood. I can never truly heal because the perpetrators and stalkers never allow me to do so. Anyone viewing these videos/pictures is just as guilty for causing me or any other exploited child undue harm, unneeded stress, and insecurity in a time when we need to feel safe and have a chance to heal/recover. As a teen, I now realize the extent of people looking at these and I'm concerned about their locations fearing that they will find me. These people need to be punished for taking away a major part of my childhood and sense of security.

Victim Impact Statement, Docket Item 287 at

There are many victims in this case, and the defendant is not one of them. But to date, the defendant has not done anything to attempt to address the damage that he has done to any of them. Even if he were for the first time to address this issue during his allocution, it would be too little too late. The defendant will serve a prison sentence and perhaps even complete supervised release, but his criminal conduct will have impacted negatively his victims for the rest of their lives. In light of the impact statements from some of the victims whose images the defendant obtained, the court can extrapolate the effects that his conduct had on other victims, many of whom are still unidentified but no less harmed.

For those who have submitted a request for restitution, the government urges the court to award an appropriate amount to each victim.

**VII. CONCLUSION**

The court should impose a term of imprisonment of 324 months followed by a lifetime term of supervised release that includes the standard and special conditions proposed in the probation report.

Dated: April 16, 2018

McGREGOR W. SCOTT
United States Attorney

By: /s/ DAVID GAPPA
DAVID GAPPA
Assistant United States Attorney

ROSS PEARSON
Assistant United States Attorney