UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )   No. 13-CR-409-DAD
                               )
vs.                            )   MOTIONS HEARING
                               )
ADAM ALAN HENRY,               )
                               )
          Defendant.           )
_____)

Fresno, California                 Monday, April 30, 2018

REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **DAVID L. GAPPA**
                          and **ROSS PEARSON**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721


For the Defendant:        Law Offices of Anthony P. Capozzi
                          BY: **ANTHONY P. CAPOZZI**
                          1233 West Shaw Avenue
                          Suite 102
                          Fresno, California 93711

1   Monday, April 30, 2018                       Fresno, California

2   1:44 p.m.

3         THE CLERK:  The Court calls case 1:13-CR-000409.

4   United States versus Adam Alan Henry.  Motion for new trial.

5   Motion for discovery and motion to continue sentencing and set

6   evidentiary hearing.

7         MR. GAPPA:  Good afternoon, you, David Gappa and Ross

8   Pearson for the United States.

9         MR. CAPOZZI:  Your Honor, Tony Capozzi with the

10   defendant, who is present in custody.

11         THE COURT:  All right.  There's quite a bit in front

12   of the Court.  Let me ask first:  The defense filed a motion

13   for discovery having to do with trial Exhibit 28.13.  The

14   government filed a response.  Nothing was filed thereafter,

15   specifically with respect to that.  Is the defense still

16   contending that Exhibit, trial Exhibit -- government's trial

17   Exhibit 28.13 was not produced?

18         MR. CAPOZZI:  Your Honor, I've just received an email

19   from my expert 15 minutes ago.  And he did meet with detective

20   Hively and went through the discovery that the government had.

21   And the snapshot was from a videotape that had been taken in

22   the bathroom.  There was a snapshot there.  But from what I

23   understood, that snapshot had not been turned over to us

24   during the discovery process.  I think detective Hively

25   discovered that this was the juvenile involved in preparing

4

1   for the trial.  And it was put into their trial packet.

2   That's when we first saw it.

3            THE COURT:  I'm not sure what I'm getting told.

4            MR. CAPOZZI:  Maybe the government can explain that

5   better than I can.

6            THE COURT:  Well, I mean, I will observe that

7   throughout the trial, Mr. Capozzi, at various times you would

8   raise issues regarding discovery.  Saying I didn't receive

9   this.  And my perception, sitting up here, was that discovery

10  was made available, was produced on request.  May not have

11  been marked as trial exhibits at the time it was produced.

12  This case was pending, I think, for over four years by the

13  time it was reassigned to me on the eve of trial.  And that

14  over the four-year period, it seemed to me during trial

15  whenever these issues would arise, that ultimately it seemed

16  to me to be the case that the information and exhibits were

17  all either produced or made available to the defense and that

18  the defense sometimes would get confused by the way that the

19  exhibits were marked for purposes of identification at trial.

20  But I never once felt that there was an instance in which the

21  defense had not either received or had made available to it

22  every single piece of evidence that was introduced at trial.

23            Now, what I hear you saying to me now is that

24  somebody on the defense team says, well, that image was made

25  available to us prior to trial, but we never saw it as a

1  separate screenshot until it was introduced at trial.  Is that

2  what you're claiming?

3          MR. CAPOZZI:  You got it, judge.  That's it.

4          THE COURT:  And what's the government's response to

5  that?

6          MR. GAPPA:  Your Honor, the Court's observations and

7  conclusions are correct.  The government did provide the

8  discovery several times, provided complete copies of all of

9  the material, including specifically all of the content from

10  the devices from which the ultimate trial exhibits, including

11  the screen captures, were created.  So for years the defense

12  had those particular still images.  And as of last week, the

13  defense expert went to meet with detective Hively and I was

14  informed that the defense expert was satisfied that it had, in

15  fact, been turned over.  So I think it's a little disingenuous

16  to say we hadn't turned it over.  We've given the attachments

17  to prove that as far back as 2014, '15, et cetera, that all of

18  that material had been turned over.  So we believe we've

19  satisfied our obligations and that there shouldn't be any

20  issue.

21          MR. CAPOZZI:  Judge, this issue isn't a crucial

22  issue.  Even with this picture, with this snapshot, my

23  arguments on Count One is still doesn't match the statute.

24          THE COURT:  Well, but I've got to rule on it.

25          MR. CAPOZZI:  Then rule against us on this, judge.

1    I'll withdraw it.  I don't want to take up your time on this

2    issue.

3         THE COURT:  All right.  Well, I'm going -- the motion

4    has been withdrawn.  I'm also going to conclude that it was

5    produced in discovery, at the very least as a video.

6         MR. CAPOZZI:  Yes.

7         THE COURT:  From which -- at the very least as a

8    video, from which a screenshot was taken for purposes of

9    admission at trial.

10        Now, Mr. Gappa, are you telling me differently?  That

11   you believe the record establishes that you actually took the

12   very screenshot, not just the video from which it came, and

13   you produced the screenshot in discovery?

14        MR. GAPPA:  Yes.  And just so we're clear, I think

15   this came up during the trial.  This screenshot, actually

16   there are several.

17        THE COURT:  We're only talking about 28.13.

18        MR. GAPPA:  Correct.  So that one was created by the

19   defendant and that was found on the devices that were seized

20   when the search warrant was executed and that screenshot had

21   been turned over years prior to the trial.  It may not have

22   had the exhibit sticker or identified as 28.13, but it

23   was -- the screen capture that was part of the evidence that

24   was all provided.  So it was not just the video, but it was

25   the defendant's creation of the screenshot from the video both

1  were turned over.

2       THE COURT:  So your position is that 28.13 was not a

3  screenshot taken by the government, it was a screenshot taken

4  by the defendant that existed on his computers or related

5  devices and everything that was on those was turned over and

6  made available, including this very screenshot?

7       MR. GAPPA:  Yes.

8       THE COURT:  I'm denying the --

9       MR. CAPOZZI:  Can I respond to that, judge?

10      THE COURT:  Sure.

11      MR. CAPOZZI:  Judge, there were -- I think it's 12

12  screen shots that were given to us.  10 were in the bedroom,

13  two were from the bathroom.  The 13th one was presented in the

14  trial exhibits.  Now, what the government is saying is that in

15  the -- all of the computer work that was taken, on that

16  computer work was this snapshot.  But this snapshot was not

17  separated from the others and given to us.  In a number of

18  motions that were filed, I attached all the snapshots to my

19  motion.  And the snapshots included 1 through 12.  Never

20  included 13 because it wasn't turned over that way.  Now, it

21  was somewhere in the computer.  It was there.  Not separated

22  by the government.  Not separated by us.  So it -- I think it

23  was overlooked by both.  But the point is this isn't a crucial

24  issue.  I'll withdraw --

25      THE COURT:  I'll say it's crucial to me.

8

1        MR. CAPOZZI:  Even in considering that picture, Your

2   Honor.  That still doesn't meet the dictates of the statute.

3        THE COURT:  I'm going to put that aside.

4        MR. CAPOZZI:  All right.

5        THE COURT:  In document 261, the defense made a

6   motion -- it's phrased, styled as a motion to continue

7   sentencing hearing, set evidentiary hearing and request the

8   government produce witnesses.  Is the defense still seeking an

9   evidentiary hearing?

