# EXHIBIT D

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19        And unless there are any questions, I'll have

20   Detective Moore come in and give you the testimony.

21        (The proceedings went off the record.)

22        THE FOREPERSON:  Could you stand?  Could you state

23   for the record your name and spell it for us, please?

24        THE WITNESS:  My name is Detective Britton Moore,

25   B-R-I-T-T-O-N, last name Moore, M-O-O-R-E.

US v. HENRY_000838

1                  **BRITTON MOORE,**

2    called as a witness herein and being first duly sworn, was

3    examined and testified as follows:

4           THE WITNESS:  I do.

5           THE FOREPERSON:  Thank you.

6                  **EXAMINATION**

7    BY MR. GAPPA:

8         Q.   Good morning, Detective Moore.

9         A.   Good morning.

10        Q.   Are you employed by the Ceres, California, Police

11   Department?

12        A.   Yes, I am.

13        Q.   And how long have you been there?

14        A.   I've been with the Ceres Police Department for --

15   since 2006.  So seven years.

16        Q.   Okay.  Could you give the Grand Jurors who are

17   here today a brief overview of the relevant training and

18   experience that you have as it relates to what you'll

19   testify about this morning?

20        A.  Since 2010 I've been assigned to the

21   investigations unit, and I'm assigned to investigate

22   technology crimes.  I'm a member of the Sacramento Valley

23   High-tech Crimes Task Force and the FBI Child Exploitation

24   Task Force.  I've attended trainings related to computer

25   crimes and internet investigations.  And 2010, September, I

**US v. HENRY_000839**

 1    attended a course for internet crimes, and October of 2010 I

 2    attended a peer-to-peer investigations course.  In April of

 3    2011 I attended an advanced peer-to-peer investigations

 4    course.  And again in July of 2012 I attended a refresher

 5    course for peer-to-peer investigations.  I've had over 500

 6    hours of high technology crime investigations training and

 7    computer forensics training also.

 8         Q.   Okay.  And when you talk about peer to peer, can

 9    you give us a very brief overview of what a peer-to-peer

10    program and a network is as it relates to what we'll hear

11    about in the presentation?

12         A.   Essentially, peer to peer is a file sharing

13    network that uses the internet.  Essentially peers from all

14    over the world use this network to trade files.  People can

15    use certain programs that use this network, and essentially

16    what they do is they enter search terms into their program

17    and it communicates with other computers who are also using

18    this network, and in return once they've entered these

19    search terms for specific files that they're looking for,

20    they can then trade with files -- trade those files with

21    other people who already have those files in their

22    possession.

23         Q.   Okay.  And at some point did you get involved in

24    the investigation of Adam Alan Henry?

25         A.   Yes, I did.

US v. HENRY_000840

1     Q.   Can you explain how the investigation began?

2     A.   Well, as a task force officer, we are assigned a

3     web based portal, which we lock into, and it gives us

4     information on IP addresses in our area that are -- have

5     been seen trading child pornography files.  I began an

6     investigation on an IP address that I had seen in my area,

7     in my county that had been trading known child pornography

8     files.

9     Q.   I'm sorry to interrupt, but just so we're clear,

10    we may all know, but just in case anybody doesn't, IP

11    address is an internet protocol address?

12    A.   That is correct.

13    Q.   And that relates to generally a specific location

14    of a device on the internet?

15    A.   Right.  IP addresses are assigned to customers

16    from an internet service provider, and that's how computers

17    communicate with each other.  One IP address from one

18    computer knows how to talk to another IP address from

19    another computer.

20    Q.   You were explaining how in the early stages you

21    detected an IP address.  You can explain what you did.

22    A.   Yes, I did.  Using my law enforcement web portal,

23    I checked for recent activity, and I found that IP address

24    71.94.43.84 had been seen as a download candidate for at

25    least twenty-four child pornography files.  I then wrote a

US v. HENRY_000841

 1    search warrant to Charter Communications, and they returned

 2    back with information on who that IP address had been

 3    assigned to during the time that I had seen this person as a

 4    download candidate for child pornography files.

