# EXHIBIT F

1                  UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF CALIFORNIA

3                          --oOo--

4  UNITED STATES OF AMERICA,      ) Case No. 13CR00409-AWI-BAM
                                  )
5          Plaintiff,             ) Fresno, California
                                  ) Monday, June 26, 2017
6      vs.                        ) 10:00 a.m.
                                  )
7  ADAM ALAN HENRY,               )
                                  )
8          Defendant.            )
   _____)

9

10                TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE ANTHONY W. ISHII
11               UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Plaintiff:           DAVID L. GAPPA, ESQ.
                                ROSS PEARSON, ESQ.
14                              United States Attorney's
                                   Office
15                              2500 Tulare Street, Suite 4401
                                Fresno, CA 93721
16

17 For the Defendant:           ANTHONY P. CAPOZZI, ESQ.
                                Law Offices of Anthony P.
18                                 Capozzi
                                1233 West Shaw Avenue
19                              Suite 102
                                Fresno, CA 93711
20                              (559) 221-0200

21 Transcriber:                 Crystal Thomas
                                Echo Reporting, Inc.
22                              4455 Morena Boulevard
                                Suite 104
23                              San Diego, CA 92117
                                (858) 453-7590
24

25 Proceedings recorded by electronic sound recording;
   transcript produced by transcription service.

1

1      <u>FRESNO, CALIFORNIA  MONDAY, JUNE 26, 2017 10:00 A.M.</u>

2                          --oOo--

3      (Call to order of the Court.)

4            THE COURT:  Good morning.  Please be seated.

5            THE CLERK:  Court calls Item Number 1, Case Number

6   1:13-cr-00409, United States versus Adam Alan Henry, Motion

7   Hearing.

8            THE COURT:  Okay.  Good morning.  If I could just

9   have your appearances for the record.

10            MR. GAPPA:  Good morning, your Honor.  David Gappa

11   and Ross Pearson for the United States.  Mr. Pearson is

12   currently with Judge Drozd covering other cases, but he will

13   be here after that.

14            THE COURT:  All right.

15            MR. CAPOZZI:  Judge, Tony Capozzi with the

16   Defendant, Adam Henry, who is present in custody.

17            THE COURT:  Okay.  I had set this hearing

18   specially regarding the charges in the superceding

19   indictment as to sexually explicit conduct, and I had

20   allowed briefing on this and submission of any documents

21   including any videos, any still photos, et cetera.  I did

22   receive from the Defense a number of videos which I did

23   review.  As indicated at a previous hearing, they show a

24   video of the minor trying on some clothing, videos of the

25   bathroom -- the camera in the bathroom.

2

1        So with that, I'm just going to allow the parties

2   to be heard.  Both sides have submitted briefing on the

3   matter.  And so I'm going to go ahead and allow, first of

4   all, with respect to the Government's brief regarding the

5   charges in the superceding indictment, specifically the

6   elements that we were concerned about, or that I was

7   concerned about.

8        MR. GAPPA:  Your Honor, the Government is more

9   than happy to proceed first.  As I do that, I'd like the

10  Court to have what I gave to counsel this morning.  It's a

11  demonstrative exhibit.  So with permission, I could give

12  that to the deputy for the Court?

13       THE COURT:  Sure.  Yes.

14       MR. CAPOZZI:  And I would object to the relevancy,

15  your Honor.

16       THE COURT:  All right.  Okay.

17       MR. CAPOZZI:  And it's new material, separate from

18  our motions.

19       THE COURT:  All right.  Well, let me do this.

20  This appears to be a time line, and, obviously, because the

21  Defense is seeing this -- at least the time line itself --

22  just a quick glance, there are a number of things that have

23  already been produced in discovery, in fact, some of them,

24  in terms of the -- some of the videos -- it's been the

25  Defense that has submitted those.  But, obviously, this is

3

1  something that would be helpful just in terms of addressing
2  the issues today.  Obviously, if the Defense needs a little
3  bit more time, we can do that.  We have not yet set a trial
4  date.
5       I just -- as I mentioned at the last hearing, I
6  just really want to make sure we get all of these issues
7  resolved before trial so that they don't come up in the
8  course of trial.  That we resolve whatever legal issues can
9  be dealt with before the trial, and then that way, once I've
10 made my rulings, the parties can prepare for trial
11 accordingly.
12      So, with that, I'll overrule the objection with
13 respect to the submission today of the Government's time
14 line.  And, obviously, if the Defense needs more time to
15 review it for accuracy and for a response, that's perfectly
16 fine also.
17      So we'll go as far as we can, but, Mr. Capozzi, if
18 during the course of the hearing you say, "Hey, look, I
19 really need to look at that before I can completely argue
20 this and for the Court to decide," I'm okay with that, too.
21 Like I say, I just want to make sure we get these issues
22 resolved.  I reviewed your briefing.  I reviewed the various
23 cases.  And it is obviously significant in terms of the
24 charges that are contained in the superceding indictment and
25 specifically what we're focusing on at least now is Count 1,

4

1  the 2251(a) and (e) statutory provisions.

2        All right.  So, all right, I'll let the Government

3  go ahead and proceed on this, then.

4        MR. GAPPA:  Thank you, your Honor.

5        Your Honor, the Government prepared this one-page

6  summary as an attempt to try to focus the issues here

7  because when we were here last time, it's a little unclear

8  whether Defense counsel misrepresented intentionally the

9  record or perhaps -- and I'm giving them the benefit of the

10 doubt, given the concession that they hadn't reviewed some

11 of the discovery -- just didn't understand the theory of the

12 case.  However, we hope, with the additional briefing,

13 that's now been resolved.  However, the concern the

14 Government has is, in response to the Government's briefing,

15 the Defendant submitted not only a brief but then some

16 videos, and what we've done in this one-page summary, your

17 Honor, is to put in blue the items that the Defense

18 submitted.

19       And let's go back real briefly before I get into

20 that, but the statement at the last hearing from the Defense

21 was, "Play that video.  Your Honor, you need to see that

22 video.  That's the essence of the Government's case, and

23 there's no sexually explicit conduct in that video.  And,

24 besides, my client had nothing to do with it."  Which is a

25 misrepresentation if -- at worst, a misunderstanding at best

5

1  of what the Government's case is.

2          We've charged this as a conspiracy.  We've done

3  the brief, and it seemed rather obvious that a conspiracy is

4  an agreement.  That's what the law is.  And we've put in

5  cases where it is clear that you do not have to have

6  completion of the crime -- the agreement -- to have a

7  conspiracy.  It's in essence the agreement.  That's what a

8  conspiracy is.

9          So our view is, though, however, that this went

10  beyond just the agreement.  That there was -- even though

11  we're not required to prove it -- evidence beyond a

12  reasonable doubt that this Defendant joined the conspiracy

13  and then participated in it by committing several overt

14  acts.  And what's important to note is the Defense

15  submission of a very limited amount of material.  They've

16  submitted the one video of Agent O'Henry (phonetic)

17  recording the victim in the Defendant's bedroom, and I'll

18  address that in due course.  But then they've also submitted

19  one video of the victim taking a shower and then one video

20  of the Defendant -- I'm sorry -- the victim changing clothes

21  and then the victim using the toilet, as well as the still

22  images.  But that's a very limited amount of material.

23          We've made all of this material available to the

24  Defense.  It was turned over -- specifically the material

25  related to the victim and material that was referenced in a

6

1  31-page report at the Defense request was provided to

2  counsel in March of 2014 on a separate disc, so all of that

3  material has been available for more than three years.  And

4  what we have provided is the context for the limited amount

5  of material that the Defense provided.

6          And what we see above on the time line is all of

7  what in the Government's view supports the theory of the

8  case, which is that there was a conspiracy between the

9  Defendant and his then wife, Angel, to secretly record this

10  minor victim as she used the bathroom at their residence.

11  And this initially was something that the Defendant said he

12  had nothing to do with.

