UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

UNITED STATES OF AMERICA,    )
                             )
        Plaintiff,           )  No. 13-CR-409-DAD
                             )
vs.                          )  EVIDENTIARY HEARING
                             )
ADAM ALAN HENRY,             )
                             )
        Defendant.           )
_____)

Fresno, California              Tuesday, May 29, 2018


REPORTER'S TRANSCRIPT OF PROCEEDINGS


KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          United States Attorney's Office
                            BY: **DAVID L. GAPPA**
                            and **ROSS PEARSON**
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721


For the Defendant:          Law Offices of Anthony P. Capozzi
                            BY: **ANTHONY P. CAPOZZI**
                            1233 West Shaw Avenue
                            Suite 102
                            Fresno, California 93711

3

INDEX

**GOVERNMENT'S WITNESSES**:

**ARTHUR HIVELY**                                        10
DIRECT EXAMINATION BY MR. GAPPA                          10
CROSS-EXAMINATION BY MR. CAPOZZI                         16

**DEFENDANT'S WITNESSES**:

**MARCUS KENNETH LAWSON**                                31
DIRECT EXAMINATION BY MR. CAPOZZI                        32
CROSS-EXAMINATION BY MR. GAPPA                           36
**WHITNEY LINDER**                                       36
DIRECT EXAMINATION BY MR. CAPOZZI                        37
CROSS-EXAMINATION BY MR. GAPPA                           38

* * * * *

4

1    Tuesday, May 29, 2018                    Fresno, California

2    3:02 p.m.

3            THE CLERK:  The Court calls case 1:13.  CR 00409.

4    United States versus Adam Alan Henry.  Evidentiary hearing.

5            MR. GAPPA:  Good afternoon, Your Honor, David Gappa

6    for the United States.

7            MR. CAPOZZI:  Your Honor, Tony Capozzi appearing with

8    the defendant Adam Henry, who's present in custody.

9            THE COURT:  And the matter is on calendar for

10   evidentiary hearing regarding whether or not trial Exhibit

11   28.13 was made available to the defense in discovery prior to

12   trial.  And does the government intend to put on any evidence?

13           MR. GAPPA:  Your Honor, we filed at the end of last

14   week what should be in the record as docket item number 303.

15   And there is a five-page memorandum that explain the

16   attachments.  There are attachments A, B that are consisting

17   of additional seven pages.

18           In our view, Your Honor, if the Court reads that and

19   understands it and considers those attachments, that

20   establishes -- especially combined with what we had previously

21   put into the record showing when the items were copied and

22   then made available to the defense, it establishes that the

23   material was made available and was identified in advance of

24   the trial.

25           THE COURT:  Well, I didn't know that this document

1   was filed until this morning.  And I've been on the bench all

2   day long.  My brief understanding of it is -- and you can

3   correct me if I'm wrong, that the government -- essentially

4   their position is that Mr. Capozzi is right, that Trial

5   Exhibit 28.13 was not forwarded to the defense labeled as

6   Government Trial Exhibit 28.13 when other photographs were

7   forwarded to the defense, but that the photograph that, in

8   fact, was trial Exhibit 28.13 was in the discovery that was

9   made available to the defense for inspection.  At some point

10  in time was available in Sacramento.  Maybe at some point in

11  time was available for review in Ceres.  But one way or

12  another was always available for review and was present.

13        MR. GAPPA:  Yes.  It was more specifically always

14  available at the Ceres Police Department.  And then beginning

15  on March 27th, 2014, it was made available at the FBI office

16  in Sacramento.  And that was to accommodate the defense and

17  their expert who had an office at that time in Sacramento.

18  And then the second copy of what was provided on March 27th,

19  2014 was provided on approximately April 6th, 2015.  And then

20  beyond that, there were specific references to what became

21  Exhibit 28.13 beginning in March of 2017.

22        THE COURT:  Well, I'm not sure if I follow it all.

23  But if your position is, judge, we've submitted our evidence,

24  it's attached to our memo and we'll stand by it.  Then I'll

25  take it under submission and rule on it when I rule on the

6

1   motion for a new trial in total.  But are you satisfied that

2   if I read this and study the exhibits, that I'll understand

3   your position?

4           MR. GAPPA:  Yes.

5           THE COURT:  The last question I'll ask you is if

6   you're resting on the position that, okay, it wasn't in that

7   one packet that went to them with actual photographs, the one

8   that Mr. Capozzi has handed up before.  But it was always at

9   FBI in the evidence available for review, does -- do the

10  exhibits that you've attached establish -- not just that there

11  were documents there, but that this document was there?

12          MR. GAPPA:  Yes.  And I guess just in an abundance of

13  caution, Your Honor, I will also add -- and if there's a

14  challenge to it, we can address it.  But we put this on the

15  record at the last hearing.  That Mr. Lawson, who's here

16  today, had been retained by the defense, initially by Mr.

17  Harralson, but then the agreement was that he continue to work

18  even though Mr. Capozzi substituted in.  He is the expert who

19  had requested the accommodation that the items be sent to

20  Sacramento.

21          He then, after this issue arose, after the trial,

22  went to the Ceres Police Department, confirmed with Detective

23  Hively that, in fact, what became Exhibit 28.13 had all along

24  been available to the defense in Sacramento.  And he was in

25  the Ceres Police Department, saw the image and confirmed that

7

1   it had been available.  So that's a confirmation from the

2   defense side as well.

3          And like I said, if there's a dispute on that, we can

4   address that.  But other than that, we believe that the record

5   shows that, as the Court noted, the image was identified in

6   advance.  But at all times it was available first in Ceres,

7   second in Sacramento.

8          And let's keep in mind, too, a couple of things that

9   the image in question is a still image.  It's a still image

10  that the defendant created.  He created it from an exhibit

11  27.7, I believe, is what it was in the trial.  But it was a

12  video that had been surreptitiously recorded of the victim.

13  And that victim was the only person whose images that were

14  created in the defendant's bathroom was identified with her

15  name on a folder.  And then further, the defendant had

16  sub-divided the content of that victim's content by age.  So

17  there was reference to "14" and then "15."  And further within

18  those folders, there was a separate subdivision between still

19  and video images.

20         And this was in the folder or folders that had the

21  still images.  So not in there were other images.  So in other

22  words, this is not something where there were intermixed

23  images of this victim with other victims.  It was clearly in

24  to a folder with that victim's name.  And it was segregated by

25  the type of file, a still image, versus a video.  And it was

1   the defendant who created it and labeled it.

2           So it was the defendant who knew all along what that

3   folder contained.  And the government was at some disadvantage

4   by not knowing for sure whether any of those images were of

5   the victim.  Initially detective Hively apparently didn't

6   identify that and that's why, in the very beginning in the

7   detention hearing, for instance, there were reference to ten

8   images.  But certainly by March of 2017, what became 28.13 was

9   identified in a forensic report.  And that was turned over to

10  the defense.

