UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )   No. 13-CR-409-DAD
                               )
vs.                            )   SENTENCING
                               )
ADAM ALAN HENRY,               )
                               )
            Defendant.         )
_____)

Fresno, California              Monday, September 10, 2018

REPORTER'S TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          United States Attorney's Office
                            BY: **DAVID L. GAPPA**
                            and **ROSS PEARSON**
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721


For the Defendant:          Law Offices of Anthony P. Capozzi
                            BY: **ANTHONY P. CAPOZZI**
                            1233 West Shaw Avenue
                            Suite 102
                            Fresno, California 93711

1    Monday, September 10, 2018                    Fresno, California

2    10:42 a.m.

3              THE CLERK:  The Court calls item number three.

4    1:13-CR-409.  United States versus Adam Alan Henry.

5    Sentencing and reconsideration of order 306 denying motion for

6    judgment of acquittal, new trial and discovery.

7              MR. GAPPA:  Good morning, Your Honor, David Gappa and

8    Ross Pearson for the United States.

9              MR. CAPOZZI:  Your Honor, Tony Capozzi with the

10   defendant who's present in custody.

11             THE COURT:  Good morning.  There's so much paper that

12   I -- let me just -- I don't want to take a recess, but I have

13   to go back into chambers.  I think I left my notes.

14             MR. CAPOZZI:  I'd like to use the restroom.

15             THE COURT:  All right.  We will take a two-minute

16   break then while I go get my notes.

17             MR. CAPOZZI:  Thanks, judge.

18      (Recess.)

19             THE COURT:  All right.  With respect to United States

20   versus Henry.  First let's take up motions.  There's a motion

21   for reconsideration of the Court's order of July 13th denying

22   defendant's motions for judgment of acquittal and for new

23   trial and discovery.  I read the papers.  I'm prepared to

24   rule.  Anything you wanted to add, Mr. Capozzi?

25             MR. CAPOZZI:  Just a couple of things, judge.  You

4

1    read the papers.  I would just be re-arguing the papers.  I

2    just want to make the record clear on that one issue dealing

3    with number 13 snapshot.  The government argues that I

4    withdrew the motion and therefore it's done.  To make it

5    clear, I think during our arguments, the motion was still

6    pending.  And if there's any question, I renew that motion.

7         But what's important to me is for the government to

8    produce the discovery to the grand jury of what was presented

9    to them with regard to these snapshots.  We were given the

10   testimony, and I think it's one of the exhibits that were

11   attached here, Exhibit D, of Britton Moore.  In that

12   testimony, he is given Exhibit 1 with the snapshots that were

13   utilized in this case.  Those snapshots were never attached to

14   that testimony.

15        And I would ask the government, I think that's

16   important for my appeal, that we have what was presented to

17   the grand jury as to what the government's position was.

18   Other than that, I would submit it on the briefs that were

19   filed, judge.

20        THE COURT:  I think actually you were just addressing

21   a different motion --

22        MR. CAPOZZI:  No.  The discovery motion.

23        THE COURT:  -- or request, which I was going to take

24   up separately.

25        MR. CAPOZZI:  Oh, sorry.

5

1      THE COURT:  Is there anything on the motion for
2  reconsideration that you wanted to add?
3      MR. CAPOZZI:  Everything is in the papers.
4      THE COURT:  Mr. Gappa, anything on the motion for
5  reconsideration?
6      MR. GAPPA:  No, Your Honor.  As long as the Court's
7  review of the documents included the Government Exhibit, which
8  is on the docket at 313.
9      THE COURT:  What are you talking about?  Oh, the
10  government's opposition is 313.
11      MR. GAPPA:  Okay.  Fine.
12      THE COURT:  Right.  I reviewed the government's
13  opposition.  Yes.
14      MR. GAPPA:  Nothing else.
15      THE COURT:  Okay.  When you say "exhibit," I thought
16  there was yet something else filed.  All right.
17      The Court is going to deny the defense motion for
18  reconsideration.  The defense argues, first of all, that the
19  Court failed to consider all motions.  That's a misnomer.
20  What the defense really is arguing is that the Court did not
21  specifically note the -- what really was an unauthorized
22  defense surreply in connection with the motion for
23  reconsideration.  Although I didn't specifically note the
24  unauthorized surreply, the filing was actually entitled an
25  addendum to defendant's reply, it's docket 292.  I did

1    consider it.

2            It was in that document that the defense argued based

3    upon the Second Circuit's decision in *Jackson versus Conway*.

4    That Mr. Ruezga was a law enforcement officer and even though

5    he worked for Child Protective Services and that any questions

6    he asked while the defendant were in custody amounted to an

7    interrogation for purposes of Miranda.  But the Court's

8    ultimate ruling on this issue, in denying the motion for

9    judgment of acquittal and new trial, did not hinge on that

10   distinction.

11           Instead, the Court concluded that Ruezga's testimony

12   was properly admitted because it was introduced to rebut

13   statements made by the defendant while on the witness stand

14   during his testimony submitted as part of the defense case.

15   And I'm fully satisfied that I considered all the defense

16   arguments prior to reaching that ruling.

17           Then the second aspect of the motion for

18   reconsideration has to do with the defense argument, pursuant

19   to *Harris versus New York*, that a limiting instruction should

20   have been given if the testimony was admitted for -- even if

21   the testimony was admitted at all under -- as rebuttal.

22           And here, the Court would note that *Harris* did not

23   hold that the Court was required to give a limiting

24   instruction, but even more importantly here, the defendant did

25   not request a limiting instruction during trial.  And the

Court is aware of no authority for the proposition that a limiting instruction was required to be given even in the absence of a defense request for one.

And finally, were I required to make such a finding, I would find that any failure here to sua sponte give a limiting instruction such as that, which the defendant now argues should have been given, that certainly that wasn't clear, clearly required under the law at the time of the trial. And nor did the failure to give that limiting instruction that the defense now argues should have been given. In my view, it did not seriously affect the fairness, integrity or reputation of the trial proceedings.

And finally in that regard, I'd cite to *United States versus Ortega*, 2003 F 3d 675 at 681, Ninth Circuit, 2000. For all of those reasons, the motion for reconsideration of the order denying the motion for a new trial or for acquittal, the motion for reconsideration will be denied as well.

Now, the defense has also filed a request to produce Exhibit 1 to the grand jury testimony of Detective Britton Moore. I have no idea really what the defense is talking about. There's no authority submitted for the -- in support of the request. It's not clear to me at all what this has to do with anything. And the request itself certainly doesn't inform me what it's about.

My initial reaction to it is why in the world,

1  post-trial, post-ruling on post-trial motions on the eve of

2  sentencing, would I require further discovery with respect to

3  exhibits that were submitted to the grand jury when the

4  defense isn't entitled to discovery of exhibits submitted to

5  the grand jury under any circumstances.  But there's no

6  authority cited, nor is it explained what the significance is.

7  So I don't understand what the defense is asking for.

8          MR. CAPOZZI:  Judge, the argument that we made is on

9  the snapshots.  The 12 snapshots, then the 13th came in at the

10 time of trial.  What I tried to show through my motion is that

11 throughout the entire discovery process, even our motions in

12 limine --

13         THE COURT:  Right.

14         MR. CAPOZZI:  We've gone through that.

15         THE COURT:  We've rehashed this ground repeatedly.

16         MR. CAPOZZI:  Right.

17         THE COURT:  I mean over and over and over again.  And

18 I said what I had to say about it in my order denying the

19 defendant's motion.  I think I even suggested that it would

20 have been my preference -- the government's position was,

21 look, all the evidence was available for viewing and was, in

22 fact, viewed.  The lead local investigator, what's his name?

23 Hive?

24         MR. CAPOZZI: Hively.

25         MR. GAPPA:  Arthur Hively.

1      THE COURT:  Detective Hively testified in connection

2 with the motion for new trial that, look, it never occurred to

3 me that that particular screenshot was of A.T. until -- and

4 I'm making it up, but I think he said something around two or

5 three weeks before trial.  Maybe two.  That two weeks before

6 trial, in getting ready for trial, I realized that that

7 screenshot was, in fact, A.T.  I kind of -- he finally pieced

8 it together given what the background showed.  And that he

9 brought it to the Assistant United States Attorney's

10 attention.  And then, in an exhibit binder that was produced

11 just prior to trial, a few -- I don't know, maybe the Friday

12 or --

13      MR. CAPOZZI:  Friday before.

14      THE COURT:  Friday before the Tuesday start.  So, you

15 know, Hively discovered that the screenshot is of significance

16 two weeks before trial.  He reports it.  The U.S. Attorney, in

17 the exhibit binder, turned over a total of maybe four days or

18 so before trial, includes that screenshot in the exhibits but

19 doesn't specifically point out, hey, there's a new one in

20 there that hasn't been specifically produced as a screenshot

21 before, even though it was in the discovery, that your expert

22 and you -- or your expert reviewed, but that you had available

23 to you.

