UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DRODZ


UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      vs.                          )   1:13-CR-00409 DAD
                                   )   TRIAL DAY 2
ADAM ALAN HENRY,                   )
                                   )
            Defendant.             )
                                   )
_____    )



Fresno, California              WEDNESDAY, NOVEMBER 8, 2017



                REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES OF COUNSEL:

For the Government:             **DAVID GAPPA and ROSS PEARSON**
                                Assistant U.S. Attorneys
                                2500 Tulare Street, Suite 4401
                                Fresno, CA 93721-1331


For the Defendant:              **ANTHONY CAPOZZI**
                                LAW OFFICE OF PATRICK CAPOZZI
                                1233 W. Shaw Avenue, Suite 102
                                Fresno, CA 93711-3718


Volume 2, Pgs. 144 - 378, inclusive


REPORTED BY:  RACHAEL LUNDY, CSR #13815

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

145

INDEX

EXAMINATION                                                    PAGE

BRITTON MOORE                                                  287



PLAINTIFF'S EXHIBITS

NO.         DESCRIPTION                                       PAGE

6           Presentation on Computers                         294

2.1         ShareazaLE Files Downloaded to                    312
            Lock-N-Stitch Address

3.1                                                           319
through     Photos, Lock-N-Stitch Search Warrant
3.7

1A          Hard Drive from Lock-N-Stitch                     323

1A.1        Forensic Report Created from 1A Showing           326
            Location of Child Pornography Files

1A.3        Child Pornography Video from Incomplete           330
            Folder on 1A

2           Network Activity Report                           332

1A.6        List of 40 Child Pornography Video Files          335
            Found on Lock-N-Stitch Hard Drive (Ex 1A)

5.1         Ceres PD Burman Drive Search Warrant              339
through     Photos
5.14

9           Netgear ReadyNAS                                  345

16          Computer Tower from Garage (Ceres PD Item         345
            16)

18          Loose Hard Drive                                  346

146

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 4 | Defendant's Apple iPhone seized at Lock-N-Stitch | 350 |
| 17 | Defendant's Apple iPhone (Model A1303 seized by Ceres PD at Burman Drive | 351 |
| 1A.4 | Report on Shareaza Search Terms Extracted from 1A | 356 |
| 9.1 | Forensic Analysis Report on Partitions on Exhibit 9 | 360 |
| 9.3 | Folder Structure for Exhibit 9 - Aurrora side | 363 |
| 9.3 | Folder | 363 |
| 9.4 | Report Showing File Paths for Child Pornography Videos Found on Exhibit 9 | 365 |
| 9.2 | Folder Structure for Exhibit 9- Media Side | 369 |
| 10.1 through 10.7 | FBI Burman Drive Search Warrant Photos | 373 |
| 12 | Canon Vixia Camcorder | 375 |
| 13.1 and 13.4 | Small Cameras from Garage | 376 |

WEDNESDAY, NOVEMBER 8, 2017          Fresno, California
8:30 a.m.

3        THE COURT:  Let the record reflect that we are

4   outside the presence of the jury.  I'm not sure if counsel has

5   had a chance to give additional thought.  I've given it some

6   additional thought over night.  It seems to me that we've got

7   possibly three options.  One of -- move forward with this

8   group, have challenges exercised, rule on them, take it until

9   we're at a point where we know whether we can or cannot get a

10   jury out of this panel and if we can move forward.  If we

11   cannot, then recess until next week to get an additional panel

12   of jurors.

13        And depending upon what you think about the exchanges

14   of yesterday, the other option is to release this panel

15   entirely, tell the jury administrator that I want even larger

16   panel, and reconvene next week and begin anew.

17        If we were to do that, I would probably modify my

18   normal practice and encourage counsel to give me very specific

19   pinpointed questions that they want me to put to the jury.

20   And I probably would be inclined not to allow supplemental

21   Voir dire by counsel at that point.

22        Not that I -- don't take that as any criticism.  I

23   don't intend any.  I don't think anything that happened during

24   attorney voir dire yesterday was inappropriate at all.  I just

25   think that the questions coming from me -- it's the sort of

1    subject matter it seems to me that once one juror in a group

2    setting, as opposed to individual -- individual voir dire

3    expresses a strong opinion that especially if counsel is doing

4    the questioning, that it can, and we saw it take place

5    yesterday, quickly spread.  And all of a sudden, folks that,

6    for a variety of reasons, perhaps, would prefer not to be

7    serving jury duty, all of a sudden jump on the bandwagon and

8    say "me too."

9              So, like I said, those, it seems to me are choices.

10   I'm not sure what you folks have talked about, whether you've

11   got a suggestion that you think gets us moving in a positive

12   direction today towards selecting a jury.

13             Mr. Gappa, any thoughts?

14             MR. GAPPA:  Your Honor, just a question.  Did the

15   Court say there were three options?

16             THE COURT:  Well --

17             MR. GAPPA:  What's a hybrid?

18             THE COURT:  The first one was actually two options.

19   We move forward and we either get a jury out of this pool or

20   we couldn't.  That's two.

21             MR. GAPPA:  Okay.

22             THE COURT:  The third is, pull the plug on this

23   panel, send them all home, and start over again.

24             MR. GAPPA:  Your Honor, we think those are the

25   available options.  And just so the Court knows, the

1   Government gave considerable thought and effort with trying to

2   come up with a proposed stipulation.  Ultimately, we drafted a

3   proposed stipulation, but didn't send it to counsel because

4   our analysis was we can't not show videos that arguably are

5   depictions of child sexual exploitation.

6          So the idea, and the majority of the focus was on the

7   child pornography, which was downloaded from the internet, and

8   recovered on the Defendant's devices.  And that is admittedly

9   more severe material.  And I believe that's probably what

10  counsel was referring to when he said he's seen this material,

11  and it's very disturbing, and it shows sex between adults and

12  children.

13         So if the jurors are told in advance that's the type

14  of material, and then there's all of this discussion, and then

15  a resolution, and then this morning they were told, We've

16  resolved that issue.  You won't have to review any of that

17  material.  Yet, we have another account, which, there is

18  absolutely no way to prove that account without showing the

19  videos that the Defendant surreptitiously recorded.

20         Then, by logic, I think anybody could fairly infer

21  that, Well, if we're being shown this material, and we were

22  told it wouldn't be severe child pornography, what do we make

23  of this?  It must not be that bad.

24         And if the Government has to prove, among other

25  things, that a visual depictions meets these elements, that's

1    something that now much more difficult for us.

2          So although, in a different case it might work to

3    come up with a stipulation.  It just doesn't in it case.  I

4    just wanted to put that on the record so that the Court didn't

5    think we were being obstinate or didn't consider all the

6    options.

7          THE COURT:  I understand the Government's position.

8    As I said yesterday, it's completely up to you.  You know your

9    case far better than I, especially, under these circumstances

10   where the matter was just reassigned to me yesterday.  I'm

11   just picking it up as we go.

12         So what would you like to do in terms -- what's your

13   position about what you'd like to do?  Do you want to forge

14   forward with this group, take their temperature this morning,

15   and see if we can get a jury out of this group?  And if not,

16   then go to -- just bring them back again, or do you want to

17   pull the plug on them and start over with a larger group?

18         MR. GAPPA:  Your Honor, I think we should move

19   forward, and do what we can today.

20         THE COURT:  Mr. Capozzi, what's your position?

21         MR. CAPOZZI:  This group is biased against me.

22   They're upset at me, because I brought this issue up.

23         THE COURT:  I don't think so.

24         MR. CAPOZZI:  Boy, I sure caught it up there.

25         If you don't think so, maybe we should go ahead.  But

1  boy, they're upset with me.  That's why I wore blue today.

2       THE COURT:  Is that it?

3       MR. CAPOZZI:  Try to tone it down?

4       THE COURT:  Is that a calming of influence?  What do

5  I have on them?  I'll wear anything it takes.  I'll put on a

6  clown mask, if it can get everybody thinking clearly.

7       MR. CAPOZZI:  Especially, Juror 011.

8       THE COURT:  Right.

9       MR. CAPOZZI:  The one juror that went off.

10       THE COURT:  I thought she was -- Mr. Capozzi, I don't

11  think she was mad at you.  She was definitely mad at me.

12       MR. CAPOZZI:  But see, I would have preferred those

13  tough questions to come from the Court.  But you just received

14  this case.  You didn't know what was coming.  And I just

15  looked at those videos two days ago, just portions of them.  I

16  can't stipulate that they not be played.  Well, I can, but I

17  can't stipulate to the agents describing them, because I

18  haven't seen them.  I've only seen snippets of two.  I guess

19  they're playing six.  I'm not aware of what's coming.  In.

20       I think they're biased.  We can try, but I think we

21  should start anew without the new panel, because everybody in

22  the courtroom heard what went on.

23       And one juror was excused because she wouldn't look

24  at it.  And others said they didn't want to look at it.  And

25  some say, I can't be sure that I can be fair.  That's not fair

1   to this Defendant.

2         THE COURT:  Well, I understand that, and I'm assuming

3   that there are challenges for cause --

4         MR. CAPOZZI:  Oh.

5         THE COURT:  -- that you're going to be making.

6         MR. CAPOZZI:  Yes.

7         THE COURT:  But what about the others?

8         For instance, there's going to be jurors in that

9   group of 21, who, I assume, you are not going to have

10   challenges for cause?

11         MR. CAPOZZI:  But I have preemptories that's were

12   going to --

13         THE COURT:  Right.

14         MR. CAPOZZI:  -- after yesterday's --

15         THE COURT:  Right.  But is it your position that

16   those who were in the courtroom, even those who have answered

17   questions indicating that they have no bias or prejudice and

18   can fairly serve as jurors, that they, too, at this point,

19   should be found to be subject to challenge for cause?

20         MR. CAPOZZI:  I think the Court should ask them

21   questions about it now.

22         THE COURT:  All right.

23         MR. CAPOZZI:  I think you really need to get into

24   that, because it's a proper.

25         THE COURT:  All right.  I will do that.

1        MR. CAPOZZI:  But I would prefer to get rid of this

2   panel.  I think after yesterday -- I've never had that before,

3   and the Court hasn't, in all my years of practice.

4        THE COURT:  All right.  Well, I'm going to conduct

5   some additional voir dire, some generalized voir dire about

6   whether anybody, after thinking it over overnight, especially,

7   the folks who have indicated some particular problem, whether

8   they're -- not ask for any long-winded speeches, just whether

9   or not they've thought more about the questions of yesterday

10  and whether their position has changed at all.

11       I probably, then, bring you to sidebar and ask for

12  preemptory -- excuse me, challenges for cause.  And excuse

13  those folks, to the extent I think they should be excused.

14  Fill them, and see, okay, what do we have left?

15       And then, I'll do some follow up with them, just to

16  see.  And I'll get your view points at that point.  But I'd

17  like to at least see whether we've got some subset of jurors,

18  at least, from whom we may be able to at least begin selecting

19  a jury out of this panel.

20       MR. CAPOZZI:  There's one other question I didn't

21  bring up that I still think is going to be a problem.  We

22  talked about the child pornography.

23       THE COURT:  Right.

24       MR. CAPOZZI:  What the evidence is going to show is

25  that there's thousands of videotapes of adult pornography; is

1    that going to be showed them?

2             THE COURT:  All right.  With --

3             MR. CAPOZZI:  We need to get into that aspect.

4             THE COURT:  That's coming into evidence, Mr. Gappa?

5             MR. GAPPA:  Certainly not our focus.

6             THE COURT:  Okay.

7             MR. GAPPA:  And there was a motion by the defense to

8    keep out some of the adult pornography that the Defendant

9    created.  And I think the ruling was that, at least,

10   preliminary the Government would not be allowed to show the

11   material that he created.

12            So there is, I believe, though, may be what

13   Mr. Capozzi is thinking about that -- well, during the course

14   of the trial there definitely be reference to downloading

15   adult pornography, because that's in part the Defendant's

16   defense, that he was only looking for adult pornography.  And

17   there is a substantial quantity of adult pornography, but

18   that's definitely not our focus.

19            THE COURT:  All right.

20            MR. CAPOZZI:  Evidence about going to come in about a

21   peer-to-peer downloading at the office where he worked, and

22   that the search terms that were put in.

23            Our argument is that the search terms, many of the

24   search terms, 99 percent of the search terms are all for adult

25   pornography.

1          THE COURT:  Okay.

2          MR. CAPOZZI:  There may be some argument as to

3   whether or not some of that could be child pornography, too.

4   There are some terms for child pornography no doubt about

5   that, but they need to know there's a lot of adult

6   pornography.

7          THE COURT:  Okay.

8          MR. CAPOZZI:  That might offend.

9          THE COURT:  But we don't have to talk about this now,

10  but at some point in this case, before we go forward, after

11  jury selection -- I'm a bit perplexed by Mr. Capozzi saying, I

12  haven't seen all the videos that are going to be shown, and

13  I've only seen snippets of two.  And yet, I understand there's

14  going to be six.

15         I don't quite understand that.  I would have thought

16  that that would have been produced in discovery, that

17  Mr. Capozzi and defense would have had access to those videos.

18  No?

19         MR. GAPPA:  They have.

20         MR. CAPOZZI:  We've had access to two that we saw,

21  last Monday I think it was.

22         And then, I thought there were only going to be four,

23  and now there's six.  But maybe sometime today, I can look.

24  They're not going to play all the videos.

25         MR. GAPPA:  Your Honor, so that is not true.

1          THE COURT:  You understand why I'm perplexed.

2          MR. GAPPA:  I understand.

3          MR. CAPOZZI:  I am perplexed too.  I want to hear why

4    this is not true.

5          MR. GAPPA:  So among other things, the defense in

6    this case had retained and has retained, Mr. Lawson.

7    Mr. Foley -- I'm sorry, there was a defense attorney, who is

8    representing the Defendant's wife.  The state laws is

9    different.  They were given access to the contraband.  So

10   their expert has actually had access to the contraband.

11         But separate from that, the Government has made all

12   the contraband from the inception of the case available

13   through the FBI office in Sacramento.  And Mr. Lawson has been

14   there, and he's reviewed it.

15         We've also put together exhibit lists, and -- and let

16   counsel know, If you want to come review these, come do that.

17         And what he's telling you about is, we had a

18   stipulation -- not on the issue of what is or isn't child

19   pornography.  There was a stipulation that covered two

20   elements of one of the counts.  And it referenced four files

21   and four titles and there were three videos.

22         And so after the stipulation, Mr. Capozzi said, I

23   guess I should review that material.

24         And we said, "Fine.  No problem," and made

25   arrangements to have that accomplished.

1          So I think that's what he's saying he's reviewed some

2     of it, but there's never been any inference of any request to

3     review any or all of the contraband.  And to the extent that

4     we get to the point of playing six, we're happy at any point,

5     today or whenever, show the specific six files.

6          But we're not going to accept that somehow we haven't

7     turned over anything, we haven't met our discovery

8     obligations.

9          THE COURT:  Your position, basically, is you've made

10    it available, although, given the restrictions on it's

11    dissemination, under congressional wisdom, that it has been

12    made available.  The defense expert, you believe, has availed

13    himself of the review.  Counsel may not have reviewed all of

14    them, but they have been made available, if somebody wanted to

15    travel to Sacramento, make arrangements, get inside of, you

16    know, a deeply bunkered FBI video review room and review them?

17         MR. GAPPA:  Yes.  And we've also made other

18    arrangements where if Mr. Capozzi would have said, Look,

19    that's inconvenient.  I don't want to travel 100 miles to

20    Ceres.  Can you bring it to the Fresno office, we've done that

21    in other instances.  So --

22         THE COURT:  Well --

23         MR. GAPPA:  I'm not saying that -- I'm just --

24         THE COURT:  You're saying that what it is from your

25    point of view.

1          MR. GAPPA:  Exactly.

2          THE COURT:  I think I understand.  All I'm saying,

3     though, is, this issue needs to be addressed further, that it

4     be addressed now or very soon.

5          MR. CAPOZZI:  Yes.

6          THE COURT:  As opposed to in the middle of the

7     presentation of evidence.

8          Last question:  You want to play six videos?

9          MR. GAPPA:  A portion.

10         THE COURT:  How many minutes are we talking about?

11         MR. GAPPA:  Well, we --

12         THE COURT:  Total.

13         MR. GAPPA:  Your Honor, we have edited each of those

14    to approximately 30 seconds.  And we may not even play that 30

15    second excerpt.

16         THE COURT:  So 30 seconds each?

17         MR. GAPPA:  Correct.

18         Bless you.

19         THE COURT:  So we may be talking about three minutes

20    of video?

21         MR. GAPPA:  Of the more severe videos related to the

22    receipt charge.  There's approximately ten videos --

23         THE COURT:  The other exploitation videos?

24         MR. GAPPA:  Correct.

25         THE COURT:  That are of a different nature?

1          MR. GAPPA:  Which do not show sexual activity.

2          THE COURT:  Well, I would just continue to urge the

3    Government counsel to, for the reasons that, you know, are

4    playing out in front of us, to really think hard about how

5    much really is necessary to be shown.

6          Even three minutes, I mean, it doesn't take much, it

7    seems to me to -- based upon my experience insofar in trying

8    these cases.  Three minutes of video is a long time.  Even 30

9    seconds of video can be a very long time.  So I would urge you

10   to continue to consider just how much you find it necessary to

11   subject the jury to, if for no other reason.

12         All right.  Let's bring them up.

13         MR. CAPOZZI:  Can I get my side?

14         THE COURT:  I mean, I'm not ruling on anything.

15         MR. CAPOZZI:  Okay.  But that wasn't -- what you just

16   heard isn't true, you know.

17         THE COURT:  Okay.

18         MR. CAPOZZI:  Judge --

19         THE COURT:  Work it out.

20         MR. CAPOZZI:  There's a stipulation for four videos

21   in this case that the agency -- or the police will testify

22   that these girls are from another state that shoe interstate

23   commerce.

24         Now, as to Mr. Lawson representing the wife, working

25   for the attorney for the wife, he may have done that.  I'm

1    unaware of any of this.  I didn't send him out to look at any

2    videos.  If he's seen them, I know -- I have no idea.

3         And again, I think he'd like to say something

4    regarding that.

5         THE COURT:  I don't want to hear from him.

6         MR. CAPOZZI:  I have not seen those videos.  I have

7    not had that opportunity to do that.

8         THE COURT:  When you say you haven't had that

9    opportunity, what do you exactly mean?

10        MR. CAPOZZI:  They're out there.  I could have gone

11   in, but I've been under the understanding there's four videos

12   that we stipulated to.  And that's what I thought was going to

13   happen here.  And now we have six that I'm not aware of, and

14   his stipulation says four.

15        THE COURT:  My -- I haven't read your stipulations,

16   and I got this case assigned to me yesterday.  So I have no

17   idea what you folks have been discussing in terms of

18   stipulation or not, but it sounds to me like the stipulation

19   involves what officers would testify to regarding impact on

20   interstate commerce.

21        MR. CAPOZZI:  Right.

22        THE COURT:  And I applaud the parties for trying to

23   streamline things by reaching stipulations so that unnecessary

24   witnesses don't have to come in and testify and consume court

25   time.

1          Doesn't sound to me like that stipulation has

2    anything to do with the stipulation about how many videos are

3    going to be shown with respect to the pornography or anything

4    else about the admission of evidence.

5          What I hear Mr. Gappa saying is, Look, Judge, like

6    any other case, any other case involving a case of child

7    pornography, we have restrictions on how we can disseminate

8    this stuff.  We can't just send defense counsel a disc.  And

9    this is just like every other case.  We're under that

10   obligation.  Congress has put those obligations on all of us.

11         And so in case, we notified defense counsel, all the

12   child pornography evidence is located in the FBI lab in

13   Sacramento, if you want to make arrangements to view, please,

14   let us know.

15         If that's not convenient, we can talk about some way

16   we can make it more convenient.  But we cannot release it to

17   you, and we can't send it to you in a disc of it, under the

18   law.

19         And their view was, and we thought everything was

20   okay in terms defense access, because Mr. Lawson, we thought,

21   had been out there to view it.  And nobody every asked us for

22   any other access.  Is that a fair characterization?

23         MR. GAPPA:  Yes.

24         THE COURT:  So if we've had a failure to communicate

25   here, where Mr. Capozzi, you thought for some reason you were

1   going to be shown somewhere else, the video evidence, as

2   opposed to having to make arrangements to go see it, where it

3   was being held inside the FBI offices, then what I'm saying

4   is, let's get that hammered out, and have you look at what the

5   Government intends to introduce so that you can argue to me,

6   if you wish, Judge, they shouldn't be allowed to show all

7   that.

8          MR. CAPOZZI:  But Judge, we went in last week to see

9   the videos they were going to show.  We saw them.  There were

10  two.

11         We'll take care of it, Judge.  It's not your problem.

12  We'll take care of it.

13         THE COURT:  Mr. Gappa, Mr. Pearson, if you know what

14  it is you intend to present, can you make whatever

15  arrangements are necessary for Mr. Capozzi to see it in its

16  entirety?

17         MR. GAPPA:  Yes.

18         THE COURT:  And once you've done that, Mr. Capozzi,

19  if you've got objections, raise them at a time outside the

20  presence of the jury, so I can avoid wasting their time.

21         MR. CAPOZZI:  I agree.

22         MR. GAPPA:  Your Honor, the only other item I have --

23  I'll just toss it for the Court's consideration is that in a

24  different case once, it was Judge Wanger, it was the only time

25  I've known him to have individualized voir dire with some of

1    the members.  And the reason I bring it up is that it

2    potentially could greatly reduce the risk of, as the Court saw

3    and noted, everybody saying "me too," if they see somebody

4    excused in response to a question of, Would you review this

5    material?  Could you do your job, and they say, "no."  I think

6    that's less likely to happen if it's an individual

7    questioning.

8         It's obviously much more time consuming, but if it

9    obviates the need to bring in a larger group next week on

10   balance.  It may be worth considering.

11        THE COURT:  I think it's not a bad suggestion, if I

12   get to the point of having to bring in another panel.

13        MR. GAPPA:  Okay.

14        THE COURT:  I think I've already crossed the Rubicon

15   with this group.

16        MR. GAPPA:  Okay.

17        THE COURT:  So I've got to do the best I can.  Let's

18   send them up.

19      (Prospective jury enters courtroom.)

20        COURTROOM DEPUTY:  Good morning, everyone.  If you

21   were previously in the jury box, could you take the seat you

22   were in yesterday.  That would be great.

23        Good morning, everyone.  I'm going to call your last

24   name.  If you could raise your hand, let me know you're here.

25      (Roll call.)

1          THE COURT:  Good morning, ladies and gentlemen, and

2     thanks for being back so timely.  We've been spending some

3     additional time talking about jury selection, seeing what we

4     can get accomplished in that regard.

5          Let me just ask a few very specific questions to

6     determine how we'll proceed from this point.  We had a

7     discussion towards the end of the day yesterday, when a number

8     of you expressed reservation about your ability to review, or

9     view at all, some of the evidence that I anticipate will be

10    admitted into evidence during the trial of this case.  And if

11    you need any more specific inquiry, let me know.

12         Juror 011, had a chance to probably mull things over

13    over night.  Having done so -- now has the microphone --

14    having done so, do you still feel the same way about your

15    ability to view the evidence that was referred to?

16         PROSPECTIVE JUROR IN SEAT NUMBER 11:  Yes.

17         THE COURT:  And your position is that you would not

18    view that evidence, if it was admitted into the trial?

19         PROSPECTIVE JUROR IN SEAT NUMBER 11:  Correct.

20         THE COURT:  Juror 008 -- can we pass the mic down.

21         You've had time as well to think about some of the

22    things that you all talked about --

23         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes, sir.

24    Yes, sir.

25         THE COURT:  -- last time.  Has your position changed

1   at all?  Would you be able to serve on this jury and view the

2   evidence that's been referred to?

3       PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I will not

4   view the evidence.

5       THE COURT:  All right.  If we could pass it back

6   down.  I'm sorry.

7       Juror 012, it's my recollection that your position

8   was a little bit more nuanced.  I think you expressed thoughts

9   that it was difficult for you to say that you'd never been in

10  a position to consider these questions before.  You weren't

11  sure how might affect you or might not affect you.

12      Having thought about it over night, and thought about

13  the exchange that we had, do you think that you could serve as

14  a fair and impartial juror in a case such as this one where

15  there may be, or will be, some evidence submitted of child

16  pornography?

17      PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  I won't be

18  able to watch it.

19      THE COURT:  If you could pass it up behind you.

20  Juror 005, you too, seemed to me, had a nuance response to

21  these questions.  So I want to be clear.

22      Do you think you could serve -- you've learned a lot

23  about the case and about some of the evidence that will be

24  admitted during the trial, knowing what you know so far, do

25  you believe that you could serve as a fair and impartial juror

166

1    and consider all of the evidence admitted in the case?

2         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I don't know.

3         THE COURT:  When you say you don't know, what exactly

4    are you uncertain about?  Your ability to be fair and

5    impartial, or your ability to view and consider all of the

6    evidence in the case?

7         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  Probably

8    both.  It's just lot of turmoil and I would have a very hard

9    time seeing the images.  I really don't want those in my mind.

10        THE COURT:  Juror 028, if we could pass the mic to

11   her.  Do you think you could be fair and impartial about

12   these --

13        PROSPECTIVE JUROR IN SEAT NUMBER 14:  You know, I

14   thought it about it last night, and I really -- I don't think

15   I could be fair and impartial, because of the because of the

16   images, you know.  I don't -- I don't think I could.

17        THE COURT:  Juror 021, I recall your answers and

18   expressing some concern.  I've got to admit, I don't think I

19   took quite as good of notes.  I was a bit back on my heels by

20   that point, I think.

21        But what do you think after thinking it over over

22   night, do you think you could be a fair and impartial juror in

23   this case and consider all of the evidence on both sides?

24        PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I'm not

25   sure, if I could consider all of the evidence.  I would want

1   to be.  I think I expressed that yesterday.  I would certainly

2   want to be fair.

3         I just -- I don't if I -- and again, I know you need

4   an answer.  I just -- I don't know how it would affect me.  I

5   know that seeing the images would be, of course, incredibly

6   disturbing for anyone.  But I -- I would want to be fair.  I

7   just -- I'm not sure if I could look at all the evidence.  I'm

8   just not sure.

9         THE COURT:  I mean, some of what you said is exactly,

10  from my perspective, from my perspective, the appropriate way

11  to, at least, think about it.  And I understand that and I

12  think as Juror 012 indicated yesterday, in response to one of

13  counsel's questions, it's hard to say how something is going

14  to affect me that I've never been called upon.  And I agree.

15  It is.

16        I talked a bit about it yesterday.  There are many

17  principals at stake here.  One is the constitutional right to

18  a fair trial, in front of an unbiased, unprejudiced jury who

19  can weigh the evidence on both sides and make determinations

20  about what the facts are, and then take those facts and apply

21  them to the law.

22        And every citizen of the United States, in fact, even

23  noncitizens who are here in the United States, have the right

24  to a fair and unbiased jury trial if they're accused of a

25  crime.  So that's a significant principal at stake.  Really

1  our whole system of justice relies on it.  It's what one of

2  the cornerstones of what makes us great as a nation.

3          So I get it when people are struggling with a notion

4  of, Look, I want to be fair.  And you're absolutely right,

5  those of you of who have said, Look, either, A, I can't be

6  fair in light of the nature of the evidence because my brain

7  will just shut down.  I can't do it.  Or B, No, I'm not

8  capable of viewing that evidence.  I can be a juror on another

9  case, but not on this kind of case because I can't even

10 consider the evidence.

11         And I've got to trust that each one of you are giving

12 me your honest heart-felt answers about that, and that those

13 answers are not just, Look, I don't want to view the evidence.

14 I will find it difficult to view the evidence.  It will be

15 troubling to me to find the evidence, know that it really is,

16 I cannot do my duty, under the constitution fairly and

17 impartially, because I cannot do it.

18         I've got to bank on the fact that you're all telling

19 me, No, it's really to that point that, no, I want to, but I

20 can't.  Because there's something just as in important on the

21 other side of that, and that's the constitutional right to a

22 fair trial by an unbiased, unprejudiced jury who is willing to

23 consider evidence and decide what the facts.

24         So I get the struggle, and I feel, Juror 021, you're

25 in the middle of that struggle, not sure in your own mind,

1   Will I be able to, or will I not?

2          But by giving that little speech, I've given you a

3   little more time to think.  What do you think?  Do you think

4   you'd be able do it, or do you have serious doubts about your

5   ability?

6          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I do

7   appreciate the case that you're making, sir, I do.  And I

8   absolutely understand it and believe that everyone deserves a

9   fair trial.

10          I just -- I -- as I said yesterday, if it were any

11   other kind of case, I know -- I really believe I could.  This

12   one concerns me greatly.

13          THE COURT:  All right.  Juror 019, on a completely

14   unrelated subject, can you be fair to the defense in this

15   case, or have you already prejudged it?

16          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No, I can

17   be fair.

18          THE COURT:  You don't think -- you don't harbor any

19   bias that in your own mind, Look, a charge has been filed,

20   that's good enough for me?

21          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No.

22   Because like I said yesterday, until I see evidence, you can

23   be uncomfortable with the situation that we're in, but still

24   look at it as a trial.

25          THE COURT:  Okay.

1           All right.  I think that I followed up with everybody

2     that I wanted to follow up on.

3           Can counsel approach sidebar?

4        (Sidebar held.)

5           THE COURT:  Is there anybody else that anybody wanted

6     me to specifically follow up on before determining who is

7     going to stay?

8           MR. CAPOZZI:  I would like you to follow up with some

9     of them, particularly number 7, the guy on the end closest to

10    you on top.

11          THE COURT:  Oh.

12          MR. CAPOZZI:  Some of the others -- we just did

13    woman.  And Juror 023, because he had his hand up at the end

14    of the day.  We asked him --

15          THE COURT:  Juror 023 just want the --

16          MR. CAPOZZI:  I wish he would say something.

17          THE COURT:  He'll do anything.  He has to be able to

18    get off.

19          MR. CAPOZZI:  But then he says he can be fair.

20          THE COURT:  Utilizing argument, I'm not talking to

21    Juror 023, but Juror 007 about his ability to understand.

22          MR. CAPOZZI:  Understand, yes.

23          THE COURT:  Okay.  Wanted to follow up a little more

24    about him.

25          MR. CAPOZZI:  Looking at these videos, would -- can

1    one look at them?  Can they be fair once they see it, and also

2    the adult videos, the adult pornography, if there's --

3            THE COURT:  I'm not done.

4            MR. CAPOZZI:  Okay.

5            THE COURT:  I'm just talking about right now, are

6    there any challenges for cause?

7            MR. CAPOZZI:  Oh, God, yes.  The ones you just did.

8            THE COURT:  Okay.

9            MR. GAPPA:  Well, no.  I don't think --

10           MR. CAPOZZI:  Really?

11           MR. GAPPA:  Well --

12           THE COURT:  Hold on.

13           MR. GAPPA:  Why?  Procedurally, just so I'm clear, is

14   there a way -- just because I think what will happen is if

15   whatever number -- if there's a number that be excused at this

16   point, they're going to know why, because everybody who

17   reviews is going to have say, I can't review, in return.  So

18   everybody else is excused in that.  And everybody else who

19   doesn't want to be here for whatever reason is going to know,

20   All I have to do is say I can't view the material.  So --

21           THE COURT:  Always the case.

22           MR. GAPPA:  Is there a way that we can combine it

23   with a preemptory dismissal?

24           MR. CAPOZZI:  That's not fair.

25           MR. GAPPA:  Well, to say that these will be excused

1  for cause, but we knew that the preemptories, and we do it all

2  as a group --

3          MR. CAPOZZI:  No.

4          MR. GAPPA:  -- to a point, because it sound with your

5  procedure that it's very likely we're going to have to fill

6  some spots anyway.

7          THE COURT:  Well, I still want -- are you challenging

8  anybody for cause?

9          MR. GAPPA:  No.

10         MR. PEARSON:  No.

11         THE COURT:  Mr. Cappozi?

12         MR. CAPOZZI:  Yes, every single one of them that you

13  excuse.

