UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DRODZ

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) 1:13-CR-00409 DAD |
| | ) TRIAL DAY 3 |
| ADAM ALAN HENRY, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

Fresno, California                    THURSDAY, NOVEMBER 9, 2017


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES OF COUNSEL:

For the Government:          **DAVID GAPPA and ROSS PEARSON**
                             Assistant U.S. Attorneys
                             2500 Tulare Street, Suite 4401
                             Fresno, CA 93721-1331


For the Defendant:           **ANTHONY CAPOZZI**
                             LAW OFFICE OF PATRICK CAPOZZI
                             1233 W. Shaw Avenue, Suite 102
                             Fresno, CA 93711-3718
Volume 3
Pgs. 379 - 514


REPORTED BY:  RACHAEL LUNDY, CSR #13815
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

380

1                                    INDEX

2    EXAMINATION OFFICER MOORE                            PAGE
          Direct Examination Resumed by Mr. Pearson        382
3         Cross-Examination by Mr. Capozzi                 400
          Redirect Examination by Mr. Pearson              453
4         Recross-Examination by Mr. Capozzi               466

5    EXAMINATION A.T.                                     PAGE
          DIRECT EXAMINATION BY MR. PEARSON                473
6         Cross-Examination by Mr. Capozzi                 477
          Redirect Examination by Mr. Pearson              484
7         Recross-Examination by Mr. Capozzi               485

8    EXAMINATION DETECTIVE ARTHUR HIVELY                  PAGE
          Direct Examination Resumed by Mr. Gappa          486

9

PLAINTIFF'S EXHIBITS

10
     NO.        DESCRIPTION                               PAGE
11

12   1          Computer Tower from Lock-N-Stitch          384

13   1A.7       Forensic Report Created from 1A Shwoing     386
                Presence of MOV Folder on Desktop of
                Lock-N-Stitch Hard Drive (Ex 1A)
14

15   13         Computer Tower from Garage                 387

16   16         Computer Tower from Garage (Ceres PD Item  388
                16)

17   14.1                                                  390
     through    Additional Cameras from Garage
18   14.3

19   19         Angele Henry's Cell Phone seized by FBI at 392
                Burman Drive
20

21   11         Hanging Macrame Plant Holder               398

22   8          Black Computer Tower from Bathroom Closet  399

23   28.12      Photograph of A.T.                         477

24

25

381

1    THURSDAY, NOVEMBER 9, 2017            Fresno, California

2    1:07 p.m.

3            COURTROOM DEPUTY:  The Court recalls case

4    1:13-cr-00409 United States versus Adam Alan Henry, jury trial

5    day 3.

6            THE COURT:  We're outside the presence of the jury.

7    I understand the parties wish to speak to me.  What's the

8    issue?

9            MR. PEARSON:  Your Honor, we have the victim in this

10   case coming to testify this afternoon.  Her father is here

11   with her.  She's asked that he be present in the courtroom.

12   He's listed on our witness list.  And I understand the defense

13   plans to call him.

14           The United States is no longer planning on calling

15   him, and we have no objection to him sitting in the courtroom

16   for her testimony so long as the Defendant's all right with

17   that.

18           THE COURT:  Any objection?

19           MR. CAPOZZI:  I have no objections so long as I can

20   still call him as a witness.

21           THE COURT:  You may.

22           MR. CAPOZZI:  Okay.  I'm fine.

23           THE COURT:  All right.  Resolved?

24           MR. PEARSON:  Yes.

25           THE COURT:  Are we going to interrupt the agent's

1 | testimony to do that?

2 |       MR. PEARSON:  No.

3 |       THE COURT:  All right.  Let's bring in the jury.

4 |   (Jury enters courtroom.)

5 |       THE COURT:  Let the record reflect we're back in the

6 | presence of the jury.

7 |       Sir, if you retake the witness stand.

8 |       And you may continue, Mr. Pearson, with your direct

9 | examination.

10 |           **DIRECT EXAMINATION RESUMED**

11 | BY MR. PEARSON:

12 | **Q.**  Good afternoon, Detective Moore.  I want to step back and

13 | take a few minutes to cover a few things that I missed

14 | yesterday.

15 |       So, first, we played two videos that contained child

16 | pornography yesterday, correct?

17 | **A.**  Yes.

18 | **Q.**  And those would have been Exhibits 1A.3 and 9.5; is that

19 | right?

20 | **A.**  Yes.

21 | **Q.**  So I just wanted to clarify it.  We played about ten

22 | second clips of each.  Were those clips the entire video?

23 | **A.**  No.

24 | **Q.**  What was the total length of the video that we played at

25 | Exhibit 1A.3?

383

1    **A.**  That was a partial downloaded video.  So it was only about

2    30 seconds in length.

3    **Q.**  And what was the total length of the video at Exhibit 9.5?

4    **A.**  It was over 20 minutes in length, the full video.

5    **Q.**  So a few other things just to cover, can we pull up

6    Exhibit 3.7.  This has been previously admitted.

7           All right.  Will you remind the jury what this photo

8    depicts?

9    **A.**  This is depicting the computer that was located on the

10   desk in the IT manager's office at Lock-N-Stitch.

11   **Q.**  And this was the computer that contained the hard drive at

12   Exhibit 1A; is that right?

13   **A.**  Yes.

14   **Q.**  Okay.

15          JUROR 044:  We don't see that.

16          MR. PEARSON:  Will you publish that, please.

17          COURTROOM DEPUTY:  Is it on now?

18          JUROR 044:  Yes, it is.  Thank you.

19   BY MR. PEARSON:

20   **Q.**  Will you please circle the computer?  Thank you.

21          Now, I'm going show you a placeholder for Exhibit 1.

22   Do you recognize this exhibit?

23   **A.**  Yes.

24   **Q.**  What is it?

25   **A.**  That's the same computer.

384

1    **Q.** Okay.  So the same item we just saw a picture of in

2    Exhibit 3.7?

3    **A.** Correct.

4    **Q.** Was this computer seized at Lock-N-Stitch on

5    September 19th, 2013?

6    **A.** Yes.

7    **Q.** And is that computer today on the Government's evidence

8    cart?

9    **A.** Yes.

10   **Q.** And is it in, substantially, the same condition as the day

11   it was seized?

12   **A.** Yes.

13        MR. PEARSON:  We would move to admit Government's

14   Exhibit 1.

15        MR. CAPOZZI:  No objection.

16        THE COURT:  Government's 1 is admitted.

17    (Plaintiff's Exhibit 1 was admitted into evidence.)

18   BY MR. PEARSON:

19   **Q.** Let's go back to Exhibit 3.7 again.

20        All right.  Now, this computer you performed

21   forensics on the hard drive for it, correct?

22   **A.** Yes.

23   **Q.** That would have been Exhibit 1A?

24   **A.** Correct.

25   **Q.** Is the hard drive?

1          Okay.  Now, let's -- I'm going to show you what's

2     been marked Government's Exhibit 1A.7.  Do you recognize this

3     exhibit?

4     **A.**  Yes.

5     **Q.**  What is it?

6     **A.**  This is a screenshot from the Encase forensic software.

7          JUROR 044:  We don't see that again.

8          COURTROOM DEPUTY:  It's not in yet.

9          JUROR 044:  Oh, I'm sorry.

10    BY MR. PEARSON:

11    **Q.**  What does this -- is this exhibit an accurate depiction of

12    the file structure of the hard drive on Exhibit 1A?

13    **A.**  Yes.

14    **Q.**  Okay.  We would move to admit Exhibit 1A.7 and publish to

15    the jury?

16          THE COURT:  Any objection --

17          MR. CAPOZZI:  It's the first time I've seen it,

18    Judge.

19          MR. CAPOZZI:  It's a screenshot of what, Counsel?

20    BY MR. PEARSON:

21    **Q.**  Could you please explain how this exhibit was prepared.

22    **A.**  So this is a screenshot from our forensic software.

23          You can see that we have the hard drive that was

24    located in the computer in the IT manager's office.

25          We have the hard drive listed here with the user

386

1   accounts, and then under that you can see the user account
2   "Adam Henry."
3           There's a folder tree here with parent folders and
4   subfolders.  And you can also see the contents of that folder.
5           MR. CAPOZZI:  No objection.
6           THE COURT:  1A.7 is admitted and may be publish.
7       (Plaintiff's Exhibit 1A.7 was admitted into evidence.)
8   BY MR. PEARSON:
9   Q.  I think we're going to cover the details of this Exhibit a
10  little later on with a different witness.  So we'll move on to
11  when -- September 19, 2013, was the day you searched the
12  Defendant's residence; is that correct?
13  A.  Correct.
14          MR. PEARSON:  Let's pull up Exhibit 5.12.
15  BY MR. PEARSON:
16  Q.  We covered this yesterday.  What does this exhibit depict?
17  A.  This is a picture of the computer -- one of the computers
18  that we located in the garage of the Henry residence.
19  Q.  I'm going to show you a placeholder for Government's
20  Exhibit 13.  Do you recognize this exhibit?
21  A.  Yes.
22  Q.  What is it?
23  A.  It's the same computer.
24  Q.  Okay.  And was this computer seized at the Defendant's
25  residence on September 19, 2013?

1    A.   Yes.

2    Q.   Okay.  Is it, today, on the Government's evidence cart?

3    A.   Yes.

4    Q.   Is it in substantially the same condition as the day it

5    was seized?

6    A.   Yes.

7           MR. PEARSON:  We moved to admit Government's

8    Exhibit 13.

9           MR. CAPOZZI:  No objection.

10          THE COURT:  13 is admitted.

11     (Plaintiff's Exhibit 13 was admitted into evidence.)

12   BY MR. PEARSON:

13   Q.   All right.  Let's pull up Government's Exhibit 5.13.  This

14   is another one we covered yesterday, but what does this

15   exhibit show?

16   A.   It was another computer that was located in the garage of

17   the Henry residence.

18   Q.   I want to show you Government's Exhibit 16.

19          Now, the physical item was admitted yesterday.  So

20   even though we talked about this yesterday I want to make sure

21   this is correct.  Will you please confirm that this photo,

22   placeholder at Exhibit 16 is an accurate photograph?

23   A.   Yes.

24   Q.   And what does it depict?

25   A.   It depicts the computer -- one of the computers located in

388

1   the garage of the Henry residence.

2   **Q.**  Okay.  And is that computer on the Government's evidence

3   cart today?

4   **A.**  Yes.

5   **Q.**  Is it in substantially the same condition as the day it

6   was seized?

7   **A.**  Yes.

8          MR. PEARSON:  Okay.  We would move to admit

9   Exhibit 16.

10         MR. CAPOZZI:  No objection.

11         THE COURT:  16 is admitted.

12     (Plaintiff's Exhibit 16 was admitted into evidence.)

13  BY MR. PEARSON:

14  **Q.**  So that's all the housekeeping items that we needed to

15  cover.  So let's pick up where we finished yesterday.

16         We were talking about the second search of the

17  Defendant's residence.  So will you remind the jury what the

18  purpose of that search was?

19  **A.**  The purpose of that search was for any items that could

20  conceal a hidden camera and for computers and other digital

21  media devices capable of storing digital data.

22  **Q.**  And why, again, were you looking for hidden cameras?

23  **A.**  This was after we did some analysis on the devices we had

24  seized under the original search warrant in which we located

25  hidden camera videos particularly notable to us of an underage

1  female in a bathroom.

2  **Q.**  Okay.  As we broke yesterday, you had just talked about a

3  box of small hidden cameras now in evidence as Government's

4  Exhibit 13.1 through 13.4.

5         I'm going to hand you one of those cameras.  It will

6  be marked as Government's Exhibit 13.1.

7         MR. PEARSON:  May I approach, Your Honor?

8         THE COURT:  You may.

9  BY MR. PEARSON:

10  **Q.**  I've handed you Exhibit 13.1.  Will you please show that

11  to the jury and describe it.

12  **A.**  This is a cardboard box that contains a small digital

13  camera.  And the contents look like it has a camera here, and

14  then it looks like it could be hooked up with video, and left

15  and right audio.

16  **Q.**  How many of those cameras were found?

17  **A.**  I don't recall the exact amount, but there were several.

18  **Q.**  Were there other cameras found in the residence as well?

19  **A.**  Yes.

20  **Q.**  Were those found?

21  **A.**  We located a camera in the master bedroom.

22  **Q.**  I think we talked about that yesterday.  Was that the

23  Canon Vixia camcorder?

24  **A.**  Yes.

25  **Q.**  Were there more cameras found in the garage as well?

390

1    A.   Yes, there were.

2    Q.   I'm going to show you Government's Exhibit 14.1 through

3    14.3.  This is a placeholder for the physical exhibits.  Do

4    you recognize these exhibits?

5    A.   Yes.

6    Q.   And what are they?

7    A.   That's items that were located in the garage of the Henry

8    residence, and in particular, there's a camera there.

9    Q.   Were these exhibits seized during the search on the

10   November 13th, 2013?

11   A.   Yes.

12   Q.   And are they, today, on the Government's evidence cart?

13   A.   Yes.

14   Q.   And are they substantially in the same condition as the

15   day they were seized?

16   A.   Yes.

17        MR. PEARSON:  We move to admit Government's

18   Exhibits 14.1 through 14.3.

19        MR. CAPOZZI:  No objection.

20        THE COURT:  14.1 through 14.3 are admitted.

21    (Plaintiff's Exhibit 14.1 through 14.3 were admitted into

22   evidence.)

23   BY MR. PEARSON:

24   Q.   Were there any phones seized on November 13, 2013?

25   A.   Yes.

1  **Q.**  Would that be Angel Henry's phone?

2  **A.**  Yes.

3  **Q.**  Was that phone logged into evidence as well?

4  **A.**  Yes.

5  **Q.**  I'm going to show you a placeholder for Government's

6  Exhibit 19, which is a physical exhibit.  Do you recognize

7  this placeholder?

8  **A.**  Yes.

9  **Q.**  And what does it depict?

10  **A.**  It depicts the evidence bag that the phone was contained

11  in.

12  **Q.**  Okay.  Is the phone, today, on the Government's evidence

13  cart?

14  **A.**  Yes.

15  **Q.**  Is it in substantially the same condition as the day it

16  was seized?

17  **A.**  Yes.

18          MR. PEARSON:  We move to admit Government's

19  Exhibit 19 --

20          MR. CAPOZZI:  This is a picture of a bag?

21          THE COURT:  Right.

22          MR. CAPOZZI:  What's inside the bag?  Can you --

23          MR. PEARSON:  Can -- may I approach the witness, Your

24  Honor?

25          THE COURT:  You may.

1          MR. PEARSON:  Hand him the physical exhibit.

2     BY MR. PEARSON:

3     Q.  Okay.  I've handed you Government's Exhibit 19.

4          Do you recognize that item?

5     A.  Yes.

6     Q.  What is it?

7     A.  It's an Apple iPhone.

8     Q.  Is that the phone that was seized on November 13, 2013,

9     from Angel Henry?

10    A.  Yes.

11    Q.  Is it in, substantially, the same condition as the day it

12    was seized?

13    A.  Yes.

14          MR. PEARSON:  We move to admit Government's

15    Exhibit 19.

16          MR. CAPOZZI:  No objection.

17          THE COURT:  19 is admitted.

18       (Plaintiff's Exhibit 19 was admitted into evidence.)

19    BY MR. PEARSON:

20    Q.  Based on your observation of the hidden camera videos,

21    were you able to determine where a camera might have been

22    locate in the Defendant's residence?

23    A.  Yes.

24    Q.  Where was that?

25    A.  From the perspective of how the videos appeared, it looked

393

1   as if it were in the upper corner of the shower area in the

2   hallway bathroom.

3   **Q.**  I'm going to show you Government's Exhibit 10.4.

4       Do you recognize this exhibit?

5   **A.**  Yes.

6   **Q.**  What is it?

7   **A.**  That's a picture of the hallway bathroom as it was during

8   the second search warrant.

9   **Q.**  So on -- as it was on November 13th, 2013; is that right?

10  **A.**  Correct.

11  **Q.**  Is it a fair and accurate depiction of the bathroom that

12  day?

13  **A.**  Yes.

14      MR. PEARSON:  Move to admit Government's

15  Exhibit 10.4.

16      MR. CAPOZZI:  What day was that again?

17      MR. PEARSON:  November 13, 2013.

18      MR. CAPOZZI:  13, 2013.

19      THE COURT:  This exhibit has already been admitted

20  10 --

21      MR. CAPOZZI:  10.4.

22      THE COURT:  10.1 through 10.7 were admitted

23  yesterday.  They were the photos taken at the time of the

24  search.

25      MR. PEARSON:  Thank you.

394

1          We move to publish 10.4.

2          THE COURT:  You may.

3   BY MR. PEARSON:

4   Q.  All right.  Will you describe where a camera might have

5   been placed?

6   A.  So I believe --

7          MR. CAPOZZI:  Objection, calls for conjecture, might

8   have been placed.

9          THE COURT:  Sustained.  Lay a foundation.

10  BY MR. PEARSON:

11  Q.  Did you observe videos that were taken from this bathroom?

12  A.  Yes.

13  Q.  Based on your observation of those videos, were you able

14  to determine an angle that a camera might have been shooting a

15  video?

16  A.  Yes.

17  Q.  Will you please point to where that angle would have been?

18  A.  Right about from that area to where this hook is in the

19  ceiling.

20  Q.  So there's nothing there in this picture; is that correct?

21  A.  Nothing other than a hook.

22  Q.  Okay.  And that was on November 13, 2013?

23  A.  Yes.

24  Q.  The second search?

25  A.  Yes.

395

1    **Q.**   Okay.  Did you review pictures of the original search on

2    September 19, 2013?

3    **A.**   Yes.

4    **Q.**   And did you review pictures of that bathroom?

5    **A.**   Yes.

6    **Q.**   And did you notice anything of significance in the

7    bathroom?

8    **A.**   Yes.

9    **Q.**   Please pull up Exhibit 5.9.  This has been previously

10   admitted.

11          What is this a picture of?

12   **A.**   This is a picture of the same bathroom as the previous

13   photograph.  However, it's notable that there is a plant

14   hanging in the upper corner.

15   **Q.**   Was this picture taken on September 19, 2013?

16   **A.**   Yes.

17   **Q.**   And so the date of the first search?

18   **A.**   Correct.

19   **Q.**   Did you look for that plant in the second search?

20   **A.**   Yes.

21   **Q.**   Did you find it?

22   **A.**   Yes.

23   **Q.**   Where was it?

24   **A.**   It was located in the garage.

25   **Q.**   Okay.  Was it seized?

396

1    **A.**   Yes.

2    **Q.**   Logged into evidence?

