515

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DRODZ


| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | 1:13-CR-00409 DAD |
| ADAM ALAN HENRY, | ) | TRIAL DAY 4 |
| Defendant. | ) | |
| _____ | ) | |


Fresno, California                    MONDAY, NOVEMBER 13, 2017


REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES OF COUNSEL:

For the Government:          **DAVID GAPPA and ROSS PEARSON**
                            Assistant U.S. Attorneys
                            2500 Tulare Street, Suite 4401
                            Fresno, CA 93721-1331


For the Defendant:          **ANTHONY CAPOZZI**
                            LAW OFFICE OF PATRICK CAPOZZI
                            1233 W. Shaw Avenue, Suite 102
                            Fresno, CA 93711-3718

Volume 4, Pgs. 515 - 601, inclusive


REPORTED BY:  RACHAEL LUNDY, CSR #13815
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

516

1                              INDEX

2    EXAMINATION DETECTIVE ARTHUR HIVELY                    PAGE
         Direct Examination Resumed by Mr. Gappa            538
3

4
     PLAINTIFF'S EXHIBITS:
5
     NO.    DESCRIPTION                                     PAGE
6
     29.2   Folder menu                                     541
7
     29.3   Call out boxes with numbers                     544
8
     29.4   Folder menu                                     545
9
     29.1   Folder highlighted called "New folder (6)"      549
10
     22     Video clip played of continuation of            552
11          Detective Hively's audio interview with
            Mr. Henry
12
     23     Miranda waiver of rights                        553
13
     29.6   Screenshot working the FTK forensic tool        555
14
     31.1-  Screen capture of Detective Hively's use of     562
15   31.3   AccessData's registry viewer

16   33     Portions of some of the forensic reports        565

17   26.2-  Video clips                                     578
     26.4
18
     27.1-  Videos located on Exhibit 13                    582
19   27.6

20   28.1-  Photographs of A.T.                             595
     28.10
21

22

23

24

25

1  MONDAY, NOVEMBER 13, 2017                Fresno, California

2  12:57 p.m.

3          COURTROOM DEPUTY:  The Court calls case number

4  1:13-CR-00409, United States versus Adam Alan Henry.  Jury

5  trial day 4.

6          THE COURT:  State your appearances.

7          MR. GAPPA:  Good afternoon, David Gappa and

8  Ross Pearson for the United States.

9          MR. CAPOZZI:  Good afternoon, Your Honor.  Toni

10 Capozzi appearing with the Defendant, who is present in

11 custody.

12         THE COURT:  So yesterday the Government filed a

13 motion in limine, and today the defense filed an opposition.

14 Over the weekend I've reviewed the - actually, I went back and

15 reviewed the other transcript as well.  I think I've reviewed

16 four or five different transcripts of hearings having to do

17 with pretrial issues.  I've got to tell you, Counsel, I find

18 the arguments that were made during those hearings to be

19 convoluted and unfocussed, in every instance.  And not

20 surprisingly, I think Judge Ishii in trying to rule, had some

21 difficulty issuing rulings that were not convoluted and

22 focused.

23         And it seems from the few pages that have been filed

24 yesterday that everybody wants to -- both sides want to keep

25 up the drumbeat of, let's argue this for a fifth time in a

1   slightly different way, or with slightly different arguments.

2          Let's go one by one.  Mr. Gappa, tell me what you

3   want to introduce into evidence?

4          MR. GAPPA:  So Your Honor, and --

5          THE COURT:  Just tell me what you want to introduce

6   into evidence, really.  I've read those transcripts.  I'm

7   frustrated with everybody.  Convoluted, unfocused, not that

8   hard, tell me was you want to introduce into evidence.

9          MR. GAPPA:  We just wanted to provide notice that

10  there would be testimony about the bestiality content on the

11  devices that were seized and --

12         THE COURT:  Mr. Gappa, you're doing it to me again.

13  Give me a list of what, in making this motion in limine that

14  you referred to on Thursday and that you filed yesterday, what

15  testimony do you wish to elicit or what exhibits do you wish

16  to introduce?

17         That's it.  I just want a list.  I don't need

18  argument.

19         MR. GAPPA:  Some of it already is in evidence,

20  Your Honor.  For instance, 9.3 and then 29.3.

21         THE COURT:  You're killing me.  You file a motion

22  yesterday saying the defense has opened the door.  Now, we

23  want to present evidence.

24         What do you want to introduce?  Don't tell me what's

25  in already.  Tell me what you want to introduce, so that I can

519

1  rule.

2         MR. GAPPA:  29.3 is one that is not in evidence.

3         29.4, 29.5, and 29.6, and 29.7.

4         THE COURT:  These screenshots, what are they?

5         MR. GAPPA:  They are screen capture of the folder

6  structure of Exhibit 9.

7         THE COURT:  Which is?

8         MR. GAPPA:  The network attached storage device

9  that's already been admitted.

10        And there's already in evidence 29.3, and the reason

11 I'm bringing it up is because 29.3 and 29.1, et cetera, that

12 whole series is just a more detailed view of what has already

13 been admitted as 29.3.

14        THE COURT:  What does this have to do with your

15 motion in limine?

16        MR. GAPPA:  So we are saying that we want

17 Detective Hively to be able to say that, When I went through

18 the folders that are depicted in 29.3, 29.2, 29.4, et cetera,

19 in that series that he found child pornography as well as

20 bestiality.  We're not intending to show any bestiality.

21        It goes to the issue of who's possible for it,

22 because in the Defendant's interview, which is not yet in

23 evidence, there is a question, series of questions about what

24 were you looking for?  And there's reference to bestiality.

25 And the Defendant says, I'm not a fan of bestiality.

1        So to the extent that the jury sees this, and then

2   sees the steps by which the material is downloaded and

3   transferred, then it could help them believe that the person

4   is interested in bestiality.  So it goes to the identify of

5   who is responsible.

6        THE COURT:  What's the evidence that the searches

7   that resulted in those screenshots were conducted by the

8   Defendant?

9        MR. GAPPA:  It's circumstantial evidence, Your Honor,

10  and they are in evidence as part of the Exhibit 1, the search

11  terms, 1A.4.

12       And those are search terms that are entered at the

13  Defendant's workplace, on the Defendant's computer, which has

14  a username and password.

15       THE COURT:  What were the search terms?

16       MR. GAPPA:  They were, among other things, there's

17  Adilia, which we would elicit testimony from Detective Hively

18  today that Adilia is searches for -- searches for horse, pony,

19  dog, animal.

20       Because in the opening, the argument was that the

21  Defendant's wife was interested in corsets, and mom and

22  daughter skirts, things of that nature.  So the argument is

23  that she's the one who entered these search terms.

24       THE COURT:  Right.  Still going to be the argument,

25  right?

521

1          MR. CAPOZZI:  I'm sorry?  Yes.

2          MR. GAPPA:  And the other part of this, Your Honor,

3   is that the bestiality like the child pornography, is found

4   only the secured side, the password protected side, the side

5   that the Defendant said only he had the password to.

6          So it goes, again, to the identity of who is

7   responsible for the child pornography.

8          THE COURT:  Pretty far afield, Mr. Gappa.

9          Anything else?

10         MR. GAPPA:  Your Honor, it is in the statement of the

11   --

12         THE COURT:  We're not going to spend this long

13   talking about it.  Anything else?

14         MR. GAPPA:  No.

15         THE COURT:  Any reference to bestiality or exhibits

16   with respect to bestiality, the previous ruling that that's

17   excluded on 403 grounds is upheld.

18         What else do you want to put on?

19         MR. GAPPA:  Your Honor, in this case, I don't think

20   we could go forward at this point, because we have the

21   Defendant's statement that references that in the --

22         THE COURT:  I guess you're going to dismiss, then, if

23   you can't go forward.

24         Is that what you're telling me?

25         MR. GAPPA:  No.  The Court just now said that there

1  was a previous ruling on that issue.

2         Our memory was that it hadn't specifically been

3  identified, the bestiality issue.

4         THE COURT:  So five different hearings where you guys

5  talked about it at length, and you never got a ruling as far

6  as you're concerned?

7         MR. GAPPA:  It was never addressed.

8         THE COURT:  I tell you, that's both of your faults.

9         MR. CAPOZZI:  Well --

10        THE COURT:  No.  That's why there's not a ruling on

11  every single thing is because the way you folks presented it

12  to Judge Ishii.

13        What else -- maybe I should send the jury home for

14  the day.

15        MR. GAPPA:  Your Honor, we could, I think, resolve

16  the other issues in terms of the evidence from the other

17  location if the defense wants the Court to view that.

18  Obviously, I don't think we would have the time to do that

19  right now.  So we could that do that at the end of the day.

20        THE COURT:  20-plus years, I've never been so

21  frustrated.  This topic that you're now raising, was addressed

22  in the motion in limine you filed yesterday, Sunday, at page

23  4.  It was the last subject that was addressed, in which you

24  argue, "The Government should be permitted to prove the

25  Defendant searched for and found bestiality videos."

1        And I just ruled, no, 403.  Next.  He's not charged

2   with having searched for, found, bestiality videos.  It's

3   irrelevant, and it's prejudicial.

4        If you want me to give the jury instruction that any

5   reference that they've already heard to bestiality of any kind

6   should be stricken from the record and disregard it, I'm happy

7   to do so.

8        MR. GAPPA:  But Your Honor, we have been providing

9   exhibits, and this has been since the inception.  And for

10  instance, these exhibits -- one of which is in evidence at

11  9.3, it has a reference to the animal folder.  And 29.1

12  through 29.6, those folders are there for the jury to see, and

13  the search terms are there.  And the statement from the

14  Defendant, which has been provided, and there was -- excuse

15  me, there was no --

16       THE COURT:  Why did you argue at page 4 of a motion

17  that you filed yesterday in the middle of trial, on a Sunday,

18  that you should be permitted to prove the Defendant searched

19  for and found bestiality videos?  Why is that there?

20       MR. GAPPA:  It's because in the opening, Your Honor,

21  the Defendant addressed who is responsible for doing those

22  searches.  And through the cross-examination of Detective

23  Moore, there was the suggestion that it was only Angele who

24  has what could be considered deviant interests.  That he

25  brought up that she was interested in bondage, interested in

524

1    skirts, and that she has the interest of children.  Whereas

2    the Defendant had only interest in normal pornography.

3            THE COURT:  I've ruled.  No further reference to

4    bestiality videos, 403, not particularly relevant.  You can

5    prove it a lot of other ways.  You don't have to do it through

6    this.

7            What else.

8            MR. GAPPA:  The other items, Your Honor are the use

9    of cameras at the residence prior to the association with

10   Angele Henry.

11           THE COURT:  What do you -- what exactly do you want

12   to elicit?

13           MR. GAPPA:  The --

14           THE COURT:  Or introduce?

15           MR. GAPPA:  Statement was --

16           THE COURT:  No.  Just tell me what you want to put

17   into evidence.  Testimony?

18           MR. GAPPA:  Video.  Videos showing the Defendant had

19   installed cameras at that prior residence.

20           THE COURT:  What video is going to show them?

21           MR. GAPPA:  So we have those, and we have screen

22   captures from those in the exhibit binders, but --

23           THE COURT:  Here's -- Mr. Gappa, if what you're

24   telling me is, Judge, we want to put on evidence in the form

25   of testimony, or in the form of video evidence depicting the

1   installation of cameras by the Defendant, at a prior address,

2   before he met Angele -- I'm going to hear from Mr. Capozzi,

3   but I'm very much inclined to allow you to put on that

4   specific evidence.  Because the defense in their opening and

5   through their examination of witnesses, has been doing

6   everything they can to suggest that everything that occurred

7   that is relevant to the charges against this Defendant was, in

8   fact, done by the Defendant's wife, Angele, not by him.

9         And it seems to me Mr. Capozzi can't have it both

10  ways, and he's gotten as close as he possibly can come.  And

11  to me, clearly in opening said everything but, "She did it,

12  not my client."

13        And if you've got that evidence, that he put in

14  hidden video cameras at his prior residence, and filmed people

15  surreptitiously, I'm very much inclined to allow you to

16  introduce that evidence.

17        If what you're telling me is, "And we want to show

18  those videos," no.  403.  There's no reason why you can't --

19  if somebody -- you want to call somebody to say, "Yes, I was

20  surreptitiously filmed by the Defendant in his bathroom at a

21  prior location, and he didn't have my permission.  I had no

22  idea I was being filmed."  I'm inclined to allow you to do

23  that.

24        Am I inclined to allow you to show that video, no.

25  Why would I?  Not necessary and unduly prejudicial.

1        Why we're even talking about this now, though, is way

2   beyond me.  All these transcripts of four different pretrial

3   motions, hearings, arguments, and we still don't -- we still

4   don't have a roadmap of what's -- what we want to put in and

5   what's going to be admitted?  I don't know understand.

