602

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DRODZ


UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )  1:13-CR-00409 DAD
                                   )
ADAM ALAN HENRY,                   )  TRIAL DAY 5
                                   )
          Defendant.               )
                                   )
_____      )



Fresno, California                 TUESDAY, NOVEMBER 14, 2017



REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES OF COUNSEL:

For the Government:          **DAVID GAPPA and ROSS PEARSON**
                             Assistant U.S. Attorneys
                             2500 Tulare Street, Suite 4401
                             Fresno, CA 93721-1331


For the Defendant:           **ANTHONY CAPOZZI**
                             LAW OFFICE OF PATRICK CAPOZZI
                             1233 W. Shaw Avenue, Suite 102
                             Fresno, CA 93711-3718


Volume 5, pgs. 602 - 727, inclusive

REPORTED BY:  RACHAEL LUNDY, CSR #13815
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

603

1                            INDEX

2
    EXAMINATION OF REBECCA LEE JACKSON              PAGE
3   Direct Examination by Mr. Pearson               651
    Cross-Examination by Mr. Capozzi                654
4
    EXAMINATION DETECTIVE OF ARTHUR HIVELY
5   Cross-Examination by Mr. Capozzi                658

6

7    PLAINTIFF'S EXHIBITS:

8    NO.      DESCRIPTION                            PAGE

9    26.5     Video                                  606

10   26.6     Video                                  609

11   27.7     Video                                  610

12   27.8     Video                                  612

13   27.10    Video 2013_4_8_11_44_2                 613

14   27.9     Video                                  615

15   35.2     Text messages exported onto a Microsoft Word  621
              document
16
     35.3     June 3, 2013 at 5:53 p.m. text message 624
17
     35.7     Video                                  636
18
     25.11    Video                                  638
19
     34.1     Folder structure layout               644
20   to
     34.7
21

22

23

24

25

604

```
 1                         INDEX

 2    DEFENDANT'S EXHIBITS                    MARKED      ID

 3     F        Photograph                     668        -

 4     G        Photograph                     668        -

 5     H        Photograph                     668       671

 6     I        Photograph                     668        -

 7     J        Photograph                     668       671

 8     K        Photograph                     668       671

 9     L        Photograph                     668       671

10     M        Photograph                     668       671

11     N        Photograph                     668       671

12     O        Photograph                     668       671

13     P        Photograph                     668       671

14     Q        Photograph                     668       671

15     R        Photograph                     668       671

16     S        Photograph                     668       671

17     T        Photograph                     668       671

18     U        Photograph                     668       671

19

20

21

22

23

24

25
```

1   TUESDAY, NOVEMBER 14, 2017          Fresno, California

2   1:01 p.m.

3     (Jury enters courtroom.)

4        THE COURT:  Let the record reflect we're back in the

5   presence of the jury.

6        Mr. Gappa, you may continue.

7        MR. GAPPA:  Thank you, Your Honor.

8            **DIRECT EXAMINATION RESUMED**

9   BY MR. GAPPA:

10  **Q.**  Good afternoon, Detective Hively.  Before I go on to any

11  new exhibits today, I just wanted to ask a question or two

12  about some of the items we covered yesterday afternoon.

13       Exhibits 28.1 through 28.10 are in evidence.  If we

14  can go to the first of those.  First, 28.1.

15       Detective Hively, that's 28.1, and your testimony was

16  that is a screen capture and there were a series of those

17  through 28.10.  Did you create those screen captures?

18  **A.**  No.

19  **Q.**  Where were they found?

20  **A.**  I located those on the NETGEAR ReadyNAS, the secure share.

21  **Q.**  Okay.  So then, let me go next to what has been marked as

22  Government's Exhibit 26.5 and ask if you recognize this

23  document.  Do you recognize it?

24  **A.**  I do.

25  **Q.**  Did you help prepare this exhibit?

1    **A.**   I did.

2    **Q.**   What is this exhibit?

3    **A.**   This is a screenshot of a video.

4    **Q.**   How did you help create this -- did you create this screen

5    capture?

6    **A.**   I assisted in the preparation of this exhibit, yes.

7    **Q.**   And can you state where it was you found the video from

8    which this screen capture was created?

9    **A.**   Yes.  I located that on Exhibit 8.

10   **Q.**   Can you explain -- and you said it was from a video.  Can

11   you tell us any more about that video?

12   **A.**   Certainly.  It was approximately three hours long.  At the

13   six-minute mark, Adam Henry and Angele Henry come into the

14   bathroom and spend about five minutes in there installing a

15   curtain in the bathroom window.

16          The rest of the video is black.

17          MR. GAPPA:  Your Honor, I'd ask that be received as

18   Government's 26.5.

19          MR. CAPOZZI:  That's in place of the video; is that

20   correct?

21          MR. GAPPA:  Yes.

22          MR. CAPOZZI:  No objection, Judge.

23          THE COURT:  26.5 is admitted.

24      (Plaintiff's Exhibit 26.5 was admitted into evidence.)

25          MR. GAPPA:  Thank you, Your Honor.  Request to be

1  published?

2           THE COURT:  It may be.

3           MR. GAPPA:  Thank you, Your Honor.

4  BY MR. GAPPA:

5  **Q.**  Detective Hively, now that everyone can see it, can you

6  briefly explain what's depicted here?

7  **A.**  Yes.  Adam Henry is standing on the stool in the bathtub,

8  and although it's not quite clear, he's holding a curtain rod

9  with a white curtain.  And Angele Henry is standing in the

10  background.

11  **Q.**  Okay.  So there was some brief testimony just before this

12  about the video from which this was created.  You said you

13  found that on Exhibit 8?

14  **A.**  I did.

15  **Q.**  Does that video have a title?

16  **A.**  It does.

17  **Q.**  What was the title?

18  **A.**  2013_4_7_15_17_52.mp4.

19  **Q.**  Were you able to determine when that video was created?

20  **A.**  Yes.  It was created on April 7, 2013.

21  **Q.**  How were you able to determine that?

22  **A.**  That was a file creation date that I saw in my forensic

23  product for that particular digital file.

24  **Q.**  Let me show you what's next been marked as Exhibit 26.6,

25  for your screen only.  If we can start that exhibit.

1          Have you seen this exhibit before?

2   **A.**   Yes.

3   **Q.**   Did you help prepare it?

4   **A.**   I did.

5   **Q.**   Can you describe what it is?

6   **A.**   Yes.  It's a video in which Angele Henry and Adam Henry

7   test out the shower -- excuse me, the video camera in the

8   bathroom.

9   **Q.**   Did you find this video somewhere?

10  **A.**   Again, it was on Exhibit 8.

11  **Q.**   Okay.  What's the name of the video, if it has one?

12  **A.**   It is 2013_4_8_7_45_44.MP4.

13  **Q.**   Were you able to determine when this video, that's now

14  marked as Exhibit 26.6, was created?

15  **A.**   Yes.  It was created on April 8th, 2013.  I was able to

16  determine that through my forensic software for that digital

17  file.

18          MR. GAPPA:  Your Honor, we'd ask that be admitted.

19          MR. CAPOZZI:  No objection.

20          THE COURT:  Is it the screenshot that's marked 26 --

21          MR. GAPPA:  Your Honor, this is a video 26.6.  So it

22  is the video file.

23          THE COURT:  As opposed to a screenshot?

24          MR. GAPPA:  Correct.

25          THE COURT:  Is there an objection?

1          MR. CAPOZZI:  No.

2          THE COURT:  26.6, the video, as opposed to the

3    placeholder, is admitted.

4       (Plaintiff's Exhibit 26.6 was admitted into evidence.)

5          MR. GAPPA:  Thank you, Your Honor.

6          So permission to publish, Your Honor?

7          THE COURT:  You may.

8          MR. GAPPA:  Thank you.

9    BY MR. GAPPA:

10   **Q.**  So if we can show this now, Detective Hively, and if you

11   can describe for the benefit of those who haven't seen it,

12   what is depicted.

13   **A.**  At this point Angele Henry is stepping into the shower,

14   exposing her bra, facing the camera.  As she exits, she does

15   the same thing.

16   **Q.**  Okay.  Let me next show you what has been marked as

17   Government's Exhibit 27.7.  Just 27.7, just for your screen,

18   if we could start that exhibit and ask if you recognize it.

19   **A.**  I do.

20   **Q.**  Did you help prepare it?

21   **A.**  I did.

22   **Q.**  What is it?

23   **A.**  It's a surreptitious recording of A.T. in the Burman Drive

24   guest bathroom.

25   **Q.**  What title, if any, does this video have?

1    **A.**   "A recording 2012-07" -- I'm sorry.  I was looking at the

2    wrong file.

3             It is "2013_4_8_12_15_8."

4    **Q.**   Were you able to determine the date on which this file was

5    created?

6    **A.**   Yes, it was April 8, 2013.

7    **Q.**   And how were you able to determine that?

8    **A.**   Utilized my forensic software, I was able to determine the

9    file creation date for this particular file.

10            MR. GAPPA:  Your Honor, I ask that Exhibit 27.7, the

11   video, be admitted.

12            THE COURT:  Any objection?

13            MR. CAPOZZI:  None, Judge.

14            THE COURT:  27.7 is admitted.

15       (Plaintiff's Exhibit 27.7 was admitted into evidence.)

16            MR. GAPPA:  Thank you, Your Honor.

17            Permission to publish?

18            THE COURT:  You may.

19   BY MR. GAPPA:

20   **Q.**   Before we show that, Detective Hively, from the beginning,

21   was this particular video that we'll see located on Exhibit 9?

22   **A.**   Yes, sir.

23   **Q.**   Where?

24   **A.**   The file path was:  "Personal, not okay, misc, people,

25   [A.T.], VID, 15."  And the last folder was, "hot tub," open

1    parenthesis, "with Sheri" close parenthesis.

2    Q.   I will now play that from the beginning.

3         (Video played.)

4    BY MR. GAPPA:

5    Q.   So Detective Hively, let me show you only the first part

6    of what's been marked as Government's Exhibit 27.8.  If we can

7    start that exhibit, I'll ask if you recognize it and whether

8    you --

9    A.   I do.

10   Q.   And did you help prepare this exhibit?

11   A.   Yes, sir.

12   Q.   What is it?

13   A.   It's a video -- surreptitious video of A.T. changing

14   clothes in the Burman Road -- correction, Burman Drive guest

15   bathroom.

16   Q.   Were you able to determine the date on which that video

17   was created?

18   A.   Yes.  It was created on April 8, 2013.

19   Q.   And how were you able to make that determination?

20   A.   Utilizing my forensic software, I located the file created

21   date for that particular digital file.

22           MR. GAPPA:  Your Honor, I ask that be received as

23   Government's Exhibit 27.8.

24           THE COURT:  Any objection?

25           MR. CAPOZZI:  No.

612

1          THE COURT:  27.8 is admitted.

2       (Plaintiff's Exhibit 27.8 was admitted into evidence.)

3          MR. GAPPA:  Permission to publish?

4          THE COURT:  Is this another video?

5          MR. GAPPA:  Yes.

6          THE COURT:  How long?

7          MR. GAPPA:  It's not as long.  I think it's

8    approximately two to three minutes almost --

9          THE COURT:  All right.

10          MR. GAPPA:  -- 40 seconds.

11       (Video played.)

12    BY MR. GAPPA:

13    Q.   So Detective Hively, let me next show you only what has

14    been marked as Government's Exhibit 27.10.  Do you see 27.10

15    playing on your screen?

16    A.   Not yet.

17    Q.   Okay.

18    A.   No.  Now I do.

19    Q.   And do you recognize this exhibit?

20    A.   Yes.

21    Q.   Did you locate this on any device that's already in

22    evidence?

23    A.   I did, Exhibit 8.

24    Q.   And was there a file path for the video?

25    A.   Yes.  It was underneath, "Users," back slash, "AH," back

613

1    slash, "video."

2    **Q.**   Does the video had have a title?

3    **A.**   Yes.

4    **Q.**   What is the title?

5    **A.**   2013_4_8_11_44_2.

6             MR. GAPPA:  Your Honor, I would ask that that be

7    received as 27.10.

8             THE COURT:  Into evidence?

9             MR. CAPOZZI:  No objection, Judge.

10            THE COURT:  27.10 is admitted.

11       (Plaintiff's Exhibit 27.10 was admitted into evidence.)

12            MR. GAPPA:  If we can go back, not quite to the end.

13            Permission to publish, Your Honor.

14            THE COURT:  Yes.

15       (Video played.)

16   BY MR. GAPPA:

17   **Q.**   So Detective Hively, let me show you next what has only

18   been marked as Government's Exhibit 27.9, and if -- and if we

19   can start playing that exhibit.

20            MR. CAPOZZI:  29.9?

21            MR. GAPPA:  27.9.

22            MR. CAPOZZI:  I have 8 and 10.

23            THE COURT:  Looks like it's out of order.

24            9 is after 10.  It's in my binder wrong, too.

25            MR. CAPOZZI:  Okay.

614

BY MR. GAPPA:

**Q.**  Have you had a chance to see that?

**A.**  Yes, sir.

**Q.**  Do you recognize it?

**A.**  I do.

**Q.**  What is it?

**A.**  It is a video of A.T. changing clothes in the bathroom again.

**Q.**  Does this video have a title?

**A.**  Yes.

**Q.**  What is --

**A.**  Two --

**Q.**  Go ahead.

**A.**  2013_4_8_12_36_49.

**Q.**  Were you able to determine when that video was created?

**A.**  Yes.  On April 8th, 2013.

        MR. GAPPA:  Your Honor, I would ask that this be received as 27.9.

        THE COURT:  Any objection?

        MR. CAPOZZI:  Just to find out where was it found and in what exhibit.

BY MR. GAPPA:

**Q.**  Detective Hively, do you now where it was -- on which device you found this video?

**A.**  Yes, Exhibit 9 in the secure share.

1    Q.   And was there a particular file path?

2    A.   Yes.  Again, "Personal, not okay.  Misc, people, [A.T.],

3    VID, 15."  And the last folder was "hot tub" open parenthesis,

4    "with Sherri" close parenthesis.

5              MR. GAPPA:  Your Honor, we ask that be received.

6              THE COURT:  Move to admit 27.9?

7              MR. GAPPA:  Yes.

8              MR. CAPOZZI:  No --

9              MR. GAPPA:  And then permission to publish.

10             MR. CAPOZZI:  No objection.

11             THE COURT:  27.9 is admitted.  It may be publish.

12             MR. GAPPA:  Thank you.  If you can play that.

13       (Plaintiff's Exhibit 27.9 was admitted into evidence.)

14       (Video played.)

15   BY MR. GAPPA:

16   Q.   Detective Hively, let me next show you what's been marked

17   as Government's 28.11, 28.12, and 28.13.  Do you see these as

18   they are shown to you?

19   A.   Yes, sir.

20   Q.   Do you recognize them?

21   A.   I do.

22   Q.   What are they?

23   A.   They are, again, screen captures of A.T. while she's in

24   the restroom at the Burman Drive address.

25   Q.   So we're clear on this, again, when you say they're screen

616

1  captures, did you find them somewhere on any device that you

2  examined?

3  **A.**  Yes.  In the same location as the others 28.1 through

4  28.10.

5  **Q.**  Where specifically was that?

6  **A.**  On Exhibit 9 in the folder path, "Personal, not okay.

7  Misc, people, [A.T.]," and the last folder was "PICS."

8  **Q.**  So just to be clear, did you create these three screen

9  captures?

10  **A.**  No.  I located those in my folder.

11        MR. GAPPA:  Your Honor, I'd ask those be admitted as

12  28.1, 28.2, 23.3 -- -13.

13        MR. CAPOZZI:  I'll place an objection as to 28.13.  I

14  don't object to 28.11 and 28.12.  But I do object to 28.13 as

15  being not found on the -- any files.  This is -- I'm just

16  going to object.  And I'll, later on, explain more to the

17  Court.

18        THE COURT:  Well, the witness has testified as to

19  where he claims to have found this photo.

20        MR. CAPOZZI:  And --

21        THE COURT:  You can cross-examine him.  What's the

22  basis for the objection?  You want to approach?

23        MR. CAPOZZI:  Yeah.

24     (Sidebar held.)

25        THE COURT:  I must say that 28.13 does not appear to

1    be A.T. to me.

2         MR. CAPOZZI:  All right, then.  Look, I just -- do

3    you have it there?

4         That's not, because we weren't supplied this, to be

5    honest with you.  Hold on.  We were given 12 snapshots of two

6    girls in the bathroom.  That was it.  I don't know who this

7    is.

8         THE COURT:  As opposed to?

9         MR. CAPOZZI:  Yeah, yeah.  There's two of those like

10   that.

11        Yes, another.  Yes, no.  There's one more.  One more.

12   Yes, those two.

13        THE COURT:  I must admit, when I looked at this, I

14   thought it was somebody else.

15        MR. GAPPA:  Your Honor, what we can do is, show the

16   video that that --

17        THE COURT:  It is her?

18        MR. GAPPA:  Yeah.

19        THE COURT:  It is?

20        MR. CAPOZZI:  Who is it?

21        MR. GAPPA:  [A.T.]

22        MR. CAPOZZI:  That's [A.T.]

23        We were never given this one, I can tell you that.

24   You've got 1-10 in the bedroom, two in the bathroom.  That's

25   why I'm stunned when I saw this.

618

1    MR. GAPPA:  But it was in your binder.

2    THE COURT:  It's been in my exhibit binder all along.

3    I saw it a while ago.

4    MR. CAPOZZI:  It has -- I didn't look at that one.

5    Again, there were 12.

6    THE COURT:  The defense is objecting to the ground

7    that they weren't provided this in discovery.  What do you

8    say?

9    MR. GAPPA:  They were.

10    MR. CAPOZZI:  Where?

11    THE COURT:  Well --

12    MR. CAPOZZI:  Where?

13    MR. GAPPA:  I mean, among other places, it's in the

14    exhibit binder.

