UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13-CR-409-DAD |
| | ) | |
| vs. | ) | JURY TRIAL |
| | ) | DAY 6 |
| ADAM ALAN HENRY, | ) | (AMENDED) |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Fresno, California            Wednesday, November 15, 2017

REPORTER'S AMENDED TRANSCRIPT OF PROCEEDINGS

Volume 6, Pages 728 through 946, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:          United States Attorney's Office
                            BY: **DAVID L. GAPPA**
                            and **ROSS PEARSON**
                            2500 Tulare Street
                            Suite 4401
                            Fresno, California 93721


For the Defendant:          Law Offices of Anthony P. Capozzi
                            BY: **ANTHONY P. CAPOZZI**
                            1233 West Shaw Avenue
                            Suite 102
                            Fresno, California 93711

1                            **INDEX**

2   **GOVERNMENT'S WITNESSES**:

3    **ARTHUR HIVELY**                                        736
     REDIRECT EXAMINATION BY MR. GAPPA                       737
4    RECROSS-EXAMINATION BY MR. CAPOZZI                      744
     **ANTONIO RUEZGA (REBUTTAL)**                           906
5    DIRECT EXAMINATION BY MR. GAPPA                         906
     CROSS-EXAMINATION BY MR. CAPOZZI                        907
6    **ANTONIO RUEZGA (OUTSIDE JURY'S PRESENCE)**            921
     FURTHER CROSS-EXAMINATION BY MR. CAPOZZI               922
7    REDIRECT EXAMINATION BY MR. GAPPA                       928
     RECROSS-EXAMINATION BY MR. CAPOZZI                      928
8
    **DEFENDANT'S WITNESSES**:
9
     **GARY JACK REED**                                      750
10   DIRECT EXAMINATION BY MR. CAPOZZI                       750
     VOIR DIRE EXAMINATION BY MR. PEARSON                    760
11   CONTINUED DIRECT EXAMINATION BY MR. CAPOZZI             762
     CROSS-EXAMINATION BY MR. PEARSON                        775
12   REDIRECT EXAMINATION BY MR. CAPOZZI                     789
     **LOUISE ANN REED**                                     793
13   DIRECT EXAMINATION BY MR. CAPOZZI                       794
     CROSS-EXAMINATION BY MR. GAPPA                          802
14   **ADAM ALAN HENRY**                                     806
     DIRECT EXAMINATION BY MR. CAPOZZI                       806
15   CROSS-EXAMINATION BY MR. GAPPA                          856
     REDIRECT EXAMINATION BY MR. CAPOZZI                     888
16   RECROSS-EXAMINATION BY MR. GAPPA                        897
     FURTHER REDIRECT EXAMINATION BY MR. CAPOZZI            898
17   FURTHER RECROSS-EXAMINATION BY MR. GAPPA               899
     **ROBIN R. MARTIN**                                     900
18   DIRECT EXAMINATION BY MR. CAPOZZI                       900
     CROSS-EXAMINATION BY MR. GAPPA                          904
19   **ADAM ALAN HENRY (OUTSIDE JURY'S PRESENCE)**          937
     DIRECT EXAMINATION BY MR. CAPOZZI                       937
20                            * * * * *

21

22                           **EXHIBITS**

23  **DEFENDANT'S**                              Received
     E                                           737
24   D                                           762
     A.1, B.1, C.1, D.1 and E.1                  775
25                            * * * * *

1   Wednesday, November 15, 2017                    Fresno, California

2   9:08 a.m.

3           THE CLERK:  1:13-CR-409.  United States versus Adam

4   Alan Henry.  Jury trial.  Day 6.

5           THE COURT:  Let the record reflect we're outside the

6   presence of the jury.  We received a note this morning from

7   juror number 12, indicating that -- there's a letter that I'm

8   not reading all of.  But she was in an auto accident last

9   night and she's here.  But her lower back is bothering her and

10  she's asking for permission to get up and stand by the wall on

11  the side of the jury box if she finds it necessary.  I don't

12  see any problem with that.  If she needs to take a break, I'm

13  going to encourage her to let me know.  I may also inquire

14  whether she's on any medication.  All right?

15          MR. CAPOZZI:  I agree.

16          THE COURT:  Agreed?

17          MR. GAPPA:  Yes.

18          THE COURT:  Mr. Capozzi, agreed?

19          MR. CAPOZZI:  Yes, sir.

20          THE COURT:  Let's bring Juror Seat Number Twelve in

21  by herself before we bring the other jurors in.

22          MR. GAPPA:  Your Honor, we had just a couple of

23  housekeeping things.  We had the stipulation regarding those

24  two witnesses who were not called.  So does the Court have any

25  objection if I read that stipulation?

1          THE COURT:  Not at all.

2          MR. CAPOZZI:  I want to know if we've agreed to it.

3     I sent a different one to you.

4          MR. GAPPA:  Yeah.  I said that this morning.

5          MR. CAPOZZI:  Is mine okay?

6          MR. GAPPA:  Yeah.

7          MR. CAPOZZI:  Okay.

8       (The Juror Seat Number Twelve entered the courtroom.)

9          THE COURT:  Let the record reflect that we have

10    brought juror number 12 into the courtroom.  Juror 044, I have

11    not read your entire letter.  But it sounds like you were in a

12    not minor traffic accident last night; huh?

13         JUROR SEAT NUMBER TWELVE:  Yes, sir.  On the way

14    home.

15         THE COURT:  How are you feeling?

16         JUROR SEAT NUMBER TWELVE:  Sore.

17         THE COURT:  Yeah  did you take a trip to the

18    hospital?

19         JUROR SEAT NUMBER TWELVE:  No, I did not.  At the

20    time neither the person that I hit the back of nor myself

21    felt -- there was no blood or bruising or obvious signs of

22    injury.  So we exchanged information and got out of the way

23    because behind us a few cars back, there were at least four

24    others that were also in a pileup.

25         THE COURT:  Boy.  Well, are you -- first of all,

1  you've asked for permission to stand up by the wall next to

2  the jury -- immediately adjacent to the jury box.

3          JUROR SEAT NUMBER TWELVE:  Yes.

4          THE COURT:  Actually a little bit closer to the

5  witness stand.  If you feel the need.

6          JUROR SEAT NUMBER TWELVE:  Yes, sir.

7          THE COURT:  Because of back discomfort.  And we've

8  all agreed that, of course, that's certainly fine.

9          JUROR SEAT NUMBER TWELVE:  Thank you.

10          THE COURT:  You don't need to ask.  If you need to,

11  just get up and stand.  My only other question is are you on

12  any pain medication?

13          JUROR SEAT NUMBER TWELVE:  No, sir.  Just Aleve.

14          THE COURT:  Okay.  And you don't feel the need for

15  any?

16          JUROR SEAT NUMBER TWELVE:  Not right now, no.

17          THE COURT:  All right.  Lastly, if at any point

18  things get worse and you need a break or you need to talk to

19  us about how you're feeling, please just raise your hand and

20  get my attention and we'll get to you immediately.  Okay?

21          JUROR SEAT NUMBER TWELVE:  Thank you, sir.

22          THE COURT:  All right.  Why don't you go back to join

23  your fellow jurors right now.

24          JUROR SEAT NUMBER TWELVE:  I can open the door if --

25          THE COURT:  And we'll bring you out.

734

1          JUROR SEAT NUMBER TWELVE:  Unless it shocks me or
2    something.
3          THE COURT:  And we'll bring you back in just a couple
4    of minutes.
5          JUROR SEAT NUMBER TWELVE:  Yes, sir.
6          THE COURT:  Thank you.
7      (Juror Seat Number Twelve left the courtroom.)
8          THE COURT:  All right.  Well, that -- at least it's
9    no worse than that.  Hopefully she doesn't start feeling worse
10   throughout the day.
11         So one, you're going to, Mr. Gappa -- we're outside
12   the presence.  Mr. Gappa, you're going to read the parties'
13   stipulation.  That's fine.  And?  Was there something else?
14         MR. GAPPA:  We agreed to let the defense admit two
15   additional -- well, one additional exhibit.
16         MR. CAPOZZI:  The extraction report.  It's
17   Exhibit -- this is Exhibit E for us in our binder.
18         THE COURT:  E as in Edward as it's in the binder,
19   it's the thicker one?
20         MR. CAPOZZI:  Yes.
21         THE COURT:  Are you going to do this through this
22   witness?
23         MR. CAPOZZI:  I want to do it real quick and then I'm
24   done with him.
25         MR. GAPPA:  I think a better way -- he had nothing to

1  do with the creation of it, so there would be no point in

2  doing that.  It's just a stipulation to admit it.

3          MR. CAPOZZI:  He has put together, not this exact

4  exhibit, but another exhibit dealing with the extraction from

5  the telephones.

6          THE COURT:  Tell you what.  Just put on the record

7  that -- move in to evidence Exhibit E.  I'll let you describe

8  it briefly and say there's a stipulation.

9          MR. CAPOZZI:  Okay.

10          THE COURT:  Move it into evidence.  And then if you

11  have any questions for the witness about E and its similarity

12  to something else, you can ask those.

13          MR. CAPOZZI:  Okay.

14          THE COURT:  Does that sound like a --

15          MR. CAPOZZI:  I'll just describe.  It's the

16  telephone -- you tell me.

17          MR. GAPPA:  I'll ask the questions too.

18          THE COURT:  So what is it, Mr. Gappa?

19          MR. GAPPA:  It's a Cellebrite extraction report that

20  a different detective did.  There was testimony about it

21  yesterday, that a different detective looked at these devices,

22  extracted the information for at least that report.

23          THE COURT:  Okay.

24          MR. GAPPA:  And that was step one of what Detective

25  Hively did when he replicated the work.

1          THE COURT:  Okay.  Well, why don't you say what it

2     is, that there's a stipulation.  I'll acknowledge that it's

3     admitted.

4          MR. CAPOZZI:  Okay.

5          THE COURT:  Then if there's any questions you have

6     for this witness about it, you can ask him.

7          All right.  Ready to bring in the jury then?

8          MR. CAPOZZI:  Sure.

9          THE COURT:  And remind me exactly.  We're still on

10    cross.  Correct?

11         MR. CAPOZZI:  I'm done.  Once I do this.

12         THE COURT:  Okay.

13      (Off the record.)

14      (The jury entered the courtroom.)

15         THE COURT:  And let the record reflect that we are

16    back in the presence of the jury.  And Mr. Capozzi.

17         MR. CAPOZZI:  Yes.

18         THE COURT:  You may continue.

19                          **ARTHUR HIVELY**,

20    called as a witness on behalf of the Government, having been

21    previously sworn, testified as follows:

22         MR. CAPOZZI:  Thank you, judge.

23         Just that the government and the defense have agreed,

24    stipulated, to allow into evidence what's called an extraction

25    report.  It's Defendant's Exhibit E.  And it's the telephone

1    records between Adam Henry and [A.T.]  not [A.T.], Angele

2    Henry.  Oops.  Did I do something?

3            And it's quite a few pages.  I don't know the exact

4    amount.  It is approximately 101 pages.  Both sides have

5    agreed to admit it.  Is that correct?

6            THE COURT:  And so defendant has moved Exhibit E into

7    evidence.  Any objection?

8            MR. GAPPA:  No objection, Your Honor.

9            THE COURT:  Defense Exhibit E is admitted.

10       (Defendant's Exhibit E was received.)

11           MR. CAPOZZI:  And I have no further questions for Mr.

12   Hively, thank you.

13           THE COURT:  Any redirect of Detective Hively?

14           MR. GAPPA:  Yes.  Thank you, Your Honor.

15                       REDIRECT EXAMINATION

16   BY MR. GAPPA:

17   Q.  Good morning, Detective Hively.  Yesterday you were asked

18   some questions about the reliability of titles that are

19   associated with files shared through the peer-to-peer

20   networks.  Do you remember that?

21   A.  Yes, sir.

22   Q.  And I believe that you said that it's possible that file

23   titles do not always necessarily reflect the content of the

24   file.  Is that your testimony?

25   A.  Yes, sir.

1  Q.  Let me show you what's already in evidence as Exhibit

2  29.2.  And this -- you tell us what this is.

3  A.  This is a screenshot from FTK showing the Aurrora

4  shell -- I'm sorry, the Aurrora share directory tree.  And

5  I've highlighted in this the "kid" folder.

6  Q.  And did you review the content of the videos in the "kid"

7  folder?

8  A.  I did.

9  Q.  They were how many child pornography videos there?

10 A.  I would have to check with my report.

11        I reviewed my report and I indicated there were 27

12 child pornography videos in that folder.

13 Q.  Was there a correlation between the titles of the files

14 and the content of the files in that folder?

15 A.  Yes.

16 Q.  What was the correlation?

17 A.  There were key words in the titles that are related to

18 child pornography.  And obviously the contents of the videos

19 were child pornography.

20 Q.  In any of those titles, did you see reference to the word

21 "illegal"?

22 A.  I did.  And I do.

23 Q.  Is it necessary to see the file -- to see the title of the

24 file?

25 A.  Not at all.

739

1   Q.  Let me next direct your attention to what's in evidence as

2   Exhibit 29.3.  Could you take a look at that.

3   A.  Yes.

4   Q.  What do we see here?

5   A.  Again, it's the same directory tree.  This time I have

6   highlighted the "no" folder.

7   Q.  Did you review the contents of that folder?

8   A.  I did.

9   Q.  And what was found there?

10  A.  46 child pornography videos.

11  Q.  Was there a correlation between some of the titles and the

12  content in that folder?

13  A.  Yes.  Again, many of the titles had key words related to

14  searches for child pornography.

15  Q.  Did you find reference to any title that had the word

16  "illegal" in it?

17  A.  Yes.

18  Q.  And do you see that on your screen now?

19  A.  I do.

20  Q.  You were asked some questions about who was recorded in

21  videos at the defendant's residence on Burman Drive.  Do you

22  recall that?

23  A.  Yes, sir.

24  Q.  And your testimony was that A.T. as well as her parents

25  were recorded; is that right?

1    A.   Yes.

2    Q.   And Angele Henry's mother was also apparently recorded?

3    A.   Yes, sir.

4    Q.   And then at least one additional child in addition to A.T.

5    was recorded?

6    A.   Yes.

7    Q.   Did you sometimes find one video that captured A.T. in the

8    Burman Drive bathroom as well as additional people using the

9    bathroom?

10   A.   Yes, sir.

11   Q.   Did any of those videos that you found of other people

12   using that bathroom end up in a folder with that person's name

13   on it?

14   A.   No.

15   Q.   You were asked some questions about what was on the

16   password protected side of Exhibit 9.  Do you recall that?

17   A.   Yes, sir.

18   Q.   Do you recall being asked whether there was adult

19   pornography as well as photos and family photos on that

20   secured side?

21   A.   Yes, sir.

22   Q.   And that material was on the password protected side;

23   correct?

24   A.   Yes.

25   Q.   Do you recall the defendant telling you, in your

741

1  interviews of him, what was on the password protected side?

2  A.  Yes.

3  Q.  What did he say?

4  A.  Essentially he told me that the Aurrora share was a copy

5  of the media folder, which was unsecured with the exception of

6  the items that he had added that he wanted to go through and

7  then verify they were safe to bring over to the unsecured

8  side.

9  Q.  You were asked a question or two about whether you had

10 obtained access to the password protected side of Exhibit 9

11 without using the password.  Do you recall that?

12 A.  Yes.

13 Q.  Did you actually access the password protected side

14 without a password?

15 A.  Well --

16 Q.  Or can you explain that?

17 A.  Certainly.  What I indicated yesterday is after restoring

18 those hard disk drives, I was able to reset the password to

19 Netgear1 for the admin share.

20 Q.  Do you consider that to be different than accessing it

21 without the password?

22 A.  It is slightly different in that once you reset the

23 password, then it would stay Netgear1 until somebody put it

24 back to the original one.

25 Q.  Okay.  And Mr. Capozzi yesterday asked whether you had

1    found child pornography on Exhibit 5.10.  Do you recall that?

2    A.   Yes.

3    Q.   And just so we're clear, the 5.10 computer was in what's

4    been described as either the living room or the great room at

5    the Burman Drive residence?

6    A.   Yes, sir.

7    Q.   You said you did not find child pornography on that

8    device; correct?

9    A.   That is correct.

10   Q.   Would it be possible to transfer files from the

11   Lock-N-Stitch computer, Exhibit 1 and 1-A to the network

12   attached storage device, Exhibit 9, using that computer 5.10

13   without any child pornography remaining on 5.10?

14             MR. CAPOZZI:  Objection.  Calls for conjecture.

15             THE COURT:  Overruled.  The witness can answer if he

16   is able.

17             THE WITNESS:  Yes, it is possible.

18   BY MR. GAPPA:

19   Q.   Can you explain?

20   A.   Certainly.  It's just acting as a medium between the

21   computer at work and the Netgear ReadyNAS.  It's easy enough

22   to log into a computer remotely.  You can size the screen, as

23   an example, to show half of that computer.  Open up the

24   Windows file explorer on the local computer, copy something

25   from the remote computer, paste it on the other one and it

1    just -- it's used as a conduit from one to the other without

2    anything being placed on to, in this case, Exhibit 5.10.

3    Q.  Okay.  And then you were asked some questions about

4    Exhibit 28.13.  Do you recall that?  If we could bring that

5    up.  It's in evidence.

6    A.  Yes, sir.

7    Q.  Can you please take a look at that.  And then let me next

8    have you take a look at 27.7.  This is also in evidence.  If

9    we could go, on 27.7, to the starting point at about seven

10   minutes, 20 seconds into that video.  And then play

11   approximately 15 seconds.

12           (Playing video.)

13   BY MR. GAPPA:

14   Q.  And if we could stop that and then return to that starting

15   point and then freeze it at about the 7 minute 30 second mark.

16           And if we could then put side by side with that,

17   Exhibit 28.13.

18           Your Honor, those are my questions?

19           MR. CAPOZZI:  Leave that up, if you would.

20           THE COURT:  Was there a question?

21           MR. GAPPA:  No.

22           THE COURT:  Oh.  All right.

23           MR. CAPOZZI:  Are you done?

24           THE COURT:  Recross.

25           MR. CAPOZZI:  Yes.

744

1              RECROSS-EXAMINATION

2   BY MR. CAPOZZI:

3   Q.  Have you interviewed Sherry Todd?

4   A.  I spoke to her briefly at her residence, yes, sir.

5   Q.  And who is Sherry Todd?

6   A.  That would be A.T.'s mother.

7   Q.  Mother.  Now, she's been videotaped in this bathroom; has

8   she not?

9   A.  Yes, sir.

10  Q.  Okay.  And you're saying that -- which one is the -- is it

11  29?  27.7 is the same as 28.13?

12  A.  Yes.  And that's what I indicated yesterday in my

13  testimony.

14  Q.  Have you viewed videos of Sherry Todd in that bathroom?

15  A.  Yes.

16  Q.  And you're saying it's not her mother right there?

17  A.  Correct.

18          MR. CAPOZZI:  Okay.  No further questions.  Thank

19  you.

20          THE COURT:  Any re-redirect?

21          MR. GAPPA:  No.  Thank you, Your Honor.

22          THE COURT:  May the witness be excused?

23          MR. GAPPA:  Yes.

24          MR. CAPOZZI:  Could I have one second, Your Honor?

25          THE COURT:  Yes.

745

1          MR. CAPOZZI:  Before he's excused?

2          THE COURT:  Mr. Capozzi may be asking to re-open his

3     redirect.  Or his recross.

4          MR. CAPOZZI:  I'm sorry.

5          THE COURT:  I mean his re-recross.

6     BY MR. CAPOZZI:

7     Q.  Is it true that any given file, regardless of the title,

8     will have a number of tags which one does not see in the

9     title?

10    A.  Yes.  And programs like Shareaza can pick up on those.

11    Not all the peer-to-peer file sharing programs do or the

12    communications protocols, but many do.

13    Q.  Isn't it true, in fact, that people on the peer-to-peer

14    network actually add these tag terms to gather more people for

15    sharing on their computer?

16    A.  I believe that is correct, yes, sir.

17    Q.  So if I have a child porn video and I want myself to be

18    higher in the hierarchy of the traders on the network, I might

19    add tags that have nothing to do with child pornography; isn't

20    that true?

21    A.  I'm not sure.  But it's very possible.

22    Q.  Okay.  In your experience, have you often found tags that

23    have nothing to do with the title or the content of the video?

24    A.  I've never examined the metadata of videos for tags, so I

25    can't answer that.

1  Q.  You don't know.  For example, if I want a Britney Spears

2  video, I might enter her name as a search term.  And if the

3  name Britney Spears is actually a tag word for a video of

4  child pornography, would the results include a child

5  pornography video with her name as a tag?

6  A.  I'm sorry.  You lost me a little bit on that.  Are you

7  saying there would be a tag with her name on a child

8  pornography video?

9  Q.  Yeah.

10  A.  Then certainly it could come up.

11  Q.  It would come up.  Even though her name is there and it

12  wouldn't be considered child pornography, it was just her name

13  without the tags.

14  A.  You lost me on that one.  Sorry.

15       MR. CAPOZZI:  Okay.  No further questions.  Good

16  enough.  Thank you.

17       THE COURT:  Any re-redirect?  No.  Yes.  Re-redirect.

18       MR. GAPPA:  No, Your Honor.

19       THE COURT:  May the witness be excused?

20       MR. GAPPA:  Yes, Your Honor.

21       MR. CAPOZZI:  Yes.

22       THE COURT:  Thank you, sir.  And the government's

23  next witness.

24       MR. GAPPA:  Your Honor, we have a stipulation.  And

25  if it's acceptable, the government can just read it into the

1  record.

2       THE COURT:  Yes.  Please do.

3       MR. GAPPA:  It is stipulated that two adult women

4  were surreptitiously recorded taking a shower in the home of

5  Rebecca Jackson in 2008.  Neither of the women had given

6  consent to the recording nor did they know that a video

7  recording of them had been made.

8       THE COURT:  That's the stipulation --

9       MR. GAPPA:  Yes.

10      THE COURT:  -- in its entirety?

11      MR. GAPPA:  Yes.

12      THE COURT:  And the jury will receive an instruction

13  at the end of the case regarding considering evidence, both

14  testimony given in open court, exhibits received into evidence

15  as well as any facts to which the parties have stipulated.

16  This is one of those facts.  And we've had a few others.  But

17  you'll get an instruction in that regard.

18      All right.  Government have any additional witnesses?

19      MR. GAPPA:  No, Your Honor.

20      THE COURT:  Government rest?

21      MR. GAPPA:  Yes.

22      THE COURT:  Mr. Capozzi, anything that we need to

23  take up before the defense case?

24      MR. CAPOZZI:  I have Rule 29 motions, but I don't

25  know if you want to do them now or just wait and put the other

1    witnesses on now.

2          THE COURT:  Okay.  Perhaps we -- defense has made

3    their Rule 29 motion.  We'll discuss it further at a break

4    outside the presence.  And does the defense wish to call any

5    witnesses --

6          MR. CAPOZZI:  Yes, judge.

7          THE COURT:  -- at this time?

8          MR. CAPOZZI:  Our one witness, the first witness we

9    have is out of the country.  And the government and the

10   defense has agreed to take his deposition.  And we're just

11   going to play that videotape of his deposition.

12         THE COURT:  And --

13         MR. CAPOZZI:  And we're set --

14         THE COURT:  Is that agreed?

15         MR. GAPPA:  Yes, Your Honor.

16         THE COURT:  So the videotape deposition will be

17   played for the jury.  It appears that the transcript, much as

18   in some of the other recordings that the jury has heard, that

19   a transcript will appear next to the videotape of the witness'

20   deposition.  And the jury will also receive an instruction, I

21   believe, at the end of the case that says that deposition

22   testimony is testimony given under oath and is to be treated

23   the same as if it was given here in open court.

24         So you wish to play that now?

25         MR. CAPOZZI:  Yes, Your Honor.

1          THE COURT:  Are we ready to go?

2          MR. CAPOZZI:  Yes, Your Honor.  It's the entire

3    deposition and there's no need to take a transcript of it.

4          THE COURT:  Both parties stipulate that the court

5    reporter need not attempt to report the deposition testimony?

6          MR. GAPPA:  Yes, Your Honor.

7          THE COURT:  So the disk will be part of the record in

8    the case?

9          MR. CAPOZZI:  Yes.

10          THE COURT:  Agreed?

11          MR. GAPPA:  Yes.

12          THE COURT:  All right.

13          MR. CAPOZZI:  Thank you, judge.

14          THE COURT:  Is it up on the jury's screen?

15          THE CLERK:  Yes, Your Honor.

16      (Playing video deposition of David Silva, not reported.)

17          MR. CAPOZZI:  That's the end of the deposition,

18    judge.

19          THE COURT:  All right.

20          MR. CAPOZZI:  I think we need to coordinate the

21    exhibits.

22          THE COURT:  Yeah.  We need to talk about that.

23    Because -- maybe we can take it up outside the presence.  Is

24    the defense asking that those exhibits that were referred to

25    at the deposition be admitted into evidence at trial?

Gary Reed

750

1          MR. CAPOZZI:  Yes.  And we need to re-number them.

2          THE COURT:  And so we -- yeah.  We've got double

3    numbers.  Double letters, excuse me.  So we'll have to address

4    that.  But I'll let the jury know what we end up working out.

5          All right.  And I'll take any objections that there

6    may or may not be.

7          Next witness.

8          MR. CAPOZZI:  Yes.  Thank you.  Gary Reed.  He's just

9    outside.

10                         **GARY JACK REED**,

11   called as a witness on behalf of the Defendant, having been

12   first duly sworn, testified as follows:

13         THE CLERK:  Please have a seat.  State your full name

14   for the record and then spell it.

15         THE WITNESS:  My name is Gary Jack Reed.  That's

16   G-A-R-Y J-A-C-K R-E-E-D.

17                       DIRECT EXAMINATION

18   BY MR. CAPOZZI:

19   Q.  Good morning, Mr. Reed.  Where are you employed?

20   A.  The company is Lock-N-Stitch, Incorporated in Turlock.

21   Q.  Can you try to pull the microphone close to you.

22   A.  Certainly.

23   Q.  Thank you.

24   A.  Thank you.

25   Q.  You're employed at Lock-N-Stitch?

1    A.   Correct.

2    Q.   Indeed, are you the owner of Lock-N-Stitch?

3    A.   Yes.

4    Q.   Along with Louise Reed?

5    A.   My wife, yes.

6    Q.   How long have you had that business?

7    A.   Going on 28 years.

8    Q.   And what kind of business is it?  Lock-N-Stitch?

9    A.   It's not -- doesn't have anything to do with sewing.  It's

10   a heavy industrial machinery repair business.  We have a

11   manufacturing division where we manufacture a lot of different

12   parts specially used in the repair of mostly cast iron, cast

13   iron machinery parts.  And then we have a service repair

14   division, where we perform services both at our facility and

15   on-site at the customer's location anywhere in the world.

16   Q.   Okay.  And do you operate world wide?

17   A.   Yes, we do.

18   Q.   I want to show you Government's Exhibit 3.1.  Can

19   you -- 3.1.  Can you identify that at all?

20   A.   Yes.  It looks to be --

21   Q.   Are those -- it's an aerial view, I should say that first

22   of all.

23   A.   Okay.  That's better.

24   Q.   How many of those buildings do you utilize?

25   A.   We are in two of them.

Gary Reed

752

1   Q.   Which two?  The top two?

2   A.   No, it would be three-fourths of the bottom one and

3   nine-tenths of the next one up.

4   Q.   Here.

5   A.   Yes.

6   Q.   Those are the only two that you utilize?

7   A.   Correct.

8   Q.   All right.  And showing you Government's Exhibit 3.2.  Is

9   that the sign above the entrance?

10  A.   Yes, it is.

11  Q.   And this is in what city?

12  A.   Turlock.

13  Q.   I want to show you what's marked as Government's 3.5.  Do

14  you recognize that?

15  A.   Yes.

16  Q.   Can you tell us what that is?

17  A.   That is a room that is now basically not used for much.

18  But that is where Adam Henry's work area was.

19  Q.   Showing you Government Exhibit 3.6.  Is that another

20  closeup view of it?

21  A.   Yes, it is.

22  Q.   And 3. -- Government Exhibit 3.7.  Is that another closeup

23  of his desk?

24  A.   I believe so.  Yes.

25  Q.   All right.  Did you ever see -- do you know Angele Henry?

1  A.  Yes, I do.

2  Q.  How do you know her?

3  A.  She's married to Adam.

4  Q.  Did she ever come by the office in the year 2013?

5  A.  Frequently.

6  Q.  And do you know why she came by?

7  A.  It was my understanding that they have one car.  She would

8  bring him to work in the morning and then come back in the mid

9  afternoon and wait for him to be finished.

10  Q.  And would she come back alone?

11  A.  No.  She brought her two children.

12  Q.  Okay.  And what would the children be doing while she's

13  there at the office?

14  A.  Well, they were basically roaming around.  They would come

15  into my office, my wife's office, my daughter's office.  They

16  were basically unattended.

17  Q.  All right.  Where would you see Adam Henry -- Angele

18  Henry?

19  A.  In Adam's office.

20  Q.  Did you ever see her sitting at -- showing you, again,

21  Exhibit 3.9.  Did you ever see her sitting at his desk?

22  A.  Yes.

23  Q.  Okay.  What time of day would it normally be?

24  A.  Oh, mid to late afternoon.

25  Q.  Was that on a consistent basis?

1    A.   Yeah.

2    Q.   Do you recall when they had their wedding reception?

3    A.   Yes, I do.

4    Q.   Do you remember what month it was in?

5    A.   May, I believe.

6    Q.   Of what year?

7    A.   '13.

8    Q.   Okay.  About when in May was it, do you know?

9    A.   Oh, I don't remember for sure.  It was at our house.

10   Q.   It was at your place?

11   A.   Yeah.  But I can't remember the date.

12   Q.   All right.  Would you see her coming by the office after

13   that reception?

14   A.   Yeah.

15   Q.   And how often would you see her -- maybe I asked you this.

16   How often would you see her at that desk?

17   A.   Well, I think every time when she was there and not doing

18   something else, she was in there.

