UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. DALE A. DROZD, JUDGE

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )    No. 13-CR-409-DAD
                               )
vs.                            )    JURY TRIAL
                               )      DAY 7
ADAM ALAN HENRY,               )    (AMENDED)
                               )
          Defendant.           )
_____)

Fresno, California                  Thursday, November 16, 2017


REPORTER'S AMENDED TRANSCRIPT OF PROCEEDINGS


Volume 7, Pages 947 through 1044, inclusive

KAREN HOOVEN, RMR-CRR
Official Court Reporter
CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:        United States Attorney's Office
                          BY: **DAVID L. GAPPA**
                          and **ROSS PEARSON**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721


For the Defendant:        Law Offices of Anthony P. Capozzi
                          BY: **ANTHONY P. CAPOZZI**
                          1233 West Shaw Avenue
                          Suite 102
                          Fresno, California 93711

949

1    Thursday, November 16, 2017                    Fresno, California

2    9:33 a.m.

3         THE COURT:  Let the record reflect that we are back

4    in session outside the presence of the jury.  We held an off

5    the record jury instruction conference last night.  And did

6    everybody get the finalized packet by email last night?

7         MR. CAPOZZI:  Yes, Your Honor.

8         MR. GAPPA:  Yes, Your Honor.

9         THE COURT:  And I indicated that I would allow you to

10   put any objections on the record this morning.  But before we

11   do so, the defense filed this morning a request for sealing

12   and two documents submitted requesting that they be sealed.

13        I quickly reviewed the documents that were submitted.

14   I've not yet signed the order authorizing them to be filed

15   under seal.  What does that filing relate to, Mr. Capozzi.

16        MR. CAPOZZI:  I did it under seal because it relates

17   to A.T. and the CPS investigation.  But if that's not a

18   concern to the Court, then you don't need to do it under seal.

19        THE COURT:  My quick review indicates that -- I

20   didn't see that these related to A.T.

21        MR. CAPOZZI:  Well, it relates to -- I'm sorry.  The

22   children, Mr. Henry's children.

23        THE COURT:  Right.  I mean, there's information -- I

24   mean, the names and other things in here that perhaps should

25   be redacted.  Normally I --

1          MR. CAPOZZI:  I'm okay with that.

2          THE COURT:  -- I would be saying, look, the

3    information set forth in these reports is not completely

4    subject to sealing, although the filing of a redacted version

5    certainly would be appropriate.  We're here in the middle of

6    trial.  We've got a jury waiting.  So I don't want to delay

7    things.  Does the government have any objection to these two

8    documents being filed under seal?

9          MR. GAPPA:  No, Your Honor.

10         THE COURT:  All right.  Well, in the -- for the sake

11   of expediency, I'll sign the order allowing them to be filed

12   under seal.  Mostly because I'm -- I just want the record to

13   be clear as to what was before the Court and submitted.

14         But what is the reason for submitting these

15   documents?

16         MR. CAPOZZI:  To bring further evidence out from what

17   happened yesterday.  There's a top report, but if you flip

18   over to the second report of the -- it goes to the November

19   13, 2013, it's page one of eight.  It's a delivered service

20   log from Mr. Ruezga.  It says Henry defense Bates number 6

21   down at the bottom, judge.

22         THE COURT:  All right.  I think I'm looking at the

23   document.

24         MR. CAPOZZI:  First paragraph.  November 13th at 6:30

25   a.m.  This -- Mr. Ruezga meets with the Ceres Police

1   Department Detective Art Hively, Britton Moore, FBI Mark Lucas

2   and his team for briefing of the search warrant.  It talks

3   about where the meeting took place.  They went over what they

4   were going to do.  He goes into the house.  I think it's

5   on -- if we flip over to page -- well, anyway, it's a meeting

6   prior to going in.

7        He's meeting with law enforcement.  Going in as part

8   of law enforcement.  The evidence was law enforcement was

9   there with their guns drawn when they go into the house.

10  Defendant's advised of his rights, says "I want an attorney."

11  Mr. Ruezga does his questioning and that comes into evidence.

12       Two fold.  One, it's a violation of the Miranda and

13  should not have come in.  And secondly, he's with Child

14  Protective Services.  And bringing in someone from Child

15  Protective Services during this trial here I think is unduly

16  prejudicial and not probative of anything in this case.  I

17  think it violated defense constitutional rights and I want to

18  renew my motion for a mistrial.

19       THE COURT:  Anything the government wishes to add?

20       MR. GAPPA:  Your Honor, we don't think this changes

21  the facts nor the Court's analysis.  One or both of these were

22  referenced when Mr. Ruezga was cross-examined.  And we don't

23  read anything in either of these documents that's inconsistent

24  with his description.  And we believe the Court's analysis was

25  correct.

1          And even assuming, as the Court found, that the

2     defendant was in custody, he was not subject to a custodial

3     interrogation by law enforcement.  That CPS worker is not law

4     enforcement.  He was simply there conducting an investigation

5     for his agency, not as a law enforcement officer.  As a child

6     protective service worker.  And those statements were not a

7     Miranda violation.

8          THE COURT:  Anything further, Mr. Capozzi?

9          MR. CAPOZZI:  No, judge.

10         THE COURT:  As I indicated yesterday in ruling on the

11    motion in the first instance, I believe that the evidence

12    before the Court, though perhaps not fully developed, is that

13    Mr. Henry was in custody.  There was a warrant for his arrest.

14    The FBI agent who participated in the November search executed

15    that warrant, handcuffed the defendant, provided him with

16    Miranda advisement.  He invoked his right to counsel.  And it

17    was thereafter that the CPS officer, who had accompanied law

18    enforcement to the location where the search was to be

19    executed, engaged him -- engaged the defendant in conversation

20    and did pose questions to the defendant.

21         The parties have not provided the Court with any

22    legal authority.  Mr. Capozzi now provides some further

23    evidence indicating that the CPS officer met with law

24    enforcement in a parking lot before accompanying them to the

25    residence where the search warrant was to be executed.  But

1   the fact that he was present during that briefing, I don't

2   think, indicates anything more about the extent to which he

3   was working in connection with law enforcement.

4         He testified yesterday that he did not share what he

5   learned during the interview -- or during the questioning of

6   the defendant with law enforcement officers who were present.

7   And that he also did not provide those law enforcement

8   officers with a copy of his report that reflected the

9   defendant's responses.  And that the officers were off

10  executing the search warrant when he engaged the defendant in

11  the conversation.

12        It seems to me that the CPS officer, who no longer

13  works for CPS and, from my observation, wasn't

14  particularly -- no longer works for CPS.  I think he said he

15  was in private industry now.  My perception was that he would

16  have preferred to be elsewhere rather than testifying here

17  yesterday.

18        But he indicated he's not a law enforcement officer.

19  He wasn't working in concert with the officers.  He didn't

20  share the information that he obtained with them and that his

21  conversation was focused on the welfare of the children and

22  what was going to happen with them as a result of the

23  execution of the search and the arrest.

24        For Miranda itself -- in Miranda itself, the Supreme

25  Court defined custodial interrogation as, quote, "questioning

1  initiated by law enforcement officers after a person has been

2  taken into custody or otherwise deprived of his freedom of

3  action in any significant way."

4          Here, the CPS officer was not a law enforcement

5  officer nor was the -- nor were the questions that he asked

6  motivated by a law enforcement purpose.  They were motivated

7  by a different purpose, the protection of the children who he

8  knew to be located within the home.

9          I found only one case.  Granted, I was working on

10  other cases after we ended trial.  Thought perhaps there would

11  be some authority provided.  I did what minimal research I was

12  able to do late last night.  Found only one case.  It appears

13  at 38 ALR 6th 97 published in 2008 originally.  The case

14  referred to is *People versus Greene*.  It's a New York State

15  case that appears at 189 Miscellaneous 2d 276, 730 NYS 2d 697,

16  County Court, 2001.  Where the Court held that a social case

17  worker conducting a face-to-face interview with a defendant

18  who was charged with numerous counts of rape, sexual abuse and

19  incest was not an agent of law enforcement and thus

20  inculpatory statements voluntarily made by the defendant to

21  the social worker were admissible in the defendant's

22  prosecution even though the defendant was represented by

23  counsel and was being held in a county jail interview room;

24  and even though the social worker interviewed the defendant

25  independent of law enforcement in response to a report of

1    sexual abuse made to Child Protective Services; and even

2    though the social workers were not required to give Miranda

3    warnings to interviewees.

4         So in that case, the inculpatory statements made by

5    the defendant to the social worker were found to be

6    admissible.  It's the closest I could find to anything

7    involved in this situation.

8         I will say, for what it's worth, I found the

9    testimony that was submitted in rebuttal to be, for the most

10   part, unnecessary, cumulative.  I thought that it was

11   cumulative to the extent that -- to the extent the prosecution

12   was rebutting the defendant's claim or suggestion that

13   his -- that Angele, his wife at the time, was responsible for

14   anything unlawful and that this was an attempt to rebut that

15   assertion or suggestion by the defense.

16        Detective Hively had already testified that, at least

17   at the time of the exercise of the September State Court

18   search warrant, that the defendant had made statements

19   exonerating his wife and indicating that she had no access to

20   the areas and the material in question.  So to bring in the

21   CPS officer in rebuttal to testify that he made similar

22   statements in November at the time of the federal search

23   warrant seemed to me to not add a lot to the mix.

24        And does raise this issue, which I think is

25   not -- not a frivolous one.  It's -- now, but we are where we

1    are.  I have to rule on it.  For the reasons I've stated on

2    the record, I'm denying the motion for -- to strike the

3    testimony.  I'm denying the motion for a mistrial.

4            With respect to the new aspect of the motion, which

5    is that the mere fact that the officer, Mr. Ruezga, is a Child

6    Protective Services Officer, that calling him and identifying

7    him as Child Protective Services -- as a Child Protective

8    Services Officer who is there for the welfare of the children,

9    that that somehow is unduly prejudicial to the defense.  I

10   deny the motion to strike to the extent that it's based upon

11   that new argument.

12           The notion that -- there was no emphasis during his

13   testimony regarding any danger or harm posed to the children.

14   And I think one would assume, under these circumstances with

15   children in the house, that Child Protective Services would at

16   least, as a matter of course, be involved to check in to make

17   sure that the children's well being -- that they were cared

18   for in light of the fact that they're -- that the father of

19   the house was being arrested.  And I believe the mother of the

20   house had just been released on bond, if I recall, from

21   charges in State court.

22           In any event, under these circumstances, I don't

23   think it would be unusual at all to assume that Child

24   Protective Services would at least check in to the situation.

25   And, therefore, calling a Child Protective Services Officer as

1   a witness in rebuttal in and of itself I don't think

2   prejudices the defense in any way.  So that aspect of the

3   motion is denied as well.

4           Now, jury instructions.  Does the defense have

5   objections they wish to place on the record to the

6   instructions that have been circulated?

7           MR. CAPOZZI:  Judge, the objections that I had made

8   prior to our conference.  Both the government and I had agreed

9   to.  So I don't have anything I want to put on the record.

10          THE COURT:  Well, do you still have objections?  Do

11  you have objections that you want to state on the record to

12  preserve?

13          MR. CAPOZZI:  From what I recall -- hold on one

14  second.

15          THE COURT:  Sure.  Because our conference last night

16  was an off the record conference.

17          MR. CAPOZZI:  Right.

18          THE COURT:  So if you've got -- if you've got

19  objections, it would be --

20          MR. CAPOZZI:  Just on the character evidence.  I

21  wanted to give the Devitt and Blackmar full instruction on

22  character evidence.  The Court is going to give the Ninth

23  Circuit.  I don't object to that.  I'm just going to make my

24  argument from that.

25          And on the lascivious acts one, the Court has agreed

958

1    just to do the six notations.  And I'm agreeable with that.

2    And that's all I have at this point.

3         Oh, I wanted the voyeurism put in there, but the

4    Court indicated that since it's not charged, it wouldn't be

5    given.  And I can understand that.  But I'm going to argue

6    voyeurism.

7         I'm trying to think of others that I did, but I think

8    that's it.

9         THE COURT:  Any objections to the instructions as

10   I've now proposed them in the final packet that the government

11   wishes to place on the record?

12        MR. GAPPA:  No, Your Honor.  Although we would say

13   that we did make a request and gave a proposed numbered 37

14   related to the factors that should be considered.  The Court

15   has, as noted, decided to give only six.  We had requested

16   that a seventh factor be added as well as language to say that

17   these factors are not exhaustive, but merely some of the

18   factors that could be considered.

19        THE COURT:  Right.  Actually, originally you

20   requested eight.  Then I think you withdrew number eight,

21   asked me to give seven factors.  Six *Dost* factors plus one

22   based upon a quote by the Ninth Circuit in *Overton*, plus a

23   request that I give the defense version, which included the

24   notion that the factors were not exhaustive.  And I've

25   overruled both sides' objections on that instruction.  That

1    instruction, which actually I think ultimately Mr. Capozzi has

2    adopted the Court's instruction.  But I am overruling the

3    government's and I'm only giving the six *Dost* factors.

4            MR. GAPPA:  Thank you, Your Honor.  We have nothing

5    else.

6            THE COURT:  Are we ready to proceed then?

7            MR. CAPOZZI:  Just a quick question.  Will you give

8    us a break after the government finishes theirs so I have time

9    to organize?

10           THE COURT:  Sure.  We can take a recess.

11           MR. CAPOZZI:  Thanks.

12           THE COURT:  Are we ready to bring the jury in?

13           MR. CAPOZZI:  Yes.

14           MR. GAPPA:  Yes.

15       (The jury entered the courtroom.)

16           THE COURT:  Let the record reflect that we are back

17   in the presence of the jury.  Good morning, ladies and

18   gentlemen.

19           THE JURY:  Good morning.

20           THE COURT:  And would the government like to give its

21   closing argument at this time?

22           MR. PEARSON:  Yes, Your Honor.

23           THE COURT:  You may proceed, Mr. Pearson.

24           MR. PEARSON:  Thank you.

25           Good morning.  This is the defendant's collection of

1   child pornography.  It dates from 2007 all the way to 2013.

2   And in the 2013 volume, on a password protected side, there

3   are pictures and there are videos of A.T.  Pictures and videos

4   that the defendant and his wife took from a hidden camera that

5   they set up together in the bathroom.  The defendant committed

6   these two crimes.  And that's why we're asking you to find him

7   guilty on both counts.

8          I'm going to walk through each crime and we're going

9   to talk about the elements.  And after I'm done here, the

10  judge is going to give you instructions on the elements of

11  each count.  What we have to prove beyond a reasonable doubt.

12         So receipt of child pornography has five elements.

13  I'm not going to read those all to you.  You can read them

14  later and you'll get instructions.  But we have stipulated to

15  three of those elements.  So we're really just talking about

16  two.  There is the defendant knowingly received a visual

17  depiction.  That the defendant knew that the visual depiction

18  was of a minor engaged in sexually explicit conduct.

