1
2   Adam Alan Henry #71064-097
    FCI Lompoc
3   Federal Correctional Institution
    3600 Guard Road
4   Lompoc, CA 93436

5   Petitioner/Movant in *pro se*

6





7           IN THE UNITED STATES DISTRICT COURT

8         FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,        Case No. 1:21-CV-_____

11          Plaintiff,               Criminal No. 1:13-CR-00409-DAD

12

13          v.                       **MOTION TO VACATE, SET ASIDE,
                                     OR CORRECT A SENTENCE
14                                   PURSUANT TO 28 U.S.C. §2255;
                                     BRIEF IN SUPPORT**
15  ADAM ALAN HENRY,

16          Defendant.               Before Hon. Dale A. Drozd

17

18

19  **NOW COMES** ADAM ALAN HENRY, defendant in the above-enumerated criminal case,

20  and petitioner here in the accompanying MOTION TO VACATE, SET ASIDE, OR

21  CORRECT A SENTENCE PURSUANT TO 28 U.S.C. §2255. Petitioner hereby submits

22  this brief in support of that motion and prays this Court find merit in the arguments and

23  vacates the jury verdicts with a finding of factual innocence.

24
25
26                                  
27
28

# Table of Contents

I. PRELIMINARY STATEMENT..................................................................................1

II. JURISDICTION...................................................................................................2

III. PROCEDURAL HISTORY...................................................................................3

IV. TOLLING..........................................................................................................4

V. STATEMENT OF EVENTS..................................................................................4

    A. 2005-2009...................................................................................................4

    B. 2009-2012...................................................................................................5

    C. January – August, 2013................................................................................6

    D. September – December, 2013.......................................................................8

VI. SUMMARY OF ARGUMENTS..........................................................................9

VII. GENERAL STANDARDS FOR §2255 REVIEW...............................................12

VIII. ARGUMENT I: INEFFECTIVE ASSISTANCE OF COUNSEL.............................13

    A. COUNSEL FAILED TO ARGUE LACK OF JURISDICTION ON COUNT 1........14

        1) Facts......................................................................................................14

        2) Legal Standard........................................................................................18

        3) Argument................................................................................................20

    B. COUNSEL FAILED TO INVESTIGATE AVAILABLE DISCOVERY...................21

        1) Facts: Angele Had all my Passwords.........................................................21

        2) Facts: Angele's Access to my Work Computer............................................23

        3) Facts: Angele's Access to Item 16.............................................................30

        4) Legal Standard........................................................................................31

        5) Argument................................................................................................33

    C. COUNSEL FAILED TO IMPEACH WITNESSES..........................................34

        1) Facts......................................................................................................34

            a) Detective Hively Changed His Testimony Regarding the Garage Computer.....35

b) Detective Hively Lied on the Witness Stand about the Placement of the Macrame Plant in the Bathroom.................................................................37

c) Det. Hively Knew That the PC in the Garage ran Windows XP.........................40

d) My Ex-Fiance Knew She was Recorded..............................................42

2) Legal Standard....................................................................45

3) Argument..........................................................................46

D. COUNSEL FAILED TO UNDERSTAND THE TECHNICAL ISSUES AND LAW OF THE CASE.........................................................................48

1) Facts: I was Provably Working and Not at my Desk When Angele Used My Home Computer to Transfer Child Pornography From My Work Computer To the Home NAS Share.............................................................................48

2) Facts: The Files on Item 16 Were Shown as Never Downloaded by that Computer and the File Creation Dates were Suspect.......................................49

3) Legal Standard....................................................................51

4) Argument..........................................................................52

E. COUNSEL FAILED TO INTRODUCE EVIDENCE..............................................55

1) Facts.............................................................................55

a) Angele Framed her Canadian Ex-Husband for Sexual Misconduct...................55

b) The Psychological Evaluations..................................................57

c) Angele's Police Interview......................................................59

2) Legal Standard....................................................................60

3) Argument..........................................................................61

IX. INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL.......................................63

1) Facts.............................................................................63

2) Legal Standard....................................................................64

3) Argument..........................................................................64

X. THIS COURT HAD NO JURISDICTION TO TRY OR CONVICT ME ON COUNT 1 ...................................................................................65

1) Facts............................................................................................................65

2) Law and Standard of Review.....................................................................65

3) Argument.....................................................................................................67

XI. CONCLUSION..............................................................................................68

XII. APPENDIX OF EXHIBITS..........................................................................i

A. Exhibit 1: iPhone Text Extraction from Bates 1124.....................................ii

B. Exhibit 2: Canadian Appellate Court Decision in RE: Angele's Ex-Husband's Sexual

Assault Conviction............................................................................................iii

C. Exhibit 3: The Trompetter Report.................................................................iv

D. Exhibit 4: Angele Henry Interview with Det. Moore.....................................v

E. Exhibit 5: Cell Phone Extraction between Angele and Krista......................vi

F. Exhibit 6: Cell Phone Extraction Between Angele and Courtney/Adam...................vii

## Table of Authorities

18 U.S.C. §2251(a)............................................................................................................3

18 U.S.C. §2252................................................................................................................3

28 U.S.C. §2255................................................................................................................2

*Berger v. United States,*
   295 U.S. 78 (1935)........................................................................................................1

*Davis v. United States,*
   417 U.S. 333 (1962)....................................................................................................12

*Detrich v. Ryan,*
   740 F.3d 1237 (9th Cir. 2013)....................................................................................46

*Gersetn v. Senkowski,*
   426 F.3d 588 (2nd Cir. 2005)......................................................................................60

*Gonzalez v. Raich,*
   545 U.S. 125 (2005)....................................................................................................65

*Kimmelman, v. Morrison,*
   477 U.S. 365, 384 (1986)............................................................................................31

*Miller v. Keeney,*
   882 F.3d 1428 (9th Cir. 1989)....................................................................................64

*Moffett v. Kolb,*
   930 F.2d 1156 (7th Cir. 1991)....................................................................................45

*Murray v. Carrier,*
   477 U.S. 478 (1986)....................................................................................................12

*Reynoso v. Giurbino,*
   462 F.3d 1099 (9th Cir. 2006)................................................................46

*Rompilla v. Beard,*
   545 U.S. 374 (2005)................................................................45

*Seidel v. Merkle,*
   146 F.3d 750 (9th Cir. 1998)................................................................60

*Stone v. Powell,*
   428 U.S. 465 (1976)................................................................64

*Strickland v. Washington,*
   466 U.S. 668 (1984)................................................................13

*Sussman v. Jenkins,*
   636 F.3d 329 (7th Cir. 2011)................................................................60

*Thomas v. Chappell,*
   678 F.3d 1086 (9th Cir. 2012)................................................................60

*Tucker v. Ozmint,*
   350 F.3d 433 (4th Cir. 2003)................................................................46

*Turner v. Duncan,*
   158 F,3d 449 (9th Cir. 1998)................................................................60

*U.S. Ex Rel. McCall v. O'Grady,*
   908 F.2d 170 (7th Cir. 1990)................................................................45

*United States v. Birtle,*
   792 F.2d 846 (9th Cir. 1986)................................................................64

*United States v. Heflin,*
   195 F.Supp. 3d 1134 (E.D. Ca. 2016)................................................................12

*United States v. Henry,*
  No. 18-10358 (9th Cir. January 13, 2020)..........................................................................4

*United States v. Johal,*
  No. 16-17244 (9th Cir. April 16, 2021)............................................................................64

*United States v. McCoy,*
  323 F.3d 1114 (9th Cir. 2003)..........................................................................................19

*United States v. Morrison,*
  529 U.S. 598 (2000)..................................................................................................19, 66

*United States v. Simpson,*
  No. 16-3286 (7th Cir. 2017).............................................................................................45

*United States v. Wilcox,*
  640 F.2d 970 (9th Cir. 1981)............................................................................................12

*Wiggins v. Smith,*
  539 U.S. 510 (2003)..........................................................................................................45

*Ameri v. United States,*
  No. 4:07-CV-123 (E.D. Ark. July 2, 2007)......................................................................52

1

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilty shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*- Berger v. United States*, 295 U.S. 78 (1935).

## I.   PRELIMINARY STATEMENT

I was convicted by a jury of heinous crimes. I was adjudged as guilty of conspiring to exploit a minor and for receiving child pornography. I may have been found guilty of these crimes but I am innocent of committing them. I have maintained my innocence in all this from the day I was first questioned by law enforcement.

I am a victim in this case, a victim of my estranged wife Angele. I was naive and manipulated by a sexual deviant who used my computer equipment for her own prurient interests. Some of these interests were known to me, but others were not. It is clear to me in hindsight that this case was not some misunderstanding. Rather, it was malicious and intentional acts by Angele to deflect any suspicion from her onto myself for satisfying those prurient compulsions.

In fact, she has done this before to her previous husband. My innocence would have been proven in this case if not for the machinations of the prosecution and the defense counsel's lack of familiarity with the evidence and insufficient knowledge of the technical matters involved in this case.

1     As Assistant United States Attorney Gappa stated to my trial counsel when asked why I

2 was being federally charged and not Angele; "It's easier to get a conviction for a man than it

3 is a woman in these cases."[1]

4         Prosecutor Pearson admitted on the record that all the evidence against me was only

5 circumstantial. Meanwhile, the evidence clearly shows Angele's sole presence during the

6 commission of all the crimes I was convicted of. Furthermore, my background and

7 expertise in network, internet, and computer security are at odds with the amateurish

8 manner in which these crimes were committed.

9     This §2255 does not seek, as many do, to reduce my sentence. I intend to prove here that

10 the facts so clearly point to my innocence that the jury verdict cannot stand.

11     Had the facts, as presented here, been presented by trial counsel there would have been

12 no charge carried on Count 1. Further, and more to the point, the verdict of the jury would

13 undoubtedly have been "not guilty" on Count 2.

14

15 ## II.   JURISDICTION

16 This Court had original jurisdiction over the criminal case enumerated in the heading of this

17 brief. This Court presided over my trial, and this Court sentenced me in that case.

18 Therefore, this is the appropriate venue to file this *habeas* relief request pursuant to Title 28

19 U.S.C. §2255(a):

20         "A prisoner in custody under sentence of a court established by Act of

21         Congress claiming the right to be released upon the ground that the
        sentence was imposed in violation of the Constitution or laws of the

22         United States, or that the court was without jurisdiction to impose such

23         sentence, or that the sentence was in excess of the maximum authorized
        by law, or is otherwise subject to collateral attack, may move the court

24         which imposed the sentence to vacate, set aside or correct the sentence."

25

---

1   This is paraphrased as there are no recording or transcriptions of this off-the-cuff conversation
   in the halls of the Fresno Courthouse.

## III.   PROCEDURAL HISTORY

I was arrested on November 13, 2013 after agents of several law enforcement agencies searched my residence.

I had my initial appearance on November 15, 2013 before Magistrate Judge Sheila K. Oberto. On November 18, 2013 I had a formal detention hearing, which was re-scheduled for four days later. During that hearing, before Magistrate Judge Gary S. Austin, I was ordered detained pending trial. Doc. 12.[2]

I was formally indicted on November 21, 2013 on one count of Conspiracy to Exploit a Minor (18 U.S.C. §2251(a)) and Receipt and Distribution of Child Pornography (18 U.S.C. §2252). Doc. 10.

At the advice of my mother, I replaced appointed counsel, Daniel L. Harralson, with Anthony Capozzi who entered his appearance on my behalf on December 9, 2013. Doc. 16.

Through Capozzi, I moved four more times for release pending trial and bail review. Finally, on July 7, 2014, my motions for bail review and release were heard before Hon. Judge Anthony W. Ishii. Unfortunately, Judge Ishii deferred to the decisions by the magistrate judge's, *ante*, and ordered my detention pending trial to continue.

After nine status conferences, more bail reviews, and four trial continuations, 2014, 2015, and 2016 came and went. Finally, in December of 2016 counsel began making pretrial motions to suppress evidence gained unlawfully, and statements made pre-*Miranda*.

Trial began about a year later on November 7, 2017 with *voir dire*. My trial lasted 8 days, including jury deliberations, and resulted in a verdict of guilty on both charges. After moving for a judgment of acquittal, new trial, and a bevy of other post-trial motions, I was sentenced on September 10, 2018 to 240 months in prison on each count, concurrent to each other.

I was also sentenced to 15 years of supervised release, given a fine of $3,000, and given a special assessment of $200.

---

2   "Doc." followed by a number reflects the PACER docket entry in this Court's record.

1    I appealed my trial, verdicts, and sentence to the Ninth Circuit Court of Appeals

2  (Doc. 317) and my conviction was affirmed on the grounds raised. See *United States v.*

3  *Henry,* No. 18-10358 (9th Cir. January 13, 2020).

4

5  **IV.    TOLLING**

6  My petition for *writ of certiorari* was granted and my petition was distributed for review in

7  October of 2020. That petition was denied on November 9, 2020. 28 U.S.C. §2255(f)(1)

8  states that defendants have one year from the date their judgment became final to file a

9  Motion to Vacate, Set Aside, or Correct a Sentence.

10    Thus, this motion is timely if filed on or before November 8, 2021.

11

12  **V.    STATEMENT OF EVENTS**

13  This statement of events will detail the life I had with my job, working for my aunt and

14  uncle, as well as the life I had built with my wife Angele. There are many assertions in this

15  section that lay the foundation of my arguments, and will be supported by facts on the

16  established record in the argument sections in this brief. Each argument section will have a

17  section of facts and citations from the record to substantiate each claim or assertion made

18  herein.

19    **A. 2005-2009**

20  I started working at Lock-N-Stitch for my aunt and uncle in the summer of 2005. Within a

21  couple of weeks, I met a man who had started after me and we became "work buddies." I

22  met his wife and kids, but never really had much interaction with them. Our interactions

23  were limited to simple greetings.

24    One of those kids was Angele's victim, AT. At the time I started at Lock-N-Stitch,

25  A.T. was 7 years old.

26    For years I had used peer-to-peer sharing programs. From Hotline in the late 90s, to

27  Shareaza in the 2000s, I downloaded privately-created patch files for open source

1   programs, mp3 music, and other odds and ends. It was never uncommon for those of us in
2   the Industrial Technology (IT) industry to do so.

3       After I started at Lock-N-Stitch, I was in my late 20s, living alone and dating. I
4   became engaged to a woman and we enjoyed recording our private lives with cameras that
5   were both hidden and/or obvious. Despite her testimony at trial, she was aware that the
6   cameras were present. There are plenty of intimate videos in evidence where she actively
7   acknowledges the presence of the camera recording her. She and I eventually broke up and
8   parted ways, but I had found that I enjoyed filming and watching myself be intimate with
9   partners.

10

11  **B. 2009-2012**

12      I met Angele in 2009 playing an online game called World of Warcraft, which was a
13  massively multi-player online role-playing game (called and abbreviated MMORPG). She
14  was a wild woman with a whimsical side to her, and we began frequently talking on Voice-
15  Over-IP (VoIP) programs like Ventrillo. These programs allow you to have a virtual phone
16  call using a computer instead of a phone.

17      In the summer and fall of 2009, Angele began to visit me in California and we fell in
18  love. In 2010 she began to visit monthly and moved to California permanently in the
19  summer of 2011. She brought her two children with her along with stories of abuse
20  perpetrated by her ex-husband.

21      I was happy that her move to California saved her from that abuse. In time, I would
22  come find out later that those accusations were completely fabricated, and her ex-husband
23  was later exonerated of all wrongdoing by a Canadian appellate court.

24      In the interim, Angele and I were happy. Within a few months of her arrival in
25  California, Angele was making friends through my friends. She gravitated toward my work
26  buddy's wife and daughter, AT.  Angele used A.T. as a babysitter when we went out on
27  dates.

1  We bought a house together in Turlock, California in 2011. We quietly married in
2  October of 2011 through a simple filing at the local courthouse.

3  Angele's seemingly-free-spirit spread to more than just socializing and making
4  friends. She had deviant, even prurient interests that went far beyond my own vanilla
5  world. She was very interested and excited by role play, costume play, exhibitionism, and
6  bringing others into the bedroom with us.

7  To aid her interest in exhibitionism, we installed a camera in our third, unused
8  bathroom. Our master bathroom and the bathroom her children used were not disturbed.

9  Her uninhibited tendencies included, but were certainly not exclusive to, her finding
10  girlfriends to bring home into our bedroom. More than once, we recorded our trysts with a
11  camcorder in our bedroom.

12  Unbeknownst to me at the time, Angele was also using the bathroom camera to
13  record other people in states of undress and bathing. I never made any recordings with the
14  bathroom camera. The recording and saving of those files were solely done by Angele. She
15  did this to record family friends and even minors in that bathroom.

16

17  **C. January – August, 2013**

18  In 2013, I was the sole IT manager for Lock-N-Stitch, the metal fabrication company
19  owned by my aunt and uncle. Technology wasn't just my job, it was also my hobby. I had
20  sufficient technology in my home to set up a storage server in a cupboard which could host
21  files that could be streamed from computers and DVD players to different televisions
22  throughout the house via Wi-Fi and wired intranet connection.

23  I had also set up a computer in my home to remotely access my computer at work.
24  This setup was functional and practical as it allowed me to access the servers at Lock-N-
25  Stitch during hours I was not working if a problem arose, as they often did.

26  Angele became pregnant with our son Liam in early 2013. By May of 2013,
27  complications with her pregnancy were causing pain and frequent discomfort, which
28  interrupted our sex life. I have an extreme aversion to hurting people in general, but doubly

1  so in intimate encounters, so I was wholly uninterested in "pressing on" with our sex life
2  while she was in so much discomfort.

3      Unfortunately, I later learned that when Angele's sexual life suffers, she turns to
4  deviant sexual interests online to satiate her desires. Angele had begun using my work
5  computer to access Shareaza, the program I had installed to search for and download work-
6  related files. Absent my knowledge, Angele used Shareaza to search and download files
7  which suited her deviant interests.

8      Search terms in Shareaza included terms that were well-known interests of Angele's
9  as well as search terms in French. Angele was bilingual in English and French from the part
10  of Canada she originated, while I spoke no French at all. It is easy to surmise which of the
11  two of us was using the search function on Shareaza on my work computer.

12      For our entire relationship, Angele and I had only one car between the two of us.
13  Angele would drop me off and pick me up from work, enabling her to have the car for
14  errands during the day. Many days, she would arrive before I was quite ready to leave work
15  and would busy herself at my work computer while I was off elsewhere on business
16  grounds tending to employee workstations or server racks. I didn't think anything of this
17  practice at the time.

18      While using my computer, she would search for and download legal and illegal
19  pornography. Later on, she would remotely transfer them at home from my work computer
20  to the secure file storage server I had set up in our home. I had no idea she was doing this as
21  she would erase the files from the "completed" download folder in Shareaza once they were
22  downloaded and moved to our home storage server.

23      She fed her sexual deviance in such a way as to defray any suspicion from her if the
24  activities on my work computer were audited. However, she was an amateur and didn't
25  bother to learn any techniques that a professional in IT would use to mask or obfuscate her
26  activities from law enforcement.

1  She also did not employ any measures that a professional in IT would employ to
2  secure these files using easily accessible, free encryption methods that *any* IT professional
3  of *any* worth would use. I am in this category of IT professional.

4

5  **D. September – December, 2013**

6  On September 19, 2013 I received a call from Lock-N-Stitch after I had left early that day. I
7  was asked to come back to work. This, however, this was a ruse used by police to lure me
8  out of my home. I was pulled over on my way back to Lock-N-Stitch, placed in handcuffs,
9  and my cell phone was confiscated. Noone would answer any questions as to why I was
10  detained.

11  I was then taken to Lock-N-Stitch where I met with Detective Hively for the first
12  time. He interviewed me there, mostly without telling me what the issue was for which I
13  had been detained. I tried my best to be cooperative. When Det. Hively finally disclosed
14  what the warrant concerned, I invoked my right to have an attorney present during
15  questioning.

16  Another officer there gave the standard speech equating cooperation to innocence,
17  and I began to speak with Hively again. Things were quiet for the next few months until
18  another search warrant was executed by federal authorities on my house.

19  By this point I had hired counsel to represent me and I was free on bail. During that
20  search a laptop was seized (which I'd acquired to use for work between the two warrant
21  executions). I immediately invoked my right to counsel presence during questioning and
22  was handcuffed by an FBI agent and sat with a Child Protective Services (CPS) agent.

23  This CPS agent informed me that I was required to answer his questions or he would
24  put my child, and Angele's children, in foster care. This was a clear violation of my 5th
25  Amendment protections, but he did not care.

26  I was taken into custody and appeared twice before Magistrate Judge Oberto, first
27  for my initial appearance on November 13th, then again for a detention hearing on
28  November 15th.

1   The formal indictment against me was filed on November 21st and the formal
2   indictment hearing was held the day after on the 22nd. I pleaded not guilty and was ordered
3   to continue my detainment for the duration of my pretrial time.

4   At the advice of my mother, I retained new counsel at this time, Anthony Capozzi,
5   who appeared with me for the first time on December 9, 2013 and who stayed with me
6   through trial and appeal. All arguments regarding the ineffective assistance of counsel
7   (IAC) refers to Mr. Capozzi, and Mr. Capozzi alone.

8   I have done everything in my limited power to demonstrate my innocence in this case. I
9   pored through the evidence. I voluntarily underwent multiple psychiatric evaluations, which
10   specifically indicated my forthrightness, cooperativeness, and that the crimes did not make
11   sense with my personality.

12   I even volunteered to undergo a polygraph examination, administered by a former
13   police lieutenant who has spent over 40 years as a certified polygraph examiner working for
14   local, state, and even federal entities. I passed as having no deception, and no participation,
15   interest, or knowledge of the crimes I was charged with.

16   Defense counsel was unable to get any of it into the trial, even though both
17   psychiatric evaluations and polygraph examinations are both used by federal probation to
18   help determine if violations occur, somehow they were not able to be used to help
19   demonstrate my innocence.

20

21   **VI.   SUMMARY OF ARGUMENTS**

22   There is a jurisdictional question on Count 1 that was never addressed by counsel. That is
23   that the camera or cameras used to justify the conspiracy and justify federal jurisdiction
24   were never identified.

25   Without identifying the cameras, jurisdiction over Count 1 could not be established,
26   as the invocation of interstate commerce for any/all cameras was never established. The
27   federal government lacked the jurisdiction to prosecute me for Count 1. Counsel failed to
28   argue this, violating my constitutional right to the effective assistance of counsel.

1    Counsel also failed to investigate several issues. First, and foremost, counsel made

2  no efforts to understand the technology of the issues at hand, and admitted to such in open

3  Court, to the jurors. Without sufficient knowledge of the facts of the technology, he was

4  incapable of defending a case that centered around technology.

5    The evidence shows Angele was capable of, and did in fact remotely access my

6  work computer. She downloaded whatever she wished on Shareaza from my work

7  computer, and then transferred it to our home storage remotely from the comfort of our

8  home. Counsel, however, was not knowledgeable enough about the technology to make this

9  argument which was central to persuading the jury that I was not guilty of these charges.

10    Without advanced, or at least intermediate, knowledge of the technologies at hand

11  counsel was at the mercy of the prosecution's arguments as he was completely incapable of

12  refuting technological arguments. These arguments were the crux of the entire case against

13  me. Examples and specifics are argued in their specific argument sections below.

14    Counsel failed to impeach witnesses. The testimony of Detective Hively was the

15  backbone of the testimony used to secure the guilty verdicts against me on both counts.

16  Detective Hively testified that a computer in my possession at the time of the searches in

17  my home contained contraband before Angele came to visit. He had testified to the grand

18  jury that Limewire was responsible for this downloading, but retracted that at trial.

19    The fact of the matter is they were downloaded by Angele before she had come to

20  California for the first time and were copied to that computer from an external source. Mr.

21  Capozzi could not comprehend the technical aspect of this, so he failed to impeach the main

22  witness against me.

23    Counsel was ineffective in legal and technological understanding. Mr. Capozzi,

24  while admitted to the federal bar and this Court, was not knowledgeable enough about

25  federal criminal law to effectively defend me at trial. He was woefully unprepared to

26  defend a sexual offense case in federal court, and one that had technology beyond his

27  comprehension as a focal point.

1    To compound counsel's ineffectiveness, Mr. Capozzi refused to avail himself of my

2  own expertise in computers, network security, and the internet. With my future at stake, I

3  used a large part of my pretrial detainment to go through the discovery as it was produced

4  and made notes on how to demonstrate my innocence, including many of the issues brought

5  up in this motion.

6    Because my expertise is in computers, not law, I carefully noted everything I could

7  find, not knowing what would have legal merit. I generated many of these notes over the

8  course of my pretrial confinement. Despite repeated and vocal requests, counsel simply

9  would not take the time to read my notes or spend the time with me to familiarize himself

10  with them.

11    Since my interactions with him were primarily limited to a few minutes at a time in

12  hushed conversation in court, I had no opportunity to force the issue. My pretrial

13  detainment meant I could not go to his office and insist on being seen and heard. Due to

14  this, and combined with his own admitted lack of technological knowledge, counsel

15  repeatedly missed opportunities during the trial to make use of information clearly

16  indicated in the discovery. Then when he would return to the table, I would mention it and

17  he would make comments such as "oh, it's too late now."

18    Counsel failed to introduce vital evidence at trial. Angele had framed one ex-

19  husband before me for spousal rape and child abuse. Her ex-husband was exonerated of all

20  charges by a Canadian appellate court, but counsel never introduced this information at

21  trial.

22    Trial counsel failed to argue for the introduction of psychological evaluations I had

23  underwent before trial. He just 'gave up' trying to get them introduced during convoluted

24  and complicated pretrial proceedings. It was simply too hard for him to do. See Transcript

25  of Hearing Sept. 59, 2017 before Hon. Judge Ishii.

26    In that hearing, Mr. Capozzi was not even prepared to argue about the psychological

27  evaluations and expert witness testimony of the evaluators. He decided to fly by the seat of

28  his pants instead of asking for a continuance (or coming to court prepared) which resulted

1  in Hon. Ishii granting the government's motion *in limine* to exclude the evaluations and

2  evaluators as expert witnesses.[3]

3  Trial counsel never argued the evidence already in the record that demonstrated that

4  I could not have been responsible for the downloading of the files in question on Count 2.

5  My work logs were demonstrative of this, and were readily available to Mr. Capozzi before

6  trial. However, he could not be bothered to review these logs and simply never explored

7  that defense.

8  The same lawyer who failed so miserably at trial, also represented me on appeal.

9  Instead of making meritorious arguments that were discussed before the appeal, counsel

10  made four arguments that did not include the arguments discussed. On appeal, counsel

11  argued:

12  (1) That the district court erred in denying my motion for acquittal, new trial, and

13   mistrial;

14  (2) That the government withheld discovery, violating due process;

15  (3) That Count 1 suffered from insufficient evidence to convict; and,

16  (4) Government's closing comments were prejudicial.

17  Among other arguments, jurisdiction on Count 1 was an argument with more merit

18  than the arguments made. There were further arguments that counsel failed to make on

19  appeal that held equal or better merit. Those will be discussed herein.

20  Finally, the ineffectiveness of counsel for failing to make the jurisdictional argument

21  on Count 1 will be fully brought to light and the argument for that point fully made.

22

23  **VII. GENERAL STANDARDS FOR §2255 REVIEW**

24  "Section 2255 provides four grounds upon which a sentencing court may
   grant relief to a petitioning in-custody defendant:

25

---

3  One issue was with the Seymour report, who failed to note what sources were used to come to
some conclusions. A specific instance of this was a police report that supposed that I had
encountered child pornography, which Seymour took as fact instead of supposition. This, in
part, is why that report was excluded, as it did more harm than good to the defense.

1
2
3
4

> "[1] that the sentence was imposed in violation of the Constitution or laws of the United States, or [2] that the court was without jurisdiction to impose such sentence, or [3] that the sentence was in excess of the maximum authorized by law, or [4] is otherwise subject to collateral attack ..."

5  *United States v. Heflin*, 195 F.Supp. 3d 1134, 1136 (E.D. Ca. 2016).

6  Claims not raised on direct appeal can only be raised first in a *habeas* petition only if

7  the petitioner can first demonstrate cause and prejudice, or that he is actually innocent.

8  *Murray v. Carrier,* 477 U.S. 478, 485 (1986). Only a narrow range of claims fall within the

9  scope of §2255. *United States v. Wilcox,* 640 F.2d 970, 972 (9th Cir. 1981). The legal error

10  must be "a fundamental defect which inherently results in a complete miscarriage of

11  justice." *Davis v. United States,* 417 U.S. 333, 346 (1962).

12

13  A motion for relief under §2255 follows the procedures established by the "rules

14  Governing Section 2255 Cases in the United States District Courts" (hereinafter, the

15  "Rules" or "Rule"). The text of §2255 states that,

16
17
18
19
20

> "[u]nless the motion of the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto." 28 U.S.C. §2255 (emphasis added).

21  Similarly, the Rules dictate that, upon initial consideration by the assigned District

22  Judge, a 2255 motion should be dismissed only "if it plainly appears from the motion, any

23  attached exhibits, and the record of prior proceedings that the moving party is not entitled

24  to relief." Rule 4(b) (emphasis added). In all other cases, "the judge must order the United

25  States attorney to file an answer, motion, or other response within a fixed time, or to take

26  action the judge may order." *Id.* The rules also authorize, where appropriate and by order of

27  the Court, discovery proceedings, an expansion of the record, and an evidentiary hearing.

1    Subsequent to the "Preliminary Review" stage set out in Rule 4, the ultimate legal

2  standard for motions brought pursuant to §2255 is prescribed by the statute:

3       "If the court finds that ... that there has been such a denial or
          infringement of the constitutional rights of the prisoner as to render the
4         judgment vulnerable to collateral attack, the court shall vacate and set the
          judgment aside and shall discharge the prisoner or resentence him or
5         grant a new trial or correct the sentence as may appear appropriate." *Id.*
6

7  **VIII. ARGUMENT I: INEFFECTIVE ASSISTANCE OF COUNSEL**

8  Generally, ineffective assistance of counsel is judged against the framework laid out by

9  *Strickland v. Washington,* 466 U.S. 668 (1984). *Strickland* set forth a two-part test for

10  determining if deficient counsel requires undoing. First, counsel's performance must be

11  deficient and, second, that deficiency must have prejudiced the defense. *Id.* at 687.

12    To demonstrate "prejudice," it is necessary to show "there is a reasonable probability

13  that, but for counsel's unprofessional errors, the result of the proceeding would have been

14  different." *Id.* at 694.

15

16    **A. COUNSEL FAILED TO ARGUE LACK OF JURISDICTION ON**

17        **COUNT 1**

18  The government never established jurisdiction to prosecute Count 1, and trial counsel failed

19  to make this argument, resulting in a jury trial and a verdict of Guilty on Count 1.

20

21    **1)   Facts**

22  Angele and I set up a camera in the unused bathroom of the house we shared. Angele is the

23  only person to make recordings off this camera. She made several recordings (ensuring I

24  was in the frame) demonstrating some of the adjustments I had made to that camera in that

25  bathroom. This information was used as circumstantial evidence that I had also participated

26  in a conspiracy with Angele to setup of the camcorder that Angele had used in the Master

27  Bedroom in order to secure video of the victim in this case, A.T., in a state of undress. This

28  is a step too far.

1   On the record, there is no evidence of this. Further, there was never a determination

2   of what type and kind of camera was used in the recordings that were made in the master

3   bedroom. Nowhere in the discovery do law enforcement reports even make a guess as to

4   what camera was used in the bathroom

5   Because the recording of A.T. in the master bedroom was the primary evidence used

6   to conclusively demonstrate that Angele and I had conspired to exploit a minor, and

7   because the camera used by Angele to create that recording was never identified, the federal

8   government lacked the jurisdiction to prosecute Count 1 at all.

9   The remaining footage that was recorded and kept in the secured file share (storage)

10   on our home storage server were from the bathroom that I, admittedly, aided in setting up.

11   However, the conspiracy alleged in Count 1 with the bathroom never happened. I had set up

12   that camera to record Angele, whereas Angele used the placement of that camera and

13   persuaded A.T. and others to use that bathroom so that she could record them in states of

14   undress.

15   The remaining evidence, without the use of the footage from the master bedroom is

16   insufficient to charge exploitation of a minor nor carry the guilty verdict I received on

17   Count 1.

18   None of this matters, however, because the government never established what

19   camera was used to make these recordings. The recordings themselves never left the State

20   of California, or even left my home, so the only way to establish jurisdiction over this

21   offense is to show that the camera itself traveled in interstate commerce to be used to

22   commit this crime. It is clear from the Government's trial brief that there is no provenance

23   for establishing an interstate nexus for jurisdiction.

24   "After Detectives Moore and Hively found the hidden recordings and
25   identified the victim, agents with the FBI obtained a second search
   warrant for the Henry residence to look for evidence of the hidden
26   recordings. During the search, the FBI found a macramé plant with a hole
   cut in it. At the time of the search, the plant was in the garage, but it had
27   been hanging in the bathroom, positioned to record guests and fitted with

28

1   a hidden camera. In photos of the first search of the residence, in fact, the
    macramé plant can be seen hanging in the bathroom. The FBI also found
2   a number of recording devices including security cameras, small cameras,
3   and a Canon Vixio camcorder set up on the same shelf from which the
    victim, AT, was recorded."
4   Government Trial Brief, Doc. 206 at pg. 7, ln. 3-10

5       Even during the trial, the government failed to establish what camera was used to

6   make which recording. In his opening statement, Assistant U.S. Attorney Ross Pearson

7   gave short shrift to what, if any camera, was identified in taking the hidden videos of AT.

8       "On that same network they found videos taken from a hidden camera, a
    camera the defendant and his wife had set up in their bathroom of a 14-
9   year old girl while she was changing clothes, she was using the bathroom,
10  while she was showering. And who had the password to that network? The
    Defendant, Adam Henry, an IT manager."
11

12  Transcript of Trial Day 2, Doc. 331, pg. 274 ln 22 through pg. 275 ln 2.

13      In Trial Day 3, this exchange between Assistant U.S. Attorney Ross Pearson and

14  Detective Moore is all the testimony presented about the cameras.

15      Q.   I've handed you Exhibit 13.1. Will you please show that to the jury

16      and describe it.

17      A.   This is a cardboard box that contains a small digital camera. And the

18      contents look like it has a camera here, and then it looks like it could be

19      hooked up with video, and left and right audio.

20      Q.   How many of those cameras were found?

21      A.   I don't recall the exact amount, but there were several.

22      Q.   Were there other cameras found in the residence as well?

23      A.   Yes.

24      Q.   Were those found?

25      A.   We located a camera in the master bedroom.

26      Q.   I think we talked about that yesterday. Was that the Canon Vixia

27      camcorder?

28      A.   Yes.

1    Q.    Were there more cameras found in the garage as well?

2    A.    Yes, there were.

3    Q.    I'm going to show you Government's Exhibit 14.1 through 14.3.

4    This is a placeholder for the physical exhibits. Do you recognize these

5    exhibits.

6    A.    Yes.

7    Q.    And what are they?

8    A.    That's items that were located in the garage of the Henry residence,

9    and in particular, there's a camera there.

10    Q.    Were these exhibits seized during the search on the November 13th,

11    2013?

12    A.    Yes.

13    Transcript of Trial Day 3, pg. 389 ln 10 through pg. 390 ln 11.

14    The attempts by the government to establish which camera was used to create the

15    recordings of A.T. were shot down. On direct examination of Detective Hively the follow

16    exchange occurred.

17    Q.    So Exhibit 12 is in evidence, and the testimony was that this as

18    found at the Defendant's residence. It's a Cannon [sic] Visia camcorder.

19    Have you seen this before?

20    A.    Yes, sir.

21    Q.    Is there a connection between Exhibit 12 and Exhibit 27.11?

22    A.    Based on my analysis, that was the camera that was used to create

23    the video that day.

24    Q.    And why do you - -

25          MR. CAPOZZI: Objection. Calls for a conclusion, lack of

26    foundation.

27          THE COURT: Sustained. Set the foundation.

28    Transcript of Trial Day 4, Doc. 333, pg. 589 ln 19 through pg. 590 ln 5.

THE COURT: I'll ask this question: How can you tell it was that camera as opposed to some other Cannon of the same model? Based upon what you just told us, how does it distinguish from camera to camera?

THE WITNESS: I cannot.

THE COURT: Objection sustained. The answer is stricken. And the jury is instructed to disregard the witness' testimony linking the video to that particular camera.

Transcript of Trial Day 4, Doc. 333, pg. 591 ln 19 through pg. 592 ln 1.

There was never a link established to determine what camera was used to take the recordings of AT, the victim here, and thus there was never jurisdiction established to prosecute me for this crime. Even in his closing statements, Mr. Gappa made only hand-waving reference to jurisdiction.

> "One thing that hasn't been covered a lot, but I just want to point out to you is if you look at the items in evidence, you'll see things such as 'Product of Thailand," some of the items were made in other locations. For instance, this hard drive, Exhibit 1A, which came from the Lock-N-Stitch computer, was made in Thailand. And the Canon Vixia camcorder is made in Japan. So if you look, almost every single item that was used either to download the child pornography or to create the images of A.T., those items were manufactured outside of the State of California. Which is important for jurisdictional basis. So I did want to point that out to you."

Transcript of Trial Day 7, Doc. 336, pg. 1003 ln 8 through ln 19.

This demonstrates that the government *knew* they lacked concrete jurisdictional authority to prosecute Count 1, but were reliant on my counsel's ineffectiveness not to argue jurisdiction. They relied on unsupported suppositions about what (if any) of the cameras in their possession were used to grab a tenuous link to federal prosecuting authority… they were right to rely upon Mr. Capozzi's ineffectiveness.

