# EXHIBIT H

# WARNING

The President of the panel hearing this appeal directs that the following should be attached to the file:

An order restricting publication in this proceeding under ss. 486.4(1), (2), (3) or (4) or 486.6(1) or (2) of the *Criminal Code* shall continue. These sections of the *Criminal Code* provide:

**486.4** **(1)** Subject to subsection (2), the presiding judge or justice may make an order directing that any information that could identify the complainant or a witness shall not be published in any document or broadcast or transmitted in any way, in proceedings in respect of

    (a)    any of the following offences;

        (i) an offence under section 151, 152, 153, 153.1, 155, 159, 160, 162, 163.1, 170, 171, 172, 172.1, 173, 210, 211, 212, 213, 271, 272, 273, 279.01, 279.02, 279.03, 346 or 347,

        (ii) an offence under section 144 (rape), 145 (attempt to commit rape), 149 (indecent assault on female), 156 (indecent assault on male) or 245 (common assault) or subsection 246(1) (assault with intent) of the *Criminal Code*, chapter C-34 of the Revised Statutes of Canada, 1970, as it read immediately before January 4, 1983, or

        (iii) an offence under subsection 146(1) (sexual intercourse with a female under 14) or (2) (sexual intercourse with a female between 14 and 16) or section 151 (seduction of a female between 16 and 18), 153 (sexual intercourse with step-daughter), 155 (buggery or bestiality), 157 (gross indecency), 166 (parent or guardian procuring defilement) or 167 (householder permitting defilement) of the *Criminal Code*, chapter C-34 of the Revised Statutes of Canada, 1970, as it read immediately before January 1, 1988; or

    (b)    two or more offences being dealt with in the same proceeding, at least one of which is an offence referred to in any of subparagraphs (a)(i) to (iii).

Attachment O

Page: 2

(2)     In proceedings in respect of the offences referred to in paragraph (1)(a) or (b), the presiding judge or justice shall

> (a) at the first reasonable opportunity, inform any witness under the age of eighteen years and the complainant of the right to make an application for the order; and

> (b) on application made by the complainant, the prosecutor or any such witness, make the order.

(3)     In proceedings in respect of an offence under section 163.1, a judge or justice shall make an order directing that any information that could identify a witness who is under the age of eighteen years, or any person who is the subject of a representation, written material or a recording that constitutes child pornography within the meaning of that section, shall not be published in any document or broadcast or transmitted in any way.

(4)     An order made under this section does not apply in respect of the disclosure of information in the course of the administration of justice when it is not the purpose of the disclosure to make the information known in the community. 2005, c. 32, s. 15; 2005, c. 43, s. 8(3)(b).

**486.6**   (1)   Every person who fails to comply with an order made under subsection 486.4(1), (2) or (3) or 486.5(1) or (2) is guilty of an offence punishable on summary conviction.

(2)     For greater certainty, an order referred to in subsection (1) applies to prohibit, in relation to proceedings taken against any person who fails to comply with the order, the publication in any document or the broadcasting or transmission in any way of information that could identify a victim, witness or justice system participant whose identity is protected by the order. 2005, c. 32, s. 15.

# COURT OF APPEAL FOR ONTARIO

CITATION: R. v. A.P., 2013 ONCA 344
DATE: 20130528
DOCKET: C54307

Weiler, Blair and Rouleau JJ.A.

BETWEEN

Her Majesty the Queen

Respondent

and

A.P.

Appellant

Jill Copeland, for the appellant

Robert W. Hubbard, for the respondent

Heard: January 9, 2013

On appeal from the conviction entered on May 3, 2011 by Justice Michael G. Quigley of the Superior Court of Justice, sitting without a jury.

**Rouleau J.A.:**

## OVERVIEW

[1]   The appellant was convicted of sexually assaulting his wife after a trial in the Superior Court of Justice. The appellant and the complainant were the only witnesses at trial, and testified to similar, yet critically different stories. The appellant and the complainant agreed that they had engaged in dominant/submissive sexual role playing over the course of their relationship; the

Page: 4

appellant candidly admitted that on the night in question, he and his wife had sex; and he also agreed that the complainant wife had said 'no' to the appellant's request for sexual intercourse that night. The appellant stated, however, that the complainant's verbal refusal to consent to sexual intercourse formed part and parcel of their standard sexual role playing, and argued that either she actually consented to sex or that he had an honest but mistaken belief in her consent. In contrast, the complainant testified that her husband perpetrated a violent sexual assault upon her, in full knowledge of her unwillingness to participate.

