# EXHIBIT

# I

# ONTARIO COURT OF JUSTICE
# OLD CITY HALL, TORONTO REGION

B E T W E E N :

## HER MAJESTY THE QUEEN

— AND —

## ADAM PEARCE

---

Before Justice M.L. Hogan
Reasons for Judgment released on October 12, 2012

Ms. L. Collins ..................................................................... for the Crown
Ms. I. Revutsky ................................................................ for the Accused, Adam Pearce

---

**HOGAN J:**

[1]     This is the matter of Adam Pearce who is charged that on or about May 13, 2009 he did commit an assault on Aiden Pearce.  Aiden Pearce, who was 3 years old at the time of the alleged assault is the son of Adam Pearce.

[2]     The evidence in this matter was heard over several days – Aiden Pearce, his mother Angel Brennan, Adam Pearce, and Aiden's paternal grandparents Ruth and Michael Pearce all testified.

Attachment P

- 2 -

[3]     I heard submissions on September 7, 2012 and reserved my decision to today's date.


[4]     The facts as alleged are briefly as follows:  On May 13, 2009 Aiden and his sister spent the day with their father and paternal grandparents.  The visit took place both at Trinity Bellwoods Park and at the grandparents' home on Dovercourt Road, in Toronto.  At that time, Aiden's parents were separated.  Aiden's mother, Angel Brennan, was living in Brampton with her parents and Aiden's father was living with his parents at the Dovercourt Road address. The arrangements for access were that Adam would have access on Wednesdays, on a supervised basis – his parents to supervise. The children would be picked up by one or both grandparents while Adam waited close by.  They would all then spend the day together and the children would be returned by 5:00 p.m. – again dropped off by the grandparents.  On the day in question, Angel Brennan noticed Aiden playing with his neck at the dinner table.  She investigated and saw red scratches and bruising.  Aiden stated he wasn't supposed to talk about it, that he was supposed to say he fell down the stairs but that the marks had been caused by his father grabbing him around the throat.  As a result Angel went to the police with Aiden. On May 13, 2009 police photos were taken of Aiden and the marks, and on May 16, 2009 Aiden gave a video statement to the police, again stating that his father had grabbed him by the throat.


[5]     I have carefully considered the viva voce evidence, the exhibits filed and the submissions made by both Crown and Defence counsel.  I find Adam Pearce not guilty of the assault on his son Aiden Pearce.  I do so for the following reasons.

P-2

- 3 -

[6]     As Defence counsel submitted this is essentially a case of credibility.  On the one hand we have Aiden Pearce, a 3 year old boy at the time of the incident, who alleged that his father grabbed him by the throat causing the marks and on the other hand the boy's father and paternal grandparents testifying that at least one grandparent was always with Adam and Aiden that day and absolutely nothing happened to cause marks.

[7]     The evidence from Aiden and Angel varied considerably in describing what had happened.  Aiden in his video statement given on May 16, 2009 indicated at various points that Dad grabbed me by the throat, it was an accident, he was sitting on the potty reading a book,  his father ordered him to get to the potty right now, he repeated several times "I don't know" when questioned as to what happened, that he fell and hurt himself on the stairs when he jumped and tumbled at his house not his father's, it didn't hurt when his Dad put his hands around the neck,  he didn't know what happened after he was grabbed, he said to his Dad really loud "Don't grab me by the neck" and when Dad gets mad at him he grabs him by the throat and he is not scared of his father.  In his testimony, albeit almost 2 years later, he stated that his Mom told him that his Dad grabbed him by the throat when he was on the potty, that after being grabbed his Dad shook him, that it happened in his bedroom in his house when his Dad locked the door, that he didn't remember, and that his Dad grabbed him, slammed him down and then left.

[8]     Angel Brennan testified that when she discovered the marks at dinner time – about 45 minutes after Aiden had returned home – he told her that he wasn't supposed to talk about it,

P-3

- 4 -

that he was supposed to say he fell down the stairs, and that his father grabbed his throat, lifted him up, slammed him down on the toilet and called him a "stupid shit".

[9]     The only constant that runs through these accounts when Aiden was stating that he remembered, as opposed to saying as he did several times that he didn't remember,  was that his father grabbed his throat. The reasons for doing so varied as did the location as to where it happened.

[10]     I recognize that it is extremely difficult for a young child to give a statement or testify. Aiden Pearce was 3 when he gave his video statement and 5 when he testified in court. A young child is not to be held to the same expectations or standard as an adult or even to that of an older child, when giving a statement or testifying.  Having said that, I still have concerns about Aiden's statement and testimony.  As I have indicated, when giving his statement he did state a number of times that he did not remember. He also stated that the grabbing did not hurt – something that would be unusual given the scratch marks – one would expect at least it would have stung.  He also said in his statement that his father grabbed him all the time and elaborated and said that when his Dad gets mad at him he grabs him by the throat.  Yet despite this he stated on video he was not scared of his father, that he liked going to his Dad's and that playing with his father was more fun than playing with his grandparents. He also stated in his testimony that when he is being bad his Dad wouldn't spank him but just say "Stop doing that".

