

FILED

AUG 24 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

1  Adam Alan Henry #71064-097
2  FCI Lompoc
   Federal Correctional Institution
3  3600 Guard Road
   Lompoc, CA 93436
4
5  Petitioner/Movant in *pro se*
6
7              IN THE UNITED STATES DISTRICT COURT
8          FOR THE EASTERN DISTRICT OF CALIFORNIA
9

| | |
|---|---|
| 10 UNITED STATES OF AMERICA, | Case No.    1:21-CV-01619-DAD |
| 11      Plaintiff, | Criminal No.  1:13-CR-00409-DAD |
| 12 | |
| 13      v. | **DEFENDANT'S REPLY TO GOVERNMENT RESPONSE IN OPPOSITION TO MOTION TO VACATE UNDER §2255** |
| 14 | |
| 15 ADAM ALAN HENRY, | |
| 16      Defendant. | Before Hon. Dale A. Drozd |

17
18
19  **NOW COMES** ADAM ALAN HENRY, respectfully submitting this reply to the
20  government's filing, "UNITED STATES' OPPOSITION TO MOTION FILED UNDER 28
21  U.S.C. §2255" (hereinafter "Opposition Brief") [Doc. 356], filed on February 25, 2022.
22
23
24
25
26
27
28

# Table of Contents

I. Introduction..........................................................................................................5

II. Administrative and Procedural Considerations...............................................6

   A. Timeliness of Filing........................................................................................6

   B. Privileged Documents, Reciprocal Disclosure, and Government Obstruction..............6

   C. Excerpt of the Record...................................................................................8

III. Overview of Issues in this Case........................................................................8

IV. Overview of Government Arguments.................................................................9

V. Rebuttal to Government Arguments..................................................................10

   A. The Government Asserts as Fact Claims Unsupported by the Record......................11

   B. The Government Reveals Exculpatory Evidence and Other IAC..............................20

   C. Mr. Capozzi Was Ineffective Despite Being "Busy"....................................................22

   D. Prosecutorial Misconduct: Reciprocal Court-Ordered Disclosure of Privileged
       Attorney-Client Records Was Intentionally Withheld and Massively Incomplete....28

     1) Discovering the Scope of Material Withheld by Mr. Gappa...................................28

     2) Withheld Documents Containing Materials Required for Disclosure.....................32

   E. Angele Was Solely Responsible for the Child Pornography Searches and Downloads
       on my Work Computer, and Solely Capable of the Remote Transfers of Child
       Pornography to our Home Network.........................................................................36

   F. Mr. Capozzi Lied in his Declaration [Doc. 357-1]....................................................38

   G. Relevance and Admissibility of Canadian Court Proceedings...................................40

     1) Stanislaus County Family Services; Investigation and Report................................40

     2) The Government's Relevancy and Admissibility Challenge....................................44

     3) Analysis: Admissibility Under the Rules of Relevant Evidence..............................46

   H. Defense Expert Marcus Lawson Was Essentially Working for the Prosecution..........50

VI. Conclusion........................................................................................................60

VII. EXHIBITS INDEX...........................................................................................i

1. Adam Henry Interview with Det. Hively Excerpt............................................................ii

2. Text Extracts from Bates #1011 (#1015)......................................................................iii

3. Text Extracts from Bates 1011 (1131)..........................................................................iv

4. AOB Related E-mails Between Myself and Whitney Linder.........................................v

5. Mr. Gappa – 687-Page Disclosure...............................................................................vi

6. Cover Letter and Invoice from the Office of Anthony Capozzi in RE: Attorney-Client Privileged and Work Product Documents..............................................................vii

7. Emails Between Louise Reed and Miss Linder in RE: Preliminary Summary of §2255 arguments..........................................................................................................viii

8. Personal Notes Made About this Case on April 1, 2016, Including Specific Notes on the Relevance of Canadian Court Records............................................................ix

9. Personal Preliminary Summary/Road-map of §2255 Arguments...................................x

10. Timeline of Events Noting Angele's 2009 Visit to Me in California...........................xi

11. Letter from Angele's Criminal Defense Counsel Regarding No Contact with Liam. xii

12. Documents Withheld in Reciprocal Disclosure Which Implicate *Brady* and *Giglio* *V*iolations...........................................................................................................xiii

13. Content Overview of Attorney-Client Privileged and Work-Product Disclosure by Mr. Capozzi..........................................................................................................xiv

## I.   Introduction

As has been the case since the inception of prosecution here, I maintain my innocence of all illegal activity here. The government used the disclosure of attorney-client privileged information in an attempt to frighten or bully me into dropping the Ineffective Assistance of Counsel (IAC) assertions in my original §2255 supporting brief (hereinafter "§2255 Motion"). Doc. 348.

I had no fear of the contents of those privileged documents, which is a testament to one important fact: I am not guilty and I have never admitted such guilt, even in private with my attorney. I vocally, ardently proclaimed my innocence from my arrest, to trial, conviction, and appeal. This is clearly shown within those privileged documents. Without expressly admitting it, the government found no instance where I admitted even a modicum of guilt in those privileged documents.

In sum, the government uses much of its opposition brief to reiterate points made during my trial, without adding much to the issues my §2255 introduced. Many of the government's assertions in its Opposition are false or simply wishful thinking. For example, the recorded interview between myself and investigators when I was first taken into custody is consistently referred to as a "confession." However, this is not the truth. I made no admission of guilt there, nor have I done so anytime before or since.

Many arguments presented in my §2255 Motion were outright ignored by the Opposition Brief which consistently presents disproven claims as fact,[1] asserts half-truths, and reiterates unfounded assumptions in an attempt to muddy the water of my arguments.

Misinformation now proliferates American cultural discourse and it is becoming increasingly difficult to effectively refute it. The same issue is present here. I tried to write this brief as succinctly as possible, but the effort needed to rebut bad faith arguments is always far greater than what is needed to make them. Brandolini's Law states:

> "The amount of energy needed to refute bull[***] is an order of
> magnitude larger than to produce it."

---

[1]   These claims were contradicted using the government's own trial discovery.

## II.    Administrative and Procedural Considerations

### A.   Timeliness of Filing

My §2255 Motion was timely received by this Court and filed on November 8, 2021. Doc. 350. After several extensions of time were requested by the government and granted, the government's Opposition Brief was filed on February 25, 2022. Doc. 356.

I moved for a 60-day extension of time to file this reply in part because I had not yet received the reciprocal discovery from the government as ordered by this Court. Doc. 355. The request was granted. I requested two more extensions of time, once in May for 45 days, and once in July for 34 days. Docs. 363 & 365. Those were both granted as well, and my deadline to file is now August 25, 2022. Doc. 364 & 366.  Thus, this pleading is timely filed on or before August 25, 2022. Doc. 366.

### B.   Privileged Documents, Reciprocal Disclosure, and Government Obstruction

In November of 2021, the government moved for an order to partially waive attorney-client privilege. Doc. 351. That motion argued that my ineffective assistance of counsel (IAC) claims could not be verified using the available case record, and inspecting Attorney-Client Privileged and Work Product documents (hereafter, this document set is abbreviated "ACP-WP") was necessary. This Court allowed me to respond, either waiving privilege with Mr. Capozzi, or withdrawing my IAC claims. Doc. 352.

I responded, giving notice to the Court that I (1) would not withdraw IAC claims, (2) would partially waive attorney-client privilege (under the limitations set by the Court), and (3) alerting the Court of the government's non-compliance with Fed.R.Civ.P. 5(b) because I was not served a copy of the waiver-of-privilege motion. Doc. 354. I then moved for reciprocal disclosure so I, too, could examine those records.  Doc. 353.

This Court granted that request and ordered the government to disclose all documents obtained from attorney Anthony Capozzi in connection with the Court's November 22, 2021 order partially granting waiver of attorney-client privilege.

1
2
3
4

> **"The government shall produce any declaration or other records obtained from attorney Anthony Capozzi**, including attorney Capozzi's staff and agents, concerning the events and facts related to petitioner's claims of ineffective assistance of counsel asserted in petitioner's pending §2255 motion filed in *United States v. Adam Aland Henry*, No. 1:13-CR-00409-DAD-BAM (E.D. Cal.);" Doc. 355 at 2. (Emphasis added).

5   To affect disclosure, and after I complained to the court about receiving only 30 pages

6   worth of reciprocal disclosure, the government made two separate and failed attempts to

7   deliver the discovery file obtained from Mr. Capozzi's office. Both attempts were rejected

8   by the mail room here at FCI Lompoc because the government was non-compliant with

9   Bureau of Prisons (BOP) "Legal Mail" requirements. See BOP Program Statement 5265.11

10   at 4; 28 C.F.R. §540.18(a).

11       To send special mail, such as legal mail, "the sender must be adequately identified

12   on the envelope, and the front of the envelope must be marked 'Special Mail – Open only

13   in the presence of the inmate.'" *Id.* In this case, the envelope's return address only

14   contained the office designation of the U.S. Attorney, not Mr. Gappa's individual name.

15       Mr. Gappa's third attempt to deliver these documents succeeded. I received Mr.

16   Gappa's package containing 687 pages on April 15, 2022, forty-eight days after the

17   Opposition Brief was filed, and over two months after the government had, itself, received

18   the disclosure from Mr. Capozzi. This delay greatly diminished my ability to review those

19   documents for the purposes of this reply brief.

20       Further, Mr. Gappy represented those 687 pages as constituting the entire file

21   supplied to the government by Mr. Capozzi. This representation was a blatant lie. My first

22   indication that something was amiss was Opposition Brief – Exhibit G, which contained

23   billing records from Mr. Capozzi's firm and were not included in those ~700 pages.

24       No longer trusting the government to act in good faith, I took my own initiative and

25   tasked my family with obtaining a full disclosure set from Mr. Capozzi's office directly.

26

27   **The complete file contains nearly 6,000 pages**.

28

1    In argument section §V(D) below (starting on page 27), I show that Mr. Gappa willfully

2    violated the Court's order requiring full reciprocal disclosure. I also argue that this violation

3    was intentional, made in bad faith, and amounts to egregious professional misconduct.

4

5        **C.  Excerpt of the Record**

6    The government notes a discrepancy between the docket entries I cite in my original brief,

7    and their notations in the ECF record. Opposition Brief at 1, fn. 1. All efforts were made

8    then and now to cite the correct docket entry and PageID from the ECF record, taken

9    directly from the PACER-generated headers of each filed document.

10        The government neither cites examples, nor explains what those discrepancies were.

11   Instead, he cites the Excerpts of the Record (ER) and Supplemental Excerpts of the Record

12   (SER) assuming I have access to them. "The government can provide physical copies of the

13   excerpts to the court and defendant upon request, although the defendant should already

14   have received them from Mr. Capozzi's office." Opposition Brief at 2, fn. 2.

15        This court is likely aware that the second ER volume is sealed, meaning I do not

16   (and should not) have access to it here in prison. The government's intention to shift record

17   citations to the ER/SER is an obvious attempt to limit my ability to examine or argue

18   against (at least some of) the Opposition Brief citations to the case record. Exhibit 4 at 3.

19

20   **III.   Overview of Issues in this Case**

21   I demonstrated in my original §2255 filing, and will reiterate here, the core facts of this

22   collateral attack on my convictions:

23       1.  The government has never properly or fully established federal criminal jurisdiction

24           for Count 1, the importance of which the government acknowledged was critical,

25           vital, and required multiple times in the course of my prosecution here.

26       2.  Witness testimony, combined with file timestamps, placed Angele alone in my office

27           on all occasions where child pornography terms were searched on, and child

28           pornography downloads were initiated at, my work computer.

3. Text message records prove that Angele:

   a) Knew the password to the protected home network account (Aurrora), and

   b) Was alone at home on both occasions where child pornography files were transferred from my work computer to our home network,

4. Through trial-transcript and text message records, it is proven as fact that;

   a) The transfer of files from my work computer to my home network operated in only one direction: My work computer could be accessed from home;

     1. No remote access was established which would allow my work computer to access my home network;

   b) Angele was home during *both* dates/times when the government claims I initiated file transfers from my work computer to my home network, while I was working on premises at Lock-N-Stitch.

   c) Thus, Angele was the solely capable of making those transfers beyond any doubt.

5. Prosecutorial misconduct is exposed here: Mr. Gappa willfully violated the Court's order [Doc. 355] to provide reciprocal discovery in an attempt to cripple my ability to argue the merits of this matter.

Further, the privileged disclosure of attorney-client documents and work product prove both that I knew nearly all of this information during trial and that I made Mr. Capozzi aware of it many times during the years preceding, during, and after my trial.


## IV.   Overview of Government Arguments

In the government's pursuit of maintaining the perception that all is fine, and ignoring any facts presented in my initial §2255 that prove otherwise, the following arguments were made in the Opposition brief.

- My initial interview with Det. Hively was a plain confession of guilt;
- Mr. Capozzi used reasonable professional judgment when deciding which arguments to present;
- Attorney Capozzi acted as a defense attorney: he, *inter alia,* hired a digital forensics

1    expert, filed a trial brief, proposed *voir dire*, proposed jury instructions, and actively

2    participated in jury selection;

3    • Attorney Capozzi was not ineffective

4        ○ for failing to investigate available discovery;

5        ○ for failing to argue jurisdiction;

6        ○ because he billed a lot of hours of work on my case.

7        ○ for failing to impeach witnesses;

8        ○ for failing to understand technical issues;

9        ○ for failing to introduce evidence;

10    • Appellate counsel was, likewise, not ineffective.

11

12    **V.    Rebuttal to Government Arguments**

13    According to the government now, Mr. Capozzi was an outstanding defense attorney who

14    did all he could in order to effectively represent me before trial, during trial, and on appeal.

15    This support of his representation makes sense, considering the government "won" at trial.

16    The record tells a different story and this characterization does not withstand scrutiny.

17        Broadly, the government characterization of Mr. Capozzi at trial was very different

18    than the high praise received here. In relevant part, Mr, Gappa's characterization of Mr.

19    Capozzi during closing arguments to the jury was highly inappropriate and prejudicial.

20        "His job as a defense attorney is to distract and to deflect and to give
21        you alternative facts or argue things that aren't necessarily what
         actually happened." Trial Tr. Day 7, Doc. 336, Pg. 998, ln 19-22. See
22        also Appellant's Opening Brief in *United States v. Henry,* No. 18-10358
23        (9th Cir. Jan. 13, 2020).

24    These comments were far out of bounds, enough to be strongly admonished by this Court

25    post-trial at a motion hearing (and later would be addressed by the Ninth Circuit on direct

26    appeal). The Court's admonishment also highlighted the impotence of counsel at trial:

27        "But it was a low blow. I mean, now that you just read what was said, it
28        was a low blow. No doubt about that. To say a defense attorney's job is

REPLY TO GOVERNMENT OPPOSITION          9

1   to distract and to throw out out alternative facts, not to tell you
    whatreally happened, words to that effect. I mean, if there had been an
2   objection, I most likely would have sustained it and told you to move
3   on." Hearing Tr., Doc. 297, Pg. 20, ln. 7-13.

4   Mr. Gappa's characterization of defense counsel here reveals either his honest view of Mr.

5   Capozzi as an unethical defense attorney, or his view of all defense counsel. Both of these

6   conclusions are truly troubling. Today, however, Mr. Gappa's regard for the ethics and

7   performance of Mr. Capozzi has changed drastically. Now, his job performance gets

8   unwavering support, since that aids the government's purpose. This hypocrisy is not lost on

9   me, and should not be lost on this Court.

10

11   **A.  The Government Asserts as Fact Claims Unsupported by the Record**

12   The government consistently tries to control the case narrative, framing the perspective of

13   obvious guilt. A prominent example of this is labeling my Lock-N-Stitch interview with

14   Det. Hively as a "Confession." Opposition Brief at 4, ln. 3. Restated, "In light of the

15   evidence, particularly Henry's admissions to law enforcement, it is difficult to image how

16   any defense attorney could have been more effective." *Id.* at 13 ln. 2-4.

17        From the outset of this case, I have consistently been truthful in my statements made

18   to law enforcement, the Court, and defense counsel. All statements were truthful with the

19   information available to me at the time I made them. This was evident when I did not

20   hesitate to break open privileged attorney-client documents and communications: I already

21   knew, as a certainty, that I had never admitted guilt of any kind, even to my defense counsel

22   in private, privileged communication.

23        Later, the government takes a partial quote from that interview to claim I admitted to

24   the presence of child pornography on the password-protected side of our home network.

25   Opposition Brief at 15, ln. 19-22. This is simply a lie. In truth, I told Det. Hively that I

26   never intentionally searched for or downloaded child pornography and, if any existed, its

27   presence was unintentional. Det. Hively testified to this to the Grand Jury where the best,

28   most damning evidence is offered to secure an indictment.

1       "I spoke to him about the program. He admitted that he had been using
      Shareaza to download adult pornography. He indicated that if there was
2       any child pornography, it was inadvertent." Bates 1194, ln. 18-21.

3 The Opposition Brief makes this claim in several more places.

4       "Relatively early in Mr. Capozzi's representation, Henry was
      suggesting to defense counsel's paralegal in a note dated February 24,
5       2014.... These statements suggest a guilty mind working on the advice
6       of a skilled counsel to try to develop a plausible defense." *Id.* at 16.

7 This conclusion is a monumental stretch by the government and amounts to nothing more

8 than inference and wishful thinking.  The date of the note, February 24th, 2014, is only

9 three months after my federal arrest. At that time, I had yet to see any discovery at all and I

10 still believed all this to be an accident or misunderstanding.  The government takes this

11 quote entirely out of context, knowing full well the Court can read the letter in its entirety

12 in the Opposition Brief's exhibits. I hope the Court will do so. The full letter shows no such

13 guilty mind. In fact, it shows the opposite.

14       "If it can be used to defend myself without hurting her or myself in
15       criminal or civil cases, there are things was a note in the discovery
      from the officer reviewing text messages between my wife and the
16       minor. The officer said they thought my wife was 'grooming' the
17       minor. The prosecution might respond saying that I pushed her into it,
      my mother-in-law told the police my wife is a 'pleaser.' (Comment was
18       in the discovery.) But perhaps the facts that my wife chatted with her
19       via text message and facebook, while I didn't, that most of the time the
      minor spent at our house, I was at work, and that my wife was
20       obviously bi-sexual and into women (the video should clearly
21       demonstrate that) combined with the officer's report suggesting my
      wife was 'grooming' her might suggest I wasn't involved with the
22       recordings of the minor in our bathroom." [sic] Opposition Brief,
23       Exhibit K at 1, Doc. 356-4 at 20.

24 I had no "guilty mind" as the government suggests here. I was simply a naive husband who

25 did not know, and could not fathom, that his wife would do this to her family in spite of Mr.

26 Capozzi's insistence this was likely the case. Had I *actually* known what Angele had done

27 at the time I made the statement above, it would certainly indicate a guilty mind. The

28 government fails to include the many future notes I sent as the years in pretrial detention

1   grew. My notes to Mr. Capozzi reveal a transformation from naivete to confusion, hurt, and

2   finally anger at Angele's deeds. The government here, again, obscures and ignores evidence

3   which does not suit the narrative of obvious guilt.

4       Another example: "… eventually, Henry admitted that he had found a few files of

5   child pornography…" Opposition Brief at 3, ln 10-11. What I actually said was:

6

7   Q. [HIVELY]    Okay. So if I understood correctly what you told me was -- tell

8       me if this process ounds about right: You use a (inaudible)

9       peer-to-peer file-sharing program to download -- excuse me  --

10      video files, and you're saying that inadvertently sometimes

11      you get beastiality and child pornography; is that correct?

12  A. [ME]    Yes, sir.

13  Q. [HIVELY]    And then either you check at work what the contents of the

14      compete folder are or the shared folder, or sometimes you

15      copy them, take them home, and then later check there to see

16      what the contents of the folder is, the content being that which

17      was downloaded, right?

18  A. [ME]    I usually did not check at work.

19  Q.[HIVELY]    Okay.

20  A. [ME]    It would go on to the thumb drive. I would take it home. If I

21      had time, I would glance through it and sift.

22  Q. [HIVELY]    Okay.

23  A. [ME]    But usually I did not just grab it and copied it (inaudible).

24  Q. [HIVELY].    Okay. So on the hard drive that we took out of the computer at

25      work or on your NAS at home, are we going to find any

26      folders structured that would indicate to anybody looking at it

27      that you were categorizing child pornography and placing it

28      into certain folders?

1          A. [ME].          Dear God, no.

2   Interview Trans. Pg. 5 ln. 9 – Pg. 6 ln. 9. Exhibit 1 (partial transcript).[2]

3          Later, Det. Hively tried to induce me to admit consuming child pornography for

4   personal use by fabricating a prior conversation and restating that fabrication as a later

5   question. This  interrogation tactic is very common but, here, it revealed the truth:

6          Q. [HIVELY]          So earlier I asked you in the car when was the last time you

7                               watched a – or you viewed a child pornography video, and I

8                               think you said you don't remember. Is that what you said?

9          A. [ME]              I don't watch them. If I open a file and it happens to have that

10                              in it, I close the file down and immediately delet it. I don't pay

11                              attention to content. I don't watch any more than it takes. If

12                              it's even questionable, I delete it. I've got two kids of my own

13                              with a third on the way. I don't want that stuff.

14  *Id*. at Pg. 9 ln. 9 – Pg. 6 ln. 4-13.

15  Det. Hively accurately recalled this during his grand jury testimony:

16          "I spoke to him about the program. He admitted that he had been using
17          Shareaza to download adult pornography. He indicated that if there was
            any child pornography, it was inadvertent. He told me that he would
18          move the files that were completed from the shared folder onto a
19          thumb drive. He would take them home, put them on a computer there,
            and then later at his convenience, he would go through those files, and
20          if he found anything related to bestiality [sic] or child pornography, he
21          would delete those files." Bates 1194, ln. 18 – 1195, ln. 2.

22  This testimony reveals another small but vital detail: I established from the beginning that I

23  had never affected file transfers of Shareaza downloads remotely from my work computer

24  to my home network. Instead, I used a thumb drive to bring them home on physical media.

25  Angele could not do the same. She needed the remote work-computer access at home to

26  transfer files she previously searched for and downloaded from Shareaza while alone in my

_____

2   The interview audio file is available as part of Bates 662.

1  office. Once it had finished, she then *deleted* the offending file from my "completed" folder
2  to prevent me from seeing them, raising suspicion about how or why they were there at all.

3       The government can only assert a nebulous claim: at some indeterminate points in
4  time, I found some files that I presumed to be illegal, deleting them immediately. At worst,
5  this would be a specific, affirmative defense to possessing child pornography. See 18
6  U.S.C. §2252(c)(1) & (c)(2)(A), §2252A(d)(1) & (2).

7       The Opposition Brief asserts as fact many acts I never committed. Every screenshot
8  made from recordings which depicted A.T.[3] were created by Angele. However, the
9  government still asserts, "Henry created a screenshot of that video and placed it in a folder
10  named for the victim on the password-protected partition of his network." Opposition Brief
11  at 5, ln 15-16, see also *id.* at 14, ln. 17-18. Nothing in the record establishes that I created
12  anything of the sort. Det. Hively testified at trial that there was nothing to indicate who
13  created those screenshots.

14

15       Q. [GAPPA]     Okay. You don't know who took those snapshots?
16       A. [HIVELY]     I do not.
17  Trial Tr. Day 5, Doc. 334, Pg. 711, ln. 7-8

18       The only reason it was previously assumed I created these screenshots is due to the
19  now-disproven theory that Angele did not have password access to that share account.

20       It should be noted here that the government refuses to acknowledge that Angele's
21  knowledge of the Aurrora password was proven conclusively in my §2255 Motion.

22       Had Angele not known that password, my guilt in this case would be the only logical
23  conclusion. The government's consistent assertions that I took these actions perpetuates this
24  debunked narrative.

25       Angele knew that password. I proved this fact with evidence available to Mr.
26  Capozzi years before trial. Evidence which has *always* been part of case discovery. Mr.

---

3   Including the bedroom recording created solely by Angele

1  Capozzi simply failed to find it himself, then ignored me when I pointed him to it, and

2  refusing to read my notes after I had done all the work of finding this information *for* him.

3       The government ignores more facts than just the password issue. The hanging plant

4  in the bathroom, formerly used to house a camera, was still hanging in the bathroom during

5  the first executed search warrant in September of 2013. The plant remained there and was

6  still hanging there during the second, federal search warrant as well.

7       However, the government invented an idea somewhere in trial prep that I'd moved

8  the plant to the garage before the federal search in an attempt to hide its intended uses (and

9  demonstrate a guilty conscience). "At the time of the [second] search, the plant was in the

10  garage but it had been hanging in the bathroom, positioned to record guests and fitted with

11  a hidden camera." Opposition Brief at 5, ln. 24-25.

12       This is not true. It is a small detail, but vital to the government's argument of

13  "overwhelming circumstantial evidence" of my guilt. Opposition Brief at 14, ln. 10.

14       This detail is so easily fact-checked that the government's insistence otherwise can

15  only be called a blatant lie. FBI Special Agent Mark Lucas reported the plant was still

16  hanging in the bathroom.[4] Pictures from the federal search warrant conclusively show it still

17  hanging in the bathroom [Bates #891 & #892, §2255 Motion at 39-40]. Yet in the face of

18  this *actual* "overwhelming evidence," the government insists on lying about this point to

19  add to the appearance of "overwhelming circumstantial evidence" of my guilt.

20       Mr. Gappa has maintained this stance for nine years without any actual physical

21  evidence of his own, only relying on the second-hand testimony of Dets, Moore and Hively,

22  despite *clear* contradicting evidence.

23       In the face of this constant and repeated lie, Mr. Capozzi never presented the pictures

24  from Bates #891, never called Agent Lucas to testify about the plant's location from his

25  report, and never called the FBI photographer to obtain the original photos to properly

26  admit them into evidence. I alerted Mr. Capozzi to the location of this evidence, and to the

---

4  "HENRY observed writer inspect a fake house plant located in the bathroom shower. Writer
   opened the pot and observed small windows built into the pot capable of housing a video
   camera." Bates #664.

1    significance of this lie long before trial in my extensive notes.  ACP-WP: "Closing Stmts –

2    USA v Adam Henry" at 158; See also Government Bates #1513 & #1536.  Detectives

3    Hively and Moore were complicit in pushing this lie.

4

5         Q. [CAPOZZI]       And you indicated in one of your reports the FBI found the

6                                        plant in the garage?

7         A. [HIVELY]          That's what I was told, yes.

8    Trial Tr. Day 5, Doc. 334, Pg. 664, ln. 16-18.

9

10        Q. [CAPOZZI]       You heard Detective Moore testify it was in the garage; is that

11                                         correct?

12        A. [HIVELY]          I did hear him say that.

13    Trial Tr. Day 5, Doc. 334, Pg. 665, ln. 17-19.

14        As shown in my pretrial notes, I carefully laid out this issue, gave Mr. Capozzi the

15    Bates numbers and quotes from Det. Hively's report which claimed it was in the garage. I

16    gave Bates numbers for the FBI agent's report, and the FBI search photos showing the

17    opposite was true. I even explained why I believed it to be important, saying that they were

18    trying to demonstrate a guilty mind by claiming I removed it between warrants. ACP-WP:

19    "Closing Stmts – USA v Adam Henry" at 160-61; Government Bates #1537-1538. Later,

20    during cross examination at trial, Det. Hively explained the importance of this point in an

21    explanation eerily similar to my own. §2255 Motion at Pg. 40, ln. 4-11.

22        A quote I find ironic was again raised in the Opposition brief: "Ruezga testified that

23    Henry stated that 'his wife was not part of the charges that were brought about by the

24    incident.'" At the time I made this comment, I had no idea that recordings of A.T. had been

25    created in our house, using one camera had I helped Angele set up and one in our bedroom

26    that I had no knowledge of.

27        I had no idea that the downloads from my office were more than accidental, and that

28    they had been searched for (and downloaded) intentionally. Without this knowledge, if I

1  *had* blamed Angele, the accusation would demonstrate *more* knowledge of the crimes,

2  knowledge I should not have had. Believing the downloads to be an accident, and having

3  no knowledge about the hidden recordings, at that moment I could not believe she would

4  have done this to me, our friends, or to a *child.*

5          The government then makes a wild claim that it had no need to prove jurisdiction in

6  order to charge, try, and convict me for Count 1. In federal court. For a federal crime.

7          "Logically, if the government does not need to prove the commission
8          of any particular overt act, because the crime is completed when an
           agreement is made, it is also not necessary to prove that a particular
9          camera was used or that a particular image depicted a minor engaged in
           sexually explicit conduct." Opposition at 24, ln. 24-26.
10

11  There is no "logic" to this argument. In order to conspire to commit a federal crime, the

12  agreement therein must violate the federal statute itself. To violate the statute, a nexus of

13  interstate commerce must be established.

14          "Any person who employs, uses, persuades, induces, entices, or
15          coerces any minor to engage in, or who has a minor assist any other
            person to engage in, or who transports any minor in or affecting
16          interstate or foreign commerce, or in any Territory or Possession of the
17          United States, with the intent that such minor engage in, any sexually
            explicit conduct for the purpose of producing any visual depiction of
18          such conduct or for the purpose of transmitting a live visual depiction
            of such conduct, shall be punished as provided under subsection (e)...
19          **if that visual depiction was produced or transmitted using**
20          **materials that have been mailed, shipped, or transported in or**
            **affecting interstate or foreign commerce by any means**, including
21          by computer, or if such visual depiction has actually been transported
22          or transmitted using any means or facility of interstate or foreign
            commerce or in or affecting interstate or foreign commerce or mailed."
23          18 U.S.C. §2251(a) (emphasis added).

24
            "Any individual who violates, or attempts or **conspires to violate, this**
25          **section** shall be fined under this title and imprisoned not less than 15
26          years nor more than 30 years..." 18 U.S.C. §2251(e) (emphasis added).

27  The statute is clear: in order to be guilty of conspiring to violate §2251(a), the conspiracy

28  must involve an agreement which actually *violates* §2251(a). To violate that statute, it must

REPLY TO GOVERNMENT OPPOSITION               17

1   be proven that the agreement included a nexus of interstate or foreign commerce to produce

2   or transmit visual depictions of a minor engaged in sexually explicit conduct.

3        It is the government's argument here that is anything but logical. In the transcript of

4   the Grand Jury hearing that produced Superseding Indictment [Doc. 110], Mr. Gappa was

5   explicit when explaining the elements of the offense to the grand jury about jurisdiction.

> "And to go over the charges in the indictment, Count 1 is conspiracy to
> sexualy exploit a minor, and that is between approximately May of
> 2012 through approximately September 19th of 2013 in Stanislaus
> County, and it is that the defendant Adam Henry knowingly conspired
> with others known and unknown to employ, use, persuade, induce,
> entice, or coerce a minor to engage in any sexually explicit conduct for
> the purpose of producing any visual depiction of the conduct, **knowing
> or having reason to know it would be produced or transmitted
> using materials that have been shipped, mailed, or transported in
> interstate or foreign commerce** by any means, including by
> computer." Bates 1212, ln. 17 – Bates 1213, ln. 3 (emphasis added).

14   Next, in the superseding indictment, with Mr. Gappa's name in the header, the bold text

15   above is repeated. Doc. 110 Pg. 1 ln. 27 to Pg. 2 ln 2. Further, in Mr. Gappa's own closing

16   statements, he acknowledges the importance of a jurisdictional foundation: "… those items

17   were manufactured outside of the State of California. Which is important for jurisdictional

18   basis. So I did want to point that out to you." §2255 Motion at 18, ln. 19-20.

19        This constitutes three specific instances where Mr. Gappa acknowledges the

20   significance of establishing jurisdiction on Count 1: when addressing the Grand Jury, when

21   writing the superseding indictment, and in closing arguments at trial. Now, however, Mr.

22   Gappa claims there exists no requirement to prove exactly what he admitted (on three

23   occasions) being required to prove before both the grand and petite juries.

> "Once is happenstance.
> Twice is coincidence.
> Three times is enemy action."
> -Ian Flemming

28   There is simply no logic here, and no possibility Mr. Gappa believes this argument is true.

1    A well known tactic for spreading misinformation and propaganda is that a lie,

2  repeated a thousand times, becomes truth. This is not proper conduct from the office of the

3  U.S. Attorney. It is expected that the government will ardently advocate for their position.

4    Lying about the nature of the investigation and discovery, however, is not expected

5  or tolerated. As this Court observed four years ago, "The prosecutor's job isn't just to win,

6  but to win fairly, staying well within the rules." Doc. 306 at 15, ln. 9-10 (quoting *United*

7  *States v. Kojayan,* 8 F.3d 1315, 1323 (9th Cir. 1993).

8

9  **B.  The Government Reveals Exculpatory Evidence and Other IAC**

10  Proving the point the Capozzi was ineffective, the government claims that it established at

11  trial that I "had moved two completely downloaded files, at least one of which was child

12  pornography, from a folder associated with Shareaza on his work computer onto his home

13  network on the morning of the first search warrant." Opposition Brief at 18, ln. 8-10. The

14  government further claimed that, on the witness stand, I was unable "to name any other

15  person who might have been responsible for that illegal activity." *Id.* at ln. 11-12.

16    I never made those transfers. In fact, I *could not have* made them, as I was provably

17  working at Lock-N-Stitch, away from home, when they were made.

18    To begin, testimony at trial is not offered but elicited by counsel. The government

19  casting the blame upon me for failing to name another party potentially responsible for

20  transferring those files would have been successfully objected to as speculative. This is an

21  argument made in bad faith, and the government knows it.

22    The truth is based on two facts. First, the bridge between my work and home

23  computer worked only one-way: from home to work. I did not set up that bridge to work

24  reciprocally from work-to-home. The file transfers from my Lock-N-Stitch computer to my

25  home network could only be done from home.[5] Second, Angele and I had only one vehicle

26  between us. She would routinely drive me to work so she could use a vehicle during the

---

5    §2255 Motion at pg. 245, ln. 15-26; Trial Tr. Day 5, Doc. 334, pg. 719, ln 11-22.

1 day. More importantly, she would then be required to pick me up from work when I was
2 done for the day.

3      I have already proven that there were text messages that demonstrated Angele knew
4 well the password to the Aurrora share. §2255 Motion at 23. However, there are more text
5 messages between Angele and I in the available discovery that demonstrate that she drove
6 me to and from work on both days the government asserts the file transfers were made.

7

8      <u>9/19/2013 8:51:36 PM (UTC+0)</u> [Angele]: I'm a little early. Just come out when
9                         ever your [sic] ready.
10      <u>9/19/2013 8:52:04 PM (UTC+0)</u> [Adam]:  Will be about 5 minutes.
11      <u>9/19/2013 8:52:16 PM (UTC+0)</u> [Angele]: Ok Hun. No real rush.
12 Bates 1011[6] (1015) Attached as Exhibit 2.

13

14      These text messages show that I was at work at 1:51pm[7] on the day the first search
15 warrant was served, as Angele was there just before two o'clock to pick me up. They also
16 prove that I was at work and not at home when the file transfers were made, that Angele
17 was the only party who *was* home at those times, and that Angele not only was told the
18 password, but remembered it and used it.[8]  The same was shown in my original §2255
19 Motion regarding the August 23rd transfer in question. *Id.* at Pg. 27, ln. 15 to Pg. 28, ln. 2.
20      These text messages were part of the available discovery years before trial, and are
21 still there today. They ***prove*** that I was at work, that I could not have initiated those
22 transfers, and that Angele was the only other person with the capability and availability to
23 do so. Even the government's own witness at trial, Det. Hively, testified that I could not
24 have initiated this transfer while at work (only from home). *Supra,* fn. 2.

---

6   Specifically Bates 1015, Soderquist Report, iPhone4G.2013-12-19.09-49-26 → Report page 7.
7   In September of 2013, Pacific time was UTC -7 hours.
8   Due to the remote transfers being placed behind that password protection.

1    Since these prove Angele had done so, they (standing alone) cast a monumental

2  amount of reasonable doubt onto my guilt, sufficient to sway a jury into a "Not Guilty"

3  verdict. It also demonstrates that Mr. Capozzi was capable of finding this evidence, but was

4  incapable or too "busy" to be bothered to find it. It is indefensible that he did not locate and

5  use this evidence at trial.

6    No argument or declaration could absolve him from missing this. No argument could

7  demonstrate this failure was anything but ineffective assistance of counsel.

8  ### C. Mr. Capozzi Was Ineffective Despite Being "Busy"

9  The government contends Mr. Capozzi was not ineffective because he billed a lot of hours.

10  "The court can review Mr. Capozzi's declaration and see its reference to billing records

11  from the inception of his representation through the jury trial." Opposition Brief at 15, ln.

12  5-6. This is entirely irrelevant. As the famous business adage goes, "Being busy doesn't

13  mean being productive."[9] In this case, it also does not equate to being effective.

14
15    "Defense Counsel was zealous throughout his representation of Henry as
     demonstrated by filing numerous motions for Henry's release from
16    custody, pretrial motions, trial documents, as well as vigorously defending
     Henry through trial, post-trial motions, and the appellate process through a
17    petition for certiorari to the United States Supreme Court." Opposition
     Brief at 11, ln. 25-27.
18

19  This is, again, entirely irrelevant. This only demonstrates that Mr. Capozzi created a lot of

20  paperwork. He completely ignored dispositive arguments and exculpatory evidence even

21  when I told him where to look. The facts are simple and clear, despite Mr. Capozzi's (and

22  defense expert Mr. Lawson's) refusal to investigate the readily available discovery on my

23  behalf:

24  • Angele was the only one in my office when the child pornography files were

25    searched for and downloaded;

26  • Angele had the Aurrora password, and was solely capable of copying the child

27    pornography files from my work computer to our home;

---

9   Or, as author Karen McKenna put it, "Don't confuse being busy with being productive."

- Angele was present when the old child pornography files were placed on devices in my home. *None* of these files predate her presence;
- Angele is the only one of the two of us with a paraphilia;
- Angele lied to law enforcement, investigating and CPS agents, and various courts;
- Angele has previously attempted to frame a husband for crimes he did not commit;
- Angele has a history of displaying sexual interest in children, matches the profile for someone who would download and/or create child pornography, while I do not;
- The prosecution never showed jurisdiction for Count 1.

These are facts demonstrated by the existing record, facts Mr. Capozzi and his hired expert (Mr. Lawson) never used, raised, or found, and would not look for despite the proof I provided to them, using readily available discovery, before and during trial. This is not just an issue of counsel missing evidence in discovery. The fault is far more egregious.

I specifically and individually highlighted every fact here in my notes prior to trial. Mr. Capozzi and Mr. Lawson flatly refused to even *look* for them when discovery clearly (1) refuted the claims involved in the "overwhelming circumstantial evidence," and, (2) would not simply have introduced reasonable doubt on Count 1 but prevented that issue from making it to trial in the first place, and (3) *proven* I could not have been responsible for the actions constituting Count 2.

This is not a "zealous" defense nor is it effective representation under any reasonable view of the requirements of defense counsel. Evidence which refuted the government's claims was readily available, specifically pointed to here and in my original §2255 brief, and contained in the thorough notes I begged Mr. Capozzi to review before trial. This evidence was, and is, more than sufficient to provide reasonable doubt, as it definitively proves my innocence.

If I was able to find this evidence, there is no reason Mr. Capozzi and his expert could not have found what I did and more. In fact, it was their obligation to do so. An obligation they failed to meet. Mr. Capozzi may have billed 110 hours for paralegal visits to me in jail and by phone (Opposition Brief at 15, ln. 7), but this only proves my point.

> "[Capozzi's office] received numerous letters and court documents from
> Henry, many with notations on them, and they spent an additional
> unknown number of hours going over discovery and trial strategy with
> him." *Id.* at ln. 7-9.

My notes were summarized, even including a table of contents to make referencing my

findings very easy.[10] Those notes referenced many of the facts and arguments made in my

initial §2255 petition and prove that Capozzi was made aware of these points, but ignored

them/me. The discovery obtained from Mr. Capozzi's office includes these notes, but none

were included in the government's opposition. Bates 1388 *et. seq.*

The government is correct that Attorney Capozzi and I *did* spend many trial

preparation hours together. However, this does not prove that Mr. Capozzi was effective,

but rather that I found vital evidence demonstrating my innocence, but that my self-

advocacy fell on deaf ears. This is highlighted both here and the initial §2255 Motion. This

new set of discovery, including my notes, proves Mr. Capozzi completely ignored my

critical trial prep input. The relevance of the arguments pointed to in my notes definitively

shows that counsel was ineffective.

A crucial example of this is the password issue. The crux of the government's

argument from the outset of this case was the *presumed* fact that only I had the password to

the Aurrora share/account on the server in our home. This unsubstantiated (and false)

presumption was used to keep me detained during the years between arrest and trial, as

evident from the transcript of my Arraignment held two weeks before my arrest, and two

weeks *before* Mr. Capozzi was even hired as counsel. Hearing Tr., Nov. 22, 2013, Doc. 78:

> HARRELSON: Now these are all very general and open allegations, but I'm not
>
> seeing any proof that he was involved." (*Id.* at Pg. 11, ln. 17-18)

---

10 ACP-WP: "Miscellaneous 3 – Closing Stmts – USA v. Adam Henry" page 83, Bates 1455. This
   table of contents references Angele's password access to the protected side of the network and
   the glaring jurisdictional issue. To wit, the government's inability to demonstrate what camera
   was used to make any of the recordings involved in Count 1.

| | | |
|---|---|---|
| 1 | GAPPA: | Your honor, just one brief point I think refutes that and it's that the |
| 2 | | defense apparently doesn't understand that all of the video and still |
| 3 | | images that were recovered related to every victim in this case, |
| 4 | | including the 14-year-old victim were found on the defendant's |
| 5 | | computer in the portion of which was assigned to him-- |
| 6 | COURT: | Only he had access and was-- |
| 7 | GAPPA: | --and it was a password protected. So, for instance, on page seven |
| 8 | | of eight it says right there that this is in the password protected |
| 9 | | portion of the device and the defendant's wife did not have the |
| 10 | | password. |

*Id.* at ln. 14, ln. 6-15

This assumption caused Magistrate Judge Austin to order my detention, which persisted throughout the pretrial and trial. My perpetual detention pending trial crippled my ability to effectively self-advocate on these issues. It is easy for a defense attorney to ignore an inmate, but not so easy to ignore a defendant sitting in the office, glaring at him.

If Mr. Capozzi had actually paid attention to my notes, or examined the available discovery for himself, he would have easily discovered Angele's lie that she was unaware of the Aurrora password. Using this information during the subsequent bail-review hearings, which Mr. Capozzi himself requested, would have resulted in my release and the effective ability to self-advocate. Exactly as I am doing here.

This issue involves much more than the Aurrora password. I raised jurisdictional concerns regarding Count 1 to Mr. Capozzi on at least ten separate occasions before, during, and after trial. Notes made in August of 2017,[11] before trial: Bates #1453, #1457,[12] #1458,[13] and #1513.[14] Notes made during trial: Bates #1622, #1665, and #1785-87. Notes made after trial: ACP-WP: "AOB Changes" & "Whitney Linder"; See Exhibit 4 (July 16 –

---

11  Bates #1524 dates these notes, starting with the table of contents. The last sentence mentions Bates 600 as being 3½ years prior.

12  Going into detail citing Mr. Gappa's grand jury statements about jurisdiction. Bates #1212 & 1213. See also ACP-WP: "CPS Matter - People v. Adam Henry" Pg. 100 *et. seq.* & Exhibit 11.

1    18, 2019). I specifically brought the jurisdictional issue up to Mr. Capozzi in a phone call

2    after trial (March 4, 2019), prior to the submission of the Appeal Opening Brief. See

3    Opposition Brief, Exhibit G, Doc. 356-2 at 28.

4        These demonstrate I believed that the AOB properly raised the jurisdictional

5    argument for Count 1 in the Misc section. I didn't realize until after the government

6    response that it was improperly raised, exactly as stated in the §2255 Motion (at 4), as well

7    as the pre-§2255 argument summary for which Ms. Linder Whitney agreed. The dates of

8    these messages correspond with just after the government's reply to AOB on appeal was

9    filed, before the defense rebuttal to it was drafted/filed.

10
11
12
> "...and there was evidence from which the jury could have inferred that the recording was made with a Canon Vixia camcorder that had been made in Japan." Exhibit 4 at 14, e-mail with subject "Reply notes #4 (and last)" dated July 16, 2019.

13
14
15
16
> "Henry and/or his wife transferred the video to a computer and hard drive, both also manufactured outside California, and screen captures were made from these images...There was abundant evidence from which the jury could have found that Henry and his wife used multiple devices manufactured outside California." *Id.*

17
18
> "It was not necessary for the government to prove that every single item...was manufactured outside of California." *Id.*

19    My responses to these sections are clear: I believe they were supposed to be address the

20    jurisdictional problems with Count 1. However, because of my lack of professional legal

21    knowledge, I did not know it was improperly or insufficiently made in the AOB

22    Miscellaneous section.

23
24
> "Secondly, would you copy/past ER5:8-19 if possible, please? I'm curious what it says" Exhibit 4 at 3.

25
> "I'm very confused on this one. Gappa referenced this ER notation during his argument that there was plenty of evidence that items outside CA were

---

13 Noting the only camera the government even *tried* to identify having an element of interstate commerce was Angele's personal bedroom recording of A.T.

14 Noting lack of jurisdiction, citing Bates #306 – FBI Item #5 Cannon Vixia HF200, finding no unlawful recordings contained on it.

1  used, giving the feds jurisdiction. How does this ER excerpt establish what
2  computer or device was used for a screenshot, much less that such a
   computer or device was manufactured outside CA? '...was found on the
3  devices that were seized..." So what? No evidence of which one it was
   created on, and if they had it on a device that was manufactured outside
4  CA, but NOT responsible for creating the screenshot, that would only give
   them jurisdiction for possession, not manufacture, right? Either way, this
5  doesn't appear to be evidence supporting his argument, or am I missing
6  something?" *Id.*

7  I was, in fact, missing something: I had missed that Mr. Capozzi had not understood the

8  argument well enough to properly raise that issue on appeal, thus the government was never

9  required to properly argue against it. My confusion continued through these e-mails.

10      I believed Mr. Capozzi understood the significance as he verbally assured me it

11  would be included in the AOB. In reality, he did not grasp the argument's gravity and

12  included only a small reference to it in his "Cumulative Error" argument, and only included

13  as a subset of his complaint about Mr. Gappa's inappropriate closing statements.  I believed

14  this was sufficient to preserve the argument, but I am not an attorney and should not be

15  expected to have that level of knowledge of F.R.Crim.P., F.R.App.P., or Ninth Circuit Rules.

16      Despite the many hours Mr. Capozzi worked on this case, he ignored my consistent

17  harping on this issue and made no substantial argument as to the jurisdictional issue in the

18  AOB, despite my badgering that persisted for many, many years. Despite this, he still made

19  no substantial, primary AOB argument on the jurisdictional issue, as held by the Ninth

20  Circuit, and was therefore not considered. I tried, too late, to fix this after the government

21  responded to the AOB, with several follow-up e-mails to Ms. Linder. Exhibit 4 at 2-4.

22      After those e-mails, and after several long conversation with Ms. Linder, she was

23  finally able to explain the problem to Mr. Capozzi. He then, finally, fully gradped it. Ms.

24  Linder made a heroic effort to drive this point home and Mr. Capozzi, in turn, made a very

25  persuasive argument on jurisdiction in the reply brief. By that point, though, it was too late.

26  Exhibit 4. Mr. Capozzi knew it would not be considered by the Ninth Circuit because it was

27  presented this way, but he did so just to satisfy me, regardless of consequence.

28

### D. Prosecutorial Misconduct: Reciprocal Court-Ordered Disclosure of Privileged Attorney-Client Records Was Intentionally Withheld and Massively Incomplete

The reciprocal disclosure discussion here will first explain the details of how Mr. Gappa's misconduct was discovered, including the scope of documents disclosed and withheld. The second portion explains the *Brady* and *Giglio* implications of some of the documents withheld, justifying the classification of these withheld documents as professional misconduct, and necessarily making each an instance of Ineffective Assistance of Counsel.

### 1) Discovering the Scope of Material Withheld by Mr. Gappa

After the receiving both 30- and 687-page packages from Mr. Gappa with the Capozzi Disclosure, several issues arose when I compared them to the case record. First, I compared the exhibits in the Opposition Brief to the contents of those packages I received. Those exhibits were inconsistently labeled with new Bates numbers. The trial-Bates entries ended with Henry_1388 and the 30 pages given to me in conjunction with the Opposition Brief were numbered Henry_1389 to Henry_1419. These numbers made logical sense. However, I noticed that several Opposition Brief Exhibits which must have come from the Capozzi Disclosure, but:

1. Were *not* given new Bates numbers, and
2. Were *not* included in the 30-page package I received with the Opposition Brief.

Exhibits 1 & A – J, are all missing Bates designations and were not part of the 30-page delivery but were all part of the Capozzi Disclosure. These include internal e-mails between he and his staff, and between Mr. Capozzi's staff and myself or Marcus Lawson.

Of particular note is Exhibit G:[15] billing records of hours billed for my case by Mr. Capozzi's firm. This exhibit could not have come from anywhere else but Mr. Capozzi's office, and turned over to Mr. Gappa to comply with this Court's order to disclose privileged and work-product documents.

---

15 Doc. 356-2.

1       After notifying the Court about the government's non-compliance with the

2   reciprocal disclosure order, a new package was (eventually) delivered with 687 pages of

3   documents in April. Mr. Gappa represented it to me as the total document set received by

4   the government from Mr. Capozzi's Office.

5       The cover letter I received with the delivery from Mr. Gappa stated, "This is a copy

6   of the file that Mr. Capozzi maintained during his representation of you in your criminal

7   case." Exhibit 5. This unambiguously represents the contents of that package constituted

8   the file disclosed to the government by Mr. Capozzi's office.

9       In that delivery, Exhibits A, K, L, M, N, and O were present. However, the only

10  exhibit included with the 687-page delivery which was *not* part of the first 30-page delivery

11  was Exhibit A. Exhibits 1 & B, C, D, E, F, G, H, I, and J were not included in either

12  delivery. This represents ten of the sixteen total exhibits (62.5%) withheld.

13      Those Exhibits, included in the 687-page delivery, now contained Bates designations

14  which were absent (at least from Exhibit A) when attached to the Opposition Brief copy I

15  received in February. The only possible explanation for this is that Mr. Gappa did not assign

16  Bates numbers to these particular documents until after I complained to the Court about the

17  violation of the Court's reciprocal discovery order. Additionally, many of the those exhibits

18  were *still* missing, and their absence made me aware that the government had, once again,

19  withheld more ACP-WP discovery. At that point I didn't know of the extent of those

20  omissions.

21      The following list explains the Opposition Brief Exhibits which *must* have been part

22  of the Capozzi Disclosure, but were not included in either of Mr. Gappa's 30- or 687-page

23  "curated" delivery of that disclosure:

24  • Exhibit 1: Capozzi Declaration- Obviously received from Mr. Capozzi when this

25      Court's order specifically included delivery of any declarations.

26  • Exhibit B: Whitney Linder email in re: jurisdiction argument – Obviously received

27      in the Capozzi Disclosure as it was internal office communication about this case.

- Exhibit C: Marcus Lawson *Curriculum Vitae* – The header notes Mr. Lawson as CEO of Global Compusearch. He lost this company to a hostile takeover shortly before my trial. Thus, this is not a current CV that Mr. Gappa obtained on his own, but must have come from Mr. Capozzi's pretrial records.
- Exhibit D: Memo from Ms. Linder to Mr. Capozzi in re: Marcus Lawson "to do" list.
- Exhibit E & F – Emails from Marcus Lawson refusing "to do" list items and assisting with cross-examination questions.
- Exhibit G: Mr. Capozzi's internal billing records.
- Exhibit H & I: Canadian Court documents – These contain "Attachment O" and "Attachment P" hand-written on them, proving they are scans of the Family Services Report (Castro) generated during the kids' custody investigation. These could not have come to Mr. Gappa in any way other than as part of the Capozzi Disclosure. See Argument §V(G)(1), *infra* at page 39.

In May, I finally discovered the full scope of the Mr. Gappa's withholding. It was a willful, intentional violation of this Court's order requiring reciprocal disclosure, and it was egregious: omitting over 5,000 pages (87%) of the documents disclosed by Mr. Capozzi.

At the request of my family, and in compliance with the Court's order for disclosure, Mr. Capozzi's office gladly billed my aunt and uncle almost $900 have the files re-scanned by Valley Document Solutions and exported onto a DVD disc (sent to me), and onto a USB drive (sent to my aunt and uncle).

The invoice for that service, billed by Mr. Capozzi's office, contained several pieces of important information. Exhibit 6. First, the invoice was dated May 11, 2022, long after the government had its own copy of this ACP-WP document set, and long after I had received my 687-page "reciprocal disclosure" delivery from Mr. Gappa.

Second, the quantity of pages listed for standard/color images add up to 5,927.[16] Comparing this to the 687 pages I received from Mr. Gappa is no small discrepancy. The government withheld more than 87% of the entire file and only sent me a carefully-curated

---

16  Totaling 5,145 black and white documents and 773 color documents scanned.

1   document set that lacked many documents needed to fully prove my case here. This

2   flagrantly violates long-established disclosure requirements in *Brady, Giglio, and Jencks.*[17]

3         Third, the cover letter sent to me with the DVD disc confirmed that these 5,927

4   pages represented what Mr. Gappa had received Mr. Capozzi's office. That cover letter

5   states: "As requested, enclosed is a media device with a c copy [sic] of the documents that

6   US attorney has recently reviewed." Exhibit 6 at 1.

7         These omissions cannot be reasonably excused as accidental. It was so massive, it

8   could only have been a conscious decision by Mr. Gappa intended to obstruct any fairness

9   in this *habeas* review process. I can supply the entire file upon the Court's request.

10         This cannot be a simple matter of different document sets given by Mr. Capozzi's

11   office to the government and myself. If that were the case, all Opposition Brief exhibits

12   would be represented in the 687-page delivery Mr. Gappa sent to me, claiming it was the

13   full document set.

14         Because even his own Opposition Brief exhibits contained files outside of that 687-

15   page delivery, it is plainly obvious that Mr. Gappa had more than he gave me. The only

16   logical conclusion here is simple: Mr. Gappa intentionally sent me less than the full file,

17   willfully violating this Court's order to provide reciprocity in regards to these documents,

18   and likely with the intent to cripple my ability to argue the merits of my claims here.

19         If I had filed this reply brief within the originally-set briefing schedule, I would have

20   never discovered that the full set of documents were withheld. Either the government

21   purposefully curated a document set including only those documents which supported its

22   position, or Mr. Capozzi gave the government only a partial document set, which did not

23   match the one I obtained from his office (at great expense to my family), and then lied to

24   me about it. This possibility falls apart, though, because the Opposition Brief Exhibits

25   expose Mr. Gappa as possessing more than he shared.

---

17 For exculpatory evidence: *Brady v. Maryland*, 373 U.S. 83 (1963), For witness impeachment
   evidence, *Giglio v. United States*, 405 U.S. 150 (1972). For government notes, reports,
   summaries, transcripts, etc., *Jencks v. United States*, 353 U.S. 657 (1957). 18 U.S.C. §3500.

1       The most likely scenario from the facts I have, in fact the only possibility that makes

2   any sense, is that Mr. Gappa violated the Court's order intentionally.

3

4       **2)   Withheld Documents Containing Materials Required for Disclosure**

5   When considering the materials described in this section, it is important to note that Mr.

6   Gappa was required to disclose them, and that Mr. Cappozi possessed these them at trial

7   and failed to use them. Each prejudiced the outcome of my case and each one constitutes

8   both prosecutorial misconduct (for the withholding) *and* ineffective counsel (for not being

9   used at trial). The three discovery types which the government is required to share with the

10  defense are:

11      1. *Brady* material – for all discovery which exculpates wholly or partially;

12      2. *Giglio* material – for all discovery relevant to character/witness impeachment; *and,*

13      3. *Jencks* material – for all discovery relevant to investigation documents: policy

14         reports, notes, summaries, etc.

15  In this section, *Jencks* material will not be discussed. The sheer volume of investigative

16  reports and notes would be too time-consuming for comparison and analysis prior to this

17  brief's submission due-date. However, I would ask the Court to preserve my ability to

18  submit any such *Jencks* violations at a later date (if the Court finds it necessary).

19      Each of the *Brady* documents listed below may not be a "smoking gun," exculpating

20  me by itself, nor would each *Giglio* document listed serve to totally impeach a character or

21  witness testimony in and of itself. The cumulative effect of all of these documents, though,

22  necessarily demonstrates prejudice and demonstrates both prosecutorial misconduct and

23  ineffective counsel. Below is a bullet-point list of which documents were withheld and why

24  they constitute *Brady/Giglio* violations.

25  • Surgeon's Report (March 22, 2006) – This post-surgery report prohibits work for six

26     more weeks. ACP-WP: "Adam Henry – People v. Adam Henry"  at 131. Exhibit 12.

27      ○ Police reports conclude none of the child pornography files in Count 2 were

28        downloaded using any computers in my home. §2255 Motion at 36-37.

- ○ Of the seventeen (17) child pornography files found on Item 16,[18] one file (file #2) was created on April 4, 2016 when I was at home, living with my former-fiancee Rebecca, and out of work recovering from surgery.
  - ○ Since I was at home for six weeks afterward, healing, where no downloads occurred,  I could not have been responsible for that file's creation.
- • Cut/Paste text message excerpts from cell phone extract. ACP-WP → "Adam Henry – People v. Adam Henry" Page 152-153.
  - ○ One of the texts here is the same message I raised in the §2255 Motion, showing Angele asking for (and receiving) the password to the Aurrora share.  Because of the placement, this file was in my case record before trial, meaning Mr. Capozzi had possession of it, but did not use it to totally derail the government's foundational argument that I had exclusive access to that share, and that I alone was capable of committing these crimes.
- • More text message excerpts relating to Angele's visit to California in July of 2010– ACP-WP → "Adam Henry – People v. Adam Henry"  Page 156.
  - ○ The government's argument at trial and in the Opposition Brief consistently claims Angele was not present in California before August 20, 2010 and, therefore, could not have been responsible for files created before then. The relevance and importance of proving her presence in my home before August 20, 2010 is discussed in Argument §(V)(J) below (page 55). See also Exhibit 10 at 3.
- • E-mail from Ms. Linder to Mr. Capozzi discussing relevancy of the Canadian cases, CPS Reports.  ACP-WP: "Angele Henry – People v. Adam Henry"  Pages 71-74.
  - ○ No excuse could be made for not understanding these documents' relevance.
  - ○ Included here are references to the custody order, discussed below, that Angele intentionally withheld from current counsel; one clear pattern among others.
- • California prosecuting attorney filing in state case against Angele (Stanislaus Superior Court Case No. 4004512) acknowledging Angele had access to the

---

18  See Bates 679.

password-protected Aurrora share.  ACP-WP: "Angele Henry – People v. Adam Henry"  Pages 83 – 84. Acknowledging Angele had access to the Aurrora share. Pg. 83 at ln. 6-7, pg. 84 at ln. 14. Dated January 20, 2017.

- ○ The primary argument made by the government to focus prosecution on me, not Angele, and the primary reason I was ordered to be detained pending trial was based upon the assumption that Angele did not have the password to this share.

- • Declaration of Angele Dated January 20, 2017 claiming domestic abuse in both of her marriages. ACP-WP → "Angele Henry – People v. Adam Henry" Page 87.

- ○ Continuing her pattern of falsely claiming spousal abuse whenever and however it helps her avoid consequences for her actions. This directly conflicts with the statements she gave to Det. Moore in her interview for the instant case.

- • Personal explanation for Mr. Capozzi regarding the "to-do" list I had created for Marcus Lawson, defense expert in computer technology (below at page 50). ACP-WP: "CPS Matter - People v. Adam Henry" Pg. 99-101.

- ○ Proof positive that Mr. Capozzi was made aware and explained to in detail why each list-item was relevant and important to my defense. Mr. Capozzi cannot claim ignorance or having been misinformed by Mr. Lawson on these subjects.

- • Personal notes, transcribed by Ms. Linder on March 16, 2016, ACP-WP → "CPS Matter - People v. Adam Henry" Pg. 106, 110 et. seq.

- ○ These notes include my raising of the Count 1 jurisdictional issue 1 ½ years before trial. Scanned copies of these notes, written before March of 2016, contain more discussion of jurisdiction above and beyond the transcription of these notes made by Ms. Linder. Not only do these notes prove the Capozzi Declaration contained lies, but makes the decision to exclude that argument intentional.

- • Notes regarding Count 1 jurisdiction, dated May 2, 2017, six months before trial. ACP-WP: "CPS Matter - People v. Adam Henry" Pages 122-123.

- • Note on government closing arguments. written by Mr. Capozzi, showing he knew Angele had the Aurrora password. ACP-WP: "Put with Henry Letters" at 2.

- "Section A" notes jurisdictional argument issues including a note that no files were transferred out of the house on the internet, and that the Gov. must prove nexus of interstate commerce via hardware only.
- These notes are nearly illegibly written, because they are not my handwriting. These notes, dated six months before trial, **are in Mr. Capozzi's own handwriting**. He cannot claim I did not raise this issue before trial or filing of the AOB.

- Note reading "Need to Show Computer Parts from out of State." ACP-WP: "CPS Matter - People v. Adam Henry" Page 54.
  - The heading for this small section is written as "Conf with A", obviously short for, "Conference with Adam" since this was privileged work-product in my file.
  - Once again, this acknowledgment of the jurisdictional argument **was written by Mr. Capozzi himself,** four days before trial began.
  - Mr. Capozzi cannot *now* claim I didn't raise this issue, claim someone else did, claim he thought it up on his own but discarded it, or any other reason to escape his lie in the Capozzi Declaration. Boldly stating I had never told him about it can only be an intentional lie, made under penalty of perjury.
  - Mr. Gappa supported and repeated this lie in the Opposition Brief, while withholding this note from me in violation of this Court's order do disclose it.

The Opposition Brief claimed that I failed to prove that I told Mr. Capozzi to make the jurisdictional argument for Count 1. "Putting aside his patent failure of proof that he told Mr. Capozzi to make a jurisdictional argument he now claims would have let him win his appeal…" Opposition Brief at 24. It is now clear that the reason I was unable to effectively make that argument is because Mr. Gappa did his very best to ensure I did not have access to the documents necessary to prove that argument.

All of these documents are important for substantiating the arguments made in my initial §2255 Motion. All were intentionally withheld from by Mr. Gappa, in knowing violation of this Court's reciprocal disclosure order. Nearly all of these documents

1   constitute violations of material for which *Brady* and *Giglio* require disclosure to the

2   defense and, for the Court's own review, all are included in Exhibit 12.

3        With leave of the Court, I can and will continue to go through all 5,927 pages which

4   make up the entire ACP-WP disclosure, contrasting them with the 30- and 687 page

5   document sets received from Mr. Gappa, where I no doubt will find many more instances

6   where these violations occurred. To preserve the current filing deadline, however, I will

7   conclude the found-documents discussion here.

8

9   **E.   Angele Was Solely Responsible for the Child Pornography Searches**

10   **and Downloads on my Work Computer, and Solely Capable of the**

11   **Remote Transfers of Child Pornography to our Home Network**

12   Mr. Capozzi was wholly ineffective and, essentially, inoperative as defense counsel in

13   regards to Count 2. He was given more than enough discovery not only to establish

14   sufficient reasonable doubt regarding Count 2, but to establish factual innocence.

15        As I have argued here and before, I was on site working at Lock-N-Stitch and

16   Angele was home when the child pornography file transfers of were made[19] using the

17   remote access I had set up between my work computer and home network. At the risk of

18   becoming repetitive, that connection only worked in one direction: my work computer was

19   accessible from home, but my home network was not accessible from work.[20] If I had made

20   those transfers, I would have needed to be home. Text records demonstrate that I was not.

21        Further, Mr. Capozzi hired his expert, Mr. Marcus Lawson, to handle the

22   complicated computer forensic issues of my case. Mr. Lawson failed at his duty in

23   spectacular fashion. Location information was stored in my cell phone and was preserved in

24   available discovery. I now know where that data resides.

---

19  For August, 23, 2013 see §2255 Motion at 27-28. Report portion attached as Exhibits 2 & 3; for
the Search Warrant date (9/19/13) see *supra* at §V(A), pg. 20.

20  Confirmed by testimony of Det. Hively: §2255 Motion at 24, Tr. Trial, Doc. 334, pg 719.

1    Bates #1011 ("Cellebrite") contains the cell phone extractions from both Angele's

2    phone and my own. In Bates #1015, a complete copy of my iPhone 4G files and system

3    was made on December 27, 2013. It remains there and is preserved in img/.iso format.[21]

4    Within that file, known as an "ISO" or "Disc Image," are the system files from my iPhone.

5    Relevant here is the file which stores location data for the iOS operating system, located in

6    the following folder path: /usr/libexec/locationd

7    This file can only be opened by forensic software, but contains date and time data

8    with location information from the phone system and would conclusively place me at work

9    on August 23rd and September 19th of 2013 when those file transfers were made and when

10   the text messages between Angele and I occurred. This location data, when matched with

11   the time-stamps of the text messages, would conclusively show my whereabouts during

12   these transfers and exonerate me of any participation in them.

13   To address the use of my work computer to search and download these child

14   pornography files, location data could demonstrate that I was away from my desk during

15   those events as well.[22] However, Mr. Lawson never attempted this or anything else to help

16   in my defense. He was convinced of my guilt of both crimes from the moment he was

17   hired. ACP-WP: "Adam Henry – People v. Adam Henry" at 82-85, "Closing Stmts – USA

18   v. Adam Henry" at 83-182. See also Opposition Brief, Exhibit D & E.

19   My notes contained in the ACP-WP disclosure documents, including notes I made as

20   early as 2014 but especially those created prior to the closing statements at trial, detail

21   much of the proof of my innocence argued here.[23] In addition to proving factual innocence,

22   they also necessarily demonstrate ineffective assistance of counsel.

23

---

21 Bates #1015: "iPhone4GSM_6.1-6.1.3_Physical_Physical_17-12-13_03-17-09" when mounted
   into a host file system reveals the "BrightonMaps10B329.N90OS" phone image capture.

22 Depending on the accuracy of iPhone GPS location technology implemented in iOS 7.1.2.

23 Bates #1432 & 1433, 1759-1761. See also Exhibit 11 [ACP-WP: "CPS Matter - People v.
   Adam Henry" Pg. 100 *et. seq*]

**F.   Mr. Capozzi Lied in his Declaration [Doc. 357-1]**

In addition to their Opposition filing, the government filed a "Declaration of Tony Capozzi" (hereinafter "Capozzi Declaration"). Initially, this was intended to be filed as an exhibit to their opposition, but was omitted and was later filed on March 1, 2022 [Doc. 357] with Exhibit 1 as the declaration itself.  In relevant part, Mr. Capozzi states the following: "The jurisdictional issue was never brought up by Mr. Henry or myself as to what issues should be argued." Capozzi Declaration at 2, Doc. 357-1 at 3. This is not the truth.

As shown by the collection of my notes obtained in the ACP-WP disclosure from Mr. Capozzi's own office, *supra*, I raise this issue on *at least* ten different occasions. See page 24, and fn. 11-14. These occasions were before, during, and after trial, including before the AOB was due. I not only raised the issue, I did so repeatedly, and aggressively.

Mr. Capozzi signed the Capozzi Declaration under penalty of perjury. The only circumstance here where Mr. Capozzi is not committing perjury here is where he never even *read* my notes. However, his own handwritten notes acknowledging this argument bar any such defense. He read, spoke to me, and acknowledged this argument several times. In his own handwriting. Exhibit 12. Before (and when) the AOB was filed, I did not realize that Mr. Capozzi had not properly brought/preserved the jurisdictional argument because I simply did not have the legal understanding necessary to discern that the AOB argument was improperly made. See above, page 25 and Exhibit 4. That is literally what Mr. Capozzi was paid to understand.

My notes on the AOB were mostly grammatical because, at the time, I did not recognize the legal ramifications of how the jurisdictional argument was improperly made. It was only tangentially mentioned in the "Cumulative Error" section at the end of arguments, without substantive argument. Compared to all of my notes on the issue, it was hardly mentioned at all.

The Opposition Brief infers from the ACP-WP and "Exhibit A" that I never raised the issue of jurisdiction before the filing of the AOB, using a single e-mail I sent to Ms. Linder, stating my AOB edits were "more formatting and wording issues than content."

Again, this is not true. During preparation for filing my original §2255 motion, I conferred with Ms. Linder about the facts (as I remembered them) from trial and appeal. I sent a four-page summary of the issues I imagined raising in this §2255 matter,[24] and her response. She confirmed that my memory was not faulty and, although quite critical of the writing of it, provided much of her own commentary regarding the validity of these arguments. Attached as Exhibit 7.

I address this issue in my preliminary summary of §2255 arguments which I sent to Ms. Linder for her review and fact-checking. Exhibit 9.  See also Exhibits 4 & 12. That correspondence, between Ms. Linder and I, directly or indirectly refutes the statements made in Mr. Capozzi's declaration:

> "The second thing on Count 1 is the issue of jurisdiction. Part of the count requires a link to "interstate commerce." The only such link the prosecution attempted to establish was a camcorder the police found. On the stand the detective admitted there was nothing related to the case found in it's memory, but said that his testing of it showed it created files like those that my wife had recorded of herself, and the device was manufactured overseas. After cross, the judge said there was not enough evidence to say that the camcorder was involved and ordered the jury to disregard the testimony. Without that testimony, there was no evidence presented in the trial, or any of the Bates, to establish the interstate requirement of Count 1. I tried to explain this to my attorney, but either I didn't make myself clear or he just didn't get it, because in the appeal he did mention it in the miscellaneous section, but didn't broach it properly as a jurisdiction issue. I spent some time on the phone with his paralegal, spelling it out step by step, and after she understood it she explained it to my attorney. He did clarify it in the response to the prosecution's reply to our appeal, but the appellate judges said he brought it up too late and 'declined to consider' it." Exhibit 9.

In reply, Ms. Linder confirmed she saw no factual errors in my assessment of the case:

> "I read over Adam's notes and I think they are well focused and a very good introduction to his case. The only comment I have about them is this, Adam does a good job explaining that Tony had difficulty with the technology end of the case, but he fails to mention anything about the expert Marcus Lawson." Exhibit 7.

---

24  See Exhibit 9.

### G.  Relevance and Admissibility of Canadian Court Proceedings

The Opposition Brief questions any relevance of the Canadian criminal case against Angele's ex-husband, Adam Pearce. It Further claims they would not be admissible at trial even *assuming* that they were relevant.

That case, the Canadian case involving Angele's ex-husband, Adam Pearce, was instigated by criminal reports to law enforcement made by Angele The very *existence* of these Canadian court proceedings were unearthed by the Child and Family Services agent Valeria Castro and that entire saga demonstrates Angele's capability to lie to authorities and misuse the law to her advantage. Perhaps most relevant here is that the local Family Services investigation revealed Angele's willingness to use me as an unknowing screen for her parental kidnapping. She married me for the sole purpose of separating her older two children from Mr. Pearce, a practice she continues with me and our son, Liam. *Infra,* see also Exhibit 11. Despite the Canadian appellate decision exonerating Mr. Adam Pearce of all wrongdoing, Angele's scheme worked for a time, until Aiden and Siobahn were returned to their father in Canada.

### 1)    Stanislaus County Family Services; Investigation and Report

Agent Castro's responsibilities, as related to Angele's children and our son Liam, were to determine the best placement for the children going forward. Her reports were not kind to Angele. See "Jurisdiction/Disposition Report" Defense Bates 14, *et. seq.*[25] Early on in her investigation into the welfare of the children, Agent Castro had already observed lies made by Angele regarding the children and the criminal investigation.

> "On November 20, 2013, the Agency received police reports concerning the criminal investigation of the parents. After a review of these reports it appeared evident Mrs. Henry's involvement was more than she previously reported… Due to this newly learned information it was decided Family Maintenance Services were no longer appropriate for the family." Defense Bates 20. See also Defense Bates 22, "Evidence against Angele Henry."

---

25  Filed in the Superior Court of California, County of Stanislaus by Valerie Castro of the Stanislaus County Community Services Agency / Child and Family Services department.

1    Angele essentially jailed her ex-husband and kidnapped Aiden and Siobhan from Canada

2    when she moved here to California. She had <u>no</u> legal justification to leave with Aiden and

3    Siobhan, and her claims that their father had relinquished parental rights or was stripped of

4    them are complete fabrications. "Mrs. Henry reports that [Adam Pearce] eventually signed

5    over paternity to her. However, she was not able to provide a copy of this order." Defense

6    Bates 33. Angele was not, in fact, legally allowed to leave Canada with the children. See

7    Defense Bates 40 (Point #15) and Ontario Court of Justice File Number: Ref: D45898/08.

8          Mr. Pearce overcame Angele's attempt to sever any relationship between he and his

9    children using spousal rape accusations, when he was released on bail/bond pending trial.

10   He seemingly had better pretrial representation than I. At that point, Canadian family

11   services began the process of reunifying him with Aiden and Siobahn. Defense Bates 175-

12   193. Less than two weeks later, Angele escalated/retaliated by lodging (physical) child

13   abuse accusations as a way ensure Pearce would be jailed pending trial. Defense Bates 35,

14   39 (See point #6), and 243 *et. seq*.

15
16   > "The Applicant Wife was not happy with the results and immediately after
17   > the rendering of the report by the OCL the Applicant Wife started making
     > claims that the children were being harmed by the father. On May 21,
     > 2006, the Respondent Father was charged -again- with assaulting his son.
18   > … As pointed out to the Judge it would be ridiculous for the Respondent
     > Father to show any 'improper behavior' toward the children since he is
19   > already being charged with a sexual assault against the Applicant Wife that
20   > was based on an incident she allegedly said occurred 6 months before the
     > parties even separated. After the marriage counseling ended (due to the fact
21   > that the marriage counselor suggested more access to the Respondent
22   > Father) the Applicant Mother immediately commenced a Court
     > Application and laid a sexual assault charge against the Respondent Father.
23   > It appears as if the Applicant Mother is using the criminal courts to thwart
24   > my client's access to the children." Defense Bates 259-260.

25   Although Mr. Pearce was fully acquitted of physically abusing Aiden, and he was later

26   exonerated of spousal rape by the Canadian Court of Appeals, his Counsel advised against

27   seeking custody after that exoneration due to Angele's "history of escalation by bringing

28   new complaints. Defense Bates 40 (Point #13) & 261.

> "Upon an extensive review of the lengthy documentation provided by Mr.
> Pearce and obtained from Canadian authorities the Agency has been able
> to confirm Mr. Pearce's conviction was overturned." Defense Bates 44.

Ms. Castro's assessment of the entire Canadian situation included notes on Angele's legal manipulations, false accusations against Mr. Pearce, and lies. It begins on page 38 of her report [Defense Bates 51] where Castro ties together all of the observations made during the investigations related to this criminal case, and the custody case in Stanislaus County.

Ms. Castro's report shows that Angele continued to claim Mr. Pearce was abusive. When she was confronted with the fact of Mr. Pearce's exoneration on appeal, Angele did exactly what Mr. Pearce's counsel had already predicted: she escalated. Angele again weaponized false-accusations, claiming for the first time on record that Mr. Pearce had sexually abused Siobhan. Defense Bates 51.

Ms. Castro reports Angele was almost certainly lying about her lack of knowledge regarding Mr. Pearce's successful appeal. Ms. Castro specifically noted Angele's claim about Mr. Pearce having lost all parental rights was unsupported by anything in the voluminous documents received by Canadian authorities regarding this matter. Further,

> "Mrs. Henry has failed to admit she has not complied with the court orders
> from her own country when she failed to keep the father informed of her
> travels with their children outside of their country and also in her
> establishing a residence in a foreign country. By her own reports she states
> she married Mr. Henry in San Joaquin County in the event that if Mr.
> Pearce tried to learn of her and the children's whereabouts he would not
> realize that she was residing in Turlock…" Defense Bates 32.

Essentially, Angele used me for the purpose of obfuscating the whereabouts of herself, Aiden, and Siobahn. From the beginning of our relationship, she used me. She first used me for use of my last name as a way to hide her whereabouts from Mr. Pearce and Canadian authorities. Later, she used my computer systems and networks to hide her hidden camera recordings and illegal downloads. In hindsight, it is clear: I was never anything but a means to avoid any consequences for her actions in getting what she wanted.

The conclusion of this report acknowledges that Angele had intentionally and *falsely* accused her ex-husband of spousal abuse, spousal rape, child abuse, and child sexual abuse.

The report then recommends sole legal and physical custody be returned to Mr. Pearce. However, there is an unfortunate typo at the end of this section:

> "The Agency has considered the implications of returning custody to Mr. Pearce for the children, the mother, and the maternal family. However, it is the Agency's position any other recommendation concerning Mr. Pearce would be punitive as Mr. Pearce is involved in these proceedings through no fault of his own and any concerns presented by the mother that the Agency would have in making a recommendation for release have been quashed by compelling and accurate records the Agency is in receipt of and has provided to the Court as attachments of this report. Therefore, it is recommended that sole legal and physical custody of the children, Aidan and Siobhan be given to the father, Adam Henry." Defense Bates 54.

It is reasonably clear that Ms. Castro's intention was to recommend Adam Pearce for placement, not me. However, the sentiment in this concluding section is important and highly relevant.

Here in California, the family court Judge presiding over the custody of Liam ordered shared custody in the form of letters/pictures. That order also mandated I be notified if Angele moved. I was later told she had moved to Alameda, CA without informing me, exactly as she had done to Mr. Pearce.

Since my initial pretrial detention, I have never received a single picture of Liam nor letter from Angele about his well-being. I asked my aunt Louise to speak to Angele about communicating with Liam and later received a letter from Angele's criminal defense attorney stating she advised Angele against any such communication. Exhibit 11.

It is obvious to me, and a logical near-certainty, that Angele never informed her defense counsel about the custody order, continuing her pattern of violating family court orders to eliminate paternal involvement in the kids' lives. Defense Bates 64-65.

## 2)   The Government's Relevancy and Admissibility Challenge

> "Mr. Capozzi researched the proceedings, obtained court records, reviewed them, and then determined – correctly – that they were not relevant to issues in Henry's case... Henry still has not outlined how any evidence from any proceeding in Canada would have been relevant to any issue in his case. And

1   more importantly, he has not demonstrated how any of that evidence would
have been admissible in his trial. A tactical decision by counsel that is not
2   objectively unreasonable, but with which the defendant disagrees, does not
3   constitute ineffective assistance of counsel." Opposition Brief at 22.

4   To begin, Mr. Capozzi did no such thing. It was Ms. Castro who obtained those Canadian

5   records, and supplied them directly to me as part of her Family Services reports. *I* gave

6   them to Mr. Capozzi with my notes and observations on those Canadian documents and Mr.

7   Capozzi completely ignored them. Despite this, the government once again heaps high

8   praise on a strategic decision Mr. Capozzi made, a decision which benefited only their side.

9        The relevance of these court documents is entirely self-evident. If Angele was

10  willing and capable of condemning her ex-husband to prison for her benefit in 2008, she

11  certainly would have the capability to commit the acts I claimed in my defense at trial.

12  Adam Pearce's years-long nightmare exposes the obvious relevance of these documents,

13  and the government is simply feigning ignorance to it.

14       In the ACP-WP disclosure, my notes on this issue go into great detail about how and

15  why these Canadian documents were vital to my defense.[26]

16   "The Canadian court docs included, the judge specifically accuses her of
17   lying, and getting their son to lie in order to frame her ex of sex crimes,
     including possession of CP. Exactly the circumstances I find myself in
18   now, about as close to an exact repeat as you can get, isn't it?" ACP-WP:
19   "Adam Henry – People v. Adam Henry" at 106. Exhibit 8.

20  The government's argument, ironically, serves only to prove my point. Introducing these

21  Canadian records was critical to my defense as they reveal Angele's malevolent behavior in

22  Canada, taken against her ex-husband. Whether Angele was willing and capable of doing

23  this to me is *predicated* upon a showing that she had already done so in the past. My

24  defense depended on establishing credibility to Angele's alleged actions here, actions

25  almost identical to her actions against Mr. Pearce in Canada.

26

---

26  To wit, that Angele was responsible for the illegal activity here and had intentionally acted in a
way that would indicate the responsible party was me, defraying suspicion from herself.

1         Admitting these case documents as evidence in my trial was, again, part of what Mr.

2   Capozzi was hired to competently know and handle. As a peace officer, Mr. Capozzi could

3   have questioned Ms. Castro on the process of receipt and review of those Canadian

4   documents, or he could have done the same with Michael Blaylock, who took over for Ms.

5   Castro in the custody case for the Children's Services Bureau – San Joaquin County Human

6   Services Agency. Or even Mr. Ruzega, who I made statements to and created a legal

7   controversy regarding whether those statements were custodial but non-Mirandized.

8         In sum, Mr. Capozzi was wholly ineffective regarding these Canadian documents.

9   Their relevance is clear. Introducing them at trial would establish many crucial facts,

10   primarily that:

11      •  Anglele was capable of falsely accusing her (ex)husband of illegal actions,

12      •  Angele was willing to lie in support of those false accusations,

13      •  Angele was willing to coach her son to lie in support of those accusations,

14      •  Those accusations closely resemble the facts I make in my defense, and

15      •  Angele's actions in Canada substantiate the possibility/plausibility of my defense:

16          ○  Angele was solely responsible for the filming and recording creation of A.T., the

17              search for and acquisition of all child pornography found. Angele intentionally

18              acted in such that any law-enforcement discovery of illegal acts would implicate

19              me, and only me, as responsible.

20   This was said best by Stanislaus Family Services in a September 15, 2015 report on the

21   custody of the children, after the psychological evaluations by Dr. Seymore and Dr.

22   Trompetter were completed.[27]

23       "It is unfortunate that the psychological evaluation of Adam Henry by Dr.
    Harold Seymour was not received by the Agency until September 1, 2015.

24       The information contained in this report outlines a plausible explanation

25       regarding the involvement and predilections of both Mr. Adam Henry and
    Mrs. Angele Henry. Clearly, Dr. Seymour's report points to the possibility

26       that Mr. Henry is not a pedophile and may have been caught up in the

27       manipulations and desires of Angele Henry." Defense Bates 453.

---

27  §2255 Motion at 59. Defense Bates 876 & 889.

1    That is, of course, exactly what occurred.

2           Mr. Gappa was correct on one point in the quote opening this section. Mr. Capozzi

3    was unwilling/unable to understand the importance of these Canadian Court documents,

4    their relevance, or their admissibility and, because of this ineffectiveness, it is now *my*

5    responsibility on §2255 to show their relevance and admissibility. To do so, I was required

6    to extensively research, and become a quasi-professional in, the Federal Rules of Evidence.

7    Specifically Article IV: Relevant Evidence.

8

9    **3)    Analysis: Admissibility Under the Rules of Relevant Evidence**

10   This is the resulting analysis of that research:

11          Rule 401: Test for Relevant Evidence

12          "Evidence is relevant if:

13                (a) it has any tendency to make a fact more or less probable than it would be

14                      without the evidence; and

15                (b) the fact is of consequence in determining the action."

16   On the face of it, these Canadian court documents are relevant and pass the Rule 401 test.

17          Rule 402: General Admissibility of Relevant Evidence

18          "Relevant evidence is admissible unless any of the following provides otherwise:

19                •   the United States Constitution;

20                •   a federal statute;

21                •   these rules; or

22                •   other rules prescribed by the Supreme Court.

23          Irrelevant evidence is not admissible."

24   There are no provisions in the U.S. Constitution which bar the admission of foreign court

25   documents in U.S. federal court, but there is a statute in Title 18 addressing this rule:

26          "Any book, paper, statement, record, account, writing, or other document,
             or any portion thereof, of whatever character and in whatever form, as well

27          as any copy thereof equally with the original, which is not in the United
             States shall, when duly certified as provided in section 3494 of this title, be

28

1  |  admissible in evidence in any criminal action or proceeding in any court of
2  |  the United States if the court shall find, from all the testimony taken with
   |  respect to such foreign document pursuant to a commission executed under
3  |  section 3492 of this title, that such document (or the original thereof in
   |  case such document is a copy) satisfies the authentication requirements of
4  |  the Federal Rules of Evidence, unless in the event that the genuineness of
   |  such document is denied, any party to such criminal action or proceeding
5  |  making such denial shall establish to the satisfaction of the court that such
6  |  document is not genuine. Nothing contained herein shall be deemed to
   |  require authentication under the provisions of section 3494 of this title of
7  |  any such foreign documents which may otherwise be properly
8  |  authenticated by law." 18 U.S.C. §3491.

9  "...foreign judgments, documents and records of 'regularly conducted activity' may be

10  used in evidence in criminal cases. 18 U.S.C. §§ 3491, 3505." *United States v. Garland,*

11  991 F.2d 328 (6th Cir. 1993). Not only do these documents constitute a foreign judgment,

12  they also fall under the "regularly conducted activity" provision.

13  The government never questions the authenticity of these Canadian court

14  documents, and rightfully so. It is reasonable to assume, due to their availability from the

15  Canadian government's own offerings, that the authenticity of these documents is assumed.

16  Thus, 18 U.S.C. §3491 allows these documents to be admitted in "any criminal action or

17  proceedings in any court of the United States..." *Id.*[28]

18  Adding to this, 18 U.S.C. §3505 allows authentic foreign records of "regularly

19  conducted activity" to be admitted. This statute specifically disallows records like this to be

20  excluded using the hearsay rule, "unless the source of information or the method or

21  circumstances of preparation indicate lack of trustworthiness." Since the authenticity and

22  trustworthiness of documents maintained by the closest ally of the United States is not

23  being questioned here, it is therefore assumed.

24  Other than a hearsay exclusion, which does not apply here, no other exclusionary

25  rules exist which would prohibit Canadian court documents from admission so long as they

26  constitute relevant evidence under Rule 401. And, of course, they do.

---

28  A search of Supreme Court decisions for "3491" and "foreign" returned no relevant case law on
   this statute before or after its current language was enacted in 1975. See Pub. L. 94-149, §3.

1        Rule 403: Excluding Relevant Evidence for Prejudice, Confusion, Waste of

2        Time, or Other Reasons

3        "The court may exclude relevant evidence if its probative value is
       substantially outweighed by a danger of one or more of the following:

4        unfair prejudice, confusing the issues, misleading the jury, undue delay,

5        wasting time, or needlessly presenting cumulative evidence."

6 Admitting the Canadian Court documents would have demonstrated Angele's willingness

7 and ability to have her ex-husband convicted of, and incarcerated for, crimes he did not

8 commit. This singular point was vital to my defense, establishing essential credibility to my

9 claim that Angele had set me up to take the fall for her illegal actions.

10       These documents would not waste any time, as they were already available. They

11 were not surplus evidence of a fact for which cumulative evidence had already proven. In

12 fact, they were essential to my defense and were completely missing from trial. They would

13 not have misled my jury, confused any issues, nor introduced any unfair prejudice.[29]

14 Advisory Committee Notes on Rule 403 address exclusion this way:

15        "Exclusion for risk of unfair prejudice, confusion of issues, misleading the
       jury, or waste of time, all find ample support in the authorities. 'Unfair

16        prejudice' within its context means an undue tendency to suggest decision on

17        an improper basis, commonly, though not necessarily, an emotional one."

18

19        Rule 404: Character Evidence; Other Crimes, Wrongs, or Acts.

20        "(b) Other Crimes, Wrongs, or Acts.

21            (1) Prohibited Uses. Evidence of any other crime, wrong, or act is not

22               admissible to prove a person's character in order to show that on a

23               particular occasion the person acted in accordance with the character.

24            (2) Permitted Uses. This evidence may be admissible for another

25               purpose, such as proving motive, opportunity, intent, preparation,

26               plan, knowledge, identity, absence of a mistake, or lack of accident.

27            (3) Notice in a Criminal Case. In a criminal case, the prosecutor must:

---

29  With the exception of causing *due* prejudice to the government's prosecution.

1         (A)  provide reasonable notice of any such evidence that the

2               prosecutor intends to offer at trial, so that the defendant has a

3               fair opportunity to meet it;

4         (B)  Articulate in the notice the permitted purpose for which the

5               prosecutor intends to offer the evidence and the reasoning that

6               supports the purpose; and

7         (C)  do so in writing before trial – or in any form during trial if the

8               court, for good cause, excuses lack of pretrial notice."

9 Presenting evidence of other wrongs is admissible under section (b)(2). It shows

10 preparation, knowledge, and absence of mistake or accident. A good example is somebody

11 using malicious, false accusations to cause prosecution of an ex-husband for conduct

12 alarmingly similar to the conduct for which the current husband stands trial. Additionally,

13 because Angele was not on trial here at all, the exclusionary portions of this rule do not

14 apply. The Canadian court documents reveal that Angele was willing to, and capable of,

15 exposing her current husband to criminal conviction and prison if it would serve her

16 primary goals.

17      In 2008-2009, her goals involved separating from Adam Pearce, leaving Canada, and

18 heading to California with sole legal and physical custody of her children at all costs. Here,

19 her only goal involved avoiding detection and prosecution for her illegal, voyeuristic

20 behaviors and child pornography fixation.

21      Introducing this evidence to cast reasonable doubt on my guilt is permissible (404

22 (b)(2)), even if the admission of such evidence against her at her own trial would possibly

23 be excluded for undue prejudice (404 (b)(1)).

24      The remaining rules of Relevant Evidence support the admission of this evidence. It

25 proves her character was not as pure as the she (and the government) portrayed. Rule 405

26 (b). It also demonstrates a pattern of behavior (Rule 406), including "past behavior and

27 predisposition (Rule 412).

28

Thus, these documents were/are highly relevant, are not excluded by hearsay or other exclusionary rules, and are plainly admissible under multiple rules in Article IV of the Federal Rules of Evidence. It is noteworthy, and did not go unnoticed, that the government offers no rule by which it would have moved to exclude this evidence at trial

These Canadian legal documents were relevant, admissible, and vital to my defense. Unfortunately they were completely discarded by Mr. Capozzi at trial, even though they were among the first documents added to his Defense Bates ahead of trial. This issue alone warrants a finding of Ineffective Assistance of Counsel and a full review of the verdict in light of his failure here.

## H.  Defense Expert Marcus Lawson Was Essentially Working for the Prosecution

After reviewing my initial summary of the most important arguments to make on §2255, Mr. Capozzi's paralegal observed the following about defense "expert" Marcus Lawson:

> "Adam does a good job explaining that Tony had difficulty with the technology end of the case, but he fails to mention anything about the expert Marcus Lawson. In my personal opinion (which doesn't amount more than a hill of beans) I believe he was a liability. He did not help Tony understand very much. In fact I got the impression (which could be very
>
> off base) that he felt Adam was guilty and didn't attempt to help Tony with the technical stuff." Exhibit 7.

Ms. Linder's suspicion regarding Mr. Lawson's presumption of guilt is wholly accurate. That viewpoint is supported by Mr. Lawson's own words on the record, using the government's Opposition Brief exhibits:

> "He did what he did and if he is willing to own up to it I'll do my best to help minimize the consequences but if he continues along this line that 'the wife did it' there isn't much I can do to help him. If he is willing to admit what he did, I think there are some mitigating things that would helhp, but as long as he takes this current stand, there is very little I can d to help him [sic]." Opposition Brief, Exhibit E at 1.

1   Mr. Lawson had made up his mind about my guilt long before trial and intentionally did

2   nothing which would potentially assist Mr. Capozzi in securing a "not guilty" verdict. He

3   failed in his job as a defense expert and Mr. Capozzi failed as defense counsel by

4   maintaining Mr. Lawson's employment through the end of trial.

5        The quote above, taken from an e-mail from Mr. Lawson to Ms. Linder, references

6   his assessment of a "to do" list I had made specifically for Mr. Lawson. Since I was

7   employed in the IT field, I knew quite well how the systems at issue operated. That to-do

8   list included task items for analysis of the computer equipment seized by the government

9   and intended for use at trial. See Exhibit 12, ACP-WP: "People v. Adam Henry" at 154, *et.*

10  *seq.* (complete); see also Opposition Brief, Exhibit D (partial).

11       There are many items contained in that to-do list which were highly relevant at trial,

12  and are still relevant today. Despite their relevance, Mr. Lawson flatly refused to do many

13  of these tasks, making decisions on behalf of Mr. Capozzi which only my defense attorney

14  should make about their relevance.

15       That list shows no indication of the "guilty mind" the government claims I showed,

16  and contained a total of 26 tasks for Mr. Lawson. Each shows my technical knowledge and

17  most asked only to confirm details I already knew to be true. His notations to that list

18  refuses to do 11 of the first 16 items, and totally ignores the final 10 items.

19       Because that list, including Mr. Lawson's notations, is included as Opposition Brief

20  Exhibit D, it will not be redundantly included here. My purpose in this section is to detail

21  the relevance of each point both when I wrote it and today. All points below correspond to

22  the same point-number from that to-do list.

23  1. This was attempting to show that none of the videos were viewed, edited, etc. Part of

24      my duties at work was editing company videos. The police discovery described

25      many of the home recordings as hours of empty room, with a few minutes of activity

26      here and there. This task, if completed, would conclude that I had never viewed any

27      of the downloaded child pornography, nor edited out the empty space of the home

28      recordings. This conclusion only makes sense: if I were responsible, or even

1   conspiring with Angele, the hours of empty room would have been edited out.

2   Mr. Lawson notes here,

3       "Aside from his unsupported claim that his wife used his computer to do
4       this, there is ample evidence to show that is exactly what he was doing."

5   This note is particularly damning. As an inmate, I was able to support *exactly* this

6   using the government's own discovery. If Mr. Lawson had done his job, what other

7   evidence was available in those files that were omitted from the police reports?

8   2. Here, I intended to counter the government's claim of distribution as well as receipt

9      of child pornography. I knew I had disabled all sharing whenever I installed any

10     P2P-type software. Thus, despite the police reports claiming otherwise, no

11     downloaded file could leave my system(s). Mr. Lawson notes that this was "done"

12     but never made any report noting his findings here.

13  3. This would show my advanced computer knowledge and skills. These are extremely

14     relevant, doubly so in the context of internet security, which directly relates to the

15     amateurish way these files were obtained and transferred. This was done without any

16     type of security.[30]

17          Police reports specified Item 3 (my home computer) had zero contraband files

18     on it and never noted that item 3 was my computer. During Angele's interview with

19     Det. Moore, she stated Item 3 was the only computer she had never used. Because

20     that computer was my personal PC, and contained no illegal files, the government's

21     claim that I was obtaining these files for personal use without Angele's knowledge

22     would have been completely undermined.

23

---

30 Det. Moore's search warrant reports repeatedly note details he *expected* to find (based upon his
   experience with child pornography investigations. Some examples listed were encrypted drives,
   physically hidden thumb drives, further downloads on bail between search warrants, etc. He did
   not find any of these expected details here, things an "average" offender does to hide their
   deeds. This was unexpected of a suspect with my advanced IT knowledge. This point was
   raised during defense cross-examination of Det. Moore. This task tied my capabilities to what
   investigators expected to, but did not find, which makes no logical sense unless somebody
   *intended* the evidence to lead back to me.

4. This would support the argument that I had no history of paraphilia nor warning signs detailed in the psychological evaluations both Angele and I had done. Angele had several, and consistently/intentionally engaged with minors daily.

5. Originally the government and police tried to connect adult-oriented search terms with child pornography terms. This task was an attempt to demonstrate the separation between the two and add plausibility to the defense that Angele was responsible for those searches and downloads.

I demonstrated this on my own, later, using *Jencks* discovery material such like the timestamps of those searches and the "File Created" timestamps of the child pornography downloads. This narrows those searches/downloads to time windows where Angele was in my office alone.

By connecting the adult terms with my personal PC, which contained no illegal files, I could demonstrate clear separation between my searches and those made by Angele alone. Mr. Lawson's notes are troubling, "It only takes into account the most recent searches still remaining in the P2P logs. It does not take into account any searches prior to the date of seizure." This shows willful ignorance, proving he never even looked at the P2P search terms nor the discovery of those search terms.

Those search terms were last timestamped on June 3, 2013, months before the search warrant. That PC, quite obviously, contained entries last-entered months prior to the seizure but Mr. Lawson here assumes that performing this task would not show any searches prior to the date of the search warrant and seizure. This calls into question his knowledge as an expert and proves he didn't even look at the available discovery.

6. This task item would have demonstrated that all downloads/transfers of child pornography were made in a narrow window compared to the years I had used various P2P programs. I was easily able to accomplish this myself using pretrial discovery and we raised this issue in the 2255 Motion. The hard drives' "in use" dates combined with child pornography file timestamps and Mr. Silva's testimony

1     verify that I had been using P2P program for nearly 8 years. Yet, all child

2     pornography discovered was acquired over three separate days, the exact days

3     Angele was observed alone at my desk. The relevancy of this task was clear, but Mr.

4     Lawson refused to even look into it.

5    7. This task demonstrated Angele's more-advanced knowledge of computers and

6     software, knowledge which she claimed not to have in her interviews with both Det.

7     Moore and Stanislaus County Community Services Agency / Child and Family

8     Services. Her technical knowledge included P2P program usage. Angele claimed in

9     both interviews that her skills were akin to, "I know what button to push to turn it

10     on." This lie was one among many, was highly relevant to show Angele's true

11     character, and was easily revealed with only a modest review of available discovery.

12     Mr. Lawson, once again, refused.

13    8. This task showed the links between what Angele was searching for (and interested

14     in) and the search terms entered in tandem with the child-pornography-specific

15     search terms. The "S&S" file folder contained material from the "Sex and

16     Submission" website, and Angele claimed ownership of those files in her interview

17     with Det. Moore. One of the damning search terms here was "bondage".

18    9. Because item 5 was Angele's personal computer I had no knowledge of what it

19     contained. This task was designed to detect if anything on that computer could be

20     connected with the Aurrora share and, in turn, prove that she knew the password and

21     had access to that password-protected area.

22    10. In retrospect, this task was not relevant, though in context this does demonstrate

23     privileged communication that, at that time, showed ignorance/innocence of the

24     child pornography in question.

25    11. This task was intended to help build a timeline. The government claimed this

26     computer was used before Angele arrived in California, thus concluding that the

27     child pornography resident there belonged to me. Dating the usage was highly

28     relevant to refuting this claim. In spite of Mr. Lawson's refusal to perform this task, I

was able to prove this in the 2255 Motion using only the government's own discovery. It proved that Angele was in California, visiting me, more than a year before that computer was last used, despite Mr. Gappa's claims otherwise.

12. This task was designed to show that the Aurrora share was named after one of Angele's in-game characters and was, thus, intended for her use. Thus, it could not be intended to hide files from Angele behind a password, as the prosecution claimed. It was, in reality, created *for* her.

13. If there was no Gateway IP address, these items could not have accessed or have been accessed by, anything outside the home network router, much less by anything on the internet. This task would have helped prove that these devices could not have downloaded or shared anything at all. This preemptively addressed the distribution arguments the government may have (and did) make. Additionally, this would demonstrate that the child pornography could not have been downloaded on these devices, only copied there from a different device which was not in my possession. See Bates 1185 & 1233. See also §2255 Motion at 42,.

14. This was intended to help demonstrate why the Aurrora share was created, and why it was password protected. The government has claimed, from the outset of this case, that the share was created specifically to hide files from Angele. This task set would have entirely debunked that notion.

15. This task would prove Angele had put files on the password-protected Aurrora share. The government had argued since my second detention hearing that I created the Aurrora share to hide files from Angele. To combat this required a demonstration that Angele had her own files behind that password-barrier, and those files were *also missing from* the unprotected side. It would also raise the question: why would her own self-recordings be hidden from her? Logically, they would not be.

16. This task was vitally crucial to my defense. However, its relevance was either totally lost on Mr. Lawson, or intentionally ignored by him as it would be "too helpful" to my defense. The video in question remains in the discovery, and I know its exact

location (I found the filename in screenshots contained in discovery). I was never able to force Mr. Lawson to extract the information needed to show its contents.

The result would affirmatively prove that Angele was in my house, and in my living room, several months *before* Item 16 was shut down for the last time. This is the same system the government claimed was used exclusively before Angele began visiting. Thus the child pornography found there predated her and belonged to me.

Through text message records, ACP-WP disclosure documents, and Angele's interview with Det. Moore, it has been fully verified that Angele was in my home (several times) beginning almost a year before Item 16 was last shut down. This video irrefutably puts Angele in the same room the month before Item 16 was last used, a fact that is quite relevant as it disproves the government's claim. Exhibit 10 at 5-9, ACP-WP: "CPS Matter – People v. Adam Henry" at 36-40.

The Opposition Brief states the files were copied "Aug 20, 2010 before Angele was living with the defendant." *Id.* at 19. This video shows Angele and I in my living room one month *before* August of 2010. The file creation date is in July of 2010 and Angele was there, in the same room, only a month before. Relevancy remains high, since the government refuses to abandon this argument. Again, I was never able to force Mr. Capozzi nor Marcus Lawson to so much as look at it.

17. In retrospect, this task was not relevant.

> Note: From this point onward, Lawson provides no commentary on any task items, and the trial record shows no indication that he ever performed any of them, regardless of their relevance to my defense.

18. This task item would prove that my former fiancee, Rebecca, was very aware she was being recorded. Mr. Lawson's help here would have laid bare Rebecca's perjury, casting doubt on the argument that this showed a behavioral pattern. Yet again, I could not force, beg, plead, or coerce Mr. Capozzi or Marcus Lawson to look at it.

19. Rebecca was never averse to recording own recorded nudity, which is highly relevant to combating the narrative that she was recorded without her consent. Those

"selfies" were voluntary, not at all coerced. Pictures of interest to me, on my own phone, were saved. All images from the baseball game, and the pictures of A.T. Angele sent to me, every file the government used to claim I had interest in minors, were never saved nor backed up. This task further demonstrated that I clearly have a "type." A.T. specifically (and minors in general) did not fit that archetype.

20. Piggybacking on the previous task/note, I felt my defense needed to demonstrate I never sought out contact with A.T. at all. I was unfortunately correct in this assessment. In reality, Angele solely sought out this contact. I never called A.T., sent A.T. a text, and never took her picture despite being friends with her father for eight years. Conversely, Angele exchanged more than 1,000 texts with and took many of pictures of A.T. after knowing her for less than two years. This could have lent needed credibility to my defense.

21. This intended to refute the government's claim that anyone who saw the file names would know those files contained child pornography. This task, if completed, would show I did not pay attention to filenames because they rarely reflect the file contents.[31] In actuality, I would not have seen them in the first place, as Angele was copying them remotely before I could do so. At the time, however, I was unaware she had done so.

22. In her interview with Det. Moore, Angele admitted ownership of the S&S folder, which extended to areas in the network server the government claimed Angele could not access. Several police reports showed a picture-copy on the password-protected Aurrora share including this folder, for which the government still claims Angele had no access.

23. The intent of this task was to try and build a timeline of events, in an attempt to discover what actually happened. Today this is irrelevant: Angele was present when all those files were placed onto Item 16. I was able to do establish this fact through police reports in discovery, and detailed those findings in the §2255 Motion.

---

31 Det. Hively confirmed that that file names often do not reflect content in his trial testimony.

24. This task, again, involved showing separation between all of the adult pornography and child pornography search terms. And again, I was able to establish this separation in the 2255 Motion, using timestamps together with witness testimony.

25. This item was also argued in the 2255 Motion, and revealed important information. My personal user's data-usage on the password-protected Aurrora share did not account for all of the files contained therein. This fact shows someone else was required to have access, and the only other person able to do this was Angele.

26. This final task was, again, attempting to establish a timeline showing when P2P software was installed and used. Copies of the executable to install it existed on external hard discs, discs which contained child pornography. Through his report(s), Det. Hively attempted to imply that the P2P program was found on it, when it was not. The intended implication was that the program was installed and running, downloading files, and this implication was simply not true.

A timeline of what was installed, and when, including installation locations would have helped demonstrate that I never searched for or initiated these downloads. Once again, I was able to accomplish this myself in the 2255 Motion. All of the child pornography was downloaded during the times when Angele was alone and unsupervised in my office.

Many of these tasks were necessary, and required me to do them myself once I had already been found guilty and was given direct access to discovery here in prison. How much easier would it have been to prove my innocence, and how much more evidence was there to be found that I never knew to look for? Because Mr. Lawson had convinced himself of my guilt before trial, he refused to look for the evidence I *knew* was there, and later found on my own. How much more is left to be found? If Mr. Lawson had only bothered to look, I would likely have no need to write this brief, as I would have never been convicted at trial to begin with.

The conclusion here is plain: Mr. Lawson was convinced of my guilt long before trial, and did not hide this fact from Mr. Capozzi's office. Mr. Lawson would not lift a

1   finger to find readily-available evidence which may jeopardize the verdict *he* decided was

2   the correct one. I knew this. Ms. Linder knew this. Even Mr. Capozzi had to realize that Mr.

3   Lawson was contributing nothing to my defense.

4          Had Mr. Capozzi even *looked* at any of the items here, or anywhere else in my notes

5   which contained obviously vital information, his defense would not have been deficient.

6   Failing to investigate is grounds for ineffective assistance of counsel when, "...reviewing

7   those records, he would have uncovered information that would have prompted him to"

8   alter defense strategy. *Washington v. Ryan*, 922 F. 3d 419 (9th Cir. 2019) (citing *Rompilla v.*

9   *Beard*, 454 U.S. 374, 390 (2005)).

10         All this considered, Mr. Capozzi should have terminated Mr. Lawson's status as our

11  defense expert at many points before trial. Mr. Capozzi hired Mr. Lawson to be part of his

12  defense team when, in reality, Mr. Lawson was acting as a function of the government

13  prosecutor, intentionally crippling Mr. Capozzi's ability to defend my case. Case law

14  clearly establishes Lawson's actions, and the way those actions affected Mr. Capozzi's legal

15  representation, constitutes ineffective assistance of counsel.

16         "There are, however, circumstances that are so likely to prejudice the
       accused that the cost of litigating their effect in a particular case is
17     unjustified. Most obvious, of course, is the complete denial of counsel. The
       presumption that counsel's assistance is essential requires us to conclude
18     that a trial is unfair if the accused is denied counsel at a critical stage of his
       trial. Similarly, if counsel entirely fails to subject the prosecution's case to
19     meaningful adversarial testing, then there has been a denial of Sixth
20     Amendment rights that makes the adversary process itself presumptively
       unreliable....on some occasions when although counsel is available to
21     assist the accused during trial, the likelihood that any lawyer, even a fully
       Competent one, could provide effective assistance is so small that a
22     presumption of prejudice is appropriate without inquiry into the actual
23     conduct of the trial." *United States v. Cronic*, 466 U.S. 648 (1984)
24

25  Here, Mr. Lawson's fully-admitted prejudice concerning my guilt rendered Mr. Capozzi's

26  representation as ineffective through no fault of his own besides having no personal

27  expertise in computers or Information Technology.

28

## VI.   Conclusion

I cannot include all occasions where ineffective assistance of counsel occurred in my case. As a prisoner, I have neither the resources nor time time to analyze well over 15,000 pages of case documents to find and brief all instances of IAC. Presented here are only the largest, most relevant issues, all of which could individually show prejudice while together the cumulative prejudice is obvious.

I willingly waived attorney-client privilege here as I knew the truth: I never admitted guilt of these crimes to anybody at any time. This includes my defense counsel, with statements made during communications which *could have* stayed confidential forever.

This shows only an innocent mind, not a guilty one. Whatever "guilty mind" the government attempts to show here is ludicrous. I made nearly 6,000 privileged document pages available to the government. Only my willful, intelligent waiver of privilege allowed the government access them, after which Mr. Gappa intentionally withheld most of them to prevent me from seeing exactly what he found: no evidence of, or admission of guilt anywhere within them. The government could not find a single note, scrap of paper, statement, or quote wherein I admit, imply, or infer guilt of any kind. In truth, the opposite is present: I consistently, vehemently declared my innocence to anybody who might listen.

The government makes no novel arguments in their Opposition Brief because there were none to be found. The opposite is true here. In my limited research capacity as an inmate at FCI Lompoc, I found dozens and dozens of documents demonstrating Mr. Capozzi's ineffectiveness. Worse still, several of these documents highlight Mr. Lawson's intentional disregard for his duty to my defense and a singular purpose of ensuring a guilty verdict at my trial.

The U.S. Attorney's office never established jurisdiction to prosecute Count 1, and Mr. Capozzi improperly brought this to the attention of the Ninth Circuit, despite years of pleading for him to take that argument seriously.

Angele has always known the password to the locked share on our home network, and text message records prove that. Angele even had her own folders in that password-

REPLY TO GOVERNMENT OPPOSITION          59

1    protected area. The entire foundation of the government's case-in-chief was based upon

2    Angele's lie that *she did not know that password*. I was detained during the entirety of the

3    five years before my trial based on that one lie. A lie like she often tells law enforcement.

4        Angele can be placed in my office, unsupervised, when all searches for child

5    pornography were made, and all such downloads initiated. Angele can be placed at home,

6    and I at work, when the one-way file transfers of child pornography were made from my

7    work computer to my home network.

8        Angele has a proven history of discarding husbands she intends to divorce into the

9    hands of criminal justice. And that proven history also includes **strong** evidence that her

10   allegations against Adam Pearce were completely fabricated.

11       Any single issue discussed here, or in my original §2255 Motion, is sufficient

12   grounds for a finding of Ineffective Assistance of Counsel under either *Strickland* or

13   *Chronic* (or both). Worse, though, is that Mr. Gappa felt it necessary to engage in

14   prosecutorial misconduct, and Mr. Capozzi felt it necessary to perjure himself, in order to

15   either protect their egos, maintain a high conviction rate, or maybe even just to protect their

16   professional reputation.

17       I pray the Court agrees, and concludes that any or all of the arguments made in this

18   request for §2255 *habeas* review raise enough merit on ineffective assistance of counsel to

19   concretely conclude that any jury, when presented with this collection of evidence, would

20   find sufficient reasonable doubt to find me "not guilty."

21       Yet, this is not the finding the Court need make. There is no requirement that a Court

22   conclude all twelve jurors would have found reasonable doubt. If the evidence presented

23   here is sufficient to convince *a single juror* of my innocence, due to Mr. Capozzi's

24   ineffectiveness, both guilty verdicts cannot survive.

25

26

27

28

1    Submitted this 22nd day of August, 2022

2

3

4

5                                                    ADAM ALAN HENRY #71064-097
6                                                        Lompoc FCI
                                                         Federal Correctional Institution
7                                                        3600 Guard Road
8                                                        Lompoc, CA 93436
                                                     Pro Se Defendant, Petitioner
9

10

11

12

13

14

15

16

17

18

19

20

21

22   <u>Certificate of Service</u>

23   With my signature above, I attest that I have served a true and correct copy of the foregoing

24   brief upon the Clerk of the U.S. District Court for the Eastern District of California, Fresno

25   Division, at the Robert E. Coyle Federal Courthouse located at 2500 Tulare Street, Room

26   1501, Fresno California, 93721. As registered EM/ECF users, the government has

27   consented to electronic service and is therefore served pursuant to Fed. R. Civ. P. 5 once the

28   Clerk has docketed this brief.

REPLY TO GOVERNMENT OPPOSITION              61

1

2 **Index of Exhibits**

3 VII. EXHIBITS INDEX............................................................................................i

4 Exhibit 1: Adam Henry Interview with Det. Hively Excerpt..............................ii

5 Exhibit 2: Text Extracts from Bates #1011 (#1015)..........................................iii

6 Exhibit 3: Text Extracts from Bates 1011 (1131).............................................iv

7 Exhibit 4: AOB Related E-mails Between Myself and Whitney Linder...........................v

8 Exhibit 5: Mr. Gappa – 687-Page Disclosure....................................................vi

9 Exhibit 6: Cover Letter and Invoice from the Office of Anthony Capozzi in RE:

10     Attorney-Client Priivileged and Work Product Documents........................vii

11 Exhibit 7: Emails Between Louise Reed and Miss Linder in RE: Preliminary Summary

12     of §2255 arguments...............................................................viii

13 Exhibit 8: Personal Notes Made About this Case on April 1, 2016, Including Specific

14     Notes on the Relevance of Canadian Court Records..................................ix

15 Exhibit 9: Personal Preliminary Summary/Road-map of §2255 Arguments.....................x

16 Exhibit 10: Timeline of Events Noting Angele's 2009 Visit to Me in California..............xi

17 Exhibit 11: Letter from Angele's Criminal Defense Counsel Regarding No Contact with

18     Liam..............................................................................xii

19 Exhibit 12: Documents Withheld in Reciprocal Disclosure Which Implicate *Brady* and

20     *Giglio V*iolations...............................................................xiii

21 Exhibit 13: Content Overview of Attorney-Client Priiveleged and Work-Product

22     Disclosure by Mr. Capozzi........................................................xiv

23

24

25

26

27

**Exhibit 1:   Adam Henry Interview with Det. Hively Excerpt**

See: ACP-WP: "Adam Henry – People v. Adam Henry.pdf"

(Audio Recording of Same: Bates 662)

1    minutes later, you asked me if you could talk to me and

2    withdraw or revoke that request.

3        A.   Yes.

4        Q.   And then we have maybe another 15-minute

5    conversation between there and here, and I said just to

6    make sure we're clear, I want to give you this again,

7    right?

8        A.   Yes.

9        Q.   Okay.  So if I understood correctly what you told

10   me was -- tell me if this process sounds about right:  You

11   use a (inaudible) peer-to-peer file-sharing program to

12   download -- excuse me -- video files, and you're saying

13   that inadvertently sometimes you get beastiality and child

14   pornography; is that correct?

15       A.   Yes, sir.

16       Q.   And then either you check at work what the

17   contents of the complete folder are or the shared folder,

18   or sometimes you copy them, take them home, and then later

19   check there to see what the contents of the folder is, the

20   content being that which was downloaded, right?

21       A.   I usually did not check at work.

22       Q.   Okay.

23       A.   It would go on to the thumb drive.  I would take

24   it home.  If I had time, I would glance through it and

25   sift.

UNITED STATES vs ADAM ALAN HENRY
Recorded Interview of ADAM ALAN HENRY taken on 09/19/2013

1      Q.    Okay.

2      A.    But usually I did not just grab it and copied it

3    (inaudible).

4      Q.    Okay.  So on the hard drive that we took out of

5    the computer at work or on your NAS at home, are we going

6    to find any folders structured that would indicate to

7    anybody looking at it that you were categorizing child

8    pornography and placing it into certain folders?

9      A.    Dear God, no.

10     Q.    Okay.  So I'm not a hundred percent sure, and

11   we're talking about this NAS again.  How many partitions

12   are on the NAS -- the NAS?

13     A.    Two.

14     Q.    Okay.  So two partitions, right?

15     A.    Yes.

16     Q.    You've got four drives and maybe 500 each, give

17   or take, right?

18     A.    Yes.

19     Q.    So two partitions?

20     A.    Yes, sir.

21     Q.    Two volumes; is that what we're saying?

22     A.    I don't know exactly how the drive structures

23   them.  They might even just be classified as main root

24   folders but for all intents and purposes --

25     Q.    Are they going to come up with different drive

1
2     **Exhibit 2: Text Extracts from Bates #1011 (#1015)**
3
4 Specifically Bates #1011 "1015 – Soderquist Report – iPhone4G.2013-12-19.09-49-26 –
5 Report" See page 7.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | | | | |
|---|---|---|---|---|
| 19/08/13 22:23:03 (GMT) | +12096788993 | +15594335513 | Hay Hun, Kelly just messages me to remind me I have training tonight. Would you like me to skip it and stay home to do the tank or go and do the tank on Wednesday? I am exhausted so don't mind skipping it if you would like. | Sent |
| 19/08/13 22:23:59 (GMT) | +12096788993 | +15594335513 | There are a lot of changes in premier so it might be good to go, but we don't want to lose any more fish so I understand if we think I should stay home. | Sent |
| 19/08/13 22:25:24 (GMT) | +15594335513 | | Don't skip on my account. I'm a little hesitant to do anything until I can talk to the fish guy, soonest being going up after work tommorow. | Read |
| 19/08/13 22:26:27 (GMT) | +12096788993 | +15594335513 | Ok. You will have the car either way, Kelly will pick me up. | Sent |
| 19/08/13 22:27:53 (GMT) | +15594335513 | | Going to gymnastics first? | Read |
| 19/08/13 22:28:54 (GMT) | +12096788993 | +15594335513 | Training is at 5:30, gymnastics is at 6:00. So it's one or the other or neither for me. | Sent |
| 19/08/13 22:29:31 (GMT) | +15594335513 | | Let me know what you need from me. | Read |
| 19/08/13 22:30:35 (GMT) | +12096788993 | +15594335513 | You are good. I need you to come home and relax...and perhaps do one more cheat night on dinner. | Sent |
| 19/08/13 22:32:05 (GMT) | +15594335513 | | Ok. Just don't expect me to come home without you coming to get me... | Read |
| 19/08/13 22:32:33 (GMT) | +12096788993 | +15594335513 | Lol...but it worked so well that once. | Sent |
| 19/08/13 22:32:32 (GMT) | +15594335513 | | Right. | Read |
| 22/08/13 14:37:44 (GMT) | +12096788993 | +15594335513 | Are you able to get into settlers? | Sent |
| 22/08/13 14:40:07 (GMT) | +15594335513 | | No. The site says maintenance and if you click the Facebook link you'll see posts about it still being down with no word from the company. | Read |

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 22/08/13 14:41:00 (GMT) | +12096788993 | +15594335513 | My apologies. Sorry for bothering you. | | Sent |
| 22/08/13 16:09:50 (GMT) | +15594335513 | | It's up. | | Read |
| 22/08/13 19:18:35 (GMT) | +12096788993 | +15594335513 | So are we picking you up after work or did you figure something out. | | Sent |
| 22/08/13 19:21:22 (GMT) | +15594335513 | | I've got it. | | Read |
| 22/08/13 19:21:49 (GMT) | +12096788993 | +15594335513 | Ok Hun, keep me posted if that changes. | | Sent |

| #212 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 23/08/13 15:47:12 (GMT) | +12092167548 | | Good morning I delivered all the orders but one (will do that at lunch time) Stephanie McKinneys necklace has a broken magnet. Can I drop it by your house sometime? I saved the package and sticker it came with Thanks | | Read |
| | 23/08/13 15:49:19 (GMT) | +12096788993 | +12092167548 | Absolutely. What time were you thinking? | | Sent |
| | 23/08/13 15:49:20 (GMT) | +12092167548 | | How about 1215 is that ok? | | Read |
| | 23/08/13 15:52:27 (GMT) | +12096788993 | +12092167548 | I have to take the car in to get a tune up, so if I'm not here you can leave it in the corner at the front door and ill take care of it. | | Sent |
| | 23/08/13 15:51:28 (GMT) | +12092167548 | | Cool ok will do | | Read |

| #213 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 23/08/13 18:22:56 (GMT) | +12092774442 | | Hey how have u been feeling | | Read |
| | 23/08/13 18:52:40 (GMT) | +12096788993 | +12092774442 | Exhausted!!! Lol | | Sent |
| | 23/08/13 20:50:40 (GMT) | +12096788993 | +12092774442 | Oh they are so happy. Both love their teachers so much and just have such a good vib with them. I am thrilled! Heg | | Sent |
| | 23/08/13 20:51:22 (GMT) | +12092774442 | | That's so great! | | Read |

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 23/08/13 20:54:23 (GMT) | +12096788993 | +12092774442 | Oh agreed! It is so amazing to have a teacher really GET my kids. | | Sent |
| 23/08/13 20:56:42 (GMT) | +12096788993 | +12092774442 | How are your little guys liking school? | | Sent |
| 23/08/13 20:56:32 (GMT) | +12092774442 | | Karly loves it and we love her teacher she's great! Jenner starts preschool when he turns 3 in 2 weeks | | Read |
| 23/08/13 20:59:17 (GMT) | +12096788993 | +12092774442 | Oh that's so great! | | Sent |
| 23/08/13 20:58:40 (GMT) | +12092774442 | | Yeah it's fun big change for us going everyday | | Read |

| #214 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 23/08/13 21:00:59 (GMT) | +12096788993 | +15594335513 | Krista is here. Should I make excuses to have stay longer or go soon? | | Sent |

| #215 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 23/08/13 21:00:48 (GMT) | +12092774442 | | Are u guys still in gym? | | Read |

| #216 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 24/08/13 02:24:34 (GMT) | +12096788993 | +15594335513 | Mr. Luis wants us to take the kids (specifically Aidan) to this to build his confidence. He also said I am dong him a HUGE disservice by doing a 3 strike system or even doing one warning with Aidan ever. He had a long talk with Aidan and a looong talk with me. | IMG_0252.jpg MD5: EB0F9B3BD2D1919FE4AA 12E9FB0251F2 SHA256: 9BAF8432A0A191E78CD7 201A0AB57ACC9C87216C 7C916559D671DD9A6F54 8741 | Sent |
| | 25/08/13 00:29:52 (GMT) | +15594335513 | | What time will you be home? Trying to figure out dinner. | | Read |
| | 25/08/13 00:41:07 (GMT) | +12096788993 | +15594335513 | Be home in about 45 min, just packing up now. | | Sent |
| | 25/08/13 00:41:32 (GMT) | +12096788993 | +15594335513 | Got paid in cash if you want me to pick up dinner, just let me know what you would like. | | Sent |
| | 25/08/13 00:41:49 (GMT) | +15594335513 | | Sure. | | Read |

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 25/08/13 00:42:23 (GMT) | +12096788993 | +15594335513 | What would you like? | | Sent |
| 25/08/13 00:42:40 (GMT) | +15594335513 | | Indifferent. | | Read |

| #217 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 27/08/13 01:23:19 (GMT) | +12096788993 | +12092774442 | Hay sorry I missed that text. Yeah we are still in gymnastics but we don't get here every week. Last trimester is hitting me hard. Back pain, fatigue, nauseous...just lots of fun, heh. | | Sent |
| | 27/08/13 01:23:38 (GMT) | +12096788993 | +12092774442 | How is horse back ridding going? Is she loving it? | | Sent |

| #218 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 27/08/13 22:40:54 (GMT) | +15594335513 | | Will be leaving at 4:30 today. | | Read |
| | 27/08/13 22:43:14 (GMT) | +12096788993 | +15594335513 | Ok sexy | | Sent |

| #219 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 28/08/13 19:43:28 (GMT) | +12092774442 | | Never saw your text tell right now sorry | | Read |
| | 28/08/13 19:46:01 (GMT) | +12096788993 | +12092774442 | Oh no problem, I had missed your as well. How are you all doing? | | Sent |
| | 28/08/13 20:39:28 (GMT) | +12092774442 | | Great just super busy with everything | | Read |
| | 28/08/13 21:10:08 (GMT) | +12096788993 | +12092774442 | Oh I understand. School, activities, just getting back into the swing of things. | | Sent |

| #220 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 29/08/13 20:22:24 (GMT) | +15103664727 | | Lou has back to school tonight we got to leave early in oder to un load my scooter can we start next week | | Read |
| | 29/08/13 20:24:05 (GMT) | +12096788993 | +15103664727 | Ok sweet heart. | | Sent |

| #221 | Timestamp | From | To | Body | Attachments | Status |
|------|-----------|------|-----|------|-------------|--------|
| | 29/08/13 22:00:29 (GMT) | +12096788993 | +15594335513 | I killed a black widow!!! Pure instinct rather then contious response to pressure. | | Sent |
| | 30/08/13 17:08:58 (GMT) | +12096788993 | +15594335513 | She's here | | Sent |
| | 30/08/13 20:22:26 (GMT) | +12096788993 | +15594335513 | Construction bad...heh | | Sent |

| #222 | Timestamp | From | To | Body | Attachments | Status |
|------|-----------|------|-----|------|-------------|--------|
| | 31/08/13 16:53:38 (GMT) | +12096788993 | +12092774442 | 1131 burman drive turlock ca | | Sent |
| | 31/08/13 22:32:32 (GMT) | +12092774442 | | Hope you like bedding | | Read |
| | 31/08/13 22:34:08 (GMT) | +12096788993 | +12092774442 | It's gorgeous, thank you so much! We really appreciate that. | | Sent |
| | 31/08/13 22:34:40 (GMT) | +12092774442 | | Your welcome!!! ;) | | Read |

| #223 | Timestamp | From | To | Body | Attachments | Status |
|------|-----------|------|-----|------|-------------|--------|
| | 04/09/13 01:14:40 (GMT) | +15594335513 | | I cringe at the thought, but can we spare $40? My hi is wearing out, took about 15 years to do it, still the most comfortable lounge attire I've ever had. Was hoping to get a replacement. | | Read |
| | 04/09/13 01:15:51 (GMT) | +12096788993 | +15594335513 | Your "hi"?? | | Sent |
| | 04/09/13 01:17:25 (GMT) | +15594335513 | | Auto-correct... My gi. | | Read |
| | 04/09/13 01:17:59 (GMT) | +12096788993 | +15594335513 | Oh no I don't mind if you have it in the account. | | Sent |
| | 04/09/13 01:18:30 (GMT) | +15594335513 | | Only because you like how they look on me? | | Read |
| | 04/09/13 01:19:30 (GMT) | +12096788993 | +15594335513 | I want to get the kids black gi and a dark t-shirt for class to keep the whites clean for testing. | | Sent |

| 04/09/13 01:20:07 (GMT) | +12096788993 | +15594335513 | Mostly I don't mind because they seem super comfy and seem to last a LONG time. | | Sent |
| 04/09/13 01:20:24 (GMT) | +12096788993 | +15594335513 | But yes they do look good on you | | Sent |
| 04/09/13 01:21:04 (GMT) | +15594335513 | | Not sure we can afford the whole set right now, but I have a bit if a lack of comfy clothes I can still answer the door in. | | Read |
| 04/09/13 01:22:02 (GMT) | +12096788993 | +15594335513 | Oh I was thinking the kids for their birthdays. You go for comfy pants for you now if you have it. | | Sent |
| 04/09/13 01:24:25 (GMT) | +15594335513 | | Not sure we have much of anything these days. | | Read |
| 04/09/13 19:31:06 (GMT) | +15594335513 | | I might be swapping Friday for weekend work again. Not sure if its worth trying to get Krista back. Thoughts? | | Read |
| 04/09/13 19:32:02 (GMT) | +12096788993 | +15594335513 | I think we need all the help we can get. I will see if she is free. | | Sent |
| 04/09/13 19:32:29 (GMT) | +15594335513 | | Gotcha. | | Read |
| 05/09/13 15:28:07 (GMT) | +12096788993 | +15594335513 | I have taken this test twice before and the sugar never affected me. Now that we do lots of fruit and thing the one bottle has me a little punch drink. | | Sent |
| 05/09/13 15:28:00 (GMT) | +15594335513 | | Heh. Darn that healthier eating! | | Read |
| 05/09/13 15:29:32 (GMT) | +12096788993 | +15594335513 | Heh | | Sent |
| 05/09/13 15:29:56 (GMT) | +12096788993 | +15594335513 | The effects are WAY worse then out fruity pink drink. | | Sent |
| 05/09/13 16:08:30 (GMT) | +12096788993 | +15594335513 | Oooooohhhh the crashhhhh | | Sent |
| 05/09/13 16:09:22 (GMT) | +15594335513 | | Poor pab. Heh | | Read |
| 05/09/13 16:09:33 (GMT) | +12096788993 | +15594335513 | Bully | | Sent |
| 05/09/13 16:10:32 (GMT) | +12096788993 | +15594335513 | I am so picking up brunch, eating and sleeping. Hopefully I wake up feeling human. | | Sent |

| 05/09/13 16:10:30 (GMT) | +15594335513 | | Yup. If only there was a girl coming over tomorrow to make us both feel better... | | Read |
| 05/09/13 16:10:41 (GMT) | +12096788993 | +15594335513 | Yup | | Sent |
| 05/09/13 16:11:08 (GMT) | +15594335513 | | A shame she can't reschedule it. You have to kick her out by 3 anyway, right? License and all. | | Read |
| 05/09/13 16:11:20 (GMT) | +12096788993 | +15594335513 | Yup | | Sent |
| 05/09/13 16:11:57 (GMT) | +15594335513 | | Eh. I'll leave it to you two to figure out, or not. | | Read |
| 05/09/13 16:12:07 (GMT) | +15594335513 | | Enjoy the nap. | | Read |
| 05/09/13 16:12:26 (GMT) | +12096788993 | +15594335513 | Heh...when I get there I soooo well | | Sent |
| 05/09/13 16:23:28 (GMT) | +15594335513 | | Annoying, finally get willing to use her, can only use her weekdays mornings since she has to be home, can't be around for license. Which means on average might get to use her once a month.... I happen to get two days close together, on the rag for one, busy the other. | | Read |
| 05/09/13 16:24:54 (GMT) | +15594335513 | | Maybe we just shouldn't bother with her after all. The only thing she really had was convenience, which apparently she isn't after all. | | Read |
| 05/09/13 16:27:43 (GMT) | +12096788993 | +15594335513 | Ok, well lets do another month on AFF and see if we can't put out for a chick even if she's not into girls. Ill just bumbard all and hope for a hit. In the mean time I am so not going to cut lose what we have even if its just random. | | Sent |
| 05/09/13 16:29:25 (GMT) | +15594335513 | | Ah. | | Read |
| 05/09/13 16:29:52 (GMT) | +15594335513 | | I'd settle for "at all" at this point. We havnt even gotten to "random" heh. | | Read |
| 05/09/13 16:32:41 (GMT) | +12096788993 | +15594335513 | Ok fair enough | | Sent |

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 05/09/13 16:32:00 (GMT) | +15594335513 | | Just annoying.... She says she's desperate, needs it, huge crush on us, is hoping for permanent, after a year of knowing her, she finally gets her chance, and.... Nothing. | | Read |
| 05/09/13 17:01:52 (GMT) | +15594335513 | | Sorry for griping, I'll go back to bottling it up. | | Read |
| 05/09/13 17:04:14 (GMT) | +12096788993 | +15594335513 | No no your fine, just was getting blood drawn, driving home and just settling in to buff you and eat. | | Sent |
| 06/09/13 16:03:54 (GMT) | +15594335513 | | Everything ok? | | Read |
| 06/09/13 16:37:26 (GMT) | +12096788993 | +15594335513 | Order please? | | Sent |
| 06/09/13 16:39:27 (GMT) | +15594335513 | | Usual, BMT, lettuce, tomato, pickle, little mustard, little olive, little onion, little pepper only no salt. | | Read |
| 06/09/13 16:39:54 (GMT) | +12096788993 | +15594335513 | Sweet I had it right...lol | | Sent |
| 06/09/13 16:42:19 (GMT) | +12096788993 | +15594335513 | Tea or Pepsi? | | Sent |
| 06/09/13 16:42:38 (GMT) | +15594335513 | | Pepsi please. | | Read |
| 09/09/13 00:44:41 (GMT) | +12096788993 | +15594335513 | #1 no onion or tomato, diet Pepsi order large sized please | | Sent |
| 09/09/13 00:46:56 (GMT) | +15594335513 | | Too late, no food for you. | | Read |
| 09/09/13 00:48:32 (GMT) | +12096788993 | +15594335513 | Please, I was we'll with in the 2 min mark | | Sent |

| #224 | Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|---|
| | 09/09/13 16:56:10 (GMT) | +12092167548 | | Hello hope all is well with you and the family. Liz wanted to know the status of her exchange. Is it on its way? | | Read |
| | 09/09/13 17:00:40 (GMT) | +12096788993 | +12092167548 | All my returns were sent out last week. Should be about a month before I get them back. I will let you know when they arrive. | | Sent |

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 09/09/13 21:54:08 (GMT) | +12092167548 | | Cool thanks | | Read |

**#225**

| Timestamp | From | To | Body | Attachments | Status |
|---|---|---|---|---|---|
| 09/09/13 22:44:35 (GMT) | +12096788993 | +15594335513 | You get any thing good? | | Sent |
| 09/09/13 22:45:26 (GMT) | +12096788993 | +15594335513 | Every one is SOOO whinny today | | Sent |
| 09/09/13 22:51:44 (GMT) | +15594335513 | | Some horses. | | Read |
| 10/09/13 20:17:39 (GMT) | +12096788993 | +15594335513 | Here | | Sent |
| 11/09/13 16:14:56 (GMT) | +15594335513 | | If you get a second could you buff the iron smelter you missed please? Only because iron selling is my main income. | | Read |
| 11/09/13 17:29:36 (GMT) | +15594335513 | | I'll take that as a no... | | Read |
| 11/09/13 19:48:11 (GMT) | +12096788993 | +15594335513 | I'm so sorry, ill toss a sandwich on it when I get home. | | Sent |
| 15/09/13 20:32:53 (GMT) | +12096788993 | +15594335513 | Windex, dish sope, toilet cleaner, milk, bread, dog food, worms, gator aid, juice, Ajax, vim. | | Sent |
| 15/09/13 22:27:52 (GMT) | +12096788993 | +15594335513 | Cheese burger no onion or tomato, animal style, diet Pepsi fries for me please | | Sent |
| 16/09/13 18:09:42 (GMT) | +12096788993 | +15594335513 | You free for an early lunch. | | Sent |
| 18/09/13 16:04:16 (GMT) | +15594335513 | | I have a trade in to you for guild quest. | | Read |
| 18/09/13 16:05:25 (GMT) | +12096788993 | +15594335513 | Ok going in now. | | Sent |
| 18/09/13 16:06:23 (GMT) | +15594335513 | | Thanks. | | Read |
| 18/09/13 17:11:11 (GMT) | +12096788993 | +15594335513 | No problem. I think the fish tank stand looks great and is ready for sanding. You will have to take a close look tonight if you don't mind. | | Sent |
| 19/09/13 20:51:32 (GMT) | +12096788993 | +15594335513 | I'm a little early. Just come out when ever your ready. | | Sent |

1

2   **Exhibit 3: Text Extracts from Bates 1011 (1131)**

3

4   Bates #1131 #8 (Burman) – "UFED Apple iPhone 3GS 012659008045071 2013_12_17

5   (001) – Report_IMSection" Pages 117-125

6

7

8   Bates #1131 #4 (Burman) – "Report – iPhone_L.2013-12-17.06-07-18 – Report" Pages

9   220-230

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| 5394 | +12096021788 | * Todd Sherrie | 12/08/13 19:12:42 (GMT) | | Read | Inbox | Phone | Incoming | The lady with the car seat wants to know where you live you want me to give her your address if so what's your address? |
|------|--------------|----------------|-------------------------|--|------|-------|-------|----------|------------------------------------------------------------------------------------------------------------------------|
| 5395 | +12096021788 | * Todd Sherrie | 12/08/13 19:14:16 (GMT) | | Sent | Sent | Phone | Outgoing | 1131 burman drive turlock ca 95382 |
| 5396 | +12092770087 | * Todd Alyssa | 12/08/13 20:43:49 (GMT) | | Read | Inbox | Phone | Incoming | She said she also has baby any clothes that she is selling also *:)-< |
| 5397 | +12092770087 | * Todd Alyssa | 12/08/13 20:44:15 (GMT) | | Sent | Sent | Phone | Outgoing | Lol |
| 5398 | +12096021788 | * Todd Sherrie | 12/08/13 21:30:49 (GMT) | | Read | Inbox | Phone | Incoming | Did she show up? |
| 5399 | +12096021788 | * Todd Sherrie | 12/08/13 21:31:43 (GMT) | | Sent | Sent | Phone | Outgoing | Yup, it's perfect! Thank you love. |
| 5400 | +12096058638 | * Neto Kelly | 14/08/13 21:43:27 (GMT) | | Read | Inbox | Phone | Incoming | I are going to be home later today? I need to pick up stiffany. It will be around 5:30ish |
| 5401 | +12096058638 | * Neto Kelly | 14/08/13 21:44:19 (GMT) | | Sent | Sent | Phone | Outgoing | Yes I will see you at 5:30 |
| 5402 | +12096058638 | * Neto Kelly | 14/08/13 21:44:31 (GMT) | | Sent | Sent | Phone | Outgoing | Thank you so much for the loan. |
| 5403 | +12096058638 | * Neto Kelly | 14/08/13 21:48:16 (GMT) | | Read | Inbox | Phone | Incoming | You're welcome! |
| 5404 | +12096021788 | * Todd Sherrie | 15/08/13 20:10:08 (GMT) | | Sent | Sent | Phone | Outgoing | Hay Hun, are you free this week end? |
| 5405 | +12096021788 | * Todd Sherrie | 15/08/13 20:15:23 (GMT) | | Read | Inbox | Phone | Incoming | Sat I'm busy Sunday I have church at 2:30! Why? |
| 5406 | +12096021788 | * Todd Sherrie | 15/08/13 20:18:12 (GMT) | | Sent | Sent | Phone | Outgoing | I need to do a baby registry and thought you might want to go with me. |
| 5407 | +12096021788 | * Todd Sherrie | 15/08/13 20:24:49 (GMT) | | Read | Inbox | Phone | Incoming | We could do it before church! Where? |
| 5408 | +12096021788 | * Todd Sherrie | 15/08/13 20:28:02 (GMT) | | Sent | Sent | Phone | Outgoing | There is a baby's r us that I started an online registry and the store is in Modesto. So what time on Sunday works for you? |
| 5409 | +12096021788 | * Todd Sherrie | 15/08/13 20:28:56 (GMT) | | Read | Inbox | Phone | Incoming | 9:00 would that work? |
| 5410 | +12096021788 | * Todd Sherrie | 15/08/13 20:29:48 (GMT) | | Sent | Sent | Phone | Outgoing | You want to swing by here at 9:00 and go together or meet there or want me to come get you? |
| 5411 | +12096021788 | * Todd Sherrie | 15/08/13 20:54:30 (GMT) | | Read | Inbox | Phone | Incoming | Could you just come get me then we could jump on the highway and go? |
| 5412 | +12096021788 | * Todd Sherrie | 15/08/13 20:54:52 (GMT) | | Sent | Sent | Phone | Outgoing | Yup! |
| 5413 | +12096021788 | * Todd Sherrie | 15/08/13 20:55:04 (GMT) | | Read | Inbox | Phone | Incoming | Cool! |
| 5414 | +12096021788 | * Todd Sherrie | 15/08/13 20:55:10 (GMT) | | Sent | Sent | Phone | Outgoing | Ill be at your place around 9:00. |
| 5415 | +12096021788 | * Todd Sherrie | 15/08/13 20:55:24 (GMT) | | Read | Inbox | Phone | Incoming | Ok |
| 5416 | +12096021788 | * Todd Sherrie | 18/08/13 08:02:22 (GMT) | | Sent | Sent | Phone | Outgoing | Baby's r us don't open till 10am on Sundays. Ill swing by at 9:45am if that's ok? |
| 5417 | +12096021788 | * Todd Sherrie | 18/08/13 14:45:27 (GMT) | | Read | Inbox | Phone | Incoming | Ya |

| 5418 | +12096021788 | * Todd Sherrie | 18/08/13 14:48:13 (GMT) | Read | Inbox | Phone | Incoming | That's fine. I do have to be at Walmart at 1 |
| 5419 | +12096021788 | * Todd Sherrie | 18/08/13 16:17:31 (GMT) | Sent | Sent | Phone | Outgoing | Lets skip it then. I might hit another fee shops or do it another day. Gona go back to sleep for now. Catch ya later Hun. |
| 5420 | +12096021788 | * Todd Sherrie | 18/08/13 17:37:55 (GMT) | Read | Inbox | Phone | Incoming | Hey beautiful um I was wondering if I could stop by after a little bit wanna go to Turlock junior high too look for bobbys classes and I thought maybe we could stop by about 12 if your home! |
| 5421 | +12096021788 | * Todd Sherrie | 19/08/13 02:04:07 (GMT) | Sent | Sent | Phone | Outgoing | Oh hay Hun, I'm so sorry I didn't notice you sent me a message till just now. You are always welcome to stop by if your still wanting to. |
| 5422 | +12096021788 | * Todd Sherrie | 19/08/13 04:20:20 (GMT) | Read | Inbox | Phone | Incoming | Hey just got your text. I'll come by some time this week! |
| 5423 | +12096021788 | * Todd Sherrie | 19/08/13 04:22:44 (GMT) | Sent | Sent | Phone | Outgoing | Ok cool! |
| 5424 | +12096058638 | * Neto Kelly | 19/08/13 19:08:26 (GMT) | Read | Inbox | Phone | Incoming | Hi.. I have to work til 5:00 today. I won't be able to leave my house til 5:30. Then I'll be on my way to pick you up. |
| 5425 | +12096058638 | * Neto Kelly | 19/08/13 23:16:49 (GMT) | Sent | Sent | Phone | Outgoing | Ok I am going to stay home. I'm so sorry. I know how important training is and was wanting to be there. I just can't go knowing I won't be able to pay attention and worse distract others. |
| 5426 | +12096058638 | * Neto Kelly | 19/08/13 23:18:20 (GMT) | Read | Inbox | Phone | Incoming | No worries! I'll let you know what we did. But next time... lol |
| 5427 | +12096058638 | * Neto Kelly | 19/08/13 23:21:09 (GMT) | Sent | Sent | Phone | Outgoing | Perfect, thank you. |
| 5428 | +17053317913 | * Gagny Marie | 20/08/13 05:36:05 (GMT) | Sent | Sent | Phone | Outgoing | God I miss you. How is every thing going love? |
| 5429 | +12096021788 | * Todd Sherrie | 21/08/13 00:32:38 (GMT) | Read | Inbox | Phone | Incoming | Is it a good day for me to come over!? |
| 5430 | +17072080290 | * Aff Nancy | 21/08/13 03:41:12 (GMT) | Sent | Sent | Phone | Outgoing | Hay Hun, long time no see...or chat actually. How's it going? Any more cool trips? |
| 5431 | +12095817431 | N/A | 21/08/13 18:49:31 (GMT) | Read | Inbox | Phone | Incoming | What is your address this is Sharon |
| 5432 | +12095817431 | N/A | 21/08/13 18:50:07 (GMT) | Sent | Sent | Phone | Outgoing | 1131 burman drive |
| 5433 | +12095817431 | N/A | 21/08/13 18:50:31 (GMT) | Read | Inbox | Phone | Incoming | Okay thanks |
| 5434 | +12095817431 | N/A | 21/08/13 18:51:02 (GMT) | Sent | Sent | Phone | Outgoing | No problem, see you around 1:00 |
| 5435 | +12095817431 | N/A | 21/08/13 18:51:21 (GMT) | Read | Inbox | Phone | Incoming | 115 |
| 5436 | +12095817431 | N/A | 21/08/13 18:51:40 (GMT) | Sent | Sent | Phone | Outgoing | Perfect |
| 5437 | +12095817431 | N/A | 21/08/13 18:51:58 (GMT) | Read | Inbox | Phone | Incoming | K |
| 5438 | +12096021788 | * Todd Sherrie | 21/08/13 20:50:23 (GMT) | Sent | Sent | Phone | Outgoing | Donna's number is 499-4973 |
| 5439 | +12096021788 | * Todd Sherrie | 21/08/13 22:29:07 (GMT) | Sent | Sent | Phone | Outgoing | When you start to call people please let them know I am registered at baby' r us under Angele Henry. Thank you so much for this love, your awsome! |
| 5440 | +12095817431 | N/A | 22/08/13 21:58:18 (GMT) | Read | Inbox | Phone | Incoming | Hey Im at work whats up |
| 5441 | +12095817431 | N/A | 22/08/13 22:02:14 (GMT) | Sent | Sent | Phone | Outgoing | What time are you thinking of picking up the kids? 6:30 again or 8:00? |

| 5442 | +12095817431 | N/A | 22/08/13 22:03:12 (GMT) | | Read | Inbox | Phone | Incoming | 630 |
|---|---|---|---|---|---|---|---|---|---|
| 5443 | +12095817431 | N/A | 22/08/13 22:04:55 (GMT) | | Read | Inbox | Phone | Incoming | If you have any questions call 2095448194 |
| 5444 | +12095817431 | N/A | 22/08/13 22:05:46 (GMT) | | Sent | Sent | Phone | Outgoing | It's back to school night tonight. Our 1st graders are at 6:00 and the 3rd graders at 6:30. I was hoping to go for my kids, Do you mind if the girls come with me and you can pick there up at the school? |
| 5445 | +12095817431 | N/A | 22/08/13 22:06:25 (GMT) | | Read | Inbox | Phone | Incoming | Nope I dont mind |
| 5446 | +12095817431 | N/A | 22/08/13 22:06:45 (GMT) | | Sent | Sent | Phone | Outgoing | Oh thank you! |
| 5447 | +12095817431 | N/A | 22/08/13 22:16:09 (GMT) | | Read | Inbox | Phone | Incoming | I thought kids werent allowed |
| 5448 | +12095817431 | N/A | 22/08/13 22:16:24 (GMT) | | Read | Inbox | Phone | Incoming | Yes |
| 5449 | +12095817431 | N/A | 23/08/13 00:14:33 (GMT) | | Sent | Sent | Phone | Outgoing | I've always brought mine. |
| 5450 | +12095817431 | N/A | 23/08/13 00:27:10 (GMT) | | Sent | Sent | Phone | Outgoing | We are at the school. Text me when you get here. |
| 5451 | +12095817431 | N/A | 23/08/13 01:26:16 (GMT) | | Read | Inbox | Phone | Incoming | Im in Turlock |
| 5452 | +12095817431 | N/A | 23/08/13 01:28:59 (GMT) | | Sent | Sent | Phone | Outgoing | Ok we are moving to room 12B for the next. |
| 5453 | +12095817431 | N/A | 23/08/13 01:29:24 (GMT) | | Read | Inbox | Phone | Incoming | Okay |
| 5454 | +12095817431 | N/A | 23/08/13 01:39:25 (GMT) | | Read | Inbox | Phone | Incoming | Where is 12 B |
| 5455 | +12095817431 | N/A | 23/08/13 01:39:57 (GMT) | | Sent | Sent | Phone | Outgoing | Closest to the parking lot and furthest from the office. |
| 5456 | +12095817431 | N/A | 23/08/13 03:19:00 (GMT) | | Sent | Sent | Phone | Outgoing | Thanks again for being cool with us going to back to school night. |
| 5457 | +12095817431 | N/A | 23/08/13 03:19:18 (GMT) | | Sent | Sent | Phone | Outgoing | Did you need care tomorrow or are you good? |
| 5458 | +12095817431 | N/A | 23/08/13 03:20:09 (GMT) | | Read | Inbox | Phone | Incoming | Nope I dont work all next week though |
| 5459 | +12095817431 | N/A | 23/08/13 03:20:39 (GMT) | | Sent | Sent | Phone | Outgoing | Ok so I'll have them full time starting Monday? |
| 5460 | +12095817431 | N/A | 23/08/13 03:20:58 (GMT) | | Read | Inbox | Phone | Incoming | Yes |
| 5461 | +12095817431 | N/A | 23/08/13 03:21:20 (GMT) | | Sent | Sent | Phone | Outgoing | Perfect. Have a great week end. |
| 5462 | +12095817431 | N/A | 23/08/13 03:21:46 (GMT) | | Read | Inbox | Phone | Incoming | You too |
| 5463 | +17072080290 | * Aff Nancy | 23/08/13 03:59:46 (GMT) | | Sent | Sent | Phone | Outgoing | Sorry, this is Angel, I know it's been a while, Just seeing what your up to these days. We seem to catch up every few months or so. How are things going? |
| 5464 | +14088214750 | * Krista | 23/08/13 17:49:41 (GMT) | | Read | Inbox | Phone | Incoming | Hi hun is the dealer called patchetts? |
| 5465 | +14088214750 | * Krista | 23/08/13 17:50:25 (GMT) | | Sent | Sent | Phone | Outgoing | Think so...lol your there before be? |

| 5466 | +14088214750 | * Krista | 23/08/13 17:50:46 (GMT) | | Read | Inbox | Phone | Incoming | I'm here |
|------|--------------|----------|--------------------------|--|------|-------|-------|----------|----------|
| 5467 | +14088214750 | * Krista | 23/08/13 17:56:19 (GMT) | | Sent | Sent | Phone | Outgoing | Ill be 4 min |
| 5468 | +14088214750 | * Krista | 23/08/13 17:58:59 (GMT) | | Sent | Sent | Phone | Outgoing | Unless of course I hit every red light |
| 5469 | +14088214750 | * Krista | 23/08/13 18:00:16 (GMT) | | Read | Inbox | Phone | Incoming | Smiles it ok |
| 5470 | +14088214750 | * Krista | 23/08/13 18:02:03 (GMT) | | Sent | Sent | Phone | Outgoing | I'm here! |
| 5471 | +14088214750 | * Krista | 23/08/13 18:02:48 (GMT) | | Read | Inbox | Phone | Incoming | I'm outscored in customer parking |
| 5472 | +14088214750 | * Krista | 23/08/13 18:03:20 (GMT) | | Sent | Sent | Phone | Outgoing | Ok I'll be there in just a few, handing off keys and such. |
| 5473 | +12092774442 | * Courtney | 23/08/13 20:11:28 (GMT) | | Read | Inbox | Phone | Incoming | I bet! How are the kids liking school? |
| 5474 | +12096058638 | * Neto Kelly | 23/08/13 20:38:40 (GMT) | | Read | Inbox | Phone | Incoming | HI leaders! I just wanted to send a quick reminder and ask a favor. Today is the last day to place rally sample orders. I know all of you received an email from me about three weeks ago regarding one of our jewelers Cindy Howland requesting people purchase a courage bracelet so she can donate it to an organization that works with women who are battling cancer. Her best friend and former jeweler passed away right before rally from cancer. She battled it for four years and had four types of cancer. She is asking that people use their rally discount to purchase the bracelet. I mentioned this at two of the trainings over the past month. Please pass this request onto your jewelers to help Cindy with this amazingly wonderful cause! Thank you so much in advance! |
| 5475 | +14084801934 | * Paul | 23/08/13 21:49:35 (GMT) | | Sent | Sent | Phone | Outgoing | It's angele...WHAT AM I?!?!? |
| 5476 | +14084801934 | * Paul | 23/08/13 21:50:20 (GMT) | | Sent | Sent | Phone | Outgoing | Answer me |
| 5477 | +14084801934 | * Paul | 23/08/13 21:50:26 (GMT) | | Read | Inbox | Phone | Incoming | In what sense? |
| 5478 | +14084801934 | * Paul | 23/08/13 21:50:40 (GMT) | | Sent | Sent | Phone | Outgoing | Don't be a dumb ass |
| 5479 | +14084801934 | * Paul | 23/08/13 21:51:20 (GMT) | | Sent | Sent | Phone | Outgoing | Krista is an infinity symbol, some guy is sand paper...what am I? What do you see me as? |
| 5480 | +14087022288 | N/A | 23/08/13 21:52:11 (GMT) | | Read | Inbox | Phone | Incoming | I don't know yet, but it seems green. |
| 5481 | +14084801934 | * Paul | 23/08/13 21:53:19 (GMT) | | Read | Inbox | Phone | Incoming | I don't know yet, but it seems green. |
| 5482 | +14084801934 | * Paul | 23/08/13 21:54:41 (GMT) | | Sent | Sent | Phone | Outgoing | You think I am envious or sickly? |
| 5483 | +14084801934 | * Paul | 23/08/13 21:55:42 (GMT) | | Read | Inbox | Phone | Incoming | No. Ding ask me where the shapes or colours come from our what the mean. I just know people with strong textures are usually bad. |
| 5484 | +14084801934 | * Paul | 23/08/13 21:56:36 (GMT) | | Read | Inbox | Phone | Incoming | It more of a vibrant green |
| 5485 | +14084801934 | * Paul | 23/08/13 21:58:30 (GMT) | | Read | Inbox | Phone | Incoming | Textures usually come quickly. Colours and shapes take a while longer to settle. |
| 5486 | +14084801934 | * Paul | 23/08/13 22:04:36 (GMT) | | Read | Inbox | Phone | Incoming | Did the dumb ass answer your question sufficiently? |

| 5487 | +14084801934 | * Paul | 23/08/13 22:07:28 (GMT) | | Sent | Sent | Phone | Outgoing | Lol...ill accept you answer for now |
|---|---|---|---|---|---|---|---|---|---|
| 5488 | +14084801934 | * Paul | 23/08/13 22:08:49 (GMT) | | Read | Inbox | Phone | Incoming | Okay |
| 5489 | +14084801934 | * Paul | 23/08/13 22:09:15 (GMT) | | Sent | Sent | Phone | Outgoing | You know your awesome, right? |
| 5490 | +14084801934 | * Paul | 23/08/13 22:09:44 (GMT) | | Read | Inbox | Phone | Incoming | Why do you say that? |
| 5491 | +14084801934 | * Paul | 23/08/13 22:10:37 (GMT) | | Sent | Sent | Phone | Outgoing | Because you are. Learn to take a complement...*grin* |
| 5492 | +14084801934 | * Paul | 23/08/13 22:10:51 (GMT) | | Read | Inbox | Phone | Incoming | Okay, thanks |
| 5493 | +14084801934 | * Paul | 23/08/13 22:11:16 (GMT) | | Sent | Sent | Phone | Outgoing | Good boy.*kiss* |
| 5494 | +14084801934 | * Paul | 23/08/13 22:12:30 (GMT) | | Read | Inbox | Phone | Incoming | *blush* |
| 5495 | +14088214750 | * Krista | 24/08/13 00:25:54 (GMT) | | Sent | Sent | Phone | Outgoing | I'm kinda bummed, I was hoping to take advantage of you this evening. |
| 5496 | +14088214750 | * Krista | 24/08/13 00:26:36 (GMT) | | Read | Inbox | Phone | Incoming | Me too |
| 5497 | +14088214750 | * Krista | 24/08/13 00:29:13 (GMT) | | Sent | Sent | Phone | Outgoing | ...think you might be willing to come back on Sunday? |
| 5498 | +14088214750 | * Krista | 24/08/13 00:39:20 (GMT) | | Sent | Sent | Phone | Outgoing | I'm picturing sitting on the sofa, us crawl over to him, stop off our shirts and pull him out. Taking turns sucking on him, pulling out each others tits and titty fucking him. If he takes TOO long to cum that way then bend you over and have him do you doggy while I play and suck on those gorgeous tits of yours. Then I get a turn to lay him out on the floor and ride him revers cowgirl while you play with my tits. |
| 5499 | +14088214750 | * Krista | 24/08/13 00:42:27 (GMT) | | Read | Inbox | Phone | Incoming | Ok now I had pull to side of road to respond to message you. Sunday i would love tho assist you. My only concern is my aunt flow. |
| 5500 | +14088214750 | * Krista | 24/08/13 00:44:10 (GMT) | | Sent | Sent | Phone | Outgoing | Awww no way! |
| 5501 | +14088214750 | * Krista | 24/08/13 00:44:26 (GMT) | | Sent | Sent | Phone | Outgoing | How heavy is it? |
| 5502 | +14088214750 | * Krista | 24/08/13 00:45:49 (GMT) | | Read | Inbox | Phone | Incoming | Yeah. It sucks. Right n ow it is light. Nearing end. |
| 5503 | +14088214750 | * Krista | 24/08/13 00:46:13 (GMT) | | Sent | Sent | Phone | Outgoing | Soooo...Sunday? Lol |
| 5504 | +14088214750 | * Krista | 24/08/13 00:47:24 (GMT) | | Read | Inbox | Phone | Incoming | I can secondly help. At least provide a mouth to situation. |
| 5505 | +14088214750 | * Krista | 24/08/13 00:49:47 (GMT) | | Sent | Sent | Phone | Outgoing | We could do just a LONG bj switching off that...lmao...I was just typing that |
| 5506 | +14088214750 | * Krista | 24/08/13 01:04:35 (GMT) | | Sent | Sent | Phone | Outgoing | What time works for you? |
| 5507 | +14088214750 | * Krista | 24/08/13 01:54:54 (GMT) | | Sent | Sent | Phone | Outgoing | Aww...did I frighten you away too? |
| 5508 | +14088214750 | * Krista | 24/08/13 02:05:03 (GMT) | | Read | Inbox | Phone | Incoming | No hun I was driving |
| 5509 | +14088214750 | * Krista | 24/08/13 02:06:07 (GMT) | | Sent | Sent | Phone | Outgoing | Ahh...good got worried for a min |

| 5510 | +14088214750 | * Krista | 24/08/13 02:06:39 (GMT) | Read | Inbox | Phone | Incoming | I do want tho run this by Paul and make sure he is fine with this and if so any time that it's best for you guys |
|------|--------------|----------|--------------------------|------|-------|-------|----------|----|
| 5511 | +14088214750 | * Krista | 24/08/13 02:06:42 (GMT) | Sent | Sent | Phone | Outgoing | I seem to come across as too eager and then women never come back and play. |
| 5512 | +14088214750 | * Krista | 24/08/13 02:08:12 (GMT) | Read | Inbox | Phone | Incoming | I want to play I've been attracted tho you both from first moment I met yu |
| 5513 | +14088214750 | * Krista | 24/08/13 02:08:21 (GMT) | Read | Inbox | Phone | Incoming | I like eager |
| 5514 | +14088214750 | * Krista | 24/08/13 02:08:58 (GMT) | Sent | Sent | Phone | Outgoing | Ok talk to the man and let me know as early as possible. I am going to TRY to get a sitter for us. |
| 5515 | +14088214750 | * Krista | 24/08/13 02:50:29 (GMT) | Read | Inbox | Phone | Incoming | Ok at dinner I'll bring it up at movies right now. Huggles |
| 5516 | +14088214750 | * Krista | 24/08/13 02:50:57 (GMT) | Sent | Sent | Phone | Outgoing | Ok sexy. Have a good time. |
| 5517 | +14088214750 | * Krista | 24/08/13 02:54:48 (GMT) | Read | Inbox | Phone | Incoming | Nibbles and licks ill text you later when I know |
| 5518 | +14088214750 | * Krista | 24/08/13 02:55:18 (GMT) | Sent | Sent | Phone | Outgoing | Ok love |
| 5519 | +12095817431 | N/A | 24/08/13 03:19:18 (GMT) | Read | Inbox | Phone | Incoming | I only need child care Tuesday through Thursday next week |
| 5520 | +12095817431 | N/A | 24/08/13 03:22:01 (GMT) | Sent | Sent | Phone | Outgoing | Ok not a problem. Thank you for letting me know. Have a great week end. |
| 5521 | +12095817431 | N/A | 24/08/13 03:23:46 (GMT) | Read | Inbox | Phone | Incoming | You too |
| 5522 | +14088214750 | * Krista | 24/08/13 05:12:11 (GMT) | Read | Inbox | Phone | Incoming | Hello hun, paul has only one concern about me helping out. He is worried about the friendship we have developed. And doesn't want me to loss you guys |
| 5523 | +14088214750 | * Krista | 24/08/13 05:12:12 (GMT) | Read | Inbox | Phone | Incoming | as friends and a fear that I would be demined. |
| 5524 | +14088214750 | * Krista | 24/08/13 05:15:02 (GMT) | Read | Inbox | Phone | Incoming | Paul also mentioned he doesn't want you to be doing something you don't really want to and that he doesn't want you to loss a friend if things don't go w |
| 5525 | +14088214750 | * Krista | 24/08/13 05:15:03 (GMT) | Read | Inbox | Phone | Incoming | ell or if Adam no longer wishes us to be friends if this goes wrong. |
| 5526 | +14088214750 | * Krista | 24/08/13 19:13:45 (GMT) | Sent | Sent | Phone | Outgoing | Hay sexy, crashed early last night, was in a lot of pain. I don't see how you helping us out will hurt the friendship. You are needing to get some every so often and I need help keeping my man caught up. We are not trying to change our relationship or make it something it's not, just help each other blow off some steem. |
| 5527 | +14088214750 | * Krista | 24/08/13 19:15:22 (GMT) | Sent | Sent | Phone | Outgoing | We don't want to make you a girlfriend, a slave or deminish what you mean to us, it's just adding a one off sexual in counter that if it goes well might happen again from time to time and if it doesn't then we put it aside and keep the friendship. |
| 5528 | +14088214750 | * Krista | 24/08/13 19:16:56 (GMT) | Sent | Sent | Phone | Outgoing | Adam is enough like Paul that "it not going well" simply means we stay friends and keep the sex out. You and he are not going to loss us because you are kind enough to help us out. |
| 5529 | +14088214750 | * Krista | 24/08/13 19:20:01 (GMT) | Read | Inbox | Phone | Incoming | I will pass that on and i figured as much but it is nicer for Paul |
| 5530 | +14088214750 | * Krista | 24/08/13 19:20:13 (GMT) | Read | Inbox | Phone | Incoming | To be able to see what you wrote |
| 5531 | +14088214750 | * Krista | 24/08/13 19:58:33 (GMT) | Read | Inbox | Phone | Incoming | Have you discuss this with Adam? |

| 5532 | +14088214750 | * Krista | 25/08/13 00:39:32 (GMT) | | Read | Inbox | Phone | Incoming | Hey hun |
|------|--------------|----------|-------------------------|---|------|-------|-------|----------|---------|
| 5533 | 24273 | N/A | 25/08/13 01:42:44 (GMT) | | Read | Inbox | Phone | Incoming | Chase acct chk1-9228 bal $45.40 as of 08/24/2013 09:42:41 PM EDT was below the $50.00 amount in your Alerts settings. |
| 5534 | +14088214750 | * Krista | 25/08/13 01:55:51 (GMT) | | Sent | Sent | Phone | Outgoing | Yes talked to Adam, he's tired of being the only grown up so is leaving all desissions to me. If we want to try and wake him up then we can go for it, if it doesn't go over well then we just hang out and chill as we always would. |
| 5535 | +12096058638 | * Neto Kelly | 25/08/13 01:56:15 (GMT) | | Sent | Sent | Phone | Outgoing | She is behind the bushes. Thank you again so much. |
| 5536 | +14088214750 | * Krista | 25/08/13 02:09:45 (GMT) | | Read | Inbox | Phone | Incoming | That works for me Hon. What time tomorrow we're you thinking? |
| 5537 | +14088214750 | * Krista | 25/08/13 02:20:11 (GMT) | | Sent | Sent | Phone | Outgoing | Lets say 11:00 so we can hang out then send kids for naps, then hang out some more. All goes well we can go again in the evening. |
| 5538 | +14088214750 | * Krista | 25/08/13 02:20:30 (GMT) | | Sent | Sent | Phone | Outgoing | Unless your busy or I get sick...heh |
| 5539 | +14088214750 | * Krista | 25/08/13 02:46:55 (GMT) | | Sent | Sent | Phone | Outgoing | Or is that too early? |
| 5540 | +14088214750 | * Krista | 25/08/13 05:29:56 (GMT) | | Read | Inbox | Phone | Incoming | 11 is lil early here as that's Paul and i cuddle time. Mmm i could do later no problem. |
| 5541 | +14088214750 | * Krista | 25/08/13 07:19:34 (GMT) | | Sent | Sent | Phone | Outgoing | How much later? Noon? Or more like 3:00 or 4:00? |
| 5542 | +12096058638 | * Neto Kelly | 25/08/13 08:18:24 (GMT) | | Read | Inbox | Phone | Incoming | Welcome |
| 5543 | +14088214750 | * Krista | 25/08/13 17:12:28 (GMT) | | Read | Inbox | Phone | Incoming | Morning hun |
| 5544 | +14088214750 | * Krista | 25/08/13 17:12:57 (GMT) | | Read | Inbox | Phone | Incoming | I goofed big time I didn't realize my last text never got sent. |
| 5545 | +14088214750 | * Krista | 25/08/13 17:14:43 (GMT) | | Read | Inbox | Phone | Incoming | The evening work for me. If your still interested in hanging out today. Or even tomorrow. Let me know:) I'm local monday Wednesday |
| 5546 | +14088214750 | * Krista | 25/08/13 21:38:48 (GMT) | | Read | Inbox | Phone | Incoming | I guess today no go that's ok got tons of house stuff moved around. Ok be around tuesday Wednesday if you just want too hang out.Hugs |
| 5547 | +14088214750 | * Krista | 25/08/13 21:42:32 (GMT) | | Sent | Sent | Phone | Outgoing | Sorry love, I ACTULY got sleep!!! Granted it was all day not last night, but sleep none the less. Heh |
| 5548 | +14088214750 | * Krista | 25/08/13 21:43:36 (GMT) | | Read | Inbox | Phone | Incoming | I'm about tho take cast nap myself:) I'm shoo glad you got some sleep, makes me so happy for you:) |
| 5549 | +14088214750 | * Krista | 25/08/13 21:49:20 (GMT) | | Sent | Sent | Phone | Outgoing | It's past nap time for the kids now and I am not going to let you drive in the dark. I also get crabby at night these days. I didn't really think about your family in my plans. I'm sorry love. I got so focused on my own drama. |
| 5550 | +14088214750 | * Krista | 25/08/13 21:49:38 (GMT) | | Sent | Sent | Phone | Outgoing | Have a good nap sexy. |
| 5551 | +14088214750 | * Krista | 25/08/13 21:51:27 (GMT) | | Read | Inbox | Phone | Incoming | Hugs that is fine darling we can do it done other time like I said Tuesday and Wednesday i have no plans so even if you just want tho hang out |
| 5552 | +14088214750 | * Krista | 25/08/13 21:52:19 (GMT) | | Read | Inbox | Phone | Incoming | Honey it is fine that is what friends are for and i really don't mind you are worth it. Drama and ask you are well with it. |
| 5553 | +14088214750 | * Krista | 25/08/13 21:53:00 (GMT) | | Read | Inbox | Phone | Incoming | Cat nap with cell phone:) -means in bed semi naked and taking to you via cell |
| 5554 | +14088214750 | * Krista | 25/08/13 21:54:26 (GMT) | | Sent | Sent | Phone | Outgoing | Mmm...naked krista boobs...*grin* sleep well. |

| 5555 | +14088214750 | * Krista | 25/08/13 21:54:45 (GMT) | | Read | Inbox | Phone | Incoming | Smiles gulp |
|---|---|---|---|---|---|---|---|---|---|
| 5556 | +14088214750 | * Krista | 25/08/13 22:00:04 (GMT) | | Sent | Sent | Phone | Outgoing | BOZoBIS!!! |
| 5557 | +14088214750 | * Krista | 25/08/13 22:01:01 (GMT) | | Read | Inbox | Phone | Incoming | Smiles evily yes |
| 5558 | +14088214750 | * Krista | 25/08/13 22:16:43 (GMT) | | Sent | Sent | Phone | Outgoing | Heh...see now you have to come over tonight. It has been WAY too long since I played with boobies! |
| 5559 | +14088214750 | * Krista | 25/08/13 22:26:42 (GMT) | | Sent | Sent | Phone | Outgoing | Adam is a little more chatty today and asked me if we talked about your limits...I guess we should probably go over that. What are you not ok doing? |
| 5560 | +14088214750 | * Krista | 25/08/13 22:27:00 (GMT) | | Sent | Sent | Phone | Outgoing | Sorry you can get back to be after naked nap time. |
| 5561 | +14088214750 | * Krista | 26/08/13 00:01:07 (GMT) | | Read | Inbox | Phone | Incoming | Smiles its been a long time for me to. 4 years. |
| 5562 | +14088214750 | * Krista | 26/08/13 00:02:06 (GMT) | | Sent | Sent | Phone | Outgoing | Ouch! |
| 5563 | +14088214750 | * Krista | 26/08/13 00:04:18 (GMT) | | Read | Inbox | Phone | Incoming | Well since Misti... so yeah four year...and limits |
| 5564 | +14088214750 | * Krista | 26/08/13 00:04:34 (GMT) | | Read | Inbox | Phone | Incoming | Not to sue exactly what you mean |
| 5565 | +14088214750 | * Krista | 26/08/13 00:04:54 (GMT) | | Read | Inbox | Phone | Incoming | Limits how? |
| 5566 | +14088214750 | * Krista | 26/08/13 00:05:23 (GMT) | | Read | Inbox | Phone | Incoming | Glad to hear Adam is a bit more chatty |
| 5567 | +14088214750 | * Krista | 26/08/13 00:05:49 (GMT) | | Sent | Sent | Phone | Outgoing | Just what your ok doing and what's off limits? |
| 5568 | +14088214750 | * Krista | 26/08/13 00:06:36 (GMT) | | Read | Inbox | Phone | Incoming | Well I'm open to a lot of things in time. Right out if the gate I'd say no anal no tieing me up |
| 5569 | +14088214750 | * Krista | 26/08/13 00:07:07 (GMT) | | Sent | Sent | Phone | Outgoing | Fair enough |
| 5570 | +14088214750 | * Krista | 26/08/13 00:07:13 (GMT) | | Read | Inbox | Phone | Incoming | I don't do wet sports or anything like that. |
| 5571 | +14088214750 | * Krista | 26/08/13 00:09:13 (GMT) | | Read | Inbox | Phone | Incoming | Oh choking is not something I'm into either |
| 5572 | +14088214750 | * Krista | 26/08/13 00:09:47 (GMT) | | Sent | Sent | Phone | Outgoing | Yeah not my thing either. |
| 5573 | +14088214750 | * Krista | 26/08/13 00:11:28 (GMT) | | Read | Inbox | Phone | Incoming | Oh I'm also still dd free my last blood work that was done by doctors couple months back was clean |
| 5574 | +14088214750 | * Krista | 26/08/13 00:12:09 (GMT) | | Sent | Sent | Phone | Outgoing | So still think you might want to swing by tonight or tomorrow? |
| 5575 | +14088214750 | * Krista | 26/08/13 00:12:09 (GMT) | | Read | Inbox | Phone | Incoming | I'm very oral i love to give more then get at times. |
| 5576 | +14088214750 | * Krista | 26/08/13 00:13:30 (GMT) | | Read | Inbox | Phone | Incoming | I can do Tuesday Paul just reminded me that he has tho go in tomorrow and i have meds i need to pick up in Sunnyvale.but tuesday n Wednesday are wide ope |
| 5577 | +14088214750 | * Krista | 26/08/13 00:13:31 (GMT) | | Read | Inbox | Phone | Incoming | n for me. |
| 5578 | +14088214750 | * Krista | 26/08/13 00:26:56 (GMT) | | Sent | Sent | Phone | Outgoing | I have late night child care the rest of the week and can't have any one over when I have kids in care. Leaves week ends mostly for us I'm afraid. |

| 5579 | +14088214750 | * Krista | 26/08/13 00:28:01 (GMT) | | Read | Inbox | Phone | Incoming | Ok that works to. Either way any day thou want tho hang out we can do that too |
|------|--------------|----------|-------------------------|---|------|-------|-------|----------|---|
| 5580 | +14088214750 | * Krista | 26/08/13 00:35:30 (GMT) | | Sent | Sent | Phone | Outgoing | Ok sexy time for me to do the sleeping now...would love to see you if you wanted to swing by tonight, but I get that its late. |
| 5581 | +14088214750 | * Krista | 26/08/13 00:38:09 (GMT) | | Read | Inbox | Phone | Incoming | Huggles just heading our for pizza with Paul I'll check traffic if not bad I might do that |
| 5582 | +14088214750 | * Krista | 26/08/13 01:54:54 (GMT) | | Read | Inbox | Phone | Incoming | Tonight won't work traffic wouldn't have me they till 830 |
| 5583 | +14088214750 | * Krista | 26/08/13 02:27:31 (GMT) | | Sent | Sent | Phone | Outgoing | Ok sexy, another time it is. |
| 5584 | +14088214750 | * Krista | 26/08/13 02:28:06 (GMT) | | Read | Inbox | Phone | Incoming | But I'd you still want to just hang out I'd love to do that to |
| 5585 | +14088214750 | * Krista | 26/08/13 04:23:08 (GMT) | | Sent | Sent | Phone | Outgoing | And back to bed with this pregnant mama |
| 5586 | +14088214750 | * Krista | 26/08/13 04:31:27 (GMT) | | Read | Inbox | Phone | Incoming | I'll be day dreaming if taking you to bed he he |
| 5587 | 732873 | N/A | 26/08/13 06:02:55 (GMT) | | Read | Inbox | Phone | Incoming | Your verification code is 295173 - Blizzard Entertainment |
| 5588 | 732873 | N/A | 26/08/13 06:05:15 (GMT) | | Read | Inbox | Phone | Incoming | Your verification code is 295173 - Blizzard Entertainment |
| 5589 | +14088214750 | * Krista | 26/08/13 21:15:07 (GMT) | | Read | Inbox | Phone | Incoming | Thinking if you and sending you a hug:) |
| 5590 | +12096021788 | * Todd Sherrie | 27/08/13 01:24:04 (GMT) | | Read | Inbox | Phone | Incoming | hey angel was it 1 o'clock so we decided for the baby shower |
| 5591 | +12096021788 | * Todd Sherrie | 27/08/13 01:24:22 (GMT) | | Sent | Sent | Phone | Outgoing | Yup! |
| 5592 | +12096021788 | * Todd Sherrie | 27/08/13 01:24:37 (GMT) | | Sent | Sent | Phone | Outgoing | What do you need me to do to help? |
| 5593 | +12096021788 | * Todd Sherrie | 27/08/13 01:25:55 (GMT) | | Read | Inbox | Phone | Incoming | I don't know |
| 5594 | +12096021788 | * Todd Sherrie | 27/08/13 01:26:43 (GMT) | | Sent | Sent | Phone | Outgoing | Heh...ok fair enough. Keep me posted and I will be happy to help. |
| 5595 | +12096068387 | N/A | 27/08/13 03:53:10 (GMT) | | Read | Inbox | Phone | Incoming | (1/2) Hi Angele Sorry, about yesterday, ended up having out of town company all day. I guess what I could do is meet up with you at your house or somewhere tom |
| 5596 | +12096068387 | N/A | 27/08/13 03:53:17 (GMT) | | Read | Inbox | Phone | Incoming | (2/2) orrow evening to settle up the party. Just tell me when and where, I'll be there :) Thanks bunches ! |
| 5597 | +12095817431 | N/A | 27/08/13 21:21:41 (GMT) | | Read | Inbox | Phone | Incoming | What is your address again sorry I forgot it |
| 5598 | +12095817431 | N/A | 27/08/13 21:53:02 (GMT) | | Sent | Sent | Phone | Outgoing | 1131 burman drive turlock ca 95382 |
| 5599 | +12095817431 | N/A | 27/08/13 21:55:46 (GMT) | | Sent | Sent | Phone | Outgoing | What time can we expect you tonight? Also, Cai-Lin thinks she does not have to do any home work till she gets home with you. I tend to insist we all work on it right after snack, but if you would rather she do it with you she can have that time to read instead. I do not want to mess up your routines with you and your kids. I just want to help. |
| 5600 | +12095817431 | N/A | 27/08/13 22:46:38 (GMT) | | Read | Inbox | Phone | Incoming | 630 and does she have any homework for tonight |
| 5601 | +12095817431 | N/A | 27/08/13 23:23:20 (GMT) | | Sent | Sent | Phone | Outgoing | Yes she had some math. When we all sat down to work on it she got hers done as well. |

| 5602 | +12096068387 | N/A | 28/08/13 00:02:45 (GMT) | Read | Inbox | Phone | Incoming | Will we be meeting up tonight ? |
|------|--------------|-----|-------------------------|------|-------|-------|----------|---------------------------------|
| 5603 | +12096068387 | N/A | 28/08/13 00:03:49 (GMT) | Sent | Sent | Phone | Outgoing | Oh sorry. Yes we can meet up tonight. I have kids in care till 6:30. Where and when would you like to meet? |
| 5604 | +12096068387 | N/A | 28/08/13 00:07:18 (GMT) | Read | Inbox | Phone | Incoming | How about Starbucks on lander in front of the savemart ? At like 730 ? |
| 5605 | +12096068387 | N/A | 28/08/13 00:08:33 (GMT) | Sent | Sent | Phone | Outgoing | Ok sounds good to me. |
| 5606 | +12096068387 | N/A | 28/08/13 00:08:53 (GMT) | Read | Inbox | Phone | Incoming | K great |
| 5607 | +14088214750 | * Krista | 28/08/13 02:52:51 (GMT) | Read | Inbox | Phone | Incoming | Evening beautiful lay hope your day went well |
| 5608 | +14088214750 | * Krista | 28/08/13 02:53:12 (GMT) | Read | Inbox | Phone | Incoming | Lady not lay omg |
| 5609 | +14088214750 | * Krista | 28/08/13 18:12:01 (GMT) | Read | Inbox | Phone | Incoming | Morning gorgeous, how is your day going guides of beauty? |
| 5610 | +14088214750 | * Krista | 28/08/13 19:43:30 (GMT) | Sent | Sent | Phone | Outgoing | Hay sexy, sorry I haven't responded. Had a hard few days pregers wise. I just can't seem to keep my eyes open and focus on any thing, and when I can its been because I am in a lot of pain. |
| 5611 | +14088214750 | * Krista | 28/08/13 19:44:32 (GMT) | Sent | Sent | Phone | Outgoing | Other then that things are good. Really appreciate you listening to me vent and bitch the other day. How have you been this week? |
| 5612 | +14088214750 | * Krista | 28/08/13 19:48:34 (GMT) | Read | Inbox | Phone | Incoming | I've been good been busy with the house |
| 5613 | +14088214750 | * Krista | 28/08/13 19:55:13 (GMT) | Read | Inbox | Phone | Incoming | 20 boxes undone yesterday |
| 5614 | +14088214750 | * Krista | 28/08/13 19:56:35 (GMT) | Sent | Sent | Phone | Outgoing | Wow! Great job love! |
| 5615 | +14088214750 | * Krista | 28/08/13 19:57:29 (GMT) | Sent | Sent | Phone | Outgoing | Want to come help me unpack my garage? It's still a mess from us moving in two years ago...lol |
| 5616 | +14088214750 | * Krista | 28/08/13 19:57:58 (GMT) | Read | Inbox | Phone | Incoming | Yeah Paul was shocked |
| 5617 | +14088214750 | * Krista | 28/08/13 19:58:17 (GMT) | Sent | Sent | Phone | Outgoing | Heh...Adam would be as well. |
| 5618 | +14088214750 | * Krista | 28/08/13 19:58:26 (GMT) | Read | Inbox | Phone | Incoming | Lol I still have 70 of mine tho go |
| 5619 | +14088214750 | * Krista | 28/08/13 20:01:43 (GMT) | Read | Inbox | Phone | Incoming | Yeah it was a large enough debt that Paul's face feel tho flour. It was so priceless and worth the hard work |
| 5620 | +14088214750 | * Krista | 28/08/13 20:02:59 (GMT) | Sent | Sent | Phone | Outgoing | Heh |
| 5621 | +14088214750 | * Krista | 28/08/13 20:30:54 (GMT) | Read | Inbox | Phone | Incoming | I should have taken a picture cause you could see him try and stay composed |
| 5622 | +14088214750 | * Krista | 28/08/13 20:31:27 (GMT) | Sent | Sent | Phone | Outgoing | Heh, oh I would have loved to have seen it! |
| 5623 | +14088214750 | * Krista | 28/08/13 20:32:27 (GMT) | Read | Inbox | Phone | Incoming | Yeah it was such a turn on |
| 5624 | +14088214750 | * Krista | 29/08/13 00:14:20 (GMT) | Sent | Sent | Phone | Outgoing | So are we going to get the pleasure of your company this week end? |
| 5625 | +14088214750 | * Krista | 29/08/13 00:17:51 (GMT) | Read | Inbox | Phone | Incoming | Smiles I might e able tho swing by I'm working out details and not sure if I'll be 100% so though..sho just so you know. |

| 5626 | +14088214750 | * Krista | 29/08/13 15:38:40 (GMT) | | Sent | Sent | Phone | Outgoing | I I have no kids tomorrow and the kids after school activity was canceled. Any chance you want to meet for lunch and hang out in the evening with Adam and I? |
|---|---|---|---|---|---|---|---|---|---|
| 5627 | +14088214750 | * Krista | 29/08/13 17:14:49 (GMT) | | Read | Inbox | Phone | Incoming | That would be nice. So long as I don't have to drive Paul in the work tomorrow and puck him up that would be nice. |
| 5628 | +14088214750 | * Krista | 30/08/13 01:08:29 (GMT) | | Sent | Sent | Phone | Outgoing | Any news? |
| 5629 | +14088214750 | * Krista | 30/08/13 01:12:49 (GMT) | | Sent | Sent | Phone | Outgoing | And if you don't have to drive him, any chance you want to swing by tonight and "help out" then we can hang out tomorrow? |
| 5630 | +14088214750 | * Krista | 30/08/13 01:16:09 (GMT) | | Sent | Sent | Phone | Outgoing | Or are sleep overs crossing the line? |
| 5631 | +14088214750 | * Krista | 30/08/13 02:43:36 (GMT) | | Read | Inbox | Phone | Incoming | Hi hun paul doesn't have tho go in tomorrow so I'll be able tho head over in the am. And spend the afternoon with you and party of the evening. Tonight I |
| 5632 | +14088214750 | * Krista | 30/08/13 02:43:39 (GMT) | | Read | Inbox | Phone | Incoming | 'd already made plans with Paul to have quite dinner and unpack more. As for sleep overs in the future I don't see problem with it just like if you guys |
| 5633 | +14088214750 | * Krista | 30/08/13 02:43:41 (GMT) | | Read | Inbox | Phone | Incoming | were ever here and needed to crash. Sorry took so long to reply I was driving when your text came through |
| 5634 | +14088214750 | * Krista | 30/08/13 15:39:16 (GMT) | | Sent | Sent | Phone | Outgoing | Good morning gorgeous. How did you sleep? |
| 5635 | +14088214750 | * Krista | 30/08/13 16:02:10 (GMT) | | Read | Inbox | Phone | Incoming | Tell you about it when get there |
| 5636 | +14088214750 | * Krista | 30/08/13 16:30:05 (GMT) | | Sent | Sent | Phone | Outgoing | Still think you think you'll be here around 10:00am? |
| 5637 | +12096021788 | * Todd Sherrie | 31/08/13 02:09:02 (GMT) | | Read | Inbox | Phone | Incoming | Hey what are you up to? |
| 5638 | +12096021788 | * Todd Sherrie | 31/08/13 02:09:28 (GMT) | | Sent | Sent | Phone | Outgoing | Absolutely nothin |
| 5639 | +12096021788 | * Todd Sherrie | 31/08/13 02:10:34 (GMT) | | Read | Inbox | Phone | Incoming | I'm a couple houses down from you! |
| 5640 | +12096021788 | * Todd Sherrie | 31/08/13 02:12:28 (GMT) | | Sent | Sent | Phone | Outgoing | Sweet! Feel free to swing by. |
| 5641 | +12096021788 | * Todd Sherrie | 31/08/13 02:13:09 (GMT) | | Read | Inbox | Phone | Incoming | I'm sitting here with 4guys and my son, can you say board! |
| 5642 | +12096021788 | * Todd Sherrie | 31/08/13 02:14:40 (GMT) | | Sent | Sent | Phone | Outgoing | Lol...good luck with that...or come over and bobby can come here when he's ready |
| 5643 | +12096021788 | * Todd Sherrie | 31/08/13 02:14:47 (GMT) | | Read | Inbox | Phone | Incoming | I'm coming over, want too go for a walk? |
| 5644 | +14088214750 | * Krista | 31/08/13 03:04:37 (GMT) | | Read | Inbox | Phone | Incoming | Made it here safe and sound and I too took nap |
| 5645 | +12094992972 | * Tod Rob | 31/08/13 04:13:54 (GMT) | | Read | Inbox | Phone | Incoming | Hi Angele it's Sherri. Are you both going to be up like in 20- 30 min? Rob told Adam we would stop by |
| 5646 | +12094992972 | * Tod Rob | 31/08/13 04:15:13 (GMT) | | Sent | Sent | Phone | Outgoing | Yeah we should be. He's just getting into this new game and I just started a show. |
| 5647 | +14088214750 | * Krista | 31/08/13 04:16:17 (GMT) | | Sent | Sent | Phone | Outgoing | Good to hear. Thanks for swinging by and hanging out today. |
| 5648 | +12094992972 | * Tod Rob | 31/08/13 04:24:30 (GMT) | | Read | Inbox | Phone | Incoming | Cool |
| 5649 | +12094992972 | * Tod Rob | 31/08/13 04:30:06 (GMT) | | Read | Inbox | Phone | Incoming | Rob said about 10 min |



# Extraction Report
Apple iPhone (Physical)

## Summary

| | |
|---|---|
| **Connection Type** | Cable No. 110 |
| **Extraction start date/time** | 12/17/2013 3:17:22 PM |
| **Extraction end date/time** | 12/17/2013 3:34:33 PM |
| **UFED Physical Analyzer version** | 3.6.5.18 |
| **Case number** | Ceres 213-004554 |
| **Case name** | Henry |
| **Evidence number** | #2 1015 Soderquist |
| **Examiner name** | Weber |
| **Department** | Modesto PD |
| **Location** | Modesto, Ca |

## Device Information

| # | Name | Value | Del? |
|---|---|---|---|
| 1 | Activation State | WildcardActivated | |
| 2 | Application Entries | 18 | |
| 3 | Application Size (bytes) | 733061120 | |
| 4 | Board | n90ap | |
| 5 | Book Entries | 0 | |
| 6 | Book Size (bytes) | 0 | |
| 7 | Capacity | 7GB | |
| 8 | Cloud Backup Enabled | False | |
| 9 | CPID | 8930 | |
| 10 | Data Entries | 1 | |
| 11 | ECID | 0000005440020CB7 | |
| 12 | Extraction_Partition | User_System_Data | |
| 13 | Free Memory (bytes) | 852287488 | |
| 14 | iBoot (firmware) version | iBoot-1537.9.55 | |
| 15 | ICCID | 89014104255087435236 | |
| 16 | Last Backup Computer Name | A | |
| 17 | Last Backup Computer Type | PC | |
| 18 | Last Sync | 3/27/2013 3:46:12 AM(UTC+0) | |
| 19 | Last Sync | 6/24/2013 4:29:36 AM(UTC+0) | |
| 20 | Last Used ICCID | 89014104255087435236 | |
| 21 | Locale Language | en_US | |
| 22 | Memory Size (bytes) | 6797123584 | |
| 23 | Owner Name | A's iPhone | |
| 24 | Passcode | 1010 | |
| 25 | Phone Number | +15594335513 | |
| 26 | Proofing Entries | 0 | |
| 27 | Proofing Size (bytes) | 0 | |
| 28 | Ringtone Entries | 0 | |
| 29 | Ringtone Size (bytes) | 0 | |
| 30 | Serial number | DNQJ3J3MDP0N | |
| 31 | Sync Host Name | AH-PC | |
| 32 | Sync Host Name | AH-PC | |
| 33 | Synced with | Computer: AH-PC\User: A | |
| 34 | Synced with | Computer: A-PC\User: A | |
| 35 | Time Zone | America/Los_Angeles | |
| 36 | USB(Ethernet) MAC | 6E:3E:6D:6F:EF:A1 | |
| 37 | VoiceMemo Entries | 3 | |
| 38 | VoiceMemo Size (bytes) | 1024000 | |
| 39 | Wi-Fi MAC | 6C:3E:6D:6F:EF:A0 | |

1

Image Hash Details (1)

| | Name | Info | |
|---|---|---|---|
| 1 | Image | Path | iPhone4GSM_6.1-6.1.3_Physical_Physical_17-12-13_03-17-09.img |
| | | Size (Bytes) | 7969234944 |

## Plugins

| | Name | Author | Version |
|---|---|---|---|
| 1 | **IPhonePhysicalInputID** <br> Identifies an iPhone physical input format | Cellebrite | 2.0 |
| 2 | **DMGOpener** | Cellebrite | 2.0 |
| 3 | **MBRGeneric** <br> Parses a Master Boot Record to generate a memory range for each partition listed in the MBR table | Cellebrite | 2.0 |
| 4 | **ApplePartitionMap** <br> Extracts partitions from the ApplePartitionMap | Cellebrite | 2.0 |
| 5 | **GUIDPartitionTable** <br> Parses the GUID partition Table (GPT) to extract FS Partitions | Cellebrite | 2.0 |
| 6 | **TARArchiveOpener** | Cellebrite | 2.0 |
| 7 | **HFS** <br> Decodes HFS (the Apple file system) | Cellebrite | 2.0 |
| 8 | **IPhoneCallLog** | Cellebrite | 2.0 |
| 9 | **iPhone databases** <br> Reads various databases on the iPhone, containing notes, calendar, locations, Safari bookmarks, cookies and history, Facebook friends and bluetooth pairings. | Cellebrite | 2.0 |
| 10 | **QuicktimeMetadata** <br> Extracts metadata from Apple quicktime movies | Cellebrite | 2.0 |
| 11 | **iPhone device info** | Cellebrite | 2.0 |
| 12 | **ContactsCrossReference** <br> Cross references the phone numbers in a device's contacts with the numbers in SMS messages and Calls. Will fill in the Name field of calls and SMS if there's a match. | Cellebrite | 2.0 |
| 13 | **DataFilesHandler** | Cellebrite | 2.0 |

## Contents

| Type | Included in report | | Total | |
|---|---|---|---|---|
| Calendar | 0 | | 1 | |
| Call Log | 0 | | 172 | (72 Deleted) |
| Chats | 21 | (4 Deleted) | 21 | (4 Deleted) |
|   iMessage: +15594335513 | 21 | (4 Deleted) | 21 | (4 Deleted) |
| Contacts | 19 | | 19 | |
|   Uncategorized | 19 | | 19 | |
| Cookies | 0 | | 2034 | |
| Installed Applications | 0 | | 64 | |
| IP Connections | 0 | | 19 | |
| Maps | 0 | | 46 | |
| MMS Messages | 60 | | 60 | |
|   Inbox | 38 | | 38 | |
|   Sent | 22 | | 22 | |
| Notes | 0 | | 2 | (1 Deleted) |
| Passwords | 0 | | 36 | |
| SMS Messages | 3944 | (4 Deleted) | 3944 | (4 Deleted) |
|   Inbox | 2538 | (3 Deleted) | 2538 | (3 Deleted) |
|   Sent | 1406 | (1 Deleted) | 1406 | (1 Deleted) |
| Time Line | 0 | | 6564 | (161 Deleted) |
| User Accounts | 0 | | 1 | |
| User Dictionary | 0 | | 3508 | |
| Voicemail | 0 | | 167 | (79 Deleted) |
| Web Bookmarks | 0 | | 1 | |

| | | |
|---|---|---|
| Web History | | 18 |
| Wireless Networks | 0 | 6 |
| Locations | 0 | 195 |
| Data Files | 26492 (4 Deleted) | 34597 (149 Deleted) |
| Applications | 0 | 34 |
| Audio | 0 | 1151 |
| Configurations | 0 | 5589 (142 Deleted) |
| Databases | 0 | 155 |
| Images | 26492 (4 Deleted) | 26492 (4 Deleted) |
| Text | 0 | 1122 (3 Deleted) |
| Videos | 0 | 54 |
| Carved Files | 0 | 0 |
| Infected Files | 0 | 0 |

## Chats (21)

### iMessage: +15594335513 (21)

| | Del? |
|---|---|

**1**

**Participants:**
+15594335513 ,+19165025353 Rebecca Alvernaz

**Identifier:**

| Start Time | 12/16/2011 2:48:19 AM(UTC+0) |
|---|---|
| Last Activity | 9/19/2013 6:20:00 PM(UTC+0) |

**Body file:** chat-0.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +15594335513 | | 9/19/2013 6:20:00 PM(UTC+0) | Enjoy. ;) | | |
| iMessage: +15594335513 | +15594335513 | | 9/19/2013 6:19:52 PM(UTC+0) | http://www.sciencegeek.net/lingo.html | | |
| iMessage: +15594335513 | +15594335513 | | 12/16/2011 3:19:22 AM(UTC+0) | Not too bad, did the Sizzler dinner thing with Grandpa tonight. | | |
| iMessage: +15594335513 | +19165025353 | | 12/16/2011 2:50:40 AM(UTC+0) | Yeah I just updated my software, and I'm alive I just have been busy :) how you doing? | | |
| iMessage: +15594335513 | +15594335513 | | 12/16/2011 2:49:11 AM(UTC+0) | Ok, this "iMessage" thing is new... | | |
| iMessage: +15594335513 | +15594335513 | | 12/16/2011 2:48:19 AM(UTC+0) | My turn to wonder if you're alive? | | |
| iMessage: +15594335513 | +19165025353 | | 12/16/2011 3:56:48 AM(UTC+0) | Oh, good to hear :) | | |
| iMessage: +15594335513 | +15594335513 | | 12/21/2011 1:01:39 AM(UTC+0) | Been busy, missed the notification. 'Tis the season, and whatnot. Merry Christmas, albeit prematurely. That always a problem of mine, after all. | | |
| iMessage: +15594335513 | +19165025353 | | 12/21/2011 1:50:56 AM(UTC+0) | No worries, busy enough myself, though temporarily less so while on vacation. Merry Christmas to you and yours :) | | |
| iMessage: +15594335513 | +19165025353 | | 12/21/2011 2:29:20 AM(UTC+0) | Have you figured out anything about the difference between iMessages and regular texts? | | |

**2**

**Participants:**
+15594335513 ,+18015778246

**Identifier:**

| Start Time | 2/22/2012 6:33:36 PM(UTC+0) |
|---|---|
| Last Activity | 5/13/2013 4:10:40 PM(UTC+0) |

**Body file:** chat-1.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +15594335513 | | 2/22/2012 6:36:47 PM(UTC+0) | Np at all. Better to ask and avoid problems then try to troubleshoot from this distance. Thank you for checking, glad its working. | | |

3

| iMessage: +15594335513 | +18015 778246 | | 5/13/2012 6:33:20 PM(UTC+0) | I wouldn't worry about it. I answered the text and call I knew you weren't feeling well | |
|---|---|---|---|---|---|
| iMessage: +15594335513 | +18015 778246 | | 5/13/2013 4:10:40 PM(UTC+0) | Ok thank you I will keep you posted | |
| iMessage: +15594335513 | | | 5/13/2013 4:09:04 PM(UTC+0) | Thanks, and just hit "y" for that. I have the server set to re-link the drives in case of problems. Sometimes it's a bit slow. | |
| iMessage: +15594335513 | +18015 778246 | | 5/13/2013 2:58:08 PM(UTC+0) | Got this message when I tried to connect to the S Drive any ideas. No hurry I don't like to interrupt your honeymoon congratulations by the way. | IMG_1483.JPG |

**3**

### Participants:
+15594335513 ,+12096482670 David Silva

**Identifier:**

**Start Time** 4/28/2012 2:02:40 PM(UTC+0)

**Last Activity** 7/21/2013 6:05:29 PM(UTC+0)

**Body file:** chat-2.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +15594 335513 | | 4/28/2012 2:11:28 PM(UTC+0) | Thank you very much, appreciate it. | | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 2:11:12 PM(UTC+0) | Our address is 3606 Summerdale. That's our house the table is next door | | |
| iMessage: +15594335513 | +15594 335513 | | 4/28/2012 2:07:40 PM(UTC+0) | Very nice, worth taking a look at. Can you give me an address? | | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 2:04:48 PM(UTC+0) | 6 chairs total. | | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 2:04:48 PM(UTC+0) | | IMG_7009.jpeg | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 2:02:40 PM(UTC+0) | | IMG_4608.jpeg | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 2:02:40 PM(UTC+0) | | IMG_4696.jpeg | |
| iMessage: +15594335513 | +15594 335513 | | 4/28/2012 5:46:11 PM(UTC+0) | On our way. | | |
| iMessage: +15594335513 | +12096 482670 | | 4/28/2012 5:46:40 PM(UTC+0) | Let's do it come on over. | | |
| iMessage: +15594335513 | +15594 335513 | | 4/28/2012 5:41:59 PM(UTC+0) | Just to plan my day, have a rough eta? | | |

**4**

### Participants:
+15594335513 ,+12096060172 Brandi Rollins

**Identifier:**

**Start Time** 5/4/2012 11:21:36 PM(UTC+0)

**Last Activity** 9/9/2013 1:20:47 AM(UTC+0)

**Body file:** chat-3.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096 060172 | | 5/5/2012 12:00:00 AM(UTC+0) | Thanks :) good luck with maint | | |
| iMessage: +15594335513 | +15594 335513 | | 5/4/2012 11:31:03 PM(UTC+0) | Ok, np then. I'll start maint about 11, after second shift. Good luck with the yard sale. | | |
| iMessage: +15594335513 | +12096 080172 | | 5/4/2012 11:25:52 PM(UTC+0) | Thanks :) | | |
| iMessage: +15594335513 | +12096 080172 | | 5/4/2012 11:25:52 PM(UTC+0) | No no meant next Friday :) | | |
| iMessage: +15594335513 | +15594 335513 | | 5/4/2012 11:25:22 PM(UTC+0) | Today Friday? I was going to pull it out this weekend and bring it in Monday if you meant next, but if you need today I can do that. | | |
| iMessage: +15594335513 | +12096 080172 | | 5/4/2012 11:21:36 PM(UTC+0) | Backup is being completed now :) I will be out soon. Will it be possible for you to bring in the $25 by Friday to David? | | |
| iMessage: +15594335513 | +12096 060172 | | 5/5/2012 9:37:04 PM(UTC+0) | Great great!! Got rid of almost everything :) | | |
| iMessage: +15594335513 | +15594 335513 | | 5/5/2012 9:35:06 PM(UTC+0) | Ah nice, I bet you're tired. How'd it go? | | |

4

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | +12096 080172 | | 5/5/2012 9:34:30 PM(UTC+0) | Don't know just made my Angela eat today range getting something to eat | | |
| iMessage: +1559433551 3 | +15594 335513 | | 5/5/2012 9:27:56 PM(UTC+0) | Np at all, figured you were busy. Just letting you know. Sorry for bugging you when I know you've got a full weekend. | | |

| 5 | Participants:  +15594335513 , +12096144113 Louise Reed | | | | Identifier: | |
|---|---|---|---|---|---|---|
| | Start Time : 5/12/2012 3:08:48 PM(UTC+0) | | | | | |
| | Last Activity : 8/8/2013 7:24:35 PM(UTC+0) | | | | | |
| | Body file: chat-4.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | +12096 144113 | | 5/12/2012 3:08:48 PM(UTC+0) | Good morning Adam. When you have an opportunity please check our work email server. It hasn't downloaded to our phones or been accessible through Outlook since last evening. (We have a lot of people out in the field who need it.). Thank you. | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:32:32 PM(UTC+0) | My computer has a virus. I'll try running a scan. | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:53:52 PM(UTC+0) | So far I have one named Pornis.hlpr | | |
| iMessage: +1559433551 3 | +15594 335513 | | 6/19/2012 10:41:03 PM(UTC+0) | Doesn't matter. Somewhere on the continent. | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:41:04 PM(UTC+0) | About 10 in the USA | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:41:04 PM(UTC+0) | Where do I download from?  Huge list of possibles | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:38:56 PM(UTC+0) | Ok. Super slow. Can't get on Internet. Even Outlook gave me a disconnected warning. | | |
| iMessage: +1559433551 3 | +15594 335513 | | 6/19/2012 10:38:51 PM(UTC+0) | That's a good one. Just tell it to update before running. | | |
| iMessage: +1559433551 3 | +12096 144113 | | 6/19/2012 10:38:56 PM(UTC+0) | Which do I run? Spy bot? | | |
| iMessage: +1559433551 3 | +15594 335513 | | 6/19/2012 10:35:31 PM(UTC+0) | All right.. I can come down if need be, just working on the dns for the new server. | | |

| 6 | Participants:  +15594335513 , +15597091146 Robin Martin | | | | Identifier: | |
|---|---|---|---|---|---|---|
| | Start Time : 5/13/2012 4:14:56 PM(UTC+0) | | | | | |
| | Last Activity : 7/11/2013 1:21:04 AM(UTC+0) | | | | | |
| | Body file: chat-5.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | +15597 091146 | | 5/13/2012 4:14:56 PM(UTC+0) | I don't have Angel's number. Please tell her Happy Mother's Day for me. Love you very much. | | |
| iMessage: +1559433551 3 | +15597 091146 | | 5/15/2012 8:52:16 PM(UTC+0) | Can you call me tonight?  I have a hardware/Internet question I really need your expertise on. | | |
| iMessage: +1559433551 3 | +15597 091146 | | 6/18/2012 11:10:56 PM(UTC+0) | I'm home now. It went smoothly. | | |
| iMessage: +1559433551 3 | +15597 091146 | | 7/4/2012 9:02:56 PM(UTC+0) | Can you take pics with your phone today of Daddy and send them to me????? | | |
| iMessage: +1559433551 3 | +15597 091146 | | 7/16/2012 8:26:40 PM(UTC+0) | It is a female RP-SMA.   Call me when you can | | |
| iMessage: +1559433551 3 | +15594 335513 | | 7/20/2012 2:11:05 AM(UTC+0) | Sorry I have not gotten back to you, on vacation this week. I'll get back to you on Monday with some booster options. | | |
| iMessage: +1559433551 3 | +15594 335513 | | 10/15/2012 12:45:57 AM(UTC+0) | Sorry bath night, dealing with kids, thanks for letting me know, please keep me apprised. | | |
| iMessage: +1559433551 3 | +15597 091146 | | 10/15/2012 12:25:36 PM(UTC+0) | You there????????? | | |
| iMessage: +1559433551 3 | +15597 091146 | | 10/31/2012 3:25:06 PM(UTC+0) | Happy Halloween I Love you | | |

| iMessage:<br>+15594335513 | 091146 | | 6/8/2012 6:09:44<br>PM(UTC+0) | Daniel Jackson stars on a new show... | | |

**7**

**Participants:**
+15594335513 ,rebleaz@hotmail.com    **Identifier:**

| Start Time | 6/8/2012 2:03:44 AM(UTC+0) |
| Last Activity | 6/8/2012 2:03:44 AM(UTC+0) |

**Body file:** chat-6.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage:<br>+1559433551<br>3 | rebleaz<br>@hotm<br>ail.com | | 6/8/2012 2:03:44<br>AM(UTC+0) | Daniel Jackson stars on a new show that premieres tonight, Saving Hope. Also, if you haven't already, start watching Battlestar Galactica--it's awesome. | | |

**8**

**Participants:**
+15594335513 ,+12094808375    **Identifier:**

| Start Time | 6/21/2012 7:46:08 PM(UTC+0) |
| Last Activity | 6/21/2012 9:34:56 PM(UTC+0) |

**Body file:** chat-7.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage:<br>+1559433551<br>3 | +12094<br>808375 | | 6/21/2012 9:26:24<br>PM(UTC+0) | Just an FYI for you.  I am able to get into different things but it keeps freezing up on me and I have to shut it down otherwise it just sits there for over 20 min and does nothing | | |
| iMessage:<br>+1559433551<br>3 | +12094<br>808375 | | 6/21/2012 8:05:20<br>PM(UTC+0) | Ok rebooted under safe mode but now doesn't like default password | | |
| iMessage:<br>+1559433551<br>3 | +12094<br>808375 | | 6/21/2012 7:46:08<br>PM(UTC+0) | Hi Adam, I logged back into computer , clicked on spark to open it back up and has been over 30 min and still has not opened :-( | | |
| iMessage:<br>+1559433551<br>3 | +12094<br>808375 | | 6/21/2012 9:34:56<br>PM(UTC+0) | I know it's not your fault at all either.  Machines can be so difficult at times! :-) | | |
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 6/21/2012 9:33:27<br>PM(UTC+0) | Np at all, feel bad I can't snap my fingers and make it work, heh. They can't all be the easy fixes, unfortunately. | | |
| iMessage:<br>+1559433551<br>3 | +12094<br>808375 | | 6/21/2012 9:30:40<br>PM(UTC+0) | Yes,  so very sorry.  I know you are beyond swamped! | | |
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 6/21/2012 9:30:53<br>PM(UTC+0) | I'm working on your new one now, but I doubt I'll have it done tonight. If you can survive another hour and a half today, I'll come in early tomorrow and try to stabilize it before you get in. That work? | | |

**9**

**Participants:**
+15594335513 ,+12096144114 Gary Reed    **Identifier:**

| Start Time | 11/27/2012 5:14:41 PM(UTC+0) |
| Last Activity | 5/9/2013 5:55:24 PM(UTC+0) |

**Body file:** chat-8.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 11/27/2012 5:14:41<br>PM(UTC+0) | In an appointment, just started, will be a couple hours. Need something more urgent or can I call when done? | | |
| iMessage:<br>+1559433551<br>3 | +12096<br>144114 | | 5/2/2013 4:21:20<br>PM(UTC+0) | Do you have a black armor hard drive that is not being used | | |
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 5/2/2013 4:24:00<br>PM(UTC+0) | Yes, on the bottom of the two shelves on the wall in my office, about the middle. There is a cable with it. I never used it, it either doesn't have a code, or possibly one that you or David set up. | | |
| iMessage:<br>+1559433551<br>3 | +12096<br>144114 | | 5/2/2013 5:58:45<br>PM(UTC+0) | Yes so I will see if it has a code. Thanks | | |
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 5/2/2013 4:45:41<br>PM(UTC+0) | Find it? | | |
| iMessage:<br>+1559433551<br>3 | +15594<br>335513 | | 5/9/2013 5:55:24<br>PM(UTC+0) | Got your message, Angel got the text from Louise. Thank you. | | |

**10**

**Participants:**
+12096144113 Louise Reed                                          Identifier:                                    Yes

Start Time              12/2/2012 5:14:00 PM(UTC+0)

Last Activity           12/2/2012 5:14:00 PM(UTC+0)

**Body file:** chat-9.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096144113 | | 12/2/2012 5:14:00 PM(UTC+0) | Dad went to the ER this morning. Carlton found him on the floor weak and disoriented. He has blood in his stool and has mentally come around a bit. Carlton says he will be in the hospital for a few days. | | |

**11**

**Participants:**
+19165025353 Rebecca Alvernaz,+12096144114 Gary Reed,+12096788993 Angele Brennan       Identifier:             Yes

Start Time              12/8/2012 3:10:54 AM(UTC+0)

Last Activity           9/3/2013 7:49:42 PM(UTC+0)

**Body file:** chat-10.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +19165025353 | | 12/8/2012 3:10:56 AM(UTC+0) | :( | | |
| iMessage: +15594335513 | +19165025353 | | 12/8/2012 3:10:54 AM(UTC+0) | No Netflix as of yet, pretty happy with the dvr. Next time someone says "hey you want some free tix?" you say, no thanks! :) Sorry about your grandpa. | | |
| iMessage: +15594335513 | +12096144114 | | 5/2/2013 4:21:20 PM(UTC+0) | Do you have a black armor hard drive that is not being used | | Yes |
| iMessage: +15594335513 | +12096788993 | | 5/8/2013 12:49:04 AM(UTC+0) | At the wedding | | Yes |
| iMessage: +15594335513 | +19165025353 | | 9/9/2013 1:14:40 AM(UTC+0) | No, just that the book is so much better--I had expected better from the movie. | | Yes |
| iMessage: +15594335513 | +19165025353 | | 9/9/2013 7:49:42 PM(UTC+0) | So can I ask a potentially uncomfortable question, without guile, and just for my own knowledge? | | Yes |

**12**

**Participants:**
+15594335513 ,+12096144114 Gary Reed,+12096144113 Louise Reed,+12096060172 Brandi Rollins       Identifier:

Start Time              12/12/2012 8:36:52 PM(UTC+0)

Last Activity           12/12/2012 8:39:08 PM(UTC+0)

**Body file:** chat-11.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096144114 | | 12/12/2012 8:38:26 PM(UTC+0) | Good pictures | | |
| iMessage: +15594335513 | +12096144113 | | 12/12/2012 8:37:20 PM(UTC+0) | And Smoke loves Dad | IMG_2632.JPG | |
| iMessage: +15594335513 | +12096144113 | | 12/12/2012 8:36:52 PM(UTC+0) | Butchie loves Dad | IMG_2645.jpeg | |
| iMessage: +15594335513 | +12096060172 | | 12/12/2012 8:39:08 PM(UTC+0) | Butchie ahh cutie | | |

**13**

**Participants:**
+15594335513 ,+12096788993 Angele Brennan                          Identifier:

Start Time              1/24/2013 9:56:16 PM(UTC+0)

Last Activity           9/20/2013 1:21:04 AM(UTC+0)

**Body file:** chat-12.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096788993 | | 9/20/2013 1:21:04 AM(UTC+0) | Every thing ok? | | |
| iMessage: +15594335513 | +12096788993 | | 9/19/2013 8:52:16 PM(UTC+0) | Ok Hun. No real rush. | | |

7

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | +15594 335513 | | 9/19/2013 8:52:04 PM(UTC+0) | Will be about 5 minutes | | |
| iMessage: +1559433551 3 | +12096 788993 | | 9/19/2013 8:51:36 PM(UTC+0) | I'm a little early. Just come out when ever your ready. | | |
| iMessage: +1559433551 3 | +12096 788993 | | 9/18/2013 5:10:24 PM(UTC+0) | No problem. I think the fish tank stand looks great and is ready for sanding. You will have to take a close look tonight if you don't mind. | | |
| iMessage: +1559433551 3 | +15594 335513 | | 9/18/2013 4:06:20 PM(UTC+0) | Thanks. | | |
| iMessage: +1559433551 3 | +12096 788993 | | 9/18/2013 4:04:16 PM(UTC+0) | Ok going in now. | | |
| iMessage: +1559433551 3 | +15594 335513 | | 1/24/2013 10:02:35 PM(UTC+0) | Interesting... A boyfriend? Doesn't sound like she's that attached to him. Hang out with you, or us? | | |
| iMessage: +1559433551 3 | +12096 788993 | | 1/24/2013 10:00:32 PM(UTC+0) | Well enough. She wants to meet to hang out as friends on Monday. She has a bf she never sees and is very curious about our lifestyle. | | |
| iMessage: +1559433551 3 | +15594 335513 | | 1/24/2013 9:59:44 PM(UTC+0) | Cool. Summary, going well or no? | | |

---

**14**

🖼 **Participants:** +15594335513 ,+12096482670 David Silva,+18015778246 ,+12096483587 ,+12096144113 Louise Reed,+12096484407 ,+12096060172 Brandi Rollins

**Identifier:**

Start Time: 3/13/2013 8:05:20 PM(UTC+0)

Last Activity: 3/13/2013 8:07:28 PM(UTC+0)

Body file: chat-13.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | +12096 484407 | | 3/13/2013 8:07:28 PM(UTC+0) | Thanks for the update | | |
| iMessage: +1559433551 3 | +18015 778246 | | 3/13/2013 8:05:20 PM(UTC+0) | Good to know. | | |

---

**15**

🖼 **Participants:** +15594335513 ,ucbran23@aol.com

**Identifier:**

Start Time: 3/28/2013 4:22:14 AM(UTC+0)

Last Activity: 3/28/2013 4:52:16 AM(UTC+0)

Body file: chat-14.txt

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:24:28 AM(UTC+0) | K | | |
| iMessage: +1559433551 3 | +15594 335513 | | 3/28/2013 4:24:20 AM(UTC+0) | Checking. | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:22:24 AM(UTC+0) | What's the # | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:22:24 AM(UTC+0) | Lets try that | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:22:24 AM(UTC+0) | That's a good work around my scanner is giving me fits | | |
| iMessage: +1559433551 3 | +15594 335513 | | 3/28/2013 4:23:09 AM(UTC+0) | No, I don't. If you fax it to the number in the server though I can pull the document remotely. | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:22:14 AM(UTC+0) | Do you have a fax? | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:39:16 AM(UTC+0) | Ok will send in just a minute | | |
| iMessage: +1559433551 3 | +15594 335513 | | 3/28/2013 4:38:08 AM(UTC+0) | 209-632-0588 | | |
| iMessage: +1559433551 3 | ucbran2 3@aol.c om | | 3/28/2013 4:35:50 AM(UTC+0) | No prob | | |

| 16 | Participants: | | | | | Yes |
| --- | --- | --- | --- | --- | --- | --- |
| | +15594335513 | | | Identifier: | | |
| | Start Time | 4/18/2013 4:09:19 PM(UTC+0) | | | | |
| | Last Activity | 4/18/2013 4:09:19 PM(UTC+0) | | | | |
| | Body file: chat-15.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
| --- | --- | --- | --- | --- | --- | --- |
| iMessage: +15594335513 | +15594 335513 | | 4/18/2013 4:09:19 PM(UTC+0) | Ok | | Yes |

| 17 | Participants: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | +15594335513 ,+18586886886 | | | Identifier: | | |
| | Start Time | 4/26/2013 2:51:44 PM(UTC+0) | | | | |
| | Last Activity | 4/26/2013 6:46:40 PM(UTC+0) | | | | |
| | Body file: chat-16.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
| --- | --- | --- | --- | --- | --- | --- |
| iMessage: +15594335513 | +18586 886886 | | 4/26/2013 6:46:40 PM(UTC+0) | I think the Internet is down again. Shipping was having a hard time transmitting thru ups site. Things are really slow. | | |
| iMessage: +15594335513 | +18586 886886 | | 4/26/2013 2:51:44 PM(UTC+0) | It's collette, by the way... | | |
| iMessage: +15594335513 | +18586 886886 | | 4/26/2013 2:51:44 PM(UTC+0) | Hi Adam! Internet is down. | | |

| 18 | Participants: | | | | | Yes |
| --- | --- | --- | --- | --- | --- | --- |
| | +12096788993 Angele Brennan | | | Identifier: | | |
| | Start Time | 4/29/2013 2:37:31 PM(UTC+0) | | | | |
| | Last Activity | 6/4/2013 10:46:06 PM(UTC+0) | | | | |
| | Body file: chat-17.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
| --- | --- | --- | --- | --- | --- | --- |
| iMessage: +15594335513 | +12096 788993 | | 4/29/2013 2:37:31 PM(UTC+0) | Umm...that was an I'm here | | |
| iMessage: +15594335513 | +12096 788993 | | 6/3/2013 5:13:12 PM(UTC+0) | I did not hang up but can't get you on a call back. Call me back please. | | |
| iMessage: +15594335513 | +12096 788993 | | 6/3/2013 5:12:45 PM(UTC+0) | Call dropped | | |
| iMessage: +15594335513 | +12096 788993 | | 6/4/2013 10:46:06 PM(UTC+0) | ?? | | |
| iMessage: +15594335513 | +12096 788993 | | 6/4/2013 10:46:05 PM(UTC+0) | Think it would be ok to do Wendy's tonight. | | |

| 19 | Participants: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | +15594335513 ,+12095703519 | | | Identifier: | | |
| | Start Time | 5/15/2013 4:09:36 AM(UTC+0) | | | | |
| | Last Activity | 5/15/2013 4:09:36 AM(UTC+0) | | | | |
| | Body file: chat-18.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
| --- | --- | --- | --- | --- | --- | --- |
| iMessage: +15594335513 | +12095 703519 | | 5/15/2013 4:09:36 AM(UTC+0) | Hi Adam it's your cousin Christine! I got your contact info from Louise. I'm trying to access the photo booth pics online but it's asking for a password and I'm hoping you have one to share :) | | |

| 20 | Participants: | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | +15594335513 ,+12096207541 | | | Identifier: | | |
| | Start Time | 6/24/2013 2:53:17 PM(UTC+0) | | | | |
| | Last Activity | 6/24/2013 2:53:17 PM(UTC+0) | | | | |
| | Body file: chat-19.txt | | | | | |

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096 207541 | | 6/24/2013 2:53:17 PM(UTC+0) | Hi Adam, it's Greg from work. Can you tell me the WiFi password, I lost my phone over the weekend, and got a new one. But it won't update from iCloud without WiFi.. | | |

| 21 | | |
|---|---|---|
| **Participants:** +15594335513 ,+12096144113 Louise Reed,+12096788993 Angele Brennan | | **Identifier:** |
| Start Time     6/30/2013 1:31:44 AM(UTC+0) | | |
| Last Activity     6/30/2013 1:31:44 AM(UTC+0) | | |
| **Body file:** chat-20.txt | | |

| Source App | From | To | Time | Body | Attachment | Del? |
|---|---|---|---|---|---|---|
| iMessage: +15594335513 | +12096 144113 | | 6/30/2013 1:31:44 AM(UTC+0) | You had to leave just as we got back and I understand. Hope you all had a chance to eat. Thanks for the work you did.  I have purple glasses for all of you. | | |

## Contacts (19)

### Uncategorized (19)

| # | Name | Entries | Del? |
|---|---|---|---|
| 1 | ADT | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | 1 (800) 238-2727 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 2 | Angele Brennan | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | (209) 678-8993 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 3 | Aunt Diana & Uncle Ray | **Entries (3)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Home | (209) 239-6267 | |
| | Home | r_dwells@juno.com | |
| | Mobile | (209) 471-2342 | |

**Addresses (1)**

| Category | Address | Del? |
|---|---|---|
| Home | 354 Dan, Manteca, CA, 95336, United States | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 4 | Brandi Rollins | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | 2096060172 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 5 | Carlton Martin | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | 2093332374 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 6 | Coldwell Banker Clovis | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | General | 5592987558 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 7 | David Silva | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | +12096482670 | |

| # | Name | Entries | Del? |
|---|---|---|---|
| 8 | Elizabeth | **Entries (1)** | |

| Domain | Category | Value | Del? |
|---|---|---|---|
| | Mobile | (209) 213-3139 | |

1

2      **Exhibit 4: AOB Related E-mails Between Myself and Whitney Linder**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Sunday, March 10, 2019 3:05 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | AOB changes |

Whitney,

There's not enough character space to respond, so I'm putting this in a new one and referencing findings. Also, I can't copy/paste on these machines so typing it as closely as I can and referencing location to try to make it easier to find.

Part C
Last sentence before Part II
"should not have been stricken and a mistrial granted"
Shouldn't that be should be not should not be?           *GS*          *Rpts*          *ambiguous*

Part F
"the computer from in the garage used Limewire not Shareaza"
See my notes from Monday I believe it was. Det. Hively's testimony was that the contraband on Item 16 were downloaded using Limewire, a program NOT found on ANY of my computers. Item 16 had only Shareaza, which Det. Hively's reports and email to Gappa (both in Bates circa May 2015) said did NOT download any files, which were downloaded on "some other computer".

"the password unless my boss tells me."
See also my notes, not sure this one is worth tossing in, but since you have the quote in there, figured I'd point it out. Highly misleading.

That's all I could find.
Thanks for all your hard work.
Adam

*Item 16*
*Bardnew Rpts*

*AH built*

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Thursday, July 18, 2019 12:19 AM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | RE: RE: Two side things. |

## Whitney Linder

---

I'm very confused on this one. Gappa referenced this ER notation during his argument that there was plenty of evidence that items outside CA were used, giving the feds jurisdiction. How does this ER excerpt establish what computer or device was used for a screenshot, much less that such a computer or device was manufactured outside CA? "...was found on the devices that were seized..." So what? No evidence of which one it was created on, and if they had it on a device that was manufactured outside CA, but NOT responsible for creating the screenshot, that would only give them jurisdiction for possession, not manufacture, right? Either way, this doesn't appear to be evidence supporting his argument, or am I missing something?
-----Capozzi, Anthony on 7/17/2019 2:36 PM wrote:

>

ER 5:7-21
THE COURT: From which -- at the very least as a video, from which a screenshot was taken for purposes of admission at trial. Now, Mr. Gappa, are you telling me differently? That you believe the record establishes that you actually took the very screenshot, not just the video from which it came, and you produced the screenshot in discovery?

MR. GAPPA: Yes. And just so we're clear, I think this came up during the trial. This screenshot, actually there are several.

THE COURT: We're only talking about 28.13.

MR. GAPPA: Correct. So that one was created by the defendant and that was found on the devices that were seized when the search warrant was executed and that screenshot had been turned over years prior to the trial.


I think you should have the rest of what is said:

ER 5:21-25 - 6:1-7

It may not have had the exhibit sticker or identified as 28.13, but it was -- the screen capture that was part of the evidence that was all provided. So it was not just the video, but it was the defendant's creation of the screenshot from the video both were turned over.

THE COURT: So your position is that 28.13 was not a screenshot taken by the government, it was a screenshot taken by the defendant that existed on his computers or related devices and everything that was on those was turned over and made available, including this very screenshot?

MR. GAPPA: Yes.


ADAM ALAN HENRY on 7/16/2019 2:44:00 PM wrote
Whitney,

Good morning, about halfway through the last of the notes, it'll be the shortest, as the latter half is mostly repetitious arguments.

Two things. One, Gill got back to me, said his counselor's name is "Escalante". Thought you needed it for his visiting list, so asked him for it a while back.

Secondly, would you copy/past ER5:8-19 if possible, please? I'm curious what it says.

Thank you,
Adam

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Thursday, July 18, 2019 10:51 AM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | RE: RE: Reply Notes #4 (and last) |

Whitney,

No worries about the delay getting back to me, I understand completely. It took me about a week to get all that turned around and back to you, while trying to study for tests, prepare presentations, and finish a final essay. In some ways I missed college, other ways I definitely did not.

I typed and emailed the notes as I made them, so there very well could be some unnecessary repetitions. Gappa spent a lot of space repeating himself with slight variations. I tried not to respond to all of them, but could have. If you're able, would you be willing to peruse what I sent, weed out any unnecessary duplications and incomprehensible stuff before handing it off to Tony?  Also, on one hand it might be good, on another hand a pain, but our cumulative error argument might help in the end. I know the list of evidence I gave you was rather long and vague in parts, but Gappa went out of his way to state that his assertions were true and our arguments aren't. Hopfully when we show otherwise, it will undermine his credibility on everything else as far as the court is concerned. One that really jumped out at me was he flatly states yet again, that AT was the only named folder. His arguments in closing and here flat out claim that since that's the case, it obviously means the goal was flat exploitation, not voyeurism. But he even references folders and subfolders in his reply that I KNOW were named, so if you do find those, and we rub it in his face, he can't exactly claim ignorance, since he specifically talked about them, while lying about them. He did similar stuff with the computer in the garage predating Angel, saying it had to be me, in spite of Hively's testimony, reports, and emails to Gappa.

On one hand, he's gotten away with lying and misleading every step of the way, I'm trying not to hold out hope that it'll be different this time, but on the other hand, it's so absolutely blatant, I really don't understand how he can (though I've felt that way before, this seems to be even more egregious, IF we can pull up the reports, testimony and such to lay it out for the appeals judges).

I responded to the ER emails (thanks for those), done with notes on the reply, so I think I'vedone everything I can on this side. On yours, EOT no later than Friday, still going through gathering the cumulative error evidence (any progress there? Just wondering if it's locatable, and if it's as helpful as my memory suggests), and going through my response notes. I'm not sure how helpful my observations will be, please let me know.

Sorry if I'm getting to be a pain, just trying to keep everything in order, check it off my mental list as it goes by. Once we get short on time, it'll go fast.

Thanks again for all the help, and hope the trial stuff lightens up for you and Tony.

Have a good weekend,

Adam
-----Capozzi, Anthony on 7/17/2019 1:51 PM wrote:

>

Adam,

Sorry I have not gotten back to you, but our murder trial went a little off the rails. Tony is just now doing his closing arguments this afternoon. (So much for a 2 week trial.)  I will send you the stuff you requested in separate emails with the "title" of each in the subject line. I will also be putting together the EOT so it can be filed no later than Friday.

Whitney

ADAM ALAN HENRY on 7/16/2019 8:38:40 PM wrote
IV    Pg 54 1st pp "But it is also true...that even though Henry and his wife captured images of people other than AT....AT was the only victim whose images were put into a folder with her name on it."

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Thursday, July 18, 2019 12:19 AM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | RE: RE: SER request |

So these are the ER excerpts he notes in support of his argument that Ruezga was a rebuttal witness. A rebuttal witness is used to "impeach direct testimony" and can be used to prevent a defendant from using Miranda as a "shield from his untruths." In all references, a rebuttal witness is used to expose a lie said while on the stand, correct? As near as I can tell, Ruezga's testimony that I told him that "I don't know what the charges are, but Angele had nothing to do with anything" or something like that, does not directly contradict any of these quotes. I do not explicitly say she did anything. The only thing directly referenced is the video she took in the bedroom, which frankly, isn't exactly ambiuous. Am I missing something?

-----Capozzi, Anthony on 7/17/2019 2:21 PM wrote:

>

420:1-25 - 421:1-7
Q. June 3rd, 2013. I'm sorry. So does that mean the last day that the search terms were put in?
A. From my understanding, that was the last time that this registry entry was updated, written to. Which would mean the last time a search term was entered, yes.
Q. Did you put the search term "corset" in?
A. No, sir.
Q. By putting that term in -- well, if you did put it in, what would you expect to get back?
A. Probably stuff related to corsets.
Q. You didn't put that term in?
A. No, sir.
Q. Going down the list. "Adiiia"?
A. No, sir.
Q. "Horse"?
A. No, sir.
Q. "Pony"? "Dog"?
A. No, sir.
Q. Keep going down the list. "Mommy me"?
A. No, sir.
Q. "Mom daughter"?
A. No, sir.
Q. "Skirt"?
A. No, sir.
Q. Did you have an interest in little girls with skirts?
A. No, sir.
Q. Did Angele ever mention that to you?
A. I knew she liked women in skirts. She would -- had some, yes.
Q. Indeed, in that videotape of [A.T..] in the bedroom, did you see a little skirt that was displayed?
A. Yes. That was one of her favorites.

423:15-25 - 424:1-8
Q. There's a password for the Aurrora side of the Netgear; correct?
A. Yes, sir.
Q. You said that Angele had that password?
A. Yes, sir.
Q. Why are you so sure of that?
A. Because it was originally set up for us and communal access. And that side -- the media folder -- the Netgear had a couple of different functions. One of them was overall network storage. But it could also stream media to another device, like a DVD player on the network that's capable of
accepting media that way. So -- but it -- the DVD player couldn't access through a password. There was no option

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Thursday, July 11, 2019 2:35 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | Reply notes |

Whitney,

Good morning, going to do this in stages, since I only have 15 minutes at a stretch to type, no idea how long it will take to go through it all, so will send piecemeal, so at least it gets out, and we don't waste the limited response time completely by waiting for the email system to let me type. I'm not going to proof-read, because of the time constraints, so please forgive any bad grammar or misspellings.

Here goes.

Statement of the case

II
Pg 4 2nd pp "...but that were still viewable."
    Det. Hively admitted under cross that while they may have been "viewable", there was no evidence that any CP file had actually BEEN viewed on any device at all. Gappa's claim here is like saying "we found a hammer, it could have been used for the murder." Did it? Well, there's no evidence at all that it did, but it COULD have...

III
Pg 5 "...eventually Henry admitted that he had found a few files..."
    I don't recall saying I had found CP. I remember saying I had over the years found "animal stuff and worse" and when Hively said they they had found CP I was obviously shocked, asked for a lawyer at that point, later rescinded request. I said something like I had found some stuff over the years, but anything with a kid I would have deleted. Peer to peer has a lot of stuff that isn't explicit material of any type. I had come across everything from Pepsi commercials from Amsterdam to home made humor videos, like the ones on Youtube. I was trying to figure out what he was talking about, and trying to draw SOME parallel that would make sense... but I couldn't. I was rather shocked. But I don't believe I EVER said "hey, I found CP." My polygraph and unchallenged testimony both said I have never seen any.

Pg 6 1st PP "...said that his wife accessed the other folder without a password..."
    The interview record also shows I said "...she has the pass..."

Pg 7 2nd pp "as Henry had told investigators in his confession..."
    This is the first time I've seen or heard my interview referred to as a "confession." How can it he say it was? I didn't confess to looking for, knowingly receiving, or a conspiracy.

Pg 7 2nd pp "One share titled 'Media,' was not protected by any password...'Aurrora' was only accessible with a password...one key difference: only... 'Aurrora' folder contained...[CP]"
    Gappa doesn't seem capable of telling the truth, and of course every one of his lies is designed to implicate my guilt when the truth wouldn't serve. Here he is saying it had to be me because Angele didn't have the password, it was all behind the password, therefore it had to be me. Well, not only did she have the password, and Tony's cross of Det. Moore got him to admit there were discrepancies in the amount of files behind the password when correlated with my account that meant she could have been responsible for putting them there (Pull that to help refute his claims about the password share?), but one of Det. Hively's reports was an itemized and number list of all the CP found on the NAS, and where they were located. It was about 4-5 pages long, and listed ALL of them. Admittedly, there weren't many (maybe a handful), but there WERE some on his list that specifically said that they were on the Media share. Considering his "key difference" for his argument is a bald-faced lie to the 9th circuit appeals judges, hopefully that report can be correlated with this. I don't remember the date of the report, unfortunately, but it WAS Hively.

IV

# Whitney Linder

Pg 9 1st pp "...a curtain blocked the view...To fix the problem...
Pg 9 last pp "To fix the problem...installed a window shade..."
   Is he allowed argument in this reply? First off, he's conjecturing motive for the removal of the curtain and adding of window shade. I believe there was something like a year between the video where they saw the light obscured, and the one where the curtain was taken down, and in later videos is was back up. But either way, I testified as to why I was doing what I was, and he didn't even attempt to refute it under cross. Even the judge later said my explanation was "plausible."

Pg 10 1st pp "Henry created a screenshot of that video...place...on password-protected..."
   No I didn't, nor was any evidence ever presented as to who created them or on what device, aside from the prosecutor's much refuted "password" theory. Not only that, but as he just finished saying on Page 7 last pp "some of the videos of AT...on both the 'Media' and 'Aurrora' shares..." So the videos and screenshots were on BOTH shares, but  now "Henry...placed them..." Later in this reply, he even says either I or she did it. First it's on both, then I put it on one, and later it was one of us, but not sure which. He can't even keep his own accusations straight, because they aren't based on any facts at all.

Pg 10 last pp "At the time of the search, the plant was in the garage."
   Here's yet another example where he completely ignores evidence, facts, and his own witnesses testimony under cross. Hively and Moore both said it was in the garage. Under cross, Hively said this was important because it showed it was being hidden, and was evidence of guilt. Gappa clearly thinks it's important enough to include in his appeal reply. Yet under cross, Hively was confronted with FBI Agent Mark Lucas' report saying he found it still hanging in the bathroom, and the FBI search warrant photos added into the trial record that clearly showed it still hanging there. Not to mention the photos of the garage where he admitted it wasn't to be seen, he admitted the error....  But here Gappa is STILL claiming it was in the garage. He even objected specifically to the SW photos that directly showed it, arrogantly not objecting to the others. Even Drozd noted he was only objecting to the ones Tony wanted... with the plant. I ended up noticing it could be seen in the mirror in one of the ones added to the record, and Tony hit Hively with it. But here he is clearly lying, because after all that at trial, there is no way he does not know it was not in the garage, but still hanging in the bathroom.

Pg 10 last pp "...positioned to record guests..."
   This is VERY interesting. Here Gappa concedes the camera was positioned to record guests, which would be voyeurism as Tony keeps saying, but Gappa's main argument for conspiracy, and hence my guilt, both at trial and later in this same reply, is that the primary focus was to record AT specifically, making it exploitation. But here it sure sounds like he's admitting to Tony's argument that at worst this was NOT exploitation, but voyeurism. Maybe hit him with his own words on this?

Alright, that's the first chunk. If you would, please confirm receipt so I know the system is screwing with us still/again. I'll try to get the next section sent over the weekend. Let me know how the search for that cumulative error stuff goes.

Have a good weekend,

Adam

# Whitney Linder

**From:**        HENRY ADAM ALAN (71064097)

**Sent Date:**   Sunday, July 14, 2019 2:52 PM

**To:**          whitney@capozzilawoffices.com

**Subject:**     Reply Notes #2

V   Pg 11 1st pp "...Henry took the stand...and repeatedly implied that his wife may have....Henry's uncle...and...aunt... both testified...implying that she may have downloaded [CP]..."

   Note the key word "implied." As Drozd said in his July 13, 2018 ruling, "Collectively...the evidence sought to cast doubt on the conclusion that defendant attempted to download...instead implicated defendant's wife...This theory was made explicit in the defendant's closing argument..."

   So both the judge and prosecutor himself acknowledge it was only an implication. Our own EOR in the appeal of my testimony notes when Gappa asked me if I was saying she did it, I specifically said no, that I didn't know. I might believe she did, I can't think of anyone else who could have, but I didn't know what she was doing, I have no proof, so I couldn't testify for sure that she did. All I could, and did, testify was that she had access and opportunity. My testimony was supported by my uncle and aunt's, as well as David Silva's, none of which Gappa even attempted to refute other than to call them liars. Rebuttal witnesses by definition, quoted here in Gappa's own reply, are used to refute a defendant's untruths, to "impeach direct testimony." Ruezga was rebutting an implication, NOT direct testimony. He did not impeach my testimony of my wife's access or opportunity, therefore he does not qualify as a rebuttal witness. The theory was only made explicit by Tony in closing argument AFTER Ruezga had already testified.

   Pg 13 2nd pp "...the court denied Henry's motion without prejudice."
   On the basis that he was not a law enforcement officer. Gappa still completely ignores the CA penal code.

VI  Pg 13 3rd pp "...the videos and pictures Henry saved..."
   Again, no evidence other than the refuted password theory it was me and not her.

VII Pg 15 1st pp "Detectives found the screenshot on Henry's computer...."
   No, they found it on the Network Attached Storage device, which BOTH Angele and I had access to. Here he makes it sound like my own personal desktop computer.

   Pg 15 2nd pp "On the Friday before trial... provided Henry with and exhibit binder, which included Exhibit 28.13"
   It included the picture, but absolutely ZERO supporting information. Not a single word about who it was, where it came from, if the police found it or created it, nothing. Drozd himself didn't believe it was AT until seeing the video for himself. No way the defense would have recognized it or it's importance just by the picture by itself. Especially after every single report by the police, hearing statements by the prosecutor, and the indictment transcripts all said there were only 12 total.

   Pg 15 last pp "...the image...was made available no later than 2014."
   Among tens of thousands of documents, and the police didn't even realize it's significance until 2-3 weeks prior to trial, 4 years after acquiring it.

   Pg 16 1st pp "...he just did not recognize it as a picture of AT."
   Referring to Marcus Lawson. No, he didn't, if he saw it. Neither did Hively, nor even Drozd when shown it and told who is was. Drozd said he didn't recognize it as her even then.

   Page 16 last pp "The court nonetheless rejected Henry's argument because Ruezga's testimony was used in rebuttal... no basis to conclude...statement was...coerced." "The court specifically found that when Ruezga spoke to Henry, there was no evidence suggesting that the exchange was hostile or aggressive....and no evidence that Henry was in a distressed stated of mind."

   This was after the penal code was introduced (which Gappa doesn't mention or address in the entire 70 page, 12.6k word reply) and the judge had to change his ruling from allowable as non-law enforcement to allowable as rebuttal. Not only that, but on Pg 13 1st pp of this reply, Gappa has: "Henry claimed that throughout the process, he remained handcuffed, had been told he could not move, and had an agent positioned near him so he did not

# Whitney Linder

leave." That isn't evidence of coercion? I was handcuffed, listening to my scared children being corralled by strangers, watching my house get ripped apart, seeing my wife (I didn't know what she had done at the time) bracketed and escorted off by officers, all after having pistols and shotguns pointed at me, and being told my children would be taken if I didn't answer his question. Of COURSE it was hostile and aggressive. Of COURSE I was in a distressed state of mind. What sane and rational person wouldn't be? I think that qualifies as evidence of coercion. Yes I tried to protect my family. No I didn't lie or later change my story. I told the truth as I knew it at the time.

Summary of Argument
Pg 17 3rd pp "The social worker was not a law enforcement officer and did not subject Henry to any custodial interrogation..."
Still, he completely ignores and refuses to acknowledge or address the CA Penal Code. This is after he quoted Drozd on Page 16 saying "The court assumes without deciding that Henry was in custody when Ruezga questioned him." CA penal code says in black and white he was a peace officer, and everyone, including Ruezga, the FBI agent's report, and Drozd, acknowledge I was in custody when I was interrogated.

Pg 17 3rd pp "was proper rebuttal testimony and was voluntary"
It was neither of those things.

Pg 18 2nd pp "Henry and his wife set up a camera...worked together to capture videos of AT...They saved these videos and screenshots on their computer...Under these facts..."
A couple things here. First off, he calls these "facts" when they ascribe motives, goal, and actions that were circumstantially evidenced, which is a far cry from a "fact." The only "fact" here is that we set up a camera.
Second, throughout this entire document, Gappa keeps talking about how "Henry" created and saved the videos and screenshots on "his" computer, claiming that she didn't have the password and couldn't have. Now that he has to argue for a conspiracy, suddenly it changes to "they." He keeps saying proof of my guilt is that she didn't have the password, and I was putting this stuff where she couldn't get to it, hiding it from here, but indicting and convicting me on the basis of conspiring to create the very stuff he says I was doing in a way she couldn't be part of. He also claims Ruezga's testimony counts as rebuttal testimony because I told him Angele HADN'T had anything to do with anything, which would be true, negating the implication of her guilt. If my statements to Ruezga were literally true, as Gappa seems to be arguing, how could I be guilty of a conspiracy with someone I was hiding the stuff from behind a password, and who wasn't involved with anything? His arguments and the indictment are mutually exclusive.

Pg 18 2nd pp "...considering the Dost factors, is irrelevant."
More fanciful thinking on his part. Even Drozd said in his July 13, 2018 ruling, when referring to the Dost factors, "Nonetheless, whether the images constituted...is relevant..." A direct refutation of Gappa's claim here. Consider this: Conspiracy is the intent to commit the crime, Pearson admitted to the judge all they had was circumstantial evidence. Drozd also said in his July 13, 2018 ruling "A jury may infer the existence of an agreement from circumstantial evidence." As Gappa appears to concede in this reply, the sum total of the evidence of a conspiracy is the videos themselves. Therefore the videos had to be INTENDED to violate the Dost factors, at least to be capable of it. The positioning of the camera precluded the requisite focusing, she was not posed or in unnatural activities, and absolutely zero evidence was provided that the purpose of the recording was gratification of AT rather than simple voyeurism other than Gappa's claim that she was the only one with a named folder to demonstrate the focus was on her, and that is a complete fabrication, contrary to his own expert's reports. He even said on page 10 of this reply that the camera was "positioned to record guests", a tacit acknowledgement of voyeurism at worst, a far cry from the "goal...to capture and save...photos and videos of AT" as he says here.

Pg 19 1st pp "The prosecutor's observation that defense counsel represented his client well...did not criticize counsel's tactics..."
That's EXACTLY what he did. In his July 13, 2018 ruling, Drozd even noted "...the prosecutor suggested to the jury that defense counsel had intentionally provided them with a false narrative..." and "could easily have be taken as implying that defense counsel's methods were underhanded and unethical."

Pg 19 last pp "Henry has failed to demonstrate that...any comment materially affected the verdict..."
The entire case was one of credibility. They only had circumstantial evidence, as Pearson admitted and Drozd noted in his July 13, 2018 ruling; "In short, the jury was confronted with competing explanations...and rejected his version of events..." In a case reliant upon credibility were the prosecutor's sole cross of witnesses was summed as "You'd be willing to lie for Henry, wouldn't you?" His refutation of my testimony consisted of a "rebuttal witness"

**Whitney Linder**

calling me a liar, and his closing argument consisted of calling me, my witnesses, and even my lawyer liars. Meanwhile he lied to omit evidence of other named folders, lied about the location of the plant, lied about the computer in the garage downloading contraband, etc. How can ANY instance or accusation of dishonesty NOT "materially affect the verdict" when the verdict is BASED on the jury's evaluation of which side is being truthful?

7/17/2019

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Tuesday, July 16, 2019 12:06 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | Reply notes #3 |

From this section on out there is a lot of repetition. Not sure how normal that is, but I'm going to try to skip most of the repeats unless it's worded differently it might make a difference. If I need to go back and point out every single one (can't imagine why, but I don't like to assume) let me know.

Argument
I    Pg 20 last pp "...district court abuses it's discretion when it makes a clear error of law, when it rests it's decision on clearly erroneous findings of fact..."
   Such as finding Ruezga's testimony allowable because he wasn't a law enforcement officer, or as a rebuttal witness. Not to mention all the other stuff in our appeal. This is exactly what we are claiming.

   Pg 20-21 "Henry has failed to show that the court has committed any legal error."
   That's exactly what the penal code he ignores does.

   Pg 21 last pp "....the court correctly found Ruezga was not a law enforcement officer...Because Ruezga was not a law enforcement officer, his questioning of Henry could not be considered an interrogation."
   This feels like he's helping us in a way. He seems to be indirectly conceding that if Ruezga was a law enforcement officer, it would count as custodial interrogation. So if we establish him as a law enforcement officer, then it was a custodial interrogation, it becomes a clear violation of Miranda, we win... right?

   Pg 22 last pp "He testified he was neither a law enforcement officer nor a peace officer."
   So according to Gappa, while under oath he testified to this. Gappa even includes the transcript. This is obviously incorrect be the penal code. So Ruezga was either lying on the stand or completely ignorant as to his own status, demonstrating a clear lack of training or something. Either way, after such a blatantly wrong claim under oath, how can anything else he said be reliable?

   Pg 23 last pp "...that his inquiry was simply for purposes of attempting to determine whether the children could safely remain in the home..."
   Back to my earlier note, Ruezga was threatening to take my children away, which Drozd acknowledges. How can such a threat to a parent NOT be considered coercion, hostile, aggressive, or evidence that I was in a distressed state of mind?

   Pg 25 2nd pp "[Ruezga] did not share what he learned during  the interview...with law enforcement officers who were present...And... the officers were off executing the search warrant when he engaged the defendant in conversation."
   As Gappa noted on Page 13, 1st pp "Henry claimed that throughout the process...had an agent positioned near him to ensure he did not leave." So Ruezga was sharing the interview and what he learned as it happened. Another complete fabrication and misrepresentation by Gappa, contradicted by his own reply.

   Pg 25 3rd pp "...his conversation was focused on the welfare of the children and what was going to happen with them as a result of the execution of the search and arrest."
   This is a quote from Drozd, who acknowledges Ruezga was telling me he was deciding whether to take my kids or not. Ruezga told me my cooperation and answers would be the deciding factor. How is that NOT coercion? How is that NOT a "hostile and aggressive conversation?" How can they say there was no evidence I was NOT mentally distressed at the time?

   Pg 25-26 "...the Supreme Court defined custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom in any significant way."
   How nice of Gappa to again prove our argument for us. With the penal code, and my being in handcuffs, read Miranda, etc, that's exactly what it was.

7/17/2019

## Whitney Linder

Pg 26 1st pp "Henry has failed to show that these findings are clearly erroneous or legally incorrect."
Again, he just ignores the penal code like if he doesn't acknowledge it, it doesn't exist.

Pg 26 last pp "But Henry did agree to answer questions from Ruezga after he identified himself and the purpose of his investigation."
EXACTLY. I answered his questions after I was sat handcuffed in a chair, 2 feet from Ruezga, with an agent standing over me, when Ruezga told me the purpose of his investigation, as BOTH Gappa and Drozd have conceded in different quotes in these notes, was to decide whether to take my children or not. What kind of choice did I have?

Pg 28 footnote "...the statements elicited in violation of [a constitutional right], although not admissible on the prosecution's case in chief, may nonetheless be used to impeach the defendant's credibility."
Gappa and Drozd both acknowledge as I noted earlier, that Angele's culpability was only implied. you cannot impeach an implication. Another quote I've seen somewhere said rebuttal can only be used to "impeach direct testimony". None here. Since as this quote notes, it was an attack on my creditability, in violation of the Constitution, in a case revolving on credibility, it CANNOT be a harmless error. Also, no matter how "brief" Gappa or Ruezga's attacks on credibility were, the shear volume of attacks on mine, my uncle's, my aunt's, my mother's, and my lawyer's credibility, but calling or insinuating they were ALL liars at various points in the trial, makes them not "brief" at all, nor does it make it an accident. Instead, it demonstrate's the prosecutors case and intent.

Pg 29 2nd pp "...and the court repeatedly ruled that Henry was not interrogated because Ruezga was not a law enforcement officer."
Gappa helps again. So in light of the penal code, Gappa concede that Drozd repeatedly made an error of law, error of judgment, etc.

Pg 29 last pp "An assistant director...confirmed that social workers like Ruezga were not 'law enforcement officers or peace officers as defined in California Penal Code Section 830.3 (or elsewhere)."
My mistake, this is his one and only reference to the penal code. Just because he got Ruezga and an assistant director both to either lie or demonstrate their ignorance (the latter might be possible for Ruezga, but hardly believable for an assistant director who refers to the code by number) doesn't make it true. it simply demonstrates Gappa's ability to locate idiots or liars, while calling the entirety of the defense such. The penal code is very specific, no ambiguous at all. Much means yet again, the prosecution and it's witnesses demonstrate their dishonesty, while accusing us of it, in a case revolving around credibility.

Pg 30 1st pp "Henry never presented any contrary evidence in support of his argument."
Yes, we did... The CA Penal Code....

Pg 31 last pp "...because they were inconsistent with Henry's testimony at trial."
Pg 31-32 "...the government may still use these statements to impeach Ortega's inconsistent testimony..."
Gappa concedes that rebuttal can only be used to impeach inconsistent testimony, but he and Drozd both specifically refer to my testimony as implying her responsibility. By logical extension, Ruezga could not impeach an implication, therefore he was not a rebuttal witness. Not only that, my statements to Ruezga were NOT really inconsistent with my later defense. If I had told Ruezga at the time that it was my wife, that would have meant I had known what she was doing, lending credence to the argument of conspiracy. Instead, during the first warrant, I knew I had not intentionally downloaded anything, nor had I seen any contraband. I cooperated, assuming it had to have been a mistake or an accident, and wanting it cleared up. During the second warrant, I still didn't even know about the AT recordings or screenshots. I believed this was all arising out of the work stuff, and didn't know about my wife's activities, and I heard my kids being scared, and saw my wife being escorted off, while being told by Ruezga they were considering taking my kids. Believing and seeing all that, of COURSE I tried to protect my family. That's what any innocent person would have done under the circumstances. It wasn't until I found out later what had happened that my defense evolved. I'm not a mind reader. Telling the truth as I believe it at the time does not make a statement inconsistent or a lie, it simply means that I was duped just like everyone else by her.

Pg 32-33 "It is quite another to say that the defendant can...provide himself with a shield against the contradiction of his untruths."
Again, no untruths, no evidence of untruths, simply "implications." Gappa's own statements and quotes are irreconcilable.

II   Pg 37 2nd pp "...in march of 2017...report reference, in part, what became Exhibit 28.13."
Drozd himself when he ruled on this threw out this argument. The report didn't "reference" it, it was merely

## Whitney Linder

incidentally included in a screenshot that was actually referencing the other screenshots. His reason for saying this was at the time of this report and others, Hively didn't even know it was AT, therefore could not have referenced it as relevant to the case.

Pg 37 2nd pp "...that Henry labeled with the victim's name."
Now that we are past the point where he has to support a "conspiracy," we're back to "Henry" doing it, not "they" did it.

Pg 38 1st pp "This establishes that the defense was provided with notice of what became Exhibit 28.13 no later than March 2017."
Again, as Drozd said, how can this be construed as notice when Hively didn't even know who was in the picture until 2-3 weeks before trial? It just happened to be in a folder with the other pictures, and got included in a screenshot of them incidentally. The report itself describes the others, but not this one.

Pg 38 2nd pp "...identified not just 10 screen captures...but 11..."
Again, Drozd refuted this argument. It did NOT identify 11, any more than a picture of a chair with an attached report of the chair identifies the desk in the background. Hively did not, COULD not "identify" a picture that he didn't think was relevant to the case at the time. The report specifically only identified TEN.

III    Pg 43 2nd pp "By continuing to argue that the photographs and videos are not...under the Dost factors, Henry again fails to recognize that a conspiracy does not require the act to be completed."
Pg No, but it DOES require evidence that the act was intended to be completed, and when the only evidence you have is the pictures and videos themselves, they have to be at least capable of meeting the Dost requirements. Drozd himself as noted earlier said the Dost factors were "relevant." Gappa is failing to recognize that circumstantial evidence is not enough. You can't charge someone with conspiracy to murder simply on the evidence of someone breaking into an unoccupied house with a firearm. If the sole evidence is the break-in with the firearm, but no one was there to kill, that's not enough evidence. The crime has to be at least capable of being committed. His logic (or lack thereof) is nonsensical.

## Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Tuesday, July 16, 2019 8:38 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | Reply Notes #4 (and last) |

IV   Pg 54 1st pp "But it is also true...that even though Henry and his wife captured images of people other than AT....AT was the only victim whose images were put into a folder with her name on it."
   This is important, since all through trial and this reply, since the only evidence is the videos, his argument is that the goal of the camera was specifically AT, making it arguably exploitation and not voyeurism. To support that claim here is AGAIN lying about AT being the only named folder.
   It is ironic that he references "a folder called 'exes' and then subfolders that contained content that he recorded." The exes sub-folders he is referencing are named folders he immediately after says don't exist.  By lying to the jury with his statement, he was misleading them into thinking AT was the specific goal, which is demonstrably not true.

   Pg 56 1st pp "...the jury was free...to conclude that Henry was the person responsible for obtaining..."
   The jury was lied to in order to lead them to this conclusion. By telling the jury that the computer in the garage had downloaded the contraband on it, since the dates on it preceded my wife's arrival, he was telling them she could not have been responsible. Since his own expert's report said that the contraband on that computer had come from "some other device" that was never located, and Tony's cross of Hively agreed it could have been copied there after she got there, it is a BIG deal. It is yet another example of Gappa misleading the jury through lying to render a guilty verdict.

   Pg 56 2nd pp "...and that the material was downloaded before Henry lived with his wife..."
   This is why the garage computer information is important. Hively testified under cross those files could have been copied there any time after the date on them, retaining the date from a prior device rather than creating a new one. He also volunteered the info that this was more common under Windows XP. His report of the garage computer said that the files on it were downloaded "on some other device" that was never found in my possession, AND was running Windows XP. So these files were put on it sometime before Fall of 2010, from some device NOT in my possession. Moore's report on his interview of my wife notes she was staying in my house, with the kids, for a couple months, in January 2010. Text messages on cell phone records put into record at trial have me picking her up at the airport repeatedly during the summer/fall, and home videos sow her in my house in June or July 2010.
   Gappa's lies are specifically designed to preclude the possibility she brought the files with her from somewhere else, a conclusion well within the realm of possibility. The shear number of lies, all with the same goal, all clearly in opposition to his own expert's reports and testimony clearly indicate a pattern. This is obviously not a one or two time mistake, but a systematic obfuscation of the truth in order to lead the jury to false conclusions.

   Pg 57 1st pp "...and there was evidence from which the jury could have inferred that the recording was made with a Canon Vixia camcorder that had been manufactured in Japan."
   Actually, from what I recall, there wasn't. When Hively testified for Gappa (and perhaps under cross, I don't remember), he specifically stated there was NO contraband or evidence related to the case found on the Canon. Every single time Gappa and Hively tried to link the video Angele made of AT with the Canon, Tony objected and Drozd sustained. In the end, as I recall, NOTHING was allowed in the record linking them.

   Pg 57 1st pp "Henry and/or his wife transferred the video to a computer and hard drive, both also manufactured outside California, and screen captures were made from these images...There was abundant evidence from which the jury could have found that Henry and his wife used multiple devices manufactured outside of California."
   Here he references ER5:8-19. Not sure what it entails, but there was NO evidence of the manufacture of ANY device in ANY report or testimony other than the Canon Vixia except for Gappa's final argument, where he waved his hand at the evidence cart and said something about a bunch of it being manufactured outside California. I highly doubt that qualifies as "evidence." Especially in light of all his other lies in his closing regarding the information that WAS in reports and testimony. No evidence or testimony existed in any police report or the trial

# Whitney Linder

about which computer or device created the screenshots, much less the origin of the parts of the hypothetical device. Even if they had produced evidence related to the foreign manufacture of the parts the images were "transferred" to (which they didn't) after the images were created an unknown elsewhere, that would only give them jurisdiction for a possession, not a manufacturing. So his argument of "...[they] transferred the video...both manufactured outside California..." isn't relevant, even if it were true.

Pg 57 1st pp "It was not necessary for the government to prove that every single item...was manufactured outside of California."
No, but they do have to prove at least ONE for jurisdictional purposes.

Pg 58 1st pp "But it was Henry himself who volunteered in his direct testimony-several times- that he used Shareaza over the course of a decade to download music."
Yes, I did, so what? I said I downloaded music, I never said I downloaded music illegally. Lots of independent bands and some big label groups as well have released songs or even entire albums specifically through file sharing programs for free distribution. Gappa's whole premise of "everything in file sharing is illegal" as espoused to the jury, here, and everywhere else is prejudicial and misleading. His characterization of it, especially in light of the shear volume of file sharing cases he has prosecuted, cannot be accidental. It is part of a blatant attempt to mislead the jury into a conviction by lying to them.

Pg 58 2nd pp "The argument that people get [CP] from Shareaza is not...misleading..."
Yes, it was. He was intentionally misleading the jury into believing that file sharing is solely for illegal purposes. Just like the music comment above, where he in closing said something along the lines of "it's illegal, but that's not what we're here for" or when he referred to the adult, saying "You can make your own judgment whether that's right or not" or something similar. This in spite of his own expert's reports and testimony that the CP found was a small fraction. Most of the stuff found by far and away was legal, adult content. If it was only one or two instances it would be one thing, but this can only be part of a systematic effort to mislead the jury with lies.

Pg 59 1st pp "...which merely highlight Henry's shifting defense from downloading [CP] by accident or mistake to having nothing to do with anything..."
This was not a shifting defense. My defense all along was "I did not look for it, I did not knowingly download it, I did not know it was there, I did not even SEE it." The only thing that changed was believing it to be an accident or mistake (because I didn't believe anyone I know would do such a thing), to realizing it was intentional, and that Angele had betrayed pretty much everyone she knew. If I had known it was her before I went through the evidence that would have been evidence of my knowledge at the least, participation at worst. My very ignorance all through both search warrants is evidence of my innocent, not my guilt. Not only did I not know before the warrants, I didn't know between them, either. She hid it from me.

Frankly, I did not WANT to believe it. Who would? I'm not entirely sure when my family, Tony, or Whitney put it together, but I finally pieced it together and accepted it almost a year after my arrest, with the discovery. I laid it all out for Tony, who then talked to Gappa. Hardly a coincidence, just after this in Jan 2015, is when Gappa did the superceding indictment to change it fom accusing me directly to alleging conspiracy. Precisely because I pieced it together, and when presented with the evidence, he couldn't accept dropping the charges against me and going after her.

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Sunday, July 14, 2019 2:51 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | SER request |

Whitney,

Sent Parts 1 and 2, will start on the third... He doesn't even have an arm's-length association with the truth, and ethics is something he read about once.... This is ridiculous.

Anyway, hoping you could copy/past me some stuff he references, if you can.

SER 420:3-421:7, 423:15-424:8, 431:1-432:22, and 436:10-437:11

It should all be from my testimony.

Thanks,
Adam

*Attached Emailed 7/17/19*

# Whitney Linder

| | |
|---|---|
| **From:** | whitney@capozzilawoffices.com |
| **Sent Date:** | Wednesday, July 17, 2019 3:11 PM |
| **To:** | ADAM ALAN HENRY (71064097) |
| **Subject:** | RE: SER request |

420:1-25 - 421:1-7
Q. June 3rd, 2013. I'm sorry. So does that mean the last day that the search terms were put in?
A. From my understanding, that was the last time that this registry entry was updated, written to. Which would mean the last time a search term was entered, yes.
Q. Did you put the search term "corset" in?
A. No, sir.
Q. By putting that term in -- well, if you did put it in, what would you expect to get back?
A. Probably stuff related to corsets.
Q. You didn't put that term in?
A. No, sir.
Q. Going down the list. "Adilia"?
A. No, sir.
Q. "Horse"?
A. No, sir.
Q. "Pony"? "Dog"?
A. No, sir.
Q. Keep going down the list. "Mommy me"?
A. No, sir.
Q. "Mom daughter"?
A. No, sir.
Q. "Skirt"?
A. No, sir.
Q. Did you have an interest in little girls with skirts?
A. No, sir.
Q. Did Angele ever mention that to you?
A. I knew she liked women in skirts. She would -- had some, yes.
Q. Indeed, in that videotape of [A.T.] in the bedroom, did you see a little skirt that was displayed?
A. Yes. That was one of her favorites.

423:15-25 - 424:1-8
Q. There's a password for the Aurrora side of the Netgear; correct?
A. Yes, sir.
Q. You said that Angele had that password?
A. Yes, sir.
Q. Why are you so sure of that?
A. Because it was originally set up for us and communal access. And that side -- the media folder -- the Netgear had a couple of different functions. One of them was overall network storage. But it could also stream media to another device, like a DVD player on the network that's capable of
accepting media that way. So -- but it -- the DVD player couldn't access through a password. There was no option to type that in. So the media player was a folder that originally contained just sorted named movie files so that they could be played on another screen in the house. And the Aurrora folder was all our vacation pictures, the unsorted stuff, everything else basically.

431:1-25 - 432:1-22
Q. Did you take any snapshots of any of those videos with A.T. being naked?
A. I didn't even know the videos were there, much less take snapshots of them.
Q. You didn't take any of those snapshots?
A. No, sir.
Q. Did you ever see those videos before you ever came to court here? Well, I showed you, did I not?
A. Yes, sir.

# Whitney Linder

Q. Did you ever see videos of her naked, A.T.?
A. Only --
Q. Here?
A. Yes.
Q. Okay. How about the video of her in your bedroom?
A. Again, I never seen that before we were going through evidence.
Q. Did you even know that that was going to be done?
A. No. I was at work.
Q. Had you communicated with Angele that day?
A. Yes.
Q. What were you doing that -- that was taken in the afternoon; was it not?
A. From what I've seen of the discovery, the first segment, where it shows her setting it up was at 1:30 in the afternoon.
Q. Where were you at 1:30 in the afternoon?
A. I was at work.
Q. Had you talked to Angele earlier?
A. Yes.
Q. And what did you tell her you were going to be doing that afternoon?
A. Around a little before noon, right around noon, I told her that I had a meeting at two o'clock.
Q. That you had to attend?
A. Yes.
Q. Did you tell her how long it would go?
A. No. But she had the car. So whenever I --
Q. Okay. So you weren't home when that video was taken?
A. No, sir.
Q. And not aware of A.T. being videotaped?
A. No. Not even a little.
Q. Did you have any interest in seeing her in that videotape?
A. No.
Q. Were you trying to sexually exploit her?
A. No.
Q. Did you have an agreement with your wife to sexually exploit A.T.?
A. Not even a little.

436:10-25 - 437:1-11
Q. And would Angele come in and sit in your desk there?
A. Yes. Usually in the afternoon, I was quite often working out in the rest of the plant. I would come in and see her there. But I wouldn't have any idea of knowing how long she'd been there.
Q. Would your computer be running?
A. Yes.
Q. Would it usually run all day?
A. All day and sometimes night, yeah.
Q. Did you have to put a password in it every single time if it's running?
A. Depends if I locked it when I was heading out.
Q. Do you normally lock it when you were working around the business?
A. I try to remember because it's good security policy, but sometimes I forget.
Q. Do you know whether or not Angele had the password to that --
A. Oh, she did.
Q. She did?
A. Yes.
Q. How do you know?
A. Because I gave it to her. She'd come in and help me on the weekends sometimes if I had to do like server software upgrades on the weekend at work stations, where there was like 30 work stations. It cut the work load in half if two of us are doing it.

ADAM ALAN HENRY on 7/14/2019 2:51:09 PM wrote
Whitney,

Sent Parts 1 and 2, will start on the third... He doesn't even have an arm's-length association with the truth, and ethics is something he read about once.... This is ridiculous.

# Whitney Linder

| | |
|---|---|
| **From:** | HENRY ADAM ALAN (71064097) |
| **Sent Date:** | Tuesday, July 16, 2019 2:44 PM |
| **To:** | whitney@capozzilawoffices.com |
| **Subject:** | Two side things. |

Whitney,

Good morning, about halfway through the last of the notes, it'll be the shortest, as the latter half is mostly repetitious arguments.

Two things. One, Gill got back to me, said his counselor's name is "Escalante". Thought you needed it for his visiting list, so asked him for it a while back.

Secondly, would you copy/past ER5:8-19 if possible, please? I'm curious what it says.

Thank you,
Adam

*Attached*
*emailed 7/17/19*

# Whitney Linder

| | |
|---|---|
| **From:** | whitney@capozzilawoffices.com |
| **Sent Date:** | Wednesday, July 17, 2019 3:17 PM |
| **To:** | ADAM ALAN HENRY (71064097) |
| **Subject:** | RE: Two side things. |

ER 5:7-21
THE COURT: From which -- at the very least as a video, from which a screenshot was taken for purposes of admission at trial. Now, Mr. Gappa, are you telling me differently? That you believe the record establishes that you actually took the very screenshot, not just the video from which it came, and you produced the screenshot in discovery?

MR. GAPPA: Yes. And just so we're clear, I think this came up during the trial. This screenshot, actually there are several.

THE COURT: We're only talking about 28.13.

MR. GAPPA: Correct. So that one was created by the defendant and that was found on the devices that were seized when the search warrant was executed and that screenshot had been turned over years prior to the trial.

I think you should have the rest of what is said:

ER 5:21-25 - 6:1-7

It may not have had the exhibit sticker or identified as 28.13, but it was -- the screen capture that was part of the evidence that was all provided. So it was not just the video, but it was the defendant's creation of the screenshot from the video both were turned over.

THE COURT: So your position is that 28.13 was not a screenshot taken by the government, it was a screenshot taken by the defendant that existed on his computers or related devices and everything that was on those was turned over and made available, including this very screenshot?

MR. GAPPA: Yes.

ADAM ALAN HENRY on 7/16/2019 2:44:00 PM wrote
Whitney,

Good morning, about halfway through the last of the notes, it'll be the shortest, as the latter half is mostly repetitious arguments.

Two things. One, Gill got back to me, said his counselor's name is "Escalante". Thought you needed it for his visiting list, so asked him for it a while back.

Secondly, would you copy/past ER5:8-19 if possible, please? I'm curious what it says.

Thank you,
Adam

1

2        **Exhibit 5: Mr. Gappa – 687-Page Disclosure**

3

4    BOP Rejection Notice for Prior Delivery Attempt

5    Cover Letter for Delivery Dated 3/22/22

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**U.S. DEPARTMENT OF JUSTICE**

*United States Attorney*
*Eastern District of California*

*Phillip A. Talbert*
*United States Attorney*

| | |
|---|---|
| 2500 Tulare Street, Suite 4401<br>Fresno, CA 93721 | Phone  559/ 497-4000<br>Fax     559/ 497-4099<br>TTD    559/ 497-4500 |

March 22, 2022

VIA U.S. MAIL

Adam Alan Henry
71064-097
Federal Correctional Center, Lompoc
3600 Guard Road
Lompoc, CA 93436

   Re: <u>United States v. Adam Alan Henry</u>
    1:13-CR-00409

Dear Mr. Henry

  Please find enclosed additional discovery for this case. This material consists of items Bates numbered 001420 through 002107.  This is a copy of the file that Mr. Capozzi maintained during his representation of you in your criminal case.

  The government made its best effort to make the best copy of each item in the file.  If you are not able to read any of the items, I suggest you contact Mr.Capozzi's office to see whether they are willing to provide you with the original item.

         Sincerely,

         PHILLIP A. TALBERT
         United States Attorney

    By: */s/ David L. Gappa*
         DAVID L. GAPPA
         Assistant United States Attorney

Encl.
cc:

BP-A0328    **STAMPS, NEGOTIABLE INSTRUMENT & OTHER RETURNED TO SENDER** CDFRM
APR 11

**U.S. DEPARTMENT OF JUSTICE**        **FEDERAL BUREAU OF PRISONS**

| TO: (Sender - See Return Address)<br>U.S DEPT. OF JUSTICE<br>2500 TULARE ST, SUITE 4401<br>FRESNO, CA 93721 | FROM: (Institution)<br>FCC LOMPOC<br>3600 GUARD RD<br>LOMPOC CA 93436 | |
|---|---|---|
| INMATE'S NAME:<br><br>HENRY, ADAM ALAN | REGISTER NUMBER:<br><br>71064-097 | DATE:<br><br>4/07/2022 |

Check all that apply:

| | Material Rejected and Returned | |
|---|---|---|
| | **Material Rejected and Returned** | |
| Your correspondence has been examined and: | | |
| | You enclosed stamps or stamped items that cannot be given to the inmate. | |
| | You enclosed a negotiable instrument. Negotiable instruments are to be forwarded to the National Lockbox at the following address:<br>Federal Bureau of Prisons<br>[Insert Inmate Name]<br><br>[Insert Inmate Register Number]<br>Post Office Box 474701<br>Des Moines, Iowa 50947-0001 | |
| | You enclosed the following unauthorized material: | |
| | | Stationary/Blank Greeting Cards |
| | | Plant Shavings |
| | | Sexually Explicit Personal Photos |
| ✓ | | Other (specify below) |
| | The following material cannot be inspected without damage: | |
| | | Electronic Musical Greeting Card |
| | | Padded Card |
| | | Double Faced Polaroid Photos |
| | | Other (specify below) |
| Your correspondence or letter has, however, been provided to the inmate with a copy of this notice. | | |

| Package Refused and Returned | |
|---|---|
| **Package Refused and Returned** | |
| The contents of your correspondence have **NOT** been examined, however it is being returned to you because: | |
| | The inmate has failed to obtain an authorized BP-331, Authorization to Receive Package or Property. |
| | The package has not been properly marked "Authorized by Bureau Policy" in accordance with Program Statement 5800.16, Mail Management Manual, or fails to reasonably indicate the package is authorized by Bureau policy. |
| | The inmate recipient could not be identified due to missing, incorrect, or an illegible name and/or register number. |

Specific Material Returned:


PER LOX-CORRESPONDENCE,5265.14c ALL INCOMING GENERAL CORRESPONDENCE MUST CONTAIN NO MORE THAN FIVE
SHEETS OF PAPER

(Printed or Typed Name and Written Signature of Correctional Systems Officer)

A. MARTINEZ/

Record Copy - Addressee (with material); Copy - Inmate; Copy - Mail Room File.
PDF                    Prescribed by P5800          Replaces BP-328.058 of APR 94

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 6: Cover Letter and Invoice from the Office of Anthony Capozzi in RE: Attorney-Client Privileged and Work Product Documents**

Law Offices

# ANTHONY P. CAPOZZI

1233 West Shaw Avenue, Suite 102
Fresno, California 93711-3718

Phone: (559) 221-0200

Fax: (559) 221-7997

May 11, 2022

Adam Alan Henry
#71064097
Federal Correctional Institution, Low
3600 Guard Road
Lompoc, Ca 93436-2705

*RE: Adam Alan Henry Files*

Dear Adam,

As requested, enclosed is a media device with a c copy of the documents that US Attorney has recently reviewed.

A copy has been sent to Louise A. Reed to PO Box 747 Winchester, Or 79495.

Please let us know if you need anything else.

Take Care,

Diana Velasquez, *Legal Assistant to*
Anthony P. Capozzi

*Enclosures:*

Law Offices
# ANTHONY P. CAPOZZI
1233 West Shaw Avenue, Suite 102
Fresno, California 93711-3718

Phone: (559) 221-0200

Fax: (559) 221-7997

May 11, 2022

Louise A. Reed
PO Box 747
Winchester, Or 79495

RE: *Adam Alan Henry*

Dear Louise,

As requested, enclosed is a media device with a c copy of the documents that were sent to Adam.

I am also enclosing a copy of the bill from the copying service; the original price I was given was an estimate and we did not take into account the copies in color.

Please let us know if you need anything else.

Take Care,

Diana Velasquez, *Legal Assistant to*
Anthony P. Capozzi

*Enclosures:*

Valley Document Solutions
1724 Broadway
fresno, CA  93721
559-442-3522
david@virtualvds.com
www.virtualvds.com



**Valley Document Solutions**

**Invoice**

BILL TO
Diana Velasquez
Law Office of Tony Capozzi
1233 W. Shaw, #102
Fresno, CA  93710

| INVOICE # | DATE | TOTAL DUE | DUE DATE | TERMS | ENCLOSED |
|---|---|---|---|---|---|
| 33981 | 05/11/2022 | $891.81 | 05/11/2022 | Due on receipt | |

| VDS JOB# | | BILLING REFERENCE |
|---|---|---|
| 31109 | | Adam Henry |

| DATE | ACTIVITY | DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|---|
| | Imaging – Standard | Imaging – Standard Litigation – Stapled or Clipped<br>- PDF per folder (named per folder label) | 5,154 | 0.12 | 618.48T |
| | Imaging Color | Imaging – Letter Size Color – Per Page<br>- photos, charts, highlighting | 773 | 0.20 | 154.60T |
| | DVD | DVD Creation | 1 | 25.00 | 25.00T |
| | Flash Drives | 8GB Flash drive | 1 | 25.00 | 25.00T |

|  |  |
|---|---|
| SUBTOTAL | 823.08 |
| TAX | 68.73 |
| TOTAL | 891.81 |
| BALANCE DUE | **$891.81** |

The customer assures payment of invoice within 30 days of work completion. All invoices are due upon receipt. Interest at the lesser 1.5% per month or the maximum legal rate will be charged on invoices not paid in 30 days. The client agrees to pay legal fees incurred.

VDS Veltole Inc DBA Valley Document Solutions New Federal Tax Identification Number as of 5/1/2018 is as follows: 82-5045242

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 7: Emails Between Louise Reed and Miss Linder in RE:**
**Preliminary Summary of §2255 arguments**

*These are the only other emails I found with my "Whitney Linder 2255" search*

\<whitney@capozzilawoffices.com\>
**To:'Louise Reed'**
Tue, Dec 1, 2020 at 9:54 AM

Louise,

My apologies all around. Tony went in for what appeared to be a minor surgery and turned into a very serious surgery on November 13th.  He is doing better, but was only released from the hospital on November 23rd I have been scrambling to continue all his cases into the new year.

On November 9th SCOTUS issued their denial of our petition for a writ. I have attached the denial to this email. When I looked at their orders, a reason was not provided for the denial, but they do not have to give us a reason.  I have been meaning to email Adam, but things keep getting in the way. I will send him an email this morning.  Adam's next step is what is called a 2255 motion. Tony briefly gave Adam this information but did not go into great detail. There is a statute of limitations for a 2255 motion, so it should not be put off too long.

Whitney


\<whitney@capozzilawoffices.com\>
**To:'Louise A Reed'**
Tue, Dec 15, 2020 at 11:50 AM

Louise,

I spoke with Tony and the 2255 motion has to be filed one year from the date of the "last act." That being said, we have until November 9, 2021 to file the motion.

If you would like to contact Nicco you may, he has done 2255 motions in the past. He can be reached at (559) 770-7731.  Another attorney that might be willing to file the motion is my former boss, Roger Wilson. He can be reached at (559) 233-4100. Otherwise, Tony suggested that you contact Kevin Little, (559) 342-5800.  All three are excellent attorneys. Just make sure you mention Tony's name.

Whitney


\<whitney@capozzilawoffices.com\>
**To:'Louise A Reed'**
Wed, Dec 16, 2020 at 10:43 AM
Louise,

I read over Adam's notes and I think they are well focused and a very good introduction to his case.  The only comment I have about them is this, Adam does a good job of explaining that Tony had difficulty with the technology end of the case, but he fails to mention anything about the expert Marcus Lawson. In my personal opinion (which doesn't amount more than a hill of beans) I believe he was a liability. He did not help Tony understand very much. In fact I got the impression (which could be very off base) that he felt Adam was guilty and didn't attempt to help Tony with the technical stuff. Adam may know more and have a different opinion. Either way he needs to mention him and the fact that his company suffered a coup in the middle of Adam's case and he opened his own company just to finish Adam's case. He is now fully retired.

Whitney

1
2    **Exhibit 8: Personal Notes Made on 04/01/2016 About this Case, Including**
3    **Specific Notes on the Relevance of Canadian Court Records**
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Confidential*
*USA v. Adam Alan Henry*

## ADAM HENRY NOTES  4.1.16

- They say things like she "underreported her involvement" and that I may have been a victim of her manipulations." These are independent evaluator specifically trained to look for stuff like this.

- Dr. Seymour saw fit to quote or make use of a few sections, including the court docs within the soc docs saying she had framed her ex and gotten him convicted.  If the expert who's done 500+ of these evals thought it was relevant in determining whether I was guilty, shouldn't the jury get a chance to see it?

- They clearly outline that she is a predator, that she matches the profile, that she's manipulative, dishonest and deceitful.  That she will lie to anyone to get what she wants, including perjuring herself and getting her child to do the same in order to frame her ex husband for the exact same thing under similar circumstances, that I now find myself facing.

- Social worker even noted that though she "seemed cooperative and met the requirements, it was d distraction from the issues that brought her before the court."

QUESTIONS

- Putting wife on stand – good idea?  Even her shrink says she is    convincing on first meeting, takes a while so see what she really is.  Has demonstrated ability and willingness to convict husband by manipulating and lying to the jury. What if she put on her "he made me do it" she seems to be going for and the jury buys it and convicts?

- Tape measure for court clothes?

- I've been writing down stuff about facts, evidence, videos, etc. I think might be important, but I don't know what might be important and haven't had a chance to set down and get an idea of what is helpful and what isn't.  I knew

*Confidential*
*USA v. Adam Alan Henry*

the discovery and what isn't in there both left out and laying around, very well. If I can find out what types of facts, evidence, videos, etc. would help my case, I can try to come up with examples for expert to pull while we have the time.

- Why soc docs are relevant (reasons to get admitted as evidence).

- Docs point out she will do and say anything to keep herself surrounded by kids, including her own. Soc docs point out she altered her daughter's birth certificate to not list father, and judge said she got son to lie, and framed ex to keep kids.

- The next expert, would giving him the docs to be incorporated in his report help make them relevant, or risk getting report kept out of trial?

- The Canadian court docs included, the judge specifically accuses her of lying, and getting their son to lie in order to frame her ex of sex crimes, including possession of CP. Exactly the circumstances I find myself in now, about as close to an exact repeat as you can get, isn't it?

- One of their main arguments seems to be that I had to be the one who knew, while moving stuff around, because they claim she did not have the password to the NAS, as far as I can tell, this is against all evidence and based only on her saying she didn't. The social worker docs catch her in many lies, and several describe her as dishonest, deceitfully manipulative, and will to do and say anything to get what she wants and further her goals.

- Dr. Seymour's report says not only did he not think I did it, but her describes the sort of woman who would, without ever meeting her or reading her psych evals. Her evals and soc docs match her predictions perfectly. Would this not also lend credence to his conclusion that I was not involved?

- The soc docs show she's used me before to break the law, without me knowing. She describes marrying me to hide from her ex, but doesn't address the fact that they point out this was in direct disobedience to a Canadian court order.

*Confidential*
*USA v. Adam Alan Henry*

- There's a can of a handwritten statement I sent them while incarcerated. After I sent this, her first psych eval diagnosed her with exhibitionism. Doesn't that show my motive in setting it up along with her other videos?

## MISCELLANEOUS

- That she had access to NAS
  - NAS BIOS should still have individual user/pass for both her and I by name.

  - Password-protected section **named** for her. Aurrora was name of character she played in game we met in, along with Sihralni (sp.?); only names I knew her by for a couple of years or so.

  - When cooperating, logging police into NAS, had problems connecting from computer that had run camera, had to connect from my computer. Cam PC is same on recording people in bathroom, that she had laughed, said she had password, used it, in interview. She was much more used to this system than I.

  - Her computer on wireless connection to front of house so a lot slower than mine which was wired into network (100 MBps v. 1 GBps). She had mentioned she had to copy videos because trying to play them directly from NAS was slow enough the videos would stutter. This is probably why she had evidence videos on her computer. It is probably also why a thumb drive had detected contraband. If mentioned, would prosecutor retest that this makes the lack of evidence on my computer meaningless, saying I just watched without copying?

  - If I were really trying to hide such things, from wife as they say, why wouldn't I have done it on my own PC which she said she didn't use? Instead I put stuff on the NAS and left on hard drives laying around with no passwords?

*Confidential*
*USA v. Adam Alan Henry*

- Dr. Seymour's report does **NOT** differentiate between things I told him, and things the police claim I said, the bulk of which are highly twisted, if not outright untrue. This can be confirmed by the way he quotes my wife in the same way, when he had obviously not spoken with.

- What does Det. Moore say I told him different than Dr. Seymour?

- Could the way the police have omitted and twisted data be used to make not only police but prosecutor look like they are dishonest? The prosecutor only knows what police have told/given him right? So if the prosecutor, for instance, shows the screenshot of me taking down the curtain rod, say I obviously did it because I took it down, then we show whole video of it, with wife walking in and directing me, followed by vids of her measuring the window, then me helping her put curtains up, followed by pointing out that videos of her alone working with camera were getting deleted, would that type of thing undermine trust in prosecutor on other stuff?

- Wife would get me on cam, then get rid of me, most likely. Alyssa clearly says in her interview I wasn't around unless whole family was over, so days she was over, and I had alternate schedule, wife would have me do something to appear on film, then be gone before Alyssa got there, seems like.

- 17 Files, Old Computer                                                                          **17-1**
  - 17 files, date range mid-fall 2005 to mid-2008.

  - Computer installed 2007 last used in 2010, 1 year overlap.

  - Files up to 2 years older than computer. Neither this computer nor 2 older computers also in garage. Mention presence of P2P software or contraband searches in discovery. (Discovery doesn't even mention 2 computers are older. Both of which are well older than 2005.)

  - If this computer didn't download 1 year overlap files, and older ___ computers didn't download the older ones, where did files come from,

*Confidential*
*USA v. Adam Alan Henry*

if not downloaded at home?

- o Prosecutor would say at work. After all, claiming I did recently for extra bandwidth and supposed anonymity (bull, by the way), so I probably did the same back then.

- **To Refute That, Note The Following:**
  - o Until Thanksgiving Day 2005, was in a common area, not in an office. Rob Todd sat directly beside me for months, all day in view of my monitor. He's already said in his interview he'd never seen or heard anything inappropriate from me in the 8 years he'd known me.

  - o Thanksgiving 2005, shattered my knee. 1 week in hospital, 1 month in bed, not able to get up once in that time. 5 months in physical therapy learning how to walk again, first in a walker, then crutches, approximately 6 months of work. During that time, I wasn't in the office, and definitely wasn't capable of having a libido or having sex. Never even thought about it through all the pain.

  - o Several of the 17 files are dated during this period.

                                                          **17-2**

  - o One specific period, Dr. orders in medical records she orders for **another** 6 weeks off work, one file occurs in the middle of this time, May 2006 I believe it was.

  - o Some of the 17 files are time stamped when I could have been at work, others when I obviously wasn't, like the one above, others during medical leave, some outside of work hours, middle of night, etc.

  - o Since files weren't downloaded at home, how could I have downloaded files at work when I wasn't there?

  - o Prosecutor will probably say software was left running, like it sometimes was in 2013.

- **Problems with that:**

*Confidential*
*USA v. Adam Alan Henry*

- o 17 files spread fairly evenly over 3 years, 36 months, that's an average of about 0.5 files per month.

- o Police reports say they found 142 contraband files total. 17 on old computer means 125 files downloaded on work computer in 2013. Last search terms entered June 3, 2013, raid happened mid-August 2013, about 3.5 months, 100 days.

- o Another 40 or so files were still in partial files, not completed. This leaves approx. 85 files completed over approx 100 days, or 0.85 per day.

- o Note that this is not a large amount, being only approx 5% of total files.

- o During the 6 week period mentioned above, **one** file downloaded during it.

- o Ignoring 6 months off work, that it says "another" 6 weeks, focus on this one period. Since I was off work, P2P would have run for 24/7 for 6 weeks.

- o That's 1 file over 42 days.

- o The work computer, which police reports note did **not** run 24/7 over the 100 days, still averaging 0.85 files a day, would have downloaded 0.85 x 42 = 35.7 files during the time I appeared.

**17-3**

- o So not downloaded at home, not downloaded at work. So where did they come from?

- o Prosecutor might then say I downloaded the 17 manually, not automatically.

- o Problems there are:
  - o People who are interested in this sort of thing tend to do a lot more then the total number of filed I'm accused of. Dr. Seymour even notes it

*Confidential*
*USA v. Adam Alan Henry*

doesn't make sense that so few files were found. Hunting down files at an average rate of 1 file every 2 months doesn't make sense for **anything** someone might interested in, much less something like this.

o  There is absolutely no accusation, nor can there by, that I used search engines, chat rooms, forums, emails, instant messaging or anything else to search for, ask for, solicite, trade, or anything else CP.  The only place this stuff was searched for was in the P2P software on the work computer in June 2013, NOTHING before, much less all the way back to 2005-2008.

o  Also, not a single file appeared in the 17 file "kid" folder after 2008, not a single file from 2013 was so sorted, or added to the 17 on **any** device.

o  *So if they weren't downloaded at home or at work,* automatically or manually, where did they come from?  They were sorted and hidden. Obviously not an accident, someone had to do it, if not me, who? This is where evidence against wife comes in.

o  A Canadian Appeals Judge (Justice M.L. Hogan) specifically accused her of lying to a jury when she accuses him of possessing CP. (He also said she lied and got their son to lie to the jury to frame him for other sex crimes.)

o  She had accused him of having downloaded CP on his laptop, and that the police had found it. The judge noted they had not known about or seized a laptop.

**17-4**

o  In her interview with Det. Moore, when cornered about knowing more about P2P then she had admitted, she said her ex had used P2P, specifically a program called "Torrent".

o  They were married in early to mid 2005, and separated late 2008 or early 2009.  Social worker docs discuss this.

o  Their marriage exactly corresponds with the date range of the 17 files.

Her knowledge of a computer with CP on it that no one else knew was there, and that it had P2P software was installed on it.  Also, not her attempts to hide her knowledge of how P2P software works.

- o Lastly, according to her interview, her first trip out to meet me was in summer 2009, with more trips in relatively quick succession. She had full access to my computer which would have been the one with the 17 files on it, while visiting.  She would use it all day while I was at work, ostensibly to play the game we had met in, communicate with her parents and children and in general pass time until I got home.

- o The files themselves from what I can tell were hidden in an area and way I didn't do such things.

- o Also, why would I go to work leaving a person I had only recently met in person recently in full control of a computer knowing such things were on there. Especially as they accuse me of creating the password on the NAS later to hide these exact same files from her, among others?

- o *Hopefully the above shows that not only* is it unlikely that I could have done it, but that she herself quite easily could have, and in fact did the **exact** same thing to her ex-husband, just before doing it to me.

## COPYING FILES HOME                                             **Copying-1**

- The Prosecutor had said I had to know what was being copied. That I had said I went through titles, therefore had to know. Also, that I must have looked at the files themselves.

- To the first, I told the interviewing officer that I looked at file names as I was queuing them from the search terms. I specifically told him I copied the completed files home without going through them. I also said things like "if you have records of transmission then something must have come through, but how much, and if it's still in partials or completed and copied, that I don't know."

*Confidential*
*USA v. Adam Alan Henry*

- Since I did not put in the bad search terms in or add them to the queue, I would not have looked at their titles.

- *As for the claim I would not have downloaded stuff without viewing it, consider the following:*
  - o I was doing it for her, not me, why did I need to watch them?

  - o No completed files were on my work computer. All copied home, so must have been watching them at home, right?

  - o My wife and Uncle's interviews, as well as pictures all show my computer in middle of living room, monitors visible from most areas in the house. Could even see them from outside the front door, without me knowing.

  - o Kids were home before me, wife worked from home. Only time I was home alone was a couple hours a week when wife took kids to gymnastics or karate.

  - o Police have repeatedly claimed I hid the files from wife, that she didn't know, even after her recordings came up. So obviously had to watch when she wasn't around, right? Also, kids never saw anything bad on my computer. (See Social Worker reports)

**Copying-2**

  - o No one, kids, friends, random people walking up to my door, relatives, etc. ever saw a single bad thing on any computer home or work.

  - o *So maybe they suggest I watched elsewhere? Look at the numbers:*
    - ▪ As said elsewhere, approx 85 files downloaded and copied over 100 days. Since this was approx 5% of P2P files, that's 85 out of 1,700 files total, approximately.

    - ▪ But P2P was **not the only** files I downloaded during this period. What the police reports **don't** mention is I also downloaded from dozens of legal, subscription websites.

9 of _

*Confidential*
*USA v. Adam Alan Henry*

- ▪ 4 Important things about them
    1. The websites themselves were called the same search terms I entered, at times, including "mother-daughter fuck" showing I was looking for adult content, not contraband, as police and prosecutor say those terms imply.
    2. I downloaded and copied them during the same time frame that the P2P software was using.
    3. The fact that they were **all** adult, and comprise a wide range of subject matter matches what I told interviewing officer about looking for "a bit of everything" and that I was casting a wide net but only expecting or wanting adult.
    4. More files were downloaded and copied from websites than P2P.

- o *So as above, approximately 1,700 files were downloaded over 100 days, 85 tying to CP, at approx. That's 17 files total, 0.85 CP, per day.*

- o Let's say each video is an average of 20 minutes. 17 / 3 = 5.6. That would be 5.6 hours **per day** downloaded, 17 minutes of which would be CP.

- o I couldn't even pretend to work if I was actually going through all that for 3 ½ months straight. Nor could I go through it the 2 hours a week I was home alone.

**Copying-3**

- o Heck, those numbers don't take into account the website downloads, which would at least double the total time, since I'm sure their were more of them, without adding CP, since they were all legal sites, and I saw the sites, so she couldn't have done anything there.

- o That would put us at 17 minutes of CP, 11.2 hours total per day.  That doesn't factor weekends, either. When would I have time to go through all that?

*Confidential*
*USA v. Adam Alan Henry*

- o On the other hand, my wife was home alone every weekday for 7 hours straight while the kids were at school. Pictures show her office desk in a back room, behind a lockable door, with the backs of the monitors to the door, so no one could see her screens, as opposed to everyone seeing mine. She could have watched anything, anytime, with no one knowing.

- o I also specifically told the police I wasn't going through it. I was taking it home for wife to go through while kids were at school.

- o The officer in my interview said "you know we can check if these files are viewed" when I said I hadn't viewed them, I responded "of course." There is no mention or accusation for files being viewed anywhere in discovery. (Expert discussed elsewhere.) I was fully cooperative and tried to always tell the truth as I knew it at the time. That and did nothing to hide tracks anywhere else, why would this have been different? Wife on other hand admitted to knowing computers, has been repeatedly caught lying and downplaying knowledge, might well have hidden her viewing.

- o Also, I did the same file integrity check on the website downloads that I did on the completed P2P downloads, so the flags that the expert said made them "may have been viewed" would also apply. But there is way too much to have actually watched between the two. Also, I did not check the integrity of the partial files, no point since they weren't ready to be moved, police reports said some were viewable, so why couldn't I have?

## PRIOR TO BATHROOM CAMERA                                     **Prior-1**

- • The Prosecutor will probably say that blindfolded women and the camera in prior residence means I'm likely to surreptitiously record, so cam must have been me.
  - o First off, the one blindfolded woman they keep mentioning is the one the police didn't talk too or it was obvious they knew. Out of 5 different blindfolded women, the talked to one, who said not only did she know,

*Confidential*
*USA v. Adam Alan Henry*

she had done another video with me, and been in threesomes with me and my ex-fiancé. Others obviously knew.

- o So they didn't contact her, just said in discovery she didn't know. This one we also met on AFF (Adult Friend Finder), a site specifically catering to introducing people with kinks. Threesomes and blindfolds are even checkboxes of searchable kinks.

- o Police noted my wife did most of the searching on AFF. My wife's phone will have a contact called "AsiaAFF" which is the woman in this video. Expert can cross reference video dated with text messages, probably show my wife setting it up, as well as at least one prior.

- o I believe she knew, on the basis of the type of women wife liked, and AFF in general, no reason to think otherwise, though at this point, it wouldn't have been the first time my wife had lied to me.

- As to camera in former residence, ex- fiancé knew about it, police note she looked directly at it, wasn't clear whether she knew or not. But they didn't ask her. They talked to her if her mom and friend knew about it, but not her because they didn't formally want to know, easier to accuse me?

- o I don't know if she remembers or would be too embarrassed to admit it, but she liked being in front of the camera, in a variety of ways.

- o The police gloss over home movies of us stretching from 2006 to 2010. The first person in bath cam was her in 2008, then her mom on the same day, then her friend in 2009.

1
2      **Exhibit 9: Personal Summary/Roadmap of Preliminary §2255 Arguments**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

x

The main argument of the prosecution boiled down to these: That on Count 1 I conspired with my wife, and on Count 2 that I downloaded the files at work, hid them at home behind a password my wife did not have, and had downloaded other files years previously on a computer found in my home. The prosecutor did admit to the judge in court that the evidence was all circumstantial.

There was a lot of evidence that was left out, denied, ignored, or just plain invented by the prosecution, but I'm told for 2255 only a few things matter. I'll try to omit most of my own frustrations and keep to the large, demonstrable things, but there is a lot more behind what I will spell out that I'm simply not sure of the usefulness of.

On Count 1, there are 2 issues to bring up here. One is that my attorney forgot to get my wife's cell phone record admitted into evidence and couldn't use them. Among them, on the day she recorded herself setting up a camera and using it, were some texts to me at work. At around 11am she texted me asking if I was going to be at work all day or coming home early. I replied all day, that I had a meeting at 2pm. I asked if she had any plans, she said no, none. She then proceeded to text AT, invite her over, set up the camera, and record her at about 1:30. Instead of a conspiracy, she made sure I wouldn't be home, and when asked about plans, she said none instead of mentioning anything, no matter how obliquely.

The second thing on Count 1 is the issue of jurisdiction. Part of the count requires a link to "interstate commerce". The only such link the prosecution attempted to establish was a camcorder the police found. On the stand the detective admitted there was nothing related to the case found in it's memory, but said that his testing of it showed it created files like those that my wife had recorded of herself, and that the device was manufactured overseas. After cross, the judge said there was not enough evidence to say that the camcorder was involved and ordered the jury to disregard the testimony. Without that testimony, there was no evidence presented in the trial, or in any of the Bates, to establish the interstate commerce requirement of Count 1. I tried to explain this to my attorney, but either I didn't make myself clear or he just didn't get it, because in the appeal he did mention it in the miscellaneous section, but didn't broach it properly as a jurisdiction issue. I spent some time on the phone with his paralegal, spelling it out step by step, and after she understood it she explained it to my attorney. He did clarify it in the response to the prosecution's reply to our appeal, but the appellate judges said he brought it up to late and "declined to consider" it.

On Count 2, several issues requiring a bit of background. There were 3 main devices under discussion at the trial. A disassembled computer found in my garage that had been in use roughly between 2005 and 2010. A file storage device with a password-protected section, also at home. Lastly my computer at work, with 2 hard drives in it, one in use from roughly 2011-2012 and the other continuing from 2012 to the search warrant in 2013.

The computer from 2005 had the Shareaza software on it as well as contraband files in a separate area. In the superseding indictment, the detective testified a different program had downloaded the files than the Shareaza program found on the computer. When questioned about this in cross, the detective said something like "new evidence" was found saying that it was Shareaza after all. I don't remember how he verbally danced, but I believe an argument could be made that he lied on the stand there. A large chunk of his testimony and the prosecutor's argument was that I downloaded files on this computer before I met my wife, and therefore it was me and not her who downloaded the newer ones, while my defense was that I had not downloaded any of them. First off, in regards to Shareaza downloading them on the 2005 computer like the detective on the stand and the prosecutor claimed, the Bates had analysis of the

Shareaza program from all 3 devices I mentioned above. The report from the most recent one at work showed search terms used, and history of contraband files, notably including files mentioned at trial as having already been removed from Shareaza's folders prior to the search warrant. This means that the program "remembers" search terms used and files downloaded even after they are no longer within the purview of the program. The report of Shareaza from the 2005 computer shows no evidence at all of any illegal activity or files, current or old. There was even an email from the detective to the prosecutor appended in the Bates clearly stating that the files found on the 2005 computer were not downloaded on it, but on "some other device" which they never found. In fact, none of the devices in my possession, including the 3 analyzed with Shareaza, downloaded any of the files until my work computer in May of 2013, in spite of the detective's testimony and prosecution's repeated claims, and the email shows they both knew it. My attorney did not bring up any of the reports or the email.

To explain how files with dates preceding my wife by years got on the 2005 computer, my attorney on cross asked the detective a few questions that I had worked out with him. The detective finally admitted that files can retain the dates and timestamps linked to them when carried from on device to another. The detective then volunteered the statement that this was "more common in Windows XP". The detective's own report on that computer indicated it WAS Windows XP, therefore more "common", that it was entirely plausible she could have brought the files later when she started coming out and the files would retain the date she downloaded them. This would explain how they got on my computers without me having any part of it, and without them being downloaded on any of my computers. Neither the report nor the connections were brought up.

The prosecution also claimed that the files had to have been put on the 2005 computer before my wife first came out to visit. My defense was that my wife must have brought them out with her sometime before the computer was last used. Cell phone text records that were not brought up showed that she was visiting at least 3 months prior to the last-used date. Also, in her interview, she specifically told the officer she had spent 2 months at my place 9 months before the date the 2005 computer was last used, and visited roughly every other month until she moved out permanently. We tried to subpoena my wife, but she pled the 5th since her trial hadn't happened yet (and still hasn't to this day). We couldn't use her interview directly, but my attorney was able to and did ask several "are you aware" questions of the interviewing officer. However he did not bring up the cell phone records or ask the officer if he was aware of her visits to establish her access to my house and the computer over the better part of a year. All of this combined would have helped establish that I did not download the files, they were brought onto my computer from a device I didn't have, with a 9 month time window allowing my wife to have done it, and potentially that the detective lied on the stand, but none of it was brought up, nor the relevant Bates brought into evidence.

For the work computer, the prosecutor claimed I downloaded the files found on it. My defense was that my wife did. My attorney and the prosecutor at one point deposed a coworker of mine with line of sight into my office. I had given my attorney some questions to go over. Among them he asked about my wife's presence in my office. The witness said he saw my wife alone in my office, at my desk, from about 1pm to 4pm every day in the latter half of May 2013. The prosecutor got him to say he didn't actually see her hands on my keyboard, which he couldn't see from that angle, but that she was definitely at my desk during those time frames. This deposition was played for the jury.

There were police reports done on 3 hard drives containing the Shareaza program in the Bates; the 2005-2010 computer did not download anything, as mentioned. Neither did the 2011-2012 hard drive (disconnected) in my work computer. The 2012-2013 hard drive at work was the only one that had

downloaded illegal files. I had told my attorney about all this before trial, both verbally and in notes, but he did not bring up any of it. This is important because the report of the computer that did download the files clearly showed that the timestamps of every single illegal file show that they were told to download over a 3 day period at the end of May, between 1:30 pm and 3pm, exactly when the witness testified that my wife was alone in my office. Collectively, this shows that of the 8 years I was demonstrably using this program (2005-2013), the only time any illegal files were downloaded on any device in my possession was within the 2 week period, during the exact time of day, that a witness who didn't know about these reports specifically remembered my wife alone in my office, sitting at the computer that downloaded them. Also, the detective that lied on the stand was the one who wrote all these reports, but testified otherwise anyway. None of this was brought up.

Later, the detective testified that the files were copied remotely from my work computer to my home computer. When I got my attorney to cross reference the times they were copied with cell phone and company calendar records, it showed I was at work when someone at my house was copying them. The prosecutor's response was to argue that the company calendar was inaccurate. Every time a timestamp was shown during the police reports and trial for when one of these files was downloaded or moved, it exactly matches a location where my wife is alone, without me, even with almost a decade of history using this program. But almost none of this was brought up.

Lastly, the files that were copied to my house from my work computer were stored behind a password-protected section of a storage device. The prosecutor argued and the detective testified that my wife did not have that password, that I stored the illegal files there to hide them from her.

During my interview, I had said she had the pass, and it was played during the trial, but the prosecutor argued that I misspoke. But there was a few things my attorney did not bring up. First off, the same detective who testified that she did not have the password was the same officer who did the forensic analysis of both the storage device and the cell phones. On the storage device, also behind the password, were family vacation photos and other things not found anywhere else that it would have made no sense to hide from my wife. The illegal files were literally a fraction of a percent of the total data there. More importantly, in my wife's cell phone records (that I mentioned earlier, my attorney forgot to get admitted), she texted me at work one day, asking me to "remind" her of the password, that she remembered the letters and numbers, but not the symbols. Further, the officer who interviewed my wife kept repeatedly catching her displaying advanced knowledge of what was behind the password, saying things like "you know an awful lot about it" getting a response "I'm sure he gave me the password, I just forgot it". Again, we couldn't play the interview, but my attorney did not ask him if he was "aware" of her knowledge.

Those are the most potentially useful things I can think of, though of course I don't know for sure, with no legal training. My attorney's paralegal mentioned that since my wife's trial is scheduled to start soon, she might not be able to hide behind the 5th by the time 2255 came up, and we could use more. All I know is that all of this came from the officer's own evidence, interviews, and reports to the prosecutor, so they KNEW I didn't do it, and testified/argued contrary to their own facts, and since the evidence was never mentioned, they got away with it.

I voluntarily took several psych evals and a polygraph, passing all of them. Social Services ordered my wife to undergo a psych eval and she was diagnosed as a "rare" female "sexual deviant". She framed her ex-husband for child abuse and sexual assault, and he was able to clear himself only on appeal. (The jury never heard any of this either.) In spite of all this, I'm doing 20 years of federal time for something I

didn't do and had no knowledge of, while she has custody of our son and is free, pending trial in state court, a short sentence, and deportation back to Canada. Her case isn't federal because as the prosecutor told my family "it's too hard to convict women in these cases." I'm innocent, but I'm male, so I'm here and she's free. This isn't justice.

Thank you for your time and consideration.
Adam Henry

1

2 **Exhibit 10: Timeline of Events With 2009 Angele Visit to California**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Confidential*
*Attorney Work Product*

*USA v. Adam Henry*

ADAM HENRY TIMELINES

Device Timelines

17 files – "~~xxxx~~" folder *As Kids*
Date ranges 2005-2008

Recording Computers
Used with ex-fiancee 2006-2010. Recorded her
mother in 2008, friend in 2009. Wife started
using to record AT in 2012.

*None* of these devices would have gateway IP
addresses configured, or **any** email, P2P or
other transfer-capable software configured.
Production indictment requires that I 'know" or
have reason to know the depictions would be
transported." *Not Possible.*

Windows 7   **Item #** 16
In use 2007-2010

| External HDD backup **Item #** Copied 2010  16 | Old/New house in use 2006-2013  **Item #** 13 | |
| External HDD backup **Item #** Copied 2012  7 | New house in use 2013  **Item #** 8 | NetgearNAS   **Item #** ~~18~~ 9 |
| NetgearNAS   **Item #** ~~18~~ 9 Copied 2012 | | Loose thumb drive deleted videos of A.T. Item #  11 6 |

Older PC's

Expert doesn't have, police
reports don't mention in-use
dates, just "no evidence
related to the case."

P2P downloads

Work PC   **Item #'s 1A and 1B**
In-use 2011-2013

P2P CP downloads start May 28, 2013 thru SW

| Linux 2004?   **Item #** 14/15 | | NetgearNAS   **Item #** ~~18~~ 9 In use 2012-2013 |
| XP? 2003?   **Item #** 14/15 | | |

References
1. Justice Quigley court file No.  R-10-40000268-000 released 5/3/2011, heard March 2010
2. Justices Weiller, Blaid, and Rouleau, Court of Appeal Docket C5 4307, released 5/28/2013
3. Justice Hogan, regarding assault charges on son, released 10/12/2012
4. LNS company calendar
5. Police Reports
6. Cellebrite cell phone records
7. R.T. interview
8. A.T. interview
9. Angele's interview
10. CPS reports to court
11. Files on Netgear, expert can confirm

**1997**
Angele and ex met when she was 18. (1 pg. 7) Their relationship "quickly became sexual" and she "felt free to explore other aspects of her persona that he said included an interest in bisexual sex." (1 pg. 12)  Their "sexual relationship was initially conventional...however it quickly started to expand." (1 pg. 3)  "This included fantasy role-playing, such as a 'teacher/student' or 'daddy/daughter' dynamic." (1 pg. 3)  "Sexual-role playing was claimed to be a central part of their relationship." (1 pg. 4)

"She had been sexually assaulted as a pre-teenager and, although she did not like the experience, there were aspects of it she wished to explore further." This resulted in some of their more aggressive role-playing. (3 pg. 6)

"The teacher/student type scenario would take place 2-3 times a week, and centered around power and dominance of the teacher over the student leading to intercourse." (1 pg. 13) Note her PTA membership, teaching jobs.

**Dec. 31, 2003**
Angele marries Adam Pearce. (1 pg. 13)

**June 2005**
Adam Henry begins working at Lock-n-Stitch (LNS) within a week or so of R.T. We became friends. (4 pg. 7)

**Oct. 25, 2005**
Angele and Adam Pearce's son Aiden is born. (1 pg. 7)

"Their sexual relationship was interrupted by the birth of their son on 10/25/2005 and their daughter on 9/21/2007. (1 pg. 14)

They engaged in role-playing "particularly prior to their marriage and the birth of their two children." (1 pg. 12)

They "had a good marriage until their son was born." When she became "a stay-at-home mother." (1 pg. 7) This was after she left her job at a daycare. (10)

**Nov. 2005**

*Item 16*

The first of the 17 files in the ~~kid~~ folder was created. (5) Less than a month after their son was born, ending her 2-3 times a week role-playing minors, as well as her job at a daycare.

**Summer 2006**

Adam build's computer, used consensually with my then fiancee at least twice during this summer.  Consensual videos with her range from 2006-2010. In the middle of this time frame, this computer recorded two other women. I mother in 2008 and her friend in 2009.  Later in spring 2012, Angele asked me to set up this computer for her exhibitionism, similar to what my ex wanted it for, only Angele preferred recording herself alone. She ended up using it to record A.T. and others, instead. (5 pg. 11)

**Sept. 21, 2007**

Angele and her ex's daughter, Siobhan, is born. (1 pg. 7)

**Dec. 2007**

Sometime "before Christmas but after Boxing Day"… "they had sex that involved a 'daddy/daughter' scenario.  It was triggered by Angele allegedly calling him 'daddy' during sexual foreplay." (1 pg. 15)  Note: she does this just 3 months after daughter's birth.

**Aug./Sept. 2008**

*Item 16*            *downloaded*

The last of the 17 files from the ~~kid~~ folder was ~~created~~. (5)  Only a month or so before she begins child custody battle and accuses her ex of raping her.

**Oct. 10 & 20, 2008**

Angele obtained an order from family court granting her custody of their two children, restraining him from having any contact.  The order was granted 10/10/2008.  When her ex became aware of the order, he sought a variation. On 10/20/2008 it was varied to allow him supervised access.  She went from family court to the police station and there accused him of raping her 8 months previously, "on or about 2/8/2008." (1 pgs. 7, 29; 3 pg. 11)

During the trial for this accusation, pictures of her in bondage were entered into evidence. She insisted the pictures "were taken by (him), not her, and at his instigation." She said "she was not comfortable with the bondage." (1 pg. 10)  This statement is demonstrably untrue, as evidenced by home movies, her interview, and her text conversation with Krista.

Her ex's response to this claim was that the photos "originated at her instigation." That "she did so by way of a remote control cable trigger." (1 pg. 13)  Which makes more sense, given her obvious and diagnosed exhibitionism, I believe that his, combined with finding the computer my ex and I

used might be where she got the idea of using a remote control camera to take videos in a fashion to blame me for them.

**May 2009**

Her ex was out on bail pending trial on the rape charge, and had supervised visits with the children still. She accuses him of assaulting their son, on one of these visits. He was eventually acquitted during the [assault] trial. It was later submitted to the Ontario Court of Appeals on the rape case that "constitutes compelling evidence that the complainant exhibits a pattern of bringing false charges against him." (2 pg. __)

The [Appeals] court also noted "the trial judge wrote that the complainant does seem to have a tendency to dramatize, both in her evidence at trial and in her victim impact statement." (2 pg. 28)

In h[er] notes Justice Hogan noted her "account of what son said to her regarding what had happened was considerably exaggerated compared to what son said." (3 pg. 5) "This indicates to me that there may well have been an agenda on Angel's part." (3 pg. 6)

There are also documents where the justice notes that she also accused him of having CP on his laptop, claiming the police had seized it and found it. The justice notes that no such laptop had been seized. Note that this would have been the same computer she said in her interview that she learned how to use P2P software on, after getting caught lying in order to hide her knowledge of P2P. The charges were leveled just a few months after the last of the 17 "kid" files were created. I believe the existence of this computer lines up the timeframe of the "kid" files, her learning to use P2P and the reasons for hiding it, as well as demonstrate yet another pattern of brining false charges, in this case downloading CP on her spouse's computer, in order to get away with it if/when found. The court does say he "heard submissions" on 9/7/2012, 3 ½ years later. Perhaps she practiced and "dramatized" her testimony to the point she forgot they hadn't actually seized the computer she'd downloaded it on. Obviously she isn't having that problem with me, though she is still getting caught repeatedly in lies and dramatizations.

**2009**

This is the year she made her first visit to me our here. (9) When she arrived, she used my computer to keep in contact with her parents and children in order to avoid long-distance costs, as well as to pass time while I was busy or working. That computer was the one in use from 2007-2010, seized from my garage, where the "kid" folder first appeared, there is at least a year overlap between her first visit in 2009, and when the computer stopped being used in 2010, during which she made several visits, according to her interview. This would have given her plenty of time and opportunity to bring out the "kid" files, which had a date range of 2005-2008, and hide them on my computer without me knowing.

Note that there is also at least a year overlap between the "kid" files (2005-2008) and the computer (2007-2010) namely 2007-2008. Yet the files were not downloaded on this computer, nor were they found on ay of the 3 other computers that were in use prior to 2007 that the police seized.

So their origin on my side is questionable, yet line up with times and statements on her side.

**~~July~~Aug. 2010** *(July)*

Another of Angele's visits.  This is the first visit where we made home movies.  (11)  One of them took place a few feet from my desk. Sitting by my desk, with her there, in ~~Aug.~~ 2010, is the computer in use from 2007-2010 demonstrating sufficient overlap, and giving her opportunity.

**Jan. 2011**

The first visit where she brought the kids to see if we could work as a family.  We took them to Disneyland, took pictures which will be behind the password on the Netgear. (11)

**July 2011**

After several more visits back and forth, this is when she moved out here permanently. (6 pg. 9)

Within 4 days of her getting a phone, and a week or two of moving out, she's trying to get the Todd's over for dinner.

    Angele:  "I have kept meaning to ask about food for tomorrow..."
    Adam:  "Ask them their preference?"
    Angele:  "They said the same thing..."  (6; 7/17/11)

**Nov. 2011**

Angele's first recorded text conversation directly with A.T.'s phone.  At this point, I'd known R.T. for over 6 years and had never once, to this point or even after to my arrest, directly contacted A.T. via _any_ medium.  It took Angele less than 6 months. (6; 11/21/11)

**Jan. 2012**

6 months after she moved out, and she is surrounding herself with children and children's activities, while I'm at work.

We started the business in my name in Dec. 2011 because she couldn't without a SSN, and we needed the income.  She used it to teach art classes to children at the local school, park, an dour home during the day.

    Adam:   "Work on your website?"  (6; 1/3/12 & 1/4/12)
    Angele:  "Are you able to sign into the site to print off applications and forms?"

Note the side implications of her computer skills that she's building "her" website, with skills she hadn't had time to learn here.  Also that the website, and the business itself by inference, were "hers."

She's also in charge of the "walking club" for students at the local elementary school.

    Angele:  "Walking club canceled..."

Adam:   "...helps make sure no one catches up to the laps done by the son of the person running it, hmm?"

~~Angele~~: "...teasing, don't think you'd stop for such a petty reason." (6; 1/3/12)

Walking club also used a very advanced excel spreadsheet to calculate and track student's progress. The expert can find this on her computer further demonstrating her computer skills were above average.

She's also trying to get her daughter into gymnastics. She gets both kids in, and is almost always the one who takes them, except for 2 occasions where she was ill. More time around women/kids.

Angele: "I think we can totally get Taba into gymnastics over ballet." (6; 1/3/12)

**April 2012**

By now she's not just bringing the Todd's over for dinner, but hanging around A.T. and S.T. without me or R.T.

Angele: "Was at the park with Sherri and the kids for an hour, now we're back at our place. Just a heads up in case they are still here when you arrive." (6; 4/11/12)

Angele: "Rob's not here so I'm going to hang out for a bit...perhaps 30 min to an hour." (6; 4/20/12)

Angele starts recording A.T. in our bathroom in May. So this is the month before, but we're not exactly "conspiring." She's letting me know in case they are still there when I get home, that's it.

**May 2012**

By now, she's also joined the PTA, and is using local school to pass out fliers for her children's art classes.

Angele: "Just finished PTA meeting, now handing out the last of the flyers to schools." (6; 5/3/12)

This is also the month she starts recording A.T. in our house. (5) She has the opportunity because A.T. was helping her teach art classes, and was at our house a lot more than I knew.

Angele to A.T.: "It's odd going so long when I saw you twice a week all summer." (6; 8/26/12)

**June 2012**

So she's now got A.T. hanging out at our house during the day while I'm at work, and has begun recording her.

Angele: "Alyssa is hanging out for the day, so please don't get mad if nothing gets done."

Confidential
Attorney Work Product                                       *USA v. Adam Henry*

Adam:     "Wow, you must really think I'm an ogre."  (6; 6/5/12)
Angele:  "You ok if I harbor Alyssa again?"
Adam:     "Doesn't bother me at all, you done with errands for the day?"  (6; 6/13/12)

If I knew she was recording A.T., if I'd been conspiring with her for less than a month to get this kid into our house, why would she be asking if not to get mad, or if I was ok with A.T. being over?  Not much of a conspiracy if she's worried about me being mad just a couple weeks into it.

**July 2012**
Angele and I have a conversation about her needing to work, going to have to borrow $4k for taxes that we didn't know about. This conversation is the beginning of what led me to agree to the daycare.

Angele:  "Guess what we owe in taxes on this place?"
Adam:     "Oh no"
Angele:  "4 grand"
Adam:     "We just HAVE to get your paperwork done, we can't keep putting it off."
Adam:     "4k for a years taxes wouldn't be bad, if you were working.  (6; 7/24/12)

**Aug. 2012**
More worrying about money, possibly losing our house, and pics/convo all while at baseball game. (6; 8/18/12)

**Nov. 2012**
Needing the money, I've agreed to the daycare, as it will take a lot less time than her citizenship paperwork.  She's started the classes/lectures she needs to operate it. I am not attending them as I won't be part of it.

Angele:  "Just got a reminder call, I have another one of those child care lectures 6:00-8:00 tonight."  (6; 11/14/12)

About now is when we would have been planning which rooms would be dedicated to the daycare.  It was to include the bathroom where her camera was. I told her I'd be pulling it out when I had the time, before the daycare went operational. I didn't know what she'd been doing with it, and no way she could argue with me finding out.

**Jan. 2013**
This is when she recorded A.T. in our bedroom, while I was at work. (5, 8)  It happened only a month or so after the conversation about removing the camera. I now believe she was looking for an alternative. I believe that having to record herself setting the camera up made implicating me less likely, so she did not do it again.

This is also when the cellebrite records practically cease, leaving 7-8 months (now until SW in Sept.) missing. ← found messages

**Feb. 2013**

This is when she became pregnant with our son, born 10/22/2013.  Shortly after finding out she was pregnant, our sex life started declining.  As she describes, sex during her pregnancy sometimes caused discomfort, and I was extremely loathe to do anything that hurt her. She started talking about adding "spice." (7, 9)  This is apparently very similar with what happened to her ex. Eventually she talked me into downloading adult movies for her.

**April 2013**   4/6/13

The last video of A.T. was recorded in our bathroom. (5)

**~~May~~ 2013**  4/24/13

The last video (an adult) was recorded in our bathroom.  I pulled out the camera during a 2 ½ week vacation I took during May. (4)  I had the time, and she was getting close to getting her daycare license.

She was still doing the art classes, and was still bringing A.T. over during the summer.  If I was wanting to record minors, or conspiring with her to do so, why would I pull the camera right before she went on summer break and started coming over more frequently? Or before the daycare went operational and even more kids were over?

**~~June~~ 2013**  5/28/13 - 6/3/13

The CP downloads start on my work computer, just after we return from vacation.  The CP terms and those with them were added after the adult terms I had put in for her.  The added terms start after an obvious break, and a term in French, which she spoke and I did not. The terms interspersing the CP terms reflect her interests, both obvious and stated. For instance "corset" she made numerous exhibition videos wearing one, and also got A.T. to try one on in the video she recorded. (5, 11)  Another was related to renaissance faires. While on vacation I took her and the kids to their first one. She was intrigued even going so far as to sew costumes for the whole family, including, of course, a corset for herself. Then the term shows up, added with the CP after we get back. During this time, witnesses put her at my desk while I was elsewhere, giving her the opportunity.

Again, logically, if I was looking for/conspiring for CP, why would I remove the camera at home that apparently was unnoticed to download it at work with absolutely no attempt to hide it, in spite of my extensive skills at networking, and security?

Why would I use P2P for at least ~~2 ½~~ years at work before suddenly deciding to commit a crime on it?

**Aug. 2013**

The daycare goes operational, gets its first client mid-month. (5, 9)

**Sept. 2013**

State Search Warrant, arrest.

*Confidential*
*Attorney Work Product*                                                  *USA v. Adam Henry*

I think what happened to me has obvious parallels and originated with her and her ex. She got pregnant, sex life declined, in both cases.  Also, in both, she lost other "sources."  Her camera with me, her daycare job to be a stay-at-home mother with her ex, CP terms were added on to my P2P program, and it seems to his as well. She used a remote camera in each case, blaming her spouse for the results. She gets caught lying about evidence in each case, with the apparent goal of getting her spouse convicted while she walks away to do it again. She has violated court orders and perjured herself. (10)  Also, in both cases she is confident of her ability to talk her spouse into going along with her role-playing and verbal fantasies, then presents them as evidence of her spouse's guilt. (1, 2, 3, 9, 10)

1
2    **Exhibit 11: Letter from Angele's Defense Counsel in RE: No Liam Contact**
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Stanislaus County**
Striving to be the Best

1021 I STREET, SUITE 201
P.O. BOX 3428
MODESTO, CALIFORNIA 95353-3428
Phone: (209) 525-4200
Fax: (209) 525-4244

OFFICE OF
**THE PUBLIC DEFENDER**
SONNY SANDHU
PUBLIC DEFENDER

February 8, 2019

Adam Alan Henry
71064-097
FCI LOMPOC
Federal Correctional Institution
3600 Guard Road
Lompoc, CA 93436

Dear Mr. Henry,

    I am the attorney representing Angele Henry in her matter pending in Stanislaus County Superior Court. Please be advised that due to the ongoing nature of Ms. Henry's case, I have advised her not to speak to you or any of your representatives, family members, etc. until her case has concluded.  Thank you for your understanding.

Sincerely,

Jennifer Jennison
Deputy Public Defender
Stanislaus County



NAME:    ADAM HENRY
PT#:     28329

Adam is now four months status post left tibial plateau
fracture. He is actually doing well. He is ambulating now
without crutches. However, he says he gets sore at the end of
the day and has difficulty standing for long periods of time.

He is increasing his activities and trying to do his
exercises, but he complains of decreased range of motion to
that left leg.

**PHYSICAL EXAMINATION:**
On exam, the wound is well healed without any evidence of
infection. He still has some generalized swelling with mild
warmth. He has some global mild tenderness along the
hardware, but no _____ of fracture. His range of motion
comes out to full extension and he flexes to about 100 degrees
I think. He says he can get farther, a little bit, when he is
warmed up. When he ambulates he does so with a vaulting gait.
He really does not come up on his toes and walk with a normal
gait. He is unable to do single toe raises or single heel
raises on that side.

**X-RAY FINDINGS:**
X-rays show excellent evidence of healing and the hardware to
be in place.

**ASSESSMENT/PLAN:**
Mr. Ward now just really needs to work on range of motion,
especially strengthening of the quadriceps. I gave him some
exercises to do and he should continue with his therapy.

I will keep him off work, disabled, for the next six weeks
until I see him.

*BRAD ZWAHLEN, M.D.*

BAZ/jj
Dictated Not Read

R: 03/24/06
T: 03/27/06
Doc#BZ0322

Curious texts

482 From: +14169700346 11/14/2010 12:39:06 AM(UTC+0) Read Whats the number in your pasword on your comp? I remember the word not the number. 2) you gona be home soon? Like next 30 min?


462 Inbox From: +12096788993 Angele Brennan 1/3/2012 4:56:38 PM(UTC+0) Read What's my list of honey dos for today? Intact
463 Sent To: +12096788993 Angele Brennan 1/3/2012 4:59:49 PM(UTC+0) Sent No idea. Finish the laundry, walk the dogs, exercise yourself, work on the house and your web site? Maybe do some of those Eve quests? Or procrastinate, take a nap, and play Sims? ;)

625 Sent +12096788993Angele Brennan* 2/5/2012 12:24:12 AM(UTC+0) Sent How's class? Intact
626 Inbox +12096788993 Angele Brennan* 2/5/2012 12:25:48 AM(UTC+0) Read Good. He's a really great instructor. My class mates are a young hot blond mother and her twin daughters just turned 20. So all in all, enjoying the company and the view.

826 Inbox +12096788993 Angele Brennan* 4/11/2012 10:10:14 PM(UTC+0) Read Was at the park with Sherrie and the kids for an hour, now we're back at our place. Just a heads up in case they are still here when you arrive.

846 Inbox +12096788993 Angele Brennan* 4/21/2012 1:16:35 AM(UTC+0) Read Robs not here so I'm going to hang out for a bit...perhaps 30 min to an hour Intact
847 Sent +12096788993 Angele Brennan* 4/21/2012 1:17:35 AM(UTC+0) Sent Have fun. I'll make sure to kick the girls out before then. Intact
848 Inbox +12096788993 Angele Brennan* 4/21/2012 1:26:02 AM(UTC+0) Read Or take pictures and tell them I'll be joining in

885 Inbox +12096788993 Angele Brennan* 5/3/2012 6:19:34 PM(UTC+0) Read Meh. Afraid to eat, feeling nautilus. I am drinking though. Just finished PTA meeting, now handing out the last of the flyers to schools. Then I will head home to relax before hitting your honey dos list.

992 Inbox +12096788993 Angele Brennan* 6/13/2012 6:04:13 PM(UTC+0) Read You ok if I harbor alysa again? Intact
993 Sent +12096788993 Angele Brennan* 6/13/2012 6:05:01 PM(UTC+0) Sent Doesn't bother me at all. You done with errands for the day? Intact
994 Inbox +12096788993 Angele Brennan* 6/13/2012 6:07:37 PM(UTC+0) Read What were they again? I didn't clean yet...no I didn't do any thing but get the kids fed and ready, go to sherrie's and calm alysa down, go to the firer station and we are heading back to her house now. Intact
995 Sent +12096788993 Angele Brennan* 6/13/2012 6:14:03 PM(UTC+0) Sent That's what I meant, the running around stuff. Calm her down from what? Intact
996 Inbox +12096788993 Angele Brennan* 6/13/2012 6:16:42 PM(UTC+0) Read Being a teenage girl Intact
997 Sent +12096788993 Angele Brennan* 6/13/2012 6:17:02 PM(UTC+0) Sent Hehe

Curious texts

336 Sent +12092770087 Todd Alyssa* 8/26/2012 12:11:47 AM(UTC+0) Sent Soooo excited to see you guys tomorrow! Feels like forever. Intact
337 Sent +12092770087 Todd Alyssa* 8/26/2012 12:14:15 AM(UTC+0) Sent It's odd going so long when I saw you twice a week all summer. So why is school only fine?

1977 Inbox From: +12096788993 Angele Brennan 1/13/2013 10:18:49 PM(UTC+0) Read Teen drama is hurting my head Intact
1978 Sent To: +12096788993 Angele Brennan 1/13/2013 10:21:44 PM(UTC+0) Sent But I know how much you LOVE drama. Intact
1979 Inbox From: +12096788993 Angele Brennan 1/13/2013 10:25:04 PM(UTC+0) Read Yup Intact
1980 Inbox From: +12096788993 Angele Brennan 1/13/2013 10:32:11 PM(UTC+0) Read My head hurts...can you drive home? Oh wait, I came with a 14 year old. Intact
1981 Sent To: +12096788993 Angele Brennan 1/13/2013 10:32:54 PM(UTC+0) Sent That much fen, hrm? Intact
1982 Sent To: +12096788993 Angele Brennan 1/13/2013 10:33:04 PM(UTC+0) Sent Fun, rather. Intact
1983 Inbox From: +12096788993 Angele Brennan 1/13/2013 10:33:06 PM(UTC+0) Read Yup Intact
1984 Inbox From: +12096788993 Angele Brennan 1/13/2013 10:33:38 PM(UTC+0) Read You would had LOVED this..NOT

736 Sent +12092770087 Todd Alyssa* 8/4/2013 1:03:01 AM(UTC+0) Sent Hay sweetheart, new date for mom and teen show is Friday August 9th. Need you to get at least 3 friends and their moms to attend. I would love it if you could get Broke's mom and Haily and mom, so want to meet them and really get to chat!!

# MEMORANDUM

=================================================================

**TO: Tony Capozzi**
**FROM: Whitney Linder**
**DATE: August 6, 2015**
**RE: Adam Henry Juvenile Dependency (Case No.: J07119)**

=================================================================

Tony:

I scanned and reviewed the Dependency report concerning Liam Alan Henry which Adam gave you on 8/5/2015.  Here are some key points that I found regarding Angele Henry.

- The report was authored by Michael Blalock, San Joaquin County Human Services Agency/Children's Services Bureau 102 So. San Joaquin St., P.O. Box 201056, Stockton, CA 95201-3006, (209) 468-1220.

- The report begins by summarizing the police reports written by Dets. Art Hively and Britton Moore.  They detail the 2 arrests and investigation into the Child Pornography ultimately found on the computers at Lock-N-Stitch and the Henry's home computers.

STATUS REVIEW REPORT

- Page 5:

    - "Recordings about 30 sec long in which Mrs. Henry appears to be testing the lighting and angles of the camera in the bathroom."

    - "Video of Mrs. Henry entering the tub waving at the camera and blowing a kiss to the camera as she exits."

    - "...Mrs. Henry setting up a camera on a shelf in her bedroom and then Mrs. Henry assisting the fourteen year old victim try on a bustier..."

    - "...Mrs. Henry can be observed turning [the victim] towards the camera."

- Page 6:

    - "[Angele Henry] advised that she enjoyed watching adult pornography on the computer involving females being dressed up, mild bondage, and role play."

    - "[Angele Henry] advised she was the more adventurous one..."

- o "[Angele Henry] informed Det. Britton of the adult Websites she used and admitted to having a subscription to the adult pornography website, Sex and Submission."

- o **Evidence Against Angele Henry:**  Angele had participated in setting up the concealed camera used to capture video of confidential victim #1 while she undressed several times and showered in the nude; concealed camera in her bedroom and later coercing victim to undress in front of the concealed camera; screen shots from videos which depict Mrs. Henry assisting with the set-up of the concealed cameras prior to capturing video of the victim #1.

- o Mrs. Henry stated she knew about the video equipment in the home, had helped set it up for her and her husband's personal use and did not know her own child was filmed.

- Page 13:

  - o Dr. Johnson of Parents United stated: "Given the progress she made, we recommend reunification with her child."

- Page 15:

  - o Mrs. Henry presented as an intelligent, well spoken, and educated individual. [Stanislaus County Child Protective Services] is hard pressed to believe Mrs. Henry was not aware of [Mr. Pearce's] appeal and favorable outcome, especially given her current husband, Mr. Adam Henry, acknowledged to his Stanislaus County Court Social Worker he was aware Mr. Pearce had successfully appealed his charges and been found not guilty.

- Page 16:

  - o Justice Mary L. Hogan, Ontario Court of Justice, states in her opinion dated October 12, 2012, regarding the allegations of physical abuse by Adam Pearce, "[t]his suggests that there may well have been an agenda on Angel's part to distance Aidan from Adam and his family."

  - o "...the above lends to the Agency's perception that the mother's actions and behaviors to seem somewhat of a distraction and/or diversion tactic of the actual events which bring her children before the Court."

  - o "...she failed to keep the father informed of her travels with their children outside of their country and also in her establishing a residence in a foreign country."

  - o "...she married Mr. Henry in San Joaquin County in the event that Mr. Pearce tried to learn of her and children's whereabouts..."

- "It seems Mrs. Henry may be minimizing her role in the child pornography she and Mr. Henry engaged in. Mrs. Henry has stated the cameras in the family home were for her and her husband's private use. However, law enforcement records allege the contrary."

- "It appears appropriate she participate in a psychiatric evaluation to determine what specific treatment would be needed and/or provided to her in her reunification efforts.

- Dr. Philip S. Trompetter, Ph.D. psychological evaluation dated May 31, 2015, states in part: "Ms. Henry is under advisement by her criminal defense attorney to be circumspect in her discussions with me regarding the alleged criminal conduct.... Nevertheless, it would have been helpful if the truth or falsehood of the allegations was already established."

- **Page 17:**

  - Dr. Trompetter's assessment of Angele Henry: "Exhibitionistic Disorder is highly unusual in females. The criteria for diagnosis, however, fit Ms. Henry.... Ms. Henry demonstrates the essential features of this disorder, and given it's rational linkage to behaviors that resulted in Ms. Henry's arrest, an additional treatment goal for her reunification should include targeted treatment for this disorder."

  - "Stanislaus County's position...Mr. Pearce was involved in the proceedings through no fault of his own...it [is] ordered that sole legal and physical custody of the children, Aidan and Siobhan be given to the father, Adam Pearce."

  - Angele Henry's L.C.S.W., L.M.F.T. Mike Klemin has "completed two sessions, including Sexual Addiction Screening Test and Post Traumatic Stress Index. Mr. Klemin felt that 'Ms. Henry's Exhibitionism disorder does not pose a threat to her child and her behaviors are not compulsive but stem from PTSD and co-dependency issues.'"

- **Page 18:**

  - Mrs. Henry is "taking online classes for graphic design, attending psychology education classes at Parents United, and attends meetings at AMAC (Adults Molested As Children).

  - Recommendation: "this case be dismissed without prejudice and the mother be granted full physical and legal custody of her minor son, Liam Henry.

CASE PLAN UPDATE

- **Page 24:**

  - *2. Express anger appropriately and no not act negatively on your impulses.*
    "Mr. Klemin shared that thus far he feels that Ms. Henry's Exhibitionism disorder
    does not pose a threat to her child as he feels her behaviors are not
    compulsive..."

- **Page 26:**

  - *5. Comply with medical or psychological treatment.* Dr. Philip S. Trompetter,
    Ph.D. wrote, "her incongruent enjoyment in discussing many of the difficulties
    she has experienced may be related to other forms of exhibitionistic dynamics
    that have contributed to this situation." Exhibitionistic Disorder "criteria for the
    diagnosis, however, fit Ms. Henry..." **"I have no reason to believe that <u>Parents
    United or Sierra Vista personnel</u>, like me, have the necessary training and
    education to successfully treat this condition."**

[NOTE:  Mike Klemin and Francine Ortiz both work for Sierra Vista and Dr. Johnson works for
Parents United.]

- **Page 28:**

  - <u>Child-Parent Visitation</u>:  Father is currently incarcerated in Bakersfield **awaiting
    permanent assignment**.  Visitation will be quarterly in the form of cards, letters,
    or pictures.

- **Page 29:**

  - <u>Social Worker-Parent Contacts</u>:  "Social worker to complete monthly compliance
    contact with mother to ensure case plan engagement, progress and compliance.
    **If the mother were to move out of the county, and/or become incarcerated out
    of the county, monthly compliance can be completed by telephone and/or
    letter."**

[NOTE: There is **NO** Social Worker-Parent Contact planned for the Father!!]

1  warrant was served at the workplace of Adam Henry. Child pornography was located on the work

2  computer, and on a password protected computer in the Henry's home which was subsequently

3  searched. Adam Henry is being prosecuted in Federal Court for the child pornography located on his

4  work computer, accessible only by him, and for the child pornography images located on his password

5  protected partition of the home computer. This involves the 20 terabytes of data which is not evidence

6  against the Defendant in this case.

7      Images of Jane Doe and John Doe were found on the home computer accessible by the

8  Defendant. Images were recovered that showed the Defendant herself manipulating the camera, blowing

9  kisses at the camera, checking the lighting for the camera, and also showing her breasts to the camera.

10  Images of Jane Doe and John Doe with exposed genitals were recovered from the home computer, as

11  clearly taken by the hidden camera in the guest bathroom. Images of Jane Doe in the master bedroom,

12  with the Defendant manipulating her toward the camera and exposing her breast were also located on the

13  home computer accessible by the defendant in this case.

14  
15  

**LAW AND ARGUMENT**

I

THERE IS NO GOOD CAUSE TO

DEVIATE FROM PD AND CONFLICT APPOINTMENTS.

18      Under Penal Code Section 987.2 (d), the court **shall** first utilize the services of the public

19  defender to provide criminal defense services for indigent defendants. In the interest of justice, a

20  court may depart from that procedure **if there is good cause** and stating the reasons on the

21  record. Thus, the court should subject the indigent Defendant to representation by the public

22  defender unless they can make a sufficient show of good cause.

23      In assessing the appointment of counsel, the trial court can consider the subjective wishes

24  of the Defendant and objective factors regarding counsel and the matter itself. Purely subjective

25  issues, such as a defendant's preference for, trust of, or confidence in, a specific attorney is

26  insufficient to warrant appointment of requested counsel. (*Drumgo v. Superior Court* (1973) 8

27  Cal. 3d 930.)

    In *Harris*, the trial court abused its discretion in denying defendants' request to appoint

28  attorneys of their choice where defendants had been represented by those attorneys in related

29  prosecutions, substantial amounts of time and effort would be required of new counsel to attain

2

---

1  necessary factual and legal background, new counsel supported defendants' plea that they not be

2  appointed and defendants had personal preference for attorneys of their choice based upon trust

3  and confidence developed over substantial period of time. (*Harris v. Superior Court* (1977) 19

4  Cal. 3d 786.)

5      In the present case, substantial amounts of time and effort would not be required for a

6  new counsel. The People charged the Defendant with four counts.  Unlike in *Harris*, that

7  Defendant was charged with thirteen counts total:  one count of aggravated kidnapping with

8  bodily harm, one count of simple kidnaping, one count of robbery, nine counts of assault with a

9  deadly weapon, and one count of felony false imprisonment. Further, in *Harris*, there were two

10 defendants with competing interests in the outcome. The Defendant faces no such obstacles in

11 this case. Thus, the present case, is substantially less complex than the *Harris* case.

12     The Statement of Facts submitted clearly show the present case is not complex. The

13 Defendant touched Jane Doe with lewd intent. The Defendant set up a hidden camera that filmed

14 Jane and John Doe's exposed genitals. Lastly, she retained the hidden camera footage within a

15 computer tower and storage device that she could access.

16     Adam Henry, the Defendant's husband shielded the Defendant from the 20 terra-bytes of

17 child pornography. Adam Henry is being prosecuted Federally. The defendant is not charged

18 with the possession of child pornography found on her husband's work computer network nor

19 the password protected portion of the home computer. The Defendant here befriended minors,

20 set up cameras, adjusted the cameras and/or the minor to the desired position and made sure

   there was sufficient light. Thus, it is unlikely a substantial amount of time or effort is required to

   familiarize oneself with the case.

21     The Defendant has not shown that prior counsel refused to take or re-take the case. In

22 *Harris*, the public defender filed a motion showing a conflict of interest. The Defendant, in this

23 case, failed to show a conflict of interest prevents the public defender from taking the case.

24 Further, the public defender did not request that Stephen L. Foley take the case on their behalf.

25 The Defendant argued she trusts and has confidence in Stephen L. Foley. However, as noted in

26 *Drumgo*, (*supra*) trust and confidence are subjective and alone are not determinative.

27     The Defendant argued that Stephen L. Foley spent three years reviewing the Defendant's

28 case. The People's evidence spent half of a day in hearing. There are 5 witnesses for the People.

29 The evidence is not overly burdensome. The large quantity of child pornography associated with

3

1    outlines my treatment for childhood trauma, domestic abuse during my marriages, sex

2    offender treatment, parenting classes, Post Traumatic Stress Disorder, distress in trusting

3    others, and healthy communication in relationships.

4  8.   I have great difficulty trusting others so that I am asking the Court to appoint Mr. Foley to

5    represent my because I am unable to pay him for his services and it would be traumatic to try

6    and forge a bond with a new lawyer at this late stage.

7  9.   I would have to spend a significant amount of time to develop a bond with a new attorney and

8    I would like to get this case concluded as quickly as possible.

9  I declare under penalty of perjury under the laws of the State of California, that the foregoing

10  is true and correct except as to those matters stated on information and belief, and as to those matters,

11  I believe them to be true.

12    Executed this _20_ day of January, 2017, at Modesto, California.

13

14

Angele Henry,
Defendant
TO BE SIGNED IN COURT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

*Confidential*
*USA v. Adam Alan Henry*

## ADAM HENRY LETTER 7.18.16

Whitney,

Because we are limited on both time and money for Lawson, I am including a brief explanation of what each thing is for, so Tony can judge if it might be helpful/needed. There is more than this, but this should be enough to get Lawson started. Also, I don't remember the associated evidence numbers, but if you reference my notes (the thicker packet with the table of contents) there is a section describing all the evidence that will give you the evidence item numbers and associated bates numbers. Again, only a <u>partial</u> list, of time consuming items. I'll have to give the rest to Tony when we go over my notes.

Thank you.

- Cellphones (Hers and mine, a 3rd phone was older and duplicate of data)
  
  - Full conversations prosecutor keeps mentioning. (baseball game, wife talking about minor sunbathing, wife talking about karate instructor, etc.) I don't remember verbatim, but I think they might have edited what they presented, removing some comments.

  - Show frequency any type of contact of each phone with Rob, Sheri, Alyssa and Bobby Todd, especially after first SW 9/19/13. Will show I never even attempted to contact any member of the family but Rob, my friend/co-worker, and that very rarely. I didn't even have contact info for the minors. My wife was in almost daily contact, mostly while I was at work. Also, after first SW wife tried pretty desperately to re-establish communication.

  - Look through phone text history, especially note to conversations with pictures.  Before my wife cajoled me into "people-watching", I never took a simple picture of a stranger. Afterwards, were conversations with her. Police/prosecution omit several talking about women our age, and one I talked about the inappropriateness of a minors attire in a store.

- My PC (Police Notes say "nothing related to the case was found.")
  - Confirm no facebook, email, google searches, etc of any minors, attempts to contact, etc. This PC was used to look at legal stuff on TV, history will reflect that, but never used to look at or talk to minors in any form or venue.

  - Email exchange account configuration will show a highly encrypted connection to the office using a self-signed SSL certificate I created over a HTTPS connection. Hopefully, this will help demonstrate my knowledge of secure and encrypted communications, making the way the contraband was received to be nonsensical for me to have done intentionally myself.

  - Confirm through the email account, etc. that this is my home PC. In the discovery, when the Detective didn't find anything on this computer, he started referring to the Netgear as "his personal computer" even after interviews and the SW refer to it as a server. Tony was surprised when I told him that MY personal computer had nothing on it, and that the Netgear the Detective claimed was my PC wasn't a PC at all, but a server accessible by both of us.

- My Work PC
  - Confirm presence of "AVS" video editing software, and its use. It should be installed on both hard drives, 1A and 1B. Discovery talks about the videos recorded at the house as being upwards of an hour or two long, with only a couple minutes having any activity. One of my work duties was creating/editing videos for DVDs, Youtube, imbedded web-site videos, etc. If I was responsible for the home videos, wouldn't I have edited out all the dead air to conserve hard drive space, as well as not hunt through 2 hours of video for a couple minutes every single time?

- Wife's PC (2 of them, she was in process of migrating to new one.)
  - Pull facebook, email, etc. contacts. Show contact with minors.

  - Look up police reports "only adult evidence related to the case was found." What evidence? Discovery doesn't say **anywhere**.

*Confidential*
*USA v. Adam Alan Henry*

Presumably some home videos, but either way, links to her computer to the case whereas mine had nothing on it. Need to find out exactly what it is, where it is, and also **where else** it can be found. Hopefully can use this to prove beyond any doubt she had access to Netgear password.

- o Look up alternate PC login under minor's name "Alyssa." How often and when was it used? Police discovery doesn't mention it at all, but I remember her talking about it. More of wife tying minor to herself.

- o Look for knowledge of computers applied to her activities involving minors:
    - ▪ Web design software she used to create a web-site for "Art in the Park", daycare, etc.
    - ▪ Advanced Excel spreadsheet she used for "Walking Club."
    - ▪ Documents created in Word, etc. for pamphlets, banners, etc. She obviously had more than a passing familiarity with computers, and she used it to attract and talk to minors in a variety of ways and places.
    - ▪ Quicken/Quickbooks tracking Art & daycare finances.

- • Netgear
  - o Make sure new copy is accessible, had to have police resend because Lawson couldn't access the data. I have a list of things to get off this. Want to make sure its functional now rather than finding out later that it isn't.

Whitney —

Because we are limited in both time and money for Lawson, I am including a brief explanation of what each thing is for, so Tony can judge if it might be helpful/needed. There is more than this, but this should be enough to get Lawson started. Also, I don't remember the associated evidence numbers, but if you reference my notes (the thicker packet, with the table of contents) there is a section describing all the evidence that will give you the evidence item numbers and associated Bates numbers. Again, only a partial list, at time-consuming items, I'll have to give the rest to Tony when we go over my notes.

Thank you.

★ Cell phones (Hers and mine, a 3rd phone was older and duplicate of data)

— Full conversations prosecutor keeps mentioning. (Baseball game, wife talking about minor sunbathing, wife talking about karate instructor, etc.) I don't remember verbatim, but I think they might have edited what they presented, removing some comments.

— Show frequency and type of contact of each phone with Rob, Sheri, Alyssa and Bobby Todd, especially after first SW 9/19/13 Will show I never even attempted to contact any member of the family but Rob, my friend/co-worker, and that very rarely. I didn't even have contact info for the minors. My wife was in almost daily contact, mostly while I was at work. Also, after first SW wife tried pretty desperately to reestablish communication.

— Look through phone text history, especial note to conversations with pictures.

Before my wife cajoled me into "people-watching", I never took a single picture of a stranger. Afterwards, were conversations with her. Police/prosecution omit several, talking about women our age, and one I talk about the inappropriateness of a minor's attire in a store.

\* My PC (Police notes say "Nothing related to the case was found")
— Confirm no Facebook, email, google searches, etc. of any minors, attempts to contact, etc. This PC was used to look at legal stuff on TV, history will reflect that, but and I never used to look at or talk to minors in any form or venue.
— Email exchange account configuration will show a highly encrypted connection to the office using a self-signed SSL certificate I created over a HTTPS connection. Hopefully this will help demonstrate my knowledge of secure and encrypted communications, making the way the contraband was recieved to be non sensical for me to have done intentionally myself.
— Confirm through the email account, etc that this IS my home PC. In the discovery, when the det. didn't find anything on this computer, he started refering to the Netgear as "his personal computer" even after interviews and the SW refer to it as a server. Tony was surprised when I told him that MY personal computer had nothing on it, and that the Netgear the Det. claimed was my PC wasn't a PC at all, but a server accessible by both of us.

\* My work PC
— Confirm presence of "AVS" video editing software, and its use. It should be installed on both hard drives, 1A & 1B. Discovery talks about the videos recorded at the house as being upwards of an hour or two long, with only a couple minutes having any activity. One of my work duties was creating/editing videos for DVDs, Youtube, imbedded web-site videos, etc. If I was responsible for the home videos, wouldn't I have edited out all the dead air to conserve hard drive space, as well as not hunt through 2 hours of video for a couple minutes every single time?

**\*Wifes PC** (2 of them, she was in process of migrating to new one)

— Pull Facebook, email etc contacts, show contact w/ minors.

— Look up police reports "only adult evidence related to the case was found." What evidence? Discovery doesn't say anywhere. Presumably some home videos, but either way, links her computer to the case whereas mine had nothing on it. Need to find out exactly what it is, where it is, and also where else it can be found. Hopefully can use this to prove beyond any doubt she had access to Netgear password.

— Look up alternate PC login under minor's name "Alyssa." How often and when was it used? Police discovery doesn't mention A at all, but I remember her talking about it. More of wife tying minor to herself.

— Look for knowledge of computers applied to her activities involving minors:

   — Web design software she used to create a web-site for "Art in the Park", daycare, etc.

   — Advanced Excel spreadsheet she used for "Walking Club,"

   — Documents created in Word, etc for pamphlets, banners, etc. She obviously had more than a passing familiarity with computers, and she used it to attract and talk to minors in a variety of ways and places, ~~and tracking~~

   — Quicken/Quickbooks tracking Art/daycare, finances.

**\* Netgear**

   — Make sure new copy is accessible, had to have police resend because Lawson couldn't access the data. I have a list of things to get off this, want to make sure it's functional now rather than finding out later that it isn't.

Adam Henry
Big 161 2750
P.O. Box 872
Ciesno, CA 93712

93711-371827

ANTHONY P. CAPOZZI
ATTORNEY AT LAW
1233 WEST SHAW AVENUE, SUITE 102
FRESNO, CALIFORNIA 93711

SACRAMENTO CA 957
15 JUN 2016 PM31



RECEIVE
JUL 1 8 2016
R



## ADAM HENRY NOTES 3.16.16

Would not asking for last of discovery leave room for appeal, since we've already asked for <u>all</u> of it, and they've still withheld and destroyed some?

MISCELLANEOUS

- Tony keeps pointing out that we don't have to prove me innocent, they have to prove me guilty.  ON the production charge, he talked to the prosecutor, who said they aren't going after me for the knowing part, but that it was done one items manufactured / shipped from out of state, 90% odds that is the case, but don't they have to still prove it? Nowhere in any discovery does it mention which of several cameras or computers found were included in various recordings, much less any investigation as to where they originated. So are they allowed <u>some</u> assumption of guilt or when we get to trial can we point out that it's hard to prove me guilty if you don't even investigate the requirements of the charge itself? This goes to everything else this detective has done during this case to arbitrarily lay blame at my feet while ignoring or glossing over facts and his own investigative procedures.

At what stage does the chain break down? Laws are supposed to be reasonable, right? If a part was purchased, made/shipped across state lines, alright, but what if the part was acquired locally, second hand? What if the entire product was made here, but a component was made elsewhere? Or some copper used in its manufacturing came from elsewhere? Where does the chain end?

Almost every single part I got used, second hand. If a client/work computer, camera, etc. was replaced/upgraded, rather than throwing away parts I can't re-use or re-sell since they are used, I end up collecting stuff I use here and there, building computers, cam for wife, etc. Discovery specifically notes piles of old computer parts, cams, etc. in garage. I acquired almost every single one locally, used, through this job or a previous one. THEY acquired them out of state in most cases, some I even bought for the company before they later ended up in my possession, but I acquired them locally.

Not that the police would know this. As I said, the discovery makes no mention anywhere of even determining which parts were used, much less where they came from, so how can they prove guilt?

Unless its considered a fait accompli and the allegation is enough, or the law is loose enough they can interpret it to include as many times removed as they need, but even then, isn't the burden of proof on them?

Would this help? I mean, along with other examples, their entire case is built on assumptions like this, where they either ignored evidence or stopped investigating, presumably so they wouldn't have to report what they found. Or they doctored the police reports more than the once I found evidence of. Either way, they are obviously relying on shock and emotional knee-jerk reaction to garner a conviction rather then evidence. Would putting light on that tactic nullify it?

A lot of the stuff that the police have omitted/ignored, it seems the prosecutor is as uninformed as Tony is. Could that be used to blindside them, throw them off balance during trial?

- They are saying 142 files total. It was 5% of the files downloaded during the 3 ½ month period P2P was downloading. That doesn't even take into account the files I had, which combined no CP at all, that had been accumulating for 15 years or so. One folder alone, which was not part of the downloaded files, was mentioned in the police reports as containing "over 3,000" legal, adult files. That's another folder the CP would be 5% of. Add that to the downloads, it goes down to 2.5%, just by files mentioned in police reports. There are a lot more files like that. Probably on the order of 15,000 – 20,000 legal files, so less than 1%. Someone looking for this stuff would not have that few or that proportion of files. Nor 15 years of legal files, a few months of not.

- New psych report? Updating Dr. Seymour with her psych reports?

- The police reports were very careful not to list which home computer was who's, except for claiming the server was my personal computer, when they knew it wasn't, probably.  This in spite of my wife's interview describing which ones she accused, and who's they were. This can be confirmed by the expert based on facebook logins, etc. I believe Det.

Henry Notes 2 of 4

Moore omitted this, not even telling the prosecutor, because it points toward my wife, not me. Every single computer my wife said she accessed had evidence related to the case on it. They don't mention it, but I know my wife's computer even had a login for the minor she was grooming! When Det. Moore asked if she accessed the one that had been used to record minors, <u>before</u> they found the videos, she <u>laughed</u> and said of course she had the password and used it. In fact the only computer she said she <u>did not</u> access was mine. Which she described as such, which was the only personal computer in use that did not have evidence related to the case on it.

- FBI Agent Lucas said in his report that the federal investigation was comprised almost exclusively on Det. Moore's investigation. Det. Moore edited reports, ignored instructions from the Federal DA, refused to hand over discovery, ignored and omitted evidence, all I believe I can prove and all in an effort to implicate me. I know the feds only file charges when they believe they have a slam dunk case, but when that case relies exclusively on a local officer's agenda, and the federal officers and prosecutors are given a skewed and edited version and not even of all of it, how can they accurately judge my guilt?

- Social worker docs listed the kids birthdays, reinforcing timeline of her framing ex and bringing the 17 files to my computer. Birthdays match marriage which in turn match _____ range of files.

- They listed my computer as "not containing evidence related to the case." It is described as my computer that on one else used by me, my wife, and my uncle. Doesn't the fact that my computer had nothing on it evidence itself? Why didn't they rate it was mine? Why have they tried so hard to repeatedly claim the NAS was my "personal computer" instead? Why did they not hand it over in discovery in spite of rules, in spite of being specifically asked for "all discovery" for almost 2 years? The same with several other pieces of discovery, including my wife's computers as well as phone logs.

- Moore specifically said most people who do this so it as often and as soon as possible, even to the point of saying they do it while on bail after being arrested for the same crime. He even used this as a key point for the federal SW, saying he "expected" to find file a mere 2 months after

Henry Notes 3 of 4

my first arrest, because he knew I had a computer. So if that's all it takes to "expect" files, 2 months and access to computers, why is there only 17 files over a 3 year period, followed by 5 years of no downloads at all? At the very least, wouldn't I have been downloading concurrently with the bathroom ca, since I probably had P2P installed during that time? Yet like every other bit of contraband, it only appeared immediately after my wife got access to a devise, <u>NOT</u> immediately after <u>I</u> did.

Would not asking for lost of discovery leave room for appeal, since we've already asked for _all_ of it, and they're still withheld and destroyed some?

Misc

- Tony keeps pointing out that we don't have to prove me innocent, they have to prove me guilty. On the production charges, he talked to the prosecutor, who said they aren't going after me for the knowing part, but that it was done one items manufactured/shipped from out of state, 90% odds that is the case, but don't they have to still prove it? Nowhere in any discovery does it mention which of several cameras or computers found were involved in various recordings, much less any investigation as to where they originated. So are they allowed _some_ assumption of guilt or when we get to trial can we point out that it's hard to prove me guilty if you don't even investigate the requirements of the charge itself? This goes to everything else this detective has done during this case to arbitrarily lay blame at my feet while ignoring or glossing over facts and his own investigative procedures.

At what stage does the chain break down? Laws are supposed to be reasonable, right? If a part was purchased, made/shipped across state lines, alright, but what if the part was acquired locally, second hand? What if the entire product was made here, but a component was made elsewhere? Or some copper used in it's manufacturing came from elsewhere? Where does the chain end?

Almost every single part I got used, second hand. If a client/work computer, camera, etc was replaced/upgraded, rather than throwing away parts I can't re-use or re-sell since they are used, I end up collecting stuff I use here and there, building computers, cam for wife, etc. Discovery specifically notes piles of old computer parts, cams, etc in garage. I acquired almost every single one locally, used, through this job or a previous one. THEY acquired them out of state in most cases, some I even bought for the company before they later ended up in my possession, but I acquired them locally.

(Continued →)

Not that the police would know this. As I said, the discovery makes no mention anywhere of even determining which parts were used, much less where they came from, so how can they prove guilt?

Unless it's considered a fait accompli and the allegation is enough, or the law is loose enough they can interpret it to include as many times removed as they need, but even then, isn't the burden of proof on them?

Would this help? I mean, along with other examples, their entire case is built on assumptions like this, where they either ignored evidence or stopped investigating, presumably so they wouldn't have to report what they found. Or they doctored the police reports more than the once I found evidence of. Either way, they are obviously relying on shock and emotional knee-jerk reaction to garner a conviction rather than evidence. Would putting light on that tactic nullify it?

A lot of stuff that the police have omitted/ignored, it seems the prosecutor is as uninformed as Tony is. Could that be used to blindside them, throw them off balance during trial?

— They are saying 142 files total. It was 5% of the files downloaded during the 3½ month period P2P was downloading. This doesn't even take into account the files I had, which contained no CP at all, that had been accumulating for 15 years or so. One folder alone, which was not part of the downloaded files, was mentioned in the police reports as containing "over 3,000" legal, adult files. That's another folder the CP would be 5% of. Add that to the downloads, it goes down to 2.5%, just by files mentioned in police reports. There are also more files like that. Probably on the order of 15,000-20000 legal files, so less than 1%. Someone looking for this stuff would not have that few or that proportion of files. Nor 15 years of legal files, a few months of x

—New Psych report? Updating Dr. Seymour with her psych reports?

—The police reports were very careful not to list which home computer was who's, except for claiming the server was my personal computer, when they knew it wasn't, probably. This in spite of my wife's interview describing which ones she accessed, and whose they were. This can be confirmed by the expert based on Facebook logins, etc. I believe Det. Moore omitted this, not even telling the prosecutor, because it points toward my wife, not me. Every single computer my wife said she accessed had evidence related to the case on it. They don't mention it, but I know my wife's computer even had a login for the minor she was grooming. When Det. Moore asked if she accessed the one that had been used to record minors, before they found the videos, she laughed and said of course she had the password and used it. In fact the only computer she said she did not access was mine, which she described as such, which was the only personal computer in use that did not have evidence related to the case on it.

—FBI Agent Lucas said in his report that the federal investigation was comprised almost exclusively on Det. Moore's investigation. Det. Moore edited reports, ignored instructions from the federal D.A., refused to hand over discovery, ignored and omitted evidence, and all I believe I can prove, and all in an effort to implicate me. I know the feds only file charges when they believe they have a slam dunk case, but when that case relies exclusively on an local officer's agenda, and the federal officers and prosecutors are given a skewed and edited version, and not even of all of it, how can they accurately judge my guilt?

→ Sex worker docs list the kids birthdays, reinforcing timeline of her framing ex and bringing the 17 files to my computer. Birthdays match marriage which in turn match date range of files.

→ They listed my computer as "not containing evidence related to the case." It is described as my computer that no one else used by me, my wife, and my uncle. Doesn't the fact that my computer had nothing bad on it evidence itself? Why didn't they note it was mine? Why have they tried so hard to repeatedly claim the NAS was my "personal computer" instead? Why did they not hand it over in discovery in spite of rules, in spite of being specifically asked for "all discovery" for almost 2 years? The same with several other pieces of discovery, including my wife's computers as well as phone logs.

→ Moore specifically said most people who do this do it as often and as soon as possible, even to the point of saying they do it while on bail after being arrested for the same crime. He even used this as a key point for the federal SW, saying he "expected" to find file a mere 2 months after my first arrest, because he knew I had a computer. So if that's all it takes to "expect" files, 2 months and access to computers, why is there only 12 files over a 3 year period, followed by 3 years of no downloads at all? At the very least, wouldn't I have been downloading concurrently with the bathroom cam, since I presently had P2P installed during that time? Yet like every other bit of contraband, it only appeared immediately after my wife got access to a device, NOT immediately after I did

Confidential                                           USA v. Adam Henry
Attorney Work Product                                  February 28, 2017

### ADAM HENRY PERSONNAL NOTES

Here's a sorted list of the things we need to get/do per Tony.  I've tried to put in details and locations where possible to make things easier to find.  I also sorted this list so it might be a bit more coherent then the notes Tony made while going through what he did and did not want.

Evidence item numbers we need to get or make sure we have:

State Search Warrant at work:   Item **1A**  Pretty sure we have this   *hard drives from my*
~~1B~~  No idea if we have this   *computer*

State Search Warrant Home:
Item 3 – My PC
4 – Wife's PC – *need*
5 – Wife's PC  *need*
7 – External Hard Drive – No idea if we have this.
8 – PC from bedroom
~~9 – Netgear NAS~~
11B – Thumb drive – No idea if we have this.
~~13 – PC from garage – pretty sure we have this~~
14 – PC from garage – We DO NOT have this
15 – PC from garage – We DO NOT have this
16 – PC from garage – No idea if we have this
~~18 – loose hard drive – No idea if we have this~~

*1/22/14 letter sent asking for all digital evidence Bates 626*

**\*\*Cell phone records.**  We've been asking for these since January 2014.  The copy the finally sent in October 2016 has 6 plus month gaps in several different places, and entire missing contacts. Need the **complete** cell phone exports.  *cellebrite*

**TO DO LIST:  (Not Expert)**

1. Need a copy of the Canadian court documents where the justice discusses my wife talking about CP.  Apparently her ex does not have this document nor was Whitney able to get it in their online archives. The **only** place I have seen it was in a report from the Stanislaus CPS to Stanislaus Family Court.  This was early to mid-2014 I believe, and definitely before the case was moved to San Joaquin County.  Apparently, they got it through CPS channels.  It was around 3-5 pages, if I really and I believe it was written by Justice Hogan. It seems like a lot of their family court docs get locked down, like ours, and the only way this one got out was because it was CPS asking. I imagine we'll have to get it from Stanislaus County, but whether CPS or family court would be easier I don't know.

2. Not mentioned anywhere in police records or discovery, but in my office I had a Maxtor Black Armor external hard drive and wireless capable PC's the size of paperback books

*Confidential*
*Attorney Work Product*

USA v. Adam Henry
*February 28, 2017*

that I had installed around the facility. My uncle should be able to confirm, and give pictures and hopefully model numbers so the specifications can be looked up. Police in SW talk about people who "routinely" do this use hidden and encrypted devises to avoid capture. The Maxtor is a hardware level encrypted drive and the book PC's were wireless capable when had had access to 9 warehouses and tens of thousands or square footage it could have been hidden. Both were sitting in my office, yet neither used.

3. Witnesses
   A. Amber Brennan – Character reference known her around 25 years, literally since she was born.
   B. David Triffo – Character reference known him over 15 years, was my employer for 4 years or so before LNS. Knows my knowledge and skill set with computers, networking, and the internet. Could speak to the nonsensical nature of me doing this the way it was done. Also, saw me around his kids and step-kids for many years, including 2 step-daughters who were 7 or 8 or so when I went to work for him, and are now grown with kids of their own. So he can also speak to me not showing any undue interest in minors.
   C. David Silva – saw my wife in my office at my computer doing the time frame the CP terms were entered.
   D. Adam Pearce – wife's ex-husband, can speak to all the things she did to him, especially her years-long interest in minors in the form of role-playing. Not to mention her duplicitous and manipulative nature.


TO DO LIST: (Expert)

1. My work computer contained 2 hard drives, 1A and 1B. Have expert confirm presence of video editing software, AVS. Also, if possible, that it was never used to open, view, or edit any of the contraband files.

2. Also from 1A and 1B, pull the settings from the P2P program of both drives. Confirm that shared folders have been removed, and that upload bandwidth and simultaneous upload settings have been crippled.

3. My home PC, item 3. Confirm that it is my PC, easiest way is probably that my work email is configured in outlook. Also check outlook account settings to show I had built company email server to use a self-signed SSL certificate to create an encrypted connection tunneling through HTTPS. That this shows an advanced knowledge and awareness of encrypted communications that was employed for email, when the contraband was not hidden or obscured at all.

4. Also from 3, confirm my PC had no attempts to find, look at, or talk to minors through Facebook, Google searches, etc.

5. Also from 3, the porn terms I had entered in P2P are as follows in order:

> "Brandi Belle", "mother-daughter", "mother daughter fuck", "ffm", "amatuer", "teen", and "libertines".

The police have claimed that the "mother daughter" and "teen" terms are CP related. ON my PC, item 3, my wife and I had looked at a website called searchgalleries.com. The expert should be able to confirm from the web history that all these terms are adult, legal subjects found in categories on this site, or websites found through it. The "mother daughter" website is also "ffm" related, which is why the search terms were entered together. Hopefully this should show that not only are they adult subjects, but that I **knew** they were adult and was not looking for CP.

6. Items 14 and 15. Need the "in use" date ranges from the drives when they were installed, and when they were last used.

7. Items 4 and 5. Need to confirm that these were my wife's PC's. She was migrating from one to the other. Confirmation can probably come from outlook email accounts, facebook accounts, etc. Need to confirm presence of the following, if able to:

   a. Website design software, used to build her business website;
   b. Advanced excel spreadsheet she used to administer "walking club" at local elementary school;
   c. Accounting software she used for the business;
   d. Pamphlets, flyers, etc. in word and perhaps elsewhere she'd made for her business;
   e. Anything else either demonstrating her above-average computer skill set or that the art/daycare business was hers, not mine, including the contact information on the page she built. One of these also had an alternate login for "Alyssa", which one?

8. Also items 4 and 5, web history, she has said she liked bondage and other "out there" subjects, did she look at that kind of stuff? Did she have her "S&S" folder on either or both PC's?

9. Also item 5 – police reports say that PC had "adult pornography related to the case" found on it, but doesn't say what or where, need to locate, ascertain what exactly it is, and **where else** it can be found. Is it only here and in the "Aurrora" folder on the netgear? Is it also on a loose hard drive? Everywhere else it can be found.

10. Item 18 – a loose hard drive. What were the files put on the drive? What CP was found on it, and from where? Did it also have AT videos on it?

11. Item 13. Need the "In use" date range, when it was installed, when it was last used.

12. Item 16 - 2007-2010 PC. Met and talked to wife on this computer, through game called "World of Warcraft." Install folder is "program files\wow" I believe. She played two different characters, one named "Silviah" and the other "Aurrora." I have no idea what if any communications the game saves, but see if you can find chat logs, contact lists, something that links the two names either to my wife, to each other, or both.

13. Items 8, 9, and 13. All three should have manually configured IP Settings with no gateway IP address configured. Can get screenshots of the three, and also confirm that none contain any configured/installed communications software. IE, No P2P, IM, configured email, etc.

14. Item 9 – Netgear NAS. The police have alleged that the password-protected "Aurrora" folder existed to hide CP from my wife while she used the "Media" folder. Need expert to confirm as much of the following as possible:
    a. The netgear is not only a network storage device, but a media streaming device.
    b. The "Media" folder was a manufacturer installed folder set-up to stream media to devices like our DVD player, so they could be played on the T.V. This is why the "media" folder was a duplicate of files in the Aurrora folder. Movie files were copied to it from the "Aurrora" folder for streaming purposes, and should have contained nothing but.
    c. The "Aurrora" folder on the other hand was essentially the "master." It should have contained all the media from the media folder as well as pretty much everything else-document back-ups, mp3 back-ups, email back-ups, even whole hard drive back-ups, our home movies, vacation pictures and movies of us and the kids, etc. All this plus the low percentage of files that actually were CP should show that the Aurrora folder was not the hidden CP storage they are alleging.

15. Also, on item 9. The netgear, under the "Aurrora" share, should have a folder called "Silviah" containing samples of my wife's exhibitionism, including one instance with her wearing the same corset I've seen in discovery screenshots of her and A.T. Can we get descriptions and file dates?

16. Also on Item 9. In the same "Silviah" folder should be a home sex movie of my wife and I from August or September 2010. If the camera pans to the back of the room, it should show item 16 (2007-2010 PC) on the floor by my desk. If it does, a screenshot of the PC and a confirmation of video date.

17. Also on item 9. During my interview I mentioned find bad stuff, especially in folders given to me years ago in folders I never brought myself to go through or just flat deleted. The police are alleging these comments referred to CP. One of these folders, probably originally given to me 15 years or so ago now in the "Aurrora" share, would be called "hmm" or something similar. It should contain a hodge podge of files, specifically looking for animal related stuff (should NOT be any bestiality, but I'd said "animal stuff" in my interview and they ran with it, would like the option of clarifying) as well as

videos of self-mutilation, which are what I was referring to with police when I'd described bad stuff I would delete whenever I found.

18. Also on Item 9 as well as item 13 – On the netgear in the "Aurrora" share should be a folder called "Rebecca Alvernaz" between it and item 13 should have videos of my ex and I ranging from 2006 to 2010 showing she was not exactly camera shy, quite the opposite. Need date of video on bates 1083 in Lawson's report for wife when he says ex is "obviously aware" of camera. Intent of all this to show that camera was not setup without her knowledge and participation. It was not intended to be a surreptitious camera, though 2 other unknowing people did get recorded. Get file names from 2006 videos and dates.

19. Also in Item 9. At one point my ex texted me photos of herself topless. They can be found in the "Rebecca Alvernaz" folder. This was what was done with photos of people I was interested in. I never saved or stored any of the phone pics my wife sent me or that the police are alleging I took with bad motives. Also, an examination of the videos/pics that I am responsible will show a marked interest in heavy set, darker haired women about 5'6" in general, and my approximate age. I very clearly have a "type" that I tend to gravitate toward if this can be demonstrated. A.T. and the others my wife noted were not of this mold.

20. Phone logs, if we get them. Overall, look for stuff showing I'm not interested in minors, ever sought to be around them, and edits, omissions, or selective representation police did to insinuate. Specifically, show I never had direct contact with any of the Todd family other than the father. My wife was the only one to communicate with the victim, did so on an almost daily basis, in a manner befitting a teenager, rather than a 30-year old. That after the first search warrant, when they were alerted to the case, she tried to re-establish contact through the victim and her mother. Also, I believe wife had quite a few pics on her phone, need to go through them.

21. Need a list of files compiled which shows files with terms that might be considered CP related in the file name, but legal content.

22. Need a list of all the evidence items where the "S&S" folder shows up, contents are bondage videos and wife's website subscription to "sex and submission." Need evidence item number where found folder path, and screenshot of adjoining folders where found.

5/2/17  PC begin

{ Hively
bou  Moore
wfes  Alyssa
  Robert Todd
  Gary Reed

I offer - dismiss of 1 - leave
open Ct 2 w/ a plea -
bou argues up
we argue down

Z 6 2.2 - cross reference
(c) to Z 6 2.8

5/8/17  ct App

Evidence Why A had PW to Netgear

① A in his statement said she had PW to Netgear
    Hively statement

② A interview w/ Moore describing PW + describe iden
    (said pretty much a duplicate)    on Netgear
    Moore said Netgear was                 S + S
    Duplicate of PW protected            Folder
    side  -  Hively said same thing

③ Moore by his own forensic evid
    said she did not have PW

④ Hively did a proof on Concept + found
    that Netgear files could be Accessed
    w/o PW

Section A

MOORE                                Count I

1) Knowing - all files at house & could never left
File Computer          all devices were Extranet
                       Harddrives or

         Home Computer w/o internet Access,
         computer
                    Removed Gateway I P
                              Internet Protocol

        OR

2) Produced using interstate material

        Hively couldn't determine why camera
was used in bathroom

        bou found camera that wife used in Blum
no files on it But it matched up

        18  2256(2) - sexual Explicit


Can bot establish if a video lookedat?




        93    52           1° 4 4
        42    42
        (41)   10          (62)
                            (56)

11/3/17   Carl of 1

Sheskeya from   12/21/05 ⟶ 9/19/13
only CP Entered in 5/28/13
6/3/13

garage Item 16
        CP Not downloaded
there But Not downloaded

Ct 1 — Need to show Computer on Parts
        from out of State

Hively — Bathroom Camera unknown
        Bdrm camera consistent of Canon
                                    ViXiA
        But cant this used for Alyssa

only thing on Bdrm camera –
        Adult video + gf + wife + 3rd party

Butera 1204 — Moore   10 snap shots created
                    By Someone      ✱

✱ NO Screenshot of Alyssa fully
                                Nude
    ✱ Angle likes woman partially attired
    Screen shots not of fully nudity but of
    partial Nudity

Gov Closing   11/16/17   9:50 AM

Δ's collection of CP 2005 - 2013

Item 16 -

9/16/17 - Morning of search - Titles not seen

She has pass ! Video

did he correct himself

You listen to Tape !

protecting his wife !

A lot of AP & a lot of CP

Search Terms = Knew of her interest

Not saying he was closer

Search terms

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit 12: Documents Withheld in Reciprocal Disclosure Which Implicate *Brady* and *Giglio* Violations**

1

2

3

4

5

**Exhibit 13: Content Overview of Attorney-Client Priveleged and Work-**

6

**Product Disclosure by Mr. Capozzi**

7



8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3             **<u>File Enclosed – Names (As Received) and Page Counts</u>**

4

5   • Adam Henry - People v. Adam Henry.pdf ....................... - 171 Pages

6   • Affidavit in Support of Search Warrant.pdf ..................... - 40 Pages

7   • Alyssa Todd - USA v. Adam Henry.pdf ......................... - 72 Pages

8   • Amber Brandon - People v. Adam Henry.pdf ................. - 6 Pages

9   • Angele Henry - People v. Adam Henry.pdf .................... - 156 Pages

10   • AOB Changes.pdf ................................................. - 1 Page

11   • Closing Stmts - USA v. Adam Henry.pdf....................... - 644 Pages

12   • CPS Matter - People v. Adam Henry.pdf....................... - 574 Pages

13   • CTS Reporting, Inc..pdf ......................................... - 7 Pages

14   • David Silva - USA v. Adam Henry.pdf ......................... - 119 Pages

15   • Decrypting Secure Zip Encrypted Media.pdf ................. - 12 Pages

16   • Defense Closing Argument - USOA v. Adam Henry.pdf ...... - 28 Pages

17   • Det. Britton Moore - People v. Adam Henry.pdf .............. - 16 Pages

18   • Det. Chris Weber - USA v. Adam Henry.pdf ................. - 69 Pages

19   • Dr. Harold Seymour - People v. Adam Henry.pdf.............. - 207 Pages

20   • Evidentiary Hearing - USA v. Adam Henry.pdf ............... - 48 Pages

21   • Gary Reed – Emails.pdf ......................................... - 97 Pages

22   • Gary Reed - People v. Adam Henry.pdf ........................ - 13 Pages

23   • Government Closing Arguments - USOA v. Adam Henry.pdf. - 35 Pages

24   • Henry, Adam – 00165-Henry.pdf ................................ - 371 Pages

25   • Howard B. Terrell, M.D. - USA v. Adam Henry.pdf .......... - 39 Pages

26   • HY Malinek, Ph.D. - USA v. Adam Henry.pdf ............... - 122 Pages

27   • In Limine Motions - USA v. Adam Henry.pdf ................. - 285 Pages

28   • Jury Instructions - USA v. Adam Henry.pdf..................... - 138 Pages

1   • Louise Reed - People v. Adam Henry.pdf ......................   -   9  Pages

2   • Mark Lucas (FBI) - People v. Adam Henry.pdf ...............   -  30  Pages

3   • Miscellaneous 1.pdf ..............................................  128  Pages

4   • Miscellaneous 2.pdf ..............................................  193  Pages

5   • Miscellaneous 3.pdf ..............................................  460  Pages

6   • Miscellaneous 4.pdf ..............................................  189  Pages

7   • Miscellaneous 5.pdf ..............................................   58  Pages

8   • Miscellaneous 6.pdf ..............................................  196  Pages

9   • Miscellaneous 7.pdf ..............................................  438  Pages

10  • Ofcr. Art Hively - People v. Adam Henry.pdf ................  125  Pages

11  • Opening Stmts - USA v. Adam Henry.pdf.....................    4  Pages

12  • Order enying Defendant's Motion for Judgement of

13    Acquittal - USA v. Adam Henry.pdf ...........................   -  19  Pages

14  • Phillip Trometter, Ph.D. - USA v. Adam Henry.pdf ...........   -  16  Pages

15  • Photos - People v. Adam Henry.pdf ............................   -  90  Pages

16  • Put with Henry Letters.pdf .....................................   -  34  Pages

17  • Request for Reconsideration.pdf ...............................   - 209  Pages

18  • Robert Todd - USA v. Adam Henry.pdf ........................   -  28  Pages

19  • Robin Martin - People v. Adam Henry.pdf ....................   -  11  Pages

20  • Sharon Minor - USA v. Adam Henry.pdf ......................   -  12  Pages

21  • Supplemental Report.pdf ........................................   -  12  Pages

22  • Transcript Motion Hearing - USA v. Adam Henry.pdf ........   -  54  Pages

23  • Trial Day 3, Excerpt - USOA v. Adam Henry.pdf .............   - 102  Pages

24  • US v. Adam Henry Defense Discovery.pdf .....................   - 121  Pages

25  • USA v. Adam Alan Henry.pdf ...................................   - 100  Pages

26  • Whitney Linder.pdf ..............................................   -  19  Pages

27

Notes:

- In Capozzi ACP-WP Miscelaneous 7, pages 238 – 245. Adam's note on contradictions
- In Misc. 3 –
  - more Adam notes pg 151-157
  - Hively Grand Jury testimony (210 et seq), Bates 1186 et seq.
  - More Adam notes pg 334 – 383 (re: evidence list for trial)
  - More Adam notes pg 388 – 421
- "Closing Stmts – USA v. Adam Henry" –
  - transcription of contradictions notes p 46 -53
  - More notes 68 – 77
  - **BINGO:** Starting on page 83 -182
    - Table of Contents page 83 (pg 135 = Bates 1513) (Bates 1524 = pg 146, dating these notes to August of 2017)
    - **Jurisdiction**, pg 84
    - 273 -   342 (pg 313 & 374 re: Angele access to Aurrora)
    - 355 – 402
    - 411 - 434 (specifically 416 for Bates 1622)
    - ### – 469
    - 497 – 504
    - 520 – 521 (notes on/after Gappa closing statements made)
    - 552 – 559 (7/2018)
    - 564 –  644 (571

xvii