10        MR. CAPOZZI:  Well, on whatever evidence the

11   government wants to present in terms of enhancing his

12   sentence, I'd like to have a hearing on it.  Because we're not

13   going to stipulate to it.

14        THE COURT:  I don't know what you mean.

15        MR. CAPOZZI:  Well, I'll not sure what evidence

16   they're going to present.

17        THE COURT:  It's your motion.  You moved for -- I

18   mean, I'm just looking at the motion.  It's docket number 261.

19   It was filed on January 10th.  I don't know if it's still a

20   live motion or not.

21        MR. CAPOZZI:  Well --

22        THE COURT:  You moved this Court to continue the

23   sentencing date of March 5th and to schedule an evidentiary

24   hearing instead to determine whether the testimony of Jose

25   Antonio Ruezga violated the defendant's right to due process.

1          MR. CAPOZZI:  Yes, that is my --

2          THE COURT:  And requested several witnesses, four

3     different witnesses be produced.

4          MR. CAPOZZI:  That was to determine whether or not we

5     could even proceed to a sentencing hearing, judge.  Had that

6     evidentiary hearing to determine whether or not the comments

7     by Mr. Ruezga affected this case.  I think that issue has to

8     be determined first.  Then we get to the sentencing.

9          THE COURT:  I'm going to ask you a third time.  Are

10    you requesting an evidentiary hearing to determine whether the

11    testimony by CPS Officer Ruezga violated the defendant's

12    constitutional rights?

13         MR. CAPOZZI:  I did ask for that, judge.

14         THE COURT:  And do you still?

15         MR. CAPOZZI:  Only if the Court thinks more evidence

16    is needed on that issue.  The government obviously doesn't

17    think so.  The only issue I would have brought up for an

18    evidentiary hearing now is to have the defendant testify as to

19    how that interview took place.  That would be my evidentiary

20    hearing.  I think we got enough evidence from Mr. Ruezga

21    through your questioning of him.

22         THE COURT:  There finally is a motion for acquittal

23    or new trial in which, I think, five separate bases are now

24    alleged.  First, a motion for acquittal because the evidence

25    on the charge of conspiracy to sexually exploit a minor in

violation of 18 USC Section 2251(a) and(e) was insufficient to support the conviction.  B, an alternative request that if not, a judgment of acquittal is entered on Count One, that a new trial on that count be ordered.  Third is an alleged discovery violation based upon the failure to produce Exhibit 28.13.  The fourth grounds of the motion is based on this prosecutorial misconduct.  First, the prosecutor's closing argument comments directed at defense counsel.  I'm sorry, not five.  Six grounds.  The fifth ground was alleged cumulative error.  And the sixth ground, which was raised in the defense reply brief, was that the admission of the testimony of CPS Officer Ruezga -- that the testimony was improperly admitted in violation of the defendant's fifth and sixth amendment rights and that a new trial should be granted on that grounds.

Are those all the grounds that the defense moves for a new trial or for acquittal?

MR. CAPOZZI:  Yes, judge.

THE COURT:  Let's take them up one by one.  Again, I have not studied, nor have the parties cited to me, in connection with these motions, what motions and rulings in response to motions with respect to Count One -- it's Count One, right?  The conspiracy to sexually exploit a minor.  I'm not well versed in what motions or rulings were made prior to trial by Judge Ishii when the case was pending before him that touch on this subject.  I know that it came up frequently

1    during the trial.  I ruled as best I could in whatever context

2    that it came up.

3         The defendant -- and I'm not being critical of

4    anybody, I'm just trying to get it right.  The defense

5    arguments to me are not particularly well focused.  I'm not

6    exactly sure what the defense is arguing as to why the

7    evidence there was insufficient.  Throughout the trial, there

8    was this notion that, judge, voyeurism is not a crime.  That's

9    what this is.  There seemed to be arguments from the defense

10   based upon the so-called Dost factors that the minor has to be

11   engaged in some specific form of conduct in order to be

12   qualified under the statute.  I think, as I remember

13   correctly, it was a long time ago now, this trial it seems to

14   me, but I think I rejected those arguments.  Because I became

15   convinced that was not a correct reading of the law.

16        In opposition to the defense motion for new trial,

17   the government is citing me to other hidden camera cases, both

18   published and unpublished.  I will say that it seems to me

19   that when I review all of those, they -- the cases -- those

20   cases do tend to at least refer to evidence of depiction of

21   genitalia or the pubic area at least of the minor.  Nobody is

22   citing me to specific trial exhibits.  I understand the whole

23   notion that the -- that one of the relevant questions is the

24   intention of the -- of what it is supposed to -- what the

25   images is supposed to generate from the viewer, that it's

1   irrelevant what the intention of the victim is in any

2   particular photo.  But are there specific trial exhibits that

3   the government points me to with respect to what I understand

4   to be the requirement in order for it to pertain to sexually

5   explicit conduct.  I think that's the magic language of the

6   statute.  That the government wants to point me to that, you

7   know, judge, look at these trial exhibits because

8   they -- that's the best from which a jury could find that,

9   yes, it is a depiction of the pubic area or genitalia that,

10  depending upon what may be in the mind of a viewer qualifies

11  it as sexually explicit conduct regardless of the fact that it

12  was filmed surreptitiously.  Because I remember at trial the

13  depictions of naked breasts.  I'm not sure -- I don't think

14  that those would -- if that's all there was, I'm not sure, I'd

15  have to ask, that doesn't satisfy the requirement.  Does it?

16  Under the Dost factors.  And I haven't seen any case that

17  does.  Now, if that's not the government's theory, if you're

18  relying upon a different theory, can you remind me of the

19  exhibits that the government thinks satisfy it.

20          MR. PEARSON:  Your Honor, we're relying

21  on -- primarily on the theory that this is criminal

22  conspiracy.  Not that it has to be a completed offense.  And

23  so in our response to the motion, we set out kind of our two

24  alternative arguments which we raised at trial too.  The first

25  is that the offense was completed when the defendant and

1  Angele Henry agreed to sexually exploit A.T. today.  And when

2  he intended to commit that sexual exploitation.  And so we

3  rely on the Johnston case from the Ninth Circuit on page two

4  of our brief.  That says that you don't need the completed

5  offense here.  So whether any one of these pictures qualifies

6  as sexually explicit material is not the focus.  It's whether

7  the defendant and Angela greed to try and sexually exploit

8  A.T. and whether he intended to create sexually explicit

9  material.

10       As to your question of whether there were

11  sufficient -- whether there were specific exhibits that would

12  amount to sexually explicit material?  We believe that there

13  were.  I don't have -- if I can have one second, Your Honor.

14       THE COURT:  Sure.

15       MR. PEARSON:  So 28.13 is the exhibit of A.T. where

16  she's fully nude facing the camera.  And we believe that at

17  the very least, looking at the dose factors, that it would

18  be -- that a rational juror could conclude that that was

19  sexually explicit material.

20       There are also the bedroom videos where A.T. is seen

21  in a bedroom, which is a sexually explicit location.  She's

22  facing the camera and these pictures were saved on the

23  defendant's laptop along with his other pornography and child

24  pornography, which suggests that the intended response was to

25  elicit a sexual response from him.  So our main position is

1    that the Court doesn't even need to reach that issue, doesn't

2    need to determine which specific picture qualifies as sexually

3    explicit material, but that there are pictures that would

4    qualify as such.