 5         Q.   Okay.  And what was the search warrant designed to

 6    lead you to?

 7         A.   That original search warrant to Charter was just

 8    for who the internet subscriber was during that time

 9    frame.

10         Q.   You were able to figure that out when you got a

11    response from that search warrant being served?

12         A.   Correct.  Once Charter sent back the information

13    on who had been assigned that IP address.

14         Q.   Who was it assigned to?

15         A.   It was assigned to a business.  The business was

16    Lock & Stitch in Turlock, California.

17         Q.   Okay.  And so what steps then did you take to

18    determine who in particular might have been responsible for

19    those child pornography files that you detected?

20         A.   Based on that information that I received from

21    Charter, I wrote an additional search warrant for Lock &

22    Stitch.

23         Q.   And that was executed at some point then?

24         A.   Yes, it was.  It was served on September 19th of

25    this year.

US v. HENRY_000842

1          Q.    Okay.  And that was done in Turlock, California?

2          A.    Correct.

3          Q.    Okay.  So were you present when that second search

4     warrant was executed?

5          A.    Yes, I was.

6          Q.    And can you explain what, if anything, related to

7     the investigation was discovered there?

8          A.    Yes.  We located a computer in the IT manager's

9     office, and on that computer we located a peer-to-peer file

10    sharing software program that had been installed to the hard

11    drive.  I then conducted an analysis on that hard drive and

12    found that there was in fact child pornography files on that

13    hard drive.

14         Q.    Okay.  You mentioned the IT director.  Who was

15    that?

16         A.    The IT manager was a guy named Adam Henry.

17         Q.    He's the person named in this indictment?

18         A.    Correct.

19         Q.    So what was the number, approximately, of images

20    of child pornography that were recovered from the hard drive

21    that was found at his office?

22         A.    At that -- on that particular hard drive there

23    were forty-two videos.

24         Q.    Okay.  And you've reviewed some or all of those

25    videos?

US v. HENRY_000843

1    A.    I have.  Some of those videos -- most of those

2    videos were partial downloads.  Yet they were still

3    viewable.  So they hadn't been quite completed as far as

4    being fully downloaded.

5    Q.    But can you develop that a little bit when you say

6    they were in the process of being downloaded but still

7    viewable?  How is that if the file itself isn't fully

8    downloaded, how could a computer or somebody using that

9    computer still view that video?

10    A.    When the videos are downloaded, portions of the

11    video come in from the internet and you can view those

12    portions that are already downloaded using a media player

13    program.

14    Q.    So from what was just on that particular hard

15    drive at the time that search warrant was executed, would it

16    have been possible or was it possible for somebody to press

17    play on a video viewer and see one or more images of a minor

18    engaged in sexually explicit conduct?

19    A.    Absolutely.

20    Q.    Okay.  So then what were the next steps in the

21    investigation?

22    A.    I then had officers set up surveillance on Adam

23    Henry's residence, and when he was called into work, he was

24    apprehended.  I then wrote a search warrant for his

25    residence, and that was signed by a Stanislaus County judge.

US v. HENRY_000844

1      Q.   And was there any effort by anybody to ask Adam

2   Henry any questions about what was being discovered at his

3   place of employment?

4      A.   At that point he was interviewed by Detective

5   Hively, who is my partner with the high-tech team.

6      Q.   And what statements, if any, did Henry make?

7      A.   Mr. Henry had told him that he had inadvertently

8   downloaded child pornography files, that that wasn't his

9   intention.  He was intending to download adult pornography,

10   but he had seen some child pornography files come through.

11      Q.   Okay.  And did he state, Henry that is, did he

12   state what, if anything, he had done with the child

13   pornography which he said had inadvertently appeared on his

14   computer?

15      A.   He said he immediately deleted them.

16      Q.   Okay.  So was that the extent of any statements

17   that he made at that time?

18      A.   Well, he had made additional statements about his

19   knowledge of peer to peer.  He admitted that he had used

20   search terms from videos that he had received and copied and

21   pasted some of those search terms into the search query in

22   order to seek out additional files that he had interest in.