13          And, again, he went back to this video that was

14  recorded in the bedroom in 2013, and then, as the Government

15  pointed out that there were additional videos that had been

16  recorded prior to his relationship with Angel, then I guess

17  the theory changed a bit, but it's very clear to the

18  Government, and we can show as many of these videos as the

19  Court might find it necessary to look at, but the Court has

20  already seen parts of two of those videos, one from May 3rd

21  of 2008 where the Defendant had recorded a woman without her

22  knowledge in a shower at the residence that he had at that

23  time in Fresno.

24          It's significant for a number of reasons.  One, it

25  shows that he's got an interest in recording females without

7

1 their knowledge.  He's done it by hiding a camera.  And

2 later what you see is he changes the technique.  He changes

3 the position of the camera to try to enhance the quality.

4 So he's done this at that residence in Fresno and recorded

5 several women there.  And that he eventually does the same

6 thing when he moves into the residence on Irma Drive

7 (phonetic).  He initially has a camera and records, reviews

8 the material, and thinks of ways that he can improve the

9 quality of the images that are being recorded.

10          And we can show that it is something where he's

11 definitely wanting to make sure that he has the genital and

12 pubic area recorded because you see the Defendant himself

13 standing in the shower and exposing his own genital area.

14 So there's no question, in the Government's view, of what

15 the intent was and what the focus was.  And when we see, for

16 instance, that on April 17th of 2012, after he's already

17 installed the cameras or camera with the help of Angel and

18 they've made some of the videos beginning in February of

19 2012, in April of 2012 he enhances the quality of the

20 equipment being used.  And you can see the Defendant.  He's

21 recorded himself during the installation process.  So

22 there's no question that it's the Defendant who's involved

23 in this, just as he had been for at least four years prior

24 to that point.

25          Then he's recording the victim about five weeks

8

1   later on May 26th of 2012 as she's using the bathroom and

2   changing into a swimsuit.  And it's interesting that, when

3   you look at the time line, after that material is recorded

4   and reviewed, it is apparent that the victim is somewhat

5   obstructed by a shower curtain.  So what you see on June

6   12th is the Defendant and his wife coming in -- that's all

7   recorded -- and they take the shower curtain out of the

8   bathroom, and that's because they want to get an

9   unobstructed view of the victim.  And that's done just

10  shortly before on the same day the victim coming into that

11  bathroom and changing clothes.

12          So given the relationship between the Henrys and

13  that victim, they knew full well that she was going to be

14  using the bathroom and most likely would be changing

15  clothes.  They wanted an unobstructed view of her.  In fact,

16  that's what they got because there are at least two

17  recordings -- three recordings on that day after they take

18  the shower curtain out, and they've gotten that victim on

19  three separate recordings.

20          It's not the end, unfortunately.  What they

21  discover is that there's a window above the shower, and,

22  depending on the time of day, there's a lot of light, and it

23  interferes with the quality of the images.  So, for

24  instance, on June 21st of 2012, this is nine days after

25  they've removed the shower curtain to improve the quality of

1  the images, they find a solution for the exposure problem,

2  because now they've created a curtain and they are recorded

3  installing this curtain to obstruct the light which was

4  interfering with the quality of the images being produced.

5  And then they very shortly after that record the victim

6  using the toilet in the bathroom and changing clothes.

7  That's on June 21st of 2012.

8         On February 4th, 2013, the Defendant creates 10

9  screen shots from a video that he's recorded -- well, that

10 was recorded in the bedroom.  So that's the video that Angel

11 Henry recorded.  Defendant makes a big deal about that video

12 and the Defendant had nothing to do with it.  But we can

13 see, by the time that video is recorded, the Government

14 anticipates the testimony from the victim will be that she

15 had spent enough time at the Henry residence that on more

16 than one occasion the Defendant had approached her and

17 physically touched her in what she considered to be an

18 inappropriate way, and, in her words, "He weirded me out."

19 And she had confronted him on at least one occasion and

20 indicated that she was not comfortable with that.  So it was

21 clear by this time, in early 2013, that the Defendant was

22 never going to overtly record this victim without clothes or

23 in any kind of lewd or lascivious exhibition, which is

24 obviously why he's recorded this surreptitiously.

25         And then when you look at that video, there are

10

1 several things that are significant.  There's a concerted

2 effort, in the Government's view, for the victim to be

3 directly exposed to the camera, and there are several times

4 during which the interactions take place where Angel

5 repositions the victim, pulls her hair back, removes some of

6 the clothing, and knows where that camera is that's

7 recording this, and makes efforts to capture as much of that

8 victim in the most vulnerable positions as possible.  And,

9 given the variety of clothes that were made available to

10 her, it's certainly reasonable that you could conclude that

11 one of the efforts was to get her at some point, whether

12 it's with no top at the same time as no bottom, but as much

13 nudity as possible.

14          And we've cited cases that say, for sexually

15 explicit conduct, it's not necessary for there to be nudity.

16 The images don't necessarily need to be zoomed in on the

17 genital or public area.  But, more importantly, again, we

18 need to remember, this is charged as a conspiracy, so we

19 don't necessarily need to have a jury conclude that any one

20 of those images would constitute a lewd lascivious

21 exhibition.  However, when you see the screen captures that

22 are made, it's significant, in the Government's view, that

23 several of those are focused on the frontal area, which

24 includes the genital or pubic area of that victim.

25          But the Defendant also created screen shots from

1 one of the videos that was created when the victim was using

2 the bathroom that was done after the video in the bedroom

3 was recorded, after those other screen shots from that

4 bedroom video were recorded -- were created. And then again

5 on April 7th of 2013, there's an effort made to enhance the

6 image quality. And then they go in the next day and create

7 test videos to see if their efforts have improved the

8 quality of the recordings. And then on that same day, which

9 again suggests that they knew that this victim was going to

10 be coming over and changing clothes, they've recorded her.

11          And then on April 9th, there's a recording -- two

12 separate recordings, actually -- where the Defendant enters

13 the bathroom and he sees the victim's clothing on the floor,

14 and, item by item, he picks it up. He picks up her bra. He

15 looks at it. Holds it up to the camera. He picks up her

16 underwear. He looks at it. He holds it to the camera.

17 There are two separate videos where the Defendant has done

18 that.

19          So all of that that I've just gone over is

20 material that the Defendant did not submit to the Court and

21 is understandably, I guess, trying to not have the Court

22 understand is there, but it certainly informs the material

23 that the Defendant did submit. So when we look at

24 everything in its context and remember that overlaid over

25 all of this is Count 2, and we see that, as early as

12

1 November of 2005, the Defendant is downloading, having

2 searched for images of child pornography and bestiality.

3        And I mention bestiality because, although the

4 Defense seems to have shifted over time, and initially it

5 was, "My client had nothing to do with this.  He has no

6 interest in children.  He has no sexual interest in

7 children.  It's all Angel Henry."  When it was pointed out

8 that there are images of child pornography found on

9 computers in the Defendant's garage that he was using before

10 the relationship with Angel Henry developed, there wasn't a

11 real solid explanation for that, but it was then suggested

12 that, when she first came to visit from Canada, she had

13 access to the computers and/or she brought them or perhaps

14 some other people were responsible.  But then as more

15 material was found and from earlier dates, that explanation

16 seemed to become less plausible.

17        And so when you look at the material, it's been

18 consistent over time, not only how that computer and the way

19 it was configured with multiple hard drives.  So it is not

20 just a computer that most of us would go to Best Buy or some

21 electronics store and open a box and then plug in and start

22 using.  This is a sophisticated, multi-hard drive

23 configuration, which the Defendant, as an expert in

24 networking, had configured and was using during the relevant

25 time period.

1           It shows his interest not just in child

2  pornography but also in bestiality, which is relevant

3  because it goes to his identity and his culpability for the

4  charged child pornography.  All of that is taking place for

5  seven or eight years before he's now figured out a way to

6  record this victim in his own bedroom.  And also, during the

7  time between 2012 and 2013, the Court has already seen the

8  text communications between the Defendant and Angel where,

9  for instance, in approximately August of 2012, the Defendant

10 is at a baseball game and he references what he says is "a

11 bountiful amount of T and A."  He then takes pictures and

12 makes comments.  In our view, those items all demonstrate

13 his sexual interest in minors because, although it's not

14 possible to go back in time and identify who those victims

15 were, it appears, and I think a reasonably jury can

16 conclude, that those at least in part are pictures of

17 minors.  And when you make the comments that were made, it

18 is a demonstration of a sexual interest in minors.