11          THE COURT:  Well, much of that argument goes to

12  issues that I could care less about.  Certainly the notion

13  that, well, the defendant made the recording so he was aware

14  of it.  That carries no weight with me whatsoever.

15          The question -- the only question I have is did the

16  government make this image available in discovery?  I would

17  have thought that when the photos were produced, since the

18  government was in large part going to base its argument at

19  trial on 28.13, that they wouldn't have stopped at 28.12 when

20  they sent over the still shot photos.  But it now appears to

21  be undisputed that that's what the government did.

22          MR. GAPPA:  Well, just --

23          THE COURT:  I would characterize that as sloppy.

24          MR. GAPPA:  I disagree.  We didn't stop at 28.12.

25          THE COURT:  You stopped earlier?

1          MR. GAPPA:  No, but what we did is progress --

2          THE COURT:  But you're interrupting me.  I view that

3   way of producing discovery to be sloppy.  Now the only

4   question I have is was it available?  Because if it was

5   available, if it was there, whether they specifically sent you

6   a set of photos and say, "here's the photos that we're going

7   to rely upon" and it didn't include that, but that still shot

8   was available at FBI offices or any other repository where

9   discovery was being kept, that's sufficient.  All I need to

10  know is can you establish it.  You tell me, judge, the brief

11  we just filed establishes it.  If you're right, then you got

12  nothing to worry about.  If you're wrong, then you do.

13         MR. GAPPA:  Your view is that it establishes it.

14  Just to be extra sure, we have Detective Hively who can

15  confirm that what is in the report as untitled 11 is 28.13.  I

16  believe it's adequately covered in the report, but I don't

17  want the Court to, at some point when it has a --

18         THE COURT:  Hey, it's set for evidentiary hearing,

19  Mr. Gappa.  You heard what I think about it.  I don't like the

20  fact that all the stills were sent as stills, but apparently

21  the one that was the one that was going to be the focus, it

22  looks like where we left this at the last hearing, that one

23  wasn't included.

24         MR. GAPPA:  That is -- I'm sorry if that's the

25  perception.  That is not what happened.

1          THE COURT:  I think that's exactly what they say

2     happened.  And you haven't put on -- you keep not putting on

3     anything.

4          MR. GAPPA:  I'll call Detective Hively.

5          THE COURT:  You do what you want to do.  It's set for

6     evidentiary hearing.  Last chance.

7                         **ARTHUR HIVELY**,

8     called as a witness on behalf of the Government, having been

9     first duly sworn, testified as follows:

10         THE CLERK:  Please have a seat.  State your full name

11    for the record and spell it.

12         THE WITNESS:  My name is Arthur Hively, H-I-V-E-L-Y.

13         THE COURT:  You may proceed.

14         MR. GAPPA:  Thank you, Your Honor.

15                    DIRECT EXAMINATION

16    BY MR. GAPPA:

17    Q.  Detective Hively, you testified in the trial of this case;

18    is that right?

19    A.  I did.

20    Q.  And is there anything about your background, your

21    experience that's changed since the last time you testified?

22    A.  No, sir.

23    Q.  So in the trial, there was reference to what was marked

24    and received as a Trial Exhibit 28.13.  You're familiar with

25    that image?

1   A.   Yes.

2   Q.   And that was an image of a victim in the case; is that

3   right?

4   A.   Yes.

5   Q.   And did you recover that image on any of the devices that

6   the Ceres Police Department seized when it executed a search

7   warrant in the investigation of the case?

8   A.   Yes.

9   Q.   And do you recall where it was that image was located?

10  A.   Exhibit 9, the Netgear ReadyNAS.

11  Q.   And do you recall specifically further where, within that

12  device, the particular image was located?

13  A.   There were two shares on that device.  One was the media

14  share, which did not have a password to it.  One of the images

15  was on that side.  On the protected share, there were two

16  separate locations where that image resided.

17  Q.   Okay.  And then within the material, was there reference

18  to a set of folders.  And Your Honor, may I approach?

19        THE COURT:  You may.

20  BY MR. GAPPA:

21  Q.   And Detective Hively, I'm going to show you what is in the

22  record as document item 303-1.

23        MR. CAPOZZI:  Can we use the Elmo?  Would that help?

24  That would help me.

25  BY MR. GAPPA:

1  Q.  Detective Hively, do you see a document on your screen?

2  A.  I do.

3  Q.  And what is it we're looking at here?

4  A.  This is the directory tree on the left-hand side for the

5  unsecured media share for the Exhibit 9, the Netgear ReadyNAS.

6  Q.  And it's a little bit difficult with this version of the

7  document to see, but do you see your initials and the date?

8  A.  That would be my supervisor's.  My name is there and my

9  badge number is there.

10  Q.  Okay.  And what was the date of the document, if you know?

11  A.  Signed by my supervisor on March 21st, 2017.

12  Q.  Okay.  Is that about the same time that you would have

13  prepared this report?

14  A.  Yes, sir.

15  Q.  And what is in this report?

16  A.  Well, on this particular page, as I indicated, we have a

17  directory tree on the left-hand side.  On the right-hand side,

18  we have the contents of that particular folder.  And that

19  folder labeled "pics" is exactly the same in two separate

20  locations on this secured side.

21  Q.  So let me go next to page 20 of 33 of that report.  And

22  that's the next page, which in the Court record is page 9 of

23  12 on document 303-1.  Do you recognize that page?

24  A.  Yes.

25  Q.  What do we see on this page?

1   A.   It's essentially the same contents.  The only difference

2   is the last written date has been sorted.

3   Q.   Okay.  So can you explain what item 7 refers to?

4   A.   Yes.  Untitled 11 is the image of the victim which was

5   taken from the video file of her taking a shower in the home

6   on Burman Drive in Turlock, California.

7   Q.   Was that particular video one of the videos that was

8   played in the trial?

9   A.   Yes, sir.

10  Q.   And was given Exhibit number 27.7?

11  A.   Yes.

12  Q.   Okay.  So what else is in this folder, in particular

13  terms?  Were there still images or video images?

14  A.   There were 13 digital pictures in that folder.  No videos.

15  Q.   And when we talk about a folder, just so we're clear, can

16  you give us some information about what folder, where it was

17  located?

18  A.   Certainly.  It was in the folder called pics, capital

19  P-I-C-S.  Underneath the victim's name, which was a parent

20  folder.  The parent folder to that was spelled capital M-I-S-C

21  space capital P-E-O-P-L-E.  Not sure how far up you want me to

22  go.