24      And I think I even said in the order, look, would it

25 have been my preference that the government counsel had

1    said -- given the defense an indication that, hey, there's an

2    additional one in there than maybe has been shown before, but

3    it's always been available and your guys actually looked at

4    it?  Yeah, it would have made life simpler.  I think -- I

5    haven't re-read that order for a while, but I think I

6    commented on it.

7         But was it a violation in any way?  I ultimately

8    concluded that it was not.  Now, what's the grand jury

9    transcript have to do with it?

10        MR. CAPOZZI:  Well, I just wanted -- well, I think it

11   has a lot to do with it, judge.  Again, you ruled on it.

12   Denied the motion.  That's fine.  We're going to appeal.

13   We'll deal with the issue.

14        It's just consistent with the government's

15   position --

16        THE COURT:  What's the --

17        MR. CAPOZZI:  Yeah.  I'll tell you.  I want to show

18   the consistency of the government's position that there were

19   12 snapshots presented to the grand jury.  The indictment is

20   based on that.  We go through in limine motions.  I make

21   request for discovery.  They've given us 12 snapshots.  I

22   submit those in my in limine motions and say, "Are these the

23   only ones?"  "Yes, they are."  Two times in limine motions

24   argued, the government's position is only 12.  Just before the

25   trial, 13 comes up.  I think it was misleading to us.  That's

1 │ it.

2 │     THE COURT:  Okay.  So actually, what would be more

3 │ meaningful to me is if you said, look, we now believe that the

4 │ 13th shot was actually shown to the grand jury.

5 │     MR. CAPOZZI:  Well, I'd like to --

6 │     THE COURT:  And they knew about it all along and

7 │ didn't show it to us at all.  That would be of more

8 │ significance to me.  But you're not saying that.

9 │     MR. CAPOZZI:  Well, thank you.  I don't know.  The

10 │ point is I don't know, judge.  I'd love to see that.  Now, my

11 │ anticipation is there is no grand jury Exhibit 1 right now.

12 │ It's not in any grand jury records.  It's not kept anywhere.

13 │ And I would submit that that should be produced to show

14 │ whether or not there were 12 or 13.  I'd like to hear the

15 │ government answer that.

16 │     THE COURT:  Government have anything they want to say

17 │ about this request for grand jury exhibits?

18 │     MR. GAPPA:  It's untimely, but this also relates to

19 │ the initial indictment.  There was a superseding indictment,

20 │ which in the government's view makes the request even less

21 │ relevant.  But more importantly, we agree with the Court's

22 │ apparent analysis that this most recent request is ultimately

23 │ under the auspices of the Court's order from July 13th, which

24 │ denied the defense motion for discovery.

25 │     So to the extent that this was an issue that the

1    defense really wanted to pursue, even at that late stage after

2    trial, it could have been included in the initial round of

3    motions for discovery post-trial.  So given the current

4    posture of this and the untimely nature of it, with the

5    minimal relevance, we urge the Court to deny the motion.

6            MR. CAPOZZI:  Just a comment, judge.

7            THE COURT:  Yes.

8            MR. CAPOZZI:  Even if there is a superseding

9    indictment, it's still based upon what was presented to the

10   grand jury.  And again, this exhibit that was -- well, it was

11   put in through Detective Moore and the grand jury superseding

12   indictment would still be based on that.  I'm just asking the

13   government to produce it.  If there's no harm, why not just

14   produce it.  And maybe there are 13 snapshots there.  I don't

15   know.

16           THE COURT:  The defense request for Exhibit 1 to the

17   grand jury testimony of Detective Moore is denied.  I don't

18   think that it -- I don't think any showing has been made that

19   it would illuminate this issue at all.  And the Court has

20   taken testimony as to when the significance of the screenshot,

21   that was part of a videotape, it was a videotape obtained

22   through the hidden camera in the defendant and his then wife's

23   bathroom.

24           And the screenshot of that videotape that was

25   belatedly realized, in fact, depicted A.T., even though

1    through the -- if you just took a look at that screenshot by

2    itself, you wouldn't immediately think that.  I mean, it

3    didn't look like AT when -- you originally looked at that

4    screenshot.  It really was -- you know, as Detective Hively

5    testified, it was after I had seen it a number of times and

6    realized that the background was the exact same.  And then

7    when I matched it up, I realized, yeah, that screenshot

8    doesn't look like A.T. necessarily, but it is, in fact, a

9    screenshot of the videotape of A.T.

10          Everybody knew the significance of the videotape.

11   I -- you know, it is what it is.  And I've addressed it, I

12   think, as fully as I can address it.  But I do not believe

13   that its inclusion as a trial exhibit was violative of the

14   defendant's rights nor do I think it was a *Brady* violation, a

15   discovery violation.  It was all information that was

16   available.  The significance of it, not necessarily.  Turned

17   out to be more significant at trial than one would have

18   thought.  But I don't think that that resulted in a

19   constitutional or any other sort of violation.  So I'm denying

20   the request for production of Exhibit A to the grand jury

21   testimony of Detective Moore.

22          I think that resolves any pending motions.  And so I

23   want to turn to sentencing.  And Mr. Capozzi, have

24   you -- well, first --

25          MR. CAPOZZI:  Is it okay to stay here or do you want

1   us at the podium?

2            THE COURT:  You may stay wherever.

3            MR. CAPOZZI:  Thank you, judge.

4            THE COURT:  I received and reviewed the presentence

5   report that was filed back on April 9th, 2018; the formal

6   objections of the defense filed April 16th; the government's

7   sentencing memorandum and response to defendant's sentencing

8   memorandum -- sentencing arguments filed April 16th.  Victim

9   impact statements filed through probation on April 13th.

10  That's docket 287.

11           The evaluations of Doctors Terrell and Seymour filed

12  through probation on April 19th.  Character reference letters

13  filed through probation on April 20th.  And most recently,

14  additional victim impact statements filed through probation

15  with the Court on August 31st, docket number 312.

16           Is there anything else that I should have received in

17  connection with sentencing?  Anything the government's aware

18  of?

19           MR. GAPPA:  No, Your Honor.

20           THE COURT:  The defense?

21           MR. CAPOZZI:  There was a report of Dr. Malinek to

22  the probation report, but it's attached to the report.

23           THE COURT:  If it's attached to the report, I've

24  reviewed it.

25           MR. CAPOZZI:  Okay.

1          THE COURT:  As opposed to Terrell and Seymour?

2          MR. CAPOZZI:  Right.  They weren't attached for some

3    reason.

4          THE COURT:  I didn't bring it back out with me,

5    because I did not bring out all of the attachments because

6    there were many of them to the presentence report.  I think a

7    vast array of pages.  Can you -- was there some significance

8    that you -- particular significance that you wanted me to

9    attach to that report?

10         MR. CAPOZZI:  It's very similar to Terrell and

11   Seymour, defendant's not a predator, et cetera.

12         THE COURT:  Right.  I did read it.

13         MR. CAPOZZI:  Yeah.

14         THE COURT:  Is there -- and Mr. Capozzi, have you

15   received the presentence investigation report, all of the

16   attachments and the subsequent memorandums from probation and

17   had the opportunity to review them with Mr. Henry?

18         MR. CAPOZZI:  I have, Your Honor.

19         THE COURT:  Mr. Henry, have you received the

20   presentence report in your case, all the attachments and the

21   subsequent memorandums with attachments submitted by

22   probation, had the opportunity to both review them and discuss

23   them with your attorney?

24         THE DEFENDANT:  Yes, sir.

25         THE COURT:  Let's then take up objections first.  I'm

1    a bit puzzled by some of the defense objections.  The first

2    objection is to paragraph 14 of the presentence report,

3    footnote 7, the entire objection states, "All Shareaza

4    programs had sharing disabled.  Evidentiary hearing

5    requested."

6            MR. CAPOZZI:  Throughout the trial, Judge,

7    the -- both our expert and I believe Detective Hively said the

8    Shareaza programs were disabled, which would prohibit

9    distribution.  And indeed, probation has not recommended

10   distribution enhancement anyway.  That's all that's for.

11           THE COURT:  And what do you want an evidentiary

12   hearing for?

13           MR. CAPOZZI:  Well, if the government is now saying

14   they were not disabled, then let's prove it.

15           THE COURT:  My -- well, what's the government's

16   position about this?

17           MR. GAPPA:  Your Honor, we believe the specific

18   offense characteristic for distribution applies.  We put in

19   the record and the Court reviewed it, research that Detective

20   Hively did in reference to one of the computers with a hard

21   drive that had one version of Shareaza at his place of

22   employment.

23           Actually, there were two versions of that program.

24   In one of the versions, at the moment the computer and the

25   hard drive were seized, the sharing feature had been disabled.