14         THE COURT:  Okay.  I'm not sure, Mr. Gappa, that I

15  can mask it at this point.

16         MR. CAPOZZI:  Obviously, Juror 011, she will not view

17  the evidence.  Juror 008, Juror 012, Juror 005, Juror 028,

18  Juror 021.

19         THE COURT:  You're moving to excuse all of those for

20  cause?

21         MR. CAPOZZI:  Oh, God, yes.

22         THE COURT:  And your position?

23         MR. GAPPA:  I believe that's as thorough as the

24  Court's questioning was on several, it didn't go beyond, Would

25  you view the material?  I mean, is the focus, really at this

1 | point on whether they could be fair and impartial.  So in

2 | other words, somebody may say, I don't know want to view the

3 | material, because I just want --

4 | THE COURT:  Again, did you find anything that says

5 | that a juror can do their duty and refuse to look, even view

6 | some of the evidence in the case?  I'm having a hard time

7 | figuring that out.  How they can do both, or how they can

8 | refuse to look at the evidence and still perform their duty.

9 | MR. CAPOZZI:  A jury instruction that you have to

10 | consider all of the evidence --

11 | MR. GAPPA:  Consider.

12 | MR. CAPOZZI:  Consider, yeah, but they're not

13 | consider anything.

14 | THE COURT:  I don't know.  You mentioned --

15 | MR. GAPPA:  That's when I ran out of time this

16 | morning.

17 | THE COURT:  It just seems counterintuitive to me.

18 | MR. GAPPA:  Right.

19 | THE COURT:  I have my concept that somebody can be

20 | fair and impartial if they, say, are going to refuse to view

21 | the evidence and --

22 | MR. GAPPA:  To be honest, even though we're not

23 | moving risk to the Government, if somebody doesn't view it, or

24 | is exposed to it --

25 | THE COURT:  There is.

1          MR. GAPPA:  -- that they could project their anger at

2     the Government, so --

3          THE COURT:  Okay.

4          MR. GAPPA:  That's a consideration, frankly, as well.

5          THE COURT:  I'll follow up a little bit more.

6          MR. CAPOZZI:  Okay.

7          MR. GAPPA:  Okay.

8       (Sidebar end.)

9          THE COURT:  I apologize again to all of you.  I'm

10    going to ask a few more questions to those of you who I've

11    asked a few already this morning.  And I apologize that this

12    is taking so long.

13         Let's hand the microphone back up to Juror 005.

14    We'll go in order this time as opposed to out of order.

15         THE COURT:  Juror 005, you've indicated that you

16    don't believe that you would be able to view the evidence that

17    we've referred to, correct?

18         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  Correct.

19         THE COURT:  Do you think that -- let me ask you a

20    slightly different question, or maybe not so slightly, do you

21    think you could be a fair and impartial juror to both sides in

22    this case?

23         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I do believe

24    I can be fair.  What I am struggling with is not knowing what

25    the testimonies are going to be, and what the witness'

1    information and how that plays into this.  That could be very

2    emotional for me.

3         THE COURT:  I understand that.  I mean, a jury during

4    the selection process, I, as the presiding judge over the

5    trial, I don't know what all the evidence is going to be.  And

6    what the testimony is going to be.

7         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  Yes.

8         THE COURT:  I mean, to some extent it plays out in

9    front of us.  The question is not whether you will be

10   influenced properly by the evidence, whatever it is, one way

11   or the other.  But whether the evidence is of such a nature in

12   the case that you will not be able to do your job of deciding

13   what the facts are and apply those facts to the law just

14   because of, Look, I saw a photo that I find very disturbing.

15        Will you be able to consider that evidence and say,

16   All right, that's one piece of the evidence in the case?  Let

17   me apply all the evidence, what I think about all the

18   witnesses, read the instructions, and work through those

19   instructions as the judge has given it to me to decide what my

20   verdict should be.

21        Or is it a situation where you say, Look, the kind of

22   evidence that you're talking about, as soon as I see it,

23   regardless of what I think about the witnesses, I'm afraid

24   that just seeing a photo is going to cause me to say, I'm

25   voting for guilt.  That's it.  I saw that photo.  It's over.

1    I can't do the rest of my job.

2           PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I get it.

3           THE COURT:  That's what we're trying to find out.

4           PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I understand

5 what you're saying.

6           THE COURT:  Can you be fair --

7           PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I don't know.

8           THE COURT:  Can you be fair, even if the evidence is

9 disturbing?

10           PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I cannot

11 answer that question until I know that situation.  My

12 preference would be to not be in that situation.

13           THE COURT:  Okay.

14           PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  I want to

15 serve.  I believe in our constitution, I believe in our

16 country and our rules, but I don't know that I can do that in

17 this situation.

18           THE COURT:  All right.  Let's go down to Juror 008.

19           Juror 008, could you be a fair and impartial juror to

20 both sides in light of the nature of some of the evidence in

21 the case?

22           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I believe I

23 could.  My main issue is I will refuse to see images or watch

24 video.  If a description of what others will be seeing, I can

25 take that into consideration, and I believe I can be partial,

1    because at this point I don't know how it plays into the --

2          THE COURT:  Impartial?

3          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes.  I'm

4    sorry.  I'm sorry.

5          THE COURT:  That's okay.

6          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Correct.

7          THE COURT:  I just wanted to make sure the record is

8    clear.

9          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Understand.

10         THE COURT:  I thought that's what you meant.

11         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Thank you.

12         My biggest issue is that I will refuse to watch the

13   images, the videos, whatever.

14         THE COURT:  Understood.

15         And Juror 011, could you be a fair and impartial

16   juror to both sides in this kind of a case?

17         PROSPECTIVE JUROR IN SEAT NUMBER 11:  Definitely not.

18         THE COURT:  And Juror 012?

19         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  As much as

20   I want to, just like I believe everybody should have a fair

21   trial, I just feel in this case, this trial, I just don't

22   think I can.

23         THE COURT:  Juror 028?

24         PROSPECTIVE JUROR IN SEAT NUMBER 14:  When I was

25   thinking last night, I was thinking I could do it.  But I

178

1    think, it's just seeing that image, it would just stick in my

2    head, and then, I think I would automatically, you know, think

3    this person was guilty just because of those images.  And I

4    try -- I want to be fair, but this is the one case I -- I was

5    hoping it wasn't going to be, because I knew that's how I

6    would feel.

7            THE COURT:  All right.  And Juror 021?

8            PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Again,

9    would really want to be fair.  As disturbing as the images

10   could be, and I think I echoed that.  It's like, this is the

11   one type of case that I really just -- I just don't know how I

12   would be influenced by that.  I just can't say for certain.

13           THE COURT:  And do you have a -- substantial

14   concern --

15           PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I do.

16           THE COURT: -- that you couldn't be fair --

17           PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:

18           THE COURT:  -- to both sides?

19           PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:

20   Substantial?

21           THE COURT:  Not insignificant.

22           PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  It's

23   not insignificant.  I think that would be a way to phrase it,

24   yes.

25           THE COURT:  All right.  Juror 007.  Can we pass the

1 | microphone up to Juror 007?

2 | Juror 007, late yesterday into this morning, I've

3 | been talking about some legal principals.  Have you been able

4 | to understand what I'm talking about?

5 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yeah, you're

6 | talking about somebody misuse minor or kids?

7 | THE COURT:  Have you been able to follow some of the

8 | concepts I've been talking about, like the sixth amendment

9 | right to a fair trial, in front of a fair and unbiased jury?

10 | Do you understand what I'm talking about?

11 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yeah.  I

12 | understood you're asking me -- me to give my opinion after we

13 | watch the video, that person, whoever did that thing, he's

14 | guilty not -- guilty or not?

15 | THE COURT:  True.  Yes.

16 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.  I can

17 | watch the video, and hopefully, I am able to tell the guy, you

18 | know, right.

19 | THE COURT:  Have you understood all of the words that

20 | I've used?

21 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Not really.

22 | THE COURT:  All right.  Counsel approach again.

23 | (Sidebar.)

24 | THE COURT:  So, any Government challenges for cause?

25 | MR. GAPPA:  No.

1          THE COURT:  Any defense challenge for cause.

2          MR. CAPOZZI:  Yes.

3          THE COURT:  And if you have them repeat, even though

4   you've previously indicated.

5          MR. CAPOZZI:  Just -- oh, yes, Juror 011, Juror 008,

6   Juror 012, Juror 005, Juror 028, Juror 021, Juror 007,

7   clearly.

8          Juror 023, he does want to be here?  I don't think he

9   would be.  I would challenge cause with him, and I think we

10   ought to check with -- was it the two on the end, in the front

11   sitting on the bottom row --

12          THE COURT:  All right.

13          MR. CAPOZZI:  -- as to where they are, because we

14   never got to them.

15          THE COURT:  I don't think that they've previously

16   expressed the same concerns, but I'll double back.

17          MR. CAPOZZI:  I never got them so.

18          THE COURT:  What's the Government's position with

19   respect to those four cause challenges?

20          MR. GAPPA:  I think the one that -- well, with Juror

21   008, we understood that she said she could be --

22          THE COURT:  Got it.

23          MR. GAPPA:  -- fair.

24          MR. CAPOZZI:  But couldn't look at the evidence.

25          THE COURT:  True.

1        MR. GAPPA:  But she could take into consideration a

2   description from other people.

3        THE COURT:  Got it.  Any other responses?

4        MR. PEARSON:  Did you say Juror 023?

5        THE COURT:  No.  But he hasn't been well.

6        MR. CAPOZZI:  Yeah.

7        THE COURT:  I'm going to deny it.

8        MR. CAPOZZI:  You surprised me.

9        MR. GAPPA:  She said she could be fair.  She just

10  doesn't know what the evidence could be, could be very

11  emotional.  So I'm not sure.

12        THE COURT:  Submitted on four causes for right now?

13  This is not precluding future for clauses.

14        MR. CAPOZZI:  Yeah.

15        MR. GAPPA:  I guess on further thought, Juror 005 for

16  cause.  I think there's enough there.

17        THE COURT:  Okay.  I am denying the four cause

18  challenges on Juror 005.

19        MR. CAPOZZI:  Which one?

20        THE COURT:  Juror 005.  I'm going to go in order.

21  Cause for Juror 007.  Denying the cause on Juror 008.

22  Granting for cause on Juror 011, Juror 012, Juror 028, and

23  Juror 021.

24        I will question Juror 015 and Juror 016 here to see

25  if they have any responses based upon what they've been

1   hearing.

2           MR. CAPOZZI:  Judge, which one were you denying?

3           THE COURT:  I'm denying 5 and 8, Juror 005, and Juror

4   008.  One for each of you.

5           MR. CAPOZZI:  Okay.  Give me Juror 008.  You're

6   denying -- what was the other?

7           THE COURT:  Juror 005, 5, and 8, I'm denying four

8   cause challenges granted.

9           Everybody else is granted.

10          MR. CAPOZZI:  Can I give a few arguments on those two

11  on?  Juror 008, the fact that she doesn't want to look at the

12  evidence and won't look at it, she just can't take a

13  description.  She's not allowed to consider the evidence?  You

14  just hear from someone else.  I think that's cause for by

15  itself.

16          And Juror 005' husband that was prosecuted for this

17  child pornography.

18          THE COURT:  Yeah.

19          MR. CAPOZZI:  Just don't see --

20          MR. PEARSON:  You don't want her on your jury?

21          MR. CAPOZZI:  No, no, I don't, not at all, especially

22  when she says can't be fair and impartial.

23          MR. GAPPA:  We accept.

24          THE COURT:  I understand the defense's position.

25          (Sidebar end.)

1          THE COURT:  Juror 015?  Can we get the mic down in

2     front.

3          Juror 015, just wanted to double check with you,

4     you've sat through the discussions that we've been having last

5     night and this morning, is there anything that you need to

6     tell me based upon your reaction to those discussions, or put

7     a different way, based upon everything that's been said so

8     far, do you have a doubt as to your ability to be fair and

9     impartial in a case like this one?

10         PROSPECTIVE JUROR IN SEAT NUMBER 15:  No.  It's going

11    to be hard like everyone else says, but you've got to kind of

12    separate your kids.  And of course, I'm a teacher, so anything

13    with children is going to be difficult but --

14         THE COURT:  But you think you could be fair and

15    impartial to both sides?

16         PROSPECTIVE JUROR IN SEAT NUMBER 15:  I think I

17    could.

18         THE COURT:  Juror 016, anything that you wanted to

19    add or do you think you could be fair and impartial to both

20    sides in the case such as this?

21         JUROR 16:  I believe I can be fair and impartial.

22    Even though I have kids and bonus kids, and you know, I deal

23    with laws and emotions all day long.

24         THE COURT:  All right.

25         JUROR 16:  So I think -- I'm hoping you know, I can

184

1   separate that.

2              THE COURT:   Okay.

3              All right.   Ms. -- the following individuals are

4   excused at this time.   And my instructions to all of you are

5   to please call back into the eight-hundred number after

6   five o'clock on Friday for further instructions.   And I do

7   thank you for your service.

8              And I really do understand where those who have

9   expressed opinions are coming from.   I don't take them

10  lightly.   I do take them seriously.   Hopefully, you all

11  understand that we're all doing the best we can to do what's

12  required as well.   I certainly didn't mean any offense by

13  anything that I may have said.

14             The following individuals are excused.   Ms. Hamilton

15  Juror 005, Juror 007.

16             Juror 007, I'm actually excusing you from your

17  summons.   You do not have to call back in on Friday at

18  five o'clock, all right.   You are excused.

19             Juror 011, Juror 012, Juror 028, and Juror 021, you

20  are all excused.

21             COURTROOM DEPUTY:   Juror 031, Juror 032.   Juror 031,

22  top row, closest to the audience.

23             Juror 033.   Juror 032, top row, top row, please,

24  closest to the bench.   Perfect.   Thank you.

25             Did I correctly pronounce your last name?

1      PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Juror 033.

2      COURTROOM DEPUTY:  Juror 033, thank you.

3      PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Where do I

4  go?

5      COURTROOM DEPUTY:  To the middle row, closest to the

6  public.

7      PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  That way?

8      THE COURT:  Yes.

9      COURTROOM DEPUTY:  Yes, this way.

10      Juror 034.  Middle row, closest to the audience.

11      Juror 035, Juror 036.

12      Juror 035, middle row.

13      THE COURT:  You're good.

14      COURTROOM DEPUTY:  Yes.

15      THE COURT:  If you can get me a new seating chart, as

16  soon as both --

17      COURTROOM DEPUTY:  All right.

18      THE COURT:  All right.  For those of you who were

19  just seated -- and these questions are directed only to those

20  of you who have been newly seated.

21      Those of you already seated, if you remember

22  something that you forgot to tell me already, go ahead and

23  raise your hand, and we'll get back to you.  But these

24  questions are going to be a repeat, really, of what we've gone

25  over with the rest of you.

1          All right.  So for those of you newly seated, is

2     there anyone who is having difficulty seeing, hearing, or

3     understanding me?  No response.

4          You've heard me describe the length of this trial, is

5     there anybody -- and you've also heard me talk about how

6     important jury duty service is to our constitutional system of

7     governments, and to our justice system as a whole.

8          Knowing that and knowing that I can only excuse you

9     for an undue hardship, not merely for inconvenience, is there

10    anyone who service on this jury would cause them an undue

11    hardship?  Is there anybody?  No answer.

12         Anyone who is suffering from any physical condition

13    that would make it difficult for them to serve as a juror in

14    case?  No response.

15         Do any of you know any of the courtroom personnel,

16    any of the lawyers or parties involved, or any of the

17    witnesses whose names I read earlier?

18              THE COURT:  Yes.  I'm sorry, sir, your name?

19              PROSPECTIVE JUROR IN SEAT NUMBER 11:  Juror 033.

20              THE COURT:  And Who is it that you know, sir?

21              PROSPECTIVE JUROR IN SEAT NUMBER 11:  I know a Gary

22    Reed, but he's from Dinuba area.  So he may not be the one in

23    there.

24              THE COURT:  Counsel is indicating that's not the same

25    Gary Reed.

1          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Perfect.

2          THE COURT:  Anyone else?

3          Have any of you heard anything about this case or

4    anything to do with it before coming to Court yesterday and

5    today?

6          Do any of you have any financial interest or any

7    other interest in the outcome of this case?  No response.

8          Have any of you newly seated prospective jurors had

9    any contact with United States Attorneys Office, Federal

10   Defenders Office, the office of the attorney, Mr. Capozzi, any

11   of the participants in this trial?

12         Have any of you or close family members or close

13   friends ever been a party to a civil case?

14         How about, ever been a party, a defendant, in a

15   criminal case or a witness in a criminal case, either you,

16   close family members, close friends?  No response.

17         Do any of you have any belief or feeling towards any

18   of the parties, attorneys, or witnesses, as you sit here right

19   now that would make it difficult for you to act fairly and

20   impartially to both sides in this case?

21         MR. CAPOZZI:  Judge, we have a hand.

22         THE COURT:  Yes, Juror 032?

23         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  May I

24   approach?

25         THE COURT:  You wish to approach, Juror 032?

1          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, yes.

2          THE COURT:  All right.  Counsel approach sidebar.

3          (Side bar held with Juror 032 and attorneys and the

4     Court.)

5          THE COURT:  Yes, sir?

6          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  I'm freaking

7     out over this stuff.  I'm not sleeping.  I'm not eating.  My

8     chill pills don't work.

9          THE COURT:  Are you --

10         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  It freaks me

11    out.

12         THE COURT:  Okay.  Are you under treatment of a

13    doctor?

14         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

15         THE COURT:  For what sort of condition?  Just --

16         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Just not

17    sleeping.

18         THE COURT:  And when you say -- refer to "chill

19    pills."

20         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  That's what

21    she gives me.

22         THE COURT:  It's some sort of medication to help you

23    sleep and calm you down?

24         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

25         THE COURT:  I understand you suffer from -- I

1  understood from my courtroom deputy that you suffer from very

2  severe claustrophobia.

3          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

4          THE COURT:  You're unable to take the elevators up

5  here to the courtroom.

6          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Right.

7          THE COURT:  And is -- do you have difficulty being in

8  groups of people?

9          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

10         THE COURT:  Here?  A lot?

11         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  A lot.

12         THE COURT:  Yes?

13         MR. CAPOZZI:  There is a jury room afterwards.

14         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  That's what

15  I'm trying to get at.

16         THE COURT:  Any objection?

17         MR. CAPOZZI:  No.

18         MR. GAPPA:  No.

19         THE COURT:  Juror 032, we're going to excuse you at

20  this time.  I'm actually going to excuse you from the -- I

21  don't think you should be called back.

22         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Okay.

23         THE COURT:  Thanks for being here.

24         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Thank you.

25         MR. CAPOZZI:  Thank you.

1              (Sidebar end.)

2              THE COURT:  Please feel that seat.

3              COURTROOM DEPUTY:  Juror 037.

4              THE COURT:  Juror 037, any of the questions I've just

5      asked, not the ones that from yesterday, any of the ones that

6      I just asked, do you have any responses to any of those?

7              PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No, I don't.

8              THE COURT:  Have any of your -- to those newly

9      seated, have any of your -- have you yourself or any of your

10     family members or close personal friends been employed by the

11     Federal Government with the exception of military?  Yes, Juror

12     035.  Let's give the mic to Juror 035.

13             PROSPECTIVE JUROR IN SEAT NUMBER 14:  My wife works

14     seasonable for the IRS.  That's it really.

15             THE COURT:  Anything about her working for the IRS --

16     I take it she does not work in criminal investigations?

17             PROSPECTIVE JUROR IN SEAT NUMBER 14:  No.

18             THE COURT:  What sort of position?

19             PROSPECTIVE JUROR IN SEAT NUMBER 14:  She's just, I

20     guess a file clerk.

21             THE COURT:  Anything about that employment that would

22     cause you to be biased or impartial in any way either towards

23     or against the Government?

24             PROSPECTIVE JUROR IN SEAT NUMBER 14:  No.

25             THE COURT:  All right.  Thank you, sir.

1          PROSPECTIVE JUROR IN SEAT NUMBER 6:  There's another

2   one.

3          THE COURT:  Juror 037?

4          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  You said

5   work?  I worked for United States Census Bureau, but this was

6   about 17 years ago.

7          THE COURT:  Anything about that employment that would

8   make you biased or prejudice either for or against the

9   Government?

10         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

11         THE COURT:  You've heard me talk over the last couple

12  days about a number of legal concepts.  The concept that the

13  Government has the burden to prove Defendant guilty beyond a

14  reasonable doubt of the offenses of which he is charged and

15  the presumption of innocence.

16         The lawyers have mentioned the fact that the jury is

17  not to consider punishment in its assessment of the evidence

18  because punishment is a matter solely for the Court.

19         The jury's role is to just a find the facts, apply

20  the facts to the law as I instruct you, and to reach a verdict

21  based on your determination of and the evidence shows and what

22  the evidence shows if the Government has satisfied its burden

23  of proof.  Does anyone of the newly seated of you have any

24  quarrel or difficulty following or those types of legal

25  proposition that I will instruct the jury on at the conclusion

1 | of the case?  Anybody have the inability to follow my

2 | instructions with respect to those principals?

3 | Any of you or members of your family or close friends

4 | belong to any groups focussed on criminal justice issues, for

5 | instance, on one side of the spectrum, Mother's Against Drunk

6 | Driving, perhaps on the other side of the spectrum groups such

7 | as Families Against Mandatory Minimums, but organizations that

8 | take a very special interest in criminal justice issues?  Any

9 | of you or any of your close family members involved in any of

10 | those types of organization?  No response.

11 | Have any of you or members of your family or close

12 | friends of yours ever been a witness in a criminal case?

13 | Same group of folks, yourselves, your family members

14 | or close friends ever been arrested or charged with a crime?

15 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

16 | THE COURT:  Juror 037?

17 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.  My

18 | brother-in-law, but this was about 25 years ago.

19 | THE COURT:  What sort of offense?

20 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  It had

21 | something to do with shooting at police officer s.

22 | THE COURT:  Were you involved to the extent of

23 | providing support or attending court hearings or that sort of

24 | thing in those proceedings?

25 | PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No, not at

1  all.

2       THE COURT:  Did it happen anywhere near --

3       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  LA County.

4       THE COURT:  Were you located in LA --

5       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  I was at the

6  time, yes.

7       THE COURT:  But you didn't attend court proceedings?

8       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

9       THE COURT:  Anything about either what took place

10  during that criminal prosecution or the result of it or the

11  way things that you heard about it from your family, anything

12  at all leave you with a bitter taste or a strong impression

13  about the criminal justice system?

14       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Back then,

15  it did, a little bit, towards the police officers.  But that

16  was just based upon what I heard from family members of how

17  the events took place.

18       THE COURT:  All right.  So at the time it didn't seem

19  fair?

20       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  That is

21  correct.

22       THE COURT:  Was your brother-in-law convicted of an

23  offense?

24       PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, he was.

25       THE COURT:  And sentenced to a period of

1    incarceration?

2           PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  That is

3    correct.

4           THE COURT:  And he's married to your sister?

5           PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, he is.

6           THE COURT:  And still is?

7           PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

8           THE COURT:  All right.  Having your family have that

9    experience, do you think that it would cause you to view the

10   testimony of law enforcement officers with distrust?

11          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

12          THE COURT:  If you were sitting in the prosecutor's

13   shoes, would you be satisfied with somebody of your frame of

14   mind sitting as a juror in case?

15          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, I

16   would.

17          THE COURT:  Do you think you can be fair?

18          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, I can.

19          THE COURT:  Are you concerned at all that you got a

20   bias against law enforcement that might make it difficult for

21   you to judge their testimony on the same terms as you'd judge

22   anyone else's testimony?

23          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

24          THE COURT:  Have any of you, members of your

25   immediate family or close friends ever been a victim of a

1   crime?  Juror 031?

2          PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  This was when

3   I was a kid, our house was broken into and burglarized.  We

4   were on vacation.  Our van was broken into, but neither time

5   was the person found or anything.  So there was no trial or

6   anything involved.

7          THE COURT:  Anything about those experiences that

8   left you with strong either negative or positive impressions

9   of law enforcement, the criminal justice system, anything like

10  that?

11         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  No.

12         THE COURT:  Do you think those experiences would

13  cause you to have any biases either for or against any the

14  participants in this trial?

15         PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  No.

16         THE COURT:  Have any of you, any members of your

17  immediate families or close friends ever been affected by the

18  enforcement of laws with respect to child pornography or

19  obscenity or sexual exploitation of children?  Any of you ever

20  had anyone close to you involved in any of those kinds of

21  offenses?

22         Juror 033?

23         PROSPECTIVE JUROR IN SEAT NUMBER 11:  Yes.  My niece

24  was molested by her father, and he went to prison.  And it ran

25  its course.

1          I never attended the trials.  I have no opinion about

2     anything one way or the other.  It just happened, and he

3     served his time.  And I don't know where he is.  He's

4     excommunicated from the family, so --

5          THE COURT:  All right.  Are you close to your niece?

6          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Probably not

7     for ten years.  She's 43 now, this happened 43 years ago.

8     Pretty much ruined her, I think.

9          But you know, it happened.  And the guy was no good,

10    and that's -- they got divorced, and I don't know where he is.

11    So --

12         THE COURT:  Anything that -- you've heard the nature

13    of the charges in this case.  I read them --

14         PROSPECTIVE JUROR IN SEAT NUMBER 11:  Uh-huh.

15         THE COURT:  -- to everybody at the outset, and

16    obviously, you heard some of the other discussions that's gone

17    own regarding the nature of some of the evidence that has been

18    presented -- or will -- appears to be presented in case.

19         Do you have a concern that based upon that impact on

20    your family, that niece of yours, that it might be difficult

21    for you to be fair and impartial in a case like this?

22         PROSPECTIVE JUROR IN SEAT NUMBER 11:  No.

23         THE COURT:  Do you think you could consider the

24    evidence fairly, impartially, and decide the case based solely

25    on the evidence and the instructions I give you in this case?

1          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Yes.

2          THE COURT:  Anyone else?

3          Do any of the newly called of you have specialized

4    training in computer technology, use of the internet, that

5    sort of thing?

6          Juror 034?

7          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  I'm an IT

8    manager for -- I've been in the IT career for over 20-plus

9    years association.  I do from configuration of hardware to

10   software programming, daily work.  We do audits on employee

11   emails, cyber security.

12         THE COURT:  So you're very computer savvy?

13         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Correct.

14         THE COURT:  And would be very familiar with

15   peer-to-peer sharing networks and things like that?

16         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Correct.

17         THE COURT:  You know, somebody whose got some

18   specialized knowledge, you know, they sometimes say knowledge

19   can sometimes be a dangerous thing, because your job here, as

20   a juror in a case, is to decide the case on the basis of the

21   evidence that's presented in court.

22         Now, with specialized knowledge, you may have a

23   different view of that evidence, and certainly, we can't

24   expect you to leave your life experience behind you.  But by

25   the same token, you cannot fill in the gaps, for instance.

1          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Uh-huh.

2          THE COURT:  Or decide that you know something that

3    wasn't discussed in the evidence in the case, but, here's --

4    I'm going to bring my own knowledge to bear on this.

5    Everybody else is wrong.  I'm right about this.  Do you

6    understand the distinction?

7          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Yes.

8          THE COURT:  Do you think you could do that?

9          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Sure.

10         THE COURT:  Yeah.

11         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Uh-huh.

12         THE COURT:  Do you think you're capable of deciding

13   the case just based on the evidence you hear in court and the

14   law as I give it to you?

15         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Yes.

16         THE COURT:  Without being overly influence by your

17   specialized knowledge?

18         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Yes.

19         THE COURT:  All right.  Anyone else with specialized

20   training or knowledge in the use of computers?

21         THE COURT:  Okay.  There it is.  For those of you

22   newly called, just to get a better idea, how many of you use a

23   computer at least once a week?

24         And how many of you have ever sent or received files

25   or documents to other computer users over the internet?

1           (JUROR 010, JUROR 033, JUROR 031 raised hands.)

2           THE COURT:  And, have you ever been sent -- how many

3   of you have ever been sent or received pictures or movie files

4   over the internet?

5           (JUROR 033, JUROR 034, JUROR 031, JUROR 037 raised

6   hands.)

7           THE COURT:  I think I covered this already, but have

8   any of you, any of your family members or close friends ever

9   been arrested for or charged with a crime other than a minor

10   traffic incident that you haven't already disclosed?

11          Other than what you've already disclosed, has anyone

12   in your family or close friend of yours ever been involved of

13   a crime involving a child other than what's already been

14   disclosed?

15          Anybody have any extremely positive or extremely

16   negative experiences with law enforcement officers?  No

17   response.

18          Have any of you, any members of your family or close

19   friends ever been audited by or had a dispute with any agency

20   or department of the United States such as the IRS, the Social

21   Security Administration, or the Veterans Administration or any

22   city, county or, state government?  Juror 037?

23          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes, my

24   mother.

25          My mother about 13 years ago, through the IRS, she

1  was audited, but it was resolved.

2              THE COURT:  Anything about that experience with the

3  IRS and your mother that would cause you to have negative

4  feelings towards the Federal Government?

5              PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

6              THE COURT:  Anything about how that was resolved that

7  you think would make it difficult for you to be a fair and

8  impartial juror in a case brought by the United States

9  Government?

10             PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

11             THE COURT:  Anyone else?  No.

12             Any of you have any moral, ethical, or religious

13 beliefs that's would make it difficult, if not impossible for

14 you to pass judgment on another person?  No response.

15             Now, you've sat in the audience and heard my

16 questions and the questions of counsel about certain evidence

17 that will come into -- that will be presented during the

18 trial, video clips or photographs, which we will try to keep

19 to a limited number.  Is there anything about the fact that

20 this case will involve the presentation of such evidence that

21 will make it impossible for you to be fair and impartial to

22 both sides?

23             You've heard counsel talk about the fact, and you've

24 heard some of the folks that have been called as prospective

25 jurors, say, Judge, I hear what you're saying about our duty

1    to protect the constitutional right to a jury trial by a fair

2    and impartial jury.  But the kind of evidence that you're

3    referring to, depictions of children.  Is going to be too

4    traumatic for me to consider at all and will result in me

5    being incapable of being fair and impartial to both sides in

6    this case?  Which means, I just can't do the job of a juror in

7    a case like this one.

8            Is there anyone, you know, you've heard everybody's

9    views.  Is there anybody who is newly seated that feels that

10   way?  That feels they could not be fair and impartial in a

11   case like this one?  No response.

12           Counsel approach.

13     (Sidebar.)

14           THE COURT:  Are there other questions -- additional

15   questions that you want me to ask?

16           MR. CAPOZZI:  Bring up the adult pornography.

17           THE COURT:  I'm sorry.

18           MR. CAPOZZI:  Yeah, and I'd like to know her level of

19   expertise on the IT tech.  I mean, what's her level of

20   expertise?  I think that's important.

21           THE COURT:  Any questions that you want me to ask?

22   Do you want me to turn it back over to you guys or not?

23           MR. GAPPA:  Probably not.  But have you ever gone

24   through the list of questions?

25           THE COURT:  Not yet.  I'm going to do that.

1          MR. CAPOZZI:  That's right.

2          MR. GAPPA:  Yes.

3          THE COURT:  And I'm going to do that.

4          MR. GAPPA:  I agree, I wanted to follow up on her

5    level of expertise and as a result of any audit that she's

6    done.  Has that ever involved in-tech software.

7          MR. CAPOZZI:  Good point.

8          THE COURT:  Okay.  I'm going to keep going especially

9    in that line of questioning.

10          If you have something else that you want to ask, give

11    me the "hi" sign, and I'll let you ask about that.

12          MR. CAPOZZI:  Yes.

13          THE COURT:  I'll keep digging a little bit on the

14    other stuff, but when I'm done I'm going to turn over to the

15    sheet of questions on each of the new ones.

16          MR. CAPOZZI:  Okay.  I'd still --

17          MR. GAPPA:  Okay.

18          MR. CAPOZZI:  There's Juror 008, she said that thinks

19    she could be fair, and but not to look for evidence.  I think

20    that's ground for cause.