3    **A.**   Yes.

4    **Q.**   Is that on the Government's exhibit cart today?

5    **A.**   Yes.

6    **Q.**   Was it marked Exhibit 5.9?

7    **A.**   Yes.

8    **Q.**   Is Exhibit 5.9 in substantially the same condition as the

9    day it was seized?

10   **A.**   Yes.

11          MR. PEARSON:  We move to admit Exhibit 5.9.

12          MR. CAPOZZI:  Do we have a picture of it?

13          MR. PEARSON:  You can pull up the placeholder

14   picture, please.

15          MR. CAPOZZI:  So 5.9 is just the picture of it?

16          MR. PEARSON:  5.9 is the physical exhibit.  We have a

17   placeholder.

18          THE COURT:  The photos are in evidence.  The exhibit

19   is not.

20          MR. PEARSON:  I'm sorry.  I apologize.  Government's

21   Exhibit 11.

22          MR. CAPOZZI:  Oh.

23          MR. PEARSON:  I wrote it down wrong.

24          THE COURT:  Yes, 5.1 through 5.14, are the

25   photographs.  They were admitted into evidence yesterday.

1           This exhibit is the physical exhibit pictured in 5.9.

2    It's been marked itself as Exhibit 11.

3           MR. PEARSON:  Yes, Your Honor.

4           MR. CAPOZZI:  It's a planter.

5           THE COURT:  Why don't you do what you did with the

6    phone and show it to the witness.

7           MR. PEARSON:  Yes, Your Honor.

8    BY MR. PEARSON:

9    **Q.**  Just handing you Government's Exhibit 11.  Do you

10   recognize that exhibit?

11   **A.**  Yes.

12   **Q.**  What is it?

13   **A.**  This is the plant that we located.  This is the fake plant

14   and planter that we located in the garage during the second

15   search on November 13th.

16   **Q.**  This was the one that you testified was seized on

17   November 13th?

18   **A.**  Yes.

19   **Q.**  Is it in substantially the same condition as the day it

20   was seized?

21   **A.**  Yes.

22          MR. PEARSON:  We move to admit Government's

23   Exhibit 11.

24          MR. CAPOZZI:  No objection.

25          THE COURT:  11 is admitted admitted.

1      (Plaintiff's Exhibit 11 was admitted into evidence.)

2   BY MR. PEARSON:

3   Q.  Will you please take that plant out of the box that it's

4   in, and hold it up for the jury.

5        You'll have to get closer to the mic, but will you

6   please describe to the jury what you see there.

7   A.  So basically, this is a fake plant, and a planter base

8   here that looks to have been holes cut out into it with a with

9   a dark film colored plastic that's see through.  And it's been

10  cut out on several different portions of the plant base.

11       MR. PEARSON:  Can we pull up Government's Exhibit 5.9

12  again.

13  BY MR. PEARSON:

14  Q.  Again, will you circle where that plant was hanging.  That

15  was on the day of the first search, September 19th?

16  A.  Yes.

17       MR. PEARSON:  One moment, Your Honor.

18  BY MR. PEARSON:

19  Q.  All right.  Can we pull up Exhibit 5.7.

20       Okay.  We showed this you yesterday.  Will you please

21  remind the jury what this is a picture of.

22  A.  This is a picture of a computer and the Netgear NAS that

23  was stored in the master bedroom cabinet -- I'm sorry, master

24  bathroom cabinet.

25  Q.  And was the computer seized that day?

399

1    **A.**  Yes.

2    **Q.**  Okay.  I'm going to show a placeholder for Government's

3    Exhibit 8.  Do you recognize that item?

4    **A.**  Yes.

5    **Q.**  What is it?

6    **A.**  That's the same computer that was just previously

7    pictured.

8    **Q.**  Okay.  It was seized on September 19, 2013?

9    **A.**  Yes.

10   **Q.**  Okay.  Is it today on the Government's evidence cart?

11   **A.**  Yes.

12   **Q.**  Is it in substantially the same condition as the day it

13   was seized?

14   **A.**  Yes.

15        MR. PEARSON:  We move to admit Government's

16   Exhibit 8.

17        MR. CAPOZZI:  No objection.

18        THE COURT:  8 is admitted.

19      (Plaintiff's Exhibit 8 was admitted into evidence.)

20        MR. PEARSON:  Nothing further, Your Honor.

21        THE COURT:  Any cross-examination?

22        MR. CAPOZZI:  Yes.  Just a minute, Judge, I'm trying

23   to --

24        THE COURT:  Of course.

25   ///

400

1                         CROSS-EXAMINATION

2    BY MR. CAPOZZI:

3    Q.  Detective Moore, was there an FBI Agent Whitney on this

4    case?

5    A.  Yes.

6    Q.  Was he there on that November date when you went back in

7    on the search?

8    A.  November 13, 2013?

9    Q.  Yes, yes.  Was he there?

10   A.  Yes.

11   Q.  Do you have his report there?

12   A.  I do not have his report.

13   Q.  Okay.  Do you know whether or not he went into that

14   bathroom on that day on that search?  Was he the one in charge

15   of the bathroom area?

16   A.  I don't know.

17   Q.  Were you there on that search?

18   A.  Yes.

19   Q.  Who recovered the planter in the garage?

20   A.  I can't recall.

21   Q.  Do you know whether or not it was Agent Whitney or --

22   A.  I don't know.

23   Q.  You didn't --

24   A.  (No audible response.)

25   Q.  Do you know whether or not that camera was in the bathroom

1  and taken out and put in the garage by one of the men

2  searching or agents searching?

3  **A.**   I know that the -- I'm sorry.  Are you asking if the

4  planter was removed or --

5  **Q.**   Yes.

6  **A.**   -- or the camera?

7  **Q.**   Do you know one way or the other?

8  **A.**   So the planter was located in the garage --

9  **Q.**   I understand.

10  **A.**   When we arrived at the residency, it was there in garage.

11  **Q.**   So you found the planter in the garage before you ever

12  went into the house?

13  **A.**   So when we do a search warrant, we do an overall security

14  sweep of the residence before we begin searching for items.

15  **Q.**   Did you go into the bathroom to see no planter there?

16  **A.**   Yes.

17  **Q.**   You did?

18  **A.**   I did.  It was one of the most important things we were

19  looking for.

20  **Q.**   Okay --

21  **A.**   -- was what was in that bathroom.

22  **Q.**   Okay.  Now, did you put together the affidavit for the

23  search warrant of Lock-N-Stitch and for Burman, the

24  Defendant's house?

25  **A.**   I did.

402

1   **Q.**  Yeah, you did the affidavit?

2   **A.**  Yes.

3   **Q.**  Right.  And in the affidavit you indicated you have

4   experience in doing these kinds of cases?

5   **A.**  Yes.

6   **Q.**  Correct?

7         And how many cases had you worked on prior to this

8   time?

9   **A.**  It -- approximately 30.

10  **Q.**  Pardon me?

11  **A.**  Approximately 30.

12  **Q.**  30?

13  **A.**  Involved in that -- this specific type of crime.

14  **Q.**  Okay.  And in those 30 cases that you were involved with,

15  did you find that the people who downloaded child pornography

16  were very sophisticated?

17  **A.**  It's -- comparative.  Generally, maybe not as much.

18  **Q.**  As they thought they were?

19  **A.**  As they thought they were.

20  **Q.**  In -- what I'm trying to get to you is, in your search

21  warrant affidavit, the one for Lock-N-Stitch, going

22  specifically on page 4, here's some words that were written.

23  And let me know if this what you put down, okay:

24       "By virtue of my training and experience, I have

25  become familiar with the methods used by criminals to comit

1  their crimes, and the sophisticated tactics they routinely

2  used to attempt to thwart investigations into their illegal

3  activities?"

4        You put that in your affidavit?

5  A.  Sounds familiar.

6  Q.  Yeah, okay.  You pretty much put them into all your

7  affidavits for these kinds of cases?

8  A.  Generally, through law enforcement training and experience

9  we've become familiar with how criminals attempt to thwart law

10  enforcement --

11  Q.  Can you speak into the --

12  A.  Sorry, I don't know what was heard and --

13  Q.  I don't hear as well as I used to.

14        Anyway, would you say that Mr. Henry was

15  sophisticated in terms of all the computers he had in the

16  networking he had set up?

17  A.  Yes.

18  Q.  Yeah, okay.

19        You didn't ultimately interview him, did you?

20  A.  No.

21  Q.  It was Mr. Hively?

22  A.  Detective Hively.

23  Q.  Okay.  All right.  In your investigation of this case, did

24  you -- and other cases that you've had, did you find that

25  these videotapes, the child porn, would be encrypted?

404

1   **A.**   There -- I am aware that there are sometimes encrypted

2   containers or volumes or files on occasion, yes.

3   **Q.**   And what do I mean when I say "encrypted"?  What does that

4   note to you?

5   **A.**   Essentially, without a key or password entered in you

6   wouldn't able to access those files due to its complex

7   encryption algorithm.

8   **Q.**   Is that different than just having a password?

9   **A.**   Yes.

10   **Q.**   How is it different?

11   **A.**   Well, encryption, depending on what type of encryption, it

12   is usually very complex and hard to crack, if you will.

13   **Q.**   Okay.  And did you find any encryptions on anything here

14   in any of these videos?

15   **A.**   No.

16   **Q.**   None?

17          Did you find hidden files?

18   **A.**   No.

19   **Q.**   In other cases that you've had, have you seen hidden

20   files?

21   **A.**   I have seen encrypted files.

22   **Q.**   And hidden files?

23   **A.**   I've seen encrypted containers.

24   **Q.**   Isn't encryption and hidden the same thing?

25   **A.**   Essentially, if you're attempting to hide a file, yes.

1   Q.   None of that in this case?

2   A.   No.

3   Q.   No?

4        When you went to the first search in September 23,

5   2013, you were provided passwords, were you not?

6   A.   Yes.

7   Q.   Was it you, or was it Detective Hively?

8   A.   I was provided, with --

9   Q.   You were --

10  A.   -- some passwords.

11  Q.   This was at his house; is that correct?

12  A.   Yes.

13  Q.   All right.  Were you provided the password for his

14  computer?

15  A.   His pass -- his computer was unlocked.

16  Q.   Unlocked?

17  A.   I did not have a --

18  Q.   So --

19  A.   -- did not provide --

20  Q.   You didn't need a password to get into it?

21  A.   No.

22  Q.   Was that item 3, the computer in the living room?

23  A.   Yes.

24  Q.   Okay.  That's item number 3, the one in the living room

25  with the monitor there.  Did you find any child porn on

1    Mr. Henry's computer, that item 3?

2    **A.**   No.

3    **Q.**   None?  Okay.

4          And was the password protected, that computer?

5    **A.**   No.

6    **Q.**   It was not.  Anyway --

7          THE COURT:  Sorry.  I want to interrupt for a second.

8          You referred to item 3.

9          MR. CAPOZZI:  Which is different than exhibits --

10   you're right.

11         Which exhibit number was item 3?  Which ones were the

12   pictures of it?

13         THE COURT:  It's the five series.

14         MR. CAPOZZI:  Yes.  Thank you, Judge.

15         THE COURT:  I just want to make sure that --

16         MR. CAPOZZI:  Good point.

17         THE COURT:  -- what everybody is talking about is the

18   same thing.

19         MR. CAPOZZI:  It's Exhibit 5.1, and I'm not sure how

20   to display it.

21         Can you display it?

22   BY MR. CAPOZZI:

23   **Q.**   Now, referring to Exhibit 5.1 that's in front of the jury

24   now, that was Mr. Henry's computer?

25   **A.**   Yes.

1   Q.   That's the one in the living room?

2   A.   Correct.

3   Q.   No child porn on that?

4   A.   No.

5   Q.   Now, did he give you passwords that you requested to get

6   into certain computers?

7   A.   Yes.

8   Q.   And it was stitch@11?

9   A.   Correct.

10  Q.   And there was a few other passwords; were there not?

11  A.   Correct.

12  Q.   And the second one was stitch@ -- I think it's hashmark

13  11?

14  A.   I'd have to refer to my report.  I couldn't tell --

15  Q.   Could you do that?

16  A.   Sure.

17       I have the four passwords that he provided me.

18  Q.   What were they?

19  A.   Stitch@11, stitch@#11.

20  Q.   Pound sign, yes.

21  A.   Stitch11, and pink lagoon.

22  Q.   Okay.  And under that pink lagoon was the Aurrora and

23  media file?

24  A.   Pink lagoon was also the host name for the NAS device.

25  Q.   Okay.  That set, you're talking about?

1   **A.**   Correct.

2   **Q.**   All right.  Now, you were aware that Angele Henry had come

3   out to California in 2008, 2009?

4   **A.**   I don't recall the exact time that she came out.

5   **Q.**   Okay.  You were aware at some point she brought out her

6   children to live with him?

7   **A.**   Yes.

8   **Q.**   Okay.  And you were aware that in -- well, was it 2011

9   that she came out with her kids and moved in?

10  **A.**   I believe that was the time frame.

11  **Q.**   Do you remember when they got married?

12  **A.**   I might have documented it in my report.

13  **Q.**   October 2011 sound familiar?

14  **A.**   Sounds about right.

15  **Q.**   All right.

16          When you went through the house did you see -- the

17  house and the garage, on the first search, did you see a lot

18  of computers and computer parts all over the place?

19  **A.**   I saw a significant amount of computers, I would say, for

20  a single family residence.

21  **Q.**   Were there parts in the garage?

22  **A.**   I can't recall exactly everything that was in the garage.

23  **Q.**   Do you know whether or not people dropped off their

24  computers at his house for him to repair?

25  **A.**   I would have no way of knowing that.

1    Q.  Do you remember anybody telling you that?

2    A.  Angele Henry told me that.

3    Q.  Okay.  Isn't it true that she had access to all of these

4    computers?  She told you that?

5    A.  I don't know if she had access to all of the computers.

6    Q.  Did she tell you that?

7    A.  I can't recall.  I'd have to read my report.

8    Q.  Can you take a look?

9    A.  Sure.

10            I remember the interview now.

11   Q.  I'm sorry, sir?

12   A.  I remember what she said about the computer.

13   Q.  What did she say?

14            MR. PEARSON:  Objection, hearsay.

15            MR. CAPOZZI:  Well --

16            THE COURT:  Sustained.

17            MR. CAPOZZI:  Okay.

18   BY MR. CAPOZZI:

19   Q.  Were you aware that she had access?

20   A.  She claimed that --

21            MR. PEARSON:  Objection, hearsay.

22   BY MR. CAPOZZI:

23   A.  Were you aware that she had access --

24            THE COURT:  The objection is overruled.  The question

25   is appropriate.  Witness may answer.

1    THE WITNESS:  She claimed that she technically had

2    access to all of the computers.  However, she did not have

3    access to all of the passwords.

4    BY MR. CAPOZZI:

5    Q.  Okay.  Were you aware that she was -- enjoyed adult

6    pornography?

7    A.  Yes.

8    Q.  Were you aware that she specifically liked sex and

9    submission types of pornography?

10   A.  Yes.

11   Q.  Were you aware that she liked females dressed up with mild

12   bondage?

13   A.  Yes.

14   Q.  Were you aware that she liked role playing?

15   A.  Yes.

16   Q.  Were you aware that Adam Henry just liked normal sex?

17   A.  According to her --

18   Q.  Right.

19   A.  -- yes.

20   Q.  Right.

21        Were you aware that she like costuming and costume

22   play?

23   A.  Yes.

24   Q.  Were you aware that she liked bondage types of sex?

25        MR. PEARSON:  Your Honor, I'm going to object on

411

1    grounds of hearsay and foundation.

2           MR. CAPOZZI:  I can ask how he's aware.

3           THE COURT:  It appears that all of this is elicited

4    from the Defendant's then wife.

5           MR. CAPOZZI:  And follow up with that in terms of

6    looking at --

7           THE COURT:  Well, why don't you ask -- why don't you

8    rephrase the question.

9    BY MR. CAPOZZI:

10   Q.   Okay.  Were you -- did you look at any of these videos?

11   A.   Which videos?

12   Q.   Well, did you see any videos with bondage?

13   A.   Which videos are you talking about?  I saw -- are you

14   talking about adult pornography videos?

15   Q.   Yes.

16   A.   Yes.

17   Q.   Okay.  Bondage?

18   A.   Yes.

19   Q.   Sex and submission --

20   A.   Yes.

21   Q.   -- yes?

22          Were you aware that she liked little girls in skirts?

23   A.   I'm not aware that she liked little girls in skirts.

24   Q.   Did you see any passwords or search words that said

25   "skirts, little girls"?

412

1    A.  I'd have to refer to the search terms.

2    Q.  I'll get to those.  I'll get to that.

3        Were you aware that she knew what Peer-to-Peer was?

4    A.  She mentioned she had heard of it before, but she wasn't

5    really that experienced with it.

6    Q.  Okay.  Was the word "torrent" ever mentioned?

7        MR. PEARSON:  Objection, hearsay.

8        MR. CAPOZZI:  I could ask.

9        THE COURT:  Rephrase.  Sustained.  Rephrase.

10   BY MR. CAPOZZI:

11   Q.  Were you aware of the word "torrent"?  Were you aware that

12   the word "torrent" was used when you interviewed her?

13       MR. PEARSON:  Objection, hearsay.

14       THE COURT:  That's a poor question.  Sustained.

15       MR. CAPOZZI:  I know.

16   BY MR. CAPOZZI:

17   Q.  Did the word "Limewire" ever come up with Adam Henry?

18   A.  Interviewing with Adam Henry --

19   Q.  Well, you didn't interview Adam Henry; did you?

20   A.  No.  You asked if I was aware.

21   Q.  Did the word "Limewire" come up with Mr. Henry or

22   Mrs. Henry?

23   A.  Again, I can't recall if Limewire was mentioned.

24   Q.  Okay.

25   A.  I'd have to review the --

413

1   Q.  That's fine.

2   A.  -- interview.

3   Q.  In the reports that you did -- and I'm just picking out

4   these reports, item number 18 which, is the loose disc?

5   A.  It's a hard drive that --

6   Q.  Hard drive.

7   A.  -- that's located in the desk --

8   Q.  Okay.

9   A.  -- of the --

10  Q.  You did you find 45 child porn videos on that?

11  A.  Yes.

12  Q.  And three of them were bondage?

13  A.  Yes.

14  Q.  And item number 9 was that the Netgear --

15  A.  Yes.

16  Q.  -- NAS?  Yes?

17  A.  Yes.

18  Q.  There were 103 child porn?

19  A.  Correct.

20  Q.  And seven bondage?

21  A.  Yes.

22  Q.  So that's a total of 148 child porn.  Ten of those being

23  bondage; is that correct?