6        And when I read these transcripts, as I say, I lay

7   the fault at both counsel.  I think if those were the most

8   convoluted hearings, I've read.  Nobody every focused on

9   anything concrete.

10       What's the next thing you want to admit?  We've got a

11  jury waiting.

12       MR. GAPPA:  Your Honor, those were the items.

13       THE COURT:  What about the part of the motion in

14  limine that was filed yesterday that talks about -- I mean,

15  I'm not inclined to allow you to admit it, but you went to

16  some length talking about bondage, sex videos, sex with other

17  females, including between his wife and the third female.  I'm

18  not inclined to admit any of that.  Are you withdrawing that?

19       MR. GAPPA:  No, Your Honor.  That was on the list of

20  items, which we think it has been made relevant by, again,

21  statements that were only made after the trial started.

22       In the cross-examination of Detective Moore, again,

23  the portrayal of Angele was the one that had the more deviant

24  interest, and the Defendant was the one that had at best an

25  interest in what was characterized as normal pornography.

1    So this, again, also goes to show them working

2  together, but it refutes the idea that the Defendant's wife is

3  the driving force behind --

4    THE COURT:  Look, if what you want to elicit is

5  testimony that on computer systems, whether servers, the

6  multi-disservers that there was a wide array of pornography,

7  not just so-called normal pornography, if you want to elicit

8  testimony that there was bondage pornography, even bestiality

9  pornography, that there was a wide array of pornography.  But

10  to try out titles like those screenshots, seems to me, to fall

11  within 403.  And I definitely wouldn't allow the depiction of

12  any of that pornography.

13    If your position is, look, the defense has said all

14  he was into was normal pornography, we ought to at least be

15  able to elicit that.  Well, I guess normal is within the eye

16  of the beholder.  But there's a vast array of pornography in a

17  variety of different areas, and therefore, to set up the

18  argument that, look, the defense says his entire life was

19  changed by his wife that was into things far, far wider than

20  he was, but ladies and gentlemen, you heard the officers

21  testify what they found on the server that was accessible to

22  the Defendant, and our argument is really only accessible to

23  the Defendant was a wide array of pornography, I'll allow you

24  to do enough to make that or to set the stage for that

25  argument.

1        But trotting out all these screenshots of these lured

2   descriptions, to me, does seem to fall on the 403, unduly

3   prejudicial side of things.  I get what you're saying, that,

4   you know, and I -- I'm conveying to Mr. Capozzi, you can't

5   have it both ways.

6        You can't argue that, Hey, she changed my life

7   completely.  It was all her.  None of it was me.  And then

8   when the Government tries to show, No, it was you, too, say,

9   Well, no, that's inadmissible.  That can't come in.

10       I agree with you.  It's more of a matter of degree

11  specificity.  And to me, those screenshot titles fall on the

12  wrong side of that line.

13       MR. GAPPA:  Your Honor, there was never a motion in

14  limine to keep those out.

15       THE COURT:  What can I tell you?

16       MR. GAPPA:  We provided --

17       THE COURT:  I don't know why you addressed them in

18  the your motion in limine then.  Why did you even put -- why

19  is page 4 on your motion in limine?  You raised it.

20       MR. GAPPA:  Well, Your Honor --

21       THE COURT:  Just like in your motion in limine, you

22  said -- you objected to all the questions about what

23  Mrs. Henry said.  I bet we if go back and look at that

24  transcript, you see you didn't object to all of them.  You

25  objected to some, not all.  Some of those questions got

1   answered without drawing any objection.

2           MR. GAPPA:  Your Honor, the other reason why these

3   titles are important is that the testimony thus far has

4   established the way in which those titles get onto a device is

5   through use of Shareaza.  And one of the first things that

6   happens when you open the program is you get a search box.

7   And you put in those search --

8           THE COURT:  You can put in search terms.  I'm talking

9   about the titles of what go turned up afterwards.

10          Which I think, based upon what your witnesses have

11  testified to, it's already been established that, look, you

12  put in search terms, you get back what you get back.  Some of

13  it may be responsive, not all of it may be responsive.  And

14  you may get all sorts of things in there.

15          I think even your own witnesses have said that.

16  Search terms, I agree with you.  Whatever somebody put in as a

17  search term, I have -- you know, it is what it is.

18          But you're asking me, Judge, we want to put in

19  evidence of titles kind of being turned up pursuant to those

20  search terms that are clearly bestiality videos.  Why do we

21  need to admit those into evidence.  Why can't you just elicit

22  testimony from your witnesses that there was that type of

23  pornography within that which was found.

24          MR. GAPPA:  We can elicit that testimony, but these

25  29 series exhibits represent the content of videos that are on

1    the Defendant's home computer.  And so there is --

2            THE COURT:  Are we going to put in every one of them?

3            MR. GAPPA:  We haven't even put in every single one.

4            THE COURT:  Good.  So we won't start now.

5            MR. GAPPA:  But, Your Honor --

6            THE COURT:  I'm done, Mr. Gappa.

7            MR. GAPPA:  Okay.

8            THE COURT:  We've kept them waiting 25 minutes.

9            Why this wasn't resolved, if it was an issue, I don't

10   know.  I read those transcripts, and it seems to me that they

11   were resolved.  Although, there was supposed to be a lot more

12   meet and conferring than seems to me than there's been.  I've

13   ruled.

14           Mr. Capozzi, anything you want to argue about?  I'm

15   letting them in.  I'm going to allow them, my inclination,

16   unless you talk me out of it, to establish that your client's

17   prior home, he installed a hidden video camera in the bathroom

18   and filmed people without their knowledge.  I mean, I'm

19   inclined to let them put that in without put in the actual

20   videos that were taken.  But to have people testify, if

21   they've got them that, Look, I've got film in compromising

22   situations, naked, whatever, without my knowledge and without

23   my consent.

24           MR. CAPOZZI:  The one video that the Government wants

25   to bring is with Rebecca Alvarez, his former fiance.

1        THE COURT:  I'm not letting in videos.

2        MR. CAPOZZI:  Pardon me?

3        THE COURT:  I'm not letting in videos.

4        MR. CAPOZZI:  But --

5        THE COURT:  I'll allow testimony that -- that the

6   Defendant, at a prior location, before he ever met Angele,

7   installed a hidden camera that filmed people in the bathroom

8   of his home, in various states of disrobing or engaged in

9   personal conduct without their knowledge and without their

10  concept.

11       MR. CAPOZZI:  Okay.  If we were to call Rebecca as a

12  witness, we believe she would say she knew it was there.  In

13  the videos -- and I'm just giving you some background, in the

14  videos, while she's in the bathtub, she's looking at the

15  camera, smiling at the camera, acknowledging it's there.  Our

16  evidence would show --

17       THE COURT:  My understanding is, from reading the

18  transcripts is that there's a dispute about this.  I'm not

19  sure the Government is going to -- well, I don't know what --

20  I have no idea what evidence the Government is going to

21  introduce in that regard.

22       My understanding is that the Government has

23  consistently proffered that there are people who will say that

24  they were filmed on that camera without their consent, not

25  knowing that they were being filmed.  Am I right about that,

```
 1   Mr. Gappa?
 2            MR. CAPOZZI:  That's true to a degree.
 3            MR. GAPPA:  Yes.
 4            THE COURT:  Is that what you want to put on?
 5            MR. GAPPA:  Yes.
 6            THE COURT:  I'm inclined to allow it.
 7            MR. CAPOZZI:  I can't disagree with it.
 8            As to another -- well, again, the Government was
 9   trying to put in the videotapes of the bondage and the sex, et
10   cetera.  And you're not allowing the screenshots.  There are
11   some screenshots they've submitted as evidence, I'm going to
12   move to exclude.  Again the video --
13            THE COURT:  I'll rule on one at a time.
14            MR. CAPOZZI:  Let me go back to number two on the
15   prior hidden camera.
16            All of that is adult -- all of these people were
17   adults.  There's no child pornography involved, there's no
18   exploitation of a child.
19            THE COURT:  I don't care.
20            MR. CAPOZZI:  Okay.
21            THE COURT:  The reason I don't care is this -- the
22   reason I don't care is this, you painted a picture in your
23   opening statement in your examination --
24            MR. CAPOZZI:  Got you.
25            THE COURT:  -- that suggests, at the very least
```

1  suggested that the surreptitious filming of individuals in the

2  Defendant's home, in this bathroom, and in the bedroom, you

3  didn't distinguish really between the two was attributable to

4  Angele.

5           The fact that the Defendant OO that the Government

6  says, We've got evidence that he had a surreptitious camera in

7  his bath -- in the prior residence in the bathroom before he

8  ever lived with Angele, responds to that suggestion.  I'm

9  going to allow it.

10          I don't care whether it was minors, not minors, the

11  fact that he had a camera, surreptitious camera installed is

12  relevant in and of itself regardless of who was captured

13  without their consent or knowledge.

14          MR. CAPOZZI:  Okay.

15          THE COURT:  In my opinion.

16          MR. CAPOZZI:  The third issue is, I think you're

17  allowing them to put testimony in that there were pictures --

18  or not pictures.  I think you're saying that they're allowed

19  to bring in videotape -- not tape.

20          Testimony that there was a three-person sex with

21  bondage with the Defendant included; is that my understanding?

22  To me, it's adult -- it's adult sex.  It's not illegal.

23          THE COURT:  No.  I would not allow them to elicit

24  that testimony.  I would urge the Government if they want to

25  respond to this suggestion of the defense that his interest

1    was only in quote, "normal pornography," that I will allow the

2    Government to elicit testimony that within the pornography

3    that the Defendant had access to was a wide variety of

4    pornography touching upon -- fitting various descriptions.

5    Whether it be pornography involving animals, pornography

6    involving multiple participants.  You know, I'll give them the

7    ability to set up their argument that, look, while the

8    Defendant says he was only interested in normal pornography,

9    that depends on whose version of normal you think it is.

10   There was all sorts of stuff on there.

11           MR. CAPOZZI:  I have nothing more to argue.

12           THE COURT:  What I don't want, and what I would

13   preclude, and if there's an objection, it would be my

14   intention to sustain it, is the eliciting of testimony that

15   the Defendant himself was personally engaged in what many

16   jurors would find despicable, distasteful acts, personally.

17           Which seems to me, is unduly prejudicial even if it

18   has some possible relevance.  I want to steer the middle

19   course here.

20           This case is about the two charges in this in

21   indictment.  It's not about whether the Defendant has interest

22   that jurors might think are deviant.  It is about the two

23   charges in the indictment.

24           And I think, when I read the transcripts, I think

25   that's what Judge Ishii kept trying to come back to.  But it

535

1   was a moving target, in my opinion, on all sides.  And I think

2   he was doing the best he could to steer that middle ground,

3   and so am I.

4          So I've been as specific as I can.  In order to get

5   any more detail, you know, ask your questions, takes your

6   chances.  If the other side has an objection, I'm going to

7   rule on it.

8          If you've got an exhibit, make sure that I've got it

9   on my screen.  If there's an objection, I'll rule on it.  I'm

10  trying to stake out parameters as specifically as I can.

11         MR. GAPPA:  Your Honor, the concerns -- and just to

12  put it out there, the Government has these screen captures.  I

13  don't see a way to redact them in light of the immediate

14  ruling that we just had.

15         What we could do -- and we don't intend to highlight,

16  in light of the ruling, any --

17         MR. CAPOZZI:  What exhibit are you looking at?

18         MR. GAPPA:  29.1 through 29.7.

19         THE COURT:  Are none of those in right now?

20         MR. GAPPA:  Correct.

21         But these folders are where the child pornography was

22  located?

23         THE COURT:  Right.

24         MR. GAPPA:  And so --

25         THE COURT:  You know --

1        MR. GAPPA:  The Defendant had asked that we redact

2   the word "pedo," "pedophilia," any reference to P-e-d-o.

3   We've done that.  That was the only request from the

4   Defendant.  So based on that, and it not having been flagged

5   as an issue, we did not further redact.  So, for instance, in

6   here it says "massive dog cream pie."

7        THE COURT:  Well, see --

8        MR. GAPPA:  That hasn't been redacted.

9        THE COURT:  To me -- no.

10        MR. GAPPA:  I'm --

11        THE COURT:  I am not going to sua sponte prevent you

12   from entering this exhibit, if you've established a foundation

13   based on that kind of entry.

14        Have I studied everyone one of your exhibits?  Heck

15   no.  If I get an objection to an exhibit, I'm going to rule on

16   it.  If you're asking me, Judge, are you going to let -- are

17   you going to disallow the admission of 29.1 because the word

18   dog is in one of the entries?  No.