15    MR. CAPOZZI:  Well, now it is.

16    THE COURT:  Was it turned over in discovery?

17    MR. GAPPA:  It's in the --

18    MR. CAPOZZI:  Where was this in discovery?  In his

19    report he says there's 12 snapshots in the -- just ten in the

20    bath -- bedroom, and ten in the -- two the bathroom.  Not that

21    one.  Remember the motion in limine for submitted all of

22    snapshots, that wasn't in there.

23    MR. GAPPA:  Your Honor, I can pull up our discovery

24    file.

25    MR. CAPOZZI:  I'd like to see that.

619

1        MR. GAPPA:  We provided all of the electronic copies

2   of these particular video images and videos in our drive.

3   So --

4        THE COURT:  The defenses preserve their objection on

5   the ground of Bradiy, B-R-A-D-I-Y, you can either stick by,

6   hear your desire to move this into evidence despite that

7   objection.  If it turns out that Mr. Capozzi establishes that

8   this was never provided in discovery, then you've got a

9   problem that you're going to have to deal with.  Frankly, I'm

10  not sure.

11       MR. CAPOZZI:  It's in the binder here.

12       THE COURT:  I'm not sure about -- why a lot of this

13  evidence is coming in.  Beats the heck out of me.

14     (End of Sidebar.)

15       THE COURT:  Which exhibits are -- is the Government

16  now moving into evidence?

17       MR. GAPPA:  Thank you, Your Honor.  It's 28.11,

18  28.12, 28.13.

19       THE COURT:  And does the --

20       MR. CAPOZZI:  I object to -13, Judge.

21       THE COURT:  All right.  And the Court will admit all

22  three exhibits noting Defendant's objection, and the basis for

23  that objection as stated at sidebar.

24       MR. GAPPA:  Thank you, Your Honor.  And then

25  permission to publish.

1          THE COURT:  You may.

2          MR. GAPPA:  If we can go first to 28.11, then 28.12,

3   and then 28.13.  And if we can take that down.

4   BY MR. GAPPA:

5   **Q.**  Then Detective Hively, I want to next direct your

6   attention to what have been -- what's been marked for

7   identification as the Exhibit 35.2.  Have you seen this

8   exhibit previously?

9   **A.**  Yes, sir.  I prepared this.

10  **Q.**  And how did you do that?

11  **A.**  I utilized my Celebrite forensic software, which of

12  course, allows me to get extractions from mobile devices.

13          In this particular case, Exhibits 4, 17, and 19,

14  which were all iPhones.  After getting extractions from those

15  particular devices, I brought them into Celebrite Physical

16  Analyzer, which is a separate components, which goes by

17  Celebrite P.A.

18          I went through that device looking for images, text

19  messages, videos, emails, anything that might be relevant to

20  this case.

21          For this particular exhibit, I was looking at text

22  messages between Adam Henry and Angele Henry.  I exported

23  those out and prepared this Microsoft Word document.

24  **Q.**  Okay.

25          MR. GAPPA:  Your Honor, we ask that be admitted as

1    35.2.

2            MR. CAPOZZI:  In this case -- if this came from the

3    telephone of Henry -- or Adam Henry?

4            THE WITNESS:  Yes, sir.

5            MR. CAPOZZI:  Okay.  No objection so long as we have

6    an agreement we're okay.

7            All right.  No objection, Judge.

8            THE COURT:  35.2 is admitted.

9            MR. GAPPA:  And permission to publish?

10           THE COURT:  35.2 may be published.

11       (Plaintiff's Exhibit 35.2 was marked for identification.)

12   BY MR. GAPPA:

13   Q.  So Detective Hively, we see the first page of 35.2.  Can

14   you explain a little bit more what we are looking at here?

15   A.  Yes, sir.  There are columns on the page.  The first

16   column would be the item number.

17           The second is the type.  In this case SMS messages,

18   which is the same as text messages.  Direction as to incoming

19   or outgoing.  And then, we have a date timestamp for that

20   particular message.

21           The party is listed there, from and to.  And in this

22   case, it says "Angele Brennan," which is her maiden name that

23   was in the cell phone, and then the description, which would

24   be the actual text message.

25   Q.  Okay.  So if we go to item 3 on this first page, and if we

622

1   look at that information, can you walk us through what we see

2   there?

3   A.   Certainly.   Item 3 is SMS messages.   It's incoming to

4   Adam Henry's phone -- correction.   That was my mistake

5   earlier.

6         This is from Angele Henry.   So I have to correct

7   myself on that.   This is an incoming message to Angele Henry,

8   or says here "Angele Brennan" from Adam Henry on August 17,

9   2012, at 8:22.

10         It indicates -- the first word is spelled, S-o-o-o.

11   Second word is "much," and the third is "T" ampersand "A" and

12   then "...".

13   Q.   Who made that statement, just so we're clear?

14   A.   This is coming from Adam Henry to Angele Henry that can be

15   seen in the party column.

16   Q.   We next go to item 15.   If we highlight that entry, can

17   you explain what information is contained there?

18   A.   Yes, sir.   Again, this is an SMS message incoming to

19   Angele Brennan's phone from Adam Henry.   And the next message

20   indicates, "Red heads needed representation."

21   Q.   Okay.   In this report, are there some images?

22   A.   Yes, sir.

23   Q.   Can you explain how the images got in the report?

24   A.   Yes.   They were an attachment to the SMS messages.

25   Q.   If we go to item 10, can you explain what you see there?

623

1    **A.**   Yes.   In this case it's an MMS message, meaning a

2    multimedia message incoming to Angele Brennan's phone from

3    Adam Henry on August 17, 2012, at 8:25 p.m.

4           And there's an attachment, which is a photograph of

5    some females.

6    **Q.**   If we go to item 11, can you explain what we see here in

7    this entry?

8    **A.**   Yes.   It's another incoming multimedia message from

9    Adam Henry to Angele Henry -- in this case, Angele Brennan.

10   And it's, again, another photograph of female in shorts.

11   **Q.**   Okay.   If we go to item 16, what do we see there?

12   **A.**   Again, another multimedia message incoming into this phone

13   from Adam Henry to Angele Brennan.   It's another photograph

14   attachment of a female in shorts.

15   **Q.**   Finally, if we go to item 26, what do we see here?

16   **A.**   Another multimedia message incoming to this particular

17   phone from Adam Henry with the photograph of two females in

18   shorts, and the text message, "These two keep walking by

19   hanging around."

20   **Q.**   Okay.   Let me next direct your attention to what has been

21   marked as Government's Exhibit 35.3.   Do you see this?

22   **A.**   Yes.

23   **Q.**   Have you seen it previously?

24   **A.**   I prepared this document.

25   **Q.**   Did you do that in the same way using the same forensic

624

1    tool as 35.2?

2    **A.**  Yes, in the same process.

3            MR. GAPPA:  Your Honor, I would ask that that be

4    received as 35.3.

5            MR. CAPOZZI:  No objection.

6            THE COURT:  35.3 is admitted.

7        (Plaintiff's Exhibit 35.3 was admitted into evidence.)

8            MR. GAPPA:  And permission to publish, Your Honor?

9            THE COURT:  You may.

10           MR. GAPPA:  Thank you.

11   BY MR. GAPPA:

12   **Q.**  So Detective Hively, if we could focus on entry number 2,

13   and if you could please explain what information is there.

14   **A.**  Yes.  This is the date, June 3, 2013 at 6:53 p.m.

15           The text message says, "I think she's 16.  Good Lord,

16   she fits into that category we have been talking about."

17   **Q.**  Who made that statement?

18   **A.**  That was an incoming text message from Angele Henry to

19   Adam Henry.

20   **Q.**  Okay.  What date was that statement made?

21   **A.**  June 3, 2013.

22   **Q.**  Okay.  If we go to page 3 on entry 7.  Can you explain

23   some information about that entry?

24   **A.**  Yes.  It's June 4, 2013, another message from Angele Henry

25   to Adam Henry.

1          And the body of the text says, "LMAO!!! [A.T.] just

2    asked if she can tan here topless.  I said, in caps,

3    'Anytime!!!  LOL."

4    **Q.**  Let me next direct your attention to what's been marked as

5    Government's Exhibit 35.5.  Have you seen this before?

6    **A.**  Yes.  I prepared this document in the same manner as the

7    other two.

8    **Q.**  All right.

9          MR. GAPPA:  Your Honor, I would ask this be received

10   as Exhibit 35.5.

11         THE COURT:  Any objection to the admission of 35.5?

12         MR. CAPOZZI:  No.

13         THE COURT:  35.5 is admitted.

14         MR. GAPPA:  Thank you, Your Honor.

15         And permission to publish this.

16         THE COURT:  You may.

17         MR. GAPPA:  Thank you.

18   BY MR. GAPPA:

19   **Q.**  What do we see here, Detective Hively?

20   **A.**  This is an incoming message to Adam Henry's phone from

21   Angele Henry.  It has an attachment, was a photograph of A.T.

22         And the body of the text says, "I had to help her get

23   into that!"

24   **Q.**  And is there a date associated with the transmission of

25   that message?

1    **A.**  Yes.  September 16, 2012.

2    **Q.**  All right.  Let me next show you what's been mark as

3    Government's Exhibit 36.2.  Do you recognize that?

4    **A.**  I do.  I prepared this ten-page document.

5    **Q.**  How did you create this exhibit?

6    **A.**  This came from Exhibit 16, which is the largest computer

7    tower on the evidence cart.

8          It has eight base in the front of it.  The top five

9    base have 500 giga bite hard disc drives in them.

10         The lower three have 250 giga bite hardware -- excuse

11   me, hard disc drives.

12         They are composed of two separate RAIDs.  The top

13   five is a separate RAID for storage only, and the bottom RAID

14   is the -- the RAID for the operating system.

15         So I was able to reconfigure these RAIDs in my

16   forensic software.  Once I did that, I examined the folder

17   structures on both sides, on both RAIDs.

18         And on the five-disc RAID, I was able to locate 61

19   child pornography videos in two separate folders.

20         MR. GAPPA:  Your Honor, I would ask that 36.2 be

21   admitted.

22         MR. CAPOZZI:  No objection.

23         THE COURT:  36.2 is admitted.

24         MR. GAPPA:  And before we -- permission to publish,

25   Your Honor?

1          THE COURT:  Yes.

2    BY MR. GAPPA:

3    **Q.**  Before we do that, Detective Hively, there's an exhibit

4    sticker on Exhibit 16.  I'm just going to walk over to it.

5    Would you recognize that tour from where you're seated?

6    **A.**  Yes, sir.  I can see it from here.

7    **Q.**  Is this it?

8    **A.**  Yes, sir.

9    **Q.**  So now that we know where this report came from, can we

10   look at some of the information on it.  And if we focus on the

11   first entry, can you walk us through the information there?

12   **A.**  Certainly.  Each item on this document has an item number.

13   The next portion of that would be the title of the actual

14   file.  Did you want me to read that?

15   **Q.**  No.  I --

16   **A.**  Okay.

17   **Q.**  I think it's?

18   **A.**  The next item would be the name, which is essentially the

19   repeat of the item number, the file title name.

20          The file extension, the logical size.  In other

21   words, the size of that particular video file on the computer.

22   The date it was created, the date it was last accessed, and

23   then, where on that item, on that particular RAID, that

24   particular video was located.

25          In this case, "New folder, new folder," and then the

1  subfolder "no."

2  Q.  Okay.  And then everything beyond that last backslash is

3  the file title?

4  A.  Yes, sir.

5  Q.  The file "EXT" that's the third line of this entry, there

6  are letters "MPG," what does that mean?

7  A.  It's a video file.  That's the file extension for the

8  video file.  That's a video file impeg.

9  Q.  There's a file created entry.  Can you explain what that

10 is?

11 A.  Yes, sir.  That's the date of 12-19-07.  That's the date

12 that that particular video file would be placed on that RAID.

13 Q.  If we can go all the way to entry number 59.  If we can

14 zoom in on that information like the first one.

15      Can you walk us through the information for this

16 entry?

17 A.  Yes, sir.

18      It's item 59, and the title is, in fact, of the title

19 of the actual video file, which follows under name as well.

20 The file extension, again, is M-peg, mpg.  There's a logical

21 size.  The file created date, last access date, and then,

22 again, the item path where that resides on the computer.

23      And in this case, would be in the folder labeled,

24 "New folder."  And what follows from that is the file itself.

25 Q.  Okay.  Again, the file extension, what kind was it?

1    **A.**   A video file, MPG.

2    **Q.**   Where was Exhibit 16 located when it was seized on

3    September 19, 2013?

4    **A.**   It was in the garage of the Burman Drive address.

5    **Q.**   Was it an operable computer at that time?

6    **A.**   No.  As it is today, it didn't have a power supply or

7    motherboard, which is required to operate the computer.

8    **Q.**   Did you try to determine when the computer had last

9    operated as such?

10   **A.**   Yes.  The operating system, again, is on the three RAID

11   disc set and last used or shut down August 20th, 2010.

12   **Q.**   I want to ask you some questions about what's been

13   received as Exhibit 18.  That was a computer hard drive that

14   was found at the Burman Drive residence.

15         Did you do a forensic examination of Exhibit 18?

16   **A.**   I did.

17   **Q.**   How did you do that?

18   **A.**   Again, utilizing my software product of choice, Encase, I

19   imported the forensic image into my software.  And I examined

20   it by looking at the directory structure, the files on the

21   hard disc drive.

22   **Q.**   Okay.  What were you looking for?

23   **A.**   Any evidence that would be important in this particular

24   case relating to possession of child pornography.

25   **Q.**   Did you find any files that you considered to be, based on

1   your training and experience, child pornography?

2   **A.**   Yes.   I located approximately 59 video files that were

3   child pornography.   I was able to play them and view them.

4   **Q.**   Where were they located within Exhibit 18?

5   **A.**   There were two separate locations.   The first one, the

6   path was, "New folder," and the subfolder was "kid."   There

7   were 34 child pornography videos in that particular folder.

8          And then, also in a file path of "new folder," open

9   parenthesis, the number "2," close parenthesis, subfolder,

10  that would be "new folder" and the last subfolder would be

11  "no."   And there were approximately 25 child pornography

12  videos in that file, that folder.

13  **Q.**   Okay.   So the total was approximately 59?

14  **A.**   Yes, sir.

15  **Q.**   Okay.   Let me next show you what has been marked

16  Exhibit 25.5.   And this is actually a video.

17          So for your screen only at this time, can you take a

18  look at this?

19  **A.**   Yes, sir.   I recognize it.

20  **Q.**   Have you seen this before?

21  **A.**   Yes, sir.

22  **Q.**   Where did you find or where did you see this video

23  previously?

24  **A.**   I located this on Exhibit 13.

25  **Q.**   Is there a title for this video?

1    **A.**   Yes.  It is 4-2008-05-03-0.

2            And I should add that the word "recording" is

3    actually at the beginning of that title.

4    **Q.**   Okay.  Were you able to determine a file creation date for

5    this video?

6    **A.**   Yes, may 5, 2008.

7    **Q.**   How were you able to do that?

8    **A.**   Again, my examining this particular digital file in my

9    forensic software and looking at the file creation date.

10           THE COURT REPORTER:  I'm sorry?

11           THE WITNESS:  Again, by looking at this digital file

12   in my forensic software and locating the file creation date.

13           MR. GAPPA:  Government asks that be received as

14   Exhibit 25.5.

15           THE COURT:  Any objection to the admission of 25.5?

16           MR. CAPOZZI:  Need to know more about it, lay some

17   foundation as to where it is, et cetera.

18           THE COURT:  Sustained.  Lack of foundation.

19   BY MR. GAPPA:

20   **Q.**   Well, Detective Hively, where was it that you located this

21   video?

22   **A.**   Again, on Exhibit 13.  And the file path was, "New

23   folder," open parenthesis "2" close parenthesis.  It was

24   located inside of that folder.

25   **Q.**   Where was Exhibit 13 found?

1  **A.**   Inside the garage at the Burman Drive address.

2  **Q.**   Okay.

3         MR. GAPPA:  Your Honor, we believe that would be

4  sufficient.

5         MR. CAPOZZI:  Still lack of foundation.

6         THE COURT:  Overruled on foundation.

7         MR. CAPOZZI:  Relevance.

8         THE COURT:  Sustained on relevance.

9         Right now all I've got in front of me is a video.  I

10  don't know what it depicts.  It's not an obvious relevance.

11         MR. GAPPA:  Your Honor, can we approach?

12         THE COURT:  No.  The objection is sustained.  No

13  relevance yet established.

14  BY MR. GAPPA:

15  **Q.**   Detective Hively, when you were reviewing all of the

16  evidence in this case, did you try to determine whether the

17  Defendant had installed any camera in a residence prior to the

18  one in Burman Drive?

19  **A.**   I located evidence of that affect.

20  **Q.**   And what was the evidence?

21  **A.**   A number of videos with Mr. Henry manipulating a camera

22  both in the space above the sheetrock, which would be part of

23  ceiling as well as other videos with him manipulating a camera

24  within the exhibit that has the planter.  I don't remember the

25  number.

633

1  **Q.**  And I'm not asking you to describe any of the content of

2  any videos that might have been produced from any of those

3  cameras, but did some of that, in your opinion, become

4  relevant to your investigation?

5              MR. CAPOZZI:  Objection, calls for conjecture.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8  BY MR. GAPPA:

9  **Q.**  How so?

10 **A.**  I saw a similarity in behavior and methodology between

11 these videos that I just described and those that were

12 recorded at the Burman Drive address in Turlock.

13             MR. GAPPA:  Your Honor, we ask this now be received.

14             THE COURT:  Were you able to determine -- this is

15 Exhibit 29.5.  As a result of your investigation, were you

16 able to determine the location?

17             THE WITNESS:  Yes, sir.

18             THE COURT:  How were you able to do that.

19             THE WITNESS:  By interviewing Mr. Henry's ex fiance.

20             THE COURT:  And you say the creation date of this

21 video was?