19   Q.   Would she be in there alone?

20   A.   Yes.

21   Q.   And where would the children be?

22   A.   My office, my wife's office or my daughter's or something

23   like that.  But I -- I know sometimes, you know, she would

24   sometimes go in and talk to my wife.  Angele would.  Or, you

25   know, maybe chat with other people.  But for the most part, my

1    memory is that she was in there.

2    Q.   Okay.   And in the -- Adam Henry's office, there was a

3    computer?

4    A.   Yes.

5    Q.   And was that computer hooked up to a network in the

6    office?

7    A.   Yes.

8    Q.   Was there a network server in the office?

9    A.   In another room, yes.

10   Q.   Another room.   And was his computer, if you know, hooked

11   up to that server?

12   A.   Yes.   They all are.

13   Q.   All of your computers?

14   A.   Yeah.

15   Q.   Now, in those buildings that we looked at -- let me go

16   back to that.   Were there -- so your business was spread out

17   between building 1 and building 2?

18   A.   Correct.

19   Q.   Were there computers or kiosks in different parts of these

20   buildings?

21   A.   Yes.   Quite a few actually.

22   Q.   I said kiosks, are they monitors?

23   A.   Two different situations and we had some of both.

24   Q.   Tell me.   Go ahead.   Were those hooked up to the network

25   system within the business?

1  A.  Yes.

2  Q.  And how many of those were there throughout the business,

3  do you know?

4  A.  At that time I'm thinking 30ish computers.  Maybe.  Yeah,

5  somewhere in the 30ish range.  There's more than that now.

6  Q.  All right.  Could you -- now can you hook up to -- do you

7  have a computer at home?

8  A.  Yes.

9  Q.  Can you hook up your computer at home to your computer at

10 the office?

11 A.  Not to the computer at the office.  But to the server.

12 Q.  Back then, in 2013, if you had a computer at home, was it

13 hooked up to your computer on your desk?

14 A.  Never.

15 Q.  No.

16 A.  That was always a security issue.

17 Q.  Do you know whether or not Adam's computer in his

18 office -- at home, I'm sorry.  Adam's computer at home was

19 hooked up to his computer at the office?

20 A.  I don't believe that was possible.

21 Q.  But you did have the home computers hooked up to the

22 server at Lock-N-Stitch?

23 A.  I honestly don't remember when that occurred.  I actually

24 think it took place after Adam was arrested.  We had to switch

25 to an IT service corporation that took care of everything.

757

1   And things advanced quite a bit and there were different ways

2   of doing that.  And so there are, I think, four now that can

3   have access to the server, you know, through the server only.

4   Where we -- that's where all of our personal data is stored.

5   Nothing on the individual PCs is -- nothing is stored there.

6   Q.   So in your business is -- are there a lot of patents

7   involved?

8   A.   Yes.

9   Q.   And is it important that that be kept password protected?

10  A.   Absolutely.

11  Q.   How many patents do you have?

12  A.   30 some odd.

13  Q.   That you've developed?

14  A.   Yeah.

15  Q.   And it's important that they be kept confidential?

16  A.   Absolutely.

17  Q.   Did you have a password to your computer?

18  A.   Yes.

19  Q.   All right.  Did Adam Henry have a password to his

20  computer?

21  A.   I'm sure he did.

22  Q.   Did you have access to it?  His computer?

23  A.   No.

24  Q.   Do you know whether or not his -- when he was not in the

25  office, do you know whether or not his computer was still

1  running?

2  A.  My assumption would be, because most of us leave ours on,

3  I mean, it's -- you know, we -- we're protected through

4  firewalls and things like that.  So the only reason we'd be

5  afraid of somebody that worked there would be, you know,

6  getting into our computers.  And I know I leave mine turned on

7  all day long in my office.  But I think others do as well.

8  It's kind of a common practice.

9  Q.  Uh-huh.  Do you have a policy about downloading adult

10 pornography at the office?

11 A.  Absolutely.

12 Q.  And the policy?

13 A.  Well, it's not tolerated.  And, you know, a person could

14 be terminated if that happens.

15 Q.  Has that happened with other employees in the past?

16 A.  It did happen with one.

17 Q.  And when you found out about it, what did you do the first

18 time?

19 A.  Well, I pulled him aside and told him that he had violated

20 a very serious policy, to the extent that he can be terminated

21 for that.

22 Q.  Did you terminate him then?

23 A.  I did not.  I gave him a chance.  I liked the guy and

24 I -- I liked him.  So --

25 Q.  And did he violate that policy again?

1    A.  Yes, he did.

2    Q.  And you terminated him?

3    A.  Yes, I did.

4    Q.  Okay.  You understand now that there was pornography found

5    on Adam Henry's computer?

6    A.  I've been told that.

7    Q.  Does your business keep track -- have some kind of a

8    document that keeps track of a work schedule of employees?

9    A.  Absolutely.

10   Q.  Have you been asked to supply that to the defense?

11   A.  Yes, I was.

12        MR. CAPOZZI:  Judge, if I can approach and show him.

13        THE COURT:  You may.

14        MR. CAPOZZI:  It's going to be Exhibit D.

15   Q.  If I can show you this and see if you can identify this.

16   A.  Yes.  These are from our calendar that we keep that

17   everybody has access to that has computers.  And we keep track

18   of events and when people are going to be at work and not, so

19   everybody knows.  So nobody's running around, "Where's Tom?"

20   Or "Where's Fred?"  Whatever.  You know.  So, yeah, we've been

21   doing this for years.  Actually, Adam set this up many years

22   ago.

23   Q.  Do you keep that in the normal course of business?

24   A.  Oh, yeah.  Yeah.

25   Q.  And you note the dates down there at the time it occurs?

Gary Reed - VD

760

1   A.  Yeah.  This is how we keep track of, you know, for payroll

2   purposes.  When they're working, not there working, on leave,

3   you know, various different things like that, they -- it's

4   what we have to do, you know, keep track of payroll.

5   Q.  And you keep this in the normal course of business?

6   A.  Absolutely.

7          MR. CAPOZZI:  I would move for the admission, Your

8   Honor, of the work records.

9          MR. PEARSON:  Your Honor, we object on the basis of

10  foundation and hearsay.  If I could ask a few followup

11  questions.

12         MR. CAPOZZI:  Sure.

13         THE COURT:  You may.

14         MR. CAPOZZI:  No objection.

15                    VOIR DIRE EXAMINATION

16  BY MR. PEARSON:

17  Q.  Mr. Reed, do you personally enter the dates in this

18  system?

19  A.  Sometimes I will enter mine.  We used to all do it

20  ourselves.  But somebody still had to be kind of -- well, if

21  it's a meeting or something like that, yes.  But payroll

22  issues, no.

23  Q.  So when you say "we used to all do it ourselves," does

24  that mean an employee would personally enter when he was going

25  to be out of the office?

1 A. No. That was -- I'm talking about meetings and -- I mean,

2 this has multiple purposes. But any payroll issues,

3 absolutely not.

4 Q. Who would enter when the employee was in and out of the

5 office?

6 A. A clerk that would handle payroll. It's how we keep track

7 of time off.

8 Q. Okay. And where would that clerk get the information?

9 A. From time clocks. From things that were on the calendar.

10 We would -- everybody's required to fill out a piece of paper

11 if they're not going to be there. And they turn that in. And

12 then that clerk uses that to post those types. And they have

13 to be approved. If somebody wants to have a day off, they've

14 got to go to a doctor or something. They fill out a paper.

15 And then it turns in to her because she's responsible to make

16 sure that they're always put in to the calendar.

17 Q. So these records are records the clerk entered; correct?

18 A. Yes.

19 Q. These aren't the time off requests that the employee

20 submitted?

21 A. Well, it is -- that's what it is. It's a record of those

22 things. It's when they're at work and when they're not at

23 work.

24 Q. Are these records made contemporaneously with when the

25 employee submits the time off request?

1   A.   They have to be -- well, we try to make them in advance.

2   That's the plan.  But if somebody's sick, that doesn't happen.

3   So they fill it out when they come back.

4   Q.   And if the employee ends up not being out of the office,

5   are these records modified?

6   A.   I don't understand the question.

7   Q.   So if I -- if an employee requested a day off and then

8   later decided to come to work, would these records be

9   modified?

10  A.   Absolutely.

11  Q.   And so these are completely accurate?

12  A.   Yes.

13  Q.   Okay.  But they're not the actual time sheets that the

14  employee submits; is that correct?

15  A.   That's correct.

16          MR. PEARSON:  Your Honor, we still object on basis of

17  foundation and hearsay.

18          THE COURT:  Overruled.  D is admitted.

19      (Defendant's Exhibit D was received.)

20                  CONTINUED DIRECT EXAMINATION

21  BY MR. CAPOZZI:

22  Q.   How long have you known Adam Henry?

23  A.   Since I met his aunt.  1988.

24  Q.   Who is his aunt?

25  A.   My wife.

1   Q.  Oh.  Okay.

2   A.  Sorry about that.

3   Q.  So your wife is his --

4   A.  Aunt.

5   Q.  -- aunt.  Okay.  So your wife is related to his mother?

6   A.  His mother is my wife's sister.

7   Q.  Okay.  There we go.  Have you had an occasion to develop

8   an opinion as to his character for telling the truth?

9   A.  Prior to all of this, I trusted him completely.  I put a

10  lot of trust in him and I never had an occasion of any sort to

11  think that he was lying to me, he was being deceitful.  If he

12  didn't know the answer to a question, he'd just say "I don't

13  know."  So I had -- you know, I put complete trust in him.

14  And that's the way it was.

15  Q.  You said prior to this incident.  Has this changed your

16  view of his truthfulness?

17  A.  Well, I haven't had much to do with him since then.  I've

18  talked to him on the phone a few times.  But no, it hasn't

19  changed.  I -- you know, I don't think he did this.  So I -- I

20  don't see him in a lesser light in any way.

21  Q.  You see him as an honest person?

22  A.  I do.

23        MR. CAPOZZI:  No more questions.  Thank you.

24        THE COURT:  Let's take our morning recess at this

25  time.  Ladies and gentlemen, please heed the Court's previous

764

1    admonition.  We will reconvene at approximately 10:30.

2        (The jury left the courtroom.)

3        THE COURT:  We are outside the presence of the jury.

4    Counsel, let's reconvene in about ten minutes to talk about

5    some of the issues we need to talk about outside the presence.

6        (Recess.)

7        THE COURT:  We're outside the presence of the jury.

8    Sorry to keep you waiting.

9        So, Mr. Capozzi, you had a motion.

10       MR. CAPOZZI:  Yes.  29 motion.  On Count One, Your

11   Honor.

12       THE COURT:  Yes.

13       MR. CAPOZZI:  The government has not shown any

14   exploitation of this young woman, A.T., for sexual

15   exploitation.  The charge is "knowingly conspired."  I have

16   seen no evidence whatsoever of any agreement anywhere.  And

17   even if you -- when you look at all the pictures -- you know,

18   I let the pictures play.  I didn't object, I should say.  Of

19   the pictures in the bathroom with the minor being in there.

20   It went on and on and on.

21       And I purposely didn't object because there was

22   nothing pornographic there.  Nothing to show a sexually

23   explicit conduct for the purposes of producing a depiction, a

24   visual depiction, knowing that this would be produced or

25   transmitted in interstate commerce.  I just don't see where

 1   the evidence is on Count One at all.  When you look at the

 2   elements, clearly all the elements have not been met.

 3         And on Count Two, on the -- clearly the distribution

 4   aspect of Count Two, I think that should be deleted from -- or

 5   dismissed from the counts.  Did he knowingly receive and

 6   distribute?  Government witnesses say there was no way to

 7   distribute.  So I think that should knock that out.  Did he

 8   knowingly receive?  There's no evidence of knowingly

 9   receiving, other than it coming in to that computer.

10         Nothing more, Your Honor.

11         THE COURT:  Government wish to respond?

12         MR. PEARSON:  Yes, Your Honor.  For Count One, our

13   theory of the case is two-fold.  So it's first off that the

14   defendant and Angele did actually create sexually explicit

15   photos and videos of A.T.  But even that notwithstanding, and

16   that's a factual issue under the factors set forth in

17   this -- in *Overton* and in this Court's jury instruction for

18   the jury to find whether those videos and images do constitute

19   sexually explicit material.

20         Even if they don't, though, we've charged conspiracy.

21   And the crime for conspiracy is the agreement and the overt

22   act.  Here we have circumstantial evidence that the defendant

23   and his wife are setting up a camera in the bathroom.  That

24   they take a number of steps to capture photos and videos of

25   A.T.  And that those photos and videos then end up in a folder

766

1  labeled [A.T.] on the password protected side of the NAS,

2  which the defendant said he was the only one who had the

3  password to.

4         So this is -- whether that constitutes conspiracy,

5  whether it meets the elements is a factual question for the

6  jury to decide.

7         THE COURT:  Well, I don't really understand that

8  argument that distinguishes it between the substantive offense

9  and the offense of conspiracy.

10        MR. PEARSON:  So --

11        THE COURT:  Conspiracy subsumes -- the conspiracy is

12  to commit the underlying offense.  So I don't understand that

13  argument.

14        MR. PEARSON:  What we're saying is that we think they

15  actually completed the offense.  That they agreed to commit

16  this offense and then they acted and they were able to do it.

17  And that depends on whether the jury, under *US versus Overton*,

18  finds that the factors were sufficient to make these videos

19  and images of A.T. sexually explicit conduct.

20        But the crime in itself is the agreement.  And from

21  this Court's proposed jury instructions, first, that there was

22  an agreement between two or more persons to commit the crime

23  of sexual exploitation.

24        You can see that circumstantially from the steps that

25  they took.  From them setting up the camera together.  From

1   them removing the bathroom curtain, from them fixing the glare

2   in the camera and then from where the pictures end up.

3       And then second is the purpose.  And there's this

4   argument that the purpose here was just generally voyeurism,

5   to take videos of anyone.  But there weren't videos of just

6   anyone categorized on the Aurrora share.  It was only videos

7   of [A.T.] categorized.  And so our theory is that conspiracy

8   here is met at least to overcome a Rule 29 argument.

9       THE COURT:  Right.  The aspect of the argument that

10  I'm not really appreciating is the distinction between the

11  substantive offense of sexual exploitation of a minor and a

12  conspiracy to sexually exploit a minor.  I'm not -- if you're

13  trying to make a distinction how, even if we haven't submitted

14  evidence sufficient to convict of the substantive -- of a

15  substantive offense, we've somehow submitted evidence

16  sufficient with respect to a conspiracy to commit that

17  offense.

18      MR. PEARSON:  I --

19      THE COURT:  I really haven't heard any evidence

20  that -- here that suggests that there was an attempt or

21  conspiracy to accomplish a goal that wasn't, in fact,

22  accomplished.  I'm having a hard time following that argument

23  or that logic.

24      MR. PEARSON:  I admit that -- sorry.  Only to respond

25  to the defendant's argument that there's nothing sexually

768

1    explicit here.  We disagree with that position.

2              THE COURT:  Right.  I think I do too.  But that goes

3    to the substantive offense.

4              MR. PEARSON:  Sure.

5              THE COURT:  As opposed to something special about the

6    fact that, hey, we charged a conspiracy here.  I don't know.

7    Maybe I'm missing the boat.

8              MR. CAPOZZI:  My argument is, judge, there's not

9    enough evidence here to show explicit --

10             THE COURT:  Yeah, I know.  I get your argument.

11             MR. CAPOZZI:  How can you agree if --

12             THE COURT:  I get your argument.  I'm about to

13   disagree with it.

14             MR. CAPOZZI:  Okay.

15             MR. PEARSON:  And I guess to --

16             THE COURT:  But I understand your argument.  I'm a

17   little not sure I understand what the government's argument

18   is.  But at any rate.

19             MR. PEARSON:  To boil it down, our argument is that

20   we don't need to show sexually explicit material was actually

21   produced because it's a conspiracy.

22             MR. CAPOZZI:  You have to show it.

23             THE COURT:  You're losing me there.  But how about

24   the pornography charge -- or the -- not pornography, the --

25             MR. CAPOZZI:  Receipt.

769

1          THE COURT:  Right.  Mr. Capozzi's made an argument
2     regarding receipt and distribution, saying that the
3     distribution -- any aspect of alleging that distribution
4     should be subject to a Rule 29 motion.  I thought this was a
5     receipt case.
6          MR. PEARSON:  It is a receipt case.
7          THE COURT:  Not a distribution case.
8          MR. PEARSON:  That's correct, Your Honor.
9          THE COURT:  Again, I'm learning the case as we go.
10    But Mr. Capozzi, is there some --
11         MR. CAPOZZI:  In the indictment it's charged receipt
12    and distribution.  Or distribution.  Receipt and distribution.
13    Which can be and/or.
14         THE COURT:  I think that my proposed jury
15    instructions only instruct the jury with respect to receipt.
16         MR. CAPOZZI:  That's correct.
17         THE COURT:  I didn't realize the government's theory
18    involved distribution.  Does it?
19         MR. PEARSON:  It doesn't, Your Honor.
20         THE COURT:  All right.
21         MR. PEARSON:  We always plead it that way.
22         THE COURT:  Okay.  So the -- I'm not going to be
23    referring to distribution either in the instructions and the
24    jury is not going to have the indictment.  So submitted?
25         MR. CAPOZZI:  Yes.

1          MR. PEARSON:  Yes, Your Honor.

2          THE COURT:  All right.  Well, I am denying the

3    defense motion.  I think when one goes through the elements of

4    sexual exploitation of a minor, first -- as alleged in Count

5    One, three elements.  First, that A.T. was under the age of

6    18.  That's undisputed.

7          Second, that the defendant or another person

8    employed, used, persuaded, induced, enticed or coerced A.T. to

9    engage in sexually explicit conduct for the purpose of

10   producing a visual depiction of such conduct.  That's what the

11   defense argument focuses on.

12         And third, that the defendant knew or had reason to

13   know that it would be mailed or shipped or that the visual

14   depiction was produced using materials that have been used and

15   shipped, specifically a computer or hard drive was made out of

16   state, that the visual depiction was mailed or actually

17   transported.  I think that element has been -- through the use

18   of the computers has been established.

19         So really, the argument focuses on the second

20   element.  And that takes a few steps.  I think it was

21   something that Judge Ishii talked to you quite a bit about

22   leading up to the trial.  I haven't had one of these before

23   either.  But my understanding of the law, now that I've sat

24   down and studied the appropriate instructions, there are a few

25   steps with respect to the sexually explicit conduct element.

1            Sexually explicit conduct means a number of things,

2    but part of them are lascivious exhibition.  And lascivious

3    exhibition, in turn, under *Dost*, the *Dost* factors, and the

4    Ninth Circuit's decision in *Overton*, can include consideration

5    of whether the minor is fully or partially clothed or is nude.

6    That factor is present here.

7            And I think, in *Owens*, also whether the depiction is

8    intended or designed to elicit a sexual response from the

9    viewer.  And here, that is a question of fact for the jury to

10   resolve as the finder of facts, whether the depictions, which

11   have been admitted into evidence, which clearly include

12   par -- pictures of A.T. partially clothed or without clothes

13   were also intended or designed to elicit a sexual response

14   from the viewer.

15           The government's going to point to the fact that

16   they're stored in a number of places, that they're categorized

17   into files, reflecting the age of A.T. at the time all as

18   circumstantial evidence indicating that, yes, those

19   screenshots, as well as videos themselves, were made and then

20   categorized in such a way as to suggest that they were

21   intended or designed to elicit a sexual response from the

22   viewer.

23           The defense is going to argue that they were not.

24   And the jury is going to be called upon ultimately to make

25   that decision.

Gary Reed

772

1        But as far as I'm concerned, there is sufficient

2   evidence from which a reasonable jury could find that they

3   were.  And for that reason, I deny the defense Rule 29 motion

4   in its entirety.

5        The other matter has to do with these photographs.

6   They were marked for purposes of Mr. Silva's deposition as

7   Defendant's A through E.  But now, at trial, we've already had

8   another set of exhibits marked Defendant's A through E, some

9   of which have been, but not all of which have been admitted

10   into evidence.  So we've got duplicate numbers.  I can think

11   of two ways to do it.  We can either take the photographs and

12   I think we've already used -- we've used a whole bunch of --

13        THE CLERK:  Our next in order is W, judge.

14        THE COURT:  We could either start with W or we could,

15   I suppose, make them A.1, B.1, C.1, just add a point one to

16   each one of them in order to distinguish.  Does anybody care?

17        MR. GAPPA:  No, Your Honor.

18        MR. CAPOZZI:  Not on defense, we don't care.

19        THE COURT:  What do you think, Renee?  Want to just

20   make them --

21        THE CLERK:  A.1.

22        THE COURT:  A.1, B.1, C.1.

23        THE CLERK:  Sure.

24        THE COURT:  Let's do that.  Let's just add a point

25   one to each of the photographs and I'll tell the jury -- can

1  you move them into admission, Mr. Capozzi?

2        MR. CAPOZZI:  Yes, I will.

3        THE COURT:  Just so the record is clear.

4        MR. CAPOZZI:  And what numbers are they, letters

5  again?

6        THE COURT:  They're going to be A.1 through E as in

7  Edward .1.

8        MR. CAPOZZI:  Okay.

9        THE COURT:  Anything else we need to talk about

10  outside the jury's presence?

11        MR. CAPOZZI:  One of my witnesses is in a wheelchair.

12        THE COURT:  Yes.  We've got a lift.

13        MR. CAPOZZI:  Okay.  Good.

14        THE COURT:  It's working; isn't it?

15        THE CLERK:  Yes, Your Honor.  It's slow, so it will

16  just be -- if he's next, I can lower it now.

17        THE COURT:  Well, no, we're still with --

18        MR. CAPOZZI:  It won't be until after lunch.

19        THE CLERK:  Okay.

20        THE COURT:  But we have a lift.  It's easily

21  accomplished.

22        All right.  Let's bring Mr. --

23        MR. CAPOZZI:  Reed.

24        THE COURT:  Thank you.  Mr. Reed back.  And bring the

25  jury in.

1        Counsel.  We got a letter that I think juror number

2   12 prepared for general purposes, kind of describing

3   everything that happened during the accident.  But the note

4   itself says, "I was in an accident, is it all right if I

5   stand?"  Does anyone have any objection to the Court returning

6   the letter and merely making the note part of the record?

7        MR. CAPOZZI:  No objection.

8        MR. GAPPA:  No objection.

9        THE COURT:  Let's return the letter to juror number

10  twelve.

11     (The jury entered the courtroom.)

12        THE CLERK:  The feedback is from someone's cell phone

13  being on.  If anyone in the courtroom has a cell phone on,

14  please turn it off.  Thank you.

15        THE COURT:  Yes.  If anyone has a cell phone on, if

16  they could turn it off.  That static that we get on the system

17  is from a cell phone.  Somebody's.

18        Let the record reflect we're back in the presence of

19  the jury.  Ladies and gentlemen, before we turn to

20  cross-examination, during the deposition that was played to

21  you, the defense moved certain exhibits into evidence during

22  the deposition.

23        First of all, Mr. Capozzi, are you moving those

24  exhibits into evidence here at trial?

25        MR. CAPOZZI:  I am, Your Honor.

1      THE COURT:  Mr. Gappa, is there any objection -- or

2   Mr. Pearson, is there any objection to the admission of those

3   exhibits?

4      MR. PEARSON:  No, Your Honor.

5      THE COURT:  Those exhibits will all be admitted.  You

6   might have noticed on the -- into evidence.  You might have

7   noticed that on the video, they were referred to as Exhibits

8   A, B, C, D and E.  Defense exhibits.  Because we already have

9   Defense Exhibits A, B, C, D, E, F -- well, I think we went all

10  the way through W, or about W.  The photographs that were

11  first introduced during the videotape deposition are going to

12  be, for our record purposes, A.1, B.1, C.1, D.1 and E.1.

13     (Defendant's Exhibits A.1, B.1, C.1, D.1 and E.1 were

14       received.)

15     THE COURT:  And is there cross-examination of this

16  witness?

17     MR. PEARSON:  Yes, Your Honor.

18     THE COURT:  You may proceed, Mr. Pearson.

19     MR. PEARSON:  Thank you.

20                   CROSS-EXAMINATION

21  BY MR. PEARSON:

22  Q.  Good afternoon, Mr. Reed.  How are you related to the

23  defendant?

24  A.  He is my wife's nephew.

25  Q.  So your nephew too?

1    A.   Yes.

2    Q.   How long did he work for you at Lock-N-Stitch?

3    A.   Well, he started in the summer of 2005 up through when he

4    was arrested.

5    Q.   So about eight years?

6    A.   Yep.

7    Q.   A little more than eight years.  And he was your IT

8    manager?

9    A.   Yes.

10   Q.   How was he as an IT manager?

11   A.   Actually did a pretty good job.

12   Q.   And what were his job duties as an IT manager?

13   A.   Well, quite a few.  You know, we were basically all

14   in-house and self-sufficient.  We even had our own website on

15   our own servers.  So that was kind of a big project.  So he

16   would keep everybody's PCs running.  Of course we'd have to

17   replace them from time to time.  We would have to repair them.

18   We added quite a bit during that period of time.  And so he

19   would help with -- you know, we'd have to run cables and, you

20   know, all these different kind of things to keep everybody

21   connected.  So it was a pretty big project.

22   Q.   How many computers or devices would you say he managed?

23   A.   Probably 30.

24   Q.   So he's pretty skilled technically; is that right?

25   A.   Yes.

1    Q.  Did you ever have someone come in and check your IT system

2    as well?

3    A.  We did.

4    Q.  And what were the results of that check?

5    A.  Said everything looked just wonderful to him.  And we did

6    that because we couldn't -- I couldn't validate what he was

7    doing or wasn't from a technical standpoint because I don't

8    know that stuff.

9    Q.  Was he also in charge of network security?

10   A.  Absolutely.

11   Q.  So making sure people protected their devices?

12   A.  It wasn't -- it wasn't -- nobody had access to the devices

13   from outside.  So there wasn't really any kind of a way to

14   protect the devices.  It was basically the network with fire

15   walls and that sort of stuff.  The best I understand.

16   Q.  Okay.  So you mentioned that, I think on direct, no one

17   had access to their devices outside.  What do you mean by

18   that?

19   A.  Okay.  So the way it's set up and still the same way.  We

20   have a large server.  And on that server, there are various

21   different -- they're kind of virtual drives, I guess the way

22   it is today.  But so there's one for our quality management

23   system.  There's one for our service department.  And so each

24   department -- some of the departments have their own virtual

25   drive on there.

1              But every individual who sits in front of a PC has

2      their own drive and it's on what we call the U drive or the

3      users drive.  And there's a folder there where they put their

4      documents and things like that.  And so we -- so that is set

5      up so that nobody from the outside can get past that and get

6      past it to the individual PCs.  But there's nothing kept on

7      the individual PCs usually.  Except programs.  Different kinds

8      of programs.  You know, like there's Microsoft and things like

9      that.

10             So the PC has to have its own operating system.  But

11     then it's connected through the network to these different

12     drives.  You know, we have one that's like a shared drive.  So

13     everybody has access to it.  There's forms and things there

14     they might need.  But each individual has what's called their

15     own user drive.  And that one today, there are four of us who

16     can get into that one remotely.  And that's all set up through

17     this outside company.

18             And the reason we do it that way, just to be clear,

19     is that is really designed for protection.  It's always a big

20     deal of mine, protection.  We talked about that earlier.  And

21     so I think probably the best way to see it visually is an

22     incoming thing like from the internet.  It goes to the server.

23     Then each individual is kind of connected to that.  So they

24     can, through their own drive -- but the main reason is we

25     don't -- we back up the servers.  We never back up the

1   individual PCs.

2          So if an employee didn't keep their files or their

3   data or their Word documents or whatever, if they didn't keep

4   it backed up -- if they didn't keep it in the -- on the U

5   drive on the server, it wouldn't get backed up and it could be

6   lost.  You know.  You remember the day when you lose your

7   computer and you lose everything.  Right?  So that's the way

8   it's done now.  So it's that kind of a system.

9   Q.   Okay.  You lost me a little bit there.  I guess my main

10  question is did the defendant have the ability to access his

11  computer from home?  Could he work remotely?

12  A.   The desktop?  Not that I know of.

13  Q.   Okay.

14  A.   I -- that was kind of forboden.

15  Q.   But he did work from home; correct?

16  A.   He could get into the server, yes.

17  Q.   And he did that frequently; right?

18  A.   I believe so, yeah.

19  Q.   Now, you mentioned that his computer was password

20  protected; is that right?

21  A.   All of them are.

22  Q.   And you didn't have his password; right?  No one had his

23  password?

24  A.   Nor anybody else's.

25  Q.   And part of the defendant's job duties were making sure

1   that no one downloaded pornography on the work computers; is

2   that correct?

3   A.  That is correct.

4   Q.  And you take that policy seriously?

5   A.  Absolutely.

6   Q.  And, in fact, you mentioned that you fired an employee for

7   downloading pornography?

8   A.  Yes.

9   Q.  So you must have taken it very seriously when Ceres Police

10  Officers executed a search warrant on September 19th?

11  A.  Absolutely.

12  Q.  And then they told you that they'd found child pornography

13  on the computer?

14  A.  Yes.

15  Q.  On the computer in the IT office?

16  A.  Yes.

17  Q.  That only the defendant had the password to?

18  A.  Yes.

19  Q.  And did you -- you let your nephew come back to work after

20  that?

21  A.  Yes.

22  Q.  In fact, he came back to work the next day; right?

23  A.  I'm not sure if it was the next day or what, but yes.  We

24  still needed his services and we certainly didn't believe that

25  he did anything like that.  So we still trusted him.

1  Q.  All right.  Let's talk a little bit about the work

2  schedule that was submitted as Defense Exhibit D.

3       MR. CAPOZZI:  I think it was.

4  BY MR. PEARSON:

5  Q.  Defense Exhibit D.  You mentioned that they're time

6  sheets; is that right?

7  A.  No.  Well, we use time clocks.  Today they're digital,

8  protected by -- you have to use your thumbprint or

9  fingerprint.  Biometric, whatever.  So, you know, that is

10  how -- for hourly people, they punch a time clock.  Salaried

11  people don't.  But everybody, when they are going to be off or

12  doing something other than they're at work every day, they

13  have to fill out this form.  I sign them every day for people.