19         In this case, there's a lot of child pornography.

20  And it spreads from 2007 to 2013.  You heard the testimony.

21  Exhibit 16, the defendant's old computer.  There's child

22  pornography on there from 2007, 2008, 2009, 2010.  It starts

23  three years before the defendant knew Angele, before Angele

24  moved to the United States.  There's the hard drive, the loose

25  hard drive that was found in the defendant's living room.  Has

1    pornography on it from 2010.  Child pornography.  And then, of

2    course, the two items that you heard a lot about, the

3    Lock-N-Stitch hard drive and the NAS in the defendant's home.

4         So let's talk about Lock-N-Stitch for a little bit.

5    The defendant was the IT manager there.  He was a good IT

6    manager.  You heard Gary Reed tell you he was sophisticated,

7    he knew networks, he knew computers, he knew how to set things

8    up.  You heard him explain in his own words.  This is a

9    sophisticated IT manager.

10        And the morning of the search on a computer that only

11    he had access, on a computer that was locked, that he had the

12    password to, there was child pornography moved into a folder

13    called "MOV."  The very morning of the search.

14        Now, his job was network security.  His job was to

15    make sure that no one was downloading pornography of any kind,

16    not just child pornography.  But for a number of months, may,

17    June, July, August, September, there was child pornography

18    being downloaded on that computer.  And then the morning of

19    the search, that child pornography, with the titles that you

20    can see here, was moved into a folder called MOV, move.  That

21    child pornography was headed to the NAS.  And you heard about

22    the NAS.  You heard that there was a password protected

23    portion and an unprotected side.

24        Yesterday the defendant was asked when you spoke with

25    Detective Hively, "Was there anything that you told him that

1    was not true?"  And he said, "No, not from what I remember."

2    So let's hear what he said about that password protected side

3    of the NAS.

4         (Playing video.)

5         MR. PEARSON:  She accesses the side without the

6    password.  He starts to say she has the password and then

7    corrects himself.  She's going to go through the open side and

8    categorize it.  He makes another statement to Detective Hively

9    that day about who has access to the password protected side.

10        (Playing video.)

11        MR. PEARSON:  Angele doesn't have access to the

12   password protected side.  That's what the defendant told

13   Detective Hively that day.  "She accesses the one without the

14   password." And he explains why, it's because he's worried that

15   she might stumble across something bad.  What should that tell

16   you?  That he knows that there's something bad on that side.

17   He knows that he's been downloading files and he's been

18   placing them on to that computer.

19            And that's true.  And we know it's true because he

20   can see the Aurrora file.  And you can see the files that he

21   created.  You see Aza and Aza 1 and Aza 2.  And there is a lot

22   of adult pornography in there.  There's also child pornography

23   in there.

24            And remember Detective Moore's testimony when we

25   started this trial.  It's that to get the child pornography

1   into that point you need to take a number of steps.   The

2   defendant would have to go on to Shareaza, have to enter the

3   search terms, have to click a file with a title to download

4   that file.   Once that file downloaded, he'd see the title and

5   he would move it to the NAS, to this password protected side,

6   the side that Angele didn't access.

7         And so there's a lot of adult pornography and a lot

8   of child pornography.   But this isn't just a big dump of

9   everything he downloaded from the NAS because he sorted it.

10  We've been through this, but it's important.   "Sorted."

11  "Bad."  "No."  "Kid."  This folder should tell you a lot.

12  There is a folder on the password protected side of the NAS

13  called "kid" and it has child pornography in it.   That's not

14  an accident.   That's not mistaken downloads.

15        Now, you heard that -- you heard the defendant say

16  sometimes the names are wrong, sometimes they don't really

17  indicate what's in the video.   These names weren't wrong.   You

18  saw the names.  Lolita.  Preteen.  6 yo.  PTHC.  And even

19  worse.

20        These videos were clearly child pornography.   And

21  there were 27 of them in a folder made for child pornography.

22  That wasn't an accident because the defendant made the folder.

23  He sorted it.   This was his collection of child pornography.

24  It was made meticulously, it was made by an IT manager.   And

25  he did the same thing with the child pornography from 2007 and

964

1    2010.  If you look at the file paths, that child pornography

2    is sorted also.

3         So what about the search terms?  Who was sitting at

4    that computer?  Let's look again at what the defendant told

5    Detective Hively the day he was arrested.

6         (Playing video.)

7         MR. PEARSON:  You notice that?  He doesn't say,

8    "Angele was sitting at my computer typing in these search

9    terms."  He said, "I created a bunch of searches and just let

10   it run."  That was four years ago.  And what were the search

11   terms that he put in?  These right here.  All right?

12        And if you notice, this was a small detail, but he

13   also says he was trying to find things to spice up their

14   relationship.  He was looking for things Angele was into.

15   What was Angele into?  Costumes.  We have searches for

16   "costume porn."  And "costume."  She was into medieval things.

17   We have searches for "medieval" and "renaissance."  And in

18   between those searches, he searched for "PTHC," he searched

19   for "preteen" and he searched "underage."  And you saw some of

20   the titles that those searches would generate.  That's

21   knowingly downloading child pornography.

22        This isn't Angele sitting at the computer searching.

23   That's not what he told Detective Hively four years ago.  This

24   is the defendant searching for terms to spice up their life.

25   Searching for things that she's interested.  Searching for

1   child pornography.

2        Now, what about this password issue?  Who has this

3   password?  The defendant does.  He gave it to Detective

4   Hively.  He gave it to Detective Moore.  He's protective of

5   his passwords.  Gary Reed got up here and testified that no

6   one else at Lock-N-Stitch had the defendant's password, not

7   even the owner of Lock-N-Stitch had the password for his work

8   computer.

9        Defendant said he was very protective of his media,

10  that's why he needed to create the password protected side.

11  He said that he set up that password protected side so that he

12  could store items on there.  And remember Detective Moore

13  testified about how that side was set up.  There were two user

14  accounts on the NAS.  There was an account called "Adam."  The

15  Adam account had access to the entire NAS, it was an

16  administrator.  And then there was an account called "Angele."

17  The Angele account didn't have access to the full NAS.  It had

18  limited access.  It didn't have access to the Aurrora share

19  where the child pornography was found.

20        It doesn't make sense.  And that's why this was Adam

21  and not Angele who committed this offense.  Adam was the IT

22  person at Lock-N-Stitch.  Adam was the one who set up the

23  network.  Adam was the one who made the accounts to give the

24  Adam account full access, the Angele account partial access.

25  Adam was the one who typed in the search terms.  Adam was the

1   one who said he had access to the protected side.  Adam was

2   the one who said Angele didn't.  The defendant was the one who

3   downloaded this child pornography.  That's why he is guilty of

4   receipt of child pornography.

5           So what about the conspiracy?  The judge will

6   instruct you that a conspiracy has two elements.  The

7   defendant must agree with another person to commit sexual

8   exploitation of a minor.  And the defendant must become a

9   member of that conspiracy knowing of at least one of its

10  objects and intending to accomplish it.

11          So there's an agreement to commit a crime and there

12  must be a criminal purpose for that agreement.  And as I told

13  you in my opening statement, it takes two people to have a

14  conspiracy.  Here it was Adam and it was Angele.  We're not

15  trying to minimize what Angele did.  We're not hiding from it.

16  We're saying that she was an equal participant in this

17  conspiracy.

18          She was the one who was texting A.T.  She was the one

19  who was chatting with her.  She was the one who was trying to

20  make A.T. feel comfortable changing in the bathroom, changing

21  in the bedroom, showering.  It wouldn't have made sense for

22  Adam to do that.  He didn't have that personal relationship.

23  He had a different role and he still helped Angele set up the

24  camera, create these videos, create these screenshots.

25          Let's look at the scope of this agreement.  And

1   there's this significant date of January 2nd, 2013.  Where the

2   defendant says Angele was home alone with A.T.  And Angele was

3   the one who set up the camera in the bathroom there -- we're

4   not denying -- set up the camera in the bedroom there.  We're

5   not denying that.  But where did that video end up?  On the

6   password protected side of the NAS.  And screen captures from

7   that video on the password protected side of the NAS.

8           The agreement began well before this too.  It

9   actually starts back in February of 2012 when Adam and Angele

10  together set up the camera in the bathroom.  And you can see

11  the videos of them.  Adam gets in the bathroom.  Counts.

12  Tests the picture.  That same day, Angele gets in the

13  bathroom, adjusts the camera.

14          For an agreement, they need to have had a meeting of

15  the minds.  You don't need to see them shake hands, send a

16  text message to each other saying "Let's exploit A.T."  You

17  can infer it here.  Here you can infer it from them setting up

18  the camera and creating it to capture videos and images of

19  A.T.

20          The next point in this is April of 2012.  When the

21  defendant personally upgrades the camera in the bathroom.  You

22  can see the picture quality improving.  They're refining their

23  technique.  They're getting it better.

24          And then about a month later, A.T. uses the bathroom

25  and she changes clothes and they capture that and that video

968

1    ends up on the password protected side of the NAS.  But

2    there's a problem with it.  There's this curtain in the way.

3    You can see A.T. right here.  But you can't really see her

4    because there's a curtain blocking the view.

5           So what do Adam and Angele do?  They take the curtain

6    down.  And note the date on this.  June 12th, 2012.  You can

7    see them together removing this curtain.  And the defendant

8    told you yesterday it was cleaning day.  This curtain gets

9    dirty, they just had to take it down every once in a while and

10   clean it.

11          But the date is significant because that very same

12   day A.T. comes over and three times they catch her changing

13   clothes, changing clothes again and then using the bathroom.

14   That's why that date is so crucial.  Because two weeks before

15   they take a video and they can't see A.T.  And then two weeks

16   later, the very day that A.T. comes over, they happen to take

17   the curtain down to clean it.  That's not cleaning day.

18   That's not a coincidence.  That's them conspiring to get these

19   screenshots, get these videos of A.T.  This is them working

20   together for that specific purpose.

21          They did other problem solving in this case too.  A

22   few weeks later, A.T. uses the bathroom, but there's a bright

23   light.  You can't see the video of her.  So eventually, Adam

24   and Angele install a window shade.  And then the very next day

25   they test that window shade.  This is them working, refining

1  their technique.  They see a problem.  A light shining in the

2  bathroom that prevents them from seeing A.T.  So they work

3  together, put up a window shade to block that light.  And then

4  they test it.

5          And then April 8th, the day that -- the day after

6  they put up that shade, A.T. comes over again.  And they catch

7  her three times changing clothes.  And the third time she

8  showers.  And that video of her showering ends up on a

9  password protected side of the NAS.  It ends up in a folder

10  called [A.T.] beneath a folder labeled "exes" including the

11  defendant's ex-fiancee.  And underneath a bunch of folders

12  labeled "not okay."

13          And that video is the clearest video of A.T. naked.

14  And that screenshot ends up in that same folder.  And what

15  does the defendant do that day?  He rummages through the

16  underwear and holds them up to the camera.  That's him

17  participating.  That's him taking part in this conspiracy.

18  That's him agreeing to sexually exploit A.T.

19          And so it's not just this one date.  That date is

20  important.  But they had tried to capture videos of A.T.

21  before that.  And they continued to try to capture videos of

22  A.T. after that.  This is a conspiracy developing, them honing

23  their technique, them working together.  Even if you don't

24  hear them say "Let's exploit A.T.," you can see the agreement

25  forming.

1              And, in fact, the agreement was not just because

2    Angele was there.  Because you heard the defendant had

3    surreptitiously recorded people even before Angele showed up.

4    Four years before this conspiracy happened, the defendant had

5    a hidden camera in his bathroom, recorded three different

6    women.

7              The purpose of this conspiracy was to exploit A.T.

8    She was the object of their attention.  She was -- this wasn't

9    just Angele acting alone.  Angele joking and texting the

10   victim.  That was part of the conspiracy.  That was developing

11   her, grooming her to be comfortable.

12             And you can see that -- oops.  Sorry.  You can see

13   that in the text messages that they exchanged.  Angele saying

14   there was a 16 year old that fit that category they'd been

15   talking about.  The defendant going to a baseball game and

16   sending pictures about the T and A that he saw.  Those girls

17   that Detective Hively called "age difficult."

18             And you can especially see that in where these videos

19   and where these pictures ended up.  This isn't just voyeurism.

20   There was only a folder created for [A.T.].  From the guests

21   that the defendant recorded, only [A.T.] got her own folder.

22   Only [A.T.] got her own screen captures.  So it wasn't just a

23   running video trying to get anyone that came through.  This

24   was a conspiracy to get videos and pictures of A.T.

25   specifically and it worked.

1        That's why those pictures didn't just end up on

2   Angele's share of the NAS, just on the media side.  They ended

3   up on the Aurrora side because the defendant was

4   participating.  He agreed to commit this crime.  He agreed to

5   try to get pictures, screenshots of A.T. to try to exploit

6   her.  And we believe that they succeeded.  We think that those

7   screenshots, that those videos and pictures, that they amount

8   to sexual exploitation.  But even if they don't, it's the

9   agreement that's the crime.  It's them meeting together

10  thinking, "How can we record A.T.?  How can we create these

11  videos?  How can we get these pictures?"  And that's why the

12  defendant is guilty of conspiracy to sexually exploit A.T.

13        Now, you're about to hear a different story here.

14  You're going to hear that this was all Angele.  That she was

15  the one sitting at the computer typing in the passwords and

16  she dumped her child pornography on to the computer that he'd

17  had for a few years before she showed up.  And that the fact

18  that he ended up on camera was just some combination of

19  accident or bad luck or something else.

20        But go back to the statement the defendant made to

21  Detective Hively four years ago.  Four years before he had

22  time to see the evidence, to think about the case.  He

23  told -- he never said this was Angele.  He didn't say Angele

24  was the one at my computer typing in the password.  He didn't

25  say that Angele was the one searching for child pornography.

1    He didn't say Angele had access to the Aurrora share.  He said

2    that she had access to the unprotected side.

3         So what do we know here?  What's undisputed?  There

4    is child pornography downloaded at Lock-N-Stitch.  It was

5    downloaded on a computer in the defendant's office.  A

6    computer that's locked by password.  That child pornography

7    ended up on the NAS in the defendant's house.  Ended up on a

8    side of the NAS that's locked by a password, a password that

9    the defendant gave to Detective Hively and Detective Moore.

10   And on that same password protected side, there were videos of

11   A.T. and screen grabs taken from a camera that the defendant

12   and his wife set up together.

13        That's why we're asking you to find the defendant

14   guilty on both counts.  Thank you.

15        THE COURT:  Ladies and gentlemen, we're going to take

16   a brief five-minute recess to allow the attorneys to get set

17   up for the next closing argument.  Please heed the Court's

18   previous admonition.  We'll be back in five minutes.

19       (Recess.)