1    **2)   Legal Standard**

2    The statute for which I was convicted is very specific that a nexus of interstate commerce

3    must be affected for a crime under that statute to be committed. The statue reads:

4    "(a) Any person who employs, uses, persuades, induces, entices, or
coerces any minor to engage in, or who has a minor assist any other

5    person to engage in, or who transports any minor in or affecting

6    interstate or foreign commerce, or in any Territory or Possession of the

7    United States, with the intent that such minor engage in, any sexually
explicit conduct for the purpose of producing any visual depiction of

8    such conduct or for the purpose of transmitting a live visual depiction

9    of such conduct, shall be punished as provided under subsection (e), if
such person knows or has reason to know that such visual depiction

10   will be transported or transmitted using any means or facility of

11   interstate or foreign commerce or in or affecting interstate or foreign
commerce or mailed, **if that visual depiction was produced or**

12   **transmitted using materials that have been mailed, shipped, or**

13   **transported in or affecting interstate or foreign commerce by any**
**means, including by computer,** or if such visual depiction has

14   actually been transported or transmitted using any means or facility of

15   interstate or foreign commerce or in or affecting interstate or foreign
commerce or mailed." 18 U.S.C. §2251(a) (Emphasis added)

16

17   It is clear from the record that the visual depictions of A.T. were recorded at my

18   home in California, and were never transmitted or transported out of my home in

19   California. There is not, and has never been, any dispute over this fact. There is also no

20   dispute over the issue of commerce: neither Angele nor I were ever accused of selling or

21   attempting to sell the produced images.

22   Thus, the only way the government may prosecute a crime here is if the materials

23   used to produce the images were transported in interstate commerce. Without a showing of

24   this, the crime here is unconstitutionally applied to me. *United States v. McCoy,* 323 F.3d

25   1114 (9th Cir. 2003).

26   Whether an act substantially affects interstate commerce is controlled by *United*

27   *States v. Morrison,* 529 U.S. 598 (2000). *Morrison* lays out a four-part test to make this

28   determination:

1    1)  Whether the statute in question regulates commerce "or any sort of economic
2         enterprise";
3    2)  Whether the statute contains any "express jurisdictional element which might limit
4         its reach to a discrete set" of cases;
5    3)  Whether the statute or its legislative history contains "express congressional
6         findings" that the regulated activity affects interstate commerce; and
7    4)  Whether the link between the regulated activity and a substantial effect on interstate
8         commerce is "attenuated."

9    *McCoy* at 1119 (Quoting *Morrison*, at 610-612).

### 3)   Argument

It is clear that §2251(a) relies on prong 1, above, to establish constitutional jurisdiction over the production of illicit sexual images of a minor. To wit, purchasing a camera to produce those images, where such camera traveled in interstate commerce to reach the defendant, qualifies under *Morrison* as lawful regulation of interstate commerce.

Here, though, there was no such finding because there was no showing of which, if any, of the cameras found at my residence were used to create any of the recordings that were the subject of my indictment and conviction here.

Any attempt by prosecuting counsel to make that connection was shot down by the Court. Because it is clear that there was no jurisdiction established by the government to prosecute Count 1, it was a clear failing of Defense Counsel when Mr. Capozzi never used this information in my defense.

It was never too late to do so. He could have done so during the myriad pretrial motions and hearings on said motions. Defense Counsel could have argued this at trial. Mr. Capozzi could have argued this in post-trial motions like the motion for new trial [Doc.

1  254] or in his oral motion for judgment of acquittal. Doc. 304. Mr. Capozzi could have

2  raised this issue in the principal brief on appeal to the Ninth Circuit, but did not.[4]

3  Defense Counsel did none of these things, which caused prejudice by subjecting me

4  to a conviction on this count. While it is true that the conviction on both counts carried the

5  same sentences ran concurrently, prejudice remains on the fact of conviction on Count 2.

6  The prejudice is caused by an enhancement of two points to my adjusted offense

7  level for the two counts together. PSR at ¶55.

8  Thus, Defense Counsel's failure satisfies both prongs of the *Strickland* test. First,

9  trial counsel was constitutionally ineffective for failing to argue the lack of jurisdiction on

10  Count 1.

11  Second, this caused measurable prejudice in the eventual sentence I received for

12  both Counts 1 and 2 by increasing my total adjusted offense level by two points.

13  Therefore, my conviction on Count 1 should be vacated for lack of jurisdiction. My

14  sentence should also be vacated and I should be re-sentenced, under this argument with an

15  adjusted offense level two points lower than originally used.

16

17  **B. COUNSEL FAILED TO INVESTIGATE AVAILABLE DISCOVERY**

18  **1) Facts: Angele Had All My Passwords**

19  The file storage server which I installed in our home, called Network Attached Storage

20  (NAS), contained two "shares" that were accessible. Each one of these shares contained

21  folders and files. One share was password protected, one was not.

22  Angele used the computer at my work to access Shareaza and download a lot of

23  child pornography from that program. She let the files accumulate in the "incomplete"

24  folder of Shareaza and then transferred them to our NAS at home remotely when they had

25  completed downloading. She would then delete the completed files from the "Complete"

---

4  He did argue this in the response brief, but as any appellate practitioner knows, new issues are disallowed in response briefs, and he was too late in arguing this for the 9th to rule on the issue on the merits.

1 folder of my work computer to shoddily cover her tracks. It worked on me because I

2 blindly trusted my spouse, but not on law enforcement

3    When she would remotely transfer these files from my work computer to our home

4 NAS, she would put these files into the password-protected share of the NAS. That share

5 was called "Aurora" after a character name of Angele's in an online video game.

6    A large part of the decision to prosecute me for Count 2 was based upon the

7 assumption that Angele did not have access to the password protected share. One of the sole

8 arguments the government made was that I was the one downloading the files and saving

9 them was predicated on this assumption.

10    "Good afternoon. Police found child pornography on a password protected

11    site on the Defendant's home computer network. On that same network
       they found videos taken from a hidden camera, a camera the Defendant

12    and his wife had set up in their bathroom of a 14-year old girl while she

13    was changing clothes, she was using the bathroom, while she was
       showering. And who had the password to that network? The Defendant,

14    Adam Henry, an IT manager."

15 Transcript of Trial Day 2, Doc. 331, pg. 274 ln 20 through pg. 275 ln 2.

16    "Before they did this forensic analysis, they talked to Adam Henry. And
       you'll hear him tell them how this home network was set up. There was a

17    password protected side and an unprotected side. That his wife had access

18    to the unprotected side, but only he had access to the protected side."

19 Transcript of Trial Day 2, Doc. 331, pg. 274 ln 20 through pg. 275 ln 2.

20    The password to the protected side of this NAS was "Stitch@11". Doc 331, pg 348,

21 ln 20. This will become relevant shortly.

22    The only evidence that the government had that Angele *didn't* have the password to

23 the Aurora share was a statement from her, saying as much. This, plus the idea that the non-

24 password-protected share was accessible to Angele's network, but the password protected

25 share was not. During Detective Hively's grand jury testimony, he stated:

26    "We find in many of our investigations individuals who are trying to

27    maintain files will keep file folder names associated with different types of
       sex acts or different – boys versus girls, that type of thing. He did say he

28

1
2
3

"We find in many of our investigations individuals who are trying to maintain files will keep file folder names associated with different types of sex acts or different – boys versus girls, that type of thing. He did say he did not – he didn't have any categorization on that password protected side.

4
5
6
7

"He told me his wife did not have access to that side, and I asked him if she ever asked him, "Why do you need to have a password protected side?" and he said he told her it was because he wanted to make sure he had an opportunity to go through those files, delete anything that was inappropriate before she could actually see them."

8   Bates #1196 at ln. 7-18.

9       However, this is not a fact and I can prove that Angele did, in fact, know the

10  password and had administrative access to everything the NAS contained. In the case

11  discovery, it is plainly shown that I had freely given Angele access to the password

12  protected side of the NAS. From a set of text messages between Angele and I:

13
14

"ANGELE: Whats the number in your password on your comp? I remember the word not the number. 2) you gona be home soon? Like next 30 min?

15
16

"ME: It's 11 and no, not so soon. Am on yahoo here though. Can talk that way.?"

17  Bates 1124, iPhone Extraction Report, Page 2. Attached as Exhibit 1.

18      I did not reuse passwords, and this is the only place I used "Stitch@11" as a

19  password to anything. I freely gave this password to Angele, and the text message exchange

20  above demonstrates that I had done so more than once. This casts serious doubt upon the

21  government's argument that only I could have downloaded and saved these images.

22      Mr. Capozzi did not complete his document review thoroughly enough to find this

23  evidence and use it to contradict the government's position that I was the only person with

24  access to the file locations that contained the child pornography. This fact, standing alone,

25  would be enough to cast significant doubt upon the government' argument-in-chief and cast

26  ample reasonable doubt upon my jury verdict on Count 2.

27

**2) Facts: Angele's Access to my Work Computer**

Angele was always present at my work computer when the child pornography files were downloaded from my work computer. I was away from my desk when those files began downloading, and Angele was home, alone, accessing my work computer when the files were transferred from my work computer to the password-protected share where the files ended up.

The password-protected share that Angele definitively had the password to.

Even a cursory investigation by Mr. Capozzi of the logbooks at Lock-N-Stitch would show that I was working away from my desk when the files were being searched and downloaded.[5]

Det. Hively testified at trial that I remotely copied files from my work computer to the home NAS, at times when I was provably not at home. From Mr. Capozzi's cross-examination of Det. Hively:

Q. Are you saying then that he was at home when he did this?

A. All I can say is that this occurred at three o'clock in the afternoon on August 23rd, 2013?

Q. Okay. So what does that mean?

A. That means that it is likely that he was at home, because he would have had remoted in, and then copied and pasted them into NETGEAR ReadyNAS secure share.

Q. So are you saying he was at home?

A. That would be my analysis, yes.

Q. And what time did these transfer occur, it was roughly between 3:05 and 3:07 in the afternoon?

A. Yes, sir.

---

5   Not to mention the server logs that would have shown my username working on site, which Mr. Capozzi never had extracted for evidence.

1    Transcript of Trial Day 5, Doc. 334, pg. 719, ln 11-22.

2       Mr. Capozzi pointed out on cross examination that the company calendar had me at

3 work that day, but he did not research the easily found proof that it was *Angele* at home, not

4 I, copying the files.

5

6    Q.    Did you review the text messages between Adam and Angele

7          Henry?

8    A.    Yes.

9    Q.    Did you read all of them?

10    A.    Text messages?

11    Q.    Yes.

12    A.    There were quite a few. I attempted to get through most of them as

13          thoroughly as possible, but I certainly could have missed some.

14    Q.    How about the ones on August 23, 20132, did you read them?

15    A.    Not specifically.

16    Q.    There were two of them? You don't remember reading them?

17    A.    I do not.

18    Q.    Would it - - there were two of them on that date August 23rd, 2013,

19          you don't remember one way or the other?

20    A.    No, I'm sorry. No.

21    Q.    Well, how would it be possible for Mr. Henry to have accessed his

22          work computer from his home on August 23rd at three o'clock if he

23          was at work, at that time? Could he have done that?

24    A.    No.

25 Transcript of Trial Day 5, Doc. 334, pg. 720, ln 10 through page 721, ln 5.

26       Instead of leaving it as a hypothetical "If he was at work" and referring to texts

27 Hively didn't remember, Mr. Capozzi should have just *presented* those texts. Hively

28 admitted I could not have done those activities while at work. With text messages

1  demonstrating that Angele was home alone, Mr. Capozzi could have elicited an admittance

2  from Det. Hively that I could not have possibly been responsible, and that Angele was

3  guilty of transferring those files and, additionally, proven that she would have had my work

4  and NAS secure share passwords to do it.

5       From the direct examination of Det. Hively:

7  A.    Certainly. The title or label would be from the NETGEAR

8          ReadyNAS, Aurrora, new misc, new folder, Aza folder.

9             We have the name of the file, we have the file extension, and

10          we have the created date. I should clarify the - - in each one of

11          these, the top screenshot is from EnCase. And the lower screenshot

12          is from FTK. And that's why we have a bit of a difference in their

13          display.

14  Q.    Okay. What is the significance of the created date as it relates to the

15          entry in the bottom half of the first page of Exhibit 33?

16  A.    It's within a couple of minutes of when the file was placed in the

17          recycle bin in item number 1. It was created on the NETGEAR

18          ReadyNAS.

19             So my interpretation would be it was dragged and dropped

20          through a remote desktop protocol, and it was created on the

21          NETGEAR ReadyNAS within a couple of minutes of it going into

22          the recycle bin at Lock-N-Stitch.

23  Transcript of Trial Day 4, Doc. 333, pg. 567 ln 13 through pg. 568 ln 4.

24      The implication here was that I was technically able to make this transfer. What

25  wasn't demonstrated was my availability to do so. A deeper investigation by Mr. Capozzi

26  would show that I was working from different computer terminals around the Lock-N-

27  Stitch compound when those searches and downloads were initiated. This would have

1  required an analysis of the user logs from the main server/firewall hardware of Lock-N-
2  Stitch.

3       Exhibit 33 mentioned above is derived from Det. Hively's report found on Bates
4  1211-1214. Both show the dates referred to in the testimony as approximately 3:05 P.M. on
5  8/23/13.

6       Access here was one way. I could access my work computer from home, but could
7  not access my home NAS from my work computer. Two facts stand out here: whoever was
8  at my home, copying these files, (1) had access to my remote work station, and (2) had the
9  password to Aurora share. Because I was provably at work that day, this could only have
10 been Angele, who I've already shown lied about having the password to the Aurora share.

11      Without question, a showing of the user logs (along with the search terms in French)
12 would have shown Angele as the likely perpetrator of the downloading and cataloging of
13 the illegal files in question. However, more easily accessible are Angele's text messages
14 from that day:

15      The excerpts of cell phone records [Bates #1124] will show that Angele was home at
16 the time, and I was not. These extracts need to be seen by the Court.

17 • 08/23/2013; 8:45 A.M.: Angele texts a friend, mentioning she is taking our car in for
18     a tune-up. We only had one car, as indicated by police reports and David Silva's
19     deposition. If she had the car, I did not, and therefore had no way of getting home
20     until picked up by Angele at the end of the day.

21 • 08/23/2013; 11 A.M.: A different friend of Angele's (named Krista) picks Angele up
22     from the dealership after dropping our only car off there.

23 • 08/23/2013; 2 P.M.: Angele texts me while I was present at work, asking if I thought
24     she should try to get Krista to stick around until I finished work for the day.

25 • 08/23/2013; 3:05 P.M.: The child pornography files were remotely copied.

26 • 08/24/2013; The following day, Angele and Krista exchange text messages about
27     how next time, Krista should stick around. This indicates that Krista left our home

1    after 2pm, but before Angele picked me up from work, leaving Angele home alone

2    exactly when those files were copied.

3    In short, exactly one hour before somebody used both the work and NAS passwords

4    from the house, I was at work while she was at home alone with our only vehicle.

5    At the very least, it would have demonstrated significant doubt as to my culpability

6    on Count 2, far more significant than is necessary to demonstrate reasonable doubt.

7    Moreover, the facts of the matter are much more in line with reality than the story

8    the government wove at trial. Bates 1182 talks about Item 16, the computer from my home

9    garage. This computer was last used on 8/20/10, Shareaza having been installed on that

10    computer on 4/29/09, and Det. Hively reported that the Shareaza program on that computer

11    did not have any search terms entered, and that he manually reviewed the Shareaza data

12    files for artifacts relating to child pornography and found none. See below, page 35.

13    Bates 674 describes Item 1B, a loose hard drive for my work computer. The

14    operating system was installed on 1/19/11 and was last used on 3/29/12. Shareaza was

15    installed, but no child pornography had ever been searched or downloaded on this drive's

16    Shareaza installation.

17    Bates 548 describes Item 1A, the active hard drive in use on my work computer.

18    That operating system was installed on 1/31/12 and was last used in 9/19/2013 when it was

19    seized during the State search warrant. child pornography files *were* found on this drive.

20    Detective Moore (Bates 676) and Det. Hively (Bates 680) both listed search terms

21    used on Item 1A which included terms related to child pornography. According to both, the

22    registry information was "Last Written" on 6/3/2013 at 23.19.29 UTC, or 3:19 P.M. Pacific

23    Time.

24    The "Last Written" means the last time a search term was entered into the Shareaza

25    program. Bates 548 shows the child pornography files still in the incomplete folder of

26    Shareaza on Item 1A. The File Creation dates, which indicate when the files were *begun*

27    downloading, break down as follows:

28    • 39 Files on 5/28/2013 between 1:20 P.M. and 3:35 P.M.

1    • 1 File on 5/31/2013 at 7:33 A.M.

2    • 2 Files on 6/3/13 at 2:23 P.M.

3  From Mr. Capozzi's cross examination of Det. Hively

4       Q.    All right. Let me go onto something else. On the terms that were put

5             in for child pornography on 1A, they were from May 28 to June 3rd,

6             2012?

7       A.    I understand there are two dates that files – those are the two dates

8             that files were initiated from download on that Exhibit 1A, yes.

9  Transcript of Trial Day 5, Doc. 334, pg. 661 ln 22 – 28.

10          Altogether, what this means is that from the first computer to the last, I had nearly

11  constant Shareaza usage history from 4/29/09 – 9/19/2013. Out of roughly 4½ years of

12  usage, the only time frame child pornography was searched for and downloaded was the

13  seven days between 5/28/13 and 6/3/13, exclusively in the afternoon or early morning when

14  Angele would be dropping me off or picking me up from work.

15          No searches for child pornography occurred before or after, and no downloads began

16  before or after these times. Five days out of 4½ years of usage, and only when Angele had

17  access to my work computer.

18          From the deposition of David Silva by Mr. Capozzi and AUSA Gappa:

19      Q.    Okay. When did you come back and work?

20      A.    It was May 11th or 12th.

21      Q.    Okay. Then did you come back and work?

22      A.    Yes.

23      Q.    All right. Did you see Adam Henry working there?

24      A.    Yes.

25      Q.    Did you ever have - - ever have occasion to see Angele Henry there

26            at Lock-N-Stitch?

27      A.    Yes.

1    Q.    And when would you - - when would you see her? What time of

2          day?

3    A.    It was in the afternoon, 2:30, 3:00 o'clock.

4    Q.    Was this back in May of 2013?

5    A.    Yes.

6    Silva Deposition, Page 8, ln 3-20.

7

8    Q.    Okay. Would there be occasions when she was in the office when

9          the defendant - - when Adam Henry was not there?

10   A.    Yes.

11   Q.    And how often would that happen?

12   A.    Quite a few times.

13   Q.    Okay. And was it always in the afternoon?

14   A.    Yes.

15   Q.    Do you have a viewpoint from your office to Adam's office?

16   A.    Yes.

17   Q.    Was there ever occasions when the doors were closed between the

18         two offices?

19   A.    Not that I recall.

20   Q.    Really. Okay. Okay. What did you see Angele Henry doing in his

21         office when Adam Henry was not there?

22   A.    She would be sitting in his chair.

23   Silva Deposition, Page 11, ln 6-25.

24

25   **3)   Facts: Angele's Access to Item 16**

26   As will be reiterated in Section (D) (Page 48), Mr. Capozzi failed to understand the

27   technology involved in this case at all. He specifically tells the jury this on more than one

28   occasion. However, this technological ineptitude affected the outcome of my case.

1    One way this presented itself was regarding Item 16: the garage computer. Det.
2    Hively, in conjunction with Mr. Gappa, intentionally misled the jury regarding the files and
3    their creation/access dates on Item 16 because both knew that Mr. Capozzi would be totally
4    unable to refute their assertions on this matter.

5    Again, greater detail will be given in Section (D) (Page 48) below to avoid
6    duplication of evidence presentation. However, relevant here is the available discovery that
7    Mr. Capozzi *should have* known at trial, if he would have completed his document review
8    during trial prep.

9    Angele brought child pornography with her from Canada and installed it in a
10   directory (folder) in Item 16 when I was still using it. She did so in such a way as to keep
11   the file creation dates and modification dates within the file. Relevant here, though is the
12   "last access" dates associated with the files she transferred onto that computer.

13   In Bates 1168-1177, the file access dates for the child pornography files are listed
14   fall on one of four dates:

15   1. July 5, 2009

16   2. January 22, 2010

17   3. April 13, 2010, and

18   4. August 20, 2010.

19   All of these dates correspond to dates that Angele was in California visiting me. This
20   can be verified with Det. Moore's report on the interview he completed with Angele where
21   she states what those dates were. If viewed together, the 60-some files' access dates all
22   occur in the windows when Angele was visiting, in clumps that would match her irregular
23   visits, rather than spread out if I was watching them regularly.

24   This important bit of discovery is readily available for viewing, but Mr. Capozzi was
25   woefully incomplete in his trial preparation and couldn't be bothered with it enough to
26   make an argument here, showing very convincingly that those files were viewed by Angele
27   alone.

1  **4)   Facts: Angele's Prurient Interests Emerge when her Sexual Life**

2  **Suffers**

3  When looking at the dates where Angele downloaded child pornography, it is without fail

4  during a time of lull in her day-to-day sexual life. For an example, her son Aiden was born

5  October 21, 2005 and Bates 1180 and 1131 show the oldest child pornography files found

6  on the Garage PC (Item 16) as "last written" on November 5, 2005. Canadian court

7  documents show that Angele's sex life suffered after Aiden was born because as he was a

8  very colicky baby

9      Similarly, our son Liam was born October 22, 2013. This was a hard pregnancy for

10 Angele and sex became painful for her in the middle months of her pregnancy. This

11 coincides directly with her downloading child pornography on my work PC  between May

12 28th and June 3rd of 2013. See Bates 548.

13     Mr. Capozzi never lined up the dates to make this connection and, thus, it was never

14 argued as such.

15 **5)   Legal Standard**

16 Counsel commits constitutionally ineffective counsel if he fails to investigate for vital

17 evidence as part of a defense.

18     "[A]ccess to counsel's skill and knowledge is necessary to accord
   defendants the 'ample opportunity to meet the case of the prosecution' to
19 which they are entitled... Counsel ... has a duty to bring to bear such skill
   and knowledge as will render the trial a reliable adversarial testing
20 process" *Strickland,* at 685, 688.

21

22     "In other words, counsel has a duty to make reasonable investigations or to
23 make a reasonable decision that makes particular investigations
   unnecessary." *Id.* at 691.
24

25     "Counsel's competence, however, is presumed, *id.,* at 689, and the
   defendant must rebut this presumption by proving that his attorney's
26 representation was unreasonable under prevailing professional norms and
27 that the challenged action was not sound strategy."

28 *Kimmelman, v. Morrison,* 477 U.S. 365, 384 (1986).

The prevailing standards by which a defense attorney should be measured come from the American Bar Association Standards for the Defense Function.

Standard 4-3.7, entitled, "Prompt and Thorough Actions to Protect the Client," provides in relevant part:

> (b) Defense counsel should **promptly seek to obtain and review all information relevant to the criminal matter**, including but not limited to requesting materials from the prosecution. Defense counsel should, when relevant, take prompt steps to ensure that the government's physical evidence is preserved at least until the defense can examine or evaluate it.

> (c) **Defense counsel should work diligently to develop, in consultation with the client, an investigative and legal defense strategy**, including a theory of the case. As the matter progresses, counsel should refine or alter the theory of the case as necessary, and similarly adjust the investigative or defense strategy. (Emphasis Added)

Standard 4-4.1, "Duty to Investigate and Engage Investigators," requires:

- **Defense counsel has a duty to investigate in all cases**, and to determine whether there is a sufficient factual basis for criminal charges.
- **The duty to investigate is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt**, a client's expressed desire to plead guilty or that there should be no investigation or statements to defense counsel supporting guilt.
- **Defense counsel's investigative efforts should commence promptly and should explore appropriate avenues that reasonably might lead to information relevant to the merits of the matter**, consequences of the criminal proceedings, and potential dispositions and penalties. Although investigation will vary depending on the circumstances, it should always be shaped by what is in the client's best interests, after consultation with the client. Defense counsel's

investigation of the merits of the criminal charges should include efforts to secure relevant information in the possession of the prosecution, law enforcement authorities, and others, as well as independent investigation. Counsel's investigation should also include evaluation of the prosecution's evidence (including possible re-testing or re-evaluation of physical, forensic, and expert evidence) and consideration of inconsistencies, potential avenues of impeachment of prosecution witnesses, and other possible suspects and alternative theories that the evidence may raise.

- **Defense counsel should determine whether the client's interests would be served by engaging fact investigators**, forensic, accounting or other experts, or other professional witnesses such as sentencing specialists or social workers, and if so, consider, in consultation with the client, whether to engage them.

So if it is my duty to demonstrate ineffective assistance of counsel, and that ineffectiveness is judged against the prevailing standards, and those standards require defense counsel to investigate or hire experts to do their investigations for them, then Mr. Capozzi's performance should be judged against the ABA Standards for the Defense Function.

### 6)   Argument

Mr. Harrelson's and Mr. Capozzi's performance before and during trial cannot withstand the scrutiny of this Court. A basic document review of the discovery in my case would show that Angele knew the password to the Aurora share.

Mr. Gappa submitted during my second detention hearing that I was the only person with access to the Aurora share, meaning I was provably involved in filming A.T. This was totally untrue and this alone casts sufficient doubt on my culpability as to warrant reasonable doubt before a jury.

However, there is much more than simply a showing that Angele did, in fact, know the password to the Aurora password-protected share on our home NAS.

1    It was easily researched and provable that Angele was present at Lock-N-Stitch

2  when the searches for child pornography were made. It was easily researched and provable

3  that Angele was present at Lock-N-Stitch when the child pornography files were created

4  and began to download.

5    It was easily researched and provable that Angele was home, and that I was away

6  from my work computer, when the completed child pornography files were transferred

7  from my work computer to the Aurora password-protected share on our home NAS.

8    A competent SysAdmin professional, if hired by Mr. Capozzi, could have easily

9  shown that the server logs at Lock-N-Stitch placed me away from my work computer when

10  the transfer of those files were initiated from my work computer to the Aurora password-

11  protected share on our home NAS.

12    It was easily researched and provable that Angele was present when, and only when,

13  the child pornography files on Item 16 (the garage computer) were accessed. This shows

14  two things: that she knew they were there and, because of my *lack* of accessing those files

15  when she was not visiting, that I likely had no idea they were there.

16    This is all information I found, researched, and know *from prison*, and in a much

17  more hamstrung position than Mr. Capozzi during trial preparation. These facts create much

18  more reasonable doubt, on their own, than Mr. Capozzi was able to create during the

19  entirety of my trial. This much reasonable doubt would have changed the jury verdict on

20  Count 2.

21    Mr. Capozzi was ineffective for this, and that ineffectiveness resulted in a verdict of

22  guilty on Count 2.

23

24  **C. COUNSEL FAILED TO IMPEACH WITNESSES**

25    **1)   Facts**

26  Detective Hively lied multiple times while on the stand. Most prominently, these lies

27  surrounded my involvement in the charges against me, and the placement of the Macrame

1  plant that was found in the bathroom during the local search versus the placement of that

2  plant during the federal search.

3      My ex-fiance also lied on the stand, although that lie is certainly understandable

4  considering the distance in time between our relationship and my trial. She testified that she

5  did not know she was being recorded on my cameras in my previous residence when, in

6  fact, she knew very well that I had recorded her and the two of us together in intimacy.

7      Mr. Capozzi failed at every turn to impeach the testimony of the government's star

8  witness, and failed to impeach the testimony of my ex-fiance with text-message proof that

9  she knew well that she was being recorded. This testimony painted a picture of a prurient

10 pervert instead of the considerate partner that I was, solidifying to the jury that I was

11 lacking in any sort of moral character, ensuring a guilty verdict on Count 1.

12      ### a) Detective Hively Changed His Testimony Regarding the Garage

13          ### Computer

14      Detective Hively did the bulk of the forensic work on my case. He analyzed the

15 NAS and other computer hardware where he found child pornography and videos Angele

16 had recorded using the camera I had helped her set up.

17      Detective Hively changed his stories multiple times between his forensic reports,

18 grand jury testimony, and trial testimony. In his forensic reports and grand jury testimony,

19 he made it clear that the computer in my garage (that had files dating back to 2005) had no

20 history of Shareaza search artifacts for child pornography, and had not used Shareaza to

21 download the files that were found there. AUSA Gappa questioning Det. Hively:

22

23      Q.    Okay. And did they - - I think you mentioned it - - were they

24            currently downloading using a different peer-to-peer program

25            known as Limewire?

26      A.    Yes.

27 Bates #1209 at ln 18-21.

1      But nowhere in any discovery was Limewire found on any device. Nowhere in any

2  discovery document is there *any* mention of Limewire. In four years of reports, Det. Hively

3  did not once mention Limewire, but does so on the stand in a case that involved peer-to-

4  peer sharing. Mr. Capozzi did nothing to thwart this unsubstantiated conclusion.

5      During trial, he stated the opposite, that it was not known what had been used to

6  download the files on the garage computer. This testimony was also elicited by AUSA

7  Gappa. Under cross examination by Mr. Capozzi, Det. Hively stated that the change in

8  testimony was due to "new evidence." Mr. Capozzi stopped there when he should have

9  impeached Det. Hively's testimony. This was not a matter of a mistake, or "new evidence,"

10  but blatant perjury by Det. Hievly and suborned by AUSA Gappa.

11      It is clear from his forensic reports (Bates 1182), e-mails (Bates 1185), and grand

12  jury testimony that Hively knew that the files on the garage computer had been moved

13  there from an outside drive. From Bates 1182:

14     "I reviewed the NTUSER.dat file for "Administrator" for artifacts related
        to Shareaza. The install date for the program was 4/27/09. The Search hive
15     did not have any search terms entered. The Shareaza.exe file was installed
16     in the normal location, "C:\Program Files (x86)\Shareaza".

17     "I manually reviewed the following three Shareaza data files for artifacts
18     related to CP but did not locate any.

19         Library1.dat
20         Library2.dat
           Searches.dat"

21

22      It is likely that Angele had brought some child pornography with her from Canada

23  and had transferred those files to that computer before it was decommissioned and placed in

24  the garage. Windows XP oftentimes did not update the file creation/modification dates of

25  files that were transferred like this, as admitted on the witness stand by Detective Hively.

26

1    Q.    When is it that you can move something from one document to

2          another document, from one computer to another, and the creation

3          date doesn't change?

4    A.    There are some rare circumstances in which that can occur.

5    Q.    How does that happen?

6    A.    It's a little complicated, but as an example, if you have a Windows

7          XP machine.

8    Transcript of Trial Day 5, Doc. 334, pg. 659 ln 24 through pg. 660 ln 5.

9         Capozzi failed to grasp the magnitude of this discrepancy, and failed to latch onto

10   the technical import of the garage computer which *was* running on Windows XP. This

11   specifically allowed for the original file creation date to persist through a file transfer. See

12   Bates 1185 & 1237.

13        His inability to grasp the magnitude or importance of this information lead to his

14   inability to impeach the testimony of Det. Hively on the witness stand. As the lead and star

15   witness for the government, throwing his testimony into considerable doubt would have

16   cast my *verdict* into considerable doubt.

17

18        *b) Detective Hively Lied on the Witness Stand about the Placement of*

19            *the Macrame Plant in the Bathroom*

20   During his trial testimony, Det. Hively stated certainty about the placement of the macrame

21   plant that was entered into evidence. Here are some excerpts from Capozzi's cross-

22   examination of Det. Hively regarding the macrame plant.

23

24   Q.    Just handing you Government's Exhibit 11. Do you recognize that

25          exhibit?

26   A.    Yes.

27   Q.    What is it?

1    A.   This is the plant that we located. This is the fake plant and planter

2         that we located in the garage during the second search on November

3         13th.

4    Q.   This is the one that you testified was seized on November 13th?

5    A.   Yes.

6    Transcript of Trial Day 3, Doc. 332, pg. 397 ln 9-18.

7         Capozzi then concedes this point, even though evidence from the FBI search photos

8    showed the plant in the bathroom during the second search on November 13, 2013.

9

10   Q.   Okay. Do you know whether or not [FBI Agent Whitney] went into

11        that bathroom on that day on that search? Was he the one in charge

12        of the bathroom area?

13   A.   I don't know.

14   Q.   Were you there on that search?

15   A.   Yes.

16   Q.   Who recovered the planter in the garage?

17   A.   I can't recall.

18   Q.   Do you know whether or not it was Agent Whitney or - -

19   A.   I don't know.

20   Transcript of Trial Day 3, Doc. 332, pg. 400 ln 13-22.

21        That plant was present during the first search of my residence hanging in the third

22   bathroom of the house. I had cut out a part of the base of that plant for a hidden camera to

23   record Angele in the shower, with Angele's full knowledge of its presence and use. During

24   previous testimony, Det. Hively had stated the plant was found in the garage during the

25   second search on November 13, 2013. See also Bates 1288.[6]

---

6   See also Bates 1287, which is a report by Det. Hively showing the final recording of A.T. in the
    bathroom on April 8, 2013. Bates 487-488 show that the daycare kids were enrolled on August
    13, 2013. The final recording was done more than five months before the search warrant
    because I had pulled the camera out of the plant in advance of the daycare going live. I never

1    Mr. Capozzi could have easily shown that the plant was still hanging in the third

2  bathroom during the FBI search. The photo of that plant hanging during the second search

3  is plainly shown in Bates #891-892.[7]

4    This minor detail holds a lot of importance toward a showing of guilt on Count 1.

5    Q.    Okay. Is there a significance of that plant being in the garage and

6          not being in the bathroom from your perspective?

7    A.    Yes, sir.

8    Q.    What is that significance?

9    A.    Well, if it's in the garage that indicates that Mr. and Ms. Henry took

10          it down from the bathroom to remove it from that location from

11          where all those videos were created.

12  Transcript of Trial Day 5, Doc. 334, pg. 665 ln 23 through pg. 666 ln 4.

13    Additionally, that bathroom was mostly unused since Angele's children used the

14  second bathroom (and Angele and I primarily used the master bathroom). Once I learned

15  that Angele was planning on starting an in-home daycare, and assuming that our third

16  bathroom would be used by children, I removed the camera from that macrame plant.

17    Nowhere in any transcript, forensic police report, or search photo does a camera

18  appear in that macrame plant. This is because it had been removed when I'd found out

19  about the planned daycare.

20    However, the government and Det. Hively put forth at trial that the macrame plant

21  had been moved in between the two searches and placed in the garage. This was a tool used

22  by the government to demonstrate the actions of a guilty man. If I felt guilty about the use

23  of that plant to obtain illicit, unlawful videos, I would attempt to mitigate my culpability by

24  removing the plant from the third bathroom.

---

knew she used that camera for recording anybody but herself.

7  See Bates 54 for the September 2013 State agency search picture. In Bates 664, the FBI Agent,
   Mark Lucas, stated clearly that the plant was in the bathroom during the FBI search.

1    Hively would have not only *not* reviewed the pictures from the warrant during 4

2  years of pretrial investigation in order to be ignorant of this fact, but would have also never

3  read the FBI agent's report (Bates 664) on the federal warrant in all that time as well.

4    However, it is easily shown that the plant was still hanging in the third bathroom

5  during the second, federal search warrant.

6    Either Det. Hively was completely unaware that the FBI had taken pictures during

7  their search (and was therefore willfully ignorant of the pictures showing the plant in the

8  same bathroom, in the same place as the first search), or he was actively lying on the stand

9  to further the narrative that I was a law-breaking sexual pervert who knew I was guilty of a

10  crime.

11

12    *c)  Det. Hively Knew That the PC in the Garage ran Windows XP*

13  In his reports, Det. Hively specifically notes that the computer found with contraband in my

14  garage (Item 16) was running Windows XP. Bates 1182. See Section (a), *supra*.

15    This is significant because of one aspect of the Windows XP operating system. Det.

16  Hively didn't just note the presence of Windows XP here, he researched when it was

17  installed and when it was last used. He reiterated this in his final report of the draft, in Bates

18  1233, and noted as such in an e-mail to AUSA Gappa in Bates 1185. From Capozzi's cross-

19  examination of Det. Hively on Day 5 of trial:

20

21    Q.    When is it that you can move something from one document to

22          another document, from one computer to another, and the creation

23          date doesn't change?

24    A.    There are some rare circumstances in which that can occur.

25    Q.    How does that happen?

26    A.    It's a little complicated, but as an example, if you have a Windows

27          XP machine.

28  Transcript of Trial Day 5, Doc. 334, pg. 659 ln 24 through pg. 660 ln 5.

1    Here, Det. Hively acknowledges that Windows XP does not change a file creation

2    date when files are transferred into that operating system. This is the very same system that

3    Det. Hively reported that child porn had existed on since 2007.

4    Det. Hively, however, neglects to mention here how that computer _was_ running on

5    Windows XP and the file creation dates were carried over from wherever those files were

6    transferred from. There is simply no way Det. Hively and AUSA Gappa did _not_ know that

7    computer was running Windows XP and maintained "modified" dates from original

8    volumes. This is especially so since Det. Hively told AUSA Gappa that this was the exact

9    circumstances with this computer in an e-mail. Bates 1185.

10    On May 23, 2017 AUSA Gappa sent Mr. Capozzi an e-mail with sections obviously

11    copy/pasted from an e-mail by Det. Hively (to Gappa) that says, in part, "This is where I

12    had recently gotten the 2005 date from. It appears that the date was retained from a

13    previous volume in Adam Henry's possession." Bates 1185. However, no such "previous

14    volume" was ever discovered because it was Angele who had brought the files to

15    California, presumably on a flash drive.

16    This fact was then contradicted by testimony at trial. On direct examination of Det.

17    Hively, Mr. Gappa intentionally made the point several times that I had been downloading

18    child pornography since 2005. This was determined as "fact" by Mr. Gappa and Det. Hively

19    because the child pornography on that computer predated my relationship with Angele.

20    The draft report from Bates 1185 was finalized the day after the May 23rd email on

21    May 24, 2017. See Bates 1233. This final report reiterates that no child pornography was

22    searched for or downloaded using the garage computer. There were no new reports, thus

23    nothing to indicate "new evidence," between that report and my trial.

24    The government's supposition that I had downloaded child pornography onto the

25    garage computer is simply a theory that Mr. Capozzi couldn't counter with evidence readily

26    available in discovery. Angele had transferred those files from a source she brought with

27    her from Canada and Windows XP had kept the original file creation dates from their

28    original downloading.

1       According to Det. Moore's report based on his interview with Angele (Bates 126):

2 "They began an online relationship sometime in 2008. She then made several trips to the

3 United States to visit O/HENRY, Adam. In January of 2010, she brought her children to

4 visit with O/HENRY, Adam for six weeks…" Angele had a year or more of frequent,

5 lengthy visits before the computer was last used, providing ample time and opportunity to

6 transfer those files.