[2]     The trial judge convicted the appellant, finding the complainant to be the more credible of the two witnesses. The appellant appeals his conviction on the basis that the trial judge misapplied the principles outlined by the Supreme Court of Canada in *R. v. W.(D.)*, and erred by placing the burden of proof on the appellant and in his analysis of whether he was left with a reasonable doubt as to the appellant's guilt. For the reasons that follow, I allow the appeal and order a new trial.

**FACTS**

[3]     The appellant and the complainant met in 1997. They started dating shortly thereafter and their relationship gradually became sexual. They married on December 31, 2003. They have two children, the first born in October 2005 and the second in September 2007.

Page: 5

[4]    The appellant testified that while his and the complainant's sexual relationship was initially conventional, it became increasingly imaginative over time. The complainant expressed an interest in bisexuality. They had an open relationship for a period. They experimented with bondage. And they explored sexual role playing of a dominant/submissive nature. Except for one particular occasion, the appellant always played the dominant role and the complainant always played the submissive role. The appellant testified that when the complainant played the submissive role, she adopted a quiet, subservient voice. Both the complainant and the appellant testified that role playing had been a significant part of their sexual relationship, but their evidence conflicted regarding the nature of the role playing and the frequency with which the role play occurred over the course of their relationship.

[5]    The appellant testified that one of their role playing scenarios, the "teacher/student" scenario, was played out one to three times a week, both when he and the complainant were dating and after their marriage. The appellant would portray a teacher character and the complainant would be his student. The appellant would find some aspect of his "student's" performance wanting and the complainant would try to remedy the situation with sexual favours.

[6]    The appellant testified that he and the complainant also enjoyed acting out an assailant/victim sexual scenario throughout their relationship. He viewed this as a variation of dominant/submissive role play, similar to the teacher/student

Page: 6

scenario in which they routinely engaged. When in his "assailant" character, the appellant used a gruff, aggressive, and demanding tone of voice. He testified that they began performing this more aggressive scenario when the complainant disclosed to him that she had been sexually assaulted as a pre-teenager and, although she did not like that experience, there were aspects of it that she wished to explore further. In the course of cross-examination, the appellant was asked to provide specific instances when this type of scenario was played out and the appellant was only able to specify two: a failed attempt on the first night of their honeymoon and a daddy/daughter episode in December 2007.

[7]     In his testimony, the appellant stated that he and the complainant had agreed on a safe word – "cabbage" – to ensure that these games did not surpass either of their comfort levels. The appellant stated that it had not been used after 2003.

[8]     The complainant acknowledged in her testimony that she had engaged in sexual role play with the appellant, including an attempt early on to explore bondage, but only at his instigation. Before their marriage, the role playing included the appellant taking on an aggressor personality and barking out orders for her to obey. She testified, however, that role playing was limited to situations of domination and submission such as the "teacher/student" scenario. According to the complainant, the appellant favoured scenarios where he caught a young girl off her guard, but she submitted to demands and agreed that she in fact

Page: 7

wished to convey sexual favours. The complainant explained that the appellant wanted scenarios where she was a willing participant because, according to the complainant, "being unwilling would be against his kink". The complainant testified that the role play largely ceased after she and the appellant got married.

[9]     The complainant also testified that the appellant had repeatedly discussed with her his desire to explore more aggressive role playing scenarios or "rape scenarios", but that she adamantly refused any use of force or to feign unwillingness to participate in sex. The complainant testified that this was because she had been sexually assaulted as a pre-teenager and was deeply uncomfortable with the idea of reliving such a traumatizing experience. The complainant maintained that she and her husband had never agreed on a safe word, because it was unnecessary given that aggressive sex was unacceptable to her in all cases.

[10]    There were photos tendered in evidence that depicted the complainant in scenes of mild bondage. The complainant testified that she had consented to these photos being taken by the appellant at his request. The appellant, however, testified that the complainant had taken these photos of herself as part of a university art assignment that required her to explore parts of her personal life that she did not want to make public. He testified that she took most of the photos using the remote trigger for the camera and that his only involvement was putting his finger in the complainant's mouth in certain pictures.