p.4

[11]    Angel Brennan's account of what Aiden said to her regarding what had happened was considerably exaggerated compared to what Aiden said in both his video statement and in his viva voce testimony.   Aiden never stated in his video or in his court testimony that he had been lifted up, slammed down on the toilet and called "a stupid shit".   It was clear from the evidence that the separation of Angel and Adam was not an amicable one.   Apparently, there were prior allegations of injury, court proceedings and CAS involvement.   Aiden himself in his viva voce testimony stated that his Mom told him that Dad grabbed him by the throat when he was on the potty, that she said he could see his father if he's better and doesn't hurt him anymore, that my Mom doesn't really like me talking to him (reference to his father) and that his Mom was a little upset when he went to visit Dad.   Ms. Revutsky, counsel for Mr. Adam Pearce, submitted that it was clear that Angel Brennan had a bit of an agenda when testifying – the agenda being that she wanted Adam Pearce's access cut off.   While I wouldn't go so far as to say it was clear from her testimony that this was her agenda, she certainly made it clear that she felt her children returned from their access visits unhappy and in some cases distraught.   Ruth and Michael Pearce testified to the opposite and the pictures I saw of the children with their father showed happy children.   Angel Brennan's testimony left no doubt that she did not feel the access visits were beneficial to her children.   Aiden's comments in his testimony would indicate that he was at least somewhat aware of her feelings around access visits.   I also found Aiden's viva voce testimony concerning his paternal grandparents – Ruth and Michael Pearce – to be particularly troubling.   He testified that his paternal grandmother -- Ruth Pearce -- was dead and seemed to have no knowledge of or recollection of his paternal grandfather Michael Pearce.   Aiden was questioned regarding his belief and lack of recollection and he did not waver.   I was convinced that he believed his grandmother Pearce

P. 5

- 6 -

was dead and that he knew nothing of a grandfather Pearce. I find it difficult to understand how Aiden could have these beliefs unless there had been absolutely no mention of his paternal grandparents while at his mother's home or that this was something he had been told. This indicates to me that there may well have been an agenda on Angel's part to distance Aiden from Adam and his family. I also find it strange that he at some points in his evidence had a memory of being grabbed by the throat by his father, yet had absolutely no memory of the grandfather who was with him for a good part of the day on which the incident was alleged to have occurred.

[12]    Adam Pearce testified and denied any assault on Aiden nor seeing any marks on Aiden. He stated that the day of May 13, 2009 was a happy one and one without incident. I found him to be a credible and forthright witness and one who understood how important it was that he strictly obey the requirements that his access with the children be supervised by his parents at all times.

[13]    Ruth and Michael Pearce, Aiden's paternal grandparents, also testified. They confirmed the details of that day as their son Adam had given in his testimony. They both stated it had been a particularly happy access visit, with no moments when either of the children required disciplining. They both denied seeing any marks on Aiden – and confirmed that they had changed his clothes so they would have been easily visible. They both impressed me as being very aware of their responsibilities to supervise access and that one of them was to be with Adam at all times when he was with the children. They testified that that had been the case on May 13, 2009 and that Adam had not grabbed Aiden by the throat. I

P-6

found both of them to be extremely credible and no nonsense individuals. Crown counsel, Ms. Collins, suggested that they loved their son, wanted to continue seeing their grandchildren and that this might have an impact on their testimony. When this was put to Ruth Pearce she was very clear that she would not lie. When reading my notes of her testimony, I noted that I had made a comment to myself in my bench book while she was testifying that she was an excellent witness and very credible.

[14]    The evidence from all who knew Aiden was that he was a very active boy who liked to wrestle and jump and engage in all manner of physical activity. As a result it was not unusual for him to acquire bruises or scrapes, as is the case with many young children. I note as well that there was a gap of at least 45 minutes between the time Aiden returned to his mother's house and the time his mother saw him playing with his neck – so it is possible something happened during this interval. I do not know why Aiden made some of the statements he did regarding his father grabbing his throat, but he did spend most of his time with his mother, had a sense of how she felt regarding access visits to his father and may have been as Ms. Revutsky submitted an impressionable young child wanting to please his mother. I also note that the date of the alleged incident was only a few weeks following a report from the Children's Lawyer that recommended access to Aiden by Adam be increased. Angel Brennan was asked about this in cross examination and she stated that she did not agree with the recommendation. This Report was never introduced as an Exhibit - it was only referred to in Ms. Brennan's cross examination. Ms. Brennan may well have been particularly anxious around this time about the possibility of access being increased and this could have been felt by Aiden.

P-7

- 8 -

[15]    I do not know how Aiden acquired the bruises and scratches that were pictured but I

have absolutely no doubt, given the evidence I heard, that they were not acquired as a result of

Adam Pearce grabbing him by the throat or assaulting him in any manner on May 13, 2009.

There will be a finding of not guilty.


**Released:     October 12, 2012**


Signed: "**Justice M.L. Hogan**"

p-8

# EXHIBIT

# J

1

2
**ANTHONY P. CAPOZZI, CSBN: 068525**
**LAW OFFICES OF ANTHONY P. CAPOZZI**
1233 W. SHAW AVE., SUITE 102
3
FRESNO, CALIFORNIA 93711
PHONE: (559) 221-0200
FAX: (559) 221-7997
4
EMAIL: Anthony@capozzilawoffices.com
www.capozzilawoffices.com

5

6
ATTORNEY FOR Defendant,
ADAM ALAN HENRY
7

8

9
### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA
10
* * * * * *

11
UNITED STATES OF AMERICA,                 Case No.: 1:13-CR-00409-AWI

12
                    Plaintiff,

13                                                **NOTICE OF EXPERT EVIDENCE OF A**
        v.                                        **MENTAL CONDITION PURSUANT TO**
14                                                **RULE 12.2(b) OF THE FEDERAL RULES**
                                                  **OF EVIDENCE**
15
ADAM ALAN HENRY,

16
                    Defendant.

17

18
**TO THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES ATTORNEY**
**FOR THE EASTERN DISTRICT OF CALIFORNIA:**
19

20
        Defendant, Adam Alan Henry, pursuant to Rule 12.2(b) of the Federal Rules of

21
Evidence hereby notifies the United States of America that the Defendant intends to introduce

22
expert evidence relating to the mental condition of the Defendant and Angele Henry which

23
bears on the issue of guilt with the following witnesses:

24
        1.      Harold L. Seymour, Ph.D.,

25
        2.      Howard B. Terrell, M.D.,

26
        3.      Hy Malinek, Ph.D., and

27
        4.      Philip S. Trompetter, Ph.D., ABPP.