5         THE COURT:  Anything the defense wants to add on that

6    point?

7         MR. CAPOZZI:  Yes, judge.  It's those snapshots we're

8    talking about.  I have them here.  I'd be glad to give them to

9    your clerk so you can look at them.  And you decide whether

10   they're sexually explicit.  There's no chance in the world

11   these are sexually explicit.  Under the statute.

12        THE COURT:  Okay.  I've got them.  It's 28.1 through

13   13?

14        MR. CAPOZZI:  Yes.  And the one that the government

15   is really concentrating on is number 13, the one that we were

16   talking about earlier.  But even that doesn't meet the

17   dictates of the statute.  If you go through the Dost factors,

18   they just don't apply.

19        THE COURT:  So what is the evidence of a conspiracy

20   to sexually exploit?

21        MR. PEARSON:  So it's circumstantial evidence.  It's

22   the two of them acting in concert to put up the video, to

23   record A.T. secretly.  To modify the video by taking down the

24   curtain, for instance, testing the video the day before A.T.

25   comes over.  And then saving the screen shots from that hidden

1    camera video on the defendant's password protected side of his

2    computer.  And so it's evidence of them acting in concert.

3    And from who they captured, which is A.T.  and where those

4    captured videos of her naked and changing clothes ended up,

5    the inference is that the defendant intended to capture elicit

6    pictures of her and save them to his computer.

7            THE COURT:  Well, isn't the evidence really a -- that

8    whatever the defendant and his wife were doing was more

9    indiscriminate than that?  I seem to recall testimony of other

10   people having been captured on that camera.  And don't they at

11   least have to have the goal of not just capturing photographs

12   in the shower or on the toilet or otherwise, but don't they

13   have to have the goal of capturing sexually explicit conduct?

14   Photographs depicting sexually explicit conduct in order to

15   be -- in order for him to be guilty of the conspiracy charge?

16           MR. PEARSON:  Yes.  And the evidence of that -- and

17   that's actually an argument that the defendant presented to

18   the jury, that I believe from the jury verdict, the Court can

19   find was rejected.  It's that there were other people recorded

20   and filmed by the bathroom camera, which was running

21   continuously.  But the pictures that ended up screenshotted

22   and placed on the defendant's hard drive were of AT.  And the

23   bedroom video also ended up screenshotted and placed on the

24   password protected side of the NAS.  And so from that result,

25   I believe any -- well, not any.  A rational juror could infer

1   that the intent was to capture sexually explicit materials of

2   AT.  And that's the criminal agreement.  It's not required

3   that these videos amount to sexually explicit conduct.  It's

4   enough that they had a meeting of the mind, which you can see

5   from their joint action, and that the intent of that activity

6   was to capture sexually explicit material.

7           THE COURT:  But you want me to infer the unlawful

8   goal from where the photos of the minor ended up?

9           MR. PEARSON:  Yes.  And I believe that's permissible.

10  And it's something that a rational juror could have inferred.

11          THE COURT:  Mr. Capozzi.

12          MR. CAPOZZI:  Judge, if there were a conspiracy, if

13  there were an agreement, there would not have been a camera on

14  a plant above, high up shooting down.  When you read all of

15  the cases, none of the cases the government cites dealing with

16  cameras are Ninth Circuit cases.  We've cited Ninth Circuit

17  cases.  Their are cases are from Fifth, Tenth, et cetera,

18  Eleventh.  And those cameras were all placed on the vanity

19  where it's placed low, where you can see someone sitting on a

20  toilet, you can see someone going to the bathroom, you can see

21  someone coming out of the shower from the waist down.  The

22  focus on the pubic area.  The genitalia area.  The camera in

23  this case was high up above.  That's why we have, in the 13th

24  screenshot -- well, there's three of the screen shots.  10 are

25  from the bedroom.  That are focused above, not on the genital

1  area whatsoever.  And focusing on the breast is not enough to
2  cover the statute.
3          THE COURT:  All right.  I'm going to skip over the
4  request for new trial on the same grounds.  The discovery
5  violation, it's still unclear to me exactly what the defense
6  position is.
7          MR. CAPOZZI:  We're withdrawing that, judge.
8          THE COURT:  Even as a grounds for a motion for new
9  trial?
10          MR. CAPOZZI:  To me, even with this picture, 13, it
11  doesn't amount to a violation of the statute.
12          THE COURT:  What if I disagree with you?
13          MR. CAPOZZI:  Well, then, you know --
14          THE COURT:  Are you saying you didn't get that
15  photograph?
16          MR. CAPOZZI:  You know, it's there on the computer.
17  There's no question about it.  Our expert looked at it last
18  week and it's there.  But it wasn't presented to us separately
19  with all the others.  So technically we should have dug more.
20          THE COURT:  Well, I don't understand what you're
21  saying to me.  It's on the computer.
22          MR. CAPOZZI:  Yes.
23          THE COURT:  The computer was made available to the
24  defense.
25          MR. CAPOZZI:  Right.  And our expert looked at it.

1      THE COURT:  Are you saying in terms of all the images

2   that you requested copies of, or did the defense not ask for

3   copies of all the images that appeared on the computer or the

4   computer system?

5      MR. CAPOZZI:  We asked for that and we asked for

6   snapshots.  And we got 12, judge.  12.  We got 13 at the time

7   of trial.  Now, how we screwed up?  I don't know.  I don't

8   think we did.

9      THE COURT:  All right.  Prosecutorial misconduct.

10  The comments aimed at the defense counsel.  You know, Mr.

11  Capozzi, I don't have -- or if I do have, I haven't looked at

12  it.  I don't know if I have a copy of the -- all the arguments

13  that were made.  If I do, if it's on the docket, I haven't

14  reviewed it.  But I don't recall any objection.

15     MR. CAPOZZI:  I didn't.  I will be the first to admit

16  it, I didn't.  I don't like to object during final argument.

17     THE COURT:  For good reason.  Strategically.  It's

18  not -- I understand that.  But what exactly -- the comment

19  that you're most -- you're now claiming was improper and

20  prejudicial?

21     MR. CAPOZZI:  Let me find that in my motion.  I set

22  that out.  He makes -- the government makes the owe so we want

23  to thank you for your service.  This is when he first starts

24  out.  You play a very important role in the process.  And

25  we're asking you to find the defendant guilty of these two

1    counts.  I want to let you know that Mr. Capozzi did a great

2    job on his closing."  And I -- I knew what was coming, but I

3    didn't say anything at the time.  "And the defendant is

4    entitled to be well represented.  Mr. Capozzi is the most

5    experienced attorney here.  He's done his job.  But what is

6    his job?  His job as a defense attorney is to distract and to

7    deflect and to give you alternative facts to argue things that

8    aren't necessarily what happened. And he started by bringing

9    up something irrelevant to this case."

10            What he's doing is saying that I'm lying.  And that's

11   clearly improper conduct on behalf of the government to say

12   that.  I should have objected at that point.  I didn't.

13            THE COURT:  Again, I'd be -- I would not be being

14   candid if I say I recall that aspect of the closing argument.