23      Q.   Okay.  What were some of those search terms?

24      A.   He admitted to using several search terms that

25   were indicative of child pornography.  I don't actually have

US v. HENRY_000845

```
 1    them right in front of me.  I do, but I'd have to look for
 2    them.
 3         Q.   Okay.  Do you think you could find them if you
 4    took a minute or so --
 5         A.   Sure.
 6         Q.   -- to look at them?
 7         A.   Well, Detective Hively had named off several
 8    search terms and asked him if he had recognized any of those
 9    search terms.
10         Q.   Okay.
11         A.   And he didn't directly admit to using those exact
12    search terms, but he had admitted that he had recognized
13    them and may have used some of them.
14         Q.   Okay.  And have you been able to locate some of
15    those terms?
16         A.   I have.
17         Q.   What are those?
18         A.   Detective Hively named off several search terms
19    that we know are indicative of searching for child
20    pornography.  One was hussy fan.  One was ray gold with the
21    "A" as an at symbol.  Vicky pthc, which we know stands for
22    preteen hard core.  Lolita, queer T, and pedo.  He denied
23    that he used the term pedo, but he did not deny that he used
24    the other terms.
25         Q.   And then you said that there was a search warrant
```

US v. HENRY_000846

```
 1      that was issued for his residence, correct?

 2           A.    There was.

 3           Q.    And was that executed?

 4           A.    It was.

 5           Q.    And you -- were you present then?

 6           A.    Yes, I was.

 7           Q.    And what, if anything, did you or your colleagues

 8      recover as it relates to the investigation?

 9           A.    Well, Adam Henry also went along with us to the

10      search warrant.  He wanted to cooperate with law enforcement

11      at that point.  And he told me he would show me where the

12      files were residing on his computer and other digital media

13      devices that he had downloaded from Shareaza, which was the

14      peer-to-peer file sharing program.

15           Q.    Okay.  So he then went to his residence with you

16      and your colleagues.  Did you recover any computer or other

17      electronic storage device at the residence?

18           A.    Yes, I did.

19           Q.    Did somebody at some point then take a forensic

20      review of the evidence recovered from the Henry residence?

21           A.    Some of the items were -- analysis was conducted

22      by myself, and some of it was conducted by my partner,

23      Detective Hively.

24           Q.    Can you give us an overview of the most relevant

25      items as it relates to what we have in the proposed
```

US v. HENRY_000847

1  indictment today?

2       A.   As far as child pornography, which I believe was

3  traded using peer to peer, I located approximately 200 child

4  pornography video files.

5       Q.   Okay.   And do you recall where it was within the

6  drive?

7       A.   He had these files stored on a network attached

8  storage device, which we call a NASD.   And essentially it's

9  kind of like a mini server that is used for private home

10  use.

11       Q.   Let me just take a step back.   I think you

12  mentioned he was an IT director.   Did he have an above

13  average level of knowledge of how technology works and

14  different pieces of equipment and did he help create and run

15  the computer network at the business where he worked?

16       A.   I would say he was an expert in computer

17  technology --

18       Q.   Okay.

19       A.   -- and networking.

20       Q.   And what, if anything, did you see that was

21  significant about the way his computer was set up at home?

22       A.   Well, he had all of his computers networked

23  together.   And a network attached storage device, though it

24  is sold privately, is not very common in most households.

25       Q.   Okay.

US v. HENRY_000848

1      A.  So I would say he did have a higher level of

2    expertise in that area.

3      Q.  Okay.  So do you think that when he said initially

4    that it was inadvertent that he received this child

5    pornography, does the level of knowledge and sophistication

6    that he has with technology, in your mind does that discount

7    the likelihood that any of this was inadvertently put on his

8    computer?

9      A.  Absolutely.  He was in charge of a pretty

10   profitable business I believed, and he was the only person

11   in charge of the entire network at that business, and I did

12   interview the owner of the business, who also told me that

13   he was very good at his job.

14      Q.  Okay. Was there some indication that he had used

15   the work computers to obtain child pornography and it might

16   have been transferred from that location to his residence?