19           So all of that is taking place as some of the more

20 significant material in this case is being produced.  So

21 when the Court -- and I know the Court has looked at the

22 cases -- understands the way the case is charged as a

23 conspiracy, and understands the statutory definition and the

24 case law definition of sexually explicit conduct, that it is

25 true that we're focused on the lewd or lascivious exhibition

14

1  or display of the genital or pubic area, and we know that

2  does not even require nudity.  Here, we have nudity.  We

3  don't need the camera to zoom in on the genital or pubic

4  area, but we could see from some of these videos that the

5  Defendant and his wife were definitely setting up cameras to

6  create the best possible quality of images and images that

7  created the full frontal nudity of this particular victim.

8          So in the Government's view, it's not even a close

9  call.  There's definitely sufficient evidence to go to a

10  jury and for a reasonable jury to conclude that the

11  Defendant did commit this offense as charged.  So that's our

12  position at this time, your Honor.

13          THE COURT:  All right.

14          And Defense?

15          MR. CAPOZZI:  I'm stunned.  This is dangerous,

16  what the Government is doing, your Honor.  Dangerous.  I

17  can't believe it.  What the Government just espoused to the

18  Court is the figment in their imagination.

19          Go back to these May 3rd videos -- November --

20  December 13 videos.  These are adult woman being videoed,

21  living with his fiance, with her agreement, the video was

22  placed in a bathroom.  He's videoed himself in the bathroom.

23  She's videoed in the bathroom.  Videos of her looking up at

24  the camera.  And now this is to be used to show child

25  pornography.

15

1         And I've seen what the Government's going to do.
2    They're talking about bestiality.  They're talking about
3    filming adults without their knowledge.  And they want to
4    get this all before the jury to prejudice the jury.  Adult
5    pornography has nothing to do with child pornography.  And
6    the Government's trying to play that off and to creating the
7    image of the Defendant.  Those images back in '08 are from
8    his fiance, and his mother-in-law was taken in one of those
9    pictures, too, if I'm not mistaken, she did not know it
10   happened.  In none of those videos is there any focus on the
11   genital area or the pubic area, and I stressed this in my
12   citing the cases where the camera was placed.  It's up high.
13   And all the cases -- almost all of the cases the Government
14   cites, the camera's placed in the bathroom either below the
15   toilet, leave it under the toilet, or put on a vanity of the
16   sink showing from the waist down.  None of those setups were
17   here.

18         The camera or video in the bedroom -- it's obvious
19   from the video that I submitted to the Court who set that
20   up, who was doing that.  It was Mrs. Henry, not this
21   Defendant.  And the evidence is going to show he was at work
22   during most of this time.

23         The Government gets into these communications at
24   the baseball game.  We saw some of those when we were here
25   last time.  Some are children.  Some are adults.  And the

1  texts back and forth, let me -- I sill submit to the Court

2  the Government has not submitted all of those texts to you

3  because much of it will clear up what was happening between

4  the two.

5          I submitted the video of the bedroom video, and

6  then I submitted the snapshots -- and I think there's 10 or

7  12 snapshots of the girl dressing, undressing -- and I

8  submitted the bathroom videos.  To me, that's the child

9  pornography allegations here.  I believe that falls within

10  the voyeuristic motif rather than child pornography.  Child

11  pornography is where you have to use or coerce a minor to

12  engage in sexually explicit conduct.  Nowhere in any of the

13  videos that were submitted to the Court is sexually explicit

14  conduct.

15          I Googled "teen bikinis" to see if there's

16  anything that would resemble what we saw in these two

17  videos.  On Google -- in the public internet -- I swear to

18  you -- they should be indicted for child pornography based

19  upon the Government's theory.  They focused in on the

20  genital area.  They focus in on the pubic area.  I mean,

21  just take away everything else but the bikini and those two

22  areas are online trying to sell bikinis.

23          In this particular case, we don't have that.  Some

24  of the videos that were the snapshots taken in the bedroom,

25  it would have been somebody on the beach undressing or

17

1 putting their clothes on.  There's no question of Mrs. Henry

2 -- of what she was doing in that bedroom and attempting to

3 do.  Again, this Defendant had no part of that whatsoever.

4          Now, the Government, smartly, charges this as a

5 conspiracy, so whatever Mrs. Henry does, my client is

6 responsible for.  But there is no agreement that's shown

7 that they're intending to establish or commit any --

8 establish any videos of child pornography.

9          I've looked at those videos over and over again.

10 I don't see where in the world there's using or coercing a

11 minor to engage in sexually explicit conduct and lascivious

12 exhibition of the genitals or pubic area of any person.

13 Judge, that doesn't exist anywhere.

14          If anything, this is on all fours for the Steen

15 (phonetic) case.  This is where the guy is in the tanning

16 booth, puts a camera up on the top so he can videotape the

17 girl next door, and it shows her undressing, and it shows

18 her getting into the tanning booth, and it does show the

19 pubic hair, no question about it, 1.5 seconds.  Now, you

20 could equate that to our video in the bathroom where the

21 young girl here is taking off her clothes and getting into

22 the shower, and the pubic area is seen for maybe a second or

23 two, seen again when she gets out, maybe two or three

24 seconds, maybe four seconds, that's it.  But nothing is

25 focused on the pubic area.  It's the entire bathroom.  It's

18

1 the entire body.  And in those videotapes is her mother
2 coming in to change clothes.  And in the -- I think the last
3 videotape, another women walks -- comes in through the door.
4 It's not the minor.  It's her mother.  Which shows that he's
5 not just focusing on minor.  He's focusing on anybody coming
6 into the bathroom.

7          And, indeed, there are some other videotapes in
8 the bathroom of Mr. Todd (phonetic) coming in and, and using
9 the bathroom.  I don't have those videotapes yet.  I've sent
10 an email to the Government saying, "These are the ones we
11 don't have," and I'm sure we'll be getting them.  And
12 they'll allege that we already have them.  We don't.

13          But when looking at everything in this case -- at
14 least on Count 1 -- I'm not arguing Count 2, judge -- that's
15 another story.  But in Count 1, this is voyeurism at its
16 best, I would say.  And maybe he gets his kicks off of
17 voyeurism, but that isn't child pornography, and there's no
18 proof that he does.  I just don't think this is something
19 that should go to a jury, and the only reason why the
20 Government is doing this is to prejudice the jury against
21 this Defendant.

22          And when you look at all of this time line, this
23 is dealing with adult pornography, not child pornography.
24 And when you look at what's there, it doesn't even amount to
25 child pornography.  I would submit, and if you have

19

1 questions, Judge.

2          THE COURT:  Uh-huh.

3          And Government?

4          MR. GAPPA:  Your Honor, just very briefly, we're

5 not doing it to prejudice the Defendant.  If anything, the

6 material on Count 2 is more prejudicial because it shows the

7 actual penetration, the direct physical abuse by hands-on

8 offender, so by comparison these recordings don't show any

9 particular adult molesting the victim.  We don't need to

10 have that.  So it's a little bit also like saying, "Your

11 Honor, my client is not a pedofile."  Well, that's really

12 not a relevant issue for this Court or for a jury.  It's not

13 whether he's a pedofile.  It's whether he's downloaded

14 images of a minor engaged in sexually explicit conduct or

15 whether there was a conspiracy to sexually exploit a minor.

16 So it's definitely a little more nuanced, and we, for the

17 reasons we've already argued, think that there is a

18 sufficient legal and a sufficient factual basis for both

19 counts to go forward.

20          MR. CAPOZZI:  And, your Honor, if I can respond on

21 Count 2?

22          THE COURT:  Sure.

23          MR. CAPOZZI:  Count 2 has nothing to do with this

24 Defendant actually doing something to children.  It's

25 downloading videos -- the allegation is.  Thank you, Judge.

1          THE COURT:  Right.

2          MR. CAPOZZI:  Does the Court have any questions?

3          THE COURT:  Let me just make comments, and then --

4 obviously then counsel can respond.