23  Q.   Okay.  But in general, you're talking about items of

24  evidence that were on the Netgear ReadyNAS?

25  A.   Yes, sir.

1   Q.   And did you or a colleague make the forensic copy of that

2   Netgear ReadyNAS that was in the Ceres Police Department

3   evidence room and then provide that to the defense in this

4   case?

5   A.   Yes.

6   Q.   And that was made available beginning in 2014?

7   A.   Yes, sir.  I believe we actually provided it more than

8   once.

9   Q.   Okay.  And was this particular entry that you've testified

10  about, number 7, on the copy of -- well, first, at the Ceres

11  Police Department?

12  A.   I don't understand the question.

13  Q.   I think it's obvious.  But just so we're clear.  This

14  entry is for an image.  Correct?  Entry 7.

15  A.   Untitled 11 is a digital picture on a forensic image, yes.

16  Q.   It was also on the original item, the Netgear ReadyNAS?

17  A.   Yes, sir.

18  Q.   And that Netgear ReadyNAS was at the Ceres Police

19  Department?

20  A.   Yes, sir.

21  Q.   And was this particular item, entry number 7, that digital

22  image, copied on to the forensic copy made available through

23  the FBI in Sacramento?

24  A.   The forensic image that this represents was copied on to a

25  separate drive and provided to the FBI in order that it could

1   be transported to Sacramento so it could be examined.

2   Q.  Correct.  And the forensic image was an exact copy of the

3   entire device and its contents; correct?

4   A.  Yes.

5   Q.  So it included entry number 7, that particular image.

6   A.  Absolutely.

7   Q.  Okay.  And both times when you made the copy or the

8   colleague made the copy and sent it to the FBI in Sacramento,

9   what became 28.13 was on that copy that went to the FBI?

10  A.  Yes.

11  Q.  After the trial, were you contacted by Mr. Lawson, Mark

12  Lawson?

13  A.  Yes.

14  Q.  And what was it -- in general, what was the nature of the

15  contact that you received?

16  A.  I received an email.  He asked that he be allowed to come

17  to the Ceres Police Department so he could view the forensic

18  image at my office that contained those images, which would

19  have been untitled 11.

20  Q.  And did you sit down and go over the evidence with him?

21  A.  We did.  On April 24th this year.

22  Q.  Of 2018?

23  A.  Yes.

24  Q.  And did he confirm that that image, which you testified

25  about, which is entry number 7, was available at the FBI?

16

1          MR. CAPOZZI:  Objection.  Leading.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes.

4          MR. GAPPA:  I don't have any other questions, Your

5     Honor.

6          THE COURT:  Any cross-examination?

7          MR. CAPOZZI:  Yes, Your Honor.

8                    CROSS-EXAMINATION

9     BY MR. CAPOZZI:

10    Q.   Detective Hively, you testified before the grand jury in

11    this case; did you not?

12    A.   I believe I did, yes, sir.

13    Q.   And you provided an Exhibit 1 to the grand jury; did you

14    not?

15    A.   I don't remember, sir.  I'm sure there was an exhibit.

16    Q.   Have you reviewed your grand jury testimony?

17    A.   No, sir.

18    Q.   Pardon me?

19    A.   No.

20    Q.   Okay.  Let me ask you if this would refresh your memory.

21    Do you remember being asked how many pictures there were,

22    snapshots of the victim in this case?

23    A.   I do not remember.  But I wouldn't be surprised if that

24    was a question.

25    Q.   Okay.  And what was your answer to that question if that

1  was asked to you?

2  A.  I don't remember it being asked, so I'm not sure what the

3  answer was.  I'm sure the transcripts are accurate.

4  Q.  Okay.  Your Honor, if I could approach the -- or does the

5  Court have my memo?

6          THE COURT:  Yeah.

7          MR. CAPOZZI:  Document 299?

8          THE COURT:  I do.

9          MR. CAPOZZI:  Okay.  It's on page 2, line 14 for the

10  government.  It's the grand jury testimony of Detective

11  Hively.  And let me go to that section.  Page 27.  If I could

12  approach, Your Honor?

13          THE COURT:  You may.  Can I cut this short, though?

14          MR. CAPOZZI:  Yeah.  Please.

15          THE COURT:  I think what I'm likely to hear is that

16  he said there was 12.

17          MR. CAPOZZI:  That's right.

18          THE COURT:  And then the government's going to tell

19  me, yeah, but the grand jury appearance in the indictment, all

20  that was at a fairly early stage in the proceedings.

21          MR. CAPOZZI:  Right.

22          THE COURT:  At a point where we had not yet

23  determined, for the reasons that were talked about at trial

24  actually, who that was an image of.  It was later determined

25  that that was an image of the same girl featured earlier.  But

1    none of that has anything to do with whether or not it was

2    made available in discovery.

3              MR. CAPOZZI:  All right.  Let me go a little further.

4    Q.  How many videos were in this case that you discovered on

5    those computers at his office and at home?

6    A.  I have no idea.

7    Q.  Well, give me a guess.  More than 1,000?

8    A.  Are you referring to just the victim or are we talking

9    about total?

10   Q.  Total.

11   A.  Certainly in excess of 1,000.

12   Q.  And indeed it was in excess of 10,000; was it not?

13   A.  It's very possible.  I believe that was the figure you

14   used at trial.

15   Q.  Right.  And you agreed with that, did you not?

16   A.  I don't remember.

17   Q.  Okay.  Anyway, when did you discover Exhibit 28.13?

18   A.  Referring to the digital picture untitled 11?

19   Q.  I'm going to put 28.13 on.  Exhibit 28.13 on.  Exhibit

20   28.13.  When did you discover that photo?

21   A.  That had to be at the initial part of my investigation,

22   when I was examining the contents of the Netgear ReadyNAS.

23   Q.  Okay.  Why didn't you present that to the -- why did that

24   snapshot be given to the defense?

25   A.  I don't understand what you mean by "given to the

1  defense."

2  Q.  When was it turned over to the defense?  That 28.13.

3  A.  I'm not sure I understand the question.  Because the

4  forensic images were provided to the defense.  So I'm not sure

5  if you're talking about something in addition to that.

6  Q.  Detective Hively.

7  A.  Yes, sir.

8  Q.  The request was made for snapshots taken from the

9  videotapes.  And they were turned over to the defense.  Were

10 they not?

11 A.  I don't remember.

12 Q.  You don't remember?

13 A.  It's possible.

14 Q.  Did you turn them over to the U.S. Attorney?

15 A.  That was a long time ago.  It's very possible that I was

16 asked for contents of the Netgear ReadyNAS that related to the

17 victim.  And if that's the case, then I turned over everything

18 I had that I had determined at that time was related to her.

19 Q.  And it was ten snapshots in a bedroom.  Correct?

20 A.  I don't remember.

21 Q.  Okay.  Two snapshots in the bathroom.

22 A.  There were a total of 12 that I had identified early on as

23 being the victim.