1    The other version of the program at that same location, the

2    sharing had not been disabled.

3            But in addition, Detective Hively put in his reports

4    that the sharing feature on an earlier version on a different

5    computer, which came into evidence as Exhibit 16, which is one

6    that the defendant had used many years prior to the work

7    computer, sharing had not been disabled in the Shareaza

8    program.  But even assuming that the sharing had been disabled

9    on the version of one of the two programs that was in use at

10   the Lock-N-Stitch office, Detective Hively went a step

11   further, researched whether it was impossible to share files.

12           And what his research showed, based in part on a

13   white paper from the National White Collar Crime Center, was

14   that any time a file goes into a specific folder, and he

15   referenced it, it's available for sharing.  So even while the

16   file is being downloaded, and as that process completes, that

17   file is available to everybody on the entire network that also

18   is using Shareaza or any other file sharing program.

19           And so we also know that on the day of the search

20   warrant, at least one child pornography file had been in that

21   particular folder and was being shared.  But we can also

22   assume that many others had also come in that same file path

23   and that they also had been made available.

24           So in our view, and this has been consistent, that

25   distribution enhancement applies.  Especially when it's

1  factored in to the Ninth Circuit law on the issue where, when

2  the Ninth Circuit specifically addressed file sharing and

3  whether an enhancement applies, there's reference to a

4  presumed intent.  And the defendant, having to come forward

5  with affirmative evidence to negate the intent to file share.

6  But we've gone, I think, beyond a presumption.  We've actually

7  proven that there was distribution.

8            THE COURT:  How did you do that?

9            MR. GAPPA:  Well, through the reports --

10           THE COURT:  Hively's testimony that it wasn't

11  impossible?

12           MR. GAPPA:  Well, that it was in a location and if a

13  file is in that location, it is available for sharing.

14           THE COURT:  So you submitted a --

15           MR. GAPPA:  This is the attachment to the sentencing

16  memorandum.  And there is attachment A --

17           THE COURT:  Well, I'm not going to -- I'm going to

18  take them one at a time.  I read everything that you folks

19  submitted.  I don't -- didn't understand most of what you were

20  arguing.  Still don't.  I'll take them one at a time.

21           So back to the one that I'm actually dealing with.

22  Page 7, paragraph 14, footnote 7.  What's the government's

23  response?  Not whether the -- not whether the adjustment

24  applies.  There's a factual objection to page 7, paragraph 14,

25  footnote 7, what's the government's response.

1          MR. GAPPA:  It's paragraph 14?

2          THE COURT:  Page 7, paragraph 14, footnote 7 of the

3    presentence report.

4          MR. GAPPA:  Well, our view is that the defendant had

5    used that computer even before he knew Angele Henry.  And that

6    is Exhibit 16.  And that's the computer from his garage that

7    had the Shareaza program installed where sharing had not been

8    disabled.  And it also was used to obtain child pornography.

9          THE COURT:  So Mr. Capozzi, the defense says that's

10   the one computer that the trial testimony stated it wasn't

11   disabled.

12         MR. CAPOZZI:  But there was no evidence -- the child

13   pornography on that was from Shareaza.  Shareaza was disabled.

14   All the other -- any other information --

15         THE COURT:  He's saying it wasn't.

16         MR. CAPOZZI:  -- was not child pornography.

17         THE COURT:  They're saying it was not.

18         MR. CAPOZZI:  I'm sorry, judge.

19         THE COURT:  Their position is that the trial

20   testimony was that that was the computer upon which the

21   program was not disabled.

22         MR. CAPOZZI:  And that's not what the testimony was.

23   I just --

24         THE COURT:  Okay.  Where do I look for that?

25         MR. CAPOZZI:  Pardon me?

1          THE COURT:  Where do I look?

2          MR. CAPOZZI:  Well, it -- Detective Hively testified

3    that Shareaza was disabled.  And I do not recall if any aspect

4    of his testimony where any Shareaza was allowed for the

5    distribution.  He testified at the grand jury of LimeWire on

6    Exhibit 16, which is different than Shareaza.

7          THE COURT:  Got a page cite?

8          MR. CAPOZZI:  Off the top of my head, no, I don't.

9          THE COURT:  Mr. Gappa?  You're telling me that Hively

10   testified at trial that it wasn't disabled on that computer.

11   Got a page cite?

12         MR. GAPPA:  I'm looking, Your Honor.

13         Your Honor, I'm going to refer the Court to docket

14   item 289.  This is the government's sentencing memo.  And in

15   the attachments, this should be 5 of 14.

16         THE COURT:  Well, my 289 is 17 pages long.

17         MR. GAPPA:  I'm not sure how that happened.

18         MR. CAPOZZI:  Mine is 17 also.  I don't have an

19   attachment.

20         MR. GAPPA:  This is -- well, maybe it's docket item

21   289-1.

22         THE COURT:  Okay.  At page?

23         MR. GAPPA:  5 of 14.  This is a report that Detective

24   Hively prepared after the trial.  And he's addressing the

25   computer that was in the garage, I believe.  As well as the

1 | two computers at the Lock-N-Stitch.

2 |         THE COURT:  And what does it say?

3 |         MR. GAPPA:  Well, on page 1, he summarizes what he

4 | did.  And he's saying as of when the computer was down, one of

5 | the programs, one of the Shareaza programs had sharing

6 | disabled.  And that's on page 2 of 4 in the text.  It says

7 | "sharing had been disabled."  There's no way to indicate if

8 | sharing was on before that date.  That's page 2.

9 |         Then on page 3, he references a different hard drive

10 | or different version of Shareaza.  So this is a different

11 | version.  Sharing had been on as of June 21st, 2011.  So those

12 | are the two that are at Lock-N-Stitch.

13 |         But he did the same review of the computer in the

14 | garage, which was evidence in Exhibit 16.  And that computer

15 | had child pornography on it.  It also had Shareaza as a

16 | program.  And the sharing was enabled.  So it had not been

17 | turned off.  As of when it had last been used.

18 |         THE COURT:  What are you reading from?

19 |         MR. GAPPA:  Oh, this is page 4 of 4 on 289-1.  It's

20 | perhaps on the docket, it's page 8 of 14.  But it's 4 of 4 of

21 | Hively's report.  It's docket --

22 |         THE COURT:  You're just messing with me.

23 |         MR. GAPPA:  It's document 289-1, page 8 of 14.

24 |         THE COURT:  And you think that that page says what?

25 |         MR. GAPPA:  Well, it says in the text that from the

1   computer in the garage with child pornography, that sharing

2   was enabled as of the last written date of April 28th, 2009.

3   So this is contrary to the defense position.

4           THE COURT:  Now, remind me.  Was anything -- so was

5   that computer, at the time of any of the searches -- the two

6   searches involved in this case, was that computer in any use?

7   It wasn't in the bedroom.  And it wasn't at Lock-N-Stitch;

8   right?  It was --

9           MR. GAPPA:  In the garage.

10          THE COURT:  In the garage.

11          MR. GAPPA:  Correct.  But --

12          THE COURT:  So as of 2009, Shareaza was enabled on it

13  and what should I draw from that?

14          MR. GAPPA:  That is evidence that when the defendant

15  had last used that computer, that it had the Shareaza program

16  on it.

17          THE COURT:  Back in 2009?

18          MR. GAPPA:  Correct.  And also --

19          THE COURT:  What are the dates of this indictment?

20          MR. GAPPA:  I'm sorry?

21          THE COURT:  Dates of this indictment.

22          MR. GAPPA:  It references, for the receipt and

23  distribution, November 2005 through September 19th of 2013.

24  So this is, in the government's view, evidence that that

25  computer had been used to receive and distribute child

pornography, the significant quantity of which was recovered from that hard drive.

THE COURT:  All right.  The defense objection number one is overruled based upon Detective Hively's report, specifically with respect to a computer found in the garage that was enabled -- with the Shareaza program enabled on it with the -- as of the last written date of April 28th, 2009.

Objection two.  Page 7, paragraph 14.  Defendant is not aware of any child pornography videos three hours in length nor of any child pornography depicting bondage. Bondage was the interest of the defendant's wife.  Evidentiary hearing requested.

What is it exactly that you're objecting to?

MR. CAPOZZI:  We know nothing of any videos of bondage that are three hours in length.  We've never seen this child pornography.  The government makes the allegation that it's there.  I don't want the Court to sit through watching this.  If it's there, it's there.  We never saw it.

THE COURT:  Well, again, there was a lot of -- there was a lot of evidence available for viewing.  From a guideline -- you may or may not have gone and viewed it.  I mean, this wasn't the largest cache of child pornography that the Court has had experience with in the last several years, but it wasn't insignificant either.