21          THE COURT:  Oh, I hear you.

22          MR. GAPPA:  That's preemptory.

23          MR. CAPOZZI:  I don't want to waste it on preemptory.

24    It's for the record.

25          THE COURT:  I got you.

1          MR. CAPOZZI:  Thank you.

2     (Sidebar end.)

3          THE COURT:  Juror 034.

4          PROSPECTIVE JUROR IN SEAT NUMBER 12:  Juror 034.

5          THE COURT:  I keep getting that wrong, tell us a

6     little bit more about the exact nature of your training, for

7     instance, in IT, at what -- what is the level of your training

8     experience and education in that area?

9          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Uh.

10         THE COURT:  If we can get --

11         PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  As I

12    mentioned, I've been doing/in the IT field for 20-plus years,

13    started out as a technician where I just configure computer,

14    put together, do operating system configuration.

15         From there I just I moved up to IT manager where now

16    I just look at audit a little bit.  The programming part that

17    I'm speaking of is just dealing with adding, configuring

18    reports for the hospital system and stuff like that.  So I

19    look at audits on -- you know, email audits, encryption

20    audits.  I mean, we have special network admin that does

21    configuration on the server side of things, but the normal

22    audit daily work is what I look at just to see if there's

23    anything outstanding, anything unusual that flows through the

24    network.

25         THE COURT:  And how about formal education or

1  training in the IT area?

2          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  I just have

3  my bachelor's in organizational management, and you know, just

4  your certification, as in you're a-plus comp classes and stuff

5  like that.

6          THE COURT:  Okay.  Any investigative type work that

7  you do?

8          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  Yes.  When

9  it comes to patient information being breached, we run audits

10  on where the breach came from throughout the facility.  And

11  then, we identify which area that is, and then it will flow

12  over to our privacy officer, who will do the investigation on

13  who was accessing the patient's record at this date and this

14  time and so forth.

15          THE COURT:  Anything more, Counsel, on this issue?

16          MR. GAPPA:  No, Your Honor.

17          THE COURT:  Just on this issue.

18          MR. CAPOZZI:  No.

19          THE COURT:  All right.  Do any of you have strong

20  opinions or feelings about those who view adult pornography

21  that would cause you to be biased against someone merely

22  because they viewed adult pornography?

23          Juror 008.  Well, as we pass the mic down, let me ask

24  this question.  This is really to all of you.

25          Yesterday, a number of questions that were asked and

1   a number of responses, at one point, I felt the need to step

2   in and fairly directly direct perspective juror to stop

3   providing further information.  There was a reason from my

4   point of view to do that.  Those exchanges yesterday, were

5   frank and straightforward and important.

6           Are there any of you, who, as you sit here today,

7   were offended by the exchanges that took place yesterday

8   either between myself and any of the prospective jurors

9   counsel and the prospective jurors?  That is, are you unhappy

10  with any of the participants in this proceeding to the extent

11  that you think it might get in the way of you being fair and

12  impartial?  Anyone?  If you do, I need you to let me know.

13  Certainly, wasn't anybody's intention, but if you were

14  offended, please tell me.  No response.

15          Juror 008, just getting back to this issue of the

16  viewing evidence.  I'm struggling with the notion -- you've

17  indicated to me that you think you can be fair and impartial

18  to both sides in the case.  And that you could base your

19  determination of the fact s based upon the evidence that you

20  heard.  And that you could faithfully apply the law as I give

21  it to you.

22          Your one position that you've been quite clear about

23  is, I take it, I'm inferring based upon religious beliefs,

24  that you cannot view evidence of actual claimed child

25  pornography.  That you won't be able to do that?

1          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Correct.

2          THE COURT:  And you've indicated, though, that

3    nonetheless you think you can be fair and impartial.

4          I'm trying to figure out whether or not that's

5    possible.  In my own mind, can you do that.

6          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  That's fair.

7          THE COURT:  What would you be relying on in reaching

8    a determination about the facts if you did not view that

9    evidence?  If you turned your eyes away and said, I just can't

10   look.  How would you decide what was depicted?  What had been

11   proved?

12         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I don't

13   know.  I don't understand why we're having to view something

14   unless it has something to do with the Defendant and that was

15   a participation of the Defendant.  So not knowing more details

16   and how viewing this plays a part -- I mean, if this is

17   something that he viewed, and he sent over the web, whatever,

18   I don't understand why we have to view that in order to

19   understand that's what he did.  I don't know how else to --

20         THE COURT:  I understand your question.

21         So your view is if somebody would just describe it to

22   you, so that you didn't have to view it --

23         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Right.

24         THE COURT: -- you could be fair and impartial?

25         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I believe

1  so.

2          THE COURT:  And if there wasn't a witness who

3  described it, what, you'd be relying upon what other jurors

4  who did view the evidence would tell you about what it

5  depicted?

6          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Basically,

7  yes.

8          THE COURT:  All right.

9          Ladies and gentlemen, the newly seated jurors, would

10  you pick up those sheets that are on your seats.

11          And Juror 031, we'll start with you.  If you could

12  provide the answers to those inquiries.

13          PROSPECTIVE JUROR IN SEAT NUMBER FIVE:  My name is

14  Juror 031.  I live in Visalia, California, I am a seventh

15  grade math teacher.  I did that right out of college.  I did

16  not have a previous occupation.

17          I have a bachelor's in liberal arts from Fresno State

18  University along as my teaching credential from as well.

19          I have no military service.  I'm not married nor ever

20  have been married.  I do not have any children.

21          And I have been called to jury service, but I've

22  never served on a jury.

23          THE COURT:  All right.  And Juror 037?

24          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Hello.  My

25  name is Juror 037.  I live in Visalia.  I'm currently a titled

1   to administration technician for the Tulare County.  My

2   previous occupation was a law clerk.  My previous occupation

3   was a law clerk.

4        My educational background, I have associates degree

5   in paralegal.  No military service.

6        I'm currently not married, but I live with my fiance.

7   So his occupation is a supervisor for a concrete cutting

8   company.  No former spouse.

9        One of my children is a civil engineer.  The others

10  are students.

11        And no prior jury experience.

12        THE COURT:  Juror 037, you say you were a law clerk

13  and then a paralegal?

14        PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.  I was

15  just a law clerk.  I have my associates degree in paralegal,

16  but I've never been a paralegal.

17        THE COURT:  How long did you work as a law clerk?

18        PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  I believe it

19  was only for two years.

20        THE COURT:  What sort of work -- what sort of area of

21  work?

22        PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  The area was

23  on business litigation.

24        THE COURT:  And you say that was quite a long time

25  ago?

1          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.  That

2    was in 2004.

3          THE COURT:  And so you received training as a

4    paralegal in school.  That you have a degree of -- tell me a

5    little bit more about where it was from, and how much study it

6    involved.

7          PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  So that was

8    my associates degree, and it just basically was legal classes,

9    like torts and trust and civil litigation, a little bit of

10   everything in different areas, some criminal justice classes.

11   I believe it was only been one or two classes.

12         THE COURT:  Will you be able to follow my

13   instructions regarding the law whether you agree with the law

14   or not?

15         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  Yes.

16         THE COURT:  Do you have any difficulty doing that in

17   light of your own exposure to some degree in legal training?

18         PROSPECTIVE JUROR IN SEAT NUMBER SEVEN:  No.

19         THE COURT:  Juror 035?

20         PROSPECTIVE JUROR IN SEAT NUMBER 14:  My name is

21   Juror 035.  I live in Clovis, California.  I retired from the

22   City of Clovis, and before that I was a correctional officer.

23         I have some college credits from the military.  I was

24   in the United States Navy for 21 years.

25         I'm married.  And my wife is retired and seasonal

1  worker at the IRS.  And my ex-wife, she's back in Illinois.

2      I have two children.  One is a fireman and one is a

3  school teacher.  I've had, like, four, calls for a jury.  I've

4  served on two of them.

5      THE COURT:  I'm sorry you served?

6      PROSPECTIVE JUROR IN SEAT NUMBER 14:  I served on two

7  of the juries I was called for.  One was criminal and one was

8  civil.

9      THE COURT:  Were both of those in state court?

10      PROSPECTIVE JUROR IN SEAT NUMBER 14:  Yes.

11      THE COURT:  How long ago was the most recent?

12      PROSPECTIVE JUROR IN SEAT NUMBER 14:  Oh, gosh.  It

13  was in early 2000s.

14      THE COURT:  And the one before that?

15      PROSPECTIVE JUROR IN SEAT NUMBER 14:  They were

16  between 2002 to 2006.

17      THE COURT:  Did both of those injuries reach

18  verdicts?

19      PROSPECTIVE JUROR IN SEAT NUMBER 14:  Yes.

20      THE COURT:  Where did you serve as a correctional

21  officer, sir?

22      PROSPECTIVE JUROR IN SEAT NUMBER 14:  At Pleasant

23  Valley Prison in California Substance Abuse Facility and State

24  Prison, Corcoran.

25      THE COURT:  How long did you serve as a correctional

1  officer?

2          PROSPECTIVE JUROR IN SEAT NUMBER 14:  About two and a

3  half years.

4          THE COURT:  When was that?

5          PROSPECTIVE JUROR IN SEAT NUMBER 14:  Oh, gosh, I

6  think I went to the academy in 1998 to 2001, I believe.  So

7  something like that.

8          THE COURT:  And after 2001, what did you do?

9          PROSPECTIVE JUROR IN SEAT NUMBER 14:  I worked for

10  the City of Clovis.

11          THE COURT:  As?  I'm sorry?

12          PROSPECTIVE JUROR IN SEAT NUMBER 14:  I worked in the

13  solid waste department.

14          THE COURT:  How long did you do that?

15          PROSPECTIVE JUROR IN SEAT NUMBER 14:  13 years.

16          THE COURT:  And that's where you retired from?

17          PROSPECTIVE JUROR IN SEAT NUMBER 14:  Yes.

18          THE COURT:  And the Navy, what did you do?  Where did

19  you serve?

20          PROSPECTIVE JUROR IN SEAT NUMBER 14:  I was engine

21  man.  I spent ten years in Japan and just San Diego and that

22  was it.  I was an instructor at Great Lakes Training Center.

23          THE COURT:  And what rank were you at separation?

24          PROSPECTIVE JUROR IN SEAT NUMBER 14:  E7.

25          THE COURT:  Any military police background?

1          PROSPECTIVE JUROR IN SEAT NUMBER 14:  I was military

2     police for probably about six months in Yakota, Japan.

3          THE COURT:  Anything about that service or your

4     service as a correctional officer that you think would make it

5     difficult for you to be a fair and impartial juror in a

6     criminal case like this one?

7          PROSPECTIVE JUROR IN SEAT NUMBER 14:  No.

8          THE COURT:  Juror 034?

9          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  My name is

10    Juror 034.  I live in Porterville, California.  My position is

11    IT manager.  Previously occupation is also in IT.  I have my

12    BA in organizational management.  No military services.

13          I am married.  My spouse works for Tulare County

14    Child Support Services as a case worker.

15          I have four kids.  Three in college.  One in high

16    school.

17          And I have served on a jury probably ten-plus years

18    ago, in Tulare County, criminal case, and we did reach a

19    verdict.

20          THE COURT:  All right.  Where are the college-aged

21    kids?

22          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  22, 21, and

23    20, and then I have a high school.

24          THE COURT:  Where are they going to school?

25          PROSPECTIVE JUROR IN SEAT NUMBER TWELVE:  One is San

1    Francisco State, Fresno City, and then Porterville College.

2            THE COURT:  All right.  Juror 033?

3            PROSPECTIVE JUROR IN SEAT NUMBER 11:  Okay.  My name

4    is Juror 033.  My primary residence is in Kingsburg, but right

5    now I've been living in Valley Wells, California, which is

6    40 miles north of Ridgecrest, fixing up a property.  I own

7    properties and have rentals.

8            My current occupation, I guess, would be just

9    property management.  And former occupation, a welder

10   fabricator, chassis fabrication for classic cars.  Done

11   everything, general construction, cement work, worked at a

12   winery for 13 years.  Worked for an irrigation district for 13

13   years.  Worked at machine shop.  Done all of kinds of jobs,

14   jack of all trades, master of none.

15           Educational background, I got a little two-year

16   degree at Reedley College, an AA or BA whatever it is.  I

17   don't even remember -- didn't do me any good.  No military

18   service.

19           Been married for 38 years.  Currently married.  My

20   spouse is a homemaker and caregiver for her parents.

21           I have three children.  My oldest is a teacher in

22   Yukawa.  My middle is a PCA for BASF, which is all

23   agricultural jargon.  My youngest is going to college in

24   San Luis and working also.

25           I've been on two or three juries, two for sure.

1   Seems like there have been three.  Probably, been ten years

2   since the last one.  I think they were all criminal, because

3   there were shooting involved and stuff.  So that would be

4   criminal.  We came to a decision on all the cases I was on.

5   That's about it, now you know it all.

6           THE COURT:  When was the most recent criminal jury

7   that you sat on?

8           PROSPECTIVE JUROR IN SEAT NUMBER 11:  You know, I bet

9   it has been 15 years ago.  It was in Visalia.

10          THE COURT:  All right.

11          PROSPECTIVE JUROR IN SEAT NUMBER 11:  So --

12          THE COURT:  Juror 036, let's get the mic down there.

13          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Where was --

14          THE COURT:  Right in the corner, front corner.

15          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  My name

16  is Juror 036.  I live in Porterville, California.

17          I work for Gillespie Ag Service for the last

18  21 years.  Before that I was a maintenance machinist for

19  standard register.  Just a high school background.

20          I've been married once, not for very long.  Don't

21  know where my spouse is.  She left.

22          Let's see, I got two kids.  My daughter Lacy is 28.

23  She's a dispatcher for Tulare County Fire.  And my son Logan

24  is 26, and he has his own welding business.

25          I've been on three other juries.  The last one was

1  two years ago in Visalia.  It was drunk driving, and he was

2  guilty.

3          The one before that, was an attempted murder --

4          THE COURT:  Don't tell me the verdict.

5          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Don't

6  tell you the verdict?

7          THE COURT:  Nope.

8          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Oh.

9          THE COURT:  Just tell me if you reached one.

10          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:

11  Attempted murder, did not reach a verdict.  And a rape case

12  and did not reach a verdict.

13          THE COURT:  And the most recent of those was two

14  years ago?

15          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Yeah,

16  the DUI.

17          THE COURT:  And the others were about how long ago?

18          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Three

19  years prior to the each one.  I get picked every two years.

20  Lucky me.

21          THE COURT:  On that, now you --

22          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  It's

23  fun.

24          THE COURT:  Now you hit the big banana.

25          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I know.

1          THE COURT:  You got picked in Federal Court.

2          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Yeah,

3     sweet dreams.

4          THE COURT:  All right.  Ladies and gentlemen, we're

5     going to take a morning recess at this time.  As I told you

6     yesterday, you can talk about anything you want except what

7     we're talking about in here.  Please return in 15 minutes, and

8     we will proceed.

9          I would ask you to exit the courtroom now, however,

10    so I can have some conversation with counsel.

11       (Prospective Jury exits courtroom.)

12         THE COURT:  Let the record reflect we're outside the

13    presence of the jury.

14         And are there any challenges for cause by the

15    Government to the 21 that are now seated?

16         MR. GAPPA:  No, Your Honor.

17         THE COURT:  Any challenges for cause by the defense

18    to the 21 now seated?

19         MR. CAPOZZI:  Yes, Your Honor, Juror 008.  I just

20    don't think it's proper for her not to view evidence and

21    listen to what the other jurors say about it.  It can't be

22    fair and impartial.

23         THE COURT:  What's the Government's position on that?

24    I'm still struggling with that notion.

25         MR. GAPPA:  Your Honor, I think the Court did a good

1    job of going over, again, today with her how she would

2    approach this if the evidence did involve videos or images.

3    She said that she could rely on descriptions, if it were

4    necessary for anybody to view it, and that she could be fair

5    and impartial.

6         THE COURT:  The problem is that the descriptions may

7    or may not come in the form of testimony at trial.  In which

8    case, she said she would be depending on the description of

9    her fellow jurors, which that to me seems problematic.

10        And even if they came from another witness, I mean,

11   usually don't have jurors telling us that they're going to

12   pick and choose between what evidence they're going to

13   actually look at and what evidence they're going to

14   intentionally ignore and refuse to consider.  It's a problem.

15        Renee, how many do you have left out in the audience?

16        COURTROOM DEPUTY:  Seven, Your Honor.

17        THE COURT:  I'm going to grant the challenge for

18   cause and excuse Juror 008.

19        So we'll fill that seat.  I'll bring whoever replaces

20   her up to speed.  Apologize to her for keeping her a little

21   bit longer.

22        And then once we get that juror qualified, I'm going

23   to start passing the strike sheet.  However, that will leave

24   us, presumably, with no more than six.  If we get to the point

25   where more than six challenges are exercised -- actually, if

1   six challenges are exercised, I'll fill back with what we've

2   got out in the audience and see where we end up with.  And

3   then stop at some point if it becomes apparent that we're not

4   going get to get to a jury.

5        If, on the other hand, you take a look at what you've

6   got, and elect to pass, and proceed, we can proceed today.  So

7   we're going to play it a little bit ear.

8        MR. CAPOZZI:  Just a quick question, Judge.  So

9   Number 1 is on the end, furthest from the Court?

10        THE COURT:  You should have --

11        MR. CAPOZZI:  Yeah, okay.  But when we start excusing

12   people, they will start filling in -- well, how would that --

13   would just the first 12 that are left --

14        THE COURT:  Yes, is your jury.

15        MR. CAPOZZI:  Then the last --

16        Pardon me?

17        THE COURT:  You can exercise your challenges wherever

18   you want on the 21.

19        MR. CAPOZZI:  Yeah.

20        THE COURT:  That's up to you.  But if you get back to

21   back passes, the lowest number 12, as they appear on this

22   seating chart, would be remaining.  That's your jury.

23        MR. CAPOZZI:  Okay.

24        MR. GAPPA:  Just so we're clear, on our side, Your

25   Honor, we have six preemptories.  Does that include any that

1   we might need for the alternates?

2          THE COURT:  No.  We're picking two alternates, and

3   you get an additional challenge, each of you, by statute --

4   under Rule 24, each of you, with two alternates, get an

5   additional challenge with respect to the selection of

6   alternates.

7          So we will pick the jury.

8          MR. GAPPA:  Okay.

9          THE COURT:  And then once we say those 12 are the

10  jurors, you'll have what's left at the back end of the 12.

11  And from that group, you will pick -- we will pick two

12  alternates.  And you will have one challenge each as to those

13  alternates.

14         MR. GAPPA:  Thank you, Your Honor.

15         THE COURT:  We will separate that, though.  We will

16  determine who your 12-person jury is, who are the available

17  jurors for alternates, and then you will exercise or pass on

18  your challenge.

19         And again, it will be the lowest two number.  Let's

20  say we had four available alternates, and both of you passed

21  on your alternate challenges, then numbers 13 and 14.  The

22  lowest number would be the two alternates, and the ones above

23  them would be excused.  Am I --

24         MR. GAPPA:  Yes.

25         MR. CAPOZZI:  Yes.

1          THE COURT:  -- describing that well enough?

2          MR. GAPPA:  Yes.

3          THE COURT:  Makes sense to me.  All right.  We may or

4     may not get there.

5          The other thing to be thinking about is, if we don't

6     get there, I'm going to be asking Renee to tell me what my

7     availability is for all of next week.  I think we've told you

8     already in that email what my availability is for all of next

9     week.  And what about the week after?  You know that -- now

10    we're into a holiday week.  We might run into issues with

11    travel.  So Monday, the 21st, is a criminal calendar.

12          COURTROOM DEPUTY:  20th, Your Honor.

13          THE COURT:  20th.

14          Tuesday, the 21st, the way things are breaking

15    unfortunately, that's another civil law and motion calendar.

16    We have got three in November, because we've got absolutely

17    slammed.  So I'm not going to be available on Tuesday the

18    21st.  Wednesday I'm available, right?

19          COURTROOM DEPUTY:  All day, Your Honor.

20          THE COURT:  But that -- is that the day before the

21    holiday?

22          COURTROOM DEPUTY:  Yes, the 22nd.

23          THE COURT:  So be thinking about if we don't get a

24    jury today, and we're not coming back until next week -- we

25    could come back, right, Monday afternoon?

1        COURTROOM DEPUTY:  1:00 p.m.

2        THE COURT:  Be thinking about, all right, how does --

3  where do we -- where do we think this trial will get to the

4  jury.  And it may cause us to lose somebody that's up there.

5  If somebody says, You know, I've got long standing plans to be

6  on the East Coast for Thanksgiving.  I'm leaving on Tuesday.

7  Either we're going to take a week recess and come back after

8  the holiday -- I'm just throwing -- I'm just throwing things

9  to think about out there.  We're going to have to be nimble,

10  all right?  See you in ten.

11        (Recess taken.)

12        THE COURT:  Juror 008, I want to -- I first want to

13  apologize for keeping you a little bit longer.

14        PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  That's okay.

15        THE COURT:  But I also want to thank you for

16  responding to the summons.  And excuse you from this panel,

17  and direct that you report -- call the eight-hundred number

18  after five o'clock on Friday for further instructions.  Thank

19  you very much.

20        COURTROOM DEPUTY:  Juror 038.  Good morning, Juror

21  038.

22        PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Good

23  morning.

24        THE COURT:  So you've heard my questions both

25  yesterday and this morning to the newly seated prospective

1  jurors.  Do any of the questions that I've asked call for a

2  response from you?

3  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No, no.

4  THE COURT:  Anything about prior involvement with law

5  enforcement?

6  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

7  THE COURT:  Anyone close to you family, friends, ever

8  been accused of a crime?

9  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

10  THE COURT:  Any extremely negative or positive

11  experiences with law enforcement?

12  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

13  THE COURT:  How about any of the computer-related

14  questions, technology, how computer savvy are you?

15  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Not too

16  familiar with it.

17  THE COURT:  All right.  Do you use a computer on a

18  regular basis?

19  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

20  THE COURT:  All right.  Have you -- do you use a

21  computer at all?

22  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  A little.

23  THE COURT:  Have you ever sent or received pictures

24  or movie by the internet?

25  PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Received

1   pictures.

2           THE COURT:  Okay.  Never sent, though?

3           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

4           THE COURT:  You've heard me describe the nature of

5   the charged offenses and some of the evidence that will be

6   coming into the case.  Do you think, in light of the nature of

7   that evidence, that you could be a fair and impartial juror to

8   both sides in a case like this one?

9           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I can try.

10          THE COURT:  And I appreciate that.

11          You've had sometime to think about it.  Do you think

12  you can do it?

13          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I'm not too

14  sure.

15          THE COURT:  As I've said before, that the -- what, of

16  course, both sides in this case are entitled to is a fair and

17  impartial jury that will decide the case based solely on the

18  evidence that's presented here in open court and the law that

19  I instruct the jury governs this case.

20          That's what both sides want, and what they're

21  entitled to.  So the question is, can you consider the

22  evidence, even evidence that might be troubling to you, but

23  not decide the case just because some of the evidence was

24  troubling, but actually consider all of the evidence, apply

25  the law, and make a determination of the facts and whether the

1   Government has proved the elements of the offenses charged

2   beyond a reasonable doubt?

3          Some people, and you've heard some of them say,

4   Judge, as soon as they show that evidence, I'm not going to be

5   able to think through the rest of that process.  Because I'm

6   going to be so upset by the evidence that as far as I'm

7   concerned, that's where my brain is going to shut off, and I'm

8   just going to say, case is over.  I saw that evidence.  I'm

9   done thinking about it.

10          On the other hand, people have said, No, I understand

11  that it might be troubling evidence.  I understand it's my

12  duty as a juror to review it and consider it along with all

13  the other evidence, and then make a decision about whether the

14  Government has proved it's case beyond a reasonable doubt as

15  it every element of the offense.  I know that may be hard, but

16  I can do that.

17          What do you think?  Can you did that?

18          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I'm not too

19  sure, because I work with -- I have child care -- I'm a

20  provider and I work with kids and I don't think I can really

21  be truthful regarding the matter.

22          THE COURT:  So you think it would be difficult for

23  you to balance the evidence?

24          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes, it

25  would be.

1          THE COURT:  As soon as you heard one piece of

2    evidence or saw one piece of evidence that might decide the

3    whole thing for you?

4          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Right.

5          THE COURT:  Mr. Gappa, do you have any questions?

6          MR. GAPPA:  Does the Court want the questions to --

7          THE COURT:  You can ask them, if you want.  I think

8    it's teed up pretty specifically at this point.

9          MR. GAPPA:  Okay.

10          So, Juror 038, just to follow up with a question or

11   two, thank you.  If you heard evidence in the case that there

12   were some illegal videos or images that were found on a

13   computer, and it was in a location near the Defendant, do you

14   understand that you would have to decide is there evidence

15   that connects the Defendant to the illegal content.

16          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I don't

17   quite understand your --

18          MR. GAPPA:  It wouldn't be enough -- do you

19   understand it wouldn't be enough if all there is is illegal

20   material and somebody?  In other words, there has to be a

21   connection between the illegal material or conduct and the

22   person who is charged.  It's not enough that you have the two

23   things even if they're together.  Do you understand that?

24          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  A little

25   bit.  The way I feel right now, I feel that he's guilty, maybe

1   because I work with kids.  I -- that's the way it is for me.

2           MR. GAPPA:  But you think --

3           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I --

4           MR. GAPPA: -- somebody is guilty just because they're

5   in the a courtroom.

6           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

7           MR. GAPPA:  Well, why --

8           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  It's just,

9   you know, the evidence I would have to go by.

10          MR. GAPPA:  But wouldn't you, if you're instructed

11  that you have to deliberate and consider all of the evidence,

12  including any evidence that offended my present, even if they

13  didn't have to, you would have to consider everything?

14          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Right.  I

15  could try, is all I can say.

16          MR. GAPPA:  Then, so do you think you could be fair

17  and impartial?

18          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Not really.

19          MR. GAPPA:  Those are me questions, Your Honor.

20          MR. CAPOZZI:  I have none, Your Honor.

21          THE COURT:  Challenge?

22          MR. CAPOZZI:  Yes.

23          THE COURT:  For cause?

24          MR. CAPOZZI:  Yes.

25          THE COURT:  Juror 038, you are -- anything the

1   Government wanted to add?

2           MR. GAPPA:  No, Your Honor.

3           THE COURT:  Granted.

4           Juror 038, please -- thank you for appearing.  Please

5   call back into the eight-hundred number after five o'clock on

6   Friday for further instructions.

7           PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Okay.  Thank

8   you.

9           THE COURT:  Thank you.

10          COURTROOM DEPUTY:  Juror 039.

11          THE COURT:  Juror 039, you've heard all of the

12  questions that I've been putting to people over the last day

13  or so.  Do you have any responses to any of these questions?

14          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Well, all I

15  feel is that we're not judging the material.  We're judging

16  the situation of what's happening now, about whether this

17  pornography, you know, was distributed or somehow viewed

18  illegally.

19          And not so much -- we already know that pornography

20  is bad, so we're not judging that.  So if I had to view it --

21  or I don't even have to view it, we just know already that

22  that's part bad.

23          THE COURT:  Any of my other questions not --

24          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No, nothing.

25  I'm fine.

1          THE COURT:  Nothing about law enforcement, positive

2     or negative contacts?

3          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No, there's

4     no problem.

5          THE COURT:  Nobody close to you ever charged with a

6     criminal offense?

7          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

8          THE COURT:  Never been a witness or victim in a

9     crime?

10         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

11         THE COURT:  Any involvement with the Federal

12     Government?  Anybody close to you work for Federal Government

13     agency?

14         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  My father,

15     who is deceased, work at the USSA office, and that's in San

16     Francisco.

17         THE COURT:  All right.  Nothing about that that would

18     impact your ability to serve?

19         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

20         THE COURT:  And ever been the subject of an audit,

21     investigation, anything like that?

22         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No.

23         THE COURT:  How about computer technology and savvy?

24         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  You press

25     the enter button and the computer blows up.

1          THE COURT:  All right.

2          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I was very

3    intimidated by them.

4          THE COURT:  All right.  Do you use a computer

5    regularly?

6          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  No, maybe

7    like a once a week or once a month, you know, maybe office,

8    you know, word processing writing a letter or notes or minutes

9    of a meeting.

10          THE COURT:  Do you have -- have you ever received or

11    sent pictures or videos by --

12          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yeah, in my

13    job where I worked at the Department of Transportation, we

14    used a computer, Lotus notes to send information to different

15    people.

16          THE COURT:  I eluded to this -- getting back to the

17    issue that you addressed, I eluded to this a little bit

18    yesterday when I read some of the elements of one of the

19    offenses that Mr. Henry is charged with.

20          And laid out that there are several requirements and

21    elements that must be proved beyond a reasonable doubt under

22    that particular federal criminal statute.

23          I believe that in order to make a determination

24    whether the evidence satisfies the Government's burden as to

25    those elements, that depending on what the evidence is,

1    whether it's submission of photographs or videos, or testimony

2    describing photographs and images -- I believe, in this case

3    it's going to be certainly some of the former -- that a juror,

4    in order to do their job, would have to view the evidence in

5    order to determine whether it is the type of image that

6    violates the statute that's been charged.

7         So with that understanding, would you be able to view

8    such evidence if it was entered into evidence in the case?

9         PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes.

10        THE COURT:  Do you think that despite the nature of

11   that evidence, even if you found it to be bad, that you would

12   nonetheless be able to work your way through the process that

13   I've described?  That is, assess all the evidence in the case,

14   decide what you believe and what you don't believe, and

15   ultimately apply the facts as you find they have been proved

16   to the law as I give it to you, in order to reach a verdict

17   one way or the other?  Do you think you could do that?

18        PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes, I can.

19        THE COURT:  Do you think you can be fair and

20   impartial to both sides in doing that?

21        PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Yes.

22        THE COURT:  Why don't you pick up that sheet and give

23   us that information.

24        PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  My name is

25   Juror 039.  I live in Fresno.  I've been retired for 12 years.

1   My previous occupation is -- I was a superintendent for the

2   Department of Transportation in the division of equipment in

3   Caltrans.

4           I have a bachelors of arts from Humbolt State

5   University.  No military service.

6           I'm married, going on 34 years.  My wife is homemaker

7   and also home educates our grandkids, or helps my daughter

8   with that.

9           And my three children, my oldest boys is a marine

10  biologist in Atascadero.  And my daughter is a cosmetologist

11  and photographer.  And my youngest boy works for Community

12  Medical Center.

13          And I've served on two juries, both criminal, and we

14  both came to a verdict.

15          THE COURT:  Were those both in state court?

16          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  Superior

17  Court here in town.

18          THE COURT:  Yes.  And how long ago was the most

19  recent of those?

20          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  12 years.

21          THE COURT:  And the one before that?

22          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  I think,

23  that must have been, like, 15 years.

24          THE COURT:  All right.  Any challenges to the jury as

25  currently seated or for cause?

1          MR. CAPOZZI:  No.

2          MR. GAPPA:  No, Your Honor.

3          THE COURT:  All right, Madam Clerk.

4          Folks, you can stand up and stretch.  The lawyers are

5    now going to be beginning the exercise of the preemptory

6    challenges.

7          Preemptory challenging can be exercised for any

8    reason at all, hunch, guess work, throwing darts at the board

9    anything.  They're just a lawyer's determination that they

10   prefer to excuse a certain juror.  Each side gets preemptory

11   challenges.  So they're going to begin their exercise of

12   preemptory challenges, and we'll see where that takes us.

13         I leave you here in the courtroom, because it's

14   helpful for them to put your face with your answers.  We will

15   reposition after the exercise of preemptory challenges.  We

16   will slide up.  The new ones will be coming up in the back

17   end.

18         Anyway, it's helpful to the lawyers if they have you

19   seated while they're doing this, otherwise it's hard to keep

20   in mind, folks, Oh, was the one over there, the one that

21   said -- it's hard.  So for that reason, I leave you seated

22   while they do this exercise.  But you can certainly stand up,

23   move around, stretch, anything you want.