24  A.  Correct.

25  Q.  Now, is there more than that 148.  I saw another number

414

1    somewhere else.

2    **A.**   Total.

3    **Q.**   Yes, total?

4    **A.**   I don't have the number of the total child pornography in

5    this case.

6    **Q.**   Somewhere between 148 and 200?

7    **A.**   At least.

8    **Q.**   Okay.  Somewhere I saw 205 does that sound familiar, child

9    pornography?

10   **A.**   Again, I'd have to -- I don't know.  I'd have to review to

11   know the total.

12   **Q.**   All right.  Could you tell whether or not the Defendant's

13   home computer that was item number 3, the one in that picture,

14   was tied into his computer at work?

15   **A.**   There was some analysis conducted on that, and I did not

16   conduct that analysis.

17   **Q.**   Okay.  Who did?

18   **A.**   Detective Hively.

19   **Q.**   All right.  Going to Exhibit 2, if you could pull that up

20   for me.

21           MR. CAPOZZI:  Exhibit 2.  It is that one sheet.  Yes,

22   there we go.

23   BY MR. CAPOZZI:

24   **Q.**   If you look at the IP address, can you read that for the

25   jury?

415

1   A.  Can we zoom in again?

2   Q.  Can you see it -- oh.

3   A.  71 --

4   Q.  Oh, thank you.

5   A.  -- dot 94.43.84.

6   Q.  Now, that's the IP address for the computer in Mr. Henry's

7   office?

8   A.  At Lock-N-Stitch?

9   Q.  Yes, that's it.  I'm sorry.  Thank you.

10          That's the computer that had the Shareaza and the

11  downloads on it?

12  A.  Correct.

13  Q.  Okay.  If we go to Exhibit 31.1; is that -- if you can

14  look at 31.3; is that a screenshot of Mr. Henry's computer at

15  home?

16  A.  This isn't from my analysis.

17  Q.  Okay.  So you haven't done this one?

18  A.  No.

19  Q.  No, okay.

20          We'll wait for Detective Hively on that, then.  Thank

21  you.

22          Did you do an analysis of the Aurrora folder at all?

23  A.  Yes.

24  Q.  You did?

25          Isn't it true in your report that you indicated there

416

1    were 2.7 terabytes on your Aurrora share?

2    **A.**   I believe that sounds about right.

3    **Q.**   Okay.  And you did an analysis of the Defendant's user

4    account, and there were 2.1 terabytes on the Defendant's user

5    account on Netgear.  Does that sound right?

6    **A.**   I'm sorry.  What was the question?

7    **Q.**   Okay.  2.7 terabytes on the Aurrora folder.  So, big?

8    **A.**   I believe it was 2.7 terabytes on the NAS.

9    **Q.**   Okay, on the NAS.

10            Okay.  And then, on Mr. Adam -- Mr. Henry's user

11   account there were 2.1 terabytes that were used?

12   **A.**   I'd have to refer to my report.

13   **Q.**   Can you do that, please?

14   **A.**   Sure.  So what I believe you're referring to is, there

15   were over two terabytes of data under the Adam user account

16   placed onto the NAS.

17   **Q.**   He put 2.1 terabytes onto the NAS, right?

18   **A.**   Approximately.

19   **Q.**   And there was 2.7 on the NAS; is that correct?

20   **A.**   I don't -- I don't have that information about the exact

21   total of data.  Unless you see it in something I'm not aware

22   of.

23   **Q.**   Hold on.

24            If I can show you one of your reports.

25            MR. CAPOZZI:  Judge, may I approach?

417

1          THE COURT:  You may.

2     BY MR. CAPOZZI:

3     Q.   And right there where I put the -- right there.

4     A.   That's --

5     Q.   Do you recall that?

6     A.   I do.

7     Q.   Okay.  What does that mean?  Because it's beyond me.

8     A.   A very large quantity of data.

9     Q.   Very large quantity of data on the Aurrora folder?

10    A.   I'd have to confirm if it's just the Aurrora folder or

11    both.

12    Q.   Okay.

13    A.   Okay, yes.  This was the Aurrora folder.

14    Q.   2.7 Terabytes of information on that?

15    A.   Approximately.

16    Q.   Okay.  And the amount of information from Mr. Henry's user

17    account was 2.1 terabytes.  So there's a difference of about

18    .6?

19    A.   Well, we're dealing with approximates in my report.

20    Q.   That's fine.

21    A.   I didn't mathematically calculate the exact number.

22    Q.   But there's approximately 2.1 on his user account; 2.7 on

23    the other account.  The difference is .6, I would assume;

24    somewhere around there.

25    A.   Without the numbers in front of me --

418

1   **Q.**   Okay.

2   **A.**   -- I can't guarantee that.

3   **Q.**   And we're approximating.

4   **A.**   We're approximating?

5   **Q.**   Yeah.

6   **A.**   But I can't guarantee that --

7   **Q.**   Where did that additional information come from that was

8   the Aurrora, if it didn't come from Mr. Henry's user account?

9   **A.**   Well, that's inferring that what you're saying is correct,

10  which has not been verified.

11  **Q.**   Well, let's -- I want to be correct.

12         You said there was 2.7 terabytes on the Aurrora file;

13  is that correct?

14  **A.**   Approximately.

15  **Q.**   Have you found a report where you said there were -- 2.1

16  was his other account?

17  **A.**   I said over 2 terabytes.

18  **Q.**   I'm sorry?

19  **A.**   I believe I said over 2 terabytes.

20  **Q.**   Do you have that report?

21  **A.**   I think you pointed it out to me.  Actually, it might be

22  on this additional one here.  It's a 15-page report.  It's

23  page 7.  I said over two terabytes of data on this.

24  **Q.**   But you didn't say 2.7?

25  **A.**   No, I said over 2.

419

1    Q.   Okay.  So if there's a difference between 2.1 or 2 and 2.7

2    there's a gap of .6, .5, whatever?

3    A.   Potentially.

4    Q.   If we're on -- okay.

5         Where did that other information come that was put on

6    the Aurrora if it didn't come from Mr. Henry?

7    A.   Well, there's obviously operating system overhead and

8    whatnot for the NAS itself.

9    Q.   Explain that.

10   A.   So the NAS is a device.  It requires a file structure and

11   also requires administrative management of files on the NAS.

12        So that's going to take up some reserve space on the

13   actual device itself.

14        So you have an area where you can store your personal

15   data, and -- but the NAS, and I don't have -- since it's a

16   propriety software, I don't have access to that.  You'd have

17   to ask the developer how much space is reserved for the NAS,

18   administratively.

19        But then you'd also have to understand how the NAS

20   works, and it works with parodies.  So some of it is

21   duplicating the data so that if one of those drives goes bad,

22   it can rewrite to that drive that's replaced.

23   Q.   Are you saying you can't tell for sure where that

24   information came from?

25   A.   I'd have to do some additional research to verify if those

420

1  numbers --

2  Q.  Those numbers --

3  A.  -- what you're saying, are correct.

4  Q.  Okay.  I'm just going from your reports.

5  A.  Yes, I said over 2 terabytes on that additional report,

6  so...

7  Q.  Okay.  Let's go through the investigative protocol you

8  used in this case.

9       This was Peer-to-Peer like you spoke about earlier.

10  You know, I'd like to go in your Peer-to-Peer analysis.  I

11  think it was exhibit -- is it 6, when you dealt with Shareaza,

12  and you put in the terms "Yellow Submarine"?

13       MR. CAPOZZI:  Oh, can you pull that one up?

14  BY MR. CAPOZZI:

15  Q.  Is it on your screen?

16  A.  Yes.

17  Q.  Okay.  So the term you put in was "Yellow Submarine," and

18  what comes out are anything related to Yellow Submarine would

19  be on that list.  Is there's something that's unrelated to

20  Yellow Submarine?  For example, Sea of Tide, Sea of Holes, are

21  those songs?

22  A.  I'm not familiar with that.  It could potentially be

23  unrelated.  It might have the word "submarine" in it.  Hence,

24  it says "Sea of Tide," so could be a tag of submarine there.

25  Q.  In the Shareaza I saw on the one of the screens -- let's

1   see -- multiple downloads -- this was the Shareaza Beatles

2   Yellow Submarine --

3            I don't think that that's the same.  Is this the same

4   one?

5   **A.**  I believe it's the last slide.

6   **Q.**  Okay.

7   **A.**  This shows the two downloaded files.

8   **Q.**  Yes, there you go.

9            Okay.  Referring to go over to the right where you --

10  can you circle where it says "bit torrent."

11           Is that -- do you see that there?

12  **A.**  It might be cut off on my end.

13           MR. CAPOZZI:  Can I approach, Judge, and show him the

14  one I have?

15           THE COURT:  Yes.

16           THE WITNESS:  Okay.  I see there.

17  BY MR. CAPOZZI:

18  **Q.**  Do you see?

19  **A.**  I see what you're referring --

20  **Q.**  Can you circle it for me?

21  **A.**  Sure.

22  **Q.**  What is "torrent"?

23  **A.**  Torrent is -- a torrent file is basically a file that has

24  information about specific files that can be found on the

25  Peer-to-Peer network.

422

1    **Q.**   Okay.  But torrent is tied into Peer-to-Peer?

2    **A.**   Correct.

3    **Q.**   Okay.  Going back to your protocol -- investigative

4    protocol here, you told us how the case came about through

5    your software, that those numbers came up at Lock-N-Stitch; is

6    that correct?

7    **A.**   Yes.

8    **Q.**   You have a computer running in your office that's

9    monitoring the files, you saw some child pornography to this

10   address, right -- or tell us --

11   **A.**   Well, the data is collected through the Child Rescue

12   Coalition, and that data is accessed through law enforcement,

13   through this web based portal.

14          So we can log in, and we can receive that data that

15   they've collected.  And that data, again, is pushed out from

16   the suspect.  It's not taken from them.  It's pushed to the

17   servers, and they collect that data.

18   **Q.**   But on your software you saw that IP address; is that

19   right?

20   **A.**   I did log in, and I was able to see that IP address.

21   **Q.**   So you went to the hash values and matched to that hash

22   value what that video was; is that correct?

23   **A.**   Correct.

24   **Q.**   You couldn't pull it up from Lock-N-Stitch computer, could

25   you?

1  **A.**  No, I could not.

2  **Q.**  No.

3          Once you found out/verified that your software and

4  tied it into those hash values, did you attempt to connect to

5  the computer at Lock-N-Stitch to get what the videos were?

6  **A.**  My law enforcement edition software was able to make a

7  connection with the Shareaza program that was running at

8  Lock-N-Stitch and was able to initiate a browse host and was

9  able to see the notable files to us, which were 24 child

10  pornography files.

11  **Q.**  To you, but you never got it from the computer at

12  Lock-N-Stitch, did you?

13  **A.**  I did not actually download a child pornography from

14  Lock-N-Stitch.

15  **Q.**  Isn't it a fact that any device to have distribution from

16  Lock-N-Stitch in any of these files was in place, that you

17  couldn't do it?

18  **A.**  I'm sorry --

19  **Q.**  Wasn't there a device on the Lock-N-Stitch computer that

20  prevented anyone from seeing anything that was coming in?

21  **A.**  I'm not aware of a device that would prevent us --

22  **Q.**  Well, it's not a device.  I'm using the wrong word.

23  **A.**  Essentially, what it is, is the information is being

24  pushed out from his -- or from the lock -- the computer at

25  Lock-N-Stitch is pushing out that information, broadcasting

424

the Peer-to-Peer network.  I have these files.  I want to participate in these files, because I have a percentage and need the rest of these files.

So the Peer-to-Peer network relies on information being shared from computers on this network.  So that information is collected that's been pushed out from the computers, and --

Q.  But wasn't the ability to share from that computer shut down?

A.  At the time of the seizing device, it's possible that it was turned off -- uploading was turned off.

Q.  Right.  You weren't able to take anything from computer, were you?

A.  I was not able to get a download from the computer at Lock-N-Stitch.

We rely on the hashes to verify that they are the same exact file.

Q.  Right.  From somewhere else, but not from Lock-N-Stitch?

A.  Correct, we --

Q.  Correct.

A.  -- we use the hashing values.

Q.  All right.

Now, wouldn't it be true that none of these videos -- because of that prohibition of downloading them or sharing them, isn't it true that none of those videos could ever be

1    shared?

2    **A.**   No, that's not true.

3    **Q.**   Not true?  It's the device is -- not device, whatever you

4    do in terms clicking to prevent sharing, you're saying that

5    was never done in this computer?

6    **A.**   Well, what it is is -- it's, you have the ability to

7    accept downloads, which means you're receiving packets of

8    files from the Peer-to-Peer network.

9           You can also stop uploading so you could prevent it,

10   but that's easily turned off and on.

11   **Q.**   Right.  But it was turned off here; wasn't it?

12   **A.**   At the time of the seizure of the device we believe it may

13   have been turned off.

14   **Q.**   Believe?

15   **A.**   I haven't verified that.

16   **Q.**   Who did the inspection of that computer?

17   **A.**   I conducted the analysis along with my partner,

18   Detective --

19   **Q.**   You can't tell us if that was shut off?

20   **A.**   I don't have that information.

21   **Q.**   Did you put it in your report?

22   **A.**   I don't believe I put in there that sharing was turned

23   off.

24   **Q.**   Wouldn't that be important?

25   **A.**   I believe it could be important, yes.

1   **Q.**   What Peer-to-Peer application was Mr. Adam Henry?

2   **A.**   Shareaza.

3   **Q.**   Only Shareaza?

4   **A.**   That I know of.

5   **Q.**   Okay.  Which version of Shareaza was he using?

6   **A.**   2.6.0.0.

7   **Q.**   That was back then in 2013 or '12?

8   **A.**   Yes.

9   **Q.**   Give me those numbers again.

10  **A.**   2.6.0.0.

11  **Q.**   Okay.  There are a number of varieties of Shareaza; are

12  there not?

13  **A.**   There's has been several versions of Shareaza.

14  **Q.**   Does it get updated as years go on?

15  **A.**   I believe so.

16  **Q.**   You've told us what Shareaza is is sharing information

17  from other computers coming in; is that basically it?

18  **A.**   File sharing.

19  **Q.**   Files.  I'm sorry, yeah.

20          So you download a file in Shareaza, the user would

21  insert a search term -- like we did with Yellow Submarine --

22  and send it out through Shareaza; is that correct?  Through

23  the Shareaza system?

24  **A.**   Well, Shareaza is the program that uses the Peer-to-Peer.

25  So there are several networks that are out there.  Shareaza is

1    a program that utilizes that.

2    **Q.**   Okay.  And you can select the categorize such as video,

3    music, adult, software; isn't that correct?

4    **A.**   Correct.

5    **Q.**   Once someone does this, Shareaza will search other user's

6    computers around the world for files that match that search

7    criteria; isn't that correct?

8    **A.**   It will search information about what other computers have

9    basically advised that they have.

10   **Q.**   Okay.  And does Shareaza require a search term or can it

11   search by category alone?

12   **A.**   I don't believe that it would be beneficial to just search

13   by category alone.  You'd have to have a search term in order

14   to know what you're looking for.

15   **Q.**   Do you know if a user does use a search term, does that

16   have to appear in the file name?

17   **A.**   No, the search term does not have to appear in the file

18   name.  There could be tags associates with that.

19   **Q.**   So if a user used the search term and selected a category

20   such as "adult video" the -- the results could be a result of

21   the search term entered, correct?

22   **A.**   If you typed in "adult video."

23   **Q.**   Right.

24   **A.**   You would get results related to adult and videos.

25   **Q.**   And if a user used the term search and selected categories

428

1    such as "adult video," results could be a result of the

2    category entered; could it not?

3    **A.**  I'm not familiar with that category, that categorization

4    for searches.

5    **Q.**  If search results were the result of a selected category,

6    then it would be reasonable that the search term used may not

7    be present, correct?

8    **A.**  I'm not familiar with that feature.

9    **Q.**  Okay.  Now, once the user performs a search, Shareaza

10   populates a search return window with the file names and other

11   information like the size of the file, the number of persons

12   who have it -- have it available for downloading; isn't that

13   correct?

14   **A.**  Yes.

15   **Q.**  Okay.  Does the Shareaza give a preview image or sample

16   file for the person searching the file to determine -- read

17   that again.

18          Does Shareaza give a preview image or sample of file

19   for the person searching for the file to view prior to

20   downloading?  I mean, can they see what's on the video before

21   they download?

22   **A.**  Yeah, I'm not familiar with being able to do that.  You

23   could initiate a download, and you would be able to preview

24   what portion of that has already been download.

25          For instance, if you began and initiated a download

1    of a video, as those packets are coming in and if you had

2    enough of those packets to have a portion of the video that

3    was viewable, you could view portions of that.

4    **Q.**   Okay.  So is the person downloading, can they see, the

5    contents of the file before they download it?

6    **A.**   They can see them after they've initiated a download.

7    **Q.**   After.

8    **A.**   Sometimes after the completion of the download, depending

9    on the type of file and how much has been downloaded.

10   **Q.**   But when it comes down to it, they have to rely on the

11   name listed; don't they?

12   **A.**   Essentially, you have to rely on your search terms --

13   **Q.**   Right.

14   **A.**   -- having specific to what interest the file you're

15   looking for, yes.

16   **Q.**   Even with the search terms you put in, doesn't at types of

17   other information come in unrelated?

18   **A.**   There are times that the file -- or the hit results that

19   you get appear to be unrelated to what your interest may have

20   been.  There could be tags or something like that as -- for

21   instance, the example that you provided were Sea of Monsters.

22   It's at submarine.  So it's related, but may not be of your

23   specific interest per se.

24   **Q.**   So are file names reliable in the Shareaza world?

25   **A.**   File names are, essentially, a way to narrow down your

1   search and kind of focus to what you're looking for.  But as

2   far as reliability of exactly what the title says, no, because

3   again, titles can change -- titles of files can change, but

4   the hash values cannot.

5   **Q.**   In your expert experience, have you seen file names with

6   common child pornography terms in them which are not child

7   porn?

8   **A.**   Yes.

9   **Q.**   So just because the file name says you're downloading an

10   adult movie, it could be child porn?

11   **A.**   Yes.

12   **Q.**   If the title says, it's child porn it may very well be

13   completely legal adult pornography; isn't that correct?

14   **A.**   Yes.

15   **Q.**   When you install Shareaza, is there a folder called

16   "incomplete" created on a computer?

17   **A.**   Yes.

18   **Q.**   What's the purpose of the incomplete folder?  Why is that

19   there?