19        MR. GAPPA:  In light of the ruling, we are not going

20   to ask if the agent reviewed that video and if it had

21   bestiality.

22        THE COURT:  Exactly.

23        MR. GAPPA:  Because we can't prove where the child

24   pornography was without these exhibits, because this is where,

25   on item 9, the child pornography was located.

1          THE COURT:  I thought you already introduced evidence

2  that established that, but if you think you need more then I

3  -- you'll proceed.  And if I draw -- get objections, I'll rule

4  on them as they come.

5          MR. GAPPA:  There is also just the other part of it

6  that I wanted to -- I've already said this, so I don't want to

7  be repetitive.

8          THE COURT:  Good.  Let's go.

9          MR. GAPPA:  There's reference to bestiality.  So

10  obviously, there's no way for us to redact that at this point.

11          We did redact other things from this statement, but

12  this was never flagged as a concern of the defense.  So --

13          THE COURT:  I'm going to stop, and we're going to

14  start.  I will just point out read page 4 of your motion in

15  limine.  I'm just responding to what you're filing.

16          (Jury enters courtroom.)

17          THE COURT:  Let the record reflect that we are back

18  in the presence of the jury.

19          Ladies and gentlemen, I apologize for getting a late

20  start.  There was some work that we had to do this afternoon,

21  and I had a morning calendar, so, you know, got to do what you

22  have to do.

23          And in any event, we'll get going now, and thank you

24  for all being here promptly.

25          You may continue, Mr. Gappa.

538

1          MR. GAPPA:  Thank you, Your Honor.

2                    **DIRECT EXAMINATION RESUMED**

3     BY MR. GAPPA:

4     **Q.**  Detective Hively, when we broke on Thursday had heard what

5     has been received as Exhibit 21, the audio statement of the

6     Defendant and your interview of him.  Did the Defendant tell

7     you in that interview that he would delete any files that were

8     downloaded, if the file did not have a title?

9     **A.**  Yes, he did.

10    **Q.**  Did you initially understand his response to your question

11    on that topic?

12          MR. CAPOZZI:  Objection, calls for conjecture, "Did

13    he understand"?

14          THE COURT:  Overruled.  I'll allow the witness to

15    answer what his understanding of that response was, if he can.

16          THE WITNESS:  I didn't, and I asked for

17    clarification.

18    BY MR. GAPPA:

19    **Q.**  So in your experience in investigating cases involving

20    file sharing and use of Peer-to-Peer networks how common is it

21    that files are downloaded without titles?

22    **A.**  I've never seen it happen before.

23    **Q.**  Did the Defendant tell you during that interview where

24    child pornography might be found at his residence?

25    **A.**  Yes.

539

1  **Q.**  Where did he say it might be found it?

2  **A.**  Indicated it would be on the secured share of the NETGEAR

3  ReadyNAS.

4  **Q.**  And did he give a more descriptive answer of where it

5  would be on that device?

6  **A.**  Well, throughout interview he did talk about his

7  methodology, and how he would create folders with Aza, Aza1 or

8  Aza2.  And that that might be where those might be located.

9  **Q.**  Let me show you what's been received as Government's

10  Exhibit 5.7.

11          Detective Moore testified that Exhibits 8 and 9,

12  which are now in evidence were there on September 19th, 2013.

13  Did you see Exhibits 8 and 9 when they were still at the

14  Defendant's residence?

15  **A.**  I did.

16  **Q.**  Could Exhibit 9 fairly be described as a series of hard

17  drives?

18  **A.**  Yes.

19  **Q.**  How many hard drives were contained within Exhibit 9?

20  **A.**  Four hard disc drives.

21  **Q.**  So is that a computer or just a storage device?

22  **A.**  It's a network attached storage device.

23  **Q.**  Did you do a forensic examination of that exhibit?

24  **A.**  I examined files that were located on there that were

25  provided to me by Detective Moore.

1  **Q.**  So Detective Moore also examined that device?

2  **A.**  Yes.

3  **Q.**  Why did both of you examine it?

4  **A.**  We broke up the workload due to sheer volume of data that

5  had to be examined.  The number of computers, the number of

6  files in this particular case, I've never seen a case before

7  this one, four years ago, that had this many computers, hard

8  disc drives, or storage space.  So we broke it up because of

9  that.

10  **Q.**  And did Detective Moore leave the Ceres Police Department

11  at some point?

12  **A.**  He did.  July 2014 he went to the Mountain View Police

13  Department.

14  **Q.**  And the investigation was still ongoing at that time?

15  **A.**  Yes.

16  **Q.**  Did you find child pornography on Exhibit 9?

17  **A.**  I did.

18  **Q.**  Where did you find it?

19  **A.**  I found it in a number of different locations.

20  **Q.**  Let me show you first only what has been marked as

21  Government's Exhibit 29.2.  Do you recognize this document?

22  **A.**  I do.  I assisted in the preparation of this exhibit.

23  **Q.**  How did you prepare it?

24  **A.**  Utilizing the Forensic Toolkit, which is a product of

25  AccessData, I examined the logical file that had been provided

1  to me by Detective Moore.  And I expanded some of the file

2  folders on there, and I took a screenshot of it.

3          MR. GAPPA:  Your Honor, I would move that that be

4  admitted as 29.2.

5          THE COURT:  Any objection to 29.2 being admitted?

6          MR. CAPOZZI:  No objection.

7          THE COURT:  29.2 is admitted.

8          MR. GAPPA:  Thank you, Your Honor.  And request it to

9  be published.

10          THE COURT:  You may.

11      (Plaintiff's Exhibit 29.2 was admitted into evidence.)

12  BY MR. GAPPA:

13  **Q.**  Detective Hively -- and so that everybody can see this,

14  can you explain more thoroughly what it is we're looking at

15  here?

16  **A.**  Yes, I can.  Certainly, we can at the top we have the file

17  number for our particular case at Ceres Police Department.

18          It says 213-004554.  It says "Aurrora folder."  And

19  Aurrora is spelled A-U-R-R-O-R-A, dot AD1.  AD1 is an

20  AccessData logical evidence file that was provided to me by

21  Detective Moore.

22          As I worked my way down the file structure or

23  directory tree we have:  Copy, copy, sorted, bad, new folder.

24  Underneath new folder we have:  Animal.  Under that, directly

25  under that is:  New folder.  And the contents of new folder

1  would be one folder labeled "kid," in lower case.  And beneath

2  that, in the same new folder, is a folder labeled "no," lower

3  case.

4  Q.  Let me ask you a question about those folder titles, how

5  did those get on the device?

6  A.  Well, they're user created.  Generally speaking, if a

7  person wants to create a new folder, you can just right click

8  and select "new folder."  If you don't change the default,

9  then the name is going to be "new folder."  Anything other

10 than that, is going to be user created.

11 Q.  So looking, then, at the -- would you call it a subfolder

12 or a folder that has the word kid, K-I-D?

13 A.  Kid is a subfolder of new folder.

14 Q.  Did you examine the content of that subfolder?

15 A.  I did.

16 Q.  What did you see there?

17 A.  I located child pornography.

18 Q.  What was the total number of child pornography items, in

19 your opinion?

20 A.  27 videos of child pornography out of 34 in that folder.

21 Q.  And below the file structure what do we see?

22      If we could --

23 A.  Thank you.  What I've done in this particular case is I've

24 highlighted the "kid" folder.  What we can see at the bottom

25 of that are the files listed there.

1          In this case, the first 12 in that particular folder.
2    As I said there were 34 in there.
3    **Q.**  Okay.  And of the 34, 27, in your opinion, were child
4    pornography?
5    **A.**  Yes.
6    **Q.**  And what you have there are titles of, obviously, fewer
7    than 27, correct?
8    **A.**  Yes.
9    **Q.**  Were those of interest to you in your investigation?
10   **A.**  Yes.  The investigation resolved [sic] around the
11   possession of child pornography.
12   **Q.**  Did you find a copy of these 27 videos from that kid
13   folder on the non-password protected side?
14   **A.**  I did not.
15   **Q.**  Let me show you next what has been marked as Exhibit 29.3.
16   Do you recognize this document?
17   **A.**  I do.  I prepared this document as well for exhibit.
18   **Q.**  And did you do this the same way that you created 29.2
19   that you just testified about?
20   **A.**  Yes, sir.
21          MR. GAPPA:  Your Honor, I would ask that this be
22   admitted as 29.3.
23          THE COURT:  Any objection?
24          MR. CAPOZZI:  No objection.
25          THE COURT:  29.3 is admitted.

544

1    MR. GAPPA:  Thank you, Your Honor.

2    Then request permission to publish.

3    THE COURT:  You may.

4    (Plaintiff's Exhibit 29.3 was receive into evidence.)

5  BY MR. GAPPA:

6  **Q.**  Detective Hively, now that everybody can see this, can you

7  explain what it is we're looking at?

8  **A.**  Certainly.  I created a number of call out boxes that have

9  a number, and then the letters CP.  From those boxes I have

10  arrows pointing to specific folders.

11  **Q.**  And what do the numbers in the boxes represent?

12  **A.**  That would be the number of child pornography videos

13  located in those specific folders.  For example, six child

14  pornography videos were located in the new folder in

15  parenthesis (6).

16    As I mentioned a moment ago, 27 child pornography

17  videos in the kid folder, and in the "no" folder there were 46

18  child pornography videos.

19  **Q.**  Let me show you next what has been marked for

20  identification as Exhibit 29.4.  Do you recognize this

21  document?

22  **A.**  Yes, I do.

23  **Q.**  And what is this?

24  **A.**  This is another screenshot, different folder structure of

25  the same over folder.  Again, I've labelled in call out boxes

545

1  the number of child pornography videos that were located in

2  each folder.

3  **Q.**  Was this prepared in the same way as the previous two

4  exhibits that you've testified about?

5  **A.**  Yes, sir.

6          MR. GAPPA:  Your Honor, I'd ask that this be received

7  as Exhibit 29.4.

8          MR. CAPOZZI:  No objection.

9          THE COURT:  29.4 is admitted.

10         MR. GAPPA:  And request permission to publish.

11         THE COURT:  May be published.

12         MR. GAPPA:  Thank you, Your Honor.

13     (Plaintiff's Exhibit 29.4 was received into evidence.)

14  BY MR. GAPPA:

15  **Q.**  So Detective Hively, now that everybody can see this, can

16  you give us some more explanation of what it is we're looking

17  at?

18  **A.**  Certainly.  Again, we have the same title at the top.  It

19  is the same folder structure as we work our way down.

20         Underneath the Aurrora folder, we have "new" and then

21  the word "MISC," for new miscellaneous.

22         Under that we have another new folder.  It contains

23  three folders.  The first being Aza, lower case, Aza1 one, and

24  the next folder is Aza2.

25         The call out boxes indicates in Aza there are 11

1  child pornography videos.  Asa1 there are 16 child pornography

2  videos.  And in Aza 2 there are five pornography videos.

3  Q.  Moving next, I'll ask you -- going back to that interview

4  that we heard on Thursday, did the Defendant ever tell you

5  whether or not he had reviewed the contents of the completed

6  folder for the Shareaza program on his work computer?

7  A.  As I recall, he kind of went back and forth on that.  He

8  said sometimes he would.  Sometimes he would copy them over

9  and take them home, and he would do that at a later date.

10 Q.  Did you ask, "When was the last time you checked the

11 completed folder"?

12 A.  Yes.

13 Q.  And what answer did he provide?

14 A.  He said approximately three days prior to the search

15 warrant service.

16 Q.  What did he say he found there, if anything?

17 A.  He indicated in the interview that he located two video

18 files.

19 Q.  Okay.  And you -- well, let me ask you, did you conduct a

20 forensic examination of the computer and the hard drives that

21 are now in evidence as Exhibits 1 and 1A?

22 A.  I did.

23 Q.  Did you locate any child pornography videos on those

24 exhibits?

25 A.  I did on Exhibit 1A.

1   **Q.**  And how many items did you find of interest to your
2   investigation on 1A?
3   **A.**  There were two areas of concern.  I located six child
4   pornography videos in the recycle bin in the folder called
5   "new folder."
6           On the desktop there was a folder labeled "MOV."
7   Within that, there was a folder Aza.  Within that there were 2
8   video files, one which was child pornography.
9   **Q.**  So let me show you what has been -- bless you -- received
10  as Exhibit 1A.7.  This is in evidence, can you explain what
11  this exhibit is?
12  **A.**  Yes.  We've switched forensic tools.  This is a view my
13  primary tool, which is EnCase.  On the left-hand side, we have
14  the directory for Exhibit 1A.
15          And on the right-hand side, we have the Aza folder
16  that I mentioned, which contained the two videos I just spoke
17  about.
18  **Q.**  What is the significance of a file creation day?
19  **A.**  Generally speaking, that's the date that file was added to
20  that particular computer.
21  **Q.**  So were you able to learn anything about day on which the
22  Aza folder, which these two child -- or these two files that
23  you testified about were located?
24  **A.**  Yes.  They were created the morning of the day of the
25  search warrant -- I'm sorry, the Aza folder was created on the

548

1    morning of the day of the search warrant, September 19, 2013.