22             THE WITNESS:  May 3, 2008, sir.

23             THE COURT:  And you're familiar with the home on

24 Burman, right?

25             THE WITNESS:  Yes, sir.  I was there two separate

634

1    times.

2           THE COURT:  And this video with a creation date of

3    May 3, 2008 is not the Burman Residence?

4           THE WITNESS:  That's correct, sir.

5           THE COURT:  Were you able to determine as a result of

6    your investigation, not just an address where this video was

7    taken from?

8           THE WITNESS:  I'm sorry.  You're asking if I have an

9    address for that?

10          THE COURT:  Don't give it to me.

11          Just, were you able to determine the address of the

12    residence depicted in Exhibit 25.5?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Okay.  And was it an address which is a

15    result of your investigation you associated with the

16    Defendant?

17          THE WITNESS:  Yes.

18          MR. CAPOZZI:  And the other objection is beyond the

19    terms of the conspiracy is from May 2012 to September 19,

20    2013.  This is something in 2008.

21          THE COURT:  Moving to admit?

22          MR. GAPPA:  Yes.

23          THE COURT:  Objection on the ground of relevance?

24          MR. CAPOZZI:  Beyond the terms of the conspiracy.

25          THE COURT:  And therefore not relevant?

1          MR. CAPOZZI:  Right.

2          THE COURT:  Overruled.  25.5 is admitted.

3          MR. CAPOZZI:  Is this 403(b) evidence?

4          THE COURT:  No.

5          MR. GAPPA:  So --

6          THE COURT:  This -- if you want a sidebar, I'll

7    entertain it.  But it's a matter that we spoke about

8    outside --

9          MR. CAPOZZI:  Yes, I know.

10          THE COURT: -- the presence I've previously ruled --

11          MR. CAPOZZI:  Got you, Judge.

12          THE COURT: --  in theory, to its admissibility.

13          MR. GAPPA:  Thank you, Your Honor.  Permission to

14    publish?

15          THE COURT:  You may.  It played.

16          MR. GAPPA:  Thank you, Your Honor.

17    BY MR. GAPPA:

18    Q.  Detective Hively, let me next direct your attention to

19    25.7.  This is another video.  Have you seen this video

20    before?

21    A.  Yes.

22    Q.  And did you find it on one of the items that was seized

23    from the Defendants residence on Burman Drive?

24    A.  Yes.  I located it on item 16, the computer I was talking

25    about just a short time ago.

636

1  **Q.** Was there a file path for the video?

2  **A.** Yes.  It was under a folder called "video."  And a

3  subfolder to that was "new vid, new folder," open parenthesis

4  "2," close parenthesis.

5  **Q.** Is there a title for this video?

6  **A.** Yes.  It's rather lengthy.  It is, "Unknown series," open

7  parenthesis, "unknown episode," close parenthesis,

8  2008,05-03-0.

9  **Q.** Were you able to determine a file creation date for this

10 video?

11 **A.** Yes, sir.  It was May 3rd, 2008.

12 **Q.** Were you able to -- similar to the questions on the last

13 video, determine where it was that this video was taken?

14 **A.** Yes.  The answers would be the same.

15 **Q.** Okay.

16      MR. GAPPA:  Your Honor we ask that be received as

17 marked 25.7.

18      MR. CAPOZZI:  Same objection, Judge.

19      THE COURT:  Overruled.  25.7 will be admitted.

20   (Plaintiff's Exhibit 35.7 was admitted into evidence.)

21      MR. GAPPA:  Thank you, Your Honor.

22      And permission to publish?

23      THE COURT:  Yes.

24      MR. GAPPA:  Can we play that from the beginning

25 please.

1        (Video played.)

2    BY MR. GAPPA:

3    **Q.**  Let me next direct your attention only, Detective Hively,

4    to the last of these three videos.

5            It's been marked as Government's Exhibit 25.11.  I'll

6    ask you if you've seen this before.

7    **A.**  I have.

8    **Q.**  And where did you find this video?

9    **A.**  Again, on Exhibit 13, in a folder called "video."

10   **Q.**  And where was Exhibit 13 found?

11   **A.**  In the garage on the Burman Drive address in Turlock.

12   **Q.**  Does this video that your -- and the Court is seeing, have

13   a title?

14   **A.**  Yes, starts with the word, "Recording 3-2009-12-13-0."

15   **Q.**  Were you able to determine a file creation date for this

16   video?

17   **A.**  Yes.  It was December 13th, 2009.

18   **Q.**  Were you able to determine a location where this video

19   was?

20   **A.**  Yes.

21   **Q.**  Was it the Burman Drive residence?

22   **A.**  No.  It was the previous address as the other two videos

23   were.

24           MR. GAPPA:  Your Honor, we ask that be received as

25   25.11.

638

1          MR. CAPOZZI:  Same objection.

2          THE COURT:  Overruled.

3          25.11 is admitted and may be published.

4          MR. GAPPA:  Thank you, Your Honor.

5     (Plaintiff's Exhibit 25.11 was admitted into evidence.)

6          MR. GAPPA:  Your Honor, play from the beginning,

7   please.

8   BY MR. GAPPA:

9   Q.  Okay.  Detective Hively, did you find any types of

10  pornography on Exhibits 9 and 18 other than child pornography?

11  A.  Yes.  Yes, sir.

12  Q.  What type of other pornography did you find?

13  A.  There was a wide range of adult pornography, as well as

14  videos of people having sex with animals, and obviously, the

15  child pornography.

16  Q.  Did you see any videos of adults more than one or two

17  adults --

18          MR. CAPOZZI:  Objection, relevance.

19          THE COURT:  Overruled.

20  BY MR. GAPPA:

21  Q.  More than one or two adults having sex at the same time

22  with each other?

23  A.  Yes, sir.

24  Q.  Okay.

25          MR. GAPPA:  Your Honor, if I can have a moment with

1     counsel?

2            THE COURT:  Yes.

3            MR. GAPPA:  Your Honor, we have a -- speaking with

4     counsel, we have, as the Court knows, some stipulations.  And

5     the Government's preference would be if we have

6     Detective Hively just read.  This is fairly brief.

7            THE COURT:  Any objection?

8            MR. CAPOZZI:  No objection.

9            MR. GAPPA:  May I approach?

10           THE COURT:  Yes.

11           MR. GAPPA:  This has been marked as Government's

12    Exhibit 40.1, and we would ask that that be received as

13    marked.

14           MR. CAPOZZI:  No objection.  No objection.

15           THE COURT:  Are you moving it into admission or are

16    we having it read?

17           MR. GAPPA:  Well, we do both.  So publish it after

18    it's admitted.  Actually, I don't need to publish, if he's

19    able to just -- do you have this?

20           THE COURT:  You want it both read into the record and

21    admitted into evidence?

22           MR. CAPOZZI:  I think if it's admitted, that's

23    enough.  We can state what our stipulation.  Is that's good

24    enough?

25           MR. GAPPA:  That's fine.

1          THE COURT:  I think that is a stipulation -- I have

2     no problem with it being read, and I have no problem with it

3     being published while it's being read.  But it would seem that

4     admitting it into evidence as a separate, stand alone exhibit

5     is duplicative.  It's sort of one or the other.

6          It's either the same as testimony, or it's an

7     exhibit.  I don't think it's an exhibit.  I think it's to

8     be -- there's an in instruction tells the jury that they're to

9     accept the facts stipulated to by the parties.  So I don't

10    think it's properly admitted.

11         MR. GAPPA:  Well, if the choice is one or, another

12    Your Honor, then we could ask that it just be received.

13         THE COURT:  You want it admitted into evidence?

14         MR. GAPPA:  Yes, then we won't publish.

15         MR. CAPOZZI:  I didn't hear that.

16         THE COURT:  Mr. Gappa would prefer to admit the

17    stipulation into evidence as opposed to having it read and

18    published.

19         MR. CAPOZZI:  That's fine.

20         Whatever the Court wishes to do is fine with me.

21         THE COURT:  Don't publish.  Go ahead and have him

22    read it.  I'll admit the exhibit.

23         Any objection?

24         MR. CAPOZZI:  No.

25         THE COURT:  Go ahead and have him read.

1           Just go ahead and do it.

2    BY MR. GAPPA:

3    **Q.**  It should be on your screen now.  Can you go --

4    **A.**  Can you put it in the previous format, please.  You want

5    me to start with the narrative?

6           THE COURT:  Yes.

7           MR. GAPPA:  Yes.

8           THE WITNESS:  "The United States of America by and

9    through Assistant United States Attorneys, David Gappa and

10   Ross Pearson along with the Defendant, Adam Henry, through

11   defense counsel, Anthony P. Capozzi have agreed to the

12   following facts as they relate to Count 2 of the superseding

13   indictment, and ask that the Court find them true.

14          If called as a witness, Richmond County, open

15   parenthesis, Washington, close parenthesis, sheriffs detective

16   Roy Shepherd would testify that he has received -- I'm sorry,

17   "reviewed a copy of some images" -- sorry that word is "image"

18   --  files that were recovered from a computer seized at the

19   Defendant's residence at 1131 Burman Drive, Turlock,

20   California.

21          He can confirm that the images depict a female who

22   when the videos were recorded, in the states of Washington

23   and/or Oregon was between the ages of 8 and 11.

24          Two of the videos files had the following titles:

25   "Vicky hyphen 13," and then the Spanish word, "ANOS," open

1   bracket, "preteen, 13YO Lolita," and then the letters BS --

2   I'm sorry, "BDSM, bondage gropes," close bracket,

3   "15M32S.MPG."

4           "6YR girl best, Vicky BJ& hand job with sound," open

5   parenthesis, "Raygold."  Next word I'll spell,

6   "R-E-E-L-K-I-D-D-Y-M-O-V, underage illegal, Lolita daughter,

7   incest, XXX, oral, hand job," close parenthesis, dot MPG.

8           If called as a witness, retired Stevens County, open

9   parenthesis, Georgia, close parenthesis, sheriff, sheriff's

10  major, Michael Crosier, will testify that he has reviewed a

11  copy if some image files that were recovered from a computer

12  seized at the Defendant's residence at 1131 Burman Drive,

13  Turlock, California.

14          He can confirm that the images depict a female who

15  was between the ages of four and five when the videos were

16  created.  The images were created in and distributed outside

17  the State of Georgia.

18          Two of the video files had the following titles:

19          Open parenthesis, "PTHC," close parenthesis, "the

20  ultimate collection."  I'll spell the next word,

21  "P-A-C-E-B-A-B-Y," and then, "Baby J."  That's B-A-B-Y J,

22  "Kelly, ETS," open parenthesis "2" close parenthesis, dot ADI.

23  Open parenthesis "26:44," close parenthesis.

24          "ED2K_86772DA87B9290122082470C8642B3A4.partial."

25          The parties also agree that the child pornography

1    files that were recovered from the Lock-N-Stitch computer in

2    the Defendant's office were received from use of the a

3    Peer-to-Peer software program calls Shareaza and an internet

4    connection that was supplied by Charter Communications, which

5    has servers located outside of the State of California.

6    BY MR. GAPPA:

7    **Q.**   Okay.   Thank you, Detective Hively.

8            I have what I believe might be the last --

9            THE COURT:   40.1 was admitted if the record wasn't

10   clear.

11           MR. GAPPA:   Thank you, Your Honor.

12   BY MR. GAPPA:

13   **Q.**   Detective Hively, I have what may be the last of set of

14   material that I want to go over with you this afternoon.

15           So let me direct your attention only first to a

16   series of exhibits that starting the 34.1, and it goes through

17   34.7.

18           And if you take a look at those pages, I want to ask,

19   do you recognize these items?

20   **A.**   Yes.

21   **Q.**   And can you explain what it is that we're looking at?

22   **A.**   Individually?

23   **Q.**   Well, in general, did they relate to each other in some

24   way?

25   **A.**   They are screenshots that I created utilizing my Encase

1 software program that showed the contents of the media sharer,

2 which was the unsecured side of the NETGEAR ReadyNAS.

3 **Q.** Okay. And can you give us a little more explanation of

4 how it was you applied your forensic software and how it got

5 to this set of screen captures?

6 **A.** Yes. Detective Moore provided to me a logical evidence

7 file of the media folder or share from NETGEAR ReadyNAS

8 utilizing my Encase software, I import that into my program,

9 and I examined the file structure therein.

10 **Q.** Okay.

11       MR. GAPPA: Your Honor, I would ask that these be

12 received as marked.

13       THE COURT: 34.1 to 34.7?

14       MR. GAPPA: Yes.

15       THE COURT: Any objection?

16       MR. CAPOZZI: No?

17       THE COURT: 34.1 to 34.7 are admitted.

18       MR. GAPPA: Thank you, Your Honor. Permission to

19 publish?

20       THE COURT: You may.

21    (Plaintiff's Exhibits 34.1 to 34.7 was admitted into

22 evidence.)

23 BY MR. GAPPA:

24 **Q.** Directing your attention to 34.2 now that everybody can

25 see this, can you explain what it is we're looking at? If we

645

1    need to zoom in, let us know.

2    **A.**   Certainly.  What I have here on the left-hand stride is

3    the -- left-hand side is the folder structure, again, for the

4    unsecured side of the NETGEAR ReadyNAS, Exhibit 9.

5          What I created was a spreadsheet that I inserted into

6    this screenshot that shows those files that were within the

7    two folders labeled 15 and 14, underneath the file structure

8    [A. T.] VID.

9          We can see on the right-hand side a list of those

10   files.

11   **Q.**  If we go to the next page.

12         THE COURT:  Can I ask one question?

13         The description is on the right side, those are just

14   descriptions of the content of those subfolders?

15         THE WITNESS:  Yes, I have the --

16         THE COURT:  I'm sorry.  Are those your descriptions

17   or did they appear in the folder?

18         THE WITNESS:  I created the spreadsheet that I

19   inserted into this screenshot.

20         THE COURT:  So those descriptions that appear on the

21   right side, that column starting with "V slash C1," that's

22   your language?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  Thank you.

25   BY MR. GAPPA:

1    Q.   Okay.   Can you tell us why you chose that particular

2    language?   Why is that information there?

3    A.   Well.   In this spreadsheet what I have are the three

4    videos listed at the top right, 001, 00.MTS, 001, 01.MTS and

5    001, 02MTS.   Those wore the videos that I located of A.T.

6    being recorded in the master bedroom on the Burman Drive

7    address.

8            The location for those are listed to -- immediately

9    to the left of that.   That would be the file path ending in,

10   "VID," and then folder 15.

11           I have an arrow pointing to that.

12   Q.   Okay.

13   A.   And the --

14   Q.   Okay.   And then, if we go next to Exhibit 34.3, can you

15   walk us through what we see on this exhibit?

16   A.   Yes.   In this particular case, it is screenshot, again, of

17   my Encase software showing the file structure of the unsecured

18   side of the NETGEAR ReadyNAS.

19           I've highlighted the folder "PICS" underneath the

20   folder labeled [A. T.]

21           And on the right-hand side, my forensic software

22   shows the contents of that particular folder.

23   Q.   What about the right side, there is a list and there are

24   13 entries, then there are two columns.   One says "name," the

25   other says, "file created."   Where did that information come

647

1    from?

2    **A.**   The forensic software essentially determined what was

3    inside the PICs folder listed those items there for me, 1

4    through 13 with the names and the file created dates for those

5    screenshots.

6    **Q.**   Okay.  So then, let's next go to Exhibit 34.4.  This looks

7    to me similar to 34.3.  But can you point out what the

8    difference might be between these?

9    **A.**   Yes.  On the right-hand side I have moved a column over to

10   replace a file created column with one called, "last written."

11        The "last written" date indicates that these files

12   existed on February 4th, 2013, in some other location than

13   this particular unsecure media share.

14        (Court reporter gains clarification.)

15   BY MR. GAPPA:

16   **Q.**   Okay.  What about on 34.5?  If we go to that exhibit, what

17   do you see there?

18   **A.**   Again, we're looking at the same folder structure, but

19   this time I've highlighted the folder "VID," V-I-D.

20        And on right-hand side, we can see the contents of

21   that folder, the name of the two folders that are subfolders,

22   14 and 15, and the file created dates for those two folders.

23   **Q.**   What were the dates?  I don't know if you can see that now

24   it's dark.

25   **A.**   May 27, 2013.

648

1    Q.   Okay.  So then, finally, 34.6, can you explain what

2    information was put into this report?

3    A.   In this case, underneath VID, underneath the folder 15,

4    there's a folder labeled "hot tub," open parenthesis, "with

5    Sherri," S-H-E-R-R-I, close parenthesis.

6         I've highlighted that particular folder, and it can

7    be seen on the right-hand side the four file names and the

8    four file created dates for those video files in that folder.

9    Q.   So if any of those four videos had a creation date of

10   April 8th, 2013, why would we see in the second column, an

11   entry file created 5-27-13?

12   A.   Because they were moved to this particular volume on that

13   date.

14   Q.   I see.

15        Okay.  And finally, then on 34.7, can you explain

16   what we see here?

17   A.   Again, it's the same file structure.  In this case I've

18   highlighted the folder labeled 14.

19        On the right-hand side we can see the contents of

20   that folder, three video files that were created on this

21   volume, on May 27th, 2013.

22   Q.   So I have a similar question, on these three video files,

23   were they all videos files?

24   A.   Yes, sir.

25   Q.   If the file creation of the date on which the video was

1  made was May 26th, of 2012 why would we see a file creation

2  date later than that in this column on the right?

3  **A.**  Because that would be the date that these files were added

4  to this solemn or this share.

5  **Q.**  Okay.  So if we go back to the left side of the exhibit,

6  that's a folder structure of folders that were found on this

7  particular device, correct?

8  **A.**  Yes, sir, on the media share.

9  **Q.**  And did you find any folder with the name Robert Todd?

10  **A.**  No.

11  **Q.**  Or Sherri Todd?

12  **A.**  No.

13  **Q.**  Any other Todd?