14  You know, they come up the line.

15       I'm in charge of a good part of the company.  And so

16  they'll bring them in, put them on my desk and we talk about

17  it, whether I'm going to approve their time off, their

18  vacation when they want to or whatever.  So, you know, it's

19  just a form.  And then I give it back to them.  And they take

20  it and turn it in to the clerk who posts it on the company

21  calendar.

22  Q.  Okay.  So then Exhibit D is just your record of dates that

23  an employee was not working; is that right?

24  A.  Well, this particular record is.  I mean, if I brought the

25  whole thing in that had every day that somebody was there.  So

1  they went -- the clerk went through and just pulled out all

2  those records and each page has a separate line item of when

3  he wasn't there.

4  Q.  So are there records of when an employee was there?

5  A.  Oh, yes.

6  Q.  And we don't have those though.

7  A.  No.  They're the days that aren't on that list, I guess.

8  Q.  So from what we do have here, can we assume that if

9  there's not a day off listed, that the defendant was in the

10  office that day?

11  A.  Yes.

12  Q.  And he was personally physically in the office; is that

13  right?

14  A.  That's right.

15  Q.  He wouldn't have been working from home remotely?

16  A.  If he was at home, it would reflect that an alternative

17  schedule or something like that.  So he would -- because

18  there's times when we would do backups.  And he had to do them

19  on the weekends when people -- or at night time when people

20  weren't there.  That's what that was about.

21  Q.  And do these records reflect the hours that the defendant

22  would have been working from home?

23  A.  No.

24  Q.  Okay.  What do they reflect, then, when the defendant is

25  working from home?

1  A.  Those records?

2  Q.  Yes.

3  A.  They -- it says "alternate schedule," which in Adam's

4  case -- he was the only one that did this.  If he wasn't -- if

5  he was on alternate, he was working from home.  So he was

6  working, it wasn't time off when it said that.  Now, also on

7  there would be times if he had a vacation or whatever.  It's

8  just when he wasn't physically there is what it means.

9  Q.  Okay.  So if there's not an entry in this list of exhibits

10  and it doesn't indicate alternative schedule, that means the

11  defendant was physically present in the office; is that right?

12  A.  I believe that's correct.

13  Q.  And I guess probably Monday through Friday?

14  A.  Uh-huh.

15  Q.  What times generally?

16  A.  Well, we're open from six to five.  So it could vary, I

17  suppose.  Depending on what he needed to do.  If we're talking

18  about Adam's case, he might come in earlier or come in later.

19  Because, you know, again, we couldn't do a lot of things when

20  the whole system was up.  So --

21  Q.  Sure.  IT hours, have to work at night or --

22  A.  Could be various.

23  Q.  Got you.  So he could -- there would be times where he

24  would leave early; is that right?  Before -- early meaning

25  before five.

Gary Reed - X

784

1   A.  I don't -- I don't really recall there being times when he

2   would leave early.  He was usually -- I mean, it was kind of a

3   known thing when he was going to set these things up.  So we

4   knew in advance.  But he would usually be there that day or

5   not there that day, as I remember.

6   Q.  Okay.  Do you remember September 19th, the day of the

7   search warrant?

8   A.  Yes.

9   Q.  Is there an indication in this folder that the defendant

10  was off work on September 19th?

11  A.  I honestly don't know.

12  Q.  Okay.  Would you please flip through Exhibit -- may I

13  approach, Your Honor?

14          THE COURT:  You may.

15  BY MR. PEARSON:

16  Q.  All right.  So I just showed you Defense Exhibit 5.  What

17  is the date on that exhibit?

18  A.  The one that's here?

19  Q.  Yeah.

20  A.  September 6th.

21          THE COURT:  I'm confused.

22          MR. PEARSON:  Yes, Your Honor.

23          THE COURT:  This is Defense Exhibit D.

24          MR. PEARSON:  I'm sorry.  Defense Exhibit D.  It's

25  page 5 of Defense Exhibit D.  I apologize.

1          THE COURT:  And when you say it's page 5 --

2          MR. PEARSON:  There are Bates numbers at the bottom

3  right.

4          THE WITNESS:  005.

5          THE COURT:  Just so the record is clear.  At those

6  pages, the exhibit is mistakenly referred to as Defense

7  Exhibit E.  It's actually Defense Exhibit D.

8          MR. PEARSON:  D.

9          MR. CAPOZZI:  Yes.

10          THE COURT:  And we're looking at 005?

11          MR. PEARSON:  Correct.

12          THE COURT:  Thank you.

13  BY MR. PEARSON:

14  Q.  What is the date on that page?

15  A.  September 6th, 2013.

16  Q.  Will you please flip to page 4 of Defense Exhibit D.  It

17  will be the other way.  All right.  What is the date on page

18  4?

19  A.  September 20.

20  Q.  Okay.  So no entry in between those dates for September

21  19th; is that right?

22  A.  Correct.

23  Q.  Thank you.  So no entry, we know, means that the defendant

24  was at work until five p.m.; is that right?

25  A.  That's what it would -- was intended to do, yes.

1   Q.  And you were there at the day of the search; right?

2   A.  Yes.

3   Q.  Was the defendant at work?

4   A.  Not at that time.

5   Q.  And what time was that?  About two in the afternoon?

6   A.  Yeah, it was in the early afternoon.

7   Q.  Okay.  And at some point -- how long did the search take?

8   A few hours?

9   A.  No.  I think probably -- it was pretty frenetic.  About an

10  hour.  I think.  Basically.  To -- it could have been two, but

11  hour, one to two hours.  Something like that.

12  Q.  And the defendant wasn't at work that entire time --

13  A.  No.

14  Q.  Is that right?

15  A.  Yes.

16  Q.  So when you say that -- when you said there wasn't an

17  entry here, it meant the defendant was at work until five.

18  That's not always correct; is that right?

19  A.  Well, you know, I don't know.  Not always correct.  I

20  mean, it's the best we can do.

21  Q.  Okay.

22  A.  It's a --

23  Q.  But there are records where they actually indicate the

24  times that he was in the office; is that right?

25  A.  Because he's on a salary, we did not track the days he was

1    there.

2    Q.   You tracked the --

3    A.   Because he doesn't punch a time clock.

4    Q.   So he wouldn't have to punch in and punch out at all?

5    A.   He didn't have to do that.

6    Q.   And he was just there because he wasn't out; is that

7    right?

8    A.   Say that again.

9    Q.   So he was just -- that was a bad question.  So you can say

10   that he was there because it didn't indicate on this exhibit

11   that he was out.

12   A.   That would be the assumption, yes.

13   Q.   How often did he work from home?

14   A.   Several times a month.  Best I can say.  They just all

15   kind of ran together, so --

16   Q.   Was that -- did he ever work from home during the weeks?

17   A.   Yeah.  Yeah, it happened a few times.  Again, if he was

18   going to be working all weekend, he might be home for, let's

19   say, you know, Thursday and Friday and then we'd work through

20   the weekend doing backups or whatever.  Downloading and stuff.

21   Q.   Now, and that would be indicated with alternative

22   schedule; is that right?  In this exhibit.

23   A.   That's the way it is intended, yes.

24   Q.   Now, would it surprise you to learn that there were no

25   week days with an alternative schedule in September?

1    A.   It wouldn't surprise me.

2    Q.   Would it surprise you to learn that there were no week

3    days with alternative schedule in August?

4    A.   Yeah, I -- no, it wouldn't.  I mean, I don't really know

5    when that was used and when it wasn't.  It was just something

6    that they -- you know, basically keeping track of with an

7    individual who's on salary, it's vacation days and things like

8    that.  So -- but yeah, I -- I don't have a reference to it.

9    Q.   And there are, in fact, other days where the record states

10   that Adam was out and then specifies working remotely; is that

11   right?

12   A.   Yes.

13   Q.   Would it surprise you to learn there were none of those in

14   September?

15   A.   No.

16   Q.   And none in August.

17   A.   Again, I don't really have a -- it wouldn't surprise me.

18   I just -- I don't know.

19            MR. PEARSON:  May I have a moment, Your Honor?

20            THE COURT:  Yes.

21            MR. PEARSON:  Nothing further.

22            MR. CAPOZZI:  I do, Your Honor.

23            THE COURT:  Any redirect?

24            MR. CAPOZZI:  Yeah.

25   ///

1                    REDIRECT EXAMINATION

2  BY MR. CAPOZZI:

3  Q.   On September 19th, that was the day of the search; is that

4  correct?

5  A.   Yes.

6  Q.   Was it hectic that day?

7  A.   When the search went on, yes.

8  Q.   Do you know whether or not Adam had put in a form that he

9  was leaving early?

10  A.   I don't know.

11  Q.   With everything going on that day, could it have not been

12  put on the schedule because of his --

13  A.   Absolutely.

14  Q.   Was the place in turmoil on the 19th?

15  A.   Complete.

16  Q.   Tell us about the search?  Did they close down the plant?

17  A.   Oh, yeah.  It was really a very traumatic experience for a

18  lot of our employees.  They came in, some of them didn't even

19  have on -- their clothes didn't say "police."  They had

20  camouflaged.  Most of them are using -- had assault rifles in

21  their hands.  We had one individual sitting in his car taking

22  a break and one of them comes up and taps on the window with a

23  rifle pointing it at him.  So there was a lot of fear.  They

24  were yelling at everybody.  Nobody could even understand what

25  they were saying.  And they -- they got everybody, you know,

Gary Reed - #30

790

1    "Get away from your computer.  Come with us."

2          And then everybody went up to the big -- we have a

3    big training room.  And by the time I got up there, they had

4    even been over to one of the other buildings.  It was another

5    company completely and they had those people over there.

6    Yeah, it was -- they didn't really even know what they were

7    getting themselves into, they admitted to me openly.  Didn't

8    really know how many people were here or anything.  And so it

9    was a -- people left and went home.  I mean, they were scared

10   to death.

11   Q.  So --

12   A.  They didn't know what was going on.

13   Q.  Some employees left work then that day?

14   A.  Oh, yeah.

15   Q.  And what time of day was it?

16   A.  Two-ish.  And by the time they left, three, I don't know,

17   3:30, I don't know.

18   Q.  So certain things might not have been done at work that

19   day?

20   A.  I don't think anything else got done that day by anybody.

21   Q.  Going back, you mentioned that there was -- you had

22   somebody come in and do a network audit?

23   A.  Yes.

24   Q.  Was this by somebody on the outside?

25   A.  Yes.  It was an independent.  We -- we have to do reviews

1   of our employees.  And their -- and what they do.  They are

2   ISO certified, which is a quality management system by an

3   outside company.  And we have to review the performance of our

4   people.  And so we didn't quite know where to go to.

5          So we did some searching around, through some of the

6   local, you know, computer places and got the name of a guy who

7   kind of did some freelancing stuff like that.  And so we paid

8   him to come in and just check the whole thing out.  Just asked

9   Adam to go out.  He gave him access.  And he went through and

10  basically just checked security.  That's always a big thing.

11  Checked security.  And just to see if the system is set up

12  well, is set up correct.

13  Q.  Did you specifically find out from that audit whether or

14  not -- did he verify that there was no outside access to the

15  computers of individual employees?

16          MR. PEARSON:  Objection.  Hearsay.

17          THE WITNESS:  I --

18          THE COURT:  Hold on.

19          MR. CAPOZZI:  Wait.

20          THE COURT:  Rephrase.  Sustained.

21  BY MR. CAPOZZI:

22  Q.  There was an audit done by this outside person.  Correct?

23  A.  Yes.

24  Q.  Were you able to determine, after that audit was done,

25  whether or not there was access from outside the plant to the

1    computers inside the plant?

2              MR. PEARSON:  Objection.  Foundation and hearsay.

3              MR. CAPOZZI:  Let me --

4              THE COURT:  Overruled.

5              MR. CAPOZZI:  Did you read --

6              THE COURT:  Did you learn anything as a result of

7    that audit?

8              MR. CAPOZZI:  Right.  Thank you.

9    Q.   Can you answer that question?

10   A.   Okay.  What we learned was --

11             MR. PEARSON:  Objection.  Hearsay.

12             THE COURT:  Overruled.  You can object to my

13   questions.  No, feel free.  I'll reconsider.  But I think

14   that's an okay question.  Did you learn anything as a result

15   of that audit?

16             MR. CAPOZZI:  That was overruled --

17             THE COURT:  With respect to outside access to desktop

18   computers.

19   BY MR. CAPOZZI:

20   Q.   Can you answer that?

21   A.   We earned that the system was secure.  That it was

22   functioning the way it was intended to.  That we didn't have

23   viruses running amuck in our system.  That the overall setup

24   of the network was within standards like Microsoft and such.

25   Okay?  Because that's the products we use.

1       And so the whole issue of not having access to

2  computers was basic -- that was just base.  That was just the

3  whole system was built that way.  And so he verified that

4  everything was set up appropriately, to the best of my

5  knowledge and memory.

6  Q.  The fact that from the outside computers you could not

7  remote access to computers inside the business?

8  A.  Yes.

9           MR. CAPOZZI:  Okay.  Thank you.  No more questions.

10          THE COURT:  Recross.

11          MR. PEARSON:  Nothing further, Your Honor.

12          THE COURT:  May this witness be excused?

13          MR. CAPOZZI:  Yes, Your Honor.

14          THE COURT:  Thank you, sir.

15          THE WITNESS:  Thank you.

16          THE COURT:  The defense next witness.

17          MR. CAPOZZI:  Louise Reed.

18          THE CLERK:  Good morning.  Please approach the

19  witness stand.

20                         **LOUISE ANN REED**,

21  called as a witness on behalf of the Defendant, having been

22  first duly sworn, testified as follows:

23          THE CLERK:  Please have a seat.  State your full name

24  for the record and spell it.

25

794

1                          DIRECT EXAMINATION

2     BY MR. CAPOZZI:

3     Q.  Can you pull that microphone up close.  And can you state

4     your name, please.

5     A.  My name is Louise Ann Reed.

6     Q.  And Reed is spelled R-E-E-D?

7     A.  Correct.

8     Q.  Okay.  Are you a co-owner of a business?

9     A.  Yes.  I am.

10    Q.  And the name of it?

11    A.  Lock-N-Stitch.

12    Q.  Okay.  And is that in Turlock, California?

13    A.  Yes, it is.

14    Q.  And do you know who the other owner is?

15    A.  Yes.  My husband.

16    Q.  Okay.  Do you go to work every day there?

17    A.  Yes.

18    Q.  What's your job there at the business?

19    A.  Well, I'm an administrative type.  I act a little -- I get

20    involved in the warehouse.  I get involved in costing.  I get

21    involved in HR.  I prepare reports out of accounting, but mine

22    are minimal.  We have accounting people for that.  I take care

23    of a lot of the social.  I'm constantly busy.

24    Q.  Are you there from Monday through Friday?

25    A.  Yes.  And some --

795

1   Q.   Your hours?

2   A.   Yeah.   We put in a lot of hours.

3   Q.   Okay.   Are you there on the weekends?

4   A.   On occasion.   But it's just us because then sometimes it's

5   quieter and we can get more done.

6   Q.   Yes.   Do you know Adam Henry?

7   A.   Yes.

8   Q.   How do you know him?

9   A.   He is my nephew.   He is my sister's son.

10   Q.   And where did he work?

11   A.   Starting in summer of 2005, he worked at Lock-N-Stitch

12   with us.

13   Q.   Up until the time of September 2013?

14   A.   2013.

15   Q.   Do you -- what was Adam's job?

16   A.   He was our IT guy.

17   Q.   And is this Adam, your nephew, here in the courtroom

18   today?

19   A.   Yes.

20   Q.   Okay.   So he took care of computers, et cetera?

21   A.   He did.   And we're a small business.   So it kind of meant

22   anything and everything.   He'd work on the phones for us too.

23   He set up a wireless routers because we were run seam

24   machinery.   Just a little bit of everything.   In a small

25   business, you just wear a lot of hats.   If you've got the

1    skill set and we've got the need, we kind of put you together.

2    Q.   Do you know Angele Henry?

3    A.   Yes, I do.

4    Q.   And who is Angele Henry?

5    A.   She is Adam Henry's wife.

6    Q.   All right.  And would she ever come by the business?

7    A.   Yes.

8    Q.   And do you know why she would come by?

9    A.   Well, they had one car between them.  And she had two

10   small children, who were in school.  And so they would all

11   make the trek in the morning and drop Adam off at work.  And

12   make the trek back in the evening to pick him up.

13   Q.   You say "in the evening," what time about are you talking?

14   A.   Well, depending on the work load.  I mean, we would like

15   to say, you know, work is 7:30 to 4.  But it --

16   Q.   And your husband said 6 to five.

17   A.   Well, I would like to say it's 7:30 to 4.  But the reality

18   is we have shifts that start at six.  Gary and I traditionally

19   say seven.  Adam sometimes stayed later.  Sometimes he was

20   doing overnight things and had to come in and out to do.  So

21   it -- you just say, "Here's the work load.  Work the load."

22   Q.   Okay.  Would you see Angele Henry come by in the

23   afternoons?

24   A.   Yes.

25   Q.   And would she have anybody with her?

1   A.   Yes.  Her two children, Siobhan and Aidan.

2   Q.   And what would they do when they were there?

3   A.   Well, they're children.  They would come in to our

4   offices.  My daughter also works there.  She runs accounting.

5   They would go into her office.  They would come into my

6   office.

7   Q.   You say "they," all three?

8   A.   No.  No.  Not all three.  Angele would come in.  She would

9   bring the two children.  And on occasion, then she would walk

10  them to one of our offices and then she would disappear.  And

11  then we would entertain or try to educate the children.

12  Q.   Okay.  All right.  And did you ever see Angele go to

13  Adam's office?

14  A.   Yes.

15  Q.   Did you ever see her at his desk?

16  A.   Yes.

17  Q.   On how many occasions?

18  A.   I could not tell you how many, but it was more than enough

19  for me to accept it.  That's what I would see when I would

20  walk by the office.

21  Q.   Did she ever talk to you first before going in to Adam's

22  office?

23  A.   Yes.

24  Q.   Can you explain the circumstances?

25  A.   She would -- I felt like come in, just to greet, say hi

1    and leave the kids.  That's how I felt.  And I admit, as I

2    would kind of get upset about, "Hey, I'm at work.  I want to

3    get things done."  But still appreciated the little courtesy

4    of coming by and leaving the children.  At least greeting me.

5    There was one time when I got a little more irritated about it

6    because I was already feeling irritated because the children

7    were interfering with work.  Not their fault.  They were being

8    kids.

9    Q.  And she wasn't with the children at the time?

10   A.  Right.

11   Q.  Okay.  Where was she?

12   A.  Sometimes I would see her in Adam's office.  And other

13   times I don't know where she went.

14   Q.  All right.  Did you ever see her in Adam's office when

15   Adam wasn't there?

16   A.  Oh, yes.

17   Q.  Numerous times?

18   A.  Yes.  Because a lot of Adam's duties were out and about in

19   the plant.

20   Q.  Okay.  Was there ever an occasion that she sought

21   permission to use his computer in his office?

22   A.  There was a situation that was close to that.

23   Q.  Can you tell us.

24   A.  She -- she came in with the kids right after they had gone

25   on a trip.  I believe it was their honeymoon.

1    Q.   Do you know what month it was?

2    A.   Give me a minute.  I have to -- it's been a while.  This

3    particular thing I'm thinking of was end of May of 2013 or

4    first of June maybe, because --

5    Q.   Okay.

6    A.   Trying to think of when they left for this honeymoon.  But

7    it was after they came back.

8    Q.   All right.

9    A.   And the kids were just excited.  Had all kinds of stories

10   and talking.  And something about what they said, something

11   about what they said triggered her to make a comment like --

12            MR. GAPPA:  Objection, Your Honor.  Hearsay.

13            THE COURT:  Sustained.  Ask a question.

14   BY MR. CAPOZZI:

15   Q.   All right.  Pursuant to the comment, what did she do?

16   A.   She started walking out of my room.

17   Q.   She was in your office?

18   A.   She was standing in my office and started to walk out.

19   Q.   What was your impression that she was going to do --

20   A.   She was --

21   Q.   -- when she walked out?

22   A.   My impression was she was headed to Adam 's office to look

23   something up on the internet.

24   Q.   Look what?

25   A.   Look something up on the internet.

1    Q.   On Adam's computer?

2    A.   Yes.

3    Q.   Did she ask you for the password?

4    A.   No.

5    Q.   But after that conversation with her, she left the office.

6    And did you see her go to Adam's room?

7    A.   Yes.

8    Q.   And work on a computer?

9    A.   I couldn't see the computer from my desk.

10   Q.   Okay.

11   A.   And then I got involved with the kids.

12   Q.   All right.

13   A.   And the reason it sticks out is because --

14        MR. GAPPA:  Objection, Your Honor.  There's no

15   question.

16   BY MR. CAPOZZI:

17   Q.   Why does that --

18        THE COURT:  Hold on.

19        MR. CAPOZZI:  I'm sorry, judge.

20        THE COURT:  Sustained.  Ask a question.

21        MR. CAPOZZI:  Yes.

22   Q.   Why do you remember this?

23   A.   Because I was irritated at myself.

24   Q.   Why?

25   A.   I flashed a little that she was going to go work on our

1    computers, which was obviously going to be a personal thing.

2    But I was upset with myself for not saying something to her.

3    That I kind of just backed off because I didn't want to

4    confront her in front of the kids because I'm not a confronted

5    person.  But I didn't tell her, "Wait a minute.  That's our

6    company stuff.  Can't you do that at home?"  But I didn't say

7    it.

8    Q.  Did she ask you for the password before she went in there?

9    A.  No, huh-uh.

10   Q.  Do you have an opinion as to whether or not Adam is a

11   truthful person?

12   A.  Yes, I do.

13   Q.  And what's that opinion?

14   A.  He is a truthful person.

15   Q.  Why do you say that?

16   A.  Many years of interactions with him.  Things at work that

17   I knew when I would ask, the answer I was -- if I got the

18   right answer, I wasn't going to be happy about it.  And I did

19   get the right answer.  I've seen him in interactions with

20   co-workers.  I see the way they interact with him.  I believe

21   he is a truthful person.

22        MR. CAPOZZI:  Thank you.  I have no more questions.

23   Thank you very much.

24        THE COURT:  Cross-examination.

25        MR. GAPPA:  Thank you, Your Honor.

                            CROSS-EXAMINATION

BY MR. GAPPA:

Q.  Good morning, Ms. Reed.  You are the defendant's aunt.  Is

that right?

A.  That is correct.

Q.  And you're related to his mother?

A.  Yes.  She is my sister.

Q.  And so you obviously are considering him a family member;

correct?

A.  Yes, I do.

Q.  And you've known him for quite a while?

A.  Yes, I have.

Q.  You'd rather not see him convicted for any crime; correct?

A.  That is correct.

Q.  There were times when he would work from home; correct?

A.  Yes.

Q.  And you said that his schedule was somewhat flexible?

A.  It was to accommodate overnight batching -- I'm sorry.  I

don't know all the words.  But I know there were things that

had to be done while we weren't working.

Q.  Okay.  And you obviously, with the number of employees at

your company, don't know what every employee is doing at every

moment; correct?

A.  Correct.

Q.  So you don't know whether he was downloading pornography

1  on his computer at work; correct?

2  A.  I have no knowledge of that.

3  Q.  Did you ever look at what he was doing on his computer at

4  work?

5  A.  Do you mean walk behind him and look?  Or after hours go

6  in and peek?

7  Q.  Either.

8  A.  Go behind him and look, yes.  Just in a normal course of

9  business, I'm walking up, I got to talk to him about

10  something.  I will walk up right behind people and glance.

11  Q.  But you don't know what was on his computer?

12  A.  Whatever was up there, I could see.  And he wasn't -- you

13  know, some people you walk behind, they diminish real quick.

14  He didn't do that.

15  Q.  You don't know what was on his computer; correct?

16  A.  In the hard drive, no.

17  Q.  Okay.  And you've never looked at his computers at home;

18  correct?

19  A.  Correct.

20  Q.  So you don't know what he was doing on his home computers?

21         THE COURT:  Didn't get an answer to that question.

22         THE WITNESS:  Oh sorry.  No.  Thank you.

23  BY MR. GAPPA:

24  Q.  Now, did it bother you at all that Angele would, according

25  to your testimony, bring defendant's children to the work

1  place?

2  A.  Yes.  It did.

3  Q.  You were co-owner of the company.  Correct?

4  A.  Yes.

5  Q.  And according to your testimony, this happened regularly;

6  correct?

7  A.  Yes.

8  Q.  But you never said anything to her?

9  A.  No.

10  Q.  About bringing the children?  You never said anything to

11  the defendant about it?

12  A.  No.

13  Q.  And so if the children were a distraction at work, did you

14  ever mention to the defendant, "maybe you should not have

15  Angele do anything except pick you up and take you home"?

16  A.  No, I did not.

17  Q.  And again, you don't know what she did on a computer, if

18  she even used a computer in his office; correct?

19  A.  No.  I don't.

20         MR. GAPPA:  Your Honor, I don't have any other

21  questions.

22         THE COURT:  Any redirect?

23         MR. CAPOZZI:  No, judge.

24         THE COURT:  May this witness be excused?

25         MR. CAPOZZI:  Yes, Your Honor.

1          THE COURT:  Government?  Yes?  Excused?

2          MR. GAPPA:  Yes.  Correct.

3          THE COURT:  Thank you, ma'am.  You're free to go.

4          THE WITNESS:  Thank you.

5          THE COURT:  Next defense witness.

6          MR. CAPOZZI:  Yes.

7          THE COURT:  Are we checking?

8          MR. CAPOZZI:  Judge, can we have a quick recess?

9          THE COURT:  Right.  Are we checking on anyone?

10         MR. CAPOZZI:  No.  We're fine out there.

11         THE COURT:  Ladies and gentlemen, we're going to take

12    about a seven-minute recess.  Please heed the Court's previous

13    admonition.  This is not our lunch break.  I'd give you longer

14    than seven minutes.  All right?

15      (The jury left the courtroom.)

16         THE COURT:  Let the record reflect we're outside the

17    jury's presence.  We'll get Mr. Henry moved.  He's the next

18    witness.

19      (Recess.)

20      (The jury entered the courtroom.)

21         THE COURT:  Mr. Capozzi, the next defense witness.

22    We are back in the presence of the jury.

23         MR. CAPOZZI:  Call Adam Henry, Your Honor.

24

25

1                          **ADAM ALAN HENRY**,

2    called as a witness on behalf of the Defendants, having been

3    first duly sworn, testified as follows:

4           THE CLERK:  Please have a seat.  State your full name

5    for the record and spell it.

6           THE WITNESS:  Adam Alan Henry.  A-D-A-M A-L-A-N

7    H-E-N-R-Y.

8                          DIRECT EXAMINATION

9    BY MR. CAPOZZI:

10   Q.  Okay.  I didn't hear a thing.  Can you spoke closer to

11   that.

12   A.  Adam Alan Henry.  Is that better?

13   Q.  Better.

14   A.  A-D-A-M A-L-A-N H-E-N-R-Y.

15   Q.  Adam, how old are you?

16   A.  39.

17   Q.  39?

18   A.  Yes, sir.

19   Q.  Where were you working when all of this incident occurred?

20   A.  Lock-N-Stitch in Turlock, California.

21   Q.  And your position?

22   A.  The IT manager.

23   Q.  I'm sorry?

24   A.  The IT manager.

25   Q.  What was your job?  What did it include?

1   A.   Pretty much anything with a circuit in it.  I did

2   telephones.  I did some of the remote wireless for the

3   computer controlled machines in the background.  The computers

4   themselves.  Just kind of a basket of everything.

5   Q.   Okay.  I'm going to jump to something else right now

6   before we get into the work there.  Were you living with

7   another woman, someone named Rebecca Jackson, prior to being

8   married to Angele Henry?

9   A.   Different name, but yes.  Same woman.

10  Q.   Her name was different back when you were with her?

11  A.   Yes.

12  Q.   You were living together with her?

13  A.   Yes, sir.

14  Q.   You saw her testify yesterday:

15  A.   Yes, sir.

16  Q.   Did you set up a camera in the bathroom of the house the

17  two of you were living in?

18  A.   Yes, sir.

19  Q.   And how did that come about and why?

20  A.   We were each other's second significant relationship each

21  and we were kind of going through the whole, you know,

22  experimental stage.  Just try a little bit of everything, see

23  what -- finding out what types of things we liked, I guess.

24  And that was some of -- the camera was a part of that.

25  Q.   You did install a camera in that bathroom?

808

1    A.   Yes, sir.

2    Q.   Did she have knowledge of that?

3    A.   Yes, sir.

4    Q.   Did you talk to her first before you did that?

5    A.   In fact, actually in a couple of those that were shown,

6    she was watching it and telling me how to angle it.  Yes.

7    Q.   All right.  And again, why did you guys do that?

8    A.   Just playing around to be honest.

9    Q.   And was she ever videoed on that camera?

10   A.   Yes.

11   Q.   And at the time she was being videoed, did you tell her?

12   A.   She was part of turning it on, so I didn't have to -- I

13   didn't specifically say, "hey," because we were both standing

14   there turning it on.

15   Q.   Did you turn it on when she's in the shower without her

16   knowing it?

17   A.   No.

18   Q.   How long did you live together with her?

19   A.   Barring a few month gap at one point, basically five

20   years.

21   Q.   Five years.

22   A.   Yes, sir.

23   Q.   At some point did you meet Angele Henry, then Angele

24   Brennan?

25   A.   Angele Brennan, yes.

1   Q.   And how did you meet Angele?

2   A.   Rebecca was -- she tended to bring her work home.  So

3   she'd be working evenings and to pass the time sometimes I'd

4   play around on online video game.  And one of the people that

5   I ended up spending time with online just doing stuff

6   was -- turned out to be Angele.

7   Q.   Okay.  You're playing a game on a computer?

8   A.   Yes.  With people around the world.  And she just happened

9   to be one of them.

10   Q.   What game was this?

11   A.   It was called World of Warcraft.  It's an cartoony

12   like --

13   Q.   Try to speak into the --

14   A.   It's called World of Warcraft.  Cartoony type -- just a

15   time passer.