20        THE COURT:  We are back in the presence of the jury.

21   Mr. Capozzi, your closing argument on behalf of defendant.

22        MR. CAPOZZI:  May it please the court.  Counsel for

23   the government.  Ladies and gentlemen of the jury, this is my

24   opportunity to explain our side of the case.  Keep in mind

25   what the government just said is mere argument.  What I'm

1   going to say is mere argument.  You're going to hear the law

2   from the judge.  He's what counts.  We're just arguing.

3          But what's missing in this case?  What's missing?

4   Who isn't here?  Here's a chair that nobody is sitting in.

5   But you've heard a lot of evidence in this case.  And is it

6   all Adam Henry?  Is it all Angele Henry?  No.  No.  There's a

7   little bit of both.  More of Angele Henry.  Our position is

8   she's the one who's responsible for this.  And this is a case

9   where there was a rush to judgment.

10         One of the agents, I think it's Detective Moore said

11  he saw on his law enforcement computers that some child

12  pornography was going to Lock-N-Stitch.  So he got a search

13  warrant, went to Lock-N-Stitch and sure enough, there it is.

14  Child pornography being brought down on Shareaza, the

15  peer-to-peer.  And whose office?  Adam Henry's.  Immediately

16  he's guilty.  We found it.  He's a dead duck.

17         But they don't take it further.  They pull down what

18  came there.  There's child pornography.  No question about it.

19  But do they ever check to see all the tens or thousands of

20  adult pornography that's there too?  And when you put terms

21  in, if you think it's adult, it may come back child

22  pornography.

23         Do they look to see when the child pornography came

24  down?  Remember these dates.  He put it in May 23rd, 2013.  He

25  started downloading on Shareaza for adult pornography.  Five

1  days later, May 28th, other terms are put in and child

2  pornography starts coming in.

3         Now, was he there when that was happening?  You have

4  witnesses.  You saw the deposition of David Silva, the guy on

5  the monitors that you saw.  He worked across the hall from

6  Adam.  I'll show you a picture.  This is defendant's A-1.

7  That's the view from Silva's office to Adam's office.  He sees

8  Angele there.  And there is Gary Reed sitting at that same

9  table, same type of picture.  And this is the office as it

10  was -- D-1, as it was back then when the search was done.

11         Now, was David Silva being honest?  I got to tell

12  you, he was.  Because he said "I didn't see her on the

13  computer."  If he was lying, he would have said, "Yeah, I saw

14  her doing it, I saw her downloading."  He didn't say that.  He

15  was being honest.  "I saw her there, I don't know what she was

16  doing."  That's fair.

17         But it puts her there in the afternoons after they

18  came back from the honeymoon in May 2013.  She's in there in

19  the afternoons.  She brought the kids.  The kids are running

20  around.  You heard from Gary Reed, you heard from Mrs. Reed,

21  Louise Reed, on the kids being there.

22         And you even heard from Louise Reed, she asked me, I

23  don't know, if I can use the computer or I'm going to use the

24  computer.  Does that tell you she knew the password?  She goes

25  into Adam's office and uses the computer.  And these are in

1  the afternoons when he wasn't there.

2          And when did these downloads happen?  From May 28th

3  to June 6th.  And I'll show you on some of the search terms.

4  But those are the dates that this happened.  He's not there.

5  She's there.  And no one is sitting here.  No one.

6          They have to prove this case beyond a reasonable

7  doubt.  Please follow the rules.  Have they proven their case

8  beyond a reasonable doubt?  Think about it.  Think about it

9  hard.  They haven't.  They want to throw everything up against

10  the wall.  I always say -- I say spaghetti against the wall

11  and see what sticks.  My wife says jello.  What sticks?

12          They're trying to find some way to prejudice you.

13  Bringing in all those videos from Rebecca Jackson.  What does

14  that have to do with A.T.?  Rebecca Jackson is a female grown

15  adult.  The other two women in that room that were videotaped

16  were grown adults.  Is that child pornography?  Or is that

17  voyeurism?  He's not here for voyeurism.  He's here for

18  exploiting a child.

19          And look at the videos that are taken of A.T.  They

20  just put those in with her.  You heard Detective Hively.

21  There were over 22 videos of that bathroom in their house.

22  Whose on there?  Robert Todd, Mrs. Todd.  Angele is on there.

23  And there's a few others.  But they don't play those for you.

24  They just want [A.T.].  So it prejudices you to think all he

25  ever did is go after [A.T.].

1         And ladies and gentlemen, how many text messages were

2    there with Adam and [A.T.]?  A big fat zero.  When you look at

3    Defendant's Exhibit C, you're going to see -- I'll give you

4    the last page.  Right there.  This number.  759 text messages

5    between A.T., the minor, and not Adam but Angele.  He's not

6    talking to her.  He's not trying to groom her.  She is.

7         Well, is he helping her do that?  That's the

8    government's position.  Where is there an agreement?  You

9    could put a timeline together.  You could put statistics

10   together to have them say anything you want them to say.

11        But listen to the other side of the story.  He had no

12   contact with her.  The most contact he had was he rubbed her

13   shoulders once.  And his wife was in the room.  And he rubbed

14   her shoulders and rubbed hers.  That's it.  He's known [A.T.]

15   since 2005 when he's at Lock-N-Stitch working.  Sees her

16   there.  Nothing.  Nothing.  This is the government's

17   concoction to add more to the child pornography and Count Two.

18   Throw it up against the wall and see what sticks.

19        Then the government argued after that first search,

20   he took down that plant because he knew we'd be coming back.

21   But I asked Detective Hively, what's the significance of that?

22   He says, well, it would show that we were coming back and he

23   wanted to hide something.  Detective Moore said that that

24   plant was found in the garage.  Detective Hively said the same

25   thing.

1        When you look at Defendant's Exhibit H, somewhere

2   here, there it is.  H.  I got to -- this is the picture of the

3   bathroom when they came out on the second search.  Hively says

4   this was in the garage.  Moore says this was in the garage.

5   Defendant said, no, it wasn't, it was still there.  And here's

6   the mirror, here's the painting, there's the plant.  It's

7   still there.

8        What's he trying to hide from them?  Nothing.  He

9   cooperated with them.  He told them passwords.  And then the

10  agent took a picture.  Exhibit J from the defense.  There's a

11  picture that the agent had taken and there's the painting in

12  the bathroom.  It was still there.  Nothing hidden.  I showed

13  pictures of the garage to Detective Hively, he said he never

14  went in the garage, but he didn't see any plant in those

15  pictures because it wasn't there.

16        And if he was guilty of something, he'd be trying to

17  hide it.  He didn't.  All is made of this interview with

18  Detective Hively and the videotape.  This was when they came

19  out back in September now.  This is not the November time.

20  This is September when they first come out.  And he's brought

21  to the office.  A ruse, "come to the office."  He gets in his

22  car, gets to the office, they arrest him.  Takes him to the

23  office in cuffs.

24        They get to the office, take the cuffs off and they

25  start talking about these things.  You heard Detective Hively.

978

1  Talking about assuming something and just being a rush to

2  judgment.  They sit him in the room.

3          "Now, tell me, Adam, you know the words I want to

4  hear.  What are those words?"  Listen to that videotape,

5  you'll see.  "What are the words?"

6          It might not be the videotape.  It might be the one

7  in the car.  "What are the words?  Tell me those words."

8          He goes, "What are you talking about?"  "Downloading,

9  what did you download?"

10          He says, "Well, there's some nasty stuff on there."

11          "Tell me the words.  You know what the words are."

12          He goes, "Bestiality."

13          "No, you know what they are.  They're child porn.

14  Child porn."

15          He goes, "What?  Child porn?  What are you talking

16  about?  When I download, and if I see child porn, I delete it.

17  I don't keep it."

18          But that didn't stop Hively.  And I got to say,

19  Hively was a good witness.  And I got to tell you, he's a good

20  cop, he's a good detective.  He was truthful.  But he focused

21  on Adam.  That was it.  He's a male.  He's not a female.  You

22  don't see females do these things.

23          But you remember the one videotape you saw?  I mean,

24  it was brief, ten seconds.  It was a grown female in that

25  videotape with a young child.  Wasn't a male.  In the others

1    there were males, yes, but this was a female with a child

2    committing child pornography.  No question about that.

3    Females can commit the same offenses that men commit.  And I

4    submit to you the agents, the cops focused on Adam because

5    he's a male.

6            Again, you have to find the evidence of the

7    government beyond a reasonable doubt.  And reasonable doubt is

8    proof that leaves you firmly convinced that he's guilty.  It's

9    not required that the government prove guilt beyond all

10   possible doubt.  But a reasonable doubt is based upon reason

11   and common sense and not based on any speculation.

12           If you can come to either of two conclusions, he

13   might be guilty; but then again, he might be innocent, you

14   have to find him innocent.  That in itself is reasonable

15   doubt.  If you have any reasonable doubt as to whether he

16   committed this crime or doubt as to whether she did, there's

17   some questions.  That's reasonable doubt.

18           And it comes from careful and impartial consideration

19   of the evidence or from the lack of evidence.  After careful

20   and impartial consideration of all the evidence, you are not

21   convinced beyond a reasonable doubt that the defendant is

22   guilty, it is your duty -- you may not want to find him not

23   guilty.  But it's your duty.  You got to follow the law.  The

24   judge is going to tell you what the law is.

25           You may feel he's guilty because you saw all this

1   stuff.  You saw that child pornography.  Who would ever want

2   to watch that stuff?  He never did.  Remember what Detective

3   Hively said?  He's not here.  Detective Hively, Detective

4   Moore.  Do you have any proof that anyone looked at that child

5   pornography that we saw in court?  I think we saw four or five

6   videos, I'm not sure what it was.  Is there any proof that

7   Adam Henry looked at that?  No.  None.  Take it further.  Is

8   there any proof that Angele looked at it?  None.  Because

9   there was no proof that anybody looked at it.

10         First count is dealing with child exploitation.

11   Second count is dealing with the child pornography.  So it's

12   two different scenarios completely.  The judge will read the

13   entire instruction to you.  I have them so just so you know.

14         But Count One, is where they charge A.T.  This is

15   where [A.T.] one comes in.  Knowingly.  Knowingly.  You have

16   to know what you're doing.  Conspiring to employ, use,

17   persuade, induce, entice, coerce a minor to engage in sexually

18   explicit conduct.  What is sexually explicit conduct?  For the

19   purpose of producing a visual depiction -- videotape -- of

20   such conduct knowing or having a reason to know that the

21   visual depiction would be produced or transmitted in or

22   affecting commerce.

23         That's Count One.  Knowingly using her to engage in

24   sexually explicit activity.  What sexually explicit activity

25   did A.T. take part in?  Was there any at all?

1       Here's what the government has to show in Count One.

2   On or about May, 2012 and ending September 19, 2013, there was

3   an agreement between one or more persons to commit the sexual

4   exploitation of a minor.  And obviously that other person is

5   Angele.

6       Secondly, that the defendant became a member of the

7   conspiracy knowing at least of one of its objects, intending

8   to accomplish it.  Conspiracy is a kind of criminal

9   partnership, an agreement between two or more persons to

10  commit one or more crimes.  The crime of conspiracy is the

11  agreement to do something unlawful.  It does not matter

12  whether the crime agreed upon was actually committed.

13      And I'll go through what the agreement has to be

14  between them.  For a conspiracy to have existed, it's not

15  necessary that the conspirators have a formal agreement or

16  that they agreed on every aspect of the conspiracy.  It is not

17  enough, however, that they simply met, discussed matters of

18  common interest and acted in similar ways or perhaps helped

19  one another.  You must find that there was a plan to commit at

20  least one of the crimes alleged in the indictment -- and

21  that's the exploitation of A.T. -- as an object of the

22  conspiracy with all of you, all of you agreeing as to the

23  particular crime which the conspirators agreed to commit.

24      One becomes a member of a conspiracy by willingly

25  participating in the unlawful plan and with the intent to

982

1   advance or further some object or purpose of the conspiracy,

2   even though the person does not have full knowledge of all of

3   the details of the conspiracy.

4       Furthermore, one who willfully joins an existing

5   conspiracy is as responsible as though he was one of the

6   originators.  On the other hand, one who has no knowledge of a

7   conspiracy -- this is where Adam comes in.  One who has no

8   knowledge of a conspiracy but happens to act in a way which

9   furthers some object or purpose of the conspiracy does not

10  therefore become a conspirator.  Similarly, a person does not

11  become a conspirator merely by associating with one or more

12  persons who are conspirators, nor merely by knowing that a

13  conspiracy exists.

14      Adam didn't know what she was up to.  Who's the one

15  dealing with kids all of the time?  It's not Adam.  759 texts

16  between her and A.T.  Who's the one in the park?  Doing Art in

17  the Park with kids?  She is.  Who's there with her?  A.T.  And

18  other kids.  Indeed, the day that they took the video of the

19  bedroom, what did A.T. -- yeah, I think A.T. said, "I came

20  from Art in the Park and we went to the bedroom and that's

21  when the video was taken."  Angele was with her that morning

22  and brought her to the house for that.

23      But is that sexual exploitation?  Is that enough in

24  the bedroom?  Is that enough with the scenes in the bathroom?

25  What is sexual exploitation?

1          The offense of sexual exploitation of a minor, as

2   alleged in Count One, has three elements that have to be

3   shown.  At the time she was under 18.  No question, she was.

4          Two, defendant or another person employed her, used

5   her, persuaded her, induced, enticed or coerced A.T. to engage

6   in sexually explicit conduct for the purpose of producing a

7   visual depiction of that conduct.

8          Who did the persuading?  Adam Henry?  Or Angele

9   Henry?  And did he have an agreement with her to have that

10  happen?  Even if he did, was it sexual exploitation of her?

11  A.T.?  We'll get into what sexual exploitation is.  Keep

12  going.

13         The defendant had to know or had reason to know that

14  the visual depiction would be mailed or transported across

15  state lines.  The visual depiction was produced using

16  materials that had been mailed, shipped or transported across

17  state lines.  That is the computer or hard drive was made out

18  of state.  The visual depiction was mailed or actually

19  transported across state lines.

20         Were those elements proven?

21         Sexually explicit conduct.  What does it mean?  It

22  means actual or simulated sexual intercourse.  Was there any

23  sexual intercourse here with A.T.?  No.  Nothing.  Was there

24  genital to genital?  Was there a focus on to her genital

25  areas?  I submit to you no.  Was there oral-genital?

1    Anal-genital?  Oral-anal?  Whether between persons of the same

2    or opposite sex.  Bestiality, masturbation, sadistic or

3    masochistic abuse or lascivious exhibition of the genitals or

4    pubic area of any person?

5         Was there any concentration on that?  Any focusing on

6    that?  There's one in the bedroom with her changing clothes.

7    She's got her bikini underwear on, she's got her bra on.  But

8    is that focusing on the pubic area?  No pubic hairs or

9    anything of that nature.  I submit this hasn't been shown.