7

8       That this was a possibility was never mentioned by Gappa or Det. Hively, and was

9 never argued by Mr. Capozzi. Had Mr. Capozzi familiarized himself with the discovery, or

10 even the *e-mail he received*, he would have been able to catch Det. Hively in a blatant

11 example of perjury and the government suborning said perjury.

12       Det. Hively's grand jury testimony, reports, supplemental reports, and emails with

13 Mr. Gappa (Bates 1185) all show that he knew Item 16 never downloaded any child

14 pornography, and that those files were transferred from another device after their creation

15 dates, which were preserved because of Windows XP's treatment of creation dates. Mr.

16 Gappa, with his history of communication with Det. Hively about this topic, shows he also

17 knew this very well.

18       Hively provably knew that the files matched all the criteria for retaining the creation

19 dates. He provably knew that Angele copying the files to that computer matched the exact

20 circumstances he found that would retain those dates. He then lied and stated unequivocally

21 under cross that those files were placed there on those dates.

22       ***d) My Ex-Fiance Knew She was Recorded***

23 My ex-fiance, Rebecca Jackson (née Alvernaz) was well aware that she was recorded in

24 intimate ways during the course of our relationship. I never hid the fact that I had a camera

25 in my prior residence from her. She lied on the witness stand about this knowledge. From

26 Mr. Pearson's direct examination:

27

28       Q.     Did you know that video was taken at the time?

1    A.    No, sir.

2    Q.    Okay. Did you give permission to be recorded?

3    A.    No, sir.

4    Transcript of Trial Day 5, Doc. 334, pg. 653 ln 8 - 11.

5    However, on cross-examination, she admits she doesn't remember:

6

7

8    Q.    Ms. Jackson, you interviewed with Detective Hively in June of

9           2017?

10    A.    Yes, sir.

11    Q.    And you told him you didn't know you were being videotaped?

12    A.    Correct.

13    Q.    Do you remember talking to him in - - on October 3, 2013?

14    A.    Yes.

15    Q.    And in there you said - - was your memory better then in 2013 or

16           better now in 2017?

17    A.    My memory is fine now. When he asked me that, I was

18           overwhelmed.

19    Q.    Was it good in 2013?

20    A.    Yes.

21    Q.    Okay. That as closer to 2010?

22    A.    Yes.

23    Q.    Right?

24               Okay. You remember telling Detective Hively you don't

25           remember if you had given him permission to use the - - to have a

26           camera in the bathroom?

27    A.    He asked me if I had given permission to be filmed in the bathroom.

28    Q.    Yeah.

1    A.    I said I don't remember.

2    Q.    Okay.

3    A.    But he did not ask if I had given consent to be filmed without my

4          knowledge in the restroom.

5    Q.    Okay. What's the difference? You're saying that you don't

6          remember if you had given him permission to record you in the

7          bathroom?

8    A.    Correct.

9    Q.    Okay. Now you're saying what?

10    A.    I don't remember if I gave permission for him to bring a camera

11          into restroom when I was in there and could see the camera.

12          I certainly did not give him consent to film me without

13          knowing I was being filmed.

14    Q.    Okay. But back then you said you did not remember if you had

15          given him permission to record you while showering?

16    A.    Right.

17          She gives cyclical answers to this question, but Mr. Capozzi never called this what it

18 was: lying. Her lie could come from several places. It could be that she just didn't

19 remember that I had recorded her, or that she had given me permission to do so. See Hively

20 supplemental report, October 23, 2013: Bates 517. After all, it was many years between the

21 end of our relationship and my trial.

22          However, her lie is more plausibly associated with her current marital status. She

23 was likely so embarrassed to admit that she had willingly been intimately recorded with and

24 by me that, to save face, she perjured herself.

25          An extraction of the cell phone records from both of us during our relationship

26 would have shown multiple instances of text messages affirmatively establishing her

1   knowledge of my camera and her being recorded on it. However, Capozzi lacked both the

2   will and skill to subpoena those records to discredit her testimony.[8]

3        Her testimony established for the government a pattern of my behavior that led the

4   jury to believe that I had a long history of recording people without their consent.

5   Therefore, assuming this narrative to be true, this situation would be no different.

6        **2)   Legal Standard**

7   As detailed in the previous argument, defense counsel renders ineffective counsel when

8   their failure to investigate discovery falls short of satisfying the constitutional minimum

9   required for effective assistance of counsel. Failing to investigate and the failure to impeach

10  witnesses are often tied together in §2255 decisions.

11       In *Rompilla v. Beard,* 545 U.S. 374 (2005) the Supreme Court found that failure to

12  investigate available discovery for facts that counsel should have known the prosecution

13  would offer the jury constituted ineffective counsel. Counsel is also ineffective when failing

14  to introduce evidence to counter government's arguments when it was readily available in

15  the pretrial discovery and files of defense counsel. *Wiggins v. Smith,* 539 U.S. 510 (2003).

16       Failure to impeach witnesses constitutes ineffective assistance of counsel and a

17  violation of a defendant's Sixth Amendment guarantee.

18
19       "[D]efense counsel has not represented the defendant to the satisfaction of
         the Sixth Amendment when counsel fails to pursue an impeaching cross-
20       examination or present additional evidence that would in all reasonable
         probability cast a reasonable doubt on the testimony of the government's
21       main identification witness."

22  *U.S. Ex Rel. McCall v. O'Grady*, 908 F.2d 170 (7th Cir. 1990).

23

24

---

8   There are also intimate videos of the two of us in which she is obviously aware of the camera's
    presence.

1    This standard also applies when defense counsel fails to impeach witnesses with

2  inconsistent statements. *Moffett v. Kolb,* 930 F.2d 1156 (7th Cir. 1991) and *United States v.*

3  *Simpson,* No. 16-3286 (7th Cir. 2017).

4  
5  "Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel."
6  

7  *Reynoso v. Giurbino*, 462 F.3d 1099 (9th Cir. 2006). (Citing *Tucker v. Ozmint,* 350 F.3d 433,

8  444 (4th Cir. 2003).

9    Failing to impeach witnesses for conflicting or inconsistent statements in Court is

10  also recognized as ineffective assistance of counsel in the 9th Circuit. *Detrich v. Ryan,* 740

11  F.3d 1237 (9th Cir. 2013).

12    The point at which failure to investigate and introduce impeaching evidence against

13  a witness, however, is more nebulous.

14  
15  "[I]f counsel's failure to investigate possible methods of impeachment is part of the explanation for counsel's impeachments strategy (or lack thereof), the failure to investigate may in itself constitute ineffective
16  assistance of counsel." *Reynoso* at 1112.

17    **3)   Argument**

18  While a "[C]ourt must indulge a strong presumption that counsel's conduct falls within the

19  wide range of reasonable professional assistance…" *Strickland* at 689, the evidence to

20  counter the governments assertions here were both obvious and in the available discovery.

21    This presumption of effectiveness obviously has its limits. Here, it is plain to see

22  from a simple review of the transcripts of prior hearings and testimony that Det. Hively

23  changed his story multiple times, whenever that change would most benefit the prosecution.

24    Considering that Det. Hively was the prosecution's main witness, encompassing

25  more than half of all the Government's witness testimony, impeaching this witness should

26  have been at the forefront of Capozzi's defense strategy. Instead, however, he simply

27  acquiesced to things like the macrame plant placement and my fictitious downloading of

1  child porn onto Item 16, allowing the Government's witness to appear untainted by
2  fluctuating testimony.

3      Even assuming that Det. Hively's memory was just bad; that he honestly
4  remembered that the plant being in the garage during the second search; that he never
5  reviewed the FBI file on the second search throughout his years of writing reports on this
6  case. Even assuming these things are true, any competent defense counsel would then
7  question how sure Det. Hively was of his memory in all sorts of other areas.

8      However, Occam's Razor here would lend credence to the fact that Det. Hively
9  knew that the plant was still hanging in the bathroom during the second search and simply
10  lied on the stand about it.

11      Effective counsel here could have swayed the jury with only this strategy.
12  Neglecting any other arguments, which have their own merit, failing to impeach witnesses
13  came with a cost: a guilty verdict on both counts.

14      Also impeachable was Det. Hively's knowledge that item 16 was running Windows
15  XP and, therefore, preserved the file creation dates of files that were transferred from
16  another source onto that machine. It is entirely plausible that Angele had brought child porn
17  with her from previous Limewire downloading and transferred it to item 16 during one of
18  her visits from Canada in 2009 and 2010.

19      Det. Hively knew it was plausible that Angele had done this, but said nothing. Mr.
20  Gappa knew this was plausible, but still elicited the answer he knew to be a lie. Mr.
21  Capozzi didn't understand the technology enough to elicit this as a response and, in turn,
22  impeach the testimony he had given just prior.

23      Rebecca is plain in her lie to the Jury. However, Mr. Capozzi was unable to call her
24  lie what it was, and allowed her to outwit him with semantics that were, in the end,
25  meaningless. She had given me permission to record her in the shower. She was well aware
26  that the camera was there.

27
28

1    Mr. Capozzi was ineffective in impeaching her testimony. This, combined with the

2    testimony given by Det. Hively that was knowingly perjurous, had the ability to sway the

3    jury away from the Government's star witness and full narrative that I was a spying pervert.

4

5    **D. COUNSEL FAILED TO UNDERSTAND THE TECHNICAL ISSUES**

6        **AND LAW OF THE CASE**

7    This topic covers nearly the entirety of the pretrial and trial which resulted in my

8    incarceration. Mr. Capozzi was constitutionally defective in numerous ways which, were it

9    not for his lack of technical expertise or hiring of outside expertise, I would not have been

10    convicted of a crime at all.

11    First, Mr. Capozzi didn't understand the operating system file technology discussed

12    in the previous section. In Windows XP, file creation dates persist even if a file is

13    transferred from one device to another device. This is why the files Angele put onto the

14    garage computer (Item 16) retained their creation dates which dated back to her

15    downloading child porn in 2005.

16

17    **1)   Facts: I was Provably Working and Not at my Desk When Angele**

18        **Used My Home Computer to Transfer Child Pornography From My**

19        **Work Computer To the Home NAS Share**

20    The facts of this matter are simple.

21    The computer found to contain child pornography in my garage (Item 16) had never

22    downloaded child pornography itself. The files resident on that computer were transferred

23    there from another source. Since this computer was running Windows XP, the file creation

24    dates from the original download of those files persisted. The files were transferred onto

25    that computer after Angele started visiting me in 2009. See, *supra*, Bates #1182, and

26    Transcript of Trial Day 5, Doc. 334, pg. 659 ln 24 through pg. 660 ln 5.

27

28

1    I was working and away from my desk when the child pornography files were

2  transferred via remote connection from my work computer to my home NAS. The excerpts

3  of cell phone records [Bates #1124] show that Angele was home at the time, and I was not.

4    •   08/23/2013; 8:45 A.M.: Angele texts a friend, mentioning she is taking our care in

5        for a tune-up. We only had one car, as indicated by police reports and David Silva's

6        deposition. If she had the car, I did not, and therefore had no way of getting home

7        until picked up by Angele at the end of the day.

8    ◦   08/23/2013; 11 A.M.: A different friend of Angele's (named Krista) picks Angele up

9        from the dealership after dropping our only car off there.

10   •   08/23/2013; 2 P.M.: Angele texts me while I was present at work, asking if I thought

11       she should try to get Krista to stick around until I finished work for the day.

12   •   08/23/2013; 3:05 P.M.: The child pornography files were remotely copied.

13   ◦   08/24/2013; The following day, Angele and Krista exchange text messages about

14       how next time, Krista should stick around. This indicates that Krista left our home

15       after 2pm, but before Angele picked me up from work, leaving Angele home alone

16       exactly when those files were copied.

17  Exhibit 5 & 6.

18    In short, exactly one hour before somebody used both the work and NAS passwords

19  from the house, I was at work while she was at home, alone, with our only vehicle.

20    She was home alone when the NAS password was used and the files copied. This

21  correlates with the company calendar stating that I was at work all day, per my Uncle's

22  testimony. Angele was the *only* one capable of being at home to copy those files, and would

23  have *needed* the password to the protected NAS share in order to copy them. The same

24  password the government and law enforcement swore and testified under oath that she did

25  not have.

26    She was also alone, unsupervised, at my desk at work when the searches and

27  downloads of the child pornography were made and begun. These were the only searches

28  and downloads for child pornography that were ever made at my computer, in all the years I

1  had been using Shareaza. The only searches and downloads for child pornography occurred

2  when Angele was sitting alone, unsupervised, at my desk.

4  **2)   Facts: The Files on Item 16 Were Shown as Never Downloaded by**

5  **that Computer and the File Creation Dates were Suspect**

6  Several facts about this case are not disputed. First, that Item 16 was running Windows XP.

7  Second, that Windows XP (more than other operating systems) retains file creation dates

8  after files have been transferred from one medium to another. Three, that Item 16 was not

9  responsible for downloading any child pornography, and that the files on that computer had

10 to come from an external source. Fourth, that external source was never identified.

11 From Mr. Gappa's direct examination of Det. Hively:

13 Q.      What is the significance of a file creation day?

14 A.      Generally Speaking, that's the date that file was added to that

15         particular computer.

16 Transcript of Trial Day 4, Doc. 333, pg. 547 ln 18 – 20.

18 Q.      Sorry to interrupt, but can you explain what significance, if any, is

19         there to a file creation date?

20 A.      Certainly. As I mentioned earlier, generally speaking, when a file is

21         created on a volume or a computer, the date and timestamp,

22         according to computer is applied to the file creation date.

23 Transcript of Trial Day 4, Doc. 333, pg. 566 ln 14 – 19.

25 Q.      There's a file created entry. Can you explain what that is?

26 A.      Yes, sir. That's the date of 12-19-07. That's the date that that

27         particular video file would be placed on that RAID.

1  Transcript of Trial Day 5, Doc. 334, pg. 628 ln 9 – 12.

2       Notice here that Hively has changed from "generally speaking" to outright claiming

3  the file was placed on Item 16 on that date. The reality is that Windows XP retained that file

4  creation date from the previous volume it had been placed on. It must have, because Det.

5  Hively admitted that no program was used to download those files onto Item 16. See Bates

6  1185.

7  Later, from Mr. Capozzi's cross-examination of Det. Hively:

8       Q.   When is it that you can move something from one document to

9            another document, from one computer to another, and the creation

10           date doesn't change?

11      A.   There are some rare circumstances in which that can occur.

12      Q.   How does that happen?

13      A.   It's a little complicated, but as an example, if you have a Windows

14           XP Machine.

15      Q.   Windows.

16      A.   And you copy something over to a thumb drive. And then you, as an

17           example, put that material on a Windows 7 machine, sometimes,

18           depends on whether you cut and paste or copy and paste, the file

19           created date can sometimes remain the same.

20  Transcript of Trial Day 5, Doc. 334, pg. 659 ln 24 through pg. 660 ln 5.

21

22       In Det. Hively's email to Mr. Gappa, he specifically tells Mr. Gappa that Item 16

23  was running Windows XP, and that the file's 'date was retained from a previous device'.

24  Det. Hively, then, knew it was likely if not a certainty that the file creation date was

25  retained from a previous volume, but did not say so on the stand. Mr. Capozzi was too inept

26  with technology to catch him in this and force him to answer the question that would throw

27  meaningful doubt on my guilt here.

28

**3)   Legal Standard**

"Professed technological incompetence is not an excuse for discovery misconduct." [9]

Here, to demonstrate that counsel was ineffective for his computer illiteracy, a general showing of ineffective assistance of counsel is needed.

> "To prevail on a claim of ineffective assistance of counsel, Petitioner must first show that his counsel's performance fell below an objective standard of reasonableness. Petitioner must identify the acts or omissions of counsel that are alleged to have been the result of unreasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."

*Ameri v. United States,* No. 4:07-CV-123 (E.D. Ark. July 2, 2007)

**4)   Argument**

Item 16 was never used to download any contraband and the existence of it on that computer was a result of it being transferred there. Mr. Capozzi, however, was unable to make that argument through technological incompetence. Mr. Capozzi was unable to argue that the older contraband (pre-2010) had not been downloaded by *any* device found in my possession, pointing solely to Angele as the downloader/collector.

Next, Mr. Capozzi was unable to combat the government's narrative that I was responsible for transferring child porn from my work computer to my home computer. An analysis of the text messages extracted from mine and Angele's cell phones on August 23, 2013, juxtaposed with my work calendar that day, would demonstrate that I was on site, working, when the files were transferred *using my home computer* from Lock-N-Stitch to my home computer.

Third, Mr. Capozzi was totally outmatched in terms of understanding and arguing technology when it came to the timestamps and deposition testimony which placed Angele at my computer, alone, when the child pornography searches and downloading (creation

---

9   *James v. Nat'l Fin. LLC*, No. CV 8931-VCL, 2014 WL 6845560 (Del. Ch. Dec. 5, 2014)

1   'dates/times) were began. Count 2 was not a conspiracy charge, and thus Angele acting

2   alone exonerates me from any wrongdoing on this Count.

3       Fourth, the report by Det. Moore on the NAS showed that the storage was 79%

4   utilized. Bates 828. Total storage was 5,543 gigabytes, and 79% of that amount is 4,378,970

5   Megabytes (MB). According to that same report, the Adam user was responsible for

6   uploading 2,120,696 MB. That leaves 2,258,274 MB. More than half of the data on the

7   NAS. Bates 829 also shows Angele's account was responsible for 0 MB. This means that,

8   because Angele was provably at home while I was provably at work, the transfers had to

9   have been done by her. Additionally, since 0 MB were attributed to her account, she *must*

10  have been logged in as Admin (the administrator access account) during that time.

11      So if I was using my account, who uploaded the rest of the data, and with what

12  account? The only logical explanation would be Angele, using the Admin account, with the

13  Stitch@11 password that she provably had.

14      Because of Mr. Capozzi's technological incompetence, discovery misconduct

15  occurred in a number of these situations. It doesn't take technological understanding to

16  match text-message timestamps to work calendars. It doesn't take technological prowess to

17  comb through thousands of text messages in an extract to find out definitively that Angele

18  knew the password to the protected ("Aurora") share on the home NAS.

19      Mr. Capozzi was unable to properly understand and explain to the jury why the

20  nature of the file downloading made no sense in the context of my considerable technology

21  skill set.

22      Mr. Capozzi was unable to properly understand or explain to the jury why Det.

23  Moore's testimony concerning the user account access to the home NAS was entirely

24  flawed.

25      Mr. Capozzi was unable to properly research and understand how the peer-to-peer

26  (P2P) technology used to download these files worked. Further, he failed to argue that, in

27  the many years I had been using P2P software, the only times that child pornography was

1  searched or downloaded was *after* Angele had moved in with me, when an independent
2  witness placed her (completely unsupervised) at the computer in question.

3      Mr. Capozzi was unable to understand the logistics of the users on the NAS and was
4  therefore incapable of demonstrating to the jury that half the data on that NAS came not
5  from myself, but from Angele. This is, itself, reasonable doubt.

6      Mr. Capozzi was unable to understand the nuance of file creation dates that operated
7  on Windows XP, nor did he do sufficient document research in trial prep to know that
8  Hively *knew* that the child pornography files on Item 16 were transferred there and had
9  retained their file creation dates from their previous volume, undermining his argument that
10 I had been downloading contraband long before my relationship with Angele.

11     Mr. Capozzi did not understand or grasp any of the technological aspects of this
12 case, nor did he use the technical expert hired to assist him with it. The expert hired, Mr.
13 Lawson, did not generate a single report on my behalf the way he had done for Angele. He
14 did not look into any of the issues I brought to him, did not testify on my behalf, and was
15 thoroughly unused in my defense. Further, his firm was in the midst of a hostile takeover
16 during my case, and his capacity to assist me was greatly diminished.

17     If he had been used, he would have known that Windows XP preserved the creation
18 date of a file that was transferred from one drive onto the Windows XP system. This fact
19 was even testified to at trial, but that failed to indicate to Mr. Capozzi that it was entirely
20 possible that Angele had transferred the files onto that computer before it was
21 decommissioned. This is reasonable doubt, waiting to be argued, but it never was.

22     If Mr. Capozzi had hired a technical expert, he would have known that not only was
23 it possible for Angele to have been the one to transfer the illicit files from my work
24 computer to my home computer, but that it *must have been* Angele who did so, because I
25 was unable to physically accomplish this while on-site at work. I simply was not home
26 when this happened, but Mr. Capozzi couldn't grasp the technical aspect of this, so he was
27 unable to make the arguments made herein.

1  Finally, as argued earlier in this brief, Mr. Capozzi was ineffective during discovery.

2  He never extracted the phone records of text messages that concretely prove that Angele

3  had the password to the protected share that the government purported only I knew the

4  password to.

5  The entire foundation of the government's argument here was that I was the only

6  person capable of accessing those files on that share. Mr. Capozzi was so ill-equipped to

7  understand the technology at issue, that he couldn't make the arguments necessary to mount

8  a defense for me even though the evidence for such a defense was staring him in the face.

9

10  **E. COUNSEL FAILED TO INTRODUCE EVIDENCE**

11  Angele framed her ex-husband for domestic and sexual abuse of not just her, but the

12  children they shared. Her ex-husband was, in fact, convicted of these crimes before that

13  conviction was overturned by a Canadian court of appeal.

14  There were three psychological evaluations done to attest to my psychological

15  predisposition toward children during the pretrial time on this case, none of which Mr.

16  Capozzi wanted to introduce as Mr. Gappa had convinced him claiming it was in my

17  benefit to not have them on the record. The opposite was true. These had the potential of

18  weighing in my favor during the numerous pretrial detention hearings. Being detained for

19  the entirety of my pretrial and trial phases prejudiced the outcome of this case greatly.

20  Finally, in Angele's own interviews, she invoked her 5th Amendment right to protect

21  herself against self-incrimination in one. However, there were admissions she made during

22  the second interview that would have greatly impacted the Jury's view of my culpability

23  and influenced the outcome of my trial.

24

25  **1)  Facts**

26  ***a)  Angele Framed her Canadian Ex-Husband for Sexual Misconduct***

27  Angele wanted out of her marriage to her ex-husband in Canada. She also wanted full and

28  sole custody of her children after that divorce. Her psychological profile is much worse

1   than what I thought it was and she displays Borderline Personality and even Sociopathic

2   tendencies.

3          Angele accused and framed her Canadian ex-husband for spousal abuse, sexual

4   abuse, and child abuse, for which he was convicted in Canadian criminal court. This

5   conviction, however, was overturned by the appellate courts in Canada for good cause.

6          In the appellate decision, the following were laid bare: Angele's penchant for

7   bondage, sexual role-play that toyed with the boundaries of legal consent, and her

8   proclivity to lie in court to satisfy whatever ends needed means in order to justify.

9          "There were photos tendered in evidence that depicted the complainant in
10         scenes of mild bondage. The complainant testified that she had consented
           to these photos being taken by the appellant at his request." Pearce Appeal,
11         Exhibit 2, at 6 (¶10).

12         Aside from spousal rape, Angele had also alleged that her ex-husband had assaulted

13   their son, Aiden. He was acquitted at trial of those charges.

14         "The appellant also brought a motion to file fresh evidence. The proposed
           evidence relates to the appellant's acquittal, after his trial for sexual
15         assault, on further charges brought against him by the compliant for
           assaulting their young son in May 2009. The appellant submits that the
16         reasons for acquittal given by the trial judge in that case constitute
17         compelling evidence that the complainant exhibits a pattern of brining
           false charges against the appellant to gain advantages in their family law
18         proceedings." Pearce Appeal, Exhibit 2, at 12 (¶30).
19

20   The appellate court also found that the role-play between Angele and her ex-husband

21   frequently blurred the lines of consent between "no" and "yes".

22         "More importantly, nowhere in his reasons for judgment does the trial
           judge make a specific finding as to whether, in the specific context of the
23         appellant and complainant's sexual relationship, "no" had ever meant
24         "yes". As appears from the excerpt set out at para. 46 of these reasons, he
           thought that if "no" meant "yes" in their relationship, this was a strong
25         indicator that it would be unsafe to convict. Indeed, the fact that "no"
26         meant "yes" in the appellant and the complainant's relationship was a
           corenerstone of the appellant's defence. [sic] It was not until he issued his
27         reasons for sentence that the trial judge revealed that he accepted the
28         appellant's evidence in that regard. As set out in the reasons for sentence,

1

2

3

> "it is clear that in the context of their relationship 'no' frequently did mean 'yes' " and that the complainant and the appellant had 'for some years, acted as if no meant yes albeit on a less serious or aggressive plane.'"
> Pearce Appeal, Exhibit 2, at 22 (¶57).

4    Angele used these blurred lines to bring criminal charges of spousal rape against her

5  ex-husband when it would benefit her custody fight against him in family court. Her ability

6  to openly crucify the father of her children to benefit her family court proceedings speaks to

7  her character in a way that would certainly sway a jury against her in the context of this

8  case. Mr. Capozzi's refusal to add this as evidence of my innocence constitutes ineffective

9  assistance of counsel that prejudiced the outcome of my case.

10    Canadian court records also reinforce her own statements to Stanislaus CPS (not

11  introduced by Mr. Capozzi) that she had interests in children, adult-child role-play, and

12  bondage; issues that were clearly relevant and present in her Shareaza searches on my work

13  computer. Defense Bates 613.

14

15    ### b) The Psychological Evaluations

16    I underwent multiple psychological evaluations and even a polygraph examination

17  during the pendency of my pretrial phase, all of which showed that I did not fit the

18  psychological profile of a pedophile or sexual predator.

19    The first was done by Dr. Harold Seymore, a clinical and forensic psychologist. His

20  diagnostic impression ruled out pedophilia. Dr. Seymore had, at that time, evaluated more

21  than 500 defendants in sexual offense cases. In his opinion he wrote, in part, "Mr Henry

22  does not present with many of the characteristics seen in pedophiles." Defense Bates 874.

23  In his opinion, he ruled out pedophilia as a possibility in my case.

24    Mr. Capozzi gave up trying to introduce this as evidence during pretrial, allowing

25  himself to be bulldozed by Mr. Gappa because Mr. Capozzi wasn't familiar enough with his

26  own evidence to form an opinion regarding this evaluation.

27    The second was done by Dr. Howard B. Terrell, a Psychiatrist with board

28  certifications in both psychiatry and forensic psychiatry. He also concludes that, even if it

1  were *assumed for the sake of argument* that I were guilty of these crimes, that I would be at

2  low risk of physically victimizing any children, or re-offending at all. This evaluation was

3  completed for the purposes of bond hearings only, and assumed guilty for the sake of

4  caution and *still* recommended bond be granted. Defense Bates 889. He also notes that

5  Angele's behavior with A.T. is much more like a pedophile. Defense Bates 876.

6       Mr. Capozzi never attempted to introduce this as evidence during pretrial.

7       The third was done by Dr. Hy Malinek: another clinical and forensic psychologist.

8  Dr. Malinek had more than 28 years of clinical experience at the time of my evaluation and

9  had been a member of the State of California SVP (Sexually Violent Predators) evaluator's

10  panel since its inception in 1996. Defense Bates 891. With a battery of psychological

11  testing and an evaluation of the discovery on record, Dr. Malinek also found me to be of

12  low-risk of recidivism, hands-on child offending, and felt that I did not fit the profile of a

13  sexually offending pedophile. Defense Bates 904. He also excluded "the diagnostic

14  possibility of voyeurism" for my profile. This is exceptionally relevant for Count 1, and

15  speaks to my lack of interest in all things related to that count.

16       Mr. Capozzi never attempted to introduce this as evidence during pretrial.

17
18       "Dr. Trompetter, a renowned forensic psychologist who examined Mr.
         Henry's wife, applied the diagnosis of exhibitionism in **her** case. Indeed,
         this is a rather rare condition in women. This diagnosis appears to have
19       been justified in Ms. Henry's case given her own reports regarding her
         sexual interests and history." *Id*. (Emphasis in original)
20

21       Angele's own psychological evaluation, as referenced in the quote above,

22  specifically diagnosed her with a paraphilic disorder, namely Exhibitionism.[10] See

23  Trompetter Report, Exhibit 3. She has the only diagnosis (between the two of us) of any

24  paraphilia, but like all the other information from the pretrial psychological evaluations,

25  that was not introduced by Mr. Capozzi during pretrial or trial.

---

10  This is highly relevant to Count 1, and explains why the bathroom camera was set up in the first
    place. I knew this to be true since the day Angele asked me to set up the bathroom camera to
    record her in the shower.

1    In her psychological evaluation, Angele underwent the same Minnesota Multiphasic

2  Personality Inventory -2 Restructured Form (MMPI-2-RF) that I had undergone. Whereas

3  my MMPI test results were labeled as completely forthright, Angeles were "an unusual

4  combination of responses on the MMPI-2 that is sometimes associated with noncredible

5  reporting of various symptoms)." Exhibit 3 at 6.

6    Dr. Seymore noted that "we have pretty clear evidence that Angele was involved in

7  grooming a minor female and had an active interest in bondage." Defense Bates at 897.

8  Any and all paraphilic behavior noted by the psychologists and psychiatrists that evaluated

9  both Angele and I only saw paraphilic behavior and diagnosis in Angele, and none in me.

10  This was never argued or introduced by Mr. Capozzi.

11

12    *c) Angele's Police Interview*

13  Angele openly lied during her interview with Det. Britton Moore on numerous occasions,

14  and these lies were never exposed or even spoken of by Mr. Capozzi at trial. The jury never

15  knew about these lies, about Angele's pattern of lies, or her proclivity to throw her

16  husbands "under the bus" when it would suit her purposes best.

17    In that interview with Det. Moore, Angele addresses her aptitude for computers as,

18  "I'm sorry. I know that you push the big circle button with the line on it." referring to the

19  power button of a computer. Angele Interview with Det. Moore,  Exhibit 4 at 17.

20    This is demonstrably false as she was able to access my work password-protected

21  work computer, open Shareaza, search for specific terms including terms in French (a

22  language I don't speak), and find files in the completed/incomplete folders to send them to

23  the trash.

24    Regarding her access to our computers at home. "I (inaudible) access to. I

25  technically have access to all of them... I know that there's a lot of passwords and stuff,

26  and I just never asked what the passwords are." Exhibit 4 at 19.

1    This is a demonstrable lie, as argued above in this brief. There are text message

2  exchanges in Bates 1124 where Angele specifically asks (not for the first time) the

3  password to the protected Aurora share on our home NAS.

4    Angele's willingness to lie, to play the 'dumb girl with computers' role, and

5  obfuscate the truth during her interview with Det. Moore speaks volumes, when combined

6  with her false accusations of sexual violence against her ex-husband. Capozzi could have

7  introduced this evidence at trial, but did not.

8    Angele lied to Det. Moore about accessing my computer at home. She said that my

9  computer at home was used for work, "And because of that, I've never tried to get onto his

10  computer." Exhibit 4 at 19, lines 18-25. However, the evidence shows that she could and

11  *did* access that computer. She was the only person home at the time when the remote

12  transfers from my work computer occurred.

13    This evidence is crucial to the defense we sought, which is the truth of the matter.

14  Namely: that Angele was responsible for all of the child pornography found by state law

15  enforcement agents in my possession, and Angele was solely responsible for the illicit,

16  illegal video captures using the hidden camera in our bathroom that I had installed solely

17  for the purposes of recording *her* in the bathroom to satisfy her exhibitionist tendencies.

18    This missing evidence, when taken wholly or in part, prejudiced the trial against me

19  when reasonable doubt could have *easily* been established by Mr. Capozzi if he wasn't

20  woefully ineffective in my defense.

21

22    **d)  *Other Evidence Exposes Angele as lying, manipulative, and sexually***

23        ***deviant***

24  Aside from the lies she told police during her interview, there are a plethora of other

25  documents from the investigation into this case that show Angele as who she really is, as

26  opposed to the innocent bystander that the prosecution portrayed.

27    Canadian Court documents show that Angele was adept at estranging the children

28  from their father and fabricating allegations against their father to accomplish this.

1  Stanislaus County Child Protection Services did extensive work to try and ensure Angele's

2  children, and the son we had together, were properly protected during this mess. In that

3  investigation, there are many details that paint Angele as anything but a naive spouse here.

4      All of these documents are in evidence, but were never introduced by Mr. Capozzi at

5  trial. All of these documents portray Angele as somebody that was capable of manipulating

6  the situation in this case to make me appear the guilty party.

7      Here are some excerpts from those documents:

8  • First, from the Canadian appellate decision which exonerated Angele's ex-husband,

9     pages 5 & 6, shows Angele had a history of acting out scenarios that involved

10     victimizing children:

11       ◦ "The appellant testified that one of their roleplaying scenarios, the

12       "teacher/student" scenario, was played out one to three times a week…"

13       ◦ "The appellant testified that he and the complainant also enjoyed acting out an

14       assailant/victim sexual scenario throughout their relationship."

15       ◦ "…she had been sexually assaulted as a pre-teenager and, although she did not

16       like that experience there were aspects of it that she wished to explore further. In

17       the course of cross-examination, the appellant was asked to provide specific

18       instances when this type of scenario was played out and the appellant was only

19       able to name two: a failed attempt on the first night of their honeymoon and a

20       daddy/daughter episode in December 2007."

21  • In the Stanislaus County CPS Report by an agent named Castro, in evidence as

22     Defense Bates 14:

23       ◦ Page 7 (Defense Bates 20): "ON November 20, 2013, the Agency received police

24       reports concerning the criminal investigation of the parents. After a review of

25       these reports it appeared evident Mrs. Henry's involvement was more than she

26       previously reported as she was involved in setting up cameras in the family home

27       which recorded unsuspecting victims."

  ○ Page 15 (Defense Bates 28): "She stated [Adam Pearce] is extremely aggressive and no longer had any parental rights to their children." This is a lie.

  ○ Page 39 (Defense Bates 52):

    ■ "Mrs. Henry presents as an intelligent, well spoken, and educated individual. The Agency is hard pressed to believe Mrs. Henry was not aware of the appeal and the favorable outcome, especially given that her current husband, Mr. Henry, acknowledged to the undersigned that he was aware…"

    ▫ Angele was unable to produce any documentation that Adam Pearce's parental rights had been terminated as she claimed. This is because they didn't exist, "Considering the importance and nature of such documents and the impact Mrs. Henry states these events had on her and her children, it is somewhat difficult to understand how she relocated to another country without such documents."

    ■ "Although Mrs. Henry has been cooperative and pleasant, followed through with her referrals in a timely manner, and has made herself available to the Agency, the above lends to the Agency's perception that the mother's actions and behaviors to seem somewhat of a distraction and/or diversion tactic of the actual events which bring her children before the Court. Further, Mrs. Henry has failed to admit she has not complied with the court orders from her own country when she failed to keep the father informed of her travels with their children outside their country and also in her establishing a residence in a foreign country. By her own reports she states she married Mr. Henry....in the event that if Mr. Pearce tried to learn [her] whereabouts…"

  ○ Page 40 (Defense Bates 53):"It seems Mrs. Henry may be minimizing her role in the child pornography..."

• Angele was flagrantly violating the Court custody order regarding her two older children by traveling to visit and marry me without informing their father, Adam Pearce, of her travels outside the country. Defense Bates 66 at ¶4.

1      • Defense Bates 512: Garland Smith, responsible for Angele's sessions for CPS, says

2        "My thought is that she may have acted as a predator."

3      • Defense Bates 333: Det. Weber did an analysis of our cell phones and said "I also

4        noticed that Angele's relationship with [A.T.] is much like a pedophile grooming

5        their victim."

6    All of this is available discovery from the Defense Bates papers. Each demonstrates that

7    Angele lied to authorities, manipulated her ex husband, fabricated false allegations against

8    her ex-husband, and was generally manipulative, sexually deviant, and determined to

9    deflect any blame for her prurience.

10         In Defense Bates 302 at 487, the Canadian Police went after Adam Pearce's personal

11   computer to try and locate inappropriate pornography there. They found none, but it was

12   close enough to Angele's personal computer that she took all the contraband files on her

13   computer and transported them to California to place them onto my computer, Item 16, via

14   thumb drive.

15         This is not just plausible, but what actually occurred, and Mr. Capozzi did not even

16   introduce this fruitful evidence at trial. This evidence would have displayed the real Angele

17   to the jury, and cast monumental doubt onto my guilt, sufficient to warrant question on the

18   verdicts delivered in this case.

19

20   **2)   Legal Standard**

21   Trial counsel's conducted inadequate investigation into evidence when the defense centers

22   around a perpetrator who isn't the defendant is ineffective counsel. *Thomas v. Chappell,*

23   678 F.3d 1086 (9th Cir. 2012).

24         Failing to introduce evidence that indicates exculpation of a defendant is ineffective

25   assistance of counsel. This is especially so when defense counsel fails to introduce evidence

26   of prior false allegations of sexual assault had been made by a witness. *Sussman v. Jenkins,*

27   636 F.3d 329 (7th Cir. 2011).

1    Failing to introduce mental health evidence that may convince a jury of a

2  defendant's innocence is ineffective assistance of counsel. *Seidel v. Merkle*, 146 F.3d 750

3  (9th Cir. 1998).

4    Failing to introduce expert psychological testimony into evidence in a sexual offense

5  case constitutes ineffective assistance of counsel. *Gersetn v. Senkowski,* 426 F.3d 588 (2nd

6  Cir. 2005).

7

8    "[Defendant's] attorney failed to take even the most basic steps to
   investigate and prepare [his] defense, although evidence relevant to his

9    mental state was readily available and could have been discovered simply
   by reading the case file. This deficient representation deprived [him] of the

10   best evidence that he could have presented to corroborate his testimony…"

11   *Turner v. Duncan*, 158 F,3d 449 (9th Cir. 1998).

12

13   **3)   Argument**

14  Angele has a history of lying to police, prosecutors, and CPS when it suits her needs. She is

15  a calculating manipulator who has gotten away with this behavior in the past. She

16  convinced investigators and a trial judge in Canada that her husband had raped her, despite

17  ample evidence on the record that they had engaged in substantial dominant/submissive

18  roleplay (including a safe word "Cabbage") in the past.