Page: 8

[11]   As of February 8, 2008, the date of the events in issue, the appellant was a doctoral student in political science and the complainant was a stay-at-home mother. She had previously studied visual arts at the university level and hoped to continue those studies in the future. The couple and the children lived together in an apartment in graduate housing. They also had a male boarder living with them at the time.

[12]   On the evening of February 8, the appellant went to bed before his wife. She stayed up and was play-wrestling with the boarder, something the two friends apparently did quite often.

[13]   The appellant testified that the sounds of the complainant wrestling with the male boarder aroused him. When the complainant came to bed, the appellant testified that she laid down with her back to him. He reached over and grabbed her hair and said in his dominant voice "you want it, don't you?" to which the complainant responded "no". However, the appellant testified that his wife's "no" was spoken in her submissive tone, the tone she would take whenever they engaged in role play. This, to him, indicated consent. The appellant said that he then massaged her breasts and she responded receptively, which was consistent with his understanding of her having consented. He pulled down her pants. His right hand was holding, but not pulling, her hair and his left hand was supporting his weight. He had sex with the complainant from behind with her pushing back receptively. The appellant testified that the complainant responded in a passive,

0

Page: 9

passionate, and submissive way throughout. After he ejaculated, they went to sleep.

[14]   The appellant recounted that the next day everything was normal. He told his wife that he had enjoyed the night before, to which she responded that she had not enjoyed it.

[15]   The complainant's testimony concerning the events of February 8 was fundamentally different from that of her husband. She testified that she entered the bedroom and was sitting on the edge of the bed removing her socks when the appellant rolled over and came up behind her. Without saying a word, the appellant threw her back onto the bed and put his forearm over her throat. She found it difficult to breathe, move, or make any noise. He began to hiss in her ear, saying that he was going to "fuck her and take what was his", among other profane and degrading statements. The appellant slapped her, ripped her tank top off, and pinched her nipples. He pulled down her jogging pants and got between her legs, while holding her down with his considerable weight. He forcibly copulated with her as she laid sobbing, hitting, and scratching him as best she could. He responded by saying "stop crying — you knew this was coming". After he ejaculated, he threw her aside and went to sleep.

[16]   The complainant testified that she got up and showered until the water ran cold. She put on a big sweater and pyjama pants and went back to bed,

wrapping herself in a blanket. She testified that the next day, the appellant asked her "that was pretty awesome, wasn't it?" to which she responded "no, no, it wasn't awesome" and that it was rape. The complainant explained at trial that she sustained several injuries from the assault, including bruises and sore muscles.

[17]   In March 2008, the appellant took a trip to Africa to conduct field research for his doctoral thesis. The complainant testified that she felt relieved while he was away. Upon the appellant's return in the spring of 2008, he suffered a back injury. Because it was difficult for him to recuperate with two small children around, the appellant went to live with his parents to convalesce. The complainant testified that in the absence of the appellant, she realized her unwillingness to have him return to the family home. The complainant called the appellant and told him he was not welcome in their apartment any longer. The appellant testified that he was heartbroken.

[18]   The appellant and the complainant separated in June 2008. They attended two marital counselling sessions together, but their efforts to reconcile were unsuccessful. The complainant testified that in the course of these sessions, the appellant admitted to having raped her and apologized. The appellant denies this.

Page: 11

[19]   On October 10, 2008, the complainant attended family court, where she applied for and obtained an ex parte order granting her custody of their two children and restraining the appellant from having any contact with her or their children. When the appellant became aware of the order, he sought a variation. On October 20, 2008, the complainant reluctantly agreed to vary the order so as to grant the appellant supervised access to his children. According to the complainant, the family court duty counsel told her to take the varied order to the police station and to insist on speaking to a police officer and having the officer read the affidavit the complainant had filed in family court.

[20]   The complainant testified that she followed duty counsel's instructions and, upon reading the affidavit, the police officer asked her to make a videotaped statement; the complainant did so. Shortly thereafter, the appellant was arrested and charged with sexually assaulting his former spouse.

**THE SECTION 276 APPLICATION**

[21]   At the opening of trial, the appellant brought an application under s. 276 of the *Criminal Code* to adduce evidence of the complainant's sexual activity throughout their relationship. The appellant maintained that this evidence was crucial to provide the background and foundation for his defence of honest but mistaken belief in her consent on February 8, 2008. The trial judge agreed and

allowed the appellant to cross-examine the complainant on various aspects of their sexual relationship.