28
///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:   December 29, 2016          By:   /s/Anthony P. Capozzi
                                          ANTHONY P. CAPOZZI
                                          Attorney for Defendant ADAM ALAN
                                          HENRY

1

2  **ANTHONY P. CAPOZZI, CSBN: 068525**
   **LAW OFFICES OF ANTHONY P. CAPOZZI**
   1233 W. SHAW AVE., SUITE 102
3  FRESNO, CALIFORNIA 93711
   PHONE: (559) 221-0200
   FAX: (559) 221-7997
4  EMAIL: Anthony@capozzilawoffices.com
   www.capozzilawoffices.com

5

6  ATTORNEY FOR Defendant,
   ADAM ALAN HENRY
7

8

9              **UNITED STATES DISTRICT COURT**

               **EASTERN DISTRICT OF CALIFORNIA**
10
                       * * * * * *
11 UNITED STATES OF AMERICA,              Case No.: 1:13-CR-00409-AWI

12              Plaintiff,

13      v.                                **NOTICE OF EXPERT WITNESSES**

14

15 ADAM ALAN HENRY,

16              Defendant.

17

18 **TO THE ABOVE-ENTITLED COURT AND TO THE UNITED STATES ATTORNEY**
   **FOR THE EASTERN DISTRICT OF CALIFORNIA:**
19

20      Defendant, Adam Alan Henry, hereby notifies the United States of America that the

21 Defendant intends to introduce expert evidence from the following witnesses:

22      **1.     Harold L. Seymour, Ph.D.,**

23      **2.     Howard B. Terrell, M.D., and**

24      **3.     Hy Malinek, Psy.D.**

25      Experts, Dr. Harold Seymour, Dr. Howard Terrell, and Dr. Hy Malinek would testify as

26 to the traits of one who collects child pornography and as to whether the Defendant displays

27 those traits. (Reports to follow under seal.)

28 ///

---

**4.    Philip S. Trompetter, Ph.D., ABPP.**

Dr. Trompetter would testify to the traits of one who collects child pornography and as to whether Angele Henry displays those traits. (Report to follow under seal.)

**5.    Marcus Lawson**

Mr. Lawson would testify as to count one regarding the allegations therein.   Mr. Lawson is also being utilized as an expert in preparing this case for trial and in the cross-examination of the Government's expert witnesses.   He would only testify as to any rebuttal or clarification of the Government's experts. (Report to follow under seal.)

Respectfully submitted,

Dated:    August 7, 2017          By:    /s/Anthony P. Capozzi

ANTHONY P. CAPOZZI
Attorney for Defendant ADAM ALAN
HENRY

**ANTHONY P. CAPOZZI, CSBN: 068525**
**LAW OFFICES OF ANTHONY P. CAPOZZI**
1233 W. SHAW AVE., SUITE 102
FRESNO, CALIFORNIA 93711
PHONE: (559) 221-0200
FAX: (559) 221-7997
EMAIL: Anthony@capozzilawoffices.com
www.capozzilawoffices.com

ATTORNEY FOR Defendant,
ADAM ALAN HENRY

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

\* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>ADAM ALAN HENRY,<br><br>        Defendant. | Case No.: 1:13-CR-00409 AWI-BAM<br><br>**REPLY TO GOVERNMENT'S OPPOSITION TO PROPOSED EXPERT TESTIMONY**<br><br>**Date: May 30, 2017**<br>**Time: 1:30 p.m.**<br>**Court: 2**<br>**Hon. Anthony W. Ishii** |

TO:    **THE ABOVE ENTITLED COURT AND TO THE UNITED STATES ATTORNEY GENERAL FOR THE EASTERN DISTRICT OF CALFIORNIA:**

    Defendant, ADAM HENRY, by and through his attorney, Anthony P. Capozzi, hereby responds to the Government's Motion to Exclude Expert Testimony:

    Count 1 of the Superseding Indictment returned on March 16, 2017, alleges a conspiracy to sexually exploit a minor in violation of 18 U.S.C. § 2251(a) and (e) from May 2012 through September 19, 2013.

    Count 2 alleges receipt and distribution of Child Pornography in violation of 18 U.S.C. § 2252(a)(2).

///

Rule 702 of the Federal Rules of Evidence states:

**Rule 702. Testimony of Expert Witnesses**

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.)

In *United States v. Romero,* 189 F.3d 576 (7th Cir. 1999) the prosecution witness testified regarding,

1. Characteristics of "preferential" child molesters and the methods they used to attract and abuse children.

The testimony at trial dealt with child molesters in general, not from the specific facts of the case. The agent testified to the general traits usually exhibited by sex offenders.

The defense argued that this testimony invaded the province of the jury in that the testimony focused on the mental state of the defendant and it amounted to group character evidence which is not permitted under Rule 404(a) of the Federal Rules of Evidence.

The court denied the defense objections and allowed the testimony of the general traits of child molesters.

In *United States v. Betcher,* 534 F.3d 820 (8th Cir. 2008), a case involving a violation of 18 U.S.C. § 2251(a),(b), 18 U.S.C. § 2252(a)(2) and 18 U.S.C. § 2252(a)(4)(B) the defense objected to the testimony of an expert in child abuse regarding,

1. age appropriate sexual behavior,

2. delayed disclosure, and

3. sexual abuse.