15   Mr. Capozzi's quoted from it and read from it, so I assume

16   he's got a transcript of it.  What's the government -- I know

17   the government's opposition seemed to be, well, you know,

18   we -- we were complimenting him.  It was a direct compliment.

19   Well, yeah, one sentence of it.  That certainly wasn't -- that

20   certainly wasn't the rest of it.  What's the government got to

21   say about whether or not that's grounds for relief?

22            MR. GAPPA:  Well, Your Honor, as we argued, in

23   document 278 at page 14.  And as the Court has noted, there

24   was no objection at the time.  It was a fleeting reference at

25   the beginning of what ended up to be approximately a 30-minute

1  rebuttal closing argument.  It was not something that the

2  government went back to within that 30 minutes.  The Court

3  instructed the jury that lawyers are not witnesses, their

4  questions, statements and objections.

5           THE COURT:  Right, I know.

6           MR. GAPPA:  -- and arguments --

7           THE COURT:  But it was a low blow.  I mean, now that

8  you just read what was said, it was a low blow.  No doubt

9  about that.  To say a defense attorney's job is to distract

10  and to throw out alternative facts, not to tell you what

11  really happened, words to that effect.  I mean, if there had

12  been an objection, I most likely would have sustained it and

13  told you to move on.  What do you think?

14           MR. GAPPA:  That certainly wasn't the intent.  And

15  it's unfortunate that's what the Court and counsel inferred.

16           THE COURT:  That's what the words say.  They speak

17  for themselves.

18           MR. GAPPA:  But on balance, when we put it into its

19  context and then see what followed and then look at where that

20  argument fit in at the end of what took place over the

21  preceding seven court days, we don't think that it was a basis

22  to grant a -- either a mistrial or a new trial.

23           THE COURT:  All right.  Cumulative error.  I don't

24  think I need any argument on that.

25           MR. CAPOZZI:  No.

1    THE COURT:  Now, the whole thing with -- you know

2    what I really want to say about the Ruezga rebuttal case is

3    that we shouldn't have had to deal with it because it was

4    unnecessary.  But instead we had to deal with it as best we

5    could with a jury waiting.  I ruled.  Mr. Capozzi, in his

6    reply brief, and maybe even in the addendum, is now arguing

7    that as a matter of California law, that my ruling that the

8    CPS officer was not a law enforcement officer is wrong as a

9    matter of law under California law.  That he is, in fact, a

10   law enforcement officer and that I erred when I concluded

11   otherwise.  That's the way -- is that what you're arguing?

12   MR. CAPOZZI:  If --

13   THE COURT:  I don't.

14   MR. CAPOZZI:  I'm not going --

15   THE COURT:  Maybe that's not what you're arguing.  I

16   thought --

17   MR. CAPOZZI:  I am arguing that.  But really, beyond

18   that, judge, he's an agent for law enforcement agents.

19   THE COURT:  Well, I rejected that notion.

20   MR. CAPOZZI:  Really?

21   THE COURT:  The first time through.  I mean,

22   I -- look --

23   MR. CAPOZZI:  The first time through, yes.  The

24   second time --

25   THE COURT:  It came on in rebuttal.  You objected.

1    As I recall, it was at the end of a day.  I think I tried to

2    research as fast as I could and rule because it was in the

3    rebuttal case.  So the case is ready to go to the jury.  It

4    wasn't briefed.  It was argued.  And I ruled the best I can.

5            Now I read you as telling me, judge, even after you

6    reconsidered your ruling, you were still basing it upon your

7    finding that he wasn't a law enforcement officer.

8            MR. CAPOZZI:  That's correct.

9            THE COURT:  And you erred as a matter of law because

10   here's California law, he is a law enforcement officer.  Is

11   that what you're arguing?

12           MR. CAPOZZI:  I am.

13           THE COURT:  I mean, I understand your position is,

14   hey, he was acting at the behest of law enforcement, he was

15   there as part of their team, he wasn't -- you made all those

16   arguments originally and I said, no, he was there as a CPS

17   officer with a different function and a different purpose.

18           MR. CAPOZZI:  And --

19           THE COURT:  The thing that might get me to double

20   clutch about whether I got it right or not on the fly is the

21   argument now that I think you're making that I was wrong as a

22   matter of law.  And that, in fact, under California law he's a

23   law enforcement officer.

24           MR. CAPOZZI:  A peace officer, which I think equates

25   to it.  That's what the statute says, judge.

1          THE COURT:  And I don't think the government has

2    responded to that argument.  But I can see how that could make

3    a difference.  If he, in fact, is a peace officer under

4    California law.  See, I mean, I got to tell you, my -- I

5    think, I haven't gone back and reviewed all the transcripts

6    and tried to remember exactly what I did.  But at least in

7    part what my ruling was, no, he wasn't acting as law

8    enforcement there.  He was there as Child Protective Services

9    with a separate function, the safety and well being of the

10   children who are located in the house, with the understanding

11   that both parents were likely to be arrested at the time of

12   the execution of the search warrant or shortly thereafter.

13   And he's trying to figure out, "Are the kids safe?  What is

14   the circumstances here?  And where should they go from here?"

15   Especially if both parents are arrested.  And I, on the fly,

16   doing as much as I could, ruled based upon the fact that he

17   wasn't law enforcement, that that was not an interrogation.

18   If I got that wrong, if he is law enforcement and he's there

19   with other law enforcement agents at the time of the execution

20   of a search, even though his concern is the safety of the

21   children.  But if he's law enforcement, does that change

22   things?  Does that bring him within the Miranda holding?  I

23   can't remember, Mr. Gappa, as I sit here now whether he had

24   already invoked at that point with the FBI case agent and the

25   others there with him.  I can't recall whether he had invoked

1    already at that point.  I think he had.  And that, therefore,

2    the CPS officer, if he is a law enforcement officer or a peace

3    officer under California law, if him asking any questions is

4    then a violation of Miranda.  I never got that far, I don't

5    think, in my analysis.

6            MR. GAPPA:  Well, Your Honor, I think the Court got

7    very close.  And I think the Court did more than make a ruling

8    on the fly.  I did go back and review the transcripts of the

9    trial testimony.  The Court is correct that it

10   came -- Ruezga's testimony came at the end of the case

11   obviously, it's in rebuttal.  It was extremely brief.  There

12   were only a handful of questions that were elicited on the

13   direct.  The defense did a fairly extensive cross.  And then

14   the jury went out and there were arguments and a motion to

15   strike.  There was argument back and forth.  And then I

16   believe that the Court conducted a hearing.  And then --

17           THE COURT:  Right.  Where we had him come back.

18           MR. GAPPA:  Correct.  Well -- correct.  But even

19   before that, the defendant also was recalled.  So there

20   was -- the defendant was recalled and there were statements

21   taken.  And then the witness, Ruezga, was recalled.  But

22   initially the Court ruled that there was no -- that the

23   defendant was not in custody and that there was no

24   interrogation.  Then, based on the hearing outside the

25   presence of the jury, the Court said I'm going to modify my

1    ruling.  And to the extent that now the defendant has stated

2    as he did, I'm going to find that he was in custody.  But it

3    doesn't change my ruling on whether there was an interrogation

4    because, as the Court has recalled today, the Court found

5    that, upon extensive questioning, that Ruezga was not a law

6    enforcement officer, he's not a peace officer, he had no

7    investigatory powers for law enforcement, he didn't have a

8    badge, he couldn't carry a gun, he couldn't make arrests.  And

9    his purpose was not to elicit statements and then make

10   referrals to law enforcement.  That was not within the ambit

11   of his job description and it's not what he did that day.  So

12   the Court made its thorough record, made its rulings.  Then

13   not satisfied, the defendant the next morning raised the issue

14   again and referred to a case.  The Court had done its own

15   research.  Went through the analysis an additional time and

16   then found, again, that Ruezga didn't share what he learned

17   during the interview, he didn't provide the officers with a

18   copy of his report, the CPS officer indicated he's not a law

19   enforcement officer.  He wasn't working in concert with them.