17      A.  The fact that I had found partially downloaded

18   child pornography videos that had not been completely

19   downloaded and found the completed ones at his residence led

20   me to believe that he was using his work computer to

21   actually download the files and once they were completed he

22   was moving them onto his network attached storage device at

23   his residence.

24      Q.  And I think you were going to give us kind of a an

25   overview of what the quantity and nature of some of those

US v. HENRY_000849

1    images that were recovered from the home device were.

2         A.    I located a total of 205 child pornography videos.

3    Twelve of these child pornography videos contained bondage.

4         Q.    Okay.  So clearly minors under the age of eighteen

5    engaged in sexually explicit conduct?

6         A.    Yes.

7         Q.    Okay.

8         A.    And most of them a lot younger than that.

9         Q.    And you've got a sample of some of those that

10   you've put into an envelope?

11        A.    I do.

12        Q.    That has a sticker that says Count 1; is that

13   right?

14        A.    No, that would be Count 2.

15        Q.    Count 2.  I'm sorry.  I will mark that then as

16   Grand Jury Exhibit 2.  We'll leave that for consideration.

17             (Exhibit 2 was marked for identification.)

18        Q.    But then did you and/or Detective Hively in

19   looking at the storage devices that were recovered at his

20   residence see what appeared to be some homemade still and

21   video images of people in bathrooms and bedrooms, et cetera?

22        A.    Yes.  We located numerous videos which appeared to

23   be from a hidden camera placed in Adam Henry's bathroom.

24   From the perspective of this camera, you could see there

25   appeared to be a plant or something obstructing a portion of

US v. HENRY_000850

```
 1    the view of the camera.  And I also looked at the for -- I'm
 2    sorry -- the photographs that we took when we served the
 3    search warrant at his house, and I noticed that when we took
 4    a picture of the bathroom that there was a plant in the
 5    corner that was hanging from the ceiling, and I suspect that
 6    there was a hidden camera in that video -- based on these
 7    videos.
 8         Q.   Images that appeared to have been taken in the
 9    bathroom recovered in the evidence seized at his residence
10    in September of 2013?
11         A.   Yes.
12         Q.   And what was the nature of some of those as it
13    relates to one particular victim -- and let me ask you this:
14    Was there -- were there images that were recovered of a girl
15    who at some time was fourteen and then turned fifteen?
16         A.   Yes, there was.
17         Q.   And you know who she is?
18         A.   Yes, I do.
19         Q.   And is her first name        ?
20         A.   Yes.
21         Q.   Okay.  So was          somebody that Adam Henry
22    knew?
23         A.   Yes.
24         Q.   And how was it that he knew her?
25         A.   Adam had a friend that was a coworker of his and
```

US v. HENRY_000851

```
 1        that was his friend's daughter.
 2             Q.   Okay.  And did she, the girl,          , did she
 3        baby-sit for Adam Henry?
 4             A.   Yes, she did.
 5             Q.   Did Adam Henry have a wife and does he have a wife
 6        named Angele?
 7             A.   Yes, he does.
 8             Q.   That's A-N-G-E-L-E?
 9             A.   Correct.
10             Q.   Okay.  And did Angele have some children of her
11        own from a previous relationship with somebody else?
12             A.   Yes, she did.
13             Q.   And those lived in the house with Adam Henry?
14             A.   Yes.
15             Q.   And then more recently Adam and Angele have had
16        their own child?
17             A.   She just gave birth to their child, yes --
18             Q.   Okay.
19             A.   -- recently.
20             Q.   So Adam and Angele used the fourteen-year-old girl
21        as a babysitter for children that they had in their
22        household?
23             A.   Correct.
24             Q.   Okay.  So the girl was in the house for purposes
25        of baby-sitting and did she otherwise come over for other
```

US v. HENRY_000852

1    social activities?

2         A.    She did.    In her mind, she felt she was friends

3    with Angele Henry.    They used to do events, community events

4    together.    And she also -- the fourteen-year-old girl was

5    also asked to watch the house when they were gone, and so

6    she did that sometimes, watch and feed the dogs and baby-sit

7    and whatnot.