5          Yeah, I'm not dealing with Count 2, which is --

6          MR. CAPOZZI:  Right.

7          THE COURT:  -- receipt and distribution of the

8 visual depiction beginning not later than approximately

9 November, 2005, and I don't -- I think that the time line

10 that the Government has submitted is helpful.  Obviously, if

11 it needs more discussion, but it does indicate the basis for

12 that, that is the downloading -- the downloads that were

13 discovered in 2005.

14          But, okay, so I'm dealing basically with Count 1.

15 As I mentioned at the last hearing when I allowed briefing,

16 it was somewhat novel to me anyway as to whether or not what

17 was presented to me and was shown to me constituted sexually

18 explicit conduct.  And reviewing the cases, this is my

19 understanding now.  And I think the Holmes case, the 11th

20 Circuit case, 814 F.3d 1246, 2016 case, pretty much outlines

21 -- is a relatively recent case and pretty much outlines this

22 sort of a situation.  In that case, the defendant was -- the

23 appellant was charged with surreptitiously videotaping his

24 teenage stepdaughter performing her daily bathroom routine

25 over a period of approximately five months and being in

1  possession of videos and depictions of her in the nude.   In

2  the appeal, Holmes basically argued that the images did not

3  constitute child pornography because they do not depict a

4  minor engaged in sexually explicit conduct.   Ultimately, the

5  decision -- he was convicted.   The decision was affirmed by

6  the appellate court.   The holding was that depictions of

7  otherwise innocent conduct by a minor can constitute a

8  lascivious exhibition of the genitals or pubic area based on

9  the actions of the individual creating the depiction, so

10 focusing or looking at the person's recording, not

11 necessarily simply at the victim or alleged victim or the

12 visual depictions.

13         The Court goes on to explain, and I'm not going to

14 go into great detail on this, but the Court in its holding

15 states that federal law defines child pornography as,

16 amongst other things, production of such visual depiction

17 involved in the use of a minor engaging in sexually explicit

18 conduct, and then going to the definition of sexually

19 explicit conduct as being -- one of them being lascivious

20 exhibition of the genitals or pubic area of any person.   And

21 then the Court goes on to indicate that the appellant there

22 contended that the images depict mere nudity, making him at

23 most a voyeur.   And that his -- the images do not depict a

24 lascivious exhibition of the genitals or pubic area.

25         And the Court noted in support of this argument

1 that the appellant noted that the minor did not knowingly

2 engage in sexually explicit conduct.  Rather, that she was

3 simply secretly recorded while in her bathroom performing

4 normal, everyday activities.  And that even the ones in

5 which the minor's pubic hair is fully visible do not depict

6 sexually explicit conduct.  And then the Court then states,

7 "We disagree," and concludes that depictions of otherwise

8 innocent conduct may in fact constitute a lascivious

9 exhibition of the genitals or pubic area of a minor based on

10 the actions of the individual creating the depiction.

11          And then the Court goes on to say the Eighth,

12 Ninth and Tenth Circuits have each confronted the same

13 question, and then indicates the Ninth and Tenth Circuits

14 have focused on the intent of the producer, and they cite

15 United States v. Wiegand, W-I-E-G-A-N-D, 812 F.2d 1239,

16 Ninth Circuit case.

17          MR. CAPOZZI:  Can I add a comment to that, your

18 Honor?

19          THE COURT:  Hold on just a second.  And then they

20 say:

21          Today we join the Eight, Ninth and Tenth

22          Circuits and hold that a lascivious

23          exhibition may be created by an

24          individual who surreptitiously videos or

25          photographs a minor and later captures

*Echo Reporting, Inc.*

1           or edits a depiction even when the

2           original depiction is one of an innocent

3           child acting innocently.  Holmes's

4           conduct, including placement of the

5           cameras in the bathroom where his

6           stepdaughter was most likely to be

7           videoed while nude, his extensive focus

8           on videoing and capturing images of her

9           pubic area, the angle of the camera

10          setup, and his editing of the videos at

11          issue were sufficient to create a

12          lascivious exhibition of the genitals or

13          pubic area.

14          Okay.  Now, those were the facts in that case.

15  Obviously, the facts in our case could be different, but

16  that sort of sets the framework.  What it did, it resolved

17  my initial concern that, well, wait a minute.  This isn't

18  what I typically see in terms of sexually explicit conduct

19  because the vast majority of cases -- in fact, pretty much

20  almost all of them that I've dealt with personally as a

21  trial judge, actually shows a minor in a number of ways

22  being sexually exploited.  So I will say this.  I'm -- my

23  tentative thought is that, after reviewing all the

24  materials, when you're dealing with a conspiracy charge,

25  which as both sides know very well is simply the agreement,

1  and obviously it's a question for the jury as to whether or

2  not this whole history of the Defendant and Angel

3  purportedly setting up these cameras and the one where Angel

4  is secretly recording the minor in the bedroom changing

5  clothes and setting up the cameras in the bathroom, reflect

6  an implicit agreement that ultimately what they are trying

7  to do is to get the minor in a situation, either in a

8  bedroom changing clothes or in the bathroom or whatever,

9  exposing yourself completely and then focusing in on the

10 pubic area.  That I understand would be essentially the

11 theory of the Government on a conspiracy charge, and a

12 conspiracy charge, as both sides are well aware, does not

13 require completion of the offense itself, that is, the

14 actual production of sexual video or stills of the minor

15 "engaging in sexually explicit conduct."

16         So, anyway, that's really what I'm starting to see

17 here.

18         But, yes, Defense.

19         MR. CAPOZZI:  Yes, your Honor, in that Holmes

20 case, I think the important factor was that the camera was

21 placed on the counter -- I think the sink, so it was from

22 the waist down, and screen shots were taken -- 26 screen

23 captures from certain sections of the video were taken.  Two

24 of those depicted close-up views of the victim's pubic area,

25 while remaining still images depicted her naked breasts.  We

25

1 have none of that in this case, your Honor.  None.

2          THE COURT:  Right.

3          MR. CAPOZZI:  The only still shots we have are

4 from the bedroom, and those are not even close to any child

5 pornography whatsoever.  Indeed, the Google teen bikinis was

6 10 times worse than whatever we saw in the video there.  And

7 I -- again, I'll submit, your Honor.

8          THE COURT:  And, again, the thing about the

9 conspiracy charge, as you know --

10          MR. CAPOZZI:  Yeah.

11          THE COURT:  -- probably better than I, is it

12 doesn't have to show completion.  They don't actually have

13 to -- the Government doesn't actually have to prove by

14 showing the -- basically the enhanced pubic area -- just

15 setting it up.  And what sort of concerned me about the

16 setting it up is that the camera angle may have been up

17 above rather than below, but if the jury finds that they

18 were working to enhance the image, and for whatever reason

19 could not -- did not think to set the camera lower, it would

20 appear the jury could find that they were certainly doing

21 their best to enhance the video image in the bathroom by

22 getting better equipment, removing a shower curtain, putting

23 window shades on, just trying to perfect that situation

24 where the view of the minor -- a minor would be enhanced or

25 could be enhanced.

26

1          So, as I indicated at the outset, when I reviewed

2     the <u>Holmes</u> case, I recognize that there are some factual

3     differences, but I was impressed with the analysis as far as

4     it somewhat seemed to answer the question or concern I had

5     at the last hearing.

6          Anyway, the Government?

7          MR. GAPPA:  Your Honor, I think the Court has

8     arrived at the correct conclusions, and we appreciate the

9     Court's open mindedness in analysis and understanding.

10          MR. CAPOZZI:  But for this Count 1, doesn't the

11     Government have to show some kind of an agreement here to

12     get this in?  Obviously, they do.

13          THE COURT:  Right.

14          MR. CAPOZZI:  And I don't think they've shown any

15     of that yet.

16          THE COURT:  Well, okay.  As you're well aware and

17     the jury instruction provides, you know --

18          MR. CAPOZZI:  Yes.

19          THE COURT:  -- there doesn't have to be an

20     agreement -- an agreement as you and I are aware.  It's just

21     from the inference of both of them working -- allegedly --

22     maybe working together to help enhance the imaging in the

23     bathroom, arguably Angel prepping, if you will, the minor.