24 Q.  Early on.

25 A.  Yes, sir.

1   Q.   Now, when you were preparing for trial, isn't that when

2   you discovered 28.13?

3   A.   Absolutely.

4   Q.   Okay.  And when was that?

5   A.   About two or three weeks before trial in preparation for

6   trial, I watched the entire video in which she had been

7   recorded taking a shower.  Towards the end of that video is

8   when she flipped her hair back and I saw that that was, in

9   fact, the image that had been located in the pics folder and I

10  could see then that it was, in fact, the victim.

11  Q.   And you determined that just before trial?

12  A.   Two to three weeks before trial.

13  Q.   Did you then take that snapshot and give it to the U.S.

14  Attorney?

15  A.   I certainly communicated with him about it, but I'm not

16  sure how we did that.

17  Q.   Did you send it to the defense?

18  A.   I don't send anything to the defense.

19  Q.   Okay.  But did you send it to the U.S. Attorney?

20  A.   Again, I'm not sure how we communicated, whether it was

21  email or phone call.  But I communicated with him that I had

22  identified that image --

23  Q.   You --

24  A.   -- for --

25          THE COURT:  Let him finish.

1          MR. CAPOZZI:  I'm sorry.

2    Q.  Have you finished?

3    A.  I was just going to say that I notified him that that

4    image that had been in the pics folder that had previously

5    been unidentified, I then identified as her.  I did that two

6    or three weeks before trial.

7    Q.  Then did you then send that snapshot over to the U.S.

8    Attorney?

9    A.  I don't think I sent it separately because he had it in

10   one form or another.

11   Q.  You had it?

12   A.  Yes.  I'm not sure when or how I sent it to him after that

13   identification.

14   Q.  All right.  But prior to that time, the only reference to

15   this was in those trees that were sent to the defense.  Do you

16   understand what I'm saying?

17   A.  Yes.  I had initially not identified her as being this

18   particular person in this video.  So when I was writing my

19   reports, I did not identify this as her because I didn't know

20   it was her.

21   Q.  Okay.  Now, the videotapes and these snapshots that you

22   have for discovery, they're at the Ceres Police Department?

23   All the discovery in this case.

24   A.  Yes.

25   Q.  And then you also sent it up to the FBI so Mr. Lawson

22

1   could review it.

2   A.   Certainly.

3   Q.   And did you ever sit down with Mr. Lawson in Sacramento

4   and go through these?

5   A.   I did not.

6   Q.   So the only time you sat down with Mr. Lawson would have

7   been in Ceres after the trial?

8   A.   April 24th of this year, yes, sir.

9   Q.   Okay.  And is that the first time that -- in your

10  conversation with Mr. Lawson, did you understand that to be

11  the first time you saw that picture?

12  A.   Could you ask the question again, please?

13  Q.   When you met with him in April of this year to go over the

14  evidence and it was specifically regarding 28.13, wasn't it

15  apparent that was the first time he had seen this snapshot?

16  A.   I'm not sure.  I could certainly tell you what he told me.

17  Q.   What did he tell you?

18  A.   He indicated that it was there, it was obviously there,

19  that it didn't look like her and that may have been the reason

20  he didn't bookmark it when he conducted his analysis in

21  Sacramento.

22  Q.   And when you saw it the first time, you didn't bookmark it

23  either; did you?

24  A.   That's correct.

25  Q.   All right.  You discovered it just before trial.

1    A.   That's correct.

2    Q.   And then you told the U.S. Attorney about it.

3    A.   Yes.

4    Q.   Do you know when the exhibit binder was given to the

5    defense in this case?

6    A.   I do not.

7    Q.   But prior to that time, that snapshot, 28.13, had never

8    been turned over to the U.S. Attorney; had it?

9    A.   As a collection of images, you mean, in that regard?

10   Q.   As an exhibit.  Given to the defense.

11   A.   Again, I'm not sure about the defense.  You asked me if I

12   had provided that to the government.  And I'm sure at one

13   point or another I provided those images to them.  But it

14   wasn't identified as being her until prior to the trial.

15   Q.   And that was just prior to trial.

16   A.   Yes, sir.

17   Q.   In all of your police reports that you did, and I've

18   attached it to my motion, you said there were 10 snapshots

19   from the bedroom and two snapshots from the bathroom.  Isn't

20   that correct?

21   A.   Probably.  I mean, that's what my -- the state of my mind

22   was.  That's probably what they say.

23   Q.   Where did you ever say there were 13 snapshots from the

24   bedroom and the bathroom?  Total.

25   A.   Probably never.

1    Q.   Never.  And in the grand jury -- we're beyond that.

2         THE COURT:  It doesn't make any difference.

3         MR. CAPOZZI:  We're beyond that.

4    Q.   And you prepared two reports, did you not?  33 page

5    reports.  Do you recall that?

6    A.   In general, yes.

7    Q.   I've had -- there's a March 27th -- marked as Exhibit A if

8    the Court has it up there.  It's a March 27, 2017 report.

9         THE CLERK:  You gave me C, counsel.  I haven't

10   seen --

11        MR. CAPOZZI:  Oh, I just said C for court.  I'm

12   sorry.  Is it marked as --

13        THE COURT:  What are you talking about?

14        THE CLERK:  Is this A or C?

15        MR. CAPOZZI:  C is fine.

16        THE CLERK:  We can make it A.

17        MR. CAPOZZI:  I put "C" on there for court is what I

18   meant.

19        THE CLERK:  It's now A.

20   BY MR. CAPOZZI:

21   Q.   On March 27th, you did a 33-page memo.  Do you recall?

22   Well, that's the cover letter.  Do you recall doing the 33

23   page --

24   A.   I remember doing a number of long reports.  This does look

25   like one of mine.

1    Q.   Okay.  And in that report, we go to page 3.  You were

2    asked by the U.S. Attorney to locate all of the video files,

3    even if redundant, of the victim confidential one.  Right?

4    A.   Yes, sir.

5    Q.   The following spreadsheet is a result of that effort.

6    Okay?

7    A.   Yes, sir.

8    Q.   So we're on page 3.  Let's go to page 4.  Is that the

9    results of everything that you found with [A.T.]?

10   A.   Up and through that time, yes, sir.

11   Q.   And this is March 27, 2017.  And when we go down to where

12   I've yellowed it, it says, "[A.T.] pictures."  What does that

13   tell us there?

14   A.   That up through that date, untitled 11 hadn't been

15   identified as being the victim.