From a guideline perspective, Mr. Gappa, with respect

1 to length of videos, the fact that whether it was -- that

2 there were some videos that were three hours, approximately

3 three hours in length, two of them, from a pure guideline

4 calculation perspective, doesn't the guideline talk about a

5 much shorter length of time as being significant?  I mean,

6 whether it's an hour or two doesn't make any difference, does

7 it?

8         MR. GAPPA:  Well, it could.  So I think the Court

9 might be thinking about an application note that references if

10 a video is substantially longer than five minutes, an upward

11 departure may be warranted.

12         THE COURT:  Right.  That's what I was thinking.

13         MR. GAPPA:  Why do you say that the difference

14 between one hour and two hours in length could make a

15 difference in a guideline calculation?  Just because two is

16 longer than one?

17         MR. GAPPA:  No, just because of that application

18 note.  So in other words --

19         THE COURT:  Right.

20         MR. GAPPA:  If we had what we showed at trial --

21         THE COURT:  We're not -- we are -- the application

22 note kicks in at more than five minutes.

23         MR. GAPPA:  Correct.

24         THE COURT:  So once you're past five minutes, it's

25 potentially in play.

1        MR. GAPPA:  Exactly.

2        THE COURT:  And so whether it's -- I mean, you could

3    argue, well, two hours is even more in play than one hour, but

4    really at this point it's in play.  It's -- the exact -- the

5    precise amount of how long over five minutes it is doesn't

6    make a difference in terms of whether that places the

7    application note in play is what I'm getting at.

8        MR. GAPPA:  I think we agree.

9        THE COURT:  Okay.  Good.  I'm going to direct, then,

10   in response to the defense objection, although it's not

11   specific.  Let's modify the -- where is the -- instead of "or

12   approximately three hours in length," let's just modify that

13   to provide "and two were considerably longer."  Doesn't really

14   matter whether they were three hours in length or not.  But

15   they were considerably longer.  Any objection to that

16   modification in the report?  It's at paragraph 14.

17       MR. GAPPA:  No, Your Honor.  But I'm sure that the

18   Court also saw the government's reference to an additional

19   number.  I'm looking for the exact number, I think it's six,

20   that were more than one hour.

21       THE COURT:  Okay.  I'm going to take these one at a

22   time.

23       Third objection.  Page 7, paragraph 15.  Child

24   pornography was put on the computer which dated back to 2005.

25   Evidence established that the child pornography on item 16,

1    computer in garage, was not downloaded but came from another

2    device.   The child pornography on item 16 was not in Shareaza.

3            Again, I have no idea what the defense is trying to

4    tell me.

5            MR. CAPOZZI:   Because we're saying it didn't come

6    from Shareaza, Your Honor.   It came from another computer that

7    was put on to item 16.   Shareaza is this website where you can

8    download --

9            THE COURT:   I know what it is.

10           MR. CAPOZZI:   Okay.   And it goes to the world.   This

11   is not that.   Pornography was not taken down that way.

12           THE COURT:   Well, I just went through this with the

13   first objection.   Hively's reports say that the computer in

14   the garage, which was -- had a last active date some time in

15   2009, that the Shareaza program appeared on that computer and

16   was enabled.

17           MR. CAPOZZI:   My comment is at the time of trial,

18   Shareaza was disabled.   Subsequent to trial, in December, he

19   does this report that the government talks about saying that,

20   oh, I looked at it again and there is some parts of it that

21   were not disabled.   That's new evidence, judge.

22           THE COURT:   Any government response with respect to

23   the objection to page 7, paragraph 15 of the presentence

24   report?

25           MR. GAPPA:   The only comment we have is, as the Court

1    noted, the Court essentially addressed most of this in our

2    view.  And the reference that we would make, again, is to

3    docket 289-1, page 11 of 14.  And there it shows that from

4    this report, the first item listed there is a child

5    pornography video and the date on which it was placed on that

6    hard drive was November 4th, 2005.  And that other dates

7    reference 2006, 2007, 2008.  So we believe the report is

8    accurate.

9         THE COURT:  I'm looking at 289-1, page 11 of 14.  And

10   I see titles.  And what are you telling me that that

11   signifies?

12        MR. GAPPA:  Well, I understood that at least part of

13   the objection was the reference to when those files appeared,

14   as far back as 2005.  So that is our view of the significance

15   of this exhibit.  It shows that there were child pornography

16   files being put there as early as 2005 through 2008.

17        THE COURT:  The objection is that the evidence at

18   trial established that child pornography on the computer in

19   the garage, Exhibit 16, I think you've been referring to it

20   as, was not downloaded but came from another device.

21        MR. GAPPA:  Well, I wouldn't say it's not completely

22   irrelevant, but for purposes of sentencing, we're in a

23   different context.  And I'm not sure it matters how it got

24   there.  Our view is that it was there.  We've already

25   addressed the sharing issue.  So I don't see a need -- I don't

1  see a basis for this objection.  I think the Court can

2  overrule it.

3          MR. CAPOZZI:  I think the Court could sustain it.

4          THE COURT:  You guys are both a lot of help.

5          MR. CAPOZZI:  Well, that's why an evidentiary hearing

6  is requested, judge.  This is all new stuff.

7          THE COURT:  I agree with the government that as it's

8  been stated, the defense objection is irrelevant.  Paragraph

9  15 simply states that, "These videos were located on password

10             protected partition of the NAS drive and were saved

11             in folders associated with the names of the

12             individual being recorded.  Investigators also noted

13             some of the files depicted child pornography dating

14             back to 2005."

15         That's all it says.  It doesn't talk about how they

16  were obtained.  It doesn't talk about Shareaza at all in that

17  paragraph of the presentence report.  And therefore, I find

18  defense objection 3 to be misguided and, on that basis,

19  overrule it.

20         Objection four.  Defendant should be entitled to

21  minor role in that the evidence was overwhelming that the

22  defendant was unaware of the video taken of the minor.

23         I'm overruling that objection in its entirety.  The

24  evidence at trial, to my view, established that the defendant

25  was very active in the filming in question.  Set up the camera

and, you know, by the way, had set up hidden cameras in bathrooms before he became involved with Angele Henry, as we heard evidence establishing.

In addition, there was the bit of the video in which the defendant was captured on that camera, that he had installed, going through what I believe were the victim A.T.'s undergarments, holding them up to the camera, essentially mugging for the camera at that point.  To argue that he was unaware of these videos, I think, is baseless.  And I reject the argument.  The objection is overruled.

Page 9, paragraphs 24 through 26, the defense objects to any victim loss and/or restitution.  I don't think that we're going to get to restitution at this point.  I'm assuming that that will be dealt with following sentencing unless I'm wrong.  I don't think I read anything where restitution figures are being proposed.  Am I wrong about that?  Are you going to do it today?

MR. GAPPA:  Well, there is reference, Your Honor, to -- in the multitude of filings, there is a request for restitution from two different victims.

THE COURT:  Right.

MR. GAPPA:  One much more substantial than the other.  But the Court is -- if I understand what the Court might be suggesting, that can be severed and it doesn't have to be finalized today.

1    THE COURT:  Is the government prepared to take any

2    position with respect to restitution today?

3    MR. GAPPA:  Yes.

4    THE COURT:  So you were going to do that?

5    MR. GAPPA:  If we have time.

6    THE COURT:  Is it in the -- is it in your sentencing

7    memorandum?

8    MR. GAPPA:  We didn't quantify the amounts.

9    THE COURT:  Okay.  All right.  I'll note the defense

10   objection to any victim loss or any payment of restitution.

11   Although these are -- isn't restitution -- is this mandatory

12   victim restitution?

13   MR. GAPPA:  Yes.

14   THE COURT:  That's what I thought.  So to the extent

15   that the objection is to any payment of restitution, or any

16   consideration of any payment of restitution, I'm going to

17   overrule the objection.  It's a Mandatory Victim Restitution

18   Act case.

19   As to any objection to the amount of restitution,

20   I'll hear it when we get down to talking about the specifics.

21   Adjustment for obstruction of justice.  Pages 9 and

22   10, paragraphs 28 and 29.  Is there -- does the defense want

23   to add anything on this?

24   MR. CAPOZZI:  No.

25   THE COURT:  I -- the defendant's testimony was

1    rejected by the jury in all respects.  And I will say I found

2    aspects of it to be incredible and to be lacking in candor.

3    The defendant's complete and total denials with respect to the

4    child pornography in particular, I think they're just refuted

5    by all the other evidence at trial.  And I do find that an

6    obstruction of justice enhancement under the guidelines is

7    appropriate here.  So the objection's overruled.

8            The offense level computations, those are subsumed in

9    the substantive objections.  Mental and emotional health,

10   pages 15, 16, paragraphs 79 through 81.  Footnote 16.  Now --

11   okay.  When you were referring to Dr. -- was it Dr. Malinek's

12   report?  That's Kings View Hospital that you referred to?