24     (Recess held.)

25         THE COURT:  All right.  The following individuals are

233

1   excused and should call back in on the eight-hundred number

2   after five o'clock on Friday.

3          Juror 037, Juror 034, Juror 035, Juror 036, and Juror

4   015.

5          Now, what I need you folks to do, Juror 039 --

6          COURTROOM DEPUTY:  Correct.

7          THE COURT:  Juror 039, I need you to come all the way

8   back up, and around into that top seat.

9          I need everybody else in that second row to move

10  down, so you're next to each other.  Juror 016, Juror 026,

11  Juror 027, come up in that order into that second row.

12         And Juror 019 and Juror 022, if could you move down

13  all the way.

14         And Madam Clerk, please fill the remaining seats.

15         COURTROOM DEPUTY:  Juror 040.

16         JUROR 040:  It's Juror 040.

17         COURTROOM DEPUTY:  Juror 040, thank you.

18         Closest to the audience.  Thank you.

19         COURTROOM DEPUTY:  Juror 041.  Juror 042.

20         Juror 043.

21         JUROR 043:  It's Juror 043.

22         COURTROOM DEPUTY:  And Juror 044.

23         THE COURT:  Now to each of the newly seated jurors,

24  you've heard me ask a number of questions both yesterday

25  afternoon and this morning, covering much of the same ground.

1   Juror 040 -- and let's get the microphone.  There we go.

2          Juror 040, do you have any answers to any of my

3   questions that you've heard over the last two days?

4          PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  I'm due

5   to go out of town tomorrow on a flight, but I can postpone

6   that.

7          THE COURT:  All right.

8          PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  If

9   needed.

10         THE COURT:  How about in -- it is not a prepaid

11  ticket?

12         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  It is a

13  prepaid ticket, yeah.  I was going to go for a weekend with

14  friends.  But I see we're getting down to the end here.

15         THE COURT:  Well, I'll note that, but it may or may

16  not be an issue.

17         How about any of my other questions?  Law enforcement

18  connections?

19         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No,

20  none.

21         THE COURT:  No criminal case exposure as a witness or

22  a victim?

23         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No.

24         THE COURT:  How about computer usage?

25         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  I use it

1    on a regular basis.  And yes, I have sent and received files,

2    photos, videos.

3          THE COURT:  Would you describe -- do you have any

4    special training?

5          PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No.

6          THE COURT:  Ever used a peer-to-peer network?

7          PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No.

8          THE COURT:  How about exposure to the legal system in

9    general as a witness, as a participant in any way?

10         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No.

11         THE COURT:  You've heard me talk about the law.  Any

12   of the legal principals that I've eluded to saying that I'm

13   going to instruct the jury that the law is as follows.  Any of

14   the things that I've talked about in that regard that you

15   think you'd have any difficult following and applying as is

16   the duty of the jurors.

17         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  No.

18         THE COURT:  You've heard me also describe the nature

19   of the charges and some of the evidence that will be submitted

20   during the course of the trial.

21         Do you think, in light of that, that you can be a

22   fair and impartial juror in a case like this to both sides?

23         PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  Yes.

24         THE COURT:  041, same questions.

25         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  No, sir.

1   The only thing I will mention, my sister does work for the

2   IRS.  She has for better than 20 years now, but has no bearing

3   on anything here today.

4           THE COURT:  And you've heard a lot of discussion

5   regarding people's reaction to different types of evidence and

6   whether it would affect their ability to serve, fairly

7   consider the evidence for both sides.  Do you have any doubts

8   about your ability to do that here?

9           PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  It's

10   definitely not going to be easy.  It's going to be

11   troublesome.  However, I don't believe it will take away from

12   my ability to maintain impartiality or anything.

13           THE COURT:  Juror 042?

14           PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Yes, sir?

15           THE COURT:  Same questions, anything that I've been

16   inquiring about that calls for a response by you?

17           PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No.

18           THE COURT:  No involvement in the legal system?

19           PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No.

20           THE COURT:  How about specialized training -- I

21   forgot asks Juror 041, computer use?

22           PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  Yes, sir.

23   Daily.

24           THE COURT:  Daily?

25           PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  Yes, sir.

1          THE COURT:  Any specialized training?

2          PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:

3   Basically, it's a student database that I work with, everyday

4   student information, staff, a lot of memos, and pictures and

5   activities from our school functions.  That's about the extent

6   of it.

7          THE COURT:  Okay.  Any specialized training in

8   information, technology, computer usage, the internet?

9          PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  No.  Not

10  above using the database system that we were trained on, but

11  nothing beyond that.

12         THE COURT:  You have sent or received pictures or

13  music files via the internet?

14         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  Yes.

15         THE COURT:  Ever use peer-to-peer network?

16         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  No.

17         THE COURT:  Know what it is?

18         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  I'm

19  sorry?

20         THE COURT:  Do you know what it is?

21         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  I have an

22  idea based on the conversations you've had here.

23         THE COURT:  But no specialized knowledge?

24         PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  No.

25         THE COURT:  Juror 042 back to you.  I'm sorry.

1          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  It's

2     okay.

3          THE COURT:  Any involvement Federal Government, law

4     enforcement experience, either positive or negative, that we

5     should know about?

6          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Nothing.

7          THE COURT:  Ever participate in a civil case as a

8     party or witness?  Anything like that?

9          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No, sir.

10         THE COURT:  How about in a criminal case?

11         PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Nope.

12         THE COURT:  Any friend, family, ever been accused of

13    criminal conduct?

14         PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No.  Is

15    it working?  No?  Sorry.  I hit it with my thumb.

16         COURTROOM DEPUTY:  Okay.  So it's on moot, if you

17    press button on the bottom, you can just unmute it.

18         PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Sorry.

19         THE COURT:  No problem.  And any problem following

20    legal instructions?

21         PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No.

22         THE COURT:  Even if you disagree with what I tell you

23    the law requires; can you do that?

24         PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Yes, sir.

25         THE COURT:  How about the nature of the charge and

1    types of -- some of the evidence that might be involved in the

2    presentation of the case, does that cause you concern about

3    your ability to be fair and impartial to both sides even in

4    light of the nature of that evidence?

5              PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Well,

6    like everybody else says it's not going to be easy to watch.

7    My father sexually molested my sister when she was little, so

8    I don't know if that will hold any bearings to my opinion.

9    But that's the only disagreement I have.

10             THE COURT:  Well, how old were you at the time?

11             PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Six.  My

12   sister was 12.

13             THE COURT:  So at the time that that was happening,

14   you probably, I'm speculating, may not have been aware of --

15             PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Correct,

16   correct.  But I was part of the backlash, you know, that my

17   sister, what she had to go through even as she got older.

18   So --

19             THE COURT:  In a case like this, given that family

20   background, because there are two charges in this case.  One

21   of them is the child pornography charge, one of them is sexual

22   exploitation of a minor, given that family history and what

23   your family went through in connection with that, do you think

24   you could be fair and impartial to someone accused of sexual

25   exploitation of a minor?

1          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Well, I

2     can't predict my feelings, you know.  Obviously, I don't know

3     what's going to be happen in the case.  I certainly would try.

4     I can't tell you ahead of time how something is going to

5     affect me.  I don't feel like I'm going enjoy it at all,

6     obviously.  I'd like to say that can.

7          THE COURT:  Do you feel like you're a person who, for

8     lack of a better term, can compartmentalize and realize that

9     every situation is different, and that what happened to your

10    sister and your family in that case, does not dictate or

11    influence in any way, what the correct decision is in this

12    case?

13          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  I believe

14    so.

15          THE COURT:  Are you confident of it?

16          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Can I

17    give you a 90 percent?  I mean, don't know what to expect.

18          THE COURT:  Right.

19          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  I'd like

20    to say I can be fair and impartial.  I feel like I could

21    but --

22          THE COURT:  Mr. --  anything else that you think you

23    need to tell me?

24          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  No, sir.

25          THE COURT:  Juror 043, how about any responses to any

1  of my questions?

2          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I just have

3  one.  My job is still making me work, since I work graveyard.

4  So I'm coming here.  So technically, I'm really, really tired.

5  I can barely keep my eyes open right now.

6          THE COURT:  Do you think, given the schedule that

7  I've laid out, which is quite a few half days.

8          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I should be

9  fine for those half days.

10          THE COURT:  And if maybe once during the week gets a

11  full day, do you think you can get through it?

12          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I should be

13  fine.

14          THE COURT:  Okay.  You haven't fallen asleep yet.

15          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I try not

16  to -- almost.

17          THE COURT:  All right.  You're tired, but you think

18  you can do it?

19          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Yes.  I just

20  need a Monster, and I should be good for a couple hours.

21          THE COURT:  We'll see what we can do.

22          Any of my other questions involving positive or

23  negative experiences with law enforcement?

24          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I got

25  robbed -- well, we got robbed twice within seven years.  The

1    first time it took, maybe, the cops three days to get to our

2    house to actually file the report.

3              And then the second one was, like, this year in

4    February, it took them an entire week just to get to our house

5    to actually file the report.

6              THE COURT:  Do you think being -- I take it that you

7    weren't very happy about that?

8              PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Yes, because I

9    just got off work when that incident happened.

10             THE COURT:  Do you think that would impact the way

11   you might view the testimony of law enforcement officers, or

12   will you be able to make the distinction that, look, I wasn't

13   happy about that, they took too long to get to me.  But, this

14   is a completely different situation.  I'm supposed to have

15   evaluate the testimony of law enforcement officers, using the

16   same standard, the same way that I have evaluate the testimony

17   of any other witness.  Can you do that?

18             PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Yes.  Because

19   the officer that came by actually apologized for taking so

20   long to actually come to us.

21             THE COURT:  So you don't have too hard feelings?

22             PROSPECTIVE JUROR SEAT NUMBER TWENTY:  No, not

23   really.

24             THE COURT:  Any of my other questions that you think

25   call for an answer from you?  Anything that the lawyers would

1  want to know about you when deciding whether you would be a

2  fair and impartial juror in case?

3          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Not that I can

4  think of, no.

5          THE COURT:  Okay.  Juror 044?

6          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Yes,

7  Your Honor?

8          THE COURT:  Any responses to any of my questions?

9          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I think

10 so.

11         THE COURT:  There's been a lot of them.  You're at

12 the very last --

13         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I have

14 notes.

15         THE COURT:  That's a very good thing that you did

16 there.

17         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I do

18 have law enforcement in my family.  My son-in-law is a deputy

19 sheriff for Tulare County.  He works in the drug and gang task

20 force.

21         My nephew is a sheriff in king County.  I love them

22 both dearly, but they're people like anyone else, and I

23 wouldn't take law enforcement's word over anyone else's

24 testimony.

25         I have sat on a jury.  It was criminal case in Tulare

1    County.  We did reach a decision.  I've only sat on one jury,

2    but I've been called for many.

3           My husband and I have been audited by the IRS.  I

4    don't necessarily dislike them.  My cousin is retired from the

5    IRS.  So he was in higher level.  They just are doing their

6    jobs.

7           I have worked for the Federal Government in the past.

8    I would worked for the United States of Department of

9    Agriculture, ASCS Office implement Government subsidy programs

10   and explain those to farmers.  I left at an E6.

11          My brother and brother-in-law both have served time

12   for using drugs and distributing and taking illegal, stolen

13   items.  They are not currently incarcerated.  They made bad

14   choices, and they received the punishment they deserve for

15   what they chose to do.  And I felt they were fairly treated.

16          Next card:  I do access technology frequently from

17   home and at schools, as I am a third grade teacher.  I do have

18   access to district websites.

19          And I have sent have and received digital photographs

20   and documents.  I don't know what peer-to-peer network is.

21   And I only heard it when I came to court today.

22          And as far as observing or watching the evidence as

23   presented, I thought a lot about that over night, and I had

24   some thoughts occur to me that might alleviate that issue, but

25   I don't know whether or not to share that with you personally

1   or and/or the attorneys or just to tell you.

2           THE COURT:  All right.  I'll get back to you on that.

3           PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Okay.

4           THE COURT:  Let's pass the mic to Juror 040.  Juror

5   040, if you can answer the questions on that sheet.

6           PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  My name

7   is Juror 040.  I live in Fresno.  I am a bookkeeper.

8           Prior to that, I was an opthalmic assistant.  I have

9   approximately two years of college.  No military service.

10  I've been married for 35 years.  My husband is an

11  orthodontist.  My oldest child is a dentist in the Army

12  currently serving in Germany.  My daughter is a homemaker.

13  The next son is an orthodontist.  And a daughter in college.

14          And I have not served on a jury before.

15          THE COURT:  And your two years of college, where was

16  that?

17          PROSPECTIVE JUROR IN SEAT NUMBER SEVENTEEN:  One year

18  at BYU and one year at Clovis Community.

19          THE COURT:  Thank you.  041?

20          PROSPECTIVE JUROR IN SEAT NUMBER EIGHTEEN:  Name is

21  Juror 041.  I live in Parlier, California.  I'm current a vice

22  principal at an elementary school.

23          Previously occupation -- I've been doing that since

24  college, but prior to that I worked license pharmacy tech.

25          Educational background, I do have a masters degree

1   from Fresno Pacific, bilingual cross culture education.  A

2   Bachelor's degree from Fresno State, major in Spanish and

3   minor in English.  I served six years in the United States

4   Army.

5           I am currently married for 20 years.  Only one

6   spouse.  He's a realtor.  No former spouse.  I have two

7   children, a 16-year old, junior in school.  And a 13 year old,

8   8th grader.

9           I've been called but never served.

10          THE COURT:  What did you do in the Army?

11          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  91Q

12   pharmacy technician.

13          THE COURT:  For six years?

14          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  As a

15   reservist for four.

16          THE COURT:  For the two active, at what station?

17          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  Those

18   were my training days and those were in Fort Dixon New Jersey,

19   and then in Fort Time Houston, Texas

20          THE COURT:  Juror 042?

21          PROSPECTIVE JUROR IN SEAT NUMBER NINETEEN:  I am

22   Juror 042.  I live in Clovis, California.  I'm currently

23   unemployed.  Previous employment is construction

24   administration for the last ten years.  Prior to that, I did

25   nails for 20 years.  Never served in the military.

1          Married.  My spouse is a long-haul truck driver.

2    Former spouse is deceased.  I have one child, and she is

3    currently holding my first grandbaby any day now.  She works

4    for Verizon.

5          And never been on a jury.

6          THE COURT:  Juror 043?

7          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  My name is

8    Juror 043.  I live in Fresno, California.  I work at Foster

9    Farms.

10          Before then, I was working at a Playland store in a

11    kid amusement park.  I went to school for maybe two and a half

12    years.  No military service.

13          Single, not married.  Don't have a spouse, kids.

14          And I only served on one jury and don't remember what

15    it was.  I don't remember, actually.

16          THE COURT:  How long ago?

17          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  It was in

18    2000 -- I think 2012.

19          THE COURT:  Do you know if that jury reached a

20    verdict?

21          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  Yes.

22          THE COURT:  It did.

23          Do you know if it was a criminal case or a civil

24    case?

25          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I think it was

248

1    a criminal.  I'm not sure.

2            THE COURT:  All right.  Juror 044, I think you

3    covered some of this.

4            PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  I think

5    so.  I'm sorry, I was just going over my notes.

6            THE COURT:  You were very organized, and I appreciate

7    it.

8            PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  My name

9    a Juror 044.  I reside in Farmersville, California.  My most

10   current occupation is a third grade teacher at Snowden School.

11   My previous occupation was with the Department of

12   Agricultural -- and prior, I was a program assistant.  And

13   prior to that, I worked in a packinghouse as a control product

14   data clerk for citrus.

15            I have an AA from College of the Sequoias in liberal

16   studies in Visalia, and a bachelor of arts from Fresno State,

17   and a clear credential.  I have no military service.

18            I am married.  My husband is a branch manager for air

19   conditioning refrigeration company in Bakersfield, California.

20            I have two children, two adult children.  My daughter

21   is a nurse at Kaweah Delta in Visalia.  My son-in-law, her

22   husband is the sheriffs officer in drug and gang task force in

23   Tulare County.  And my oldest son was a police officer in

24   Tulare County, but he is now a lineman in Texas -- an

25   electrical lineman.

1          I have had prior jury experience.  I've only sat on

2    one jury, and it was an criminal case at the state level, and

3    we did reach a verdict.

4          THE COURT:  How long ago was that?

5          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  About

6    ten years.

7          THE COURT:  Counsel, and Juror 044, approach sidebar

8    please.

9          (Sidebar held between the Court, Counsel and JUROR

10   044.)

11         THE COURT:  Yes, Ma'am.  You want to tell

12   us something.

13         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  It was

14   just as I understand the law as you went over it as regards to

15   the Defendant, that one of the statutes was that we had to

16   verify that it was a minor or a child in the explicit sexual

17   act that he received in the data or the transmitted, not

18   necessarily that we had to see that data or that actual

19   explicit act.  And my thought was, if the lawyers already have

20   seen that information, and they concur that the video contains

21   those explicit acts, would they be able to verify that there

22   was minor involved or a child involved in the act without

23   having to see those explicit acts.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  By

1  doing that, we could satisfy the law as it's required for us

2  to make that clarity or that distinction.

3         THE COURT:  All right.  You can be seated.

4         THE PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:

5  Okay.  I'm sorry.  I know you guys don't --

6         THE COURT:  Counsel stay up.

7         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Oh,

8  sorry.

9         THE COURT:  No, you go.  You go.  We stay.

10         I mean obviously, yeah, we've been talking about that

11  all.  I'll cover it with her.  Any challenges for cause at

12  this point?

13         MR. GAPPA:  No.

14         MR. CAPOZZI:  No.

15         THE COURT:  Okay.

16         MR. CAPOZZI:  Well, I just -- why are we even

17  questioning these people?  The two alternates are going to be

18  right there unless we throw somebody off.  Don't we have a

19  jury now?

20         THE COURT:  But you guys got preemptories.  I don't

21  know what you're going to do with them.  You guys got quite a

22  bit.

23         MR. GAPPA:  We have two and you have --

24         MR. CAPOZZI:  But you passed.

25         MR. GAPPA:  No, we didn't.

1          MR. CAPOZZI:  I thought you passed.

2          MR. GAPPA:  We still would have strikes each if we --

3          THE COURT:  Even if they did the -- unless it's back

4    to back pass.

5          If there's a back to back pass, then that's our jury.

6    But if they pass, they lose it.  But they didn't pass.

7          MR. CAPOZZI:  I assume you passed when they brought

8    it back up.

9          THE COURT:  No.  See they're one.  You're two.

10   They're three.  You're four and five.  Exactly.

11         MR. CAPOZZI:  Oh, I assumed we have our jury there.

12         THE COURT:  No.

13         MR. CAPOZZI:  I was happy.

14         THE COURT:  So I don't know what you guys are going

15   to do.  Is it still possible that --

16         MR. CAPOZZI:  Yeah.

17         THE COURT: -- that we'll get a jury?  Yeah, it's

18   possible.  I have to see what you guys do with your --

19         MR. CAPOZZI:  Up to you next.  You're up next.

20         THE COURT:  Got it.

21         MR. CAPOZZI:  Yes.

22         THE COURT:  All right.

23         MR. CAPOZZI:  Thank you.

24      (Sidebar ended.)

25         THE COURT:  Juror 044?

1          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Juror

2     044.

3          THE COURT:  Juror 044, yes.  Sorry.  I wrote it down,

4     but I wrote it down wrong.

5          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  No

6     worries.

7          THE COURT:  The notion that you suggested at sidebar

8     is, or at least is a variation of things that have been

9     considered.

10         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Okay.

11         THE COURT:  However, it is my belief that photographs

12    and excerpts of videos, to some limited degree, will be

13    presented into evidence in the case.  Will you be able to

14    consider that evidence along with all other evidence in the

15    case and be fair and impartial to both sides in reaching a

16    determination of whether or not the charges have been proved

17    beyond a reasonable doubt?

18         PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Yes,

19    Your Honor.

20         THE COURT:  So even though you had a notion that,

21    Gee, couldn't we do it this other way?  If I tell you, No,

22    we've considered it.  You're going to have to -- the jury in

23    this case is going to receive some evidence along the lines of

24    that that I've described, do you still believe that you can be

25    fair and I'm impartial to both sides?

253

1          PROSPECTIVE JUROR IN SEAT NUMBER TWENTY-ONE:  Yes,
2    Your Honor.
3          THE COURT:  Still no challenges at this point?
4          MR. CAPOZZI:  No.
5          MR. GAPPA:  No.
6          THE COURT:  Please, Madam Clerk, please, pass the
7    strike sheet.
8          Do Counsel have current seating?
9          MR. GAPPA:  No.
10         COURTROOM DEPUTY:  Let me print it for you.
11         MR. CAPOZZI:  Oh, yes.  It's different now.
12         THE COURT:  Again, ladies and gentlemen, while
13   they're determining how to exercise challenges, you may
14   stretch and do you whatever you'd like.
15         Juror 023?
16         PROSPECTIVE JUROR IN SEAT NUMBER 4:  Can I talk with
17   the important gentleman for just a moment, you and the
18   lawyers?
19         THE COURT:  I'm sorry.  I didn't hear you.
20         PROSPECTIVE JUROR IN SEAT NUMBER 4:  Can I have a
21   sidebar with ya'll real quick?  One simple little thing?
22         THE COURT:  All right.
23      (Sidebar between Court, Counsel and Juror 4.)
24         PROSPECTIVE JUROR IN SEAT NUMBER 4:  I'm trying to
25   find the appropriate time without interrupting to talk to you

1  all.  There was a gentleman that was sent away, because he

2  knew somebody.  When he walked out, he ended up having a

3  conversation with my girlfriend, who was standing around.  He

4  made a few comments that she told to me, an idle chitchat.  I

5  don't know that that affects me, but I feel it's necessary

6  that you all know that that information was given.  And he was

7  talking about one -- he did mention that one of the possible

8  witnesses was his ex-brother-in-law.  He feels -- he kind of

9  feels that the Defendant is kind of being set up by some other

10  people, some of which are in the witness part.  Understand the

11  full context it was kind of their conversation, and what she

12  said, I don't go forward without making sure that has been

13  said to me.

14         THE COURT:  Okay.  Juror 023, do you understand that

15  the fact that a juror who has been excused has made a comment

16  about their view of the case without any evidence having been

17  presented here in Court --

18         PROSPECTIVE JUROR IN SEAT NUMBER 4:  It's definitely

19  all hearsay.

20         THE COURT:  Can't be considered by you in any way.

21         PROSPECTIVE JUROR IN SEAT NUMBER 4:  And that's the

22  whole thing I -- you know, she mentioned it to me.  I said,

23  "That's not stuff I should be hearing."  I tried to put it out

24  of my brain, but it's been popping back up.  And like I said,

25  to be fair, everybody right here needs to know that

1    information was given to me.

2        THE COURT:  Do you think it would affect your ability

3    to be a fair and impartial juror to both sides prosecution and

4    defense, even though you were allegedly exposed to this

5    statement?

6        PROSPECTIVE JUROR IN SEAT NUMBER 4:  That's one thing

7    I've been trying to consider, because there's no evidence to

8    back up what was said.  It's all freaking hearsay.  I'd like

9    to have legitimately put in front of me.  It is in my head.

10   It is something that's going to roll around with all of my

11   other decisions.

12       THE COURT:  Can you be fair and impartial and not

13   based on anything that's been said to you outside of court?

14       PROSPECTIVE JUROR IN SEAT NUMBER 4:  I want to say,

15   yes, but like I said, I have -- it's a concern enough that I'm

16   not sure what was said.

17       THE COURT:  All right.  Anything further?

18       PROSPECTIVE JUROR IN SEAT NUMBER 4:  He deserves a

19   completely fair trial.  If I were in his shoes, I would want

20   it completely fair.

21       MR. CAPOZZI:  I understand.

22       THE COURT:  Any questions you have?

23       All right.  You can take your seat.  Let counsel

24   stay.

25       Any for cause?

1        MR. GAPPA:  I don't think the record would support

2    it.  I don't think the record would support it.

3        MR. CAPOZZI:  No.

4        THE COURT:  All right.  Okay.

5        PROSPECTIVE JUROR IN SEAT NUMBER 4:  I may have

6    forgot something.

7        THE COURT:  Counsel approach.

8        (Sidebar between the Court, Counsel and Juror 033.)

9        COURTROOM DEPUTY:  Please talk normally over the

10   microphone.

11       PROSPECTIVE JUROR IN SEAT NUMBER 11:  I don't know.

12   I just -- I forgot he's -- when you mentioned/familiarized

13   the -- in the law enforcement like that, but my brother-in-law

14   is a private -- I mean, worked for the Federal Government has

15   investigator.

16       THE COURT:  What agency, do you know?

17       PROSPECTIVE JUROR IN SEAT NUMBER 11:  I don't know.

18   He was saying Fresno, here.  I don't know.  It's federal.

19       THE COURT:  Do you know if he was a federal

20   investigator?

21       PROSPECTIVE JUROR IN SEAT NUMBER 11:  I don't know

22   Federal Bureau Investigator.  I just let you know.  I'm not

23   sure.  I don't think it's going to affect me --

24       THE COURT:  Do you --

25       PROSPECTIVE JUROR IN SEAT NUMBER 11:  -- mentioned it

1  to me.

2          THE COURT:  Did you talk to him a lot about what he

3  did for a living.

4          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Yeah, because

5  sometimes we have gatherings on the weekend and things like

6  that, and sometimes he would mention a little bit, you know.

7  But it's -- it's some of this thing about what he would keep

8  quiet.

9          THE COURT:  But don't even know what agency he worked

10  for?

11          PROSPECTIVE JUROR IN SEAT NUMBER 11:  No, just -- he

12  said just federal.

13          THE COURT:  Do you know what kind of investigations

14  he did?

15          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Sometimes

16  narcotics, things like that.

17          THE COURT:  Narcotics you think?

18          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Yes.

19          THE COURT:  Okay.  Do you think it would affect your

20  ability to weigh the testimony of the law enforcement

21  officers?  I mean, because of your brother-in-law, do you

22  think you would tend to believe law enforcement officers over

23  some other witnesses?

24          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Uh --

25          THE COURT:  Would you view them all the same?

1          PROSPECTIVE JUROR IN SEAT NUMBER 11:  It's all the

2     same to me.

3          THE COURT:  All right.

4          PROSPECTIVE JUROR IN SEAT NUMBER 11:  Sometimes,

5     like, kind of the guy that sometimes -- if it's moving too

6     much, then I can doze off a little bit like here and --

7          THE COURT:  I'll try keep a look at it.  Thank you,

8     sir.

9          PROSPECTIVE JUROR IN SEAT NUMBER 11:  All right.

10         THE COURT:  Thank you very much.  You can return.

11         MR. CAPOZZI:  Anymore?  Okay.

12         THE COURT:  Pass the strike sheet, please.

13         Counsel approach.

14         THE COURT:  Okay.  The next challenge order would be

15    to the Government.  Both the Government and the defense has

16    one preemptory and both of your alternate challenges left.

17         We are now at 13 jurors in the box.  So unless there

18    were to be the bowling, back-to-back passes, no exercise of

19    challenge as to alternates, and us all being willing to go

20    with one alternate as opposed to two and take our chances,

21    we're done for the day.  We could come back, done for the day,

22    and we would come back on Monday.  I would advise these folks

23    we might go into the following week.  Although, perhaps not

24    certain that we can maybe perhaps still be done.

25         MR. GAPPA:  One of the main reasons we had to finish

1  by next Friday for couple witness we had.

2  THE COURT:  What can I tell you --

3  MR. GAPPA:  Understood.  So we had two witnesses that

4  had to end by next Friday.

5  Has the Court ever done -- is it an option to do the

6  trial without any alternates?

7  THE COURT:  Well, then we're just rolling the dice.

8  And I mean, I could.

9  MR. GAPPA:  I'm fine.

10  THE COURT:  I could do it and hope.

11  MR. CAPOZZI:  But he won't agree to 11.

12  THE COURT:  Okay.

13  THE COURT:  You want to go one more and see what

14  happens?

15  MR. CAPOZZI:  You're losing me.  What do you mean by

16  that?

17  MR. GAPPA:  You have one preemptory.

18  MR. CAPOZZI:  But you passed.

19  THE COURT:  Well, but he --

20  MR. CAPOZZI:  He's next up.

21  THE COURT:  Well, he's next up.  He just lost that

22  one, because he passed.

23  MR. CAPOZZI:  Okay.

24  THE COURT:  It will be up --

25  MR. CAPOZZI:  Up to you.

1       THE COURT:  Want to go one more time around and see

2  what we got, and then confer back up here again?

3       MR. CAPOZZI:  See, if you're going to pass?  Okay.

4     (Sidebar ended.)

5       COURTROOM DEPUTY:  Ladies and gentlemen, can you pick

6  up the papers on the floor with the questions around you and

7  just pass them forward?  Thank you.

8       THE COURT:  Counsel, approach.

9     (Sidebar.)

10       THE COURT:  Okay.  So that's 12.  Everybody's

11  exercised their challenges.  We're done.  We could try the

12  case without any alternates.  Never done it.  Risky

13  proposition.  If we lose anybody, it's a mistrial.

14       Under those circumstances, if somebody got ill, I

15  would be inclined to try to take a recess until they were able

16  to rejoin us, and bring folks back, which could result in a

17  trial being broken up even more.  But as my first wild

18  courtroom deputy points out to me, while the strike sheet,

19  Judge, we've already got two days into the trial, maybe we

20  should just forge ahead.

21       I suppose, if the parties are willing to risk a

22  mistrial, because we lose a juror, I am.  I'll go -- I'll go

23  with this 12 without an alternate and hope that we don't lose

24  anybody.

25       I have in the five criminal trials that I've had so

1    far lasted between one and two weeks, I haven't lost anybody

2    yet, but you never know.  We're taking our chances, but I'm

3    willing to do it, if you all want to go forward with your 12,

4    and no alternates.  Is that what the Government would prefer?

5                MR. CAPOZZI:  Can I talk to my client really quick?

6                THE COURT:  Yes, of course.

7                MR. GAPPA:  I learn something every time sometimes.

8    I learn more than other times.

9                THE COURT:  You never know what you're going to get.

10   I mean, this struck me as an odd group.

11               MR. CAPOZZI:  We're fine.

12               THE COURT:  All right, then.  We will go forward with

13   no alternates.  We'll break until 1:30.  Get instructions and

14   opening statements and first witness, if we can.  I'll go

15   ahead until 4:30 today.

16        (Sidebar ended.)

17               THE COURT:  All right.  Ladies and gentlemen, rather

18   than to have you -- well, actually, yeah, we're okay to do it

19   this way.

20               The following individuals are excused.  Each of you

21   is instructed to phone in to the eight-hundred number after

22   five o'clock this Friday for further instructions.  Juror 023,

23   Juror 024.  Did I ever get it right?

24               PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  That was

25   perfect.

1          THE COURT:  And now you're leaving.

2          PROSPECTIVE JUROR IN SEAT NUMBER EIGHT:  The last

3    one.

4          THE COURT:  That stinks.

5          Juror 026, Juror 019, Juror 022, Juror 040, 041,

6    Juror 042, and Juror 043.

7          PROSPECTIVE JUROR SEAT NUMBER TWENTY:  I may go?

8          THE COURT:  You may leave.  Call the eight-hundred

9    number after five o'clock on Friday.

10          If I can ask -- how do we want to seat?

11          COURTROOM DEPUTY:  Six and six.

12          THE COURT:  Okay.  The three in the upper row who are

13    furthest from me, can you move down one seat.

14          Juror 027, move over.  And Juror 044, if you can move

15    up into the jury box.

16          Ma'am Clerk, please swear the jury.

17          COURTROOM DEPUTY:  Please stand and raise your right

18    hands.  After I administrator the oath, please affirm by

19    saying "I do."

20          You and each of you solemnly swear that you will well

21    and truly try this cause now before the court and a true

22    verdict therein render accordingly to the law and evidence.