20   **A.**   Again, the incomplete folder is there by means of storing

21   the downloaded files as they progressively grow in size until

22   the completion, and then they are moved to the downloads

23   folder.

24   **Q.**   So when a file --

25   **A.**   So essentially, a temporary folder.

1  Q.  I'm sorry.

2          So when a file is in the process of downloading.  The

3  file is stored in the incomplete folder; isn't that correct?

4  A.  Correct.

5  Q.  So once the file begins downloading -- the downloading

6  process, the file is available for sharing?

7  A.  Actually, the file is available from the first packet you

8  download.  So you could actually be uploading the same packets

9  that you have before you've even completely downloaded the

10  rest of the file.

11          Because you've got understand that the Peer-to-Peer

12  network relies on packet of files not full complete files.

13  Q.  But this is done automatically; isn't it?

14  A.  It's written into the development of the software.

15  Q.  So the user has no part in process, does he?

16  A.  The user's only part in that process is by searching for

17  related search terms, locating those results, double clicking

18  them, and saving them or discarding them.

19  Q.  Once file the is completed the downloading, it is moved to

20  the shared folder automatically by the Shareaza program; isn't

21  that correct?

22  A.  It's moved to the downloads folder by default.  However,

23  users have the ability to change that location to a different

24  location, if they choose.

25  Q.  Okay.  Does a user have to be present for this process to

1  occur?

2  **A.**  The user has to be present for the initial set up of

3  Shareaza, which basically allows you to change the location of

4  where the completed files are going to.

5         But once you set -- set those parameters, you do not

6  have to present once you launch the program and it begins it's

7  process of downloading files that you selected.

8  **Q.**  So once the downloading process begins, no user

9  interaction or presence is needed?  That's what you just said?

10  **A.**  Right.  Once you launch it, you don't have to remain

11  sitting there for any reason.

12  **Q.**  Was adult pornography also found either downloaded or

13  partially downloaded on this Lock-N-Stitch computer?

14  **A.**  Yes.

15  **Q.**  Lots of it?

16  **A.**  Yes.

17  **Q.**  Weren't there approximately 752 downloads or videos?

18  **A.**  I believe there was over 700 incomplete files that are

19  there.

20  **Q.**  How many of those were child porn?  27?

21  **A.**  There were 40 that were viewable.

22  **Q.**  42?

23  **A.**  There was a very large significant amount that were not

24  viewable either, because there wasn't enough of it

25  downloaded -- or there was -- it was just the initiation of

1    progress.  So zero of it was downloaded or only a few packets

2    that weren't viewable.

3            I was only able to locate 40 that enough of the

4    packets downloaded that were viewable were child pornography

5    videos.

6    Q.  But of the 752, 40 were child pornography?

7    A.  Of the 700 and something?  I feel like it was 727.

8    Q.  Oh, you're right.  727, yes.

9    A.  Okay.

10   Q.  Did you uncover any evidence that those child porn videos

11   were looked at?

12   A.  No.

13   Q.  Opened up and looked?

14   A.  No.

15   Q.  No?

16   A.  No.

17   Q.  And you checked for that?

18   A.  I have no way of knowing if he viewed -- I'm sorry.  I

19   have no way of knowing if the user viewed those videos.

20   Q.  Or if anyone used those -- or saw those videos?

21   A.  I have no way of knowing that.

22   Q.  Again, I think you said that you didn't -- wait the -- do

23   you know if the Shareaza application settings were set not to

24   allow sharing at the time the computer was seized?

25   A.  I believe that the sharing -- the upload was -- uploading

1   was turned off at that time.

2   **Q.**  So it couldn't be shared?

3   **A.**  At that time.

4   **Q.**  Right.  Well, at that time Mr. Henry wasn't even there at

5   the business when you guys seized it; is that correct?

6   **A.**  Correct.

7   **Q.**  So I think -- are you saying, then, there's no evidence

8   whatsoever that any of the files in question were ever shared

9   or distributed to anyone; isn't that correct?

10  **A.**  Correct.

11  **Q.**  All right.  In your experience as a forensic investigator,

12  how do you go about establishing a particular user is

13  responsible for a certain activity on a computer?  What do you

14  do?

15  **A.**  Well, we rely on the evidence that we have.  So in this

16  case, we have a computer that was only allowed access by the

17  IT manager.  We have the IP address and the GUID, globe unique

18  identifier that's pointing to this was, in fact, the computer

19  that we had identified prior to the search warrant at the

20  business.

21          And we also rely on the fact that we have interviews,

22  and that Adam Henry admitted to my partner that he had

23  downloaded and used Shareaza and that he had seen child porn

24  videos on there and he was aware that they were there.

25          And the fact that he had a complex network set up in

435

1   his residence, and we also located child pornography videos

2   there that were indicative and very similar to the same files

3   that we had seen on the Shareaza program including -- the

4   browse host and network activity, and the incomplete video

5   files.

6   Q.  Okay.  The question was:  How do you go about

7   establishing?  You just told us what you did in this case; is

8   that correct?

9   A.  Right.  So --

10  Q.  Okay.  Let me ask you a question.

11  A.  Okay.

12  Q.  Don't you do a timeline analysis?

13  A.  I'm sorry?

14  Q.  Timeline analysis?

15  A.  In regards to?

16  Q.  Well, the files on the computer can be sorted by time and

17  date; is that correct?

18  A.  Yes.

19  Q.  You can look for anything peculiar to a specific person in

20  around the dates of importance; true?

21  A.  True.

22  Q.  Yes, okay.

23       So for example, if they -- someone checks their

24  email, if someone checks their password protected email, a

25  Facebook page for instance, and that's contemporaneous with a

436

1   download of child porn, wouldn't that be pretty good evidence

2   of who was doing the download?

3   **A.**   Are you saying that if someone was logged into their

4   Facebook at the same time that there was a download --

5   **Q.**   Yes.

6   **A.**   -- that could be a portion of evidence that would be

7   really relevant to the case?

8   **Q.**   Pretty strong?

9   **A.**   Yes.

10  **Q.**   Did you do a timeline analysis of Mr. Henry's computer?

11  **A.**   We have documented the dates and times related to the

12  child pornography.

13  **Q.**   But do you know who was at the keyboard when these movie

14  files were downloaded?

15  **A.**   No.

16  **Q.**   All you know is, and be honest, is that Adam Henry's

17  computer was being used, correct?

18  **A.**   Correct.

19  **Q.**   You don't know who was in that room at those times that

20  those search terms were put in, do you?

21  **A.**   No.

22  **Q.**   If someone else had Mr. Henry's password for that

23  computer, or he just simply remained logged in for days at a

24  time, anyone could have started those downloads at

25  Lock-N-Stitch; couldn't they?

1    A.  Yes.

2    Q.  And of -- the question I have is, when those downloads are

3    put in, and I think we have a period of time, and I'll get to

4    a period of time.  It was sometime in May 2013 to June 2013;

5    is that correct?

6    A.  If we're referring to the incomplete files --

7    Q.  Yes.

8    A.  Those were the created dates.  There was May 28 and

9    June 3rd.

10   Q.  Thank you.

11          And the point is, it takes a long time for those

12   files to be download; does it not?

13   A.  It depends on the file.

14   Q.  Well, in September when you went in and did the search,

15   weren't files still being downloaded?

16   A.  Yes.

17   Q.  And that was from the terms that were put in in May of

18   2013 and June.  And you're there in September.  They're still

19   being download, correct?

20   A.  Correct.

21   Q.  So that was a large number of files; was it not?

22   A.  It's a large number of files.

23   Q.  So if someone else besides Mr. Henry was be behind these

24   downloads, you couldn't tell unless you had some evidence of

25   someone being there and seeing it happen?

438

1    **A.**   Correct.

2    **Q.**   Okay.  Now, what's a file creation date?  What's that

3    mean?

4    **A.**   File creation date is the date that the file was placed on

5    to the volume.  So in this case placed onto the hard drive.

6    **Q.**   But what does that mean?

7    **A.**   So that --

8    **Q.**   Yes, go ahead.  Explain it.

9    **A.**   So on a Windows operating system, whenever a file is

10   placed onto the volume there is a date that is created.

11   **Q.**   When you say "placed on a volume," what do you mean?

12   **A.**   That means if you download a file, if you move it to a

13   file, or if you copy it to -- if you move it to the operating

14   system where you copy it.

15   **Q.**   So when something is downloaded, it creates a file date?

16   **A.**   It does.

17   **Q.**   Okay.  If I take that and move it somewhere else, what

18   happens in the dates?

19   **A.**   On that new volume, a new created date.

20   **Q.**   Another date comes up?

21   **A.**   Yes.

22   **Q.**   What if I copy to another file?

23   **A.**   If you place it onto the same volume, it would maintain

24   the same created date.

25            If you place it on a different volume, it would have

439

1    a new created date.

2    **Q.**   When you say "volume," what do you mean "volume"?

3    **A.**   So a logical volume is the partition, the space that that

4    operating system and that installation is occupying.

5            So in this case, Adam Henry's user environment, if

6    you will, when it -- when that -- when that file is placed

7    onto that incomplete folder, it is given a created date.

8    **Q.**   So the created date could be anywhere from that June date

9    to September date?

10   **A.**   It would be as soon as that file was entered into -- so,

11   basically, what it is is, it's an NTFS file system.  That's

12   what Windows uses.

13           And in the NTFS file system, there's a master file

14   table, and the master file table keeps track of every single

15   file that's allocated to that device.

16           So when there's an entry made in the master file

17   table, that's where the created date is.

18   **Q.**   Okay.  And if it's taken from that computer or that volume

19   and moved somewhere else, doesn't it keep the same date?

20   **A.**   If it's on the same volume it would keep the same created

21   date.  If it's moved somewhere else, depending on the file

22   system, it would be given a new created date.

23   **Q.**   You say it's moved to another volume.  Is that another

24   computer?

25   **A.**   Sure.

440

1   **Q.**   What if something was copied to another computer?

2   **A.**   If it was another volume -- so if it was another one, yes,

3   it would have a new created date.

4   **Q.**   How does it keep the same date when it's taken from here

5   and put somewhere else?

6   **A.**   Because it already has an entry in the master file table.

7   So if it's on the same volume it already has the created date.

8   **Q.**   It would stay the same, then?

9   **A.**   Sure.  If it's moved around the same volume, it still has

10   the same entry.

11   **Q.**   Okay.  All of these files that you've got from

12   Lock-N-Stitch had a created date?

13   **A.**   Are we talking about the incomplete folder files?

14   **Q.**   Yes.

15   **A.**   Yes.

16   **Q.**   Okay.  Did you compare those creation times with

17   Mr. Henry's work schedule to see if he was even there?

18   **A.**   I do not have a list of his work schedule.

19   **Q.**   You didn't check it?

20   **A.**   But, I mean -- :

21   **Q.**   Yes or no, did you check it?

22   **A.**   I didn't check it.

23   **Q.**   Okay.  Did somebody else?

24   **A.**   I believe that we have seen the work schedule, but you'd

25   probably have to ask my partner that.

441

1    **Q.**  That's fair.

2          Now, if Mr. Henry was moving the pornography from

3    Lock-N-Stitch's computer to his home network, external drive,

4    would he necessarily have had to look at those before he

5    transferred them?

6    **A.**  No.

7    **Q.**  And you don't know whether or not he did see those before

8    he put them on a thumb drive and took them to the Netgear?

9    **A.**  I don't know for sure.

10   **Q.**  Okay.  Would it be a fair statement that there was a great

11   deal of adult pornography also being downloaded at

12   Lock-N-Stitch through the Shareaza program when you got there?

13   **A.**  Yes.

14   **Q.**  Yeah.

15         Would it be to fair to say there were literally

16   hundreds of other adult porn videos in the process of

17   downloading at the time you arrived there?

18   **A.**  Yes.

19   **Q.**  So --

20         MR. CAPOZZI:  Judge, I have a few more questions, but

21   I need to review my notes.  Can we take a break?

22         THE COURT:  All right.  We'll take our afternoon

23   recess.  We'll reconvene at 2:40 -- I think at 2:42, a

24   15-minute recess.

25         Ladies and gentlemen, please heed the Court's

442

1  previous admonition.

2       (Jury exits courtroom.)

3          THE COURT:  Let the record reflect that we are

4  outside the presence of the jury.  Are we going to be able to

5  get her on and done?  Think so?

6          MR. PEARSON:  Yes.

7          THE COURT:  All right.

8       (Recess taken.)

9       (Jury enters courtroom.)

10         THE COURT:  Let the record reflect we're back in the

11  presence of the jury.

12         Mr. Capozzi, you may continue with your

13  cross-examination.

14         MR. CAPOZZI:  Thank you, Judge.

15  BY MR. CAPOZZI:

16  Q.  Detective Hively, did you have a chance to locate that

17  report that we were talking on the 2.1 terabytes and 2.7?

18  A.  I'm Detective Moore.

19  Q.  I'm sorry.  You don't even look alike.

20         Were you able --

21  A.  To answer your question, yes.

22  Q.  Thank you.

23         In that report what's the date of the report?

24  A.  Can I refer to my report?

25  Q.  Sure, sure.

443

1    **A.**   This was documentation of an analysis that was conducted

2    between November 12, 2015, and November 13, 2015.

3    **Q.**   You were asked to go back and relook at the evidence,

4    weren't you?

5    **A.**   Yes.

6    **Q.**   Okay.  Did you then do an analysis of Mr. Henry's user

7    account on the Netgear?

8    **A.**   Yes.  I did an analysis on both user accounts that were on

9    the Netgear.

10   **Q.**   And then Mr. Henry's account -- you tell me, what was the

11   number?

12   **A.**   It was roughly a little over 2 terabytes, about 2.1

13   terabytes, maybe, 2.2.

14   **Q.**   Tell us what you said in your report.

15   **A.**   Over 2 terabytes.

16   **Q.**   It doesn't say 2.1?

17   **A.**   I'm looking at the data here and without a calculator --

18   but it's a little over 2 terabytes.

19   **Q.**   On the next page, isn't there a screenshot?

20   **A.**   Yes.

21   **Q.**   What does the screenshot say?

22   **A.**   The screenshot confirms it was over 2 terabytes.

23   **Q.**   What does the screenshot say?

24   **A.**   2,120, 696 megabytes.

25   **Q.**   So 2.1, what?

1   **A.**   Terabytes.

2   **Q.**   So it's around 2.1?

3   **A.**   Yes.

4   **Q.**   And there was 2.7 on the Netgear Aurrora folder?

5   **A.**   Correct.

6   **Q.**   So there's a gap of .6; is that a lot of space?

7   **A.**   Yes.

8   **Q.**   You don't know how that got there?

9   **A.**   Well, I have -- there's possible reasons.

10  **Q.**   Sure.  You can say --

11  **A.**   I'm sorry?

12  **Q.**   You're going to say Mr. Henry did it?

13  **A.**   Did what?

14  **Q.**   Put it on there?  Put the excess --

15  **A.**   Well --

16  **Q.**   You didn't know who did it, do you?

17  **A.**   Well, I'd have to -- I'd have to do additional analysis to

18  determine when that user account was created.

19          Of course, the administrator account, which has full

20  access to the entirety of the NAS.  And then there were two

21  user accounts set up as well.  One was Adam, and one was

22  Angele.

23          The Adam user account has roughly over two terabytes

24  of data that was entered on there.  I don't know when the Adam

25  account was created.  So 600 gigabytes could have been added

445

1    from a different user account and deleted, and this new user

2    account could have been created and only put 2.1 terabytes, so

3    that would reflect under that user account.

4           Without doing additional analysis, I can't confirm

5    it, but that would be most likely that there was another user

6    account that might have been deleted beforehand.

7    Q.  That could have been Angele Henry?

8    A.  Could have been any user account, I'm sure.

9    Q.  That's fair.

10          Do you know if she had the password to the Aurrora

11   file?

12   A.  She said she didn't.

13   Q.  She said she didn't, but was she aware of the passwords

14   that were being used?

15   A.  With my interview with her she said there were passwords

16   that were being used that she didn't have access to.

17   Q.  Didn't she -- aren't you aware that she was able to view

18   the Aurrora file?

19   A.  She said that she had viewed files from the NAS, but I

20   don't believe she specifically said she viewed them from the

21   password protected Aurrora share.

22   Q.  But if she had the password, she would have access to all

23   the computers, would she not?

24   A.  If you have the password, you would have full access to

25   anything on the share if you had the administrator password.

446

1   **Q.** Did you do a timeline analysis of the Aurrora folder to

2   see if there was anything in particular to Angele or Adam

3   around the time of the movement of the child porn files to

4   that file?

5   **A.** So the Aurrora share was being used as data storage.  So

6   it wouldn't really document -- as he had given the example

7   earlier about Facebook or something like that.  I mean, this

8   is a data storage device, if you will.  It doesn't document

9   when someone logs in to Facebook, as the example was provided

10  earlier.

11  **Q.** So there's no way to check it; is that what you're saying?

12  **A.** Not on that device, no.

13  **Q.** Okay.  Let's go 1A.4 if you could would, sir.

14       MR. CAPOZZI:  Can you blow it up?  Can you make it

15  any bigger?

16       All right, it is okay.

17  BY MR. CAPOZZI:

18  **Q.** Okay.  Looking at Exhibit 1A4 tell us what this is.

19  There's three pages of it.

20  **A.** This is an artifact from the Shareaza program that

21  indicates there were 56 search terms entered into the

22  application program.

23  **Q.** Was the last term the word "corset"?

24  **A.** That was listed as "search dot 01" was "corset."

25  **Q.** What was the date and the time?

447

1   **A.**  Well, the only date and time that's documented in this --

2   on this piece of evidence would be June 3, 2013.

3   **Q.**  What does that mean?  Why is it there?

4   **A.**  That essentially means that that was the last time that

5   this file was written to.  This entry was written to.

6   **Q.**  Okay.  It says "UTC."  What does that mean?

7   **A.**  That's Universal Time code.

8   **Q.**  What does that mean?

9   **A.**  That's basically the time code that we base all of our

10  other time codes off of.  So in this particular instance, it

11  would be seven hours ahead of Pacific Time, which is our time

12  code.

13  **Q.**  So says 21:19:29.  Would that be in our time?  Do you have

14  any idea?

15  **A.**  So 3:00.

16  **Q.**  Okay.

17  **A.**  Or 4:00, sorry.

18  **Q.**  That's fine.

19          But it's "corset" --

20          THE COURT:  Well, if it was seven hours difference,

21  is what you said?

22          THE WITNESS:  Depending on the time of the year.  I'd

23  have to look it up, because we have the daylight savings time

24  also.  I don't recall if June 3rd or not would fall into that,

25  whether it's seven or eight hours.