2    **Q.**  At what time?

3    **A.**  7:02 in the morning.

4    **Q.**  Did you look for a folder called "MOV" on the password

5    protected side of Exhibit 9?

6    **A.**  That's part of my normal investigation.  I looked at all

7    the files and folders there, and I did locate one called

8    "MOV."

9    **Q.**  Where was that folder located?

10   **A.**  I don't remember.

11   **Q.**  Let me show you only what has been marked as Government's

12   Exhibit 29.1.  Do you see 29.1?

13   **A.**  I do.

14   **Q.**  Do you recognize it?

15   **A.**  I do.  I prepared this document as well for exhibit.

16   **Q.**  Can you explain briefly how it was that you prepared 29.1?

17   **A.**  We're back to using FTK.  In this particular one, it's the

18   same as the ones we saw earlier with the Aurrora at the top of

19   directly tree.  And as we go down towards the bottom, about

20   two thirds of the way down, there's a folder labeled "mov",

21   lower case.

22           MR. GAPPA:  Your Honor, I ask that that be admitted.

23           THE COURT:  29.1?

24           MR. GAPPA:  Yes.

25           THE COURT:  Any objection?

1       MR. CAPOZZI:  And this was created by this witness?

2   That you say --

3       MR. GAPPA:  Yes.

4       MR. CAPOZZI:  Okay.  No objection.

5       THE COURT:  29.1 is admitted.

6       MR. GAPPA:  Thank you, Your Honor.

7       THE COURT:  It may be published.

8   (Plaintiff's Exhibit 29.1 was received into evidence.)

9   BY MR. GAPPA:

10  Q.  Now, everybody can see it, can you explain what it is that

11  you were testifying about, and if need be, point it out?

12  A.  I believe the question earlier was, did I locate on the

13  secure side of the NETGEAR ReadyNAS a folder name "mov."  I

14  would indicate with a circle on the exhibit where that is.

15  Q.  And on this document, there's a folder highlighted called

16  "new folder," then a (6).  Did you look at the contents of

17  that folder?

18  A.  Yes.  That was an earlier exhibit we just displayed.

19  Q.  Can you circle that folder or subfolder?  Did you examine

20  the contents of that subfolder?

21  A.  Yes.

22  Q.  What was in that subfolder?

23  A.  Child pornography.

24  Q.  If we focus on the bottom portion of 29.1, can you explain

25  what it is that we see?

1    **A.**  It's a partial listing of the contents of new folder, (6).

2    **Q.**  Within the new folder you said you found some child

3    pornography videos?

4    **A.**  There were six in that particular folder, yes, sir.

5    **Q.**  Going back to the top portion of the 29.1, did you see a

6    folder called "elite porn pass"?

7    **A.**  I did.

8    **Q.**  Can you point that folder out?

9         THE COURT:  I need you to switch your -- there you

10   go.  Actually, yes.  Thank you.

11        THE WITNESS:  I've drawn a circle, as best as I can

12   around "elite porn pass," the folder.

13   BY MR. GAPPA:

14   **Q.**  Was there any child pornography in that folder?

15   **A.**  Yes.  There was a subfolder called Aza, and inside that

16   there were child pornography videos.

17   **Q.**  And do you recall what was the number of child pornography

18   videos?

19   **A.**  I'm sorry.  What is the number of the exhibit?

20        THE COURT:  No, number of videos, child porn videos

21   found in that folder.

22        THE WITNESS:  Yes, sir.  I'm asking which exhibit

23   this is.  It's --

24        THE COURT:  29.1.

25        THE WITNESS:  Thank you.  There were six child

551

1   pornography videos in that particular folder.

2   BY MR. GAPPA:

3   **Q.**  Okay.  I want to next draw your attention to what has been

4   marked as Government's Exhibit 22.  What is Exhibit 22?

5              MR. CAPOZZI:  Which exhibit number, Counsel?  Sorry.

6              MR. GAPPA:  22.

7              THE WITNESS:  It's going to be an interview that I

8   conducted with Mr. Henry at the police station in Ceres.

9   BY MR. GAPPA:

10  **Q.**  Let me see if I can ask some questions to help set that

11  up.

12             Did you create, then, a recorded interview of the

13  Defendant on September 19th, 2013?

14  **A.**  Yes.  After we came back from the business location

15  Lock-N-Stitch, we arrived back at the Ceres Police Department,

16  I conducted that interview in an interview room in which we

17  have video recording equipment.

18  **Q.**  And after the video was recorded, do you have an

19  opportunity to review just the video?

20  **A.**  I did.

21  **Q.**  And then, was there a transcription made of the questions

22  and answers?

23  **A.**  Yes, sir.

24  **Q.**  Have you had a chance to review the transcription?

25  **A.**  I did.

1  **Q.**  And in your opinion does the transcript accurately reflect

2  the recorded statements?

3  **A.**  It does.

4       MR. GAPPA:  Your Honor, I would ask that this

5  Exhibit 22 be admitted.

6       MR. CAPOZZI:  No objection, Judge.

7       THE COURT:  22 is admitted.

8     (Plaintiff's Exhibit 22 was received into evidence.)

9       MR. GAPPA:  Your Honor, this is in some way similar

10  to Exhibit 21.  Where there was an agreement the court

11  reporter would not need to try to transcribe.  And this is --

12       MR. CAPOZZI:  True.

13       MR. GAPPA:  Video is approximately 23 minutes 37

14  seconds.  We have no objection to that same procedure.

15       THE COURT:  Agreed counsel for the Defendant?

16       MR. CAPOZZI:  I agree, Your Honor.

17       THE COURT:  All right.  The reporter need not report

18  this as it's played.

19       MR. GAPPA:  Your Honor, can I just ask

20  Detective Hively once we press the arrow, and it starts to

21  play, what is it in general that we'll see or hear?

22       THE WITNESS:  As I said earlier, it's a continuation

23  of my audio interview with Mr. Henry.  It was my goal to try

24  to get more information from him on his use of Shareaza, his

25  methodology, how he -- after downloading files from work, how

553

1    he would get them home.  Also information regarding the

2    NETGEAR ReadyNAS, and specifically, issues related to the

3    secure side of that versus the nonsecure side.

4           MR. GAPPA:  Your Honor, request permission to publish

5    that exhibit.

6           THE COURT:  You may.

7       (Audio played.)

8    BY MR. GAPPA:

9    Q.  So Detective Hively, let me next show you, only what's

10   been marked as Government 's Exhibit 23.  Do you see this

11   document?

12   A.  Yes, sir, I do.

13   Q.  What is this document?

14   A.  This is a form that I prepared for Mr. Henry that has his

15   Miranda waiver of rights.

16   Q.  Did we see this original version of this in what was

17   received as Exhibit 22, that recorded statement?

18   A.  Yes.

19          MR. GAPPA:  Your Honor, I would ask this be admitted

20   as Exhibit 23.

21          MR. CAPOZZI:  No objection, Judge.

22          THE COURT:  23 is admitted.

23          MR. GAPPA:  And permission to publish, Your Honor.

24          THE COURT:  Sure.

25      (Plaintiff's Exhibit 23 was received into evidence.)

1    BY MR. GAPPA:

2    Q.  Detective Hively, can you explain what it is now that

3    we're looking at?

4              THE COURT:  Relevance?

5              MR. GAPPA:  Your Honor, we can move on.

6              THE COURT:  Okay.

7    BY MR. GAPPA:

8    Q.  Let me next, Detective Hively, direct your attention to

9    what's been marked as Government's Exhibit 29.4.

10             If we can go 29.7 -- I'm sorry.  29.4 has been

11   admitted so if we can put that up, actually, 29.4.

12             Your testimony was that those are subfolders that

13   were found on the secured side of the NAS, the NETGEAR network

14   attached storage device in Exhibit 9?

15   A.  Yes, sir.  That was consistent with Mr. Henry's statement

16   with me that he would create folders with Aza, Aza1 and Aza2.

17   Q.  If we could go, for your review, first, only 29.6.  Do you

18   see 29.6 on your screen?

19   A.  I do.

20   Q.  What is this?  What is this Exhibit 29.6?

21   A.  You're going to have to give me a second, please.

22             THE COURT:  Right.  Because there's no folder at the

23   top, right?

24             THE WITNESS:  This is a screenshot, lower down, the

25   correct tree on the secure side of the NETGEAR ReadyNAS.

1   BY MR. GAPPA:

2   **Q.**  Is there a connection between 29.4 and 29.6?

3   **A.**  Yes.  Underneath the file folder labeled "new folder," we

4   have the same folders Aza, Aza1, and Aza2.

5   **Q.**  Did you prepare 29.6 in the same manner that you prepared

6   29.4?

7   **A.**  Yes, sir.  It's a screenshot working the FTK forensic

8   tool.

9           MR. GAPPA:  Your Honor, I ask 29.6 be admitted.

10          THE COURT:  Any objection?

11          MR. CAPOZZI:  No.

12          THE COURT:  29.6 is admitted.  You may publish.

13     (Plaintiff's Exhibit 29.6 was received into evidence.)

14          MR. GAPPA:  Thank you, Your Honor.

15  BY MR. GAPPA:

16  **Q.**  Detective Hively, now that everybody should be able to see

17  29.6 can you explain what it is that we're looking at on this

18  exhibit?

19  **A.**  Certainly.  It appears to be the contents or a portion of

20  the contents of the Aza folder.  At the bottom of the exhibit

21  we can see there are 70 folders in that particular -- I'm

22  sorry, 70 files within that folder.

23  **Q.**  Did some of those titles have significance to you as the

24  investigator on this case?

25  **A.**  Yes, sir.  They have terms indicative of child

1    pornography.

2    **Q.**   What are some of those?

3    **A.**   PTHC, 11YO boy, ten year old boy and mommy; 13YO preteen;

4    R@Gold is one of the terms.

5    **Q.**   Any others?

6    **A.**   3YO toddler girl rape; 6YR girl best dickie.

7    **Q.**   So then, Detective Hively, in what has been received as

8    Government's Exhibit 22, the video recorded statement, did you

9    hear the Defendant state, "Dear, God, no," when asked if there

10   would be any folders that would indicate somebody was

11   categorizing child pornography on the devices that he had

12   access to?

13   **A.**   Yes, sir.

14   **Q.**   Let me show you, I believe, this is in evidence, 29.2.  Do

15   you see that?

16   **A.**   Yes, sir.

17   **Q.**   And what is this?

18   **A.**   State folder structure underneath the Aurrora folder that

19   shows down the directory tree, the new folder.  Underneath

20   that we have "animal" and a new folder.  And within the new

21   folder, there's "kid" and "no."

22   **Q.**   And based on your training and experience that you stated

23   on Thursday, does this, in your opinion, indicate that

24   somebody was categorizing the material being downloaded by

25   Shareaza?

1    A.   Yes, sir.

2    Q.   Why is that?

3    A.   Because the folder labeled "kid" had 27 child pornography

4    videos within it.

5    Q.   Did the Defendant tell you that he would look for types of

6    pornography that Angele liked?

7    A.   He indicated that she liked pornography with costumes,

8    like, Renaissance and those type of things, if that's what

9    you're asking.

10   Q.   Did he tell you whether he had ever found any of that

11   material?

12   A.   In the interview he indicated that he found a couple of

13   those items.

14   Q.   Did he tell you anything about his wife at that time being

15   pregnant?

16   A.   In the interview he indicates she's approximately eight

17   months pregnant.

18   Q.   This was on September 19, 2013?

19   A.   Yes, sir.

20   Q.   You were at the Defendant's residence that day at some

21   point, correct?

22   A.   Yes, that evening.

23   Q.   Did you see her, Angele Henry?

24   A.   I did.

25   Q.   Did she appear to you to be about eight months pregnant

1   then?

2   A.   Yes, sir.

3   Q.   How many total child pornography videos did you locate on

4   Exhibit 9?

5   A.   Approximately, 150.

6   Q.   What did you do after you completed the recording that

7   we've now seen as Exhibit 22?

8   A.   I drove Adam Henry to his residence on Burman Drive in

9   Turlock, California.  I turned him over to Detective Moore.

10  Then I assisted with the collection of evidence from that

11  residence.

12  Q.   Then once the evidence was collected at Burman Drive on

13  that day, did you do some additional work on that

14  investigation?