14  **A.**  No.

15          MR. GAPPA:  Your Honor, those are my questions for

16  this witness right now.

17          THE COURT:  Cross-examination?

18          MR. GAPPA:  Your Honor, if I could -- I talked to

19  Mr. Capozzi, we have three witnesses who have driven quite a

20  distance.  I believe he's okay, if the Court is okay to take

21  out of order.

22          THE COURT:  You want to take them out of order?

23          MR. CAPOZZI:  Maybe get a recess so we can do

24  something outside the presence.

25          THE COURT:  All right.  We'll take our afternoon

1  recess, ladies and gentlemen.  We'll reconvene at 2:40.

2         Please the heed the Court's previous admonition.

3     (Jury exits courtroom.)

4         THE COURT:  Counsel, is there anything you want to

5  talk to me about, or do you --

6         MR. CAPOZZI:  Yes.

7         THE COURT:  -- get it all worked out?

8         MR. CAPOZZI:  Going to be calling the ex-fiance.

9         THE COURT:  3?

10        MR. GAPPA:  3 woman.

11        MR. CAPOZZI:  I know.  And she's going to say that --

12 we'll see what she says but knowing the camera is there, we're

13 going to get into some statements she made to the police.

14        But the next two are relatives and friends of hers.

15 We would stipulate that they were videotaped and didn't know

16 it.

17        MR. GAPPA:  Can we think about that at the break and

18 then we'll --

19        THE COURT:  Yes.  All right.

20        But there's either going to be a witness and a

21 stipulation, or there's going to be three witnesses but

22 they're all going to be from the -- on direct, at least,

23 they're going to be very brief.

24        MR. GAPPA:  Yes.

25        MR. CAPOZZI:  Yes.

1          THE COURT:  All right.  And then, we'll recall the

2     Detective Hively for cross.  All right.

3       (Recess taken.)

4       (Jury enters courtroom.)

5          THE COURT:  We are back in the presence of the jury,

6     and I understand that the prosecution wishes to call a witness

7     out of order?

8          MR. PEARSON:  Yes, Your Honor the United States calls

9     Rebecca Jackson.

10         COUNTY DEPUTY:  Good afternoon.  Please approach the

11    witness stand.  Come right on up the stairs.  Remain standing.

12    Raise your right hand to be sworn.

13         After I administrator the oath please affirm by

14    saying "I do."

15                         **REBECCA JACKSON**,

16              having been first duly sworn, was

17              examined and testified as follows:

18         THE WITNESS:  I do.

19         COUNTY DEPUTY:  Please have a seat.  State your full

20    name for the record and spell it.

21         THE WITNESS:  Rebecca Lee Jackson, R-E-B-E-C-C-A,

22    L-E-E, J-A-C-K-S-O-N.

23                      DIRECT EXAMINATION

24    BY MR. PEARSON:

25    **Q.**  Ms. Jackson, are you married?

1  A. Yes.

2  Q. Okay.  What was your name before you were married?

3  A. Rebecca Lee Albernan.

4  Q. Do you know Adam Henry?

5  A. Yes.

6  Q. How do you know him?

7  A. We dated off and on from 2005 to 2010.

8  Q. At some point, did you live together?

9  A. Yes.  We lived together in about 2005 to 2006 for about

10  8 months, then from 2008 to 2010.

11  Q. Where did you live?

12  A. First was in Houston, and the second was in Fresno.

13  Q. At a house in Fresno?

14  A. Yes, sir.

15  Q. At some point, did police officer, a detective with the

16  Ceres Police Department contact you?

17  A. Yes.

18  Q. Was that in June of 2017?

19  A. Is that this year?  Yes.

20  Q. Also, he would have spoken with you in 2013?

21  A. Yes, that is correct.

22  Q. All right.  Was that Detective Hively?

23  A. Exactly.

24  Q. Did Detective Hively show you a video of yourself?

25  A. Yes, sir.

653

1  **Q.** Will you generally describe what that video was?

2  **A.** I was in the shower, taking a shower, and that was about

3  it.

4  **Q.** Do you know where that video taken?

5  **A.** That was at the Fresno house.

6  **Q.** Specifically, where in the house?

7  **A.** In the bathroom of the master bedroom.

8  **Q.** Did you know that video was taken at the time?

9  **A.** No, sir.

10  **Q.** Okay.  Did you give permission to be recorded?

11  **A.** No, sir.

12  **Q.** Remind me how long did you date Adam Henry?

13  **A.** From 2005 to 2010.

14  **Q.** Did he have a computer when you were dating?

15  **A.** Yes.

16  **Q.** More than one?

17  **A.** Probably, but in the house, I believe, this was only one,

18  two monitors.

19  **Q.** Did he ever let you use that computer?

20  **A.** Very rarely.

21  **Q.** Was the computer password protected?

22  **A.** Yes.

23       MR. CAPOZZI:  Objection, relevance.

24       THE COURT:  Sustained.

25       MR. PEARSON:  I'm sorry, which question was

1    sustained?

2         THE COURT:  "Was the computer password protected?"  I

3    sustained a relevance objection.

4         MR. PEARSON:  Okay.

5    BY MR. PEARSON:

6    **Q.**  Did --

7         MR. PEARSON:  May I have a moment, Your Honor?

8         Nothing further.

9         THE COURT:  Any cross?

10        MR. CAPOZZI:  Yes, Judge.

11                        **CROSS-EXAMINATION**

12   BY MR. CAPOZZI:

13   **Q.**  Ms. Jackson, you interviewed with the Detective Hively in

14   June of 2017?

15   **A.**  Yes, sir.

16   **Q.**  And you told him you didn't know you were being

17   videotaped?

18   **A.**  Correct.

19   **Q.**  Do you remember talking to him in -- on October 3, 2013?

20   **A.**  Yes.

21   **Q.**  And in there you said -- was your memory better then in

22   2013 or better now in 2017?

23   **A.**  My memory is fine now.  When he asked me that, I was

24   overwhelmed.

25   **Q.**  Was it good in 2013?

655

1    A.   Yes.

2    Q.   Okay.  That was closer to 2010?

3    A.   Yes.

4    Q.   Right?

5         Okay.  You remember telling Detective Hively you

6    don't remember if you had given him permission to use the --

7    to have A camera in the bathroom?

8    A.   He asked me if I had given permission to be filmed in the

9    bathroom.

10   Q.   Yeah.

11   A.   I said I don't remember.

12   Q.   Okay.

13   A.   But he did not ask if I had given consent to be filmed

14   without my knowledge in the restroom.

15   Q.   Okay, what's the difference?  You're saying that you don't

16   remember if you had given him permission to record you in the

17   bathroom?

18   A.   Correct.

19   Q.   Okay.  Now you're saying what?

20   A.   I don't remember if I gave permission for him to bring a

21   camera into restroom when I was in there and could see the

22   camera.

23        I certainly did not give him consent to film me

24   without knowing I was being filmed.

25   Q.   Okay.  But back then you said you did not remember if you

656

1   had given him permission to record her while showering?

2   **A.**  Right.

3   **Q.**  You didn't remember it?

4   **A.**  No, I did not recall giving him permission.

5   **Q.**  You could have?

6   **A.**  Could have what?

7   **Q.**  Given him permission?

8   **A.**  I could have.

9   **Q.**  Okay.

10   **A.**  Only with him in the shower in --

11   **Q.**  With you?

12   **A.**  -- as well.

13   **Q.**  Oh, together?

14   **A.**  Well, no.  Standing -- I imagine that I might have given

15   him consent to film me with the camcorder in the bathroom.

16   Not from a secret location in the bathroom.

17   **Q.**  You do have videotapes of him videotaping you?

18   **A.**  Yes.

19   **Q.**  Correct?

20   **A.**  Uh-huh.

21   **Q.**  And were they in the shower?

22   **A.**  No, I don't believe so.  But I don't remember.

23   **Q.**  Okay.  Some outside the shower?

24   **A.**  Yes.

25   **Q.**  Okay.  And naked?

1    **A.**  Uh-huh.

2    **Q.**  Okay.  Having sex?

3    **A.**  I don't remember the specific nature of those videos.

4    **Q.**  All right.

5              MR. CAPOZZI:  No more questions -- well -- no more

6    questions.  Thank you.

7              THE COURT:  Any redirect?

8              MR. PEARSON:  Nothing further, Your Honor.

9              THE COURT:  May this witness be excused?

10             MR. CAPOZZI:  Yes, Your Honor.

11             MR. PEARSON:  Yes, Your Honor.

12             THE COURT:  Thank you, Ma'am.

13             And I understand that the parties have reached a

14   stipulation, which is going to be reduced to writing during

15   the recess regarding some additional witnesses; is that

16   correct?

17             MR. CAPOZZI:  Yes, Your Honor.

18             THE COURT:  And so given the fact that there's going

19   to be that stipulation, are we now back to Detective Hively?

20             MR. GAPPA:  Yes, Your Honor.

21             THE COURT:  Detective Hively, if you can retake the

22   witness stand.  Keep in mind you're still under oath.

23             And Mr. Capozzi, your cross-examination.

24             MR. CAPOZZI:  Thank you Judge.

25

1          CROSS-EXAMINATION

2   BY MR. CAPOZZI:

3   Q.  I just want to start with some general questions if we

4   can.  There's no logical order.

5          When someone is using Shareaza like in this case,

6   when they're downloading different files, are they seeing

7   what's in the file?

8   A.  Only if they select a file and --

9   Q.  Only if you select a file; is that right?

10  A.  Yes, only if they select the file, and then press the

11  media play button to see what's actually being downloaded

12  either partially or completely.

13  Q.  But you're not seeing the contents as it's downloaded?

14  A.  Depends on what you mean by "content."  The titles are

15  available to see, but the actual content of the video wouldn't

16  be unless you selected that option.

17  Q.  Okay.  So all a person do would is rely on the file name

18  that's listed, around -- that's being sent from someplace

19  around the world; isn't that correct?

20  A.  Somewhere around the world, yes.

21  Q.  All right.  In your experience, are the file names

22  reliable in the Shareaza world?

23  A.  No.

24  Q.  Have you seen file names with common child pornography

25  terms, but really aren't child pornography?

1    **A.**  Yes.

2    **Q.**  Okay.  So just because a file name says your downloading

3    an adult movie, that could be child porn; could it not?

4    **A.**  It could be.

5    **Q.**  If a title says it's child porn, it could be legal adult

6    porn, true?

7    **A.**  Yes, sir.

8    **Q.**  All right.  Works both ways.

9         We've seen just recently you talked about these file

10   creation dates.  Is that the date that something is downloaded

11   to a computer?

12   **A.**  That's one way to do it, yes, sir.

13   **Q.**  What's another way?

14   **A.**  You can copy something to a computer.  You can create a

15   Microsoft Word document on a computer, and that could be would

16   be the created date when you actually created that document.

17   **Q.**  So would you move something from one document to another,

18   does that create -- make a new creation date?

19   **A.**  You said move one --

20   **Q.**  I said that wrong, sorry.  Withdraw it.

21        If you move a file from one computer another, does

22   that create a new creation date on the new computer?

23   **A.**  Generally speaking, that is correct, yes.

24   **Q.**  When is it that you can move something from one document

25   to another document, from one computer to another, and the

1 | creation date doesn't change?

2 | **A.** There are some rare circumstances in which that can occur.

3 | **Q.** How does that happen?

4 | **A.** It's a little complicated, but as an example, if you have

5 | a Windows XP machine.

6 | **Q.** Windows.

7 | **A.** And you copy something over to a thumb drive.  And then

8 | you, as an example, put that material on a Windows 7 machine,

9 | sometimes, depends on whether you cut and paste or copy and

10 | paste, the file created date can sometimes remain the same.

11 | **Q.** How about when transferring folders from one computer to

12 | another; is that the same as moving?

13 | **A.** I'm not sure what you mean by "transferring."

14 | **Q.** Well, if I have something on my one computer at home and I

15 | want to move it to this other computer, how do I do that?

16 | Transfer it over?  Move it over?

17 | **A.** I'm sure there's a number of ways you can do that.  You

18 | can put it on a thumb drive, you can do it over the internet

19 | depending on your connectivity.

20 | **Q.** If I put it onto a thumb drive, on one computer to a thumb

21 | drive then to another computer, does that create a new

22 | creation date?

23 | **A.** Usually, yes.

24 | **Q.** Okay.  In some instance it would not?

25 | **A.** Correct, in rare instances.

1    **Q.**  Okay.  So a file creation date is that when something is

2    downloaded from the internet it's the moment in time when this

3    first hits the hard drive, that's the file creation date?

4    **A.**  Yes.  If we're talking as an example Shareaza.

5    **Q.**  Okay.

6    **A.**  When the first packet reaches it, creates a file name,

7    then it would have that date time stamp.

8    **Q.**  So does that mean when the moment in time when the person

9    shares a file to download, and it's on downloaded, and this is

10   on Shareaza, does that application then say the creation date

11   is when it comes into that computer?

12   **A.**  Yes.

13   **Q.**  All right.  The files that came in on the Lock-N-Stitch

14   computer 1A, did that all have the same file creation times?

15   **A.**  I don't know what files you're talking about, sir.

16   **Q.**  Okay.  The ones that were playable?

17   **A.**  Could you help me out, narrow that down a little bit for

18   me, please?

19   **Q.**  All right.  Let me go onto something else.

20          On the terms that were put in for the child

21   pornography on the item 1A, they were from May 28th to

22   June 3rd, 2013?

23   **A.**  I understand those are the two dates that files -- those

24   are the two dates that files were initiated for download on

25   that Exhibit 1A, yes.

1    **Q.** Okay.  When you were talking about your background and

2    your expertise, you were talking about all the different

3    programs that you've gone to, and all the different seminars

4    you attended, and you attended quite a few on forensic

5    investigation; isn't that correct.

6    **A.** Are we talking about conferences?

7    **Q.** On your background and qualifications.  I'm sorry.

8    **A.** Are we talking about conferences when you say a "number of

9    them"?  Are you talking --

10   **Q.** Yes.

11   **A.** -- talking about courses?

12   **Q.** Both.

13   **A.** Oh, yes, uh-huh.

14   **Q.** A number of them.

15          You've been with the police department how long?

16   **A.** I've been with Ceres Police Department since

17   February 2006.

18   **Q.** 2006.  Do you have a college degree?

19   **A.** I do not.

20   **Q.** Okay.  You said when you were asked, "What does the phrase

21   computer forensic mean?"  In that answer you said that it's,

22   "The examination of evidence in an effort to determine whether

23   or not the individual being investigated is innocent or

24   guilty."  Is that your job?

25   **A.** If you're asking -- I'm looking for evidence to support

663

1    either innocence or guilt.  Certainly, I need to find some

2    evidence one way or another.

3         If there's something in there that's going to show

4    somebody is innocent of something I need to document that as

5    well.  I'm trying to express in that that there's a neutral

6    role.

7    Q.  So your job is a neutral role; isn't that correct?

8    A.  Yes, to investigate the evidence, in this case, digital

9    evidence.

10   Q.  All right.  But when you went in 20 -- is it -- when did

11   you do the search of Lock-N-Stitch?  2013?

12   A.  September --

13   Q.  September 19th?

14   A.  September 19, 2013, yes, sir.

15   Q.  Okay.  And the evidence you have there was that somebody

16   there was downloading child pornography?

17   A.  In a general sense, yes.

18   Q.  All right.  From there you did the search, and then from

19   there you went to Mr. Henry's house to search the house; is

20   that correct?

21   A.  I was there eventually, but in between there, of course,

22   is my interview with Mr. Henry.

23   Q.  Right.  You heard Mr. Detective Moore testify that the --

24   at the house when they searched the garage when they went back

25   on the second search -- there were two searchs of Burman; is

1  that correct?

2  **A.**  Yes, sir.

3  **Q.**  Okay.  One by, I guess, state officials and another by

4  federal officials?

5  **A.**  Yes, sir.

6  **Q.**  When was the second one by federal officials?

7  **A.**  Third week in November 2013.  It was about eight weeks

8  later.

9  **Q.**  Okay.  And you were on that second search?

10 **A.**  Yes.

11 **Q.**  Okay.  And indeed, did you do a report on the search on

12 where you found the plant that was at one time in the

13 bathroom?

14 **A.**  The FBI located that.  They actually conducted a search at

15 that particular residence at that time.

16 **Q.**  And you indicated in one of your reports the FBI found the

17 plant in the garage?

18 **A.**  That's what I was told, yes.

19 **Q.**  What you were told.

20         So you weren't there and saw it the garage?

21 **A.**  Correct.  I was in the residence in the living room area.

22 **Q.**  Did you ever go into that bathroom where the those videos

23 were taken?

24 **A.**  I may have on the second search warrant.

25 **Q.**  That's what I'm talking about.  I'm sorry.

665

1   **A.**   I may have on the second search warrant just to look at
2   the room, but I would be a --
3   **Q.**   Okay.
4   **A.**   But I don't remember.
5   **Q.**   All right.  You saw the videotapes today that were played
6   in Court.  Those were of that bathroom, were they not?
7   **A.**   Yes, sir.
8   **Q.**   Okay.  And do you recall on that second time of the
9   search, that that plant was still in the bathroom?
10  **A.**   I don't have that recollection, no, sir.
11  **Q.**   Okay.  Do you recall -- you don't recall seeing that plant
12  in the garage?
13  **A.**   Correct.  I don't recall seeing it in the garage.  I'm not
14  sure I was in the garage, but I may have been.
15  **Q.**   You were just told it was in the garage?
16  **A.**   Yes.
17  **Q.**   You heard Detective Moore testify it was in the garage; is
18  that correct?
19  **A.**   I did hear him say that.
20  **Q.**   Okay.  Do you know whether or not it was in the garage or
21  in the bathroom when you went back on the second search?
22  **A.**   I only know what I was told by the FBI agent.
23  **Q.**   Okay.  Is there a significance of that plant being in the
24  garage and not being in the bathroom from your perspective?
25  **A.**   Yes, sir.