16   Q.   How do you play the game?  You assume a role and someone

17   else assumes another role?

18   A.   Yes.  The characters have names.

19   Q.   And how do you know it was Angele Henry -- or Brennan on

20   the other side?

21   A.   Through a long process.  Initially she was just the

22   character of whatever.  We ended up -- our characters worked

23   well together, so over time we started talking more in game

24   and then some of the activities in the game are better

25   facilitated by voice chats.  So we'd start doing that.  And

1  just over time started talking more, getting to know each
2  other.
3  Q.  Okay.  Did she assume any names in the games that you were
4  playing?
5  A.  Yes.  She had two main characters that she would switch
6  back and forth.
7  Q.  And what were the main characters?
8  A.  Her primary was named Sylvia, her secondary was named
9  Aurrora.
10  Q.  Aurrora.
11  A.  Yes, sir.
12  Q.  Did those names ultimately turn up on your computers?
13  A.  They were used when we set up the Netgear, yes, sir.
14  Q.  All right.  Why were those names used?
15  A.  It was actually her choice.  She chose the network name of
16  Pink Lagoon and then we just picked those names.  I believe,
17  if I remember correctly, the password share got named Aurrora
18  and then her individual folder that she kept all her personal
19  private videos in was named Sylvia.
20  Q.  Was that on the Aurrora side of the Netgear?
21  A.  Yes.
22  Q.  Did she have access to that?
23  A.  Yes, sir.
24  Q.  Did she have the password to that?
25  A.  Yes, sir.

811

1    Q.   Did you ever tell Detective Hively that she did not have
2    the password?
3    A.   No, sir.
4    Q.   Did you tell him she had the password?
5    A.   I believe my exact words were "she had the pass," at one
6    point.  "Pass" short for password.
7    Q.   So you met her on a computer.
8    A.   Yes, sir.
9    Q.   And did she give you her personal background, et cetera,
10   while you were playing this game?
11   A.   Again, not for a long time.  It's one of those things,
12   you're anonymous -- you don't know the other person on the
13   other side and you just kind of slowly start getting to know
14   somebody.  It's probably a slower process than in real life.
15   But eventually we got to know each other, trust each other
16   enough that we started sharing more and more information.
17   Q.   Did you tell her you were living with somebody else?
18   A.   Yes.  Actually, in -- for a long time, in order to avoid
19   unnecessary complications, I used to just say "yeah, I'm
20   married" just to not have to deal with drama.
21   Q.   Did she -- did you find out whether or not she was married
22   at the time?
23   A.   Eventually I learned that -- I can't remember the exact
24   timing, but she was either -- I believe she was in the middle
25   of going through a divorce right when we started getting to

1    that point of information sharing.

2    Q.   Okay.  And when did you start chatting with her on this

3    game?  What year?

4    A.   At what point did I first meet the character?  Or actually

5    start exchanging personal information?

6    Q.   Probably the personal information.

7    A.   That would have been towards the latter end of 2008, I

8    believe.

9    Q.   Okay.  And that's when she revealed who she was and you

10   revealed who you were?

11   A.   Names were not really exchanged.  By personal information,

12   it was more, "Hey, I happen to be living in this time zone,

13   this city," then it got to here's the general -- it was a very

14   slow leaking of information.

15   Q.   Where did you ultimately learn she was living?

16   A.   Toronto, Ontario, Canada.

17   Q.   Canada?

18   A.   Yes, sir.

19   Q.   And you told her where you were living?

20   A.   Yes.  Yes, sir.

21   Q.   Did she -- did you ever invite her to come out, to meet

22   her personally?

23   A.   Yes.  Eventually when the divorce was final, she was

24   looking to spread her wings, do a little bit of touristy

25   stuff.  I offered to show her around California, she came out.

813

1   Q.  When did she come out?

2   A.  The first time was about a year after that, latter end of

3   2009, I believe.

4   Q.  Some time in 2009?

5   A.  Yes, sir.

6   Q.  You said the latter end?

7   A.  I believe so.

8   Q.  Okay.  How long was she here the first time?

9   A.  The first time?  Not very long, maybe like a week.

10  Q.  Okay.  And then did you continue the communication with

11  her?

12  A.  Yes.  After we actually met each other face to face, it

13  kind of -- started talking more.  That was right about the

14  time Rebecca and I were starting to drift apart.  We

15  eventually were still living together, but we were roommates

16  basically.  Separate lives.  Separate rooms.  All that.  And

17  Angele ended up becoming my best friend.

18  Q.  Okay.  Did she come out again?

19  A.  Frequently, yes, sir.

20  Q.  Did she ever bring the children with her?

21  A.  Eventually, once we learned enough about each other that

22  she trusted me around her children, yes.

23  Q.  Okay.  Did she -- when she came out to stay with you, did

24  she stay with you when Rebecca was there?

25  A.  When I was still with Rebecca, living with Rebecca, no.

814

1   She would usually get a motel.  After we were roommates, she

2   would tend to stay, yes.

3   Q.  So at some point you and Rebecca moved on, separate

4   residences?

5   A.  Eventually, yes, sir.

6   Q.  After you did that, were you living in an apartment?

7   A.  Yes, sir.

8   Q.  Would Angele then come out and stay with you in the

9   apartment?

10  A.  She helped me move into the apartment.  Yes, sir.  And

11  then she would come out and stay.

12  Q.  Did you have a computer in the apartment?

13  A.  Just one at that point because there wasn't much room.

14  Q.  Was it any of the ones in this case that we have?

15  A.  I don't believe so.  I believe it's been reformatted,

16  retasked, yeah.

17  Q.  All right.  At some point did you then move from that

18  apartment to a place, a house?

19  A.  Yes, sir.

20  Q.  Where?

21  A.  That would be the Burman Drive address.

22  Q.  And that's where the search took place?

23  A.  Yes, sir.

24  Q.  And you moved there with Angele?

25  A.  Yes.

815

1    Q.   And were the kids with you guys then?

2    A.   Yes, sir.

3    Q.   Her two children?

4    A.   Yes.

5    Q.   When you're there at the house now, you had -- was there

6    more space?

7    A.   Quite a bit.  Quite a bit, yes, sir.

8    Q.   Okay.  Were you working at Lock-N-Stitch at the time you

9    first met Angele?

10   A.   Long before, yeah.  I was working there when I was living

11   in Fresno and commuting.

12   Q.   I forgot to ask you.  When did you start at Lock-N-Stitch?

13   A.   It was actually July of 2005.

14   Q.   Okay.  And you -- she started coming out in 2009?

15   A.   Yes, sir.

16   Q.   So you'd been there four years already?

17   A.   Yes, sir.

18   Q.   And you have -- how many computers did you have in your

19   apartment?

20   A.   Not much space, just one at that point.

21   Q.   When you went to the house, how many square feet in that

22   house?

23   A.   Oh, 2500 and change.

24   Q.   How much?

25   A.   2500 and change.

816

1   Q.   Okay.  And did you have more than one computer then?

2   A.   Not on day one.  But very shortly after, she got her own.

3   More started being added as parts became available.  Yes, sir.

4   Q.   In addition to your job at Lock-N-Stitch, did you help

5   other people repair their computers?

6   A.   Quite often.  Yes, sir.

7   Q.   Did people drop off their computers at your place?

8   A.   Yes, sir.

9   Q.   And did you ever get to work on all of them?

10  A.   Most of them, yes, sir.  Sometimes there would be just a

11  dead one and I'd try booting it up and determined that it was

12  just flat dead and I'd have to tell them and they'd just go

13  buy a new one and it would just stay there.

14  Q.   Did you keep them there at your house though?

15  A.   Any time I thought there was a part that I could salvage

16  and retask, I would generally, yes.

17  Q.   Keep it there.  Where did you put it?

18  A.   Big pile in the garage.

19  Q.   Okay.  There was an item 16 that was found in the garage.

20  A.   Yes, sir.

21  Q.   Now, was that a computer that was in use when Angele came

22  out?

23  A.   When she first came out, yes.  It was actually my primary

24  in 2009.  Yes, sir.

25  Q.   2009.  Okay.  And did she use that item 16 at all?

1    A.   Yes.  In fact, actually in the summer of 2010, I had moved

2    on to another computer and set that one up for her.  She

3    became a sole user of it.

4    Q.   Was that being used -- do you know what Skype is?

5    A.   Yes, sir.

6    Q.   And that -- you tell us.

7    A.   It's a video chat that you can -- it's almost like the

8    iPhone app, the FaceTime, similar to that.

9    Q.   Did she use that, Skype --

10   A.   Yes.

11   Q.   -- aspect of that computer?

12   A.   Yes, sir.

13   Q.   To do what?

14   A.   Long distance rates were kind of expensive.  Often times

15   she would visit without the kids.  She would use that to keep

16   in contact daily, talking to them before bedtime.  Just

17   keeping in contact with them.

18   Q.   That's when they were back in Canada and she's here?

19   A.   Yes, sir.

20   Q.   Okay.  Now, did you guys have a common interest in terms

21   of adult pornography?

22   A.   Yes, sir.

23   Q.   Tell us about that.

24   A.   She liked watching it.  And so did -- and I -- wasn't

25   objectionable.  Yes, I liked it too.

818

1   Q.  You both enjoyed watching adult pornography?

2   A.  Yes.  Not -- together, yeah.

3   Q.  Yeah.  Did you ever download adult pornography?

4   A.  Yes.  Yes, sir.

5   Q.  And when did you start doing that?  Was it before her or

6   after her?

7   A.  Sorry.  Back in college, I'd had some friends, we'd all

8   swap around data.  We'd get stuff.  There was quite a bit of

9   that being exchanged.  We were all young guys.  And those all

10  kind of ended up in the junk pile.  And eventually she came

11  out, those got pulled out, put on the stuff.  And then later,

12  I ended up downloading more, yes, sir.

13  Q.  Okay.  So you were downloading adult pornography prior to

14  her coming out?

15  A.  I don't know.  I don't remember ever actually downloading

16  it.  I think it was more just swapped around on CDs and

17  various media.

18  Q.  Okay.  Are you familiar with the Shareaza program?

19  A.  Yes, sir.

20  Q.  What is -- it's a peer-to-peer program?

21  A.  Yes, sir.

22  Q.  Have you used that before?

23  A.  Yes, sir.

24  Q.  When did you start using Shareaza?

25  A.  The earliest date that I know for sure is based on some of

1    these evidence reports.  The oldest file was from December of

2    2005, I believe it was.

3    Q.  And why were you using it in December of 2005?

4    A.  I've used it for years for primarily music.  It did have a

5    few applications for work, but mostly just for music.

6    Q.  Did you use Shareaza for work at all?

7    A.  Yes, sir.

8    Q.  And from 2005?

9    A.  Yes, sir.

10   Q.  Okay.  For what purpose for work?

11   A.  As an example, there was one program that my employer

12   was -- liked to use, it was his preference.  And the company

13   ended up going bankrupt.  But they weren't bought out by

14   anybody.  So the program wasn't transferred to another

15   company.  So he'd asked me if I could find a copy of it for

16   him.  And I was able to find one on Shareaza.

17   Q.  Did you use the Shareaza program at work to download adult

18   pornography?

19   A.  Eventually, yes, sir.

20   Q.  When did you start doing that?

21   A.  After we got back from the honeymoon.  So it would have

22   been, approximately, I believe, the third week of May 2013.

23   Q.  The third week.

24   A.  Yes.

25   Q.  And you were downloading adult pornography?

820

1   A.  Yes, sir.

2   Q.  Okay.  How many videos of adult pornography do you think

3   you had?

4   A.  I never did an exact count, but between all the devices,

5   old, new, et cetera, probably in the realm of 10,000.

6   Q.  That many?

7   A.  Very -- like some of them would be tiny, some of them

8   would be large, but total quantity probably --

9   Q.  Did you ever get to view all of those?

10  A.  No.

11  Q.  Why would you have so many if you haven't even viewed

12  them?

13  A.  At first it was just because they were handed over and

14  they just kind of went into the pile.  I was at work all day.

15  Angele would watch a lot of them while she was home alone

16  without the kids.  Eventually she -- we were talking and she

17  said she had either gone through all or at least most of them

18  and was looking for fresh material.

19  Q.  So you would put search terms in for the adult pornography

20  at work?

21  A.  Yes.

22  Q.  You knew it was -- did you know it was against policy?

23  A.  Yes.

24  Q.  Why did you do that?

25  A.  Angele was -- we -- she had gotten pregnant in February, I

1   believe, of that year.  And --

2   Q.  2013?

3   A.  Yes, sir.  And she started having issues, complaining of

4   complications.  She was always wanting to engage in sex on a

5   daily basis.  But it started becoming problematic for her.

6   And she was -- the way she said it was she wanted something to

7   spice it up, to engage her more, something that she could take

8   her mind off, something new.  And that was my first time going

9   through a pregnancy with somebody and to me it was -- it

10  seemed like her version of pickles and ice cream, I guess.

11  Q.  Okay.  I'm going to show you what's marked as Government's

12  Exhibit 1.  There's 1.  Do you recall seeing this at all?

13  A.  Yes, sir.

14  Q.  And what is this?

15  A.  That was my computer at work.

16  Q.  At work.  And my finger is pointed to what?

17  A.  I believe that is 1A, sir.

18  Q.  And the one next to it?

19  A.  1B, sir.

20  Q.  On this 1A, is this the downloading material that you had

21  from Shareaza?

22  A.  Both of those had been used to download Shareaza in their

23  time.  When the police showed up, it was the one on the left

24  that was currently being used.

25  Q.  Okay.  And the one on the right, what was on that one?

1    A.   That also had Shareaza.   That was the hard drive in use

2    prior to the other one.   It was -- that one was in use from, I

3    believe it was January of 2011 to approximately the same time

4    in 2012.   And then 1A was in use from approximately January of

5    2012 up to the search warrant.

6    Q.   All right.   Did you dislodge the distribution -- I can

7    never think of the right terminology.   Dislodge -- prevent

8    anything coming in from being distributed?

9    A.   Yes, sir.

10   Q.   Did you do that on Exhibit -- on 1A?

11   A.   I habitually did it on all the copies of Shareaza that I

12   use.

13   Q.   Even on the 1B that had the music on it?

14   A.   Yes, sir.

15   Q.   Why did you do that?

16   A.   Years ago, when I first started using it, internet lines

17   were quite a bit slower and I found -- like I said earlier, I

18   did spend time playing online games and stuff.   And a lot of

19   time I would let Shareaza run in the background.   And when I

20   first started using it, I used the default settings across the

21   board.   And I found that it would take up so much of the

22   connection that anything else that I tried to do was

23   agonizingly slow.   So I just got in the habit of turning that

24   off.

25   Q.   Okay.   Did you have computers at home at this point in

823

1    time?  In September of 2013.

2    A.  Yes, sir.

3    Q.  All right.  Did you have one that you used most of the

4    time?

5    A.  Yes, sir.

6    Q.  I want to show you what's marked as 5. -- Government's

7    Exhibit 5.1.  Can you tell us what that is?

8    A.  That is my computer, my primary computer at home on the

9    desk in the living room.

10   Q.  And looking at 5.2.

11   A.  Same computer.

12   Q.  Same computer?

13   A.  Yes, sir.

14   Q.  And that was in the living room?

15   A.  Yes, sir.

16   Q.  Did you ever play child pornography on that computer?

17   A.  No, sir.

18   Q.  Did you ever download any child pornography --

19   A.  No, sir.

20   Q.  -- on that computer?

21           Did you ever access that computer to your work

22   computer at work that was in Exhibit 1?

23   A.  No, sir.

24   Q.  Could you have done that?

25   A.  No, sir.  Not the way anything was configured.

824

1   Q.   Showing you Government's Exhibit 5.3.  What is that on the
2   table there?
3   A.   That was two computers.  She was actually in the middle of
4   transferring from one computer to another.
5   Q.   Who is "she"?
6   A.   Sorry.  Angele.  She did not have enough room in her
7   office for both computers under the desk.  So I -- she
8   temporarily set up a work station on the kitchen table just to
9   transfer data over.
10  Q.   Was she using the computers there at the table?
11  A.   Yes, sir.
12  Q.   Looking at Government's 5.5, what is that?
13  A.   That is the master bedroom looking into the master
14  bathroom.
15  Q.   And is there a computer in that picture at all?
16  A.   There is a monitor, keyboard, et cetera on the dresser fed
17  to a computer in the wall behind.
18  Q.   In the bathroom, is it?
19  A.   Yes, sir.
20  Q.   And showing you Exhibit 5.6, what is this?
21  A.   Side view of the same monitor and dresser.
22  Q.   Showing you Exhibit 5.7.  What are those?
23  A.   Number 8 is the computer that the lines go through the
24  wall into the monitor we just saw.  And 9 is the network
25  attached storage, the Netgear device.

1   Q.  This is in the bathroom?

2   A.  Yes, sir.

3   Q.  Any particular reason why it's in the bathroom?

4   A.  As I said, she and I would watch it and that computer,

5   having the monitor there was obviously, you know, personal

6   time, you don't want the kids -- it's --

7   Q.  Exhibit 5.8.  What is this one?

8   A.  That is a set of shelving units, areas in the master

9   bathroom -- bedroom, excuse me, looking into the master

10  bathroom.  At the time we were using it as a changing table

11  for the newborn.

12  Q.  Did you ever set up a camera in the bedroom to videotape

13  anybody?

14  A.  We had had -- my wife was very firmly bisexual and we had

15  had a few threesomes, some of those were recorded.

16  Q.  Specifically did you ever set up a camera to videotape

17  A.T. in the bedroom?

18  A.  No, sir.

19  Q.  Did you ever set up a camera to videotape A.T.?

20  A.  I set up the camera that was used to, but I never set it

21  up for that reason, no, sir.

22  Q.  All right.  Let me show you what's marked as Government's

23  Exhibit 5.9.  What is that?

24  A.  That is the bathroom at the front of the house, just

25  outside my wife's office.

1   Q.  All right.  And there is the planter there.

2   A.  Yes, sir.

3   Q.  And is that the planter that has the camera in it?

4   A.  I don't know if it did at this time.  Depending on which

5   warrant that was out of.  But that was the one that was used,

6   yes, sir.

7   Q.  This is a picture taken from the first warrant by the

8   state.

9   A.  Okay.  Then it's not in there, no, sir.

10  Q.  Okay.  It's not in there?

11  A.  No, sir.

12  Q.  When was it put in?

13  A.  Put in?  February of 2012.

14  Q.  And the purpose of putting it in?

15  A.  My wife was very firmly an exhibitionist and she used to

16  do public stuff in Toronto.  And when she came out here, I

17  told her "you cannot get away with that here."  And she had

18  otherwise -- there are quite a few videos in her folder.  She

19  would record herself in various activities alone and she

20  wanted to be able to continue doing that.

21  Q.  And view the videos?

22  A.  Yes, sir.

23  Q.  Were you intending on videotaping other people in the

24  bathroom?

25  A.  No, sir.

Henry - B

827

1   Q.  Show you a picture of the --

2           THE COURT:  Would this be a convenient time to break?

3           MR. CAPOZZI:  Oh, yes.  I'm sorry, judge.  We're

4   going to go a while.

5           THE COURT:  Ladies and gentlemen, please heed the

6   Court's previous admonition.  We'll reconvene at 1:30 this

7   afternoon.  1:30.

8       (The jury left the courtroom.)

9           THE COURT:  We're outside the presence of the jury.

10  Are there other defense witnesses after Mr. Henry?  One more.

11          MR. CAPOZZI:  Short character.

12          THE COURT:  Do you still think we're going to

13  conclude this afternoon?

14          MR. CAPOZZI:  I'll be done in an hour.

15          THE COURT:  Okay.  And then cross.  Perhaps it would

16  be best, then, if we -- whenever we end, if we end early,

17  would counsel then be available to talk briefly about jury

18  instructions?

19          MR. CAPOZZI:  Yes, I think we should.

20          THE COURT:  And we'll finalize that tonight.  Mr.

21  Gappa was nodding, I didn't wait for his answer.

22          MR. GAPPA:  Yes.  Yes.

23          THE COURT:  So whenever we finish today, we'll --

24          MR. CAPOZZI:  Good.

25          THE COURT:  -- talk about jury instructions.  We'll

1   get them finalized so that you have a packet if not late

2   tonight, then by the minute you report to the courtroom

3   tomorrow.

4          MR. CAPOZZI:  Okay.

5          MR. GAPPA:  And Your Honor, just as a protocol issue,

6   is it the Court's practice to do all or most of the

7   instructions after argument?

8          THE COURT:  I do all of the instructions after

9   argument.  But that's why I want to finalize the packet.  You

10  are free to use the packet of jury instructions during your

11  argument.

12         MR. GAPPA:  Thank you, Your Honor.

13         THE COURT:  All right.  See you at 1:30.

14     (Lunch Recess.)

15     (The jury entered the courtroom.)

16         THE COURT:  Let the record reflect we are back in the

17  presence of the jury.  Sorry for the delay, ladies and

18  gentlemen.  I had one additional matter I was taking care of

19  just before we brought you back in, ran a little over.

20         Mr. Capozzi, you may continue with your examination.

21         MR. CAPOZZI:  Thank you, judge.

22  Q.  I think I was showing you some pictures of the residence

23  on Burman Avenue.  And showing you Exhibit Number 5.10.  I

24  think I showed this to you, but I'm not sure.  Is this the

25  computer that you use at your house?

829

1    A.   Yes.

2    Q.   And this is the one that was sitting on the desk?

3    A.   Living room.

4    Q.   What is this that I'm looking at?  What is this?

5    A.   That's the computer tower.

6    Q.   Computer tower?

7    A.   Yes.

8    Q.   Okay.  And then this, in Exhibit 5.1, that's the monitor?

9    A.   Yes.

10   Q.   On your desk?

11   A.   And the tower is over to the right of it.

12   Q.   To the right?

13   A.   Yes.

14   Q.   Over here somewhere?

15   A.   Between the fish tank and the monitor.

16   Q.   Right in here somewhere?

17   A.   Yes.

18   Q.   Is it on the floor or up higher?

19   A.   No, it was right where you were pointing.

20   Q.   Then you had items stored in the garage.  Did you not?

21   A.   Yes, sir.

22   Q.   And on the day that the state came in and did a search

23   warrant, Exhibit 5.11.  Was that the condition of your garage?

24   A.   Yes.

25   Q.   Now, on your computer at work.  That Exhibit number -- I

830

1    think it was Number 1.  Did you put in the Shareaza program on

2    that computer?

3    A.  Yes, sir.

4    Q.  What date did you do that?

5    A.  I don't remember, but I would think it would be shortly

6    after the installation of the operating system and stuff.

7    Which I believe was on 1A we're talking about, or 1B?

8    Q.  I'm talking about Lock-N-Stitch where you did the Shareaza

9    to download the adult pornography.

10   A.  Oh, what date did I install Shareaza?

11   Q.  Yes.

12   A.  There's two hard drives, they both have Shareaza on it.

13   1B would probably have been installed around January of '11

14   and the other one around January of '12, on 1A.

15   Q.  When did you start downloading the adult pornography

16   on --

17   A.  I believe it was the --

18   Q.  -- work --

19   A.  -- second or third week of May of 2013.

20   Q.  Was that around May 23rd?

21   A.  Yeah, it would have been just before then, I believe.

22   Q.  And you were using Shareaza?

23   A.  Yes, sir.

24   Q.  Ever hear of LimeWire?

25   A.  Not until recently in regard to this case.

1    Q.   Have you ever used LimeWire?

2    A.   No.

3    Q.   Pardon me?

4    A.   No, sir.

5    Q.   And when you say you downloaded adult pornography starting

6    on May 23rd, tell us the process how that works.

7    A.    It's been pretty well described in here.  There's -- you

8    can either go by category or I would do like kind of generic

9    search terms related to some of the adult stuff that Angele

10   and I had seen on websites, commercial websites.  And look for

11   stuff with that.

12   Q.   So you put -- assume you put the word search terms in at

13   ten o'clock in the morning.  Do you sit there and wait until

14   noon to get everything that you put in?

15   A.   No.  When you first enter the search terms, it relatively

16   quickly comes back with a list of available files associated

17   with either that term or the tags or whatever.  And then you

18   can select files from that list and tell them to download and

19   then they can begin.

20   Q.   Okay.  Does it -- what period of time were you downloading

21   this adult pornography?

22   A.   As in what time did I start it going?  Or what time was it

23   running?

24   Q.   Started it on May 23rd, around there.

25   A.   Yeah, about a few days before.

1   Q.   How long did it run?

2   A.   Just in the background off and on until the police came.

3   Q.   Pardon me?

4   A.   In the background off and on until the police came, the

5   program was running.

6   Q.   The police came in September, 2013?

7   A.   Correct.  Some files will download quickly, other ones

8   will take a long time.  In fact, as was mentioned earlier,

9   even at the warrant, there was still like 700 plus files in

10  the process of being downloaded that had not finished even

11  months later.

12  Q.   So from May 23rd, 2013 until September, was it 19th, 2013,

13  when the raid happened, the search happened, downloads were

14  still occurring?

15  A.   Yes.  The downloads at the time of the search warrant were

16  still -- continuation of the searches that apparently happened

17  way back in May.

18  Q.   Okay.  And did you have an opportunity to review all of

19  those videos that came through during that period of time?

20  A.   No, sir.

21  Q.   What would you do?

22  A.   I would -- whenever there was something in the completed,

23  I'd move it over to a storage file.  And whenever there was a

24  few in the storage file, I would copy them using like a thumb

25  drive to the Netgear at the house.

1   Q.  What's a thumb drive?

2   A.  A little stick you can plug into a USB port that has

3   storage on it.  That's all it's for.

4   Q.  You plug it in the side of your computer at work?

5   A.  Yes.

6   Q.  And then you would download what's on the computer from

7   the Shareaza on to that thumb drive?

8   A.  Yes, sir.

9   Q.  Do you sit there and watch everything while it's

10  happening?

11  A.  No, sir.

12  Q.  It just happens without being on the monitor?

13  A.  You get like a little progress bar and it's done.

14  Q.  So you take it on the thumb drive.  What do you do with

15  that thumb drive?

16  A.  Then I would, when I went home for that day, either that

17  day or a few days later, whenever I got to it, I would do the

18  same thing in reverse and move them over to the Netgear.

19  Q.  Did you watch them when you do that?

20  A.  No, sir.

21  Q.  How many times did you do that, download it on a thumb

22  drive?

23  A.  I don't recall.  They -- they go slowly.  It wasn't very

24  many times over the months.

25  Q.  Okay.  And you saw the police reports in this case.

834

1    A.   Yes.

2    Q.   When did the child pornography start downloading, what

3    date?

4    A.   May 28th.

5    Q.   And it went through to what date?

6    A.   June 3rd.

7    Q.   2013?

8    A.   Yes, sir.

9    Q.   And there was no more search terms put in --

10   A.   No more search terms, no more new downloads.  All of it

11   was within that time frame.

12   Q.   Okay.  Let's look at Exhibit 5. -- well, let me see.  Here

13   it is.  Exhibit -- Government Exhibit 1A.4 is the exhibit

14   number.  Can you read it up there?

15   A.   Yes, sir.

16   Q.   Now, these are -- tell us what this is, if you can.

17   A.   That is a list of the search terms recovered from item 1A.

18   Q.   The search terms recovered from where?

19   A.   1A, my work computer.  It's a partial list.  There's

20   another 26, I believe.

21   Q.   Looking at page 2.  There's more.

22   A.   Yes.

23   Q.   Searches terms.

24   A.   Yes.

25   Q.   And page three.

1   A.   Yes, sir.

2   Q.   Okay.  Now, did you come to learn what Angele's interests

3   were?

4   A.   Yeah, she was pretty open about some things.

5   Q.   In terms of -- what about renaissance fairs, have you guys

6   gone to renaissance fairs?

7   A.   Yes.  We ended up going to one.  In fact, she like

8   homemade costumes for the whole family to wear.  And of course

9   hers included a corset.  And, yes.

10  Q.   And do you speak French?

11  A.   I picked up a couple of phrases, like "come here please" I

12  would hear her say to the kids.  But other than that, I surely

13  wouldn't be able to spell it.

14  Q.   Did she speak some French?

15  A.   Yes, sir.  A fair amount.

16  Q.   Did she write some French?

17  A.   I believe so.  I'm not sure I ever actually saw her

18  writing much, but I've seen her write a few odds and ends.

19  Q.   Do you speak French?

20  A.   No, sir.

21  Q.   Do you understand French?

22  A.   No, sir.

23  Q.   Okay.  On the top here, it says last written date is June

24  30th.  You see that?

25  A.   June 3rd.

836

1   Q.   June 3rd, 2013.  I'm sorry.  So does that mean the last

2   day that the search terms were put in?

3   A.   From my understanding, that was the last time that this

4   registry entry was updated, written to.  Which would mean the

5   last time a search term was entered, yes.

6   Q.   Did you put the search term "corset" in?

7   A.   No, sir.

8   Q.   By putting that term in -- well, if you did put it in,

9   what would you expect to get back?

10  A.   Probably stuff related to corsets.

11  Q.   You didn't put that term in?

12  A.   No, sir.

13  Q.   Going down the list.  "Adilia"?

14  A.   No, sir.

15  Q.   "Horse"?

16  A.   No, sir.

17  Q.   "Pony"?  "Dog"?

18  A.   No, sir.

19  Q.   Keep going down the list.  "Mommy me"?

20  A.   No, sir.

21  Q.   "Mom daughter"?

22  A.   No, sir.

23  Q.   "Skirt"?

24  A.   No, sir.

25  Q.   Did you have an interest in little girls with skirts?

1    A.   No, sir.

2    Q.   Did Angele ever mention that to you?

3    A.   I knew she liked women in skirts.  She would -- had some,

4    yes.

5    Q.   Indeed, in that videotape of [A.T.] in the bedroom, did

6    you see a little skirt that was displayed?

7    A.   Yes.  That was one of her favorites.

8    Q.   How about "r@ygold"?

9    A.   No.  I never even heard of that before this case.

10   Q.   "Costume porn"?

11   A.   No, sir.

12   Q.   And going to the next page is "costume porn" again.  Any

13   of these down the list to where my pen is, where it says

14   "bedroom dancing paroles did he chanson"?