10   And it has to be shown.

11        Now, what else does the government have to show?

12   This is all Count One.  In determining whether a depiction

13   includes lascivious exhibition of the genitals or pubic area

14   of any person, you may consider the following factors:

15   Whether the focal point of the depiction is the minor's

16   genitals or pubic area.

17        Whether the setting of the depiction is sexually

18   suggestive, for instance, is the setting in a place or pose

19   generally associated with sexual activity.  Well, the

20   bathroom.  The bedroom.  But is A.T. sitting on a bed with her

21   legs spread or bent over for anal sex?  Legs spread for sex?

22   Did you see any of that?  No.  It's changing clothes with the

23   corset.  Putting a bathing suit on, I think it was.

24        Whether the minor is depicted in an unnatural pose or

25   inappropriate attire considering the age of the minor.  Well,

1   was any of that attire she had on inappropriate?  Was there an

2   unnatural pose?  I submit there was not.

3           Whether the minor is fully or partially clothed or is

4   nude.  She was nude in the bathroom.  No question.  Partially

5   clothed in the bedroom.

6           Whether the depiction suggests sexual coyness or a

7   willingness to engage in sexual activity.  Did you see any of

8   that with her?  Willingness to engage in sexual activity?

9   This is A.T. now we're referring to.  None.

10          Whether the depiction is intended or designed to

11  elicit sexual response from the viewer.  Did the viewer who

12  took the video, did the viewer who took the snapshots have a

13  sexual response to that?  You have to decide that.  Did that

14  create a sexual response?  Those pictures of her in the

15  bedroom?  And the bathroom?

16          In order to establish any visual depiction of a minor

17  engaged in sexually explicit conduct, that it was transported

18  in interstate commerce, the government may prove that the

19  image or any instrument that was used to produce or receive

20  such an image traveled in interstate or foreign commerce.

21  That's between one state, territory, possession or District of

22  Columbia and another state, or territory, or commerce with a

23  foreign country.  Interstate or foreign travel of an image may

24  be accomplished by means of a computer.

25          Do we have any evidence either in Count Two or County

986

1    One of these videos being sent out?  Remember on Count Two,

2    the loading of the child pornography from Shareaza at

3    Lock-N-Stitch, both Detective Moore and Detective Hively said

4    this couldn't be distributed.  It was dislodged.  It couldn't

5    be sent out.  If it couldn't be sent out, where is the crime?

6         Count Two is the one dealing with the child

7    pornography.  November '05 to September 19th, 2013, defendant

8    knowingly received.  Knowingly received through the internet

9    at least one visual depiction of at least one minor engaging

10   in sexually explicit conduct transported in interstate or

11   foreign commerce, had been sent or received using any means of

12   interstate or foreign commerce of which contained materials

13   mailed, shipped or transported in interstate commerce.

14        Clearly it came across interstate commerce.  The

15   question is did he know child pornography was coming in to his

16   computer when he was on the Shareaza, the peer-to-peer, from

17   May 23rd to June 3rd?  Child pornography didn't start coming

18   in until May 28th, five days later, after he started the

19   Shareaza.  And in that period of time, who's in his office?

20   Someone who isn't here.

21        I think this is important for you to know.  And I

22   think it's pretty clear.  Adult pornography is not unlawful.

23   You can have as much adult pornography as you want.  That's

24   not against the law.  And he had a lot of adult pornography.

25   You can't find him guilty for that.

1          Again, I say this case is a rush to judgment.  I

2    think the government was wrong in their analysis in many

3    respects here.  They were wrong in determining that Adam

4    accessed his work computer from home.  That became a big issue

5    here.  And the reason why the government is saying that is

6    that, yeah, Angele is in his office in the afternoon.  They

7    can't deny it now.  We have one, two, three I think -- yeah,

8    three witnesses saying she was there.  So the government's got

9    to overcome that somehow.

10         She's there, he's not there, but yet during that

11   period of time is the only time child pornography search terms

12   are put in.  And if that's true, she's the one who did it.

13   Government says, oh, no, wait a minute, he did it from home.

14   He did it from home in those afternoons.  Really?  Really?

15         You heard Gary Reed, the owner of the company.  Adam

16   was in charge of the IT.  He had an audit done to check on

17   Adam to see if what he was doing was working, if it was right.

18   Gary Reed said there was no connection from the home computer

19   to the office computer.  Well, he's his uncle, you can't

20   believe him.  What did the auditors say?  There was no

21   connection between the home computer to the office computer

22   A-1, the one that was using Shareaza.  There was no home

23   connection.  Even if the government says there was.  And I'll

24   get to that.  I'll show some proof from their angle.  Again,

25   anything could be twisted, anything, to say what you want to

988

1  say.

2       Here's the defendant's home computer, Government's

3  Exhibit 5.1.  Where is it?  It's in his home on a desk in the

4  living room.  People can walk by, people can see what's going

5  on.  Is he going to be playing child pornography on that

6  computer for everybody to see?  What does the evidence show?

7  No child pornography on that computer.  None.  None.  And that

8  came from the government witnesses.

9       And here's Exhibit 5.10, that's the tower to that

10  computer.  Nothing of child pornography on those -- that

11  computer.  None.

12       The evidence is clearly overwhelming, one, that he

13  wasn't connected to that computer at work.  Overwhelming there

14  was no child pornography on his computer at home.

15       So what does the government do?  He has to connect to

16  that computer or else the case is out the window.  What do

17  they do?  They bring in 31.1.  And they said, see, see this

18  server.  This is his home computer.  He's connected to a

19  server.  That's that 72.18.240.

20       Then we go to Exhibit 31.2.  This is his home

21  computer.  And they say, see, these server numbers here, that

22  72.18.240.  That's hooked to the office.  We got you

23  defendant, you're lying to us.  That is the number at the

24  office.  That is his home computer.  But it's not to his

25  computer at the office.  How do we know that?  How do we know

1   that?  Defendant must be lying because he's on trial.  He'd

2   lie to get out of this.  And we're the government, what we say

3   is the truth.  You got to trust us.  We're the government.

4   The government are people just like you and me.  They make

5   mistakes.

6            What does the evidence truly show?  Their Exhibit 2.

7   And what does it show that the Shareaza computer, Adam Henry's

8   computer.  Ladies and gentlemen, please follow this.  This is

9   important.  This has a lot to do with the rest of his life.

10  What's that number?  Not the same as they said it was.  Any

11  home computer, anything he had was not connected to the

12  computer that had the Shareaza that was downloading.

13           71.94.43.84.  That's the computer that was

14  downloading on Shareaza peer-to-peer.  The adult pornography

15  and, yes, child pornography came in.  Did he know it?  We say

16  no.  They're trying to show ways to show that he must have

17  known.

18           But the point is he couldn't have been doing this

19  from home because there was no connection.  Gary Reed said it.

20  I forgot who else said it.  Oh, the auditor said it.  But the

21  government says, no, there's got to be another way.  Got to be

22  another way.  He must know.  He must be connecting.  Because

23  if it's only Angele in that office at that time from May 28th

24  to June 6th in the afternoon -- and I'll show you something

25  else on the hours.  There's a reasonable doubt, my goodness.

1    You may want to find him guilty.  Because of this

2    terrible stuff.  Because he's stupid to take this voyeurism

3    pictures of people.  That's awful stuff.  But is he being

4    charged with it?  No.  No connection to that computer, ladies

5    and gentlemen.  None.

6        Well, wait a minute.  We got more evidence.  We'll

7    show you how he did it.  Look at this.  Look at Government

8    Exhibit 33.  We got you now defendant.  We got you.  This is

9    Mr. Hively testified to this.  File created date May 28th.

10   Who's in the office?  Well, what time is she there?  Go to the

11   right.  What time is it?  3:05 in the afternoon.  Who's there

12   in the afternoons in that office alone?  Gary Reed says it,

13   Louise Reed says it, David Silva says it.  And there it is.

14       Then they say, well, it was transferred to the home

15   computer on -- within minutes or seconds.  And they have a

16   time.  Now it's 15:07, that's military time.  So if you

17   subtract however that works, 12 hours off of that, that's

18   shortly after one up on top.  Okay.  Jeez, I asked Detective

19   Hively, I said, God, how can that happen?  Well, because he's

20   at home and he's doing it remotely.  Hmm.  If he's at work,

21   could he have done that?  He goes, no, it couldn't have

22   happened.  Look at his work records.  He was at work on August

23   23rd, 2013.  Couldn't have happened.  Even Hively says that.

24   And the work records are confusing, no question about that.

25       So after we did that, what does the government say?

1   Those work records are terrible.  They're not accurate.  You

2   can't count on those.  Every time we bring something up, they

3   throw something more there.  Can't rely on those records.

4          Well, Mr. Reed testified as to how those records were

5   put together.  They're given to one of the clerks.  I mean,

6   obviously you put down when you're going to be gone.  It's

7   given to a clerk, they put it into the records.

8          Now, there's something that came up on the day of the

9   arrest, September 19th, 2013.  There wasn't a record put into

10  the work schedule that Adam was gone because he was at home.

11  Well, that happened on the 19th.  Nobody ever got a lot done

12  on that day.  Indeed, the employees went home early that day.

13  So that may be one screw up on the 19th.

14         But on August 23rd, he was at the office.  And I

15  remember writing this down in my notes.  It could not have

16  happened if he was at work.  Ladies and gentlemen, he was at

17  work and the records show it.  Remember the records show when

18  you are not at work.  If it's not there, that means he was

19  there.  If it's not in the records that he was gone, that

20  means he was at work.  The records show when you're gone.

21         And I got to say again, Detective Hively.  When I

22  asked him that, he was forthright.  He was honest.  He says it

23  couldn't have happened if he was at work.  And to me, that

24  just shows there was no remote connection.

25         You know, the government ignores Adam's explanation

1    that he was downloading mass copies of videos without any

2    knowledge of what's coming in.  When you look at -- I tried to

3    do some calculations.  We say there's 10,000 videos.  That's

4    high.  I don't know.  I asked Mr. Hively, Detective Hively how

5    many child porn were there.  He said around 200.  I think it's

6    like 150.  But give them the benefit of the doubt, 200.

7            If there's 200 child porn and about 10,000 adult

8    video, I -- in my calculation, that's two percent.  Two

9    percent of child pornography out of the 10,000.  Well, okay.

10   Give them the benefit of the doubt.  There's not 10,000.

11   There's 5,000.  I think he went up to 5,000.  And there's,

12   say, 200.  I think that's high.  Child porn.  What percent is

13   that?  I did it.  I think it's five percent.  Four percent.

14   Four percent of child pornography.  Did he get to see that

15   four percent of the 5,000 or did he get to see the two percent

16   of the 10,000?  We submit to you he didn't.

17           And what does the evidence show?  Detective Hively,

18   can you show any evidence that anybody looked at this child

19   porn?  No.  "Detective Moore, is there any evidence that

20   anybody looked at these?"  "No."

21           You have to knowingly receive it.  He's charged with

22   receipt.  Not just receiving, but did you know you were

23   receiving?  I think the evidence is clear there is no evidence

24   that he knowingly received.

25           The government purposely presents one side.  And it's

1    those videos in the bathroom.  Only A.T.  Not Robert Todd, not

2    Mrs. Todd, not Angele's mother was also in there.  None of

3    that is shown to you.

4         Again, they talked about the peer-to-peer and all of

5    these videos that are coming down and all of this child

6    pornography, but yet they never check to see whether or not he

7    could distribute any of it and send it out on the internet.

8    Ultimately it was determined it could not be sent out.

9         And the work records show that on August 23rd, 2013,

10   at 3:05 when that exhibit I just showed you, he was at work

11   which made it impossible for him to send anything from home to

12   the work computer back home.  They were wrong about those

13   internet addresses I just showed you.

14        They left out all the others in the bathroom.

15   Rebecca Jackson, with her and the other adults there.  What is

16   voyeurism?  It's defined as capturing of an image of a private

17   area of an individual without their consent, and knowingly

18   does so under circumstances in which the individual had a

19   reasonable expectation of privacy.  That's voyeurism.

20        Did you see that here?  No question.  No question.

21   A.T.  That's voyeurism.  She's expecting privacy.  Privacy in

22   the bathroom.  Frankly with the other people that were in the

23   bathroom, they expected privacy.  That's voyeurism.

24        Is there any question -- the government keeps pushing

25   this.  Is there any question that Angele had access to the

password to the Netgear?  To the Aurrora file?  To the Sylvia

file?  And they were saying he said in his statement to Agent

Hively or Detective Hively, September 19th, 2013 when he was

interviewed.  They keep showing you the videotape there of the

comments he made.

Go back to September 13th, 20 -- September 19th,

2013.  They come in with their guns, they come in, they're

going to search the place.  I take that back.  It wasn't on

the 13th.  The 13th they tell him to come to the office.  He's

arrested on the way to the office.  He's brought in.  And Adam

doesn't know why he's there.  And he's in this interview room.

And that's when Hively keeps prodding him.  "You know

it's child porn, you know it's child porn."  And this is all

new to him as to what's going on because he's asking, "What's

this about?  What's this about?"  And they're saying that he

said that Angele didn't have the password.  Well, when you

look at it and listen to it, he starts to say "she had the

pass" -- and then went into something else.  And keep in mind,

he doesn't know what's going on here.  He doesn't know what

they're looking at.  He doesn't know whether it's some kind of

adult pornography or some kind of bestiality, whatever it is,

which is not unlawful.

But yeah, I think at that time he was trying to

protect his wife.  He didn't know all this other stuff.  He

didn't know about A.T. and the videos in the bathroom.  He

1   didn't know about the child porn.  He didn't know about what

2   was going on in the bedroom.  He didn't see any of that stuff.

3           So if he's trying to protect his wife, I could see

4   that.  Adam Henry cooperated all the way through this.  He

5   tried to do what he could to work with them and giving them

6   information on passwords, et cetera.

7           And I think what's important here is -- and I may

8   have left this part out.  This is Government's Exhibit 1A.4.

9   Again, 6-3-2013.  These are the search terms that the

10  government says Adam put in.  Moore said her interests were

11  corsets, renaissance, et cetera.  You can see the last search

12  term here is "corset."  Then go down the line.  And these are

13  other search terms.  But here, "r@ygold" is clearly a child

14  porn.  "Strip."  "Costume porn."  Who's into costumes?  Adam

15  isn't.  And these are the child porns right here on page two.

16  "Medieval."  Who's into medieval?  Not Adam.  Who's into

17  renaissance?  Not Adam.  "Bedroom dancing."  "Bedroom dancing

18  paroles de la chanson."  That doesn't sound Italian.  It

19  doesn't sound English.  It's French.  "Bedroom."