19    Introducing this as evidence was not only relevant to my defense, but vital to it. The

20  decision of the Canadian appellate court was published in November of 2013, well before

21  my trial, and in plenty of time for it to be admitted into evidence. It is even available online

22  without any need for extra-jurisdictional compulsion for disclosure.[11]

23    There was no reason or tactical decision that would compel Mr. Capozzi to ignore

24  this as evidence, especially because this is evidence that speaks directly to my defense.

25  Angele was the perpetrator of a fraudulent conviction against her first ex-husband, and is

26  now the perpetrator of another fraudulent conviction against her second.

---

11 See http://www.ontariocourts.ca/decisions/2013/2013ONCA0344.htm

1    This is relevant, germane, and vital for the jury to know when the cornerstone of my
2    defense against these charges was that Angele was the sole perpetrator of both Counts. She
3    is an expert at manipulating situations where she gains the benefit of the doubt, and her
4    husbands take the fall for her.

5    This pattern of behavior is further fleshed out in the psychological evaluations that
6    both Angele and I underwent as a part of this investigation. I endured three separate
7    psychological evaluations which showed no markers for normal pedophilic behavior aside
8    from the fact that I was male, white, and over 30 years old with no substantial criminal
9    record. Angele's evaluation, on the other hand, labeled her with paraphilia and labeled her
10   behavior toward A.T. as "grooming".

11   I showed no indication that I was interested in, or wanted to be interested in, the
12   sexual exploitation of children nor that I had any paraphilias at all. Angele's MMPI-2 was
13   all over the place and demonstrated irrational and inconsistent answers which are markers
14   of dishonesty.

15   Mr. Capozzi failed to argue effectively for the introduction of any of this into
16   evidence at any point during my prosecution. This information could have garnered bail, so
17   I could have been on pretrial release during my trial prep. Not being so certainly prejudiced
18   my ability to compel Mr. Capozzi to do a better job at trial.

19   Further, lacking this evidence prejudiced the jury against me in several ways. First,
20   because they did not get a clear picture of the type of manipulator Angele truly is. This
21   knowledge would cast reasonable doubt that I knew or had *anything* to do with either
22   charge against me.

23   Additionally, the jury was left only with an avalanche of evidence of my possession
24   of child pornography, without any plausible explanation of how these files could be on my
25   computer without my knowledge or participation. Without this evidence, there was no room
26   to do anything *besides* convict me.

27   Finally, adding to both her ability to falsely convict her husbands of sexual
28   misconduct and her obviously paraphilic psychological evaluations, she provably lied to

1   investigators (namely Det. Moore) about her ability to work with computers, her knowledge

2   of the passwords to our computers, and many other facts. Her willingness to lie to

3   investigators places even *more* emphasis on her deviance and more plausibility that she was

4   the perpetrator of the acts that brought this case.

5       My part in this case, as a source for her to blame if anything like this case ever came

6   about, is intuitive with this evidence introduced and unbelievable without it. The jury was

7   prejudiced against me because Mr. Capozzi couldn't be bothered to fight for the

8   introduction of this evidence, or was convinced by AUSA Gappa (with regards to the

9   psychological evaluations) to not fight for this evidence with backhanded tactics by the

10   government.

11       This ineffective assistance of counsel cost me a "not guilty" verdict.

12

13   **IX.   INEFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL**

14     **1)   Facts**

15   Mr. Capozzi handled not only my trial, but my appeal as well. See *United States v. Henry*,

16   No 18-10358 (9th Cir. 2019). The opening/principal brief was filed on March 11, 2019. It

17   argued that:

18     I.   This Court erred in denying my motion for acquittal, new trial, and mistrial;

19     II.   The government failed to produce material discovery;

20     III.   That the evidence was insufficient to sustain a conviction on Count 2; and,

21     IV.   The government's final argument was improper and prejudicial.

22       During the entire process of trial and post-trial preparation, I harped continuously on

23   the issue of jurisdiction on Count 1, the same issue as is argued in this brief.

24       Despite this, however, Mr. Capozzi didn't even bring up the issue on the principal

25   brief on appeal to the 9th Circuit. He did, however, finally understand the arguments I was

26   making on the jurisdictional issue during the process of appeal. Unfortunately, he only

27   made the argument for the first time on a reply brief.

1   The decision of the 9th Circuit affirmed my convictions. Relevant to the jurisdictional

2   argument that should have been made on the opening/principal brief, the Ninth Circuit had

3   this to say:

4   > "Henry further argues that the evidence was insufficient to show that the
5   > hidden cameras and other recovered devices were transported in interstate
6   > or foreign commerce. Because Henry raised that argument for the first
7   > time in his reply brief, we decline to consider it. See *United States v. King*,
    > 257 F.3d 1013, 1029 n.5 (9th Cir. 2001)." *Id.*

8   This was the only argument that Mr. Capozzi made that had any merit to it, as

9   evidenced by the affirmation of my convictions. However, he was so poorly prepared to file

10  the opening/principal brief, that he only made this argument on reply to the government's

11  response, ensuring that the merits of that argument were never considered by the Ninth

12  Circuit panel.

13

14  **2)   Legal Standard**

15  Although the guarantee of counsel on appeal, and the right to appeal in general, is relatively

16  new jurisprudence, it is established law that counsel on appeal is held to the same duty as

17  counsel at trial.

18  "The due process clause of the fourteenth amendment guarantees a criminal

19  defendant the right to the effective assistance of counsel on his first appeal as of right."

20  *Miller v. Keeney*, 882 F.3d 1428, 1431 (9th Cir. 1989) (Citing *Stone v. Powell*, 428 U.S. 465

21  (1976)). "We review claims of ineffective assistance of appellace counsel according to the

22  standard set out in *Strickland v. Washington*, 466 U.S. 668…" *Id.* at 1433.

23  Thus, it must be shown that counsel's advice fell below an objective standard of

24  reasonableness and that there is a reasonable probability that, but for counsel's

25  unprofessional errors, I would have prevailed on appeal. See *United States v. Birtle*, 792

26  F.2d 846 (9th Cir. 1986).

27  The performance and prejudice components are mixed questions of law and fact, and

28  are reviewed *de novo. United States v. Johal*, No. 16-17244 (9th Cir. April 16, 2021).

### 3)    Argument

There is no question that Counsel failed to make a jurisdictional argument on principal brief, and because of that, the merits of this issue were not ruled on by the Ninth Circuit on my direct appeal.

As argued in section VII(A) of this brief, the jurisdictional issue on Count 1 has clear merit. This will be argued again in the section below, but this time without the perspective of ineffective counsel, and through only the lens of missing jurisdictional authority.

Counsel failed to argue this in the principal brief of the appeal, or ever to argue this at the district court before, during, or after trial. The question is then re-framed: if this argument has merit, then counsel *was necessarily* ineffective for failing to raise this argument at any stage before the reply brief on direct appeal. Both *Strickland* prongs are therefore satisfied.

## X.    THIS COURT HAD NO JURISDICTION TO TRY OR CONVICT ME ON COUNT 1

### 1)    Facts

I was convicted by a jury verdict of guilty on Count 1: Conspiracy to Sexually Exploit a Minor (18 U.S.C. §2251(a) & (e)). In order for this verdict, and the conviction, to stand, jurisdiction must be proven to a jury beyond a reasonable doubt.

However, jurisdiction was never proven at all, and only inferred. There were cameras found during the searches of my home in September and November of 2013. There was a showing that secret recordings were made of people without their prior knowledge through a hidden camera in a Macrame plant hanging from the ceiling in my third bathroom of my California home.

However, no showing was ever made as to which, if any, camera that was found during the search was used to make any/all of these recordings.

The nexus through which the federal government has the jurisdictional authority to prosecute this count would necessarily come from the transportation of that/those camera(s)

1 | through interstate or international commerce. Without a showing of which camera was
2 | used, there was no showing of jurisdiction.

3 | The government never knew or proved which camera(s) were used in making the
4 | recordings used to convict me of the conspiracy in Count 1.

5 | **2)   Law and Standard of Review**

6 | Paraphrased, 18 U.S.C. §2251(a) makes it a crime to produce visual depictions of minors
7 | engaged in sexually explicit conduct "if that visual depiction was produced or transmitted
8 | using materials that have been mailed, shipped, or transported in or affecting interstate or
9 | foreign commerce by any means…"

10 | However, pursuant to the Supreme Court decision in *Raich,* actions that fail to
11 | interfere with interstate commerce may also affect interstate commerce sufficiently enough
12 | to trigger federal jurisdiction under the Commerce Clause. *Gonzalez v. Raich,* 545 U.S. 125
13 | (2005).

14 | Whether an act substantially affects interstate commerce is controlled by *United*
15 | *States v. Morrison,* 529 U.S. 598 (2000). *Morrison* lays out a four-part test to make this
16 | determination:

17 | 1) Whether the statute in question regulates commerce "or any sort of economic
18 | enterprise";

19 | 2) Whether the statute contains any "express jurisdictional element which might limit
20 | its reach to a discrete set" of cases;

21 | 3) Whether the statute or its legislative history contains "express congressional
22 | findings" that the regulated activity affects interstate commerce; and

23 | 4) Whether the link between the regulated activity and a substantial effect on interstate
24 | commerce is "attenuated."

25 | *United States v. McCoy* at 1119 (Quoting *Morrison*, at 610-612).

26 | *Raich,* being the more recent standard, controls intrastate actions where federal
27 | jurisdiction and control of intrastate means of affecting interstate commerce is concerned.

28 |

1

2

3

4

5

> [In *Raich*] "The Supreme Court reiterated that there are three general categories of activity that Congress's commerce power gives it the authority to regulate. First, Congress can regulate the channels of interstate commerce. Second, Congress has the authority to regulate and protect the instrumentalities of interstate commerce. Third, Congress has the power to regulate activities that substantially affect interstate commerce."

6   See *United States v. McCalla,* 545 F.3d 750, 753 (9th Cir. 2008) (internal quotations

7   omitted). Insofar as *Raich* was concerned, the intrastate cultivation and use of marijuana

8   affected the interstate trade of illegally sold marijuana and therefore invoked federal

9   jurisdiction.

10   Here, there was no transport or sale (attempted or otherwise) of the videos depicting

11   A.T. or anybody else. There is no intra- or interstate commerce nexus here. Therefore, the

12   only interstate commerce affected that could trigger jurisdiction over Count 1 comes from

13   the materials used to produce those videos. Namely, the camera(s).

14

15   **3)   Argument**

16   The video recordings taken of A.T. were used to demonstrate the criminal conspiracy

17   to violate §2251(a). These videos were recorded solely by Angele, as argued *supra*.

18   However, my knowledge and promotion of those actions would still constitute a conspiracy

19   for which I *could* be convicted.[12]

20   It is undisputed that these videos were not transported, electronically or otherwise,

21   outside of our home in California. They were not sold or offered for sale to anybody,

22   anywhere. Therefore, interstate transport of the videos themselves cannot be used to

23   establish jurisdiction here.

24   Only the interstate transport of the cameras used to record the videos of A.T. can be

25   used here to establish federal jurisdiction over Count 1. The government failed to do so

26   under even a preponderance of the evidence standard when, jurisdiction being central to a

27   conviction here.

---

12  This is solely said for the sake of argument, and not in anyway an admission of participation.

1    This begs two questions:

2    1.  What standard of proof must the government meet when establishing jurisdiction

3        over a charged count to a jury?

4    2.  Was this burden of proof met?

5    The answer is that jurisdiction must be proven to a jury beyond a reasonable doubt,

6    and the government failed to do that here. The quotes and arguments made in section

7    VII(A) of this brief will not be rehashed here. They show that the government gave little

8    care to the establishment of jurisdiction and my attorney did not even attempt to challenge

9    them on that issue.

10   Here, on collateral appeal, this Court must address the issue of jurisdiction, the

11   burden of proof needed to establish jurisdiction to a jury, and whether the government met

12   that burden of proof.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  ## XI.   CONCLUSION

2  For the reasons stated here in this brief, this honorable Court should conclude that there was

3  insufficient proof of jurisdiction to prosecute Count 1 in my case, and vacate that

4  conviction with prejudice.

5      Second, this Court should find that, through ineffective assistance of counsel, I was

6  convicted on Count 2 of the Receipt and Distribution of Child Pornography for which I was

7  no party to and, in fact, was the sole actions of Angele alone. Therefore Count 2 should be

8  vacated with prejudice.

9

10  Submitted this _____ day of November, 2021

11

12

13

14

15  ADAM ALAN HENRY #71064-097

16  Lompoc FCI
    Federal Correctional Institution

17  3600 Guard Road
    Lompoc, CA 93436

18  Pro Se Defendant, Petitioner

19

20

21  Certificate of Service

22  With my signature above, I attest that I have served a true and correct copy of the foregoing

23  brief upon the Clerk of the U.S. District Court for the Eastern District of California, Fresno

24  Division, at the Robert E. Coyle Federal Courthouse located at 2500 Tulare Street, Room

25  1501, Fresno California, 93721. As registered EM/ECF users, the government has

26  consented to electronic service and is therefore served pursuant to Fed. R. Civ. P. 5 once the

27  Clerk has docketed this brief.

28

1 | # XII. APPENDIX OF EXHIBITS
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**A. Exhibit 1: iPhone Text Extraction from Bates 1124**

Extraction Report

## SMS Messages (147)

| # | Folder | Party | Time | Status | Message | Del? |
|---|--------|-------|------|--------|---------|------|
| 1 | Inbox | From: +14169700346 | 7/9/2010 11:34:23 AM(UTC+0) | Read | Flight delaied. Can you send me a reply so I know you got this? Thanks babe. See you soon...I hope *wink* | Intact |
| 2 | Sent | To: +14169700346 | 7/9/2010 11:55:47 AM(UTC+0) | Sent | Got it. Any idea on delay? | Intact |
| 3 | Inbox | From: +14169700346 | 7/9/2010 11:59:46 AM(UTC+0) | Read | Well it's been an hour so far and we are not yet in the air. Apparently exess fluid needs to be drained and they can't get the valve open. | Intact |
| 4 | Sent | To: +14169700346 | 7/9/2010 12:04:16 PM(UTC+0) | Sent | Ah that sucks. Well let me know when you do leave if you can, will adjust my arrival accordingly. | Intact |
| 5 | Inbox | From: +14169700346 | 7/9/2010 12:05:36 PM(UTC+0) | Read | You will know as soon as I do. You still comffy at home then? Get any sleep? | Intact |
| 6 | Sent | To: +14169700346 | 7/9/2010 12:10:10 PM(UTC+0) | Sent | Yeah still at home, got a little sleep. | Intact |
| 7 | Inbox | From: +14169700346 | 7/9/2010 12:13:44 PM(UTC+0) | Read | Hay, it's crazy to think this is all my fault, right? That all these people are suffering because I made up my mind to be selfish? | Intact |
| 8 | Sent | To: +14169700346 | 7/9/2010 12:19:03 PM(UTC+0) | Sent | A wee bit. Flights get delayed all the time. | Intact |
| 9 | Inbox | From: +14169700346 | 7/9/2010 12:21:31 PM(UTC+0) | Read | Ok. Hay, how long does it take you to get to san fran from your place? You gona try and get some more sleep or what IS your plan now? | Intact |
| 10 | Sent | To: +14169700346 | 7/9/2010 12:25:14 PM(UTC+0) | Sent | Takes me about 3.5 hours. Was already getting around. Just going to leave a bit later. Won't get more sleep though. | Intact |
| 11 | Inbox | From: +14169700346 | 7/9/2010 12:27:05 PM(UTC+0) | Read | Ok sexy sorry about all this shit. Ill let you kow as soon as I get another update. See, shouldn't have said yes *wink*kiss* | Intact |
| 12 | Sent | To: +14169700346 | 7/9/2010 12:33:19 PM(UTC+0) | Sent | Right. You're fine don't worry. | Intact |
| 13 | Inbox | From: +14169700346 | 7/9/2010 12:56:07 PM(UTC+0) | Read | Ok looks like we are finaly on our way. They say 2 hours behind schedual so you can ajust and let me know what your doin. *kiss* | Intact |
| 14 | Sent | To: +14169700346 | 7/9/2010 12:58:50 PM(UTC+0) | Sent | Ok I'll just leave 2 hours later then. That puts you in about 11:30. | Intact |
| 15 | Inbox | From: +14169700346 | 7/9/2010 1:00:30 PM(UTC+0) | Read | Perfect! See you then love. Cell has to go off now. *kiss* see you soon...for a nap lol | Intact |
| 16 | Inbox | From: +14169700346 | 7/18/2010 7:19:17 PM(UTC+0) | Read | Hay love. Well in settled and waiting to load. Thank you for a great week. I really had a wonderful time building that friendship face 2face | Intact |
| 17 | Sent | To: +14169700346 | 7/18/2010 7:23:57 PM(UTC+0) | Sent | Me too. Glad we got you there at a good time to make it. Send me a text when you get home so I know you made it safe if you can. | Intact |
| 18 | Inbox | From: +14169700346 | 7/18/2010 7:26:24 PM(UTC+0) | Read | I absolutly will sexy, nice to know you might worry about me *kiss* enjoy the camping, hope I gave you enough fun to last a week without lol | Intact |
| 19 | Inbox | From: +14169700346 | 7/18/2010 7:54:01 PM(UTC+0) | Read | Loading into seats, man stands over me says'oh don't mind me just admiering the veiw' leans down looks out window 'of the wing, apparently' | Intact |
| 20 | Sent | To: +14169700346 | 7/18/2010 7:54:43 PM(UTC+0) | Sent | Dear lord | Intact |
| 21 | Inbox | From: +14169700346 | 7/18/2010 7:56:06 PM(UTC+0) | Read | I said 'oh yeah? What do u think?' he says looking at my chest, 'it's very nice...your not buying hmm? Thout about just saying nice rack... | Intact |
| 22 | Inbox | From: +14169700346 | 7/18/2010 7:58:00 PM(UTC+0) | Read | But thought that was a little cocky.' guy behind him chims in 'dude she's not gona fuck you keep moving' lol... Guys are funny...stupid lol | Intact |
| 23 | Sent | To: +14169700346 | 7/18/2010 8:01:23 PM(UTC+0) | Sent | Wow..... Just wow. | Intact |
| 24 | Inbox | From: +14169700346 | 7/19/2010 12:35:26 AM(UTC+0) | Read | I know right? I mean really...such is my life. You conect with the wife ok? I just landed, sorry for the delay in responce.hug* enjoy camp | Intact |
| 25 | Sent | To: +14169700346 | 7/19/2010 12:58:56 AM(UTC+0) | Sent | Yup. Just finished "connecting" with her. Your text came in at the end. Glad you got in safe. | Intact |
| 26 | Inbox | From: 14169700346 | 7/19/2010 1:02:50 AM(UTC+0) | Read | Oh? Well then lucky you. Told ya another woman is just the way to get the possesive juices going. Think you may even get another out ofit | Intact |
| 27 | Sent | To: +14169700346 | 7/19/2010 1:13:53 AM(UTC+0) | Sent | Oh not complaining. Just sucks that you can't be alone 2 hours without some jackass making the whole gender joke bad. Glad you are home though. Have fun with the kids. | Intact |
| 28 | Inbox | From: +14169700346 | 7/19/2010 8:38:39 PM(UTC+0) | Read | Hay, want ne to wait for you for the weekly? We can do it friday together? Did you get a secand dip btw? Lol hows camping? | Intact |

| 29 | Sent | To: +14169700346 | 7/19/2010 9:04:26 PM(UTC+0) | Sent | Heading up to the middle of nowhere now. If you want to wait for weekly of course I'll do it with you, but I don't need the badges. Won't hurt my feelings if you do it. | Intact |
|----|------|------------------|------------------------------|------|------|--------|
| 30 | Inbox | From: +14169700346 | 7/19/2010 9:35:33 PM(UTC+0) | Read | Pshl You know I'd rather run it with you. Ill wait. Have a blast ans see you online in a few days*kiss* | Intact |
| 31 | Inbox | From: +14169700346 | 7/20/2010 5:02:27 AM(UTC+0) | Read | Spent 6 hours on the phone with jim...I hate men. | Intact |
| 32 | Sent | To: +14169700346 | 7/20/2010 5:19:43 PM(UTC+0) | Sent | 6 hours? That sounds painful. Hate men eh? Good thing I'm just a troll. I hope it wasn't too bad. Able to get through to him? | Intact |
| 33 | Inbox | From: +14169700346 | 7/20/2010 6:19:10 PM(UTC+0) | Read | Yup, 6 painful hours, but I think he finaly gets it. He agreed he would rather have me as a friend then not at all. Lot more to it then that | Intact |
| 34 | Inbox | From: +14169700346 | 7/20/2010 6:20:59 PM(UTC+0) | Read | But you get the picture. Also should have said hate guys not men. Working out details for nov now and trying to fit in a CA trip for Jan | Intact |
| 35 | Sent | To: +14169700346 | 7/21/2010 5:14:10 PM(UTC+0) | Sent | Glad he's coming around. Nov and Jan? Fun. | Intact |
| 36 | Inbox | From: +14169700346 | 7/21/2010 6:02:11 PM(UTC+0) | Read | Nov for sure, talk to u about that fri but yeah, thinking about one last trip in the new year. Any interest? Or ideas? | Intact |
| 37 | Inbox | From: +14169700346 | 7/22/2010 10:41:44 PM(UTC+0) | Read | Hay guess what? I miss you, you arrogant , pompous, cocky ass monkey! *wink*kiss* Crazziest thing | Intact |
| 38 | Inbox | From: +14169700346 | 8/2/2010 2:34:55 AM(UTC+0) | Read | Net crapped out. Be back in as soon as I can, can they wait or you just want to run it with out me? *kiss* sorry cant be helped | Intact |
| 39 | Sent | To: +14169700346 | 8/2/2010 2:36:27 AM(UTC+0) | Sent | Holding your spot, just get back if you can | Intact |
| 40 | Inbox | From: +14169700346 | 8/2/2010 2:37:40 AM(UTC+0) | Read | Working on the issue now...doin all I know to do. Will be back as soon as I can | Intact |
| 41 | Inbox | From: +14169700346 | 8/13/2010 11:46:15 PM(UTC+0) | Read | Ok, new CA # is 209.485.9328 so this should work out well all around with me visiting too. Explain later *kiss* | Intact |
| 42 | Inbox | From: +14169700346 | 8/16/2010 6:55:38 AM(UTC+0) | Read | If you are still up I could use your sholder, otherwise I guess I will talk to you tomorrow. Luv u sorry for calling so late | Intact |
| 43 | Sent | To: +14169700346 | 8/16/2010 1:27:18 PM(UTC+0) | Sent | So sorry I missed your call. Will be on road for next hour. Call if you can. | Intact |
| 44 | Inbox | From: +14169700346 | 9/8/2010 12:00:27 AM(UTC+0) | Read | I love you. Yes it was wroth the quarter to tell you that, if you don't agree put it on my tab. *kiss*smile* I really do love you so much. | Intact |
| 45 | Inbox | From: +14169700346 | 9/9/2010 2:09:44 PM(UTC+0) | Read | Shocker, flight delay of 35 min is the estimation at this time. Will keep you posted love. I'm so sorry aboit this. | Intact |
| 46 | Sent | To: +14169700346 | 9/9/2010 2:11:21 PM(UTC+0) | Sent | No problem thanks for letting me know. | Intact |
| 47 | Inbox | From: +14169700346 | 9/9/2010 3:02:28 PM(UTC+0) | Read | Flights leaveing now. See you in 5-6 hours my love.*kiss* | Intact |
| 48 | Sent | To: +14169700346 | 9/9/2010 3:03:35 PM(UTC+0) | Sent | Sounds great | Intact |
| 49 | Inbox | From: +14169700346 | 9/9/2010 8:56:57 PM(UTC+0) | Read | Arrived and waiting for iugage... No idea how long now or where exactly I am | Intact |
| 50 | Sent | To: +14169700346 | 9/9/2010 8:59:15 PM(UTC+0) | Sent | Cool. I'm a few minutes away in the cell phone lot, just call me when you are heading for the door. | Intact |
| 51 | Inbox | From: +14169700346 | 9/10/2010 3:34:52 PM(UTC+0) | Read | Be back soon my ass *wink* how far out are you love? | Intact |
| 52 | Inbox | From: +14169700346 | 9/19/2010 7:45:49 PM(UTC+0) | Read | I am green love. Thank you and you get to go home now. Luv ya *kiss* | Intact |
| 53 | Inbox | From: +14169700346 | 9/19/2010 8:12:38 PM(UTC+0) | Read | Really hoping you got that and are well onyou way. Love you | Intact |
| 54 | Sent | To: +14169700346 | 9/19/2010 8:14:24 PM(UTC+0) | Sent | Yes ma'am. Fly safe. | Intact |
| 55 | Inbox | From: +14169700346 | 10/5/2010 8:17:01 PM(UTC+0) | Read | Not sure if you responded. Not ignoring you, just got called back to the eye doctor. I'll chat with you about it when I get back home*kiss* | Intact |
| 56 | Sent | To: +14169700346 | 10/25/2010 5:40:06 AM(UTC+0) | Sent | Now I'm going to have trouble falling asleep. Saying sorry sends us back around again, so not sure what else to say. Tried being clear, was feeling ignored, now we are pissed at eachother. Talk about a good night gone bad. | Intact |
| 57 | Inbox | From: +14169700346 | 10/25/2010 6:00:19 AM(UTC+0) | Read | So what would you like to do? Vent? Yahoo? Or leave it till tomorrow? | Intact |
| 58 | Sent | To: +14169700346 | 10/25/2010 6:01:05 AM(UTC+0) | Sent | No idea. | Intact |
| 59 | Inbox | From: +14169700348 | 10/25/2010 6:03:30 AM(UTC+0) | Read | Well I'm logging in to both yahoo and vent . This is gona get expencive for you to do via text. ILL be on for 10 min then getting back 2 bed | Intact |
| 60 | Inbox | From: +14169700346 | 11/1/2010 6:29:06 PM(UTC+0) | Read | Hay hun. Just landed and getting bags. Talk to you soon. Did you bring mandy? | Intact |
| 61 | Sent | To: +14169700346 | 11/1/2010 6:30:14 PM(UTC+0) | Sent | Yup | Intact |
| 62 | Inbox | From: +14169700346 | 11/1/2010 6:34:53 PM(UTC+0) | Read | Eric just messaged me saying he is 30 min out of the city and got the day off. Do I ask if he's seeking an invite to hang with us or ignor i | Intact |
| 63 | Sent | To: +14169700346 | 11/1/2010 6:39:13 PM(UTC+0) | Sent | Don't care at all. Up to you. Can talk about it when I get you. | Intact |
| 64 | Inbox | From: +14169700346 | 11/1/2010 6:50:26 PM(UTC+0) | Read | I am in international termanal and at 'door 1' still waiting for my bag but not long now | Intact |

| 65 | Sent | To: +14169700346 | 11/11/2010 6:57:41 PM(UTC+0) | Sent | Want me to head your way? And 5 minutes away | Intact |
| 66 | Inbox | From: +14169700346 | 11/11/2010 6:57:09 PM(UTC+0) | Read | Now better for me to wait on you then you circleing for me. Ill call when i get my bag. Should just be a few min but wait just in case | Intact |
| 67 | Inbox | From: +14169700346 | 11/14/2010 12:39:08 AM(UTC+0) | Read | Whats the number in your pasword on your comp? I remember the word not the number. 2) yous gona be home soon? Like next 30 min? | Intact |
| 68 | Sent | To: +14169700346 | 11/14/2010 12:40:53 AM(UTC+0) | Sent | It's 11 and no, not so soon. Am on yahoo here though. Can talk that way. | Intact |
| 69 | Inbox | From: +14169700346 | 11/30/2010 4:16:13 PM(UTC+0) | Read | Boarded and all setteled in. Its the oddest feeling, I am going to my kids but dont feel like I am going home. Odd right? You broke me&hookr | Intact |
| 70 | Sent | To: +14169700346 | 11/30/2010 4:17:50 PM(UTC+0) | Sent | Hehe. You're turning into a Californian. Glad you're ok i made it to work on time, so good all around. Sorry if you were there too early. | Intact |
| 71 | Inbox | From: +14169700346 | 11/30/2010 9:43:45 PM(UTC+0) | Read | I was more meaning you are becoming that feeling of home more then cali being home but what ever works *wink* kiss | Intact |
| 72 | Sent | To: +14169700346 | 12/21/2010 3:29:35 AM(UTC+0) | Sent | Can you hop back on vent please? | Intact |
| 73 | Inbox | From: +14169700346 | 12/23/2010 1:36:08 AM(UTC+0) | Read | Nets down for a while. If you want to talk you will have to call my love. *kiss* | Intact |
| 74 | Inbox | From: +14169700346 | 1/1/2011 1:06:42 PM(UTC+0) | Read | Leving on time. See you at 10:40 | Intact |
| 75 | Inbox | From: +14169700346 | 1/1/2011 11:01:59 PM(UTC+0) | Read | Kids are spent, we will head to the aquarium, if you get this let me know and we will wait by the tree up front | Intact |
| 76 | Inbox | From: +14169700346 | 1/5/2011 3:36:07 PM(UTC+0) | Read | Did you bring in the gerocories last night? Nothing in the fridge | Intact |
| 77 | Inbox | From: +14169700346 | 1/8/2011 1:38:32 AM(UTC+0) | Read | Did you buy tri tip seasioned or un the other night? | Intact |
| 78 | Sent | To: +14169700346 | 1/8/2011 1:39:24 AM(UTC+0) | Sent | Un, did it myself. | Intact |
| 79 | Inbox | From: +14169700346 | 1/26/2011 9:14:37 PM(UTC+0) | Read | Been at RHL park since 11 and no one here. Guess its too cold & wet. Hope your having a great day. | Intact |
| 80 | Inbox | From: +14169700346 | 2/9/2011 7:36:43 PM(UTC+0) | Read | We're out front when ever you are ready | Intact |
| 81 | Inbox | From: +14169700346 | 2/18/2011 5:33:47 PM(UTC+0) | Read | Got speed checked through just to find out our flight is delayed an hour. Such is life. Think my tummy thing was stress. threw up now better | Intact |
| 82 | Sent | To: +14169700346 | 2/18/2011 5:34:27 PM(UTC+0) | Sent | Heh ok glad better | Intact |
| 83 | Inbox | From: +14169700346 | 2/18/2011 6:06:53 PM(UTC+0) | Read | Nopa, still sick, blah. Thanks for driving. I appreciat it very much! Thank you for making the last month every thing 8 knew it would be! | Intact |
| 84 | Sent | To: +14169700346 | 2/18/2011 6:47:24 PM(UTC+0) | Sent | Just got home. Check in when you're on plane and home safe please. Hope you feel better, talk to you tonight/tomorrow on im. | Intact |
| 85 | Inbox | From: +14169700346 | 2/18/2011 7:52:06 PM(UTC+0) | Read | Just got seated, NOT in first class, and with no credit card this will be a LONG flight. Thanks for the extra cash, would starve with out it | Intact |
| 86 | Inbox | From: +14169700346 | 2/19/2011 4:05:05 AM(UTC+0) | Read | Landed, fed, home and settled. Missing us yet? | Intact |
| 87 | Sent | To: +14169700346 | 2/19/2011 4:18:21 AM(UTC+0) | Sent | Glad to hear it, thanks for letting me know. | Intact |
| 88 | Inbox | From: +14169700346 | 2/19/2011 4:22:41 AM(UTC+0) | Read | Of course. Got to check up on your family. We love you so much! They were braging to papa about you. And its bed time & taba wants to go hom | Intact |
| 89 | Inbox | From: +14169700346 | 2/23/2011 2:25:49 PM(UTC+0) | Read | Please call me as soon as your out of bed and before you leave the house for work. I have to get a number and after wor will be too late. | Intact |
| 90 | Inbox | From: +14169700346 | 3/2/2011 3:34:43 PM(UTC+0) | Read | Dad understands and is accepting of the fact that you wont meet him befor we are leagaly wed. So YAY! If thats the way we go no drama there. | Intact |
| 91 | Inbox | From: +14169700346 | 3/2/2011 4:41:47 PM(UTC+0) | Read | Trial is starting  I will testify this week and we will see what happens next. I am nurvious, and might need some of you attention. Love you | Intact |
| 92 | Inbox | From: +14169700346 | 3/4/2011 7:03:07 PM(UTC+0) | Read | I am spent, tired, scyared and I want to come home!!! I don' want to do this any more. Not sure my armor is holding up. | Intact |
| 93 | Sent | To: +14169700346 | 3/4/2011 7:10:35 PM(UTC+0) | Sent | Let me know if I can help. | Intact |
| 94 | Inbox | From: +14169700346 | 3/4/2011 10:41:36 PM(UTC+0) | Read | Might just have to listen to me cry. Pressure off and I am feeling the affects. Daddy says I am a supper star did fantasticly well! | Intact |
| 95 | Inbox | From: +14169700346 | 3/6/2011 6:14:26 PM(UTC+0) | Read | I hate that point when you start to feal a little better but your body is not yet cought up enough to let you do ANY thing about it. Luv you | Intact |
| 96 | Sent | To: +14169700346 | 3/6/2011 6:23:47 PM(UTC+0) | Sent | Well you know where to find me when you're feeling better, but don't push yourself. | Intact |
| 97 | Inbox | From: +14169700346 | 3/6/2011 6:25:56 PM(UTC+0) | Read | Yeah. Its eassier to function as long as I stay horizontal atm. You can call if you ever miss the sound of my lovlly voice *wink*. | Intact |
| 98 | Inbox | From: +14169700346 | 3/6/2011 11:52:26 PM(UTC+0) | Read | Okay. Sick and tired of being sick and tired. All done and wana come come! Oh yeah, and to eat real food too. *wink* | Intact |
| 99 | Inbox | From: +14169700346 | 3/7/2011 11:29:56 PM(UTC+0) | Read | I AM OFFICIALY DEVORCED!!! As of the 31st of March I can remarry. Next cout date is the 18th so I can fly out of here on april 1 till 10ish. | Intact |

| 100 | Sent | To: +14169700346 | 3/10/2011 11:33:33 AM(UTC+0) | Sent | Lose internet or avoiding me? | Intact |
|-----|------|------------------|------------------------------|------|--------------------------------|--------|
| 101 | Inbox | From: +14169700346 | 4/1/2011 11:08:59 AM(UTC+0) | Read | OK I can officialy marry you. Took me 3 days to get my na signature right, but now I have it so we're good *wink*kiss* hehe... See you soon. | Intact |
| 102 | Inbox | From: +14169700346 | 4/1/2011 12:01:51 PM(UTC+0) | Read | Leaving on time so see you at 10:30 | Intact |
| 103 | Inbox | From: +14169700346 | 4/11/2011 8:37:34 PM(UTC+0) | Read | Got through fast and eassy and take off on time. Call you when I get home and said good night to the kids. Love you my darling | Intact |
| 104 | Inbox | From: +14169700346 | 4/17/2011 2:21:17 AM(UTC+0) | Read | Can you give me a quick call please | Intact |
| 105 | Inbox | From: +14169700346 | 4/20/2011 6:10:53 PM(UTC+0) | Read | Any news? | Intact |
| 106 | Sent | To: +14169700346 | 4/20/2011 6:17:15 PM(UTC+0) | Sent | Havnt heard a thing | Intact |
| 107 | Inbox | From: +14169700346 | 4/20/2011 6:17:53 PM(UTC+0) | Read | Well shit | Intact |
| 108 | Inbox | From: +14169700346 | 4/20/2011 6:34:16 PM(UTC+0) | Read | Ok just called. Apparently the other offer didnt qualify for the morgage so we are the only offer atm. They are going to get back us soon. | Intact |
| 109 | Sent | To: +14169700346 | 4/20/2011 6:35:21 PM(UTC+0) | Sent | Whewl Bad to be happy for someone elses bad news? That does explain what they were waiting for though. | Intact |
| 110 | Inbox | From: +14169700346 | 4/20/2011 6:37:31 PM(UTC+0) | Read | Yeah. But they were fighting for the grand. Now they are reconsidering our amount. Sooo *fingers crossed* | Intact |
| 111 | Sent | To: +14169700346 | 4/20/2011 6:43:15 PM(UTC+0) | Sent | Yeah, just gotta hope a grand isn't worth them sitting on the house for longer. I'd say they'll probably give it to us. | Intact |
| 112 | Inbox | From: +14169700346 | 4/20/2011 6:44:18 PM(UTC+0) | Read | Yeah we figure that too. Tony said he'll be in touch. | Intact |
| 113 | Sent | To: +14169700346 | 4/20/2011 9:13:01 PM(UTC+0) | Sent | Just ringing and ringing. Call me when you can. | Intact |
| 114 | Inbox | From: +14169700346 | 5/11/2011 10:29:30 PM(UTC+0) | Read | Can you set up the insurence for them in their name so that they dont have to do research and slow down the prosses. Or call me. confusewas | Intact |
| 115 | Inbox | From: +14169700346 | 5/13/2011 6:35:25 PM(UTC+0) | Read | Wire is through so give tony a call when you are ready to meet at the house for keys. | Intact |
| 116 | Inbox | From: +14169700346 | 5/13/2011 10:03:13 PM(UTC+0) | Read | Ok good to talkbif you needed me . *kiss* | Intact |
| 117 | Inbox | From: +14169700346 | 5/20/2011 3:10:15 AM(UTC+0) | Read | Mom reset the router...did not hang up and will brb | Intact |
| 118 | Inbox | From: +14169700346 | 5/25/2011 5:30:06 AM(UTC+0) | Read | Net crashed, feel free to call and continue | Intact |
| 119 | Inbox | From: +14169700346 | 5/28/2011 12:27:31 AM(UTC+0) | Read | Net crashed | Intact |
| 120 | Inbox | From: +14169700346 | 5/28/2011 1:45:21 PM(UTC+0) | Read | Heard from tony, bank wants to close tuesday BUT they want us to sign papers extending the contract to the middle of next month. Said hellno | Intact |
| 121 | Inbox | From: +14169700346 | 5/28/2011 2:41:51 PM(UTC+0) | Read | Sorry had to into a meeting for taba for her recital. All clear now. Call if you wish or I will call you when we get home. | Intact |
| 122 | Sent | To: +14169700346 | 5/28/2011 4:48:09 PM(UTC+0) | Sent | You tell me to call you, but don't answer your phone for two hours. Everything OK? | Intact |
| 123 | Inbox | From: +14169700346 | 5/29/2011 7:02:55 PM(UTC+0) | Read | Aidan no longer believes in faries. This is a sad sad day for me. I STILL believe in faries. | Intact |
| 124 | Sent | To: +14169700346 | 5/29/2011 7:04:20 PM(UTC+0) | Sent | So do I, but that's because they all live in San Francisco now. | Intact |
| 125 | Inbox | From: +14169700346 | 5/29/2011 7:05:29 PM(UTC+0) | Read | LMAO!! Your no help at all *kiss* and yet I still love you. | Intact |
| 126 | Inbox | From: +14169700346 | 5/31/2011 12:16:22 AM(UTC+0) | Read | Having issues getting the net back on line. Call if you wish to continue talking now. Otherwisw talk to you in a bit | Intact |
| 127 | Inbox | From: +14169700346 | 6/2/2011 6:45:40 PM(UTC+0) | Read | Heard fron tony, call me when you get a moment. | Intact |
| 128 | Inbox | From: +14169700346 | 6/2/2011 7:17:44 PM(UTC+0) | Read | I can keep talking, forwarded it to cell if you wanted to call again | Intact |
| 129 | Inbox | From: +14169700346 | 6/4/2011 4:17:02 PM(UTC+0) | Read | Of coures as soon as I tell you I cant reetch them, I get through, fml | Intact |
| 130 | Inbox | From: +14169700346 | 6/4/2011 4:19:32 PM(UTC+0) | Read | If they cant come today, whats the next best day for you? | Intact |
| 131 | Sent | To: +14169700346 | 6/4/2011 4:20:26 PM(UTC+0) | Sent | After work any day during week, or tomorrow. | Intact |
| 132 | Inbox | From: +14169700346 | 6/4/2011 4:21:21 PM(UTC+0) | Read | Soonest monday 5-7pm, booked it for you | Intact |
| 133 | Sent | To: +14169700346 | 6/4/2011 4:21:39 PM(UTC+0) | Sent | Thanks | Intact |
| 134 | Inbox | From: +14169700346 | 6/10/2011 4:46:47 PM(UTC+0) | Read | Sorry, realised I left abroptly. Took Aidan to the bus and now getting a few things at the stroe with dad for the kids. Out for a while. | Intact |
| 135 | Inbox | From: +14169700346 | 6/12/2011 8:20:05 PM(UTC+0) | Read | So got tabas blood results in , we are all three O-commin to join your O-I How much does that rock?!? | Intact |
| 136 | Inbox | From: +14169700346 | 6/15/2011 1:47:01 PM(UTC+0) | Read | Try again love | Intact |
| 137 | Inbox | From: +14169700346 | 6/16/2011 12:29:32 AM(UTC+0) | Read | You rang darling? | Intact |
| 138 | Inbox | From: +14169700346 | 6/18/2011 1:11:31 AM(UTC+0) | Read | Sorry we went swimming for aidans graduation party. Call if you need me. I have the phone on me now. | Intact |
| 139 | Inbox | From: +14169700346 | 6/21/2011 9:48:06 PM(UTC+0) | Read | You called, every thing ok? Was at the vet call if you need me love. | Intact |

| 140 | Inbox | From: +14169700346 | 6/22/2011 2:53:59 AM(UTC+0) | Read | Another long day ahead and I am at the comp, call if you need me. *kiss* | Intact |
|-----|-------|--------------------|------------------------------|------|---------------------------------------------------------------------------|--------|
| 141 | Sent | To: +14169700346 | 6/25/2011 5:37:58 AM(UTC+0) | Sent | Still up? | Intact |
| 142 | Inbox | From: +14169700346 | 6/25/2011 6:45:22 AM(UTC+0) | Read | Yes,, | Intact |
| 143 | Inbox | From: +14169700346 | 6/25/2011 6:32:27 PM(UTC+0) | Read | Its 2:30 here if you ould wait till 4:30 that would be great! Love talk to you soon. Drive safe. | Intact |
| 144 | Inbox | From: +14169700346 | 6/26/2011 7:19:04 PM(UTC+0) | Read | Been spending the day with the kids at the ark. Feeling better after some sleep. Looking forward to seeing you tomorrow! | Intact |
| 145 | Inbox | From: +14169700346 | 6/27/2011 12:07:49 PM(UTC+0) | Read | Departing a few min late so might not be in till 10:30 or later. Call you when I land. *kiss* | Intact |
| 146 | Inbox | From: +14169700346 | 6/27/2011 5:44:33 PM(UTC+0) | Read | Just for laughs sesion 4 episode 4. Got to watch the last act! Oh and we are landing now. | Intact |
| 147 | Inbox | From: +14169700346 | 6/30/2011 11:06:34 PM(UTC+0) | Read | Here *smile* | Intact |