**THE DECISION BELOW**

[22]   The trial judge began by setting out the four elements of sexual assault that the Crown must prove beyond a reasonable doubt to secure the appellant's conviction:

1. the appellant intentionally applied force to the complainant,

2. the complainant did not consent to the force applied,

3. the appellant knew that the complainant did not consent to the force being applied, and

4. the force applied by the appellant took place in circumstances of a sexual nature.

[23]   Since the appellant conceded that he and the complainant had sexual intercourse on the night of the events in question, the trial judge stated that the only remaining issues were the complainant's consent and the appellant's knowledge of her lack of consent.

[24]   The trial judge therefore held that the sole issue in the case was the credibility of the two trial witnesses, the complainant and the appellant. The question of the appellant's guilt thus fell to be decided under the test established

Page: 13

by the Supreme Court of Canada in *R. v. W.(D.)*, [1991] 1 S.C.R. 742. The trial judge found that a critical factor in his credibility assessment of the witnesses would be his finding as to whether they had a history of engaging in aggressive-assailant sexual role playing, as the appellant had testified.

[25]   The trial judge rejected the appellant's evidence as to the nature of his sexual relationship with his wife. He attributed particular importance to the fact that despite the appellant's testimony that he and the complainant regularly engaged in assailant/victim sexual relations, he was unable to recall any specific event or aspect of such relations. The trial judge ultimately concluded that the appellant's evidence was internally and externally inconsistent and "defied common sense". The trial judge concluded that he neither believed the appellant's evidence, nor was he left in a state of reasonable doubt by it.

[26]   The trial judge found the complainant's evidence and description of what transpired on February 8, 2008 to be credible and reliable. He concluded that her testimony was more in line with both witnesses' description of the event as an instance of aggressive-assailant sexual role playing and the use of physical force that entails.

[27]   The trial judge disagreed with the defence's argument that the complainant's credibility was negatively affected by her delayed reporting of this event on the very same day that her custody order was varied to grant the

Page: 14

appellant access to their children. The trial judge acknowledged that while the timing appeared suspicious on its face, the complainant gave credible evidence as to why she reported the assault on October 20, 2008.

[28]   The trial judge convicted the appellant of sexually assaulting the complainant and later sentenced him to four months' imprisonment and three years' probation.

## ISSUES ON APPEAL

[29]   The appellant raises five issues on appeal:

1) Did the trial judge err in his assessment of the burden of proof as it relates to credibility?

2) Did the trial judge misapprehend the relevance of the delay and the timing of the complainant's report of the offence to the police?

3) Did the trial judge err in applying an objective test for recklessness and wilful blindness, and requiring that, to constitute a defence, a mistaken belief in consent must be reasonable?

4) Did the trial judge misapprehend relevant evidence by focussing on whether the complainant or the appellant had been the instigator of previous dominant/submissive role playing? And

5) Did the trial judge err in failing to recognize a distinction between the issues of the complainant's actual subjective consent and the appellant's honest but mistaken belief in consent?

[30]   The appellant also brought a motion to file fresh evidence. The proposed evidence relates to the appellant's acquittal, after his trial for sexual assault, on further charges brought against him by the complainant for assaulting their young son in May 2009. The appellant submits that the reasons for acquittal given by the trial judge in that case constitute compelling evidence that the complainant exhibits a pattern of bringing false charges against the appellant to gain advantages in their family law proceedings.

[31]   In my view, the reasons of the trial judge contain errors and gaps in his assessment of credibility and in his allocation of the burden of proof. Viewed in the context of the reasons as a whole, these errors and gaps show that the trial judge did not consider all of the evidence relating to the ultimate issue of guilt or innocence, thereby committing an error of law. The appeal therefore ought to be allowed. As a result, I need not deal with all of the grounds of appeal, nor consider the application to admit fresh evidence.

## ANALYSIS

[32]   The appellant has raised several grounds of appeal. The essence of the appellant's position, however, is that the trial judge's reasons show that he

Page: 16

approached the evidence in a piecemeal fashion, erred in his assessment of the burden of proof and, ultimately, did not take into account all of the evidence when determining whether he was left with a reasonable doubt on the critical issue of the appellant's intent.

[33]   As set out in *R. v. Morin*, [1992] 3 S.C.R. 286, at p. 296, a failure by the trial judge to consider all of the evidence relating to the ultimate issue of guilt or innocence constitutes an error of law.