The court in referring to Rule 702 stated that in the context of child abuse cases, a qualified expert can inform the jury as to behavioral characteristics of sexually abused children in

1 | general.

2 |     The court found the expert's testimony relevant because it educated the jury on issues

3 | necessary to their determination of the issues.

4 |

5 |         HY MALINEK, PSY.D and HAROLD SEYMOUR, PH.D

6 |     Both experts, Dr. Hy Malinek and Dr. Harold Seymour, would testify as to the traits of

7 | one who collects child pornography and as to whether the Defendant displays those traits.

8 |     Accordingly, based on the cases cited herein, the testimony of Dr. Hy Malinek and Dr.

9 | Harold Seymour should be allowed.

10 |               MARCUS LAWSON

11 |     Marcus Lawson has testified in a number of cases in the Eastern District of California

12 | as an expert.   The defense has submitted Mr. Lawson's report to the Government that he

13 | prepared in *People v. Angele Henry,* case number 4004512, in the Superior Court of Stanislaus

14 | County.

15 |     Mr. Lawson would testify as to count one regarding the allegations therein.   Mr.

16 | Lawson is also being utilized as an expert in preparing this case for trial and in the cross-

17 | examination of the Government's expert witnesses.   He would only testify as to any rebuttal or

18 | clarification of the Government's experts.

19 |

20 |         PHILIP S. TROMPETTER, PH.D, ABPP

21 |     Dr. Trompetter would only be called as a witness if Angele Henry were to testify to

22 | clarify her testimony or for impeachment.

23 |

24 |            Respectfully submitted,

25 | DATED:     May 19, 2017    By:  */s/ Anthony P. Capozzi*

26 |            ANTHONY P. CAPOZZI
   |            Attorney for Defendant ADAM ALAN HENRY

27 |

28 |

# EXHIBIT

# K

*Confidential*
*Attorney Work Product*

*USA v. Adam Henry*
*February 24, 2014*

## ADAM HENRY PERSONNAL NOTES

This is probably not helpful, but just in case, the only other time I've been in trouble with the law, was more due to niavete and stupidity on my part than maliciousness or anything, but I pled guilty to misdemeanor grand theft I believe it was back in 2000 I think it was. I was given probation and community service, no jail time. I did my community service with the Red Cross, even knowing the theft charge, when my hours were completed, they didn't ask me to stay on as a volunteer, they wanted me to stick around bad enough that they gave me $250 worth of classes for free and gave me a position as a paid instructor. Which is rare for an organization that relies so heavily on volunteers, even disregarding the theft charge. For the next year or two, I taught CPR and first aid every Saturday, showing up as the only staff member, with keys and alarm codes. After that, I worked at an ISP for 4 years, with keys and alarm codes. Recently I worked for family for the past 8-9 years. Again with keys and alarm codes. The prosecution describes me as a betrayer of trust, but as far as I know, my family still believes in my innocence, and doesn't feel betrayed, much less that they withdrew support.

Above covers about 10 years after pleading to theft of computer equipment where I was trusted with complete, unrestricted access to entire companies filled with computer equipment. Yes people make mistakes, but I really do feel I am trustworthy.

*Side Thought*
I still don't understand how I could be pulled over, searched, cuffed, had my car searched and locked, put in a police car and taken to work without being told why without having a warrant, and having all questions ignored.

Another thought. I don't want to stab my wife in the back, and I know it looks bad for her and I don't want to add to it, Mr. Capozzi had mentioned an option of her blaming me and me blaming her. He's pointed out she's the one in the video. I know her appearing in the video and the civil case with the kids changes things. (Especially since the civil case allows hearsay.) I haven't been able to talk to her, get her side, and I do believe in innocent until proved guilty. I also don't believe she would harm a child. I think there has to be another explanation and will want to avoid stabbing her in the back or adding to the evidence against her.

If it can be used to defend myself without hurting her or myself in criminal or civil cases, there are things was a note in the discovery from the officer reviewing text messages between my wife and the minor. The officer said they thought my wife was "grooming" the minor. The prosecution might respond saying I pushed her into it, my mother-in-law told the police my wife is a "pleaser." (Comment was in the discovery.) But perhaps the facts that my wife chatted with her via text message and facebook, while I didn't, that most of the time the minor spent at our house, I was at work, and that my wife was obviously bi-sexual and into women (the video should clearly demonstrate that) combined with the officer's report suggesting my wife was "grooming" her might suggest I wasn't involved with the recordings of the minor in our bathroom.

HENRY_001401

In the opposition to detention the prosecution mentioned some texts between my wife and I suggesting that it showed collaboration. But I don't think they do. I can't remember an instance where I encouraged her even in just such a thing.


More thoughts and notes                              Started 2/24/14

Yesterday in court the prosecutor said there was no more discovery to hand over. I've read through the 600 odd pages and some things still seem to be missing.

I understand the police reports wouldn't cover every video or even every video in a set, so the fact that they didn't cover all the "home videos" I've made with women aren't covered, just "some" of the ones containing blindfolded women, so noting it, but not overly warried about it.

There are also references to a "cell phone forensics report" that is nowhere in what I've seen. Texts form my wife's phone were used against me in the detention opposition but that phone was confiscated during the federal warrant of which no discovery has been seen by me.

There does seem to be 3 glaring holes in the discovery though. The first would be a copy or transcription of the police interviewing me. The second would be the list of search terms. One of the police reports said they found a list of 56 or so search terms, which were listed elsewhere in the report, then lists 10 or so "bad" ones as examples. But the page with the full list isn't in anything I've seen.