20   He didn't share what he had obtained with them.  His

21   conversation was focused on the welfare of the children and

22   what was going to happen with them as a result of the

23   execution of the search and the arrest.  So the Court

24   concluded, again, that he was not interrogated --

25              THE COURT:  But here's my question.  If I was wrong

1    about whether he's a law enforcement officer, so that he is,

2    that's what I thought I was getting argued to me by the

3    defense.  I have not researched further what they've argued to

4    me.  But if I was wrong and he is law enforcement, then does

5    anything else matter?  Because if he is law enforcement and he

6    was there during the execution of the search warrant and one

7    of the other law enforcement officers Mirandized the defendant

8    and the defendant invoked, then is the fact, if he were to be

9    a law enforcement officer, isn't he bound by the invocation?

10   He can't ask him anything.

11          MR. GAPPA:  That could be the case.  But --

12          THE COURT:  That's what I'm worried about.  I want to

13   get it right.  If I got it wrong, I at least need to deal with

14   it.  I don't know whether I got it wrong.

15          MR. GAPPA:  You did get it right.  And -- no, I -- in

16   all seriousness, the Court got it right because those

17   questions were asked directly to Ruezga.  And then I followed

18   up with him.  It's not in the record, but I asked him.  I

19   showed him a job description and asked him is this your job

20   description?  And it's for a social worker.  He's a social

21   worker, he's not law enforcement.  And the code section that

22   counsel references does not address social worker.  There may

23   be -- and I think Ruezga even talked about there may be some

24   branch within Child Protective Services, not the one that he

25   worked in, that could make reports for purposes of court.  But

1   that's not what Ruezga's job description was.  That's not what

2   his purpose was.  He clearly stated under oath that he's not

3   law enforcement.  He's not a peace officer.  He didn't have a

4   badge, didn't have a gun, didn't have arrest authority.  And

5   he couldn't make referrals for criminal prosecution.  So the

6   record is clear that he was not law enforcement and the code

7   section that counsel's referring to does not make him a law

8   enforcement officer.  So I think the Court did get it right.

9          MR. CAPOZZI:  Can I --

10          THE COURT:  Anything else on that point?

11          MR. CAPOZZI:  Yes.  Page eight of our reply sets out

12   California Penal Code 830.3, which says that social service

13   workers are peace officers.  It's clear.  It's right in the

14   statute that they are.

15          But our case doesn't just rely on the fact that the

16   CPS officer was a peace officer or law enforcement officer.

17   It also relies on the fact that he goes in -- in our addendum

18   brief, Your Honor, there are three exhibits attached.  One is

19   the report from FBI Agent Lucas.  He's the one who headed up

20   the search warrant that day.  In his report, he

21   indicates -- and it's Exhibit A to the addendum.  He said the

22   search including the following participants.  The purpose of

23   the search was to locate evidence in support of production,

24   collection of child pornography.  The search included the

25   following participants.  And he lists FBI agents, police

1    officers and he lists specifically CPS officer Luis Maldonado.

2    He asked him to come with him.  And Maldonado went along with

3    them on the search.  There's no distinction between who's FBI,

4    who's CPS.  They're all going in as law enforcement officers.

5    And they -- he talks about Maldonado conducting interviews

6    with the children.

7         THE COURT:  When you say Maldonado, are you talking

8    about Ruezga?

9         MR. CAPOZZI:  No, it's Maldonado in his report.  It's

10   not Ruezga yet.  We'll get there.  We'll get there.  He asks

11   more than one CPS officer to come during the search.  That's

12   Exhibit A to the addendum.

13        Exhibit B is a report from detective Hively, the

14   police officer, the detective who was involved with the Ceres

15   police department, I believe.  What happened is U.S. Attorney

16   Tierney asked him to talk to Ruezga.  How did he come across

17   this statement from the defendant?  And here's what Hively

18   says.  In November 2013, I had requested, prior to the search

19   warrant at the Henry home that a CPS worker be with us in case

20   of the children in the home needed to be taken into protective

21   custody.  Ruezga was assigned that task.  He was present with

22   us when the FBI search warrant was served.  While in the home,

23   according to Ruezga, Adam Henry indicated to him, while being

24   interviewed by Ruezga, that his wife had nothing to do with

25   the charges or his children were not exposed to any of this.

1   But he talks about an interview with the defendant.  Not a

2   conversation.  That was one of the basis the Court ruled

3   before was that this was a conversation, not an interview.

4          And then, Exhibit 3 is Ruezga's statement when he

5   talks about, "I interviewed Mr. Henry.  Did not advise him of

6   his rights.  Did not tell him that any of the information he

7   gave could be used at a trial against him."  Like the Johnson

8   case that I cited, which I think is on all fours with our

9   case.  Says that that is improper and a violation of

10  defendant's Fifth Amendment right.  And he talks about the

11  interview with the defendant, never tells him who he is, that

12  he's with CPS.  Never tells him he has a Miranda right.  Yet

13  he goes and talks to the children and tells the children that

14  this interview is voluntary.  You don't have to talk to me.

15  Tells that to the children, but not to the guy who's

16  handcuffed in the chair two feet from him during his

17  interview.  Clearly a violation, be he a law enforcement

18  officer or a CPS officer.  He's an agent with the police.

19  He's there under the auspices of law enforcement.  You know,

20  when he manifestly portrays himself with all of the attributes

21  of law enforcement and acts in a manner consistent with law

22  enforcement, he cannot later argue that he's not law

23  enforcement.  Judge, if it walks like a duck, talks like a

24  duck, it's a duck.  He violated this defendant's rights.  When

25  the government brings that evidence into trial, the testimony

1  itself is a clear violation of his Fifth Amendment rights.

2  Take it to another example.  I think the government's arguing

3  this is rebuttal and it really is a different standard.  But

4  if the defendant were beaten up or tricked into testifying --

5       THE COURT:  It doesn't make any difference whether it

6  was introduced in the case in chief or rebuttal.  I think

7  personally that it was completely and wholly unnecessary,

8  which is what galls me that it's now going to take up as much

9  time as it is.  But it makes no difference.  The government

10  put it on.  If the government introduced it and I erroneously

11  let it in, then it's got to be addressed.

12       MR. CAPOZZI:  Even if the Court would have thrown it

13  out at that point, I think the damage was done.

14       THE COURT:  We're past that Rubicon now.

15       Anything the government wants to add with respect to

16  anything we've talked about so far?