8         Q.    So we focus now on images and that camera which

9    you said was in the bathroom.    Did it appear that somebody

10   had put the camera in the bathroom in a position so that you

11   could capture somebody using a toilet and a shower?

12        A.    Yes.    From the perspective of where the camera was

13   placed, you can view both of those things happening.

14        Q.    Were there images recovered of the

15   fourteen-year-old girl using that bathroom in the Henry

16   residence?

17        A.    There were videos recovered of the

18   fourteen-year-old girl changing several times.    There was

19   also video of her using a toilet and video of her showering.

20        Q.    Okay.    And so if we break that down a bit, when

21   she's using the toilet, presumably no clothes are on, she's

22   essentially partially nude?

23        A.    Yes, in these videos she was -- had been exposed

24   and was partially -- at least partially nude or fully

25   nude.

US v. HENRY_000853

1      Q.    When you say changing, can you describe, was it

2  something where she just changes one layer of clothing or

3  did she completely disrobe?

4      A.    Adam and Angele Henry had a hot tub in their

5  backyard, and I suspect that -- the fourteen-year-old girl

6  was changing into a bathing suit several times.  So she

7  would get fully nude and change into a bathing suit and then

8  again come back, change back into her clothes and that sort

9  of behavior.

10     Q.    Okay.  So that was conduct that was recorded on

11 the video camera in the bathroom; is that right?

12     A.    Correct.

13     Q.    And when, if you know -- and I know this is still

14 an ongoing investigation.  So what is believed to be the

15 time frame that these videos were produced?

16     A.    I believe that they started in May of 2012 and all

17 the way until April of 2013.

18     Q.    Okay.  And are you able to determine that on -- a

19 number of things including what's known as metadata about

20 images that will tell you for instance what camera took it,

21 the dates and times, et cetera?

22     A.    Correct, these files were date and time stamped.

23     Q.    Okay.  So from approximately May of 2012 you have

24 videos of her in the bathroom, and then was there a point at

25 which she was using a shower in that bathroom?

US v. HENRY_000854

1          A.    Yes.

2          Q.    And was she -- can you describe, was it that she

3     was fully unclothed at that time?

4          A.    Correct, she was fully unclothed taking a shower.

5          Q.    And then was there a point at which there were

6     videos or a video of the fourteen-year-old girl being taken

7     into a bedroom at the Henry residence and a video was

8     produced of that, that time when the babysitter was in the

9     bedroom with Angele Henry?

10         A.    Yes.  We were able to recover three videos which

11    all appear to be of the same instance, time frame.  And this

12    video we see Angele Henry placing the camera on a shelf,

13    which appears to be hidden, and then we see the

14    fourteen-year-old girl enter into the bedroom and Angele

15    Henry is trying to get her to change on various different

16    items of clothing.

17         Q.    Okay.  And was this in approximately January of

18    2013?

19         A.    Correct.

20         Q.    And can you give us a little bit more detail of

21    what the interactions were?  Was this something where you

22    believe it was the girl's idea to just go in there and

23    change clothing or was it something --

24         A.    Essentially, we see Angele Henry place the hidden

25    video camera on a shelf, and directly in front of that view

US v. HENRY_000855

1     she laid out several items of clothing in front of this
2     camera.  She then called in the fourteen-year-old victim and
3     then basically directed her to try on various different
4     items of clothing.  Specifically she also made other
5     statements such as, "You need to shake your breasts before
6     putting on a corset," which was one of the items, "so that
7     your breasts don't get pinched in the corset," and of course
8     that was in front of the video camera.  There was also an
9     instance where after she had placed -- was placing on items
10    of clothing Angele Henry would also hold the victim's hair
11    out of the view of the camera so that there was a direct
12    sight onto the victim's exposed body parts.  She also led
13    the victim to believe that she was in a private area.  She
14    told her, "Oh, go head and change.  I'm going to leave the
15    room," and she left the room.  At no point did she ever tell
16    the victim that she was being videotaped.

17         Q.   Okay.  And was it later discovered when you and
18    your colleagues were going through those several videos that
19    were created that there were actually some still images that
20    were produced from the video images?