24     You know, I saw that whole length of that.  It's really

25     lengthy.  If we -- if you go to trial and if it is shown, I

1 don't know if it can be modified or whatever, but if it

2 can't, it can't.  I mean, but -- and, again, that could be

3 very innocent.  An adult being very gracious, very kind by

4 giving her a number of items to try on.  Obviously, a big

5 problem with that is she's recording it, which is not what a

6 kind adult would be doing for a minor child if all the adult

7 wanted to do was to give the minor some clothing just to try

8 on either for fun or for giving her the clothing.

9         So -- and that's problematic, but, again, my

10 determination, as you know, is not beyond a reasonable

11 doubt.  It is can the jury reasonably infer from the alleged

12 actions of Mr. and Ms. Henry together and separately and

13 conclude by essentially the time frames and what they did

14 that they were working towards getting the minor into some

15 position, either in the bedroom or the bathroom, where she

16 is fully exposed for a lengthy period -- lengthier period of

17 time.  And then, of course, then they can -- if they -- they

18 don't have to prove that, but they could obviously then get

19 the screen shots or the stills or whatever.

20         So, yeah, I agree there's not an explicit

21 agreement -- "Let's do this" -- I haven't seen evidence of

22 that, but, as you know, most alleged conspiracies, they

23 don't have that face-to-face, "Let's do this."  It's just

24 the actions of the individuals -- the alleged co-

25 conspirators, and the jury making a determination of whether

28

1 or not it was a -- whether or not an agreement is reached.

2          MR. CAPOZZI:  Well, is the Court making a

3 determination as to whether or not the depiction here is of

4 explicit -- sexually explicit conduct?

5          THE COURT:  Yeah, I'm not making that

6 determination.  All I can say is in the Holmes case, the

7 Court does discuss -- and it says specifically "innocent

8 conduct" --

9          MR. CAPOZZI:  Uh-huh.

10          THE COURT:  -- by an innocent child, so, arguably

11 -- you could argue that's what we have here.  Innocent child

12 trying on clothes.  Innocent child using the bathroom

13 facilities.  But that's just part of the analysis.  What

14 that tells me is the fact that it might even be arguably

15 innocent in this case -- well, I shouldn't say arguably.

16 The conduct of the alleged victim in both the bedroom video

17 and the bathroom, certainly she was innocent and not aware.

18 So was she lasciviously exhibiting her genitals or pubic

19 area, I can't say that, but, again, the Holmes case doesn't

20 say that that is required.  So I'm not making a firm

21 determination on that.  I'm saying that's a matter for the

22 jury.  But I am saying that, according to the Holmes case,

23 and the proffer so far by the Government and all the

24 evidence I've reached so far, that a jury could -- a jury

25 could find that there was an agreement between Defendant and

1 Angel that wasn't completed, obviously, but an agreement to

2 attempt to get the minor in a position of being nude and

3 that it could result in sexually explicit conduct, which

4 could ultimately result in sexually specific conduct as

5 defined by statute, that is, a lascivious exhibition of the

6 genitals or pubic area of any person, understanding that

7 lascivious exhibition of the genitals or pubic area may

8 include depictions of otherwise innocent conduct of a minor

9 which are surreptitiously taken by an alleged producer and

10 made lascivious based upon the actions of the producer and

11 not the child.  I'm just quoting verbatim from Holmes.

12          Okay.  Anyway, tentatively, that's -- I just want

13 to let you know that's what I'm thinking based on what I've

14 seen and heard.  I know, Mr. Capozzi, at the outset you

15 objected to the time line submitted by the Government.  I

16 have to say I didn't rely on it, but it did help just as a

17 -- a chart, if you will, of the time line that just sort of

18 put everything into context at least in terms of the time

19 frame, and it's also helpful in terms of the exhibits that

20 were submitted by the Defense as to where they fit on all of

21 this.  But, again, if there are anything else -- anybody --

22 I know both sides have done extensive research on this, and

23 I don't know if there's anything else that --

24          MR. CAPOZZI:  Nothing from the Defense side other

25 than we sent an email to the Government about the additional

1 videos.  Will the Government supply that?

2         MR. GAPPA:  Your Honor, as counsel said, I'm sure

3 we'll figure that out.  What it is, is that we, as I

4 mentioned, as a courtesy, gave the Defense all of the items

5 that were referenced in a 31-page report related to the

6 detention hearing.  We put those on a separate disc, so

7 there are probably some things that weren't referenced in

8 that report that they want.  Those are all and have been

9 available at Series PD (phonetic), but to the extent that

10 any of that is not material that is prohibited by law, we're

11 willing to ask Series PD if they could put that on another

12 device for the convenience of the Defense counsel.

13         THE COURT:  Okay.

14         MR. GAPPA:  I don't think that in the end that'll

15 be a problem.

16         MR. CAPOZZI:  All right.

17         THE COURT:  Okay.  Now, if there are discovery

18 disputes that arise -- well, for any reason at all, go ahead

19 and direct them to me in terms of a motion either for

20 further discovery, discovery sanctions, whatever either side

21 thinks would be appropriate, so that I can go ahead and

22 address them, if it comes up.  But it seems that if you can

23 get the information to Defense as requested, then hopefully

24 there won't be any issues.

25         Let me just indicate in conclusion, then, if the

1 matter is submitted, that I was concerned at the last

2 hearing regarding the issue of what constitutes, in this

3 case, sexually explicit conduct, lascivious exhibition of

4 genitals, having viewed at that time what could arguably be

5 innocent conduct, changing clothes in a bedroom, using

6 bathroom facilities, et cetera, as to whether or not that

7 would be what I'll just now generally call child

8 pornography.  I'm satisfied from the briefing, the exhibits

9 that have been submitted to me, the proffers, the case

10 authorities, that, on a conspiracy charge, that the

11 information submitted by the parties is sufficient.  That

12 I'm satisfied that the Government can proceed on Count 1 on

13 a conspiracy charge.

14          MR. CAPOZZI:  Is that based on the <u>Holmes</u> case,

15 Judge?

16          THE COURT:  Well, <u>Holmes</u> was, I think, the one

17 that just sort of laid everything out.  You know, <u>Holmes</u>

18 itself cites to a number of cases, including, as I

19 indicated, a Ninth Circuit case.  And I'm also aware that

20 the Ninth Circuit very recently in the <u>Perkins</u> (phonetic)

21 case, filed March of 2017, 850 F.3d 1109, in that case, the

22 majority opinion found that the materials that were subject

23 to that case were not sufficient, and that was a situation

24 on an appeal with respect to a motion to suppress.  But I'm

25 aware that -- and I'm also aware that there are other cases

32

1 in other circuits that have come to an opposite conclusion.

2          MR. CAPOZZI:  Was it 850 F.3d, Judge?

3          THE COURT:  The?

4          MR. CAPOZZI:  Perkins.

5          THE COURT:  Perkins is 850 F.3d 1109.

6          MR. CAPOZZI:  1109.

7          THE COURT:  It's a March 13, 2017, case.

8          MR. CAPOZZI:  Is that -- the Steen case, which is

9 a Ninth Circuit case, I think you said -- no, it's not Ninth

10 Circuit.  The Steen case, though, to me, seems it would be

11 the one that would apply in this particular case.  Even

12 though it's an innocent conduct on the person in the other

13 tanning room.

14          THE COURT:  Uh-huh.

15          MR. CAPOZZI:  Pubic area is shown, and yet the

16 Court said that's voyeurism, not child pornography.  How is

17 that distinguished from Holmes?

18          THE COURT:  Well, it's distinguished from this

19 case in that this is a charge of a conspiracy.

20          MR. CAPOZZI:  True.

21          THE COURT:  And so it doesn't have to be a

22 completed -- the underlying crime does not have to be

23 completed, and the key is whether or not there's an

24 agreement.  As I indicated, there's agreement.  In that

25 case, it was -- and I think part of it is it's either -- I

1 guess you could clearly find, well, he was a voyeur.  He's

2 just opportunistic.  He just set up in a tanning booth.  I

3 don't think he was, like, the owner of the tanning booth who

4 set up cameras to film, you know, minors or adults even.