16   Q.   So you're telling us on this, in March 2017, everything

17   with regard to [A.T.] is on this page.  Is that correct?

18   A.   I'm sorry.  Could you ask me that again?

19   Q.   Well, let's go back to page 3.  What are you saying you're

20   going to do?

21   A.   Review the video files and identify those of the victim.

22   Q.   And you did.  Correct?  And then on the next page you put

23   down what you found to be [A.T.]; correct?

24   A.   I think we've covered this, but yes, I'll say it again.

25   Up until that particular date, those were the images that I

1    identified as the victim, yes, sir.  Since that date is --

2         THE COURT:  I think I understand what happened.  I

3    mean, Detective Hively's testimony for the first time has

4    enlightened me as to what happened.  I've got questions.  But

5    they're not for Mr. Hively.

6         MR. CAPOZZI:  Okay.

7    Q.  Then go to page 17 of this report.  The following two

8    screen shots shows the location of some of the confidential

9    victim number 1's videos.  The [A.T.] folders on the two

10   shares have identical content.  And then you have this tree.

11   Now, the pages after this are just going to tell us the

12   location of where these videos are?

13   A.  I don't know.  I'd have to see the pages, sir.

14   Q.  Okay.  But you said "location" at the top.

15   A.  Yes.  And I'm referring to the videos in this paragraph,

16   yes, sir.

17   Q.  Let's go to page 18.  Again, there's two videos from the

18   bathroom.  Isn't that correct?  Untitled 1 through 10.

19   A.  We're not talking about videos, we're talking about

20   digital pictures.

21   Q.  I'm sorry.  You're absolutely right.

22   A.  Yes, sir.  Same date on that report so nothing has

23   changed.

24   Q.  Go to page 19.  That's what the government just showed

25   you.  Did they not?

1    A.  Yes, this is a screenshot I prepared.

2    Q.  And these are the location of [A.T.] pictures.

3    A.  Yes, sir.

4    Q.  And 11 is in there?

5    A.  It is.

6    Q.  Go to the next page.  11 is in there.

7    A.  Yes, sir.

8    Q.  But everything prior to that, it's not listed; is it?

9    A.  It is not identified as being the victim, correct.

10              THE COURT:  We certainly covered this by now.

11              MR. CAPOZZI:  Okay.

12              THE COURT:  The jury trial started November 7th of

13   2017.  And you, Detective Hively, think it was a couple, two,

14   three weeks beforehand.  Do you happen to know when it was you

15   came to the realization that, hey, wait a second, now that

16   I've viewed that video again, that particular frame I know

17   where I've seen that before, that's one of the stills that's

18   located elsewhere in the computer.  That's basically what

19   happened; right?

20              THE WITNESS:  Yes, sir.  Probably around mid October.

21              THE COURT:  About mid October.  And your recollection

22   is that you advised the prosecutors at that point.  Hey, I

23   just realized something for the first time.  That image that's

24   a -- you're the expert, I'm not.

25              THE WITNESS:  Frontal nudity.

1          THE COURT:  A digital image.  A still.  That we

2    didn't know who it was, I just saw that same image and looking

3    at the video, it is our victim.  You passed that information

4    along right about the time you discovered it?

5          THE WITNESS:  Yes.  Give or take.

6          THE COURT:  Okay.  But by that time, you didn't issue

7    any more reports; right?  Or do you think you issued a report

8    that reflected that discovery on your part?

9          THE WITNESS:  No, sir.

10          THE COURT:  Okay.

11          MR. CAPOZZI:  The answer is he didn't do a report?

12          THE COURT:  Did not.  So I think I understand what

13    happened.

14          MR. CAPOZZI:  I think I do too.  But we never got it.

15          THE COURT:  That's not true.

16          MR. CAPOZZI:  Yes, it is.

17          THE COURT:  No, it's not.

18          MR. CAPOZZI:  Okay.  Let's talk about it.

19          THE COURT:  It is not true.  You didn't get it.  You

20    always had access to it.

21          MR. CAPOZZI:  Judge, 10,000 videos.  That's --

22          THE COURT:  You always had access to it.

23          MR. CAPOZZI:  That's trial by ambush, judge.

24          THE COURT:  You always had access to it.

25          MR. CAPOZZI:  Trial by ambush.

1          THE COURT:  Don't --

2          MR. CAPOZZI:  It is.

3          THE COURT:  I understand.  I don't -- hey --

4          MR. CAPOZZI:  I'm upset about it.

5          THE COURT:  Cool down and let me find out what the

6   hell happened.

7          MR. CAPOZZI:  All right.  All right.

8          THE COURT:  But I don't think I've got -- unless you

9   have more questions for Detective Hively.

10         MR. CAPOZZI:  No.

11         THE COURT:  I think he's answered everything that he

12  can answer.

13         MR. CAPOZZI:  I think so too.

14         THE COURT:  Thank you, sir.

15         THE WITNESS:  I'm extremely --

16         THE COURT:  Unless there was redirect.

17         MR. GAPPA:  I think the Court understands the

18  chronology.

19         THE COURT:  Okay.  So the biggest question for me,

20  Mr. Gappa, two questions.  One, I'm assuming when Detective

21  Hively says "the prosecutor," he's talking about you.  What

22  did you do when he contacted you in mid October and said,

23  "Hey, I just realized something?  That still is of our

24  victim."

25         First question is did you advise the defense, either

1 formally or informally?  And two, if you did not, when did you

2 make the exhibit binder available to the defense that had

3 28.13 trial exhibit in it?

4        MR. GAPPA:  I don't know the answer to the first

5 question.  I think, but I can try to get a closer

6 approximation.  But I believe the exhibit binders were

7 produced on November 3rd.  But I'd have to look before I felt

8 confident in saying that.

9        MR. CAPOZZI:  When was the trial?

10        THE COURT:  November 7th.

11        MR. CAPOZZI:  It was on a Friday, that's all I know.

12        THE COURT:  All right.  Well, I think I understand

13 what happened.  And the only -- it's a legal issue of whether

14 that's sufficient or not.  Whether that's truly making

15 discovery available.  I got to tell you what I think should

16 have happened.  Especially once it was realized that, hey,

17 we're going to use that exhibit.  The defense should have been

18 immediately apprised.

19        But is it unlawful?  Is it a violation of Rule 16 if

20 they weren't?  I'll have to do some more research to try to

21 figure that out.  But that's what I think should have

22 happened.  That if you were going to use it, you should have

23 told them as soon as you knew.  Under the circumstances where

24 you've got voluminous documents and you've got all these

25 reports that have been produced out there that refer to 12

1  photos.  This then -- now I'm not saying you thought it

2  through and said to yourself, "Oh, wait a second, now there's

3  going to be 13.  I've got all these reports I've produced

4  telling them there's going to be 12.  I better clarify that."