13           MR. CAPOZZI:  No, it's not.  But I would withdraw the

14   Kings View.  We don't have anything on it, judge.

15           THE COURT:  Okay.  I reviewed the Malinek report

16   attached to the presentence report.  And I've reviewed doctors

17   Terrell and Seymour's report that were submitted by probation

18   separately.  I've reviewed all those.  Does that moot this

19   objection?

20           MR. CAPOZZI:  Yes.

21           THE COURT:  All right.  Page 7, paragraph 94.  I

22   believe that objection should be sustained.  Maybe it's

23   already been corrected.  The minimum term on Count Two is five

24   years.  Correct?

25           MR. CAPOZZI:  That's page 17, paragraph 94.

1          THE COURT:  Right.  Correct, that count --

2          PROBATION OFFICER:  Your Honor, you are correct, but

3    unfortunately the presentence report does reflect 15 years.

4          THE COURT:  So that should be --

5          PROBATION OFFICER:  It should be five.  And I will

6    change that.

7          THE COURT:  Count One is punishable by a

8    mandatory --

9          MR. CAPOZZI:  15.

10          THE COURT:  -- minimum 15 to 30 max.  Count Two is 5

11   to 20.  It's correct in the probation report on the cover

12   page, it's just in the text there was a typo.

13          And then page 18, paragraphs 106 through 107.

14   Defendants object to any order of restitution.

15          I'm overruling that objection to any order of

16   restitution.  And I don't think that objection is well taken

17   given the Mandatory Victim Restitution Act nature of the

18   offense.  As to any objection to any specific order of

19   restitution, I'll certainly hear that.

20          I think that resolves all the defense objections.

21   Did I miss any, Mr. Capozzi?

22          MR. CAPOZZI:  I don't think so, judge.

23          THE COURT:  Now, the government has an objection to

24   the not including a two level increase under Sentencing

25   Guideline Section 2G2.2(b)(3)(F) on the grounds that file

1   sharing programs were used in this case to download child

2   pornography justifying the two level distribution.  And before

3   I hear from the government, Mr. Micheli.

4        (Discussion between The Court and the Probation Officer at

5           sidebar.)

6            THE COURT:  All right.  Anything the government wants

7   to add with respect to that -- is that the only government

8   substantive objection?

9            MR. GAPPA:  Yes.  And nothing to add beyond what's in

10  the sentencing memo.

11            THE COURT:  Anything the defense wants to add on

12  that?

13            MR. CAPOZZI:  On that issue?

14            THE COURT:  The government's objection.  They want a

15  two point upward adjustment.

16            MR. CAPOZZI:  We object to that.  And I still

17  don't -- as a matter of fact, the testimony was from Hively

18  that none of these -- there's no evidence that any of this

19  child pornography was ever viewed by anyone.  And I would

20  object to the increase of -- by adding this two point

21  enhancement.  Indeed, I would argue that 2G2.2(b)(1), because

22  there is no distribution, two points should be taken off.

23  Submitted.

24            THE COURT:  All right.  Well, I'm not doing that

25  either.  Anything?

1          MR. GAPPA:  No.

2          THE COURT:  All right.  The Court's going to overrule

3     the government's objection with respect to application of

4     2G2.2(b)(3)(F).  This issue regarding whether the Shareaza

5     program was enabled or disabled and when it was and when it

6     wasn't and how many years before and was it on all the

7     computer equipment or part of it is cloudy and murky as I

8     think the discussion here this morning has already

9     established.

10          In addition to that, in 2016 -- in 2016, intent was

11     added to that guideline, or language to that effect, which

12     arguably was an indication from the commission that it should

13     be somewhat more difficult perhaps to apply that particular

14     provision.  In any event, whether any subsequent modification

15     or amendment to the guideline language is indicative of any

16     intent by the commission or not, in this particular

17     case -- and it may be that this issue is murky and cloudy by

18     the defendant's own making.  He was -- he had a very

19     sophisticated computer setup with a significant amount of

20     child pornography on that computer system.  And how it was

21     arranged, how it was done, how it was accessed, how it was

22     transferred was all of his doing.  And so it may be that he is

23     responsible for some of that murkiness.

24          Nonetheless, I'm going to resolve that issue in his

25     favor and adopt the probation office's conclusion that he

1   knowingly engaged in distribution of child pornography upward

2   two level increase should not be imposed in this case under

3   2G2.2(b)(3)(F).

4          Having ruled on those guideline objections and there

5   being no other objections, I find that the applicable offense

6   level is 39.  The defendant's criminal history places him in

7   category Roman numeral I.  Resulting in an applicable

8   guideline range as to Count One calling for a term of

9   imprisonment of between 262 and 327 months.

10          And on Count Two, taking the guideline range to the

11   maximum punishment as to that statute, 240 months.  I do note

12   that the probation office has recommended a sentence at the

13   low end of the advisory guideline range with respect to Count

14   One, that is 262 months term of imprisonment to be imposed

15   concurrently as to both Counts One and Two.

16          The sentencing guidelines, however, are only the

17   beginning part in the sentencing process, the Court is

18   ultimately to impose a sentence that is reasonable as that

19   term has been used by the Supreme Court in its decisions in

20   both *Booker* and *Fanfan*.  Therefore, in addition to the

21   guidelines, the Court will consider the statutory factors set

22   forth at 18 USC Section 3553(a).

23          Is there any legal cause why judgment and sentence

24   should not now be pronounced?

25          MR. CAPOZZI:  Not legal cause, no.

1        MR. GAPPA:  No.  Your Honor, I don't know what point

2   it would be most appropriate to ask, but we have an

3   eight-minute video recorded impact statement from one of the

4   victims of Count Two.  So before the Court does finalize a

5   number, we would like the Court to consider that eight-minute

6   video impact statement.

7        THE COURT:  All right.

8        MR. CAPOZZI:  I would object to that, Your Honor.

9   There's been a written submission from the same victims.

10       THE COURT:  All right.  I'll allow the eight-minute

11  presentation.  But let me first ask the defense.  Mr. Capozzi,

12  anything that you wish to add with respect to sentencing?

13       MR. CAPOZZI:  Yes.  I set out the factors in my

14  formal objections.  He had a chaotic childhood growing up.

15  There was injury while he was in the womb.  He's had physical

16  and emotional abuse at the hand of his adopted father.  And at

17  one point was committed to a mental health facility.  That was

18  at Kings View we were talking about earlier.  You saw the

19  report from Dr. Malinek, Terrell, Dr. Seymour.  He's not a

20  predator.  He's a low risk re-offender.

21       To me, what I find most appalling here is we saw the

22  videos in the courtroom of the bedroom with his wife and this

23  14 year old.  She's never been brought to federal court.

24  She's charged in state court with a maximum penalty of three

25  years.  To me, this is unconscionable that the government has

1  chosen to go after the male and not the female in this

2  particular case.  I think the guidelines are awfully heavy in

3  this particular area of child pornography.  I think many of

4  these guidelines are based on the fact that there's mandatory

5  minimums.  I understand there's a 15 mandatory minimum on

6  Count One and we can't avoid that.

7          I'm suggesting to the Court that the minimum low end

8  of the guidelines is way too high in this case.  He took a lie

9  detector test by a former lieutenant with the police

10  department, it's attached to the probation report.  I think

11  the Court has seen that.  And it says that he wasn't lying.

12  That he's -- not necessarily telling the truth, but there was

13  no indications that he was not telling the truth.

14          He testified as to what he did.  He is an expert with

15  computers.  Did not have any knowledge of the child

16  pornography.  I understand that the evidence is very strong

17  against that.  I understand that.  I would ask the Court to go

18  down substantially lower than the guideline level in this

19  particular case.  And I would ask you to give -- to sentence

20  him to the 15 years.  I still vehemently believe that Count

21  One, there's not enough evidence there to show that it was

22  exploitation of a child.  But that's a jury question, I

23  understand that.  I would submit it.  And I know the defendant

24  might want to say a few words too.  Afterwards.

25          THE COURT:  I'll get to Mr. Henry at the end.

1          And Mr. Gappa, what is the government's -- does the

2     government wish to add anything?  I know you've already argued

3     in your sentencing memorandum for a sentence of 324 months.  I

4     don't think I share that view.  In fact, I'm pretty positive I

5     don't.  But I am curious about any reasons that you think a

6     sentence of that magnitude is appropriate in this case.

7          But I do also want to hear about the prosecution of

8     Angele Henry.  Because from my point of view, she, as to Count

9     One, the more serious of the two counts, would appear, from my

10    view of the evidence at trial, to be equally if not more

11    responsible for the commission of that offense.  And the

12    defense is telling me one thing.  I haven't heard a lot from

13    the prosecution about Ms. Henry.  Or maybe I did and it's just

14    been so long ago that I don't remember.  Things have kind of

15    dragged out here.  But I'm interested in that.  Because one of

16    the 3553(a) factors is disparity in sentencing.