23    So help you God?

24          (Jury Sworn.)

25          COURTROOM DEPUTY:  Thank you.

1          THE COURT:  Ladies and gentlemen, two things, first,

2     you might notice that there are 12 of you.  What that means is

3     we have no alternates in this trial.

4          If, for any reason, you are running late during one

5     of our sessions, we have no one to replace you were we to want

6     to.

7          If you become ill, we will have to stop and wait

8     until you're able to do rejoin us.  So I guess this is a way

9     of saying, get plenty of rest, take your vitamin C, drive very

10    carefully, because of that situation.

11         Now, we're going to take our first break during the

12    trial, and -- because it's 1:20 and everybody needs to get

13    something eat.  Remember, until this trial is over, do not

14    discuss this case with anyone including your fellow jurors,

15    members of your family, people involved in the trial, or

16    anyone else.  And do not allow others to discuss the case with

17    you.  This includes discussing the case in internet chatrooms

18    or through internet blogs, internet bulletin boards, emails or

19    text messaging.  If anyone tries to communicate with you about

20    the case, please let me know about it immediately.  Do not

21    read, watch, or listen to any news reports or other accounts

22    about the trial or anyone associated with it, including any

23    online information.

24         Do not do any research, such as consulting

25    dictionaries, searching the internet, or using any other

1    reference materials.  And do not make any investigation into

2    the case on your own.

3          Finally, keep an open mind until all the evidence has

4    been presented, and you have heard the arguments of counsel,

5    my instructions on the law, and the views of your fellow

6    jurors.

7          If you need to speak to me about anything during the

8    trial, simply give a signed note to Renee, my courtroom

9    deputy, or my law clerk, Sam, to give to me.

10         Sam will accompany you, right, Renee?  Or are you --

11         COURTROOM DEPUTY:  Sam is going to accompany them.

12         THE COURT:  -- to the jury deliberation room.  Do we

13    have the badges back there?

14         COURTROOM DEPUTY:  Yes, Your Honor.

15         THE COURT:  You'll get your juror badges from Sam,

16    and we will reconvene at 1:35 p.m. Let's take an hour and

17    15 minutes.

18         All right, 1:35 p.m. at that time you'll hear my

19    preliminary instructions and opening statements, if counsel

20    wish to make them.  And then we'll start hearing the evidence

21    in the case.

22         All right.  Have a nice lunch.  See you this

23    afternoon.

24         Did you have a question, Mr. -- don't have my updated

25    chart.

1          JUROR 039:  You just sounded like we were supposed to
2     go to the jury room but that's later?
3          THE COURT:  No, no.  Sam is going to take you right
4     now.
5          JUROR 039:  Okay.
6          THE COURT:  So that you can get in and out of
7     building easily.
8          COURTROOM DEPUTY:  Just hang there just one second.
9          THE COURT:  Sam will get over there and accompany you
10    and --
11         COURTROOM DEPUTY:  Your Honor, maybe I better go.
12         JUROR 044:  We're a rowdy group.  We might need two.
13       (Jury exits courtroom.)
14         THE COURT:  We're out presence of the jury.  We'll
15    reconvene in an hour and fifteen minutes.  Opening
16    statements -- preliminary instructions followed by opening
17    statements.
18         Mr. Capozzi, Renee will be back to make sure you're
19    hooked up okay.
20         MR. GAPPA:  Your Honor, just for time planning, is
21    there still likely to be afternoon break, and then Court ends
22    the 4:30.
23         MR. GAPPA:  Thank you.
24         THE COURT:  I might take the afternoon break only
25    about ten minutes.

1          MR. GAPPA:  Okay.

2      (Whereupon, luncheon recess was held from 12:22 p.m. to

3   1:37 p.m.)

4          THE COURT:  We're outside the presence of the jury.

5   Two things, Counsel, could I have both of you sign the strike

6   sheet.  In a hurry, we didn't get that done.  And also, with

7   respect to the strike sheet with regard to alternates, perhaps

8   if you could just fill in "not applicable," since we've

9   decided to go with 12.  Because that strike sheet becomes a

10  part of the record.

11         Anything else we need to take up outside the

12  presence?

13         MR. GAPPA:  No.

14         MR. CAPOZZI:  No.

15         THE COURT:  All right.  Madam Clerk, you can seat the

16  jury.  Feel free to move anything around or to move yourself.

17         MR. CAPOZZI:  It's hard to see witnesses from here,

18  so I'm just going to sit at the end of the table.

19         THE COURT:  It's fine.

20      (Jury enters courtroom.)

21         THE COURT:  Let the record reflect we're back in the

22  presence of the jury.

23         Ladies and gentlemen, you are now the jury in this

24  case.  I want to take a few minutes to tell you something

25  about your duties as jurors and to give you some preliminary

1   instructions.

2          At the end of the trial, I will give you more

3   detailed written instructions that will control your

4   deliberations.

5          When you deliberate, it will be your duty to weigh

6   and to evaluate all the evidence received in the case, and in

7   that process, to decide the facts.

8          To the facts, as you find them, you will apply the

9   law as I give it to you whether you agree with the law or not.

10  You must decide the case solely on the evidence and the law

11  before you.  And must not be influenced by any personal likes

12  or dislikes, opinions, prejudices, or sympathy.

13         Please do not take anything I may say or do during

14  the trial as indicating what I think of the evidence or what

15  your verdict should be.  That is a matter entirely up to you.

16         This is a criminal case brought by the United States

17  Government.  The charges against the Defendant are contained

18  in the indictment.  The indictment simply describes the

19  charges the Government brings against the Defendant.  The

20  indictment is not evidence, and does not prove anything.

21         The Defendant has pleaded not guilty to the charges,

22  and is presumed innocent unless and until the Government

23  proves the Defendant guilty beyond a reasonable doubt.

24         In addition, the Defendant has the right to remain

25  silent and never has to prove innocence or to present any

1   evidence.

2          The evidence you are to consider in deciding what the

3   facts are consists of, one, the sworn testimony of any

4   witness.

5          Two, the exhibits which are received in evidence.

6          And three, any facts to which the parties agree.

7          The following things are not evidence, and you must

8   not consider them as evidence in deciding the facts of the

9   case.

10          One, statements and arguments of the attorneys.

11          Two, questions and objections of the attorneys.

12          Three, testimony that I instruct you to disregard.

13          And four, anything you may see or hear when Court is

14   not in session, even what if you see or hear is done or said

15   by one the parties or by one of the witnesses.

16          Evidence may be direct or circumstantial.  Direct

17   evidence is direct proof of a fact such as testimony by a

18   witness about what that witness personally saw, or heard, or

19   did.

20          Circumstantial evidence is indirect evidence.  That

21   is, it is proof of one or more facts from which one can find

22   another fact.

23          You are to consider both direct and circumstantial

24   evidence.  Either can be used to prove any fact.  The law

25   makes to distinction between the weight to be given to either

1    direct or circumstantial evidence.  It is for you to decide

2    how much weight to give to any evidence.

3         There are rules of evidence that control what can be

4    received in evidence.  When a lawyer asks a question, or

5    offers an exhibit in evidence, and a lawyer on the other side

6    thinks that it is not permitted by the rules of evidence, that

7    lawyer may object.

8         If I overrule the objection, the question may be

9    answered or the exhibit received.

10        If I sustain the objection, the question cannot be

11   answered or the exhibit cannot be received.

12        When I sustain an objection to a question, you must

13   ignore the question and must not guess what the answer would

14   have been.

15        Sometimes I may order that evidence be stricken from

16   the record, and that you disregard or ignore the evidence.

17   That means that when you're deciding the case, you must not

18   consider the evidence that I told you to disregard.

19        In deciding the facts in this case, you may have to

20   decide which testimony to believe and which testimony not to

21   believe.  You may believe everything a witness says or part of

22   it or none of it.

23        In considering the testimony of any witness, you may

24   take into account, one, the witness' opportunity and ability

25   to see or hear or know that things testified to.

1           Two, the witness' memory.

2           Three, the witness' manner while testifying.

3           Four, the witness' interest in the outcome of the

4    case, if any.

5           Five, the witness' bias or prejudice, if any.

6           Six, whether other evidence contradicted the

7    witness's testimony.

8           Seven, the reasonableness of the witness' testimony

9    in light of all the evidence.

10          And eight, any other factors that bear on

11   believability.

12          The weight of the evidence as to a fact does not

13   necessarily depend on the number of witnesses who testified

14   about it.  What is important is how believable the witnesses

15   are, and how much weight you think their testimony deserves.

16          I will now say a few words about your conduct as

17   jurors.

18          First, keep an open mind throughout trial and do not

19   decide what the verdict should be until you and your fellow

20   jurors have completed your deliberations at the end of the

21   case.

22          Second, because you must decide this case based only

23   on the evidence received in the case, and on my instructions

24   as to the law that applies, you must not be exposed to any

25   other information about the case, or to the issues it involves

1   during the course of your jury duty.

2          Thus, until the end of the case, or unless I tell you

3   otherwise, do not communicate with anyone in any way, and do

4   not let anyone else communicate with you in any way about the

5   merits of the case or anything to do with it.

6          This includes discussing the case in person, in

7   writing, by telephone or electronic means, via email, text

8   messaging, or any internet chatroom, blog, website or other

9   feature.

10         This applies to communicating with your fellow jurors

11  until I give you the case for deliberation, and it applies to

12  communicating with everybody else, including your family

13  members, your employer, media or press, the people involved in

14  the trial, although you may notify your family and your

15  employer that you have been seated as a juror in the case.

16         But if you are asked or approached in any way about

17  your jury service, or anything about this case, you must

18  respond that you've been ordered not to discuss the matter and

19  to report the contact to the Court immediately.

20         Because you will receive all of the evidence and

21  legal instruction you may properly consider to return a

22  verdict, do not read, watch, or listen to any news or media

23  accounts or commentary about the case, or anything do with it.

24         Do not do any research, such as consulting

25  dictionaries, searching the internet, or using other reference

1   materials, and do not make any investigation or in an any

2   other way try to learn about the case on your own.  Though, it

3   is normal human tendency to converse with people with whom one

4   is thrown in contact, please, do not converse with any of the

5   parties or their attorneys or any witness during the time you

6   serve on this jury whether in or out of the courtroom.

7           By this, I mean not -- not only do not converse about

8   the case, but do not converse at all even to pass the time of

9   day.  In no other way can all the parties be assured of the

10  absolute impartiality they are entitled to expect from you as

11  jurors.  There may be occasions when you come upon one of the

12  attorneys or one of the parties in this case outside the

13  courtroom.  The attorneys and parties are being instructed not

14  to communicate with you.

15          They're failure to acknowledge you should not be

16  interpreted as they are being impolite, but merely as them

17  following the Court's orders.

18          The law requires these restrictions to ensure the

19  parties have a fair trial based on the same evidence that each

20  party has had an opportunity to address.

21          A juror who violates these restrictions jeopardizes

22  the fairness of these proceedings, and a mistrial could result

23  that would require the entire trial process to start over.

24          If any juror is exposed to any outside information,

25  please, notify the Court immediately.

1          If you need to communicate with me during the course

2    of the trial, simply give a sign note to my courtroom deputy,

3    Renee, or to my law clerk, Sam, to give to me.

4          Do not make up your mind about what the verdict

5    should be until after you have gone to the jury room to decide

6    the case and you and your fellow jurors have discussed the

7    evidence.  Keep an open mind until then.

8          When I tell you at our recesses to please remember to

9    observe the admonition that was previously given to you,

10   please bear in mind that this is that admonition.

11         If I forget to remind you that you are to remember

12   the admonition at a recess, you must nevertheless remember and

13   adhere to these admonitions.

14         At the end of the trial, you will have to make your

15   decision based on what you recall of the evidence.  You will

16   not have a written transcript of the trial.  I urge you to pay

17   close attention to the testimony as it is given.

18         If you wish, you may take notes to help you remember

19   the evidence.  If you do take note, please keep them to

20   yourself until you and your fellow jurors go to the jury room

21   to decide the case.  Do not let note taking distract you from

22   being attentive.  When you leave the courtroom for recesses,

23   your notes should be left in the courtroom.  No one will read

24   your notes.

25         Whether or not you take notes, you should rely on

1    your own memory of the evidence.  Notes are only to assist

2    your memory.  You should not be overly influenced by your

3    notes or those of your fellow jurors.

4         The next phase of the trial will now begin.  First,

5    each side may make an opening statement.  An opening statement

6    is not evidence.  It is simply an outline to help you

7    understand what that party expects the evidence will show.  A

8    party is not required to make an opening statement.

9         The Government will then present evidence, and

10   counsel for the Defendant may cross-examine.  Then, if the

11   Defendant chooses to offer evidence, counsel for the

12   Government may cross-exam.

13        After the evidence has been presented, the attorneys

14   will make closing arguments, and I will instruct you on the

15   law that applies to the case.

16        And does the prosecution wish to make an opening

17   statement at this time?

18        MR. PEARSON:  Yes, Your Honor.

19        THE COURT:  Mr. Pearson, you may proceed.

20        MR. PEARSON:  Good afternoon.  Police found child

21   pornography on a password protected site on the Defendant's

22   home computer network.  On that same network they found videos

23   taken from a hidden camera, a camera the Defendant and his

24   wife had set up in their bathroom of a 14-year old girl while

25   she was changing clothes, she was using the bathroom, while

1    she was showering.  And who had the password to that network?

2    The Defendant, Adam Henry, an IT manager.

3            That's why we're here today.  That's why the

4    Defendant has been charged with two crimes.  One of the crimes

5    is receipt of child pornography.

6            The other crime is conspiracy to sexually exploit a

7    minor.  And conspiracy is really just a criminal agreement.

8    We're alleging that the Defendant and his wife agreed to try

9    to take hidden videos and photographs of this minor.

10           I'll refer to her by her initials as A.T.

11           So I want to take a few minutes and explain how we

12   got here, tell you how the case progressed this far, give you

13   a few things to focus on as you listen to the evidence.

14           This case started in September of 2013.  A police

15   officer detective with the Ceres Police Department was using

16   forensic computer tools to search for computers known to be

17   downloading child pornography.  He found one computer and he

18   was able to trace it through internet protocol addresses to a

19   business in Turlock, California, called Lock-N-Stitch.

20           Now, Lock-N-Stitch is a midsize manufacturing

21   company.  It had over 20 employees and one IT manager, the

22   Defendant, Adam Henry.

23           On November 19th, police executed a search warrant at

24   Lock-N-Stitch.  They were looking to find this computer that

25   they'd seen downloading child pornography.  You'll hear that

1    they searched over 20 computers at Lock-N-Stitch, looking for

2    a file sharing program called Shareaza.  This was the program

3    they'd seen downloading the child pornography.

4              And in those over 20 computers that they searched,

5    only one had this program on it.  It was the IT computer.  And

6    that computer was locked and had a user account name of

7    Adam Henry.

8              Using law enforcement tools, the police were able to

9    work around the Lock account and take a look at the hard

10   drive.  And on that hard drive they found 42 files of child

11   pornography.

12             Now, Adam Henry wasn't at work when this search was

13   executed.  So they went to his house, and they searched his

14   house.  You'll hear that at his house he had a sophisticated

15   home computer network.  He was able to sit at his living room

16   table and access his work computer from home.  And police

17   there seized a number of devices and took them for forensic

18   analysis.

19             Before they did this forensic analysis, they talked

20   to Adam Henry.  And you'll hear his statement.  You'll be able

21   to watch a video of it.  You'll hear him tell them how his

22   home network was set up.  There was a password protected side

23   and an unprotected side.  That his wife had access to the

24   unprotected side, but only he had access to the protected

25   side.  You'll hear that he gave police the password to that

1  side of the computer.

2         Now, eventually, these police officers began

3  investigating the computers.  And using that password, they

4  were able to gain access to this protected side of the home

5  network.

6         On that side, they found more than a hundred videos

7  of child pornography.  Some of the videos were even sorted.

8  They were placed in folders called "Kid" and under another

9  folder called "Bad."

10         Police continued to look through these computers and

11  the other device that they seized at the Defendant's house.

12  Because it wasn't just this home computer that had the child

13  pornography on it.  There was another loose computer drive

14  that had child pornography.  There was a device in the garage

15  that had child pornography.  And that device even had child

16  pornography that had been downloaded as early as 2005, years

17  before the Defendant met his wife, Angele.

18         Now, as the police continued to look through these

19  computers, they noticed hidden camera videos, videos taken

20  from the Defendant's bathroom of a young girl.  These videos

21  were of her changing clothes and showering.  And there were

22  even pictures taken from these videos, screenshots of her at

23  various stages of changing clothes.

24         Police went back to Adam Henry's residence, and they

25  began to search it again.  This time looking for cameras and

1   other evidence of this hidden camera activity.

2           They found a number of cameras.  And we'll show you

3   the cameras.  And they found a plant that had previously been

4   hanging in the bathroom.  And in the bottom of that plant

5   there was a hole cut just big enough to fit a camera in it.

6           Now, as I mentioned before, the Defendant is charged

7   with criminal conspiracy.  And it takes two people for a

8   conspiracy.  The other person in this case was the Defendant's

9   wife, Angele Henry.

10          And you'll hear that Adam and Angele worked together

11  to commit this crime.  You'll see videos of them setting up

12  the camera, fixing the angles, testing it, making sure there

13  wasn't too much glare to ruin the video.

14          And you'll hear that on one occasion Angele was even

15  able to trick the victim, A.T., into changing clothes in front

16  of the camera that she alone had set up.  And where did that

17  video end up, not just on the unprotected side of the

18  computer, but also on that password protected side.  That

19  video was sorted under a folder with the victim's name on it

20  and another folder that said "Not okay."

21          You'll hear all this evidence, and you'll even hear

22  from the victim.  And she'll tell you that she was a family

23  friend of the Defendants.  She babysat for them sometimes.

24  And that she didn't know when she was 14 years old and

25  15 years old, that she was being photographed and videotaped

1   when she was using the bathroom.

2         After you hear all this evidence, we believe that it

3   will show beyond a reasonable doubt that the Defendant

4   received child pornography, and that he and his wife conspired

5   to sexually exploit this victim.

6         And that's why at the end of the case we're going to

7   ask you to find Adam Henry, the IT manager of Lock-N-Stitch,

8   guilty on both counts.  Thank you.

9         THE COURT:  Mr. Capozzi, do you wish to make an

10   opening statement at this time?

11         MR. CAPOZZI:  Yes, Your Honor.

12         THE COURT:  You may proceed.

13         MR. CAPOZZI:  May it please the Court.  Counsel for

14   the Plaintiff.

15         Ladies and gentlemen, you're going to hear a lot

16   about Adam Henry and how he met his wife on the internet.

17         She's French Canadian.  Lived in Canada.  And he met

18   her through a website, and they played a game on the internet,

19   called World of Warcraft.  I'm not familiar with computers,

20   but those who are into computers communicate a lot like that.

21         They were communicating back and forth in 2008.  And

22   they established a relationship over the internet.  She came

23   out to visit him in 2009.  And went back and forth to Canada,

24   came out here.  And eventually moved out here and moved in

25   with Adam.  And eventually they became -- they were married.

1          His life dramatically changed after they were

2    married.  The game that they were playing, this World of

3    Warcraft, they used names -- or she used names, one of -- two,

4    which were Aurrora and Sylvia.  And you're going to see those

5    names come up in some of the computer files in this case.

6          Prior to meeting her in 2009, he -- or talking to her

7    in 2008, and her coming out in 2009, he worked at a place

8    called Lock-N-Stitch.  It's a manufacturing company up in

9    Turlock, California.  And it is run by his uncle, his name is

10   Gary Reed.  And he'll be testifying here in the next couple of

11   days, explaining what Adam's role was there.

12         But Adam started there in 2005, he was the IT

13   technician.  He is a computer geek.  He lives by computers.

14   He loves the computers.  He knows them backwards and forward.

15   He set up -- there's four or five different buildings at this

16   plant, he set up kiosks in all the different buildings and

17   worked out communications with the different computers at the

18   business.  And set up their entire IT system.  Whenever

19   something was broken, he'd get a call at home, he'd come in

20   and fix it, and he worked with the employees.

21         He -- he used the system called Peer-to-Peer.  And I

22   think he used it even before 2005, before he started working

23   at Lock-N-Stitch.

24         Peer-to-Peer is -- again, I'm an old-timer.  I don't

25   understand this stuff -- but it's something where you can hook

1   up to the internet and bring -- and put in certain words, and

2   information comes from all over the area.  And mainly he was

3   using it for music, downloading a lot of music.

4           The other thing is, adult pornography.  He and his

5   wife were into adult pornography.  The evidence is going to

6   show, as this case goes on, that there was over 10,000 videos

7   of adult pornography, 10,000.  There's a lot on all these

8   devices.

9           You're going to see his wife was into it.  Her name

10  is Angele.  Her interest was in role play, Renaissance fairs.

11  You see those throughout the state of California, where people

12  dress up in costumes.  She was interested in costumes.  She

13  was interested specifically in corsets that women would wear.

14          You're going to see her in a videotape taken in the

15  bedroom with this young A.T., the confidential victim, the

16  underage person, and the wife.  She was into making believe

17  and fantasy and role playing.  And evidence is going to show

18  that she was an exhibitionist; she liked portraying herself

19  naked in front of the camera.  Now this is stuff you're going

20  to see.

21          There was a camera set up in the bathroom.  And there

22  was a camera for his wife to come in and exhibit herself in

23  the shower and doing certain things.  And it wasn't a video to

24  take pictures or film just of a young gal.  She was taken;

25  there's no question about it.  But there's a lot of adults who

1    come into the restroom.

2           And AT's father worked at Lock-N-Stitch.  That's how

3    the relationship happened.  Adam Henry worked with someone

4    named Robert Todd.  They were good friends.  They worked at

5    Lock-N-Stitch.  Robert Todd's daughter would come by at the

6    office.  Adam, mostly all he ever said to her was hello.

7    Never really chatted with her or done anything with her.

8           But after Angele moved out here in 2009, 2010, there

9    then was a develop of a relationship between Angele, Henry,

10   and A.T. -- we're not allowed to mention her name -- the

11   relationship was where they would see each other all the time.

12   She babysat for Adam's kids.  Again, Robert Todd was a good

13   friend.  He worked with Adam.  They would come over for

14   dinner.  Mr. and Ms. Todd along with Adam and his wife,

15   Angele, and the kids, they would come over and have dinner.

16   But the relationship was with Angele and Henry.  And let me

17   tell you, with telephones nowadays, you can text message each

18   other.  People generally text message more than they talk to

19   each other.

20          In the two-year period, there are text messages

21   between Angele Henry and A.T., the underage girl, 759 text

22   messages between the two of them.

23          The text messages between Adam Henry and A.T., are

24   zero, none, because there wasn't any kind of a personal

25   relationship.  That's what the evidence is going to show.

1          In January 2013, Angele Henry has -- she has an

2     affinity with young kids.  She has a program in Turlock where

3     she goes to the park and puts a program on called Art in the

4     Park.  And she has young kids come.  And this young gal, A.T.,

5     goes to that.  In January 2013, they come back from the Art in

6     the Park, and they go to Angele's house.

7          She takes her into the bedroom, and what she did

8     before she came is, she set up a camera, unknown to A.T. --

9     camera set up in the bedroom to videotape what goes on.

10          Now, what she brings out is a suitcase.  And it's

11    different bras, different corsets, different dress for

12    Renaissance fair, etcetera.  And you're going to hear

13    conversations between the two of them about what they're

14    doing.  And you're going to see Angele helping her change her

15    clothes, and truly, kind of turning her toward the camera so

16    the camera can see what's going on.  And you'll look at this

17    and you determine whether or not there's any child pornography

18    there.

19          Adam is not there.  He's at work.  This is in the

20    afternoon.  He doesn't even know this is going on.  Doesn't

21    even know the camera is being set up in the bedroom.

22          While Angele is working with A.T. and changing the

23    bras, and changing the corsets, she talks about when she was

24    in high school, and how she liked to appear before cameras

25    naked and take pictures, and how her mother found out about it

1  and was upset.  And this is Angele telling A.T.

2           You will then -- that's Count I -- the evidence for

3  Count I, as to whether or not it's exploitation of a child for

4  explicitly sexual conduct.

5           And then there's Count II, totally different.

6  Count II is the receipt of child pornography.  You heard the

7  Government talk about a search that took place in

8  September 2013, and that was at Lock-N-Stitch where Adam

9  works.

10          On this computer at Lock-N-Stitch, he put in search

11 terms for adult pornography -- and this is done in around May

12 23rd, 2013 -- puts in the terms for adult pornography.  And

13 this goes on for months, put in the terms and let it download,

14 and thousands and thousands and thousands come in.

15          And at certain point, he would take a thumb drive,

16 download those videotapes on a thumb drive, and then take it

17 home and give it to his wife.  And said, Here, you sort out

18 what you think would be interesting.  He never sees any of

19 this.  Doesn't see any of it.

20          Well, what happens?  How does the child pornography

21 get on there?  There's child pornography on there, no question

22 about it.

23          Well, again, he puts the Peer-to-Peer in on May 23rd,

24 2013.  He and his wife had just come back from their

25 honeymoon.  They had gotten married, I think, the fall before.

1   They went on a honeymoon in the springtime.  They came back in

2   May -- early part of May, I think it was.

3           And then when he gets to the office, he puts in the

4   Peer-to-Peer, to load as much adult porn as he could.  While

5   he's out in to the office, running to the different plants,

6   taking care of the other computers.

7           They only have one car.  She has to drive him to work

8   and pick him up in the evening.  Well, in the afternoon she

9   would come there.  They had -- she had two prior children from

10  a prior marriage.  She would come to Lock-N-Stitch, and she

11  would wait for Adam while he's out in the plant, doing his

12  certain things.  She would go to his office -- and you're

13  going to see pictures, and you're going to see some evidence

14  of people who saw her in his office, in the afternoons,

15  between 1:30 to 2:30 to 3:30 alone, sitting at his desk in

16  front of his computer.

17          Now, I don't know if anybody says they saw her typing

18  anything in, but they see her at his desk, at his computer.

19  All that's on his desk are the computers.

20          In the afternoon from May 23rd -- 28 th now, May --

21  yeah, May 28th -- I had the dates wrong.  May 23rd is when

22  Adam puts in the Peer-to-Peer.  Five days later, when she

23  starts coming in, in the afternoon, sitting at his desk, from

24  May -- I got the dates wrong again.  May 23rd is when the

25  Peer-to-Peer happened.  On May 28th, 5 days later, she's seen

1  sitting at his desk for the next 4, 5, 10 days, alone in his

2  office.  And when you look at, and the evidence is going to

3  show, it's going to come through, that what was on that

4  computer on the search terms.

5         The search terms for child pornography come in, in

6  the afternoon, on May 28th through June 3rd, when it no longer

7  had child pornography terms put in.  But from May 28th to

8  June 3rd, the child pornography terms are put in.  And who is

9  sitting in that office?  Angele Henry.  Not Adam Henry, who's

10 out in the plant.  You will hear witnesses tell you what they

11 saw.

12        He puts -- downloads these on a thumb drive, takes

13 them home, gives them to her to separate out.

14        Now, she has -- she's from France -- from Canada.

15 She's French Canadian.  She speaks some French.  You're going

16 to look at those search terms that are put in, you're going to

17 see the adult pornography terms.  Then you're going to see

18 Renaissance.  You're going to see corsets.  You're going to

19 see costumes.  And then you're going to see the child porn

20 terms.  All at the same time, in the afternoon, when she's at

21 his desk, alone, putting those terms in, unbeknownst to

22 Adam Henry.

23        Of the 10,000 -- over 10,000 videos that are found --

24 and he has -- he's a computer geek.  Again, he has over 50 to

25 58 different devices that could hold videos, could hold

1    information, 58 devices.  Only on four devices, maybe five --

2    I think it's four, is there child porn.  He doesn't know it's

3    there.  He has never seen the child porn.  You're going to see

4    videotapes here.  He has never seen those.  He has never seen

5    any videotape of A.T. in the bedroom with his wife when she's

6    changing clothes with her.  He has never seen those.

7           We're going to ask you at the end of this trial to

8    find him not guilty of both Counts.  Thank you.

9           THE COURT:  The Government's first witness?

10           MR. PEARSON:  United States calls Detective Britton

11   Moore.

12           JUROR 044:  Excuse me, could I get a pen?

13           COURTROOM DEPUTY:  Good afternoon.  Please approach

14   the witness stand.

15           Remain standing and raise your right hand to be

16   sworn.  After I administer the oath, please affirm by saying

17   "I do."

18                          **BRITTON MOORE**,

19              having been first duly sworn, was

20              examined and testified as follows:

21           COURTROOM DEPUTY:  Please have a seat.  State your

22   full name for the record and spell it.

23           THE WITNESS:  My name is Britton Moore.

24   B-R-I-T-T-O-N.  Last name, Moore, M-O-O-R-E.

25

**DIRECT EXAMINATION**

BY MR. PEARSON:

**Q.**  Good afternoon, Detective Moore.  Where do you currently
work?

**A.**  Mountain View Police Department.

**Q.**  And were you involved in this case?

**A.**  I was.

**Q.**  Where -- when you were involved in this case, where were
you working?

**A.**  I was with the Ceres Police Department at the time.

**Q.**  And before the Ceres Police Department, where were you
employed?

**A.**  Modesto Police Department.

**Q.**  Okay.  Now, at the time of your involvement in this case,
what was your job title?

**A.**  I was a detective assigned to the high tech team.

**Q.**  What's the high tech team?

**A.**  The high tech team was a unit that was -- specializes in
high tech facilitated crimes.

**Q.**  As a detective, what were your job duties?

**A.**  My duties were to investigate any sort of crimes relating
to high technology or computer facilitated crimes.  As well as
conduct digital forensic analysis on seized devices.

**Q.**  So I take it you pretty frequently analyzed the contents
of computers and other devices?

1    **A.**  Yes.

2    **Q.**  And to what extent would you say your job required you to

3    do that?

4    **A.**  Daily.

5    **Q.**  How long did you work for Ceres Police Department?

6    **A.**  I was employed there from 2006 until 2014.

7    **Q.**  Okay.  And as a detective, what portion of that time?

8    **A.**  I came on to the detective bureau in 2010.

9    **Q.**  During that time, what percentage of your work would you

10   say involved forensic analysis of computers and other devices?

11   **A.**  I wouldn't know the exact percentage, but usually on a

12   daily basis.

13   **Q.**  Now, you mentioned the high crimes task force.  Who were

14   some other members of that task force?

15   **A.**  So I was a member of the Sacramento Valley high technology

16   crimes task force, and the FBI child exploitation task force.

17   I was also partnered up with Detective Arthur Hively.

18   **Q.**  Now, I'd like to ask you some questions about your

19   background and your experience, in particular with computer

20   forensic examination.

21          While working at Ceres Police Department, what's your

22   best approximation of the number of electronic devices that

23   you analyzed?

24   **A.**  I would say conservatively over a hundred devices.

25   **Q.**  And would that include computers, hard drives, DVDs, thumb

1    drives, and cell phones?

2    **A.**   Yes.

3    **Q.**   What percentage of these examinations were performed in

4    investigations into sexual nature, sexual exploitation of

5    children?

6    **A.**   I would say over half, but more like a majority.

7    **Q.**   Now, will you please describe for the jury any training

8    and course work you received in -- that relates to your

9    forensic work in this case?

10   **A.**   I have attended several courses related to digital

11   forensics.  I've also attended several conferences related to

12   the investigation of internet crimes against children.  And

13   I've also attended courses related to computer forensics

14   investigations, and internet investigations.

15   **Q.**   What computer forensics program did you use to analyze

16   devices in this case?

17   **A.**   In this particular case, I used AccessData's, Forensic

18   Toolkit, FTK.

19   **Q.**   And what is Forensic Toolkit's function?

20   **A.**   Forensic Toolkit's suite of tools allows the forensic

21   examiner the ability to conduct the analysis that's on the

22   digital devices.

23   **Q.**   Did you attend training on Forensic Toolkit?

24   **A.**   Yes, I did.

25   **Q.**   And how many courses?