448

1   BY MR. CAPOZZI:

2   Q.   Okay.  Anyway, corset.  Corset, you were aware, that was

3   one of the interests of Angele Henry?

4   A.   Yes.

5   Q.   Down below it -- oops, I guess I --

6        There's corset.  And as we go down, "mommy/me,

7   mom/daughter, daughter/mother," are those child porn?

8   A.   That search term for Peer-to-Peer I would suspect would

9   result in results coming back for adult pornography,

10  incest-type pornography, and child pornography based on the

11  fact that mom and daughter -- daughter could be underage

12  daughter or adult daughter.  I mean, depending on how the

13  video, if we're using that as a file example what it would

14  depict.

15       Somebody who is participating in a trading of those

16  types of files would generally name that file "mother and

17  daughter," if it depicted what the contents of that video

18  would be.

19  Q.   Let's keep going down.  We'll go down to "skirt."

20  Remember the word "skirt"?  You've heard that before?

21  A.   Yes.

22  Q.   From Adam Henry -- no, Angele Henry?

23  A.   Angele Henry, yes.

24  Q.   Little girls in short skirts, do you recall that?

25  A.   I don't recall the little girls, but I'd have to review

449

1    the...

2    **Q.**   R@YGOLD is clearly child porn, correct?

3    **A.**   Yes, yes.

4    **Q.**   Then we have strip and costume porn.  Do you recall

5    costume porn being mentioned by Angele Henry?

6    **A.**   Yes.

7            MR. CAPOZZI:  Let's go to the next page, if you

8    would, sir.

9    BY MR. CAPOZZI:

10   **Q.**   Costume porn again.

11          Here's the preteen; is that considered child porn?

12   **A.**   Yes.

13   **Q.**   Let's see -- oops.  Costume pornography, PTHC, that's

14   child porn, right?

15   **A.**   Yes.

16   **Q.**   Child porn, preteen is child porn, is underage?

17   **A.**   Yes.

18   **Q.**   Then we have "costume" again.  And "medieval."  Do you

19   know whether or not Angele Henry was interested in renaissance

20   and medieval activities?

21   **A.**   I do.

22   **Q.**   And "renaissance," she was clearly interested in

23   renaissance; wasn't she?

24   **A.**   Yes.

25   **Q.**   How about bedroom dancing?  Don't know what that is?

1    **A.**  I don't know.

2    **Q.**  All right.  And then the next search term there, does that

3    look like it's French to you?

4    **A.**  I don't know.  I don't know French, so...

5    **Q.**  Okay.  "Bedroom dancing, paroles," P-A-R-O-L-E-S, "de la,

6    chanson," C-H-A-N-S-O-N.

7    **A.**  Again, I don't speak any additional languages other than

8    English, so I don't know.  But it does look like it's partial

9    English and something else.

10   **Q.**  You knew Angele Henry was from Canada?

11   **A.**  Yes.

12   **Q.**  Do you know whether or not she had a French background in

13   speaking the language?

14   **A.**  I don't know that.

15   **Q.**  Okay.

16        MR. CAPOZZI:  Judge, if I may just have a moment?

17        THE COURT:  Yes.

18        MR. CAPOZZI:  I should be done.

19        Oh, one another point I forgot to bring up.

20   BY MR. CAPOZZI:

21   **Q.**  The term -- the first date on top was June --

22        MR. CAPOZZI:  Can we go to that first page again?

23   BY MR. CAPOZZI:

24   **Q.**  Was June 3, 2013, at 21:19:29.

25        If you go to Exhibit 1A.6.  If you look at the last

1   date down here, right here.

2        MR. CAPOZZI:  Can you pull that up at all?

3   BY MR. CAPOZZI:

4   **Q.**  That's June 3rd, 2016?

5   **A.**  Correct.

6   **Q.**  Yes?  At 2:23:25?

7   **A.**  Correct.

8   **Q.**  And that's about three minutes after that term is put in;

9   isn't that correct, that last term, which was "corset"?

10  **A.**  I believe so.

11  **Q.**  Okay.

12  **A.**  Well, that -- well, that depends if it was search 01 or if

13  it was search.56.

14  **Q.**  Okay.

15  **A.**  You'd have to ask the developers of Shareaza on how they

16  make those entries.  I don't know.

17       MR. CAPOZZI:  Just, I've got one minute, Your Honor.

18       I'd like to pose to the witness, Your Honor, just one

19  police report if I can, to see if he can identify it.

20       THE COURT:  You want to approach?

21       MR. CAPOZZI:  We have it here.  We can put it on his

22  screen, if that's possible.

23       THE COURT:  Yes, not to be publish.

24       MR. CAPOZZI:  Yes.

25  ///

1    BY MR. CAPOZZI:

2    **Q.**  Is that on your screen, Detective?

3    **A.**  Yes.

4    **Q.**  Is that a report from FBI Agent Lucas?

5    **A.**  It appears to be.

6    **Q.**  Okay.  Does that help refresh your recollection as to

7    where that plant was when the search happened?

8    **A.**  I've never seen this report before.

9    **Q.**  Does that report indicate the --

10   **A.**  Can I read it?

11   **Q.**  -- plant was in the bathroom?

12            MR. PEARSON:  Objection.

13            THE COURT:  Sustained.  Strike the answer.

14            MR. CAPOZZI:  Yes.

15            THE COURT:  Jury to disregard.

16   BY MR. CAPOZZI:

17   **Q.**  Did you read it?

18   **A.**  Oh, I -- I'm sorry.

19   **Q.**  Did it help refresh your recollection as to --

20   **A.**  I wasn't reading it.  I'm sorry.

21   **Q.**  Sorry.  Specifically, that second paragraph as to where he

22   said the plant was.

23            THE COURT:  The question, Detective, is whether

24   reviewing that report from the FBI agent refreshes your

25   recollection as to where the plant was found during the

453

1   search.

2           THE WITNESS:  Thank you, Your Honor.

3           It doesn't change my recollection.  I remember the

4   plant being in the garage.

5           MR. CAPOZZI:  Okay.  Thank you.  No more questions.

6           THE COURT:  Any redirect?

7           MR. PEARSON:  Yes, Your Honor.

8                      **REDIRECT EXAMINATION**

9   BY MR. PEARSON:

10  **Q.**  All right.  Detective Moore, let's talk a little bit about

11  computers again.  Kind of going back to the start here.  We

12  have Exhibit 6, page 2 up.  Will you please describe what this

13  is.

14  **A.**  This is a computer.

15  **Q.**  This is the type of computer that you normally see?  We

16  see some in the courtroom here, correct?

17  **A.**  Correct.

18  **Q.**  And did you find a computer setup like this in the

19  Defendant's house?

20  **A.**  At least one.

21  **Q.**  Okay.  Let's go to Exhibit 5.1.  Do you see the computer

22  in that picture?

23  **A.**  Yes.

24  **Q.**  Will you please circle that?

25          Right in the living room, right?

454

1    **A.**   Yes.

2    **Q.**   This is the computer you did not find any child

3    pornography on, correct?

4    **A.**   Correct.

5    **Q.**   Let's go to Exhibit 5.7.  What is this a picture of?

6    **A.**   This is a picture of a computer and the NAS in the master

7    bathroom counter.

8    **Q.**   The NAS is the one you found child pornography on; is that

9    right?

10   **A.**   Yes.

11   **Q.**   Will you circle the NAS.

12            Now, that looks like a little different than what you

13   showed us in your presentation, right?

14   **A.**   As far as the computer part, yes.  It's a different device

15   other than --

16   **Q.**   There's no --

17   **A.**   -- traditional --

18   **Q.**   No, keyboard on --

19   **A.**   No keyboard.

20   **Q.**   No monitor on it?

21   **A.**   No monitor.

22   **Q.**   So you actually can't sit there and type something in and

23   have a screen pop up, right?

24   **A.**   Correct.

25   **Q.**   So how do you access this device then?

455

1   A.   You would need to use a computer.

2   Q.   Okay.  And will you just describe the process how that

3   works?

4   A.   So basically this network attached storage device is just

5   a device that's identified on a network.

6        Its given its own IP address so when you log in to

7   your computer, you can access the files stored on the network

8   attached storage device through a computer.

9        You can access it from a computer in one room or a

10  computer in an another room or a computer in another room as

11  long as they're all in the same network, you can access that

12  device.

13  Q.   What's the benefit of having a NAS?

14  A.   The benefit for a NAS is that there's faster read and

15  write speeds.  There's also redundancies, so if one of the

16  drives goes bad, you can replace it, because it backs up the

17  data with parody and mirroring.

18       Another function is that it has multiple drives, so

19  it's large storage capacity.  And also you can backup your

20  computers to that device.  So it could be like a backup.

21  Q.   Okay.  And with Adam Henry's NAS, were you able to access

22  it from the living room computer?

23  A.   Yes.

24  Q.   Okay.  So going back to Exhibit 5.1.  You were able to sit

25  at that desk and access the NAS?

456

1   **A.**   Yes.

2   **Q.**   That data would be stored on the NAS, correct?

3   **A.**   Correct.

4   **Q.**   But no child pornography found on that computer?

5   **A.**   No child pornography found on the computer in the living

6   room, no.

7   **Q.**   Can you explain why you didn't do a timeline analysis on

8   the NAS?

9   **A.**   Well, you can't really do a timeline analysis on the NAS,

10  per se.  I think what was the concept that was provided

11  earlier was maybe timeline analysis on a computer to see who

12  was logged in at the time of a child pornography file being

13  downloaded.

14  **Q.**   Okay.  So the NAS is like it's a big storage box, right?

15  **A.**   Right.

16  **Q.**   Okay.  So you want to be able get onto your Facebook on

17  the NAS, right?

18  **A.**   No, you can't.

19  **Q.**   Browse the internet, or anything like that?

20  **A.**   No.

21  **Q.**   It would just be somewhere you can store files, videos,

22  music, correct?

23  **A.**   Any -- any digital file can be stored there.

24  **Q.**   And a significant amount, right?

25  **A.**   Depending on how many drives you had in there and what the

1  size of the drives were.

2  Q.  All right.  Now, you testified there were over 2 terabytes

3  on this NAS; is that correct?

4  A.  Correct.

5  Q.  Sorry.

6         Over the -- the Adam account had written over 2

7  terabytes on this NAS, right?

8  A.  Correct.

9  Q.  2.1 terabytes, I think we heard?

10  A.  Yes.

11  Q.  And there were a total of 2.7 terabytes, right?

12  A.  Correct.

13  Q.  And we don't know who wrote those other .6 terabytes,

14  correct?

15  A.  Correct.

16  Q.  Now, you did perform account analysis on the NAS, though;

17  is that right?

18  A.  Account analysis?

19  Q.  Sorry.  User account analysis?

20  A.  Yes.

21  Q.  Okay.  And you found that there were -- there was an Adam

22  account and an Angele account, right?

23  A.  Yes.

24  Q.  Okay.  And the Adam account had written over 2 terabytes

25  on this device?

458

1   **A.** Correct.

2   **Q.** Okay.  Had the Angele account written any data on the

3   device?

4   **A.** Zero.

5   **Q.** Okay.

6   **A.** No data was written.

7   **Q.** So we can't say where this other .6 terabytes came from,

8   correct?

9   **A.** No.

10  **Q.** But we can say it didn't come from the Angele account; is

11  that right?

12  **A.** Correct.

13  **Q.** Let's take a look at what was on the NAS.

14          MR. PEARSON:  Can we pull up Exhibit 9.3?

15  BY MR. PEARSON:

16  **Q.** All right.  What is this exhibit again?

17  **A.** So this is showing a folder structure with parent folders

18  and subfolders, that if you drill down to a folder saved

19  within folders, ultimately we get down to two specific folders

20  that are notable to us.

21          One is called "kid," and one is "no."

22  **Q.** And this was from the NAS; is that right?

23  **A.** This was from the password protected share on the NAS.

24  **Q.** And did Angele Henry tell you if she had the password for

25  that side of the NAS?

1    **A.**   She did not have the password to --

2    **Q.**   Did Adam Henry?

3    **A.**   Adam Henry provided me with the password.

4    **Q.**   And there was a lot of adult pornography on this side; is

5    that right?

6    **A.**   Yes.

7    **Q.**   Okay.  Now, there's also child pornography, correct?

8    **A.**   Yes.

9    **Q.**   Is it common for -- in your experience, for people who

10   download child pornography to also have a lot of adult

11   pornography?

12                MR. CAPOZZI:  Objection, calls for conjuncture, and

13   lack of foundation on this case.

14                THE COURT:  Sustained as to lack of foundation.  I

15   don't know whether it's conjecture.

16   BY MR. PEARSON:

17   **Q.**   Detective, how many child pornography investigations have

18   you participated in?

19   **A.**   Numerous.  At the time of this investigation,

20   approximately 30.

21   **Q.**   Okay.  And in those 30 investigations, did you ever

22   encounter a defendant who didn't have adult pornography on

23   their computer?

24   **A.**   No.

25   **Q.**   Now, is it possible if you were searching for adult

460

1   pornography to accidently download child pornography?

2   A.   Yes.

3   Q.   So it can happen?

4   A.   Yes.

5   Q.   In theory, you could group download all those files,

6   correct?

7   A.   You can select multiple files to be downloaded, yes.

8   Q.   And they could accidently end up on your computer, right?

9   A.   Potentially, yes.

10  Q.   Okay.  We heard you say the names aren't always accurate

11  also; is that right?

12  A.   Correct.

13  Q.   If you had -- was this folder here, the kid folder, was

14  that the default location for Shareaza downloads?

15  A.   No.

16  Q.   So if someone had downloaded a file from Shareaza, they

17  would have had to take some steps to get that file to the kid

18  folder; is that right?

19  A.   Yes.

20  Q.   Let's look at what was in the kid folder.  Go to

21  Exhibit 9.4, please.

22          MR. PEARSON:  All right.  Can we go to page 2 of this

23  exhibit, and then let's blow up numbers 14 and 15.

24          MR. CAPOZZI:  This is 9.4.

25          MR. PEARSON:  9.4.

1  BY MR. PEARSON:

2  **Q.**  Will you please read the file title for number 14?

3  **A.**  "PJK," under score, "brothers 13-year old and 12-year old

4  having wild husband/wife sex.  Kitty, boy, Lolita, R@YGOLD

5  underage."

6  **Q.**  Okay.  Will you explain what the file path shows in this

7  Exhibit?

8  **A.**  The file path shows that previous folder structure that we

9  were looking at under the password protected share side of

10  Aurrora, ultimately with parent folders and subfolders

11  drilling down to the -- it being contained in the folder

12  "kid."

13  **Q.**  Okay.  So let's say, hypothetically, that this video had

14  been downloaded with a batch of adult pornography.  How would

15  it have ended up in this folder labelled "kid"?

16          MR. CAPOZZI:  Objection, calls for conjecture, and

17  vague and ambiguous.

18          THE COURT:  Sustained.

19          Not as to vague and ambiguous, but I don't think

20  you've established a foundation.

21  BY MR. PEARSON:

22  **Q.**  How would this video end up in the kid folder?

23          MR. CAPOZZI:  Same objection, lack of foundation.

24          THE COURT:  Sustained.

25          MR. PEARSON:  May I have a minute, Your Honor?

462

1    BY MR. PEARSON:

2    Q.  All right.  Let's go back Exhibit 9.3.

3         Will you explain where you found that video we just

4    saw on Exhibit 9.4?

5    A.  That was on the Aurrora password protected side in the

6    folder "kid."

7    Q.  So underneath another folder, called "bad," correct?

8    A.  Well, it was in the subfolder, new folder, which in

9    another subfolder, new folder.  And in that subfolder "bad"

10   under subfolder, sordid.

11   Q.  So sorted, bad, new folder, new folder, kid?

12   A.  Yes.

13   Q.  Did that video contain child pornography?

14   A.  Yes.

15   Q.  Let's go back to Exhibit 9.4 for a second.

16        MR. PEARSON:  We'll go back to page 2 and blow up

17   number 14 and 15, please.  Actually, let's do number 28 --

18   yes.

19   BY MR. PEARSON:

20   Q.  Will you please read that file title.

21   A.  "PTHC, family, one, mom, 16YO, son, and 6YO daughter have

22   orgy."

23   Q.  In that title we have mom/daughter; is that right?

24   A.  Yes.

25   Q.  Okay.  But where was this file located?

463

1    **A.**   Under the folder, "kid."

2    **Q.**   Okay.  And under, at some point, "sordid" and "bad" also;

3    is that right?

4    **A.**   Correct.

5    **Q.**   Did you view this video?

6    **A.**   Yes.

7    **Q.**   What was in the video?

8    **A.**   It depicted child pornography.

9    **Q.**   All right.  Now, this side of the computer was password

10   protected; is that right?

11   **A.**   Yes.

12   **Q.**   Okay.  We heard that it wasn't encrypted or hidden; is

13   that right?

14   **A.**   Well, it was hidden in the fact that it was password

15   protected, but it was not encrypted.

16   **Q.**   So if you didn't have a password you wouldn't be able to

17   access this folder?

18   **A.**   Correct.

19   **Q.**   Okay.  And we also heard you talk a little bit about

20   Shareaza's sharing functions.  Can you explain what that

21   means?

22   **A.**   So in Shareaza, in order to participate in Peer-to-Peer

23   file sharing, the whole model is reliant upon people trading

24   files depending on whatever the interest is.  It could be

25   music, could be videos, could be adult pornography, it could

1    be child pornography.

2          If order for files to be downloaded, someone has to

3    allow uploading to occur.  So the program works in the fact

4    that there's a queueing process.  If you are allowing files to

5    be uploaded, you will receive faster downloads, because you

6    will be brought up to the top of the queue.  You will be

7    identified on the network as -- by your GUID identifier as the

8    installation that's sharing.

9          Some people attempt to thwart law enforcement by

10   turning off the uploading, but what happens is it results them

11   into a lower queue where they're not downloading as fast as

12   they would probably like.  They're not getting as many packets

13   for files of interest.  This can result in files taking a

14   really long time to download.  Oftentimes these packets come

15   in a lot slower if you're not sharing.

16         We know that some suspects will turn on sharing to

17   get enough files they want and turn off uploading almost in a

18   way to kind of thwart law enforcement from their IP being

19   exposed for too long.

20         Of course, we will most likely capture that IP

21   address at some point in time.  The more uploading they're

22   doing also results in the more downloading they're doing.  So

23   they're more exposed on the Peer-to-Peer network to law

24   enforcement.

25   Q.   Okay.  So if someone had sharing turned off, you would

465

1  still be able to see their activity; is that right?

2  **A.**  Yes.  Because the sharing or downloading of files isn't

3  necessarily what's reported.  What's reported is -- to the

4  network from that installation is how much of a file they

5  have, and what file they have.