15  A.   On and off for the last four years.

16  Q.   Well, can you indicate where the different devices that

17  were seized that day were located?  You were asked to do that.

18  A.   Certainly.

19  Q.   We may get to that at some point, but let me show you next

20  for your information only at this time, Exhibits 31.1 through

21  31.3.

22       Do you see those documents?

23  A.   I have 31.1 on my screen.

24  Q.   Okay.  Can we go to 31.1.  Do you see that?

25       THE COURT:  No.

1        THE WITNESS:  Very small version of it.

2        THE COURT:  We've got 22 small versions of it.  Now

3   we have three small versions.

4   BY MR. GAPPA:

5   **Q.**  Do you see 21.2 now -- 31.2.  I'm sorry?

6   **A.**  I do.

7   **Q.**  And then, next do you see 31.3?

8   **A.**  Yes.

9   **Q.**  What are these three documents?

10  **A.**  Well, part of the investigation I was requested to

11  examine, Exhibit 1A, and Exhibit 5.10.  Exhibit, 1A is the

12  hard disc drive from the Lock-N-Stitch business, from the IT

13  manager's office.

14        Exhibit 5.10 is computer that was located in the

15  great room in their home on Burman Drive on the desk.

16        That would be the one that Mr. Henry showed Detective

17  Moore how to access the NETGEAR red ReadyNAS.

18  **Q.**  Let me sort of interrupt, but just trying to get a general

19  sense, and if these are admitted, you can go into a little

20  more detail and everybody can see them.

21        But did you create these three documents?

22  **A.**  Yes, sir.

23  **Q.**  Can you explain briefly how it was that you created them?

24  **A.**  I took screenshots of them.

25  **Q.**  Okay.

1        MR. GAPPA:  Your Honor, I would ask that these be
2  admit as marked.
3        THE COURT:  Can you lay a little bit more foundation?
4        MR. GAPPA:  Sure.
5        THE COURT:  You took screenshots, 31.1 is a
6  screenshot from?
7        MR. GAPPA:  Sure.
8        THE COURT:  That sort of thing, because I'm not sure
9  I'm clear.
10 BY MR. GAPPA:
11 **Q**.  Detective Hively, I cut you off.  You were explaining what
12 these are.  So 31.1, what -- how did you create 31.1?
13 **A**.  31.1 is a screenshot that I took from a file from
14 Exhibit 5.10, which was the computer in the living room of the
15 Henry home.
16        In this particular case, I have to explain that in
17 Windows Operating Systems, there is a database -- hierarchal
18 called Windows Registry.  The Windows Registry is somewhat
19 complicated in that it maintains user preferences and
20 settings.  It contains hardware on this system and software,
21 and it retains information about the operating system.
22        These files are coalesced in a registry viewer.  So
23 they can be examined.  They have what are called "hives,"
24 which are -- essentially, look like folders when you look at
25 them.

561

1          Underneath that they have keys and values.  The five

2     hives are related to the software on the machine, the user on

3     the machine, the hardware on the machine, as well as a couple

4     of other ones.

5          So in examining parts of a computer, to determine

6     what has occurred on the computer, I would use AccessData's

7     registry viewer to exam the Windows Registry on a machine.

8     And that's what I did in this case.

9          This screen is a screen capture of my use of

10    AccessData's registry viewer, and I'm looking at a file called

11    NT-user-dot-dat.  And that's one word.  And it's from the user

12    on that particular machine.  I bring that into AccessData's

13    tools, and I can examine it for artifacts that I'm looking

14    for.

15    **Q.**  So do you see reference to AccessData Registry Viewer, and

16    then "NTuserdot@" anywhere on this document?

17    **A.**  Yes, sir.  It's a title bar in the upper left the screen.

18    **Q.**  Then did you create 31.2 and 31.3 in a similar way?

19    **A.**  Yes.  31.2 would be from the item 1A from Lock-N-Stitch.

20         And I believe 31.3 is a copy of 31.1.

21         MR. GAPPA:  Your Honor, would ask additional

22    information be admitted.

23         THE COURT:  Any objection to 31.1 through 31.3 being

24    admitted?

25         MR. CAPOZZI:  No, Judge.

1          THE COURT:  They're admitted and may be published.

2      (Plaintiff's Exhibit 31.1 through 31.3 were received into

3  evidence.)

4          MR. GAPPA:  Thank you, Your Honor.

5  BY MR. GAPPA:

6  **Q.**  Detective Hively, now that everybody can see these, can

7  you first tell us what it is on 31.1 that was significant to

8  your investigation of this case?

9  **A.**  Yes.  I was requested by United States Attorneys Office to

10  try to determine on these two machines the one from

11  Lock-N-Stitch and the one from the Henry home that

12  Detective Moore had Mr. Henry walk him through the process,

13  whether or not I can show there was any connectivity,

14  specifically remote desktop activity between the two machines.

15          Remote desktop protocol is a Windows native protocol

16  on almost all of the operating systems that Microsoft makes

17  with the Windows machines.

18          It allows for connectivity between two computers.

19  You can, as an example, sit in your home, set up a connection

20  to your work computer.

21          In order to do that you have to first get your IP

22  address at work, set the appropriate settings on you're work

23  computer, including exceptions to your firewall that will

24  allow the income and connection.

25          If you set it up properly, and then you're at your

563

1    home computer, you can create this connection by putting the

2    IP address.  And then when you make connection, you can put

3    the username and password for that particular computer.  Then

4    you're actually, just as if you're sitting in front of that

5    computer, you can have a screen in front of you that

6    represents everything s at work.

7           Most programs, not all, can be used in that manner.

8    Some won't launch, most will.  And from that position you can

9    access anything else -- any other network connected computer

10   from home as if you were sitting on the computer at work.

11          So in particular case, under what is called "terminal

12   server client," which was the former name that Microsoft used

13   for RDP, underneath there, you can see under "servers" and IP

14   address of 72, 18, 240, 20.

15          And I'll -- when I checked to see who was registered

16   through that particular IP address it came back to

17   Lock-N-Stitch.

18   **Q.**  Okay.  So what about 31.2?  What was significant, if

19   anything, on this exhibit?

20   **A.**  This is from item 1A -- correction Exhibit 1A from

21   Lock-N-Stitch, Mr. Henry's computer.  And as you can see

22   further down on the left-hand side, again it's the registry

23   viewer.  And in this came in this case the "NTuser.@" file.

24   And we can see, again, under the terminal server client folder

25   structure, we can see a number of IP addresses that this

1    computer has connected to.

2          And at the bottom we can see the same IP address as

3    the one that was from the Henry home computer.

4    **Q.**   So combining 31.1 and 31.2 what conclusion, if any, did

5    you draw about whether any computers from the residence that

6    connected with any computers at Lock-N-Stitch?

7    **A.**   Through this process, I was able to confirm Mr. Henry's

8    statement to me, while we were at Lock-N-Stitch that he

9    remotes into work, and he's able to solve networking problems

10   from home.

11   **Q.**   Did this confirm whether it's possible to transfer files

12   from the Lock-N-Stitch location to the residence?

13   **A.**   Yes, using RDP, one can easily access a computer on a

14   remote site.

15          If you have a set of files that you want to bring to

16   the local machine, you just right click on those as -- as an

17   individual item or as a collections say "copy."  And then, you

18   can also see your own screen.  You can locate where you want

19   to place those, and then you just select "paste" from there.

20   And they will copy over the internet.

21   **Q.**   Okay.  Let me show you only next what has been marked as

22   Exhibit 33.

23          This should be five pages.  If we go through those

24   pages, I'm asking do you see each of those?

25   **A.**   Yes.

1   **Q.**   What has been marked Exhibit 33?

2   **A.**   What I've done here is I prepared an exhibit that shows

3   the items that were located -- that I located in Exhibit 1A

4   from Lock-N-Stitch, the child pornography videos that were in

5   a folder called new folder in a recycle bin, were moved to the

6   NETGEAR ReadyNAS.  And I have on each screen, each page,

7   snapshots indicating the date and timestamps and the name of

8   the files that were transferred from Lock-N-Stitch to the

9   NETGEAR ReadyNAS.

10  **Q.**   How was it that this particular exhibit was created?

11  **A.**   Well, in this particular case, I used both EnCase as well

12  as FTK to select the screenshots.

13  **Q.**   So all these are just -- if I understand, these are

14  selected portions of some of the forensic reports that you

15  generated using your Forensic Tools?

16  **A.**   Yes, sir.

17  **Q.**   Okay.

18          MR. GAPPA:  Your Honor, I would ask that that be

19  admitted Exhibit 33.

20          MR. CAPOZZI:  No objection.

21          THE COURT:  33 is admitted may be published.

22          MR. GAPPA:  Thank you, Your Honor.

23      (Plaintiff's Exhibit 33 was received into evidence.)

24  BY MR. GAPPA:

25  **Q.**   Detective Hively, everybody should be able to see what you

1    were talking about.  Starting with the first page of

2    Exhibit 33, can you explain what it is that we see here?

3    A.   I have a title at the top indicating, file transfer from

4    Defendant's Lock-N-Stitch computer through NETGEAR ReadyNAS,

5    Aurrora share.

6         The first of two items or screenshots here would be

7    labeled from item one, Lock-N-Stitch recycle bin, new folder.

8    That would indicate Exhibit 1A in this case.

9         I have a title of a child pornography video.  I have

10   a file extension.  I have a file created date and an entry

11   modified date.

12   Q.   Can you --

13   A.   More than half --

14   Q.   Sorry to interrupt, but can you explain what significance,

15   if any, is there to a file creation date?

16   A.   Certainly.  As I mentioned earlier, generally speaking,

17   when a file is created on a volume or a computer, the date and

18   timestamp, according to computer is applied to the file

19   creation date.

20   Q.   Okay.  What about the entry modified?

21   A.   That gets a little more complicated.

22        For a moment we have to talk about the NTFS file

23   system, which stands for new technology file system, that came

24   out in the 1990s from Microsoft.  Essentially, it collects a

25   number of date timestamps, one being the entry modified date.

1          This date will change when an attribute for a

2    particular file changes.  And that can be the size, the name,

3    it can be anything about that particular file that changes

4    when that's entered in the master file table, it would update

5    the entry modified date.

6    **Q.**  Okay.  So what was the entry modified date on the first

7    item that says, "from Lock-N-Stitch," and there's the

8    reference to the new folder?

9    **A.**  My analysis indicates that's when it was placed in the

10   recycle bin.

11   **Q.**  What is the significance of the information in the second

12   half, the bottom half of the first page of the Exhibit 33?

13   **A.**  Certainly.  The title or label would be from the NETGEAR

14   ReadyNAS, Aurrora, new misc, new folder, Aza folder.

15          We have the name of the file, we have the file

16   extension, and we have the created date.  I should clarify,

17   the -- in each one of these, the top screenshot is from

18   EnCase.  And the lower screenshot is from FTK.  And that's why

19   we have a bit of a difference in their display.

20   **Q.**  Okay.  What is the significance of the created date as it

21   relates to the entry in the bottom half of the first page of

22   Exhibit 33?

23   **A.**  It's within a couple of minutes of when the file was

24   placed in the recycle bin in item number 1.  It was created on

25   the NETGEAR ReadyNAS.

1          So my interpretation would be it was dragged and

2     dropped through a remote desktop protocol, and it was created

3     on the NETGEAR ReadyNAS within a couple minutes of it going

4     into the recycle bin at Lock-N-Stitch.

5     Q.  If we can go next to the second page of Exhibit 33.  And

6     then, can you explain what it is that we're looking at here

7     starting with the information and moving from top to bottom?

8     A.  Certainly.  It's the same title overall.  The first title

9     for the first screenshot is the same from the recycle bin, new

10    folder.  We have the name, file extension, file created date,

11    and entry modified date.

12         Then we have the same title, approximately half way

13    through the screen from the NETGEAR ReadyNAS, new misc, new

14    folder, Aza folder.  And again, we have the name, extension,

15    created dated, and modified date.

16    Q.  And then, what collusion, if any, do you draw from

17    information on that second page of Exhibit 33?

18    A.  That the created date on the NETGEAR ReadyNAS was within

19    at couple minutes of the file being placed in the recycle bin

20    on the Lock-N-Stitch computer.

21    Q.  If we can get -- I'm sorry, go next to the third page of

22    Exhibit 33.

23         Can you explain what it is that we see here similar

24    to what you just did for the second page?

25    A.  Certainly.  We have the same overall title.  Then we have

1    from item one, which represents Exhibit 1A from the recycle

2    bin, new folder, we have the name of the file, file extension,

3    file created date, and the entry modified date.

4         Then we have the title for the lower-half being

5    NETGEAR ReadyNAS, Aurrora, new misc, new folder, Aza folder.

6         And the name of the file, file extension, and the

7    file created date, which is within a couple minutes of the

8    entry modified date from the Lock-N-Stitch computer.