1    **Q.**  What is that significance?

2    **A.**  Well, if it's in the garage that indicates that Mr. and

3    Ms. Henry took it down from the bathroom to remove it from

4    that location from where all those videos were created.

5    **Q.**  That was after the first search you're talking about?

6    **A.**  Yes, sir.

7              MR. CAPOZZI:  If I can approach, Your Honor, and show

8    him some pictures.

9              THE COURT:  You may.

10   BY MR. CAPOZZI:

11   **Q.**  Just if I can just show you a group of pictures.  They're

12   Bates numbered 890.  Start there.  Can you identify that first

13   picture?

14             THE COURT:  Can we get them marked for identification

15   first?

16             MR. CAPOZZI:  Yes.

17             THE COURT:  For identification only at this point.

18             MR. CAPOZZI:  Yes.

19             THE COURT:  Do you have premarked exhibits?

20             MR. CAPOZZI:  I have some already marked up through

21   F, I think.

22             THE COURT:  I've got a binder with A through E in

23   your defense.  Is that what you have A through E marked?

24             COURTROOM DEPUTY:  Through F.

25             MR. CAPOZZI:  That's fine, and there's a group of 15

1  pictures.

2          MR. GAPPA:  I'm not seeing it in our binder.

3          THE COURT:  No, they're not.  We're marking them now.

4  I just want to make sure we get them marked next in order.

5  I've got premarked A through E; is that what you have?

6          MR. GAPPA:  Yes.

7          THE COURT:  Has the prosecution seen these?

8          MR. CAPOZZI:  Yes, he has a copy.

9          MR. GAPPA:  We have a copy.

10         THE COURT:  Are they being marked individually?

11         COURTROOM DEPUTY:  Yes, Your Honor.

12         THE COURT:  We're marking them individually in order

13  letter F with whatever we end up.

14         COURTROOM DEPUTY:  T.

15         THE COURT:  T -- F through T.

16     (Defendant's Exhibit F through U were marked for

17  identification.)

18         THE COURT:  U is the last one.  Thank you.

19         MR. CAPOZZI:  Thank you, Judge.

20  BY MR. CAPOZZI:

21  **Q.**  I'll show you what's mark defense Exhibit F through U.

22  Take a look at those and see if you can identify them.

23         Can you identify those?

24  **A.**  I recognize these as images of the Henry home on Burman

25  Drive in Turlock.

1    **Q.**  Both of the bathroom and the garage?

2    **A.**  Yes, sir.

3    **Q.**  Okay.  And were these pictures of the contents of the

4    bathroom and the garage at the time of that search, the

5    federal search?

6    **A.**  Yes, sir, they appear to be.

7    **Q.**  And do these accurately depict what was seen at that time,

8    or what was there at that time?

9    **A.**  Based on my memory from four years ago, yes.

10          MR. CAPOZZI:  I would move for the admission of these

11   exhibits, Your Honor.

12          MR. GAPPA:  Your Honor, the only objection is to F

13   and G --

14          MR. CAPOZZI:  F and G.

15          MR. GAPPA:  -- at this point, because we haven't

16   heard that he took those photos.

17          THE COURT:  He didn't take any of these, right?

18          THE WITNESS:  That is correct.  It was special agents

19   from the FBI who conducted this search.

20          MR. CAPOZZI:  Right.

21          MR. GAPPA:  Well, I should add then, "I" as well.

22          THE COURT:  I don't have them.

23          MR. CAPOZZI:  If I can show you, Judge.

24          THE COURT:  So the Government's objection, based on

25   lack of foundation, I take it, is to F, G, and I, and you're

669

1    waiving objection as to the others?

2           MR. GAPPA:  Yes.

3           MR. CAPOZZI:  If I can try and get some foundation.

4    BY MR. CAPOZZI:

5    Q.  On those pictures that you viewed, were these pictures

6    taken at the time of the search during the federal search

7    warrant in November 2013?

8    A.  They appear to be.

9    Q.  And you were present at that search; is that correct?

10   A.  Yes.  Although I don't remember seeing anybody taking any

11   pictures that day.

12   Q.  All right.  You walked into that bathroom on that day, did

13   you not?

14   A.  I think I testified that I don't remember if I did.

15   Q.  Okay.

16          MR. CAPOZZI:  I would move those admissions, Your

17   Honor, I think it's enough for foundation?

18          THE COURT:  Government's position, same objection or

19   not?

20          MR. GAPPA:  Yes.

21          THE COURT:  Sustained.

22          MR. CAPOZZI:  As to those?

23          THE COURT:  F, G, and I.

24          MR. CAPOZZI:  Let me find those, then.  F, G, I.

25          THE COURT:  F, G, I, the ones you want.

1           MR. CAPOZZI:  No I don't think so.  Those will work.

2           I'd like to shows these, publish these, if I could.

3    Is that okay, Your Honor?

4           THE COURT:  Everything but F, G, and I, have been

5    admitted without objection.

6       (Defendant's Exhibit H admitted into evidence.)

7       (Defendant's Exhibit J through U were admitted into

8    evidence.)

9           MR. CAPOZZI:  That's fine.

10   BY MR. CAPOZZI:

11   **Q**.  I'm not sure -- oh, good it works.

12          Now, this is Exhibit H.  That's the picture of the

13   bathroom, is it not?

14   **A**.  It does appear to be, yes, sir, based on my memory from

15   four years ago.

16   **Q**.  This is the mirror right there, is it not.

17   **A**.  That's a mirror, yes.

18   **Q**.  Do you see that painting on the wall?

19   **A**.  I see a reflection of the paining on the wall in the

20   picture, yes.

21   **Q**.  Okay.  Showing you Exhibit J, I believe it is -- let's go

22   this way.  Is the picture of the plant with the hole cut in

23   it?

24   **A**.  That's the macrame plant that's sitting on the

25   prosecution's table, yes, sir.

1    Q.   Do you see that painting in the background?

2    A.   I do.

3    Q.   Can you tell us whether or not that's the same painting in

4    H?

5    A.   I'm sorry, can I see the previous?

6         It appears to be, yes.

7    Q.   Okay.  Does it appear to be that that plant was taken in

8    that bathroom on the search with a federal search warrant?

9    A.   I'm not sure I understand your question.

10   Q.   This picture shows the plant next to that painting on the

11   wall, right?

12   A.   Yes, sir.  With somebody apparently standing next to it.

13   I see a shoulder and an arm.

14   Q.   Right.  And that painting was in the bathroom; was it not?

15   A.   Yes, sir, apparently.

16   Q.   Showing you -- oh, that's it.

17        Okay.  Let's go to Exhibit K.  Is that the door to

18   the garage?

19   A.   It would appear so.  That is a common technique for the

20   FBI agent to mark doors with letters and then a title for that

21   particular room.

22   Q.   Well, going to Exhibit F, wasn't there a picture of a door

23   with a letter C on it that said "bathroom"?

24   A.   I would have to see which -- what you're referring to --

25   Q.   May I approach, Judge?

1   **A.**   -- I don't know what F is.

2        MR. CAPOZZI:  May I approach?

3        THE COURT:  Yes.

4   BY MR. CAPOZZI:

5   **Q.**   Doesn't that tell us?  You don't identify that as being

6   similar to the one you just looked at for the garage?

7   **A.**   For the technique of marking a door, yes.

8   **Q.**   So is that a picture of the bathroom at the Burman house

9   on the day of the federal search?

10  **A.**   It appears to be.

11       MR. CAPOZZI:  I would move that admission again, Your

12  Honor.

13       THE COURT:  What do you move?

14       MR. CAPOZZI:  The admission of that picture.

15       THE COURT:  Which is marked?  I don't have it.

16       MR. CAPOZZI:  Sorry, Exhibit F.

17       THE COURT:  Yes, just tell me, F.

18       He's moving F again on the basis of that questioning.

19  Government, any objection?

20       MR. GAPPA:  It's the same, Your Honor.

21       THE COURT:  Objection is sustained.

22       MR. CAPOZZI:  Okay.

23  BY MR. CAPOZZI:

24  **Q.**   Okay.  Exhibit K is the garage.

25       Right?

1        THE COURT:  I would --

2        THE WITNESS:  Yes, sir.

3        THE COURT:  I assume a foundational witness is

4   available, perhaps not today.

5        MR. CAPOZZI:  I know that.  I know.

6   BY MR. CAPOZZI:

7   **Q.**  Showing you Exhibit L, is that a picture of the items in

8   the garage?

9   **A.**  That's a picture of a -- part of the garage.

10  **Q.**  Okay.  Do you see any plant in there?

11  **A.**  I do not.

12  **Q.**  Showing you Exhibit M, was that the car that was in the

13  garage on that day?

14  **A.**  If these are pictures from that day then I would say yes.

15  Like I said, I don't remember being in the garage, but I may

16  have been.

17  **Q.**  Exhibit N, do you -- again, do you know whether or not

18  that's the picture of the contents of the garage?

19  **A.**  It appears to be.

20  **Q.**  Do you see a plant in there?

21  **A.**  It's quite a mess, but I don't see a plant there.

22  **Q.**  Exhibit O, again, contents of the garage, do you see a

23  plant?

24  **A.**  I do not.

25  **Q.**  Exhibit P, contents of the garage, do you see a plant?

674

1   **A.**   Can you move it up for me, please?

2   **Q.**   I'm sorry?

3   **A.**   It's the other direction, please.

4          I do not.

5   **Q.**   Exhibit Q, consents of the garage, any plant?

6   **A.**   I do not see a plant.

7   **Q.**   Exhibit L, contents of the garage?

8   **A.**   Again, I do not see a plant.

9   **Q.**   S?

10  **A.**   Again, I do not see a macrame planter.

11  **Q.**   T?

12  **A.**   I do not see a macrame planter in that photo either.

13  **Q.**   U?

14  **A.**   I do not see the planter.

15  **Q.**   Based on these pictures, is it your opinion that that

16  plant was still in that bathroom when you saved arrived on

17  that second search?

18  **A.**   I'm not sure I can render an opinion on that.

19  **Q.**   Okay.  From your memory, where was the plant?

20  **A.**   I don't have a memory of that.

21  **Q.**   Okay.

22  **A.**   It was a very chaotic situation, very emotional for some

23  people there, and I was dealing with some other folks.

24  **Q.**   Who were you dealing with?

25  **A.**   Angele Henry's mother.

1  **Q.** Okay.  Was the mother living there, too?

2  **A.** It was shortly after Angele Henry delivered her child, her

3  mother was there, helping out, and she was very irate.  And I

4  had to spend some time with her to calm her down.

5  **Q.** Okay.  In your investigation of this case, all the

6  downloading took place at the business Lock-N-Stitch; is that

7  correct, from Shareaza?

8  **A.** From this investigation, yes, sir.

9  **Q.** Yes.  That was being used, the Shareaza process,

10  peer-to-peer, Shareaza?  What is it called, program?

11  **A.** The Shareaza program was being used to download video

12  files from the Shareaza network, yes, sir.

13  **Q.** Okay.  And Detective Moore testified on, I think, it's

14  Government Exhibit 1, which has been admitted into evidence.

15  We talked about 1A and 1B.

16       Did I point to the right ones, 1A and 1B?

17  **A.** It appears to be correct, yes, sir.

18  **Q.** And I think you testified here yesterday that you looked

19  at both 1A and 1B?

20  **A.** I did.

21  **Q.** Okay.  And 1A, is where the downloading took place in

22  Shareaza, and there was adult pornography, child pornography

23  both on that one?

24  **A.** Yes, sir.

25  **Q.** And the capability of distribution was dislodged; is that

676

1  correct?

2  **A.**  I don't have any information on that one way or the other.

3  **Q.**  Well, I thought you said that there was something that he

4  did that prevented it from being distributed?

5  **A.**  I didn't say anything like that.  I'm not sure what you're

6  referring to.

7  **Q.**  Wasn't there -- did you hear Detective Moore say that the

8  distribution aspect of the Shareaza was dislodged?

9  **A.**  At the --

10  **Q.**  Disable the sharing ability; does that sound reasonable?

11  **A.**  If my memory serves correctly, he said he wasn't sure, but

12  I could be wrong.

13  **Q.**  Okay.  You looked at Exhibit 1A, and you're telling us

14  that you don't know whether or not that sharing disability --

15  it was the sharing disability was disabled?

16  **A.**  Correct.  I did not look at that aspect of it.

17  **Q.**  And you didn't testify to that yesterday?

18  **A.**  I definitely didn't testify to that yesterday.

19  **Q.**  How about as to Exhibit 1B, what was on that one?

20  **A.**  There was, to the best of my recollection, an operating

21  system, as well as files and folders, Shareaza, and a number

22  of music files that appear to have been downloaded using

23  Shareaza.

24  **Q.**  Okay.  And was the sharing ability disabled there?

25  **A.**  I do not know.

1  **Q.** Do you remember testifying before the grand jury in this
2  case?
3  **A.** I believe I might have done that twice in this case, yes.
4  **Q.** And do you remember being asked the question about item 16
5  found in the garage?
6  **A.** Could you tell me which grand jury testimony you are
7  referring to?
8  **Q.** I think you only testified in the second one.  Mr. Moore
9  testified in the first one.
10  **A.** Oh, well, thank you.
11       So I'm not sure when that was, but I don't remember
12  specifically -- oh, if you're referring to item 16 and items
13  that I had located on there, yes, I do remember.
14  **Q.** Okay.  And that, again, was -- there was Peer-to-Peer on
15  item 16, which was found in the garage; is that correct?
16  **A.** I think I was testifying to the fact that there were child
17  pornography videos on that device.
18  **Q.** Right, right.
19       And that it came from Peer-to-Peer?
20  **A.** I don't think that was determined, and I still haven't
21  determined that to date.
22  **Q.** Okay.  Do you remember agreeing that Limewire was used to
23  download that child pornography?
24  **A.** I think, if I recall the question correctly, I was asked
25  if there were any artifacts relating to Limewire, and I think

1    I said "yes."

2         But I'm not sure that was respective to item 16 or

3    Exhibit 16.  I don't remember.

4    **Q.**  Do you recall being asked a question, Did you discover any

5    child pornography files that appear to have been downloaded to

6    a computer or device prior to 2008?

7    **A.**  If it's in the transcript, then the question must have

8    been asked.

9    **Q.**  Okay.

10        MR. CAPOZZI:  Your Honor, if I can approach and show

11   him a copy of the transcript?  May I?

12        THE COURT:  You may.

13        MR. CAPOZZI:  Have it marked for identification or

14   no?

15        THE COURT:  Sure.

16        MR. CAPOZZI:  Page 32, start around line 10.

17        THE COURT:  Just read it to yourself, sir.

18        MR. CAPOZZI:  Yes.

19        THE WITNESS:  May I ask if there's an associated date

20   for this?

21        MR. CAPOZZI:  It's whatever you testified before the

22   grand jury in this case.  I don't have the date.

23        THE WITNESS:  Okay.

24        MR. CAPOZZI:  May 16th -- no, no.  That's when it was

25   printed.  Did you find it?

1           THE WITNESS:  No.  I was hoping we could come up with

2     a date.

3           THE COURT:  Can I see that?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Have that marked.

6           MR. CAPOZZI:  Judge, I have one for you if you want a

7     copy.

8           THE COURT:  That's all right.

9           MR. CAPOZZI:  I think it's March 16, 2017.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  And the witness has reviewed

12    the area that you've asked him to look at.  The question?

13    BY MR. CAPOZZI:

14    **Q.**  You have reviewed it?

15    **A.**  Yes, sir.

16    **Q.**  Okay.  And it said, "Did you file -- the question was:

17    "Did you discover child pornography that appeared to have been

18    downloaded to a computer device prior to 2008?"

19          And you said, "Yes, from the garage"?

20    **A.**  Yes.

21    **Q.**  Okay.  And you located a number of child pornography

22    videos dating back to November 2005, correct?

23    **A.**  That's what stated here, yes.

24    **Q.**  And then the question was:

25          "QUESTION:  And did they, I think you mentioned it,

1    were they currently downloaded using a different Peer-to-Peer
2    program as Limewire?"
3          Your answer?
4    **A.**   I answered "yes."
5    **Q.**   Okay.  Now, in all of the child pornography that was
6    downloaded here, it was through Shareaza, was it not?
7    **A.**   Yes, sir.
8    **Q.**   Okay.  Is there any evidence of any downloading of child
9    pornography or a adult pornography other than from Shareaza in
10   this case?
11   **A.**   Well, I know I found artifacts related to Limewire, but as
12   I sit here, I can't remember which device they were on.
13   **Q.**   But do you remember the item 16 found in the garage that
14   it was Limewire that where it was downloaded?
15   **A.**   Not as of today.  Although, I can read this and see what I
16   said, yes.
17         But if I could at least try to explain at least part
18   of this?
19   **Q.**   No, sure, sure.
20   **A.**   As I mentioned before, on Exhibit 16 we have five disc
21   drives, which are 500 giga bites in size, and three disc
22   drives that are 250 in size.
23         When I got this machine, it had no motherboard and no
24   power supply.  So what I had to do is image -- I had to create
25   a forensic image of each drive, and then bring those eight

1   drives into my forensic software.  At which point, I can try

2   to rebuild those RAIDs inside of there.

3          Over four years, I made numerous attempts to access

4   the proper configuration for those drives.  And just to talk

5   about some of the variables, number one, I don't -- at that

6   particular time I didn't know whether or not all eight were

7   part of one, which I initially thought.  I didn't even think

8   for a moment that there were actually two RAIDs on there.

9          Secondly, I had to know what order the RAID would be

10   in, 1, 2, 3, 4, 5, 6, 7, 8, or vice versa.

11          I had to know what type of RAID it was.  I had to

12   know what size striping there was, which could be 32 kilo

13   bites, 64 kilo bites, 128 kilo bites.  There's a lot of

14   different variables as far as what size gets striped each

15   drive.  As well as right handed or left handed striping.