15   A.   No, sir.

16   Q.   As far as you know, is that a French term?

17   A.   Looks like it to me, from what I've seen.

18   Q.   Did you put that in?

19   A.   No, sir.

20   Q.   Did you put "bedroom" in?

21   A.   No.

22   Q.   How about "friendly indians"?

23   A.   I believe so, yes.

24   Q.   What is "friendly indians"?

25   A.   It's actually -- if I remember correctly, it's the band

1    that does the theme song to one of the shows that we were

2    watching.  So we were looking for a clip of the theme song.

3    Q.  So the list below that, are those songs?

4    A.  Yes.

5    Q.  What about "libertines"?

6    A.  That is -- we got that -- or I got that from one of the

7    adult commercial websites that we would look at.

8    Q.  Going to the next page.  Did you put any of those?

9    A.  I believe I put all those in.  And they are all related to

10   like I said, the adult commercial websites.

11   Q.  Have you ever gotten child porn on any of those?

12   A.  As far as I know, no.  No.  Nothing in that time frame

13   came in.

14   Q.  In downloading adult porn, would you ever get child porn?

15   A.  Not that I have ever seen from that, no.

16   Q.  Did child porn ever come in that you didn't intend to get?

17   A.  As in "come in," you talking downloads?

18   Q.  Downloads, yeah.  Sorry.

19   A.  I've never seen any from downloads like that.  Like, when

20   we were -- like I said, back in college, when we would swap

21   stuff around, we'd end up -- there was a few things

22   that -- I've since learned a new definition of.  But at the

23   time I thought they were what I would have called questionable

24   under that, and they always got deleted.

25   Q.  Whenever you received something else that you thought was

Heggy - B

839

1   child porn, what did you do?

2   A.   Instantly deleted it.  Purged it.

3   Q.   When you took that thumb drive home and put it on a device

4   back home, which device was that?

5   A.   That would be the Netgear.

6   Q.   I'm sorry?

7   A.   That would be the Netgear, sir.

8   Q.   Item number 9?

9   A.   Yes.

10  Q.   Did you put it on the media side, Aurrora side?

11  A.   No, I would specifically put it on the Aurrora.

12  Q.   Did you ever give the thumb drive to Angele to put on the

13  Netgear?

14  A.   I don't recall.  It's possible.

15  Q.   There's a password for the Aurrora side of the Netgear;

16  correct?

17  A.   Yes, sir.

18  Q.   You said that Angele had that password?

19  A.   Yes, sir.

20  Q.   Why are you so sure of that?

21  A.   Because it was originally set up for us and communal

22  access.  And that side -- the media folder -- the Netgear had

23  a couple of different functions.  One of them was overall

24  network storage.  But it could also stream media to another

25  device, like a DVD player on the network that's capable of

1    accepting media that way.  So -- but it -- the DVD player

2    couldn't access through a password.  There was no option to

3    type that in.

4            So the media player was a folder that originally

5    contained just sorted named movie files so that they could be

6    played on another screen in the house.  And the Aurrora folder

7    was all our vacation pictures, the unsorted stuff, everything

8    else basically.

9    Q.  Why is that on the password protected if it's family

10   stuff?

11   A.  Part of my job is the whole security thing.  And you hear

12   horror stories about somebody's home network getting hacked

13   and the next thing you know home movies are all over the

14   internet.

15   Q.  There was some child pornography videos played in court.

16   Have you ever seen those child pornography videos before?

17   A.  I haven't seen them yet.  I wasn't going to watch.

18   Q.  You didn't look at them here?

19   A.  No.

20   Q.  Have you ever seen -- well, you don't know --

21   A.  The descriptions of the ones that I read in the police

22   reports, no.

23   Q.  No.  There was some videos of you taking down a curtain in

24   the bathroom.  Do you remember why that occurred and how that

25   occurred?

1    A.  It actually happened -- occurred relatively recently.  It
2    was -- frequently it was a cloth curtain.  My wife -- like I
3    said, I was usually at work, she tended to be home all day.
4    And one of the things she did take care of was the laundry.
5    And every once in a while she'd say, "Hey, it's time to wash
6    that thing" and I'd, you know, take it down.
7    Q.  And that -- in that video, it seemed -- it's a cloth
8    curtain?
9    A.  Yes.
10   Q.  What were you doing with it?
11   A.  Taking it down to be washed.
12   Q.  Were you taking it down because you couldn't get a good
13   view of [A.T.]?
14   A.  No, sir.
15   Q.  Did you even know [A.T.] was being videotaped?
16   A.  No, sir.
17   Q.  When the curtain was taken down, did you see Angele take
18   the curtain?  Did you hand it over to her?  Do you remember
19   that?
20   A.  Yes.
21   Q.  What was she doing?
22   A.  She -- when we bought it, I think she got it at like
23   Kohl's or something.  But you buy the curtain in one fabric
24   section and then nearby you can like pick which hooks you want
25   to go in it.  And they have to be like pulled out.

Heggy - P

842

1  Q.  So she was taking the hooks out?

2  A.  Yeah, they're metal hooks.

3  Q.  Can you tell whether or not she was putting them in a

4  drawer?

5  A.  It looked like she was putting them in the drawer by the

6  door.

7  Q.  What were you doing with that curtain then?  Was it

8  washed?

9  A.  I don't remember.  I handed it over to her on my way out

10  of the house.

11  Q.  Okay.  27.2.  We just have a still shot of a 27.2.  But

12  the curtain -- well, it's right here.  But it was taken down

13  that day?

14  A.  That's the one from that day, yes.

15  Q.  And then she put the hooks in a drawer there?

16  A.  Yes, sir.

17  Q.  Was that curtain ever put back up?

18  A.  Yes, sir.

19  Q.  Pardon me?

20  A.  Yes, sir.

21  Q.  Do you remember when?

22  A.  No.  Like I said, it went up and down fairly frequently.

23  We had two large dogs living in the house, trained dogs.  We

24  had two children.  Things got dirty on a relatively regular

25  basis.  So it would -- things were always getting washed and

843

1    that was one of them.

2    Q.  When the police came out and searched the first time,

3    they -- there was a plant in the -- above the shower; is that

4    correct?  With a camera?

5    A.  Well, it wasn't in there then.  But yes, the plant was

6    there.

7    Q.  Good point.  Thank you.  When the police came out the

8    first time, September 19th, 2013.  The plant was still there;

9    was it not?

10   A.  Yes.

11   Q.  Was the camera there?

12   A.  No, sir.

13   Q.  Did you know the police were coming on that first search?

14   A.  No, sir.

15   Q.  You were surprised?

16   A.  To say the least.

17   Q.  Why wasn't the camera there?  Did you take it down?

18   A.  Yes.  Quite a while before.

19   Q.  When did you take it down?

20   A.  May.  It would have been the first half of May.

21   Q.  Of 2013?

22   A.  Yes, sir.

23   Q.  But the plant was still in the bathroom?

24   A.  Yes.

25   Q.  Above the shower.  Was there any reason to leave the plant

1   still up there if the --

2   A.   Decoration.

3   Q.   Okay.

4   A.   Left it.

5   Q.   I want to find that picture, if I can.  Showing you

6   Exhibit 10.1.  Is that your house in Turlock?

7   A.   Yes, sir.

8   Q.   Now, I'm going to show you a picture.  It's Government

9   Exhibit 10.2.  10.2.  And I'll show you the Bates number on

10  this picture.  Do you see that?

11  A.   Yes, sir.

12  Q.   When was this picture taken by the government?

13  A.   I would presume that to be the second one, since it's

14  focusing on.

15  Q.   The second search warrant?

16  A.   Yes, sir.

17  Q.   And that was in November?

18  A.   Yes, sir.

19  Q.   Was there a camera in there?

20  A.   No, sir.

21  Q.   And where was this located?

22  A.   That's the front bathroom outside Angele's office.

23  Q.   So you hadn't taken that out of the bedroom?  Or bathroom?

24  A.   The plant?  No.

25  Q.   Let me show you a defense exhibit that I showed Detective

Heggy - D

845

1   Hively.  It's Exhibit H.

2   A.  Yes.

3   Q.  It was described as that bathroom where the camera was; is

4   that correct?

5   A.  Yes, sir.

6   Q.  What do you see in that picture?

7   A.  At this point, I see the counter, the tub with the curtain

8   up.

9   Q.  What's right here?

10  A.  A mirror.

11  Q.  Pardon me?

12  A.  A mirror.

13  Q.  Mirror.  And what is this right here?

14  A.  That is a painting that -- I can't remember if Angele did

15  it herself or one of her class did it or something.  But it's

16  a painting.

17  Q.  And was this on -- across the way?

18  A.  Yes, sir.

19  Q.  And what is this right here?

20  A.  I'm sorry, that's off screen, I can't see.

21  Q.  Oh, right -- oh, sorry.  What is this right here?

22  A.  That is the planter hanging in the shower.

23  Q.  And was that the way that bathroom was when the police

24  came out on the second search?

25  A.  Yes, sir.

1   Q.  And the plant was still in the same place --

2   A.  Hadn't moved.

3   Q.  -- as it was on the first search?

4   A.  Yes, sir.

5   Q.  You didn't take it down and try to hide it from them?

6   A.  Didn't -- there wasn't a reason to.

7   Q.  And showing you Exhibit -- Defense Exhibit J.  Was this a

8  picture -- let me see, which way does it go?  This way.  A

9  picture of the plant?

10  A.  Yes, sir.

11  Q.  Next to that painting?

12  A.  Yes, sir.

13  Q.  In the bathroom?

14  A.  Yes, sir.

15  Q.  And this was on the second search?

16  A.  That's when they took it, yes, sir.

17  Q.  So the plant was in the bathroom and not in the garage?

18  A.  Correct.

19  Q.  And when you put that camera in the plant in the bathroom,

20  was that to videotape juveniles?

21  A.  No.

22  Q.  To -- A.T.?

23  A.  No.

24  Q.  Other adults?

25  A.  No.  Well, other than Angele, no.

Heggy - B

847

1  Q.  Did you take any snapshots of any of those videos with

2  A.T. being naked?

3  A.  I didn't even know the videos were there, much less take

4  snapshots of them.

5  Q.  You didn't take any of those snapshots?

6  A.  No, sir.

7  Q.  Did you ever see those videos before you ever came to

8  court here?  Well, I showed you, did I not?

9  A.  Yes, sir.

10  Q.  Did you ever see videos of her naked, A.T.?

11  A.  Only --

12  Q.  Here?

13  A.  Yes.

14  Q.  Okay.  How about the video of her in your bedroom?

15  A.  Again, I never seen that before we were going through

16  evidence.

17  Q.  Did you even know that that was going to be done?

18  A.  No.  I was at work.

19  Q.  Had you communicated with Angele that day?

20  A.  Yes.

21  Q.  What were you doing that -- that was taken in the

22  afternoon; was it not?

23  A.  From what I've seen of the discovery, the first segment,

24  where it shows her setting it up was at 1:30 in the afternoon.

25  Q.  Where were you at 1:30 in the afternoon?

1    A.   I was at work.

2    Q.   Had you talked to Angele earlier?

3    A.   Yes.

4    Q.   And what did you tell her you were going to be doing that

5    afternoon?

6    A.   Around a little before noon, right around noon, I told her

7    that I had a meeting at two o'clock.

8    Q.   That you had to attend?

9    A.   Yes.

10   Q.   Did you tell her how long it would go?

11   A.   No.  But she had the car.  So whenever I --

12   Q.   Okay.  So you weren't home when that video was taken?

13   A.   No, sir.

14   Q.   And not aware of A.T. being videotaped?

15   A.   No.  Not even a little.

16   Q.   Did you have any interest in seeing her in that videotape?

17   A.   No.

18   Q.   Were you trying to sexually exploit her?

19   A.   No.

20   Q.   Did you have an agreement with your wife to sexually

21   exploit A.T.?

22   A.   Not even a little.

23   Q.   Was there any interest in sexually exploiting her?

24   A.   No interest in minors at all.  No.  No, sir.

25   Q.   Your interest is in adults?

849

1    A.   Quite firmly, yes, sir.

2    Q.   You're at this baseball game in the summer of, what, '12?

3    A.   '12, yes, sir.

4    Q.   All right.  And you're conversing with your wife.  Are you

5    not?

6    A.   Quite a bit.

7    Q.   All right.  Was it solely about young kids at the baseball

8    game?

9    A.   No.

10   Q.   What did you guys talk about?

11   A.   Talking about the fact that we were in a slew of debt and

12   we need to get her paperwork done so she could get a job.

13   Trying to figure out how we were going to pay the property

14   taxes.

15   Q.   And those are texts going back and forth?

16   A.   Yes, sir.

17   Q.   You saw the texts that the government put in?

18   A.   Yes, sir.

19   Q.   Was there more texts than just what they put in?

20   A.   Quite a bit.

21   Q.   Quite a bit?

22   A.   Yes, sir.

23   Q.   Why were you sending those pictures back to her?

24   A.   Originally it started -- she's from Toronto.  And when she

25   first started coming out here, it came as kind of a culture

1    shock at how much less the native Californians tend to wear.

2    And it was a bit of adjustment both for her and what she was

3    expecting her kids to wear in public and all that.  So it was

4    kind of just --

5    Q.   Have you gone back to Toronto?

6    A.   Yes.

7    Q.   You have?  A big city?

8    A.   It felt very similar to San Francisco actually.

9    Q.   Unfamiliar to Turlock?  Different than Turlock?

10   A.   Quite a bit.  As much as -- yes, small town versus San

11   Francisco, yeah.

12   Q.   On item 16, that's the one that was in use from '05 to '08

13   or '9, or had --

14   A.   It was in use until 2010.

15   Q.   It was last used in 2010.

16   A.   Yes.  According to the documents I've seen, it was last

17   used August 20th.

18   Q.   August 20, 2013.

19   A.   2010.

20   Q.   2010.  I'm sorry.  You're right.  Was Angele using that

21   computer?

22   A.   Yes.

23   Q.   Had you used Shareaza on that computer?

24   A.   Yes.

25   Q.   Did you use Shareaza to download any porn on that?

1  A.  No, sir.

2  Q.  She used that one.  How -- is there any way that child

3  porn -- child porn was found on 16; is that right?

4  A.  That's my understanding, yes.

5  Q.  Did you put any on there?

6  A.  No, sir.

7  Q.  Is there a way that could get there and have the dates '05

8  or '06, '07, '08 on there?

9  A.  Yes.

10  Q.  How?

11  A.  There's actually several.  The first is -- the most

12  easiest is doing like either a cut and paste or like a --

13  Q.  Speak into the mike.  I can't hear you.

14  A.  There's actually quite a few different ways that can

15  happen.  The most common would probably be either a cut and

16  paste or a move.

17  Q.  Did you have any device at your house, or at work that

18  transposed or put anything on item 16 that was child porn?

19  A.  No, sir.

20  Q.  Nothing?  Do you know whether or not the police found

21  anything, any item that transferred child porn over to that

22  device?

23  A.  Looking through everything, there was no source for it.

24  Q.  Now, we put the Cellebrite records in evidence, your

25  telephone records.

1    A.   Yes.

2    Q.   August 23rd, 2013 at 3:05 in the afternoon.  Where were

3    you?

4    A.   I was at work.

5    Q.   All right.  On the Shareaza computer at

6    Lock-N-Stitch -- let me go back to one other point.  I want to

7    show you -- it's Defense Exhibit D.1.  Is this a picture of

8    your office back then?

9    A.   Yes, sir.

10   Q.   And would Angele come in and sit in your desk there?

11   A.   Yes.  Usually in the afternoon, I was quite often working

12   out in the rest of the plant.  I would come in and see her

13   there.  But I wouldn't have any idea of knowing how long she'd

14   been there.

15   Q.   Would your computer be running?

16   A.   Yes.

17   Q.   Would it usually run all day?

18   A.   All day and sometimes night, yeah.

19   Q.   Did you have to put a password in it every single time if

20   it's running?

21   A.   Depends if I locked it when I was heading out.

22   Q.   Do you normally lock it when you were working around the

23   business?

24   A.   I try to remember because it's good security policy, but

25   sometimes I forget.

1   Q.  Do you know whether or not Angele had the password to

2   that --

3   A.  Oh, she did.

4   Q.  She did?

5   A.  Yes.

6   Q.  How do you know?

7   A.  Because I gave it to her.  She'd come in and help me on

8   the weekends sometimes if I had to do like server software

9   upgrades on the weekend at work stations, where there was like

10  30 work stations.  It cut the work load in half if two of us

11  are doing it.

12  Q.  Show you what's marked as Government's Exhibit Number 2.

13  You see the IP address on this one?

14  A.  Yes, sir.

15  Q.  71.94.43.84.

16  A.  Yes, sir.

17  Q.  What address to what computer is that?

18  A.  That was the address on the wireless through the B network

19  that Shareaza would run on.

20  Q.  And that was on that computer in your office?

21  A.  Yes.

22  Q.  On your computer that you had at home, item 3, the one on

23  your desk, there was no child pornography on that; correct?

24  A.  No, sir.

25  Q.  On the -- on Exhibit 31 of the government, 31.1.  We were

1   shown -- is this your home computer?

2   A.  I believe so.

3   Q.  Now, there's that 72.18.240.20.  What address is that for?

4   A.  That was the web server of the -- at the Lock-N-Stitch.

5   Q.  Lock-N-Stitch.  That's not to the one that had Shareaza on

6   it; correct?

7   A.  No, in fact, they're completely different addresses.  It's

8   a dedicated IP address on a T-1 --  on a completely different

9   internet access line.

10  Q.  I'm showing you an exhibit -- oops.  Somewhere here.  Oh,

11  there it is.  31.2, government's.  And there are other numbers

12  there.  Are any of those to the Lock-N-Stitch computer that

13  you had Shareaza on?

14  A.  I think the second one from the bottom one is the same

15  one.  Because it would be the wireless router.

16  Q.  The wireless router is 71.94?

17  A.  I believe so, yes.

18  Q.  Well, this is the Lock-N-Stitch computer:  Correct.

19  A.  Correct.

20  Q.  Okay.  Was that connected to your home computer, item 3?

21  A.  No.

22  Q.  Not at all.  On the 19th, you were arrested in this case;

23  were you not?

24  A.  Yes, sir.

25  Q.  And you were called to go to work and arrested on the way?

1    A.  Yes, sir.

2    Q.  Did you agree to cooperate in this case?

3    A.  Yes.

4    Q.  Did you agree to cooperate at home?

5    A.  Yes.

6    Q.  Did you give -- did you answer any questions they gave

7    you?

8    A.  I answered every question they gave me.

9    Q.  Did you give them passwords they didn't have?

10   A.  Anything they asked for or needed, yes.

11   Q.  Did you talk to them about the plant in the bathroom?

12   A.  No, sir.

13   Q.  Did they ever ask you that?

14   A.  No, sir.

15   Q.  How about in the second search?

16   A.  They didn't ask me anything because after the first one, I

17   immediately asked for an attorney.

18   Q.  Okay.  But in the questions you were asked, you cooperated

19   with them?

20   A.  Yes.  I kept thinking it all had to be some mistake and if

21   I cooperated, it would --

22   Q.  Go away.

23   A.  -- clear it up, yeah.

24   Q.  Did you lie to them?

25   A.  No, sir.

856

1   Q.  Were you honest in your answers?

2   A.  As -- from what I knew what was going on, I was trying to

3   be as honest as I could of course.

4              MR. CAPOZZI:  Thank you.  No more questions.

5              THE COURT:  Cross-examination.

6              MR. GAPPA:  Thank you, Your Honor.

7                          CROSS-EXAMINATION

8   BY MR. GAPPA:

9   Q.  So you heard Rebecca Jackson testify yesterday; correct?

10  A.  Yes, sir.

11  Q.  And you heard her testify that she never consented to

12  having you make a video recording of her in the shower;

13  correct?

14  A.  No, that's not what I heard.

15  Q.  And she testified you -- that she didn't know you had made

16  a video of her using the shower; correct?

17  A.  I believe she said something along the lines of she would

18  not -- she didn't know about a secreted camera, but she didn't

19  remember whether there was any other consensual recordings of

20  her in the shower.

21  Q.  So do you believe that Rebecca Jackson testified falsely?

22  A.  No.

23  Q.  You've had an interest in adult pornography from no later

24  than when you were in college; correct?

25  A.  Sorry.  Say that again?

1    Q.  You've had an interest in adult pornography, according to

2    your testimony, no later than when you were in college;

3    correct?

4    A.  I'm not sure I'd say "interest."  It was just one of the

5    things all the guys were doing and -- but yeah, that's when we

6    started accumulating, I guess.

7    Q.  Well, when you say "accumulating," what were you

8    accumulating?

9    A.  Most of it at that time, because we're talking like

10   mid '90s, was on like CDs, stuff like that.  I remember one CD

11   had like all the Playboy centerfolds like ever up to that

12   point.  It was just various odds and ends depending on who was

13   passing it around, where they'd gotten it from.

14   Q.  So that would be pornography; correct?

15   A.  Yes, sir.

16   Q.  And you were exchanging pornography with other people at

17   that time; correct?

18   A.  I didn't really go getting it much, so I tended to be

19   handed more stuff rather than being handing out.  But yeah.

20   Q.  You had an interest in the material?

21   A.  Yes.

22   Q.  And these were friends of yours?

23   A.  Co-workers, friends.  We were all techs.

24   Q.  So was this a formal setting, where --

25   A.  No.

1  Q.  -- you would -- or was this a one-on-one exchange with
2  people?
3  A.  It all depended.  If somebody had something -- and it
4  wasn't just pornography.  It was all kinds of stuff.  If
5  somebody got something they thought was interesting,
6  pornography, some new video game, just about anything, they'd
7  burn it off to a CD, two, three, four, and hand it out to
8  people.
9  Q.  But you exchanged pornography with some of your friends at
10 the time in college; correct?
11 A.  Yes.
12 Q.  And how did you get the pornography at that time?
13 A.  It was mostly on CDs.
14 Q.  But how did you obtain the pornography you gave to other
15 people?
16 A.  It was handed to me by other people.
17 Q.  So they would just give it to you, you didn't give it to
18 them?
19 A.  Anything I gave out, I had to get first.  So they would
20 hand me stuff.  If it was -- sometimes it would get passed on,
21 sometimes it would just end up in a junk -- in a pile.
22 Q.  And you did say it would end up in a junk pile, what did
23 you mean by that?
24 A.  Like in the garage, there was basically a large pile
25 of -- it was computer parts, CDs, just all kinds -- anything

1    related that wasn't actively being used just got tossed in a

2    pile.

3    Q.  You set up the network at Lock-N-Stitch; correct?

4    A.  Yes, sir.

5    Q.  What kind of training did you receive prior to becoming

6    the IT director at Lock-N-Stitch?

7    A.  Went to a few years of community college.  Ended up going

8    to work before finishing my degree.  I've taken several

9    seminars.  I've gotten Microsoft certifications.  I've spent

10   five years working for an ISP/tech repair company doing

11   everything from installing internet lines, wide area networks,

12   security, virus cleanups.  Anything and everything.  I've done

13   auditing work, tracking whose accessed files when and where.

14           Pretty much everything over the years except

15   programming.  And slowly over time I kind of refined my

16   preferences to I like working with networks, network security,

17   stuff like that.  And I ended up going to work for

18   Lock-N-Stitch.  And from there, I went to a few seminars

19   within that.  I kept abreast of TechNet through -- express

20   certifications, which is Microsoft's bulletin service of new

21   warnings, new stuff coming out, patches, et cetera.

22   Q.  So is it fair to say that you actually took classes and

23   you went to different training programs even before you

24   started at Lock-N-Stitch?

25   A.  Yes, sir.

1    Q.   And it sounds like you're pretty advanced in your ability

2    to work with networks.

3         MR. CAPOZZI:   Objection.  Vague and ambiguous.

4    "Pretty advanced."

5         THE COURT:   Overruled.  I'll let the witness answer,

6    if he can.

7         THE WITNESS:   I've mostly worked kind of solo, but at

8    the same time I have -- I've known enough to do what needed to

9    be done or I've known where to find out how to do it.

10   BY MR. GAPPA:

11   Q.   Well, this outside audit that was referred to earlier was

12   done for purposes in part to see how well the network had been

13   set up; correct?

14   A.   That was my understanding, yes.

15   Q.   And the end result was the assessment showed that it had

16   been set up well; correct?

17   A.   That was what I was told at the review that year, yes,

18   sir.

19   Q.   So when did you set up that network at Lock-N-Stitch?

20   A.   It was an ongoing process.  But I would have started it

21   when I started at Lock-N-Stitch, so roughly -- live 2005.

22   Q.   And when you were working there at times, there were up to

23   40 people working at Lock-N-Stitch; correct?

24   A.   I never stopped and counted, but something in that area.

25   Q.   How many computers were on the network?

1   A.   In the realm of 30 to 40.  I don't know an exact number,

2   I'm sorry.

3   Q.   How many servers were on the network?

4   A.   At what point in time?

5   Q.   Most recently when you worked there.

6   A.   Most recently, I believe we had three.

7   Q.   And that was 2013?

8   A.   Yes, sir.

9   Q.   And what were the three servers for?

10  A.   One was the web and email server.  The second one was a

11  data server, which contained all of the data for the company,

12  including the user drives that were described earlier, the

13  shared drives, all of that.  And the third one was dedicated

14  to running the company inventory control software.

15  Q.   And were those servers connected to each other?

16  A.   The data server and the program server were

17  interconnected, they ran parallel.  The web/email server was

18  not.  For security purposes, it was set kind of outside.

19  Q.   There's also a wireless network; correct?

20  A.   Yes, sir.

21  Q.   And you set that up?

22  A.   Yes, sir.

23  Q.   And that was so that when you were troubleshooting issues

24  on the network, you could jump between the wireless network

25  and then the Lock-N-Stitch network; correct?

Hegge - X

862

1    A.  Not exactly.

2    Q.  Wasn't that what you told Detective Hively?

3    A.  No, sir.

4    Q.  How many routers were on the Lock-N-Stitch network?

5    A.  Routers?

6    Q.  Yes.

7    A.  How are you defining "router"?

8    Q.  Well, what is a router?

9    A.  Usually it refers to a piece of equipment that

10   transfer -- well, routes internet traffic or network traffic

11   from one place to another.  It's usually an intelligent device

12   as opposed to the dumb version, which would be just a hub.

13   Q.  And how many of those devices did you put on the

14   Lock-N-Stitch network?

15   A.  Hubs or routers?

16   Q.  Hubs first.

17   A.  Hubs?  Whenever I needed to turn one connection into

18   multiples.  So I don't know the count.  Quite a few.

19   Q.  How many of the other devices?

20   A.  Routers?  Not nearly as many.  Maybe two or three.

21   Q.  So you knew how to navigate through that network; correct?

22   A.  I believe so.

23   Q.  And you had configured the network; correct?

24   A.  Yes, sir.

25   Q.  And what's involved with configuring the network, what

1    does that mean?

2    A.   Depends on what stage and who does it.   There's everything

3    from the actual physical cabling to the virtual

4    infrastructure, telling what can talk to what.

5    Q.   So you had set all of that up; correct?

6    A.   Yes, sir.

7    Q.   So when you say that the web and email server was not

8    allowed to set up -- I'm sorry, to communicate with the data

9    server.   You had set it up that way and configured the network

10   that way?

11   A.   I segregated them for security purposes, yes, sir.

12   Q.   And you set up a firewall; correct?

13   A.   Yes, sir.

14   Q.   And how did you do that?

15   A.   Ordered the equipment, read the manuals, cross-referenced

16   with online stuff and programmed it.

17   Q.   You told Detective Hively that you had remote access to

18   Lock-N-Stitch from your home; correct?

19   A.   Yes, sir.

20   Q.   And you used remote access when you were at home at times

21   to connect to the Lock-N-Stitch network; correct?

22   A.   Specifically to one of the servers.

23   Q.   And so you did that on more than one occasion; correct?

24   A.   Quite a few of us did.

25   Q.   And some of it was because you would have a technical

864

1    issue.  If you were working at home, you could log in

2    remotely, access the network at Lock-N-Stitch, diagnose the

3    problem and hopefully solve it; correct?

4    A.   Not exactly.

5    Q.   But something close to that; correct?

6    A.   Close to that, yes.

7    Q.   So what would be the difference?  If you -- as the person

8    who configured that network, how did you do it?

9    A.   I wasn't diagnosing the network, I was usually -- it was

10   specific to something on the server.  Because one of the

11   servers had -- trying to -- well, the remote connection was

12   set up so that people outside who needed to be -- the owners

13   of the company, the CFO could get into documents that they

14   needed while outside the network.  But all those documents

15   were configured to be accessible via the server.  So there was

16   nothing on the work stations.  So I never used it to diagnose

17   the work stations, because the entire thing was designed to

18   not pass traffic past the servers themselves.  So anything

19   that I did was done within that box.

20   Q.   Okay.  You set up a network at your home on Burman Drive;

21   correct?

22   A.   Yes, sir.

23   Q.   Is that the first time you ever set up a home network?

24   A.   I'd done like quick cabling type networks, but nothing

25   like that before, no.

1    Q.   So you set up the network attached storage device that's

2    now Exhibit 9; correct?

3    A.   Yes, sir.

4    Q.   And you knew there was a password protected side; correct?

5    A.   Yes, sir.

6    Q.   And today you're claiming that Angele had access to that

7    password protected side?

8    A.   She did, yes, sir.

9    Q.   You told Detective Hively on September 19th, 2013 that she

10   had access to the unprotected side; correct?

11   A.   She had that access also, yes, sir.

12   Q.   And you said that the password protected side is

13   essentially a duplicate of the unprotected side, but that you

14   would put anything bad on the password protected side so no

15   one could see anything objectionable.  Is that what you told

16   Detective Hively?

17   A.   I think it was something like that.  There were pretty

18   much duplicates.  I would jump -- put that stuff on that side

19   first because, yes, until it was gone through -- yeah.

20   Q.   Well, you said --

21   A.   Pretty close.

22   Q.   -- you did that because you didn't want her to see

23   anything that she might find objectionable; correct?

24   A.   I don't recall saying her specifically.

25   Q.   And then you said that she had access to the non-password

1    protected side; correct?