20          And then the others below that, I think are music.

21  The government says Adam put them in.  And they refer to his

22  video.  Listen to that video carefully, he's not saying he put

23  the search terms in.  He knew what she was interested in and

24  he was looking for some of the videos dealing with those that

25  were on the computer.

1    The important thing here is you have heard evidence

2  of the defendant's character for honesty.  In deciding this

3  case, you should consider that the evidence together of his

4  honesty, you should consider that together with and in the

5  same manner as any evidence in the case.

6    But I would submit to you that evidence of Adam

7  Henry's character for honesty and telling the truth may give

8  you reason for reasonable doubt in this case.  He has denied

9  knowingly conspiring or agreeing with Angele Henry to induce

10  or entice A.T. to engage in any sexually explicit conduct.

11  He's denied any wrong doing of child pornography.

12    You heard Gary Reed.  You heard Louise Reed.  And you

13  heard his mother.  In the wheelchair with the broken back.

14  She's not here today.  She couldn't make it.  He is so honest

15  when he was found stealing a computer part or in possession of

16  a computer part, she asked him, "Did you do it?"  "Yeah."  He

17  goes in and pleads guilty.  I did it.  This guy will tell you

18  the truth even if it hurts.

19    He didn't download child pornography knowing it was

20  being downloaded.  He didn't try to sexually exploit A.T.

21  Why?  Why would he want to exploit her?  No contact with her.

22  Rub her shoulders once.  And he's known her since 2005 at

23  Lock-N-Stitch.  Never any interest.

24    When did this interest start?  When someone, who

25  isn't here, came into the picture.  Was he helping her trying

1    to exploit?  And was there exploitation, sexual exploitation

2    of that young gal?  We submit there wasn't.  Even if they

3    wanted to, what you're seeing doesn't amount to it.  Not at

4    all.

5            What we're asking is the government -- or the Court

6    is going to be giving you a verdict form.  Think about this

7    stuff.  Think about this reasonable doubt.  And mark on Count

8    One not guilty.  Let me zoom in.  Not guilty on Count One.

9    We're asking you to do the same on Count Two.  Receipt of the

10   visual depiction.  That's the child porn one.  And this is the

11   one, Count One is conspiracy to exploit a minor, A.T.

12           I submit to you the evidence isn't beyond a

13   reasonable doubt here.  You might think he's guilty.  You may

14   feel he's guilty.  And I'm sure you do.  But look at the

15   evidence.  Have they proven it beyond a reasonable doubt?  And

16   the law is it's got to be beyond a reasonable doubt.  Even if

17   you think it, you've got to believe it.  But if it's not

18   there, do your duty.  It is not guilty.  Thank you very much

19   for putting up with me.  Thank you.

20           THE COURT:  Mr. Gappa, you may present the closing

21   argument.

22           MR. GAPPA:  Thank you, Your Honor.

23           So good morning, ladies and gentlemen.  This is the

24   government's last opportunity to tell you why you should find

25   the defendant guilty of Count One and Count Two.  Before I do

1   that and summarize some of the points that Mr. Pearson has

2   already communicated to you, I want to thank you on behalf of

3   both of us as well as Mr. Mancini, Detective Hively, the other

4   witnesses that the government presented.

5        When you came in here last week, you were told that

6   this case was projected to conclude at the end of this week

7   and that through the course of the evidence coming out, some

8   of it would be very disturbing material.  And indeed some of

9   that was.  We did our best to limit your exposure to that.

10  There were three clips that we edited and then further

11  restricted those to about ten seconds.  But there's also a lot

12  of disturbing content, just on those file titles alone.

13       So we want to thank you for your service.  You play a

14  very important part in this process.  And we're asking you to

15  find the defendant guilty of these two counts.  And I want to

16  let you know that Mr. Capozzi did a great job on his closing.

17  And the defendant is entitled to be well represented.  Mr.

18  Capozzi is the most experienced attorney here.  And he's done

19  his job.  But what is his job?  His job as a defense attorney

20  is to distract and to deflect and to give you alternate facts

21  or argue things that aren't necessarily what actually

22  happened.  And he started by bringing up something irrelevant

23  for this case.

24       This case is not about who should be or who was

25  sitting in that chair.  This case is about Adam Henry, the

999

1    defendant, and what he did and why he's guilty of these two

2    offenses.  It's about the crimes that he committed using these

3    pieces of evidence.  And we want you to think through his

4    inconsistent arguments, think about when he was interviewed on

5    September 19th, 2013, what had he done that morning?

6           We know there's testimony from witnesses, including

7    the defendant, that he went to work early that morning.  Where

8    did he go?  He went to Lock-N-Stitch.  What did he do?  He

9    logged on to his password protected computer and what did he

10    do?  There's evidence there that he saw the completed folder

11    for Shareaza that had been installed on that computer and used

12    on that computer to download child pornography, had been

13    downloading for months.

14           And even the defendant admits that he starts the

15    process for downloads, he lets it run and then he checks it.

16    And when it's completed, he moves things over.  And what had

17    he done on the morning of September 19th, 2013?  Just that.

18    He checked the incomplete folder.  He checked the complete

19    folder.  He saw two titles that he was interested in.  He put

20    them into a folder that he created called "Aza."  And look at

21    those two titles.  One of those is clearly indicative of child

22    pornography referenced a "12 yo" and the other title

23    references sexual activity and 13 people.

24           So there's no doubt that the defendant saw that

25    material on that day.  And that he moved those over to be

1  transported to his Netgear Ready NAS, Exhibit 9.  That's what

2  he did that morning.  Then he went home.  Little did he know

3  that law enforcement had been detecting his conduct for

4  months.  And you saw that network activity report.  Exhibit 5.

5  You only saw one page.  But remember, there is a lengthy

6  portion of that report that you didn't see.

7          But just take a look at those titles.  And you see

8  those are all titles that, during the period of time the

9  Detective Moore was using his law enforcement version of

10  Shareaza, that those files were being detected shared from or

11  available from that Lock-N-Stitch hard drive.  And you look at

12  those titles and you decide.  Is that child pornography?  Is

13  somebody who has those titles and those files on that device

14  somebody who's interested in only adult pornography?  Or is

15  that somebody who's looking for the titles and the content

16  that's reflected in that exhibit?

17          So he knows what's been going on.  And that's why,

18  when he's brought in to Lock-N-Stitch and he's interviewed,

19  he's nervous.  But he's pretty smart.  We'll concede that.

20  And he's obviously got some college education, he's been

21  trained, he knows how to do networks.  And he's thinking.

22  Uh-ho.  The police are here.  I'm in trouble.  I've got to

23  come up with an explanation for what's been going on.

24          So what does he do?  He says different things.  He

25  says, "I was just looking for adult porn."  Detective Hively

asked him, "Well, how did you do that?"  And he says, "I didn't know how to use Shareaza and I didn't know how to search for adult porn on Shareaza.  So I would just put in search terms, general terms like XXX porn."

Think about whether that's credible when you hear now his testimony that as far back as when he was in college, he had an interest in pornography.  And it was interesting that he wouldn't concede that he was downloading pornography back in college.  He did admit that he was exchanging it with other people.  And asked how did you get the pornography?  Oh, I got it from other people.  So for some reason he doesn't want to concede that he's downloading adult pornography back in college.  But he admits that he had that interest in that pornography as far back as college.  And he's sharing it with people.

And we would argue that his interest in pornography progressed and it got worse.  And his interests evolved and they devolved, because you heard Detective Hively talk about, when asked how much was there on that set of computers?  And there's no doubt there's a lot of adult pornography.  And it's true.  And we're not saying that it's illegal.  Everybody has their own opinion about whether that's appropriate.  And you can make your own judgments.  That's not what we're focused on.  We're focused on the illegal material.

And it's important to know -- and review the

1    testimony.  Detective Hively found Shareaza on Exhibit 16, the

2    computer that was first used.  That program had been installed

3    on this computer.  Take a look at this computer, ladies and

4    gentlemen.  This is an eight disk raid.  This is a defendant

5    production where he took all of those hard drives and he put

6    them together and he figured out a way to make that work.  And

7    then he installed Shareaza on it.

8            And what did he do with Shareaza?  He downloaded

9    child pornography.  And how do we know that?  Because we have

10   an exhibit that shows exactly what was on there.  It's 36.2.

11   And we know that there were about 61 child pornography files

12   that were on this computer.  And where were they found?  They

13   were found in folders.  One of them is "new folder."  And one

14   of them is "new folder/no."  Does that sound familiar?  We'll

15   get to the folder structure from item 9 and see how the

16   classification coincided with what he had been doing years

17   earlier on that device.

18           But he had installed Shareaza.  And used Shareaza to

19   download child pornography there.  So there were approximately

20   34 child pornography videos that were then transferred over to

21   the hard drive, which is in evidence as Exhibit 18.  And the

22   evidence from Detective Hively was there were 34 child

23   pornography videos added on September 8th, 2010.  And where

24   were they put here?  In something called "new folder/kid."

25           And then there were 25 child pornography videos added

1  on August 20th, 2010.  Where were those videos put?  "New

2  folder(2)new folder/no."  This was done in 2010.  This

3  computer was last accessed and shut down on August 25th, 2010.

4  That material was downloaded before Angele Henry was living in

5  that house.  This is a computer that the defendant used and

6  created.  And that's where a significant amount of child

7  pornography was found.

8          And one thing that hasn't been covered a lot, but I

9  just want to point out to you is if you look at the items in

10  evidence, you'll see things such as "Product of Thailand,"

11  some of the items were made in other locations.  For instance,

12  this hard drive, Exhibit 1A, which came from the Lock-N-Stitch

13  computer, was made in Thailand.  And the Canon Vixia

14  camcorder is made in Japan.

15          So if you look, almost every single item that was

16  used either to download the child pornography or to create the

17  images of A.T., those items are manufactured outside of the

18  State of California.  Which is important for jurisdictional

19  basis.  So I did want to point that out to you.

20          But go back to Adam Henry explaining to Detective

21  Hively what he had been doing with Shareaza.  What do you use

22  Shareaza for?  I believe that when people were asked at the

23  beginning, whose familiar with Shareaza?  No hands went up.

24  This is a program which is peer-to-peer file sharing.  Is that

25  what people would use to look for adult pornography?  Is that

1    what people use to look for music legally?  No.  If you want

2    music legally, what do you do?  You use iTunes, you go to

3    Amazon.  Whatever your favorite vendor is.  And you pay for or

4    get however you want streaming the music that way.  What did

5    Adam Henry do?  He used Shareaza and he got it in violation of

6    copyright laws.

7           Again, we're not concerned about that.  It may be

8    wrong.  But it's interesting that you use file sharing

9    software to do things illegal.  He said back in college they

10   would circulate adult pornography, things like Playboy

11   centerfolds, et cetera.  And he conceded that a simple Google

12   search could get you adult pornography.  And, in fact, I think

13   he admitted that he had at one point accessed websites.  So

14   you don't get child pornography doing Google searches.  You

15   don't go to websites and download child pornography.  You get

16   that from Shareaza.

17          So he knows that at this point in the interview, that

18   law enforcement knows somebody's been using Shareaza to

19   download child pornography.  So he starts thinking, "How do I

20   explain this?"  So he then says, "Well, I was looking for

21   porn.  XXX porn.  And if I ever saw anything that even was

22   questionable, any kind of child pornography, I'd immediately

23   delete it."  Which is inconsistent now with what he says four

24   years later of never having seen any child pornography.  And

25   then he would say further, I would put it in the recycle bin

1    and delete it.

2          Well, think about where I started this discussion

3    with you just now?  Go back to the morning of September 19th,

4    2013.  We know his statement to Detective Hively at that point

5    is not true because he had put things in the recycle bin as

6    well.  There were six child pornography videos that were in

7    that recycle bin.  And those six are the ones that had been

8    transferred over to the Netgear Ready NAS.  So there are

9    already inconsistencies in what he's telling Detective Hively.

10         So it seemed to be that at the time he's interviewed

11   with Detective Hively, he's just trying to make it look like

12   an accident.  That he's not really interested in getting child

13   pornography.  And that if he ever stumbled across it, he

14   immediately deletes it, has nothing to do with it.

15         Well, if you go through that interview, you listen,

16   and you watch it, you'll see at some point it seems like maybe

17   it's changed.  And he realizes this story that I'm telling is

18   probably not working out.

19         So then Detective Hively says, "All right.  If we go

20   to your home, are we going it find child pornography?"  And he

21   says, "It's possible."  And then Detective Hively says, "Well,

22   if it's possible, where would we find it?"  And Adam Henry

23   says exactly where they would find it.  He says, "You'd go to

24   my house, it's in the hallway closet in a cabinet.  It's in a

25   NAS, a network attached storage device on the secure partition

1   that's password protected."  Exactly where they went and

2   exactly what they found.

3           And how was it that that material was organized?  If

4   we go to the folder structure for Exhibit 9.  You recall there

5   was testimony about the password protected side and the

6   non-password protected side.  And what did Adam Henry tell

7   Detective Hively?  He would take things from work and put them

8   on to the password protected side.  And why did he do that?

9   Because he didn't want Angele or anybody to come across

10  anything that was bad or that would be objectionable.  And so

11  it's consistent in part with what he said because he said, "I

12  would go through it and then I would put things on the

13  unsecured side for her to look at.  And we would look at that

14  together."

15          So take a look at that folder structure.  It's very

16  important.  It shows that he is sorting.  And that child

17  pornography is under a subfolder of "sorted."  "Bad."  You see

18  reference to "animal."  And then you see the "new folder."

19  And then you see those two other folders, "kid" and "no."  And

20  that's where a very significant amount of child pornography

21  was located.

22          So there's overwhelming evidence that there is

23  material that meets all of the elements of a minor engaged in

24  sexually explicit conduct that had traveled through the

25  internet and that the defendant searched for it.  Now he says

1    today, four years later, that it was Angele who came in and

2    sat at his computer and put in those search terms.

3           Well, let's just think about that for a moment.  If

4    we go to those search terms.  Think about how implausible that

5    is.  First of all, go back to his statement to Detective

6    Hively on September 19th, 2013.  What did he say?  He said we

7    were having issues -- and I'm kind of summarizing.  But we

8    were looking to spice up our sex life.  And I thought I would

9    go find material that she was interested in because we would

10   look at this adult pornography together.  So he says, "I

11   searched for things that she was interested in.  And I found

12   some things that were clearly labeled as such."  And he

13   specifically said things such as costume, renaissance, people

14   in these old outfits.  So he's attributed himself to those

15   search terms.

16          He wants you to believe that the person who put in

17   those search terms for "costume," "renaissance," "dancing," et

18   cetera, he thinks that's Angele.  Well, he had said to

19   Detective Hively on September 19th that he did that, that he

20   put in search terms looking for material for her and he found

21   it.