**B. Exhibit 2: Canadian Appellate Court Decision in RE: Angele's Ex-Husband's Sexual Assault Conviction**

# WARNING

The President of the panel hearing this appeal directs that the following should be attached to the file:

An order restricting publication in this proceeding under ss. 486.4(1), (2), (3) or (4) or 486.6(1) or (2) of the *Criminal Code* shall continue.  These sections of the *Criminal Code* provide:

**486.4    (1)**    Subject to subsection (2), the presiding judge or justice may make an order directing that any information that could identify the complainant or a witness shall not be published in any document or broadcast or transmitted in any way, in proceedings in respect of

(a)    any of the following offences;

(i)  an offence under section 151, 152, 153, 153.1, 155, 159, 160, 162, 163.1, 170, 171, 172, 172.1, 173, 210, 211, 212, 213, 271, 272, 273, 279.01, 279.02, 279.03, 346 or 347,

(ii)  an offence under section 144 (rape), 145 (attempt to commit rape), 149 (indecent assault on female), 156 (indecent assault on male) or 245 (common assault) or subsection 246(1) (assault with intent) of the *Criminal Code*, chapter C-34 of the Revised Statutes of Canada, 1970, as it read immediately before January 4, 1983, or

(iii) an offence under subsection 146(1) (sexual intercourse with a female under 14) or (2) (sexual intercourse with a female between 14 and 16) or section 151 (seduction of a female between 16 and 18), 153 (sexual intercourse with step-daughter), 155 (buggery or bestiality), 157 (gross indecency), 166 (parent or guardian procuring defilement) or 167 (householder permitting defilement) of the *Criminal Code*, chapter C-34 of the Revised Statutes of Canada, 1970, as it read immediately before January 1, 1988; or

(b)    two or more offences being dealt with in the same proceeding, at least one of which is an offence referred to in any of subparagraphs (a)(i) to (iii).

**(2)**    In proceedings in respect of the offences referred to in paragraph (1)(a) or (b), the presiding judge or justice shall

(a) at the first reasonable opportunity, inform any witness under the age of eighteen years and the complainant of the right to make an application for the order; and

(b) on application made by the complainant, the prosecutor or any such witness, make the order.

**(3)** In proceedings in respect of an offence under section 163.1, a judge or justice shall make an order directing that any information that could identify a witness who is under the age of eighteen years, or any person who is the subject of a representation, written material or a recording that constitutes child pornography within the meaning of that section, shall not be published in any document or broadcast or transmitted in any way.

**(4)** An order made under this section does not apply in respect of the disclosure of information in the course of the administration of justice when it is not the purpose of the disclosure to make the information known in the community. 2005, c. 32, s. 15; 2005, c. 43, s. 8(3)(b).

**486.6** **(1)** Every person who fails to comply with an order made under subsection 486.4(1), (2) or (3) or 486.5(1) or (2) is guilty of an offence punishable on summary conviction.

**(2)** For greater certainty, an order referred to in subsection (1) applies to prohibit, in relation to proceedings taken against any person who fails to comply with the order, the publication in any document or the broadcasting or transmission in any way of information that could identify a victim, witness or justice system participant whose identity is protected by the order. 2005, c. 32, s. 15.

## COURT OF APPEAL FOR ONTARIO

CITATION: R. v. A.P., 2013 ONCA 344

DATE: 20130528

DOCKET: C54307

Weiler, Blair and Rouleau JJ.A.

BETWEEN

Her Majesty the Queen

Respondent

and

A.P.

Appellant

Jill Copeland, for the appellant

Robert W. Hubbard, for the respondent

Heard: January 9, 2013

On appeal from the conviction entered on May 3, 2011 by Justice Michael G. Quigley of the Superior Court of Justice, sitting without a jury.

**Rouleau J.A.:**

**OVERVIEW**

[1]     The appellant was convicted of sexually assaulting his wife after a trial in the Superior Court of Justice. The appellant and the complainant were the only witnesses at trial, and testified to similar, yet critically different stories. The appellant and the complainant agreed that they had engaged in dominant/submissive sexual role playing over the course of their relationship; the appellant candidly admitted that on the night in question, he and his wife had sex; and he also agreed that the complainant wife had said 'no' to the appellant's request for sexual intercourse that night. The appellant stated, however, that the complainant's verbal refusal to consent to sexual intercourse formed part and parcel of their standard sexual role playing, and argued that either she actually consented to sex or that he had an honest but mistaken belief in her consent. In contrast, the complainant testified that her husband perpetrated a violent sexual assault upon her, in full knowledge of her unwillingness to participate.

[2]     The trial judge convicted the appellant, finding the complainant to be the more credible of the two witnesses. The appellant appeals his conviction on the basis that the trial judge misapplied the principles outlined by the Supreme Court of Canada in *R. v. W.(D.)*, and erred by placing the burden of proof on the appellant and in his

Case 1.13-cr-00409-ADA-BAM Document 348 Filed 11/05/21 Page 92 of 189 Page 4 of 24

analysis of whether he was left with a reasonable doubt as to the appellant's guilt. For the reasons that follow, I allow the appeal and order a new trial.

## FACTS

[3]     The appellant and the complainant met in 1997. They started dating shortly thereafter and their relationship gradually became sexual. They married on December 31, 2003. They have two children, the first born in October 2005 and the second in September 2007.

[4]     The appellant testified that while his and the complainant's sexual relationship was initially conventional, it became increasingly imaginative over time. The complainant expressed an interest in bisexuality. They had an open relationship for a period. They experimented with bondage. And they explored sexual role playing of a dominant/submissive nature. Except for one particular occasion, the appellant always played the dominant role and the complainant always played the submissive role. The appellant testified that when the complainant played the submissive role, she adopted a quiet, subservient voice. Both the complainant and the appellant testified that role playing had been a significant part of their sexual relationship, but their evidence conflicted regarding the nature of the role playing and the frequency with which the role play occurred over the course of their relationship.

[5]     The appellant testified that one of their role playing scenarios, the "teacher/student" scenario, was played out one to three times a week, both when he and the complainant were dating and after their marriage. The appellant would portray a teacher character and the complainant would be his student. The appellant would find some aspect of his "student's" performance wanting and the complainant would try to remedy the situation with sexual favours.

[6]    The appellant testified that he and the complainant also enjoyed acting out an assailant/victim sexual scenario throughout their relationship. He viewed this as a variation of dominant/submissive role play, similar to the teacher/student scenario in which they routinely engaged. When in his "assailant" character, the appellant used a gruff, aggressive, and demanding tone of voice. He testified that they began performing this more aggressive scenario when the complainant disclosed to him that she had been sexually assaulted as a pre-teenager and, although she did not like that experience, there were aspects of it that she wished to explore further. In the course of cross-examination, the appellant was asked to provide specific instances when this type of scenario was played out and the appellant was only able to specify two: a failed attempt on the first night of their honeymoon and a daddy/daughter episode in December 2007.

[7]    In his testimony, the appellant stated that he and the complainant had agreed on a safe word – "cabbage" – to ensure that these games did not surpass either of their comfort levels. The appellant stated that it had not been used after 2003.

[8]    The complainant acknowledged in her testimony that she had engaged in sexual role play with the appellant, including an attempt early on to explore bondage, but only at his instigation. Before their marriage, the role playing included the appellant taking on an aggressor personality and barking out orders for her to obey. She testified, however, that role playing was limited to situations of domination and submission such as the "teacher/student" scenario. According to the complainant, the appellant favoured scenarios where he caught a young girl off her guard, but she submitted to demands and agreed that she in fact wished to convey sexual favours. The complainant explained that the appellant wanted scenarios where she was a willing participant because, according to the complainant, "being unwilling would be

against his kink". The complainant testified that the role play largely ceased after she and the appellant got married.

[9]     The complainant also testified that the appellant had repeatedly discussed with her his desire to explore more aggressive role playing scenarios or "rape scenarios", but that she adamantly refused any use of force or to feign unwillingness to participate in sex. The complainant testified that this was because she had been sexually assaulted as a pre-teenager and was deeply uncomfortable with the idea of reliving such a traumatizing experience. The complainant maintained that she and her husband had never agreed on a safe word, because it was unnecessary given that aggressive sex was unacceptable to her in all cases.

[10]    There were photos tendered in evidence that depicted the complainant in scenes of mild bondage. The complainant testified that she had consented to these photos being taken by the appellant at his request. The appellant, however, testified that the complainant had taken these photos of herself as part of a university art assignment that required her to explore parts of her personal life that she did not want to make public. He testified that she took most of the photos using the remote trigger for the camera and that his only involvement was putting his finger in the complainant's mouth in certain pictures.

[11]    As of February 8, 2008, the date of the events in issue, the appellant was a doctoral student in political science and the complainant was a stay-at-home mother. She had previously studied visual arts at the university level and hoped to continue those studies in the future. The couple and the children lived together in an apartment in graduate housing. They also had a male boarder living with them at the time.

[12]   On the evening of February 8, the appellant went to bed before his wife. She stayed up and was play-wrestling with the boarder, something the two friends apparently did quite often.

[13]   The appellant testified that the sounds of the complainant wrestling with the male boarder aroused him. When the complainant came to bed, the appellant testified that she laid down with her back to him. He reached over and grabbed her hair and said in his dominant voice "you want it, don't you?" to which the complainant responded "no". However, the appellant testified that his wife's "no" was spoken in her submissive tone, the tone she would take whenever they engaged in role play. This, to him, indicated consent. The appellant said that he then massaged her breasts and she responded receptively, which was consistent with his understanding of her having consented. He pulled down her pants. His right hand was holding, but not pulling, her hair and his left hand was supporting his weight. He had sex with the complainant from behind with her pushing back receptively. The appellant testified that the complainant responded in a passive, passionate, and submissive way throughout. After he ejaculated, they went to sleep.

[14]   The appellant recounted that the next day everything was normal. He told his wife that he had enjoyed the night before, to which she responded that she had not enjoyed it.

[15]   The complainant's testimony concerning the events of February 8 was fundamentally different from that of her husband. She testified that she entered the bedroom and was sitting on the edge of the bed removing her socks when the appellant rolled over and came up behind her. Without saying a word, the appellant threw her back onto the bed and put his forearm over her throat. She found it difficult

to breathe, move, or make any noise. He began to hiss in her ear, saying that he was going to "fuck her and take what was his", among other profane and degrading statements. The appellant slapped her, ripped her tank top off, and pinched her nipples. He pulled down her jogging pants and got between her legs, while holding her down with his considerable weight. He forcibly copulated with her as she laid sobbing, hitting, and scratching him as best she could. He responded by saying "stop crying – you knew this was coming". After he ejaculated, he threw her aside and went to sleep.

[16]   The complainant testified that she got up and showered until the water ran cold. She put on a big sweater and pyjama pants and went back to bed, wrapping herself in a blanket. She testified that the next day, the appellant asked her "that was pretty awesome, wasn't it?" to which she responded "no, no, it wasn't awesome" and that it was rape. The complainant explained at trial that she sustained several injuries from the assault, including bruises and sore muscles.

[17]   In March 2008, the appellant took a trip to Africa to conduct field research for his doctoral thesis. The complainant testified that she felt relieved while he was away. Upon the appellant's return in the spring of 2008, he suffered a back injury. Because it was difficult for him to recuperate with two small children around, the appellant went to live with his parents to convalesce. The complainant testified that in the absence of the appellant, she realized her unwillingness to have him return to the family home. The complainant called the appellant and told him he was not welcome in their apartment any longer. The appellant testified that he was heartbroken.

[18]   The appellant and the complainant separated in June 2008. They attended two marital counselling sessions together, but their efforts to reconcile were unsuccessful.

The complainant testified that in the course of these sessions, the appellant admitted to having raped her and apologized. The appellant denies this.

[19]   On October 10, 2008, the complainant attended family court, where she applied for and obtained an ex parte order granting her custody of their two children and restraining the appellant from having any contact with her or their children. When the appellant became aware of the order, he sought a variation. On October 20, 2008, the complainant reluctantly agreed to vary the order so as to grant the appellant supervised access to his children. According to the complainant, the family court duty counsel told her to take the varied order to the police station and to insist on speaking to a police officer and having the officer read the affidavit the complainant had filed in family court.

[20]   The complainant testified that she followed duty counsel's instructions and, upon reading the affidavit, the police officer asked her to make a videotaped statement; the complainant did so. Shortly thereafter, the appellant was arrested and charged with sexually assaulting his former spouse.

## THE SECTION 276 APPLICATION

[21]   At the opening of trial, the appellant brought an application under s. 276 of the *Criminal Code* to adduce evidence of the complainant's sexual activity throughout their relationship. The appellant maintained that this evidence was crucial to provide the background and foundation for his defence of honest but mistaken belief in her consent on February 8, 2008. The trial judge agreed and allowed the appellant to cross-examine the complainant on various aspects of their sexual relationship.

## THE DECISION BELOW

[22]   The trial judge began by setting out the four elements of sexual assault that the Crown must prove beyond a reasonable doubt to secure the appellant's conviction:

1. the appellant intentionally applied force to the complainant,

2. the complainant did not consent to the force applied,

3. the appellant knew that the complainant did not consent to the force being applied, and

4. the force applied by the appellant took place in circumstances of a sexual nature.

[23]   Since the appellant conceded that he and the complainant had sexual intercourse on the night of the events in question, the trial judge stated that the only remaining issues were the complainant's consent and the appellant's knowledge of her lack of consent.

[24]   The trial judge therefore held that the sole issue in the case was the credibility of the two trial witnesses, the complainant and the appellant. The question of the appellant's guilt thus fell to be decided under the test established by the Supreme Court of Canada in *R. v. W.(D.)*, [1991] 1 S.C.R. 742. The trial judge found that a critical factor in his credibility assessment of the witnesses would be his finding as to whether they had a history of engaging in aggressive-assailant sexual role playing, as the appellant had testified.

[25]   The trial judge rejected the appellant's evidence as to the nature of his sexual relationship with his wife. He attributed particular importance to the fact that despite the appellant's testimony that he and the complainant regularly engaged in assailant/victim sexual relations, he was unable to recall any specific event or aspect

of such relations. The trial judge ultimately concluded that the appellant's evidence was internally and externally inconsistent and "defied common sense". The trial judge concluded that he neither believed the appellant's evidence, nor was he left in a state of reasonable doubt by it.

[26]   The trial judge found the complainant's evidence and description of what transpired on February 8, 2008 to be credible and reliable. He concluded that her testimony was more in line with both witnesses' description of the event as an instance of aggressive-assailant sexual role playing and the use of physical force that entails.

[27]   The trial judge disagreed with the defence's argument that the complainant's credibility was negatively affected by her delayed reporting of this event on the very same day that her custody order was varied to grant the appellant access to their children. The trial judge acknowledged that while the timing appeared suspicious on its face, the complainant gave credible evidence as to why she reported the assault on October 20, 2008.

[28]   The trial judge convicted the appellant of sexually assaulting the complainant and later sentenced him to four months' imprisonment and three years' probation.

**ISSUES ON APPEAL**

[29]   The appellant raises five issues on appeal:

1) Did the trial judge err in his assessment of the burden of proof as it relates to credibility?

2) Did the trial judge misapprehend the relevance of the delay and the timing of the complainant's report of the offence to the police?

3) Did the trial judge err in applying an objective test for recklessness and wilful blindness, and requiring that, to constitute a defence, a mistaken belief in consent must be reasonable?

4) Did the trial judge misapprehend relevant evidence by focussing on whether the complainant or the appellant had been the instigator of previous dominant/submissive role playing? And

5) Did the trial judge err in failing to recognize a distinction between the issues of the complainant's actual subjective consent and the appellant's honest but mistaken belief in consent?

[30]    The appellant also brought a motion to file fresh evidence. The proposed evidence relates to the appellant's acquittal, after his trial for sexual assault, on further charges brought against him by the complainant for assaulting their young son in May 2009. The appellant submits that the reasons for acquittal given by the trial judge in that case constitute compelling evidence that the complainant exhibits a pattern of bringing false charges against the appellant to gain advantages in their family law proceedings.

[31]    In my view, the reasons of the trial judge contain errors and gaps in his assessment of credibility and in his allocation of the burden of proof. Viewed in the context of the reasons as a whole, these errors and gaps show that the trial judge did not consider all of the evidence relating to the ultimate issue of guilt or innocence, thereby committing an error of law. The appeal therefore ought to be allowed. As a

result, I need not deal with all of the grounds of appeal, nor consider the application to admit fresh evidence.

## ANALYSIS

[32]   The appellant has raised several grounds of appeal. The essence of the appellant's position, however, is that the trial judge's reasons show that he approached the evidence in a piecemeal fashion, erred in his assessment of the burden of proof and, ultimately, did not take into account all of the evidence when determining whether he was left with a reasonable doubt on the critical issue of the appellant's intent.

[33]   As set out in *R. v. Morin*, [1992] 3 S.C.R. 286, at p. 296, a failure by the trial judge to consider all of the evidence relating to the ultimate issue of guilt or innocence constitutes an error of law.

[34]   In addressing this issue, I am mindful of the direction given by Moldaver J. in *R. v. Walle*, 2012 SCC 41, [2012] 2 S.C.R. 438, at para. 46, wherein he explains that in *Morin*, Sopinka J. made clear that there is "no obligation in law on a trial judge to record all or any specific part of the process of deliberation on the facts", and "unless the reasons demonstrate that [a consideration of all the evidence in relation to the ultimate issue] was not done, the failure to record the fact of it having been done is not a proper basis for concluding that there was error in law in this respect".

[35]   In my view, reading the reasons as a whole, the concerns raised by the appellant are warranted. The structure of the trial judge's reasons and the errors in those reasons demonstrate that the trial judge did not consider all of the evidence

related to the ultimate issue of the appellant's intent to sexually assault the complainant.

[36]    There are several aspects of the trial judge's reasons that, taken together, lead me to the conclusion that the appeal must be allowed and a new trial ordered. The first is that, at different points in his reasons, the trial judge appears to approach the case as a credibility contest between the appellant's and the complainant's versions of events. The second is that, at the outset of his analysis, the trial judge explains that one critical finding of fact will be used to decide whether to accept or reject the evidence of the appellant and the complainant. That finding, however, is made on a balance of probabilities; furthermore, the analysis that flows from this critical finding is flawed. The trial judge then all but convicted the appellant after making his findings concerning credibility; the reasons do not contain any further analysis of the evidence to determine whether, on the whole of the record, there remained a reasonable doubt as to the appellant's intent to commit the offence. In the circumstances of this case, there were several other relevant factors the trial judge failed to consider when determining whether, on the basis of all of the evidence led at trial, he was left with a reasonable doubt as to the appellant's guilt.

[37]    I will deal with each of these concerns in turn.

**(1) The trial judge approached his task as a credibility contest**

[38]    When the trial judge set out on his analysis of the evidence, he correctly listed the four elements of the offence of sexual assault that must be proven by the Crown. The trial judge then expressed the view that "the sole issue in this case is the credibility of the complainant and the credibility of the defendant", thereby, in the appellant's submission, viewing the case as a credibility contest.

[39]   The appellant nevertheless concedes that the trial judge identified the correct approach to be taken in such cases, which is that outlined in *R. v. W.(D.)*, [1991] 1 S.C.R. 742, at p. 758:

> First, if you believe the evidence of the accused, obviously you must acquit.
>
> Second, if you do not believe the testimony of the accused but you are left in reasonable doubt by it, you must acquit.
>
> Third, even if you are not left in doubt by the evidence of the accused, you must ask yourself whether, on the basis of the evidence which you do accept, you are convinced beyond a reasonable doubt by that evidence of the guilt of the accused.

The appellant argues, however, that the reasons show that the trial judge did not properly apply that approach to the evidence in this case. I agree. Correctly setting out the *W.(D.)* approach is not determinative of the correctness of a decision – the critical issue is whether the reasons reflect its correct application: see e.g. *R. v. Wadforth*, 2009 ONCA 716, 247 C.C.C. (3d) 466, at paras. 50-51.

[40]   The trial judge's approach to this case as a credibility contest is evident in his reasons when he is dealing with the assessment of witness credibility and the need for the Crown to prove the elements of the offence beyond a reasonable doubt. The trial judge indicated that in a case such as this, "the <u>truth</u> will be found to be the <u>version of events</u> that is in harmony with what a practical and well-informed person would recognize as most <u>probable</u> in all of the existing circumstances" (emphasis added). The trial judge referred to the "version of events" told by the appellant and the complainant a further five times in his reasons. These statements are problematic for two reasons.

[41]   First, it suggests that the point of the trial and the trial judge's task is to determine which of the two recounted versions of the event is true. This approach is an error. As the Supreme Court of Canada held in *R. v. C.L.Y.*, 2008 SCC 2, [2008] 1 S.C.R. 5, at para. 8:

> [The purpose of the *W.(D.)* analysis] was to ensure that triers of fact — judges or juries — understand that the verdict should not be based on a choice between the accused's and Crown's evidence, but on whether, based on the whole of the evidence, they are left with a reasonable doubt as to the accused's guilt. [Citations omitted.]

See also *R. v. Avetysan*, 2000 SCC 56, [2000] 2 S.C.R. 745, at para. 21. An approach that emphasizes having to decide whether to believe either the Crown's evidence or the defence's evidence neglects the third alternative that while the trier of fact may not believe the accused, they may still be left with a reasonable doubt as to the guilt of the accused on the whole of the evidence: see *R. v. S.(W.D.)*, [1994] 3 S.C.R. 521, at p. 532.

[42]    Second, having determined that the sole issue at trial was credibility, the trial judge approached this issue as one to be decided on a balance of probabilities. I acknowledge that individual facts need not be proven beyond a reasonable doubt at trial; only the elements of the offence must meet this higher standard: see *R. v. Bouvier* (1984), 11 C.C.C. (3d) 257 (Ont. C.A.), at p. 264, aff'd [1985] 2 S.C.R. 485. However, by setting up the whole case as a choice between two competing versions of events and stating that the version that is "most probable in all of the existing circumstances" will be selected as "true", the trial judge came dangerously close to deciding the ultimate issue at trial on a balance of probabilities. See *R. v. Quidley*, 2008 ONCA 501, 232 C.C.C. (3d) 255.

[43]    That the trial judge viewed his role in this case as choosing between the appellant's and the complainant's competing versions of events is further confirmed in his method of assessing their credibility. The trial judge acknowledged, in an exchange with counsel during closing submissions, that the appellant had testified in a forthright and honest manner. Since the complainant had testified in an equally honest manner, however, the trial judge set aside the fact of the appellant's honest presentation as neutral:

[B]oth the complainant and the accused, to my mind, presented honestly and well. Both gave their evidence in a forthright manner. But it seems to me that the issue of credibility is not to be decided by demeanour, it's not to be decided by the delivery of evidence, it's not to be decided by manner. It's to be decided by the internal and external consistency of the evidence given, with the evidence as a whole … .

…

So I say that only because I would almost rather have you focus on those issues of internal and external consistency or inconsistency, because to my mind that's where the truth emerges.

[44]   The trial judge assigned relevant demeanour evidence no weight because it did not help him pick between the competing versions of events told by the complainant and the appellant at trial. This is demonstrative of the fact that the trial judge viewed his task as having to choose between the complainant's and the appellant's evidence. The trial judge's either/or approach was in error because it neglected the third option, namely, that even though the trial judge did not believe the appellant, he was not convinced of the appellant's guilt on the whole of the evidence.

[45]   The appellant raises an additional concern with respect to the trial judge's findings of credibility. After carrying out the credibility analyses of the appellant and the complainant, the trial judge rejected the appellant's submission that the complainant's credibility was undermined by her delay in disclosing the assault, and disclosing it on the same day as she consented to a variation in the appellant's access to their children. He stated that there was "no evidence on this trial that persuaded me that the manner in which the reporting came about meant that her report of what transpired on February 8, 2008 was not true" (emphasis added). The appellant argues that the trial judge reversed the burden of proof by placing the burden on the appellant to "persuade" the trial judge that the report was untrue. This

Case 1:13-cr-00409-ADA-BAM   Document 348   Filed 11/05/21   Page 106 of 189

simply adds to the appellant's legitimate concern respecting the trial judge's credibility findings.

## (2) The trial judge's finding on the critical issue of fact and his piecemeal approach to the evidence

[46]   The fact that the complainant and the appellant had a history of engaging in sexual role play complicated the trial judge's analysis in this case. Both the complainant and the appellant confirmed that their role play sometimes included a dominant/submissive dynamic, such as in the teacher/student scenario. Their evidence conflicted, however, on whether they regularly enacted an assailant/victim scenario as well.

[47]   As a preface to his analysis of the evidence, the trial judge explained that he would focus on this aspect of the appellant and the complainant's relationship. Specifically, the trial judge set himself the task of determining whether in the past they had engaged in sexual role playing with an assailant/victim dynamic. The trial judge said his conclusion on this singular fact would drive his findings on credibility, and indeed, on the guilt or innocence of the appellant. The foregoing is explained in paragraphs 59 and 60 of the trial judge's reasons, which read as follows:

> If I find that [the complainant] and [the appellant] engaged in a role playing sexual relationship focused on dominance and submissiveness that probably or likely included an aggressive/submissive victim role playing scenario, then to my mind this would be a strong indicator that it would be unsafe to convict. This would be so since the Crown would have failed to establish the absence of consent beyond a reasonable doubt. That conclusion would follow, either because such a finding would necessarily call [the complainant's] evidence into serious doubt, or because it would leave open the possibility that in their sexual relationship "no" could mean "yes" or that [the appellant] could have had an honest but mistaken belief. I would be obliged to acquit the appellant of the charge he faces.
>
> On the other hand, if I find on the whole of the evidence that [the complainant] and [the appellant] did not engage in an aggressive-

Case 1:13-cr-00409-ADA-BAM   Document 348   Filed 11/05/21   Page 107 of 189

assailant/submissive-victim type of role playing scenario as part of their sexual relationship, even if they did types of role playing focussed on "teacher/student" or "daddy/daughter", or other lesser expressions of sexual dominance and submissiveness, then there would be no basis to believe the accused either that [the complainant] consented or that he had an honest but mistaken belief that she was consenting in the context of their sexual relationship. Such a finding would totally undermine any credibility to [the appellant's] assertion of holding an honest but mistaken belief that [the complainant] consented because the context in which "no" allegedly meant "yes", or in which he could have reasonably have had an honest but mistaken belief would be absent. <u>In that case, the appellant should be convicted</u> since the Crown would have established the absence of consent beyond a reasonable doubt. That would necessarily be the result if I did not believe his evidence and was not left in a reasonable doubt by it, and provided I was satisfied that the Crown had otherwise proven the absence of that consent beyond a reasonable doubt, having regard to the whole of the evidence. [Emphasis added.]

[48]   This approach, central to the trial judge's analysis, is fundamentally flawed for two reasons.

[49]   First, the trial judge determined that this critical finding of fact would be made on a standard of "probability" or "likelihood". As I noted above, although individual facts in a criminal trial need not be proven beyond a reasonable doubt, there is cause for serious concern when a critical fact that determines the outcome of the case is decided on a balance of probabilities: *Quidley*. Such an approach not only lowers the Crown's burden of proof, but also places a burden on the appellant to prove, on a balance of probabilities, that he and the complainant did indeed share a sexual history of this nature.

[50]   Second, and more importantly, the trial judge erred by tethering the appellant's acquittal or conviction to this finding of fact. The trial judge has a responsibility to consider all of the evidence in relation to the ultimate issue of whether the guilt of the accused has been proven beyond a reasonable doubt: *Morin*. The appellant was charged with sexually assaulting the complainant on February 8, 2008. The trial

Case 1:13-cr-00409-ADA-BAM    Document 348    Filed 11/05/21    Page 108 of 189

judge therefore had an obligation to consider the witnesses' testimony regarding the events of that evening, and whether it was credible in the context of the evidence as a whole, before determining the ultimate issue of the appellant's guilt.

[51]    Rather, the trial judge in this case decided that if the complainant was to be believed on the subject of the parties' sexual history, the appellant "should be convicted" because 1) his testimony regarding his honest but mistaken belief in consent would not be credible and 2) the Crown would have proved the absence of consent beyond a reasonable doubt. These were the only two issues in the case. The trial judge ultimately found that, as the complainant had testified, the complainant and the appellant's sexual relationship did not include an assailant/victim role playing scenario. The appellant's conviction flowed inexorably from this finding because the trial judge had already concluded that if the complainant and the appellant did not share a sexual history of this particular nature, then both of the appellant's defences of consent and honest but mistaken belief in consent were baseless – and this without considering all of the evidence, specifically any evidence directly related to the events of February 8, 2008. This reasoning runs counter to the analytical framework set out by the Supreme Court of Canada in *W.(D.)*. The fact that the trial judge reiterates the applicable *W.(D.)* principles at the end of the extract quoted above is not dispositive, given the obvious flaws in his analysis.

[52]    The dangers of taking such a piecemeal approach to the evidence are further realized in the trial judge's decision. The balance of the reasons demonstrate that after the trial judge decided the complainant was to be believed as to the nature of the parties' sexual history, he assumed her version of the events of February 8, 2008 was true as well. This error is of a piece with the trial judge's approach to this case as a credibility contest wherein his task was to choose between believing the

complainant's evidence or the appellant's evidence in its entirety, as earlier discussed.

[53]    The above errors led the trial judge to analyze the appellant's evidence regarding February 8, 2008 in light of the trial judge's foregone conclusion that the complainant was telling the truth about the events of that night. For example, the trial judge found that the appellant's credibility was negatively affected because the appellant "minimized his own actions and the force that he used" against the complainant, despite the appellant's having described the night's intercourse as being in the "aggressive-assailant" mode. In other words, the trial judge found that the appellant's testimony was inconsistent and could not be believed because he testified that the February 8 intercourse was in the aggressive-assailant mode, but simultaneously denied that he used any force against the complainant. These findings assume that the complainant's testimony regarding the amount of violence used against her on February 8, 2008, was true, and was an accurate depiction of what "aggressive-assailant" sexual relations are. These findings are contrary to the appellant's testimony that "aggressive" sex meant using aggressive language, not physical force, in a sexual context.[1]

[54]    In the same vein, the trial judge concluded on four separate occasions in his reasons that the complainant's testimony was "much more in keeping with" the aggressive-assailant scenario "than what [the appellant] described", particularly as to the words, force, and level of dominance used by the appellant. In other words, because the trial judge concluded that the events of February 8 were an "aggressive-assailant" scenario as the complainant had defined it, the complainant's evidence fit better with the physical force that is integral to that scenario.

[55]   The trial judge's piecemeal approach to the evidence meant that he did not consider all of the evidence in relation to the ultimate issue of whether the appellant's guilt had been proven beyond a reasonable doubt. In addition to the concerns identified above, there are several facts that are not addressed in the trial judge's reasons. These, individually or in concert, were relevant to the ultimate issue in the trial, even accepting the trial judge's finding that the complainant was credible and the appellant was not. Some of the facts and issues not dealt with in the trial judge's reasons are as follows.

[56]   Despite finding the appellant to have testified honestly, as discussed above, the trial judge rejects his evidence without analyzing the impact of that demeanour evidence. This omission is all the more problematic when one considers that in his reasons for sentence, the trial judge wrote that the complainant "does seem [to] have a tendency to dramatize, both in her evidence at trial and in her victim impact statement". These findings are never reconciled, nor considered.

[57]   More importantly, nowhere in his reasons for judgment does the trial judge make a specific finding as to whether, in the specific context of the appellant and the complainant's sexual relationship, "no" had ever meant "yes". As appears from the excerpt set out at para. 46 of these reasons, he thought that if "no" meant "yes" in their relationship, this was a strong indicator that it would be unsafe to convict. Indeed, the fact that "no" meant "yes" in the appellant and the complainant's relationship was a cornerstone of the appellant's defence.[2] It was not until he issued his reasons for sentence that the trial judge revealed that he accepted the appellant's evidence in that regard. As set out in the reasons for sentence, "it is clear that in the context of their relationship 'no' frequently did mean 'yes'" and that the complainant and the appellant had "for some years, acted as if no meant yes albeit

on a less serious or aggressive plane." The trial judge ought to have weighed this fact in determining the ultimate question of whether the appellant held an honest but mistaken belief in the complainant's consent on February 8, 2008, or whether, on the whole the evidence, the trial judge was convinced beyond a reasonable doubt of the appellant's guilt.

[58]   In summary, the trial judge erred by setting up an analytical framework wherein one critical finding of fact, determined on a balance of probabilities, drove his conclusions on both credibility and whether the Crown had proven the appellant's guilt beyond a reasonable doubt. He thereby assessed the trial evidence in a piecemeal fashion, and failed to consider all of the evidence in relation to the ultimate issue.

## CONCLUSION

[59]   The trial judge approached the trial as a credibility contest between the appellant and the complainant, he made key findings of fact on a balance of probabilities, he evaluated the evidence in a piecemeal fashion, and he failed to make some crucial findings altogether. More importantly, the trial judge's reasons show that he did not consider whether the evidence, taken as a whole, raised a reasonable doubt as to the central issue of the appellant's *mens rea* for sexual assault, and particularly whether the appellant had an honest but mistaken belief that the complainant consented. In his reasons, the trial judge correctly recites the *W.(D.)* test, but does not demonstrate that it was correctly applied. This constitutes an error of law. The appeal should be allowed and a new trial ordered.

"Paul Rouleau J.A."