[34]   In addressing this issue, I am mindful of the direction given by Moldaver J. in *R. v. Walle*, 2012 SCC 41, [2012] 2 S.C.R. 438, at para. 46, wherein he explains that in *Morin*, Sopinka J. made clear that there is "no obligation in law on a trial judge to record all or any specific part of the process of deliberation on the facts", and "unless the reasons demonstrate that [a consideration of all the evidence in relation to the ultimate issue] was not done, the failure to record the fact of it having been done is not a proper basis for concluding that there was error in law in this respect".

[35]   In my view, reading the reasons as a whole, the concerns raised by the appellant are warranted. The structure of the trial judge's reasons and the errors in those reasons demonstrate that the trial judge did not consider all of the evidence related to the ultimate issue of the appellant's intent to sexually assault the complainant.

[36]    There are several aspects of the trial judge's reasons that, taken together, lead me to the conclusion that the appeal must be allowed and a new trial ordered. The first is that, at different points in his reasons, the trial judge appears to approach the case as a credibility contest between the appellant's and the complainant's versions of events. The second is that, at the outset of his analysis, the trial judge explains that one critical finding of fact will be used to decide whether to accept or reject the evidence of the appellant and the complainant. That finding, however, is made on a balance of probabilities; furthermore, the analysis that flows from this critical finding is flawed. The trial judge then all but convicted the appellant after making his findings concerning credibility; the reasons do not contain any further analysis of the evidence to determine whether, on the whole of the record, there remained a reasonable doubt as to the appellant's intent to commit the offence. In the circumstances of this case, there were several other relevant factors the trial judge failed to consider when determining whether, on the basis of all of the evidence led at trial, he was left with a reasonable doubt as to the appellant's guilt.

[37]    I will deal with each of these concerns in turn.

**(1) The trial judge approached his task as a credibility contest**

[38]    When the trial judge set out on his analysis of the evidence, he correctly listed the four elements of the offence of sexual assault that must be proven by

Page: 18

the Crown. The trial judge then expressed the view that "the sole issue in this case is the credibility of the complainant and the credibility of the defendant", thereby, in the appellant's submission, viewing the case as a credibility contest.

[39]   The appellant nevertheless concedes that the trial judge identified the correct approach to be taken in such cases, which is that outlined in *R. v. W.(D.),* [1991] 1 S.C.R. 742, at p. 758:

> First, if you believe the evidence of the accused, obviously you must acquit.
>
> Second, if you do not believe the testimony of the accused but you are left in reasonable doubt by it, you must acquit.
>
> Third, even if you are not left in doubt by the evidence of the accused, you must ask yourself whether, on the basis of the evidence which you do accept, you are convinced beyond a reasonable doubt by that evidence of the guilt of the accused.

The appellant argues, however, that the reasons show that the trial judge did not properly apply that approach to the evidence in this case. I agree. Correctly setting out the *W.(D.)* approach is not determinative of the correctness of a decision – the critical issue is whether the reasons reflect its correct application: see e.g. *R. v. Wadforth,* 2009 ONCA 716, 247 C.C.C. (3d) 466, at paras. 50-51.

[40]   The trial judge's approach to this case as a credibility contest is evident in his reasons when he is dealing with the assessment of witness credibility and the need for the Crown to prove the elements of the offence beyond a reasonable

doubt. The trial judge indicated that in a case such as this, "the truth will be found to be the <u>version of events</u> that is in harmony with what a practical and well-informed person would recognize as most <u>probable</u> in all of the existing circumstances" (emphasis added). The trial judge referred to the "version of events" told by the appellant and the complainant a further five times in his reasons. These statements are problematic for two reasons.

[41]   First, it suggests that the point of the trial and the trial judge's task is to determine which of the two recounted versions of the event is true. This approach is an error. As the Supreme Court of Canada held in *R. v. C.L.Y.*, 2008 SCC 2, [2008] 1 S.C.R. 5, at para. 8:

> [The purpose of the *W.(D.)* analysis] was to ensure that triers of fact — judges or juries — understand that the verdict should not be based on a choice between the accused's and Crown's evidence, but on whether, based on the whole of the evidence, they are left with a reasonable doubt as to the accused's guilt. [Citations omitted.]