The biggest hole is the federal stuff. The request for the federal search warrant is in there, but I didn't see anything after. The results of that warrant, what they took, what they found, what was said, none of that was in there for the federal warrant only the state ones.

These things could be in the digital information they gave, or somewhere else I haven't seen.

HENRY_001402

# EXHIBIT

# L

*Confidential*
*USA v. Adam Alan Henry*

## ADAM HENRY NOTES  PART A

## CONTRADICTIONS

Ease of access contradictions, facts don't match police expectations of a predator or my skill level

- Knowledge
  - Bates (145) line 11 "By virtue of my training and experience, I have become familiar with the methods used by criminals to commit their crimes and the sophisticated tactics they routinely use to attempt to thwart investigations into their illegal activities."

  - My audio interview – Officer notes that the network is complicated and sophisticated, exhibiting surprise I have the skill set I do without a college degree and only hands-on experience, after asking my age. Says he's surprised I'm not making nook.

  - Wife's interview 9:55 – Det. Moore talks about my knowledge, networking, etc.

  - Wife's interview 10:31 – Det. Moore "This is a guy who is extremely computer literate."

  - Government Opposition to bail, Oct. 2013, Page 2 "The government also noted the defendant was very skilled with computers."

- ➢ So, **everyone** agrees I have skills and knowledge WELL beyond the average predator, therefore, based on Det. Moore's personal experience (years of work, symposiums, training by and representing FBI, etc.) I should be using "sophisticated tactics" beyond what he is used to.

  - Wife's Interview 10:33 – 10:35: Wife says to Det. Moore "I knew about computers..." and asks him why someone with my knowledge would do something like this in such a stupid and obvious way. He answers say that my "urges and desires" override my intellect and knowledge,

HENRY_001393

but "urges an desires" didn't stop the predators in all his other cases from using "sophisticated tactics" to try to get away with it?

- o Wife's Interview – Det. Moore claims I was very careful to keep CP off the business computers, as they only found it on my desktop.

- o Wife's interview 10:05 – 10:06, 10:11 – Det. Moore talking about how I set up the state SW (9) Netgear password to hide CP from her.

➤ None of Det. Moore's arguments or explanations make sense. If predators use their knowledge as he said before serving the SW, why would I be different? Simply "urges and desires?" If that were the case, why would I be using any of my skills to set up a password to hide the stuff or keep it separate from the business? Det. Moore noted in my wife's interview that most of the videos were of minors my step-daughter's age, saying that's why I married her. Not only was that false, but after my psych report, even Tierney said on Oct. 15 I was attracted to "teenage," perhaps not younger. Why would "urges and desires" make me forget skills to acquire something I'm not interested in?

- Hiding
  - o Bates (145) Line 11 (again) "by virtue of my training and experience, I have become familiar with the methods used by criminals to commit their crimes and the sophisticated tactics they routinely use to attempt to thwart investigations into their illegal activities."

  - o Bates (6) It notes that at the time, nine property addresses were occupied by my employer, and notes "numerous computers on the property." A related bates shows an aerial view. Nine large warehouses and 30+ computers.

  - o Bates (113) "I then conducted a thorough search of open work areas for secreted laptops that could be used to download."

  - o SW affidavit asks for permission to search for hidden devices, as they are often secreted to help hide their crimes.

2 of 8

*Confidential*
*USA v. Adam Alan Henry*

- o Bates (83) showing an external hard drive on a shelf in the master bedroom, state Home SW (7) , Bates (529), not hidden, not password protected.

- o Bates (276) line 23 "The owner also stated that Henry had full and exclusive control of the entire company's computer network."

- o Bates (13) Officer notes CP found "on a computer ... which was only accessible by" me.  My office, my computer, locked with my password.

- o Bates (599) Office demonstrating access to State Home SW (9) Netgear without requiring password.  "The idea of this entire process was essentially a "proof of concept" one in which demonstrates that accessing the contraband did not actually require a password." "At the point I stopped reviewing ... I had located ... 5 possible CP (age difficult) and 5 CP." "When I stopped the 'proof of concept,' I still had...."  Bates (601) even describes the method to reset the password to factory default, from the user guide, downloadable for free from the manufacturer's website site.

- o My audio interview – Officer says "Obviously we can look at access dates, see when they were looked at."  I respond "of course."

- o My audio interview – Officer talks about how easy it is to analyze P2P software.

➢ With my skills, access to a massive square footage and a large number of computers, with "full and complete control" including keys and alarm codes to everywhere, they only found files on my computer, in my office, located with my password.  In spite of the officer expecting to find hidden computers, and me having access to wireless computers the size of a paperback book, or even running the P2P software on a co-workers computer as a service to frame them. It makes no sense.

HENRY_001395

- o Even the password, at home were easily bypassed, hard drives just laying around. In spite of claims and expectations, **nothing** was really hidden.  I didn't know anything needed to be.

- Encryption
  - o Bates (345) line 8 "Due to the lengthy process ... such as password cracking and/or encryption cracking ... Asking for more time on SW results, expecting such measures based on his training and experience, BEFORE they knew they were dealing with someone with my skills.

  - o My audio interview – Officer asks if the computer on my desk was encrypted.  I answer with obvious surprise and puzzlement saying "no sir."  He replies "just asking."

  - o My video interview 19:12 – I told the officer when asked about my devices at home that the "contents are not encrypted."

  - o Bates (532) state home SW (11A) had unusual manufacturer-installed encryption software. "As of now, I have not located any indication that any encryption scheme has been used on any of the devices I have examined."
  - o Dr. Seymour – "... these files too easy to access for this to make sense."
  - o Prosecution opposition to bail Oct. 2013 page (6) "... and save it in a place he could easily access it."