17       MR. GAPPA:  No, Your Honor.  It's just -- it sounds

18  that the defense has essentially rehashed the record that we

19  already have.  The Court, for instance, asked and it was

20  developed that the interactions between Ruezga and the

21  defendant might have been as much as 15 minutes, but the

22  point -- one point that the government made in its response

23  was that Lucas went there.  They did advise the defendant of

24  his rights, he invoked his rights.  They went on, based on

25  what we learned at the hearings during the course of the

1   trial, the law enforcement people went on their way and were

2   executing their search warrant.  Ruezga considered himself to

3   be separate from them and he was there for a different

4   purpose, which is why he then asked questions of the

5   defendant.  So there's really nothing that's inconsistent with

6   what has been filed after the trial.

7           THE COURT:  Well, except for if Ruezga was wrong, as

8   a matter of law, that he is a law enforcement officer, then

9   regardless of his state of mind, I think it's certainly

10  arguable, probably even likely his state of mind becomes

11  irrelevant.  He's a law enforcement officer.  The defendant

12  had been Mirandized and had invoked his right to remain silent

13  and a law enforcement officer then questioned him despite that

14  invocation.  In which case Houston, we got a problem.

15          MR. GAPPA:  Well, fortunately we don't I think

16  because the --

17          THE COURT:  Your position is that what's been cited

18  to me does not establish that someone of his position is a

19  peace officer?

20          MR. GAPPA:  Correct.

21          MR. CAPOZZI:  And judge, the *Johnson* case deals with

22  that issue.  It clearly comes down on all fours on our side,

23  that it was improper.  It should never have been admitted.

24  Cert denied by the United States.  Court recourt *  *  check *

25          MR. GAPPA:  The only final point, Your Honor, is

1    obviously the Court is well versed in the law.  However, I do

2    think that it's --

3           THE COURT:  Not necessarily.  Not necessarily.

4           MR. GAPPA:  Well, in general.  But I think in this

5    case, but in general it's the government's understanding that

6    even if we were in the context -- which we're not.  But even

7    if Ruezga were as law enforcement officer, or say, for

8    instance, that it was a statement that mark Lucas to make it

9    more clear, who is a law enforcement officer, after the

10   defendant invoked and the defendant made these statements, we

11   wouldn't use those in our case in chief.  But I think it's

12   been fairly well established that for impeachment or on

13   rebuttal, that those statements can be admissible.  So I do

14   think that the context matters.  And some of the cases that

15   the defense cited -- and most recently, in the filing from

16   last Friday, I believe that was an important factor in the

17   Second Circuit decision where the prosecution used, in their

18   case in chief, statements from that defendant.  And they were

19   relied upon in the case in chief and they were argued at the

20   trial.  And relied upon to obtain the convictions.

21          Here, they were offered in rebuttal.  But in

22   addition, the government, in light of the concerns that the

23   defense had raised.  And in an abundance of caution, we didn't

24   reference that part of the testimony at all in the closing.

25   So when it's viewed in its proper context, even to the extent

1   that it were somehow by somebody to be considered a violation

2   of either the fifth and/or the sixth amendment rights of the

3   defendant, it really, on balance, wouldn't be harmful because

4   to the extent that it would justify either a mistrial or a new

5   trial, because, as the Court noted, there was already evidence

6   that had that same impact.  And we didn't refer to it in the

7   closing arguments.

8        THE COURT:  Well, I'm familiar with the concept of

9   statements of the defendant obtained not in keeping with the

10  Miranda decision being used to rebut testimony, though that

11  matter hasn't been briefed.  I'm familiar with that concept.

12  The other argument seems to me to be a harmless error

13  argument, which I'm not so sure I'm supposed to evaluate on

14  new trial.  But that certainly hasn't been briefed as well.

15  Mr. Capozzi, you stood up.  You wanted to say something?

16       MR. CAPOZZI:  Well, I think even if the Court says

17  this was not a violation, which, excuse me, but I just think

18  the evidence is so clear here it is a violation and there

19  should be a new trial based on this Johnson case.  But

20  furthermore, the Green case, the New York case that the Court

21  came up with, at the time of trial I mean.  There was no time

22  to do anything.  The green case came up and in that case,

23  there, the Court said this guy was -- the CPS worker was a

24  state agent.  And that the -- he wasn't advised of Miranda

25  rights.  But then again, they said, even if the testimony was

1  permitted, there should have been an instruction on

2  credibility.  There should have been an instruction on

3  impeachment.  That was never given in this case.  Clearly I

4  didn't ask for it.

5          THE COURT:  I was just going to say --

6          MR. CAPOZZI:  Yeah, no.

7          THE COURT:  Did you ask for it?

8          MR. CAPOZZI:  No, I didn't.

9          THE COURT:  Okay.

10          MR. CAPOZZI:  Because I still think it should never

11  have been brought up in the first place.  But the point is I'm

12  not sure I need to ask for it.  It would have been something

13  that the jury should have been aware of.  And even in the

14  Green case it wasn't asked for and the Court still threw it

15  out.  I think there are many arguments here, many theories on

16  which that testimony should be -- should have been thrown out.

17  And, two, the fact that it wasn't, should be granting a new

18  trial for this defendant.  You know, all he's asking for is a

19  fair and impartial trial.  And we did really well until we got

20  to that last witness and this came out.  And the Court could

21  tell, when that testimony came out, I was really upset.  And

22  really just in front of the jury, it all just came out.  There

23  should have been an in limine motion to determine --

24          THE COURT:  And you asked for that too.

25          MR. CAPOZZI:  I didn't ask for the in limine motion.

1    I didn't even know it was coming.

2          MR. GAPPA:  Your Honor, at the risk of belaboring it,

3    I do want to just, for purposes of the record, just to clarify

4    one thing that the Court said.  We did brief that issue on the

5    use of testimony in rebuttal on docket item 278 at page 12.

6    We said, in sum, the Court -- meaning Your Honor -- repeatedly

7    made legally correct decisions not to strike Ruezga's

8    testimony or to declare a mistrial.  Nothing compels the Court

9    to revisit the issue yet again.

10          And we cited a Ninth Circuit case that says when a

11   defendant testified in a manner arguably inconsistent with his

12   earlier explanation, the constitution does not prohibit the

13   use of his explanation during rebuttal only as impeachment

14   evidence.  Which is cited Supreme Court decision.  It's one

15   thing to say the government cannot make affirmative use of

16   evidence unlawfully obtained, it's quite another to say that

17   the defendant can provide himself with a shield against

18   contradiction of his untruth.  So I do think it was --

19          THE COURT:  At page 12?

20          MR. GAPPA:  Correct.

21          MR. CAPOZZI:  Of the government brief, was it?

22          THE COURT:  Yeah.  I apologize.  I was mainly

23   thinking of the whole Ruezga as a law enforcement officer that

24   wasn't addressed.  You did address the other argument.