21         A.   Correct.  These video files including the shower
22    scenes, the changing, the bedroom videos were all placed
23    onto Adam Henry's network attached storage device and he had
24    put them in a folder entitled "███," which was the girl's
25    name.  And there had also been screen shots taken out of

US v. HENRY_000856

1    these videos. So if you play a video and you pause it, you

2    can take a screen shot of the portion of the video that you

3    choose, and this person had taken screen shots when

4    was in various states of undress.

5        Q.    Okay. And this again was from as early as May of

6    2012 through what was the more recent date, if you know?

7        A.    I believe April 2013.

8        Q.    Okay. And did you or colleagues recover other

9    videos where Adam and Angele Henry were engaged in sexual

10   activity with other people?

11       A.    Yes. There were videos dating back all the way to

12   2008, even before he had met his wife where he had placed

13   hidden video cameras in showers and he had recorded his

14   ex-girlfriends, his ex-girlfriend's mother, and he had also

15   placed these videos in different folders on his drive

16   that -- and labeled them by the person's name.

17       Q.    Okay. But then when he's now met and has a

18   relationship with Angele and perhaps even when they're

19   married, were there -- was there at least one if not more

20   videos where the two of them as a couple are having sexual

21   activity with another in that instance adult but that adult

22   does not know that their sexual activity is being

23   recorded?

24       A.    Correct. It appears we've seen hidden videos

25   where they bring in a person who appears to be an adult and

US v. HENRY_000857

1    we see a video where they blindfold this person and engage

2    in sexual activity while the camera is running, and it

3    appears from watching these videos that the person has no

4    knowledge of the video camera and doesn't appear to look at

5    it or anything.

6        Q.   Okay.  And in terms of his -- Adam Henry's

7    interest in the fourteen-year-old girl, has she been --

8    she's been identified.  Has she been interviewed?

9        A.   I interviewed her, yes.

10       Q.   What statements, if any, did she make that would

11   in your mind be relevant to what Adam Henry was doing when

12   he was trying to record her using the bathroom and using the

13   toilet and shower and then with his wife in the bedroom?

14       A.   Well, first of all she told me she had no

15   knowledge that she had ever been filmed by them, and she

16   also told me of an instance where she had been at Adam

17   Henry's residence and he had approached her, began rubbing

18   her shoulders.  She said it quote, unquote "weirded her

19   out."  She also talked about times where he would tickle

20   her, and she generally told me she had this overall feeling

21   of being uncomfortable from him because he was an older guy

22   and he in fifteen-year-old terms "weirded her out."

23       Q.   She is now fifteen?

24       A.   Correct.

25       Q.   Okay.  So for purposes of the presentation today,

MOORE COURT REPORTERS (559)732-3225          27

**US v. HENRY_000858**

1    you have created some other images that relate to Count 1;

2    is that correct?

3         A.    Correct.

4         Q.    And you've got those in the envelope?

5         A.    Yes, I do.

6         Q.    Can you explain in general what is in what I'm now

7    marking Grand Jury Exhibit 1?

8         A.    These are the screen shots which were created and

9    were residing on Adam Henry's network attached storage

10   device, and these are screen shots taken of         when she

11   was undressed, in the shower, and of the video that Angele

12   Henry helped to create where her breasts are exposed and she

13   has her clothing off.

14              (Exhibit 1 was marked for identification.)

15              MR. GAPPA:   Okay.  All right.  Any questions at

16   this point?  All right.  We'll leave those two envelopes

17   behind.

18              (The proceedings were concluded at 10:01 a.m.)

19

20

21

22

23

24

25

**US v. HENRY_000859**

1                           CERTIFICATE

2

3

4

5

6            I, TAMARA L. MENDOZA, Certified Shorthand

7   Reporter,

8   DO HEREBY CERTIFY:

9            That the foregoing is a true and accurate

10  transcript, to the best of my skill and ability, from my

11  stenographic notes of this proceeding.

12

13

14

15  Date:   July 13, 2015____

                                TAMARA L. MENDOZA,
16                              COURT REPORTER
                                C.S.R. 9993
17

18

19

20

21

22

23

24

25

US v. HENRY_000860