5 Just seemed to be some opportunistic guy that was able to

6 hook up a camera in the tanning booth next to a minor, and

7 photographed her.  And the Court in that case found that

8 that was -- he was simply a voyeur and not chargeable, if

9 you will, with the federal offense of child pornography.

10 So --

11        MR. GAPPA:  Your Honor, I think the Court is

12 correct, and my memory is, not having that case in front of

13 me, that the appellate court even noted that the case had

14 not been charged as an attempt.

15        THE COURT:  Uh-huh.

16        MR. GAPPA:  So I think, as you just noted, the

17 appellate court, if my memory is correct, observed that --

18 at least raised the possibility that it might be a different

19 outcome if it had been charged as an attempt.

20        THE COURT:  Uh-huh.

21        MR. GAPPA:  but, your Honor, if I could, just

22 before we could -- just -- I think it might be a good use of

23 the collective four to five minutes.  The Defense has raised

24 a couple of things which I don't think are accurate.  There

25 was reference to all of the screen captures were produced

1  from that bedroom video.  That's not correct.  In fact, the

2  Defendant himself, whether they realized it or not,

3  submitted in Exhibit A, which is under seal, attachment --

4  the attachment to their brief, two screen captures which are

5  Bates stamped "U.S. versus Henry 001010."  They both have

6  that number on it.  However, they are two distinct,

7  different images.  And these are images that were created

8  from a video that was taken in the Defendant's bathroom.

9         And I'm bringing this out for a couple of reason.

10 One, to clarify the record that it is not correct that all

11 of the screen captures were only made from that one bedroom

12 video.  So that's significant.  But, two, these two images

13 were created on April 7th, 2013.  That's a significant date

14 for an additional reason, and this is, again, in response to

15 the observation or at least argument that there's no

16 agreement between the Defendant and Angel.  If I could have

17 the monitor switched so that we could show a brief part of

18 one video which was also recorded on April 7th, 2013, if we

19 could do that?

20         THE COURT:  Yeah.

21         MR. GAPPA:  I think it could be helpful for the

22 Defendant to understand.  I've just pressed "play," so it

23 should show some action soon.  But what we'll see is the

24 Defendant entering the bathroom.  And keep in mind that on

25 April 7th, he's edited and created these screen captures,

35

1   and, prior to that, they had noticed that the image quality

2   was not good because there was light coming in from this

3   window, which they're now -- he's putting the curtain above.

4   So they're making an effort here to fix that overexposure

5   issue.  So this doesn't take all that long, but you'll see

6   obviously it's the Defendant, and that's Angel Henry, and

7   they're working to improve the quality of the images such as

8   these two screen captures which were on the very same day

9   that this action is being taken, these screen captures were

10  created.

11          So I think it's a fair inference to say that

12  they've reviewed different other videos that were created in

13  this bathroom.  We've already established or will -- we've

14  done it through representation, but the evidence would show

15  that he's actually improved the quality of the camera and

16  the location.  And I won't take the time right now to

17  demonstrate that, but he's made concerted efforts over time

18  to make the best possible images, and this is just one more

19  example of that effort.

20          And it's significant that it happened on this day

21  because the very next day they record the victim on April

22  8th. and then the day after that, on April 9th, he's in

23  there recording, as I had mentioned, the Defendant picks up

24  the victim's clothing.  But this goes to refute the

25  suggestion that there's no agreement between these two

1 people.  And I'll just play about one extra minute because

2 at the end we can see that they're quite satisfied with the

3 work that they've been doing.  I suggest that the Defendant

4 was smiling at that point.

5          So, your Honor, we've given a proposed

6 instruction, which may not be the final version, but we're

7 -- as the Court knows and I'm sure counsel does, that there

8 doesn't have to be a written contract.  That evidence of an

9 agreement can be circumstantial, and that's some of what we

10 would propose to show to the jury in terms of their

11 agreement.

12          MR. CAPOZZI:  And that shows nothing with the

13 camera.  It just shows putting a curtain up in a window,

14 Judge.

15          THE COURT:  No, I totally understand, and I think

16 there could be -- and obviously the Defendant need not

17 testify and he need not present evidence.  It's possible

18 that they just needed to change the curtains.  I mean,

19 people make changes all the time, but, yeah, that's just one

20 snippet in the whole realm of what the Government is

21 intending to show, and then it's totally up to the jury.

22 The jury will make determinations with respect to

23 credibility, inferences to be drawn, if any, and then make

24 factual determinations from those -- ultimate factual

25 conclusions from those.

37

1          Okay.  All right.  So but obviously Defense

2  counsel and Government counsel are going to meet and going

3  to make sure that the Defense has everything that it would

4  be necessary to be aware of and to be given to the Defense.

5          MR. CAPOZZI:  I think we've agreed on a trial

6  date.  I don't know if the Court's been notified yet.

7          THE COURT:  Yeah, you know, I saw that, and I do

8  have that proposed order, and I did want to take that up

9  next, the trial date of November 7th.  You know, I have two

10 trials that are set on that date.  One -- they're both

11 civil.  One's a bench trial.  The concern that I have about

12 November 7th is the civil case has been very contentious

13 between the parties and counsel, and so we just -- it's one

14 of those things where I said, "Look, we'll agree on a date,

15 and that's the date it's going to go to trial."  So I don't

16 want to bump them deliberately by setting this on the same

17 date.  So I don't know if there are other dates that you

18 had --

19         MR. CAPOZZI:  What's better for the Court?

20         THE COURT:  Well, let's do this.  I've got the

21 stipulation and order.  I did not sign it.  But if you --

22 both of you could just meet and confer, check with your

23 witnesses and see, and come up with a few dates, and then

24 check back with -- well, let's see, my courtroom deputy is

25 on vacation this week.

38

1          MR. GAPPA:  Your Honor, if I could rudely

2  interrupt.  I would strongly object to that because, as the

3  Court knows, and the Court went through not last time but

4  the time before the entire chronology and how many

5  continuance, but more to the point, when we were here for

6  the last hearing, we had the issue of let's try to find a

7  new trial date.  It took two weeks.  I've spent hours trying

8  to coordinate between Defense counsel, our witnesses, co-

9  counsel, and all of that essentially went for naught

10  because, although we tried to make it work in July and then

11  we thought perhaps August and then September, every date

12  became a conflict.  This was the first available date.  And

13  I know that, once we get into December, just given the time

14  that I'm told I have to use or lose, that it's just not

15  going to be an option to go any later than this in November.

16  And I just don't see how this gets better for anybody if we

17  go into 2018.

18          THE COURT:  All right.  Well, let me do the

19  following, then.  I'll sign the order.  We'll do it November

20  7th.  I'll notify the parties on the other cases right away,

21  and then I'll just do my best to work out a workable date

22  with them.

23          So, all right, I will, then, go ahead and sign the

24  stipulation, and then basically trial confirmation will be

25  on Tuesday, October 10th, 10:00 o'clock in the morning.

39

1 Jury trial will be Tuesday, November 7th, 8:30 in the

2 morning here in this court.  By stipulation of the parties

3 and my finding that the ends of justice served outweighs the

4 best interests of the public and the Defendant in a speedy

5 trial, I will exclude time through and including November

6 the 7th, and I'll go ahead and sign the stipulation and

7 order today.

8        MR. CAPOZZI:  And, Judge, we agreed with that

9 date.  We have one witness who is not available.  He's going

10 to be traveling out of the country, and we've agreed to take

11 his deposition, but they're not -- still reserving the right

12 as to whether or not it's relevant.

13        MR. GAPPA:  Okay.  All right.

14        THE COURT:  Okay.  Sure.  And that's fine, but,

15 obviously, both sides have spent a lot of time trying to

16 work out a date, so let's make sure that it does go on

17 November 7th.  If there are any other issues that need to be

18 taken up, obviously we do have time.  Based upon my ruling

19 today, you can follow.  I know there were some issues that

20 might still be out there, and so if you want to file any

21 supplemental -- any motions that are still pending, if you

22 want to file supplemental briefing on them in light of my

23 ruling today, just go ahead and set your own briefing

24 schedule.  Obviously, the sooner the better so that we get

25 all of those issues resolved before October the 10th.  So

40

1 that on October 10th, we're just simply doing the final

2 checklist for trial itself.