5         I'm not saying that I believe that you thought that

6  through.  I know what final trial preparation is like, the

7  last two or three weeks.  Everybody's discovering all sorts of

8  things for the first time.  Because now they're very, very

9  focused on getting ready for trial.  But in hindsight, yeah,

10 you know, I think it would have -- that would have been best.

11        But on the other hand, Mr. Capozzi, yeah, there's a

12 lot of material.  But case was pending for four years when it

13 went to trial.  Four years.

14        MR. CAPOZZI:  Because we kept asking for more

15 discovery.

16        THE COURT:  Four years.  Yeah.  And it was always

17 there.  That image was there from -- I'm absolutely convinced

18 of that, that that image -- nobody knew who it was, but that

19 image was there from 2014 at the latest on.

20        MR. CAPOZZI:  We don't deny that, judge.  Let me call

21 Mr. Lawson, please.

22                  **MARCUS KENNETH LAWSON,**

23 called as a witness on behalf of the Defendant, having been

24 first duly sworn, testified as follows:

25        THE CLERK:  Please have a seat.  State your full name

1   for the record and spell it.

2          THE WITNESS:  Marcus Kenneth Lawson, it's M-A-R-C-U-S

3   L-A-W-S-O-N.

4                       DIRECT EXAMINATION

5   BY MR. CAPOZZI:

6   Q.  Mr. Lawson, you testified in this case, did you not?  No,

7   you didn't.

8   A.  No.

9   Q.  You were the expert hired by the defense in this case?

10  A.  Correct.

11  Q.  In these types of child pornography cases, are there

12  special conditions upon which you can view the evidence?

13  A.  In federal cases, yes.

14  Q.  Yes.

15         THE COURT:  I'm very, very, very familiar with all

16  the hoops one has to jump through in order to get access to

17  the evidence.

18         MR. CAPOZZI:  I just want to get this on the record

19  for appeal, judge.

20         THE COURT:  All right.  Well, I think the Court of

21  Appeal judges will be very familiar, but go ahead.

22  BY MR. CAPOZZI:

23  Q.  When you looked at the evidence in this case, you looked

24  at it in Sacramento?

25  A.  Correct.

1  Q.  How many videos were there in this case?  As best you can

2  recall.

3  A.  Detective Hively agreed with you and I would too that I

4  don't know the exact number, but probably around 10,000 all

5  together.

6  Q.  And it was -- there were child porn videos?

7  A.  There were child porn videos as well as numerous voyeur

8  videos.

9  Q.  And adult videos?

10 A.  Correct.

11 Q.  When you go through the evidence, are you doing it by

12 yourself at the FBI office or is Mr. Hively with you?

13 A.  Myself.

14 Q.  Can you then locate a picture and make a copy of that

15 picture and take it with you?

16 A.  I cannot.

17 Q.  What are the parameters?

18 A.  I cannot.  I never have done that.

19 Q.  What do you do when you see discovery that you would like

20 us to have?  Or look at?

21 A.  I can take screenshots.  I should say I -- I can't anymore

22 because, as you know, I've sold my company and I'm no longer

23 in the forensics business.  But when I was doing it, I would

24 take a screenshot of file information for a given image or

25 movie and I could produce that.  That I could take with me.

1  Q.  Well, would you have been able to take a screenshot of

2  that 28.13 and take it with you?

3  A.  I could have.

4  Q.  Could you have -- was that considered child pornography?

5  A.  When I looked at that image and recognized it during

6  trial, at your table.

7  Q.  Right.

8  A.  And my thought at the time was I probably did not think

9  that it was either the victim [A.T.] or child pornography.

10  Q.  All right.  When you met with Mr. -- or Detective Hively

11  in Ceres to go over the evidence, did he indicate to you when

12  that was discovered?

13  A.  Our conversation was along the same lines as what he just

14  repeated on the stand, which is that he also had not

15  recognized it to be [A.T.] until just before trial.

16  Q.  Did he indicate what he did with that picture then?

17  A.  Not to me, no.

18  Q.  Prior to trial in this case, how many snapshots did we

19  have in our discovery?

20  A.  There were 12.

21  Q.  12.

22          THE COURT:  And -- but that's a misnomer.  "In our

23  discovery."

24          MR. CAPOZZI:  I'm sorry.  Good point.

25          THE COURT:  The discovery is everything that is

1    being made available.

2             THE WITNESS:  You're correct.

3             MR. CAPOZZI:  Let me be more specific.

4    Q.  How many snapshots were we given of the victim in this

5    case for trial?  Prior to trial.

6    A.  I looked at the same notebook, the same trial notebook

7    that you have and there were 12.  As I recall.

8    Q.  And were you given any hard drives with discovery on it?

9    A.  Yes, I was.  Actually quite a few.

10   Q.  And you looked at those hard drives?

11   A.  Correct.

12   Q.  On any of those hard drives, did you ever see the picture

13   of 28.13?

14   A.  I probably did.  I just didn't recognize it as a piece of

15   child pornography or of the victim [A.T.]

16   Q.  Do you recall seeing that?

17   A.  I don't.

18   Q.  You don't.  All right.  Other than seeing it in

19   Sacramento, do you know whether or not that was ever put on

20   any of your hard drives for you to review?

21   A.  Well, the forensic images that I received from Ceres

22   Police Department would have been forensic images of the

23   originals.  And the same copies that the detectives were

24   looking at.  So my assumption is that if it was --

25   Q.  You assume --

1   A.  -- it would have been there.

2           MR. CAPOZZI:  Okay.  No more questions.

3           THE COURT:  Any cross?

4           MR. GAPPA:  Just briefly if I could, Your Honor.

5           THE COURT:  Sure.

6                        CROSS-EXAMINATION

7   BY MR. GAPPA:

8   Q.  Mr. Lawson, you've interacted with Detective Hively in

9   connection with this case previously.

10  A.  Yes, sir.

11  Q.  And you were able to communicate with him either directly

12  or through your assistant at the time, Ms. Isaac?

13  A.  Correct.

14  Q.  And were you ever not given information in response to any

15  of your requests for clarification or assistance?

16  A.  No.  Detective Hively was always very helpful.

17          MR. GAPPA:  Okay.  That's all I had, Your Honor.

18          THE COURT:  Any redirect?

19          MR. CAPOZZI:  No.  I agree with all that.  No more.

20          THE COURT:  All right.  Thank you, sir.

21          MR. CAPOZZI:  I'd like to call my paralegal for one

22  more -- one instance.  Whitney Linder.