17         And my view of the evidence is that as to the most

18    serious count, the one with the highest guidelines, that she

19    would appear to be at least equally culpable, is that

20    something I should be thinking about in terms of the sentence

21    that I arrive at with respect to this defendant?  Now, there's

22    the other count, which is significant as well.  I understand

23    that.  But anyway, those are things that I'm interested in.

24    And I'll also certainly view the presentation.  Is it going to

25    come up on my screen?

1           MR. GAPPA:  It should.

2           THE COURT:  But you can take those on in whatever

3    order you wish to take them on.

4           MR. GAPPA:  Thank you, Your Honor.  So because I know

5    the Court has considered the government's sentencing

6    memorandum and we went through the 3553(a) factors, I don't

7    think we need to reiterate those.  Except to the extent to

8    rebut some of the argument that we understood this afternoon

9    from the defense.

10          On the issue of his childhood, we touched on that in

11   our sentencing memorandum.  To the extent that he had

12   challenges as a child, that's certainly unfortunate.  It's not

13   unique to him.  But it shouldn't be a significant factor in

14   the government's view.  Because what we're looking at now is

15   conduct which, by my math, took place when he was age 28

16   through age 36.  So well into adulthood.

17          And in addition, he was able to finish high school.

18   He attended community college.  He was gainfully employed for

19   different employers, has an advanced sophistication and

20   familiarity with technology.  So he was, in the government's

21   view, not somebody who has some diminished capacity who's 19

22   or 20 years old.  In addition, he has a prior felony

23   conviction.  Although he's still obviously in category one.

24   There are things that counter the suggestion that the court

25   should give consideration to his allegedly difficult

upbringing.

In terms of the investigation that he is, in the defense view, not a predator, certainly I think a predator is a label that the defense has come up with.  I think what the Court needs to consider is danger to the community.  And in the government's view, is a dangerous person because his conduct escalated from, it appears, viewing legal adult pornography for many, many years.  Apparently using the reaction he was getting from that.  And then having to get into -- even though it wasn't introduced in trial, bestiality, other different genres, which are arguably outside the spectrum of normal interest.

But relevant most perhaps for sentencing is that the child pornography activity started apparently no later than in 2005.  And it was first restrained to activity on his own computer.  And that is one of the factors that came into play in deciding whether to charge his wife.  I'll come back to that and try to work through that discussion in a moment.  But on the issue of his dangerousness, his conduct went beyond what was on the computer.

So, again, arguably it's not a crime, although perhaps voyeurism was an offense that he was committing when he's recording unbeknownst to the victims in his Fresno home.  Those adult females.  But then if it went beyond that to now surreptitiously recording a minor female.

1        And it's very clear to the government that it's

2   something that was his idea because he's talking about, in

3   those text communications when he, not Angele, when he is out

4   in public at, for instance, a baseball game.  He's taking the

5   photos, looking at who else is in attendance, sending those

6   photos to Angele, commenting on them.  Referencing "that

7   category of girl that we were talking about."  When it

8   appeared to be in the context of a 16 year old.  They had

9   access to A.T., who at the time was 14 and 15.

10       So the defense can say he's not a predator.  We're

11  not using that label.  We look at the conduct.  It's conduct

12  that became increasingly concerning, increasingly severe.  And

13  the volume of the material is significant.  Although certainly

14  there have been cases where there are more than a couple

15  hundred videos, these videos are very severe.  Some of them,

16  as has been discussed, exceed three hours or at least one hour

17  in length.  So it's not somebody who casually out of curiosity

18  came across a small number of files.  That activity was

19  ongoing from 2005 through 2013.

20       On the issue of charging Angele.

21       THE COURT:  Well, not so much charging, but just if

22  she really is facing -- and boy, at this point, those have to

23  be pretty dated state court charges if they're still pending

24  and haven't been resolved.  But not so much the decision

25  whether to charge, but just the disparity even if she were to

1   receive the maximum possible punishment with whatever she's

2   been charged with.

3        So I'm not questioning whether she should have been

4   charged here or not charged here, I'm more focused on, hey, as

5   to Count One, A, is my view that she was pretty integrally

6   involved as well.  I mean, the defense tells me -- they want

7   me to say, oh, the defendant wasn't involved in that activity

8   really hardly at all.  And the prosecution's version to me is,

9   well, actually, it was most likely his idea and here's why you

10  should infer that because of other things that we can point

11  to.

12        And like is so often the case, my view's probably

13  somewhere in between.  Which is based upon what I recall

14  hearing at trial, they both seemed pretty integrally involved

15  in the placement and use of that hidden camera.  And wasn't

16  focused by the way, as I recall, it wasn't focused on A.T.

17  She's the perhaps most egregious victim.  But as I recall

18  being told, there were other people being filmed on that

19  hidden bathroom camera who were also victimized.  They were

20  filmed.  I mean, A.T. is the worst of the victims because of

21  her age at the time.  But doesn't seem like it was necessarily

22  directed -- certainly not directed solely at her.  She was

23  very much taken advantage of.

24        But anyway, if I -- in my own mind it seems like they

25  were both, Ms. Henry and the defendant, were both involved in

1    that process.  Should I be thinking at all about, hey, when

2    all is said and done, she faces a maximum of however many

3    years, which is a small percentage of the punishment that's

4    going to be imposed on this defendant in connection with this

5    crime.  Should I be thinking about it at all?

6              MR. GAPPA:  Yes.  But I think it is worthy of being

7    placed in context.  And some of the other factors are that

8    we'll never know what the explicit discussions were, because

9    the defense had attempted to call Angele Henry as a witness.

10   There was a hearing pretrial at which she indicated that if

11   she were called as a witness, she would invoke her Fifth

12   Amendment rights, which is understandable.  However, we don't

13   know precisely which charges are pending and what the

14   statutory maximum is.  My information was that there were

15   multiple counts of 288 and then 311.  So I'm not necessarily

16   convinced that her maximum exposure --

17             THE COURT:  Do we know --

18             MR. GAPPA:  -- is three years.

19             THE COURT:  Do we know what the status of that case

20   is?

21             MR. GAPPA:  Yes.  I was advised recently, meaning in

22   the last week, that her case has been continued yet again.

23   She's been out of custody.  She's gone through more than one

24   attorney.  The defense has been requesting continuances, not

25   the prosecution.  So the next court date will be November of

1 | this year.

2 | So -- but in addition, I think the Court can also
3 | consider that the guideline for the distribution or, at this
4 | point, receipt of child pornography is very significant.
5 | There's no indication at all that she had any interest in the
6 | material that forms the basis for Count Two.  His interest was
7 | pre-dating even his relationship with her.  So although he
8 | tried to suggest that she's the one that had the deviant
9 | interest, it was very clear.  I think a reasonable inference
10 | is that it was he that had the deviant interest and he that
11 | corrupted her.  And he that got her to participate in the
12 | conspiracy.  Was she a willing participant?  Probably.  I
13 | think that's partly why she's being charged in Stanislaus
14 | County.

15 | But there's an additional factor which is that she
16 | never became a US citizen.  So that was one consideration.
17 | She was also extremely pregnant when much of this was going on
18 | and/or when charging decisions were being made.  So the fact
19 | that -- given her lack of any prior criminal history, given
20 | her lack of any demonstrated interest in sexually exploiting
21 | children in any way, and seeing the time that her involvement
22 | correlated to his involvement, the decision was to charge him
23 | in this case.  I'm not suggesting that we would, but the
24 | statute still hasn't run.

25 | So if the Court had strong feelings and views that as

45

1    a basis for feeling that his sentence is too harsh relative to

2    a speculative sentence that she may or may not ever receive,

3    we would certainly consider whether, because the statute

4    hasn't run, whether she should be charged.

5         But focusing on what we do have and what we do know,

6    it would seem that, for the reasons that we've put into the

7    sentencing memorandum, that the sentence that we recommended

8    was based on the belief that he was distributing, which as the

9    Court knows, would have enhanced the offense level by two

10   additional levels, making the range much higher.  So at the

11   low end, it was 324 months.

12        Within the --

13        THE COURT:  You're right.  That was -- right.  So

14   given what I've calculated, where's the government at?

15        MR. GAPPA:  Your Honor, if I could ponder that while

16   the Court considers --

17        THE COURT:  Yes.

18        MR. GAPPA:  -- this impact statement.

19        THE COURT:  That's fine.

20        MR. GAPPA:  It should be ready to go.

21        THE REPORTER: Do you want me to report it?

22        THE COURT:  No.

23      (Playing videotape.)

24        MR. GAPPA:  Thank you, Your Honor, for considering

25   that.  In addition, I'm sure the Court noted that we finally

1  did get a statement from A.T. --

2        THE COURT:  Yes.

3        MR. GAPPA:  -- and her father.  And I hope the Court

4  will consider those.