1    **A.**   Specifically related to FTK, I know of four courses at
2    that time.
3    **Q.**   And how many hours of training would that be?
4    **A.**   I would have to refer to my CV to know.  I wouldn't want
5    to say otherwise without reviewing that.
6    **Q.**   Do you have your CV with you today?
7    **A.**   I do.
8    **Q.**   Would it refresh your recollection to refer to that?
9    **A.**   It would.
10   **Q.**   Would you please take a look at that and look up once
11   you've read it.
12   **A.**   So courses related to Forensic Toolkit specifically would
13   be Forensic Toolkit AccessData boot camp in 2012, for
14   21 hours.  Forensic Toolkit, forensic -- Computer Forensics by
15   AccessData was 35 hours in 2012.
16          Forensic Toolkit Windows Core Forensics was 21 hours
17   in 2013.  And Forensic Toolkit Windows 7 Forensics was in --
18   for 21 hours in 2013.
19   **Q.**   How often do you use -- do you use Forensic Toolkit in
20   analyzing devices in your line of work?
21   **A.**   Very often.
22   **Q.**   Daily?
23   **A.**   Yes.
24   **Q.**   Now, have you also participated in child pornography
25   investigations using Peer-to-Peer file sharing software?

1  **A.**  Yes.

2  **Q.**  And have you taken training regarding Peer-to-Peer

3  software?

4  **A.**  Yes.

5  **Q.**  Would you please describe your course work in Peer-to-Peer

6  software?

7  **A.**  I have taken several courses related to Peer-to-Peer

8  internet investigations, as well as an advance course in it.

9  **Q.**  Have you also become familiar with how computers operate

10  through your work as a detective?

11  **A.**  I have.

12  **Q.**  Okay.  And are you also familiar with what the internet

13  is?

14  **A.**  Yes.

15  **Q.**  Are you familiar with how internet protocol addresses

16  function?

17  **A.**  Yes.

18  **Q.**  And can you think of any additional training that you

19  received, that would relate to your work in this case?

20  **A.**  I've been a law enforcement officer for over 14 years.

21       MR. PEARSON:  Your Honor, we would move for

22  Detective Moore to be recognized as an expert in the areas of

23  computer forensics, how computers operate, what the internet

24  is, and how file sharing networks operate.

25       THE COURT:  Do you wish --

1          MR. CAPOZZI:  Just a quick question.

2          THE COURT:  Yes.

3          MR. CAPOZZI:  Do you have any certifications, sir?

4          THE WITNESS:  I do not.

5          MR. CAPOZZI:  Okay.  From -- where would these

6    certifications come from?

7          THE WITNESS:  Well, I do have a certification in

8    mobile data forensics.

9          MR. CAPOZZI:  In what?

10         THE WITNESS:  Mobile data forensics.

11         MR. CAPOZZI:  Did that have anything to do with this

12   case?

13         THE WITNESS:  I did not conduct the analysis that's

14   going to be presented in this case.

15         MR. CAPOZZI:  But you have no certifications related

16   to this case?

17         THE WITNESS:  No, I do not.

18         MR. CAPOZZI:  No expertise in this case?

19         THE WITNESS:  No, I do not.

20         MR. CAPOZZI:  No more questions.

21         THE COURT:  Any objection to the --

22         MR. CAPOZZI:  No.

23         THE COURT:  The witness is recognized as an expert in

24   the fields identified by counsel.

25   BY MR. PEARSON:

1   **Q.**   Okay.   Detective Moore, as part of your testimony today,

2   have you been asked to give the jury a presentation?

3   **A.**   Yes, I have.

4   **Q.**   And would that presentation be to educate the jury about

5   what the internet is, what Shareaza file sharing program is,

6   and how they relate to this case?

7   **A.**   Yes.

8   **Q.**   And also, how computers function generally?

9   **A.**   Yes.

10   **Q.**   Was that presentation marked as Government's Exhibit 6?

11   **A.**   Yes.

12   **Q.**   And do you believe that presenting that PowerPoint to the

13   jury would help provide context to the jury on the ultimate

14   question in this case?

15   **A.**   I do.

16         MR. PEARSON:  We move to admit, for demonstrative

17   purposes, Government's Exhibit 6.

18         MR. CAPOZZI:  No objection, Judge.

19         THE COURT:  6 for demonstrative -- not being admitted

20   into evidence for uses -- demonstrative use only?

21         MR. PEARSON:  That's right, Your Honor.

22         THE COURT:  That will be allowed.

23         MR. PEARSON:  We would ask to publish Exhibit 6.

24         THE COURT:  It may be.

25     (Plaintiff's Exhibit 6 was admitted into evidence.)

1   BY MR. PEARSON:

2   Q.   Detective Moore, is this your presentation?

3   A.   It appears to be, yes.

4   Q.   Will you please explain to the jury how personal computers

5   work?

6   A.   Yes.  So what we have here is a typical computer setup

7   that one might see in a business environment or at someone's

8   residence.  Over to the left side, you can see that there's

9   what we call a chassis or also sometimes known as a computer

10  tower.

11        In the center, you can see here that there's a

12  monitor and a keyboard and a mouse.  This is pretty typical of

13  what one might see in the computer setup.

14  Q.   So in case the jury couldn't see you pointing, the monitor

15  is on the left in this case -- or sorry, the computer tower is

16  on the left?

17  A.   That's correct.  The computer tower is on the left over

18  here.

19        THE COURT:  It's got a touch component.  If you touch

20  it, you can --

21        THE WITNESS:  I went ahead and circled it.

22        Thank you, Your Honor.

23  BY MR. PEARSON:

24  Q.   Will you please circle the monitor.

25  A.   (Witness complies.)

1    **Q.**  All right.  Next slide, please.

2    **A.**  So as I discussed earlier, the case or the chassis

3    contains several components inside of it.  You would have a

4    motherboard, which is responsible for the circuit board as far

5    as communicating all the devices together.

6           You have the central processing unit, which carries

7    out instructions for the computer.

8           You have RAM, which is also -- which is called Random

9    Access Memory, which stores volatile data, which is a

10   temporary source of memory until it's written to the hard

11   drive.

12          You have the graphics card, which is there to use as

13   an interface for a display, such as a monitor.

14          The power supply provides power to the entire unit.

15          And the hard drive is one of the essential

16   components, as it stores data.

17   **Q.**  Next slide.

18   **A.**  So taking a look at the inside of the chassis here, you

19   can see where these items could be laid out.  And this is kind

20   of a generic setup here.

21          You could see that the RAM is located on top, over

22   here.  And then you have the CPU, which is the processing.

23   It's hidden behind a fan here used to cool it.

24          And then down here, you have -- down here, you have

25   the graphics card.  And the hard drive would be over here.

1    And then the power supply.

2    **Q.**   Okay.  Next slide.

3    **A.**   This is a picture of a typical hard drive, and this is

4    used to store data.

5    **Q.**   Next slide.

6    **A.**   If you were to open up the inside of the hard drive, you'd

7    see that it has disc platters, and that's where the actual

8    data is stored.  And actually an arm that reads the data --

9    reads and writes data to the disc.

10          So there's -- what I'm going to talk about is two

11   different hard drives here.  This one is for that hard drive

12   that you just saw.  It has a metal platter with magnetic

13   coding.  It has the read and write arm for accessing the data

14   while the platter spins.

15          The operating system boots slower than the

16   solid-state drive, which I'll show you in a minute.  And

17   application program run slower than the solid-state drive.

18   Due to rotating discs and moving actuator arm, they're less

19   durable than a solid-state drive.

20          They're generally more -- or less inexpensive --

21   they're generally less -- they're generally inexpensive

22   compared to solid-state drive, and there's a large capacity

23   for data storage in these hard drives.

24          This is a solid-state drive.  So if we were to open

25   up the inside of a solid-state drive, we would see that it

1  contains memory chips, and that's where the data is written to
2  on these types of drives.

3       Now, a solid-state drive, the data is stored on
4  memory chips.  The operating system boots and runs faster,
5  application programs run faster, and files transfer faster on
6  these types of drives.

7       Solid-state drives have no moving parts and are
8  therefore more durable.  There is less capacity, and they are
9  generally more expensive.  And the solid-state drive is
10 technologically more advanced than the traditional hard drives
11 that I showed you earlier.

12      Now, we're going to discuss Network Attach Storage.
13 So the Network Attach Storage, often called NAS, uses the
14 concept of a RAID, which is an acronym for Redundant Array of
15 Independent Discs.  You could -- so -- okay, thank you.

16      You could see that the discs are laid up together in
17 order for them to work as one solid unit.  So it has separate
18 physical discs working together.

19      And the use for a RAID, and the reasons is storage
20 capacity, read and write speeds are faster, and data
21 redundancy.  And the reason that storage capacity, is
22 obviously because there's more discs involved.  So it provides
23 greater storage.  The read and write speeds are faster because
24 you're using -- imagine a highway with four lanes of traffic
25 as opposed to one.  You have -- read and write speeds can go

1    faster because it can write to different discs.

2         And then there's data redundancy, so that if one disc

3    goes down, depending on how the RAID is configured, the data

4    can be stored on the other discs and rebuild that disc once

5    it's replaced.

6         This is what a NAS would look like, Network Attached

7    Storage.  In this instance, we have a Netgear ReadyNAS.  And

8    you can see that it's much like the RAID that we showed you

9    there.  However, this unit can be attached to a network and

10   assigned an IP address, which I'll discuss later, allowing it

11   to work almost like a home server, if you will.

12        So if we were to open up the front door panel to this

13   device, you'd see that there are four disc bays in there so

14   the disc can work as a RAID.  And if you see down below that

15   window screen, it shows that there's an IP address there.  And

16   of course, this is for example only, showing that it is

17   assigned an IP address for a network.

18        So we're going to discuss home network here.  So

19   imagine if you have the internet out, the internet traffic,

20   you would need to have a modem in order to communicate that

21   traffic throughout the network, throughout the internet.

22        And oftentimes, users can connect to wireless router,

23   which allows you access to connect devices wirelessly to your

24   network.  Sometimes companies, such as Charter Communications,

25   will assign you a wireless router with a modem built into one.

1           Not only can you connect with wireless Wi-Fi devices,

2    but you can also connect computers throughout a home network,

3    by Ethernet cable.

4           In this example, we have two computers in the lower

5    right over here that are connected by Ethernet cable.  You can

6    also connect an Ethernet cable to a network switch.  This

7    allows greater access to the devices on the network.

8           And again, you can connect the computer to the

9    network switch, or if you have a network attached storage

10   device, you can also connect that.  And all of these devices

11   will work together on a network.

12          IP addresses, an Internet Protocol address, IP

13   address can be used for location addressing, such as

14   identifying a network location with a numerical address that

15   can be seen on the internet.

16          IP addresses are usually written and displayed in

17   readable notations, such as 172.16.254.128.  The nonprofit

18   private American corporation, IANA, Internet Assigned Notice

19   Authority, manages the IP address space allocations globally

20   and allocates IP address blocks to local internet service

21   providers and other entities.

22          Several companies, such as Charter Communications,

23   Comcast Communications, and AT&T Internet Services are all

24   internet service providers.

25          The internet service providers will then assign an IP

1   address to its subscriber, such as a business or residential

2   customer.

3          So this is kind of an example of what that could

4   potentially look like.  Now, these IP addresses are not

5   related to this investigation.  However, they're here merely

6   as an example.  So if IANA has a block of IP addresses, they

7   will assign them to an internet subscriber, such as AT&T, or

8   Charter, or Comcast.

9          And once those IP addresses are all allocated to

10  those entities, they can then provide them to subscribers once

11  you subscribe to their service.  In this example, a residence

12  can get an IP address, or a business down here can have

13  multiple IP addresses assigned to them.  Other smaller

14  businesses like coffee shops can also have IP addresses as

15  well.

16  **Q.**  I have a few questions on this slide, Detective.

17         Would it be possible for one IP address to be

18  assigned to two separate individuals, two separate locations?

19  **A.**  It is not possible to do that.  If the IP address is

20  assigned to a location, that is where it has to be.

21  **Q.**  And do these internet service providers, like AT&T, and

22  Charter, and Comcast keep track of who the IP addresses are

23  assigned to?

24  **A.**  They do.

25         File hashing.  Through a complicated algorithm, a

1  digital file can be represented by a string of alphanumeric

2  characters known as a hash value.  Different hash values

3  exists.  For example, we have MD5, which is message-digest 5.

4       SHA-1, Secure Hash Algorithm, and eD2k, "e," Donkey,

5  among others.

6       Changing the file name does not affect the hash

7  value.  Changing even one bit of data within the file will

8  alter the hash and provide a completely different value.  If

9  two files have the same hash value, they can be assumed to be

10  the same file.  Calculating a hash value is a one-way

11  operation, meaning that the file cannot be recreated from a

12  given hash value.

13  **Q.**  So if you had a picture and you just changed the file name

14  of it, would that change the hash value?

15  **A.**  No.

16  **Q.**  Okay.  If you change any portion of the picture, you maybe

17  drew a mustache on the picture, would that change the hash

18  value?

19  **A.**  Right.  If you altered that picture in any way, you would

20  get a completely different hash value.

21       According to the J.W. Osterburg study, the odds of

22  two people having the same fingerprint are 1 in 100

23  quintillion.  Based on the mathematical possibilities for MD5

24  hash, the odds of two different files having the same MD5 hash

25  value is 1 in 340.  The odds of two different files having the

1  same SHA-1 hash value are even greater.

2          So I have an example here of an MD5 hash.  If you

3  were going to take this texturing, which says "The quick brown

4  fox jumps over the lazy dog," and you were to hash that,

5  applying this mathematical algorithm to that line, you would

6  get that MD5 hash right here.

7          Just by adding one period over here after "dog," you

8  get a completely different hash value.  Since the data has

9  changed, the mathematical algorithm would compute a different

10  hash value.

11          Shareaza:  Shareaza is a program application used for

12  sharing digital files.  It allows for large file transfers and

13  introduces additional sources making downloads fast and

14  efficient.

15  **Q.**  And this screenshot on the right, what is this a

16  screenshot of?

17  **A.**  This is an example of what the user interface of the

18  Shareaza application program could look like.

19          So if we were to launch this application program, we

20  would see that there's several tabs on top.  The first one is

21  the search tab, and I've indicated that by this red box around

22  it.

23          When you click on the search tab, it opens up this

24  dialogue box over here, where you could search the internet

25  for files that you're interested in.

1           In this example, Yellow Submarine was entered over

2       here in the search.  The results is all of these files over

3       here on the right that are associated with the Yellow

4       Submarine.  Yellow Submarine is a song by the band, The

5       Beatles.  So over here in the results, we see that we have The

6       Beatles, Yellow Submarine, and some other songs by The

7       Beatles.

8           So in this example, Yellow Submarine was highlighted,

9       you could see that in blue.  And if you double click on that

10      file or if you double click on that result, it will begin

11      downloading that file.

12  Q.  It looks like we have search results that don't have

13      Yellow Submarine in it.  Why would that be?

14  A.  Because there are tags that you can apply to these files,

15      that's written in the metadata.  So, essentially, if you

16      search for Yellow Submarine, it is a Beatles song, so some of

17      these other results have Yellow Submarine as tags.

18          So once you double click on that file, if you go over

19      to the transfers tab, you can see that that file was being

20      downloaded.  We can see the progress of the file being

21      downloaded.

22  Q.  And --

23  A.  And we can see --

24  Q.  I'm sorry.  Go ahead, Detective.

25  A.  And we can see that this file is now coming in to our --

1    our computer.  And we can see that a portion of it is

2    complete.  We can see that some of the packets are there, but

3    some of the packets are missing.  We do not completely have

4    the completed file yet.

5    **Q.**  Would it be possible for the file to start downloading

6    just by searching interim?

7    **A.**  No.  It would require user action.  You would have to

8    double click on the file in order for it to begin downloading.

9    Just querying the file and showing results does not actually

10   download a file.

11   **Q.**  So to get to this page when you created this

12   demonstrative, you entered Yellow Submarine, then you actually

13   clicked on a song called Yellow Submarine?

14   **A.**  Right.  With one of the results that was displayed, I

15   clicked on the top one, which was the first one, and it began

16   downloading that file.  We can see that by going to the

17   transfers tab.

18          Over here is the minus sign before.  Right before

19   that it was a plus sign.  So when you click on that, you can

20   actually see the other participants on this network where we

21   are receiving this song from.

22          In this case, we could see that it was from someone

23   named Keith, with that IP address.  And another person,

24   Antonio, with that IP address.  And we are downloading packets

25   of that song.  At this point now, we have 47 percent complete,

1    almost half of the song is downloaded thanks to Keith and

2    Antonio over here.

3            So what happens when you click on that file and it's

4    not completely downloaded yet?  What it does is, these two

5    files are created in the incomplete folder.  The default file

6    path for that is under the user account on your operating

7    system, under app data, local, Shareaza, incomplete.

8            The first file added has a dot SD extension.  This is

9    essentially a metadata file, which contains information such

10   as the file name and the file's hash value.

11           A second file with a dot partial extension is created

12   when the file has actually begun downloading.  This file

13   contains all the actual file data that has been downloaded.

14   So essentially when we began downloading that song file, these

15   two files went to the user account's incomplete folder.

16           This right here is actually Yellow Submarine being

17   downloaded.

18   Q.  So when you say "this," you're pointing to the bottom of

19   the screen here where --

20   A.  I am.

21   Q.  -- they're demonstrating?

22   A.  These two -- these two files are created when I clicked on

23   Yellow Submarine.

24   Q.  So that is not -- that's not the name "Yellow Submarine"

25   anymore; right?

307

1    A.  That is correct.

2    Q.  What does that represent instead?

3    A.  This long stream of numbers -- alphanumeric numbers, is a

4    file hash.  So that's how the computer is able to determine

5    that that is the exact file that you're looking for.  And to

6    make sure that it's complete, they use file hashing.

7           The dot SD extension over here, is just information

8    about the Yellow Submarine file.

9           Whereas the dot partial, is the actual file, the

10   actual data of the song, and that will grow in size.  As the

11   file is downloaded, that dot partial file will begin growing

12   until it's completely downloaded.

13   Q.  And you mentioned this before I think, but the file hash

14   is like a digital fingerprint; is that right?

15   A.  It is.

16   Q.  So this is the digital fingerprint?

17   A.  You can almost say it's more accurate than a fingerprint.

18   Q.  Sure.  So just for layman's terms, this --

19   A.  Correct.

20   Q.  -- is more of a digital fingerprint for the song, Yellow

21   Submarine?

22   A.  Yes.

23   Q.  And let's talk about this default file path.  What does

24   that mean?

25   A.  So in order for the program to work properly, it needs a

1 location to store these incomplete files that you're

2 downloading.  This is where the developers of that program

3 decided to place those incomplete files.

4 **Q.**  Okay.  So if I had just downloaded this song on my home

5 computer, it would be located in this incomplete folder; is

6 that right?

7 **A.**  Correct.  So once the entire song is complete that we got

8 from Antonio and Keith earlier, we can see that the title

9 actually turned green, the progress bar shows that it's full,

10 the status is completed, and we show 100 percent that we have

11 a full file of Yellow Submarine.

12   The default location for where the completed file is

13 stored is under the user account, downloads folder.  So if you

14 go to that file path, you can see the song is there -- the

15 completed song is there.

16 **Q.**  We no longer have a hash value here; is that right?

17 **A.**  That's true.  So in order for it to be more user friendly,

18 once the song is completely downloaded, the program changed

19 the name to the original name using that dot SD file, to show

20 us, The Beatles, Yellow Submarine.

21   This is an example of how you can download multiple

22 songs or multiple files, videos, images, whatever.

23   I have here that the Yellow Submarine was completed

24 and The Beatles, Twist and Shout.  So you can actually have

25 multiple downloads in progress at the same time, and

1   completing at various different stages, depending on if all
2   the packets of that file had arrived yet or not.
3   Q.  All right.  Let's talk a little bit about your involvement
4   in this case.  How did you first get involved in the
5   investigation?
6   A.  So as a task force officer with the internet crimes
7   against children task force, we're assigned a web based login
8   portal.  And when we log in to this secure account, we're able
9   to see IP addresses in our area that have been seen on these
10  networks, participating in the trading of child pornography
11  files.
12  Q.  On September 10th, 2013, did you use that law enforcement
13  tool?
14  A.  I did.
15  Q.  And did you find any internet vertical addresses,
16  suspected of downloading child pornography?
17  A.  I did.  I logged into my user account, and I was able to
18  see an IP address in my area.
19  Q.  Is that IP address 71.94.43.84?
20  A.  Yes.
21  Q.  Was there a GUID associated with that download as well?
22  A.  There was.
23  Q.  All right.  What's a GUID?
24  A.  A GUID is an acronym, which stands for Global Unique
25  Identifier.  Essentially --

1    Q.  Sorry.  G-U-I-D, GUID, right?

2    A.  Yes, G-U-I-D.

3         Essentially, what this Global Unique Identifier is,

4    is a string of alphanumeric value, it's 32 characters in

5    length.  And it's assigned to the installation of an

6    application program.

7         So, Shareaza generated this numerical string to

8    identify that installation and separate it from the other

9    installations of Shareaza on the network.  So that's a way for

10   the network to identify which -- which one that is.

11   Q.  Is it similar to a hash value?

12   A.  It's similar to a hash value, but it's not.

13   Q.  Okay.  And how would it be different than a hash value?

14   A.  The algorithm is different.  And it's randomly generated.

15   Q.  Okay.  And a hash value is associated with a file; is that

16   right?

17   A.  A hash value is associated with a file.  A GUID is

18   associated with the installation of a program.

19   Q.  Now, once you've received this information, what did you

20   do next?

21   A.  I initiated an investigation into that IP address.

22   Q.  Okay.  And did you use Shareaza LE for that investigation?

23   A.  As a member of the task force, we are also assigned a law

24   enforcement edition of Shareaza.

25   Q.  Okay.  What does Shareaza LE, or law enforcement, allow

1    you to do?

2    **A.**   So law enforcement edition of Shareaza allows me to load

3    in that suspected IP address and attempt to connect to that IP

4    address.

5    **Q.**   Did you do that in this case?

6    **A.**   I did.

7    **Q.**   Were you able to connect to that IP address?

8    **A.**   I was.

9    **Q.**   Okay.  And what did you see?

10   **A.**   I was able to conduct a browse host, which essentially --

11   my version of Shareaza LE was able to connect to the -- to the

12   version of Shareaza that was on that suspected IP address, and

13   browse the files that were being listed as available or as a

14   download candidate for specific files.

15   **Q.**   Okay.  How many files did you see available?

16   **A.**   I saw 24.

17   **Q.**   And were those known to be child pornography?

18   **A.**   So in law enforcement, we keep a large database of known

19   child pornography files.  And these are files that we have

20   seen in law enforcement and can recognize as child

21   pornography.  And we base this upon the hash values.

22         In this case, these 24 were known child pornography

23   files to law enforcement at that time.

24   **Q.**   I'm going to show what's marked as Government's

25   Exhibit 2.1.  Do you recognize that exhibit?

1  **A.**  I do.

2  **Q.**  And what is it?

3  **A.**  That is a screenshot of my law enforcement edition of

4  Shareaza.

5  **Q.**  Okay.  Will you just generally describe what you can see

6  on it?

7  **A.**  Can we remove those other two markings that are on there?

8  **Q.**  Actually, did you -- did you take this screenshot during

9  your investigation?

10  **A.**  Yes.

11  **Q.**  Does it fairly and accurately depict what you saw in this

12  Shareaza LE screen?

13  **A.**  Yes.

14          MR. PEARSON:  We would move to admit this exhibit.

15          THE COURT:  Any objection to the admission of -- is

16  it 2.1?

17          MR. PEARSON:  2.1.

18          MR. CAPOZZI:  No objection.

19          THE COURT:  2.1 is admitted.

20      (Plaintiff's Exhibit 2.1 was admitted into evidence.)

21  BY MR. PEARSON:

22  **Q.**  We're going to zoom in on the top two rows here.

23  **A.**  So as I mentioned before, I conducted a browse host.  And

24  you can see that the IP address is 71.94.43.84.

25  **Q.**  This is a little hard to read.  But can you describe to

1    the jury what they're seeing?

2             We zoomed in on the next three rows on Exhibit 2.1.

3    **A.**  So these are the actual files that the IP address -- the

4    suspected IP address is displaying as a download candidate

5    for.  So we can see actual titles of these files.

6    **Q.**  Will you read that top file name?

7    **A.**  "Real, underage, fuck, cum, baby, 2YO, rape, cries, baby

8    sheeted, hussy fan, R@YGOLD, PTHC, 2YO, toddler, naked.

9    **Q.**  The term PTHC, does that have any significance to you?

10   **A.**  It does.

11   **Q.**  What is it?

12   **A.**  That's an acronym which stands for Preteen Hardcore.  It

13   is widely known in law enforcement as being associated with

14   child pornography files, being traded over the internet.

15   **Q.**  The term "R@YGOLD," is that also significant to you?

16   **A.**  It is.

17   **Q.**  Why is that?

18   **A.**  That is another well-known term associated with child

19   pornography files being traded over the internet.  It should

20   be noted that R@YGOLD is "R" with the @ symbol, Y-G-O-L-D.

21   **Q.**  Did you do anything to confirm whether these files were,

22   in fact, child pornography?

23   **A.**  I did.

24   **Q.**  What did you do?

25   **A.**  If you see the next column over -- I don't know if we can

1    go back -- but there's a column for hash values next to the

2    file.  So if you see that the file here were -- that first one

3    that I read off, in the next column has the SHA-1 hash value.

4    We maintain a library in law enforcement that has all of these

5    hash values for these known child pornography files.  So

6    essentially, we can view those files in our law enforcement

7    secure library.

8    **Q.**  Did you do that with any of these videos?

9    **A.**  I did.

10   **Q.**  How many?

11   **A.**  Two of them.

12   **Q.**  And what was the name of the first one that you previewed?

13   **A.**  I would have to look at my report.

14   **Q.**  Do you have your report with you?

15   **A.**  I do.

16   **Q.**  And would that refresh your recollection?

17   **A.**  It would.

18   **Q.**  Will you please read that and then look up once you're

19   finished reading it.

20        THE COURT:  While he's doing that, Mr. Pearson, where

21   in my exhibit binder is 2.1?

22        MR. GAPPA:  I have it as the last page.

23        MR. PEARSON:  The last page of Exhibit 2.  I don't

24   think we have a separate 2.1 tab.

25        THE COURT:  Thank you.

1    BY MR. PEARSON:

2    **Q.**   And did that refresh your recollection?

3    **A.**   It did.

4    **Q.**   What was the name of the file that you previewed?

5    **A.**   In parenthesis, PTHC center, parenthesis, OPBA,

6    parenthesis, 2012 Asian Cambodian SVAY001, parenthesis,

7    SND_XVID.

8    **Q.**   And again, we have PTHC in this title; is that correct?

9    **A.**   Yes.

10   **Q.**   Did you -- and the hash value was associated with child

11   pornography; is that right?

12   **A.**   Yes, it was.

13   **Q.**   Okay.  Did you watch this video?

14   **A.**   I did.

15   **Q.**   Did it contain child pornography?

16   **A.**   Yes.

17   **Q.**   There is a second video that you also previewed; is that

18   right?

19   **A.**   Yes.

20   **Q.**   Okay.  Did that one also contain child pornography?

21   **A.**   Yes.

22   **Q.**   So, at this point you had an IP address identified, and it

23   was known to be downloading child pornography, correct?

24   **A.**   It was participating in the trading of child pornography.

25   It was a download candidate.

1  **Q.**  And from your presentation, you remember that IP addresses

2  are related to specific businesses or residences; is that

3  right?

4  **A.**  Correct.

5  **Q.**  Okay.  Did you take any additional steps to investigate

6  this IP address?

7  **A.**  I did.

8  **Q.**  What did you do next?

9  **A.**  IP addresses that are assigned to internet service

10  providers are publicly advertised.  So it's publicly available

11  to find out what IP address belongs to what internet service

12  provider.  In this case, that IP address belongs to Charter

13  Communications.

14        I authored a search warrant to Charter.

15  **Q.**  And what was the purpose of the search warrant?

16  **A.**  The purpose was to get the subscriber records for that

17  IP address.

18  **Q.**  Did you get those records?

19  **A.**  Yes.

20  **Q.**  And who was the subscriber for that IP address?

21  **A.**  It was a business called Lock-N-Stitch in Turlock,

22  California.

23  **Q.**  What was the next step in your investigation then?

24  **A.**  My investigation then was to determine where this computer

25  was that was downloading child pornography at this business.

317

1   **Q.**  Okay.  So did you investigate Lock-N-Stitch?

2   **A.**  We did.

3   **Q.**  Okay.  What did you do?

4   **A.**  We essentially found out that the business was owned by

5   Gary and Lewis Reed.  And then we -- I authored a search

6   warrant to be served at that location.

7   **Q.**  Did you serve that search warrant?

8   **A.**  I did.

9   **Q.**  And let's just step back for a second.  What is

10  Lock-N-Stitch?

11  **A.**  Lock-N-Stitch is a business in Turlock that does metal

12  fabrication.

13  **Q.**  Approximately how many people work there?

14  **A.**  I would say --

15  **Q.**  I'm sorry.  At the time of the search warrant,

16  approximately how many people were there?

17  **A.**  Over 20.

18  **Q.**  Was it a weekday when you executed it?

19  **A.**  Yes.

20  **Q.**  And during the work day?

21  **A.**  Yes.

22  **Q.**  What were you searching for at Lock-N-Stitch?

23  **A.**  We were searching for any devices that were capable of

24  running the Shareaza program, or any other digital devices

25  capable of storing media.

1    **Q.**   And did you find any computers at Lock-N-Stitch?

2    **A.**   Yes.

3    **Q.**   Approximately how many?

4    **A.**   There was well over 20.

5    **Q.**   Did you take any steps to analyze these computers?

6    **A.**   We did.

7    **Q.**   What did you do?

8    **A.**   Myself and two other forensic examiners were on scene

9    during the service of the search warrant, and we basically

10   went into all of the devices that we could locate, and we

11   attempted to see if there were any versions of Shareaza or any

12   other Peer-to-Peer programs running on any of the computers at

13   the business.

14   **Q.**   Did you find any?

15   **A.**   I did.

16   **Q.**   How many?

17   **A.**   We found one.

18   **Q.**   Where was that computer located?

19   **A.**   The computer was located in the IT manager's office.

20   **Q.**   Did you find any other computers with Peer-to-Peer

21   software on it?

22   **A.**   No, we did not.

23   **Q.**   Were there any pictures taken during this search?

24   **A.**   Yes.

25   **Q.**   Will you please look in your exhibit binder at Exhibits

1   3.1 to 3.7.

2          MR. CAPOZZI:  I have no objection to displaying

3   those, if you would like.

4          MR. PEARSON:  We would move to admit those exhibits,

5   Your Honor.

6          THE COURT:  Any objections to 3.1 through 3.7 be

7   admitted?

8          MR. CAPOZZI:  No, Judge.

9          THE COURT:  Those are admitted.

10     (Plaintiff's Exhibit 3.1 through 3.7 was admitted into

11   evidence.)

12   BY MR. PEARSON:

13   Q.   Generally, what do these exhibits show?

14   A.   These are pictures of the Lock-N-Stitch business.

15   Q.   So we have Exhibit 3.1 on the screen.  Will you please

16   describe to the jury what this exhibit is?

17   A.   This is an overview of the property owned by

18   Lock-N-Stitch.

19   Q.   Okay.  And Exhibit 3.2, what is that a picture of?

20   A.   This is the front of the business, as seen from the

21   street.

22   Q.   Exhibit 3.3?

23   A.   This would be the front lobby to Lock-N-Stitch.

24   Q.   3.4?

25   A.   This is -- once you've made it past the front lobby,

320

1   you're now in the administrative portion of the business.

2   **Q.** 3.5?

3   **A.** This is a perspective looking into the IT manager's

4   office.

5   **Q.** Okay.  Can we see a computer in this exhibit?

6   **A.** Yes, we can.