6          That's how the whole network works.  It relies on all

7  of the peers communicating with each other, Hey, I have this

8  part of the file, you have this part of the file.  Let's

9  trade.

10          If one computer is attempting to connect to the other

11 one, and the upload is turned off, they still know what the

12 other installation has.  They still know it's there.  So

13 they're trying to attempt to directly connect with that peer.

14 They may not get the upload, but they know what is in the host

15 at that time.

16 **Q.**  Okay.  Is sharing the default setting on Shareaza?

17 **A.**  Yes.

18 **Q.**  Okay.  So if a user wanted not to share, they would have

19 to choose not to; is that right?

20 **A.**  Yes.

21 **Q.**  They'd go in and select "turn off sharing"?

22 **A.**  Yes.

23 **Q.**  Okay.  Were you able to download child pornography from

24 the Lock-N-Stitch hard drive?

25 **A.**  On Shareaza?

466

1   **Q.**  On Shareaza?

2   **A.**  Was I able to?  I'm sorry --

3   **Q.**  Were you able to access the Lock-N-Stitch hard drive to

4   download child pornography from it?

5   **A.**  After -- after the search warrant I was able to conduct

6   analysis and locate child pornography on the hard drive.

7   **Q.**  But not through Shareaza?

8   **A.**  Not through Shareaza, no.

9   **Q.**  But there was child pornography on that hard drive?

10  **A.**  Yes.

11          MR. PEARSON:  One moment, Your Honor.

12          Nothing further.

13          THE COURT:  Any recross?

14                   **RECROSS EXAMINATION**

15  BY MR. CAPOZZI:

16  **Q.**  Detective Moore, I want to show you Exhibit 1 -- if you

17  can, please.  Thank you.

18          Exhibit 1 has two hard drives attached in that

19  picture?

20  **A.**  Yes.

21  **Q.**  And they were both part of the computer at Lock-N-Stitch

22  of Mr. Henry's?

23  **A.**  They were both sitting in the computer in the IT manager's

24  office, yes.

25  **Q.**  Mr. Henry's office?

1    **A.** Yes.

2    **Q.** All right.  And you talked about 1A, where the child

3    pornography was in the Shareaza; is that correct?

4    **A.** Yes.

5    **Q.** All right.  And he had that shut off so it couldn't be

6    shared with the world; isn't that correct?

7    **A.** Yes.

8    **Q.** What's in 1B?

9    **A.** 1B is another operating system installation.  It had, I

10   believe, Windows XP installed on it.

11   **Q.** What was on that hard drive?

12   **A.** There was -- Shareaza was also installed on that.

13   **Q.** From what on Shareaza was there?

14   **A.** I believe there was music files.

15   **Q.** Music.  Anything else?

16   **A.** I think that was it.

17   **Q.** Pardon me?

18   **A.** I think that was it.  I'd have to refer to my report

19   again.

20   **Q.** Would you, please.

21   **A.** Sure.  All I have listed in my report is I didn't locate

22   any notable files.

23   **Q.** You didn't what?

24   **A.** Locate notable files.

25   **Q.** Notable files, but you recall it being music?

468

1    **A.**   I believe it was music.

2    **Q.**   No child porn?

3    **A.**   No child porn.

4    **Q.**   Isn't it a fact that on 1B just like 1A, the checkmark was

5    "no distribution," dislodged any distribution?

6    **A.**   I don't know.  I did not verify that.

7    **Q.**   You didn't even check it?

8    **A.**   Did not focus on the hard drive that didn't contain child

9    pornography.

10   **Q.**   Okay.  You told the jury that people dislodge that

11   distribution because they know it's illegal; isn't that

12   correct?

13   **A.**   Some people do that.

14   **Q.**   Right.  But if he's dislodging 1B, which is all music, is

15   that music illegal in any way?

16   **A.**   Well, copyright laws, yes.

17   **Q.**   But if he did 1B as he did 1A, does it seem like he is

18   doing it to hide it?

19   **A.**   I can't really answer that question other than if that's

20   the case, I don't know.  I'd have to do more research -- or

21   more analysis, I should say, on 1B to see if, in fact,

22   uploading was turned off.

23   **Q.**   Is there any way you could check that for us?

24   **A.**   Not right here.

25   **Q.**   No, I know that.

469

1      Can you do that within the next couple days?  I know
2  you're leaving town.
3  **A.**  I potentially could.
4  **Q.**  If you would, okay.  All right.  A couple other terms --
5  items.
6      MR. CAPOZZI:  I want to go to Exhibit 1A.6, please.
7  If could you blow it up some.
8  BY MR. CAPOZZI:
9  **Q.**  What is this 1A.6?  The list of child pornography videos,
10  obviously.
11  **A.**  Yes.
12  **Q.**  All right.
13  **A.**  That's the list of the videos that were located in the
14  incomplete folder.
15  **Q.**  Oh, I got the wrong one.  Should be Exhibit 2.  I
16  apologize.
17      And on this Exhibit 2, what is this Exhibit 2?
18  **A.**  This is the network activity report.  So this is the data
19  that was collected by Child Rescue Coalition in regards to
20  this IP address and this GUID, global unique identifier.
21  **Q.**  Is there any French terms on this one?  I think it's down
22  in here.
23  **A.**  Let's see.
24  **Q.**  I saw a couple, three or four French terms on here.  Do
25  you see -- can you scroll down a little bit?  "Paris, Cartier,

470

1  Lolita, vagin" -- whatever, that is.  And there's a couple

2  others on here, too.

3          Can you scroll down a little more, "cream pie."

4          Do you see any other French terms on there?

5  **A.**  I do not right now.

6  **Q.**  There's about two or three.  I'll take time later to do

7  it.  That's okay.  Thank you on that.

8          You said Angele denied having a password to Aurrora,

9  but didn't she say that she knew what was on there?  That she

10  had seen it?

11  **A.**  I think she said she knew what was on the --

12  **Q.**  That she had access to it?

13  **A.**  I think she said that she believed she would have access

14  to it, if she asked for it.

15  **Q.**  All right.  Now, you told -- in response to the US

16  attorney's question, isn't it true those who have child

17  pornography also have adult pornography?

18  **A.**  Yes.

19  **Q.**  Yes.  But isn't it true that those who have child

20  pornography have thousands of child pornography and not as

21  much adult?

22  **A.**  It depends on the type of person who is collecting.  So

23  sometimes we have subjects -- or suspects that we meet that

24  are "deleters" is what we call them.  And they'll download a

25  bunch of child pornography -- or at least for that day because

471

1  it's readily accessible through Peer-to-Peer -- view, and

2  delete.

3        So sometimes we'll go to a house suspecting that

4  there's such a vast amount of child pornography that

5  potentially could be there, and they've -- you know,

6  eventually deleted it.  So the amount of child pornography

7  located doesn't necessarily mean that they weren't

8  participating in it.

9  Q.  The password to the Aurrora folder was given to you by

10 Mr. Henry; wasn't it?

11 A.  Yes.

12 Q.  To allow you access to that?

13 A.  Yes.

14 Q.  He cooperated in everything you asked him to do?

15 A.  Yes.

16 Q.  In this particular case weren't there over 10,000 adult

17 pornography videos?

18 A.  I don't know the number of legal files that were there --

19 adult pornography.  I don't know the number, but there was a

20 vast amount.

21 Q.  A vast amount?

22 A.  From --

23 Q.  I think, at the most we're talking about is 200 child

24 pornography?

25 A.  I believe there was something around that number, 200

1    child pornography videos.

2    **Q.**  And you have seen no evidence of Mr. Henry accessing these

3    child pornography videos?

4    **A.**  Witnessing him access it, no.

5    **Q.**  Oh, you're not going to see him do it.

6    **A.**  Right.

7    **Q.**  But there's no evidence of looking at his computer, seeing

8    him logging on to a child pornography video?

9    **A.**  I can't place him behind the keyboard, if that's what

10   you're asking.

11           MR. CAPOZZI:  Right.  Thank you very much.

12           THE COURT:  Any re-redirect?

13           MR. PEARSON:  No, Your Honor.

14           THE COURT:  May the witness be excused?

15           MR. CAPOZZI:  Subject to recall.

16           MR. PEARSON:  Yes, Your Honor.

17           THE COURT:  Thank you, sir.  You're subject to

18   recall.  Stay in touch with the prosecutors in case you're

19   needed again.

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  Government's next witness?

22           MR. PEARSON:  The Government calls A.T..

23           COURTROOM DEPUTY:  Remain standing and raise your

24   right hand to be sworn.  After I administrator the oath,

25   please affirm by saying "I do."

473

1                        **A.T.**,

2              having been first duly sworn, was

3              examined and testified as follows:

4          COURTROOM DEPUTY:  Please have a seat.

5                    **DIRECT EXAMINATION**

6    BY MR. PEARSON:

7    **Q.**  Good afternoon.  Will you please say just your first name?

8    **A.**  [A.T.].

9    **Q.**  [A.T.], how old are you today?

10   **A.**  I'm 19.

11   **Q.**  So in 2012, how old were you?

12   **A.**  I'd be 14.

13   **Q.**  And 2013, I'm guessing you would have been 15?

14   **A.**  Correct.

15   **Q.**  Are you in school?

16   **A.**  Yes.

17   **Q.**  Where do you go to school?

18   **A.**  CSU Stanislaus.

19   **Q.**  And that's California State University?

20   **A.**  Yes.

21   **Q.**  What are you studying?

22   **A.**  I'm studying -- I'm majoring in liberal studies.

23   **Q.**  Do you know Adam Henry?

24   **A.**  Yes.

25   **Q.**  How do you know him?

1   **A.**   He was friends with my dad through work.

2   **Q.**   So how long have you known him?

3   **A.**   I do not remember meeting him for the first time, but

4   before I was 14.  I've known him for a while.

5   **Q.**   Okay.  What type of interactions would you have with

6   Adam Henry?

7   **A.**   Mostly just, I would go over to their house and babysit

8   their kids.

9          And I would help Angele with Art in the Park.  And

10   then I'd have dinner with them sometimes, or we'd go over with

11   my family and we'd have dinner.

12   **Q.**   Did you also know Angele Henry?

13   **A.**   Yes, I did.

14   **Q.**   Did you know her through Adam?

15   **A.**   Yes.

16   **Q.**   What type of interactions did you have with her?

17   **A.**   I'd help her with Art in the Park, and then I'd hang out

18   with her at the house after Art in the Park, and hanging out

19   with the kids and do arts and crafts and stuff like that.

20          MR. CAPOZZI:  Ross, have her speak into the

21   microphone.

22          THE COURT:  Ma'am, could I ask you to pull that

23   microphone a little bit closer to you, or you to just scoot up

24   a little bit so you're a little bit closer to it so the sound

25   system picks you up better.  Thank you.

1          THE WITNESS:  Yeah.

2    BY MR. PEARSON:

3    Q.  Was there ever a time that the Defendant -- the Defendant

4    gave you a shoulder massage?

5    A.  Uh-huh, yes.

6    Q.  Can you describe that.

7    A.  So I would be playing on the computer on, like, Facebook

8    games or something like that.  And my back would start to

9    hurt.  So I'd kind of, like, move my shoulders a little bit.

10   And he'd come up behind me and massage my shoulders.  And it'd

11   make me uncomfortable, so I'd sit there and go, Well, it's

12   okay.  And shrug him off.

13   Q.  Did this happen more than once?

14   A.  Yes.

15   Q.  Approximately, how old were you when this happened?

16   A.  Probably about 14.

17   Q.  Now, at some point were you told that there were pictures

18   of you on a computer at Adam Henry's house?

19   A.  After he was arrested and stuff.

20   Q.  Okay.  Were you asked to identity one of the pictures?

21   A.  Yes.

22   Q.  I'm going to show you what's been marked but not admitted

23   as Government's Exhibit 28.12.  Do you recognize that exhibit?

24   A.  Yes, that's me.

25   Q.  Do you know where this picture was taken?

476

1  **A.**   In the front bathroom of their house.

2  **Q.**   And did you know you were being photographed?

3  **A.**   Nope.

4        MR. PEARSON:  I have nothing further.

5        MR. CAPOZZI:  I'm sorry?  No more?  Okay.

6        THE COURT:  Hold on one moment.

7        MR. PEARSON:  Your Honor, under Rule 104, we would

8  move to conditionally admit this exhibit subject to foundation

9  being laid for it with the following witness.

10        THE COURT:  Any objection to the conditional

11  admission?

12        MR. CAPOZZI:  I didn't hear a thing.

13        MR. PEARSON:  We move to conditionally admit

14  Exhibit 28.12 subject to its foundation being laid with the

15  following witness.

16        MR. CAPOZZI:  Okay.  And that was one of the

17  screenshots we were talking about?

18        MR. PEARSON:  Yes.

19        MR. CAPOZZI:  No problem.

20        THE COURT:  It was one of the photographs?

21        MR. CAPOZZI:  Yes.

22        THE COURT:  28.12.

23        MR. CAPOZZI:  That's fine.

24        THE COURT:  Any objection?

25        MR. CAPOZZI:  No.

477

1           THE COURT:  28.12 is conditionally admitted.

2       (Government's Exhibit 28.12 was admitted into evidence

3    conditionally.)

4           THE COURT:  Anything further?

5           MR. PEARSON:  Move to publish.

6           THE COURT:  You're requesting publicly --

7           MR. PEARSON:  Yes, Your Honor.

8       (Exhibit 28.12 published to jury.)

9           MR. PEARSON:  Nothing further.

10          THE COURT:  Cross-examination?

11          MR. CAPOZZI:  Yes.  Thank you, Judge.

12                        **CROSS-EXAMINATION**

13   BY MR. CAPOZZI:

14   **Q.**  Good afternoon, hi.  I represent Adam Henry.

15          Your relationship was mostly with Angele Henry; was

16   it not?

17   **A.**  Right, correct.

18   **Q.**  Were you pretty -- try to speak into this.

19   **A.**  Sorry.

20          Yes.

21   **Q.**  Thank you.

22          Were you pretty close to her?

23   **A.**  Yes.

24   **Q.**  And did she -- when she interacted with you, was it like

25   she was a 14-year old?

1   **A.**   Yeah.

2   **Q.**   Okay.  Did you have any classes with her, go to any things

3   that she had, like --

4   **A.**   I went to the Art in the Park with her that she had, yeah.

5   **Q.**   That's what I'm referring to.

6          Tell me about the Art in the Park.  What is this?

7   **A.**   She would teach, like, little kids how to draw and stuff

8   like that, and I would just go to help her out and, like, help

9   carry the art supplies and stuff.

10  **Q.**   When would she do that?  In the afternoons?

11  **A.**   No.  It would be, like, mid-morning.  So, like,

12  ten o'clock-ish.

13  **Q.**   Summertime?

14  **A.**   Oh, yeah.

15  **Q.**   Okay.  And then, she would come by your house and pick you

16  up and take you there?

17  **A.**   Yes.

18  **Q.**   Okay.  Were your mom and dad aware of it?

19  **A.**   Yes.

20  **Q.**   Did you see any problem with that?

21  **A.**   No.

22  **Q.**   Okay.  And then, one day did you come back to the house,

23  Adam and Angel's house?

24  **A.**   Uh-huh.

25  **Q.**   And then she showed you some corsets and renaissance

1  clothing?

2  **A.**  Yes.

3  **Q.**  Okay.  What was her interest in that, and your interest?

4  Why would that happen?

5  **A.**  She was talking about taking me to a renaissance fair and

6  stuff like that with the family.  So she was, like, "Oh, this

7  is what they, kind of, wear.  This is what they dress up as."

8  **Q.**  Did you --

9  **A.**  So --

10  **Q.**  -- go into her bedroom and try on some of the clothes?

11  **A.**  Yes.

12  **Q.**  Were you aware that you were being videotaped?

13  **A.**  No.

14  **Q.**  Tell us what happened in the bedroom.  Described what

15  happened.

16  **A.**  She pulled out a bunch of different corsets.  And I was

17  just trying them on because she thought that maybe she would

18  have an old one, that would it fit me.

19  **Q.**  Was this something you were going to wear at some

20  renaissance fair?

21  **A.**  Uh-huh.

22  **Q.**  Did you guys ever go to one?

23  **A.**  No.

24  **Q.**  No, okay.

25      Did you feel uncomfortable trying on those clothes?

480

1   **A.**   At the time, no, I didn't see anything wrong with it.

2   **Q.**   How often would you and Angele text each other?

3   **A.**   I don't remember.

4   **Q.**   Do you still have that same phone?

5   **A.**   I have the same phone number.

6   **Q.**   If I read you --

7   **A.**   Uh-huh.

8   **Q.**   -- that telephone number, would you tell me if this is it?

9   **A.**   Uh-huh.

10  **Q.**   277-0087.

11  **A.**   Yes, that's my telephone number.

12  **Q.**   That's -- oh, okay.

13       How often in a day would you contact Angele, and how

14  often would she contact you?

15  **A.**   I don't recall.

16  **Q.**   Okay.  How many times -- did you text Angele Henry?

17  **A.**   I probably did, yeah, about Art in the Park, or if I was

18  going to babysit the kids.  But I don't remember how often.

19  **Q.**   Did she text you back --

20  **A.**   Yeah.

21  **Q.**   -- a lot?

22       How many times did you text Adam Henry?  If you

23  recall?

24  **A.**   I don't recall.

25  **Q.**   Did you ever talk to Adam Henry on the telephone?

1   **A.**   I think once or twice, like when we were at the store

2   getting food or something like that.

3   **Q.**   You said that Adam rubbed your shoulders?

4   **A.**   Yes.

5   **Q.**   You were working on the computer?

6   **A.**   Uh-huh.

7   **Q.**   At Adam's house?

8   **A.**   Yes.

9   **Q.**   Which computer was it, was it in the living room?

10  **A.**   No.  It was in the room right off from the entryway.

11  **Q.**   Was that Angele's room?

12  **A.**   Yeah.

13  **Q.**   Okay.  How many computers are in there?

14  **A.**   There was two, if I recall correctly.

15  **Q.**   Was Angele in a room?

16  **A.**   Yes.

17  **Q.**   Okay.  And isn't the fact that her shoulders were hurting

18  and he was rubbing her shoulders?

19  **A.**   I don't recall.

20  **Q.**   And from there Angele's shoulders were hurting, and then

21  did you say anything about your shoulders?

22  **A.**   No, I said nothing about my shoulders.

23  **Q.**   You don't remember saying anything?

24  **A.**   No.

25  **Q.**   What did he do, just come over and massage your shoulders?

1  **A.**  Uh-huh.

2  **Q.**  Was it a long time?