9    Q.   So again, what conclusion, if any, do you draw from the

10   information contained on this page?

11   A.   That within at couple of minutes of the files going into

12   the recycle bin on the Lock-N-Stitch computer, this file was

13   created on the NETGEAR ReadyNAS at the Henry home.

14   Q.   If we can go to the next page.  What do we see here?

15   A.   Again, we have the same format, same overall title from

16   item 1, Lock-N-Stitch, the recycle bin, new folder.  We have

17   the name of the file, file extension, file created date.  We

18   have the entry modified date.

19        On the lower half of the screen, we have from the

20   NETGEAR ReadyNAS, Aurrora, new misc, new folder, Aza folder,

21   then the name of the file, extension, and the created date.

22   Q.   Is that the last page of Exhibit 33?

23   A.   I think we're only up to 4.

24   Q.   If we can go, then, to the last page.  What do you see

25   there?

1    **A.**   Again, the same format of the previous four pages with the

2    title at the top.  Then, the first screenshot is going to be

3    from the Lock-N-Stitch recycle bin folder, with the name of

4    the file, file extension, file created date, and entry

5    modified date.

6            On the lower half of this screen the screenshot from

7    the NETGEAR ReadyNAS, Aurrora share, new misc, new folder, Aza

8    folder.  With the name, file extension, and the created date.

9    **Q.**   Okay.  So what conclusion, if any, do you draw from the

10   information on the fifth page of Exhibit 33?

11   **A.**   That, again, this file was created within one minute of

12   the original file in the Lock-N-Stitch computer's recycle bin

13   is created on the Aurrora share.

14   **Q.**   Did you find those five files on Exhibit 9?

15   **A.**   I did, and the Aza folder.

16   **Q.**   Okay.  And did you prepare an excerpt of one of those

17   titles and give that and help make that into Exhibit 33.1?

18   **A.**   Yes.

19   **Q.**   And can you describe what it is that is represented in

20   33.1?

21   **A.**   I have to check the exhibit list.

22           MR. CAPOZZI:  On 32.1.

23           THE COURT:  33.1.

24           MR. CAPOZZI:  Oh, 33.1.

25           THE WITNESS:  So child pornography video.

1    BY MR. GAPPA:

2    **Q.**  Do you know the full length of the video?

3    **A.**  I don't have that information --

4    **Q.**  Okay.

5    **A.**  -- with me.

6    **Q.**  But the portion that you've put into what has been marked

7    as Exhibit 33.1 is not the full length?

8    **A.**  Correct.

9    **Q.**  The information in you have is approximately 30 seconds?

10   **A.**  At the most.

11           MR. GAPPA:  Your Honor, I would ask to be permitted

12   to show less than ten seconds of that clip.

13           THE COURT:  Any objection?

14           MR. CAPOZZI:  Other than -- object.  I think we've

15   already seen enough of the videos.  I don't think we need to

16   see more.

17           THE COURT:  Are you introducing 33.1 into evidence?

18           MR. GAPPA:  Yes.

19           THE COURT:  Objection to 33.1 being admitted?

20           Same --

21           MR. CAPOZZI:  No objection to be being admitted.

22   Object to playing.

23           THE COURT:  33.1 is admitted, and the Court will

24   permit a brief excerpt.  No more than ten seconds to be

25   played.

1        MR. GAPPA:  And Your Honor, I'll just instruct our

2   assistant at the table to stop before we get to the ten

3   seconds.

4        THE COURT:  To take it down.

5        MR. GAPPA:  Right.

6     (Video played.)

7        MR. GAPPA:  And for the record, I believe that was

8   less than ten seconds.

9        THE COURT:  It was.

10  BY MR. GAPPA:

11  **Q.**  Detective Hively, let me next direct your attention to

12  what I believe has been received in evidence as Exhibit 9.2.

13  Do you see 9.2?

14  **A.**  I do.

15  **Q.**  And Detective Moore testified this shows how the folders

16  on Exhibit 9, this item, were structured.  Do you see -- let

17  me ask you first, are you familiar with what is depicted here?

18  **A.**  I am.

19  **Q.**  Okay.  So do you see a folder called [A.T.]?

20  **A.**  I do.

21  **Q.**  Where is that?  Can you circle it?

22  **A.**  (Witness complies.)

23  **Q.**  And so we're clear, where was this folder or subfolder

24  called [A.T.] where was that as it relates to this exhibit?

25  Where was that located?

1    **A.**  On a secure share of the -- I'm sorry, of the NETGEAR

2    ReadyNAS.

3    **Q.**  Did you review the contents of that folder?

4    **A.**  I did.

5    **Q.**  What, generally, did you see?

6    **A.**  I number of videos of A.T.

7    **Q.**  And --

8    **A.**  And --

9    **Q.**  Go ahead.  And the --

10   **A.**  In the Henry home guest bathroom as well as the Henry home

11   master bedroom.

12   **Q.**  Okay.  If you could explain to us, what is found on this

13   structure beneath the entry [A.T.].

14          Are there any other subfolders?

15   **A.**  Yes.  Underneath [A.T.] we have a folder called VID,

16   V-I-D, for which there are two subfolders.  One being 15, and

17   the other one being 14.  And another folder underneath [A.T.]

18   is capital P-I-C-S, pics.

19   **Q.**  Okay.  So let me ask whether -- these are not in evidence,

20   but there are exhibits marked 26.2, 26.3 and 26.4.  Are you

21   familiar with those three exhibits?

22   **A.**  I'm going to check the exhibit list.  You said 26?

23   **Q.**  26.2, 26.3, 26.4?

24   **A.**  Yes, I am.

25   **Q.**  What, generally, are those three exhibits?

574

1   **A.**   Essentially Adam and Angele Henry setting up and testing a

2   camera in their guest bath on Burman Drive in Turlock.

3   **Q.**   Were the three exhibits, 26.2 through 26.4 found on a

4   device that was seized on September 19, 2013?

5   **A.**   Yes, on a computer that was located in the garage of that

6   residence.

7   **Q.**   Did that have an exhibit number in this case at this time?

8   **A.**   Yes, sir, Exhibit 13.

9   **Q.**   So if we can show a photo of Exhibit 13.  It's in

10  evidence.  So the three -- well, the three exhibits that you

11  are explaining, were found on that device?

12  **A.**   Yes, sir.  The hard disc drive that's taped to the top of

13  the computer tower.

14          MR. GAPPA:  Your Honor, I would ask that Exhibits

15  26.2, 26.3 and 26.4 be admitted.

16          THE COURT:  Any --

17          MR. CAPOZZI:  Videos or snapshots?

18          MR. GAPPA:  The videos.

19          THE COURT:  26.2?

20          MR. GAPPA:  26.3, and 26.4.

21          THE COURT:  They're videos or screenshots?  I mean, I

22  know what I've got in my binder.  They're just --

23          MR. GAPPA:  Your Honor, the request is the videos.

24          So we -- just to explain, I think now I understand

25  the question.

1          THE COURT:  These are placeholders?

2          MR. GAPPA:  Correct.

3          THE COURT:  So the Government is representing that

4    what's in our exhibit binders, 26.2 through 26.4 are just

5    screenshot placeholders of the actual videos.

6          MR. CAPOZZI:  We're --

7          THE COURT:  -- that appeared on the computer in the

8    garage.  And the Government is moving the videos, which have

9    not been shown into evidence?

10         MR. GAPPA:  Correct.

11         And just so we're clear, the videos were provided on

12   a disc, but for purposes of a hard copy --

13         THE COURT:  Right.  Is there an objection to the

14   videos from which 26.2, 26.3, and 26.four were taken?

15         MR. CAPOZZI:  Are these all taken on one day?

16         MR. GAPPA:  Well, we'll get to that.

17         THE COURT:  Is there an objection to the admission of

18   the videos?

19         MR. CAPOZZI:  I need more foundation, yes.

20         THE COURT:  Let's take our afternoon recess at this

21   time.  Ladies and gentlemen, please heed the Court's previous

22   admonition.  We'll reconvene at 3:15.

23      (Jury exits courtroom.)

24         THE COURT:  We're outside the presence of the jury.

25         Mr. Gappa, I understand what you're described to me.

1   Are you planning on showing those videos?

2           MR. GAPPA:  Yes, I was.

3           THE COURT:  I have not seen them.  They've been made

4   available --

5           MR. CAPOZZI:  I've seen them.

6           THE COURT:  -- to the defense.

7           Mr. Gappa wants to admit the videos, each of these

8   three into evidence.  And then show all of them -- all three?

9           MR. GAPPA:  Yes.

10          THE COURT: -- to the jury.  If you have an objection

11  to foundation, then perhaps you can establish more of a

12  foundation through this witness.

13          But if you have no objection I'll admit them and just

14  move on to show them.

15          MR. CAPOZZI:  I just need to know -- there's a number

16  of the videos.  And I don't know whether this is, putting it

17  together all the different ones on different dates.

18          MR. GAPPA:  No.  I can tell you what the dates are

19  for each one, if you want them.  So the first one is --

20          MR. CAPOZZI:  These are just of A.T.?

21          MR. GAPPA: No, these are the Defendant and Angele.

22          THE COURT:  Install the camera.

23          MR. CAPOZZI:  Okay.  That one is no objection.

24          THE COURT:  All of --

25          MR. GAPPA:  All three are --

577

1          MR. CAPOZZI:  Pardon me?

2          THE COURT:  All --

3          MR. CAPOZZI:  Oh, then, no objections.

4          THE COURT:  Okay.  Then, I'll get that on the record.

5     When the jury comes back, we'll admit it, and you can show.

6          MR. GAPPA:  Your Honor, just for planning purposes

7     does the Court have a firm time in which it needs to end

8     today?

9          THE COURT:  No.

10         MR. GAPPA:  Did --

11         THE COURT:  I mean, I told the jury that I wouldn't

12    go past 5:00.

13         MR. GAPPA:  Okay.

14         THE COURT:  Somewhere between 4:30, 5:00 makes sense

15    to break.  It is when we'll break.  Thank you.

16       (Recess taken.)

17         THE COURT:  Back on the record.  Is there an issue?

18         MR. GAPPA:  No.

19         THE COURT:  No?

20         MR. GAPPA:  I don't think so.

21         THE COURT:  We're good?

22         MR. CAPOZZI:  On these that we're doing right now.

23         THE COURT:  There's going to be no objection?

24         MR. CAPOZZI:  Right.

25         THE COURT:  They're going to be admitted into

578

1   evidence and you're going to plan --

2          MR. CAPOZZI:  Plan.

3          THE COURT:  You can go back, Renee.

4      (Jury enters courtroom.)

5          THE COURT:  Let the record reflect we're back in the

6   presence of the jury.

7          Mr. Gappa, you can continue with your direct

8   examination.

9          MR. GAPPA:  Thank you, Your Honor.

10         So Your Honor, we move to admit exhibits 26.2, 26.3

11  and 26.4.

12         MR. CAPOZZI:  No objection, Judge.

13         THE COURT:  Those Exhibits, 26.2 through 26.4, are

14  admitted and may be played.

15     (Plaintiff's Exhibits 26.2 to 26.4 were received into

16  evidence.)

17         MR. GAPPA:  Thank you, Your Honor.

18  BY MR. GAPPA:

19  **Q.**  So Detective Hively, I want show to you, and then we'll

20  play Exhibit 26.2.

21         Can you briefly explain what it is we'll see in 26.2?

22  **A.**  We have Adam Henry setting up a camera in the guest bath

23  at Burman Drive address, in Turlock.

24  **Q.**  Okay, can we play that?

25         As that plays, let me ask you a question or two.

1   With all of these that we'll see next, is there any audio that

2   was associated with the videos?

3   **A.**  All the videos that were recovered from the bathroom at

4   the Burman Road address there were no audio files.

5   **Q.**  Do you see what appears to be any equipment in this

6   particular video?

7   **A.**  Yes.  On the right-hand side the ladder is leaning up

8   against the wall.

9   **Q.**  What was the title of this video that's now as 26.2?

10  **A.**  Quote, "Recording, 5-2012-02-20-0," unquote.

11  **Q.**  Based on your training and experience in your examination

12  of these three videos, the first of which we have seen, did

13  there appear to be a correlation between the title and the

14  creation date of the file?

15  **A.**  Yes.  Through my analysis the titles for these movies are

16  the same as the file creation date.

17  **Q.**  Okay.  So if we could next play 26.3.

18      (Video played.)

19  BY MR. GAPPA:

20  **Q.**  Do you know the length of this video, of this portion of

21  the video?

22  **A.**  I don't have that information, sir.

23  **Q.**  Okay.  Does the file have a title?