16          So over the years, whenever I had the opportunity, I

17   went back to that particular project and worked on it.  I had,

18   at times, been able to come close to seeing a complete

19   directory, and I described as best I could, that which I saw

20   with a partial directory or a partial reconfiguration of those

21   drives.

22          It wasn't until May of this year that -- with pure

23   determination and a whole lot of luck, I was actually able to

24   reconstruction both these RAIDs, which gave me a complete

25   directory for both of those, and I could then see clearly the

682

1  items that were on there.

2          So when I was testifying in March of 2017, I was

3  basing my answers on a partial reconfigured RAID analysis.

4  **Q.**  And based on that analysis, you determined Limewire was

5  used?

6  **A.**  I determined that there were artifacts related to

7  Limewire, and I thought at that time that Limewire was used to

8  download child pornography, yes, sir.

9  **Q.**  Are you saying now that Limewire wasn't used?

10  **A.**  I'm saying I couldn't find Limewire on there after I

11  reconfigured the RAIDs correctly.  Although, there are some

12  artifacts indicating it had been there before.

13  **Q.**  But there's no evidence in this case other than that one

14  computer that Limewire was ever used; isn't that correct?

15  **A.**  To the best of my knowledge today, yes, sir.

16  **Q.**  Purely Shareaza?

17  **A.**  Yes.

18  **Q.**  In your investigation of this case you found about how

19  many computers and devices that would have had information on

20  them?  In the 50s?

21  **A.**  Well, if I can look at the search ID list.

22  **Q.**  Go ahead.

23  **A.**  I can give you a partial answer.

24          There were 24 items that were seized during the Ceres

25  Police Department search warrant that could contain digital

1   evidence.

2          And there were a number of items not very large that

3   were seized during the FBI search warrant.

4          I take that back, there were quite a few laptops as

5   well.  So I'm not sure if 50 is a good number, but certainly

6   this case had more evidence and sheer volume size than any

7   other case I've dealt with before or after.

8   Q.  Right.  I had 49 devices.  I was wrong on the number.  I

9   had three phones, one iPod, ten CDs, four thumb drives, 38

10  computers and hard drives, one cam recorder, a picture card.

11  I came out with about 58 total devices, but somewhere around

12  49.

13         How many of those devices had child porn on them?  1A

14  for sure, right?

15  A.  Did you want me to --

16  Q.  Go ahead.

17  A.  Thank you.  I have four.

18  Q.  Which ones?

19  A.  Exhibit 1A, which is the Lock-N-Stitch hard disc drive.

20  Exhibit 9, which is the secured side of the NETGEAR ReadyNAS.

21  Exhibit 13 -- I'm sorry, that should be 18.

22  Q.  Yes, 18.

23  A.  And Exhibit 16.

24  Q.  So the four of the -- I counted 58 total devices.  I may

25  be off a few numbers there.  But only four had child porn on

684

1  it; isn't that right?

2  **A.**  Yes.

3  **Q.**  Now, is there any evidence of anybody accessing the child

4  porn on any of these devices?

5  **A.**  I was not able to locate any video players or utility

6  players that showed any artifacts of anyone viewing the child

7  pornography.

8       But if somebody had used Shareaza to do that there

9  wouldn't be any artifacts of that affect.

10  **Q.**  Explain that.

11  **A.**  Certainly.  Shareaza is downloading, and there are some

12  child pornography videos there or titles related to it.  And I

13  selected one, and then wanted to play a preview of it, and it

14  did, there's no way for me to know one way or the other that

15  occurred.

16  **Q.**  Okay.  But there's no evidence of Mr. Henry looking at any

17  of these child porn videos; is that correct?

18  **A.**  Except for his own statement.

19  **Q.**  Wait a minute.  You didn't find any evidence of it, did

20  you?

21  **A.**  I did not.

22  **Q.**  If you look at page 36 of the grand jury testimony, line

23  20.

24  **A.**  I'm sorry, did you say page 36, line 20?

25  **Q.**  Yes, and down.

685

1   **A.**   Where Mr. Gappa is speaking?

2   **Q.**   Yes.  Was the opinion given to the grand jury as to

3   whether or not these items were viewed?

4   **A.**   I'm still reading.

5   **Q.**   Pardon me?

6   **A.**   I'm still trying to read.  How far down did you want me to

7   go on page 37?

8   **Q.**   It's five lines.  Have you gone by five lines on page 36?

9   **A.**   Okay.  On page 36.

10  **Q.**   Starting on line 20.

11  **A.**   Yes, sir.  There's a statement by Mr. Gappa.

12          THE COURT:  Don't read it.  Just review it, and let

13  counsel know when you're done reviewing it.

14          Tell him from page 36, on a certain line.

15          MR. CAPOZZI:  From line 20.  Thank you, from --

16          THE COURT:  From what page to the next line you want

17  him to read.  Once you're done, tell him.

18          MR. CAPOZZI:  20 to 24.

19          THE WITNESS:  I have read that.

20          THE COURT:  Question.

21  BY MR. CAPOZZI:

22  **Q.**   All right.  Was the opinion given to the grand jury that

23  these child porn videos were viewed?

24          MR. GAPPA:  Objection, hearsay.

25          THE COURT:  Let me see it.  I don't have it.

1    Sustained.

2    BY MR. CAPOZZI:

3    **Q.** Did you provide any evidence to the grand jury that the

4    child porn videos were viewed?

5    **A.** I don't recall.

6    **Q.** Okay.

7    **A.** But if you have a page and line for me to read, I'd be

8    more than happy to do so.

9    **Q.** I did not find anywhere you did.

10   **A.** Okay.

11   **Q.** I'm asking if you did somewhere else.  I don't know.

12        Did anybody present evidence to the grand jury that

13   these child porn videos were viewed?

14   **A.** I know that I would have to read this document to see if I

15   did, but if you're saying that it's not in there, then I would

16   say I did not.  And I can't speak to anyone else.

17   **Q.** Well, did you read that transcript?

18   **A.** I didn't read the whole thing, no.

19   **Q.** Did you read lines 20 to 24?

20   **A.** Yes.

21   **Q.** Was there an opinion given to the grand jury that these

22   child porn videos were viewed.

23        MR. GAPPA:  Objection, hearsay.

24        THE COURT:  Sustained.

25        MR. CAPOZZI:  All right.  I'll have to call a

1    different witness, okay.

2    BY MR. CAPOZZI:

3    **Q.**  Now, you heard the testimony today from Rebecca Jackson

4    now, about videotapes in her bathroom; is that correct?

5    **A.**  Yes, sir.

6    **Q.**  All right.  And you saw the videotapes that, obviously,

7    that you presented in Court today of [A. T.] Being videotaped

8    in the bathroom; is that correct?

9    **A.**  Yes, sir.

10   **Q.**  Okay.  How many videotapes were there of the bathroom?

11   **A.**  I'm sorry, which bathroom?

12   **Q.**  Thank you.

13           Burman address?

14   **A.**  I don't know.  There were quite a few.

15   **Q.**  At least 22 videotapes of people in that bathroom; isn't

16   that correct?

17   **A.**  I'm not sure, but there was a large number.  Yes, sir.

18   **Q.**  You just showed the ones of [A. T.] -- [A. T.], in the

19   bathroom; isn't that correct, today?

20   **A.**  The people showed those videos after I prepared them for

21   the prosecution.

22   **Q.**  But in fact, there were other people being videotaped in

23   that bathroom, were they're not?

24   **A.**  Absolutely.

25   **Q.**  There was Sherri Todd?

1   **A.**   Yes.

2   **Q.**   [A.T.] mother?  Yes on no?

3   **A.**   I said "yes."

4          THE COURT:  You spoke over him.

5          MR. CAPOZZI:  I'm sorry.

6          THE COURT:  He did answer.

7          MR. CAPOZZI:  I'm sorry.  Make sure you speak into

8   the microphone.  I can't hear a thing.

9   BY MR. CAPOZZI:

10  **Q.**   Robert Todd?

11  **A.**   Yes, sir.

12  **Q.**   Any other -- well, Ms. Henry, obviously?

13  **A.**   Yes.  As well as --

14  **Q.**   Who else?

15  **A.**   As well as Angele Henry's father.

16  **Q.**   Okay.

17  **A.**   As well as a couple of children that used the facility,

18  small children.

19  **Q.**   How about Angele Henry's mother?

20  **A.**   I'm sorry.  I thought we already said that.

21  **Q.**   You did?  Okay.  When I say "Ms. Henry" I meant Angele

22  Henry?

23  **A.**   Yes, Angele Henry's mother, was recorded on December 24th,

24  2012 in the shower.

25  **Q.**   Okay.  And she didn't know she was being recorded, did

1   she?

2   **A.**   She did not, and that's what part of the problem was on

3   day of the search warrant with the FBI and her being upset.

4   **Q.**   Okay.  And did Robert Todd know that he was being

5   recorded?

6   **A.**   He did not.

7   **Q.**   Sherri Todd?

8   **A.**   She did not.

9   **Q.**   Was there anybody else I'm missing here?

10  **A.**   I think that's pretty much it.

11  **Q.**   Okay.

12  **A.**   But there may have been somebody we never identified,

13  maybe one woman we never identified.

14  **Q.**   Okay, okay.  You know what voyeurism is?

15  **A.**   I have an idea what it is yes, sir.

16  **Q.**   You use that term in one of your report, did you not?

17  **A.**   I may have.  I wrote something in the neighborhood of 30

18  reports in this case.

19  **Q.**   And didn't you talk about Rebecca Jackson being video

20  long with some other people being video in her bathroom that

21  Defendant had these voyeuristic tendencies?  Do you recall

22  saying that?

23  **A.**   I do not, but if you can tell me which report or give me a

24  date and a page, that would be great.

25  **Q.**   I have Bates 296.  Do you have bate numbers on yours?

1    A.   I do not.

2    Q.   November 20, 2013, second paragraph.

3    A.   Yes, sir.  I've read that.

4    Q.   "I was also able to determine"?

5    A.   Yes, sir.  I read that.

6    Q.   Okay.  And did you use -- did you state that he was

7    behaving in a voyeuristic fashion of videotaping people?

8    A.   I did.

9    Q.   By setting up video recordings and devices in restrooms,

10   recording family and friends, their children, while they used

11   the restroom and shower facilities?

12   A.   I wrote that, yes, sir.

13   Q.   And you said that you felt as that it was voyeuristic

14   tendencies; is that correct?

15   A.   Yes.

16   Q.   Okay.  Is Mr. Henry being charged with voyeurism in this

17   case?

18   A.   Not that I'm aware of.

19   Q.   All right.  Now going to the password on the NETGEAR.

20   There were two -- there's two folders, right, the media and

21   the Aurrora?

22   A.   Yes, or two shares.

23   Q.   Is that what you call them, shares?

24   A.   I've learned that from Mr. Henry.  That's what he called

25   them.

691

1   **Q.**  Is there a difference between a share and folder or not?

2   **A.**  I think he indicated they were synonymous.

3   **Q.**  All right.  On the password side -- did you interview

4   Angele Henry?

5   **A.**  I did not.

6   **Q.**  Detective Moore did?

7   **A.**  Yes, sir.

8   **Q.**  Okay.  Could you tell whether or not she had access to the

9   Aurrora side of that share?

10  **A.**  I did no analysis to make had determination.

11  **Q.**  So you don't know for sure if she did or did not?

12  **A.**  I did no analysis to make that determination.

13  **Q.**  Okay.  Do you recall her saying that both the media side

14  and the Aurrora aside were identical?

15          MR. GAPPA:  Objection, calls for hearsay.

16          MR. CAPOZZI:  I withdraw the question.  Good point.

17  BY MR. CAPOZZI:

18  **Q.**  And on the password -- you looked at the password

19  protected side, did you not?

20  **A.**  I did.

21  **Q.**  On there there was child pornography?

22  **A.**  Yes.

23  **Q.**  On there was [A.T.], A.T.'s videos?

24  **A.**  Yes, sir.

25  **Q.**  On there there was adult pornography?

1   A.   Yes, sir.

2   Q.   On there there were videos of Angele Henry, correct?

3   A.   I'd have to double check, but I would say it's likely.

4   Q.   On there there was personal videos of their vacations,

5   correct?

6   A.   I don't remember that, but it's possible.

7   Q.   On there there were pictures of their children?  Yes or

8   no?

9   A.   Can I say, "I don't know"?

10   Q.   If you can -- if you don't know, say you don't know.

11   A.   I don't remember, sir.

12   Q.   Okay.  But you did check that Aurrora file thoroughly, did

13   you not?

14   A.   Yes.  And there was quite a bit of data on that device.

15   Q.   But it was adult pornography, child pornography, and a lot

16   of personal items?

17   A.   Yes.

18   Q.   All right.  So if there's personal items on there, is

19   there any reason to have it kept from Angele Henry?

20   A.   According to Mr. Henry, yes.

21   Q.   Even all the personal items of the family pictures,

22   et cetera?

23   A.   Mr. Henry is the one who told me it was password

24   protected, and he didn't want her on that side because there

25   were some things that were bad.

1  **Q.**  Did he also tell you if she had the password?

2  **A.**  No.

3  **Q.**  No?

4  **A.**  Correct.

5  **Q.**  Now, in your analysis of the Aurrora share, didn't you get

6  into it without using a password?

7  **A.**  That was one step I did take, yes.  If you'd like me to

8  explain that to the jury.

9  **Q.**  Go ahead.

10  **A.**  Certainly.  What I did is, I created forensic images of

11  the four 2-terybite drives in the NETGEAR ReadyNAS.

12      Once I did that, I purchased four 2-terybite drives.

13  And through what EnCase calls a "restore process" I can have

14  the forensic product, bit for bit, place the same data from

15  the forensic image onto the new drives that I had.  So they

16  would be essentially identical to the four that were in there.

17  The goal being not to disturb the original evidence.

18      Interestingly enough, it took about one week per

19  disc.  So took me four weeks to go through that process.  That

20  way I can put those four discs inside of the NETGEAR ReadyNAS,

21  Exhibit 9.  Then I can make efforts to get into that to see if

22  I could get past the password.

23      And I learned from the user guide that if you have

24  connection to that, and -- you could, if you have connection

25  to it and the proper software, you could reset the password to

1    NETGEAR 1.  Is that what you're referring to, sir?

2    **Q.** You lost me, but I'll go along with it.

3         Would you go to Bates number 1183?

4    **A.** I don't have a Bates number, sir.

5    **Q.** I'm sorry, your report of -- says "Draft Document 1 of 7."

6    **A.** Are you saying it's a seven-page document?

7    **Q.** Yes.

8         MR. CAPOZZI:  Your Honor, may I approach as to show

9    him the report?

10        THE COURT:  You may.

11        MR. CAPOZZI:  Here's the first page.  It's 1 of 7,

12   and I'm looking at the last page.

13        THE WITNESS:  You want me to read the first page,

14   sir?

15   BY MR. CAPOZZI:

16   **Q.** No.  I want you to find that report and go to page 6 of 7.

17   **A.** I think I am there.

18   **Q.** Okay.  In that report didn't you say that you reviewed the

19   Aurrora share/Aurrora folder?

20   **A.** On page 6 of 7?

21   **Q.** Yes.

22   **A.** Yes, sir.

23   **Q.** And going down to the second to the last paragraph, does

24   this help refresh your memory as to whether or not

25   Angele Henry was on that Aurrora folder?

695

1    A.   Yes, sir.

2    Q.   And indeed, didn't you say this folder contains many

3    images of Angele in provacative posses, the dates for these

4    are file created 6-28-13?

5    A.   Yes, sir.

6    Q.   She was on there?

7    A.   Yes, sir.

8    Q.   And this is the password protected side?

9    A.   Yes.

10   Q.   Does this have anything to do with the name Sylvia?  Did

11   you see that above?

12   A.   Yes.  I was asked to conduct an analysis to see if I can

13   find any folders with the name Sylvia, I believe, on item 16.

14   Q.   Okay, that's fine.  But again, Angele Henry is on the

15   Aurrora folder on the password protected side?

16   A.   Yes, sir.

17   Q.   Thank you.

18        Now, on the -- you talked about the Aza files,

19   correct me if I'm wrong, but did the Defendant say that he

20   would get the download through Shareaza at the office, then do

21   a thumb drive, and take them home, the videos that he got at

22   the office?

23   A.   Yes.

24   Q.   Now, there's something about the Aza file, Asa1, Asa2 tell

25   me about that again.  How did that come about?

1    **A.**  He indicated that periodically he would check the download

2    folder.  In this case, the completed files, which he had name

3    Shareaza.  And once in a while when he would check that he

4    would take those files from there, and put them in a folder.

5    He indicated could be Aza, Asa1, or Asa2.

6    **Q.**  Okay.  In there, wasn't just child pornography, was there?

7    **A.**  That is correct.  There was more than just child

8    pornography.

9    **Q.**  It was adult pornography?

10   **A.**  Yes, sir.

11   **Q.**  Anything else?

12   **A.**  People having sex with animals.

13   **Q.**  The bestiality issues we talked about earlier, right?

14   **A.**  Yes.

15   **Q.**  But there were over 10,000 adult videos of pornography,

16   wasn't there?

17   **A.**  I heard you make that statement before.  I would say there

18   were a lot, but I'm not sure I would go that high.  But there

19   were thousands.

20   **Q.**  Okay.  More than 5,000?

21   **A.**  I don't know.  I didn't even attempt to count.  There were

22   thousands of videos.

23   **Q.**  Okay.  How many child pornography videos were there?

24   **A.**  Approximately 150 that I located.

25   **Q.**  150 child pornography, and you think maybe 5,000 adult

697

1   videos?

2   **A.**  I said thousands.  You said 5,000.

3   **Q.**  I'm sorry.  I apologize.

4         When you say thousands, it could be 2,000, 3,000?

5   **A.**  Certainly could be.

6   **Q.**  Could be 5,000?

7   **A.**  Possible.