2    A.   As well as the Aurrora, yes, sir.

3    Q.   And you said that you had this electronic folder from

4    years ago you'd gotten from a friend that had pornography on

5    it.  And that went on to the non-password protected side;

6    correct?

7    A.   I believe it was on both.  That was one of those things I

8    was talking about getting stuff from --

9    Q.   But you said it went to the non-password protected side;

10   correct?  That's what you told Detective Hively?

11   A.   I believe it ended up in both locations, yes.

12   Q.   So you told Detective Hively it went to the non-password

13   protected side and that Angele hadn't even gone through all

14   that pornography; correct?

15   A.   Sounds correct.

16   Q.   And then the reason that you told Detective Hively that

17   you started looking for pornography was that at some point you

18   would -- after she was delivering the baby -- sit down and

19   that would be a bonding experience to go through new material;

20   correct?

21   A.   When I first started, it was because we were looking for

22   the spice.  As I said, by the time the police were there, she

23   was eight months pregnant.  That was delayed, so it became

24   once she had it, we would go through it.  Yes, sir.

25   Q.   So is it your testimony that you were looking for material

1    that would spice up your sex life, even though you had a large

2    amount of material that she hadn't gone through on the

3    non-password protected side that she had access to?

4    A.   When I said "gone through," what I was referring to is not

5    necessarily just watched, but she was going to be going

6    through and -- as we've said, the titles don't necessarily

7    reflect the content.  A lot of those had names that had

8    nothing to do with the content.  So what she was doing, she

9    was going through, watching the video and then renaming the

10   file to actually reflect the content so that way she could put

11   them into folders by content type, figured out what she wanted

12   to watch, et cetera.  So I kept the other stuff separate until

13   she could do that.  Because if I just started dumping

14   unsorted, un-renamed stuff on to those, it would just block up

15   whatever she was doing.

16   Q.   So you used the word "sorted," you admit that you were

17   sorting through the material that you were putting on the

18   secured side; correct?

19   A.   No, sir.

20   Q.   Well, when you say that you didn't want to give her things

21   that hadn't been sorted, what did you mean?

22   A.   They were still in just the Aza and Aza 1 folder, I

23   mean --

24   Q.   And then you would sort it from there; correct?

25   A.   The idea was we would, yes.

1   Q.  But you did that; correct?

2   A.  I never sorted any of the stuff that came in through the

3   peer-to-peer.

4   Q.  Is there anything that you told Detective Hively on

5   September 19th, 2013 that was not true?

6   A.  As far as I know, no.  I was trying very hard to be

7   honest.  To be honest, I was in a bit of shock at the time.  I

8   was trying to be fully cooperative.

9   Q.  Was there anything that you told Detective Hively on

10  September 19th, 2013 that was not true?

11  A.  As far as I'm aware, no.

12  Q.  So everything that you told him that day was true?

13  A.  As far as --

14          MR. CAPOZZI:  Asked and answered.  As far as he is

15  aware.

16          THE COURT:  Overruled.

17  BY MR. GAPPA:

18  Q.  So you told Detective Hively on that day that you were

19  really good at noticing patterns on the firewall; correct?

20  A.  That was one of my jobs was trying to keep track of

21  traffic, yes.

22  Q.  So part of the Lock-N-Stitch policy was that no

23  pornography was to be downloaded on that network; correct?

24  A.  Correct.

25  Q.  You knew you could get into serious trouble if you were

1   caught downloading any type of pornography at Lock-N-Stitch;

2   correct?

3   A.  I knew I was at risk of being potentially fired.  It never

4   occurred to me that I would be here for adult pornography.

5   Q.  But isn't adult pornography readily available with any

6   internet browser?

7   A.  Usually stand alone pictures and stuff like that, but yes.

8   Q.  And you could do that search with a basic Google search;

9   correct?

10  A.  That was how we found some of the commercial terms that I

11  had used on the search terms, yes.

12  Q.  And you'd already had a large amount of pornography before

13  2013; correct?

14  A.  Yes.

15  Q.  In fact, you had a large amount of pornography even before

16  you first met Angele; correct?

17  A.  Yeah, it was -- like I said, the junk pile, but yeah, it

18  was there.

19  Q.  So you started to become more curious about all types of

20  pornography; correct?

21  A.  Not exactly.

22  Q.  So the still images weren't of great interest to you;

23  correct?

24  A.  They were not of great interest to her.  No.

25  Q.  They were not of great interest to you; were they?

1    A.   They didn't impact me one way or the other, the difference

2    between the two.

3    Q.   So you really enjoyed your job at Lock-N-Stitch; didn't

4    you?

5    A.   Yes.

6    Q.   But you were willing to risk it just for the opportunity

7    to download adult pornography?

8    A.   Oversimplification, I believe.  But essentially, yeah.

9    Q.   You were pretty nervous when you began your interview with

10   Detective Hively on September 19th, 2013; weren't you?

11   A.   I'd been pulled out of my house without any notification,

12   any -- yes, yes, I was.

13   Q.   And you were pretty nervous because you'd been downloading

14   child pornography at Lock-N-Stitch; correct?

15   A.   Not even a little.

16   Q.   And you had, in fact, moved a child pornography video from

17   the Shareaza completed folder to a folder that was on the

18   network attached storage device, Exhibit 9; correct?

19   A.   No.

20   Q.   There were only two files in that folder that you had

21   moved that morning on September 19th; correct?

22   A.   I don't remember.

23   Q.   Well, can we go to Exhibit 1A.6.  This is in evidence.

24        So those are two files that were completely

25   downloaded using Shareaza; correct?

1    A.   They appear to be.

2    Q.   And they were downloaded on Exhibit 1A at the

3    Lock-N-Stitch work place; correct?

4    A.   Looks like the case, yes, sir.

5    Q.   And the completion happened prior to September 19th, 2013;

6    correct?

7    A.   I don't see any way to tell that from here.

8    Q.   And the files were created on May 28th, 2013; correct?

9    A.   Yes, sir.

10   Q.   And they were last modified on September 19th, 2013 at

11   7:02 a.m.; correct?

12   A.   I don't see the a.m. or p.m. on here, but that looks like

13   the case, yes.

14   Q.   Do you see 07:02:02.

15   A.   Oh, military time, yes, sir.

16   Q.   So that was the morning of the search warrant; correct?

17   A.   Appears to be the case.

18   Q.   And you'd been at work that morning at Lock-N-Stitch;

19   correct?

20   A.   Yes, sir.

21   Q.   And then you went home?

22   A.   Yes, sir.

23   Q.   And then did you end up going back to work because there

24   was a search warrant being executed there; correct?

25   A.   I was taken back, yes, sir.

1   Q.  So these were two files you moved that morning at

2   Lock-N-Stitch and put into a folder called Aza; correct?

3   A.  If it was me, then yes.  If it wasn't me, then no.

4   Q.  And there were only two files in that particular folder;

5   correct?

6   A.  According to the screen, yes.

7   Q.  And one of those files has "Pthc candygirls Ira 12yo."

8   Correct?

9   A.  Yes, sir.

10  Q.  And that was a file you put into that folder in that

11  morning; correct?

12  A.  As I said, I don't know if I put it in that folder.

13  Q.  Well, who would have done it?

14  A.  Anybody with access to that computer.

15  Q.  Who was there that morning with you at seven in the

16  morning?

17  A.  A few people, including people who dropped me off.

18  Q.  Okay.  So -- and then are you saying Angele Henry did

19  this?

20  A.  No, I'm not.  I'm saying I don't know.  I don't remember

21  doing it myself, so I can't say yes or no.

22  Q.  The second title is "21 Guys Fuck 13 Young Fertile Girls

23  And Cum Inside Their Pussy."  That was a file you put into

24  that folder; isn't it?

25  A.  Again, I don't remember if it was me or not.

873

1   Q.  And you put it into that folder because you wanted it to

2   end up on Exhibit 9; isn't that true?

3   A.  That was how generally stuff got moved.

4   Q.  That's how all the child pornography on Exhibit 9 got

5   there; correct?  You downloaded it from Lock-N-Stitch and then

6   you transferred it to the NAS on the secured side.  Isn't that

7   true?

8   A.  From what the police report stated, yes, the child

9   pornography came in with the adult stuff and then was

10  transferred over to the Netgear, yes.

11          THE COURT:  Mr. Gappa, can I ask you one question?

12  What -- no, that screenshot that was just up.  What exhibit is

13  that?

14          MR. GAPPA:  1A.7.

15          THE COURT:  Yeah, I don't -- see, that's not what was

16  up.

17          MR. GAPPA:  It's a two-page document.  I think we

18  were looking at the second page.

19          THE COURT:  Mine's not.  Mine's a one-page.

20          MR. CAPOZZI:  Is it 1A.7?

21          THE COURT:  1A.7, and there's a second page to that?

22          MR. GAPPA:  Yes.

23          THE COURT:  Can we -- can I see the defense binder?

24  Can I see anybody's binder?  Is it in there?

25          MR. GAPPA:  Yeah.

1      THE COURT:  Okay.  Good.  Thanks.  Sorry to

2  interrupt.

3      MR. GAPPA:  I apologize if for some reason that

4  second page is missing.

5      THE COURT:  Yes.  You may proceed.  I apologize for

6  interrupting.  But it was important for me to make sure that I

7  knew what was being displayed.

8  BY MR. GAPPA:

9  Q.  So I was having you confirm that you put the files from

10  the Lock-N-Stitch drive on to Exhibit 9; correct?

11  A.  I put some files, I don't know if I put all of them.

12  Q.  And you created this folder structure; correct?

13  A.  No, sir.

14  Q.  So when you would put those in there, you would sort

15  through it, as you said, to Detective Hively because you

16  didn't want anything to go on to the non-password protected

17  side that would disturb Angele; correct?

18  A.  As I told him, I had not sorted anything downloaded

19  through the peer, but eventually that was the plan.

20  Q.  So you just kept downloading and moving things over,

21  downloading and moving things over and you never got around to

22  sorting it?

23  A.  He asked me that same question and I said yes.

24  Q.  And even though you -- before you did those first searches

25  in May of 2013, even though you still had a large quantity of

1   pornography on the unsecured side that hadn't been sorted?

2   A.   It had been viewed by her, but it had not been sorted.

3   And I was asked for fresh material, so I was trying to provide

4   it.  Yes.

5   Q.   Now, you told Detective Hively that if you ever saw a file

6   without a title, you would immediately delete it; correct?

7   A.   Correct.

8   Q.   How often did you download any files with Shareaza that

9   did not have a title?

10  A.   I'm not sure I ever come across that in Shareaza itself.

11  Q.   So why did you tell Detective Hively "if there was

12  anything without a title, I would immediately delete it"?

13  A.   Because over time, like I said before, I had received

14  files in the past and sometimes there would be a file without

15  a title and I learned early on that a lot of times that was

16  indicative of like a virus attachment or something like that,

17  that basically made the file dangerous to open.  So I would

18  delete it.

19  Q.   So how often did you get a file without a title using

20  Shareaza?

21  A.   I don't recall of an instance where that happened.

22  Q.   So then why did you tell Detective Hively that if -- when

23  that happened, that you would immediately delete the file?

24  A.   I was suddenly confronted, out of the blue, by saying,

25  hey, your computer is doing this.  I was trying to figure out

1    how that could have happened.  To do that, I was trying -- I

2    was trying to go back through the entire history of my

3    interactions with received files, download files, trying to

4    figure out some type of correlation, explanation for how that

5    could have happened.  And there was a bit of bleed over

6    because there was a few times I was talking about the old

7    files I got from a friend, there was no titles, some bleed

8    over back and forth as I was trying to figure out what the

9    heck could have happened.

10   Q.  You knew that you had been downloading child pornography,

11   you knew the police were there, you knew you were caught, you

12   knew you were in trouble and you were trying to come up with a

13   story, isn't that true?

14          MR. CAPOZZI:  Objection.

15          THE WITNESS:  Not even a little bit.

16   BY MR. GAPPA:

17   Q.  So you knew there would be a problem because they would

18   find titles that indicated child pornography; correct?

19   A.  No, sir.

20   Q.  In fact, if we go back to the second page of the exhibit

21   we were looking at, there were only two files there; correct?

22   A.  The document you showed me, yes, sir.

23   Q.  And you're telling me that you didn't think that that

24   material might get you into trouble?

25   A.  I'm telling you I didn't know what the material was.

1   Q.  If we could go to Exhibit 33.  The testimony from

2   Detective Hively indicated that, in his opinion, this exhibit

3   which has five pages which relate to five different titles and

4   five videos indicates that each of those videos was on the

5   Lock-N-Stitch hard drive and then within minutes was on the

6   Netgear ReadyNAS Exhibit 9.  Did you hear that testimony?

7   A.  Yes, sir.

8   Q.  And there was also testimony about how that could have

9   happened.  And it was explained that that could be done

10  through remote access.  Correct?

11  A.  I heard that testimony.

12  Q.  And do you have a different explanation for how files got

13  from Exhibit 1A, the Lock-N-Stitch hard drive, within minutes

14  getting on to your Netgear ReadyNAS?

15  A.  Yes, there's easy explanations for that.

16  Q.  And what is the explanation, in your opinion?

17  A.  The file created date has been somewhat misrepresented to

18  this point.  It's not a reliable metric for auditing files

19  like this.  The problem with it is the file created date is

20  actually the first date the file is created.  Period.  On any

21  device.  It doesn't matter what it is.  So if you have -- do

22  you mind if I give an example?

23  Q.  Go ahead.

24  A.  Let's say you have a thumb drive with a file on it.  And

25  you plug it into a laptop.  You want this file on this laptop.

1    If you just do the left click drag and drop, the default that
2    everybody does, it's going to automatically create a copy.
3    The copy is a new file independent of the original in the
4    thumb drive, so it's going to have a new file created date.
5          Alternatively, you can do things like you can select
6    a move, you can do a cut and paste.  There's a few other
7    things I believe, like a WinZip archive extraction, a few
8    other things.  But if you do those and copy it, what it does
9    is it moves the original from the thumb drive to the laptop.
10   And it's not considered a new file.  It's considered the
11   original in a new place.  So it's not going to have a file
12   created date.  Doing that, you could carry a file around, if
13   you're moving it, through half a dozen devices across ten
14   years and it will still keep the original file created date.
15   Q.   And that's an interesting --
16   A.   It wouldn't change.
17   Q.   -- explanation and it may or may not true, but it doesn't
18   explain how the file creation date shows that within minutes
19   this file was on Exhibit 1A and then on Exhibit 9.
20   A.   Okay.  If you put a thumb drive into 1A and you copy the
21   file to it, that might take a little bit of time.  You take it
22   to the Netgear.  You move it on to the Netgear.  It's going to
23   retain the date from 1A.  A couple of minutes ago, according
24   to it.  Even if it was hours, days, weeks, months later, it
25   would still be within a couple of minutes.

1   Q.  And you said perhaps file creation dates are

2   overemphasized; correct?

3   A.  From my experience and training, that they are not

4   considered, in fact, actually -- usually when we're doing

5   auditing on servers, you're not supposed to allow -- to use

6   the internal dates.  They have highly expensive software you

7   buy that does nothing but keep track of it independently so

8   that it could be accurately tracked.

9   Q.  But you've been very concerned about the actual date that

10  relates to this set of file creation dates, May 28th, 2013;

11  correct?

12  A.  What do you mean "highly concerned"?

13  Q.  Well, you presented evidence of what was going on in your

14  office and who was there and who might have been using the

15  computer.

16  A.  Well, that seems to be the -- when this was happening.  So

17  yes, that was the focus of what I was paying attention to.

18  Q.  So you told Detective Hively you really didn't know how to

19  look for adult pornography when you were first using Shareaza;

20  correct?

21  A.  I said I -- yeah, I mostly used like commercial websites.

22  I was using peer to peer at that point, yes.

23  Q.  And when did you first use Shareaza to look for adult

24  pornography?

25  A.  I believe it was, like I said earlier, about the second to

1   third week, somewhere in there, of May.

2   Q.  Of what year?

3   A.  2013.

4   Q.  And so you had used Shareaza previously though; correct?

5   A.  Yes.

6   Q.  When was the first time you used Shareaza?

7   A.  I don't remember exactly.  The oldest copy that I've seen

8   in the police reports, I believe, was dated December of 2005.

9   Q.  And how many times did you download and install Shareaza

10  on any computer that you had access to?

11  A.  Quite a few.

12  Q.  How many times approximately?

13  A.  Probably most of the computers that I had, maybe half a

14  dozen to ten.

15  Q.  And why were you putting Shareaza on all of those

16  computers all those times?

17  A.  Because I used it for various things.

18  Q.  Like what?

19  A.  Sometimes for music, sometimes for work related stuff.

20  Various odd times.  Nothing major.  Just like a little thing

21  here and there.  It might go weeks or months or even years

22  without being used.  But then I might find -- need one thing,

23  go look for it and then not again.

24  Q.  You had this interest in pornography that went back many

25  years.  You had various versions of Shareaza.  You knew how to

1    search for music, but you didn't start using Shareaza to look
2    for pornography until 2013?
3    A.  As you pointed out, I had quite a bit.  It wasn't really a
4    need.
5    Q.  So then when you finally did decide you'd take a look at
6    Shareaza for purposes of looking for pornography, you said you
7    really didn't know what search terms to put in.
8    A.  As I said, I haven't used it for that.  I mean, with
9    music, it's kind -- and programs, if you're looking for that,
10   it's pretty cut and dried, you type in the program name, you
11   type in a song and you get what you're searching for.
12   Q.  And you would then put in search terms and you're saying
13   that you never looked at any of the material that was being
14   downloaded?
15   A.  No.  I was asked not to.
16   Q.  So you would put in the search term, see the potential
17   files related to the search term and then decide, looking at
18   the titles, which ones you were interested in; correct?
19   A.  Incorrect.  No.
20   Q.  And then you would complete the download process or at
21   least tell it to complete the download process; correct?
22   A.  That part, yes.
23   Q.  And speaking of those searches terms, if we could go to
24   Exhibit 1A.4.  You testified that these search terms were not
25   all put in to Shareaza by you; correct?

1   A.   Correct.

2   Q.   You only put in things that related to music?

3   A.   Incorrect.   No.

4   Q.   And so you didn't put in the term "PTHC"?

5   A.   No, sir.

6   Q.   Or "preteen"?

7   A.   No, sir.

8   Q.   "Underage"?

9   A.   No, sir.

10  Q.   "Animal"?

11  A.   No, sir.

12  Q.   And all of that type of material ended up on the secured

13  side of Exhibit 9; correct?

14  A.   So I've read, yes, sir.

15  Q.   Now, during the interview with Detective Hively at some

16  point he asked you for the password; correct?   For the

17  Lock-N-Stitch network or computers there.

18  A.   Yes.

19  Q.   And you were reluctant to give it to him?

20  A.   Yes.   Until I got confirmation.   It wasn't mine to give

21  out.

22  Q.   But you had come up with the password; correct?

23  A.   Correct.

24  Q.   And it wasn't until your employer told you to give it to

25  law enforcement that you gave it up?

1   A.  Of course.  It wasn't mine to give out.

2   Q.  And you're saying now that you gave the password to Angele

3   Henry and that she would come in on weekends and help you with

4   IT related projects?

5   A.  Yes.

6   Q.  What type of IT work did she do?

7   A.  Sometimes we'd get a new version of the software and

8   basically you have to go around to every single computer and

9   double click the process and just let it run.  And it was just

10  scut work mostly.  Just help make it go twice as fast.

11  Q.  If we could go to Exhibit 35.3.  If we go to the second

12  page.  These are communications between you and Angele;

13  correct?

14          MR. CAPOZZI:  What exhibit was this?  I'm sorry.

15          MR. GAPPA:  This is 35.3.

16          THE COURT:  At page 2?

17          MR. GAPPA:  Yes.

18          THE WITNESS:  They appear to be, yes, sir.

19  BY MR. GAPPA:

20  Q.  And this -- at the beginning, on that first entry, is from

21  Angele to you; correct?

22  A.  It looks that way, yes.

23  Q.  And then the second one is also from Angele to you;

24  correct?

25  A.  Yes, sir.

884

1   Q.  And the statement is, "I think she's 16, good Lord she

2   fits into that category we have been talking about."

3         You got that message; correct?  From Angele?

4   A.  It looks like my phone did.  I don't remember ever reading

5   it.  I certainly never responded to it.

6   Q.  So you hadn't been talking about any category of girls

7   with Angele?

8   A.  We had talked about categories of women.  Like I said, she

9   was bisexual.  We had talked about women.

10  Q.  So if we go to 35.2.  This also was a series of messages

11  between you and Angele.  These were taken in August of 2012

12  and sent in August of 2012; correct?

13  A.  It looks correct, yes, sir.

14  Q.  And you sent a message saying "Soooo much T and A";

15  correct?

16  A.  Yes, sir.

17  Q.  And that was on August 17th of 2012; correct?

18  A.  Either that or the 18th.  The documents we got from the

19  report say the 18th, but these say the 17th.  I'm not sure why

20  there's a discrepancy, but one or the other.

21  Q.  But then you were sending, in close proximity to that

22  message to Angele, photos to her; correct?

23  A.  Correct.

24  Q.  And we see these photos that you had taken in close

25  proximity to that message; correct?

1   A.   I haven't seen it on my screen.  Yes, sir.

2   Q.   And if we go to item 24.  Do those people appear to be

3   under the age of 18?

4   A.   You talking about the ones on the screen or in general?

5   Q.   On the screen.

6   A.   I don't know.

7   Q.   Well, what do they appear to be to you?

8   A.   I don't know.

9   Q.   What about on entry 26?

10   A.   I didn't ask them their age.  They were posing for a

11   picture.  I took it.  I didn't ask them their age, no.

12   Q.   And you'd been noticing them; correct?

13   A.   They'd kind of walked back and forth, yeah.

14   Q.   They kept walking back and forth, hanging around,

15   according to your message; correct?

16   A.   Yeah.

17   Q.   You took a picture of them?

18   A.   I asked them if I could and they said yes.

19   Q.   And you sent it to Angele?

20   A.   Correct.

21   Q.   If we go to Exhibit 35.5.  That's a message you received

22   from Angele; correct?

23   A.   Looks like it.

24   Q.   So is your testimony that the camera in Burman Drive was

25   installed for purposes of Angele's interest in being an

1    exhibitionist?

2    A.   That was my understanding when I agreed to put it up.

3    Q.   Understanding that you had?

4    A.   We had talked about it.  She asked me if I could put it up

5    for her for that purpose.  I said all right.  And then when we

6    started doing other plans for that room in the front area, I

7    took it out.

8    Q.   So did you make recordings of her being an exhibitionist?

9    A.   There's quite a few.

10   Q.   Did you put them in any particular folder?

11   A.   They are in her Sylvia folder, as I recall.

12   Q.   From that camera?

13   A.   I don't know if they're from that camera.  If she put them

14   in there.  I didn't mess with that stuff.  We had made the

15   exhibitionism videos of her and they ended up in there.  But

16   she -- whatever she recorded on this, I don't know what she

17   did with it.

18   Q.   And is there any particular reason that you chose the

19   guest bathroom as opposed to your bathroom?

20   A.   There were reasons and it was not the guest bathroom when

21   I agreed to do it.

22   Q.   There were two bathrooms in the residence; correct?

23   A.   There are actually three.

24   Q.   Okay.  If we could go to Exhibit 27.10.  That's in

25   evidence.  Can we play that?

1              (Playing video.)

2    BY MR. GAPPA:

3    Q.  What are you doing there?

4    A.  I was holding up a set of undergarments.

5    Q.  And that's --

6    A.  Two sets actually.

7    Q.  -- A.T.'s clothing there; correct?

8    A.  I did not know that.

9    Q.  She was there that day at your residence; correct?

10   A.  I did not know that either.

11   Q.  And you recorded her in that bathroom; correct?

12   A.  No.

13   Q.  And --

14             (Playing video.)

15   BY MR. GAPPA:

16   Q.  This is the same day that this video was recorded; isn't

17   it?

18   A.  I would have no way of knowing that.

19   Q.  And then after that video was recorded of her using the

20   shower, you created that screen capture; didn't you?

21   A.  No.

22             MR. GAPPA:  Those were my questions, Your Honor.

23             THE COURT:  Would you like a recess before redirect?

24             MR. CAPOZZI:  Good idea.  Thank you.

25             THE COURT:  Ladies and gentlemen, we'll take our

1   afternoon recess at this time.  We'll reconvene at 10 minutes

2   after three.  Please heed the Court's previous admonition.

3       (Recess.)

4           THE COURT:  Let the record reflect that we're back in

5   the presence of the jury.  Mr. Capozzi, you may conduct your

6   redirect.

7           MR. CAPOZZI:  Thank you, judge.

8                       REDIRECT EXAMINATION

9   BY MR. CAPOZZI:

10  Q.  Mr. Henry, you were asked by the U.S. Attorney whether or

11  not you were reluctant to give the password at Lock-N-Stitch

12  to Mr. Hively.

13  A.  Yes.

14  Q.  Did you say you were reluctant?

15  A.  No, sir.

16  Q.  Isn't it true you said, "Before I can give it to you, I

17  need to check with the owner"?

18  A.  What I told him was I needed to either see the search

19  warrant or have my boss tell me it was okay.  It was not mine

20  to give.

21  Q.  All right.  And didn't Mr. Hively then get up and call for

22  Mr. Reed and ask if he could have that password?

23  A.  Yes, sir.

24  Q.  And then you said okay, I'll give it to you?

25  A.  He told me to give it to him and I immediately recited it.

889

1  Q.  Okay.  You weren't trying to hide it, were you?

2  A.  Of course not.

3  Q.  Then 35 -- Government's Exhibit 35.3.  It's on page 2.

4  Government 35.3 this is.  Page 2.  "I think she's 16, good

5  Lord she fits into that category we have been talking about."

6  Is that from Angele to you?

7  A.  Yes, that's from her to me.

8  Q.  Did you respond to that?

9  A.  As you can see, no, I didn't.  I'm not even -- I don't

10  even remember seeing it.  That one is dated 6-3.  The next

11  text message in the line is a day later with no response.

12  Q.  You carry your cell phone with you?

13  A.  I have a tendency to set it down and walk away.

14  Q.  You forget it.

15  A.  I try to.

16  Q.  My wife always complains at me for not having it.

17  A.  Yeah.

18  Q.  When you get text messages, did you respond to them

19  immediately?

20  A.  Sometimes not.

21  Q.  Do you check your phone every ten minutes for a text

22  message?

23  A.  I deal with screens all day, I tend to avoid them if I

24  can.

25  Q.  All right.  So this "I think she's 16, good Lord she fits

1  into that category we have been talking about."  What were you

2  talking about?

3  A.  I don't even remember specifically.  I know we had -- she

4  was actively looking for women to involve, because like I

5  said, she was bisexual and we had discussed different types,

6  trying to find a common interest in women.  That's the only

7  thing that I could think of.

8  Q.  A common interest of women under 18?

9  A.  No.  No, no, no.  Women.  Women.

10 Q.  She's talking about 16.  "She fits into that category."

11 Do you know what she's referring to?

12 A.  No.  No, sir.

13 Q.  Did she have an interest in children?

14 A.  Not that I knew of before this, no.

15 Q.  All right.  Didn't she run a day care center up in

16 Toronto?

17 A.  Yes.

18 Q.  Didn't she run an Art in the Park for children in Turlock?

19 A.  Yes, sir.

20 Q.  And didn't [A.T.] attend that Art in the Park with her?

21 A.  Yes, sir.

22 Q.  On a number of occasions?

23 A.  Most occasions from what I understand.

24 Q.  Did you ever go to Art in the Park with the kids?

25 A.  Never.  I was at work.

1  Q.  All right.  Let's go to 35.5.  Were you emailed this

2  picture of [A.T.]?

3  A.  According to this I was texted it.

4  Q.  Or texted.  I'm sorry.  On 9-16-2012.

5  A.  Yes, sir.

6  Q.  All right.  What was happening that day?

7  A.  My understanding is Angele and [A.T.] were costume

8  shopping for Halloween.

9  Q.  September 16th?

10  A.  Yes, sir.

11  Q.  All right.  And was that an outfit that she had tried on,

12  as far as you know?

13  A.  As far as I know, yes, she tried on -- from looking

14  through the evidence after the fact, several.  And that was

15  apparently one of them.

16  Q.  Do you know whether or not [A.T.] was aware when that

17  picture was taken?

18  A.  I have no idea.

19  Q.  No idea.  Okay.

20       The U.S. Attorney asked you about the Sylvia folder

21  and why that was under password protected or whether you put

22  stuff on that one.  Was there a reason you would put

23  information on the Sylvia that was password protected?

24  A.  Yes.

25  Q.  And the reason was?

1   A.   As I mentioned before, you always hear nightmares about

2   people's home movies getting hacked and suddenly they're

3   plastered all over the internet.  And that was where she kept

4   her personal videos.

5   Q.   Did Angele put videos on the Aurrora side under Sylvia?

6   A.   They were all of her, yes, she put them there.

7   Q.   And were these pictures, videos of her naked?

8   A.   Every one of them, yeah.

9   Q.   Okay.  Is this the exhibition thing you were talking

10  about?

11  A.   Yes.  Yes.  There were videos, pictures, yes.

12  Q.   And those videos, she's masturbating?

13  A.   Yes.

14  Q.   And she takes videos of that?

15  A.   Yes.

16  Q.   And then does she look at those videos?

17  A.   Yes.  Most of them she'll put on one of her corsets,

18  masturbate.  And then later watch it and masturbate to herself

19  masturbating, yes.

20  Q.   On Exhibit 27.10, you're showing undergarments in the

21  video in the bathroom.

22  A.   Yes.

23  Q.   Explain that.

24  A.   She would often -- often, but here and there, as a

25  surprise or her idea of foreplay, however you'd call it.  I'd

1    come home and sometimes there would be a trail of clothing to

2    the bedroom where she would have a friend of hers.  Other

3    occasions, I'd be at home, she'd go out, supposedly grocery

4    shopping and come home with a friend.  That day, I'd come home

5    and I had to turn around and leave.  I was just picking

6    something up.  And she said, hey, I've got a friend or two in

7    the hot tub or whatever.  Before you leave, display that and

8    keep in mind for when you come back.  I -- apparently it was

9    A.T. and someone else, but I did not know that at the time.

10   It was not from her an abnormal request.

11   Q.  So when you say she had some people, you would come home

12   from work or from shopping or wherever and you would see

13   clothing, under garments?