22          So it's another thing of is it inconsistent?  He says

23   one thing.  When it doesn't work he thinks about it some more

24   and shifts his theory.  And think about it, the defense that

25   he's presenting, does this make sense?  Angele Henry

1  apparently at the time, when these search terms were entered,

2  was probably six months pregnant.  And then if you go into the

3  following months before the search, six, seven, eight, nine

4  months pregnant.  And she comes in using the only car to his

5  work place, goes to his password protected computer.

6         And remember, he is already on record as telling

7  Detective Hively that he didn't give her the password to the

8  Netgear Ready NAS at home.  And when Detective Hively says "I

9  need the password for the work computers," he says "I'm not

10  going to give it to you unless my boss tells me."  So

11  initially he's, I think, telling the truth that he's

12  protective of his passwords.  But he's got a password

13  protected computer.  You need to put in a user name and a

14  password.

15         So Angele allegedly comes in six to nine months

16  pregnant, puts in these search terms and -- by the way, nobody

17  saw her typing.  Every witness the defense put in, nobody

18  could say they saw her typing.  At best they could say she was

19  in his chair in his office.  But assume that she's there.  You

20  would have to believe that she was typing.  And that she got

21  on to his password protected computer, opened up Shareaza, saw

22  what the search box was, typed in these terms, saw the titles

23  that were available for downloading, clicked on those.

24  Started the download process.  And then went about her

25  business.  Because the defendant says it sometimes will run in

1  the background for months.  And he said he had no idea any of

2  that was happening.

3          This is a man who built the network at Lock-N-Stitch.

4  Who does network security.  Who set up the fireball.  Who

5  knows everything about the way a router can direct things to a

6  specific computer.  And he says he had no idea that was going

7  on?  It's just not believable that she would do that in the

8  first instance.  But once that process is started, that she

9  would weeks, months later, go in, check the Shareaza folder

10  for completed files and then move them over to a place where

11  they could either remotely transfer them as he did at times or

12  put them on a USB drive.  And then transfer them.

13          That's a lot of work.  And she's not the

14  sophisticated person who uses Shareaza, who is using the

15  network that is password protected at work.  So that's a lot

16  of work.  You would think if she were really interested in

17  doing that, she could sit at home while he's at work.  And if

18  you believe him and his presentation yesterday, she had access

19  to the secured side.  So she could just download at will any

20  kind of child pornography and just keep it.  He didn't know

21  about it, she could keep it hidden on the secured side of the

22  NAS.  That's what he wants you to believe.

23          So it's very inconsistent.  I mean, you've got to

24  decide what is your defense?  And it seemed like at the

25  beginning he's saying it was all an accident, it's a mistake,

1    I didn't intend to do it.  And then when he sees years later,

2    "Boy, they sure have a lot of evidence.  Maybe I better come

3    up with a better argument."  Now it's Angele.  But again,

4    we're not here to judge Angele.  She is part of the

5    conspiracy.  And I'll get to that in a few minutes.  But his

6    explanation is very inconsistent.  And so we know he's the one

7    who's responsible for downloading that child pornography.

8         I just want to take a moment to respond to the

9    arguments and the back and forth on the transfer of files from

10   Lock-N-Stitch to the Ready NAS.  Our evidence was, and

11   Detective Hively talked about how, if you look at Exhibit 33,

12   and you look at the file creation dates and the entry modified

13   dates.

14        The end result of that testimony, if you look at

15   those five files, our view is that those show that within

16   moments, within less than two minutes, they were on the

17   Exhibit 1A Lock-N-Stitch hard drive and then they were on the

18   Netgear Ready NAS.  And the only way that could have been

19   accomplished is if they were transferred remotely.  And the

20   defendant had said to Detective Hively he often worked

21   remotely from home.

22        And he says, well, that IP address doesn't go to that

23   computer, but it's also true that those are Lock-N-Stitch IP

24   addresses and all of the traffic goes through those IP

25   addresses to a router and the router directs it to a specific

1  | computer.  So, again, that's another deflection and

2  | distraction.

3  |       The point is it's certainly possible and Detective

4  | Hively established that those files went from the

5  | Lock-N-Stitch computer to the secured partition on the Netgear

6  | Ready NAS.  But in addition, the defendant himself said I

7  | would take things.  I would create folders called Aza, Aza 1,

8  | Aza 2, and I would put those on a thumb drive and then I would

9  | take them home and put them on the Netgear into the secured

10 | partition.  So whether these particular files in Exhibit 33

11 | went through remote transfer or whether they went through a

12 | thumb drive transfer, the point is they went from 1A to

13 | Exhibit 9.

14 |       So ladies and gentlemen, I think on the count for

15 | receipt, in light of some of the parts that are already agreed

16 | to, in light of the content that you've seen, in light of all

17 | those titles, where they were found, the period of time under

18 | which they were downloaded and the search terms that were

19 | entered, the methodology, where they all ended up, the folder

20 | structure on the locations where they were found, going as far

21 | back as 2010 and the reference to "kid" and "no," that's all

22 | Adam Henry's evidence.

23 |       Now, I'm going to segue over to the conspiracy count.

24 | There's a connection there.  He says there's no evidence that

25 | the defendant -- and then he said, in fact, there's no

1   evidence that Angele viewed any of the child pornography.

2   Well, when you see the sorting and the folder structure,

3   that's circumstantial evidence, which is every bit as valid

4   and as powerful as direct evidence.  So don't be misled by

5   that.  And it relates, again, to A.T.'s material.  There was

6   no intent on his part, he says.  He didn't even know that that

7   material was there.

8          But that's not credible, ladies and gentlemen,

9   because think about it.  We saw and Mr. Pearson showed you the

10  summary of the installation of the cameras, you see the

11  defendant on a ladder.  You see Angele Henry on a ladder.  You

12  see them making these adjustments.  They go in.  They test the

13  recordings.  And then over time, as needed, they make

14  adjustments.  And he walked you through when there's a shower

15  curtain obstructing the view of A.T. behind there using the

16  toilet, to take the shower curtain down and solve that

17  problem.  Then when there's that light and the glare, they put

18  a curtain over the window.  He says we just happened to be

19  cleaning that day.  What a coincidence that on that very day

20  when the shower curtain comes down, you've got them recording

21  multiple videos of A.T.

22         And he says he had nothing to do with that.  That he

23  had no interest in her.  You heard her come in and testify

24  that one time when she was typing at a keyboard, that he went

25  over and he rubbed her shoulders.  And that made her

1   uncomfortable.  You saw the text messages where he's at a

2   baseball game and he's taking pictures.  You look at those

3   pictures and you see do those appear to be girls, young girls?

4   Minors?  People under the age of 18?  And that he's commenting

5   and sending those to Angele.

6          And then you think, separately from that on different

7   dates, there are messages where one of the images is of [A.T.]

8   and she's in a provocative outfit and there's a reference to

9   "I had to fit her into this."  And then there's one, too, that

10  you need to pay careful attention to.  And that's where Angele

11  says to Adam, "You've got to come next week.  One of those

12  assistant instructors or instructors gets me every time.

13  She's 16.  She fits into that category we've been talking

14  about."

15         And remember when the defendant was testifying

16  yesterday.  I think he slipped a little bit.  Because he said,

17  "Yeah, Angele and I were interested in having sex with another

18  woman."  And that was directly in the context of these

19  communications.  So he admits that he was interested in having

20  sex with other people with his wife, but he denies that it was

21  ever directed to a 16 year old.

22         At the same time he says "I never had any interest in

23  A.T."  But look at those screen captures.  He says, again,

24  there's no evidence that he ever viewed that material.  But

25  where do those screen captures end up?  They're on the secured

1   side.  And the fact that he was at work when the bedroom

2   videos was created doesn't mean that much because he clearly

3   knew that video was there because there are ten screen

4   captures that are made.

5         Can we go to those screen captures?  That's one of

6   them.  I think we can infer that somebody who's looking at a

7   video and creates a screen capture is really focused on what

8   they're interested in.  And what do you see there?  And there?

9   And then you saw efforts of Angele directly to reposition her.

10  And then she actually even at one point said, "What do you

11  think?  Should I go get a camera?  We'll take some pictures."

12  She said, "I left the room so you could have your privacy."

13  So very manipulative on Angele's part.

14        And on this count, what she does can be attributed to

15  the defendant because we're now in January of 2013.  So this

16  is well after the installation of the first cameras and the

17  first videos of this victim.

18        So then we have the screen captures from the bathroom

19  videos.  And he says, "I didn't know those were made.  I had

20  no interest in that."  Those are the screen captures from the

21  bathroom.  If we go through those.  And the last one, there

22  was even a question of, "Is that the victim?  Is that A.T.?"

23  And then we showed that was made from Exhibit 27.7, that video

24  that was created on April 8th, 2013.  And it takes a lot of

25  work to actually get a screen capture at a specific point.

1  And that's the one that he was most interested in.

2           So that, in our opinion, is material that meets the

3  definition of sexually explicit conduct.  It takes a little

4  bit of work to get the instructions.  You'll be given a lot of

5  definitions.  But I trust that you will be able to work

6  through that and you'll see is there any pubic hair showing in

7  this picture?  This doesn't show oral sex, this doesn't show

8  intercourse.  You don't have to have that.  You can have that,

9  that certainly qualifies.  But you don't need that.

10          Sexually explicit conduct includes lewd or lascivious

11  exhibition or display of the genital area.  You don't have to

12  have nudity.  Here we do.  And there are factors that you can

13  look at.  One of those is is it intended to elicit a sexual

14  response in the viewer?  You'll go through those factors.  And

15  our position is that the material satisfies that definition.

16  As Mr. Pearson said, again, keep focused on what the crime

17  that's being charged is and what he's guilty of.  It's

18  conspiracy.

19          And what is conspiracy?  You'll get this definition.

20  If we could switch to -- "A conspiracy is a kind of criminal

21  partnership, an agreement of two or more persons to commit one

22  or more crimes.  The crime of conspiracy is the agreement to

23  do something unlawful; it does not matter whether the crime

24  agreed upon was committed."

25          It says that it doesn't matter whether the crime that

1   they agreed to commit was committed.  Our position is they did

2   not only agree, but they actually committed the crime of

3   sexual exploitation of A.T.  So that's why we will ask you to

4   find the defendant guilty.

5        The defense also referenced the standard.  It's a

6   standard that we embrace and take very seriously.  Beyond a

7   reasonable doubt.  But you will also be instructed that it is

8   not required that the government prove guilt beyond all

9   possible doubt.  We submit to you that we have proven these

10  crimes beyond a reasonable doubt.  And for those reasons, we

11  ask that you find the defendant guilty on both counts.  Thank

12  you for your time and for your service.

13        THE COURT:  Ladies and gentlemen, we'll take a

14  five-minute recess.  When you come back, there will be a

15  packet of instructions sitting on your chairs.  You can either

16  read along with me, although I've been told by some folks that

17  they like to listen to the instructions read out loud once.

18  That that resonates more with them.  Either one you choose is

19  fine.  But you will each have a packet of instructions with

20  you when you return to the jury room to deliberate.  All

21  right.  See you in five minutes.

22     (Recess.)

23        THE COURT:  We are back in the presence of the jury.

24  Members of the jury, now that you have heard all of the

25  evidence, it is my duty to instruct you on the law that

1  applies to this case.  A copy of these instructions will be

2  available in the jury room for you to consult.  It is your

3  duty to weigh and to evaluate all the evidence received in the

4  case and, in that process, to decide the facts.  It is also

5  your duty to apply the law as I give it to you to the facts as

6  you find them, whether you agree with the law or not.

7         You must decide the case solely on the evidence and

8  the law and must not be influenced by any personal likes or

9  dislikes, opinions, prejudices or sympathy.  You should also

10  not be influenced by any person's race, color, religious,

11  national ancestry, gender, sexual orientation, profession,

12  occupation, celebrity, economic circumstances or position in

13  life or in the community.  You will recall that you took an

14  oath promising you to so at the beginning of the case.

15         You must follow all of these instructions and not

16  single out some and ignore others.  They are all important.

17         Please do not read into these instructions or into

18  anything I may have said or done any suggestion as to what

19  verdict you should return.  That is a matter entirely up to

20  you.

21         The indictment is not evidence.  The defendant has

22  pleaded not guilty to the charges.  The defendant is presumed

23  to be innocent unless and until the government proves the

24  defendant guilty beyond a reasonable doubt.

25         In addition, the defendant does not have to testify

1 or present any evidence to prove innocence.  The government

2 has the burden of proving every element of the charges beyond

3 a reasonable doubt.

4        The defendant has testified.  You should treat his

5 testimony just as you would the testimony of any other

6 witness.

7        Proof beyond a reasonable doubt is proof that leaves

8 you firmly convinced the defendant is guilty.  It is not

9 required that the government prove guilt beyond all possible

10 doubt.  A reasonable doubt is a doubt based upon reason and

11 common sense and is not based purely on speculation.  It may

12 arise from a careful and impartial consideration of all the

13 evidence or from lack of evidence.

14        If, after a careful and impartial consideration of

15 all the evidence, you are not convinced beyond a reasonable

16 doubt that the defendant is guilty, it is your duty to find

17 the defendant not guilty.  On the other hand, if, after a

18 careful and impartial consideration of all the evidence, you

19 are convinced beyond a reasonable doubt that the defendant is

20 guilty, it is your duty to find the defendant guilty.

21        The evidence you are to consider in deciding what the

22 facts are consists of:  One, the sworn testimony of any

23 witness; two, the exhibits received in evidence; and three,

24 any facts to which the parties have stipulated or agreed.

25        In reaching your verdict, you may consider only the

1   testimony and exhibits received in evidence as well as facts

2   to which the parties have stipulated.  The following things

3   are not evidence and you may not consider them in deciding

4   what the facts are.

5           One.  Questions, statements, objections and arguments

6   by the lawyers are not evidence.  The lawyers are not

7   witnesses.  Although you must consider a lawyer's questions to

8   understand the answers of a witness, the lawyer's questions

9   are not evidence.  Similarly, when the lawyers have said in

10  their -- what the lawyers have said in their opening

11  statements, in their closing arguments and at other times is

12  intended to help you interpret the evidence.  But it is not

13  evidence.  If the facts as you remember them differ from the

14  way the lawyers state them, your memory of them controls.

15          Two.  Any testimony that I have excluded, stricken or

16  instructed you to disregard is not evidence.  In addition,

17  some evidence was received only for a limited purpose.  When

18  I've instructed you to consider certain evidence in a limited

19  way, you must do so.

20          Three.  Anything you may have seen or heard when

21  court was not in session is not evidence.  You are to decide

22  the case solely on the evidence received at the trial.

23          Evidence may be direct or circumstantial.  Direct

24  evidence is direct proof of a fact, such as testimony by a

25  witness about what that witness personally saw or heard or

1  did.  Circumstantial evidence is indirect evidence.  That is,

2  it is proof of one or more facts from which you can find

3  another fact.  You are to consider both direct and

4  circumstantial evidence.  Either can be used to prove any

5  fact.  The law makes no distinction between the weight to be

6  given to either direct or circumstantial evidence.  It is for

7  you to decide how much weight to give to any evidence.