"I agree K.M. Weiler J.A."

"I agree R.A. Blair J.A."

Released: May 28, 2013

---

[1] While the appellant did agree in cross-examination that dominant/submissive role play includes an element of "aggressive physicality", he described examples of this physicality as holding the complainant's hair in his hand and not talking to her in a soothing way. He clarified that neither he nor the complainant ever hurt one another during this type of role play and refused to agree with the suggestion that the role play would involve more physicality than he had described: *Cross-Examination of A.P.*, March 8, 2011, at pp. 254-57.

[2] See paras. 7, 57, 59, 60, 74, 80, and 81 of the trial judgment.

**C. Exhibit 3: The Trompetter Report**

# PHILIP S. TROMPETTER, PHD, ABPP

Board Certified Specialist in Police and Public Safety Psychology
A PSYCHOLOGICAL CORPORATION
License #PSY3827

1600 G Street, Suite 201
Modesto, California 95354

TELEPHONE: (209) 622-3399
FAX: (888) 814-6161
EMAIL: trompetteroffice@gmail.com

May 31, 2014

Valerie Castro, Associate Clinical Social Worker
Social Worker IV – Court Unit
Stanislaus County Community Services Agency
Adult, Child and Family Services
251 East Hackett Road
P.O. Box 42
Modesto, California 95353-0042

Re:   In the Matter of Liam Alan Henry
      Court No.: 516916

Dear Ms. Castro:

This document is a psychological evaluation of Ms. Angele Henry, the mother of Liam Alan Henry, that was completed at your request. As a result of your referral, Ms. Henry was seen for a 3.4 hour, face-to-face interview in my private office on May 29, 2014. She was advised of the purpose of the evaluation and admonished of the limits to confidentiality and privilege attached to any information observed or revealed in the process. She was informed that I was not providing treatment but rather an evaluation to assist your agency regarding her reunification plan with her son, Liam. She was asked to carefully read my "Disclosure Statement for a Forensic Psychological Evaluation" and to ask any questions regarding the purpose of the evaluation and the use of my report. Following a discussion, Ms. Henry expressed her understanding and signed an informed consent document agreeing to proceed with the evaluation and to authorize the release of my written report to your agency.

Preceding the face-to-face interview, Ms. Henry completed three psychological tests. They included:

- Minnesota Multiphasic Personality Inventory – 2 (MMPI-2) (also scored and interpreted as an MMPI-2-RF)
- Hogan Personality Inventory (HPI)
- Hogan Development Survey (HDS)

The MMPI-2-RF is a psychological test that aids clinicians in the assessment of mental disorders and personality functioning, the identification of specific problem areas, and suggestions for treatment planning in a variety of settings. The HPI is a measure of normal personality functioning. The HDS identifies personality-based performance risks and obstacles to effective interpersonal behavior. The MMPI-2-RF has the advantage of being able to compare the test-taker's scores with a selected comparison group. In this case, I was able to compare Ms. Henry's test scores to a group of females who were also undergoing parental capacity evaluations. This data makes it possible to compare her scores and item level responses with those of individuals tested in a similar setting, usually under roughly similar circumstances.

Henry Defense 000468

Re:  In the Matter of Liam Alan Henry                                              May 31, 2014
Court No.: 516916

It should be noted that both Hogan instruments are validated not for child protection matters but for workplace settings. Even though the Hogan instruments were not validated for child protection matters, I find both tests useful in assessing specific interpersonal deficits that are arguably applicable to assessing interpersonal functioning in settings outside the workplace (e.g., parenting).

Collateral information provided, reviewed and considered for this evaluation included:

1.  Your May 14, 2014, referral letter.
2.  Juvenile Dependency Petition (Version I), December 06, 2013 (12 pages).
3.  Jurisdiction/Disposition Report, filed 02/16/14 (44 pages).
4.  Child Welfare Services Initial Case Plan, 02/26/14 (6 pages).
5.  Attachment A – Child Custody Orders from Ontario Court of Justice, 06/15/09.
6.  Attachment B – there is none.
7.  Attachment C – Ceres Department of Public Safety Supplemental Report, Case #213-004554.
8.  Attachment D – Delivered Service Log, 09/22/13 – 09/24/13.
9.  Attachment E – Additional Ceres Department of Public Safety Report.
10. Attachment F – Initial Crime Report, Ceres Department of Public Safety, File #213-004554.
11. Attachment I – FBI Arrest Order, 11/04/13.
12. Attachment J – Additional reports from the Ceres Department of Public Safety, File #213-004554.
13. Attachment K – Additional Ceres Department of Public Safety documents, File #213-004554.
14. Attachment M – Stanislaus County Superior Court Case Index Search.
15. Attachment N – Ontario Court of Justice document, report of the children's lawyer signed by Steven D'Souza, MSW, RFW, 05/14/09.
16. Attachment O – Appellate Court Decision by Court of Appeal for Ontario and Adam Pearce (Ms. Henry's first husband), released 05/28/13.
17. Attachment P – Ontario Court of Justice, Decision by Justice M.L. Hogan, 10/12/12.
18. Attachment Q – Various e-mails.
19. Attachment F – Medical report regarding Adam Pearce from Jeff Bloom, M.D., 01/26/14.
20. Attachment T – E-mail to your agency from the Toronto Child Protective Agency regarding a home visit assessment of Adam Pearce, 01/31/14.
21. Attachment U – Letter from attorney Stanley J. Potter, 08/20/09.
22. Attachment V – Two letters from counsel for Adam Pearce, 09/23/13.
23. Attachment W – Copy of the Children's Aide Society of Toronto Family Service file pertaining to Ms. Henry and her children (50 pages).
24. Attachment X – Multiple documents from the Peel Children's Aide Society in Mississauga, Ontario, between 2008 – 2014 (104 pages).

REFERRAL QUESTION

While there are various concerns related to a child's welfare and health in a child protection matter, this evaluation addresses only the specific referral questions.  In this case, the referral letter defines the objective of this evaluation, which states:

"In order to provide Ms. Henry with services to maximize her opportunity to reunify with Liam, it is hoped that a psychological evaluation will reveal if Ms. Henry suffers from any mental illness or disability that may have contributed to the circumstances that put her children at risk, or may interfere with her ability to utilize reunification services."  Furthermore, "Please provide your professional opinion as to whether Ms. Henry's current Case Plan tasks are adequate to address her specific needs, or if you recommend additional or different programs to maximize her chances of regaining custody of her son. Of

-2-

Henry Defense 000469



*interest and concern to the Court will be how Ms. Henry's progress in her counseling programs can be measured, upon completion, to determine if she will be able to protect her child and avoid the circumstances that caused him to be removed from her care."*

It should be noted that the reliability and validity of this evaluation, like all psychological evaluations, depends in large part upon the accuracy and completeness of the data.   The withholding or misrepresentation of material information with failure to make available pertinent information by any party could result in erroneous findings, conclusions and/or recommendations from this examination.

## PROLOGUE
Following several years of child custody conflict in Canada between Ms. Henry and her first husband, Adam Pearce, along with allegations that Mr. Pearce assaulted his son and sexually assaulted Ms. Henry, Mr. Pearce was arrested and convicted but his convictions were later overturned and the matter stayed. Ms. Henry now finds herself having been arrested in Stanislaus County for alleged sexual misconduct in concert with her current husband, Adam Henry, who is in Federal custody, having been arrested for downloading and producing child pornography.   Ms. Henry's current husband is being prosecuted federally and Ms. Henry is being prosecuted by the State. Ms. Henry is under advisement by her criminal defense attorney to be circumspect in her discussions with me regarding the alleged criminal conduct. The truth of those allegations will be deferred to the trier of fact. Nevertheless, it would have been helpful if the truth or falsehood of the allegations was already established.

Ms. Henry is currently involved in individual counseling through Sierra Vista as well as group counseling through Parents United, a self-help group dealing with intrafamilial sexual abuse.   She has also participated in anger management and parenting classes.   This evaluation attempts to determine if Ms. Henry suffers from a mental illness or disability that contributed to the situation that resulted in her children being removed from her custody and care, and/or may interfere with her ability to utilize reunification services. In addition, this evaluation attempts to identify any additional treatment that may enhance her chances of regaining custody of her son.

## BACKGROUND INFORMATION
*Ms. Henry is the primary provider of information contained herein.   To whatever degree her reported information is factually incorrect, the expressed opinions may require reconsideration. If the reader is aware of any objective evidence relevant to this evaluation other than that provided to me and contained in this report, or if the reader has reason to believe my conclusions run counter to the objective evidence, please inform me.*

Angele Christine Henry was born on November 10, 1979, in Toronto, Ontario, Canada.   She is now 34 years old.   Both of her parents are alive and their marriage remains intact.   Her father is 66-years-old and is a retired police officer from the Metropolitan Toronto Police Department where he served for 36 years before his retirement ten years ago.   Her mother is 64-years-old and is a real estate instructor, having worked for years as a real estate broker.   They continue to reside in Ontario. Ms. Henry described the quality of her parent's marriage as "torturous."   She described her mother as hypercritical, hyperirritable, impulsive and abusive.   She described her father as largely passive but provocative. Within the context of this disharmonious relationship, Ms. Henry described herself as "the peace keeper." Ms. Henry views this early childhood role as influential in her personal development and inclination to be excessively obedient, compliant and unassertive in other relationships.   She describes herself as a "pushover" and "too malleable." While she described her mother, who was many years later diagnosed with a bipolar disorder, as verbally and emotionally abusive, she was not physically abusive. In addition, Ms. Henry did not witness any domestic violence between her parents. When the marital and parenting tension became too great for

-3-

Henry Defense 000470

Re:   In the Matter of Liam Alan Henry
      Court No.: 516916                                                              May 31, 2014

her mother, she would leave for weeks and months at a time.  Ms. Henry believes that this has created
"abandonment issues" for her.

Unknown to her husband and without his participation in the decision, Ms. Henry's mother had a tubal
ligation after Ms. Henry's birth; therefore, Ms. Henry has only one older brother and no younger siblings.
The family, however, took in foster boys who stayed in the home anywhere from two to ten years.  Ms.
Henry's older brother, Bradford, was born on April 06, 1975.  He was diagnosed with schizophrenia as a
younger man.  He was institutionalized following an arrest for some type of violence toward the family and
he was psychiatrically hospitalized for a significant period after which he was placed in a supervised living
situation.  He returned home for awhile but that did not work out and he was again placed in a supervised
residential living arrangement where he remains and reportedly is doing reasonably well.  Two of her foster
brothers are now dead – one was killed in prison and one committed suicide by jumping in front of a train.
Ms. Henry reports being sexually victimized by two of her foster brothers - one foster brother, Jody, when
Ms. Henry was three or four, would watch her undress, watch her bathe and instruct her how to behave
sexually when she was bathing while he would masturbate.  This foster brother progressed from fondling
her to oral sex to intercourse when Ms. Henry was 6-7.  Another foster brother, Scott, also molested her.
Ms. Henry stated that it "didn't occur to me that this didn't happen in families."  She indicated, "I
remember thinking I only had worth if someone was getting something from me.  It gave me self-worth."

She was also gang raped at the age of eleven by a group of older teenagers who were friends of her foster
brothers'.  Of the five older boys that were present, four engaged sexually with her.  She said, "It never
occurred to me to report it" because "I was public property.  I didn't have personal space."  She denies any
other childhood sexual abuse.  She was never molested by any adult family members or friends of the
family.  However, she does report that at the age of thirteen, she spent the night at a girlfriend's house and
her girlfriend was being molested by her stepfather and on one occasion the stepfather molested her.  The
multiple incidents of childhood sexual victimization has caused long term maladjustment, to be discussed
below.

Her medical history is unremarkable.  She reports no history of serious illnesses.  Her only surgical
procedures were C-sections for her first and third children.  She reports a number of childhood injuries, one
of which resulted in a fracture - she was twelve when she fractured her arm falling out of a tree fort.  When
she was younger she stepped on a rusty nail.  She reports a number of other trips to emergency rooms but
"no admissions."  She also had a number of burns to her hands and arms.  She denies any history of self-
inflicted injuries either by suicide attempt or self-mutilation.  She reports no history of medical
hospitalizations other than giving birth three times.

She denies any current problems with her health.  The only medication currently prescribed to her is to help
regulate her menstrual cycle.  She has never been prescribed a psychotropic medication for an anxiety,
mood, psychotic or sleep disorder.  She has never previously been evaluated by a mental health
professional except related to child protection matters and an early history of learning difficulty.  She has
never been psychiatrically hospitalized.  She has previously undergone some counseling in association with
alleged physical and sexual assaults within her first marriage when she was still in Canada.  In addition, she
is and has been in individual counseling over the past seven months (with Francine) at Sierra Vista.  She
started Parents United five weeks ago attending each Monday evening.  She has been through stress
management and anger management and is just starting an assertiveness training group with Sierra Vista.

She has never been in a treatment program for drug or alcohol abuse.  She states that she drinks alcohol
rarely, last consuming alcohol three nights ago but before that she'd had nothing to drink since New Year's

-4-

Henry Defense 000471

Re:    In the Matter of Liam Alan Henry                                        May 31, 2014
       Court No.: 516916

Eve 2011. She denies any history of drug abuse, stating even though marijuana was legal in Canada, she had no interest in it. She has never smoked cigarettes either.

She was never placed in a group home or foster home. The only out of home placement occurred when she stayed at her maternal grandmother's for two months during a period when he mother was particularly irritable and critical.

She is a 1998 graduate of Turner Fenton Secondary School in Brampton, Ontario, a suburb of Toronto. She completed her Associate of Arts degree in 2000 at Sheridan College in Brampton, Ontario. In 2002, she started a Bachelor of Fine Arts program at York University in Toronto but became pregnant after two years of school. She then returned after her first pregnancy for a year but became pregnant again. She states that she is 13 units shy of her Baccalaureate degree. Her GPA at York University is approximately 3.8.

Her employment has consistently been in childcare. Her most recent employment was an attempt to run a daycare out of her home, an effort that ended upon the arrests associated with this case.

Her first marriage was to Adam Pearce – the marriage occurred on December 31, 2004. They separated in 2008 and were divorced by 2010. She married her current husband, Adam Henry, in October 2011. She indicates she has no plans to reconcile with her husband. Two children were born from her first marriage - they are her son Aidan, age 8, and her daughter Siovhan, age 6. She has a son, Liam, age 7 months, from her current marriage. Aidan and Siovhan are with their father in Canada and are not involved in the current reunification process.

Ms. Henry denies any history of prior arrests. She denies any history of moving vehicle code violations. She denies being the subject of any criminal investigation. This reportedly is her first contact with the criminal justice system in Canada and the United States.

MENTAL STATUS EXAMINATION
It had been previously noted by others that Ms. Henry tends to be dramatic in her presentation. I did not find her particularly dramatic but noted that she appeared to enjoy the reporting of her many difficult life events. She spoke of these difficulties in a nonchalant manner (I would not use the term nonchalance to describe her presentation when talking about the removal of her children). Her incongruent enjoyment in discussing many of the difficulties she has experienced may be related to other forms of exhibitionistic dynamics that have contributed to this situation, to be discussed below.

There are no signs or symptoms of any major mental disorder. That is, she denies any history of auditory or visual hallucinations and displays no behavior to indicate that she is hallucinating. She expresses no delusional beliefs. There is no history of expressing delusional beliefs. There is no indication of loose associations, thought blocking, racing thoughts, flight of ideas or any form of thought disorganization. She was dressed casually for her appointment but appears to be attentive to her hygiene. Her speech is normal in volume, rate, tone, prosody and articulation. She is precisely oriented to time, place and person. Her affect or emotional display seemed a little forced and not entirely genuine at moments but was generally normal in range and intensity and congruent with the content of her remarks and the context of her situation. While she reports a considerable amount of childhood and adult unhappiness, she has no history of a major disturbance in her mood - she has had no periods of sustained depression with vegetative signs. She has had no history of mania or hypomania.

She reports that anxiety is a significant clinical problem for her but she does display any noticeable clinical

-5-

Henry Defense 000472

signs of anxiety now.  She reports, however, what may be panic attacks that started after her children were removed. The frequency of these attacks had been every other day at first but now they have reduced to one every other week. She reports no significant phobias other than a fear of spiders and closed spaces.  Her sexual trauma history has resulted in reoccurring nightmares that appear to be thematically related to her history of childhood sexual abuse, all of which has been exacerbated by the current situation.  There does not appear to be any intrusive daytime imagery associated with her victimization but the nightmares along with evidence of hyperreactivity she experiences in listening to stories from others in the Parents United groups indicate that she has elements, if not the full features, of a posttraumatic stress disorder.  She also has a history of eating disordered behavior that started during puberty. She apparently was highly valued as a young dancer until her body started changing at puberty. In response to her dance teacher's critiques, she started to diet excessively.  After she fainted and her father realized what was going on, she stopped starving herself.  Once in high school, however, she engaged in problematic eating and purging for two years. She notes that, "I haven't been comfortable with my body since puberty."

## PSYCHOLOGICAL TEST RESULTS

Ms. Henry provided an unusual combination of responses on the MMPI-2 that is sometimes associated with noncredible reporting of various symptoms. Such over-reporting is unusual for a parent going through a parental capacity evaluation where usually there is more of an attempt to under-report symptoms.  Ms. Henry's heightened reporting seems likely to reflect the amount of internal distress she is currently experiencing.  She is also motivated to report and display her distress (this is sometimes found with individuals who are newly involved in psychotherapy).  There is evidence of some under-reporting in which she tries to present herself in a very positive light by denying several minor problems that most people readily acknowledge.  This level of virtuous self-presentation may reflect a background that stresses traditional values.

Ms. Henry reports feeling sad and unhappy, and is very unhappy with her current life circumstances. Her testing suggests that she is depressed, which is contrary to her clinical presentation. She reports lacking confidence in herself and feeling useless. She experiences a considerable amount of self-doubt, insecurity and feelings of inferiority. At this time she appears to be stress-reactive and prone to worry. She reports various negative emotional experiences.  She also reports feeling constantly anxious, feeling that something dreadful is about to happen to her, being frightened almost every day and having frequent nightmares. She also reports some feelings of heightened excitation and energy, however, this was not apparent clinically nor is it apparent in her history. It is not surprising that she reports conflictual family relationships and lack of support from family members in her test replies.

Her level of emotional distress is likely to motivate her for treatment. Helping her to manage her stress would be an appropriate initial target but other targets include her low self-esteem, self-doubt, faulty stress management, heightened negativity and pervasive anxiety.  Her level of distress may also be ameliorated by mood stabilizing and/or antianxiety medications.

Keeping in mind that the HDS scoring system was based on studies from workplace environments, with that caution in mind her scores nonetheless suggest that others may see her as being too critical at times and as a person who over-reacts to difficult situations. At times she will seem defensive and sensitive to criticism. A prominent characteristic is her tendency to be generally conservative and very worried about making mistakes. This would contribute to her being unassertive and fretful. She is reluctant to make decisions. She does not want to make mistakes and get into trouble. She is excessively eager to please others to gain their approval and to maintain cordial relationships with others. People like her tend to be

-6-

Henry Defense 000473

Re:   In the Matter of Liam Alan Henry                                    May 31, 2014
      Court No.: 516916

pleasant, agreeable, compliant and usually make a very positive first impression but upon longer acquaintanceship their reluctance to make decisions on their own may create interpersonal difficulties.

With the same caution for the HPI as with the HDS, Ms. Henry tests as a highly sociable, outgoing individual who at times is attention-seeking and impulsive. She likes to be a center of attention. She wants to be recognized and attended to. She also tends to be friendly and highly sensitive to the interpersonal environment in which she finds herself. She is usually organized, dependable and thorough. She follows rules well. She tends to be inquisitive and interested in understanding things. She tends to enjoy education and will perform well in a training environment.

## ADDITIONAL AREAS OF ASSESSMENT

Due to the nature of the circumstances leading to this referral, areas of Ms. Henry's sexuality were explored. She describes herself as an "exhibitionist." Starting in college when she was 20 years old, she would go into public places and display herself sexually for the "thrill' of maybe getting caught." In addition, she noted she had a bedroom window in her residence that backed onto another apartment in which there was a bachelor. She intentionally would only partially close her blinds when she was getting ready for bed and would either undress or be naked in front of the blinds hoping to be seen by her bachelor neighbor. She provided another example of being in a computer lab and masturbating under her skirt primarily because there was a male there watching her that was important for her arousal. She said, "I got off on that." With her first husband, they would have sex in cars or in public parks and while no one would generally be around, the possibility of being seen "provided an edge." She stated, "I don't like public places anymore." She has enjoyed being photographed or videotaped in the nude, taking a shower or engaged sexually. Of course, there is an abundant amount of alleged exhibitionistic behavior by Ms. Henry that is associated with the criminal charges, an area she preferred to avoid in compliance with her criminal attorney's advice. These allegations link this area of inquiry to the referral question.

In addition to her exhibitionistic history, she said, "I get off on other people's kicks." As an example, she said in the past that she has had partners who were violent in bed and who "were pleasured" by her pain. She provided some example. She stated, "I wouldn't involve someone else if it was nonconsensual." She then added, "Whatever gets a partner off, I will do," and confirms that she continues to have an interest in "mild and consensual bondage." Her sexual interests likely have played a substantial role in the current legal circumstances.

Exhibitionistic Disorder is highly unusual in females. The criteria for the diagnosis, however, fit Ms. Henry. The criteria (DSM-5 302.4) include:

- *Over the period of at least 6 months, recurrent and intense sexual arousal from the exposure of one's genitals to an unsuspecting person, as manifested by fantasies, urges, or behaviors.*
- *The individual has acted on these urges with a nonconsenting person, or the sexual urges or fantasies cause clinically significant distress or impairment in social, occupational or other important areas of functioning.*

## FINDINGS AND RECOMMENDATIONS

Treatment of a paraphilia (i.e., sexual deviation) is not my area of expertise. It is generally known with the male exhibitionist that it is a chronic disorder with a high rate of recidivism. It may follow a similar course with a female with exhibitionistic disorder. Inasmuch as Ms. Henry demonstrates the essential features of this disorder, and given it's rational linkage to behaviors that resulted in Ms. Henry's arrest, an additional treatment goal for her reunification program should include targeted treatment for this disorder. I have no

-7-

Henry Defense 000474

Re: In the Matter of Liam Alan Henry
Court No.: 516916

May 31, 2014

reason to believe that Parents United or Sierra Vista personnel, like me, have the necessary training and education to successfully treat this condition.

The remainder of her reunification program is appropriate for her treatment needs to successfully reunify with her son. You should consider providing this report to her Sierra Vista counselor for the detail it contains, particularly the psychological testing results, as it can inform her counselor's treatment planning. How to measure Ms. Henry's progress to determine if she will be able to protect her child and avoid the circumstances that caused him to be removed from her care would best come from regular reporting from the treatment providers who offer the services she needs, particularly the specialist who will treat her exhibitionistic disorder, if that specific service is available to Ms. Henry (I don't have knowledge of available providers for this condition). This provider's prognosis and treatment progress, given the chronic nature of exhibitionism, would be particularly important to your referral questions.

I hope this report is helpful. Thank you for the opportunity to provide this evaluation.

Sincerely yours,

Philip S. Trompetter, Ph.D.

Philip S. Trompetter, PhD, ABPP
Clinical Psychologist
PSY 3827

PST:kw

-8-

Henry Defense 000475

**D. Exhibit 4: Angele Henry Interview with Det. Moore**

# CTS Reporting, Inc.

RECORDED INTERVIEW OF

ANGELE HENRY

UNITED STATES vs ADAM ALAN HENRY

CONDUCTED ON: SEPTEMBER 24, 2013



cts-reporting.com

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                       -- o0o --

4                                    CERTIFIED COPY

5   UNITED STATES OF AMERICA,

6           Plaintiff,

7     vs.                          No. 1:13-CR-00409 AWI-BAM

8   ADAM ALAN HENRY,

9           Defendant.

10  _____

11

12

13

14      REPORTER'S TRANSCRIPT OF RECORDED INTERVIEW OF

15                    ANGELE HENRY

16                 SEPTEMBER 24, 2013
         RECORDING TIME:  9:37 A.M. TO 10:40 A.M.
17
                 CONDUCTED BY:  DET. BRITTON MOORE
18               LOCATION:  CERES POLICE DEPARTMENT

19

20

21

22

23  TRANSCRIBED BY:
    SALLY ANNA FRITS
24  CA CSR CERTIFICATE NO. 11709
    OUR FILE NO.:  2470
25

```
 1                          *  *  *  *  *

 2                      REPORTER'S TRANSCRIPT

 3                          *  *  *  *  *

 4   BY DET. MOORE:

 5        Q.   Here's your water, Angele.  Hang on.  I'm going

 6   to grab a notepad.  I'll be right back.  Okay?

 7        A.   Okay.

 8                    (Det. Moore exited the room)

 9                    (Det. Moore entered the room.)

10   BY DET. MOORE:

11        Q.   Okay.  Are you already ready already?

12        A.   (Inaudible).  I know that everything's usually

13   positioned because of the camera, but I have a little bit

14   of OCD so I moved the table just a little.

15        Q.   Okay.

16        A.   (Inaudible).

17        Q.   Yeah, no, you can -- you're -- whatever will make

18   you comfortable.

19        A.   Okay.

20        Q.   I'm comfortable.  You're comfortable.  We're all

21   comfortable.

22             Okay.  First off, I understand that your name is

23   spelled Angele with an "e" at the end?

24        A.   Correct.

25        Q.   And your last name is Henry?
```

1       A.   Correct.

2       Q.   What's your maiden name?

3       A.   Brennan, B-R-E-double-N-A-N.

4       Q.   First off, you understand that you're not under

5    arrest.   Right?

6       A.   Yes.

7       Q.   You came here on your own free, as a scheduled

8    appointment to meet with me.   Today's Tuesday.   And you can

9    leave at any time.

10      A.   Okay.

11      Q.   You don't have to talk to me.

12      A.   Okay.

13      Q.   So, you know, if you go out this door, you just

14   go down the hallway, and you're in the lobby again.

15      A.   Okay.

16      Q.   And you know how to get out from there.

17      A.   Fair enough.

18      Q.   Sound good?

19      A.   Sounds good.

20      Q.   Okay.   So Brennan's your maiden name?

21      A.   Correct.

22      Q.   And what's your birthday?

23      A.   November 10th, 1979.

24      Q.   And I understand that you're from Canada.

25      A.   Yes.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1      Q.    How long have you been in the United States?

2      A.    Two years and 15 months.

3      Q.    So what brought you to the United States?

4      A.    Adam.

5      Q.    How'd you guys meet?

6      A.    We met online --

7      Q.    Okay.

8      A.    -- and became really good friends.  We sort of

9   helped each other through some bad times.  I had a bad ex

10  that I was, you know, going through court and all kinds of

11  stuff.  And he sort of became a really good friend.  And

12  then I came out just to sort of get away from all the

13  stress and drama once everything had come to conclusion at

14  home.

15     Q.    Uh-huh.

16     A.    And came out and hung out and had an amazing

17  three weeks.  And then a couple months later, we were, like

18  -- we both available, both a little less stressed a lot.

19     Q.    Uh-huh.

20     A.    And I started came out again to visit more

21  romantically just to sort of see if we can work as more

22  than friends.

23     Q.    And when -- when was this?

24     A.    2009.

25     Q.    So two thousand -- when did you first meet him

1    online?  What year was that?

2         A.   Five years ago, so what's that?  What is that?

3    Put it at --

4         Q.   We're in 2013.  So, yeah, 2008?

5         A.   Yeah.

6         Q.   And then you came out to meet him sometime in

7    2009?

8         A.   Uh-huh.

9         Q.   Okay.

10        A.   I could be off but --

11        Q.   Okay.

12        A.   -- it's thereabouts.

13        Q.   Thereabouts.  And then --

14        A.   If you need corroborating evidence, I can get my

15   passport document.

16        Q.   No.  No.  I'm just talking with you, trying to

17   get an idea of --

18        A.   I'm terrible with dates, so I'm just saying...

19        Q.   I am too.

20        A.   If I'm wrong, I apologize.

21        Q.   I'm horrible with dates.

22        A.   To the best of my knowledge.

23        Q.   Dates and names -- I'm probably going to start

24   calling you something else here.

25        A.   I'm terrible with names too.  Unless I've shaken

```
 1   your hand and --

 2        Q.   Uh-huh.

 3        A.   -- looked you in the face, and, hey, I'm Bob --

 4   but ten times --

 5        Q.   Yeah.   There must be a certain number where you

 6   say the name and then you start to remember.

 7        A.   Yeah.   Hopefully dementia quits.   But before

 8   that, it's, like, hmmm, who are you again?

 9        Q.   Yeah, who are you?

10        A.   I know we've met like 20 times, but one more

11   time.

12        Q.   So you're thinking in 2009 is when you came out

13   to visit?

14        A.   Yeah.

15        Q.   Roundabout.

16        A.   Yeah, 2009.

17        Q.   Then -- then -- then what happened?

18        A.   We hit it off.   We had a great time.   I started

19   coming out about every other month --

20        Q.   Uh-huh.

21        A.   -- for about a year.   In 2010 -- I think January

22   2010, I brought the kids out for six weeks --

23        Q.   Uh-huh.

24        A.   -- did Disneyland, you know, did mount -- or to

25   the redwoods, just all over the place, just to sort of see
```

1    how the family could work --

2         Q.   Right.  Kind of like a test time?

3         A.   Yeah.  And, actually, had like a good time, a

4    good long chunk of time where, you know, the honeymoon

5    stage, the initial, hey, he's really cool would wear off

6    with the kids --

7         Q.   Right.

8         A.   -- and he's-a-jerk would set in.

9         Q.   Uh-huh.

10        A.   Or they, hey, I really like him.  It was just

11   sort of getting to a routine.  And after the six weeks, the

12   kids just were having a great time, did not want to go back

13   to Canada.  And Adam and I were clicking really well into a

14   real good routine.  Okay.  So this could -- this could

15   work.

16        Q.   Uh-huh.

17        A.   We went back to Canada and started talking

18   seriously and just really went through the whole, you know,

19   what are your morales, what are your ethics, what are you

20   goals for life, what are your (inaudible) strategies.  You

21   know, it was basic -- basically like a three-day

22   interrogation where I just fired off question after

23   question:  What would you do in this scenario?  What would

24   you do in this scenario?  And if a kid came up and did

25   this, what would you say?  How would you deal with that?

1    Q.    Uh-huh.

2    A.    And so there's just -- you know, and he was

3   really good with me asking and just answered everything

4   honestly and sat there and put up with being drilled for

5   three days.

6    Q.    Uh-huh.

7    A.    And then he turned around and had a few

8   questions.  And, like, okay, so there's -- there's --

9   there's potential for compatibility.  There's potential for

10  a future here.

11   Q.    Uh-huh.

12   A.    I came out again in April, just on my own, and

13  sort of began (inaudible) to live, you know, checked out

14  school districts and things like that, and just really see

15  the logistics of moving down here.  And so I came down.

16  And while I was down here, Adam proposed.  And went back

17  home.  And he came up (inaudible) to my family and met

18  everybody and, you know, hey, this is who I am, and

19  answered all their questions, and there was quite a few

20  questions for the guy that every -- no one had met yet.

21  And then we -- the kids and I came back that summer in

22  2011.

23   Q.    Uh-huh.

24   A.    The kids and I came here.  We were going to spend

25  the summer here and just figure out where we're going.

1       Q.    Uh-huh.

2       A.    While we were down here, it was just one of

3  those, you know, we don't want to leave.  We don't want to

4  go.  I called USCIS and asked for, you know, hey, what's

5  the process if we don't want to leave?  And, you know, had

6  a huge packet of paperwork sent to the house and --

7       Q.    Right.

8       A.    -- you know, we ended up getting a place and

9  started talking about what we were going to do next.  And,

10  okay, well, you know what?  I don't want to go home, and I

11  don't want this to end.  So we went out and had a few

12  friends go with us and got hitched and made it all --

13      Q.    So when --

14      A.    -- legal, official --

15      Q.    -- when were you married then?

16      A.    October 2011.  Please don't ask me for the exact

17  date.  I'm terrible with them.  Just don't tell Adam I

18  forgot.

19      Q.    I won't tell him.

20      A.    He probably doesn't know the exact date either,

21  I'm willing to bet, because he's terrible with dates too.

22  I know it's October of 2011.

23      Q.    Okay.

24      A.    That's the part I know.  Because we went a couple

25  of times.  The first time we went --

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1      Q.   So when did you actually finally move out here?

2      A.   We moved out here that August.

3      Q.   Before 2011.  So August 2011?

4      A.   August 2011.

5      Q.   Okay.

6      A.   We didn't technically move here.  We came out

7   here for the summer when (inaudible) school.  That all

8   started.

9      Q.   Okay.  So 2011, spent the summer.  You were here

10   with the kids.

11      A.   And then it just was, hey, you know what?

12   (Inaudible).  And I called the USCIS --

13      Q.   So you stayed -- when that went on, you stayed

14   here?

15      A.   (No verbal response.)

16      Q.   Okay.

17      A.   So we didn't intend to move here.

18      Q.   Okay.

19      A.   But once I was here, I called the immigration, am

20   I allowed to stay?  Do I -- do anything I need to do?

21   Well, you can't work here without a green card.

22      Q.   Uh-huh.

23      A.   Okay.  I asked if I could enroll my kids, and,

24   absolutely, you can (inaudible) education.  Okay.

25      Q.   Okay.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

```
1      A.    Yeah.

2      Q.    So you've been here since, basically, the summer

3   of 2011?

4      A.    Yeah.

5      Q.    Okay.

6      A.    Yeah.  I haven't been back home since then.  I

7   (inaudible).

8      Q.    So basically two years?

9      A.    Yeah.  Is it two?  Yeah, 2013.

10      Q.    Yeah, and it's now --

11      A.    (Inaudible).

12      Q.    -- pretty much just -- the summer just ended, so

13   it's pretty much been about two years --

14      A.    Yeah.

15      Q.    -- and a little bit of change?

16      A.    Yeah.

17      Q.    Okay.  Tell me about your ex-husband.

18      A.    What do you want to know?

19      Q.    Who's the father of your kids?

20      A.    Adam --

21      Q.    Are they the same father for both of them?

22      A.    Yes.

23      Q.    Okay.

24      A.    Sebastian Alan -- Edgar Alan -- Sebastian Alan

25   Edgar Pierce, number something.
```

```
 1      Q.   Sebastian --

 2      A.   Adam Edgar Pierce, and there's a number in there.

 3      Q.   A long history of this name?

 4      A.   Yeah.  It's following aristocracy.  He's from --

 5   he's from england.

 6      Q.   Okay.  Is he living in England now?

 7      A.   No.

 8      Q.   He lives in Canada?

 9      A.   No, he's not allowed to travel because he's

10   (inaudible) jail time (inaudible).

11      Q.   What did he do jail time for?

12      A.   Beating my son and eventually raping me.

13      Q.   So child abuse?

14      A.   Sexual assault.  I have a fun history.  What else

15   do you want to know?

16      Q.   What do you mean by "sex assault"?

17      A.   He raped me.  I don't know how else to -- we were

18   having some problems in our relationship --

19      Q.   Uh-huh.

20      A.   -- because he was extremely aggressive.  We had

21   sort of separated and were in separate rooms, trying to go

22   through counseling, trying to figure some things out, and

23   trying to decide what the best thing was (inaudible) --

24      Q.   Uh-huh.

25      A.   -- what the best thing -- Siobhan was just -- I
```

```
 1    don't know -- I don't think Siobhan was born yet at the

 2    time.  But we were working on trying to figure out how we

 3    were going to do things, because none of us wanted to be

 4    part-time parents --

 5         Q.   Uh-huh.

 6         A.   -- but we lived together.

 7         Q.   Uh-huh.

 8         A.   And I was trying to figure out what to do.  And

 9    he decided that it was well within his right to come into

10    my room and force himself upon me and hold me down and

11    (inaudible).

12         Q.   So he was convicted?

13         A.   Yes.

14         Q.   And sentenced?

15         A.   Yes.

16         Q.   And he's in custody right now?

17         A.   He is out on -- he is trying to get -- I'm

18    terrible with terms too.  He's trying to get --

19         Q.   Is he in custody or out of custody?

20         A.   He's out of custody at the moment --

21         Q.   Okay.

22         A.   -- as of --

23         Q.   So he's on (inaudible) thing?

24         A.   He's under house arrest at the moment.

25         Q.   House arrest, okay.
```

```
 1     A.   So he's not allowed to leave the house.

 2     Q.   Does he have contact with the children?

 3     A.   No.  He signed over all parental rights in two

 4   thousand -- I think it was two thousand --

 5     Q.   Do you know his birthday?

 6     A.   August 23rd, '77.  Wow.  That came out.

 7     Q.   Okay.  So let's fast-forward.  We're here in

 8   California --

 9     A.   Yeah.

10     Q.   -- with Adam Henry.

11     A.   Yep.

12     Q.   You guys are married?

13     A.   Yep.

14     Q.   When does he start work at Lock-N-Stitch?

15     A.   He starts at 7:30.

16     Q.   No.  I mean, when did he employ -- was he

17   employed before you met him?

18     A.   Oh, yeah, he was employed for years before I met

19   him.

20     Q.   Okay.

21     A.   He's been there, I think, eight years now.

22     Q.   Uh-huh.

23     A.   I think he just did his eighth anniversary a few

24   months ago.

25     Q.   Okay.  And what about all the computers?  I mean,
```

Case 1:13-cr-00409-ADA-BAM  Document 348  Filed 11/05/21  Page 138 of 189
UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1    you know, there's a bunch of computers in your house.

2        A.    Oh, people stop by all the time, like, hey, can

3    you fix this?  And he'll spend a while looking at it,

4    saying here's what your system looks like, here's what we

5    can fix, here's what we can't fix.  And if they decide it's

6    better to go and buy a new one, they leave their crap

7    there.  So he's picked up computers and hard drives and

8    parts and monitors and --

9        Q.    Kind of like collecting stuff --

10       A.    Yeah.

11       Q.    -- as he goes along?

12             So he does sort of computer home repairs.

13   (Inaudible) pay for it?