See also *R. v. Avetysan*, 2000 SCC 56, [2000] 2 S.C.R. 745, at para. 21. An approach that emphasizes having to decide whether to believe either the Crown's evidence or the defence's evidence neglects the third alternative that while the trier of fact may not believe the accused, they may still be left with a reasonable doubt as to the guilt of the accused on the whole of the evidence: see *R. v. S.(W.D.)*, [1994] 3 S.C.R. 521, at p. 532.

Page: 20

[42]   Second, having determined that the sole issue at trial was credibility, the trial judge approached this issue as one to be decided on a balance of probabilities. I acknowledge that individual facts need not be proven beyond a reasonable doubt at trial; only the elements of the offence must meet this higher standard: see *R. v. Bouvier* (1984), 11 C.C.C. (3d) 257 (Ont. C.A.), at p. 264, aff'd [1985] 2 S.C.R. 485. However, by setting up the whole case as a choice between two competing versions of events and stating that the version that is "most probable in all of the existing circumstances" will be selected as "true", the trial judge came dangerously close to deciding the ultimate issue at trial on a balance of probabilities. See *R. v. Quidley*, 2008 ONCA 501, 232 C.C.C. (3d) 255.

[43]   That the trial judge viewed his role in this case as choosing between the appellant's and the complainant's competing versions of events is further confirmed in his method of assessing their credibility. The trial judge acknowledged, in an exchange with counsel during closing submissions, that the appellant had testified in a forthright and honest manner. Since the complainant had testified in an equally honest manner, however, the trial judge set aside the fact of the appellant's honest presentation as neutral:

> [B]oth the complainant and the accused, to my mind, presented honestly and well. Both gave their evidence in a forthright manner. But it seems to me that the issue of credibility is not to be decided by demeanour, it's not to be decided by the delivery of evidence, it's not to be

Page:  21

> decided by manner. It's to be decided by the internal
> and external consistency of the evidence given, with the
> evidence as a whole ... .
>
> ...
>
> So I say that only because I would almost rather have
> you focus on those issues of internal and external
> consistency or inconsistency, because to my mind that's
> where the truth emerges.

[44]   The trial judge assigned relevant demeanour evidence no weight because it did not help him pick between the competing versions of events told by the complainant and the appellant at trial. This is demonstrative of the fact that the trial judge viewed his task as having to choose between the complainant's and the appellant's evidence. The trial judge's either/or approach was in error because it neglected the third option, namely, that even though the trial judge did not believe the appellant, he was not convinced of the appellant's guilt on the whole of the evidence.

[45]   The appellant raises an additional concern with respect to the trial judge's findings of credibility. After carrying out the credibility analyses of the appellant and the complainant, the trial judge rejected the appellant's submission that the complainant's credibility was undermined by her delay in disclosing the assault, and disclosing it on the same day as she consented to a variation in the appellant's access to their children. He stated that there was "no evidence on this trial that persuaded me that the manner in which the reporting came about meant that her report of what transpired on February 8, 2008 was not true" (emphasis

added). The appellant argues that the trial judge reversed the burden of proof by placing the burden on the appellant to "persuade" the trial judge that the report was untrue. This simply adds to the appellant's legitimate concern respecting the trial judge's credibility findings.

### (2) The trial judge's finding on the critical issue of fact and his piecemeal approach to the evidence

[46]   The fact that the complainant and the appellant had a history of engaging in sexual role play complicated the trial judge's analysis in this case. Both the complainant and the appellant confirmed that their role play sometimes included a dominant/submissive dynamic, such as in the teacher/student scenario. Their evidence conflicted, however, on whether they regularly enacted an assailant/victim scenario as well.

[47]   As a preface to his analysis of the evidence, the trial judge explained that he would focus on this aspect of the appellant and the complainant's relationship. Specifically, the trial judge set himself the task of determining whether in the past they had engaged in sexual role playing with an assailant/victim dynamic. The trial judge said his conclusion on this singular fact would drive his findings on credibility, and indeed, on the guilt or innocence of the appellant. The foregoing is explained in paragraphs 59 and 60 of the trial judge's reasons, which read as follows:

If I find that [the complainant] and [the appellant] engaged in a role playing sexual relationship focused on dominance and submissiveness that probably or likely included an aggressive/submissive victim role playing scenario, then to my mind this would be a strong indicator that it would be unsafe to convict. This would be so since the Crown would have failed to establish the absence of consent beyond a reasonable doubt. That conclusion would follow, either because such a finding would necessarily call [the complainant's] evidence into serious doubt, or because it would leave open the possibility that in their sexual relationship "no" could mean "yes" or that [the appellant] could have had an honest but mistaken belief. I would be obliged to acquit the appellant of the charge he faces.