➤ Further evidence of me not following predator patterns, I'm not one, and had no idea what was going on.  All police expectations from a standard predator, without my skills, said they expected to find heavy password and encryption methods in place.  In spite of access to devices with encryption pre-installed, an advanced hardware – encrypted Master Black Armor hard drives in my office, no encryption was used anywhere.

*Expert Check*

➤ As for passwords, I flat our gave them all the passwords, but half the devices didn't even have passwords, and the ones that did have them the police were able to bypass without needing them, as seen in the "proof of concept."  The

HENRY_001396

only one who didn't find this stuff "too easy to access" is the prosecutor, who has been constantly wrong and ignored facts in every claim he has made.

- IP Address
  - o Bates (162) – (163) Attachment H talking about the internet, "These communications can be very fast, relatively secure, and almost as anonymous as desired. All these advantages which promote anonymity ... are well known and are the foundation of transactions."

  - o Bates (442) "All of these advantages which promote anonymity for both the distributor and the recipient are well known and are the foundation of transactions between..."

  - o Det. Moore in SW said people use the internet to contact other people interested in such things to discuss them, swap pictures and such, etc.

  - o Bates (167) – (168) line 25 describes tracking a computer by IP address through the ISP.

  - o Bates (168) line 19 "By using publicly available computer programs on the internet, it is possible to determine the ISP/ESP which owns the range of IP Addresses which contain the suspect IP Address." It's actually even easier than he makes it sound, you don't even need a program these days. Typing the IP Address into Google will give you the information.

  - o Bates (3) "This GUID ... had been associated with this IP Address ... for several months."

  - o Bates (5) talks about the ISP, and that my company had a static (dedicated and unchanging) IP Address at my recommendation.

  - o Bates (276) "The response from Charter Communications also showed that the IP Address was a static IP Address. This means that it had 'indefinitely been assigned.'"...

5 of 8

Confidential
USA v. Adam Alan Henry

➢ I worked for an ISP for 5 years, before coming to work here, I know exactly how IPs work, and how to track them, because I've done it. I know how to use IPs relatively anonymously, through proxy servers, IP forwarding, and other forms of IP anonymizers. A commercial static IP address is flat out the easiest to track down, and I know it. Not to mention the P2P program was associated with that IP for "months." (See "GUID"). Not to mention my knowledge and experience with encrypted IP connections. Not only have I set up secure WANS, VPSs, IP tunneling, remote access, etc., but the expert can find an example in discovery. I set up the email system to use an authenticated IMAP connection tunneling through HTTPS with a 256 bit encrypted self-signed SSL certificate. This is a rare, difficult to do, and extremely secure method of internet communication. The expert can confirm this in the email clients on my computer.

*Expert Check*

➢ Someone who knows enough to set up and maintain connections like this would NOT believe the way these files were downloaded were even remotely secure, it's like sending up a flare and screaming "come find me" on a bullhorn.

*Expert Check*

➢ Recently in the aftermath of the Paris attacks, the news agencies are talking about secure methods of communication I've known about for years.

➢ Also note that at no point, on any computer, phone, or other device is there a single suggestion of evidence that any emails, IMS, texts, forum posts, or anything else to discuss, share, trade, or collect CP. In spite of officers expectations. Hacking or using an unsecured neighbor's wireless would have been easy and made more sense.

• My PC
  ○ My audio interview – I mention the state home SW (9) Netgear, officer asks me about it. I explain it, he says "oh, so it's like a NAS?" I say "yes, that's exactly what it is." He says he was confused by the way I said it.

  ○ Evidence sheet itself refers to state home SW (9) as "Netgear Media Storage." Not as a computer or tower.

HENRY_001398

- o Bates (672) An example where they refer to the Netgear as **my** "home computer."

- o Prosecutor opposition to bail Oct. 2013 page (2) "...the defendant saved these videos on a password protected computer."

- o Same place, page (3) "...the defendant's home computer system ... he took them home and saved them to a password protected computer system..."

- o Bates (599) The officer doing a "proof of concept" to show files on the Netgear could be accessed without the password.

➢ Police and prosecution are fond of twisting evidence and lying to try to apply guilt to me.  Originally, they claimed my wife didn't have the password to the Netgear, so it must have been me, more and more evidence against her came out, and now they are trying to say the Netgear was my personal computer. This is wrong in just about every way.

➢ It is **NOT** a "personal computer."  As originally noted, it is a NAS, Network Accessible Storage. It is a file server device.  It has **NO** ability to directly access it.  No monitor, keyboard, or mouse connections. It can **ONLY** be accessed by an actual computer on the network, but **ANY** computer can access it.  *My* personal computer had nothing on it.  My wife's did, and OUR Netgear that she was sorting files on did also.

- Separation
  - o Wife's interview – Det. Moore tells my wife I was careful to keep illegal activities and work separate, after they didn't find anything at work except on my desktop.

  - o Bates (671) Notes that in his previous analysis, he focused on in my work computer a user account that was "a domain user account created on the LNS server."

HENRY_001399

➢ It took them almost 2 years to mention that the user account they found the P2P program in was created on and attached to the same server Det. Moore claims I was keeping separate from.

● Repeat
   ○ Bates (250) "based on my training and experience, individuals who view...often obtain additional...devices even after items have been seized...." In the federal warrant, they knew I was working again and had computers. They are saying people who view CP often do it again as soon as they can, even while on bail after having items seized.