25          MR. CAPOZZI:  It's also on page 13, Mr. Pearson

1  pointed out.  There's a lot here, Your Honor.  So it's

2  understandable that the citations wouldn't have -- and that

3  was Mr. Gappa

4          THE COURT:  I'm not sentencing today.  I'm taking the

5  motion under submission.  The motion, all the motions.  The

6  only question I have in my mind is I still think -- I don't

7  like the state of the record regarding the allegation of a

8  discovery violation with respect to 28.13.  I've got the

9  government saying, no, it was produced, it was made available

10 and it was produced and it was produced as a screenshot.  I've

11 got the defendant saying, no it wasn't.  I've got the

12 defendant saying we're withdrawing.  Then I've got the

13 defendant saying, no, we're not withdrawing.  We're relying on

14 it in support of our motion for a new trial.  Because that

15 specific image was never produced to us in discovery.  I don't

16 like the state of the record.  I am generally under the

17 impression that the defense had all discovery, at the very

18 least made available to it.  I think it's possible that what

19 the government's telling me is, no, Exhibit 28.13, as a

20 separate piece of paper, was, in fact, ordered and produced to

21 the defense prior to trial.

22         MR. CAPOZZI:  And our position is it was not, judge.

23         THE COURT:  I know your position is that it was not.

24 And that's what's bothering me.  Is that the defense keeps

25 coming back to Exhibit 28.13 was never produced to us prior to

1    trial.  It may have been buried within everything that was on

2    all the computers.  But, you know, an incredible amount of

3    stuff was on the computers.  So in that sense, we had it made

4    available to us.  But we never got shown 28.13 until it was

5    introduced at trial.  It was just buried in, you know,

6    thousands and thousands of pages of documents of which

7    apparently we didn't request.  I'm not sure what the real

8    situation is.  And I'm inclined to set it for evidentiary

9    hearing and get the record clearly established as to

10    government's trial Exhibit 28.13 and whether it was ever

11    produced to the defense as a separate document prior to trial.

12           MR. CAPOZZI:  I'm going to request that.

13           MR. GAPPA:  Your Honor, I don't think it's necessary.

14    I think the record makes it abundantly clear that that was

15    produced.

16           THE COURT:  It's not clear to me.

17           MR. GAPPA:  Well, if we could look at 27 -- I'm

18    sorry.  Docket item 272.  It's the government's response to

19    the motion to produce the previously provided evidence.  And

20    then as the attachment, at 272.1, we have a letter dated

21    August 16th, 2017.  And this is to Mr. Capozzi.  Please find

22    supplemental discovery with Bates numbers 1284 through 1316.

23           THE COURT:  I'm sorry.  Mr. Gappa, which page?

24           MR. GAPPA:  It's page 14 of 16.  And then pages 15

25    and 16 are items that were provided to the defense in a

38

1    report.

2           THE COURT:  And --

3           MR. GAPPA:  And if you look --

4           THE COURT:  What number is 28.13?

5           MR. GAPPA:  It's -- it appears --

6           THE COURT:  Because my copy doesn't have a Bates

7    stamp on it.  Do you have one that is Bates stamped?

8           MR. GAPPA:  Should.  Because if the Court's looking

9    at docket 272-1.  It has the Bates number 1302.  And then

10   272-1, page 16 --

11          THE COURT:  Stop.  I'm at -- I thought I was at where

12   you told me to go to.  I'm at 272-1, page 14.

13          MR. GAPPA:  Oh, okay.  Well, that -- you're correct.

14   That is the cover letter.

15          THE COURT:  Okay.

16          MR. GAPPA:  So if we go to the next page.

17          THE COURT:  15.

18          MR. GAPPA:  That, at the bottom, has the Bates number

19   1302.

20          THE COURT:  And that tells me what?

21          MR. GAPPA:  That this particular page was given to

22   Mr. Capozzi on August 16th, 2017.  And on the right side,

23   about the middle of the page --

24          THE COURT:  I don't know how that -- I don't know how

25   it does that.  This is a supplemental report from the Ceres

1   department of public safety that's a screenshot of a -- you

2   know, subfolders.  So how do you link any of those entries on

3   the subfolders to Government's Exhibit 28.13?  What would do

4   it for me is if you had a copy of trial Exhibit 28.13 that had

5   a government Bates stamp number on it that showed that

6   Government Exhibit 28.13 fell within those Bates stamp numbers

7   that appear in that letter.  That would do it for me.  You got

8   that?  You should have that.

9          MR. GAPPA:  That's what this is.

10          THE COURT:  That's not that.

11          MR. GAPPA:  Can I try one more time?

12          THE COURT:  Not barking up that tree.  Because that

13   doesn't do it.  Show me something that looks -- show me 28.13

14   that's got a Bates stamp number on it.

15          MR. GAPPA:  Well --

16          THE COURT:  Show me that photo with a Bates stamp

17   number.  That would do it.

18          MR. GAPPA:  What we've said all along that it didn't

19   have the exhibit sticker.

20          THE COURT:  No.  It doesn't have to have an exhibit

21   sticker.  In fact, it shouldn't have the exhibit sticker.

22   Just show me, okay, I'm looking at this photo.  28.13.  Here's

23   the same photo, doesn't have 28.13 on it.  But it's Bates

24   stamped within those numbers.  Otherwise you're going to have

25   to show me that -- you're going to have to link one of these

1  entries to 28.13.  And I don't think you can do that based

2  upon anything that I'm looking at.

3          MR. GAPPA:  Well, it's untitled 11.

4          THE COURT:  Well, that's your position.  Show me

5  something that proves it.  What have you given me that proves

6  that to me?  It shouldn't be hard.  If, in fact, you produced

7  it.  And I suspect you -- I mean, look, I've been up front

8  from the outset.  I suspect you did, in fact, produce it.

9  Because there were many times during this case that the

10  defense said, "We've never seen that before."  And it turned

11  out they had.

12          MR. CAPOZZI:  Well --

13          THE COURT:  Or at least I became convinced that they

14  had.

15          MR. CAPOZZI:  I think it was just this issue, judge.

16          THE COURT:  I don't think so.  That's not my

17  recollection.

18          MR. CAPOZZI:  All right.

19          THE COURT:  I'm not saying that it was easy to keep

20  track of everything in this case.  It was a four-year old case

21  by the time it went to trial and it had thousands of pages of

22  documents because the computers held thousands and thousands

23  of pages of everything under the sun.  So can you prove to me

24  that you turned it over?

25          MR. GAPPA:  Your Honor, the letter references the

1   items that we gave.  So the only thing that I think the Court

2   is missing is a Bates stamp number related to this untitled

3   11.  So if the Court --

4          THE COURT:  Well, then you're going to have to link

5   untitled 11 to this photo.

6          MR. GAPPA:  Well --

7          THE COURT:  To me, it would seem that somewhere in

8   your file you've got that letter with everything you actually

9   produced attached with it.

10          MR. GAPPA:  Yes.  And that's in the Court's file as

11   well.  If we look at --

12          THE COURT:  That's just not it.

13          MR. GAPPA:  -- page 11 of 16.  11 of 16 at 272.1.  I

14   can show you -- because this is the image.  And it's

15   highlighted up above, the untitled 11.  And that's the image.

16          THE COURT:  So I should take your word for it?  You

17   know, if what you're telling me, Mr. Gappa, is, hey, the way

18   we produced discovery in this case is we referred to Bates

19   stamp numbers, but all we attached was screen shots of folders

20   and not the actual Bates stamped discovery that we were

21   producing, then you don't leave yourself in a very good

22   position when it comes down to questioning whether you

23   produced it or not.  I would have thought that somewhere we'd

24   have the old fashioned way.