3          MR. GAPPA:  One other issue is the Court had

4 reserved -- well, the Court was prepared to and intended to

5 rule on the motions related to the Defense experts.

6          THE COURT:  Uh-huh.

7          MR. GAPPA:  Defense counsel asked that that not be

8 done at the last hearing.  Our concern is that if we don't

9 set any kind of a deadline for the Defense to provide the

10 disclosures, that we're going to have a problem similar to

11 what we had last time, and that is where the Court's trying

12 to make rulings, and the Court doesn't have the benefit of a

13 report, the Government doesn't.  So if we could address that

14 and an understanding of when we could get these reports.

15          THE COURT:  Yeah.

16          MR. CAPOZZI:  I've given the reports to the

17 Government.  I haven't submitted them to the Court.

18          THE COURT:  Okay.

19          MR. CAPOZZI:  I think the last one was Dr. Melnick

20 (phonetic) I haven't.  The others were submitted -- for the

21 probation -- or for bail hearings.  But I need to tie it

22 into -- I need to look at the video that's entitled

23 "something predator" that the Government plans on submitting

24 to the Court on Count 2.  And basically what the experts are

25 going to say is that they interviewed the Defendant, and he

41

1    does not have the characteristics of a predator, a child

2    predator, and that those who are into child pornography have

3    these certain characteristics that does not exist with this

4    Defendant.  That's all they'll say.

5             MR. GAPPA:  Okay.  All right.

6             THE COURT:  All right.  Well, make sure you get

7    the -- let me do this.  In terms of any disclosures of

8    expert reports, I'll go ahead and set a deadline.

9             MR. CAPOZZI:  Okay.

10            THE COURT:  And let's see.  We're on June 26th, so

11   let's say not later than July 24th both sides must submit

12   your respective reports to the other side.  And the sanction

13   if you fail to do that will be that it is very possible that

14   your expert would not be allowed to testify, so keep that in

15   mind.  So any expert reports must be disclosed and provided

16   to the opposing side not later than July 24th.

17            MR. CAPOZZI:  I think those all have been turned

18   over to the Government.

19            MR. GAPPA:  Well, your Honor, what happened then

20   is that we filed our motion to exclude that testimony, and

21   then I think the Court had made some tentative observations

22   about the potential relevance, and then there was a

23   suggestion that they might have to redo the reports, so I

24   think this will be very helpful.

25            MR. CAPOZZI:  Okay.  That's fine.

42

```
1           THE COURT:  Yeah, and there was some concern
2  raised by Defense counsel as to whether or not it would be
3  in the best interests of Defense to call one of the expert
4  witnesses who apparently submitted a report in Angel's case
5  in the Superior Court.  So I wanted -- and I think Mr.
6  Capozzi said he needed to think about this.  So any time --
7  and it could be before July 24th when you folks meet and
8  confer, but if either side -- if either side feels that you
9  need to either renew or bring back to the Court's attention
10 or file a new motion to exclude or limit expert testimony,
11 go ahead and file that and we'll set a briefing schedule and
12 a hearing date for that.
13          MR. CAPOZZI:  You said July 24th?
14          THE COURT:  Yeah, that's the deadline for
15 disclosing any expert report.  And if they've already been
16 disclosed, no problem.  And if there might have been some
17 experts that you don't intend to call, so whatever.  But
18 certainly it's in your best interest obviously to disclose.
19 Just make sure that any reports that you believe have been
20 disclosed to the other side in fact have been disclosed.
21          MR. CAPOZZI:  The other question, Judge, is there
22 was another motion.  I filed a memorandum regarding
23 admissibility of adult pornography.
24          THE COURT:  Uh-huh.  Yes.
25          MR. CAPOZZI:  And I cited the case that the
```

43

1 Government cited and distinguished, and my argument is that

2 the adult pornography in this case should not be brought

3 into evidence to this jury.  Again, it's just to prejudice

4 the Defendant.

5      THE COURT:  Okay.  Now, by adult pornography, are

6 we dealing with those videos of people, like, using the

7 bathroom, or are we talking about other things that were

8 found that arguably relate to Defendant?

9      MR. GAPPA:  I believe the Defense is talking about

10 material where the Defendant has, at times with permission,

11 at other times apparently without permission, recorded

12 himself engaged in sexual activity with one or more other

13 adult women.  I think that's what he's talking about.  And

14 so it's I think an issue where -- part -- I think it's

15 difficult for the Court to make a ruling in advance because,

16 to the extent that the defense becomes, "This is not

17 something that I was involved in or I didn't have any sexual

18 interest in making these recordings," I think that refutes

19 that.  But that was the reason the Government had suggested

20 that we might want to introduce that evidence.  So I could

21 see it potentially becoming more valuable if in rebuttal,

22 depending on what the defense is.

23      THE COURT:  Okay.  Well, let me do this.  As to

24 that description, that is, any videos or stills of Defendant

25 engaged in any kind of sexual activity or conduct with other

1 adults, is not admissible.  However, as the Government

2 counsel's already indicate, it's possible during the course

3 of trial that it may become relevant, at which time the

4 Government can move for reconsideration.  And then at that

5 point in time we'll have more information, obviously, to be

6 drawn on from the trial itself.  But I think that's a

7 cleaner way to do it.  That way you know it's not going to

8 come in unless and until the Government moves for

9 reconsideration.  At that time, we will have received

10 evidence during the course of trial, and I -- we can make a

11 determination on both relevancy and possible 403 grounds.

12          MR. CAPOZZI:  I would submit, your Honor, and the

13 case that I -- I think it's the Rainy (phonetic) case that I

14 cited in my brief, it says that if the Court doesn't review

15 this and allow it in, it's just reversible error.

16          THE COURT:  Right.

17          MR. CAPOZZI:  I would say that the Court should

18 take care of that issue prior to trial rather than waiting

19 to see if it's going to come in.  We know what the videos

20 are.  I'd rather have you look at them now so we can make a

21 determination later -- before the trial, I mean, so it

22 doesn't happen back then.

23          THE COURT:  Okay.  I can, except that I've already

24 ruled that it's not admissible.

25          MR. CAPOZZI:  Okay.  All right.

45

1          THE COURT:  And I understand.  Yeah, the case --
2  and the other cases also indicate that -- and I think even
3  in the Ninth Circuit case, as I said, the <u>Perkins</u> case.

4          MR. CAPOZZI:  <u>Perkins</u> case, yes, that's right.

5          THE COURT:  There was criticism that the Court did
6  not view information and simply relied on the representation
7  by the agent as to what the video showed.  And so bottom
8  line is that it may not come to pass.  There may not be any
9  reason for me to need to review it at all because right now
10 I'm saying it's not admissible.

11         MR. CAPOZZI:  Okay.  The Government is just saying
12 that we want the one -- the videos with the Defendant
13 actively involved with sex with other adults.  We also want
14 to keep out his fiance taking a shower back in 2008.  He did
15 have a video in the bathroom back then with his fiance, and
16 it was all adult videos.  I don't think that should be
17 permitted to come in on this case dealing with the child
18 videotapes and child pornography.  It has nothing to do with
19 it.

20         MR. GAPPA:  Well, your Honor, two things.  One,
21 it's very clear from interviews, some of which were done in
22 the last two weeks, they confirmed what they had already
23 been told two years ago, that the Defendant's significant
24 other at the time did not know that the camera was there and
25 did not give consent.  And there was another adult female

1 where the same thing was confirmed.  So there are at least

2 two women who did not know they were recorded.  But it's not

3 to say that those are necessarily pornographic.  That's not

4 the point.  The point was, and it was briefed, that that

5 shows the identity -- the method of the way he worked that

6 initially cutting the hole literally in the ceiling and

7 hiding the camera up there, and then later refining the

8 placement of the camera to enhance the images that were

9 captured.  So it all goes to how he was creating these

10 images.  When it was -- that he started with that.  And,

11 again, all because not long ago the Defendant was saying, "I

12 didn't do any of this.  It was all Angel."  So it's for the

13 purpose of identity, absence of mistake, his motive,

14 opportunity, et cetera, all of those permissible grounds

15 under 404(b).