23                        **WHITNEY LINDER**,

24  called as a witness on behalf of the Defendant, having been

25  first duly sworn, testified as follows:

Linder - D

37

1          THE CLERK:  Please have a seat.  State your full name
2    for the record and spell it.
3          THE WITNESS:  It's Whitney Linder, L-I-N-D-E-R.
4                         DIRECT EXAMINATION
5    BY MR. CAPOZZI:
6    Q.  And Ms. Linder, you work for my law office; is that
7    correct?
8    A.  Yes.
9    Q.  And are you a certified paralegal?
10   A.  Yes, I am.
11   Q.  You're familiar with the Adam Henry case?
12   A.  Yes.
13   Q.  And are you familiar with the discovery in this case?
14   A.  Yes.
15   Q.  That was provided to our office.
16   A.  Correct.
17   Q.  How many disks were there or hard drives, I should say?
18   A.  There were two hard drives, one originally that stopped
19   working.  And then a second one that we provided.
20   Q.  We provided to the U.S. Attorney?
21   A.  Yes.
22   Q.  All right.  And was that then returned to us?
23   A.  Yes, it was.
24   Q.  And did you review all of the evidence on that hard drive?
25   A.  Yes, I did.

Linder - X

38

1    Q.  Everything?

2    A.  Yes.

3    Q.  Did you ever see 28.13, that photo that was put into

4    evidence at trial?

5    A.  No.

6    Q.  Did we ever receive any emails or correspondence from the

7    US Attorney's Office just prior to trial telling us that there

8    was a 28.13 additional snapshot?

9    A.  No.

10             MR. CAPOZZI:  No more questions.

11             THE COURT:  Any cross?

12             MR. GAPPA:  Briefly, if I could, Your Honor.

13             THE COURT:  Yes.

14                         CROSS-EXAMINATION

15   BY MR. GAPPA:

16   Q.  Ms. Linder, when you talk about hard drives that were

17   provided to you, you're talking about a subset of some of the

18   information that was provided in the discovery process;

19   correct?

20   A.  Yes.

21   Q.  And this was in conjunction with material that was shown

22   at the detention hearing; correct?

23   A.  Correct.

24   Q.  In 2013.

25   A.  I believe so.

1    Q.  And then when you were asked about with reference to

2    Exhibit 28.13, did you receive communication about 28.12?

3    A.  I'm not sure.

4    Q.  Did you -- in other words, was there any communication to

5    you that these are Government Exhibits 28.1 through 28.12?

6    A.  Yes.

7    Q.  But was that at the very same time there was no reference

8    to 28.13 or was it that all of the exhibits were turned over

9    for the first time with 28.1 through 28.13?

10   A.  No.  We had 28.1 to 28.12 for the majority.  But we just

11   did not have .13.

12   Q.  When was the first time that you received an exhibit

13   binder with 28.12 as an exhibit sticker on it?

14   A.  I believe it was the Friday before trial.

15   Q.  And there was also a 28.13 in there?

16   A.  Yes.

17   Q.  Okay.  And you received all those at the same time?

18   A.  Yes.

19            MR. GAPPA:  That's all I have, Your Honor.

20            MR. CAPOZZI:  Nothing more.

21            THE COURT:  So the point that Mr. Gappa just

22   clarified.  At the last hearing, I was shown something, was it

23   a cover letter?

24            MR. GAPPA:  Yes.

25            THE COURT:  From which I drew the inference that

1   trial Exhibits 28.1 through some number were produced, but

2   28.13 was not.  And you've just attempted to establish that to

3   correct me in that regard, saying, no, Trial Exhibits 28.1

4   through 28.13 were all turned over at the same time and were

5   all turned over with the exhibit binders on the Friday before

6   trial.

7           MR. GAPPA:  Yes.  With the caveat, I believe it was

8   the Friday.  It might have been Thursday.  But they

9   were -- whatever date it was, all in the same binder, all at

10  the same time.

11          THE COURT:  So Mr. Capozzi, when you've been arguing

12  to me, look, right here, it's 12, it's 12, it's 12.  And here

13  are the 12 pictures.

14          MR. CAPOZZI:  Right.

15          THE COURT:  I get the part that the reports were

16  referring to there's 12 --

17          MR. CAPOZZI:  Uh-huh.

18          THE COURT:  -- at various points in time because, as

19  Detective Hively has just described to us, hey, when I

20  testified before the grand jury, when I did those reports,

21  that's what we thought because it wasn't until two or three

22  weeks before trial that, in looking at that video one more

23  time, I realized for the first time, hey, I've seen that image

24  that I just saw on video.  We've got that as a still shot in

25  the other file folder that he maintained.  And for the first

1   time drew that link.

2          Are you still contending that at some point you were

3   given 12 screenshot photographs that didn't include 13?

4          MR. CAPOZZI:  Yes.  Yes.  We did.  Because when you

5   look at the --

6          THE COURT:  Where?

7          MR. CAPOZZI:  In limine -- I'll tell you exactly.

8   June of 2017.  In my motion for in limine, I attach all of

9   those exhibits to my motion saying, "Are these the only ones

10  you have?  If they are, it doesn't come out to be exploitation

11  of a child."  And I submitted that to the Court.  Not you.

12  Judge Ishii.  It was submitted under seal.  And I argued it at

13  the time then.  And I asked the government then, "Are these

14  the only ones you have?"  "Yes."

15         THE COURT:  Of course, it was true then.

16         MR. CAPOZZI:  Yeah.

17         THE COURT:  It was true.

18         MR. CAPOZZI:  In limine motions prior to trial, yes.

19         THE COURT:  It was true as far as they were

20  concerned.  We just heard Detective Hively say it wasn't until

21  mid October.

22         MR. CAPOZZI:  That's all true, judge.

23         THE COURT:  So I think I got a handle on it.  I've

24  said what I think, you know, what would have solved this.

25  What I wish would have happened and we wouldn't have wasted

42

1    two days worth of dealing with this issue.  And I'd already

2    have the motion for new trial decided.

3           Okay.  It didn't happen.  So what's the result?  Does

4    it matter?  Your position is, hey, that's trial by ambush.

5    You know.  There's tens of thousands of images and, sure, it's

6    in there and made available but, you know, under these

7    circumstances, you're obligated to tell me, hey, this is an

8    image that we're actually relying on.  And the government's

9    position is, you know -- I think the government's position is,

10   look, it was always available to you.  And it was produced as

11   a trial exhibit when the exhibit was produced.  And by the

12   way, we didn't even realize it was of her until right before

13   trial.

14          MR. CAPOZZI:  Then tell us.

15          THE COURT:  I'm not sure what the government is

16   telling me about whether they did anything about that.