5        I don't know if I finished the thought of, on the

6  issue of Angele versus Adam and charging.  But the idea was

7  that because Angele was not a United States citizen, she's a

8  citizen of Canada.  If she were convicted of either of the

9  charges for which she's being prosecuted, then it would seem

10 that she would be facing removal to Canada.  Which has its own

11 set of consequences.  That was one additional factor.

12       But on the issue also of disparity, one thing I think

13 the Court needs to also focus on and perhaps give more weight

14 to is other defendants with this charge and similar charges in

15 the Fresno division of the Eastern District of California.

16       Just last week, in a different courtroom with Judge

17 O'Neill, there was a sentencing for a defendant who had one

18 count of conviction similar to Count Two in this case.  As it

19 turned out, at the end of the sentencing hearing, the

20 resulting guideline range was 240 months.  It actually was

21 higher -- would have been higher than that but for the

22 statutory maximum.  So his range was 240 months.  The

23 government argued for 240 months, as I believe probation did.

24 And then having heard from the defendant, who was at that

25 point representing himself, he had multiple attorneys prior to

1   that.  But he received a 240 month sentence with ten years of

2   supervised release.

3           Based on that, as well as additional other cases that

4   have been sentenced in this court, to answer the Court's

5   question, we believe that a 300 month sentence -- without

6   prejudice to what ultimately if we were to pursue an appeal on

7   that guideline issue and prevail, without prejudice to that.

8           Based on the range that we have before us today, we

9   believe that 300 months would be appropriate given that this

10  defendant, for instance, last week, who had only the charge

11  related to receipt, distribution of child pornography.  It was

12  a case investigated by Turlock Police Department.  Detective

13  Hively had a role in it.  But it was conduct that was for a

14  shorter period of time.  And my memory is that it was

15  actually, in the end, a smaller number of child pornography

16  videos involved.

17          So in light of that, our recommendation is for 300

18  months of Bureau of Prisons time with lifetime supervision.

19          THE COURT:  Anything in reply, Mr. Capozzi?

20          MR. CAPOZZI:  Yes.  Yes, please.  Your Honor, the

21  government talked about the defendant's prior criminal

22  history, having a felony.  It was at age 21 and it was a

23  misdemeanor.  It was a theft.  And he received 10 days in jail

24  and three years probation.  The video here -- and it's

25  disheartening to hear all of this from this young lady who is

1  now married and it's just terrible what the child pornography

2  and the effects of it.  No question.  Her concern was the

3  distribution of the child pornography.  And in this case,

4  Detective Hively testified there is no evidence that any of

5  this child pornography was ever viewed.  And he did say that

6  it was disabled.

7          As to Angele Henry, the information that I put in to

8  the objections came directly from the docket sheet of

9  Stanislaus County.  And I've attempted many times to talk to

10  the DA and won't return my phone calls.  But it's a maximum

11  penalty of three years.

12          And in talking to her former attorney, they were

13  working something out where she would be doing 90 days

14  possibly in custody if she pled.  But they keep continuing the

15  case.  She did come to federal court because I wanted her to

16  testify.  But she invoked her Fifth Amendment rights.

17          But keep in mind, the testimony that came out, the

18  defendant did not deal with A.T.  It was Angele Henry who

19  dealt with A.T.  she's the one that A.T. worked with to go to

20  the park to deal with the Art in the Park with the children.

21  I think I sent the videos to the government of her Facebook

22  where she's now on Facebook dealing with young children in her

23  new programs that are going on.

24          The government recommendation of the 300 months is

25  based upon the fact of distribution.  I think distribution

1  doesn't exist in this case.  This young man has had a tough

2  childhood.  He's had some mental problems in the past.  He's

3  been at Kings View, he spent time there.  He's had a very

4  difficult time with his upbringing.  Yes, there is a violation

5  here and the jury has found him guilty.  Clearly there's going

6  to be punishment.

7          I would ask the Court to sentence him closer to the

8  15 years in this particular case, with some reasonable

9  supervision.  And frankly, his expertise is in computer work,

10 I would ask that he be allowed to not be prohibited from

11 working with computers and somehow, some kind of oversight be

12 given there while he's on supervised release.  Thank you,

13 judge.

14         THE COURT:  Mr. Henry, is there anything that you

15 wish to say to me before I impose sentence in your case?

16         THE DEFENDANT:  Reading these impact statements,

17 seeing these videos.  They're heart breaking.  I would never

18 have condoned or tolerated this stuff if I'd known what was

19 going on.  I don't know what else to say.  Sorry.

20         THE COURT:  All right.  I think this is an odd case,

21 has been throughout from my point of view.  Befuddling in some

22 ways.  I don't probably share either party's same view of the

23 case.  Very hard to understand what exactly was going on here

24 and why, in my view.  The defendant, in my view, was to some

25 degree influenced by his then wife.  He's also not -- let me

1   back up.  Leave the exploitation of a minor case aside for the

2   time being.

3          On the child pornography side, I -- I think it is the

4   case that I, and many of my colleagues in sentencing child

5   pornography cases, are often trying to determine exactly what

6   the risk factors in the future are.  Why?  Why is somebody

7   collecting or downloading or possessing this material?  Why

8   are they -- whether it's on file sharing programs, whether

9   they understand all the ramifications are actively involved?

10  Why are they doing this?  You know, what's their issue?  And

11  in some cases it's very, very clear.  And those cases pose

12  very high future risk of danger.  No doubt about it.  And I

13  think, you know, almost ten out of ten judges look at

14  those -- the facts in those cases and say, yes, I'm confident

15  that's a high risk case and the sentence needs to reflect it.

16         But for me personally, those cases probably represent

17  the highest disparity in sentencing.  Because I've imposed

18  time served sentences in child pornography possession cases

19  where I thought the circumstances were truly unique and that

20  there was a very, very low risk of future danger imposed.  And

21  that there was explanations that made sense as to why this

22  person ended up in possession of the material.

23         On one hand in this case, there's -- the government

24  would point me to evidence of the ballgame photos, the

25  defendant's interest in teenage girls, what the government

1  would say was his interest in teenage girls as depicted by

2  those text messages and photographs sent back to his wife.

3      The defense would put a different spin on it,

4  probably pointing towards Angele Henry herself.  I remember

5  being told, or maybe it was during A.T.'s testimony herself,

6  about her feelings of uneasiness.  And I refute -- I agree

7  with the defense about, yes, was Angele Henry more involved in

8  A.T.'s life than Mr. Henry?  Yes, she was.  Was Mr. Henry not

9  involved at all?  No, that's not true.  He was.  There were

10  instances of their contact that, as I recall, A.T. described

11  as creepy or certainly made her uncomfortable.  Especially in

12  retrospect.

13      And yet, on the other hand, you know, here's somebody

14  who, according to the government's version of the case, has

15  been collecting, at least at some level, child pornography

16  since 2005 all the way up through the time of his arrest.  If

17  someone was a pedophile, for example, one would have expected

18  there would be more indication of the defendant having acted

19  out on those impulses over that extended period of time.  Or

20  at least that's the way I think I view it.  So I don't know

21  what to make of this.  Was it -- was it motivated solely by

22  the defendant?  I -- I don't know.  I find it all very, very

23  perplexing.

24      As the government rightfully points out, look, judge,

25  it couldn't have been all Angele Henry, he was -- he had stuff

1  in his possession dating back all the way to 2005.  That was

2  long before he knew her.  You know, the defendant had his own

3  explanation.  Oh, that was just stuff, you know, me and my

4  college friends, you know, accessed but we kept it.  I kept

5  it.  I never looked at it, I kept it.  It's all very odd.

6          I mean, I reviewed the expert reports.  The doctors

7  say that they've studied him and view him as a low risk to

8  children in the future.  There were children living in the

9  home.  There's no suggestion of any inappropriate conduct with

10  respect to the children that were in the home.  And they

11  weren't his.  So I don't know, it just doesn't neatly fit into

12  any sort of characterization.

13          And then all the activity with the hidden camera.  I

14  mean, the defendant can say all he wants about that being

15  Angele Henry's doing, but, you know, that's completely and

16  totally refuted by the testimony we heard at trial about this

17  wasn't the first time he'd planted a hidden camera in a

18  bathroom.  There is serious issues and problems going on here.

19          And the latest victim impact statements from A.T. and

20  her father, you just feel -- you know, I mean, you feel

21  horrible for all the victims.  But, I mean, that just makes

22  your stomach crawl.

23          I am going to -- out of that, what I think is just

24  very unclear, like so many other things in this case, the

25  conduct is extremely serious.  The defendant, in my view, is

1   not deserving of any significant variance.  And I have varied

2   in child pornography cases before, but I'm not going to vary

3   significantly in this one in light of the -- all of the

4   conduct considered together.