7   **Q.** Can you please circle that.

8   **A.** (Witness complies.)

9   **Q.** Exhibit 3.6?

10   **A.** This is a closer, zoomed-in view of the same location.

11   **Q.** And again, the same computer as this one; is that right?

12   **A.** Yes, it is.  I just circled it.

13   **Q.** All right.  And Exhibit 3.7, what is this a picture of?

14   **A.** This is the same computer from a different perspective,

15   looking at it across from the desk view.

16   **Q.** And this is, again, in the IT manager's office?

17   **A.** Yes.

18   **Q.** So let's talk about that computer.  Was it turned on when

19   you first located it?

20   **A.** Yes.

21   **Q.** Were you able to access that computer immediately?

22   **A.** We had physical access to the computer.

23   **Q.** Okay.  What was on the screen?

24   **A.** It was a Windows lock screen.

25   **Q.** Okay.  And what did the lock screen say?

1   **A.**   The user account, Adam Henry, was logged on, but the

2   screen was locked.

3   **Q.**   So you needed a password to get in?

4   **A.**   Correct.

5   **Q.**   Was Adam Henry present at Lock-N-Stitch?

6   **A.**   No.

7   **Q.**   What steps did you take to analyze that computer?

8   **A.**   We removed the hard drive from the computer, and we

9   conduct -- we connected it to one of our forensic machines.

10  **Q.**   Okay.  What was the purpose of that?  What were you

11  looking for?

12  **A.**   We were attempting to conduct analysis on that hard drive,

13  to see if there was any versions of Shareaza or other

14  Peer-to-Peer programs operating on that system.

15  **Q.**   Did you find any?

16  **A.**   We did.

17  **Q.**   But you hadn't found any Shareaza on any other computers,

18  correct?

19  **A.**   No.

20  **Q.**   Did you take any additional steps to analyze that

21  computer?

22  **A.**   At that moment, that's -- that's -- at that location,

23  that's what we did.

24  **Q.**   Okay.  Later that day, did you do any other analysis of

25  it?

322

1   **A.**   Yes.   I took that hard drive to the Ceres Police

2   Department high tech team.

3   **Q.**   And what were you looking for when you did that?

4   **A.**   I was looking for any evidence of child pornography files.

5   **Q.**   How did you perform that analysis initially?

6   **A.**   I conducted that analysis through AccessData's Forensic

7   Toolkit.

8   **Q.**   Did you find any child pornography files?

9   **A.**   I did.

10   **Q.**   And there were two hard drives on this computer; is that

11   right?

12   **A.**   That's correct.

13   **Q.**   Was there child pornography on both of them?

14   **A.**   No, there was not.

15   **Q.**   Just on one of them?

16   **A.**   Yes.

17   **Q.**   Now, I'm going to show you what's been marked as

18   Government's Exhibit 1A.  We have a placeholder.  Do you

19   recognize that item?

20   **A.**   Yes.

21   **Q.**   And what is it?

22   **A.**   That's the hard drive that was in that computer, in the IT

23   manager's office.

24   **Q.**   Okay.  One moment, please.

25           All right.  I'm going to actually hand you what's

1  been marked as Government's Exhibit 1A.

2          MR. PEARSON:  Your Honor, may I approach?

3          THE COURT:  You may.

4  BY MR. PEARSON:

5  **Q.**  Do you recognize that item?

6  **A.**  Yes.

7  **Q.**  What is it?

8  **A.**  This is the hard drive that was in the computer, in the IT

9  manager's office.

10  **Q.**  Is it in substantially the same condition as the day it

11  was seized?

12  **A.**  Yes.

13          MR. PEARSON:  We move to admit Exhibit 1A.

14          THE COURT:  Any objection?

15          MR. CAPOZZI:  No, Judge.

16          THE COURT:  1A is admitted.

17      (Plaintiff's Exhibit 1A was admitted into evidence.)

18  BY MR. PEARSON:

19  **Q.**  Can you hold that up and show it to the jury.

20  **A.**  (Witness complies.)

21  **Q.**  Was this the hard drive that contained child pornography

22  on it?

23  **A.**  Yes.

24  **Q.**  And where, digitally, within the hard drive did you find

25  child pornography?

1    **A.**   I located child pornography files in the incomplete

2    folder.

3    **Q.**   Now, will you remind us, what's an incomplete folder?

4    **A.**   So when you launch the Shareaza program, and you begin

5    downloading a file, while it's partially downloaded and not

6    completed yet, the program stores that file in the incomplete

7    folder until it's completely downloaded.  And then moves it to

8    the location set up by the user's preference or the default

9    location under the downloads folder.

10   **Q.**   In the incomplete folder, can you still see the video

11   that's being downloaded?

12   **A.**   Sometimes.

13   **Q.**   Why would these videos not be completed yet?

14   **A.**   So these files are still in the process of being

15   downloaded from these Peer-to-Peer networks.  So they're not

16   in their complete state.

17         Sometimes video files specifically are hard to view

18   unless you have enough of that data to view at least segments

19   of the video.

20   **Q.**   So that day you performed a preliminary forensic analysis;

21   is that right?

22   **A.**   I did.

23   **Q.**   Okay.  And then later on, you more fully analyzed

24   Exhibit 1A, correct?

25   **A.**   Yes.

1  **Q.**  Now, when you did that more complete analysis, how many

2  files of child pornography did you locate?

3  **A.**  I located at least 40.

4  **Q.**  Okay.  And were there files that weren't child pornography

5  in the incomplete folder?

6  **A.**  Yes.

7  **Q.**  Approximately how many?

8  **A.**  Hundreds.

9  **Q.**  Did these files have titles on them?

10  **A.**  The files that are in the incomplete folder, do not have

11  specific titles associated with the file name that you would

12  be searching for, because remember, they have -- they are

13  titled with a hash while they're in the incomplete folder.

14  Once they're completed, then they're moved to the downloads

15  folder, and at that point, they're shown their true name.

16  **Q.**  So in your demonstrative, that's when Yellow Submarine

17  would turn into a hash value; is that right?

18  **A.**  As soon as you double click on that result, it will

19  display it, if -- if you search into that incomplete folder

20  under the hash.

21  **Q.**  Okay.

22        MR. PEARSON:  Can we bring up Government's

23  Exhibit 1A.1.

24  BY MR. PEARSON:

25  **Q.**  Do you recognize this exhibit?

1   **A.**  I do.

2   **Q.**  What is it?

3   **A.**  This is a screenshot of the folder tree on that hard drive

4   on the operating system.

5   **Q.**  From Exhibit 1A; is that right?

6   **A.**  Yes.

7   **Q.**  Okay.  The device you seized had this screen on it,

8   correct?

9   **A.**  This is being viewed from our forensic software.

10  **Q.**  Okay.  Thank you.

11          Did you prepare this exhibit?

12  **A.**  I did.

13  **Q.**  Okay.

14          MR. PEARSON:  We would move to admit this exhibit.

15          THE COURT:  Any objection of 1A.1 being admitted?

16          MR. CAPOZZI:  No, Your Honor.

17          THE COURT:  1A.1 is admitted.

18     (Plaintiff's Exhibit 1A.1 was admitted into evidence.)

19  BY MR. PEARSON:

20  **Q.**  So will you please describe to the jury what this exhibit

21  depicts?

22  **A.**  If you look up here on the top, you can see that this is

23  where the user accounts on this operating system was set up.

24          And then underneath that -- that folder, you can see

25  two sub-folders.  One says "A."  And one says "Adam Henry."

1   And we have opened up the "Adam Henry" folder tree.  So we can

2   see the sub-folders under the Adam Henry user account.

3          If we follow the path location where we know that

4   incomplete files are stored, we can see that it's users,

5   Adam Henry, app data, local, and then all the way down here,

6   under the local folder, we have "Shareaza incomplete."

7          So this is the file path location under the folders

8   and sub-folders of where these files are stored during the

9   downloading process.

10  Q.  And is that where you found the child pornography?

11  A.  Yes, it is.

12          MR. PEARSON:  May I have a moment, Your Honor?

13          THE COURT:  Actually, let's take our afternoon

14  recess.

15          At this time, ladies and gentlemen, we'll reconvene

16  at 3:20.  Please heed the Court's previous admonition.

17      (Jury enters exits courtroom.)

18      (Recess taken.)

19      (Jury enters courtroom.)

20          THE COURT:  You may continue with your direct

21  examination, Mr. Pearson.

22          MR. PEARSON:  Thank you.

23  BY MR. PEARSON:

24  Q.  Detective Moore, when we stopped, we had Exhibit 1A.1 up

25  on the screen.  Can you please remind us what this exhibit

1  was?

2  **A.**  So this is the folder structure on the hard disk drive

3  that was located in the IT manager's office.

4  **Q.**  And on the right here, we see a number of hash values; is

5  that right?

6  **A.**  Correct.  So this is a representation of the files that

7  were in this incomplete folder over here.  So if we look at

8  this incomplete folder, these are the files that were -- and

9  not all of them were displayed.  It's magnified, so you can

10  actually read it because there's hundreds in there.

11  **Q.**  And these were files that were partially downloaded from

12  Shareaza?

13  **A.**  Yes.  You can tell because if you look at this file name

14  right here, it has the dot partial file extension, and then it

15  also has the dot SD file extension with the same hash value

16  here.  These two are the same.

17  **Q.**  Did you preview this file?

18  **A.**  I did.

19  **Q.**  And what was it a depiction of?

20  **A.**  It depicted child pornography.

21  **Q.**  Will you please pull up Exhibit 1A.3.

22       Detective Moore, have you reviewed Exhibit 1A.3 on

23  the Government's laptop?

24  **A.**  Yes.

25  **Q.**  And is that a fair and accurate depiction of the file that

329

1   you previewed in this folder?

2   **A.**  Yes.

3          MR. PEARSON:  We move to admit and publish a small

4   portion of Exhibit 1A.3.

5          MR. CAPOZZI:  Is that the videotape?

6          MR. PEARSON:  Yes.

7          MR. CAPOZZI:  So we don't have it.

8          MR. PEARSON:  There should be a disk that was

9   provided.

10         MR. CAPOZZI:  I don't think so.

11         MR. PEARSON:  One moment, Your Honor.

12         MR. CAPOZZI:  We don't receive those because that's

13  the child pornography.  But no objection to playing a small

14  snippet.

15         THE COURT:  Counsel approach.

16         (Sidebar held.)

17         THE COURT:  My question is whether it was made

18  available.

19         MR. CAPOZZI:  Yes, it's no problem.

20         THE COURT:  How long is it that we would play?

21         MR. GAPPA:  We would play up to 10 seconds.

22         MR. PEARSON:  It's 30 seconds total.  We'll play the

23  whole thing.

24         THE COURT:  Ten seconds.

25         MR. PEARSON:  Yes.

1          THE COURT:  All right.

2      (Sidebar concluded.)

3          MR. PEARSON:  Your Honor, we move to admit and

4   publish a small portion of Exhibit 1A.3.

5          THE COURT:  No objection, correct?

6          MR. CAPOZZI:  Yes.

7          THE COURT:  1A.3 is admitted and may be -- an excerpt

8   may be published.

9      (Plaintiff's Exhibit 1A.3 was admitted into evidence.)

10         MR. PEARSON:  Will you start it around the ten second

11  mark?

12         MR. GAPPA:  Is it displaying?

13         It's playing on ours, but not the jurors.

14         THE COURT:  Not on mine.

15         COUNTY DEPUTY:  It's just -- the play button is

16  showing is all.  Do you have it hooked up to the VGA input?

17  BY MR. PEARSON:

18  **Q.**  So stepping back for a second.  You initiated this

19  investigation using a law enforcement tool, correct?

20  **A.**  Yes.

21  **Q.**  Okay.  And does Child Protection System maintain a

22  database of internet protocol addresses that are seen sharing

23  child pornography on Peer-to-Peer networks?

24  **A.**  It does.

25  **Q.**  How is that information entered into the database?

1   **A.**   The Child Rescue Coalition maintains secure servers, that

2   only allow access by law enforcement personnel or authorized

3   personnel only.   It collects the data recovered from these

4   Peer-to-Peer networks and stores them on these servers.

5   **Q.**   Is the -- how is the information maintained?

6   **A.**   So the information is maintained on these secure servers.

7   And the data is distributed to law enforcement personnel based

8   upon region.

9   **Q.**   And is the information secured?

10   **A.**   It is.

11   **Q.**   Is it checked for reliability?

12   **A.**   It is.

13   **Q.**   We would -- I'm going to show you Government's Exhibit 2.

14   Do you recognize this exhibit?

15   **A.**   Yes.

16   **Q.**   What is it?

17   **A.**   This is the network activity log for the suspected IP

18   address that initiated this investigation.

19   **Q.**   Did you generate this exhibit?

20   **A.**   My law enforcement web base portal that I logged into

21   provided me with this data.

22   **Q.**   Is this exhibit an accurate representation of the data

23   that you retrieved?

24   **A.**   Yes.

25            MR. PEARSON:   We would move to admit solely the first

1   page of Exhibit 2.

2           MR. CAPOZZI:  Is this from the Lock-N-Stitch computer

3   that was seized?

4           THE WITNESS:  This is the network activity report.

5           MR. CAPOZZI:  Right.

6           MR. PEARSON:  Yes.

7           MR. CAPOZZI:  All right.  No objection.

8           THE COURT:  So Page 1 only of Exhibit 2?

9           MR. PEARSON:  That -- one moment, Your Honor.

10          Yes, only Page 1, Your Honor.

11          THE COURT:  Page 1 of Exhibit 2 is admitted without

12  an objection.

13      (Plaintiff's Exhibit 2, page 1 was admitted into

14  evidence.)

15  BY MR. PEARSON:

16  **Q.**  Detective Moore, will you describe generally what this

17  exhibit depicts?

18  **A.**  This is the network activity of the IP address -- our

19  suspect IP address, as it pertains to the Peer-to-Peer file

20  sharing.

21          MR. PEARSON:  Can we zoom in on the first two lines

22  of this report.

23  BY MR. PEARSON:

24  **Q.**  Will you please walk the jury through these different

25  columns in Exhibit 2?

1   **A.**   So the IP address, which is over here on the left column,

2   is the same as the one that we discussed earlier, 71.94.43.84.

3   That's the IP address to Lock-N-Stitch.

4        This GUID right here is the global unique identifier

5   that identifies that specific installation of Shareaza on the

6   computer at Lock-N-Stitch.  This over here is the SHA-1 hash

7   value, which is like a digital fingerprint for that specific

8   file.  The date and timestamp over here, is the date and time

9   in UTC code of when this IP address or this GUID was

10  broadcasting this information, that they had these files by

11  file name and hash value, and this is the percentage of the

12  file that they had -- that this computer at Lock-N-Stitch had

13  for these two specific files.

14       In this case, the first file, there was 81.19 percent

15  complete.  The second file was 80.66 percent complete.

16  **Q.**   And were these files child pornography?

17  **A.**   Yes.

18  **Q.**   Okay.  And did the hash -- does the hash value confirm

19  that?

20  **A.**   The hash value is confirmed as known child pornography to

21  law enforcement.

22  **Q.**   And the timestamp, will you please read that?

23  **A.**   9:19:2013, 22:22 hours.

24  **Q.**   22:22 hours, do you know what time zone that is?

25  **A.**   This network activity report is displayed in UTC,

334

1    Universal Time Code.

2    **Q.**   So what time would that be Pacific time?

3    **A.**   Depending on the time of the year, it could be seven or

4    eight hours off.  So at this time of the year, it would have

5    been 3:22 p.m.

6    **Q.**   Was the date September 19th, significant to you?

7    **A.**   It was.

8    **Q.**   Why is that?

9    **A.**   That was the day we executed the search warrant at

10   Lock-N-Stitch.

11   **Q.**   And approximately what time of day did you execute the

12   search warrant?

13   **A.**   About an hour prior to that.  About -- around 2:30 in the

14   afternoon.

15   **Q.**   Approximately what time did you seize the hard drive at

16   Exhibit 1A?

17   **A.**   Approximately an hour later after having been at the

18   business.

19   **Q.**   I'm going to show you what's been marked as Government's

20   Exhibit 1A?

21            MR. CAPOZZI:  1A?

22            MR. PEARSON:  1A.  I'm sorry, 1A.6.  My mistake.

23   BY MR. PEARSON:

24   **Q.**   Do you recognize this exhibit?

25   **A.**   Yes.

1   Q.  What is it?

2   A.  This is a screenshot of my forensic software, displaying

3   the list of 40 child pornography videos that I located in the

4   incomplete folder for the computer at Lock-N-Stitch.

5   Q.  So again, this is generated from Exhibit 1A, correct?

6   A.  From that hard drive that we were looking at earlier.

7   Q.  Okay.  Is this screenshot a fair and accurate

8   representation of the list of child pornography videos that

9   you located?

10  A.  Yes, in the incomplete folder.

11       MR. PEARSON:  We move to admit Exhibit 1A.6.

12       THE COURT:  Any objections?

13       MR. CAPOZZI:  No.

14       THE COURT:  1A.6 is admitted.

15   (Plaintiff's Exhibit 1A.6 was admitted into evidence.)

16       MR. PEARSON:  Can we zoom in on the first two rows of

17  1A.6.

18  BY MR. PEARSON:

19  Q.  Detective Moore, will you please describe what these first

20  two rows depict?

21  A.  Again, we're in the incomplete folder, so the titles of

22  the files have a hash as the title.  We see that the file

23  extension is dot partial, indicating that it is not a complete

24  file.

25       We could see the next column, the date that it was

1   created, and that is the date that that file was placed on the

2   vine of the hard drive.  So May 28th, 2013, at 1:20 in the

3   afternoon was when that file began downloading on to this

4   computer.

5        The next column shows a modified date.  And a

6   modified date is any time that you make a change to that file

7   while it's on the same volume.  And it shows September 18th,

8   2013, at 4:40 p.m.

9        So that shows me that this partial file began

10  downloading on to this computer on May 28th, and it's the

11  latest packet that it received of that file before it was

12  completed, was in September 18th.

13  **Q.**  Let's look at a few entries on the modified column.

14       MR. PEARSON:  John, can you do five and six.  We'll

15  expand those.

16  BY MR. PEARSON:

17  **Q.**  Will you please describe to the jury what this column

18  depicts again.

19  **A.**  So this is a list of files, and we can see here that they

20  have various different dates.  Because as they are receiving

21  these packets, and these dot-partial files are expanding in

22  size, the -- the date timestamps are being modified to reflect

23  the new size of this file.

24       So we can see that some of them had not received an

25  updated packet.  If we were to look over here, May 30th is

1    last time they received that packet for that file -- data

2    packet.  And then some were more recent, September 19th.

3            So you've got to understand that these files, as

4    they're downloading from Peer-to-Peer, they're growing in size

5    as they're pulling different parts of the data from different

6    sources.

7            Sometimes those sources go offline or come back

8    online.  So you may not get a full, completed file, and it may

9    take a long time to get actual completed files, depending on

10   what type of file they are.

11           Video files specifically are generally larger in

12   size, and so it oftentimes takes longer to download the

13   completed full version of a video.

14           So you'll see that this basically is displaying that

15   there was ongoing activity with the Shareaza program.  Ongoing

16   downloads being received, ongoing files growing in size until

17   completion.

18   Q.  All right.  We're going to step back just to

19   September 19th, 2013.  So you had executed the search warrant,

20   correct?

21   A.  Yes.

22   Q.  All right.  And you seized Exhibit 1A, right?

23   A.  Yes.

24   Q.  You took it and you found child pornography on that

25   exhibit, correct?

1    A.  Yes.

2    Q.  And that exhibit had been taken from the computer with the

3    Adam Henry account on it?

4    A.  Yes.

5    Q.  What steps did you take next in your investigation?

6    A.  Based on the fact that Adam Henry was not at Lock-N-Stitch

7    at the time, we sought to locate Adam Henry, who is the IT

8    manager of the business.

9    Q.  Were you able to locate him?

10   A.  We were.

11   Q.  How did you do that?

12   A.  We were able to speak with his boss, who was the owner of

13   Lock-N-Stitch.  And he called him into work, basically

14   assisting us without letting him know that the police were

15   there.  And Adam Henry stepped out of his residence, and we

16   met with him.

17   Q.  Did you later obtain a search warrant for Adam Henry's

18   residence?

19   A.  I did.

20   Q.  Did you execute that search warrant?

21   A.  I did.

22   Q.  When was that?

23   A.  It was later in that same evening.

24   Q.  What were you searching for?

25   A.  The search warrant was for digital devices and computers,

1  and other devices capable of storing digital media.

2  **Q.**  Okay.  And generally, what did you find during your search

3  of the residence?

4  **A.**  We found numerous computers and other digital devices

5  inside of the Adam Henry residence.

6  **Q.**  Did Adam live alone?

7  **A.**  No.

8  **Q.**  Who else lived there?

9  **A.**  He also lived there with his wife, and his wife's two

10  children.

11  **Q.**  Okay.  We're going to walk through a few photos taken of

12  the residence that day.

13      Will you please review the Government's Exhibits 5.1

14  through 5.14.

15

16      MR. CAPOZZI:  I have no objection to admission.

17      MR. PEARSON:  We would move to admit those photos.

18      THE COURT:  5.1 through --

19      MR. PEARSON:  5.14 -- sorry, might be 13.  Through

20  5.14.

21      THE COURT:  Without objection, 5.1 through 5.14 are

22  admitted.

23    (Plaintiff's Exhibit 5.1 through 5.14 were admitted into

24  evidence.)

25  *///*

1    BY MR. PEARSON:

2    **Q.**  Okay.  So let's start with photo 5.1.  What does this

3    photograph depict?

4    **A.**  This is inside of the Henry residence.  And we can see

5    from this perspective, the living room with a desk set up

6    behind the couch.

7    **Q.**  Will you please circle that desk?

8    **A.**  (Witness complies.)

9    **Q.**  5.2, what does this photo depict?

10   **A.**  This is -- this is the same area from a different

11   perspective, but over here, if you look, this is the desk.

12   And there's a computer tablet or chassis over here.

13   **Q.**  Exhibit -- we're going to jump here to 5.10, what does

14   this depict?

15   **A.**  That is the same desk.  And this is the computer that I

16   had circled.

17   **Q.**  Okay.  Was this in the living room?

18   **A.**  Yes.

19   **Q.**  Let's jump to 5.14.  What does this exhibit depict?

20   **A.**  So this is the same desk in the living room.  This right

21   here is a hard disc drive, which is labelled with the number

22   18.  And this is an iPhone box that contained an iPhone, which

23   is labelled with the number 17.  And these items were located

24   in this top left desk drawer.

25   **Q.**  I'm going to change colors of highlight in here so we can

1    see it better.

2          Let's jump to Exhibit 5.3.  What does that exhibit

3    depict?

4    **A.**   So if you were standing in the living room and looked over

5    from a different perspective, you would see the dining room.

6    And on the dining room are two computers over here.

7    **Q.**   Exhibit 5.4, what does this exhibit depict?

8    **A.**   This is one of those computers.

9    **Q.**   Was this computer functional?

10   **A.**   I did not conduct analysis on this computer.

11   **Q.**   Exhibit 5.5, what is this a picture of?

12   **A.**   This is in the master bedroom of the Henry residence.

13   **Q.**   What can you see in this picture?

14   **A.**   What I can see here is, if you're looking at it from the

15   bed, facing the bathroom entryway over here, you can see that

16   there's a monitor, keyboard, and mouse wired through the wall,

17   into the area that would be the bathroom behind this wall, the

18   master bathroom.

19   **Q.**   So where these wires run, it looks like there's a hole.

20   Is that where the wires went?

21   **A.**   Correct.  There is a hole in the wall here so that this

22   monitor keyboard and mouse can be connected to a device on the

23   other side of this wall.

24   **Q.**   Exhibit 5.6, what is this a picture --

25   **A.**   This is the same master bedroom, but from a different

1   perspective showing the cables going into that master

2   bathroom.

3   **Q.**   Exhibit 5.8, what is this a picture of?

4   **A.**   So this is the master bathroom entryway.  And you can also

5   notice that there are built-in shelves right next to it.  But

6   if you were to enter in here, you would go into the master

7   bathroom from the master bedroom.

8   **Q.**   And this purple portion at the bottom of the screen that I

9   am circling, what is that?

10   **A.**   That is a part of the bed.

11   **Q.**   Exhibit 5.9, what is this a picture of?

12   **A.**   This is a hallway bathroom.

13   **Q.**   Exhibit 5.11, what is this a picture of?

14   **A.**   This is a picture of the garage.

15   **Q.**   I'm going to jump back.  Exhibit 5.7 --

16   **A.**   Okay.

17   **Q.**   -- what is this a picture of?

18   **A.**   So we're back in the master bathroom.  And those wires

19   that were going through the wall, were connected into this

20   computer tower here -- actually, I'm sorry, I take that back.

21   They were connected into this switch and connected to this

22   computer here.  So the -- the computer was connected to the

23   switch by Ethernet cable, and the mouse, the keyboard, and the

24   monitor went through the wall to the master bedroom.

25   **Q.**   So this was on the other side of that picture of the

1    bedroom; is that correct?

2    **A.**   Correct.

3    **Q.**   This item here with the number 9 under it, what is that?

4    **A.**   That is a Network Attached Storage device, specifically

5    Netgear brand ReadyNAS.

6    **Q.**   Let's jump to item number 5.12.  What is this a picture

7    of?

8    **A.**   A computer.

9    **Q.**   And where was this found?

10   **A.**   This was located in the garage.

11   **Q.**   And Exhibit 5.13, what is this a picture of?

12   **A.**   That is another computer.

13   **Q.**   Do you know where this was located?

14   **A.**   That was also located in the garage.

15   **Q.**   All right.  We're going to jump back to Exhibit 5.7.

16          Now, this item here, Number 9, you described it as a

17   NAS.  Was that seized?

18   **A.**   Yes.

19   **Q.**   Okay.  And was that item later of significance to you?

20   **A.**   Yes.

21   **Q.**   Why is that?

22   **A.**   Upon analysis of that device, we located child pornography

23   files.

24   **Q.**   And would you consider this a sophisticated home setup?

25   **A.**   I would say specifically for that time, it was a little

1   bit more sophisticated than the average user would have of a

2   home network setup.  Simply because the average user wouldn't

3   generally have a network switch, though possible, and

4   generally wouldn't have a home server or Network Attached

5   Storage device.

6   **Q.**  Did you seize a number of items from the Henry residence?

7   **A.**  Yes.

8   **Q.**  Okay.  And you mentioned that you seized item Number 9?

9   **A.**  Yes.

10  **Q.**  Okay.

11          MR. PEARSON:  Can we pull up Exhibit 9.

12  BY MR. PEARSON:

13  **Q.**  What is Exhibit 9?

14  **A.**  That's the same device the Netgear ReadyNAS.

15  **Q.**  And was that item seized?

16  **A.**  Yes.

17  **Q.**  Is it here today?

18  **A.**  I believe so.

19  **Q.**  Was it placed on the cart?

20  **A.**  Yes.

21  **Q.**  Is the item substantially in the same condition as the day

22  it was seized?

23  **A.**  Yes.

24          MR. PEARSON:  We would move to Exhibit 9.

25          MR. CAPOZZI:  No objection.

1          THE COURT:  9 is admitted.

2      (Plaintiff's Exhibit 9 was admitted into evidence.)

3          MR. PEARSON:  Let's pull up Exhibit 16.

4  BY MR. PEARSON:

5  **Q.**  Do you recognize that item?

6  **A.**  Yes.

7  **Q.**  What is it?

8  **A.**  That is a computer.

9  **Q.**  Was this the computer found in the garage?

10  **A.**  Yes.

11  **Q.**  Okay.  And was that item seized?

12  **A.**  Yes.

13  **Q.**  Is it on that cart today?

14  **A.**  Yes.

15  **Q.**  Is it in substantially the same condition as it was the

16  day it was seized?

17  **A.**  Yes.

18          MR. PEARSON:  We move to admit Exhibit 16.

19          MR. CAPOZZI:  No objection.

20          THE COURT:  16 is admitted.

21      (Plaintiff's Exhibit 16 was admitted into evidence.)

22          MR. PEARSON:  Pull up Exhibit 18.

23  BY MR. PEARSON:

24  **Q.**  So same question:  What is this?

25  **A.**  That is a 500 gigabyte hard disc drive.

1   Q.   And where was this item located?

2   A.   That was located in the desk drawer of the Henry

3   residence.  The desk was located in the living room.

4   Q.   Okay.  Was this item also seized?

5   A.   Yes.

6   Q.   Is it on the cart today?

7   A.   Yes.

8   Q.   Is it in substantially the same condition as the day it

9   was seized?

10  A.   Yes.

11         MR. PEARSON:  We would move to admit Exhibit 18.

12         MR. CAPOZZI:  No objection.

13         THE COURT:  18 is admitted.

14     (Plaintiff's Exhibit 18 was admitted into evidence.)

15  BY MR. PEARSON:

16  Q.   Now, we're going to touch a little on your -- or we'll

17  touch a lot, actually, on your full forensic examinations in a

18  little bit.  But just briefly here, did you examine item 18?

19  A.   Yes.

20  Q.   Did you locate child pornography on it?

21  A.   Yes.

22  Q.   Approximately how many videos?

23  A.   Approximately 45.

24  Q.   Was Adam Henry present when you executed the search

25  warrant?

1    **A.**   He did arrive at the location during the service of the

2    search warrant.

3    **Q.**   Did he help you identify any devices?

4    **A.**   Yes.

5    **Q.**   What did he identify?

6    **A.**   Specifically, the Netgear ReadyNAS, and the computer that

7    was on the desk in the living room.

8    **Q.**   So the ReadyNAS, will you remind us where that was?

9    **A.**   So that Netgear ReadyNAS was in the master bathroom

10   cabinet.

11   **Q.**   And the computer was in the living room; is that right?

12   **A.**   The computer was on a desk in the living room.

13   **Q.**   Okay.  Were you able to access the computer?

14   **A.**   I was.

15   **Q.**   Okay.  And how did you do that?

16   **A.**   With the assistance of Adam Henry.

17   **Q.**   How did he assist you?

18   **A.**   We approached the computer, and I asked him how could we

19   locate any files that had been downloaded from Shareaza.

20   **Q.**   Okay.  What did he say?

21   **A.**   He told me there were files stored on the ReadyNAS.

22   **Q.**   So sitting in the living room, you located the NAS in the

23   bathroom?

24   **A.**   Yes.

25   **Q.**   Did you need a password to do that?

1    **A.**  So with the assistance of Adam Henry, we could see that

2    the ReadyNAS was attached to the network.  And there were --

3    was a share that was showing as available.  And once

4    Adam Henry clicked on it, it required a password.

5    **Q.**  Just briefly, what's a share?

6    **A.**  So a network attached storage device requires user

7    accounts and shares.  And shares are basically like folders

8    that contain data -- contain files.

9          Now, depending on the authentication level of the

10   user accounts depends on whether or not that user account can

11   access that share.  Some shares can be password protected, and

12   some shares may not require a password.

13         In this particular case, there was a share entitled

14   "Aurrora," that was password protected.  Once trying to access

15   that share, it prompted with an administrative password log

16   on -- or password log on, I should say.

17   **Q.**  What was the password?

18   **A.**  Adam Henry told me that it was Stitch with a capital "S,"

19   T-I-C-H, with the @ symbol, one, one.

20   **Q.**  Stitch@11?

21   **A.**  Correct.

22   **Q.**  And using that, were you able to access that Aurrora share

23   or file?

24   **A.**  Yes.  Once Adam Henry provided the password, I was able to

25   look through folder structure.

1    Q.   What did you find in the folder structure?

2    A.   I found child pornography videos.

3            MR. PEARSON:  You have them all, Your Honor?

4            THE COURT:  Yes.

5    BY MR. PEARSON:

6    Q.   Were there any phones seized on September 19th, 2013?

7    A.   Yes.

8            MR. PEARSON:  Can you please pull up Government's

9    Exhibit 4.

10   BY MR. PEARSON:

11   Q.   Would this be one of the phones that was seized?

12   A.   Yes.

13   Q.   Okay.  And do you know where this item was located?

14   A.   That was on Adam Henry's person.

15   Q.   And is it on that cart today?

16   A.   Yes.

17   Q.   Is it in, substantially, the same condition as the day it

18   was seized?