3  **A.**  Yeah -- well, I would get uncomfortable, and I'd kind of

4  shrug it off.

5  **Q.**  So was it pretty quick?

6  **A.**  Yeah, it was pretty quick.

7  **Q.**  Okay.  When you first met Adam, was it at the

8  Lock-N-Stitch office where your dad was working?

9  **A.**  I don't recall the first time I met Adam.

10  **Q.**  Did you go to Lock-N-Stitch to see your dad at work?

11  **A.**  Uh-huh.

12  **Q.**  Do you remember seeing Adam there?

13  **A.**  No, because my dad worked in the front office, and he

14  worked in the back.

15  **Q.**  In the back, okay.

16      Did you and your family visits the Henries and have

17  dinner there?

18  **A.**  Yes.

19  **Q.**  Was it very often?

20  **A.**  I don't recall if it was very often, but I do remember

21  going over there and having dinner as a whole family.

22  **Q.**  Were you ever alone with Adam in the house?

23  **A.**  In the house, no.

24  **Q.**  No.

25      Were you ever alone with Adam somewhere else?

1    A.   Yeah.

2    Q.   Tell us.

3    A.   I can't remember, like, if he picked me up or what had

4    happened.  But we went to KFC once and got, like, root beer,

5    and then went back to the house with Angele and the kids.

6    Q.   Were your parents there?

7    A.   No.

8    Q.   Did anything unusual happen there?

9    A.   No.

10   Q.   Most of your interaction was with Angele Henry, was it

11   not?

12   A.   Correct.

13           MR. CAPOZZI:  If I can have a moment, Judge.

14           THE COURT:  Yes.

15   BY MR. CAPOZZI:

16   Q.   Do you remember when that video was taken in the bedroom

17   trying on the corset?

18   A.   I don't remember a specific day, but I remember being in

19   the room and stuff like that, yeah.

20   Q.   Was Adam Henry there?

21   A.   No -- wait.

22   Q.   Do you know if he was at work --

23   A.   I don't remember if he was there or not.

24   Q.   That's fine.

25           Do you remember coming from Art in the Park and going

484

1   to the house to try these on?

2   **A.**   Yeah.

3         MR. CAPOZZI:   Thank you very much.

4         THE COURT:   Any redirect?

5         MR. PEARSON:   Briefly.

6                    **REDIRECT EXAMINATION**

7   BY MR. PEARSON:

8   **Q.**   ████, did you talk to Angele about going to the

9   renaissance fair?

10  **A.**   Yes.

11  **Q.**   And was Adam there when you were talking to her about it?

12  **A.**   Yes.

13  **Q.**   What did she say about Adam?

14  **A.**   That he -- that they had gone before and how he had, like,

15  a specific shirt that he would wear.

16  **Q.**   Okay.

17  **A.**   And -- to go to the renaissance fairs.

18  **Q.**   Did she say anything else about him?

19  **A.**   How about he looked good in it.

20        MR. CAPOZZI:   Hearsay.

21        THE COURT:   Sustained.

22        MR. CAPOZZI:   And ask that the prior statement be

23  stricken.

24        THE COURT:   Too late.

25  BY MR. PEARSON:

485

1   **Q.**  So Adam went to the fair with Angele?

2   **A.**  Yeah, as far as I know.

3          MR. PEARSON:  I have nothing further, Your Honor.

4          THE COURT:  Any recross?

5          MR. CAPOZZI:  Just one quick question.

6                        **RECROSS-EXAMINATION**

7   BY MR. CAPOZZI:

8   **Q.**  At the Art in the Park with Angele, was Adam Henry ever

9   there for that?

10  **A.**  No.

11         MR. CAPOZZI:  Thank you.  No more questions.

12         THE COURT:  Any re-redirect?

13         MR. PEARSON:  No, Your Honor.

14         THE COURT:  May the witness be excused?

15         MR. PEARSON:  Yes, Your Honor.

16         THE COURT:  Thank you very much.

17         The Government's next witness?

18         MR. GAPPA:  Thank you, Your Honor.  The Government's

19  next witness is Detective Art Hively.

20         COURTROOM DEPUTY:  After I administer the oath,

21  please affirm by saying "I do."

22                        **ARTHUR HIVELY**,

23              having been first duly sworn, was

24              examined and testified as follows:

25                   THE WITNESS:  I do.

486

1          COURTROOM DEPUTY:  State your full name for the

2    record and spell it.

3          THE WITNESS:  My name is Arthur Lawrence Hively,

4    A-R-T-H-U-R, last name is spelled H-I-V-E-L-Y.

5          MR. GAPPA:  Thank you, Your Honor.

6                      **DIRECT EXAMINATION**

7    BY MR. GAPPA:

8    **Q.**  So Detective Hively, who do you work for?

9    **A.**  I currently work for Ceres Police Department in

10   Stanislaus.

11   **Q.**  Since when have you worked for the Ceres Police

12   Department?

13   **A.**  I was hired as a reserve police officer in February 2006.

14   **Q.**  And what is your current position with the Ceres Police

15   Department?

16   **A.**  I'm a full time police officer working as a detective with

17   the police department.

18   **Q.**  Prior to joining the Ceres Police Department, were you

19   employed?

20   **A.**  I was for 24 and a half years.  I worked at the Santa

21   Clara County Sheriffs Office.

22   **Q.**  And Santa Clara County is another county in California?

23   **A.**  Yes, sir.

24   **Q.**  And San Jose is in Santa Clara County?

25   **A.**  San Jose, yes, sir.

1   **Q.**   Is that where you worked in San Jose?

2   **A.**   That's where the headquarters for the sheriffs office is

3   located, yes.

4   **Q.**   And you worked there for more than four years?

5   **A.**   Approximately, three and a half years.

6   **Q.**   What were your responsibilities there in Santa Clara

7   County, the sheriffs office?

8   **A.**   Throughout my career with the Santa Clara Sheriffs, I had

9   a number of different roles that started with four years in

10   the custodial division.  I had one year in our transportation

11   division where you transported inmates around the County

12   courthouses as well as state prisons.

13          I also had a total of three years, not consecutively,

14   but three years as court bailiff in Santa Clara County, about

15   14 years as a patrol deputy, again, not continuous, but

16   through my 14 years in patrol as a deputy working the streets

17   and the county.

18          And for three years I was a sergeant.  And my last

19   year as a sergeant, I was assigned to a high technology crimes

20   task force in San Jose.

21   **Q.**   Was there a more specific name for the task force that you

22   were assigned to for that last year in San Jose?

23   **A.**   Yes.  The acronym is REACT task force.  It stands for

24   Rapid Enforcement Allied Computer Team.  That's one of the

25   five tasks forces in the State of California that are all

1    essentially structured the same, in that, half that task force

2    would worked in ID theft investigation and the other half on

3    internet crimes against children, which is the acronym ICAC,

4    which is child exploitation investigation.

5    **Q.**   Or also Internet Crimes Against Children; is that ICAC as

6    well?

7    **A.**   Yes, I thought I said that.

8    **Q.**   Okay.  So what have your responsibilities been with Ceres

9    Police since February 2006?

10   **A.**   As I mentioned, I was -- 18 months I was reserve police

11   officer.  I was hired in February 2006.  The Chief of Police

12   at the time, Art DeWork asked in either March or April of that

13   year, that based on my training and experience with the REACT

14   task force, if I would be the Ceres Police Department's member

15   of the Sacramento Valley Hi-Tech Crimes task force.

16           And that's spelled H-I, hyphen, T-E-C-H, Sacramento

17   Valley Hi-Tech Crimes task force.

18           So I was, from Spring of 2006 until today, a member

19   of that particular task force.  As a member of that task

20   force, I'm also a member of the ICAC task force, which is a

21   subgroup of that particular task force.  And there are 61 of

22   those throughout the United States.

23           And the purpose of the ICAC task forces are to work

24   to combat child exploitation on the internet dealing with

25   child pornography.

1          I also worked as a patrol officer, school resource

2     officer, and I was hired full time in August of 2007.  So I've

3     been about ten years of full-time employee.  And I went to the

4     detective division January 2010, and with the exception of

5     eight months last year, I've been assigned to the detective

6     division.

7     Q.  So during all of that time, including with the Ceres

8     Police Department, have you investigated crimes related to the

9     sexual exploitation of children?

10    A.  I have.  I've been either the primary investigator or

11    assistant investigations probably at least 75 cases of child

12    exploitation.

13    Q.  Do you conduct digital forensic analysis of computers,

14    cell phones, cameras, other devices capable of storing digital

15    data?

16    A.  Yes, I do.  And I've been doing that since 2005.

17    Q.  So are you familiar with the phrase "computer forensics"?

18    A.  I am.

19    Q.  What does the phrase computer forensics mean?

20    A.  Throughout my career, I've seen a number of different

21    definitions for what computer forensics is.  But that which

22    seems to apply best to law enforcement is the acquisition or

23    the seizure of digital evidence in a legally responsible way.

24    The examination of that evidence and effort to determine

25    whether or not the individual being investigated is innocent

1    or guilty, then reporting of that information, and then the

2    presentation of that information in the court of law.

3    **Q.**   So during the course of the training that you've been

4    attending and the work that you've done, have there been

5    specific programs that you've been at that focused on how to

6    conduct a forensic examination of a digital storage device?

7    **A.**   Classes or software?  I'm not sure what the question is.

8    **Q.**   Classes.

9    **A.**   Yes.  I attended more than 33 courses throughout my

10   career, since 2005, on high technology crimes investigations,

11   which is more than 1,000 hours.

12        Of that there is a subset of courses related

13   specifically to computer forensics.

14   **Q.**   And yes, I want to have you go through all 33 classes

15   since 2005, but if you could start -- there's a reason for

16   it -- at the beginning and just go over some of the initial

17   courses that you've took --

18   **A.**   Of course.  In 2005, I took a number of courses when I was

19   a part of the REACT task force that were related to high

20   technology crimes investigations.

21        Four of the courses that were related specifically to

22   computer forensics would be the first class I took, was in San

23   Jose.  It was provided by a nonprofit organization called

24   white color crime center -- sorry, that would be the National

25   White Color Crime Center.  It's based on the East coast.  One

1    of the nonprofit organizations that provides training to law

2    enforcement local, state, or federal level in cases regarding

3    high technology crimes.

4          So that first course in San Jose in 2005 was a basic

5    course into, essentially, the introduction to computer

6    forensics, talk about how computers work, talked about how

7    information is put on hard disc drives, how investigators can

8    examine those hard disc drives using specific software.

9          The second course I took was provided through the

10   California Department of Justice.  It had that back then what

11   was called an "advance officer training curriculum" for

12   different disciplines within law enforcement.  But they had

13   one for high technology crimes.

14         And again, the subset of that would be, digital

15   forensics.  So I took a course in 2005, which essentially

16   built upon the first course I just described giving additional

17   information.

18         The California Department of Justice, in their

19   advance officer training curriculum had a set, of course.

20   That is, you had to go through in particular order.  You had

21   to meet a prerequisite to get to the next course.  So those

22   were the first two they required.

23         The third one was a course that was sponsored by the

24   California Department of Justice, but the instruction -- or

25   was actually from a company called Guidance Software

492

1   Incorporate or GSI.

2          There's was symbiotic relationship between the

3   advance officer training center and different companies or

4   vendors who provide specific software for forensics so

5   companies like Guidance Software would send their instructors

6   to the courses.  And their software would be used to get the

7   material across to the staff or the students.

8          So the -- that was my first introduction to a program

9   called EnCase.  That's spelled, capital E-n, capital C-a-s-e.

10  EnCase, is one word, and it's a stand alone forensic product

11  that's produced by Guidance Software.  They have a number of

12  programs that they do sell dealing with e-discovery, network

13  intrusion, as well as other software.  But this is a primary

14  tool that I've used since 2005 to conduct computer forensics.

15  **Q.**  Let me interrupt you there.  Sorry for that.

16         But is that a software program that other forensic

17  investigators use as well?

18  **A.**  Yes.  Throughout the world, there are two primary tools

19  that are used.  One would be EnCase.  The other would be FTK

20  that Detective Moore spoke of earlier.

21  **Q.**  I'll ask a couple questions about that in a moment.  But

22  you were talking about the specific training from Guidance

23  Software, their product, and EnCase that was back in 2005?

24  **A.**  Yes.

25  **Q.**  So then, without, again, going into great detail about the

493

1    remaining courses, were there additional courses beginning

2    about 2006 that you attended?

3    **A.**   Yes.   For the specific titles, I would have to check my

4    resume.

5    **Q.**   Can you tell us generally what they covered?

6    **A.**   Sure.   I attended a course, again, sponsored by the

7    California Department of Justice, but hosted by Santa Barbara

8    Sheriffs Office.   It was a two-week course.   The nickname for

9    the course is called "Build a box," in which the first of the

10   two weeks to actually put together a computer, learn how the

11   computer works.

12        Part of the curriculum was during a break the

13   instructors go around and sabotage your machine, and then you

14   would come in and try and diagnose the problem and get it

15   fixed.

16        The second week was an instructor or from Guidance

17   Software who went over artifacts and other instructions

18   related to their program, EnCase.

19        I also attended my first cell phone forensic course

20   during that time frame as well as two sources from access

21   data, which is spelled, capital A-c-c-e-s-s, capital D-a-t-a.

22   And that's one word.   AccessData has a product called FTK or

23   Forensic Tool Kit.   And I attended two of those courses during

24   that time frame?

25   **Q.**   That's the program that Detective Moore testified about

494

1    yesterday and some of today?

2    **A.**   Yes.

3    **Q.**   Okay.  Were there any other trainings that you've received

4    that related to investigative work that you've done related to

5    the sexual exploitation of children?

6    **A.**   Yes.  In March 2010 I traveled to Yuba City in California.

7    I spent a week with ICAC instructors learning how to use

8    Shareaza LE, which is the law enforcement version of Shareaza.

9            During that course I learned how Peer-to-Peer file

10   sharing programs work, and how to use the Shareaza LE program

11   to identify individuals in my region that were downloading

12   child pornography.

13   **Q.**   Have you received other training in how Peer-to-Peer

14   software programs work?

15   **A.**   Not that I recall.

16   **Q.**   Have you ever received any certifications as a result of

17   your training?

18   **A.**   Yes, through guidance software for their tool EnCase, they

19   have a program in which you can be certified for their product

20   called EnCe.  And that's the EnCase certified examiner.

21           You can take an online exam, and then they provide to

22   you a forensic image.  You have to examine that and then

23   answer questions related to that.  I earned by certification

24   for NC in December 2011.

25           For AccessData's Forensic Toolkit, I earned my

495

1    certification for their product in January or February 2011.

2           And that's the two I've earned for forensic software,

3    specifically.

4    **Q.**  Then once you've gotten that certification, is that

5    considered valid forever, or is it something where you would

6    be expected to renew that?

7    **A.**  No.  You have to renew them every three years.  I

8    recertified with both of those products twice each, and I'm

9    current with both of them.

10   **Q.**  So specifically with AccessData, what were the times or

11   dates that you got the recertifications?

12   **A.**  I would have to check my resume for that, if I might.

13   **Q.**  Okay.

14   **A.**  For AccessData I earned my certification in February 2012.

15   I recertified in March 2015, and I March 2017.

16   **Q.**  What about for EnCase?

17   **A.**  For Guidance Software EnCase certified examiner, I earned

18   that in 2011, and recertified in June 2014, and recertified in

19   April of 2017.

20   **Q.**  Okay.  To the extent you haven't already referenced any

21   specialized training that you received in recovering data from

22   cell phones or other mobile devices, could you tell us if

23   you've received specialized training in that area?

24   **A.**  Yes.

25          As I mentioned, I took one course on basic cell phone

1    examinations.  It was a basic course just to introduce

2    students in how to examine cell phones.

3          Since then I've taken a number of additional courses

4    in that area to include -- it was a course called certified

5    Cellebrite training.  And it was called certified only because

6    the instructor from a third party taught the Cellebrite tool.

7    Cellebrite is a company that's world -wide company out of

8    Israel.

9          There are two primary tools world wide that are used.

10   That's one of the two tools.  They have a number of different

11   rods that they produce, for but primarily, they have a

12   hardware device that you can utilize to get extractions from

13   mobile devices, which include cell phones, tablets, GPS

14   devices, those types of things, as well as the software

15   component that allows for the analysis of those items after

16   you get the mobile device extraction.

17         I also took a one-week course in 2015 in Sonora

18   taught by Cellebrite personnel.  It's a required course, if

19   you want to be certified in their product.  They required you

20   actually go through their training first.  You can't just

21   challenge the certification.

22         So after that particular course, I did take their

23   exam, and I was certified with their exam in 2015.

24   **Q.**  Did you already spell Cellebrite, for the record?

25   **A.**  Thank you.  Cap C, E-L-L-E-B-R-I-T-E.

497

1  **Q.**  And that's the name of the company.  But sometimes people

2  refer to that as the hardware developed and manufactured by a

3  company by the same word Cellebrite?

4  **A.**  Yes, sir.

5  **Q.**  Okay.  So is that a tool that you used during the course

6  of your investigative work on this case?

7  **A.**  Yes, sir.

8  **Q.**  As a member of the Hi-Tech Crimes task force in

9  Santa Clara, did you belong to any groups or professional

10  associations related to technology?

11  **A.**  Yes.  At the time, I belong to the Silicone Chapters --

12  Silicone Valley Chapter of HTCIA, which is the High Technology

13  Crimes Investigator Association.  It's an international

14  association that has law enforcement and civilian individuals

15  who participate in training and examinations of digital

16  devices.

17  **Q.**  Have you been a member of a corresponding association

18  working in Ceres as a member of the Silicone Valley -- I'm

19  sorry, the Sacramento Valley Hi-Tech task force?

20  **A.**  Well, as I mentioned earlier, I'm a member of the ICAC

21  task force as well.

22  **Q.**  Okay.  Do you know what white papers are?

23  **A.**  Yes, sir.  White papers are industry papers.  In this

24  case, of course we're talking about computer forensics.  It'll

25  be papers that can be produced by employees of vendors, paper

1    that is produced as a thesis for a doctoral candidate or

2    perhaps a Ph.D. candidate.  And they cover all kinds of topics

3    related to, in this case, high-technology investigations or

4    digital investigations.

5    Q.  And have you ever at times if you encounter a problem that

6    you don't have an immediate answer to, do you sometimes read

7    white papers related to the issue?