24  **A.**  Yes, sir.

25  **Q.**  What was the title?

1    **A.**   "Recording 5-2012-02-20-1," unquote.

2    **Q.**   Okay.  Based on your training and experience and reviewing

3    the titles for Exhibits 26.2 and 26.3, do you have an opinion

4    as to when these two videos were created?

5    **A.**   Yes.  The titles indicate the file created time of these

6    videos.

7    **Q.**   What was the date that they were created?

8    **A.**   Certainly.  February 20th, 2012 for both of them.

9    **Q.**   If we can go to 26.4 and play that video.

10            And while that plays, have you recognized who was

11   depicted in this video -- well --

12   **A.**   In 26.3?

13   **Q.**   26.4, which is what we should be looking at now.

14   **A.**   Certainly.  26.4 is Mr. Adam Henry.

15       (Video played.)

16   BY MR. GAPPA:

17   **Q.**   Detective Hively, you've seen that video and the others

18   that have been played, and you were at the Burman Drive

19   residence.  Do you have an opinion where these videos were

20   created?

21   **A.**   Yeah, at the guest bathroom at the Henry home.

22   **Q.**   In evidence is Exhibit 11, we have this item.  Do you

23   believe that Exhibit 11 was used in the creation of the three

24   videos that we've just seen?

25   **A.**   Yes.  It's clearly seen that that is very, very similar to

1   what Adam Henry was manipulated here a short time ago.

2   Q.  Is there a date associated with the video that we've been

3   watching 26.4?

4   A.  Yes.  April 17, 2012.

5   Q.  Okay.  So Detective Hively, next I want to ask you whether

6   you're familiar with what has been marked at this point for

7   identification as Exhibits 27.1 through 27.6.

8   A.  Yes, sir.

9   Q.  And we have created screen captures of these exhibits; is

10  that right?

11  A.  Yes, sir.

12  Q.  And the screen captures are in the exhibit binder at those

13  placeholders; is that right?

14  A.  I'd have to check.

15  Q.  Okay.

16          MR. CAPOZZI:  Counsel, there are 27.1 to what?

17          MR. GAPPA:  Point-six.

18          MR. CAPOZZI:  6?

19          THE WITNESS:  Yes, sir.

20  BY MR. GAPPA:

21  Q.  Okay.  So what is it that those exhibits are?  What are

22  they?

23  A.  Surreptitious recordings of A.T. while utilizing the guest

24  bathroom at the Burman Drive address.

25          MR. GAPPA:  Your Honor, I'd ask those be admitted and

1   mark 27.1 through 27.6, the actual videos.

2            THE COURT:  Any objection?

3            MR. CAPOZZI:  No.

4            THE COURT:  And where were these retrieved from?

5            THE WITNESS:  They were all located on Exhibit 13,

6   the computer tower located in the garage at the Burman Road

7   or -- sorry, Burman Drive address.

8            THE COURT:  27.1 through 27.6 will be admitted.

9       (Plaintiff's Exhibit 27.1 through 27.6 were received into

10  evidence.)

11           MR. GAPPA:  Then request to publish those.

12           THE COURT:  The screenshots?

13           MR. GAPPA:  The actual videos.

14           THE COURT:  Any objection?

15           MR. CAPOZZI:  No.

16           THE COURT:  You may.

17           MR. GAPPA:  Thank you, Your Honor.

18  BY MR. GAPPA:

19  Q.  First Detective Hively, if we can go to 27.1.  Does this

20  video that we see have a title?

21  A.  Yes, sir.

22  Q.  And what title is on the video?

23  A.  Quote, "Recording 5-2012-05-26-0."

24  Q.  Can we show this video, please.

25       (Video played.)

1    BY MR. GAPPA:

2    **Q.**   Detective Hively, you saw at the beginning and the end, I

3    believe, that there was a light that went on or off.  Is this

4    video, do you now if it was approximately 3 minutes 40

5    seconds, this clip?

6    **A.**   This particular edited version, yes.

7    **Q.**   So was it part of a longer recording that was edited for

8    purposes of presenting it as need to be in the Court?

9    **A.**   Yes.  The many, many videos that I located throughout a

10   number of different computers and systems range from anywhere

11   from 30 seconds to three hours.

12   **Q.**   So then, let me ask you specifically about the one we last

13   saw, which should be 27.1.

14           Did a copy of that end up on Exhibit 9?

15   **A.**   Yes, sir.

16   **Q.**   Where did it end up?

17   **A.**   In the folder labeled A.T., in the subfolder labeled VID,

18   V-I-D, and subfolder under that which is the number 14.

19   **Q.**   So now I want to go to Exhibit 27.2.  Does that have a

20   title?

21   **A.**   Yes, sir, quote, "recording 5-2012-06-12-0," unquote.

22   **Q.**   And is this version of that recording, approximately three

23   minutes 12 seconds?

24   **A.**   Yes, sir.

25   **Q.**   Can we play that.

584

1       (Video played.)

2   BY MR. GAPPA:

3   **Q.**  Is that is playing, can you describe who, if anybody, you

4   see there in the video?

5   **A.**  Yes.  That's Henry and his wife, Angele Henry.  And if I

6   haven't mentioned that's A-N-G-E-L-E.

7       (Video played.)

8   BY MR. GAPPA:

9   **Q.**  Is it a fair conclusion to say that this is another video

10  that was edited for length?

11  **A.**  Yes.

12  **Q.**  So what do we see now?

13  **A.**  A.T. changing into a swimsuit.

14  **Q.**  Was this part of that same overall file, though?

15  **A.**  Yes the same file name, same file.

16  **Q.**  The title, again, was?

17  **A.**  Quote, "recording 5-2012-06-12-0."

18  **Q.**  Does it appear to you at this point she has removed all of

19  the clothing of her top?

20  **A.**  Yes, sir.

21  **Q.**  Did it appear at some point that she removed all of the

22  clothing such as the bottom of the swimsuit or underwear?

23  **A.**  Yes, sir.

24  **Q.**  Okay.  Did a copy of this video end up on Exhibit 9?

25  **A.**  It did in the same location as the previous one, "A.T. vid

585

1   14" folder.

2   Q.  Let me direct your attention to Exhibit 27.3.  Does this

3   have a title?

4   A.  Yes, sir.  "Recording, 5-2012-06-12-3."

5   Q.  Did you believe this video is approximately -- this

6   version is approximately 1 minute 13 seconds?

7   A.  Yes, sir.

8   Q.  And can we play that?

9       (Video played.)

10  BY MR. GAPPA:

11  Q.  If we can go next to Exhibit 27.4.  What is the title if

12  it has one of this exhibit disc file?

13  A.  Certainly.  "Recording, 5-2012-06-21-0."

14  Q.  And does this approximately a version that has 3 minutes

15  40 seconds?

16  A.  Yes, sir.

17  Q.  Can we play that?

18      (Video played.)

19  BY MR. GAPPA:

20  Q.  Detective Hively, what appears to be happening in this

21  video?

22  A.  A.T. is changing close into a swimsuit.

23  Q.  Okay.  And at some point is she without any top, her

24  breasts are exposed?

25  A.  Yes, sir.

1        (Video played.)

2    BY MR. GAPPA:

3    **Q.**   So let me direct your attention next to what has been now

4    in evidence as 27.5.  Is this the video that's been edited to

5    about 1 minute 35 second version?

6    **A.**   Yes.

7    **Q.**   Can we play that.

8        (Video played.)

9    BY MR. GAPPA:

10   **Q.**   Can you tell us what appears to be happening here?

11   **A.**   Yes.  A.T. appears to be using the toilet.

12   **Q.**   Was there anything else about this particular video that

13   you noted as part of your investigation?

14   **A.**   Yes, sir.  During the time of day there was quite a bit of

15   glare coming from -- from the bathroom window.

16   **Q.**   You've been in this bathroom, correct?

17   **A.**   Yes, sir.

18   **Q.**   And in the video, does it appear that there are that --

19   there's at least one mirror in the bathroom?

20   **A.**   Yes, sir.

21   **Q.**   So let's next go Exhibit 27.6.

22        Is there a title associated with that video?

23   **A.**   Yes, "Recording, 5-2012-07-29-0."

24   **Q.**   And can we play that video.

25        (Video played.)

1    BY MR. GAPPA:

2    **Q.**   Is this approximately 1 minute 11 seconds?

3    **A.**   Yes, sir.

4    **Q.**   And what do we see here?

5    **A.**   A.T., again, using the toilet.

6    **Q.**   So Detective Hively, during the course of your

7    investigation and your review of all of the evidence, did you

8    find any video or videos that appear to show Angele Henry and

9    A.T. in the Defendant's bedroom?

10   **A.**   Yes, sir.

11   **Q.**   How many videos like that did you find?

12   **A.**   There were three segments all part of the same instance.

13   **Q.**   Did those segments have titles?

14   **A.**   Yes, sir.

15   **Q.**   Can you explain what the titles were?

16   **A.**   Certainly.  The first one is 00100.MTS.

17          The second title was 00101.MTS.

18          And the last one was 00102.MTS.

19   **Q.**   Okay.  Did you review all three of those file segments?

20   **A.**   I did.

21   **Q.**   Were they combined into what has become for identification

22   Exhibit 27.11?

23   **A.**   Yes, sir.

24   **Q.**   And have you reviewed Exhibit 27.11?

25   **A.**   I have.

1   **Q.**  And does this video have audio with it?

2   **A.**  It does.

3   **Q.**  Was there a transcript made of this video?

4   **A.**  Yes, sir.

5   **Q.**  And have you had an opportunity to review the transcript?

6   **A.**  I did.

7   **Q.**  Does, in your opinion, the transcript accurately reflect

8   the statements that are heard in the video?

9   **A.**  Yes.

10          MR. GAPPA:  Your Honor, I would -- the Government

11  moves to admit Exhibit 27.11.

12          THE COURT:  Any objection?

13          MR. CAPOZZI:  No objection.

14          THE COURT:  27.11 is admitted.

15          Do you wish to play it?

16          MR. GAPPA:  Yes, Your Honor.  And similar to others

17  that have a synchronized transcript, we have no objection to

18  the court reporter not being obligated to record.

19          THE COURT:  Agreed?

20          MR. CAPOZZI:  Yes.

21          THE COURT:  The court reporter need not report the

22  audio.

23          MR. GAPPA:  And Your Honor, this one just so we

24  understand, there was an agreement that we would play -- this

25  is more extended.  It's approximately 40minutes, ten seconds.

1  And I don't believe the defense objects to that length being

2  played.

3       MR. CAPOZZI:  No objection.

4       THE COURT:  You may.

5       MR. GAPPA:  Thank you.

6       Can we play this?

7    (Video played.)

8  BY MR. GAPPA:

9  Q.  So Detective Hively that was Exhibit 27.11, did the full

10 unedited version of that file end up on Exhibit 9?

11 A.  Yes, sir.

12 Q.  Where did that end up on Exhibit 9?

13 A.  It's actually in two locations, but the primary location

14 this document was a folder labeled, "Personal, not okay, misc"

15 -- M-I-S-C, "people."  Then a folder called "A.T.," a folder

16 called, "vid" and a subfolder called "15."

17 Q.  Is there a file creation date for this video?

18 A.  Yes, January 2nd, 2013.

19 Q.  So Exhibit 12 is in evidence, and the testimony was that

20 this was found at the Defendant's residence.  It's a Cannon

21 Visia camcorder.  Have you seen this before?

22 A.  Yes, sir.

23 Q.  Is there a connection between Exhibit 12 and

24 Exhibit 27.11?

25 A.  Based on my analysis, that was the camera that was used to

1    create the video that day.

2    **Q.**  And why do you --

3            MR. CAPOZZI:  Objection.  Calls for a conclusion,

4    lack of foundation.

5            THE COURT:  Sustained.  Set the foundation.

6            MR. GAPPA:  Sure.

7    BY MR. GAPPA:

8    **Q.**  Let me go back.

9            In your opinion, was there a connection between

10   Exhibit 12 and 27.11?

11   **A.**  Yes.

12   **Q.**  Did you examine Exhibit 12 to try to determine whether it

13   was used to create what was used to create Exhibit 27.11?

14   **A.**  I did.

15   **Q.**  What steps did you take?

16   **A.**  I took a flash memory camera card and placed it inside of

17   the camera.

18           I took a number of videos using that camera.  Then I

19   took the card out.  I took a forensic image of it and brought

20   it into my forensic software.

21           Then I examined it, and I compared it to the videos

22   that were previously located.  And the files appear to be the

23   same including the extension which was "MTS."

24   **Q.**  When you say the files appear to the be the same, can you

25   explain that?