8   **Q.**  It could be 7,000?

9   **A.**  I don't know.

10  **Q.**  All right.  But 150 or so child pornography?

11  **A.**  Yes, sir.

12  **Q.**  On those four different items you mentioned?  16, the one

13  in the garage, 1A, the one at the office, NETGEAR number 9,

14  and number 18, the loose hard drive?

15  **A.**  Yes, sir.

16  **Q.**  Very good.

17        Which computer was Adam Henry's computer?  What item

18  was it?

19  **A.**  Can you narrow down what you mean by which computer was

20  Adam Henry's computer?

21  **Q.**  The one that he used at home.

22  **A.**  That would be Exhibit 5.10.

23  **Q.**  5.10 that was the one in the living room?

24  **A.**  Yes.  I tend to call it a great room because of the size

25  and the layout of the house, but it can be called a living

1  room.

2  Q.  You said it was 5.1?

3  A.  5.10.

4  Q.  Oh, ten.  It's mark as 3, but 5.10.  That's Mr. Henry's

5  computer that he used at home?

6  A.  Well, I would say that was a family computer that was used

7  at home.  I don't think it was exclusively Mr. Henry's.

8  Q.  Wasn't there an item 4 and 5?

9  A.  Yes, sir.

10  Q.  Who used those?

11  A.  I don't know.  They were located on the dining room table

12  in the dinette area.  And I don't know where I got the

13  information specifically, but I believe Mr. Henry indicated he

14  was repairing them for Lock-N-Stitch.  But I could be wrong

15  about that.

16  Q.  I'm showing you Exhibit 5.1 and that's the desk in the

17  great room?

18  A.  Yes, sir.

19  Q.  Is that the same as the other picture we looked at as the

20  one Adam Henry was using?

21  A.  A different perspective, but yes.

22  Q.  Did you find any child pornography on the computer that

23  Adam Henry was using item 5; is it?  Exhibit 5?

24  A.  Exhibit 5.10?

25  Q.  Yes.

1  **A.**  I did not.

2  **Q.**  I want to go to that Exhibit 33 -- let's go to 31.1.  If I

3  can show you that one.  Exhibit 31.1.

4           And this one is -- is this the home computer at

5  number that 5.1 that we just talked?

6  **A.**  Exhibit 5.10.

7  **Q.**  I say 5.15.  5.10.

8  **A.**  Yes.

9  **Q.**  This one that I just yellowed, it's an address; is it not?

10  **A.**  It is IP address, yes, sir.

11  **Q.**  I know very little about computers, that's like me having

12  an address at a certain location, mail is sent there.  It's

13  going to go there.

14           With this number, anything sent will go to that

15  address?

16  **A.**  Yes, sir.

17  **Q.**  Okay.  And this number is tied into what address?  To what

18  computer?  Where does that go?

19  **A.**  The IP address is part of a block of IP addresses signed

20  to Lock-N-Stitch.

21  **Q.**  Lock-N-Stitch, okay.  And that's from his home computer;

22  is that correct?

23  **A.**  Yes.  Exhibit 5.10.

24  **Q.**  Yes.  Okay.

25           Showing you Exhibit 31.2, there are -- this is

1    Lock-N-Stitch computer; is that correct?

2    **A.**   This is the analysis of the NT user dot dat file for

3    Exhibit 1A.

4    **Q.**   It's what tell me again?

5    **A.**   It's my analysis using the access data registry viewer for

6    the NT user dot dat file from the Adam Henry user on

7    Exhibit 1A.

8    **Q.**   But that number 7218240.20, what that's again?

9    **A.**   That's an IP address.

10   **Q.**   I'm sorry.  I'm sorry.  Go ahead.

11   **A.**   That's assigned to Lock-N-Stitch.

12   **Q.**   Okay.  And the others above that, what are those?

13   **A.**   The one right above that which is 71.94.43.83 is one digit

14   off from the IP address that Detective Moore indicated that he

15   found downloading child pornography at Lock-N-Stitch.  That

16   was 84 instead of 83.

17        That address is assigned to lock -- charter

18   communications, and the three above that are internal or

19   intranet addresses.

20   **Q.**   Okay.  I'm going to show you what's marked as your

21   Exhibit 2.

22        This is exhibit -- again, Government Exhibit 1.

23        THE COURT:  2.

24   BY MR. CAPOZZI:

25   **Q.**   Oh, 2, I'm sorry.  And what is the address of the

1   Lock-N-Stitch computer that Shareaza was downloading both

2   adult and child pornography?

3   **A.**   71.94.43.84.

4   **Q.**   Okay.  So those numbers on the home computer for

5   Adam Henry, didn't lock into that particular computer, did it?

6   **A.**   That would not be my analysis.

7   **Q.**   Okay.  If we go to this -- this is 71.94.83.84.  That's

8   where all the Shareaza was found, right?

9   **A.**   Yes.

10  **Q.**   And on the home computer -- I guess that's 31.1 -- it's

11  721824020 is that a different number?

12  **A.**   Yes.

13  **Q.**   Tell us why I'm off here?  What's wrong?

14  **A.**   Well, one thing I didn't explain when you use remote

15  desktop protocol is when you go into a network, one thing that

16  has to be determined at the router is a particular port.  Then

17  it gets redirected to a particular computer.

18          So the router has to know, because there are so many

19  computers on the network, which one you specifically want it

20  to go to.

21          So it certainly is possible to have the computer at

22  home, communicating with that IP address through the router,

23  and also have him at different times downloading on a separate

24  one.  There's no rule that says he can only have one IP

25  address for that machine.

1  **Q.**  But all you have here is a different number, different IP

2  address, don't you?

3  **A.**  I have one IP address here that confirms to me what

4  Mr. Henry told me that he remotes into work and works through

5  his home computer.

6  **Q.**  He works through the server at Lock-N-Stitch?

7  **A.**  He connects to work and remotes into his computer and he

8  said he can then solve problems from home over the internet.

9  **Q.**  Okay.  But he has to go through the server at

10 Lock-N-Stitch, does he not?

11 **A.**  I'm not a network guy, so I don't know how that works with

12 respect to servers and that type of thing.  But I know that in

13 order to have the RDP work properly it has to go through a

14 router.  And it may or may not bounce off a server before it

15 gets to his computer so he can connect to other computers.

16 **Q.**  Okay.  We showed earlier, I think it was Exhibit 26.2, a

17 video of Adam putting in a camera.  Yes, a video of Defendant

18 putting in a camera.  It was on February 20th, 2012.  Wasn't

19 also Angele Henry in that video, too?

20 **A.**  I don't remember.

21 **Q.**  Okay.  All right.

22 **A.**  There were a number of them, so I'm not sure which is

23 which.

24 **Q.**  Okay.  And you showed a video of a shower curtain being

25 taken down.  Is there any way you could pull that up as an

703

1  exhibit?  I think it's 27.1.

2  **A.**  It doesn't look like 27.1.

3  **Q.**  Do you know which one it is, sir, the video taken?

4  **A.**  27.2 appears to be the one you're referring to.

5  **Q.**  May 20, 2012.

6  **A.**  If you're talking about removing shower curtain, it's

7  27.2.

8  **Q.**  Okay.  Can you pull that up please.

9        That's Adam Henry taking down; is that correct?

10  **A.**  Yes, sir.

11    (Video played.)

12  BY MR. CAPOZZI:

13  **Q.**  And handing over that curtain to Angele Henry?

14  **A.**  Yes, sir.

15  **Q.**  Watch what she's doing.  What is she doing when she gets

16  that curtain?  Is she taking something off of the curtains,

17  putting them in a drawer?

18  **A.**  I'm sorry.  She is, but the resolution is very poor.

19  Perhaps the hooks off of the top of curtain.

20  **Q.**  Is that a plastic curtain or a cloth curtain?

21  **A.**  I have no idea.

22  **Q.**  You didn't see it?

23  **A.**  I may have, but I don't recall.

24  **Q.**  Okay.  Do you know whether it was being taken down to be

25  washed?

1   **A.**  I do not know.

2   **Q.**  In later videos of that bathroom, do you see the curtain

3   back up?

4   **A.**  I'm not sure, but I know there are somewhere -- it's not

5   up.  But it may be replaced later.

6   **Q.**  Did you look at all the bathroom videos?

7   **A.**  Yes, every single one of them.

8   **Q.**  And back in December, I think, Ms. Brennan, her mother,

9   was videotaped.  Wasn't the curtain up?

10  **A.**  Yes, sir, December 24, 2012.

11  **Q.**  The curtain was up?

12  **A.**  Yes, sir.

13  **Q.**  Back up?

14          THE COURT:  He said "yes."

15  BY MR. CAPOZZI:

16  **Q.**  Okay.  On any of those videos shown in Court with [A. T.]

17  Were they edited down to just her portion being in there?

18  **A.**  Yes, sir.

19  **Q.**  Was there a lot of dead time where the camera is just

20  running for hours?

21  **A.**  Yes, sir.

22  **Q.**  On each one of those was the camera running for a number

23  of hours?

24  **A.**  As I mentioned before, the span of time for these

25  different videos range from 30 seconds to three hours.

1    **Q.**   Each video from 30 seconds to three hours?

2    **A.**   Some were 30 seconds long, up to three hours long.  And

3    many of them, it was just black, nothing was being recorded

4    except darkness.

5    **Q.**   And that's how you found them on the different devices?

6    **A.**   Yes, sir.

7    **Q.**   They weren't edited down by Mr. Henry, or by anyone?

8    **A.**   When I located them?

9    **Q.**   Yes.

10   **A.**   I would have to take another look at the videos that were

11   in the VID folder under the folder name [A. T.], to see

12   whether or not there were other videos with the same name that

13   would be longer, but I know I edited them for efficiency.

14   **Q.**   What was his job at Lock-N-Stitch; wasn't -- you tell us.

15   What did he tell you?  Sorry.

16   **A.**   He said -- he said that he was the IT manager at

17   Lock-N-Stitch.  He was responsible to make sure the network

18   stayed up and running.

19   **Q.**   Did he edit videos for the Lock-N-Stitch employees?

20   **A.**   I believe he did.

21   **Q.**   He had experience doing that?

22   **A.**   I believe he did.

23   **Q.**   But none of these from the bathroom were edited out?  All

24   those three hours that were blank wasn't edited out?

25   **A.**   Many of them were not, yes, sir.

1   **Q.**  Well, were any?

2   **A.**  That's what I'm trying to say.  I'd have to look at the

3   video files and determine how long they are and determine

4   whether or not there are some that are just -- I'm going to

5   have to go back and say that's correct.  I don't believe any

6   editing was done based on my memory.

7   **Q.**  Okay.  In the bedroom video of A.T., [A. T.], and

8   Angele Henry, you saw her putting on a corset, correct?

9   **A.**  [A. T.] -- I'm sorry, A.T.

10  **Q.**  A.T., I'm sorry.

11        And you saw her with a little skirt?

12  **A.**  Yes, sir.

13  **Q.**  You saw that?

14        Weren't those search terms that were put in for

15  Shareaza corset, skirt?

16  **A.**  I believe that is correct.

17  **Q.**  Renaissance?

18  **A.**  I don't believe that one, but it's possible.

19  **Q.**  We'll go through that, okay.

20        And looking at those videos that we had in Court

21  today of [A. T.] in the bathroom, is there any aspect of those

22  videos that are in Exhibit 27 that in your experience could be

23  defined as sexually explicit conduct?

24        MR. GAPPA:  Objection, Your Honor.

25        THE COURT:  Sustained.

1  BY MR. CAPOZZI:

2  **Q.**  All right.   In item 16, the one in the garage that was

3  from 2005 to 2009 somewhere in those years, when was the last

4  time it was accessed?

5  **A.**  August 20, 2010, was the shutdown date for that computer.

6  **Q.**  Was any contents of that computer put somewhere else on

7  another computer?

8  **A.**  Yes.  I believe they were copied over to item -- I'm

9  sorry, Exhibit 18, the loose hard disc drive.

10  **Q.**  18, all right.  Did you look at all -- everything that was

11  on 16, the one found in the garage?

12  **A.**  Yes.

13  **Q.**  Was there any of Angele Henry in there?

14  **A.**  I specifically looked for that and didn't locate anything,

15  no pictures of her on there.

16  **Q.**  Pardon me?

17  **A.**  No pictures, no videos of her on there that I can recall.

18  **Q.**  Any family pictures on there?  Anything of that nature?

19  **A.**  Not that I can recall.

20  **Q.**  Okay.  Can you tell whether or not that computer was

21  used -- do you know what Skype is?  I'm sure you do.

22  **A.**  Yes.

23  **Q.**  Where you can talk to someone on the computer to someone

24  somewhere else.  Can you tell whether or not that computer was

25  used for Skype at all?

1   A.   I'm not sure which computer it was on, but I found

2   artifacts related to Trillion.  And upon my research, that

3   appears to be a similar type of communication protocol where

4   you can see somebody on the other computer.  You can

5   communicate.  And I think it even has some association with

6   Yahoo chat, but I'm not sure which computer I found that on.

7   Q.   Could you tell who those Skype conversations were with or

8   where they went?

9   A.   The Trillion --

10  Q.   Yes.

11  A.   -- conversations?  No.  I just found artifacts that showed

12  that I -- again, I'm not sure which machine that there was

13  some communication going on, but if -- I certainly did locate

14  images, if that's what you're referring to, that appeared to

15  show that there was some communication going on with a Skype

16  -type program.

17  Q.   Okay.  We showed some pictures of -- in the bathroom.  So

18  snapshots in the bathroom.  Do you remember what exhibit that

19  was?

20  A.   Well, the snapshots would be, I think, 28.1.

21  Q.   Can we pull that up.  I think there were --

22  A.   28.13.

23  Q.   In the bathroom?

24  A.   Oh, I'm sorry.  Looks like 28.11 is the beginning of

25  those.

1  **Q.**  There were three of them, and I don't --

2  THE COURT:  In sequence.

3  MR. CAPOZZI:  No, that's not right.

4  THE COURT:  28.11 through 28.13.

5  MR. CAPOZZI:  Three.

6  THE COURT:  Those were in sequence; - 11 is up.

7  BY MR. CAPOZZI:

8  **Q.**  Okay.  -11 is that [A. T.] -- I'm sorry.  A.T.?  I'm

9  sorry.

10  **A.**  Yes, sir.

11  **Q.**  Go to the next one.  Similar picture?

12  **A.**  Yes, sir.

13  **Q.**  Go back to the one before -11 again.  Did you see

14  something there on the counter?

15  **A.**  I see something.

16  **Q.**  Just something?

17  **A.**  Sink area.

18  **Q.**  Okay.  Go to -12.  It's still there on the counter?

19  **A.**  Yes.

20  **Q.**  All right.  Go to -13 that object is no longer there, is

21  it?

22  **A.**  Correct.

23  **Q.**  And there's something else on the counter?

24  **A.**  Yes.

25  **Q.**  Is that [A. T.]/A.T.?

1   **A.**   Yes.

2   **Q.**   That A.T.?

3   **A.**   Yes.

4   **Q.**   Okay.

5   **A.**   If I can explain.

6   **Q.**   Go ahead.

7   **A.**   For some quite time, I had her in a folder -- this

8   particular snapshot in a folder called "unidentified."  Then

9   when I watched one or two months ago, the video of her taking

10  a shower, at the end of the shower she throws her hair back,

11  and that is exactly what that picture is of, from the shower

12  video.

13  **Q.**   And this was a snapshot taken?

14  **A.**   A screenshot.

15  **Q.**   Screenshot, I'm sorry.

16  **A.**   Same thing, yes.

17  **Q.**   Where was this found?

18  **A.**   In the same folder as the other ones, in the [A. T.].

19  **Q.**   Okay.  Go back to -11 again, if you would.  Is that --

20  when she's taking the shower, going to take the shower?

21  **A.**   I didn't do that analysis to determine which event this

22  came from, but I don't think so.

23  **Q.**   All right.  And these all three of these pictures were on

24  the Aurrora side, password protected?

25  **A.**   Yes.  To clarify, sir, these files and folders for A.T.,

1    and the [A. T.] folder were in three separate locations.

2    **Q.**   Tell us.

3    **A.**   On the media side, and then also in two locations on the

4    secured side.

5    **Q.**   So they were on the unprotected side of Aurrora?

6    **A.**   Yes, sir.

7    **Q.**   Okay.  You don't know who took these snapshots?

8    **A.**   I do not.

9    **Q.**   Did you do an analysis of the -- well, you showed us some

10   text messages between [A. T.] and -- you can take that one

11   down -- between [A. T.] and -- not [A. T.] -- between Angele

12   and Adam Henry.  Approximately, how many text messages were

13   there between the two of them?

14   **A.**   I'm sorry.  I have no idea.

15   **Q.**   Right.  But you saw the Celebrite what are Celebrite

16   records?

17   **A.**   Well, I'm not sure what you're talking about, but if I

18   think I do, certainly, you can go through the Celebrite

19   physical analyzer analyzing a mobile device, if it has, as an

20   example, text messages, as I mentioned earlier, you can select

21   individual ones that you want to export out in a report, or

22   you can just select them all and export them out into a

23   report, if that's what you're referring to.

24   **Q.**   I never heard the word Celebrite until I had this case.

25   But that's where you pull up what's on the telephone and what

712

1  is said between the parties?

2  **A.**  What text messages go back and forth, yes, sir.

3  **Q.**  And did you that for Adam Henry and Angele Henry?

4  **A.**  I did.

5  **Q.**  Okay.  And you did that for A.T. and Angele Henry?

6  **A.**  Yes.  From Angele Henry's phone.

7  **Q.**  How many text messages were there from Adam Henry to A.T.?

8  **A.**  I don't know.  -- oh, I'm sorry.  From Adam Henry to her,

9  zero.

10  **Q.**  Zero?

11  **A.**  Yes.

12  **Q.**  How many text messages were there from A.T. to

13  Angele Henry?

14  **A.**  I do not know.