14   A.  The equivalent of a whole trail of rose petals was her

15   idea was, yes.

16   Q.  And she's with somebody?

17   A.  Yes.

18   Q.  Were they men?

19   A.  No.  Never.

20   Q.  Other women?

21   A.  Yes, sir.  Invariably.

22   Q.  And on this day, you came home during the day?

23   A.  Yes.  If I recall correctly, cross-referencing with the

24   text messages, there was -- something had broken and I needed

25   some parts.  I couldn't find them locally and we couldn't

1    afford to wait to get them shipped in.  The big pile of stuff

2    I had, I had a spare so I came home just to grab it.

3    Q.  Okay.  And then she -- how did she tell you to show those

4    up for the camera?

5    A.  I didn't --

6           MR. GAPPA:  Objection, Your Honor.  Hearsay.

7           THE COURT:  Sustained.

8           MR. CAPOZZI:  Withdraw.

9    Q.  How did you know what to do?

10   A.  Of course whenever I come in and out, whenever I move

11   around, I try and be, you know, spouse, I'd check in.  Hey,

12   this is what's happening.  So I told her, hey, I'm going to be

13   swinging by to pick something up.  She had met me at the door

14   and kind of laid it out.  Saying, hey, I'm planning a

15   surprise.  Just titillation type thing.  "Keep this in mind

16   for the rest of the day" or whatever.  And asked me to do that

17   while she watched on the screen.  I remember I did it once.

18   And then I started to set it down and go to leave.  And she

19   called me back and said, "No, no, I didn't see it clearly" or

20   something.  "Do it again." And I did it just like real quick

21   and, "Hey, I got to go."

22   Q.  Where did you go?

23   A.  Back to work with the part to fix it.

24   Q.  Back at Lock-N-Stitch?

25   A.  Yes.

Henry - 89

895

1   Q.  I'm going to show you what's marked as 31.2.  Government

2   Exhibit 31.2.  What -- can you interpret this for us?  What do

3   you see there?  What does that mean?

4   A.  Yes, sir.  The remote capability built into windows has

5   two components to it.  There's a client and there's a server.

6   Basically the thing that connects and the thing that gets

7   connected to.  This --

8   Q.  Say that again.

9   A.  You have a client half and a server half.  The client

10  connects to a server, the server receives connections from a

11  client.

12  Q.  Okay.

13  A.  So what this is it's saying that this has -- the server

14  client has been activated.  The client is built into --

15  Q.  Server client.  Is that right here?

16  A.  Yes, sir.  The client is built in to all versions of

17  windows.  It's one of the ways they get money.  They ship the

18  client out for free and then they charge for the server.  So

19  what happens is the first time you connect to a -- a terminal

20  server, it registers the IP address of the server in this

21  list.

22  Q.  Is that this list that's right here?

23  A.  Yes, sir.

24  Q.  So what does that mean, that this client was making

25  contact with those addresses?

1   A.  Yes, sir.

2   Q.  All right.

3   A.  And that's reflective of what I had said earlier, we -- I

4   would connect in to the Lock-N-Stitch server.  So those are

5   the servers.

6   Q.  Which computer is this?

7   A.  This is my work computer.

8   Q.  Okay.  So it's -- is it configured to those addresses?

9   A.  All that means is at one point or another, this computer

10  connected to other computers at those addresses.

11  Q.  Well, does this mean that it's configured to receive?

12  A.  No.  In fact, actually this one you can tell was never

13  configured to receive.

14  Q.  How do you know that?

15  A.  The other half of terminal service is -- from terminal

16  server client is the terminal server service or host.  And

17  that's a completely separate piece of software.  When that

18  gets configured, it creates another entry like the one you

19  see, only instead of terminal server client, it would be

20  terminal server -- sorry, I don't remember the exact verbiage.

21  It was either server host, service or something like that.

22  But it is in alphabetic order replied after terminal server

23  client.  And as you can see here, the next entry is TPG, not

24  terminal server, service, client host or whatever.  So this

25  one has never been configured to receive a connection.

1    Q.   Okay.  Now, in plain English, what did you just say?

2    A.   Sorry.  This computer in its entire lifetime has never

3    received a terminal server client, otherwise you would see

4    another line.

5    Q.   And that means what?

6    A.   My work computer was never connected to from anywhere much

7    less my home computer.

8    Q.   It was not?

9    A.   It was not.  Never.

10        MR. CAPOZZI:  No more questions.  Thank you.

11        THE COURT:  Any recross?

12        MR. GAPPA:  Very briefly, Your Honor.

13                   RECROSS-EXAMINATION

14   BY MR. GAPPA:

15   Q.   The IP addresses on Exhibit 31.2 belong to Lock-N-Stitch;

16   correct?

17   A.   I'm not sure which --

18   Q.   If we could put up 31.2.  It's on the left side.  You see

19   the folder structure with reference to servers?

20   A.   Yes, sir.

21   Q.   And those IP addresses belong to Lock-N-Stitch?

22   A.   May I make a clarification?

23   Q.   Well, do those IP addresses belong to Lock-N-Stitch?

24   They're aligned to Lock-N-Stitch?

25   A.   Short answer is no.

1  Q.  They're assigned to Lock-N-Stitch.

2  A.  No.

3  Q.  Associated with Lock-N-Stitch?

4  A.  No.

5  Q.  And the -- well, what are they connected to then?

6  A.  The top three are intra net IP addresses, they can be

7  assigned or associated with any internal network.  They just

8  happen -- I used that as an internal scheme.  The last two are

9  IP addresses associated with two different internet lines run

10  into Lock-N-Stitch.

11  Q.  So when you would remote from your home computer, did you

12  use any of those IP addresses?

13  A.  Yes.

14  Q.  Yes?

15  A.  Yes.

16  Q.  Which ones?

17  A.  The very bottom one.  That's the only one.

18  Q.  Okay.

19       MR. GAPPA:  Those are my questions, Your Honor.

20       THE COURT:  Any re-redirect?

21       MR. CAPOZZI:  Just one quick question.

22              FURTHER REDIRECT EXAMINATION

23  BY MR. CAPOZZI:

24  Q.  The bottom one on that list?  Is it still up?

25  A.  Yes, sir.

1   Q.  Is that attached to the item 1A, the Shareaza computer at

2   work?

3   A.  No.  It's completely segregated.

4           MR. CAPOZZI:  Thank you.  No more questions.

5           THE COURT:  Any re-recross?

6           MR. GAPPA:

7                     FURTHER RECROSS-EXAMINATION

8   BY MR. GAPPA:

9   Q.  It's completely segregated because you set the network up

10  that way?  You configured it?

11  A.  Correct.

12          MR. GAPPA:  That's all I have, Your Honor.

13          THE COURT:  Triple redirect.

14          MR. CAPOZZI:  That's it.

15          THE COURT:  All right.  Shall we take a brief recess?

16          MR. CAPOZZI:  Yes, please.

17          THE COURT:  I understand we have to get the lift down

18  and that will take a few moments.  Ladies and gentlemen, we've

19  got to take a five-minute recess so that we can accommodate

20  one of the next witnesses.  Please heed the Court's

21  admonition.  You'll be back in shortly.

22      (Recess.)

23          THE COURT:  Let the record reflect we are back in the

24  presence of the jury.  And Mr. Capozzi, your next defense

25  witness.

900

1          MR. CAPOZZI:  Thank you, Your Honor.  I'd like to

2    call Robin Henry.

3                    **ROBIN R. MARTIN,**

4    called as a witness on behalf of the Defendants, having been

5    first duly sworn, testified as follows:

6          THE CLERK:  Please state your full name for the

7    record and spell it.

8          THE WITNESS:  Robin, R-O-B-I-N R. Martin,

9    M-A-R-T-I-N.

10                    DIRECT EXAMINATION

11   BY MR. CAPOZZI:

12   Q.  Mrs. Martin, try to speak into that microphone as much as

13   possible.  Your voice is very soft and I'm hard of hearing.

14          Do you know Adam Henry?

15   A.  Yes.  He's my son.

16   Q.  Okay.  Do you know Angele Henry?

17   A.  Yes.

18   Q.  Your son grew up with you.  You raised your son?

19   A.  That is true.

20   Q.  You're here to give an opinion as to whether or not you

21   think he has a reputation for telling the truth.  You're his

22   mother.

23   A.  Yes.

24   Q.  Do you have an opinion as to whether or not he tells the

25   truth, has a reputation for that?

901

1    A.   Absolutely.

2    Q.   What do you base that on?

3    A.   Without a doubt.

4    Q.   You have an opinion.  And your opinion is what?

5    A.   He would tell the truth even if it went -- even if he knew

6    you were going to punch him in the nose for it, he would still

7    stand there and tell you the truth.

8    Q.   Let me go back a minute.  I missed something.  What's your

9    education?

10   A.   Well, I have a juris doctorate.

11   Q.   Pardon me?

12   A.   I have a juris doctorate.

13   Q.   So you're a lawyer?

14   A.   I did not pass the bar.  I broke my back just as I

15   graduated.

16   Q.   I'm sorry?

17   A.   I broke my back just as I graduated.

18   Q.   From law school?

19   A.   Yes.

20   Q.   So you're in a wheelchair?

21   A.   Yes.

22   Q.   Okay.  So you're not ambulatory?

23   A.   No.  Not any longer.

24   Q.   Okay.  And you're on a handicapped elevator there?

25   A.   Yes.

1   Q.   Okay.  Going back to him.  You have an opinion that he
2   tells the truth.
3   A.   Absolutely.
4   Q.   Even if it hurts him?
5   A.   Absolutely.
6   Q.   And what do you base that upon?
7   A.   His entire life.
8   Q.   Well, give us some basis for that.
9   A.   For one thing, his role model, his hero was his
10  grandfather, my father.  And he -- my father was an extremely
11  honest man.  And to him that was the definition of a man.  You
12  had to be honest and -- otherwise you had no honor and his
13  worst insult was you're not a man.
14  Q.   Did he spend time with his grandfather?
15  A.   A great deal of time.
16  Q.   Any other instances that gives you that opinion?
17  A.   Oh, when he was a child playing in my room with his sister
18  and there was the usual horrendous crash.  I went tearing in
19  there and everything's laying on the floor.  They had broken
20  the rod that held up all my work, and he just immediately --
21  "Who did it?"  She's going and he's, "I did."
22  Q.   Fessed up to it?
23  A.   Immediately.
24  Q.   Any other instances like that?
25  A.   Yes.  It's a little embarrassing, but --

903

1  Q.  Was there a period of time that you went through a

2  depression?

3  A.  Yes.

4         MR. GAPPA:  Your Honor.  Objection.  Beyond the

5  scope.

6         MR. CAPOZZI:  I'm asking for the basis of her

7  opinion.

8         THE COURT:  Rephrase the question.

9  BY MR. CAPOZZI:

10  Q.  Are there other instances where -- that helped you form an

11  opinion as to his honesty?

12  A.  Yes.

13  Q.  Tell us.

14  A.  When he was younger, he suffered from depression.

15  Q.  All right.  And what happened?

16  A.  At one point -- he didn't like taking the medication.  And

17  he's not taking it.  He stopped taking it without telling me.

18  And shortly after, he was accused of stealing something.  And

19  I of course went to him and said, "I have to know, did you?"

20  Q.  How old was he?

21  A.  18.

22  Q.  18.  How old is he now?

23  A.  Right now?  He'll be 40 in December.

24  Q.  Okay.  Accused of stealing something.

25  A.  Yes.

1    Q.  And you went to him?

2    A.  Yes.  And I said, "I have to know.  Did you or didn't

3    you?"  And I was livid.  I was not being polite.  "Did you or

4    didn't you?"  "I did."

5    Q.  "I did"?

6    A.  "I did."

7    Q.  All right.

8    A.  "You knew it wasn't yours.  You knew better than to take

9    it.  And you took it." "I did."

10   Q.  All right.  What did he do?

11   A.  He pled guilty.

12   Q.  He went to court and pled guilty to stealing something?

13   A.  Yes.  Every day he called down there to see if there was a

14   warrant out for his arrest yet.  On the day there was, I drove

15   him down, he surrendered, we went to court and he pled guilty.

16   Q.  Okay.

17   A.  If you do it, you own it.

18        MR. CAPOZZI:  Thank you.  I have no more questions.

19        THE COURT:  Cross-examination.

20        MR. GAPPA:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. GAPPA:

23   Q.  Ma'am, you love your son; correct?

24   A.  Yes.

25   Q.  And you don't want to see anything bad happen to him;

1   correct?

2   A.   I -- where are you -- I'm sorry.  I'm not really --

3   Q.   You just talked about a time when your son pled guilty to

4   a crime.

5   A.   Yes.

6   Q.   And that was a very unpleasant experience for you;

7   correct?

8   A.   Oh, yes.

9   Q.   And it was an unpleasant experience for him; correct?

10  A.   Yes.

11  Q.   And you don't want to have that happen again; correct?

12  A.   If he did it, it would have to be that way.

13  Q.   But you don't want to have him have any consequence again;

14  correct?

15  A.   I don't understand what you're saying.  When you do

16  things, there are consequences.

17           MR. GAPPA:  Your Honor, I don't --

18           THE WITNESS:  What do you -- I don't understand, sir.

19           MR. GAPPA:  Your Honor, I don't have any other

20  questions.

21           THE COURT:  Any redirect?

22           MR. CAPOZZI:  No, judge.  Thank you.

23           THE COURT:  And may this witness be excused?

24           MR. CAPOZZI:  Yes.

25           THE COURT:  And Mr. Capozzi, does the defense wish to

906

1   call any additional witnesses?

2          MR. CAPOZZI:  Defense rests, Your Honor.  And we

3   renew our Rule 29.

4          THE COURT:  All right.  Mr. Gappa and Mr. Pearson,

5   does the United States have any rebuttal witnesses that it

6   wishes to call.

7          MR. GAPPA:  Yes, Your Honor.  We have Antonio Ruezga.

8          THE CLERK:  Please approach the stand.

9                        **ANTONIO RUEZGA,**

10  called as a rebuttal witness on behalf of the Government,

11  having been first duly sworn, testified as follows:

12         THE CLERK:  State your full name for the record and

13  spell it.

14         THE WITNESS:  My name is Antonio Ruezga.  Last name

15  is R-U-E-Z-G-A.

16         MR. GAPPA:  Thank you, Your Honor.

17                    DIRECT EXAMINATION

18  BY MR. GAPPA:

19  Q.  Sir, who do you work for?

20  A.  I currently work for Merced County Human Services Agency.

21  Q.  Who did you work for in November 2013?

22  A.  For CSA, which is Stanislaus County Child Protective

23  Services.

24  Q.  And were you, as part of your responsibilities in that

25  job, at a residence on Burman Drive in Turlock, California on

907

1  November 13th, 2013?

2  A.  Yes, sir.

3  Q.  Was a search warrant being served at the residence that

4  day?

5  A.  Yes, sir.

6  Q.  Were the adult occupants of the residence present that

7  day?

8  A.  Yes, sir.

9  Q.  Was Adam Henry present that day?

10  A.  Yes, sir.

11  Q.  Did you hear him make any statements?

12  A.  Yes, I did.

13  Q.  What did he say?

14  A.  He informed me that he wasn't sure of his charges.  And

15  stated that his wife was not part of the charges that were

16  brought about by the incident.

17          MR. GAPPA:  Your Honor, I don't have any other

18  questions.

19          THE COURT:  Any cross-examination?

20                  CROSS-EXAMINATION

21  BY MR. CAPOZZI:

22  Q.  Who were you employed by back then?

23  A.  Stanislaus County.

24  Q.  Stanislaus County what?

25  A.  Child Protective Services.

1   Q.  Was he advised of his rights one way or the other?

2   A.  I believe so, sir.

3   Q.  Were you?  Did you advise him of his Miranda rights?

4   A.  No.

5   Q.  Did someone else advise him while you were there?

6   A.  I don't recall, sir, but I --

7   Q.  Was he in custody at the time?

8   A.  Yes, sir.

9          MR. CAPOZZI:  Judge, I'd move to exclude those

10  statements.  And I don't want to ask for a mistrial at this

11  point.

12         THE COURT:  I'll rule outside the presence.  Any

13  other questions?

14  BY MR. CAPOZZI:

15  Q.  What else did he say?

16         THE COURT:  Well --

17  BY MR. CAPOZZI:

18  Q.  Did he make any other statements to you?

19  A.  We had some conversation, yes.  I don't recall everything

20  that he said, sir.

21  Q.  Wait.  I didn't hear what you said.

22  A.  We did have other conversation, sir.  I don't recall

23  everything that he told me.

24  Q.  Do you have a copy of the statement he made?

25  A.  Yes.

909

1    Q.  And what is -- in your statement?  You have it there with

2    you?

3    A.  Yes, I do.

4    Q.  Can I see that?

5    A.  Sure.

6              MR. CAPOZZI:  Can I approach, Judge?

7              THE COURT:  You may.

8    BY MR. CAPOZZI:

9    Q.  So while he was under arrest and handcuffed, Mr. Henry

10   reported to --

11             MR. GAPPA:  Your Honor, I would object.

12             THE COURT:  Sustained.  Don't read it.

13             MR. CAPOZZI:  All right.

14   Q.  Is it true that he -- was he trying to protect his wife?

15             MR. GAPPA:  Objection.  Calls for speculation.

16             THE COURT:  Sustained.

17   BY MR. CAPOZZI:

18   Q.  Did he say anything negative about his wife?

19   A.  Not to my knowledge.

20   Q.  He said she wasn't involved?

21   A.  Correct.

22   Q.  All right.  And that's on what day?

23   A.  November the 3rd -- 13th, 2013.

24   Q.  2013?

25   A.  Correct.

1  Q.  And he was under arrest when he made those statements to
2  you?
3  A.  I don't know, sir.  He did have handcuffs on.
4  Q.  Do you recall putting in your report, "while under arrest
5  and handcuffed," Mr. Henry reported to you?
6  A.  Yes, sir.
7  Q.  So you still don't know whether or not he was under
8  arrest?
9  A.  He could have been.  I don't know, sir.
10  Q.  Okay.  Did he also say that none of the children were
11  involved in or exposed to anything inappropriate?
12  A.  Yes, he did.
13  Q.  Okay.  And everything was concentrated to the bedroom,
14  where the children had no access?
15  A.  That was what he told me.
16  Q.  Right.  So what was he talking about?  Sex with his wife
17  in the bedroom?
18  A.  I don't know, sir.
19  Q.  Was he talking about child pornography?
20  A.  Maybe.  Yes, sir.
21  Q.  You think so?
22  A.  I think so.
23  Q.  Did you say -- did he say it was child pornography?
24        MR. GAPPA:  Objection, Your Honor, calls for
25  speculation.

1          THE COURT:  That question doesn't.

2    BY MR. CAPOZZI:

3    Q.  Did he say it was child pornography?

4    A.  He didn't say anything, sir.

5    Q.  Pardon me?

6    A.  He didn't say anything other than everything was

7    concentrated in the bedroom.

8    Q.  Right.  To the bedroom.  And you don't know what he was

9    referring to; do you?

10   A.  No, sir.

11   Q.  In your statement, didn't you say "upon entry into the

12   home, Mr. Henry was arrested by FBI agents"?

13          MR. GAPPA:  Objection, Your Honor.  He's reading from

14   the report.

15          MR. CAPOZZI:  I'm asking if that's in the report.

16          THE COURT:  Sustained.

17   BY MR. CAPOZZI:

18   Q.  Is that in your report?

19          THE COURT:  Sustained.

20          MR. CAPOZZI:  Oh.  Okay.

21   Q.  Do you know whether or not he was arrested by the FBI

22   prior to your statement?

23   A.  No, sir.

24   Q.  You don't.  Can I show you your report?  Judge, can I --

25          THE COURT:  You may approach.

912

1         MR. CAPOZZI:  Yes.

2   Q.  What does that say right there?

3   A.  It does say that.

4   Q.  What does it say?

5   A.  It says that he was under arrest.

6   Q.  And present at the time this was going on was his wife,

7   Mrs. Henry; is that correct?

8   A.  I believe so, yes.

9   Q.  And his mother-in-law Diane Brennan?

10  A.  Correct.

11  Q.  And his children, Aidan -- I can never pronounce that.

12        THE DEFENDANT:  Siobhan.

13  BY MR. CAPOZZI:

14  Q.  Siobhan and Liam, three children?

15  A.  They were in the residence.

16  Q.  Okay.

17        MR. CAPOZZI:  No more questions.  Thank you, sir.

18        THE COURT:  Any redirect?

19        MR. GAPPA:  No, Your Honor.

20        THE COURT:  May this witness be excused?

21        MR. GAPPA:  Yes, Your Honor.

22        THE COURT:  Thank you, sir.  You're free to go.

23        Any other government rebuttal witnesses?

24        MR. GAPPA:  No, Your Honor.

25        THE COURT:  Does the government rest at this time?

1           MR. GAPPA:  Yes, Your Honor.

2           THE COURT:  Does the defense --

3           MR. CAPOZZI:  Judge, I'm going to recall the

4  defendant.  I'm sorry.

5           THE COURT:  All right.  Surrebuttal.

6           MR. CAPOZZI:  Yes.

7           THE COURT:  All right.  We'll take a five-minute

8  recess, ladies and gentlemen.  Please heed the previous

9  admonition.  I won't have you out of the courtroom long.

10      (The jury left the courtroom.)

11          THE COURT:  Let the record reflect we're outside the

12  presence of the jury.  The defense has moved to strike the

13  testimony of the rebuttal witness on the grounds that the

14  statement that was testified to was unlawfully obtained.  I

15  have no -- I don't have enough information.  And that witness

16  clearly didn't have enough information for me to even consider

17  that issue.  And if my memory serves me correctly, I could be

18  wrong, which search -- that testimony had to do with the

19  November 13th search, federal search, execution of the federal

20  search warrant?

21          MR. GAPPA:  Yes.

22          THE COURT:  Detective Hively's interview with the

23  defendant, which we know was Mirandized, was taken in

24  connection with the state search warrant, the earlier

25  September search warrant.  Correct?

1          MR. CAPOZZI:  Right.

2          MR. GAPPA:  Yes.

3          THE COURT:  So I don't have anything in front of me

4    about any statements taken on November 13th from which I could

5    determine one way or another whether that statement was

6    lawfully or unlawfully obtained.

7          MR. CAPOZZI:  Well, judge, you heard from the

8    defendant when he testified.  Because I stupidly asked.  "Did

9    you say anything to the FBI when they came in?"  And he goes,

10   "No, I exercised my right to an attorney."

11         THE COURT:  Now that you say that.  I do think he

12   worked that into one of his answers.  Said at some point

13   during that day he invoked his right to counsel.

14              Anyway, I mean, I know nothing about the context.

15   Was he in custody?  This gentleman testified he was in

16   handcuffs.  He characterized him as being under arrest.  But

17   he doesn't know what an arrest is one way or another.  He's

18   Child Protective Services.

19              So what's the government's position about this?

20   You're going to have to defend that statement?

21         MR. GAPPA:  Your Honor, we're not saying that he was

22   in custody.  But even assuming he were in custody, even

23   assuming he had been Mirandized, our view is that these are

24   spontaneous statements and that, further, the witness who just

25   testified is not law enforcement.  So they were certainly --

1          THE COURT:  Well, that's the question.  You got a

2  brief on whether Stanislaus County Child Protective Services

3  is law enforcement for purposes of statements?  I mean, under

4  some circumstances --

5          MR. CAPOZZI:  It is.

6          THE COURT:  Are they law enforcement officers under

7  California law?  Do they have the power to arrest?

8          MR. GAPPA:  He said no.

9          THE COURT:  Who said no?

10         MR. GAPPA:  The witness.

11         THE COURT:  He didn't testify to it.

12         MR. GAPPA:  Well, but for purposes of the Court's, I

13  think, determination.  We could bring him back if the Court

14  wanted more information directly from him.  But I --

15         THE COURT:  He's your witness.  The defense has moved

16  to strike his testimony.  What's the government's position?

17         MR. GAPPA:  Well --

18         THE COURT:  We would have thought you would have

19  thought about this before you put him up there.

20         MR. GAPPA:  But then it's the defendant's burden, I

21  think, to show -- regardless, he was not in custody to the

22  extent that he was arrested.  He -- there was no

23  interrogation, so these are spontaneous statements.  And these

24  were not elicited by a law enforcement officer.

25         THE COURT:  Well, that's what you're telling me.  But

1  Stanislaus County CP -- is that what you're banking on, as a

2  matter of law, Stanislaus County Child Protective Services

3  Officers are not law enforcement officers?  Is that -- you're

4  putting all your eggs in that basket?

5          MR. GAPPA:  That's what I've been told.  But I

6  believe, Your Honor, even in the context of Miranda

7  violations.  We're not saying that there were one, but just

8  for purposes of an alternative analysis, that even if there

9  are Miranda violations, that doesn't make statements that were

10  elicited by law enforcement in violation of Miranda rights

11  completely inadmissible for all purposes.

12          THE COURT:  Mr. Capozzi, looking back at the

13  testimony.  At least based upon that testimony, it does not

14  appear even if the defendant -- at least based upon that

15  testimony, if you don't have anything else, it does not

16  appear, based upon that officer's testimony, that Mr. Henry

17  was subject to an interrogation even if the CPS officer

18  qualified as law enforcement and even if Mr. Henry was in

19  custody at the time.

20          And the reason I say that is the question was:

21          "Did you hear him make any statements?

22          "Yes, I did.

23          "What did he say?

24          "Answer:  He informed me that he wasn't sure of

25          his -- that he wasn't sure of his charges and stated

1           that his wife was not part of the charges that were

2           brought about by the incident."

3        So it was not established.  And I don't think you

4   established, in your cross-examination of the witness -- I'm

5   taking another look right now.  You established that the

6   witness did not advise the defendant of his right to remain

7   silent.  He does not know whether anyone else did.

8        You elicited testimony that at least this witness

9   believed that the defendant was in custody at the time, though

10  he equivocated about whether he was under arrest.  He really

11  didn't know.

12       And then you asked him, "Did he make any other

13  statements to you?"  We had some conversations, yes.  I don't

14  recall everything that he said.  What -- we did have other

15  conversations, sir.  I don't recall everything he told me."

16  And then you reviewed statements that he made.

17       But no where did you establish during that

18  examination that Mr. Ruezga interrogated the defendant, nor

19  was it ever established that he asked him any questions at

20  all.  At most, there was -- the witness characterized it as we

21  had a conversation.  Otherwise he said he heard him make a

22  statement.  So I don't think it's been established that there

23  was an interrogation.

24       MR. CAPOZZI:  Then we should recall this witness.

25  Because he only had one page of his report.  I'd like to see

1    the other.  And we have the FBI report from Mr. Lucas, the FBI

2    agent says he entered the house, he advised Mr. Henry of his

3    rights and he invoked his rights to an attorney --

4              MR. GAPPA:  Your Honor --

5              MR. CAPOZZI:  -- on entry to the house.

6              MR. GAPPA:  Your Honor, it wouldn't change the

7    Court's analysis I don't think.  The record establishes that

8    it wasn't an interrogation.

9              THE COURT:  So far I haven't heard anything that

10   establishes that it --

11             MR. CAPOZZI:  Then I want to call him to establish

12   it.

13             THE COURT:  Well, get your witness.

14             MR. CAPOZZI:  Is he still here?

15             MR. GAPPA:  I don't know.

16             MR. CAPOZZI:  Well, I'll get him.  Evidently he went

17   down to victim services or somewhere.  I don't know.  He's a

18   government witness, I would ask the government to get him

19   back.  Is Hively running him down?

20             THE COURT:  Detective Hively is seated in the

21   audience, I don't think he's running anybody down.

22             MR. GAPPA:  Your Honor, our view is that that is not

23   a custodial interrogation.

24             THE COURT:  I'm going to allow it.  Look, you called

25   the witness.

1        MR. GAPPA:  Right.

2        THE COURT:  I'm going to let -- if we have to recess

3   for the evening and get him back here tomorrow morning and do

4   it outside the presence of the jury, I'm letting the defense

5   attempt to establish whether this was a non-Mirandized

6   interrogated statement after the defendant invoked his right

7   to remain silent.

8        MR. GAPPA:  So would that be done outside --

9        THE COURT:  That's what I just said.

10        MR. CAPOZZI:  Yes.

11        THE COURT:  But I'm going to let him do it.

12        MR. GAPPA:  Okay.

13        THE COURT:  So do you want me to recess for the

14   evening and do it tomorrow morning?  Or do you want to see if

15   we can get him back now?

16        MR. CAPOZZI:  Let's see if we can get him back.

17        MR. GAPPA:  Your Honor, I think what might make sense

18   is if I can reach him, tell him not to leave.  We can address

19   that issue tonight.  I just -- obviously I think the Court

20   would be concerned with what the jury is going to be doing.

21   So --

22        THE COURT:  I'm not concerned.  It's four o'clock.

23   We got a half hour.  Get him back here.

24        MR. GAPPA:  Okay.

25        MR. CAPOZZI:  And I would ask the government to

1  produce FBI Agent Lucas, who did the advisement of rights.

2         THE COURT:  Well, not -- I'm not going -- we're not

3  having a full blown suppression hearing, unless you establish

4  that there was an interrogation.  If there's no interrogation,

5  you're not entitled to suppression whether he invoked or not.

6         MR. CAPOZZI:  Okay.  Comes down to a definition of

7  interrogation?

8         THE COURT:  Well, at -- I mean, you got to

9  establish -- he's got to be in custody.  Mr. Pearson is here.

10  I know Mr. Gappa stepped out, so I'm not having --

11         MR. CAPOZZI:  Yeah.

12         THE COURT:  You got to have -- he's got to be in

13  custody.

14         MR. CAPOZZI:  Yes.

15         THE COURT:  He's got to -- it's got to be in response

16  to an interrogation.

17         MR. CAPOZZI:  Uh-huh.

18         THE COURT:  And if he wasn't advised or was advised

19  and invoked and was interrogated, then the government's got a

20  problem.  Which I would have thought they would have thought

21  through before we called the rebuttal witness.