8        In deciding the facts in this case, you may have to

9  decide which testimony to believe and which testimony not to

10  believe.  You may believe everything a witness says or part of

11  it or none of it.  In considering the testimony of any

12  witness, you may take into account:  One, the witness'

13  opportunity and ability to see or hear or know the things

14  testified to.  Two, the witness' memory.  Three, the witness'

15  manner while testifying.  Four, the witness' interest in the

16  outcome of the case, if any.  Five, the witness' bias or

17  prejudice, if any.  Six, whether other evidence contradicted

18  the witness' testimony.  Seven, the reasonableness of the

19  witness' testimony in light of all the evidence.  And eight,

20  any other factors that bear on believability.

21        The weight of the evidence as to a fact does not

22  necessarily depend on the number of witnesses who testified.

23  What is important is how believable the witnesses were and how

24  much weight you think their testimony deserves.

25        You are here only to determine whether the government

1   has satisfied its burden of proving that the defendant is

2   guilty beyond a reasonable doubt of the charges in the

3   indictment.  The defendant is not on trial for any conduct or

4   offense not charged in the indictment.

5        You have heard testimony that the defendant made a

6   statement.  It is for you to decide:  One, whether the

7   defendant made the statement.  And, two, if so, how much

8   weight to give it.  In making those decisions, you should

9   consider all the evidence about the statement, including the

10  circumstances under which the defendant may have made it.  A

11  separate crime is charged against the defendant in each count.

12  You must decide each count separately.  Your verdict on one

13  count should not control your verdict on any other count.

14       You have heard testimony from Britton Moore and

15  Arthur Hively, who testified to both facts and opinions and

16  the reasons for their opinions.  Fact testimony is based on

17  what the witness saw, heard or did.  Opinion testimony is

18  based on the education or experience of the witness.

19       As to the testimony about facts, it is your job to

20  decide which testimony to believe and which testimony not to

21  believe.  You may believe everything a witness says or part of

22  it or none of it.

23       As to the testimony about a witness' opinions, their

24  opinion testimony is allowed because of the education or

25  experience of the witness.  Opinion testimony should be judged

1 like any other testimony.  You may accept all of it, part of

2 it or none of it.  You should give it as much weight as you

3 think it deserves considering the witness' education and

4 experience, the reasons given for the opinion and all the

5 other evidence in the case.

6          You have heard evidence that the defendant committed

7 other acts not charged here.  You may consider this evidence

8 only for its bearing, if any, on the question of the

9 defendant's intent, motive, opportunity, preparation, plan,

10 knowledge, identity, absence of mistake or absence of accident

11 and for no other purpose.  You may not consider this evidence

12 as evidence of guilt of the crimes for which the defendant is

13 now on trial.

14          You have heard evidence of the defendant's character

15 for honesty.  In deciding this case, you should consider that

16 evidence together with and in the same manner as all the other

17 evidence in the case.

18          When a person is unavailable to testify at trial, the

19 deposition of that person may be used at the trial.  A

20 deposition is the sworn testimony of a witness taken before

21 trial.  The witness is placed under oath to tell the truth and

22 the lawyers for each party may ask questions.  The questions

23 and answers are recorded.

24          The deposition of witness David Silva, which was

25 taken on October 25th, 2017 was presented to you.  You should

1  consider deposition testimony in the same way that you

2  consider the testimony of the witnesses who have appeared

3  before you.

4       You heard and saw recordings that were received in

5  evidence.  A transcript of the recording was provided to help

6  you identify speakers and, as a guide, to help you listen to

7  the recording.  However, bear in mind that the recording is

8  the evidence, not the transcript.  If you heard something

9  different from what appeared in the transcript, what you heard

10  is controlling.

11       During the trial, certain charts and summaries were

12  shown to you in order to help explain the evidence in the

13  case.  These charts and summaries were not admitted in

14  evidence and will not go into the jury room with you.  They

15  are not themselves evidence or proof of any facts.  If they do

16  not correctly reflect the facts or figures shown by the

17  evidence in the case, you should disregard these charts and

18  summaries and determine the facts from the underlying

19  evidence.

20       The defendant is charged in Count One of the

21  indictment with conspiracy to sexually exploit a minor in

22  violation of Section 2251(a) and (e) of Title 18 of the United

23  States Code.  In order for the defendant to be found guilty of

24  that charge, the government must prove each of the following

25  elements beyond a reasonable doubt.

1       First, beginning on or about May 12th and ending on

2   or about September 19th, 2013, there was an agreement between

3   two or more persons to commit the crime of sexual exploitation

4   of a minor.

5       And second, the defendant became a member of the

6   conspiracy knowing of at least one of its objects and

7   intending to accomplish it.

8       A conspiracy is a kind of criminal partnership, an

9   agreement of two or more persons to commit one or more crimes.

10  The crime of conspiracy is the agreement to do something

11  unlawful.  It does not matter whether the crime agreed upon

12  was committed.

13      For a conspiracy to have existed, it is not necessary

14  that the conspirators made a formal agreement or that they

15  agree on every detail of the conspiracy.  It is not enough,

16  however, that they simply met, discussed matters of common

17  interest, acted in similar ways or perhaps helped one another.

18      You must find that there was a plan to commit at

19  least one of the crimes alleged in the indictment as an object

20  of the conspiracy with all of you agreeing as to the

21  particular crime which the conspirators agreed to commit.

22      One becomes a member of a conspiracy by willingly

23  participating in the unlawful plan with the intent to advance

24  or further some object or purpose of the conspiracy even

25  though the person does not have full knowledge of all the

1    details of the conspiracy.  Furthermore, one who willfully

2    joins an existing conspiracy is as responsible for it as the

3    originators.  On the other hand, one who has no knowledge of a

4    conspiracy, but happens to act in a way which furthers some

5    object or purpose of the conspiracy does not thereby become a

6    conspirator.  Similarly, a person does not become a

7    conspirator merely by associating with one or more persons who

8    are conspirators.  Nor merely by knowing that a conspiracy

9    exists.

10            The offense of sexual exploitation of a minor, as

11   alleged in Count One, has three essential elements.  First, at

12   the time A.T. was under the age of 18 years.

13            Second, the defendant or another person employed,

14   used, persuaded, induced, enticed or coerced A.T. to engage in

15   sexually explicit conduct for the purpose of producing a

16   visual depiction of such conduct.

17            And third, A, the defendant knew or had reason to

18   know that the visual depiction would be mailed or transported

19   across state lines or in foreign commerce.  Or, B, the visual

20   depiction was produced using materials that had been mailed,

21   shipped or transported across state lines or in foreign

22   commerce (i.e., the computer or hard drive was made out of

23   state).  Or, C, the visual depiction was mailed or actually

24   transported across state lines or in foreign commerce.

25            The defendant is charged in Count Two of the

1   indictment with receiving a visual depiction of a minor

2   engaged in sexually explicit conduct in violation of Section

3   2252(a)(2) of Title 18 of the United States Code.

4        In order for the defendant to be found guilty of that

5   charge, the government must prove each and every one of the

6   following elements beyond a reasonable doubt.  First, the

7   defendant knowingly received a visual depiction.  Second, the

8   production of the visual depiction involved the use of a minor

9   engaging in sexually explicit conduct.

10       Ladies and gentlemen, your written instructions say

11   "content" there.  That word should be "conduct."

12       Let me read the second element again.  Second, the

13   production of the visual depiction involved the use of a minor

14   engaging in sexually explicit conduct.

15       Third, the visual depiction of a minor engaging in

16   sexually explicit conduct.

17       Fourth, the defendant knew the visual depiction was

18   of a minor engaged in sexually explicit conduct.

19       Fifth, the visual depiction had been either, A,

20   mailed, shipped or transported in interstate or foreign

21   commerce by any means, including by computer.  Or B, was

22   received or distributed with materials which were mailed,

23   shipped or transported in interstate or foreign commerce,

24   including by computer.  Or C, was received or distributed by

25   use of any means or facility of interstate or foreign

1 commerce.  Or D, the receipt or distribution of the image was

2 in or affecting interstate or foreign commerce.

3          "Receive" means to take into one's possession.

4          A minor is any person under the age of 18 years.

5          "Producing" means producing, directing,

6 manufacturing, issuing, publishing or advertising.

7          "Visual depiction" includes undeveloped film and

8 videotape and data stored on a computer disk or data stored by

9 electronic means incapable of conversion into a visual image.

10          Sexually explicit conduct means actual or simulated

11 sexual intercourse, including genital to genital, oral to

12 genital, anal to genital or oral to anal, whether between

13 persons of the same or opposite sex; bestiality; masturbation;

14 sadistic or masochistic abuse; or lascivious exhibition of the

15 genitals or pubic area of any person.

16          In determining whether a depiction includes

17 lascivious exhibition of the genitals or pubic area of any

18 person, you may consider any of the following factors:

19          One.  Whether the focal point of the depiction is the

20 minor's genitals or pubic area.

21          Two.  Whether the setting of the depiction is

22 sexually suggestive.  For instance, the setting is in a place

23 or pose generally associated with sexual activity.

24          Three.  Whether the minor is depicted in an unnatural

25 pose or in inappropriate attire, considering the age of the

1    minor.

2           Four.  Whether the minor is fully or partially

3    clothed or is nude.

4           Five.  Whether the depiction suggests coyness or a

5    willingness to engage in sexual activity.

6           And six.  Whether the depiction is intended or

7    designed to elicit a sexual response from the viewer.

8           Adult pornography is not unlawful.

9           In order to establish that any visual depiction of a

10   minor engaged in sexually explicit conduct was transported in

11   interstate commerce, the government may prove that the image,

12   or any instrument that was used to produce or receive such an

13   image, traveled in interstate or foreign commerce.  That is,

14   between one state, territory, possession or the District of

15   Columbia and another state, territory, possession or the

16   District of Columbia or commerce with a foreign country.

17   Interstate or foreign travel of an image may be accomplished

18   by means of a computer.

19          An act is done knowingly if the defendant is aware of

20   the act and does not act through ignorance, mistake or

21   accident.  The government is not required to prove that  the

22   defendant knew that his acts or omissions were unlawful.  You

23   may consider evidence of the defendant's words, acts or

24   omissions along with all the other evidence in deciding

25   whether the defendant acted knowingly.

1    The indictment charges that the offense alleged in

2  Count One was committed, quote, on an unknown date no later

3  than in approximately May 2012 and continuing through

4  approximately September 19th, 2013.  Close quote.  The

5  indictment also charges that the offense alleged in Count Two

6  was committed "no later than in approximately November 2005

7  and continuing through approximately September 19th, 2013."

8    Although it is necessary for the government to prove

9  beyond a reasonable doubt that the offenses were committed on

10  a date reasonably near the dates alleged in Counts One and Two

11  of the indictment, it is not necessary for the government to

12  prove that the offenses were committed precisely on the dates

13  charged.

14    When you begin your deliberations, elect one member

15  of the jury as your foreperson who will preside over the

16  deliberations and speak for you here in court.  You will then

17  discuss the case with your fellow jurors to reach agreement,

18  if you can do so.  Your verdict, whether guilty or not guilty,

19  must be unanimous.  Each of you must decide the case for

20  yourself, but you should do so only after you've considered

21  all the evidence, discussed it fully with the other jurors and

22  listened to the views of your fellow jurors.

23    Do not be afraid to change your opinion if the

24  discussion persuades you that you should.  But do not come to

25  a decision simply because other jurors think it is right.  It

1 is important that you attempt to reach a unanimous verdict.

2 But, of course, only if each of you can do so after having

3 made your own conscientious decision.  Do not change an honest

4 belief about the weight and effect of the evidence simply to

5 reach a verdict.

6          Perform these duties fairly and impartially.  Do not

7 allow personal likes or dislikes, sympathy, prejudice, fear or

8 public opinion to influence you.  You should not be influenced

9 by any person's race, color, religion, national ancestry,

10 gender, sexual orientation, profession, occupation, celebrity,

11 economic circumstances or position in life or in the

12 community.

13          It is your duty as jurors to consult with one another

14 and to deliberate with one another with a view towards

15 reaching an agreement, if you can do so.  During your

16 deliberations, you should not hesitate to re-examine your own

17 views and change your opinion if you become persuaded that it

18 is wrong.

19          Because you must base your verdict only on the

20 evidence received in the case and on these instructions, I

21 remind you that you must not be exposed to any other

22 information about the case or to the issues it involves.

23 Except for discussing the case with your fellow jurors during

24 your deliberations, do not communicate with anyone in any way

25 and do not let anyone else communicate with you in any way

1   about the merits of the case or anything to do with it.

2          This includes discussing the case in person, in

3   writing, by phone or electronic means, via email, text

4   messaging or any internet chatroom, blog, website or other

5   feature.  This applies to communicating with your family

6   members, your employer, the media or press and the people

7   involved in the trial.  If you are asked or approached in any

8   way about your jury service or anything about this case, you

9   must respond that you have been ordered not to discuss the

10  matter and to report the contact to the Court.

11         Do not read, watch or listen to any news or media

12  accounts or commentary about the case or anything to do with

13  it.  Do not do any research, such as consulting dictionaries,

14  searching the internet or using other reference materials.

15  And do not make any investigation or in any other way try to

16  learn about the case on your own.

17         The law requires these restrictions to ensure the

18  parties have a fair trial based on the same evidence that each

19  party has had the opportunity to address.  A juror who

20  violates these restrictions jeopardizes the fairness of these

21  proceedings and a mistrial could result that would require the

22  entire trial process to start over.  If any juror is exposed

23  to any outside information, please notify the Court

24  immediately.

25         Some of you have taken notes during the trial.

1  Whether or not you took notes, you should rely on your own

2  memory of what was said.  Notes are only to assist your

3  memory.  You should not be overly influenced by your notes or

4  those of your fellow jurors.

5      The punishment provided by law for the crimes charged

6  is for the Court to decide.  You may not consider punishment

7  in deciding whether the government has proved its case against

8  the defendant beyond a reasonable doubt.

9      A verdict form has been prepared for you.  After you

10  have reached unanimous agreement on a verdict, your foreperson

11  should complete the verdict form according to your

12  deliberations, sign and date it and push the buzzer in the

13  deliberation room.  And also advise the Court Security Officer

14  that you are ready to return to the courtroom.

15      If it becomes necessary during your deliberations to

16  communicate with me, you may push the buzzer in the

17  deliberation room and send a note through the Court Security

18  Officer signed by any one or more of you.  No member of the

19  jury should ever attempt to communicate with me except by a

20  signed writing.  And I will respond to the jury concerning the

21  case only in writing or here in open court.