14       A.    It's not paid.  It's just friends and family will

15   stop by, and they'll just -- I mean, I'm talking all kinds

16   of (inaudible) crap.  They'll bring telephones.  They'll

17   bring computers.  They'll bring laptops.  They'll bring

18   video cameras.

19       Q.    Uh-huh.

20       A.    Just -- he's always getting people -- anything

21   that's wired --

22       Q.    Uh-huh.

23       A.    -- people will just come in.  There's some --

24       Q.    Can you give me some names of the people who have

25   dropped this stuff by.

1      A.    I know Rob Todd.   Robert Todd dropped off a

2   laptop.   I know there's Josh -- I don't know his last name.

3   A guy named Josh, who used to be a roommate of Adam's.   He

4   can give you -- probably give you his last name.   They

5   lived together for a few years when he lived in Fresno

6   before I came along.

7      Q.    Uh-huh.

8      A.    Everyone -- I never actually met the guy but

9   every once in a while there will be a new piece of computer

10  equipment.   (Inaudible) look at that for Josh, something

11  like that.   And I know there's quite a few hard drives that

12  when he moved out, it was just a stack of hard drives.   Two

13  really old big box monitors and a tower that he just left

14  when he moved out and --

15     Q.    Uh-huh.

16     A.    -- Adam's a pack rat, so he just -- he moved this

17  crap with him as he's moved.   Most of the stuff in the

18  garage is not his.   It's stuff that he just --

19     Q.    So would it --

20     A.    -- acquired.

21     Q.    -- would it be safe to say that Adam Henry is

22  pretty well versed in computer technology?   I mean, he --

23  he understands computers quite well himself?

24     A.    He understands the physical mechanics of them

25  really well, but he can fix anything with a wire.

1    Q.   Uh-huh.

2    A.   He's pretty good at moving around them.  He's not

3    the -- he's terrible at programming.  Like, that's not his

4    schtick, but he's great with the body of it, like the

5    physical materials.

6    Q.   How well are you with computers?

7    A.   I'm sorry.  I know that you push the big circle

8    button with the line on it.

9    Q.   Uh-huh.

10   A.   And then if you learn what the icons are on your

11   front page, like on your main screen, you can do cool

12   stuff.

13   Q.   So it would be safe to say that you don't have a

14   lot of technical --

15   A.   I really --

16   Q.   -- knowledge about computers?

17   A.   I really don't.

18   Q.   Okay.  What --

19   A.   I know that -- pretty much I know how to do the

20   stuff I need to do.

21   Q.   So Adam is pretty good with computers then, as

22   far as hardware?  He knows hardware quite a bit?

23   A.   He's excellent with hardware.

24   Q.   What about software?  I mean, he is an I.T.

25   professional.  He's the I.T. manager for a pretty

 1   significant company.

 2        A.   Ummmm...

 3        Q.   I mean, he's in charge of making sure that all

 4   the software's running.

 5        A.   Well, everything's --

 6        Q.   All the networking is going proper, right?

 7        A.   Yeah.  He's a -- he's pretty savvy.  I've never

 8   really had --

 9        Q.   I mean, so much so that people are bringing by

10   stuff for --

11        A.   Yeah.

12        Q.   -- him to fix.  So he's their go-to guy.

13        A.   And he's one of the people that if he doesn't

14   know how to fix it, he knows how to get the answers.  So he

15   might not know a lot about the software stuff, but he knows

16   enough to know who to ask.

17        Q.   Uh-huh.

18        A.   I believe he's got some colleagues that he would

19   call up.

20        Q.   Uh-huh.

21        A.   He's got some forums he checks out for data.  So

22   if there's ever something that comes up at work -- and it

23   happens quite often where he'll just be like, oh, no idea

24   what to do with that.  But he can get the answers.

25        Q.   So what computers have you had access to at that

1    house?

2        A.   I (inaudible) access to.  I technically have

3    access to any of them.

4        Q.   Uh-huh.

5        A.   I know that there's a lot of passwords and stuff,

6    and I just never asked what the passwords are.

7        Q.   Uh-huh.

8        A.   His computer and the backup -- the backup drive

9    is password protected.  I've never really asked because I

10   know it's --

11       Q.   Whose computer?  Are you talking about the one

12   that's in the living room by the fish tank?

13       A.   Yeah.  Yeah.

14       Q.   That's his computer.  So you don't access that

15   computer?

16       A.   No.  It's got a password on it.

17       Q.   Uh-huh.

18       A.   And I know he uses it for work to access network

19   and all like that and --

20       Q.   To remote into it?

21       A.   Yeah.  And it's logging into the data server, the

22   e-mail server --

23       Q.   Uh-huh.

24       A.   -- and the work network.  And because of that,

25   I've never tried to get on to his computer.

```
 1      Q.   Sure.

 2      A.   And I know enough to know that I can break

 3 anything.

 4      Q.   Uh-huh.

 5      A.   So I wouldn't want to get on there and just --

 6      Q.   What about --

 7      A.   -- (inaudible).

 8      Q.   -- the computer that's in your guys' bedroom?

 9 Are you -- do you have the password to that one?

10      A.   Is it password protected?  I didn't know.

11      Q.   I'm asking you.

12      A.   Honestly, it's got -- it's got a new -- the --

13      Q.   Operating system?

14      A.   Yep.  And -- so, I mean, it's --

15      Q.   So you never use that computer?

16      A.   I've used it in a sense of -- I'll be, like, you

17 know, it's -- it's where we have some of our adult

18 entertainment.  And it will be sort of, hey, (inaudible)

19 put on something (inaudible) and so he'd just have it set

20 up, and I'd come in and there'd be, you know, just a list

21 of, hey, let's watch that.

22      Q.   So --

23      A.   (Inaudible).

24      Q.   -- you like to watch adult pornography?

25      A.   A very blunt question.
```

```
 1      Q.    You brought it up, so...

 2      A.    Sorry.  Yes.  Yes.  Sorry.  Yeah.

 3      Q.    What kind of adult pornography do you like to

 4  watch?

 5      A.    Me personally?

 6      Q.    Uh-huh.

 7      A.    I kind of like -- oh, awkward.

 8      Q.    I'm sorry.  I don't mean to be awkward.

 9      A.    I know.

10      Q.    It's kind of the subject matter that we're

11  talking about.

12      A.    Yeah.

13      Q.    Just kind of the subject of the day.

14      A.    Yeah, I understand.  Sorry.  I -- (inaudible) my

15  dad, so...

16      Q.    Was your dad a police officer?

17      A.    For 32 years.

18      Q.    Okay.

19      A.    So it's the whole -- I know you're not connected

20  to my dad's (inaudible), going to get back to --

21      Q.    Yeah.  Yeah.

22      A.    -- him at the same time.  It's an awkward

23  conversation.

24      Q.    Especially since you and I are the same age,

25  roughly, so I couldn't be your dad.  I'm 36.
```

1      A.   Yeah, okay.  Fair enough.  Personally, I like

2   stuff where the female is partly attired and the guy is

3   not.

4      Q.   Like cos play -- like costume play?

5      A.   Sure.  I mean, not anything crazy and wild and

6   out there, but just, you know, little skirts and --

7      Q.   Uh-huh.

8      A.   -- the -- the -- the passion and intensity that

9   comes with just, you know, hey, we're going to do this now.

10  We're not gonna (inaudible).

11     Q.   Uh-huh.

12     A.   Just, you know?

13     Q.   Uh-huh.

14     A.   I like some of the rougher stuff.  Not like crazy

15  rough.

16     Q.   Uh-huh.

17     A.   Which, unfortunately, is this -- when we start

18  looking for any kind of spanking or anything like that, you

19  end up getting a lot of the rough stuff.  But I -- I -- I

20  kind of like that kind of stuff, (inaudible) place and I

21  enjoy watching it --

22     Q.   Uh-huh.

23     A.   -- not necessarily --

24     Q.   So, like, bondage-type stuff?

25     A.   Mild bondage.

| | | |
|---|---|---|
| 1 | Q. | Uh-huh. |
| 2 | A. | You know, role play with -- with that kind of |
| 3 | thing, but mild. | |
| 4 | Q. | So have you viewed any of those adult videos -- |
| 5 | I'm assuming they're videos? | |
| 6 | A. | Yeah. |
| 7 | Q. | Inside of your bedroom? |
| 8 | A. | Yes. |
| 9 | Q. | On that computer that's in the bedroom? |
| 10 | A. | Yes. |
| 11 | Q. | Okay. |
| 12 | A. | They're not really Adam's cup of tea.  His thing |
| 13 | is more -- he's pretty in his tastes.  He likes role play | |
| 14 | and he likes threesomes, not all -- like not all guy stuff. | |
| 15 | Q. | Uh-huh. |
| 16 | A. | Not really anything crazy.  I was more the one |
| 17 | who was into the more adventurous stuff. | |
| 18 | Q. | Uh-huh. |
| 19 | A. | Not necessarily doing it, but checking it out. |
| 20 | So sometimes he'd try and find the rougher stuff for me. | |
| 21 | Q. | Uh-huh. |
| 22 | A. | It didn't necessarily do anything for him, but.... |
| 23 | Q. | So you prefer to see stuff where the female's |
| 24 | maybe tied up or the male is? | |
| 25 | A. | More where the female is tied up. |

```
 1      Q.   Okay.
 2      A.   And that might be because of my -- my history
 3  that I don't necessarily want to engage in it, but it's fun
 4  to watch.
 5      Q.   Okay.  So would it be safe to say that if we were
 6  to look at what's on that computer, there would be a
 7  significant amount of adult pornography that --
 8      A.   Oh, there will be --
 9      Q.   -- you call costumes-type thing, maybe a little
10  bit of cos play, maybe just outfitty type stuff and then
11  there would be some light bondage on there?
12      A.   There'll be some light bondage on there.  There's
13  going to be a pretty big file called S&S, which is -- you
14  know, it gets a little rougher and I shouldn't say that.
15  But, yeah, it --
16      Q.   So what's the file there for?
17      A.   I -- I enjoy the beginning stuff of it.
18      Q.   Uh-huh.
19      A.   Lighter.  And then it gets --
20      Q.   What does "S&S" stand for?
21      A.   Sex and submission.
22      Q.   Okay.
23      A.   Sorry.  So, yeah, there's that stuff on there.
24  And I've got -- I mean, you went to the house.  You've seen
25  some of the stuff -- some of the toys and stuff we have.
```

 1   We don't use them, but it's stuff I get in hopes that maybe

 2   one day we might try it, but...

 3        Q.   Okay.  How is your guys' sex life?

 4        A.   Before I got pregnant sex was awesome.  It was

 5   great.  We're talking at least every day, maybe every other

 6   day.  And intense and passionate and affectionate and

 7   loving.  You know, it was really a good sex life.  And then

 8   I got pregnant.  Early on it was fine because I didn't

 9   really know I was pregnant.  I didn't have a lot of

10   complications.

11        Q.   How far along are you now?

12        A.   I am due in three weeks.

13        Q.   So you're eight to nine months -- eight months.

14        A.   I'm 37 weeks.

15        Q.   Okay.  So you were saying?  I'm sorry.

16        A.   Sorry.  I started having some complications a few

17   months ago where I was getting some back pain, and I ended

18   up having a kidney infection, which was causing a lot of

19   back pain, and it was causing some problems in my leg.  And

20   so, you know, (inaudible) for that.  But that kind of

21   killed everything.  Everything we tried to do hurt and

22   anytime I got hurt, Adam would just lose interest.  And he

23   would turn into, are you okay?  Anything you want me to do?

24   And he was a lot more concerned.  So we kind of stopped

25   stuff.  And we tried to do things when I didn't hurt, but

1   it was not anywhere near as frequent or creative as it had

2   been in the past.

3      Q.   Have you ever sought out to find adult

4   pornography yourself, or do you just rely on Adam to find

5   it all?

6      A.   I'll be honest.  I've looked up some stuff on

7   Porn Hub and -- not You Tube.  Black Tube, Red Tube,

8   something like that.

9      Q.   Uh-huh.

10      A.   And I've -- I've --

11      Q.   So you've gone to normal adult porn sites that

12   were available on the internet that you can kind of get

13   free stuff?

14      A.   Yeah.

15      Q.   Okay.

16      A.   I mean, it's (inaudible).

17      Q.   So you've never subscribed to a porn --

18   pornographic site?

19      A.   I think we subscribed to S&S a few years ago, and

20   that's where we got --

21      Q.   Sex and submission?

22      A.   Sex and submission.

23      Q.   That's a website?

24      A.   Yeah.  And that's one that Adam specifically

25   subscribed to, to try and get that kind of stuff for me and

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1    (inaudible).

2         Q.    Have you -- are you familiar with Peer-to-Peer?

3         A.    I've sort of heard a bit about it.

4         Q.    As of recently?

5         A.    As of recently.  It's apparently a peer file

6    sharing program --

7         Q.    Yeah.

8         A.    -- where you can get (inaudible).

9         Q.    So before your met the police on Thursday, before

10   that, you had never heard of Peer-to-Peer?

11        A.    I had heard it in passing.

12        Q.    Who did you hear that from?

13        A.    I've heard it from Adam.  I've heard it from

14   different people, techies who, you know, were talking about

15   the program they got or some -- you know, things like that.

16        Q.    Techies -- you know techies?  You know people who

17   are technically --

18        A.    We've got a couple of friends who are techies,

19   and Adam and him will get together and they'll just sort of

20   talk their whole other language.

21        Q.    Have you heard the term "Peer-to-Peer" mentioned?

22        A.    I've heard the term "Peer-to-Peer" mentioned.

23   Again, it's one of those things that (inaudible).

24        Q.    What about Shareaza?  Have you ever heard

25   Shareaza?

1    A.   No.

2    Q.   Okay.  So you've never used Peer-to-Peer then?

3    A.   No.

4    Q.   Have you ever used the program Shareaza?

5    A.   I've never heard of the program Shareaza.

6    Q.   Okay.  About the password-protected areas on the

7  computers, you said there was a file that was labeled S&S.

8    A.   Uh-huh.

9    Q.   What about the other files?  Was there a

10  protected folder there that you were unable to access?

11  Have you ever tried to access it?

12    A.   Yeah, there's a password-protected (inaudible).

13  I know that -- again, I'm not the most -- I know just

14  enough about computers to break just about anything.

15    Q.   Uh-huh.

16    A.   So I know that there's (inaudible) inside --

17    Q.   Uh-huh.

18    A.   -- that I have access to --

19    Q.   Uh-huh.

20    A.   -- and then there's the stuff on the closed side,

21  which is pretty much a duplicate that I can't change.

22    Q.   How do you know it's a duplicate if you haven't

23  accessed it?

24    A.   That's a good question.  I don't know.

25    Q.   So that's what Adam told you?

1    A.    Well, he's had it open in front of me before and

2    said, you know, if there's anything you want to check out

3    here and, you know, they're -- you know, this whatever.  I

4    don't remember exactly what was on it.

5    Q.    So why do you think that there would be a need if

6    you have access to it and he's shown it to you before, why

7    do you think that that should -- that area would be

8    password protected?

9    A.    Honestly, because I have a tendency to go, oh,

10   that's gross, and delete it.  And he sort of is a --

11   because of his job and he's worked with computers for so

12   long, he's paranoid about losing important data, and we've

13   got family videos on there.  We've got stuff that -- the

14   first time we went to Disneyland on there.

15   Q.    So he's protected you from those files for your

16   own good?

17   A.    More for our own good.  Because if I've ever

18   wanted to get into it, he's just -- he'll open it up for

19   me.  It's so much on the --

20   Q.    Have you ever asked him to open up that folder

21   before?

22   A.    Sure.  And I've asked him, hey, can you open that

23   up and pull -- and pull out, you know, this or that.  And

24   he'll open it up and say, hey, what do you want to look at?

25   It's not secret.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

 1     Q.   But he won't tell you the password?

 2     A.   I'm sure he's told it to me.  Again, I'm not --

 3   got the greatest --

 4     Q.   Really?  So he has told you the password before?

 5     A.   I don't know.  He may have.  I can't imagine if I

 6   asked, he wouldn't have told me.  I can't imagine him not

 7   telling me.

 8     Q.   What do you think about child pornography?

 9     A.   I think that is just an absolutely horrific

10   exploitation of children.

11     Q.   What do you think of people -- about people who

12   download child pornography?

13     A.   That's a trick question.  I don't know what the

14   charges are.  I think that people who abuse children,

15   exploit children are just horrendous, and I think that

16   it's -- I think it's horrible.  I think it's terrible.  I'm

17   sorry.  There is a certain -- there's a line there of

18   consent, and it's there for a reason.  And under that age

19   of consent is -- it's there to protect them --

20     Q.   Uh-huh.

21     A.   -- and protect us (inaudible) society as a whole

22   intact and to make sure that you walk into adulthood whole

23   and -- and uncompromised and unashamed and --

24     Q.   So that's what you think about child pornography.

25   But what do you think about people who download child

```
 1   pornography?

 2        A.   People who seek it to download it?

 3        Q.   Uh-huh.

 4        A.   I think it's horrible.  Because it's a gateway

 5   thing to who knows -- who knows what.  I don't think

 6   it's -- I don't think it's morally sound.  I -- I --

 7        Q.   Uh-huh.

 8        A.   -- have issues with that -- tremendous issues

 9   with that.

10        Q.   Okay.

11        A.   I think that considering what's out there and

12   considering the search parameters that are broad,

13   considering a lot of things, I think that average citizens

14   may come across stuff they don't want to see.

15        Q.   And how do you know that?

16        A.   It's just -- it's not so much that I know that.

17   It's just -- for example -- please don't judge me.  But

18   just for example.  I like girls in little skirts.

19   (Inaudible) little skirts that we wear (inaudible)

20   clothing.  Kilt.  You can type in "kilt."  You can type in

21   "kilt" and get a 30-year-old woman dressed up as a school

22   girl.  I can imagine using some of these different sites

23   that aren't necessarily legislated -- you have to be over

24   18 -- and you type in "kilt" and get something that's not a

25   30-year-old woman dressed up as a school girl.
```

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1      Q.   Well, you said that you used -- you searched out

2   pornography yourself.  Have you ever come across child

3   pornography?

4      A.   No.  But I've always gone to completely legit,

5   legal ways.  They're -- they're the easiest ones to try and

6   get access to.

7      Q.   So you'd have to agree there's a ton of -- out

8   there of legit, legal ways to find adult pornography?

9      A.   I wouldn't say there's a ton, but there is -- I

10  don't know.  Maybe there's a ton.

11     Q.   Well, here's the thing.  It almost seems like

12  everything I say, you're almost kind of wanting to cover

13  for Adam a little bit.

14     A.   It's not so much even just Adam.  It's not even

15  just Adam.  I know that there's a lot of people who get

16  music or get MP3s that are not legal.  And, you know, you

17  put in your, hey, I want to get this band.  You type in

18  this band, and you get music from this band.  You get

19  videos of their music.  You get videos of them live.  You

20  get videos of them banging some groupie.  You type in a

21  band's name, you can end up with anything, because there's

22  so much crap out there.  There's so much information.

23     Q.   Well, you seem to be pretty knowledgeable about

24  Peer-to-Peer for not having used it before.

25     A.   My ex used to download stuff on Torrent.

1    Torrent, something like that.  It was an older one.  And he

2    used to --

3         Q.   So what do you think about -- do you think that

4    he was seeking out child pornography?

5         A.   I honestly don't.  And the reason is, after my --

6    everything happened with my ex -- sorry.  My ex also went

7    by (inaudible) sometimes.  (Inaudible).

8         Q.   So let's forget about your ex.  Let's talk about

9    Adam -- Adam Henry.

10        A.   With Adam Henry, I honestly don't.  After

11   everything with my ex, I went through a lot of counseling.

12   I went through a lot of women shelters, just educating

13   myself so I don't end up in the same situation again.  And

14   I've gone into my relationship with Adam eyes wide open.

15        Q.   Uh-huh.

16        A.   Nobody's perfect.  We have fights.  We argue.

17   Not really fights.  But we argue.  We don't always agree.

18   We don't always see eye to eye.  We don't have the same

19   opinions on things.  But at his core, he's a good person.

20        Q.   Uh-huh.

21        A.   And we have talked extensive because (inaudible).

22   We talk extensively about what we like, what we don't like,

23   what we want to try, what we don't want to try, what we

24   want to see, what we don't want to see.  And, honestly, the

25   idea of minors has never come up.

1    Q.    Do you think that if he told you that he wanted

2    to have sex with minors, that you'd be okay with it?

3    A.    No.  I'd kick his ass and leave.

4    Q.    So it would probably be safe to say that you

5    wouldn't bring that up because you'd kick his ass and

6    leave?

7    A.    True.  But there's a certain element of fantasy

8    or talk or role play or -- between husband and wife and you

9    can role play whatever, and his appetite for things that

10   get him excited are things like -- are not those things.

11   They're -- they're --

12   Q.    Okay.

13   A.    -- adults.

14   Q.    Well, let's just say this:  He has downloaded

15   child pornography and he has not only downloaded it from

16   work, but he's taken it from work and taken it to home, put

17   it in a password-protected file from his wife and stored it

18   there.

19         So how about this:  Why do you think that he is

20   using Peer-to-Peer at work when he has nine computers at

21   home that he can easily download Peer-to-Peer there?  Why

22   is he keeping it separate from the residence?

23   A.    Are you honestly wanting me to answer or --

24   Q.    I honestly want you to answer.

25   A.    I would say our -- we have a limited bandwidth at

1    home.  Again, I don't know about any child pornography.  I

2    honestly don't know anything about that.  I've never heard

3    anything about it.  I've never seen it at home.

4         Q.   Which is typical of most wives.

5         A.   Fair enough.  Fair enough.  I'm not trying to --

6    to make excuses for him.  I'm just trying to be honest.

7         Q.   So the answer -- to answer the question:  Why do

8    you think he would download it from work?

9         A.   At home we have a limit of how much bandwidth we

10   can use.  There's two of us using it, and if we download

11   and go over it, you have to pay for it.  At work they have

12   unlimited wireless, so you can download whatever.  Do I --

13   did I know he was downloading porn at work?  No.  Do I

14   think that's an ethical thing to do?  No.  But I could see,

15   hey, afterhours, weekends, or whatever using the wireless

16   to download whatever and bring it home.  Because it doesn't

17   cost over our usage and he can do whatever (inaudible)

18   bandwidth.  I know for a fact that he backs up everything

19   at work.  He backed up the data service.

20        Q.   Uh-huh.  So --

21        A.   And his own computer and (inaudible).

22        Q.   -- basically the short answer to that is for

23   bandwidth purposes.

24        A.   That was --

25        Q.   But why do you think he stores it in a protected

1   file to keep it from you?

2        A.   I don't think it's necessarily to keep it from

3   me, because he backs up his work computer at home.

4        Q.   Okay.  He --

5        A.   It would be --

6        Q.   -- told me -- well, he knows that he has seen

7   child pornography come through, and he's supposedly deleted

8   it.  Yet, he's brought some of it home.  So he knows that

9   that program is downloading child pornography.  He has

10  knowledge of that.  Whether he likes it or not, he knows

11  it's happening.

12           Now, he's taking those files and he's taking them

13  home and putting them in a password-protected area from his

14  wife, knowing that there may be child pornography on those

15  -- on some of those files.

16           Let's also look at this:  He's met you online,

17  only a few short years ago.  You're a single mother coming

18  from an abusive relationship that he met online that has

19  two young children, one of them a young girl.  He's met

20  with you.  Eventually built a relationship.  Eventually had

21  you come over to the United States and marry him.  Now,

22  this is a guy that's downloading child pornography.  Not

23  only that, you guys open up a day care inside your home.

24       A.   Which he was against.

25       Q.   Okay.  Either way, it happened, right?

Case 1:13-cr-00409-ADA-BAM   Document 348   Filed 11/05/21   Page 160 of 189
UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1      A.     Uh-huh.

2      Q.     So now that there's, I understand, two girls that

3   you've had as clients?

4      A.     (Inaudible).

5      Q.     How old are those girls?

6      A.     Six and eight.

7      Q.     Six and eight.  Now you have two -- a six- and an

8   eight-year-old girl coming over, within feet of where he

9   has a computer where he can do child -- child pornography.

10  Is anything that I said not correct?  When you look at the

11  whole picture of it, this is a typical -- absolutely

12  typical of a child predator.  This is like fitting the

13  profile to a tee, Angele.

14     A.     He's never touched my kids.  He's never looked

15  for opportunities to touch my kids.  He doesn't look for

16  opportunities to be around other people's kids.  He doesn't

17  look for opportunities to go to the children's

18  activities --

19     Q.     Uh-huh.

20     A.     -- and be around other kids.  He doesn't look for

21  those opportunities.  As a matter of fact, he looks for

22  opportunities to stay home, to not have to go out and deal

23  with other people.

24     Q.     Is there anything at a point that would make you

25  think -- what would it take for you to believe that he is

1    pedophile?  What would it take?

2         A.   If I saw him looking at someone -- at a minor in

3    a way other than if I --

4         Q.   So you'd have to -- you wouldn't be able to take

5    it from law enforcement's perspective and the years of

6    experience that we have and what we've found and the

7    evidence that we found would mean nothing to you.  What

8    would mean anything to you is if you saw it yourself?

9         A.   I wouldn't say it means nothing.  I wouldn't say

10   it means nothing by any means.  If my kids came up and said

11   they were uncomfortable, I wouldn't be here.  If I saw him

12   looking.  If I -- if he was every week sitting there

13   saying, I'll take the kids tonight.  You stay home.  And

14   then, you know, came home and was all excited.  Or even if

15   he wasn't excited.  But if -- I mean, to be honest, I lived

16   with someone who was not a good guy.  There are things to

17   look for.  There are triggers.  There are behaviors.  There

18   are --

19        Q.   Do you think that maybe you seek out guys that

20   may not be the best guys?

21        A.   I hadn't (inaudible) that yet.

22        Q.   Because here you are faced with -- you have one

23   ex-husband who was arrested for child abuse and rape.  And

24   then now here you go just two years later you have another

25   guy that's been arrested for possession of child

1   pornography.  So, I mean, he was downloading -- let's --

2   let's say he wasn't even downloading (inaudible).

3   Thousands and thousands of -- hundreds of videos to his

4   workplace --

5        A.   Yeah.

6        Q.   -- of adult pornography, let alone the fact that

7   he was downloading a numerous amount of child pornography.

8   Okay.  Do you think that maybe that you might have a little

9   bit of an issue with men, as far as finding -- I mean, I

10  understand your eight months pregnant.  You're about to

11  have this child.  It's a very tough position to be in.  I

12  understand that.  I also understand that you may be in a

13  little bit of denial here, that you may be looking for the

14  right answers.  You may be looking for those excuses.  And

15  I believe Adam is (inaudible) with a ton of excuses, which

16  are complete -- pardon my description -- but --

17       A.   It's not so much --

18       Q.   -- unbelievable.

19       A.   -- it's not so much (inaudible) ton of excuses.

20  It's a matter of --

21       Q.   Uh-huh.

22       A.   -- (inaudible) the first time.

23       Q.   Uh-huh.

24       A.   And so I have been incredibly watchful.  It's not

25  like he's the first person I've dated since.

1      Q.   Uh-huh.

2      A.   He is the first person who had -- had the same --

3  had the same goals and aspirations and parenting styles and

4  -- and -- and expectations for life.  He's not --

5      Q.   So you like the guy.  I get it.

6      A.   I do like the guy.

7      Q.   You like the guy.  I get it.

8      A.   He's an amazing person.

9      Q.   You know, you're married to him, he's your

10  husband, and you're about to have his child.  I understand

11  that.  But you're still looking past some of the facts

12  here.

13      A.   I see what you're saying, and I do see --

14      Q.   And you have his -- you have your children from a

15  previous marriage that you have to be concerned about.

16      A.   Yes.

17      Q.   Okay?  To me, when I talk with you, I feel like

18  you are extremely in denial.  Now, I don't have to convince

19  you.  It's not my job to convince you.

20      A.   Yeah.

21      Q.   Okay?  But this is very curious to me, because

22  this is almost kind of very typical of someone in your

23  position.

24      A.   That they would be trying to figure out --

25      Q.   Trying to find ways to rationalize everything.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1       A.   I don't -- I honestly -- I don't know what it
2   would take --
3       Q.   Uh-huh.
4       A.   -- to have me, you know, say, he's a jerk and
5   leave.  It would take --
6       Q.   A lot?  A lot more than this?  And I'm not saying
7   you have to leave him.  That's not what I'm saying.
8       A.   No, I know.
9       Q.   But I want to -- I want to get to --
10       A.   Social Services has already cleared him.
11       Q.   Right.
12       A.   They talked to the children.  They talked to me.
13   They don't see --
14       Q.   Uh-huh.
15       A.   -- (inaudible) there.  They have a lot of issues
16   when they first walked in.  But after talking to the kids,
17   they -- they -- her terms -- her words exactly were, "I
18   feel comfortable leaving the children with him."
19       Q.   Uh-huh.
20       A.   "I feel comfortable leaving the children here
21   with you."  "I feel comfortable that they are not being
22   mistreated in any way."
23       Q.   Uh-huh.
24       A.   That's a professional who came in expecting to
25   not like the situation.  So it's not just me in denial;

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1   there's a professional that came in --

2       Q.   Well, their -- their -- their No. 1 priority is

3   to keep the children with their mother.  That's their No. 1

4   priority.  If you look at the -- the goal of CPS, their

5   goal is to keep children as close as they can to their --

6   to their biological mother.

7       A.   Yeah.

8       Q.   So it would actually take quite a bit -- it would

9   take probably the children disclosing something for them to

10  be able to take the kids out.  So it's not a matter that

11  they trust and feel comfortable with them there, because I

12  guarantee that6's not the case.  What it is is they don't

13  have the authority to take the kids based on the fact that

14  they -- hold on -- based on the fact that they didn't

15  disclose.  So you're looking at it from a different

16  perspective, as if everything's all hunky-dory and kids are

17  happy and CPS loves having them there.  That's not the

18  case.  The case --

19      A.   (Inaudible) like having them there.  I didn't

20  go --

21      Q.   -- is actually --

22      A.   Hold on.

23      Q.   Okay.

24      A.   I'm not trying to put words in your mouth; don't

25  try to put words in my mouth.

| | | |
|---|---|---|
| 1 | Q. | I won't try to put words in your mouth. |
| 2 | A. | I'm not saying that they walked out and said, |

3  hey, this is a perfect, loving family.

| 4 | Q. | Right. |
| 5 | A. | No concerns at all. |
| 6 | Q. | Okay. |
| 7 | A. | Absolutely have a good time.  Go away. |
| 8 | Q. | Uh-huh. |
| 9 | A. | That's not what I'm saying. |
| 10 | Q. | Uh-huh. |
| 11 | A. | Obviously -- obviously the fact that there was |

12  inappropriate, illegal, and horrendous videos there --

| 13 | Q. | Uh-huh. |
| 14 | A. | -- that it was -- I don't know what was there and |

15  I don't want to know, I'll be honest.  At this point, what

16  I know of him, as transparent as he is at work in the

17  office, the door is always open.

| 18 | Q. | Uh-huh. |
| 19 | A. | His blinds are almost always open.  People are |

20  walking in and out all the time.  His computer at home,

21  he's not up all hours of the night, you know, clicking away

22  on his computer in a dark corner.  His computer at home is

23  right in the frickin' middle of the living room.  Anyone

24  who walks up and rings our doorbell is going to see what

25  he's watching.  I run a daycare from home that's 24 hours.

```
 1   I offer care whenever you need it.  That is my slogan.  I

 2   -- it's -- you know, (inaudible) --

 3       Q.   I thought it was interesting that you said

 4   there's files on there that you don't want to know about

 5   it.

 6       A.   Well, just because you said that they're there.

 7       Q.   Uh-huh.

 8       A.   And I'll be honest.  I don't -- I don't know the

 9   details.  I don't.  I don't -- I know what I was told by

10   him.  I know what I was told by --

11       Q.   When were you told by him, as far as those

12   videos?

13       A.   I was told that he downloaded a bunch of adult

14   videos at work, and this is what I've been told this

15   weekend, that --

16       Q.   Well, you were talking about videos that you

17   didn't want to know about.

18       A.   Because --

19       Q.   So what's I'm asking you about.

20       A.   Specifically the ones that he's charged with.

21   Those videos I know they're there because he came in --

22       Q.   Uh-huh.

23       A.   -- and your words --

24       Q.   Uh-huh.

25       A.   -- were that Adam walked you over and said,
```

Case 1:13-cr-00409-ADA-BAM   Document 348   Filed 11/05/21   Page 168 of 189
UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

```
 1   here's a file where I download stuff.  You typed in and
 2   found child pornography on his computer.
 3       Q.   Uh-huh.
 4       A.   I don't want to know what that video was.  I know
 5   it was a minor.  I don't need to know what was going on.
 6       Q.   When we say "minor, let's get it straight, it was
 7   a child, a small child.  Not just a minor, not under 18.
 8   I'm talking about a child, a very small child, being raped.
 9            So given that information, I don't understand how
10   you could be a mother with small children and not want to
11   know what your husband is looking at.  I don't understand
12   that.  I would think I would want to know.  If I was in
13   your shoes, I would want to know exactly what that was.  I
14   would want to know exactly what he's looking at.  And I
15   think a lot of mothers in your situation would want to
16   know.
17       A.   What do you mean by child, when you say --
18       Q.   I'm not here because they were minors that looked
19   like they could be 16.  I'm talking about 3, 4, 5,
20   6-year-old children being molested and raped.  That's what
21   I'm talking about.  That's why we're here.  This isn't
22   about iffy, questionable stuff.  This is about children.
23   This is about child pornography.  Adult males having sex
24   with children.  That's what I'm talking about.  The same
25   age as your daughter.  That's what I'm talking about.  The
```

1    same age as the children you have in your daycare.  That's

2    what I'm talking about.

3            And for you to tell me that you wouldn't want to

4    know what it is, blows my mind.  And I'm not trying to get

5    confrontational with you.  But I'm trying to let you

6    understand the facts of what is going on in this

7    investigation.

8            Now, we still have a lot of work to do.  I don't

9    know the exact amount yet.  But I'm sure there's going to

10   be a significant amount.  Because I already saw several of

11   them, just on the basic preview that I did on his work

12   computer that were -- that were being downloaded at the

13   time when we went into that business.  There was several

14   being downloaded in progress.  That's not counting

15   whichever ones he collected out of there and took home.

16   Because I haven't gone through all those yet.

17       A.   Oh.  I'm apparently (inaudible) information.

18       Q.   I think he's telling you stuff that, you know --

19   I mean, I'm sure he's trying to minimize it as much as

20   possible.  I can't control that.

21           Can you hang tight for one second.  I'll be right

22   back.  (Inaudible).  Do you want anything else?

23       A.   I'm good.

24       Q.   I'll be right back.

25               (Det. Moore exited the room)

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

```
1                  (Det. Moore entered the room.)

2

3    BY DET. MOORE:

4        Q.   Do you have any questions for me?

5        A.   Not so much at the moment.

6        Q.   Uh-huh.

7        A.   If I could get your card, that would be great.

8        Q.   I can give my cell phone number.

9        A.   Okay.

10       Q.   As a matter of fact, I'll write it down.  Or if

11   you want to put it in your cell phone.

12       A.   I'll put it in my phone here.  Just I am --

13   (inaudible) questions.  Give me your first name.

14       Q.   Britton, B-R-I-T-T-O-N.

15       A.   Last name?

16       Q.   Moore, M-O-O-R-E.

17       A.   And your phone number?

18       Q.   595-6068.

19       A.   That's 209?

20       Q.   Yes.

21            I can't imagine that you would have any other

22   questions for me or anything.

23       A.   Oh, I can think of lots of questions.  I -- I

24   just -- I'm going to need a little bit of time to process

25   some data --
```

1      Q.    Uh-huh.

2      A.    -- so --

3      Q.    So was it basically him telling you that they

4    were maybe around the questionable age and possibly 18?

5      A.    I -- he didn't get specific about what was found

6    when you guys (inaudible).  He told me that he had been --

7    he had mentioned that a Peer-to-Peer program was on there,

8    that stuff had been downloaded, that he backs up his

9    computer -- well, I know he backs up everything

10    (inaudible).

11      Q.    Uh-huh.  Yeah, I think the one video -- one of

12    the videos the first ones that I opened on that folder at

13    home was of a toddler girl.  She was probably about this

14    tall.  And just -- I went right there.  I took title.

15    Right where it was.  And I said, oh, (inaudible) right

16    here.  Anybody with any computer savvy technology -- in

17    fact, anybody without that, you can read in the title what

18    it says describing the video.  You know, this -- this is a

19    guy who has -- who is extremely computer literate, if

20    that's even a term.  This guy knows computers.  He knows

21    about networking.  He knows about file sharing.  He knows

22    about Peer-to-Peer.  He knows what's going across there.

23    It's hard not to.  Once you've -- you've --

24      A.    Seen this?

25      Q.    The fact that -- the amount each -- each has been

1    able to take, there is no way in heck that if somebody

2    found that at work would take any of those to their home

3    without knowing that they're transporting child pornography

4    from one location to another and storing it on a

5    password-protected folder in their home.

6         A.   I know -- I don't know -- there's apparently I

7    don't know.

8         Q.   Uh-huh.

9         A.   There's a lot that has not been shared.

10        Q.   Uh-huh.

11        A.   There's a lot that I'm unaware of.

12        Q.   Uh-huh.

13        A.   That I'm going to -- to get some answers on.

14        Q.   Uh-huh.

15        A.   I do know that every three weeks, he backs up his

16   hard drive there.

17        Q.   Uh-huh.

18        A.   He brings it home.

19        Q.   Uh-huh.

20        A.   He updates it to his -- his stuff.  And I know he

21   backs up the hard drive and kept it locked up in the safe.

22        Q.   Okay.

23        A.   The network, e-mail server and I know it's the

24   data server and (inaudible) computer in his office.

25        Q.   Uh-huh.

1      A.   He keeps it at work.

2      Q.   Uh-huh.

3      A.   He keeps it on his computer locked up on a data

4   server, and he keeps it locked in the safe.   It's always

5   been because if work --

6      Q.   And I'm not talking about the stuff he kept in

7   the safe, the backups for the work -- for the business.