On the other hand, if I find on the whole of the evidence that [the complainant] and [the appellant] did not engage in an aggressive-assailant/submissive-victim type of role playing scenario as part of their sexual relationship, even if they did types of role playing focussed on "teacher/student" or "daddy/daughter", or other lesser expressions of sexual dominance and submissiveness, then there would be no basis to believe the accused either that [the complainant] consented or that he had an honest but mistaken belief that she was consenting in the context of their sexual relationship. Such a finding would totally undermine any credibility to [the appellant's] assertion of holding an honest but mistaken belief that [the complainant] consented because the context in which "no" allegedly meant "yes", or in which he could have reasonably have had an honest but mistaken belief would be absent. In that case, the appellant should be convicted since the Crown would have established the absence of consent beyond a reasonable doubt. That would necessarily be the result if I did not believe his evidence and was not left in a reasonable doubt by it, and provided I was satisfied that the Crown had otherwise proven the absence of that consent beyond a reasonable doubt, having regard to the whole of the evidence. [Emphasis added.]

[48]   This approach, central to the trial judge's analysis, is fundamentally flawed for two reasons.

[49]   First, the trial judge determined that this critical finding of fact would be made on a standard of "probability" or "likelihood". As I noted above, although individual facts in a criminal trial need not be proven beyond a reasonable doubt, there is cause for serious concern when a critical fact that determines the outcome of the case is decided on a balance of probabilities: *Quidley*. Such an approach not only lowers the Crown's burden of proof, but also places a burden on the appellant to prove, on a balance of probabilities, that he and the complainant did indeed share a sexual history of this nature.

[50]   Second, and more importantly, the trial judge erred by tethering the appellant's acquittal or conviction to this finding of fact. The trial judge has a responsibility to consider all of the evidence in relation to the ultimate issue of whether the guilt of the accused has been proven beyond a reasonable doubt: *Morin*. The appellant was charged with sexually assaulting the complainant on February 8, 2008. The trial judge therefore had an obligation to consider the witnesses' testimony regarding the events of that evening, and whether it was credible in the context of the evidence as a whole, before determining the ultimate issue of the appellant's guilt.

Page: 25

[51]    Rather, the trial judge in this case decided that if the complainant was to be believed on the subject of the parties' sexual history, the appellant "should be convicted" because 1) his testimony regarding his honest but mistaken belief in consent would not be credible and 2) the Crown would have proved the absence of consent beyond a reasonable doubt. These were the only two issues in the case. The trial judge ultimately found that, as the complainant had testified, the complainant and the appellant's sexual relationship did not include an assailant/victim role playing scenario. The appellant's conviction flowed inexorably from this finding because the trial judge had already concluded that if the complainant and the appellant did not share a sexual history of this particular nature, then both of the appellant's defences of consent and honest but mistaken belief in consent were baseless – and this without considering all of the evidence, specifically any evidence directly related to the events of February 8, 2008. This reasoning runs counter to the analytical framework set out by the Supreme Court of Canada in *W.(D.)*. The fact that the trial judge reiterates the applicable *W.(D.)* principles at the end of the extract quoted above is not dispositive, given the obvious flaws in his analysis.

[52]    The dangers of taking such a piecemeal approach to the evidence are further realized in the trial judge's decision. The balance of the reasons demonstrate that after the trial judge decided the complainant was to be believed as to the nature of the parties' sexual history, he assumed her version of the

events of February 8, 2008 was true as well. This error is of a piece with the trial judge's approach to this case as a credibility contest wherein his task was to choose between believing the complainant's evidence or the appellant's evidence in its entirety, as earlier discussed.