*[handwritten margin note: Don't USA come save face to like ly to re-check]*

➢ They found absolutely nothing, because I didn't do anything, what the police reports don't mention is interesting though. While I didn't do anything, I know for a fact my wife used her phone to repeatedly attempt to reestablish contact with v/conf 1 and her family. Looking at timing in discovery, they started ignoring her when police informed them what had happened. My wife repeatedly looked for excuses to try to contact them. The baby, her jewelry sales business, etc. Doesn't attempting to contact v/conf 1 immediately after police seize all the devices showing her being "coerced" by wife match his expectations?

*[handwritten margin note: Expert Check]*

● Overall
   ○ Every single expectation based on training, experience or facts, **does not** match me. Though they all match my wife, if thought about. They expect hidden computers. How better hidden then framing someone else if found? She didn't have time to set up advanced stuff on my computer, so kept it simple. Nothing was found on work servers not because I was keeping it separate, but because my wife couldn't easily get to it, and had no reason to. She had access to my desktop. They expect predators to go back to their ways and sure enough, my wife tried reestablishing contact with v/conf 1 and her family, the victims in recordings.

8 of 8

# EXHIBIT

# M

**Whitney Linder**

| | |
|---|---|
| **From:** | Marcus Lawson <marcus@gcsforensics.com> |
| **Sent:** | Tuesday, November 14, 2017 7:33 PM |
| **To:** | Whitney Linder |
| **Cc:** | Anthony Capozzi |
| **Subject:** | direct for Adam |

These are the areas I think you want to make sure you cover with Adam tomorrow;

1. How he went about searching for porn on Shareaza.

2. That he didn't know what words like "hussyfan" meant.

3. I would stay away from saying Angele entered any of the word searches on Shareaza as that directly conflicts with his statement to Hively but that's up to you.

4. That he had Shareaza set to not share files.

5. His MO when he had collected files from Shareaza to get them home.

6. That he DID share the password to the Aurora folder with Angele (keeping in mind that he told Hively he did not).

7. That Angele had hundreds of personal items on the Aurora (protected) side of Item 9 (the NAS).

8. That he had instructed her to go through and organize the porn he brought home (I think that is his claim).

9. That he did inadvertently download  child porn from time to time but deleted it when he did (his claim)

10. That he NEVER intended to do anything other than capture unsuspecting people in the bathroom with his cameras.

11. That he NEVER intended to see AT do anything graphic or sexual

12.  That he was not home and unaware of the incident where Angele had AT try on clothes.

13. That he never saw those videos of AT (his claim).

14.  That the camera set up was strictly to capture unsuspecting people in his bathroom (his claim).

15. That he had collected thousands of porn videos from Shareaza overtime and it would have been impossible for him to have reviewed them all at the time of the S/W.

16. That he never intended to download CP, was only looking for adult material (his claim).

17. That he never SAW any CP that he didn't delete (his claim).

18. That he had no interest or desire in specifically seeing AT naked and definitely no desire for her to be in any pornographic displays (his claim).

HENRY_001391

19. That the pictures sent from the ball game were some sort of silly sexy exchange he was having with his wife that had no bases in reality.

20. That in his opinion all the girls he photographed at the baseball game were at least 18.

21. That the "old CP" from (the item in the garage) had creation dates from 2005 because they were copied and dragged (or whatever the heck he claims about those) from some other device he inherited (his claim).

22. That he has reviewed the Cellebrite records provided in discovery as well as his work records and he WAS at work on 8/23/2013 at 3:05pm making it impossible for him to have done this from home.

23. That overall he cooperated with the cops at every turn in terms of passwords etc.. And why (had nothing to hide)

24. That he used item 3 (I think it's 3) as his home computer (the one in the living room) and never viewed any child pornography on it nor transferred any to it.

25. That the IP address beginning with 72 went  the L&S server NOT to his work computer on his desk.

Marcus

**MARCUS LAWSON**
Cellular (509) 863-5052
marcus@GCSForensics.com

Confidentiality Notice: This e-mail is intended only for the personal and confidential use of the individual(s) named as recipients and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It may contain information that is privileged, confidential and/or protected from disclosure under applicable law including, but not limited to, the attorney client privilege and/or work product doctrine. If you are not the intended recipient of this transmission, please notify the sender immediately by telephone. Do not deliver, distribute or copy this transmission, disclose its contents or take any action in reliance on the information it contains.

2

HENRY_001392

# EXHIBIT

# N

From: **Marcus Lawson** marcus@gcsforensics.com 
Subject: points for close
Date: November 15, 2017 at 9:04 PM
To: Whitney Linder whitney@capozzilawoffices.com
Cc: Anthony Capozzi anthony@capozzilawoffices.com

1. The cops made a rush to judgment by focusing on Adam to the exclusion of anyone else

2. They were absolutely wrong in their analysis regarding the CP in several key aspects;

a. They were wrong in determining that Adam accessed his work computer from his house, his boss said that was impossible, the auditor said it was impossible and he said it was impossible

b. They did nothing to build a timeline of use and work history to see if Adam was even at work when these downloads occurred

c. They did nothing to build a timeline of use of the machines to see if anything pointed to Adam or anyone else

d. They totally ignored his explanation that he downloaded in mass without knowing what was coming in even though the CP comprised about 1% of the total volume of porn collected

e. They purposefully presented in court only those things they saw as pointing to Adam when in reality, there were multiple things that did not

f. As an example, although they presented evidence as detailed as looking at the registry information for the computer and recording the IP addresses associated with it but did NOT check to see if sharing on Shareaza was turned off, seriously?  How do you look at one detail so closely and miss something else so obvious?

g. That the Cellebrite records provided in discovery as well as his work records show he WAS at work on 8/23/2013 at 3:05pm making it impossible for him to have done anything remotely from home

g. They were wrong about the two main IP addresses being interconnected as was verified by the owner of the business

2. That Angele had hundreds of personal items on the Aurora (protected) side of Item 9 (the NAS) and DID have the password

3. That Adam NEVER intended to do anything other than capture his wife in the bathroom with his cameras and they had actually been removed when the cops arrived

4. That he NEVER intended to see AT do anything graphic or sexual

5. That he never planned with Angele to capture AT doing anything graphic or sexual

6. That even the government's own witness (Hively) testified under oath that nothing that was captured regarding AT was child porn

7. That he was not home and unaware of the incident where Angele had AT try on clothes.

HENRY_001389

8. That he never saw those videos of AT and did not know they had been captured

9. That he had collected thousands of porn videos from Shareaza overtime and it would have been impossible for him to have reviewed even a portion of them at the time of the S/W.