25          MR. GAPPA:  Well, there's --

1      THE COURT:  Here's all the discovery we produced.

2  It's Bates stamped.  Here's the cover letter that went out

3  with it.  You said you didn't get it.  There's the Bates stamp

4  number referred to in the cover letter, that's the one we're

5  fighting over.

6      MR. GAPPA:  And there's a --

7      THE COURT:  You got it.

8      MR. GAPPA:  Correct.  And there's an additional issue

9  involved here, which is as the Court knows the Adam Walsh Act

10 restriction on turning over sexually explicit images of

11 minors.  And these very images are those that we say crossed

12 the threshold into contraband.  So --

13     THE COURT:  Well, that would seem to be cutting

14 against your position that it's included in that cover letter.

15     MR. GAPPA:  Well, but as the Court was saying, we

16 didn't actually give the image, but we've given the --

17     THE COURT:  So tell me what you did.  Talk to me.

18 Tell me what you did.

19     MR. GAPPA:  In 2014, we made available and actually

20 even provided an electronic copy of every device that was

21 seized.  We made that available for the defense.  And then as

22 we went through those devices and identified what we believed

23 to be key pieces of evidence, they were noted in different

24 reports from detective Hively, from Detective Moore.  And

25 those reports, which identified those key pieces of evidence,

1    were provided in discovery.  So an example of that is what has

2    made its way into the record as 272.1.  And this is a report

3    that detective Hively did in advance of the trial.  And he

4    attached the screen captures that the defendant had created

5    that were made from the videos that were recorded in the

6    bedroom and the bathroom.

7              THE COURT:  You're making it worse, not better.  So

8    your letter of August 16th, 2017 that you've

9    addressed -- directed me to says, "Enclosed please find

10   supplemental discovery materials consisting of Bates stamp

11   numbers 1284 to 1316.  Please be advised that the attached

12   pages -- attached pages -- "replace pages 1250 through 1282

13   which have previously been sent to you as supplemental

14   discovery.  There is a protective order in place that controls

15   how the material may be accessed.  By accepting and retaining

16   this discovery, you agree these materials would be used only

17   by you and your staff and that you will not copy or use these

18   materials for purposes other than for the preparation of the

19   defendant -- of the defendant (sic) in this case.  Please feel

20   free to contact our office if you have any questions."

21             There's nothing about that cover letter that suggests

22   that you are not, in fact, producing the attached pages.  In

23   fact, it says you are.

24             MR. GAPPA:  And these are the pages.

25             THE COURT:  Which are nothing more than screen shots?

1  Not evidence.  I'm setting an evidentiary hearing.  You're

2  going to have to prove it to me.

3         MR. GAPPA:  That's fine.

4         THE COURT:  I may, after I do further research, also

5  want further testimony regarding the issue of the CPS officer.

6  I'm not sure.  I'll advise the parties as soon as I get there.

7  When?  When in the world can we do it?

8         THE CLERK:  How far out do you want me to look,

9  judge?

10         THE COURT:  Not any further than necessary.  Any time

11 on Monday that you think we can do it.

12         THE CLERK:  You do want it on a Monday?

13         THE COURT:  Well else are we going to do it?  I'm in

14 trial now.  I'm in trial three weeks starting next week.

15         THE CLERK:  Can we do it Tuesday the 29th?

16         MR. CAPOZZI:  Of May?

17         THE CLERK:  Yes.  2:15?  Will 2:15 --

18         THE COURT:  Is that the day after the holiday?

19         THE CLERK:  It is.

20         THE COURT:  And I'm not in trial?

21         THE CLERK:  Not until Wednesday, the 30th.

22         THE COURT:  Not until the next day.  Oh, good.  May

23 29th at --

24         THE CLERK:  Let's do 2:15, Your Honor.

25         THE COURT:  2:15 p.m.

1          MR. CAPOZZI:  I have a trial in state court starting

2     that day, but I'll ask that it be delayed a day, judge.

3          THE COURT:  For purposes of today, the only thing I'm

4     setting for evidentiary hearing is to take evidence on whether

5     or not government's trial Exhibit 28.13 was produced to the

6     defense prior to trial.  And if so, how.

7          MR. CAPOZZI:  And can we bring in our request to

8     produce the snapshots.  And we were told there were twelve.

9          THE COURT:  You can present evidence on the topic

10    that you think shows --

11         MR. CAPOZZI:  Okay.

12         THE COURT:  -- that they were never produced to you

13    prior -- that it was not produced.  That one shot was not

14    produced to you prior to trial.

15         MR. CAPOZZI:  Okay.

16         THE COURT:  If I decide I also want testimony

17    regarding the law enforcement -- whether the CPS officer was a

18    law enforcement officer or not, I'll issue a minute order to

19    that effect.  I'm delaying sentencing until we've resolved the

20    motion for new trial.

21         Let me -- as a preliminary matter, though, with

22    respect to sentencing.  The probation report contains no

23    information on this.  Does the government have any information

24    about -- is A.T. going to make any statement, submit any

25    victim impact statement one way or the other regarding

1    sentencing?

2          MR. GAPPA:  The government doesn't know at this time.

3    We haven't received a statement.  So we'll followup.  And if

4    we do get that information, we'll provide it in advance.

5          THE COURT:  What is the status with respect to Angele

6    Henry?

7          MR. GAPPA:  I don't know the current status.

8          THE COURT:  Or do we know.

9          MR. GAPPA:  I know as of roughly shortly after the

10   trial in this case, that she had switched attorneys and that

11   it was causing some delay.  But that case in Stanislaus County

12   is still pending.

13         THE COURT:  Still pending?

14         MR. CAPOZZI:  It's set for trial in September, judge.

15         THE COURT:  And that's still the case?

16         MR. CAPOZZI:  As far as I know, yes.

17         THE COURT:  Mr. Micheli, I think somewhere in the

18   presentence report it says that information hadn't been

19   confirmed, you know, the folks that I think were indicated in

20   the report that information regarding the defendant hadn't

21   been confirmed.  That surprised me.  Because those same people

22   are in the courtroom today and submitted information that was

23   part of the defense submission.  So that struck me as odd.

24         PROBATION OFFICER:  Good afternoon, Your Honor, Ross

25   Micheli from the probation department.  It took quite a doing

1   to speak with Mr. Henry's aunt and uncle.

2          THE COURT:  Right.  Who are present --

3          MR. CAPOZZI:  Right.

4          PROBATION OFFICER:  Our schedules finally aligned to

5   where we were able to make time.  It just didn't make it into

6   the report because it occurred after the actual report.  If

7   there's going to be a delay in sentencing, if Your Honor

8   orders it, we can revise the report to reflect that

9   conversation.

10          THE COURT:  Okay.  All right.  I don't have anything

11   else right now.  Thank you, counsel.

12          MR. GAPPA:  Thank you, Your Honor.

13          MR. CAPOZZI:  Judge, I'd like to order a transcript.

14   Again, I'm court appointed, so I need --

15          THE COURT:  Submit it and I'll authorize it.

16          MR. CAPOZZI:  Okay.  Thank you, judge.

17      (The proceedings were concluded at 2:58 p.m.)

18

19          I, KAREN HOOVEN, Official Reporter, do hereby certify

20   that the foregoing transcript as true and correct.

21

22   DATED:   ^                        /s/  Karen Hooven
                                       KAREN HOOVEN, RMR-CRR
23

24

25