16           MR. CAPOZZI:  And, Judge, I can submit to the

17 Court this Defendant will not deny putting a camera in that

18 bathroom in the house in Turlock on Berman Avenue

19 (phonetic).  He will not deny that whatsoever.  My point is

20 the camera back with his fiance, who did know about it, and

21 he both agreed to do that.  What did happen with the fiance

22 is her mother, I think, was videotaped in the shower, and

23 she did not know about that.  But I don't see how that's

24 relevant to this particular incident where the Defendant

25 admits putting the camera in.  He will not admit to the one

47

1  in the bedroom.

2          THE COURT:  Okay.  All right.  Well, let me do the

3  following, based upon that representation, I'll -- to the

4  extent it's a motion in limine to preclude any videos of

5  Defendant and another adult in the shower, I'll grant that

6  motion in limine subject to a motion for reconsideration.

7  But I also understand, though, and it may well require some

8  editing, it might be significant to show when the camera was

9  in place on the Government's time line if on May 3rd, 2008,

10  there was a secret recording.  Now, if that's not the one

11  where they were engaged in some kind of --

12          MR. CAPOZZI:  Judge, in my opening statement, I

13  will tell the jury this Defendant put that camera in there.

14          THE COURT:  Okay.  Yeah.

15          MR. CAPOZZI:  We're not denying that whatsoever.

16          THE COURT:  Yeah.  And the initial placement, but

17  part of that is the refinement, the alleged refinement as

18  he's attempting to make it clear and better and arguably

19  that Angel was also involved in making it clear and better,

20  and, again, this only goes -- not just that he liked to take

21  videos of people using the bathroom, specifically, though,

22  that the Government's got to be able to show that they were

23  specifically going to attempt or at least the agreement was

24  that they would ultimately video the minor.  So the only

25  significance of showing videos before then is to show that

48

1 it was in place at a certain time and place, that there were

2 these alleged refinements made to make the images clearer

3 and better, and that both the Defendant and Angel were

4 involved in that aspect, and that goes to the allegation of

5 the agreement that they were doing this all together.

6          Okay.  Anything else today that we should touch

7 on?

8          MR. GAPPA:  Your Honor, just one last item on the

9 issue of the experts.

10          THE COURT:  Yes.

11          MR. GAPPA:  There was some reference and/or

12 suggestion on the Defense computer forensics experts that he

13 -- Mr. Lawson would only be used on rebuttal.  There is no

14 rebuttal Defense case, so if the idea is we're not going to

15 identify him as an expert, designate him.  He's not going to

16 present a report.  He's going to be here, sit through the

17 trial, and then critique the prosecution evidence, and then

18 get up and testify and explain how they didn't do this or

19 that or the conclusions should be different, we would object

20 to that.  So to the extent he's going to testify, whether

21 they characterize it as rebuttal or in their case, our view

22 is he needs to have been identified and needs to do a report

23 and say what it is he would testify about, because that has

24 not been done.  We have not received a single word from Mr.

25 Lawson.

1           MR. CAPOZZI:  Because we have no idea what the

2   Government witnesses will testify to other than if they

3   stick to their reports.  It's going to be interesting to see

4   how they -- what they testify to.

5           THE COURT:  Okay.  Now, again, the deadline is

6   July 24th.  If the Government believes that there should be

7   a motion or supplemental motion on that and the issue of

8   what, if anything, a possible rebuttal expert might be

9   required to disclose, and that might depend, well, okay, the

10  Government has disclosed these are our experts, these are

11  their reports.  There are no surprises here.  Is there an

12  obligation, then, for the Defense to disclose a potential

13  rebuttal expert, knowing already what the Government experts

14  are going to be testifying to and if the Government has

15  provided a report.  So it's very possible, but that's not in

16  front of me right now.  So then we're dealing strictly with

17  their rebuttal expert and what -- whether and to what extent

18  a defendant must disclose rebuttal experts and expert

19  reports when the Government's experts are known to the

20  defendant.  You might brief that and submit that.

21          MR. CAPOZZI:  Judge, if I can ask -- I have a

22  major trial coming up on July 25th.

23          THE COURT:  Okay.

24          MR. CAPOZZI:  And I need time to prepare.  Can we

25  do these motions in August?

50

1        THE COURT:  Oh, no, that's just a deadline for

2   disclosing.  The motions -- either side can request a date

3   for --

4        MR. CAPOZZI:  I have to sit down with Mr. Lawson

5   and go through this and, again, his company just broke up,

6   and --

7        THE COURT:  Yeah.

8        MR. CAPOZZI:  Can we have -- instead of a deadline

9   for July 24th, can we move it to some time in August?  Give

10  me some time after that trial, maybe a week or so?

11       THE COURT:  What date -- when are you looking at?

12       MR. CAPOZZI:  Second week of August.

13       THE COURT:  Okay.  That's August 14th.  Now, what

14  is significant on that is that, if there's a disclosure on

15  August 14th, that doesn't give us a whole lot of time to set

16  a briefing schedule for any motions that either side might

17  file relating to the experts.  Let me ask --

18       MR. CAPOZZI:  How about August 7th?

19       THE COURT:  That might be helpful, but that would

20  still push us into September.  But I'll do August 7th.

21       MR. CAPOZZI:  All right.

22       THE COURT:  Disclose experts by -- not later than

23  August 7th.  Any experts that is required to be disclosed

24  and is not disclosed and is required to submit a report, has

25  not submitted a report by August 7th, will more than likely

51

 1 be precluded from testifying at the trial itself.

 2            MR. CAPOZZI:  Okay.  Thank you, Judge.

 3            THE COURT:  And then either side, obviously, can

 4 either supplement a motion regarding experts or file a new

 5 motion regarding experts, and we should probably have that

 6 hearing certainly before October the 10th.  Sometime in

 7 September or even October 2nd, probably at the very latest.

 8            All right.  Is there anything else that we should

 9 take up today?

10            Government side, anything you can think of?

11            MR. GAPPA:  No, your Honor, but perhaps we just

12 want to put a hearing date in place on September 11th?  I

13 think the Court's available that day, and that way we can

14 address any issues that have arisen.

15            THE COURT:  You know, I'm not, but I could do it

16 the 18th or the 25th of September.  I'd just specially set

17 it for --

18            MR. GAPPA:  The 18th is fine, your Honor.

19            MR. CAPOZZI:  What date is this?

20            THE COURT:  All right.  We'll, that would be

21 September -- I would just set a motion schedule.

22            MR. CAPOZZI:  Okay.

23            THE COURT:  Well, let me see.  On the 18th?  Oh,

24 okay.  Okay.  Let me ask you this.  Would you folks be

25 available on September 25th, either at 10:00 o'clock or

52

1  1:30?

2          MR. CAPOZZI:  Yes.

3          THE COURT:  I've got a couple of things set on the

4  18th that I'd better keep clear.

5          Which would you prefer, 10:00 or 1:30, either

6  side?

7          MR. CAPOZZI:  Either one is fine.

8          MR. GAPPA:  Your Honor, 1:30 is probably better.

9          THE COURT:  All right.  Okay.  So basically what

10  we'll do, then, is any supplemental motions or new motions

11  in limine can be filed and served by August 28th.  Any

12  opposition or other response can be filed and served by

13  September 11th.  Any reply can be filed and served by

14  September 18th.  And I'll hear any further motions, renewed

15  motions or otherwise, or there might be some continued

16  motions that I just didn't address today, those can be heard

17  on September 25th at 1:30 in the afternoon.

18          Okay.  Anything else today, then, for either side?

19          MR. GAPPA:  No, thank you, your Honor.

20          MR. CAPOZZI:  No, Judge.

21          THE COURT:  Okay.  All right.  Okay.  Thank you

22  very much.

23      (Proceedings concluded.)

24

25

53

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/Crystal Thomas                8/7/2017
     Transcriber, AAERT CERT*654      Date

6

7    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9    /s/L.L. Francisco
     L.L. Francisco, President
10   Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*