17   But --

18          MR. GAPPA:  Your Honor, if I could just add.  I think

19   it is an important detail.  And that is what I elicited from

20   Detective Hively at the start of the hearing.  And that is

21   there was an intermediate step in there.  And that is that on

22   March 27, 2017, he produced this 33 page report.  And within

23   it there are two references to the contents of the still

24   images in the [A.T.] folder.  And in that, there is untitled

25   11.  Which, if Mr. Capozzi is taken at his word, would have

43

1    been new to him.

2            And I'm not saying that it's entirely his fault.  But

3    it's not as though two weeks before the trial the government

4    for the first time revealed the contents of a drive that was

5    recovered from Angele Henry and for the first time got a piece

6    of evidence off of that and said surprise, this is now going

7    to be a trial exhibit.

8            THE COURT:  No, actually you never did that.  You

9    never -- I understand exactly what happened.  I got to tell

10   you, that argument, once again, carries virtually no weight

11   with me.

12           MR. GAPPA:  But it --

13           THE COURT:  Either -- I mean --

14           MR. GAPPA:  If I could just finish trying to make the

15   point --

16           THE COURT:  Go ahead.

17           MR. GAPPA:  -- of that intermediate disclosure, it is

18   in the report.

19           THE COURT:  It's a nondisclosure.

20           MR. GAPPA:  But this --

21           THE COURT:  He didn't even know.  The detective's

22   already testified in March, when he produced that report, he

23   also listed on the report here are all the images of [A.T.]

24   and he doesn't list that one.

25           MR. GAPPA:  Understood.

1        THE COURT:  He didn't think it was her.  He had no

2    reason to believe it was.  He had no idea who it was.

3        MR. GAPPA:  Correct.

4        THE COURT:  I understand, by the way, why people

5    thought that.  Because I think I, myself, during trial, when I

6    saw that image said, "Well, that's not even her."  And you

7    guys walked me through it to show me how you identified on the

8    photograph that it was, in fact, her.  So I get it.  I mean,

9    I'm not saying that's nefarious.  I completely understand how

10   it happened.  And I now, for the first time today, based upon

11   Detective Hively's testimony, thank you, sir, I finally

12   understand what actually happened.  Got to tell you, neither

13   one of you have helped me a lot in that regard.

14       MR. CAPOZZI:  Good work on your behalf, judge.

15       THE COURT:  No.  It wasn't my part.  It was -- you

16   guys finally asked the right questions.  But nobody -- we've

17   had two hearings where we've argued about this and until

18   Detective Hively testified, I never understood even what

19   actually happened.  I'm just telling you, you all may

20   understand lots more things than I understand up here because

21   you -- you know, you've been deep into the woods.  It would be

22   great if early on somebody would just say, "Judge, let me just

23   lay it out to you.  Here's what happened."  And we could move

24   on.  I could rule.

25          I'm going to do some research to see what I think

1   about that.  The government may well be right, Mr. Capozzi.

2   Hey, look, all the documents are available.  Whether they're

3   relevant or not, that's not for us to say.  We made it all

4   available.  It was available for years.

5           MR. CAPOZZI:  Uh-huh.  Okay.

6           THE COURT:  Years.

7           MR. CAPOZZI:  If I --

8           THE COURT:  Easy to look at because of the nature of

9   the charges?  No, not easy to look at.  But available?  Most

10  definitely.  And available for years.

11          MR. CAPOZZI:  We don't deny that, judge.

12          THE COURT:  Anybody could have said, "Hey, the

13  government hasn't snapped to this, but I've looked at this

14  photo and we better be prepared to have a position about what

15  it is or isn't because they may someday snap to the fact that

16  that may just be of the victim [A.T.]."

17          That may all be sufficient discovery.  We made it

18  available.  Nothing else is required.  We don't need

19  to -- we're not required to give you a road map.  Especially a

20  road map that we're not even aware of.  Footnote.  Maybe over

21  those last two or three weeks, right before trial, maybe a

22  supplemental report would have been helpful.

23          MR. CAPOZZI:  I think I did ask the question whether

24  or not Mr. Hively did a report to the U.S. Attorney on that.

25          THE COURT:  He told me that he didn't.

1        MR. CAPOZZI:  He did not.  That's right.  But if I

2   could just -- a few things.  I gave you some exhibits.  The

3   March 27, 2017, the 33 page memo the government just referred

4   to.

5        THE COURT:  Okay.

6        MR. CAPOZZI:  Okay.  That was Bates number 1085 to

7   1116.

8        THE COURT:  Okay.

9        MR. CAPOZZI:  On March 24th, 2017.  Let me

10  fin -- you're jumping on me.  On March 24th, or July 24th,

11  they send out another discovery, 1 to 33, pages 1250 to 1282.

12  This is the final approved of the first 33 pages.  Then one

13  month later, August 16th, the government sends us Bates 1284

14  to 1316 saying forget the first two, look at this one.  August

15  16, 2017.  Saying this precedes all of that.  But yet, in the

16  government's memo, they're referring to the March 27th

17  discovery that they say is now outdated.

18        And when you look at the memo that the government

19  filed in this case, on page 3 -- and I brought this up with

20  Mr. Hively, Detective Hively.  Page 3, document 303, page 7,

21  he's setting out all the pictures of [A.T.]  And we show that

22  in 33.

23        But when you look at the government's exhibit that

24  they filed, along with their memo, their cite to page 3 that I

25  mentioned and then go to page 19.  Skip the ones afterwards

47

1   that show "these are the only pictures of [A.T.] that we
2   have."  That's misleading, judge.
3          And I submit to the Court, I say it's trial by
4   ambush.  It's not up to us to find the needle in the haystack.
5   It's the government to present the case.  And you know the
6   case, *Berger versus United States*, the prosecution has a high
7   burden and the burden is to present all the evidence to the
8   defense.  If I can talk about another issue separate from
9   this, I think --
10          THE COURT:  No.  I'm done.
11          MR. CAPOZZI:  What about the Ruezga testimony?
12          THE COURT:  I'm done.  That was taken under
13   submission.
14          MR. CAPOZZI:  All I would do is ask you to read the
15   *Johnson* case.
16          THE COURT:  Motion is taken under submission.
17          MR. CAPOZZI:  Thank you.
18          THE COURT:  It's previously been under submission.
19   I'll rule.  As soon as I rule, if the motion for new trial is
20   denied, I'll reset the matter for sentencing.  If it's
21   granted, then we'll set a status conference to set a new
22   trial.
23          MR. CAPOZZI:  Thank you, judge.
24          MR. GAPPA:  Thank you, Your Honor.
25      (The proceedings were concluded at 4:04 p.m.)

48

1

2          I, KAREN HOOVEN, Official Reporter, do hereby certify

3    that the foregoing transcript as true and correct.

4

5    DATED:  15th of November, 2018    /s/  Karen Hooven
                                        KAREN HOOVEN, RMR-CRR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25