5        I do think that his childhood that's been documented

6   in the presentence report, his lengthy employment history, his

7   bizarre relationship with his, what I understand is his

8   ex-wife.  I'm not sure if she's still his wife, but Ms. Henry.

9   Which I think did play some role, though it's hard to put my

10  finger on exactly how great of a role.  That they justify some

11  variance.  Though not nearly to the degree being argued by the

12  defense.

13       Based upon those 3553(a) factors that I've

14  identified, pursuant to the Sentencing Reform Act of 1984,

15  it's the judgment of the Court that the defendant Adam Alan

16  Henry is hereby committed to the custody of the Bureau of

17  Prisons to be imprisoned for a term of 240 months on Count One

18  and 240 months on Count Two, both counts to be served

19  concurrently for a total term of 240 months.

20       The defendant shall pay a special assessment of $200,

21  payment to begin immediately.  The Court finds that the

22  defendant does not have the ability to pay a fine, imposition

23  of a fine is therefore waived.

24       Upon release from imprisonment, the defendant shall

25  be placed on supervised release for a term of 180 months on

54

1   Count One and 180 months on Count Two.

2           By my calculation, on a 20 year sentence with a 15

3   year term of supervised release, Mr. Henry's going to be

4   pretty close to 70 years old or so, maybe even past 70, by the

5   time that supervised release term expires.  And that's one of

6   the things I'm taking into account in imposing a 180 month

7   term of supervised release as recommended by probation.

8           Within 72 hours of release from the custody of the

9   Bureau of Prisons, the defendant shall report in person to the

10  probation office in the district to which he is released.

11          While on supervised release, the defendant shall not

12  commit another federal, state or local crime.  Shall not

13  illegally possess controlled substances.  And shall cooperate

14  in the collection of a DNA sample as directed by his probation

15  officer and shall comply with the standard conditions which

16  have been recommended by the US Sentencing Commission and

17  adopted by this Court.

18          The defendant shall comply with the requirements of

19  the Sex Offender Registration & Notification Act as directed

20  by his probation officer, the Bureau of Prisons or any state

21  sex offender registration agency in which he resides, works,

22  is a student or was convicted of a qualifying offense.

23          The mandatory drug testing condition is suspended

24  based upon the Court's determination that the defendant poses

25  a low risk of future substance abuse.  The Court declines the

1   defense request to modify the conditions of supervised release

2   with respect to use of a computer.  Once he's released from

3   custody, the defendant can certainly inquire both with his

4   supervising probation officer and ultimately with the Court if

5   he wishes to seek modification.  But at this point, I'm

6   imposing all of the special conditions recommended by the

7   probation officer on pages 24 through 26 of the presentence

8   report and all of those are listed are imposed as special

9   conditions.

10          What about the issue regarding restitution?  Is

11   restitution mandatory as to Count One as well?  Or is

12   restitution being sought as to Count One?

13          MR. GAPPA:  Yes and no.  So it would be mandatory but

14   there has not been a request.

15          THE COURT:  And do you anticipate there not being

16   one?

17          MR. GAPPA:  Correct.

18          THE COURT:  What is the government's position, then,

19   with respect to restitution?  The Court typically, in child

20   pornography cases, has imposed an amount of restitution.  In

21   light of the fact that Mr. Henry, if his conviction stands, is

22   going to be serving a lengthy term of incarceration, the

23   amounts typically imposed -- I know one of the victims here is

24   seeking restitution, what, in the amount -- is it just under

25   $20,000?

1          MR. GAPPA:  Your Honor, I read it to be -- that there

2     were two requests.  One is for approximately $1,000, the

3     higher amount is for the $10,000.

4          THE COURT:  Okay.

5          MR. GAPPA:  And the -- that actually relates to the

6     victim that the Court just heard from.  She's alternatively

7     historically been known as Vicki, V-I-C-K-I, but also Lilly.

8     We made, based on the similar packet, a request in that amount

9     last week.  And just for the Court's benefit, for what it's

10    worth, I believe Judge O'Neill imposed a restitution amount of

11    $5,000.

12         THE COURT:  And does that have to be broken out

13    between victims?  Or do I just impose --

14         MR. GAPPA:  It would be for that victim.  The other

15    victim has a much more modest request.  And it appears that

16    $1,000 is what their reasonable request is.  That didn't have

17    nearly the documentation that the Lilly/Vicki victim has put

18    together.

19       (Discussion with The Court and Probation at sidebar.)

20         THE COURT:  Mr. Capozzi, I note that you've objected

21    to restitution on Count -- on Count One, no restitution is

22    being sought.  On Count Two, the government's suggesting that

23    5,000?

24         MR. GAPPA:  That's what Judge O'Neill awarded last

25    week.  The request would be --

1          THE COURT:  The victim's request was 10,000.

2          MR. GAPPA:  And the separate request for a different

3    victim was 1,000.

4          THE COURT:  Do you wish to --

5          MR. CAPOZZI:  My only argument would be is how have

6    they shown there's damages as a result of what Mr. Henry did

7    to them?  I don't think there was any evidence of that and I

8    would suggest no damages should be issued in this case.  I'll

9    submit.

10          THE COURT:  The Court will order restitution in the

11    amount of $2500 as to the victim identified as Vicki, is it?

12          MR. GAPPA:  Yeah.

13          THE COURT:  And $500 as to the victim -- is there an

14    identification?

15          MR. GAPPA:  Tara.

16          THE COURT:  Is it Tara?  I knew it was with a T.  And

17    $500 as to the victim identified as Tara.

18          MR. CAPOZZI:  And we would ask for recommendation to

19    Sheridan.

20          THE COURT:  Sheridan, Oregon?

21          MR. CAPOZZI:  Yeah.

22          THE COURT:  The Court will recommend that Mr. Henry

23    be designated by the Bureau of Prisons to serve his sentence

24    at the Bureau of Prisons facility located in Sheridan, Oregon.

25    Only to the extent that that recommendation is consistent with

1   space availability and security classification.

2          And Mr. Henry, I'll also advise you that if you wish

3   to appeal from this judgment, you must file a written notice

4   of appeal with the Court within 14 days of today's date.  If

5   you cannot afford an attorney in connection with that appeal,

6   the Court will appoint one for you.  Is there anything

7   further?

8          MR. CAPOZZI:  No.  I would ask to be appointed,

9   though, in this case for the appeal.

10         THE COURT:  I'll leave that to --

11         MR. CAPOZZI:  I'll submit it.

12         THE COURT:  -- to the CJA administrator.

13         Anything further from the government?

14         MR. GAPPA:  No, Your Honor.  Just as a matter of

15  housekeeping, on the Court's overruling the government's

16  objection as a technical point, just to preserve our record,

17  we object to that finding.  We understand what it was.  But --

18         THE COURT:  Yes.

19         MR. GAPPA:  -- in addition to the extent there is a

20  preliminary order of forfeiture -- I actually don't see one.

21  But to the extent there is one, we would ask that it be made

22  final.

23         MR. CAPOZZI:  If I can make one comment on that.  I

24  think the government is asking for the computers to be

25  forfeited.  And there are -- there is a lot of family pictures

1    and videos of his grandparents.  We don't want those

2    destroyed.  If we can have those pulled, we wouldn't have any

3    other objection.

4              THE COURT:  Can it be resolved?

5              MR. GAPPA:  We would certainly try to continue to

6    work with Mr. Capozzi.

7              MR. CAPOZZI:  Yeah.  We can try to work together if

8    that's okay with the Court.

9              THE COURT:  Now that you're saying this, you filed

10   something which drew an objection, as I recall.  Am I making

11   this up?  Where you propose an order of forfeiture, but we got

12   an email saying the defense was going to object to it.

13             THE CLERK:  That was on the Way case.

14             THE COURT:  Nevermind.  Wrong case involving

15   voluminous filings.  So I don't think there is an order of

16   forfeiture yet in this case.  If you can work it out and

17   propose one, I'll review it and, if appropriate, sign it.  If

18   you can't work it out, and you submit something, just make

19   sure that it's served on the defense so that if there is an

20   objection, I can attempt to resolve it.

21             MR. GAPPA:  We'll do that, Your Honor.  Thank you.

22             THE COURT:  If there were to be a preliminary order

23   of forfeiture, and I've just missed it on the docket, it's

24   hereby made final and shall be incorporated into the judgment.

25   But I don't think there is right now.  Thank you.

60

1          MR. CAPOZZI:  Thank you, Your Honor.

2      (The proceedings were concluded at 12:46 p.m.)

3

4          I, KAREN HOOVEN, Official Reporter, do hereby certify

5   that the foregoing transcript as true and correct.

6

7   DATED:  20th of November, 2018     /s/  Karen Hooven
                                       KAREN HOOVEN, RMR-CRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25