19   A.   Yes.

20   Q.   We saw a picture of another phone earlier.

21           MR. PEARSON:  Can we go back to Exhibit 5.14 --

22   sorry, actually, we would move to admit Exhibit 5.

23           THE COURT:  Any objection, Exhibit 5 --

24           MR. PEARSON:  Exhibit 4, sorry.

25           MR. CAPOZZI:  Well, I'd like to know more about it

1   down the line, but no objection.

2          THE COURT:  This is the -- excuse me, not 5.

3          MR. PEARSON:  Exhibit 4.

4          MR. CAPOZZI:  4.

5          THE COURT:  4 was the telephone --

6          MR. CAPOZZI:  Telephone.

7          THE COURT:  -- the agent said was seized from

8   Mr. Henry's person.  Any objection?

9          MR. CAPOZZI:  I just need to follow-up on that, but

10  no objection at this point.  It's coming in eventually.

11         THE COURT:  All right, 4 is admitted without

12  objection.

13      (Plaintiff's Exhibit 4 was admitted into evidence.)

14         MR. PEARSON:  Let's pull up Exhibit 5.14.  This has

15  been previously admitted.

16  BY MR. PEARSON:

17  Q.  Will you please remind the jury what they see in this

18  picture.

19  A.  So these were two devices that were located in the upper

20  left drawer of the desk in the living room.

21         The item over here is a hard disc drive.

22         And the item over here is a -- what depicts a box,

23  that iPhone box, but it did contain a phone inside.

24  Q.  The one with the number 17, that phone, was that seized?

25  A.  Yes.

351

1    **Q.**  Okay.

2           MR. PEARSON:  Let's pull up Government's Exhibit 17.

3    BY MR. PEARSON:

4    **Q.**  Do you recognize that exhibit?

5    **A.**  Yes.

6    **Q.**  What is it?

7    **A.**  That is the phone.

8    **Q.**  Is it on the cart over there?

9    **A.**  Yes.

10   **Q.**  Is it in substantially the same condition as the day it

11   was seized?

12   **A.**  Yes.

13          MR. PEARSON:  We move to admit item -- Exhibit 17.

14          THE COURT:  Any objection to 17?

15          MR. CAPOZZI:  No objection.

16          THE COURT:  17 is admitted.

17      (Plaintiff's Exhibit 17 was admitted into evidence.)

18   BY MR. PEARSON:

19   **Q.**  After you seized these items, did you do any other

20   analysis that day, on September 19th, 2013?

21          THE COURT:  On these items or other items?

22          MR. PEARSON:  Sorry, that's a bad question.  I'll

23   re-ask this.

24   BY MR. PEARSON:

25   **Q.**  Once you were done searching the Defendant's residence,

1   what did you do next?

2   **A.**  All of the items were then seized and taken to the Ceres

3   Police Department.

4   **Q.**  And what was the purpose of seizing them and taking them

5   to the police department?

6   **A.**  The purpose is so that we can conduct additional analysis

7   on these devices.  Some of these devices contained a large

8   amount of data.  Many of the computers were in complex RAID

9   setups.  Some of those computers that you saw that were on the

10  dining room table had multiple disc arrays, RAID arrays

11  inside.

12        And just the sheer volume of data that needed to be

13  analyzed, required us to remove it from the residence and to

14  conduct that analysis at the high tech team.

15  **Q.**  Okay.  Did you later conduct analysis on some of these

16  devices?

17  **A.**  Yes.

18  **Q.**  Let's talk about forensic analysis generally.

19        So before you analyze a device, how do you ensure

20  that you're preserving the integrity of that device?

21  **A.**  So generally what we do when we conduct analysis is, we'll

22  inspect the device.  We'll look to make sure that we have

23  serial numbers, we have models, and we can observe the way

24  that the device is set up, to see if it would possibly be in

25  working order, and in what condition the device is in.

1          Then at that point, we would generally remove the

2    hard drive, if possible, depending on the device or what the

3    device is because that stores the data, and that's where the

4    analysis is conducted on, is generally the hard drive.

5          So we would then take that hard drive and we would

6    inspect that.  We would make sure that we saw serial numbers,

7    makes, what type of hard drive it is.

8          We would then connect that to what we call a forensic

9    write blocker.  And what this device does, is it prevents us

10   from making any writes to the drive.  We can read from the

11   suspect drive, but we can't write to it.  That way we don't

12   alter the data, and it remains in it's original state.

13         Once we've connected it to a hardware write blocker,

14   we then make a forensic copy, what we call a forensic image.

15   And that's an exact copy of the data from the suspect hard

16   drive, and we copy that data into our forensic environment.

17         And once we have that forensic image, we then verify

18   that the copy was completed properly.  Once that is done, we

19   then conduct analysis on the copy.

20         The original item, the original hard drive, the

21   original computer, whatever device it was, gets booked into

22   evidence and remains there.

23         We do all of our analysis on this forensic image.  If

24   for some reason something happens to the forensic image, we

25   can then go back down to evidence, if needed, pull up that

1   device and re-image it.  That way we do as less use of the

2   original device, even though it would still remain in its

3   original state.

4   **Q.**   Did you forensically analyze Exhibit 1A, which is the hard

5   drive seized from Lock-N-Stitch?

6   **A.**   Yes.

7   **Q.**   Did that item contain Shareaza on it?

8   **A.**   Yes.

9   **Q.**   Did you compare the GUID on that Shareaza installation to

10   the GUID that you had initially seen?

11   **A.**   Yes.

12   **Q.**   Okay.  And what were the results of that comparison?

13   **A.**   So the results of the GUID that I had initially seen from

14   my law enforcement web base portal that was reporting the

15   network activity of participating in file trading of child

16   pornography, was the same GUID that I found as an artifact on

17   the device located at Lock-N-Stitch.  Indicating to me, it was

18   the same exact installation of Shareaza, and it was the same

19   computer.

20   **Q.**   So it matched what you had seen downloaded of the child

21   pornography initially?

22   **A.**   Correct.

23   **Q.**   Did you also check that device for antivirus software?

24   **A.**   I did.

25   **Q.**   And what were the results of that check?

1    **A.**   The results were that that device or that computer had

2    antivirus software installed on that hard drive.

3    **Q.**   Did you run a scan on that device?

4    **A.**   I did.

5    **Q.**   Did you locate any viruses on the drive?

6    **A.**   I did not.

7    **Q.**   Did you find a list of the search terms on that device?

8    **A.**   Yes.

9    **Q.**   Okay.  And where would those search terms have come from?

10   **A.**   I located an artifact indicating that there had been

11   several search terms used with the Shareaza program.

12   **Q.**   Okay.  How many terms?

13   **A.**   In this case, there were 56 search terms.

14   **Q.**   Okay.  Do you know why there were only 56 search terms?

15   **A.**   There could be a -- a vast amount of reasons as why.

16   **Q.**   Was that all the search terms that were searched?

17   **A.**   I don't know.

18   **Q.**   So there could have been more?

19   **A.**   Yes.

20           MR. PEARSON:  Let's pull up Government's

21   Exhibit 1A.4.

22           This has not been admitted.

23   BY MR. PEARSON:

24   **Q.**   Do you recognize this exhibit?

25   **A.**   Yes.

356

1    Q.  What is it?

2    A.  This is a printout of the summary report for the search

3    terms that I had located.

4    Q.  Is this a fair and accurate representation of those search

5    terms that you located?

6    A.  Of the first page.

7    Q.  Will you review the next two pages as well.

8            MR. CAPOZZI:  No objection for admission.

9            MR. PEARSON:  We move to admit Exhibit 1A.4.

10           THE COURT:  1A.4 will be admitted.

11      (Plaintiff's Exhibit 1A.4 was admitted into evidence.)

12   BY MR. PEARSON:

13   Q.  Let's flip to page 2 of this exhibit.

14           What does this exhibit depict?

15   A.  This exhibit depicts that the user account under the

16   Adam Henry user account, had used Shareaza and had entered in

17   these search terms into the program, the Shareaza application

18   program.

19           MR. PEARSON:  Let's zoom in on the bottom half of

20   this exhibit.  Let's make it a little easier to read here.

21   BY MR. PEARSON:

22   Q.  Now, a few of these terms are just unrelated to

23   pornography; is that correct?

24   A.  Correct.

25   Q.  Okay.  What terms would those be?

1   **A.**  Blind Melon, No Rain.

2   **Q.**  What is Blind Melon, No Rain?

3   **A.**  I believe it to be a rock band song title.  The rock band

4   being Blind Melon, and No Rain being the song title.

5   **Q.**  And One Republic would be music; is that right?

6   **A.**  Correct.

7   **Q.**  Now, there are also a few terms on this list that would

8   relate to adult pornography, correct?

9   **A.**  Yes.

10  **Q.**  What would those terms be?  Just a few.

11  **A.**  Looking at Page 2, I could see, probably "bedroom

12  dancing."

13          Can we go to Page 3?

14          I know that the last one, search 56 was "Brandi

15  Belle."  I understand that to be an adult pornography film

16  star.

17  **Q.**  And then there are also a few terms in this search that

18  are related to child pornography, correct?

19  **A.**  Yes.

20  **Q.**  What would those terms be?

21  **A.**  Can we go back to, I believe, it was Page 1?

22          So if we look here at search 18, we have R@YGOLD,

23  which I indicated earlier, that it's a well known child

24  pornography search term.

25  **Q.**  Any other terms you notice?

1   **A.**  There are several that could be either adult or child

2   pornography, such as mom/daughter or daughter/mother.

3         Could we go to Page 2?

4   **Q.**  Do you see any terms on Page 2, that would be associated

5   with child pornography?

6   **A.**  I do.

7   **Q.**  And what are those?

8   **A.**  Search 23, is PTHC, which stands for Preteen Hardcore.

9   Search 24, is preteen.  Search 25, is underage.

10        I know from my experience, that entering these search

11  terms into the Shareaza program, will result in numerous child

12  pornography results coming back to the user.

13  **Q.**  Did you examine any other devices in this case?

14  **A.**  Yes.

15  **Q.**  And was one of them Exhibit 9, that would be the Network

16  Attached Storage device?

17  **A.**  Yes.

18        MR. PEARSON:  Can we pull up Exhibit 5.7.

19  BY MR. PEARSON:

20  **Q.**  What is this a picture of?

21  **A.**  Again, this is going back to the Henry residence.  This is

22  inside the master bathroom, in the cabinet.  And up here, we

23  have Item 9, which is the Netgear ReadyNAS or NAS, Network

24  Attached Storage device.

25  **Q.**  So is this the device that you accessed when you were at

1    Mr. Henry's residence?

2    **A.**   It is.

3    **Q.**   Now, did you take steps to ensure the integrity of this

4    device?

5    **A.**   Yes.

6    **Q.**   Are some of those the ones you've just described to us?

7    **A.**   Yes.

8    **Q.**   Will you describe, generally, the physical set up of this

9    device?

10   **A.**   So this particular device, when you open up that front

11   door panel, like the presentation that I showed earlier today,

12   has four drive base.  In this particular device, all four

13   drive base were full with physical discs.  They were each two

14   terabytes in size.

15   **Q.**   Let's talk a little bit about that digital set up as well.

16   So did you connect to this device?

17   **A.**   Yes.

18   **Q.**   And when you connected, what could you see on your screen?

19   **A.**   I could see that there were two available shares.

20   **Q.**   Okay.  And a share is similar to a file; is that right?

21   **A.**   Similar to a folder.

22   **Q.**   Folder, thank you.

23            MR. PEARSON:  Let's pull up Exhibit 9.1.

24            This has not been admitted yet.

25   ///

1  BY MR. PEARSON:

2  **Q.**  Do you recognize this exhibit?

3  **A.**  I do.

4  **Q.**  What is it?

5  **A.**  This is a screenshot of the host name, which is Pink

6  Lagoon.  So during the set up in the installation of this

7  ReadyNAS, it gives you the option of giving the device a host

8  name, which is like a nickname for a device on the network.

9  This allows you to easily identify what device that is on the

10  network.

11      In this particular instance, the user who set up this

12  device, when the option for choosing a host name came up,

13  entered Pink Lagoon.  So it gave it a nickname for this device

14  on the network.

15  **Q.**  So is this screenshot a fair and accurate depiction of the

16  screenshot that you took of this device?

17  **A.**  Yes.

18      MR. PEARSON:  We would move to admit Exhibit 9.1.

19      MR. CAPOZZI:  No objection.

20      THE COURT:  Just 9.1?

21      MR. PEARSON:  Just 9.1, Your Honor.

22      THE COURT:  9.1 is admitted.

23   (Plaintiff's Exhibit 9.1 was admitted into evidence.)

24  BY MR. PEARSON:

25  **Q.**  So here again, can you explain, we see two shares

1    underneath Pink Lagoon --

2    **A.**   Right, so we see two shares.   And again, shares are like

3    folders.   However, they require administrative level access or

4    lower level administrative access.

5           So in this case, the Aurrora share was password

6    protected and required a password to access.   The media share

7    was not password protected.

8    **Q.**   Okay.   Were you able to gain access to the Aurrora share?

9    **A.**   I was, once I entered the password that Adam Henry had

10   provided to me.

11   **Q.**   And what was that password again?

12   **A.**   It was Stitch@11.

13   **Q.**   And when you gained access to the Aurrora share,

14   generally, what were you able to see?

15   **A.**   I was able to see numerous folders and sub-folders.

16   **Q.**   Okay.   And what kind of items or documents were in those

17   folders?

18   **A.**   There was a vast amount of adult pornography.

19   **Q.**   Okay.   Also other videos?

20   **A.**   Videos.

21   **Q.**   Music?

22   **A.**   There was music, yes.

23   **Q.**   And did you discover any child pornography in that share?

24   **A.**   Yes.

25   **Q.**   Okay.   Where within that share did you discover child

1   pornography?

2   **A.**   There were several folders and sub-folders, and within

3   those folders, I located a folder titled "No."  A folder

4   titled "Kid".  A folder titled "ASA."  And another folder

5   "ASA1."  And another one, "ASA2."

6           MR. PEARSON:  Let's pull up Exhibit 9.3.

7   BY MR. PEARSON:

8   **Q.**   Do you recognize this exhibit?

9   **A.**   Yes.

10  **Q.**   And what is it?

11  **A.**   So if we look up here, we have the host name for the NAS.

12  Then we have the Aurrora share.  Once accessed, we can see the

13  directory of folders and sub-folders -- paired folders and

14  sub-folders --

15  **Q.**   Is this the exhibit that you created?

16  **A.**   Yes.

17  **Q.**   Okay.  And this is a screenshot of that exhibit; is that

18  correct?

19  **A.**   Yes.

20  **Q.**   Okay.

21          MR. PEARSON:  We move to admit Exhibit 9.3.

22          THE COURT:  Any objection?

23          MR. CAPOZZI:  Was this from the computer.

24          MR. PEARSON:  I can lay some more foundation, if you

25  prefer.

1           MR. CAPOZZI:  Okay, yes.

2    BY MR. PEARSON:

3    **Q.**  How did you create this exhibit?

4    **A.**  So this is a view from our forensic machine.

5    **Q.**  Okay.

6    **A.**  And we could see the folder structure of the NAS.

7    **Q.**  So this would have been from Exhibit 9; is that correct?

8    **A.**  Correct.  If we connect the NAS to your forensic network,

9    we can see the share -- or I'm sorry, we could see the host

10   for the device name, Pink Lagoon, so that's us connected to

11   it.  And then under there, we can see the Aurrora share.

12           MR. PEARSON:  Move to admit Exhibit 9.3.

13           MR. CAPOZZI:  No objection.

14           THE COURT:  Exhibit 9.3 is admitted.

15      (Plaintiff's Exhibit 9.3 was admitted into evidence.)

16   BY MR. PEARSON:

17   **Q.**  So can you again explain to the jury what this exhibit

18   depicts?

19   **A.**  Again, so the Pink Lagoon is --

20           MR. PEARSON:  Can we publish 9.3?

21           THE COURT:  You may.

22           MR. PEARSON:  Thank you.

23           THE WITNESS:  So looking at the Aurrora share, we can

24   see a series of folders, para-folders, and sub-folders

25   contained within those folders.  And if we drill down, all the

1   way down from copy to the next sub-folder, copy to the next

2   sub-folder; sorted, next sub-folder; bad, next sub-folder; new

3   folder, another sub-folder; new folder, we see two folders of

4   notable interest to us.

5   BY MR. PEARSON:

6   **Q.**  What are those folders?

7   **A.**  One folder is titled "Kid."  And the other folder is

8   titled "No."

9   **Q.**  Okay.  Was there child pornography in either of those

10  folders?

11  **A.**  Yes.

12  **Q.**  And so to access the folder titled "Kid," you would first

13  have to click on sorted, and then "bad," and then new folder,

14  and then new folder, and then "kid" again; is that correct?

15  **A.**  Correct.

16  **Q.**  How many child pornography videos did you locate on the

17  Aurrora share?

18  **A.**  Over a hundred.

19  **Q.**  I'm going to show you what's been marked as Government's

20  Exhibit 9.4.  Do you recognize this exhibit?

21  **A.**  Yes.

22  **Q.**  Was does -- what -- what is it?

23  **A.**  This is essentially a listing of the files and the file

24  path in which they were located, of the child pornography

25  videos that I found on the NAS.

1   **Q.**   Okay.  And did you create this exhibit?

2   **A.**   Yes.

3   **Q.**   Does this fairly and accurately depict the files that you

4   found on the NAS?

5   **A.**   Yes.

6           MR. PEARSON:  We move to admit Exhibit 9.4.

7           MR. CAPOZZI:  No objection.

8           THE COURT:  Exhibit 9.4 is admitted without

9   objection.

10      (Plaintiff's Exhibit 9.4 was admitted into evidence.)

11          MR. PEARSON:  We move to publish.

12          THE COURT:  You may.

13  BY MR. PEARSON:

14  **Q.**   All right.  So let's flip to Page 2 of this exhibit -- I'm

15  sorry, Page 3.

16          All right.  Number 45, will you please read that?

17  **A.**   Would you like me to read the whole file path or just the

18  file name?

19  **Q.**   Why don't you read the file name first.

20  **A.**   The file name is in double parenthesis, "Hussy fan PTHC,

21  lolita8" -- okay, thank you.  "Hussy fan," in double

22  parenthesis, "PTHC Lolita 8, Fame X, 617, 777, 300, in

23  parenthesis, mom licks 11YO, dad fucks 13YO, da cream pie."

24  **Q.**   Will you read the -- will you explain what the file path

25  signifies?

1    **A.**   So again, when we were looking at that folder structure

2    under this share, we could see that it was under the folder

3    copy, sub-folder copy, sub-folder sorted, sub-folder bad,

4    sub-folder new folder, sub-folder new folder, sub-folder no.

5           And within that file path, that folder structure, was

6    the file.  It was a video file.

7    **Q.**   And the term "Lolita" that's in the title, does that have

8    any significance to you?

9    **A.**   Yes.

10   **Q.**   Why?

11   **A.**   Lolita is a well-known child pornography search term

12   associated with child pornography files.  Specifically, it's

13   based upon a novel that involved a story line of an adult male

14   who fell in love with an underage female.

15   **Q.**   Let's look at number 38 on this exhibit.  Would you please

16   read that title?

17   **A.**   In Parenthesis, "PTHC center, OPVA, 2012, Asian Cambodian,

18   SVAY001," in parenthesis, "SND, XVID."

19   **Q.**   Was that number -- was that item significant to you?

20   **A.**   Yes.

21   **Q.**   Why is that?

22   **A.**   Well, it had search terms that are indicative of child

23   pornography in the title.

24   **Q.**   Okay.

25   **A.**   Specifically, PTHC, which stands for Preteen hardcore.

1   **Q.**   Have you seen this title before in this case?

2   **A.**   Yes, I had.

3   **Q.**   When was that?

4   **A.**   This was one of the files that I had viewed when I did a

5   browse host with my law enforcement edition, Shareaza

6   software, that connected to the suspect's Shareaza program.

7   **Q.**   So in layman's terms, you had seen this being downloaded

8   at Lock-N-Stitch; is that correct?

9   **A.**   Correct.

10  **Q.**   Okay.  And what does the file structure indicate where

11  this was located?

12  **A.**   It was under the folder new misc, sub-folder new folder,

13  sub-folder ASA1.  And this again, was located on the Network

14  Attached Storage device at the Henry residence.

15  **Q.**   Okay.  On the password protected side of that device?

16  **A.**   On the password protected side.

17  **Q.**   On the side that Adam Henry had given you the password to?

18  **A.**   Correct.

19  **Q.**   Detective Moore, have you reviewed Government's

20  Exhibit 9.5, that's on the Government's laptop?

21  **A.**   Yes.

22  **Q.**   Is that a video clip of this item?

23  **A.**   Yes.

24  **Q.**   Have you confirmed it is, in fact, the item contained

25  here, in item 38?

1    A.  Yes.

2        MR. PEARSON:  Your Honor, we would move to admit and

3    play a 10-second clip of Exhibit 9.5, which as Detective Moore

4    testified, was found at location number 38.

5        THE COURT:  Any objection?

6        MR. CAPOZZI:  No.

7        THE COURT:  You may.  The exhibit will be admitted,

8    and the excerpt may be played.

9      (Video played.)

10   BY MR. PEARSON:

11   Q.  All right.  Let's go back to Exhibit 9.1.  Okay.  So we

12   just talked a little bit about the Aurrora folder.

13       Did you also analyze the media folder?

14   A.  Yes.

15   Q.  Okay.  Was that folder password protected?

16   A.  No.

17   Q.  What did you find on the media folder?

18   A.  I found numerous folders and sub-folders containing files.

19   Q.  Did you find any child pornography?

20   A.  No.

21   Q.  Okay.  I'm going to show you Exhibit 9.2.

22       Do you recognize this exhibit?

23   A.  Yes.

24   Q.  Just briefly, what is it?

25   A.  So this is -- under the media share, this is the folder

1    structure containing various parent folders and sub folders.

2    **Q.**  Did you prepare this exhibit?

3    **A.**  Yes.

4    **Q.**  And does it fairly and accurately depict the structure of

5    the media folder -- media share?  Sorry.

6    **A.**  It does, as viewed from our forensic software.

7           MR. PEARSON:  We move to admit and publish

8    Exhibit 9.2.

9           MR. CAPOZZI:  No objection.

10          THE COURT:  9.2 is admitted.

11      (Plaintiff's Exhibit 9.2 was admitted into evidence.)

12   BY MR. PEARSON:

13   **Q.**  And will you just briefly explain to the jury what they

14   see in this exhibit?

15   **A.**  So this is essentially what was on the media share side of

16   the NAS.  The non-password protected side.

17          And we can see that it starts here from copy,

18   sub-folder copy, sub folder sorted, personal, not okay, X's,

19   miscellaneous people, [A.T.], vid, 15, and then a folder, hot

20   tub with Sherry, and then another folder, 14.

21   **Q.**  Okay.  We'll touch on that a little later.

22          Did you also analyze the user accounts on the NAS,

23   Exhibit 9?

24   **A.**  I did.

25   **Q.**  Okay.  What were the results of that analysis?

**A.**   I found that there were two user accounts set up on the NAS.

**Q.**   What were the names of the user accounts?

**A.**   The first user account was Adam.  And the second user account was Angele.

**Q.**   Now, what did the account Adam have access to?

**A.**   The Adam account had full administrative privileges, so the Adam account could basically change any of the settings, could create new user accounts, could create new shares, and could limit the access to those shares, and could enter passwords for the shares.

**Q.**   What about the Angele account, what did that account have access to?

**A.**   The Angele account was a lower level account and did not have administrative privileges.

**Q.**   Would that have been a default setting?

**A.**   The Angele account would have had to have been created. So during the creation of the account, you have options as the administrator to make that account an administrator as well, or to limit its ability.  So not by default, more of user specific settings that are applied during the creation of that user account.

**Q.**   So an administrator could make the Angele account access restricted; is that right?

**A.**   That is correct.

1  **Q.**  Okay.  And could an administrator also make a password

2  protected share?

3  **A.**  Yes.

4  **Q.**  Was the Angele account an administrator?

5  **A.**  No.

6  **Q.**  Was the Adam account?

7  **A.**  Yes.

8  **Q.**  During your examination of Exhibit 9, did you discover any

9  videos that appear to be recorded at the Henry residence?

10  **A.**  Yes.

11  **Q.**  Will you generally describe what you saw?

12  **A.**  I located videos that appear to depict hidden camera style

13  videos, that were from the perception of a shower of a

14  bathroom.

15  **Q.**  Why did you believe those were from the Henry residence?

16  **A.**  The way the bathroom was set up in these videos appear to

17  resemble that of a bathroom that I had located and seen in the

18  Adam Henry residence.

19  **Q.**  And who was in these videos?

20  **A.**  There were several people that were captured on this

21  video -- on these hidden camera videos.

22  **Q.**  Was one of them an underage girl?

23  **A.**  Yes.

24  **Q.**  In which share were those videos?

25  **A.**  Those videos were actually located in both shares.

1  **Q.**  So both on the password side and the non-password side?

2  **A.**  Correct.

3  **Q.**  When you first saw the videos, did you know who that

4  underage girl was?

5  **A.**  Not immediately, no.

6  **Q.**  Did you take any steps to identify her?

7  **A.**  I did.

8  **Q.**  And were you able to identify her?

9  **A.**  I was.

10 **Q.**  Okay.  And just identifying her by her initials, what were

11 her initials?

12 **A.**  A.T.

13 **Q.**  Did you speak with A.T?

14 **A.**  Yes.

15 **Q.**  Did she know that she was being recorded?

16 **A.**  No, she did not.

17 **Q.**  Did you later participate in a second search of the

18 Defendant's residence?

19 **A.**  Yes.

20 **Q.**  Would that have been November 13th, 2013?

21 **A.**  Yes.

22 **Q.**  What was the purpose of that second search?

23 **A.**  Once we had learned that there were hidden camera videos

24 involved with the residence, that search was to go back into

25 the residence and attempt to locate hidden cameras, or items

1  that could conceal a hidden camera, or additional computer

2  devices, or other electronic devices capable of storing

3  digital media.

4  **Q.**  Were there pictures taken at the second search?

5  **A.**  Yes.

6  **Q.**  Will you review Government's Exhibit 10.1 through 10.7.

7      Have you reviewed those exhibits?

8  **A.**  Yes.

9  **Q.**  Do they fairly and accurately depict the pictures taken at

10  the Henry residence on November 13th?

11  **A.**  Yes.

12      MR. PEARSON:  We move to admit Government's

13  Exhibit 10.1 through 10.7.

14

15      MR. CAPOZZI:  No objection.

16      THE COURT:  10.1 through 10.7 are admitted.

17    (Plaintiff's Exhibit 10.1 through 10.7 was admitted into

18  evidence.)

19  BY MR. PEARSON:

20  **Q.**  We're going to pull up Exhibit 10.1 here.  What is this a

21  picture of?

22  **A.**  This is a picture of the front of the Henry residence.

23  **Q.**  10.6, what is that a picture of?

24  **A.**  That is a picture of the master bedroom and the shelves

25  that were inside of the master bedroom.

374

1   **Q.**   Okay.  Do you see anything of significance in this
2   exhibit?
3   **A.**   I do.  I see a camera sitting here on the shelf.
4   **Q.**   We're going to jump back to Exhibit 5.8, it would have
5   been from the first search.  Is this the same shelf?
6   **A.**   It is.
7   **Q.**   Let's go to Exhibit 10.7.  What is that a picture of?
8   **A.**   That is a close up picture of that same device that I had
9   just circled.
10  **Q.**   Okay.  So that had been sitting on that shelf?
11  **A.**   Correct.
12  **Q.**   In the bedroom?
13  **A.**   Yes.
14  **Q.**   Was that device seized?
15  **A.**   Yes.
16  **Q.**   Okay.  I'm going to show you Government's Exhibit 12.
17  This exhibit is actually a placeholder.  Will you describe
18  what that exhibit is?
19  **A.**   That's the same device.
20  **Q.**   Okay.  And is that device in substantially the same
21  condition as the day it was seized?
22  **A.**   Yes.
23          MR. PEARSON:  We would move to admit Exhibit 12.
24          MR. CAPOZZI:  No objection.
25          THE COURT:  Exhibit 12 is admitted.

1          (Plaintiff's Exhibit 12 was admitted into evidence.)

2    BY MR. PEARSON:

3    **Q.**  Were there other cameras located at the residence?

4    **A.**  Yes.

5    **Q.**  How many, approximately?

6    **A.**  There were several.  I don't know -- I don't know the

7    approximate amount.

8    **Q.**  I'm going to show you Government's Exhibits 13.1 through

9    13.4.  They're physical exhibits, I'm going to show you

10   placeholders now.

11         MR. CAPOZZI:  What are we doing.

12         THE COURT:  Trying to pull up a photo.

13   BY MR. PEARSON:

14   **Q.**  All right.  Do you recognize these items?

15   **A.**  Yes.

16   **Q.**  What are they?

17   **A.**  They are very small cameras, and boxes of -- that would

18   likely be stored in there.

19   **Q.**  Were these items seized?

20   **A.**  Yes.

21   **Q.**  And are they here today on the Government's exhibit cart?

22   **A.**  Yes.

23   **Q.**  Are they in substantially the same condition as the day

24   they were seized?

25   **A.**  Yes.

376

1          MR. PEARSON:  We move to admit Government's

2    Exhibit 13.1 through 13.4.

3          MR. CAPOZZI:  No objection.

4          THE COURT:  Were they all seized at the house during

5    that second search?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  13.1 and 13.4 are admitted without

8    objection.

9       (Plaintiff's Exhibit 13.1 and 13.4 was admitted into

10    evidence.)

11          THE COURT:  Would now be a good time to break for the

12    evening?

13          MR. PEARSON:  I probably have 10 or 15 minutes left.

14          THE COURT:  We're going to break.  I'm sorry --

15          MR. PEARSON:  Okay.

16          THE COURT:  -- under other circumstances I wouldn't,

17    but as I advised the parties beforehand, we had conflicts

18    throughout this time that we're working around as best as we

19    can.

20          MR. PEARSON:  Okay.

21          THE COURT:  Ladies and gentlemen, we're going to take

22    our evening recess.  It wasn't very long ago that I've read to

23    you that long admonition of all the things that I need you not

24    to do.  Please keep that admonition, all right?  Have a

25    pleasant evening.

1          Now, tomorrow, we will begin at 1:00 p.m., and we'll

2     go to between 4:30 and 5:00, depending on if we can get a

3     witness done tomorrow between 4:30 and 5:00, so they don't

4     have to come back next week.  We'll probably go a little past

5     4:30.  But we won't go past 5:00 under any circumstances, all

6     right?

7          Have a pleasant evening.  We'll see you tomorrow.

8          (Jury exits courtroom.)

9          THE COURT:  Outside the presence of the jury.

10    I'm sorry, but normally I would let you finish, but

11    prescheduled long ago, Business Trial Lawyers Association that

12    I'm -- dinner that I'm speaking at, that I've got to get to

13    transportation in the next 20 minutes.  And then tomorrow

14    morning, prescheduled Operation Protect and Defend, I'm at

15    Roosevelt High School in the morning.  So I'll -- I'll give

16    you every bit of time I've got, and we'll move forward as best

17    we can, all right?

18          THE COURT:  See you tomorrow at 1:00.

19          MR. PEARSON:  Thank you, Your Honor.

20          MR. CAPOZZI:  Thank you, Your Honor.

21          (Proceedings adjourned at 4:33 p.m.)

22

23

24

25

378

1

2

3          I, RACHAEL LUNDY, Certified Shorthand Reporter, do
hereby certify the foregoing transcript as true and correct.

4

DATED:  21st of November, 2018          /s/ Rachael Lundy
5                                        RACHAEL LUNDY, CSR
                                         Certificate No. 13815
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25