8    A.  Yes, and that's quite frequently done.

9         There's actually a good source, a company called

10   SANS.  I don't know if it's an acronym or not, but it's

11   S-A-N-S.  SANS Institute is a for-profit organization that

12   teaches computer forensics to anybody who wants to pay their

13   price for the courses, which are somewhat expensive.  But they

14   have what they call a SANS reading room.  And they have

15   hundreds upon hundreds of white papers that are available to

16   anybody who wants to provide an email address.  And you can

17   access those white papers, which cover a wide range of topics

18   related to digital forensics.

19   Q.  We're getting to end of your qualifications, but are you

20   also on other list servers or email lists with other

21   investigators involved in technology crimes?

22   A.  Yes, a number of those.

23   Q.  Okay.  Can you give us an estimate of the number of

24   forensics examinations that you've done on different devices

25   using all of this training that you've attended?

499

1    **A.**   Since 2005, I've conducted hundreds upon hundreds of

2    examinations of all types of media from three and a half inch

3    floppy drive to thumb drives, flash drives, CDs, DVDs, GPS

4    devices, laptops, tablets, cell phones, and computers,

5    including complex computers like RAIDs.

6    **Q.**   What's a RAID again?

7    **A.**   Redundant array of independent discs.

8    **Q.**   Okay.  Thank you.

9           MR. GAPPA:  So Your Honor, at this point the

10   Government asks that Detective Hively be recognized as an

11   expert in the areas of how computers operate, computer

12   forensics, operation of files, sharing networks, and the

13   extracting of information from cell phones.

14          MR. CAPOZZI:  No objection, Your Honor.

15          THE COURT:  Mr. Capozzi, do you wish to ask any

16   questions?

17          MR. CAPOZZI:  No, I don't.

18          THE COURT:  All right.  The Court will recognize

19   Detective Hively as an expert in those areas.

20          MR. GAPPA:  Thank you, Your Honor.

21   BY MR. GAPPA:

22   **Q.**   So Detective Hively, you were a detective with the Ceres

23   Police Department, then, in September 2013, correct?

24   **A.**   Yes.  I was working full time as a police officer in the

25   capacity as a detective in the hi-tech team.

1   **Q.**  You worked on the investigation that's lead to this case,

2   that's in court today, correct?

3   **A.**  Yes, sir.

4   **Q.**  And when did your work on the investigation begin?

5   **A.**  September 1, 2013.

6   **Q.**  How did you get involved in the investigation?

7   **A.**  It was my day off, and I received a call from Detective

8   Britton Moore indicating that he needed me to come to work,

9   because it was his intention to serve a search warrant on a

10  company called L, o-c-k -N- stitch with a capital "S," located

11  at 1015 Soderquist Road in Turlock.

12  **Q.**  So you went to that location?

13  **A.**  Well, I went to work.  And from there, there was a

14  briefing, and then we served the search warrant that

15  afternoon, yes.

16  **Q.**  So specifically what were your responsibilities at

17  Lock-N-Stitch that afternoon?

18  **A.**  I was asked by Detective Moore to assist in attempting to

19  locate a computer that might have Shareaza or other

20  Peer-to-Peer file sharing programs that might be responsible

21  for the information he had received as a download candidate.

22  **Q.**  I'm going to ask if you can take a look at Exhibit 3.1.

23  This is already in evidence.

24       Do you see it on your screen?  If we can have that

25  for the jurors as well.  Thank you.

1          So Detective Hively, do you see Exhibit 3.1.  What's

2   depicted there?

3   **A.**   This is an aerial view of some of the buildings involved

4   in Lock-N-Stitch in Turlock California.

5   **Q.**   That's where you were on the afternoon on September 19,

6   2013?

7   **A.**   Yes, sir.

8   **Q.**   And do you have a memory of which of those buildings you

9   were in that day?

10  **A.**   Well, I started with other officers at the office

11  building.  We ended up asking all the employees from the

12  facility to go into the conference room so it can be explained

13  to them what was going on, and why we were there.

14          Mr. Reed, was the owner of the company, and he was

15  extremely cooperative.  After explaining to the employees what

16  was going on, we also told them all that if they had computers

17  and they were locked, we would need them to unlock those

18  computers so we can examine them, in this case, as a simple

19  preview, to determine whether any of them had Shareaza or

20  other file sharing programs.

21  **Q.**   What's your memory of the number of computers that you

22  physically examined that afternoon?

23  **A.**   At least 10 to 12.  I started in the main office building

24  with others, and then I progressed to other buildings on the

25  site looking for any computers that were up and running as

1  well as others that -- I believe I found at least one laptop
2  that was on the shelf that I had somebody open, turn on, and
3  checked it as well.  So there was quite a few that we did that
4  afternoon.
5  Q.  And do you know whether there was a computer network set
6  up at the business at that location?
7  A.  Yes.
8  Q.  So at some point in the afternoon did you encounter the
9  Defendant?
10  A.  Late afternoon, I believe, yes.
11  Q.  Did you identify yourself to him?
12  A.  I did.
13  Q.  Did you make --
14  A.  I also gave him my business card so he would know who I
15  was.
16  Q.  Did you tell him you wanted to ask him some questions
17  related to investigation that you had become involved in that
18  day?
19  A.  Yes.
20  Q.  Did he say he was willing to talk to you?
21  A.  Yes.
22  Q.  Where did you interview him?
23  A.  In the same conference room I eluded to earlier.  The
24  other employees left that room, and Mr. Reed gave us of that
25  room so we can have some privacy.

503

1    **Q.**  Did you advise him of any rights that he had?

2    **A.**  Yes, I did.

3    **Q.**  What rights did you advise him of?

4    **A.**  Commonly referred to as the Miranda of Rights.

5         I explained to him that he had the right to remain

6    silent.  I explained anything that he said could and would be

7    used against him in a court of law.

8         I also advised that he had a right to have an

9    attorney present prior to or during any questions.

10        Also lastly, if he couldn't afford an attorney, one

11   could be appointed to him free of charge.

12   **Q.**  Did you make any kind of a record of your interview of the

13   Defendant that afternoon?

14   **A.**  Yes.  I was, at that particular time, using an Olympus

15   audio recording device.

16   **Q.**  That was issued by your department?

17   **A.**  Yes, sir.

18   **Q.**  And the entire interview in that conference room was

19   recorded?

20   **A.**  Yes.

21   **Q.**  And after the recording was completed, at some point later

22   was a transcript produced of that interview?

23   **A.**  Yes.

24   **Q.**  And you've had a chance to review the transcript?

25   **A.**  I did.

504

1   Q.  As well as the audio recording?

2   A.  Yes.

3   Q.  And based on your review, do you believe those are

4   accurate recordings of the questions and answers between you

5   and the Defendant that day?

6   A.  Yes, sir.

7   Q.  And I would like to directing your attention to what's

8   been marked, at this point only, as Government Exhibit 21.

9        You're familiar with this exhibit?  It's an audio

10  recording of your interview?

11  A.  Yes, sir.

12  Q.  You've had a chance to review it?

13  A.  Yes, sir.

14  Q.  Okay.

15        MR. GAPPA:  Your Honor, I would ask that the exhibit

16  be admitted, and that we be allowed to play the interview.

17        THE COURT:  Any objection to the --

18        MR. CAPOZZI:  No.

19        THE COURT:  And it's labelled --

20        MR. GAPPA:  It's --

21        THE COURT:  21.

22        MR. GAPPA:  For the record, it's Exhibit 21.

23        THE COURT:  21 is admitted.

24        MR. GAPPA:  If I can explain, Your Honor, it's an

25  audio recording, and the jurors and everybody would see a

505

1    transcript that scrolls, which is synchronized to the audio.

2              THE COURT:  Any objection, Mr. Capozzi?

3              MR. CAPOZZI:  No, I don't, but he was advised of his

4    rights.  Did he say he waived his rights?

5              MR. GAPPA:  Yeah.

6              MR. CAPOZZI:  He did?  Okay, no problem.

7              THE COURT:  How long?

8              MR. GAPPA:  I think it may be about 20 minutes.

9              THE COURT:  You're going to play the whole thing?

10             Can we get a stipulation from counsel that the

11   reporter does not have to attempt to report off of the

12   recording?

13             MR. GAPPA:  Yes.

14             MR. CAPOZZI:  With her left hand, she has to do it.

15   No, I agree.

16             THE COURT:  That stipulation will be entered on the

17   Court's record.

18             And Rachael, you can thank Renee for remembering to

19   get that.

20             MR. GAPPA:  I'm told it's 31 minutes.

21             THE COURT:  All right.  I think we're going to be in

22   section for 31 minutes today.

23             JUROR 044:  Okay.

24             (Audio played.)

25             MR. GAPPA:  Your Honor, that's the conclusion of the

506

1    Exhibit 21.

2              THE COURT:  All right.

3              MR. CAPOZZI:  Your Honor, if we can advise the jury

4    that the evidence is the audio, not the transcript.

5              THE COURT:  Are you planning on seeking to admit the

6    transcript into evidence?

7              MR. GAPPA:  Your Honor, perhaps we can just reserve

8    that for --

9              THE COURT:  At this time, the audio recording is

10   what's been admitted into evidence.

11             MR. CAPOZZI:  Right.

12             THE COURT:  We'll take up later whether it should

13   be -- the transcript should also come in.

14             Do you have additional questions for the detective?

15             MR. GAPPA:  Yes, Your Honor, more than I'm sure

16   anybody wants to hear today.

17             THE COURT:  All right.  We'll take our evening recess

18   at this time.

19             We will reconvene on Monday at 1:30 p.m. same

20   schedule as today.  So if you're trying to keep track, Renee,

21   has to write it down for me, because I can't keep track.

22   Here's what next week looks like:

23             Monday and Tuesday 1:00 to 5:00, or 4:30 to 5:00,

24   about what we're doing today.

25             Wednesday and Thursday, full days, start it at 8:30.

1  And if necessary, Friday 1:00 to 5:00.

2           Now, if the case were to be submitted to the jury for

3  decision by the end of the day on Thursday, you could be

4  deliberating on Friday in the morning.

5           So that, in terms of whether Friday is a half day or

6  a full day, that really is going to kind of depend on exactly

7  where we are as that approaches.  I'm not available, but that

8  doesn't mean that you can't be working and --

9           JUROR 044:  What?

10          THE COURT:  I can come back in when you need me, all

11  right?  So there we have it.

12          One last thing, since we're going to be apart for

13  three days.

14          Remember, until the trial is over, do not discuss

15  this case with anyone, including your fellow jurors, members

16  of your family, people involved in the trial, or anyone else.

17  And do not allow others to discuss the case with you.

18          This includes discussing the case in internet chat

19  rooms, or through internet blogs, internet bulletin boards,

20  emails or text messages.

21          If anyone tries to communicate with you about the

22  case, please let me know about it immediately.

23          Do not read, watch, or listen to any news reports or

24  other accounts about the trial, or anyone associated with it,

25  including any online information.

1          And do not do any research such as consulting

2    dictionaries, searching the internet, or using any other

3    reference materials.  And do not make any investigation about

4    the case on your own.

5          Finally, keep an opening mind until all the evidence

6    has been presented, and you have heard the arguments of

7    counsel, my instructions on the law, and the views of your

8    fellow jurors.

9          If you need to speak to me about anything, give a

10   signed note to my courtroom deputy Renee, or my law clerk,

11   Sam, they will give it to me, and I will get to you as soon as

12   possible.

13         Have a very pleasant three-day weekend.  I said we

14   will see you on Monday morning, or I'm going in here on Monday

15   morning.  You're not coming in until 1:00.  See you Monday

16   afternoon.

17             (Jury exits courtroom.)

18             THE COURT:  We're outside the presence of the jury.

19             How are we doing in terms of how the Government was

20   viewing where we'd be at this point?  Are we --

21             MR. GAPPA:  Very close, very close to being where we

22   thought we would be.

23             THE COURT:  Okay.  Do you think it's possible with

24   full days Wednesday and Thursday, when do you think with half

25   days Monday and Tuesday, and full days Wednesday and Thursday,

509

1    when do you guesstimate that your case might be in?

2              MR. GAPPA:  I imagine an scenario where we're

3    finished by the end of Tuesday.

4              MR. CAPOZZI:  By the end of when?

5              THE COURT:  Tuesday, the two half days.

6              MR. GAPPA:  Yes.

7              THE COURT:  You think you may be able to put it all.

8              MR. GAPPA:  That's our hope.  That's our hope.

9              THE COURT:  Okay.

10             MR. GAPPA:  There's an issue, though, which touches

11   on the answer to that question.  And that is, two things, one

12   if the Court has yet had a chance to review the transcripts of

13   any prior hearings.

14             There was a hearing at which Judge Ischii ruled what

15   the Government could or couldn't use in terms of evidence for

16   its case in chief on the conspiracy count.

17             And our motion had been that we should be allowed to

18   use evidence of the Defendant setting up a camera in the prior

19   residence, because we anticipated the defense would be that it

20   was Angele Henry who came up with the idea, and that it was

21   her initiative that this happened.  And it was because of her

22   wish is to record herself.  In fact, that is what we heard in

23   the opening statement.  It was specifically now put it the

24   issue that Adam Henry, you know, was described as a

25   hard-working person who liked computers, he was working, and

1    everything was fine, and no reference to any problems.

2         And then Angele enters the picture in 2008, 2009.

3    She moves into his house in 2010.  The cameras are installed

4    because she an exhibitionist and wants to see herself and

5    record herself.  And inadvertently, that causes other people,

6    not just our victim, to be recorded.

7         But it was really, as we understood it --

8         THE COURT:  Right.  I got it.

9         MR. GAPPA:  So we believe that even more strengthens

10   the need for the Government to put in its case in chief

11   evidence of the Defendant installing a different set of

12   cameras in a different residence and recording other women

13   without their knowledge or permission.

14        MR. CAPOZZI:  Adult women, Your Honor.

15        THE COURT:  Okay.

16        MR. CAPOZZI:  And Judge Ishii has ruled that it's not

17   admissible.

18        THE COURT:  Well, number one, I don't know want

19   transcript you're talking about.  I have no idea.  I got the

20   reassignment order in the morning.  I got a transcript of the

21   last in limine hearing.  Where what was being discussed at

22   that hearing and what was ruled upon was titles.  And whether

23   redaction was going to be made, and that was ruled upon.

24        What hearing are you talking about, and what should I

25   be reading?

1          MR. GAPPA:  I could email --

2          THE COURT:  Same hearing or --

3          MR. GAPPA:  No.  This was a different hearing.

4          THE COURT:  How long?

5          MR. GAPPA:  There were --

6          THE COURT:  Do know there's a transcript of it?

7          MR. CAPOZZI:  There is.

8          THE COURT:  Well, then, it should be on the docket.

9    I'll go back and read it so I know what the heck happened

10   before, and whether I think that the defense has opened the

11   door already and changed the analysis.

12         MR. CAPOZZI:  Defendant hasn't testified yet, Judge.

13         THE COURT:  You can open the door other than by

14   putting the defendant on the stand.

15         MR. CAPOZZI:  Not to any evidence --

16         THE COURT:  I need to see what the argument was, what

17   the ruling was, and what was anticipated at the time the

18   ruling was made.

19         MR. GAPPA:  Your Honor, there were many hearings, but

20   I believe I can find out for sure when I get to my office.

21   But the most likely hearing would be on May 8th, May 30th,

22   and/or June 26th.

23         THE COURT:  Of --

24         MR. GAPPA:  But I would be willing to --

25         THE COURT:  Yes, this year.

1        MR. GAPPA:  But I'm will to go back through my notes

2    and then email the Court.

3        MR. CAPOZZI:  And defense attorney.

4        MR. GAPPA:  Sure.

5        THE COURT:  Just yeah tell me what transcript I need

6    to read so that I've read what it was that was ruled upon

7    before the case was reassigned to me.  And I'll read it, and

8    then I'll be prepared/know what you're all arguing about.  And

9    we'll take it up on Monday.

10        MR. GAPPA:  Right.  And just related to that, that

11    was one category which our understanding of the way it was

12    left was that -- was part of the way that the crime was

13    committed.

14        Now separate from that, there had been a motion under

15    404(b) to introduce other recordings of what was characterized

16    as adult pornography for the Defendant engaging in sexual

17    activity with other women, sometimes with his wife Angele.

18        Today, on the cross-examination of Detective Moore,

19    the Defendant tried to elicit statements through him of

20    Angele Henry and say that she's the person who has this

21    interest in sex and submission, bondage-types of activities

22    such as that.  So there are recordings of the Defendant and

23    his wife and another adult female where they are tying each

24    other up, engaging in this type of activity, which was

25    consistent with what we was trying to elicit from

1   Detective Moore.

2          So I believe the door has been opened.  So that -- it

3   doesn't leave an inaccurate picture of only Angele and Henry

4   being interested in that material.

5          MR. CAPOZZI; and Judge, we argued these motions

6   before, and Judge Ishii said this is irrelevant to this case,

7   this is child pornography.  Adult pornography has nothing to

8   do with child pornography.

9          MR. GAPPA:  And I'm sure once the Court reviews the

10  transcript, you'll also see Judge Ishii said "in the

11  Government's case in chief at this time."  And of course

12  that's subject to revisiting developments.

13         THE COURT:  It does no good to argue it to me now.

14         MR. CAPOZZI:  Right.

15         MR. GAPPA:  Right.

16         THE COURT:  I don't have the foggiest notion.

17         MR. GAPPA:  Right.  So --

18         THE COURT:  Let me go back and read to get up to

19  speed.

20         I read the in limine transcript, what I thought I was

21  supposed to be reading.  And that's not about this at all.  So

22  let me go back and read further.  And we'll talk about it on

23  Monday.  Is it going affect what you do on Monday during --

24         MR. GAPPA:  Yes.  I mean, it would affect -- I can be

25  prepared either way.

514

1          THE COURT:  Okay.

2          MR. GAPPA:  So that --

3          THE COURT:  Well, I mean, perhaps be a few minutes

4    early on Monday.  At least we can get a little bit of jump on

5    one o'clock and at least start talking about it.

6          But right now, it's like there's any use talking to

7    me, because I've got to figure out what's already been ruled

8    on.  All right?

9          MR. GAPPA:  Thank you, Your Honor.

10          THE COURT:  Have a good three days off.  See you --

11   I'm sure you all will be working, as will I, in part.  So I'll

12   see you on Monday at little bit before 1:00.

13          MR. GAPPA:  Thank you, Your Honor.

14          MR. CAPOZZI:  Thank you.

15       (Proceedings concluded at 4:56 p.m.)

16

17

18

19

20          I, RACHAEL LUNDY, Certified Shorthand Reporter, do
     hereby certify the foregoing transcript as true and correct.
21
     DATED:  14th of November, 2018          /s/ Rachael Lundy
22                                           RACHAEL LUNDY, CSR
                                             Certificate No. 13815
23

24

25