1   **A.**   Certainly.  I should be more clear.  They're -- generally

2   speaking, digital files have a header, which usually indicates

3   what particular type of file it is.  And the file header for

4   this was the same -- the file header for the experiment I

5   conducted were the same as those on the videos that we just

6   saw.

7   **Q.**   Okay.  And was the file extension significant to you?

8   **A.**   Yes, they were both the same, dot MTS, which is a

9   high-definition video file.

10  **Q.**   So based on the work that you've just testified about, did

11  you draw any conclusion about what the connection was between

12  Exhibit 12 -- I'm sorry, yes, Exhibit 12 and Exhibit 27.11?

13  **A.**   Yes, I believe that is the --

14         MR. CAPOZZI:  Objection, objection, still lack of

15  foundation.

16         THE COURT:  Overruled.

17         THE WITNESS:  I believe that was the camera that was

18  used to create the videos we just saw.

19         THE COURT:  I'll ask this question:  How can you tell

20  it was that camera as opposed to some other Cannon of the same

21  model?  Based upon what you just told us, how does it

22  distinguish from camera to camera.

23         THE WITNESS:  I cannot.

24         THE COURT:  Objection sustained.  The answer is

25  stricken.  And the jury is instructed disregard the witness'

1   testimony linking the video to that particular camera.

2          MR. GAPPA:  Your Honor, can I ask another question or

3   two?

4          THE COURT:  You can try.

5          MR. GAPPA:  Okay.

6   BY MR. GAPPA:

7   **Q.**  Detective Hively, did you find any other camera that was a

8   video camera that created the dot MTS file extension?

9   **A.**  At the Burman Drive address, no.

10  **Q.**  Okay.  Was there any other recording device that you found

11  that that created a file extension when you reviewed files

12  that it created that was MTS?

13  **A.**  No, sir.

14         MR. GAPPA:  So Your Honor, I would ask that he be

15  allowed to state that conclusion.

16         THE COURT:  You can ask the question.

17         MR. GAPPA:  Okay.

18  BY MR. GAPPA:

19  **Q.**  So based on all of that work, including your review of

20  other cameras that didn't create the dot MTS file extension,

21  do you have an opinion as to whether this -- let me ask an

22  additional question.

23         Ultimately, where was this located?  Where was it

24  found?

25  **A.**  It was located at the Burman Drive address.

593

1  **Q.**  Did you recall seeing a photograph where it was on a shelf
2  in the bedroom?
3          MR. CAPOZZI:  Objection, leading.
4          THE COURT:  Sustained.
5  BY MR. GAPPA:
6  **Q.**  So Detective Hively, if I can show -- this is in evidence
7  as Exhibit 5.8?
8          MR. CAPOZZI:  5.8.
9          MR. GAPPA:  Yes.
10 BY MR. GAPPA:
11 **Q.**  I believe this is also in evidence 10.6.  Do you see that
12 exhibit?
13 **A.**  I do.
14 **Q.**  Do you.
15         COURTROOM DEPUTY:  Not in, Your Honor, and it was
16 displaced.
17         THE COURT:  Not in.
18         COURTROOM DEPUTY:  Not in.
19         I'm sorry, 10.2 through 10.7.  I apologize.
20         THE COURT:  10.1 through 10.7 are admitted.  We
21 misspoke.
22         MR. GAPPA:  So can we put that up?
23 BY MR. GAPPA:
24 **Q.**  So 10.7 is in evidence.  Detective Hively, do you see
25 Exhibit 12 there?

594

1    **A.**   I do.

2    **Q.**   Where was this photograph taken?

3    **A.**   It was taken in the master bedroom at the Henry home.

4    **Q.**   So having found it in that location, is it your belief

5    that that's where 27.11 was created?

6              MR. CAPOZZI:  Objection.  Lack of foundation still.

7              THE COURT:  Sustained.  He can't state that in -- it

8    is in inference to be drawn from other evidence.  It is

9    something that you may ultimately argue that the jury should

10   do, but this witness cannot identify that video as having been

11   filmed with that camera, right?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Sustained.

14             MR. GAPPA:  Thank you, Your Honor.

15   BY MR. GAPPA:

16   **Q.**   Let me show you next -- these are not in evidence yet, a

17   series of exhibits, 28.1 and 28.10.

18             I'll ask as those are shown to you, if you recognize

19   them?

20   **A.**   I recognize 28.1.  I recognize 28.10.

21   **Q.**   So that's 28.2 --

22   **A.**   I recognize Exhibit 28.2.  I recognize Exhibit 28.3.  I

23   recognize Exhibit 28.4.  I recognize Exhibit 28.5 and 28.6.

24   And I recognize Exhibit 28.7 and 28.8.  And Exhibit 28.9, I

25   recognize --

1   **Q.**  And 28.10?

2   **A.**  Yes, sir.

3   **Q.**  Okay.  So did you find those on Exhibit 9?

4   **A.**  I did.  They were in folder called "pics" underneath a

5   folder called "A.T."

6   **Q.**  Okay.

7          MR. GAPPA:  Your Honor, I would ask that these be

8   admitted.

9          THE COURT:  Any objection?

10         MR. CAPOZZI:  No objection.

11         THE COURT:  28.1 through 28.10 are admitted.

12     (Plaintiff's Exhibit 28.1 through 28.10 were received into

13   evidence.)

14         MR. GAPPA:  And permission to publish, Your Honor?

15         THE COURT:  You may.

16   BY MR. GAPPA:

17   **Q.**  As we go through these one at time, if you can explain, at

18   least as we start, what's being displayed there in 28.1.

19   **A.**  It's A.T. removing a T-shirt or a blouse.

20         MR. CAPOZZI:  Objection, pictures speak for

21   themselves, Your Honor.

22         THE COURT:  Sustained.  Plus we just saw them.

23   Aren't these all screenshots from the video?

24         THE WITNESS:  Yes, sir.

25         MR. GAPPA:  Is that what all of these are, 28 -- can

596

1    we go through that so that the jury can now see them 28.2,

2    28.3, 28.4, 28.5, 28.6, 28.7, and 28.8, and 28.9, 28.10.

3    BY MR. GAPPA:

4    **Q.**   And let me next show you what has been marked as

5    Government's Exhibit 26.5.  This is in not in evidence.  Do

6    you see that and do you recognize it?

7    **A.**   I do.

8    **Q.**   What is this?

9    **A.**   This is about -- this is a screenshot from a five-minute

10   video in which Adam Henry and Angele Henry install a curtain

11   in the bathroom.

12   **Q.**   Do you know what the date was that that was created?

13   **A.**   Take me just a moment here, I don't seem to have that

14   available.

15          MR. CAPOZZI:  Judge, I think we have an issue on the

16   next exhibit, and I think the Government still has a way to

17   go.  Can we break for tonight?

18          MR. GAPPA:  It's up to the Court, Your Honor.

19          MR. CAPOZZI:  Obviously.

20          THE COURT:  You had a question pending and your

21   witness said he didn't think he could answer the question

22   based on what he had in front of him.

23          MR. GAPPA:  Okay.

24          THE COURT:  What's next?

25          MR. GAPPA:  I'll go to the next exhibit, if I could.

1          THE COURT:  Is this the one that there's an objection
2     to?
3          MR. GAPPA:  No.
4          MR. CAPOZZI:  No.
5          THE COURT:  Okay.  Go ahead.
6          MR. GAPPA:  Thank you, Your Honor.  And Your Honor,
7     just for the Court's information, we definitely have more than
8     15 minutes.  So at whatever point --
9          THE COURT:  Well, let's -- I think -- I think counsel
10    agree that they want to recess, ladies and gentleman.  I may
11    be dense, but if you hit this black lab in the nose hard
12    enough, he takes notice.  And I think that's what they were
13    trying do.
14          So we're going to recess for the evening.  Remember,
15    until this trial is over do not discuss the case with anyone
16    including your fellow jurors, member of your family, people
17    involved in the trial, or anyone else and do not allow others
18    to discuss the case with you.
19          This includes discussing the case in internet chat
20    rooms or through internet blogs, bulletins boards, emails, or
21    text messaging.
22          If anyone tries to communicate with you about the
23    case, please, let me know about it immediately.
24          Do not read, watch, or listen to any news reports or
25    other accounts about the trial or anyone associated with it,

1  including any online information.

2          Do not do any research such as consulting

3  dictionaries, searching the internet or using other reference

4  materials.  And do not make any investigation about the case

5  on your own.

6          Finally, keep an open mind until all the evidence has

7  been presented.  You've heard the arguments of counsel, my

8  instructions on the law, and the views of your fellow jurors.

9          If you need to speak with me about anything, give a

10 signed note to Renee or Sam to give to me.  Have a pleasant

11 evening.  We'll reconvene at one o'clock tomorrow.  I'll try

12 to make sure we actually start close to one o'clock.

13     (Jury exits courtroom.)

14     THE COURT:  Let the record reflect that we are

15 outside the presence of the jury.  Was there something you

16 wanted me to rule on now, or is it --

17     MR. GAPPA:  No.  I wasn't trying to give any

18 additional signal.  I was just trying to convey information

19 that at any point we were likely to go over five o' clock.

20     THE COURT:  I was only going to go another five or

21 ten.

22          But is there some issue regarding an exhibit?

23     MR. CAPOZZI:  I think the Government just wanted to

24 put in the screenshot.  I'm not sure which video this is /I'd

25 like to see the video.

1          THE COURT:  Is this the one we previously saw, a

2    screenshot from one of the earlier videos of the

3    installation --

4          MR. GAPPA:  I don't think so.

5          THE COURT:  -- of the camera?

6          All right.  Well, you can lay your foundation.

7          MR. CAPOZZI:  Yes, if I can just see it outside the

8    presence, though.

9          THE COURT:  Anything further?

10          MR. CAPOZZI:  Just a little -- you finish tomorrow?

11          THE COURT:  You think so?

12          MR. GAPPA:  (Nods head.)

13          THE COURT:  Okay.  I'll have proposed jury

14    instructions by sometime tomorrow afternoon.  Hopefully, when

15    you show up at one o'clock I'll have a packet on your desk.

16    You think you're going to take the full afternoon?

17          MR. GAPPA:  We will finish with the direct of this

18    witness definitely before the end of the afternoon.  So, yes.

19          THE COURT:  But then, there's cross, but it's

20    anticipated this is the Government's final witness.

21          MR. GAPPA:  I just need to check with counsel, make

22    sure I understand the Court's rulings.

23          THE COURT:  Did you -- were you asking for

24    clarification?

25          MR. GAPPA:  I just understood that you said that we

1  could call a witness who could say, if it's the fact, that

2  Defendant had recorded that person unbeknownst to that person

3  without permission in the prior residence.

4       THE COURT:  You got it correct.  What I said I would

5  not do is also allow you to show that video.

6       MR. GAPPA:  Right.

7       THE COURT:  Because I think that would be unduly

8  prejudicial.

9       MR. CAPOZZI:  Even --

10      THE COURT:  Not particularly relevant given the

11 nature of the charges here, but the fact that you -- if you

12 want to put on evidence that the Defendant had a prior

13 residence, before he lived with his wife Angele, planted a

14 camera to take surreptitious videos of people in a bathroom or

15 a bedroom, I would let you put on that.

16      MR. GAPPA:  I want to clarify, I think the only

17 witness who could bring it out is with one of those several --

18 well, one more of the recordings that were made with this

19 Exhibit 11 based on his review of that material.

20      MR. CAPOZZI:  Exhibit 11.

21      MR. GAPPA:  Is the plant, yeah.

22      THE COURT:  Well, I don't know the case.  I don't

23 know the evidence.

24      MR. GAPPA:  Right.

25      THE COURT:  Like, I'm not going to -- my ruling is, I

1    think, showing videos of surreptitiously recorded incidents at

2    another location of adults, would be unduly prejudicial.

3         If you have a witness who can testify that that in

4    fact did take place, and that the Defendant was the one who

5    appeared to be responsible for it, I would allow you to put on

6    that testimony.

7         MR. GAPPA:  Okay.

8         THE COURT:  But I wouldn't allow you to show the

9    videos.

10        MR. GAPPA:  And we have three of those so --

11        THE COURT:  Okay.

12        MR. GAPPA:  But that would be brief.

13        THE COURT:  If the Government were to rest tomorrow,

14   are you -- is the defense ready to proceed?

15        MR. CAPOZZI:  Yes.

16        THE COURT:  All right.  Okay.  See you in the

17   tomorrow at one o'clock.

18        (Proceedings adjourned at 4:52 p.m.)

19

20        I, RACHAEL LUNDY, Certified Shorthand Reporter, do
     hereby certify the foregoing transcript as true and correct.

21

     DATED:  14th of November, 2018         /s/ Rachael Lundy
22                                          RACHAEL LUNDY, CSR
                                            Certificate No. 13815
23

24

25