15  **Q.**  How about 759?

16  **A.**  I'll accept your number.

17  **Q.**  Okay.  If I can show you the exhibit that we had marked,

18  did you look at the Exhibit E, I believe it is, the extraction

19  records?

20  **A.**  I'm sorry.  Is that a question for me?

21  **Q.**  Yes, once I find it.  The extraction report that was

22  submitted in our binder of the contacts between [A. T.] and

23  Angele.

24  **A.**  I took a cursory look at that and notified Mr. Gappa that

25  I didn't produce those document s.

1    **Q.**   Okay.  Who produced those documents?

2    **A.**   The other person involved in this case was

3    Detective Phillip Weber from the Modesto Police Department.

4         At the beginning of this investigation, when we

5    located phone conversations between Adam Henry and his then

6    attorney -- I don't remember who that was -- we stopped

7    investigating the mobile devices and asked a third party to

8    conduct that analysis so we could create a firewall --

9    **Q.**   Okay.

10   **A.**   -- between us and those.  So I'm assuming that's his work

11   product.

12   **Q.**   All right.  Have you looked at it?

13   **A.**   Again, I just took a cursory look, and I saw what it was.

14   And I notified Mr. Gappa that I wasn't responsible for those.

15        MR. CAPOZZI:  Your Honor, I think we have a

16   stipulation to move these documents into evidence.  I think

17   it's Exhibit E.

18        THE COURT:  You're moving Exhibit E into evidence?

19        MR. CAPOZZI:  Yes.

20        THE COURT:  Is there an objection?

21        MR. GAPPA:  No, Your Honor.

22        THE COURT:  I've got it.

23        MR. CAPOZZI:  Yes.

24        THE COURT:  It's the entire thing.

25        MR. CAPOZZI:  Do you need to put an E on there?

1          THE COURT:  Okay.  Mr. Capozzi, just so that record

2    is clear, my E, defense binder, has a number -- you on

3    occasion referred to -- you have referred to item numbers.

4    Item numbers mean nothing to me.

5          MR. CAPOZZI:  I know.

6          THE COURT:  You all may refer to item numbers, but

7    that's -- that's not my parlance.

8          Defense exhibits --

9          MR. CAPOZZI:  It's C.

10         THE COURT:  Government Exhibits are numbered.

11   Defense exhibits are lettered.  And here, is how thick my

12   Defense E is.

13         MR. CAPOZZI:  Those are different phone messages.

14   It's C.  It's C.

15         THE COURT:  C, hold on.  Let me make sure.  I want to

16   make sure we're talking about the same thing.

17         MR. CAPOZZI:  It's a lot thinner.

18         THE COURT:  Hold on.  Just to make matters a little

19   more confusing, but perhaps will help us identify it, this

20   document appears as -- in my binder as Defendant's Exhibit C

21   as in Charlie.

22         MR. CAPOZZI:  Yes.

23         THE COURT:  And that's the document that you are

24   moving?

25         MR. CAPOZZI:  Yes.

1          THE COURT:  It's pages 1 through 23?

2          MR. CAPOZZI:  If there's 23 pages, yes.

3          THE COURT:  If the numbers are in the bottom

4   right-hand corner; is that are we?  Reason I'm being careful

5   is --

6          MR. CAPOZZI:  Here it is.

7          THE COURT:  -- at the bottom it says Defense

8   Exhibit D as in --

9          MR. CAPOZZI:  That's the wrong number.  Thank you,

10  Judge.

11         THE COURT:  Okay.  But it's 23 pages in total?

12         MR. CAPOZZI:  Yes.

13         THE COURT:  That's what you're moving?

14         Is there any Government objection to Defendant's

15  Exhibit C being admitted into evidence?

16         MR. GAPPA:  No, Your Honor.

17         THE COURT:  C is admitted.

18         MR. CAPOZZI:  If I'd like to display it, if that's

19  possible, Judge.

20         THE COURT:  You may.

21  BY MR. CAPOZZI:

22  Q.  You talked about text messages from the baseball game --

23  well, maybe you didn't say it was a baseball game.  But text

24  messages between Adam Henry and Angele Henry on a certain

25  date?  Do you remember that date?

716

1    **A.**   No.   But I think it was June 2013, perhaps.

2    **Q.**   June.   It's in 2013, I know that.   Was that where the

3    pictures were taken that day?

4    **A.**   Again, I may be off on that date.   That's just my memory

5    from earlier today.   So --

6    **Q.**   Okay.   Well, what exhibit was it of yours where there's

7    text messages back and forth?

8    **A.**   I'm not sure.   Maybe we can get a little help from the

9    prosecution team.

10   **Q.**   It's exhibit -- there are --

11          MR. CAPOZZI:   36.

12          THE WITNESS:   35 series, I think.

13          MR. CAPOZZI:   35.

14          THE COURT:   I agree with you.   It's somewhere in

15   there, 35.

16          THE WITNESS:   Point-two.

17          MR. CAPOZZI:   It's 9, 16, 12, I have there.

18          THE WITNESS:   Okay.

19   BY MR. CAPOZZI:

20   **Q.**   Let me find that date.   What I wanted to point out is, you

21   showed some text messages and some pictures between Adam and

22   Angele.   Were those the only text messages on that day between

23   them while he's at the baseball game?

24   **A.**   I'm not sure, but I would doubt it.

25   **Q.**   There were other conversations between them besides the

1   pictures being sent; isn't that correct?

2   **A.**   That's very likely.

3   **Q.**   Let me see if I can find something.  Hold on.  I think the

4   date is 8-18.  Is it 2012 they were at the game or '13?

5          Anyway.  Do you recall conversations other than

6   talking about the girls that they saw?

7   **A.**   Again, I do not, but I wouldn't doubt that they existed

8   since they were husband and wife and they communicate quite

9   often.

10  **Q.**   Weren't they talking, if you recall, about financial

11  matters, et cetera, if you recall?

12  **A.**   I'm not sure about that day, but I do remember reading

13  some text messages revolving around that.

14  **Q.**   Okay.  But there were other conversations besides those

15  pictures; isn't that correct?

16  **A.**   Again, I don't remember, but I wouldn't doubt it.

17  **Q.**   And the pictures that were sent, were any of those

18  pictures of adults?

19  **A.**   I would put those images of those girls in the category of

20  age difficult.

21  **Q.**   Age difficult?

22  **A.**   And that --

23  **Q.**   Age difficult?

24  **A.**   Yes, sir.  And that means it's difficult to determine if

25  they're under 18 or not.

1  **Q.**  Okay.  But there were some that were over 18; were there

2  not?

3  **A.**  Again, I would put them all in the same category.

4  **Q.**  All right.  Did you look at the pictures that weren't

5  sent?

6  **A.**  I'm sorry, what?

7  **Q.**  Pictures that were not text, that were still on the

8  camera?

9  **A.**  If we are talking about cell phone --

10  **Q.**  Yes, that's what I'm talking --

11  **A.**  I'm sure I went through all the images on all the cell

12  phones.

13  **Q.**  All right.  Would you classify that as child pornography,

14  those pictures?

15  **A.**  Which pictures?

16  **Q.**  On any of them sent at that baseball game to Angele?

17  **A.**  No.

18  **Q.**  I want to go to exhibit, I think, it was 33.  Do you have

19  the binder up there?  Should I put it up on the --

20  **A.**  I'm looking for the description.  You said 33?

21  **Q.**  Yes.

22  **A.**  It says, "File transfer analysis reports," so --

23  **Q.**  Well, let me just show you what -- this one here,

24  Exhibit 33.  Can you see it okay.

25  **A.**  Yes.

1    **Q.** I think you testified, correct me if I'm wrong that on

2    August 23, 2013, Adam Henry, accesses work computer, item 1A.

3    And then remotely transferred four child pornography videos --

4    video files to item nine, the NETGEAR at home, which is his

5    home storage device; is that what you said?

6    **A.** Yes, but I believe there were five.

7    **Q.** I'm sorry?

8    **A.** There were actually six, but five was displayed as

9    examples, but there were actually six in addition to other

10   files that were also transferred.

11   **Q.** Are you saying then that he was at home when he did this?

12   **A.** All I can say is that this occurred at three o'clock in

13   the afternoon on August 23rd, 2013.

14   **Q.** Okay.  So what does that mean?

15   **A.** That means that it is likely that he was at home, because

16   he would have had remoted in, and then copied and pasted them

17   into the NETGEAR ReadyNAS secure share.

18   **Q.** So you're saying he was at home?

19   **A.** That would be my analysis, yes.

20   **Q.** And what time did these transfer occur, it was roughly

21   between 3:05 in the 3:07 in the afternoon?

22   **A.** Yes, sir.

23   **Q.** Did you happen to check Mr. Henry's work schedule at

24   Lock-N-Stitch on August 23rd 2013, to see if he was working?

25   **A.** I did not.

1   **Q.**   So would it surprise you to learn that if there were

2   evidence to support that he was at work, what does that do to

3   your analysis?

4   **A.**   Nothing.  Because, as an example, I did examine some of

5   the documents you provided for his work schedule, and it

6   appears that he was at work all day on the 19th of September,

7   2013, and actually left early around noon on that day and went

8   home according to Mr. Reed so that certainly is a possibility

9   for every other day.

10  **Q.**   Did you review the text messages between Adam and

11  Angele Henry?

12  **A.**   Yes.

13  **Q.**   Did you read all of them?

14  **A.**   Text messages?

15  **Q.**   Yes.

16  **A.**   There were quite a few.  I attempted to get through most

17  of them as thoroughly as possible, but I certainly could have

18  missed some.

19  **Q.**   How about the ones on August 23, 2013, did you read them?

20  **A.**   Not specifically.

21  **Q.**   There were two of them?  You don't remember reading them?

22  **A.**   I do not.

23  **Q.**   Would it -- there were two of them on that date

24  August 23rd, 2013, you don't remember one way or the other?

25  **A.**   No, I'm sorry.  No.

1    **Q.**  Well, how would it be possible for Mr. Henry to have

2    accessed his work computer from his home on August 23rd at

3    three o'clock if he was at work, at that time?  Could he have

4    done that?

5    **A.**  No.

6             MR. CAPOZZI:  Judge, if I can have a minute to see if

7    I've covered everything.

8             THE COURT:  Yes.

9    BY MR. CAPOZZI:

10   **Q.**  The videos you saw of A.T., would you describe them as

11   videos of child pornography?  Obviously?

12   **A.**  No.

13            MR. CAPOZZI:  I have no more questions.  Thank you.

14            THE COURT:  Does the Government wish to redirect at

15   this time or take the evening recess?

16            MR. GAPPA:  For the evening recess, appreciate it.

17            THE COURT:  Sorry Detective Hively.

18            THE WITNESS:  I'm going to be here tomorrow anyway,

19   sir.

20            THE COURT:  Okay.  Counsel, would you agree with my

21   estimate that as I give the jury their evening instruction,

22   would -- that I also tell them that I anticipate that they're

23   likely to get this case for deliberation by sometime on

24   Thursday?

25            MR. CAPOZZI:  Oh, for sure.

722

1         THE COURT:  For sure?

2         MR. CAPOZZI:  Unless.

3         THE COURT:  What do you think, Mr. Gappa, do you

4    think the jury is likely to have the case in their hands by

5    Thursday?

6         MR. GAPPA:  Yes.

7         THE COURT:  Okay.  Just to give a -- normally, I'd

8    start at 8:30 tomorrow morning, because we have a full day

9    tomorrow.  Is there anyone who objects.

10        MR. CAPOZZI:  I don't object.

11        THE COURT:  Anybody on the jury have trouble getting

12   here by 8:30?

13        JUROR 044:  Unless it's foggy, it might be.

14        MR. CAPOZZI:  Even if you started at 9:00.

15        THE COURT:  That's really the two choices.

16        MR. CAPOZZI:  I prefer 9:00.

17        MR. GAPPA:  No objection, Your Honor.

18        JUROR 044:  I can do 8:30.  I just worry about the

19   fog.  We don't know if it's going to be foggy until it is.

20        THE COURT:  Let's set a nine o'clock start time,

21   because I think time-wise, we're on schedule.  I think the

22   jury is likely to have this case for deliberations by

23   Thursday, at the latest, in any event.  So let's start at

24   nine o'clock tomorrow morning.  It will be a full day.  So

25   we'll take a noon recess.

1        I've got one matter I've got to take over the recess

2   before, but I can get that down during the lunch hour.  Then

3   we'll go to about this time again tomorrow.  All right?

4        Ladies and gentlemen, remember until this trial is

5   over, do not discuss the case with anyone including your

6   fellow jurors, members of your family, people involved in the

7   trial, or anyone else.

8        And do not allow others to discuss the case with you.

9   This includes discussing the case in internet chat rooms, or

10  blogs, internet bulletin boards, emails or text messages.  If

11  anyone tries to communicate with you about the case, please

12  let me know about it immediately.

13       Do not read, watch, or listen to any news report or

14  other accounts about the trial or anyone associated with it,

15  including any online information.

16       Do not do any research such as consulting

17  dictionaries, searching the internet, or using other reference

18  materials, and do not make any investigation about the case on

19  your own.

20       Finally, keep an open mind until all the evidence has

21  been presented, and you've heard the arguments of counsel, and

22  my instructions on the law, as well as the views of your

23  fellow jurors.  And if you need to speak to me about anything,

24  give us a signed note to Renee or Sam, and I will respond as

25  soon as possible.  Have a pleasant night.  See you tomorrow

1   morning.  We will start at 9:00 a.m. sharp.

2       (Jury exits courtroom.)

3       THE COURT:  We're outside the presence of the jury,

4   just briefly, Sam, I think put a packet of proposed

5   instruction on your table when we started today.  That's my

6   preliminary proposed instructions.  Take a look at them

7   overnight.  We can talk about them tomorrow.  If appropriate,

8   we can meet in chambers and discuss them further before I

9   require you to put objections on the record.

10      Just for preview, I am on the, what is sexually

11  explicit conduct.

12      MR. CAPOZZI:  Yes.

13      THE COURT:  There's the six, dosed factors, the

14  Government wants to add two more.  The defense objects.  I am

15  definitely not inclined to add the 8th.  I am a bit on the

16  fence regarding the 7th since the language in the Ninth

17  Circuit decision, which name escapes me, does mention that

18  language.  It comes from a quote.  So that's one.

19      The voyeurism instruction, Mr. Capozzi, be prepared

20  to argue.

21      MR. CAPOZZI:  Yes.

22      THE COURT:  Because I'm not quite sure where you're

23  coming from.  You don't have to argue it now.  I'm just

24  telling you what you need to argue about.  Your client isn't

25  charge with voyeurism.

1          MR. CAPOZZI:  Correct.

2          THE COURT:  I know you apparently want to argue to

3  the jury that that's what this IS.  You can do that without an

4  instruction that tells them that what voyeurism is, what the

5  crime of video voyeurism is as defined by Federal Statute,

6  he's not charged with that.

7          Unless what you're saying to me -- and I've never

8  heard of this in a federal criminal prosecution, unless what

9  you're saying to me is, Judge, I want a lessor included.

10         MR. CAPOZZI:  No, no.

11         THE COURT:  I want to invite the jury to convict my

12 client of video voyeurism in violation of that statute.

13         MR. CAPOZZI:  Which is amiss.

14         THE COURT:  If that's not what you're requesting,

15 then you're going to have to convince me why it is that you

16 should get an instruction regarding the law of an offense that

17 is not charged.

18         That's not to say that I'm telling you that you

19 couldn't argue to them that this is not one of the offenses

20 charge, and that instead it is simply voyeurism.

21         But under what authority should I instruct the jury

22 as a matter of law what the crime of video voyeurism is.  That

23 seems to me to be a stretch.

24         My initial instruction is not to give that

25 instruction.  That's why it's not in your packet.  You'll see

1   that when you get there.  But I'll certainly hear from

2   everybody as to why they think I've got it wrong.  Otherwise I

3   don't think there's a lot in my packet that's too much

4   different than what you given me.  All right.  So we'll talk

5   about it at an appropriate time tomorrow.

6           If we're starting at 9:00, and I take it, that the

7   prosecution after the stipulation, and after redirect of this

8   witness, are you ready to rest?

9           MR. GAPPA:  Yes.

10          THE COURT:  And do you think that defense case is

11  going to take all day or more than a day?

12          MR. CAPOZZI:  No.  I don't think it will continue

13  tomorrow.  Yeah, I have Adam, and three other witnesses, and

14  deposition, which is 15 minutes.

15          THE COURT:  A deposition?  Remember I just got this

16  case on the day that you started trial.  There's a deposition

17  to be read?

18          MR. CAPOZZI:  Yes.  It's filed with the Court.

19          THE COURT:  Is there --

20          MR. CAPOZZI:  I have a video of it.

21          THE COURT:  Is there an agreement by the parties that

22  this is deposition is coming into evidence?

23          MR. GAPPA:  Probably.

24          THE COURT:  Okay.  And if there is such an agreement,

25  is there an agreement as to how it's coming in?

727

1          MR. GAPPA:  I think that what wasn't resolve.

2          THE COURT:  Often it would be read with someone

3    reading questions and someone reading answers.  If it's going

4    to done some other way, I suppose I'm fine with that as long

5    as, technically, we know that we can accommodate you.

6          MR. CAPOZZI:  The transcript and the video is on

7    that, and it's just like the Government has done theirs.

8          THE COURT:  Okay.  You all maybe let us know what

9    you're planing, and make sure that we can -- okay.

10          MR. CAPOZZI:  Okay, Judge.

11          THE COURT:  See you tomorrow then.

12       (Proceedings adjourned at 4:36 p.m.)

13

14

15

16

17

18

19          I, RACHAEL LUNDY, Certified Shorthand Reporter, do
     hereby certify the foregoing transcript as true and correct.
20
     DATED:  14th of November, 2018          /s/ Rachael Lundy
21                                      RACHAEL LUNDY, CSR
                                        Certificate No. 13815
22

23

24

25