22         Even if you establish that the -- he's in custody and

23  it was an interrogation, I've also got to determine that a CPS

24  officer is a law enforcement officer.  Because if it's a

25  non-law enforcement, then it can't be an interrogation.  So

1    you got quite a few hoops to jump through, I think.  But it's

2    not -- it's not frivolous to make sure that we understand the

3    circumstances.

4        (Off the record.)

5            THE COURT:  Is Mr. Ruezga returning?

6            MR. GAPPA:  Your Honor, I reached him on his cell

7    phone.  He said he would come back.  He's coming back.

8            THE COURT:  Mr. Ruezga, please re-take the witness

9    stand and remember, sir, you are still under oath.

10                           **ANTONIO RUEZGA**,

11    called as a rebuttal witness on behalf of the Government,

12    having been previously sworn, testified as follows:

13            THE WITNESS:  Yes, sir.

14            THE COURT:  We are outside the presence of the jury.

15    The defense has made a motion to strike this witness'

16    testimony on the grounds that it is the fruits of an

17    unconstitutional interrogation, non-Mirandized interrogation

18    of the defendant.  I have identified off the top of my head

19    what I think might be the issues in connection with that and

20    noted that, at least based upon what's on the record so far,

21    that I don't think the grounds for such a motion to strike

22    have been established.

23            Mr. Capozzi, you asked to be allowed to recall the

24    witness outside the presence of the jury so that you could

25    ferret out some more evidence upon which I could perhaps make

1    a more clearly informed determination.

2              Fair characterization, Mr. Gappa, Mr. Pearson?

3              MR. GAPPA:  Yes.

4              MR. PEARSON:  Yes, Your Honor.

5              MR. CAPOZZI:  Yes.

6              THE COURT:  I didn't ask you, Mr. Capozzi.

7              MR. CAPOZZI:  Oh, I'm sorry.

8              THE COURT:  All right.  You may proceed.

9              MR. CAPOZZI:  Okay.

10                        FURTHER CROSS-EXAMINATION

11   BY MR. CAPOZZI:

12   Q.  Mr. Ruezga, is it?

13   A.  Ruezga.

14   Q.  You work for Child Protective Services of -- is it

15   Stanislaus County?

16   A.  I was working --

17   Q.  Then.

18   A.  Then.  Correct.  Stanislaus County.

19   Q.  On November 13th, were you told to go to an emergency

20   response location at a family home by the Ceres Police

21   Department?

22   A.  Yes, sir.

23   Q.  And with you was Detective Art Hively.  Do you remember

24   Detective Hively?

25   A.  Yes, sir.

Buezaa - X (outside the presence of the jury)

923

1    Q.   Detective Britton Moore.

2    A.   Correct.

3    Q.   An FBI Agent Mark Lucas.

4    A.   Yes, sir.

5    Q.   Okay.  And to conduct the child welfare investigation; is

6    that correct?

7    A.   They were conducting their investigation and I was

8    conducting the Child Protective Services investigation.

9    Q.   Right.  But you went in the house with them; didn't you?

10   A.   I was invited in, yes, sir.

11   Q.   Yeah.  Along with the law enforcement agents; is that

12   correct?

13   A.   We were there, correct.

14   Q.   All right.  Upon entry into the house, Mr. Henry was

15   arrested by the FBI agents; wasn't he?

16   A.   Yes, sir.

17   Q.   Okay.  The -- and there was an FBI arrest order for Mr.

18   Henry?

19   A.   There could have been.  I'm not sure, sir.

20   Q.   Can I show you the report?  Is that what you put in your

21   report?  Can I --

22   A.   Okay.

23            THE COURT:  You may approach.

24            THE WITNESS:  Okay.  Prior -- can I clarify

25   something?

924

1   BY MR. CAPOZZI:

2   Q.  Sure.

3   A.  Okay.  Part of this report was written by a court -- by a

4   court officer with Stanislaus County Child Protective

5   Services.  So some of it was written by me, some of it wasn't.

6   That part was not written by me, sir.

7   Q.  Okay.  Do you know if there was an arrest order for Mr.

8   Henry?

9   A.  I believe so.

10  Q.  Okay.  Did you see one?

11  A.  No, sir.

12  Q.  Thank you.  I think I asked you.  You said that he was

13  arrested when the FBI agents entered the house; right?

14  A.  I think they spoke to him first and then he was arrested.

15  Q.  Okay.  Fair.  And then did you state in this report,

16  "While he was under arrest and handcuffed, Mr. Henry reported

17  to "you --

18  A.  Correct.

19  Q.  -- "Ruezga, he was not sure what he was being arrested

20  for.  But that his wife had nothing to do with the charges."

21          Is that what he said?

22  A.  Correct.

23  Q.  Did you ask him a question?

24  A.  I did ask him a question.

25  Q.  Yeah.  Okay.

1          THE COURT:  What did you ask him, sir?

2          THE WITNESS:  I don't recall specifically what I

3     asked.  The reason I was there is to conduct a child welfare

4     investigation.  And my question was not entered into that

5     document.  So I don't recall the actual question, but the

6     question that I would have probably been asking Mr. Henry

7     would be were the children present?  Was there anybody else

8     involved with the child -- with whatever was going on?  And

9     then he -- and then that was his answer, what he gave me.

10          As towards the end of my statement there, he

11     continued saying that the children were not involved -- the

12     children were not privy to whatever was going on, that

13     everything was within the bedroom.

14          THE COURT:  So you knew that it was a child

15     pornography investigation?

16          THE WITNESS:  Yes, sir.

17          THE COURT:  And you think that what you would have

18     asked him and what is referred to is "Was anyone else

19     involved?"

20          THE WITNESS:  Correct.

21          THE COURT:  And you would have done that because you

22     would want to know whether or not you could leave the children

23     in that location?

24          THE WITNESS:  Correct, sir.

25          THE COURT:  Okay.  And you think you asked that

Case 1:13-cr-00409-DAD-BAM   Document 355   Filed 11/29/18   Page 199 of 220
Ruszaa - X (outside the presence of the jury)
926

1   question in this case?

2           THE WITNESS:  I believe so, sir.

3           THE COURT:  All right.

4   BY MR. CAPOZZI:

5   Q.  And he was taken down to the police department after that;

6   do you know?

7           MR. GAPPA:  Objection.  Relevance.

8           THE COURT:  Sustained.

9   BY MR. CAPOZZI:

10  Q.  Well, on that day you went to the police department.  Is

11  that correct?  After that.

12  A.  Yes, sir.

13  Q.  Along with him?

14  A.  No, sir.

15  Q.  With Mrs. Henry?

16  A.  I met -- Mrs. Henry voluntarily went to -- or she was

17  taken to the police department.  And I then met up with them.

18  Q.  Okay.  But you asked him the question when he was

19  handcuffed and under arrest; isn't that correct?

20  A.  I guess you could say that, yeah.

21  Q.  Yeah.  And with you, standing with you, was Detective

22  Moore, Detective Hively and FBI Agent Lucas?

23  A.  At that time, no, sir.  I was --

24  Q.  Where were they?

25  A.  They -- he was sitting down handcuffed and they were

1   questioning -- I believe at that time they were questioning

2   Mrs. Henry and I was allowed to speak to him by myself.

3   Q.   Okay.   While he was handcuffed and sitting down?

4   A.   While he was sitting down, correct.

5   Q.   And you asked him questions?

6   A.   Yes, I did.

7   Q.   Were you working in tandem with the law enforcement

8   agents?

9   A.   No, sir.

10   Q.   What --

11   A.   Yes and no, sir.   They do the law enforcement part and I

12   do the Child Protective Services part.

13   Q.   Do you consider yourself a law enforcement officer?

14   A.   No, sir.   I --

15   Q.   You can't make any arrest?

16   A.   I cannot make an arrest, correct.

17   Q.   Carry a gun?

18   A.   No, sir.

19   Q.   But you're there with the law enforcement people; is that

20   correct?

21   A.   I was part -- yes, I did go with them.

22   Q.   Did you go there at the beginning of the search when they

23   all came in, were you there with them?

24   A.   No, sir.

25        MR. GAPPA:   That's been asked and answered.

928

1    MR. CAPOZZI:  I don't remember that one.

2    THE COURT:  Hold on.  Sustained.  He's already

3  answered that he did go in with the law enforcement officers.

4    MR. CAPOZZI:  With them.  I have nothing more.

5    THE COURT:  Any further questions from the

6  government?

7    MR. GAPPA:  Just one, possibly two if I could, Your

8  Honor.

9                    REDIRECT EXAMINATION

10  BY MR. GAPPA:

11  Q.  Mr. Ruezga, if I understood, you were conducting your own

12  investigation?

13  A.  Correct.

14  Q.  And you were not asking questions on behalf of any law

15  enforcement people there?

16  A.  Correct.

17    MR. GAPPA:  Those are my only questions, Your Honor.

18                    RECROSS-EXAMINATION

19  BY MR. CAPOZZI:

20  Q.  Well, did you ask him about child pornography?

21  A.  I don't recall, sir.

22  Q.  You don't recall.  Then why were you there?

23  A.  I don't recall --

24    MR. GAPPA:  Asked and answered.

25    THE WITNESS:  If I --

1          THE COURT:  Overruled.

2          THE WITNESS:  I don't recall if I particularly asked

3     him that question.  But I -- I'm pretty sure I did.

4          MR. CAPOZZI:  Yeah.

5     Q.  You had reports of child pornography being on a computer?

6     A.  That was the understanding.

7     Q.  Right.  And that's why you were there.

8     A.  Correct.

9          MR. CAPOZZI:  Okay.  Thank you.

10         THE COURT:  As a result of -- first of all, tell me,

11    as best you can recall, what questions you asked of Mr. Henry?

12         THE WITNESS:  My question would have been if the

13    children were involved in any of the pornography.  If they had

14    any knowledge of it.  Or they were either viewing it or being

15    exposed to it.

16         THE COURT:  Okay.  And do you recall what answer you

17    got?

18         THE WITNESS:  The only answer that I can recall was

19    the statement that was given, that everything was kind of

20    concerning the bedroom, constrained in the bedroom and the

21    children had no access to it.

22         THE COURT:  Did you ask any other questions?

23         THE WITNESS:  Yes.  The other questions I probably

24    would have asked, the well being of the children as far as

25    medical information and so forth.

1          THE COURT:  Any other questions?

2          THE WITNESS:  Not that I can recall.

3          THE COURT:  Did you ask specifically whether anyone

4    else was involved with child pornography?

5          THE WITNESS:  No.  I don't recall.

6          THE COURT:  Are you saying that when you asked about

7    the child pornography in general, that Mr. Henry merely

8    offered in response, "The children aren't exposed to any of

9    this.  I'm not sure of the charges that are against me but

10   whatever they are, my wife wasn't involved in it"?

11         THE WITNESS:  As I recall, that was the conversation.

12         THE COURT:  How long do you think your entire

13   conversation with Mr. Henry took place on that day?

14         THE WITNESS:  Probably 15 minutes.

15         THE COURT:  15 minutes.  That's quite a while.

16   That's not very many questions.  What else did you talk about?

17         THE WITNESS:  Concerns about the house.  The well

18   being of the children within the household.

19         THE COURT:  As a result of your part of the

20   investigation, did the children remain in the home following

21   that search or were they taken?

22         THE WITNESS:  The children remained in the home with

23   the understanding that Mr. Henry was not going to be in the

24   home and neither was Mrs. Henry.

25         THE COURT:  So --

931

1          THE WITNESS:  They -- I'm sorry.

2          THE COURT:  You made a direction?

3          THE WITNESS:  We did what we call a safety plan.  We

4   wrote up a safety plan that the children would remain in the

5   house with grandma, under grandma's care.  And that mom was

6   not allowed to go back in the house and dad was not allowed to

7   go back into the house until we said it was deemed to be safe.

8          THE COURT:  Okay.  And did you report what you

9   learned from your 15-minute conversation with Mr. Henry that

10  day, did you report that to the FBI or Detective Hively or

11  Detective Moore?

12         THE WITNESS:  No, sir.  I conducted -- I did a -- I

13  made a report and I presented it to -- present it to the court

14  officer, who then proceeds with the case to the court.

15         THE COURT:  All right.  And it's your belief that, as

16  a Child Protective Services officer at that time, that you did

17  not act under California law as a peace officer or law

18  enforcement officer?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  No power to arrest?

21         THE WITNESS:  Correct.

22         THE COURT:  Not authorized to carry a firearm?

23         THE WITNESS:  Correct.

24         THE COURT:  Ever present cases for consideration by

25  the district attorney's office for possible prosecution?

1          THE WITNESS:  I have not.

2          THE COURT:  Did you view that as part of your duties?

3  Or is there a different division --

4          THE WITNESS:  There's a different division that would

5  handle that part of it.

6          THE COURT:  Did my questions cause any other

7  questions to be asked?

8  BY MR. CAPOZZI:

9  Q.  Mrs. Henry was arrested along with Mr. Henry that day;

10  wasn't she?

11  A.  I believe so.

12  Q.  Yes.  And then you, at that time, agreed to leave the

13  children with grandma?

14  A.  After having the party sign a safety plan that the

15  children were going to remain in grandma's care, correct.

16  Q.  Then did you go down to the police department afterwards?

17  A.  I believe so, yes.

18  Q.  Why?

19  A.  Because I --

20          MR. GAPPA:  Objection.  Relevance.

21          MR. CAPOZZI:  Oh, I think it's very relevant.

22          THE COURT:  Overruled.

23          THE WITNESS:  Because I didn't interview Mrs. Henry.

24  BY MR. CAPOZZI:

25  Q.  Okay.  Did you interview Mr. Henry more?

1    A.  I don't think so.  I don't think I did anymore

2    interviewing that day.

3    Q.  Is that because he invoked his right to an attorney?

4    A.  I don't know that he invoked his right to an attorney.

5           THE COURT:  Anything further?

6    BY MR. CAPOZZI:

7    Q.  In that report that you did -- or you didn't write the

8    report; is that right?

9    A.  I wrote -- I wrote the report.

10   Q.  Portion.

11   A.  Portions of that report, correct.

12   Q.  Was that report given to any law enforcement officials?

13   A.  Not to my knowledge.

14   Q.  You don't know one way or the other?

15   A.  I don't think it would be given to any law enforcement.

16   Q.  Okay.  Do you have that full report with you today?

17   A.  No, sir.

18   Q.  Just the two pages?

19   A.  I no longer work for the county.

20   Q.  Oh, that's right.

21   A.  So I'm not privy to that information anymore.

22          MR. CAPOZZI:  Okay.  I'm out of questions.

23          THE COURT:  All right.  Any further questions from

24   the government?

25          MR. GAPPA:  No, Your Honor.

934

1          THE COURT:  May this witness now be excused?  Because

2     I'm not bringing him back again.

3          MR. CAPOZZI:  Unless the Court has other questions.

4          THE COURT:  No.  I've asked all mine.  Can the

5     witness be excused?

6          MR. GAPPA:  Yes.  Please, Your Honor.

7          THE COURT:  Thank you, sir.  Sorry for the

8     inconvenience of bringing you back.

9          THE WITNESS:  That's okay.

10         MR. CAPOZZI:  We just need information how we can get

11    ahold of him later.

12         THE COURT:  Well, that's up to you.  You've got an

13    investigator.

14         MR. GAPPA:  Your Honor, the only other point on this

15    issue is there was reference to -- thank you, Mr. Ruezga.  The

16    only other point is there was reference to his two-page report

17    by the defense.  But we got these two pages, which came from

18    the defense.  So --

19         MR. CAPOZZI:  What's the relevance of that?

20         MR. GAPPA:  Well, that was all I wanted to say.

21         THE COURT:  All right.  That's fine.  Anything else

22    that the defense wants to add to their motion to strike the

23    testimony?

24         MR. CAPOZZI:  Judge, I think this was a complete

25    violation of his rights, due process rights.  To bring someone

1  like that in at the last moment for rebuttal to try to stick

2  the knife in at the end of a trial I think is just going too

3  far.  And the government has done that in this instance.  I

4  ask for a mistrial.

5           THE COURT:  Anything else from the prosecution?

6           MR. GAPPA:  No, Your Honor.  We believe that it was

7  proper testimony.  There's no constitutional violation.  And I

8  think the Court asked the relevant questions.  The record

9  would support that finding.

10          MR. CAPOZZI:  If I can respond?

11          THE COURT:  You may.

12          MR. CAPOZZI:  15 minute conversation.  There's some

13  questions and answers going on.  He's there with Detective

14  Moore, Detective Hively and the FBI.  And in his report he

15  said there's an arrest warrant for him.  And he says he was

16  arrested in his report.  Clear violation.

17          THE COURT:  The motion to strike will be denied.  It

18  is unclear to me whether this qualified as an in-custody

19  interrogation.  The handcuffing alone, it's my recollection

20  from prior research, does not necessarily establish an arrest.

21  It may be or it may not be that Mr. Henry was in custody at

22  the time.

23          Two, I find that the -- as described by Mr. Ruezga,

24  the conversation that he had with Mr. Henry was not an

25  interrogation.

1            And finally, I conclude, at least based upon what I

2    have in front of me so far, that Mr. Ruezga was not a law

3    enforcement officer, but was acting solely for purposes of

4    child protective reasons.  According to his unchallenged

5    testimony, he didn't share the answers received nor the report

6    that he wrote with law enforcement, that his inquiry was

7    simply for purposes of attempting to determine whether the

8    children could safely remain in the home.  Which eventually

9    they did, albeit with a grandmother's care and custody.

10           For all of those reasons, the motion to strike is

11   denied.  And on the same grounds, the motion for mistrial is

12   denied.  That ruling is without prejudice if the defense can

13   provide me with any legal authority that they believe supports

14   either a motion to strike or a motion for mistrial before we

15   reconvene or when we reconvene by tomorrow morning, I will

16   certainly read it and consider it.

17           As with many issues that come up in the middle of a

18   trial, this one is requiring me to rule quickly and without

19   much consultation -- but I've done -- of legal resources.

20   I've done the best I can.  I know in my own mind how I framed

21   the issue.  I think my questions to the witness were pointed

22   at those areas.

23           I think, based upon what I have in front of me,

24   there's no basis to grant either motion so they're denied.

25   But they are denied without prejudice.

Henry - D (Outside the presence of the jury)

937

1          Now, in light of that ruling, do you wish to present

2     a surrebuttal case?  You had indicated at one point that you

3     wanted to recall your client.

4          MR. CAPOZZI:  It would be for something outside the

5     presence, Your Honor.

6          THE COURT:  In support of your motion to strike?

7          MR. CAPOZZI:  Yeah.

8          THE COURT:  All right.

9          MR. CAPOZZI:  I'd like to call him as a witness.  We

10    can do it from here, if it's okay.

11         THE COURT:  Do you mind if he remains at counsel

12    table?

13         MR. GAPPA:  No, Your Honor.

14         THE COURT:  It would be quicker.

15                        **ADAM ALAN HENRY**,

16    called as a surrebuttal witness on behalf of the Defendant,

17    having been previously sworn, testified as follows:

18         THE COURT:  Mr. Henry, you're being recalled as a

19    witness outside the presence of the jury.  Please remember

20    that you are still under oath.  You may question the witness.

21         MR. CAPOZZI:  Thank you, judge.

22                       DIRECT EXAMINATION

23    BY MR. CAPOZZI:

24    Q.  Mr. Henry, do you remember the date, was it November 13th,

25    2013?

938

1   A.  I'm not sure I'll ever forget.  Yes.

2   Q.  And you're at home.  And did some law enforcement people

3   arrive at your house?

4   A.  Yes.  I was actually asleep.  And I heard the knocking at

5   the door.  And when I opened the door, there was a bunch of

6   men with guns.

7   Q.  Speak into the microphone.

8   A.  When I opened the door, there were a bunch of men with

9   guns pointing at me, yes.

10  Q.  At the time did you know Detective Hively?

11  A.  Yes, we talked when he interviewed me during the state

12  one.

13  Q.  Was he there?

14  A.  Yes.

15  Q.  Was Detective Moore there?

16  A.  Yes.

17  Q.  FBI Agent Lucas?

18  A.  Yes.

19  Q.  Child Protective Services Ruezga, I think it was?

20  A.  He followed in behind the guns, but yes.  He was there.

21  Q.  And the guns were drawn?

22  A.  Yes.  I opened it to pistols and shotgun, yes.

23  Q.  What happened when they entered?

24  A.  Pretty much the first thing they did was they -- one of

25  them handcuffed me.  The rest of them spread through the

939

1  house.  Gathered up all the children and my mother-in-law and

2  my wife.  And while they were gathering them, they sat down.

3  As soon as they made sure they had everybody, the FBI

4  agent --

5  Q.  Hold on.  Let me ask you a question.  You're handcuffed?

6  A.  Yes, sir.

7  Q.  Were you put in a chair?

8  A.  Yes.  I was sat down, yes.

9  Q.  Did anybody tell you you were under arrest?

10  A.  Yes.

11  Q.  Do you remember who?

12  A.  It was FBI Agent Mark Lucas.

13  Q.  Lucas.  Okay.  And he said "you're under arrest."  And

14  you're handcuffed?

15  A.  Yes.

16  Q.  Then what did he do next?

17  A.  He did the whole Miranda thing.  Asked me to sign it and

18  then I invoked my right to attorney.

19  Q.  You said you wanted a lawyer?

20  A.  Yes.

21  Q.  Where was Mr. Ruezga?

22  A.  He was standing around while they were securing the

23  residence.

24  Q.  Was he in the same room that you were with Mr. Lucas?

25  A.  Yes.  We were in the great room because I had just opened

1   the door and he didn't go through the residence until they

2   secured it.  So he was in that room.

3   Q.  Then did Mr. -- Detective Hively, Detective Moore or FBI

4   Agent Lucas ask you any more questions?

5   A.  As soon as I -- as soon as they secured the residence,

6   they asked -- and I did that.  And I -- and then they stopped

7   talking to me.

8   Q.  But they said you were under arrest?

9   A.  Yes.

10   Q.  And then did Ruezga come up to you and talk to you?

11   A.  Yes, sir.

12   Q.  What did he say to you?

13   A.  He asked me if -- about what was going on, what had found

14   find.  He didn't tell me any more than the agents did what was

15   going on.  I had no idea what charges were.  I just assumed it

16   was still related to the original stuff, just being upgraded

17   as I'd been told during my interview might happen to federal.

18   I had no idea about the recordings or anything at that point.

19   Q.  Did he mention something about child pornography?

20   A.  Yes.  He was asking about that, where it might have been

21   located, who might have had access to it.  If it was on a

22   computer that the kids might have seen something on.  Things

23   of that nature.

24   Q.  And your response was?

25   A.  My response was as far as I knew everything was on the

941

1   Netgear that the police had seized during the first one

2   because that's the only place that I copied files from the

3   work computer to.  And so it was all concentrated in the

4   bedroom.

5   Q.  You made a statement about your wife?

6   A.  Yes.  At the time I had no idea about her involvement, so

7   I told the -- I didn't even know about the recordings or

8   anything.  So I just -- as far as I knew, she had no knowledge

9   or involvement at the time.  So it's --

10  Q.  Where was your wife when you were being questioned?

11  A.  She was in the next room in the kitchen being interviewed

12  by at least Detective Moore.

13  Q.  Do you know whether or not she was handcuffed?

14  A.  From the reports I read, she was not.

15  Q.  Did you believe you could have got up and left?

16  A.  No.

17  Q.  Were you told that you were being restrained and you

18  couldn't leave?

19  A.  Yes.  There was -- like I said, I was handcuffed, placed

20  in a chair, told not to move and there was an agent not quite

21  looming over me, but he was making sure I wasn't going

22  anywhere.

23  Q.  And when they came into the house, they had guns drawn?

24  A.  Yes.

25  Q.  And did they say you were under arrest?

1   A.   Yes.   It took them a couple of seconds after they came in,

2   looked around, but --

3          THE COURT:   Based upon the testimony I've heard so

4   far, unless it's challenged, I'm going to modify my ruling to

5   find that the defendant was in custody at the time of the

6   statement.

7          MR. CAPOZZI:   No further questions.

8          THE COURT:   Any cross-examination on these issues?

9          MR. GAPPA:   No, Your Honor.

10         THE COURT:   All right.   And you wish to --

11         MR. CAPOZZI:   I renew my motion.

12         THE COURT:   Okay.   The motion is still denied.   I

13  will modify the ruling in that I am now finding, based upon

14  what's in front of me now, without prejudice to something

15  different or more being presented by either side, that the

16  defendant was in custody at the time.

17         And I am basing my denial of the motion to strike and

18  the denial of the motion for mistrial on the grounds that the

19  Child Protective Services Officer was not a law enforcement

20  officer, was not acting in concert with law enforcement

21  officers in connection with his conversation and that his

22  conversation and inquiries posed to the defendant with respect

23  to child welfare did not constitute an interrogation.

24         But I am modifying the ruling and concluding that he

25  was, in fact -- I said before it wasn't clear to me.   I'm now

1     changing that, I'm ruling he was in custody at the time this

2     exchange took place.  I'm basing my ruling on the fact that

3     the CPS officer was not a law enforcement officer, was not

4     acting as a law enforcement officer and did not engage in an

5     interrogation of the defendant.  Otherwise same ruling.

6     Always without prejudice.  If anybody's got any authority,

7     they can certainly bring it to my attention and I'll

8     reconsider.

9             MR. GAPPA:  Thank you, Your Honor.

10            THE COURT:  Anything else on this issue?

11            MR. GAPPA:  No, Your Honor.

12            THE COURT:  Is the defense planning on calling any

13     surrebuttal?

14            MR. CAPOZZI:  No.

15            THE COURT:  Let's get that on the record.  I take

16     it -- well, once you -- prosecution has already rested --

17            MR. GAPPA:  Correct.

18            THE COURT:  -- following their rebuttal case.  After

19     you decline to put on any surrebuttal witnesses, you'll rest

20     your case.

21            MR. CAPOZZI:  Right.  And again renew the 29 motions.

22            THE COURT:  You're renewing your Rule 29 motions and

23     I'm denying them for the same reasons as I denied them when

24     they were initially made.  Just so the record is clear.  You

25     have renewed them.  And I am once again denying them.

1          All right?  Let's bring the jury back in so that we

2     can send them home.

3          (The jury entered the courtroom.)

4          THE COURT:  Let the record reflect that we're back in

5     the presence of the jury.  And Mr. Capozzi, do you have any

6     surrebuttal case to present at this time?

7          MR. CAPOZZI:  No, we don't, judge.  We rest.

8          THE COURT:  And the defense has rested as has the

9     prosecution.  Ladies and gentlemen, after keeping you waiting

10    as I pondered a number of things that I had to do.  It's my

11    fault.  I was taking too long.  After all that time, I brought

12    you in for that.  And I'm now going to send you home for the

13    night.

14         JUROR SEAT NUMBER TWELVE:  Good to know.

15         THE COURT:  But that's my fault.  So we're going to

16    return at 9:30 tomorrow morning.  Because I need a little bit

17    more time at the front end as well.  So 9:30 tomorrow morning.

18    At that time, you will hear the closing arguments of counsel

19    followed by the jury instructions, which I will read to you

20    and which you will have copies of to take with you into the

21    jury deliberation room.

22         So the case, as we were predicting a while back, will

23    be in your hands for decision by sometime tomorrow.

24         Remember, the trial is not yet over.  Until the trial

25    is over, do not discuss this case with anyone, including your

1    fellow jurors, members of your family, people involved in the

2    trial or anyone else.  And do not allow others to discuss the

3    case with you.  This includes discussing the case in internet

4    chat rooms or through internet blogs, bulletin boards, emails

5    or text messaging.  If anyone tries to communicate with you

6    about the case, please let me know about it immediately.

7            Do not read, watch or listen to any news reports or

8    other accounts about the trial or anyone associated with it.

9    Including any online information.  Do not do any research,

10   such as consulting dictionaries, searching the internet or

11   using other reference materials.  And do not make any

12   investigation about the case on your own.

13           Finally, keep an open mind until all the evidence has

14   been presented and you have heard the arguments of counsel and

15   my instructions on the law and the views of your fellow

16   jurors.  If you need to speak to me about anything, give a

17   signed note to Sam or Renee.  And I'll address it immediately.

18   Have a pleasant evening.  Be very safe out there.  And we'll

19   see you tomorrow morning.  We will commence at 9:30 a.m.

20       (The jury left the courtroom.)

21           THE COURT:  And counsel, would you like to have an

22   off the record discussion regarding jury instructions here in

23   the courtroom?  Would you like a few moments and come back to

24   my chambers to have that discussion?  I think one way or

25   another, though, we need to have that talk before you leave

1   tonight.

2           MR. CAPOZZI:  Yes.

3           THE COURT:  What's your preference?

4           MR. GAPPA:  Your Honor, perhaps the second option.

5   That we just take a few moments and --

6           THE COURT:  Take a few minutes to go over your notes,

7   be prepared to discuss them.  And just Renee will bring you

8   back into chambers and we'll sit down off the record and talk

9   about them.  Then in the morning, I've told them we're going

10  to start at 9:30.  I suggest that we be here ready to go no

11  later than 9:15 tomorrow.  A, in case Mr. Capozzi's got

12  something more he wants the Court to consider.  I would hope

13  that perhaps he might email me something --

14          MR. CAPOZZI:  Yeah.

15          THE COURT:  -- if it's in writing, which he would

16  also email to government counsel.  So that I could take a

17  look.  But too, even if we don't have anything further to

18  discuss on that matter, the motion to strike slash for

19  mistrial, I do need to give you time to put objections on the

20  record to the jury instructions.  So I want to give us a

21  little bit of time because I really want to start at 9:30.

22          So we will convene at 9:15.  We'll bring the jury in

23  at 9:30.  And please let Renee know when you're ready to come

24  back into chambers and she'll bring you back.  Thank you.

25      (The proceedings were concluded at 4:44 p.m.)

947

1

2          I, KAREN HOOVEN, Official Reporter, do hereby certify

3   that the foregoing transcript as true and correct.  The only

4   amendment to the transcript was updating page numbers in order

5   to be consecutive with prior volumes.

6

7   DATED:  28th of November, 2018      /s/  Karen Hooven
                                        KAREN HOOVEN, RMR-CRR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25