22      If you send out a question, I will consult with the

23  lawyers before answering, which may take some time.  You may

24  continue your deliberations while waiting for the answer to

25  any question.  Remember that you are not to tell anyone,

1    including me, how the jury stands numerically or otherwise on

2    any question submitted to you, including the question of the

3    guilt of the defendant, until after you have reached the

4    unanimous verdict or have been discharged.

5          Do all of the jurors have a pen or a pencil?  Not

6    everybody.  Renee, could you get a pen or pencil to those who

7    don't.

8          THE CLERK:  Right now, Your Honor?

9          THE COURT:  Yeah.

10         THE CLERK:  I'll have to go to their jury room.

11   They're on the table.

12         THE COURT:  Okay.  I want you all to turn back.

13   Because these are going into the deliberation room with you, I

14   want you to turn to instruction number 20 at page 21.

15         If you don't have a writing instrument, please get

16   one.  Anybody else need one?  Okay.  At line 8, I would ask on

17   each of your copies to strike the word "content" and replace

18   it with the word "conduct."  Has everyone done that?  ████

19   ████, you've made that change as well?

20         JUROR SEAT NUMBER ELEVEN:  Yeah, I did it.

21         THE COURT:  Thank you.  All right.  Is there any

22   objection by counsel to the manner in which the instructions

23   were read?

24         MR. CAPOZZI:  No.

25         MR. GAPPA:  No, Your Honor.

1034

1       THE COURT:  All right.  Madam clerk, please swear the

2   Court Security Officer at this time.

3           (Court Security Officer sworn. )

4       THE COURT:  Ladies and gentlemen, you may now return

5   to the jury deliberation room.  From this point forward, your

6   schedule, as long as it's within reason, is up to you.  When

7   you break and how you break is to be determined as a group by

8   you folks.  I think Renee will probably inquire

9   whether -- tell me, Renee, what are you going -- what are our

10  options at this point.

11      (Off the record.)

12      THE COURT:  If we were to order lunch for you, given

13  the hour, you probably wouldn't get it until after two.  So

14  one of your first decisions is going to be whether you want to

15  break for lunch and then return.  But how long you take for

16  that break is up to you.  When you break during the afternoon

17  is up to you.  And you just let the Court Security Officer

18  know if you wish to take a break.

19          And if later today you decide that you would wish to

20  return tomorrow, what time you end your deliberation today and

21  what time you return tomorrow is up to you within reason.  If

22  you do wish to begin -- or recommence deliberations tomorrow,

23  I will bring you in at the end of the day when you decide that

24  you're done for the day.  We'll do that from here in open

25  court.

1       But if you were to come back tomorrow morning, you

2   would just report once you're all here, begin deliberations.

3   It's very important that deliberations occur only when all

4   twelve of you are present however.  Okay?  Will the Court

5   Security Officer take the --

6           JUROR SEAT NUMBER TWELVE:  Can I ask one question?

7   No?

8           THE COURT:  I will say that Renee will be bringing

9   the verdict form and the exhibits in to the jury deliberation

10  room.  It will take a little while before those are delivered,

11  however.  The verdict form is already with you.  But the

12  exhibits, that's going to take a little while.  Juror 044, was

13  there another question?

14          JUROR SEAT NUMBER TWELVE:  Juror 044.  I was

15  wondering can we get delivery like pizza or something if we

16  don't want to go out?

17          THE COURT:  Even that would take --

18          JUROR SEAT NUMBER TWELVE:  A long time?

19          THE COURT:  You probably wouldn't get it until two.

20          JUROR SEAT NUMBER TWELVE:  Okay.  Never mind.

21          THE COURT:  All right.  You may return to the

22  deliberation room.

23      (The jury left the courtroom.)

24          THE COURT:  Let the record reflect that we are

25  outside the presence of the jury.  We had discussed this at

1   the instruction conference off the record last night, about

2   exhibits.  And in particular, the exhibits of the interviews

3   that appeared by video as well as the deposition that appeared

4   by video.  And I know that this has been the subject of

5   discussion between myself and judges O'Neill and Ishii as far

6   as the typical practice here in this Court.  And coming to

7   some general practice.  That's why I was a little bit unclear.

8           I am advised this morning that in cases where there

9   is video evidence that's been admitted into evidence, that the

10  practice -- the general practice has now been to have a member

11  of the Court's IT staff -- you stop me if I'm wrong,

12  Renee -- bring a computer into the jury deliberation room with

13  the -- and that the exhibits -- this is a little unclear to me

14  still -- go in either as folders or a separate disk that can

15  only be played by the jury as instructed by the IT personnel

16  on the computer they have in front of them.

17          MR. CAPOZZI:  Judge, I would object to that process.

18          THE COURT:  And your request is?

19          MR. CAPOZZI:  Come into the courtroom, play the

20  video, play the audio in the courtroom to make sure everything

21  is being heard.  I don't want some court technician going in

22  and playing a part here and a part there.  I want them to hear

23  it all and hear it pursuant to their direction.

24          THE COURT:  What's the government's position?

25          MR. GAPPA:  We would not object to the procedure as

1  outlined where they're provided a disk and the exhibit would

2  be clearly marked so that all would have to happen is the

3  technician press play or click on the file.  And then if -- I

4  trust that a -- it's such a simple task to open a file and

5  make it play, that I don't think there would be any issue.

6         MR. CAPOZZI:  Then we have another person in the jury

7  room.  I disagree with that.

8         THE CLERK:  Can I clarify?  They show them how to use

9  the laptop and they leave.  They're not in there the entire

10  time.

11         THE COURT:  Renee is clarifying that the IT person at

12  the outset, when the laptop and the exhibits are delivered,

13  instructs the jury how to use the laptop and then departs.

14  They don't actually play -- they don't stay in the

15  deliberation room.  They just provide instruction as to how to

16  use the laptop and then they depart.

17         MR. CAPOZZI:  Then there's no objection to that.  So

18  long as they're not in there when they're listening and

19  deliberating.

20         THE COURT:  And we do this only in cases where there

21  is -- where the video evidence has been actually admitted into

22  evidence.  And we only send in what's been admitted into

23  evidence.  However, that does raise another question.  And

24  that is I think on both the government's exhibits as well as

25  the deposition testimony that was admitted, transcripts

1   appeared along with the actual recordings.

2          Now, the jury has been instructed already that what

3   governs is what they heard or what they hear and not the

4   transcript.  And that if what they hear is different from the

5   transcript, they're to go by what they believe they hear.  So

6   I know we had some discussion yesterday about

7   whether -- whether the transcript feed should go in the exact

8   same way that it was played here in open court.  Whether they

9   should have access to that or not.  What's the defense

10  position?

11         MR. CAPOZZI:  Well, I think on my witness, Mr. Silva.

12  He was a witness.  I'm not even sure that should go back.

13  Because he should be treated no differently than any other

14  witness.

15         THE COURT:  Yeah, that would be like a re-read.

16         MR. CAPOZZI:  As to the other, it's going to

17  be -- the video is going to be played with the transcript

18  running along with it.

19         THE COURT:  That's the way it was played in open

20  court.

21         MR. CAPOZZI:  Yeah.

22         THE COURT:  What's your position?  You want it --

23         MR. CAPOZZI:  If there weren't a transcript, if it

24  were separate from the video, would a transcript go back to

25  the jury while they're listening to it?

1039

1          THE COURT:  No.

2          MR. CAPOZZI:  So why is it different then?  It

3     shouldn't be.

4          THE COURT:  Can you -- can that exhibit be --

5          MR. GAPPA:  Separated?

6          THE COURT:  Can the transcript be separated from that

7     exhibit?

8          MR. GAPPA:  Yes.

9          THE COURT:  Okay.  Then I would ask you to do so.

10     Make those arrangements.  I don't know how long it will take.

11          MR. GAPPA:  I think we were anticipating it going

12     either way, so I don't think it will take any longer.

13          THE COURT:  Okay.  And Renee, how you're taking that

14     exhibit in to them, I have no idea.

15          THE CLERK:  Are you talking about the video, Your

16     Honor?  On the file, a CD with a laptop.

17          THE COURT:  Do they have such a thing?  Do you have a

18     CD exhibit, which is the exhibit that was admitted without a

19     transcript?

20          MR. GAPPA:  Yes.  Well, precisely it's a DVD.  But it

21     will have not only -- every digital exhibit.  So some of those

22     videos can only be -- our understanding was the actual video

23     was admitted.  So that would go on the disk.  Anything that

24     was admitted as a digital file.  So in other words, if there

25     was a 27.7 was one, a video of A.T. in the shower.  That's

1040

1    what was admitted.  That was our understanding.

2         THE COURT:  Yes.

3         MR. GAPPA:  And that recording would go on a disk.

4         THE COURT:  Okay.  Are they all separate disks?

5         MR. GAPPA:  Well, they'll be noted with a clear

6    label, Exhibit 1, Exhibit 2, whatever the --

7         THE COURT:  Each separately?

8         MR. GAPPA:  Yes.

9         THE COURT:  So not one DVD --

10        MR. GAPPA:  Well, one disk, but there will be a

11   separate exhibit number for each file.

12        THE CLERK:  One disk, separate files labeled with the

13   exhibit number.

14        THE COURT:  Okay.  I wouldn't mind seeing it before

15   it goes in.

16        MR. CAPOZZI:  That's my point.  Yes.

17        THE COURT:  So whatever is going in -- because

18   I -- again, I don't have it.  What I've got is place holders.

19   So I would like to see for myself what's going in to the jury

20   room actually.  Because I've never seen it.

21        MR. GAPPA:  And then separate, Your Honor, from that

22   is I understood from the discussion last week with the IT

23   person that the contraband is not given to them unless they

24   ask.  That's what I was told.

25        MR. CAPOZZI:  I'm agreeable with that.

1    THE COURT:  And so, again -- yes.  Those exhibits, I

2  agree, should not go back in unless they're asked for.

3    MR. CAPOZZI:  And then do they view those back there

4  or out here?

5    THE COURT:  Well, they have to ask for them.  If they

6  ask for them, we can decide whether they should be played only

7  in open court.

8    Get me whatever it is that is being proposed be sent

9  back at this time as exhibits so that I can at least quickly

10  click through the folders to satisfy myself that, yes, I'm in

11  agreement with what you've prepared.  It's a little bit

12  awkward.  I'm not -- I'm not criticizing, it's just -- it's a

13  little awkward because, yes, I admitted that -- I admitted

14  each one of those exhibits into evidence some time often

15  without objection, sometimes over objection.  But I've never

16  actually seen them in that format.  I've seen them as they've

17  been played.

18    So I would like to be able to quickly click through

19  the DVD so that in my own mind, I'm confident that I looked at

20  it and I know what's going into the jury deliberation room is

21  what I believe I admitted into evidence and it does not

22  contain any contraband.

23    MR. GAPPA:  Yes.  Understood.

24    THE COURT:  And as soon as I've done that, then we'll

25  get that in to --

1    MR. GAPPA:  We should be able to get that finalized

2  very soon.

3    THE COURT:  All right.  Anything else?  Stay close

4  enough that -- make sure Renee knows how to get ahold of you.

5  And that you're close enough to be back in the courtroom

6  within 10, 15 minutes max.

7    MR. CAPOZZI:  Okay.

8    THE COURT:  Because I won't do anything with the jury

9  without all of you in the courtroom.  All right?  Thank you.

10    (Recess.)

11    (The jury deliberated from 12:25 to 4:48 p.m.)

12    (The jury entered the courtroom.)

13    THE COURT:  Let the record reflect that we are back

14  in the presence of the jury.  And who speaks for the jury?

15  Juror 044.

16    JUROR SEAT NUMBER TWELVE:  Yes, sir.

17    THE COURT:  You seemed reluctant.  You can have a

18  seat.

19    JUROR SEAT NUMBER TWELVE:  Thank you.

20    THE COURT:  Does the -- I understand that the jury

21  wishes to break for the evening and return tomorrow morning?

22    JUROR SEAT NUMBER TWELVE:  Yes, sir.

23    THE COURT:  And what time would you like to return?

24    JUROR SEAT NUMBER TWELVE:  8:30, sir.

25    THE COURT:  All right.  Now, we will not convene in

1   the courtroom when you get back.  Simply report to the jury

2   deliberation room.  But remember it is very important, do not

3   discuss the case or begin your deliberations until all of your

4   members have arrived.  The Court Security Officer will notify

5   us when you all have arrived and are beginning your

6   deliberations again.

7           Remember, until the trial is over, do not discuss

8   this case with anyone, including your fellow jurors, members

9   of your family, people involved in the trial or anyone else.

10  And do not allow others to discuss the case with you.  Of

11  course, you can discuss the case when you're all together in

12  the deliberation room.  But that's all.  This prohibition

13  includes discussing the case in internet chat rooms, internet

14  blogs, bulletin boards, emails or text messaging.  If anyone

15  tries to communicate with you about the case, please let me

16  know about it immediately.

17          Don't read, watch or listen to any news reports or

18  other accounts about the trial or anyone associated with it,

19  including any information that appears online.  Do not do any

20  research, such as consulting dictionaries, searching the

21  internet or using other reference materials.  And do not make

22  any investigation about the case on your own.  If you need to

23  speak to me about anything, give Renee or Sam a signed note.

24  See you tomorrow morning at 8:30.

25          JUROR SEAT NUMBER TWELVE:  Thank you.

1      (The jury left the courtroom.)

2           THE COURT:  Let the record reflect that we are

3   outside the presence of the jury.  Counsel, you may have

4   remembered that I mentioned when we began that on the 17th I

5   had a speaking engagement in the morning that was scheduled

6   long ago.  I'm going to be over at McLane High school.

7   Fortunately, Judge Ishii is going to be in the building.  And

8   so I have conferred with him.  And if a verdict is returned in

9   the -- I'm going to pass it back.  If a question is asked or a

10  verdict is returned in the morning, Judge Ishii will take it.

11  And Renee will be in contact with him.  I should be back

12  before noon and will then take it over from there.  All right?

13  So just Judge Ishii will be the one on call in the morning.

14          MR. CAPOZZI:  Is it okay to stay at my office until I

15  get a call from the Court to come down?

16          THE COURT:  How fast can you -- I mean, can you get

17  here --

18          MR. CAPOZZI:  15 minutes.

19          THE COURT:  If you can get here in 15 minutes, that's

20  fine.

21          MR. CAPOZZI:  Okay.

22          THE COURT:  And Renee can tell Judge Ishii that

23  that's what I said.  Okay?  Anything further?

24          MR. GAPPA:  No.  Thank you, Your Honor.

25          MR. CAPOZZI:  Thank you, judge.

1045

1    (The proceedings were concluded at 4:52 p.m.)

2

3         I, KAREN HOOVEN, Official Reporter, do hereby certify

4    that the foregoing transcript as true and correct.  The only

5    amendment to the transcript was updating page numbers in order

6    to be consecutive with prior volumes.

7

8    DATED:  28th of November, 2018    /s/  Karen Hooven_____
                                       KAREN HOOVEN, RMR-CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25