8   That was completely separate from what we're talking about

9   here.   He -- he had a computer that was outside -- that had

10  the ability to be outside of the network.   Okay?   He's

11  their I.T. manager.   He knows what he is doing.   He didn't

12  have any pornography interfering with the business.   He

13  kept that separate, for obvious reasons.   He took that

14  home -- yeah, he may have taken the backups home for work

15  and put them in the safe, but the two didn't cross paths

16  with each other.   He kept to the work stuff and he did that

17  properly.   An off-site backup.   And we have those.   And

18  those don't have what we're talking about here.   But he

19  took his personal priority files, including child

20  pornography and took that home.

21     A.   Took it home.

22     Q.   And stored it on his personal hard drive, his

23  personal network, and stored there in a password-protected

24  folder that no one could have access to him but him.

25     A.   You know a little bit about computers?

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1    Q.   Yes.

2    A.   Or you have people who know about computers?

3    Q.   Right.

4    A.   With the knowledge you have about computers --

5    Q.   Uh-huh.

6    A.   -- if you had illegal pornography -- I'm not

7    accusing you of, just saying general.  Sorry.  I know

8    you're an officer.  If you had illegal pornography --

9    Q.   Uh-huh.

10   A.   -- would you take it home?

11   Q.   Absolutely not.

12   A.   If you had illegal pornography, you knew it,

13   downloaded it, wanted it, and were holding onto it, would

14   you just put a password on the file, or are there other

15   ways to keep that without getting arrested?

16   Q.   Well, I can't discuss with you every single

17   option that he could have done or should have done.

18   A.   I'm not --

19   Q.   But I'm telling you --

20   A.   -- I'm not even meaning --

21   Q.   -- I'm telling you what he did do.

22   A.   I'm talking just -- you know, if you want to turn

23   off the camera and have an intelligent conversation with

24   somebody who knows about computers.  He's not a stupid man.

25   Q.   Uh-huh.  He may not be a stupid man, but he did

1   do stupid things.

2       A.   Agreed.

3       Q.   Uh-huh.

4       A.   And people do stupid things all the time.

5       Q.   Right.  But sometimes our wants and our desires

6   make us make bad judgment calls on something we wouldn't

7   normally do because we're not thinking rationally like a

8   normal person would because our wants and our desires --

9       A.   But even with your wants and your desires, you

10  don't lose your knowledge.  If you're a bank robber and

11  you -- you steal some diamonds.

12      Q.   You can't rationalize with a bank robber.

13  Because you and I would say, well, that's stupid.  But to

14  him, they do it anyway because --

15      A.   Okay.

16      Q.   -- the gain outweighs the risk.

17      A.   But you're the bank robber.  You steal some

18  diamonds.

19      Q.   Uh-huh.

20      A.   If he's an intelligent bank robber who has -- he

21  does this heist and does this for -- you know, as well as

22  Adam does his day job.

23      Q.   Uh-huh.

24      A.   And they don't cross paths.  And, you know, you

25  couldn't hack into the network and things like that.  If

Case 1:13-cr-00409-ADA-BAM Document 348 Filed 11/05/21 Page 176 of 189
UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1    you're that good at stealing diamonds, you don't take them

2    home and leave them on the kitchen table where the diamonds

3    are and don't touch it. You don't -- you find a way to

4    keep your stash.

5         Q.   I don't think that --

6         A.   (Inaudible).

7         Q.   -- this is really going to help us anyway.

8    Because it sounds almost to me like you're going to

9    probably rationalize anything that he does, and I'm

10   probably never going to agree that what he's doing is --

11   was right.

12        A.   Oh, oh, hold on.

13        Q.   So we're going to probably be at odds.

14        A.   I am by no means saying what he did was right.

15        Q.   Is there anything that you want to add or ask --

16   ask me before we part ways here?

17        A.   I'm sorry.

18        Q.   You have my number.

19        A.   Not right now.

20        Q.   So you can always --

21        A.   Not right now.

22        Q.   Yeah.

23        A.   But --

24        Q.   You can call me. That's my department cell phone

25   so you can call me, and we can discuss, you know, this

1    further, if need be.  But I think I have a pretty good idea

2    of your stance and --

3         A.    My --

4         Q.    -- your knowledge of this.

5         A.    I can barely (inaudible).

6               I -- by the way, I cancelled my license.  I take

7    my license off the wall, which I have done.

8         Q.    Okay.

9         A.    I tell them to please cancel it.  I sign it.  I

10   date it.  I put it in an envelope.

11        Q.    Uh-huh.  And that's the child care license?

12        A.    My child care license.

13        Q.    (Inaudible).

14        A.    With that cancelled on it.

15        Q.    Uh-huh.

16        A.    Once the State receives it at their office, I no

17   longer have a license.

18        Q.    Now, I understand that Henry also received a

19   license too, right -- I mean -- sorry.  Adam Henry, your

20   husband, received a license too, right?

21        A.    We were both going -- we both had our names on

22   it, and then because he wasn't home during the hours of --

23        Q.    Uh-huh.

24        A.    -- during the majority of hours of care, he

25   wasn't allowed to be on the license.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

1     Q.   Oh.  So he supplied it, didn't receive a license?

2     A.   I asked him to apply for it, because when I first

3  got here, I wasn't -- I wasn't sure how immigration stuff

4  went.  So originally I was trying to have him to get the

5  license and --

6     Q.   So that was all your doing?

7     A.   That was --

8     Q.   You wanted him to get the child care license?

9     A.   I wanted -- (inaudible).  I asked him --

10    Q.   Sounds odd.

11    A.   I wanted to run a daycare forever.

12    Q.   Uh-huh.

13    A.   My plan was always to open a building with

14  good -- with high-quality child care --

15    Q.   Uh-huh.

16    A.   -- for all ages, all hours, for all incomes.

17  That was always -- that's been my dream since I finished

18  college --

19    Q.   Okay.

20    A.   -- in '99 or '98.  That's been my goal.  I came

21  out here.  He wanted me to look for a job in school so that

22  home was home, and we both went out to work.  So he was

23  saying if you want to work with kids, go do it in the

24  school.

25    Q.   Uh-huh.

```
 1      A.   If you want to work with kids, go get a job at a

 2   daycare.  I was having a hard time finding work.

 3      Q.   Uh-huh.

 4      A.   I was having a hard time getting anything, and I

 5   went, hey, I can do -- I can do this at home.  Our friend

 6   does it at home.

 7      Q.   Uh-huh.

 8      A.   I have the education.  I can do it at home.

 9      Q.   Okay.

10      A.   He was not comfortable with having a bunch of

11   people coming in and out of our house.  But I begged.

12      Q.   Okay.

13      A.   And it wasn't -- sorry -- it wasn't him who was

14   wanting to do this.

15      Q.   Okay.  Got it.

16      A.   It was me.

17      Q.   So --

18      A.   He did everything he did to (inaudible).

19      Q.   Okay.

20      A.   The reason I'm saying this is if you call up --

21      Q.   Uh-huh.

22      A.   -- and you take my license away --

23      Q.   Uh-huh.

24      A.   -- and you tell them that my husband did

25   whatever --
```

1    Q.    Uh-huh.

2    A.    -- I leave him.  I start a new life.  Five years

3    from now I go to open a center --

4    Q.    Uh-huh.

5    A.    -- the same people work there.  And they go,

6    Angele Henry, Angele Henry, I remember you.  Because it's

7    the same lady.

8    Q.    Well, I'm going to -- you know, that -- that

9    process is being worked on right now, so we don't know

10   where we're going to go with that yet.  But I understand

11   that you rescinded your license as of now.

12   A.    Well, the reason I'm doing this is, this is

13   everything you need to do it.

14   Q.    Uh-huh.

15   A.    If you want to put this in the mailbox to make

16   sure that I have done this so that you know --

17   Q.    We'll just -- we'll probably be checking with

18   them just to see what the status is.

19   A.    Okay.

20   Q.    Okay?  I appreciate you coming down here.  I know

21   it's not -- some tough questions all around and...

22        (Angele Henry and Det. Moore exited the room.)

23

24               (End of recorded interview.)

25                      -- o0o --

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ANGELE HENRY taken on 09/24/2013

```
 1    STATE OF CALIFORNIA      )
                               )    ss
 2    COUNTY OF FRESNO         )

 3

 4         I, Sally Anna Frits, CSR No. 11709, a Certified

 5    Shorthand Reporter in and for the County of Fresno, State

 6    of California, do hereby certify:

 7         That I transcribed the recorded interview of Angele

 8    Henry to the best of my ability, which was taken down by me

 9    in shorthand and thereafter reduced to computerized

10    transcription under my direction and supervision.  I hereby

11    certify the foregoing transcript is a full, true, and

12    correct transcript of my shorthand notes so taken.

13         I make no representations as to the accuracy of the

14    speakers and/or testimony since I was not physically

15    present during the recording.

16         I further certify that I am neither counsel for nor

17    related to any party to said action nor in any way

18    interested in the outcome thereof.

19

20

21

22

23    _____
      Sally Anna Frits
24    Certified Shorthand Reporter No. 11709

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**E. Exhibit 5: Cell Phone Extraction between Angele and Krista**

| 480 | Inbox | +14088214750 Krista* | 7/13/2013 7:47:26 PM(UTC+0) | Read | Bill's my place it's disaster drop stuff off here. No can I stay at my house at moms back Bill's | Intact |
| 481 | Inbox | +14088214750 Krista* | 7/13/2013 7:47:30 PM(UTC+0) | Read | Cause I'm sure you don't want Rothko carry all yourr goodies | Intact |
| 482 | Sent | +14088214750 Krista* | 7/13/2013 7:49:45 PM(UTC+0) | Sent | I am leaving here at 2:00 just in case of trafic is bad. That means I will either be one or two hours early. Still want me to go to bills house? | Intact |
| 483 | Inbox | +14088214750 Krista* | 7/13/2013 7:50:36 PM(UTC+0) | Read | Yes hun I'm her right now getting goodies made | Intact |
| 484 | Sent | +14088214750 Krista* | 7/13/2013 7:51:26 PM(UTC+0) | Sent | Ahh...ok cool then. Can you text me the address so I have it on my phone please. | Intact |
| 485 | Inbox | +14088214750 Krista* | 7/13/2013 8:01:27 PM(UTC+0) | Read | 954 Henderson ave sunnyvale ca 94086 space 21 | Intact |
| 486 | Sent | +14088214750 Krista* | 7/13/2013 8:19:20 PM(UTC+0) | Sent | Thank you love | Intact |
| 487 | Inbox | +14088214750 Krista* | 7/13/2013 8:48:50 PM(UTC+0) | Read | ;);) | Intact |
| 488 | Sent | +14088214750 Krista* | 7/14/2013 6:44:11 AM(UTC+0) | Sent | Home safe | Intact |
| 489 | Inbox | +14088214750 Krista* | 7/14/2013 6:52:49 AM(UTC+0) | Read | Good hunny thank you again for coming pour tho do a show | Intact |
| 490 | Inbox | +14088214750 Krista* | 7/15/2013 2:01:35 AM(UTC+0) | Read | Question hun was reading on primer designs that hostess get up to 8 items at half price.how would I have qualified for that? | Intact |
| 491 | Inbox | +14088214750 Krista* | 7/15/2013 2:04:04 AM(UTC+0) | Read | Thinking of another S how once move:) | Intact |
| 492 | Sent | +14088214750 Krista* | 7/15/2013 2:31:02 AM(UTC+0) | Sent | You earn 50% off based on your total sales. You have to hit $200 in retail. | Intact |
| 493 | Inbox | +14088214750 Krista* | 7/15/2013 2:47:56 AM(UTC+0) | Read | Dang i'll have the work on that next one lol | Intact |
| 494 | Sent | +14088214750 Krista* | 7/18/2013 3:52:28 PM(UTC+0) | Sent | Hay sweetie. Thank you for thinking of me, and yes if you happen to be at the store again and they still have then I would love a few! | Intact |
| 495 | Inbox | +14088214750 Krista* | 7/18/2013 3:53:35 PM(UTC+0) | Read | They had animal print and solid colors | Intact |
| 496 | Inbox | +14088214750 Krista* | 7/18/2013 3:53:51 PM(UTC+0) | Read | How many did you want lovey | Intact |
| 497 | Sent | +14088214750 Krista* | 7/18/2013 3:55:43 PM(UTC+0) | Sent | I'm a huge fan of purple just straight up...and I would say 5 or 6 should be enough for now. | Intact |
| 498 | Inbox | +14088214750 Krista* | 7/18/2013 3:56:53 PM(UTC+0) | Read | Ok I'll try and pick up some straight colours | Intact |
| 499 | Sent | +14088214750 Krista* | 7/18/2013 3:57:26 PM(UTC+0) | Sent | Heh...thank you Hun, thank you so much! | Intact |
| 500 | Inbox | +14088214750 Krista* | 7/18/2013 3:58:19 PM(UTC+0) | Read | Anything for thou lover | Intact |
| 501 | Sent | +14088214750 Krista* | 7/18/2013 4:40:34 PM(UTC+0) | Sent | I am doing a personal order this week end. If there was any thing you wanted to get at 40% off let me know and I will add it in. | Intact |
| 502 | Inbox | +14088214750 Krista* | 7/18/2013 4:42:03 PM(UTC+0) | Read | Wohoo I'll take a look I know for sure I need those clip s silver and the dark black looking one. | Intact |
| 503 | Sent | +14088214750 Krista* | 7/18/2013 4:42:59 PM(UTC+0) | Sent | Ok cool, ill add them in | Intact |
| 504 | Inbox | +14088214750 Krista* | 8/23/2013 5:49:41 PM(UTC+0) | Read | Hi hun is the dealer called patchetts? | Intact |
| 505 | Sent | +14088214750 Krista* | 8/23/2013 5:50:25 PM(UTC+0) | Sent. | Think so...lol your there before be? | Intact |
| 506 | Inbox | +14088214750 Krista* | 8/23/2013 5:50:46 PM(UTC+0) | Read | I'm here | Intact |
| 507 | Sent | +14088214750 Krista* | 8/23/2013 5:56:19 PM(UTC+0) | Sent | Ill be 4 min | Intact |
| 508 | Sent | +14088214750 Krista* | 8/23/2013 5:58:59 PM(UTC+0) | Sent | Unless of course I hit every red light | Intact |
| 509 | Inbox | +14088214750 Krista* | 8/23/2013 6:00:16 PM(UTC+0) | Read | Smiles it ok | Intact |
| 510 | Sent | +14088214750 Krista* | 8/23/2013 6:02:03 PM(UTC+0) | Sent | I'm here! | Intact |
| 511 | Inbox | +14088214750 Krista* | 8/23/2013 6:02:48 PM(UTC+0) | Read | I'm outscored in customer parking | Intact |
| 512 | Sent | +14088214750 Krista* | 8/23/2013 6:03:20 PM(UTC+0) | Sent | Ok I'll be there in just a few, handing off keys and such. | Intact |
| 513 | Sent | +14088214750 Krista* | 8/24/2013 12:25:54 AM(UTC+0) | Sent | I'm kinda bummed, I was hoping to take advantage of you this evening. | Intact |
| 514 | Inbox | +14088214750 Krista* | 8/24/2013 12:26:36 AM(UTC+0) | Read | Me too | Intact |

| 515 | Sent | +14088214750 Krista* | 8/24/2013 12:38... AM(UTC+0) | Sent | ...think you might b willing to come back on Sunday? | Intact | |
| 516 | Sent | +14088214750 Krista* | 8/24/2013 12:39:20 AM(UTC+0) | Sent | I'm picturing sitting on the sofa, us crawl over to him, stop off our shirts and pull him out. Taking turns sucking on him, pulling out each others tits and titty fucking him. If he takes TOO long to cum that way then bend you over and have him do you doggy while I play and suck on those gorgeous tits of yours. Then I get a turn to lay him out on the floor and ride him revers cowgirl while you play with my tits. | Intact | |
| 517 | Inbox | +14088214750 Krista* | 8/24/2013 12:42:27 AM(UTC+0) | Read | Ok now I had tho pull to side of road tho respond to message you. Sunday I would love tho assist you. My only concern is my aunt flow. | Intact | |
| 518 | Sent | +14088214750 Krista* | 8/24/2013 12:44:10 AM(UTC+0) | Sent | Awww no way! | Intact | |
| 519 | Sent | +14088214750 Krista* | 8/24/2013 12:44:26 AM(UTC+0) | Sent | How heavy is it? | Intact | |
| 520 | Inbox | +14088214750 Krista* | 8/24/2013 12:45:49 AM(UTC+0) | Read | Yeah. It sucks. Right n ow it is light. Nearing end. | Intact | |
| 521 | Sent | +14088214750 Krista* | 8/24/2013 12:46:13 AM(UTC+0) | Sent | Soooo...Sunday? Lol | Intact | |
| 522 | Inbox | +14088214750 Krista* | 8/24/2013 12:47:24 AM(UTC+0) | Read | I can secondly help. At least provide a mouth to situation. | Intact | |
| 523 | Sent | +14088214750 Krista* | 8/24/2013 12:49:47 AM(UTC+0) | Sent | We could do just a LONG bj switching off that...lmao...I was just typing that | Intact | |
| 524 | Sent | +14088214750 Krista* | 8/24/2013 1:04:35 AM(UTC+0) | Sent | What time works for you? | Intact | |
| 525 | Sent | +14088214750 Krista* | 8/24/2013 1:54:54 AM(UTC+0) | Sent | Aww...did I frighten you away too? | Intact | |
| 526 | Inbox | +14088214750 Krista* | 8/24/2013 2:05:03 AM(UTC+0) | Read | No hun I was driving | Intact | |
| 527 | Sent | +14088214750 Krista* | 8/24/2013 2:06:07 AM(UTC+0) | Sent | Ahh...good got worried for a min | Intact | |
| 528 | Inbox | +14088214750 Krista* | 8/24/2013 2:06:39 AM(UTC+0) | Read | I do want tho run this by Paul and make sure he is fine with this and if so any time that it's best for you guys | Intact | |
| 529 | Sent | +14088214750 Krista* | 8/24/2013 2:06:42 AM(UTC+0) | Sent | I seem to come across as too eager and then women never come back and play. | Intact | |
| 530 | Inbox | +14088214750 Krista* | 8/24/2013 2:08:12 AM(UTC+0) | Read | I want to play I've been attracted thou you both from first moment I met yu | Intact | |
| 531 | Inbox | +14088214750 Krista* | 8/24/2013 2:08:21 AM(UTC+0) | Read | I like eager | Intact | |
| 532 | Sent | +14088214750 Krista* | 8/24/2013 2:08:58 AM(UTC+0) | Sent | Ok talk to the man and let me know as early as possible. I am going to TRY to get a sitter for us. | Intact | |
| 533 | Inbox | +14088214750 Krista* | 8/24/2013 2:50:29 AM(UTC+0) | Read | Ok at dinner I'll bring it up at movies right now. Huggles | Intact | |
| 534 | Sent | +14088214750 Krista* | 8/24/2013 2:50:57 AM(UTC+0) | Sent | Ok sexy. Have a good time. | Intact | |
| 535 | Inbox | +14088214750 Krista* | 8/24/2013 2:54:48 AM(UTC+0) | Read | Nibbles and licks ill text you later when I know | Intact | |
| 536 | Sent | +14088214750 Krista* | 8/24/2013 2:55:18 AM(UTC+0) | Sent | Ok love | Intact | |
| 537 | Inbox | 14088214750 Krista* | 8/24/2013 5:12:11 AM(UTC+0) | Read | Hello hun, paul has only one concern about me helping you out. He is worried about the friendship we have developed. And doesn't want me to loss you guys | Intact | |
| 538 | Inbox | +14088214750 Krista* | 8/24/2013 5:12:12 AM(UTC+0) | Read | as friends and a fear that I would be demined. | Intact | |
| 539 | Inbox | +14088214750 Krista* | 8/24/2013 5:15:02 AM(UTC+0) | Read | Paul also mentioned he doesn't want you to be doing something you don't really want to and that he doesn't want you to loss a friend if things don't go w | Intact | |
| 540 | Inbox | +14088214750 Krista* | 8/24/2013 5:15:03 AM(UTC+0) | Read | ell or if Adam no longer wishes us to be friends if this goes wrong. | Intact | |
| 541 | Sent | +14088214750 Krista* | 8/24/2013 7:13:45 PM(UTC+0) | Sent | Hay sexy. crashed early last night, was in a lot of pain. I don't see how you helping us out will hurt the friendship. You are needing to get some every so often and I need help keeping my man caught up. We are not trying to change our relationship or make it something it's not, just help each other blow of some steem. | Intact | |
| 542 | Sent | +14088214750 Krista* | 8/24/2013 7:15:22 PM(UTC+0) | Sent | We don't want to make you a girlfriend, a slave or deminish what you mean to us, it's just adding a one off sexual in counter that if it goes well might happen again from time to time and if it doesn't then we put it aside and keep the friendship. | Intact | |
| 543 | Sent | +14088214750 Krista* | 8/24/2013 7:16:56 PM(UTC+0) | Sent | Adam is enough like Paul that "it not going well" simply means we stay friends and keep the sex out. You and he are not going to loss us because you are kind enough to help us out. | Intact | |

16

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 544 | Inbox | +14088214750 Krista* | 8/24/2013 7:00:11 PM(UTC+0) | Read | I will pass the rest and I figured as much but it's nice for us to say it maybe | Intact | |
| 545 | Inbox | +14088214750 Krista* | 8/24/2013 7:20:13 PM(UTC+0) | Read | To be able to see what you wrote | Intact | |
| 546 | Inbox | +14088214750 Krista* | 8/24/2013 7:56:33 PM(UTC+0) | Read | Have you discuss this with Adam? | Intact | |
| 547 | Inbox | +14088214750 Krista* | 8/25/2013 12:39:32 AM(UTC+0) | Read | Hey hun | Intact | |
| 548 | Sent | +14088214750 Krista* | 8/25/2013 1:55:51 AM(UTC+0) | Sent | Yes talked to Adam, he's tired of being the only grown up so is leaving all desisions to me. If we want to try and wake him up then we can go for it, if it doesn't go over well then we just hang out and chill as we always would. | Intact | |
| 549 | Inbox | +14088214750 Krista* | 8/25/2013 2:09:45 AM(UTC+0) | Read | That works for me Hon. What time tomorrow we're you thinking? | Intact | |
| 550 | Sent | +14088214750 Krista* | 8/25/2013 2:20:11 AM(UTC+0) | Sent | Lets say 11:00 so we can hang out then send kids for naps, then hang out some more. All goes well we can go again in the evening. | Intact | |
| 551 | Sent | +14088214750 Krista* | 8/25/2013 2:20:30 AM(UTC+0) | Sent | Unless your busy or I get sick...heh | Intact | |
| 552 | Sent | +14088214750 Krista* | 8/25/2013 2:46:55 AM(UTC+0) | Sent | Or is that too early? | Intact | |
| 553 | Inbox | +14088214750 Krista* | 8/25/2013 5:29:56 AM(UTC+0) | Read | 11 is lil early here as that's Paul and i cuddle time. Mmm i could do later no problem. | Intact | |
| 554 | Sent | +14088214750 Krista* | 8/25/2013 7:19:34 AM(UTC+0) | Sent | How much later? Noon? Or more like 3:00 or 4:00? | Intact | |
| 555 | Inbox | +14088214750 Krista* | 8/25/2013 5:12:28 PM(UTC+0) | Read | Morning hun | Intact | |
| 556 | Inbox | +14088214750 Krista* | 8/25/2013 5:12:57 PM(UTC+0) | Read | I goofed big time I didn't realize my last text never got sent. | Intact | |
| 557 | Inbox | +14088214750 Krista* | 8/25/2013 5:14:43 PM(UTC+0) | Read | The evening work for me. If your still interested in hanging out today. Or even tomorrow. Let me know:) I'm local monday Wednesday | Intact | |
| 558 | Inbox | +14088214750 Krista* | 8/25/2013 9:38:48 PM(UTC+0) | Read | I guess today no go that's ok got tons of house stuff moved around. Ok be around tuesday Wednesday if you just want too hang out.Hugs | Intact | |
| 559 | Sent | +14088214750 Krista* | 8/25/2013 9:42:32 PM(UTC+0) | Sent | Sorry love, I ACTULY got sleep!!! Granted it was all day not last night, but sleep none the less. Heh | Intact | |
| 560 | Inbox | +14088214750 Krista* | 8/25/2013 9:43:36 PM(UTC+0) | Read | I'm about tho take cast nap myself:)  I'm shoo glad you got some sleep, makes me so happy for you:) | Intact | |
| 561 | Sent | +14088214750 Krista* | 8/25/2013 9:49:20 PM(UTC+0) | Sent | It's past nap time for the kids now and I am not going to let you drive in the dark. I also get crabby at night these days. I didn't really think about your family in my plans. I'm sorry love. I got so focused on my own drama. | Intact | |
| 562 | Sent | +14088214750 Krista* | 8/25/2013 9:49:38 PM(UTC+0) | Sent | Have a good nap sexy. | Intact | |
| 563 | Inbox | +14088214750 Krista* | 8/25/2013 9:51:27 PM(UTC+0) | Read | Hugs that is fine darling we can do it other time like I said Tuesday and Wednesday I have no plans so even if you just want tho hang out | Intact | |
| 564 | Inbox | +14088214750 Krista* | 8/25/2013 9:52:19 PM(UTC+0) | Read | Honey it is fine that is what friends are for and i really don't mind you are worth it. Drama and ask you are well with it. | Intact | |
| 565 | Inbox | +14088214750 Krista* | 8/25/2013 9:53:00 PM(UTC+0) | Read | Cat nap with cell phone:) -means in bed semi naked and taking to you via cell | Intact | |
| 566 | Sent | +14088214750 Krista* | 8/25/2013 9:54:26 PM(UTC+0) | Sent | Mmm...naked krista boobs...*grin* sleep well. | Intact | |
| 567 | Inbox | +14088214750 Krista* | 8/25/2013 9:54:45 PM(UTC+0) | Read | Smiles gulp | Intact | |
| 568 | Sent | +14088214750 Krista* | 8/25/2013 10:00:04 PM(UTC+0) | Sent | BOZoBIS!!! | Intact | |
| 569 | Inbox | +14088214750 Krista* | 8/25/2013 10:01:01 PM(UTC+0) | Read | Smiles evily yes | Intact | |
| 570 | Sent | +14088214750 Krista* | 8/25/2013 10:16:43 PM(UTC+0) | Sent | Heh...see now you have to come over tonight. It has been WAY too long since I played with boobies! | Intact | |
| 571 | Sent | +14088214750 Krista* | 8/25/2013 10:26:42 PM(UTC+0) | Sent | Adam is a little more chatty today and asked me if we talked about your limits...I guess we should probably go over that. What are you not ok doing? | Intact | |
| 572 | Sent | +14088214750 Krista* | 8/25/2013 10:27:00 PM(UTC+0) | Sent | Sorry you can get back to be after naked nap time. | Intact | |
| 573 | Inbox | +14088214750 Krista* | 8/26/2013 12:01:07 AM(UTC+0) | Read | Smiles its been a long time for me to. 4 years. | Intact | |
| 574 | Sent | +14088214750 Krista* | 8/26/2013 12:02:06 AM(UTC+0) | Sent | Ouch! | Intact | |
| 575 | Inbox | +14088214750 Krista* | 8/26/2013 12:04:18 AM(UTC+0) | Read | Well since Misti... so yeah four year...and limits | Intact | |

17

1      **F.  Exhibit 6: Cell Phone Extraction Between Angele and Courtney/Adam**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | +15594335513 Henry Adam* | | 8/14/2013 12:19:12 AM(UTC+0) | Almost 15 minutes later, still hasn't gotten the knots out of a single shoe. | | |

**210**

Participants:
+15594335513 Henry Adam

Identifier:
Source:
iMessages

Start Time: 8/14/2013 12:29:46 AM(UTC+0)

Last Activity: 8/14/2013 12:29:46 AM(UTC+0)

Body file: chat-209.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +15594335513 Henry Adam* | | 8/14/2013 12:29:46 AM(UTC+0) | Hey, he got one! I was beginning to lose hope. | | |

**211**

Participants:
+15594335513 Henry Adam,
+12096788993

Identifier:
Source:
iMessages

Start Time: 8/14/2013 12:30:33 AM(UTC+0)

Last Activity: 8/22/2013 7:21:49 PM(UTC+0)

Body file: chat-210.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12096788993 | +15594335513 Henry Adam* | 8/14/2013 12:30:33 AM(UTC+0) | Heh...good for him, and grats on your pacience. Heg | | |
| | +15594335513 Henry Adam* | | 8/14/2013 12:44:48 AM(UTC+0) | Yeah, you need to nail his ass to the wall for this one. It's been 30 minutes, still fighting knots. When I asked why it was taking so long, he said they'd been like this for a while, was slow getting all the knots out. When I pointed out that knowing they had knots "for a while" was directly contrary to his "I thought they were tied" his face fell as he realized he was caught in an outright premeditated lie. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/14/2013 12:47:04 AM(UTC+0) | You got it. Lecture being pros sensed and grounded tomorrow. I will figure out another more natural consequences | | |
| | +15594335513 Henry Adam* | | 8/14/2013 12:46:56 AM(UTC+0) | I've had to tell him at least 4 times to focus on his shoes, but he keeps staring at the class,, the other kids, and basically ignoring me. I'm getting VERY pissed and I'm not even remotely in a good enough place to be reasonable or rational. | | |
| | +15594335513 Henry Adam* | | 8/14/2013 12:49:04 AM(UTC+0) | I mean, it's been 45 minutes, and he STILL hasn't tied his fucking shoes. Her entire class went by and the next one is starting. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/14/2013 12:49:44 AM(UTC+0) | The next one IS his class | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/14/2013 12:50:38 AM(UTC+0) | He's right after her | | |
| | +15594335513 Henry Adam* | | 8/14/2013 12:51:12 AM(UTC+0) | Yup, Lewis is already yelling at him. | | |
| | +15594335513 Henry Adam* | | 8/14/2013 12:51:12 AM(UTC+0) | I told him to have his shoes done by the time her class ended. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/14/2013 12:52:55 AM(UTC+0) | I will deal with him when you guys get home. I'm sorry he's giving you a hard time. | | |

**212**

Participants:
+12092167546
+12096788993

Identifier:
Source:
iMessages

Start Time: 8/23/2013 3:47:12 PM(UTC+0)

Last Activity: 8/23/2013 3:52:27 PM(UTC+0)

Body file: chat-211.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12092167548 | | 8/23/2013 3:47:12 PM(UTC+0) | Good morning I delivered all the orders but one (will do that at lunch time) Stephanie McKinneys necklace has a broken magnet. Can I drop it by your house sometime? I saved the package and sticker it came with<br><br>Thanks | | |
| | +12096788993 | +12092167548 | 8/23/2013 3:49:19 PM(UTC+0) | Absolutely. What time were you thinking? | | |
| | +12092167548 | | 8/23/2013 3:49:20 PM(UTC+0) | How about 1215 is that ok? | | |
| | +12096788993 | +12092167548 | 8/23/2013 3:52:27 PM(UTC+0) | I have to take the car in to get a tune up, so if I'm not here you can leave it in the corner at the front door and ill take care of it. | | |

| | | | 8/23/2013 3:51:38 | | | |

**213**

Participants:
+12092774442 Courtney,
+12096788993

Identifier:
Source:
iMessages

Start time: 8/23/2013 6:22:56 PM(UTC+0)

Last Activity: 8/23/2013 8:59:17 PM(UTC+0)

Body file: chat-212.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12092774442 Courtney* | | 8/23/2013 6:22:56 PM(UTC+0) | Hey how have u been feeling | | |
| | +12096788993 | +12092774442 Courtney* | 8/23/2013 6:52:40 PM(UTC+0) | Exhausted!!! Lol | | |
| | +12096788993 | +12092774442 Courtney* | 8/23/2013 8:50:40 PM(UTC+0) | Oh they are so happy. Both love their teachers so much and just have such a good vib with them. I am thrilled! Heg | | |
| | +12092774442 Courtney* | | 8/23/2013 8:51:22 PM(UTC+0) | That's so great! | | |
| | +12096788993 | +12092774442 Courtney* | 8/23/2013 8:54:23 PM(UTC+0) | Oh agreed! It is so amazing to have a teacher really GET my kids. | | |
| | +12096788993 | +12092774442 Courtney* | 8/23/2013 8:56:42 PM(UTC+0) | How are your little guys liking school? | | |
| | +12092774442 Courtney* | | 8/23/2013 8:56:32 PM(UTC+0) | Karly loves it and we love her teacher she's great! Jenner starts preschool when he turns 3 in 2 weeks | | |
| | +12096788993 | +12092774442 Courtney* | 8/23/2013 8:59:17 PM(UTC+0) | Oh that's so great! | | |
| | +12092774442 Courtney* | | 8/23/2013 8:58:40 PM(UTC+0) | Yeah it's fun big change for us going everyday | | |

**214**

Participants:
+12092774442 Courtney

Identifier:
Source:
iMessages

Start time: 8/23/2013 9:00:48 PM(UTC+0)

Last Activity: 8/23/2013 9:00:48 PM(UTC+0)

Body file: chat-213.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12092774442 Courtney* | | 8/23/2013 9:00:48 PM(UTC+0) | Are u guys still in gym? | | |

**215**

Participants:
+15594335513 Henry Adam,
+12096788993

Identifier:
Source:
iMessages

Start time: 8/23/2013 9:00:59 PM(UTC+0)

Last Activity: 8/23/2013 9:00:59 PM(UTC+0)

Body file: chat-214.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12096788993 | +15594335513 Henry Adam* | 8/23/2013 9:00:59 PM(UTC+0) | Krista is here. Should I make excuses to have stay longer or go soon? | | |

**216**

Participants:
+15594335513 Henry Adam,
+12096788993

Identifier:
Source:
iMessages

Start time: 8/24/2013 2:24:34 AM(UTC+0)

Last Activity: 8/25/2013 12:42:40 AM(UTC+0)

Body file: chat-215.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12096788993 | +15594335513 Henry Adam* | 8/24/2013 2:24:34 AM(UTC+0) | Mr. Luis wants us to take the kids (specifically Aidan) to this to build his confidence. He also said I am doing him a HUGE disservice by doing a 3 strike system or even doing one warning with Aidan ever. He had a long talk with Aidan and a looong talk with me. | IMG_0252.jpg | |
| | +15594335513 Henry Adam* | | 8/25/2013 12:29:52 AM(UTC+0) | What time will you be home? Trying to figure out dinner. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/25/2013 12:41:07 AM(UTC+0) | Be home in about 45 min, just packing up now. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/25/2013 12:41:32 AM(UTC+0) | Got paid in cash if you want me to pick up dinner, just let me know what you would like. | | |

| | +15594335513 Henry Adam* | | 8/25/2013 12:41:49 AM(UTC+0) | Sure. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/25/2013 12:42:23 AM(UTC+0) | What would you like? | | |
| | +15594335513 Henry Adam* | | 8/25/2013 12:42:40 AM(UTC+0) | Indifferent. | | |

**217**  **Participants:**
+12092774442 Courtney,
+12096788993

**Identifier:**
**Source:** iMessages

**Start Time:** 8/27/2013 1:23:19 AM(UTC+0)

**Last Activity:** 8/27/2013 1:23:38 AM(UTC+0)

**Body file:** chat-216.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12096788993 | +12092774442 Courtney* | 8/27/2013 1:23:19 AM(UTC+0) | Hay sorry I missed that text. Yeah we are still in gymnastics but we don't get here every week. Last trimester is hitting me hard. Back pain, fatigue, nauseous...just lots of fun, heh. | | |
| | +12096788993 | +12092774442 Courtney* | 8/27/2013 1:23:38 AM(UTC+0) | How is horse back ridding going? Is she loving it? | | |

**218**  **Participants:**
+15594335513 Henry Adam,
+12096788993

**Identifier:**
**Source:** iMessages

**Start Time:** 8/27/2013 10:40:54 PM(UTC+0)

**Last Activity:** 8/27/2013 10:43:14 PM(UTC+0)

**Body file:** chat-217.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +15594335513 Henry Adam* | | 8/27/2013 10:40:54 PM(UTC+0) | Will be leaving at 4:30 today. | | |
| | +12096788993 | +15594335513 Henry Adam* | 8/27/2013 10:43:14 PM(UTC+0) | Ok sexy | | |

**219**  **Participants:**
+12092774442 Courtney,
+12096788993

**Identifier:**
**Source:** iMessages

**Start Time:** 8/28/2013 7:43:28 PM(UTC+0)

**Last Activity:** 8/28/2013 9:10:08 PM(UTC+0)

**Body file:** chat-218.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +12092774442 Courtney* | | 8/28/2013 7:43:28 PM(UTC+0) | Never saw your text tell right now sorry | | |
| | +12096788993 | +12092774442 Courtney* | 8/28/2013 7:46:01 PM(UTC+0) | Oh no problem, I had missed your as well. How are you all doing? | | |
| | +12092774442 Courtney* | | 8/28/2013 8:39:28 PM(UTC+0) | Great just super busy with everything | | |
| | +12096788993 | +12092774442 Courtney* | 8/28/2013 9:10:08 PM(UTC+0) | Oh I understand. School, activities, just getting back into the swing of things. | | |

**220**  **Participants:**
+15103664727 Becky,
+12096788993

**Identifier:**
**Source:** iMessages

**Start Time:** 8/29/2013 8:22:24 PM(UTC+0)

**Last Activity:** 8/29/2013 8:24:05 PM(UTC+0)

**Body file:** chat-219.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| | +15103664727 Becky* | | 8/29/2013 8:22:24 PM(UTC+0) | Lou has back to school tonight we got to leave early in oder to un load my scooter can we start next week | | |
| | +12096788993 | +15103664727 Becky* | 8/29/2013 8:24:05 PM(UTC+0) | Ok sweet heart. | | |

**221**  **Participants:**
+15594335513 Henry Adam,
+12096788993

**Identifier:**
**Source:** iMessages

**Start Time:** 8/29/2013 10:00:29 PM(UTC+0)

**Last Activity:** 8/30/2013 8:22:26 PM(UTC+0)

**Body file:** chat-220.txt