[53]    The above errors led the trial judge to analyze the appellant's evidence regarding February 8, 2008 in light of the trial judge's foregone conclusion that the complainant was telling the truth about the events of that night. For example, the trial judge found that the appellant's credibility was negatively affected because the appellant "minimized his own actions and the force that he used" against the complainant, despite the appellant's having described the night's intercourse as being in the "aggressive-assailant" mode. In other words, the trial judge found that the appellant's testimony was inconsistent and could not be believed because he testified that the February 8 intercourse was in the aggressive-assailant mode, but simultaneously denied that he used any force against the complainant. These findings assume that the complainant's testimony regarding the amount of violence used against her on February 8, 2008, was true, and was an accurate depiction of what "aggressive-assailant" sexual relations are. These findings are contrary to the appellant's testimony that

O

"aggressive" sex meant using aggressive language, not physical force, in a sexual context.[1]

[54]   In the same vein, the trial judge concluded on four separate occasions in his reasons that the complainant's testimony was "much more in keeping with" the aggressive-assailant scenario "than what [the appellant] described", particularly as to the words, force, and level of dominance used by the appellant. In other words, because the trial judge concluded that the events of February 8 were an "aggressive-assailant" scenario as the complainant had defined it, the complainant's evidence fit better with the physical force that is integral to that scenario.

[55]   The trial judge's piecemeal approach to the evidence meant that he did not consider all of the evidence in relation to the ultimate issue of whether the appellant's guilt had been proven beyond a reasonable doubt. In addition to the concerns identified above, there are several facts that are not addressed in the trial judge's reasons. These, individually or in concert, were relevant to the ultimate issue in the trial, even accepting the trial judge's finding that the

---

[1] While the appellant did agree in cross-examination that dominant/submissive role play includes an element of "aggressive physicality", he described examples of this physicality as holding the complainant's hair in his hand and not talking to her in a soothing way. He clarified that neither he nor the complainant ever hurt one another during this type of role play and refused to agree with the suggestion that the role play would involve more physicality than he had described: *Cross-Examination of A.P.*, March 8, 2011, at pp. 254-57.

complainant was credible and the appellant was not. Some of the facts and issues not dealt with in the trial judge's reasons are as follows.

[56]   Despite finding the appellant to have testified honestly, as discussed above, the trial judge rejects his evidence without analyzing the impact of that demeanour evidence. This omission is all the more problematic when one considers that in his reasons for sentence, the trial judge wrote that the complainant "does seem [to] have a tendency to dramatize, both in her evidence at trial and in her victim impact statement". These findings are never reconciled, nor considered.

[57]   More importantly, nowhere in his reasons for judgment does the trial judge make a specific finding as to whether, in the specific context of the appellant and the complainant's sexual relationship, "no" had ever meant "yes". As appears from the excerpt set out at para. 46 of these reasons, he thought that if "no" meant "yes" in their relationship, this was a strong indicator that it would be unsafe to convict. Indeed, the fact that "no" meant "yes" in the appellant and the complainant's relationship was a cornerstone of the appellant's defence.[2] It was not until he issued his reasons for sentence that the trial judge revealed that he accepted the appellant's evidence in that regard. As set out in the reasons for sentence, "it is clear that in the context of their relationship 'no' frequently did

---

[2] See paras. 7, 57, 59, 60, 74, 80, and 81 of the trial judgment.

mean 'yes'" and that the complainant and the appellant had "for some years, acted as if no meant yes albeit on a less serious or aggressive plane." The trial judge ought to have weighed this fact in determining the ultimate question of whether the appellant held an honest but mistaken belief in the complainant's consent on February 8, 2008, or whether, on the whole the evidence, the trial judge was convinced beyond a reasonable doubt of the appellant's guilt.

[58]   In summary, the trial judge erred by setting up an analytical framework wherein one critical finding of fact, determined on a balance of probabilities, drove his conclusions on both credibility and whether the Crown had proven the appellant's guilt beyond a reasonable doubt. He thereby assessed the trial evidence in a piecemeal fashion, and failed to consider all of the evidence in relation to the ultimate issue.

**CONCLUSION**

[59]   The trial judge approached the trial as a credibility contest between the appellant and the complainant, he made key findings of fact on a balance of probabilities, he evaluated the evidence in a piecemeal fashion, and he failed to make some crucial findings altogether. More importantly, the trial judge's reasons show that he did not consider whether the evidence, taken as a whole, raised a reasonable doubt as to the central issue of the appellant's *mens rea* for sexual assault, and particularly whether the appellant had an honest but mistaken belief that the complainant consented. In his reasons, the trial judge correctly recites

Page: 30

the *W.(D.)* test, but does not demonstrate that it was correctly applied. This constitutes an error of law. The appeal should be allowed and a new trial ordered.

Released: MAY 2 8 2013