10. That he never SAW any CP that he didn't delete

11. That he cooperated with the cops at every turn in terms of passwords etc. because he had nothing to hide

12. That he used his home computer (the one in the living room) and the government witness (Hively) admitted there was no evidence Adam ever viewed or accessed any child pornography on it.

13. That his employer believes he did not do this

Marcus

**MARCUS LAWSON**
Cellular (509) 863-5052
marcus@GCSForensics.com

Confidentiality Notice: This e-mail is intended only for the personal and confidential use of the individual(s) named as recipients and is covered by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510-2521. It may contain information that is privileged, confidential and/or protected from disclosure under applicable law including, but not limited to, the attorney client privilege and/or work product doctrine. If you are not the intended recipient of this transmission, please notify the sender immediately by telephone. Do not deliver, distribute or copy this transmission, disclose its contents or take any action in reliance on the information it contains.

# EXHIBIT

# O

# California vs. Angele Henry

Marcus Lawson, CEO – Global CompuSearch LLC

April 15, 2016

## Report of Forensic Findings

### History

In June 2015, Global CompuSearch (GCS) was contacted by Attorney Stephen Foley of Modesto California. Attorney Foley had been appointed in the representation of Ms Angele Henry, the defendant in the instant case. Ms Henry's case involved allegations of the possession of child pornography and use of a clandestine video camera to create the same which was alleged to have been discovered via a law enforcement online investigation of Internet child pornography trading on the Peer to Peer (P2P) file sharing network. A subsequent search warrant from that investigation resulted in the seizure and subsequent analysis of numerous computers from the Henry residence resulting in the location of two apparently clandestine videos where Ms Henry appears to direct a minor girl in trying on various items of clothing.

The case had originated on September 10, 2013 with law enforcement investigators using automated software to search the storage folders of users across the Peer to Peer network for files with hash values matching those of known child pornography images and movies. Digital files have a specific mathematical algorithm referred to as a hash value which is in effect, a digital fingerprint. Child pornography movies and images have these digital fingerprints (hash values) and these values can be searched through the various file sharing networks by law enforcement. When a known hash value for a child pornography file is found, the automated software program identifies the computer sharing that file by way of its Internet Protocol (IP) number. (IP numbers are, in essence, the "address" for a given computer on the Internet and are completely unique. Similar to the phone number, an IP number can be used to track a specific computer to its physical location.)

From my review of discovery provided by Attorney Foley, this scenario was alleged to be the case with a computer located at the company where Ms Henry's husband, Adam Henry, worked. Discovery provided indicated that a detective had reviewed the automated software which had allegedly identified numerous files available for downloading from an IP address subsequently traced to Mr. Henry's employer "Lock-n-Stitch" in Turlock California.

On 9/13/2013 a State of California search warrant was obtained and executed at the Lock-n-Stitch business location. It was determined during the execution of the search warrant that the computer identified as downloading and sharing child pornography files was controlled by the company's IT director, Adam Henry. Mr. Henry was interviewed and admitted to using Peer 2 Peer networks for downloading files. On this same date, a second search warrant was executed at the residence of Mr. Henry and his wife Angele.

A large number of media devices were seized from throughout the residence and subsequent forensic analysis by law enforcement recovered the videos in question prompting the arrest of Ms Henry and the prosecution of the instant case. Ms Henry (a Canadian citizen at the time) had first

HENRY_001403

In my opinion these three movie files do not depict either child pornography or an attempt to create the same.  Rather, what is observed in this matter is the violation of California voyeurism statute(s).

CA Penal Code 647(2) and (3)(A) state;

(2) Any person who uses a concealed camcorder, motion picture camera, or photographic camera of any type, to secretly videotape, film, photograph, or record by electronic means, another, identifiable person under or through the clothing being worn by that other person, for the purpose of viewing the body of, or the undergarments worn by, that other person, without the consent or knowledge of that other person, with the intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of that person and invade the privacy of that other person, under circumstances in which the other person has a reasonable expectation of privacy.

(3) (A) Any person who uses a concealed camcorder, motion picture camera, or photographic camera of any type, to secretly videotape, film, photograph, or record by electronic means, another, identifiable person who may be in a state of full or partial undress, for the purpose of viewing the body of, or the undergarments worn by, that other person, without the consent or knowledge of that other person, in the interior of a bedroom, bathroom, changing room, fitting room, dressing room, or tanning booth, or the interior of any other area in which that other person has a reasonable expectation of privacy, with the intent to invade the privacy of that other person.

In my opinion, and in my experience in the investigation and prosecution of child exploitation cases, this is the statute Ms Henry has violated, not California child pornography laws.

In addition, although I would agree that there is no question Ms Henry was complicit in the surreptitious filming of unwitting guests in the Henry home, it appears from many of the File Creation dates on these videos that this behavior originated with Mr. Adam Henry prior to his relationship with Ms Angele Henry.


_____

Marcus Lawson, CEO,
Global CompuSearch LLC